**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TAMARA K. ALSAADA; DEMETRIUS BURKE; BERNADETTE CALVEY; STEPHANIE CARLOCK; ANDREW FAHMY; TALON GARTH; EVA HEYER; RANDY KAIGLER; REBECCA LAMEY; NADIA LYNCH; ALETA MIXON; DARRELL MULLEN; and HEATHER WISE, | : : : : : : : : : : | Civil Action No.2:20cv3431 |
| | : | JUDGE |
| Plaintiffs, | : : | MAGISTRATE JUDGE |
| v. | : : | |
| THE CITY OF COLUMBUS; CHIEF THOMAS QUINLAN, in his individual and official capacities; SERGEANT DAVID GITLITZ, in his individual and official capacities; OFFICER SHAWN DYE, in his individual and official capacities; OFFICER THOMAS HAMMEL, in his individual and official capacities; OFFICER HOLLY KANODE, in her individual and official capacities; OFFICER KENNETH KIRBY, in his individual and official capacities; and JOHN and JANE DOE, Nos. 1-30, in their individual and official capacities, | : : : : : : : : : : : : | |
| | : | **JURY DEMAND ENDORSED HEREON** |
| Defendants. | : | |

**COMPLAINT**

**I.    Preliminary Statement**

1.    On May 25, 2020, the killing of George Floyd, who was being arrested for allegedly passing a counterfeit $20 bill to buy cigarettes, by then Minneapolis Police Department Officer Derek Chauvin was live-streamed over the Internet for eight minutes and 46 seconds and later televised around the world.

1

2.　　　Starting on May 28, 2020, in Columbus, Ohio, Plaintiffs, along with hundreds of thousands in cities, states, and countries, took to the streets to demonstrate against excessive use of force by police, saying the names of Black men and women who had recently been killed by police or vigilantes; chanting that "Black Lives Matter," "No Justice, No Peace," "I can't breathe," "Hands up, Don't Shoot," and "Whose Streets? Our Streets"; and expressing their outrage at the militarization of police forces, the disparate impact on minority communities of law enforcement priorities, and a pattern or practice of governments at all levels tolerating systemic racism and failing to adopt effective policies or implement adequate training, supervision, and discipline of law enforcement officers.

3.　　　Plaintiffs and other demonstrators in Columbus comprised a multi-racial group, informally brought together by Black community leaders and activists primarily through the use of social media and dedicated to nonviolent protest, including civil disobedience of traffic, parade, and mass-gathering regulations, to generate urgent widespread public attention to the historic and continuing police violence directed overwhelmingly at communities and people of color condoned by mostly white police supervisors and administrators.

4.　　　The goals of Plaintiffs and other demonstrators included engendering serious, effective, and immediate actions to bring a halt to the endemic racism infecting America's law enforcement and justice systems and the general tolerance of excessive force routinely administered by police officers against arrestees, regardless of innocence or guilt, and especially against citizens who question an officer's actions.

5.　　　On May 28, 2020, Plaintiffs and other demonstrators in Columbus exercised their rights of assembly and expression by gathering downtown.

6.　　　Defendants Sergeant and Officers were angered by the civil disobedience they observed, the message of the protests, and the criticisms and denunciation they heard.

7.    Defendants Sergeant and Officers had received minimal and ineffective training from Defendants City and Chief and were subject to vague, ineffective, and rarely enforced policies regarding the need to handle protesters without using force or using the least amount of non-lethal force necessary.

8.    Defendants Sergeant and Officers instead responded to the protests with excessive use of force, including pepper spraying, tear gassing, and assaulting with physical force and rubber bullets or wooden pellets, and flash-bang grenades against nonviolent protestors who were standing in the streets, from which vehicular traffic had already been blocked and eliminated by police, or on sidewalks, chanting, and holding signs and posing no threat of violence or property destruction, and typically without giving audible warnings to their targets.

9.    Defendants Sergeant and Officers either criticized, often profanely, the protestors for their chants, signs, and civil disobedience or heard, without commenting, other Officers do so while using excessive force.

10.    Defendants Sergeant and Officers purposely used excessive force to punish one or more Plaintiffs and other demonstrators, to deter them from continuing to protest and others from joining a protest with which they disagreed, and to reclaim the streets.

11.    Defendants Sergeant and Officers maliciously prosecuted one or more Plaintiffs to punish them and deter other demonstrators from continuing to protest.

12.    Just the month before, Defendants had exercised restraint when demonstrators, some of whom openly carried weapons and engaged in hate speech while violating statewide social-distancing and mask mandates, protested the COVID-19 lockdown at and around the Statehouse.

13.    Despite the excessive use of force earlier on May 28, 2020, the overwhelming majority of the demonstrators remained nonviolent, fled from the toxic chemicals, and left, sought medical assistance, or tried to regroup at a safe distance.

3

14.     After Defendants needlessly escalated and provoked protestors, there were sporadic incidents of property destruction or harassment of law enforcement officers by throwing objects, but none of these actions caused serious injury to officers, and none of them were committed by or reasonably could have been attributed to the Plaintiffs and other nonviolent demonstrators.

15.     After Defendants had escalated their force against non-violent protestors, triggering property destruction by others, they authorized more police and mutual-aid law enforcement personnel to use greater force against the remaining demonstrators, who were injured even though the overwhelming majority of them were not engaged in any violence toward police or property destruction.

16.     On May 29 and 30, a similar dynamic occurred; a curfew from 10:00 p.m. to 6:00 p.m. was imposed on May 30; and public indignation at the broadcasts on social media and local and national television of the demonstrations and reports and pictures or video sent to reportcpd@columbus.gov ultimately convinced the Columbus Mayor, who had initially falsely described what had been happening and excused the police use of force, to limit the use of tear gas and, on June 1, 2020, denounce excessive force by police officers.

17.     Plaintiffs have suffered injuries to their civil rights and their bodies, and they reasonably expect to exercise, and are unwilling to refrain from exercising, their fundamental rights to assemble, protest, travel, and live freely within and around Columbus in the future.

18.     Plaintiffs seek declaratory and injunctive relief; compensatory damages for injuries; punitive damages from Defendants Chief, Sergeant, and Officers; and attorneys' fees and costs for violations of their Fourth and Fourteenth Amendments rights to be free from excessive use of force and malicious prosecution; their First and Fourteenth Amendments rights to peaceably assemble and exercise freedom of expression; and/or their Ohio common-law right not to battered or maliciously prosecuted and/or injured by the gross negligence of police

4

officers, caused by the failure of Defendants City of Columbus and Chief to adopt effective policies and adequately train, supervise, and discipline police officers.

## II.     Jurisdiction and Venue

19.     This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

20.     Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202; 42 U.S.C. § 1983; and the common law of the State of Ohio.

21.     Under 42 U.S.C. § 1983 and the common law of the State of Ohio, compensatory damages may be awarded against all Defendants and punitive damages be awarded against Defendants Chief, Sergeant, and Officers.

22.     Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and the common law of the State of Ohio.

23.     Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio where Defendant City of Columbus is located and operates the Division of Police, headed by Defendant Chief, which empowered Defendants Chief, Sergeant, and Officers to use force.

## III.     Parties

24.     Plaintiff Tamara K. Alsaada is an African-American female and a citizen of the State of Ohio residing in Franklin County, Ohio; serves in the position of Lead Organizer for the Juvenile Justice Coalition, a non-profit organization committed to improving Ohio's juvenile justices system; was the founder and is the Organizing Director of People's Justice Project, a non-profit organization organizing working people and people of color to lead the fight for safe, healthy, equitable lives by opposing mass incarceration, and has facilitated Heal Columbus, a web site focused on restructuring the Division of Police and involving community oversight; has been actively involved in criminal justice reform for more than 15 years;  received the 2017

5

YWCA Women of Achievement award; and has published several books on topics related to her work.

25. Plaintiff Demetrius Burke is an African-American male and a citizen of the State of Ohio residing in Franklin County Ohio.

26. Plaintiff Bernadette Calvey is a 21-year-old Caucasian female, a university student, and a citizen of the State of Ohio residing in Franklin County Ohio.

27. Plaintiff Stephanie Carlock is a 21-year-old Caucasian female; graduated from The Ohio State University in December 2019; worked for Defendant City as an employee of the Columbus Women's Commission before she was indefinitely laid off due to the COVID-19 pandemic; currently works full-time at a Columbus nonprofit organization; and is a citizen of the State of Ohio residing in Franklin County Ohio.

28. Plaintiff Andrew Fahmy is a 23-year-old male and a citizen of the State of Ohio residing in Franklin County, Ohio.

29. Plaintiff Talon Garth is an African-American male and a citizen of the State of Ohio residing in Franklin County Ohio.

30. Eva Heyer is a Caucasian female, age 19, and a citizen of the State of Ohio residing in Franklin County, Ohio.

31. Plaintiff Randy Kaigler is an African-American male and a citizen of the State of Ohio residing in Franklin County, Ohio.

32. Plaintiff Rebecca Lamey is a Caucasian and Mexican female and a citizen of the State of Ohio residing in Franklin County, Ohio.

33. Plaintiff Nadia Lynch is a Caucasian Female and a citizen of the State of Ohio residing in Franklin County Ohio.

34.     Plaintiff Aleta Mixon is a 39-year-old African-American female who is the single mother of four children, employed as a nurse's aide, and a citizen of the State of Ohio residing in Franklin County Ohio

35.     Plaintiff Darrell Mullen is a Caucasian male and a citizen of the State of Ohio residing in Franklin County, Ohio.

36.     Plaintiff Heather Wise is a Caucasian female and a citizen of the State of Ohio residing in Franklin County, Ohio.

37.     Defendant City of Columbus is a political subdivision of the State of Ohio pursuant to Chapter 2744, Ohio Revised Code; at all times material to this Complaint, the employer of Defendant Chief, Sergeant, and Officers; established policies on and trained, supervised, and disciplined, or failed to do so, its Sergeant and Officers in the use of force during demonstrations and retaliating for speech they hated; and entered into agreements with other entities to provide mutual-aid law enforcement personnel under its general direction.

38.     Defendant Thomas Quinlan, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police as its Chief; is being sued in his individual and official capacities; convened Division leadership after the May 25, 2020 killing of George Floyd to prepare for mass protests in Columbus; without imposing any enforceable or meaningful restraints on the use of non-lethal force authorized Defendants Sergeant and Officers to use such force; continuously monitored the mass protests starting on May 28, 2020, in Columbus; knew that Defendants Sergeant and Officers had used excessive force; has not provided effective policies and adequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; was a 'person' under 42 U.S.C. §1983 who acted under color of law; and provided general direction to mutual-aid law enforcement personnel from other entities.

39.      Defendant Sergeant David Gitlitz, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

40.      Defendant Officer Shawn Dye, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

41.      Defendant Officer Thomas Hammel, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

42.      Defendant Holly Kanode, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in her individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

43.     Defendant Officer Kenneth Kirby, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

44.     Defendants John or Jane Doe, at all times material to this Complaint, were police officers or mutual-aid law enforcement personnel whose identities are not currently known; they are being sued in both their individual and official capacities; are employees of the Defendant City of Columbus, Ohio or a mutual-aid law enforcement entity; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they hated; and each is a "person" under 42 U.S.C. §1983 who acted under color of law.

IV.     <u>Facts</u>

    A.     <u>Societal Background</u>

45.     For years, African-Americans have been the victims of police and vigilante use of deadly excessive force, and Plaintiffs and the other demonstrators have said the victims' names during their protests.

46.     Those names include Tamir Rice, a 12-year-old African-American killed in 2015 by a Cleveland Police Officer when the child was carrying a pellet gun; Breonna Taylor, an African-American Emergency Medical Technician, shot eight times on March 13, 2020, by officers of the Louisville Metro Police Department who were executing a no-knock warrant at her residence; Michael Brown, an unarmed African-American teenager, fatally shot in 2014 by a

Ferguson, Missouri police officer; Eric Garner, an African-American whose cry, "I can't breathe," was repeated by George Floyd, fatally choked in 2014 by a New York City police officer who was arresting him for selling loose cigarettes; Philando Castile, an African-American elementary school cafeteria worker shot five times during a 2016 traffic stop by a St. Paul, Minnesota police officer; and Trayvon Martin and Ahmaud Arbery, young African-Americans killed by vigilantes, one of whom was a former police officer.

47.     Since the May 28-June 3, 2020 Columbus protests, the list has grown. https://www.cbsnews.com/news/say-their-names-list-people-injured-killed-police-officer-involved-incidents/

48.     While in a handful of cases, discipline had been meted out and prosecutions pursued, most of the police officers were not disciplined, let alone successfully prosecuted; indeed, when George Floyd was killed there had been no police discipline meted out for Breonna Taylor's death.

49.     The widespread dissemination of the May 25, 2020 video of Officer Chauvin killing George Floyd coupled with the killing of Breonna Taylor and the history reflected in those names, caused an eruption of public revulsion about police use of excessive force on African-Americans and other minorities.

50.     Social media facilitated the scheduling of demonstrations.

**B.      Defendants' Preparation for Demonstrations**

51.     Defendants knew by May 26, 2020, that demonstrations would occur in downtown Columbus.

52. Defendants knew that the group Black Lives Matter would call for such demonstrations.

53. Defendants knew that Black Lives Matter is an organized movement dedicated to non-violent civil disobedience in protest of incidents of police brutality against African-Americans, which began in 2013 when activists uses the hashtag #BlackLivesMatter on social media after the acquittal of George Zimmerman in the shooting death of African-American teen Trayvon Martin in February 2012, and was nationally recognized for street demonstrations following the Brown and Garner deaths.

54. Defendant City and Chief monitored social media communications to and from Black Lives Matter and were aware, before the evening of May 28, 2020, that Black Lives Matter was encouraging a non-violent protest in Columbus.

55. Many of Plaintiffs and other protestors were affiliated with, identified with, and/or were inspired by the Black Lives Matter movement, dressing in clothing with the group's name or initials, and using chants, such as "Black Lives Matter"; "I Can't Breathe"; "No Justice, No Peace"; and "Hands up, Don't Shoot," which were associated with the group.

56. Many Columbus police officers and their supervisors, along with some mutual-aid law enforcement personnel, nurse an abiding hatred of the Black Live Matters movement, believing that it hurts the image of police and functions as a limitation on the prerogative of police to use force in keeping peace, protecting property, and preserving law and order.

57. Many Columbus police officers and their supervisors, along with some mutual-aid law enforcement personnel, resent the chant "Black Lives Matter" and prefer "Blue Lives

Matter" and/or "All Lives Matter," slogans that dismiss and deny the existence and importance of systemic racism in policing.

58.     Anticipating the Columbus protests, many Columbus police officers and their supervisors, along with some mutual-aid law enforcement personnel, decided to use their assignments to exact revenge on the Black Lives Matter group and chill the exercise of association and freedom of expression by protestors.

59.     One tactic used by Defendants City and Chief was to have Columbus Police Officers declare that a peaceful, nonviolent protest in the streets of Columbus had become an emergency and then order the protestors to disperse, using projectile weapons and caustic chemical agents to enforce that order.

60.     Defendants City and Chief had adopted a policy, training Columbus Police Officers on that policy, to use that tactic in response to large protests.

61.     Failure to disperse when ordered by a law enforcement officer is, under R.C.  2917.04, a minor misdemeanor, unless the order is given in an emergency, when the crime becomes a fourth-degree misdemeanor.

62.     Under R.C.  2917.04(B), "Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose."

63.     Defendants City and Chief have not emphasized in that policy or training the alternative to use of non-lethal force of citing and/or arresting protestors who do not disperse.

64.     Defendants City and Chief have not emphasized in that policy or training a means for Columbus Police Officers to differentiate peaceable assembly for a lawful purpose from an actual emergency.

65.     Defendant City's Division of Police has a history of excessive use of force and other abuses of their authority in response to nonviolent demonstrations and expressive conduct by those with whom police officers and their superiors disagree.

66.     For example, on June 17, 2017, when Black Lives Matter became involved with a protest at the Columbus Pride Parade, police officers raced to the scene with pepper-spray canisters already drawn.

67.     Only weeks later, on July 7, 2017, when protestors with disabilities, many of them in wheelchairs, peacefully occupied Senator Rob Portman's Columbus office to urge him to vote against a federal health care bill supported by President Trump (who is supported publicly and privately by many police officers because he opposes any form of accountability for police abuses), Columbus Police Officers arrived at the scene, claiming there was an emergency call for assistance, and forcibly arrested the peaceful protestors using excessive force, including knocking over wheelchairs and carrying some protestors with mobility issues out of the building.

68.     The following year, on July 11, 2018, Stephanie Clifford (also known as Stormy Daniels), the adult film star who was paid hush money by President Trump to conceal an affair, visited a Columbus strip club on a publicity tour embarrassing to the President, and several Columbus police officers targeted Daniels for arrest because of her status as an anti-Trump political symbol and arrested other women working at the club because of their association with Daniels and to cover up their retaliatory motive.

69.     Social media message board posts among Columbus Police Officers celebrated the arrests as a blow against President Trump's critics.

70.   In contrast, Columbus police officers have peacefully monitored protests and other expressive events in downtown Columbus with whose messages they are neutral or sympathetic, including the recent protests at the Ohio statehouse against COVID-19-related closures and the intense mass protests and public rallies in 2011 by public employee unions (including their own) against the effort to restrict collective bargaining rights.

71.   Despite knowing about this history of Defendant City's Division of Police and the negative feelings towards Black Lives Matter of its officers and their superiors, Defendants City and Chief took no specific precautions against excessive use of force in handling the protests.

72.   Defendants City and Chief ensured that Columbus Police Officers were armed with batons, pepper spray, tear gas canisters, flash-bang grenades, and/or weapons that could shoot rubber bullets or wooden pellets.

73.   Defendants City and Chief characterized such weapons as "non-lethal" and encouraged their use as an alternative to Tasers and guns and/or rifles that used regular bullets, despite knowing that these "non-lethal" weapons, while less lethal than officers' service weapons, still have the potential to cause death or serious injury, especially (though not exclusively) when used without appropriate precautions

74.   The way Columbus Police Officers and mutual-aid law enforcement personnel used such weapons posed a significant risk of serious and harmful bodily injury to nonviolent protestors.

75.   Batons are hard, ergonomic sticks designed to inflict pain and, when applied with the usual force, will break bones and cause concussions and internal bleeding.

14

76.     Pepper spray is a chemical compound that irritates the target's eyes, causing a burning sensation, pain, and temporary blindness; inflicts shortness of breath by burning the target's lungs; and interferes with breathing by irritating the respiratory system, which, during the protests, was already a concern because of the COVID-19 pandemic.

77.     Tear gas canisters contain a chemical weapon, colloquially known as mace, which causes severe eye and respiratory pain, skin irritation, bleeding, and blindness.

78.     The use of tear gas in warfare is prohibited by international treaties.

79.     Long-lasting effects of tear gas can include development of respiratory illnesses, and and the canisters can be delivered with such force that they cause severe bruising, loss of eyesight, and/or skull or bone fractures.

80.     Flash-bang grenades, which are also known as stun grenades, are explosive devices that emit both an extremely loud bang, usually with higher decibels than a jet engine at full throttle, and ultra-bright light to disorient their targets.

81.     Flash-bang grenades cause temporary blindness and pain to the retina, impaired hearing, and/or disruption of the inner-ear fluid and consequent loss of balance.

82.     Rubber bullets, technically kinetic impact projectiles, are hard rubber or rubber-coated projectiles that can be fired at the same velocity as bullets from standard weapons or riot guns.

83.     Rubber bullets are intended to cause pain without serious injury, but they typically cause not only contusions, abrasions, and hematomas, but also bone fractures.

84.     Rubber bullets are not designed to be safely shot point-blank or at a target's head, but it is well known that law enforcement officers often disregard this instruction.

15

85. Wooden pellets are dowel-shaped rods sliced into small, bullet-sized projectiles to be fired at the same velocity as bullets.

86. Like rubber bullets, wooden pellets are intended to cause pain without serious injury, but they typically cause typically cause bone fractures as well as contusions, abrasions, and hematomas.

87. Wooden pellets can also splinter and infect areas where their targets are hit.

88. While they are not designed to be safely shot point-blank or at a target's head, officers frequently do so anyway.

**C.   Days and Nights of Police Rage**

89. Over the course of the demonstrations on May 28, 29, and 30 and June 1, 2, and 3, Columbus Police Officers beat peaceful protestors and bystanders; pepper-sprayed without provocation and at point blank range protestors and observers, including United States Congresswoman Joyce Beatty, City Council President Shannon Hardin, and County Commissioner Kevin Boyce; lobbed and/or shot tear gas canisters without provocation; fired rubber bullets or wooden pellets and flash-bang grenades directly at vulnerable body areas of protestors, as truly and accurately reflected in a video posted at https://www.youtube.com/watch?time_continue=5&v=vZaoz9ZRVOc&feature=emb_title and shown below; and targeted identified journalists and individuals providing medical assistance. A true and accurate copy of that video is provided below (double click to play or click the link).

16



90. The targeting of identified journalists was done to eliminate eye-witness reports and photographs or videos of police engaging in use of excessive force and retaliating against protestors for the content and urgency of their expression.

91. A tactic used by Columbus Police Officers is "kettling," where groups of nonviolent protestors are boxed in, typically by using commands, bicycles, horses, and/or lines of police, and moved from one place to another, even though the protestors were unwilling or, due to other protestors or physical barriers, unable to move, and then arresting them for resisting, obstructing, and/or failing to disperse.

92. Apart from assembling and chanting or holding signs in the middle of streets or other locations Columbus Police Officers wanted them to abandon, these groups of protestors were not violating, as reflected in the true and accurate pictures below, any laws, threatening violence, destroying any property, or hampering traffic.





18





93. Another tactic used by Columbus Police Officers was collective punishment: responding to any action by an isolated individual who threw a water bottle, harassed or taunted an officer, or engaged in property destruction by indiscriminately pepper-spraying or tear-gassing a group of obviously different protestors who had not engaged in any such conduct.

94. The "kettling" and collective punishment created a chaotic situation among the protestors which Columbus Police Officers then used as an excuse for additional force including

using force against protestors who moved to assist others who had been subjected to excessive force.

95.     Defendant Chief knew that such tactics were being used to provoke demonstrators and justify arrests, but he did not intervene to limit their use.

96.     To the contrary, Defendant Chief excused the targeting of identifiable journalists by falsely claiming that they had been difficult to identify and force was used in a fast-moving situation where officers were being assaulted "pelted with bottles and rocks."

97.     The false claims of Defendant Chief to excuse misconduct were intended to be taken by Columbus Police Officers, and were in fact taken, as a form of approval and condonation of their tactics and an invitation to continue and escalate them.

98.     Photographs and videos taken at the scene demonstrate that journalists, who were wearing hats and hoodies bearing the name of their newspaper, were targeted even though nothing was being thrown at the police, the protestors were not out of control, and the situation was not fast-moving.

99.     The way Defendants Sergeant and Officers routinely pepper-sprayed demonstrators who were not engaging in violent behavior is accurately illustrated by the picture below:


© Getty

100.    Social media contained first-hand accounts of excessive use of force; for example,

https://www.facebook.com/permalink.php?story_fbid=1686026474878930&id=100004147817893 accurately reported about tear gas on May 30, 2020: "I experienced a traumatic event today. I was participating in a BLM protest with hundreds of other people today in downtown Columbus. We were yelling chants & marching around the statehouse on the sidewalks but nothing more as we were told this would be a peaceful demonstration.  Then bike cops show up. All of them had gas masks on. People started getting uneasy.  A SWAT truck drives by, yelling people to stay off the road. But other than people crossing on the crosswalk, no one was on the streets nor blocking the traffic.  More cops on horseback show up.  People starts murmuring.  More police cars show up & park in the middle of a busy street. Police officers start unloading and gearing up.  People were yelling 'what are you doing? We're not doing anything wrong!'  First rounds of tear gas goes off in the crosswalk area. People start screaming

and yelling others to run. People were coughing and crying from the effects of the gas (there were children & seniors in the group). People were handing out water to those who needed to rinse their face.  Another round of gas goes off. This time, ON THE SIDEWALK. Not on the roads, but directly on the sidewalk. People were running, jumping over the fence, falling on the ground & running for their lives. This is when my friend and I were impacted and we had to rinse our faces off with water for several minutes. We decided that it was getting too dangerous and left shortly afterwards.  We weren't attacking the police. We weren't vandalizing/looting any properties.  No protester had weapons on them.  So tell me, why did we get maced?"

101.    Corroborating    that    report    is    a    video    housed    at https://www.youtube.com/watch?time_continue=30&v=AswhNfIjqG4&feature=emb_title accurately showing the tear-gassing of a group of protestors and police on horseback moving the protestors. A true and accurate copy of the video is provided below (double click to play or click the link).



102.     Reflecting the animus toward medical helpers are two accurate videotapes of Columbus Police Officers on May 30, 2020, chasing a clearly-marked helper down an alley where she had gone to help a protestor; the first posted on Twitter, (1) https://twitter.com/OncoKaty/status/1266816739444166656?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1266873339542470656&ref_url=https%3A%2F%2Fwww.columbusnavigator.com%2Fcolumbus-police-protests%2F by Katy@OncoKaty asks, "Tell me, @ColumbusPolice what part of this is protect or serve? We were treating people in an alley and you gleefully chased us and sprayed another medic from a distance of inches and LAUGHED about it. #columbusprotest #ColumbusOhio," with the second posted on Twitter, (2) https://twitter.com/SAColumbus/status/1266867613872857094, with the message: "Yet another disgusting example of what Ginther shamefully called 'exceptional restraint' - a Columbus PD officer point-blank spraying a street medic who is trying to help another protester screaming in pain (out of frame). #BlackLivesMatter #columbusprotest #georgefloyd. True and accurate copies of both videos are reflected below (double click to play or follow the links).



(1)



(2)

103.    One    May    30,    2020    video,    posted    at
https://twitter.com/lalaitskelcey2/status/1266821476122058752  by  @lalaitskelcey2,  accurately
"shows  Columbus  police  macing  a  woman  as  she  walks  away  from  them.    Absolutely
disgusting." A true and accurate copy of that video is reflected below (double click to play or
follow the link).



104.    The true and accurate copy of the picture below, which was posted by
KRobPhoto, gives a sense of how Columbus Police Officers used pepper spray to punish, here
on May 30, 2020, walking up to a protester and spraying her in the face for being on South High
Street while Congresswoman Beatty was nearby:



105.    Columbus Police Officers pushing and pepper spraying protestors on the other
side of a barrier on May 28, 2020, is accurately depicted at
https://www.youtube.com/watch?time_continue=26&v=npXL2-NT1Zs&feature=emb_title.    A
true and accurate copy of that video is provided below (double click to play or click the link).



106.    The earlier portion of the nonviolent protests on May 28, 2020, is accurately

depicted in the video at https://youtu.be/AB6LmkmLnUI which shows peaceful protestors sitting

in the middle of a street when a phalanx of Columbus Police Officers on bicycles suddenly and

without warning pepper spray them. A true and accurate copy of that video is provided below

(double click to play or click the link).



107.    On May 29, 2020, Columbus Police Officers walked their bicycles, used them to block off a group of protestors, and then pepper-sprayed protestors, as accurately depicted on the video at https://www.youtube.com/watch?v=thjbZhftL_A. A true and accurate copy of that video is provided below (double click to play or click the link).



108.    In addition to the injuries described below that each Plaintiff suffered from being mistreated by Columbus Police Officers, all plaintiffs suffered fear, frustration, anger, emotional distress, and/or humiliation, as a proximate cause of being mistreated.

**D.      <u>Defendant City and Chief Knew of the Need for Effective Training, Supervision, and Discipline to Curb Police Use of Excessive Force and Retaliation for Associations or Expression Officers Hated.</u>**

109.    According to the police tracking website https://mappingpoliceviolence.org, during the years 2013 through 2019, Columbus Police Officers killed at a rate of 7.3 per 100,000 residents, which was the highest rate of any department in the State of Ohio and more than double the rate in Cleveland, Ohio.

110.    During that period, Columbus Police Officers killed 27 African-Americans, including in 2016 Henry Green, age 23, who was killed by plainclothes officer in the predominantly Black neighborhood of South Linden, and three months later, 13-year-old Tyre King.

111.    African-Americans make up 28% of the population of the City of Columbus, but during that period constituted half (varying between 49% and 53% since 2013) of the use-of-force incidents.

112.    Defendant City and Chief were aware of these statistics and, while claiming to believe that most of the individual uses of force were justified, still knew Columbus Police Officers were engaging in a troubling pattern of mistreating African-Americans.

113.    Despite this knowledge, Defendant City and Chief did not take specific steps to address what appeared to be mistreatment of African-Americans.

114.    In order to become a Columbus Police Officer, applicants need only have a high school diploma or GED, be 20 years of age or older, have a valid driver's license, and be a U.S. citizen.

115.    Upon hire, Columbus Police Officers receive an initial salary of $58,947.20 per year, which steadily increases over their first four years of service, with officers who have worked for the department for more than 48 months receiving an annual salary of $90,230.40.

116.    In addition to their salary, Columbus Police Officers receive a generous benefits package which includes paid training, college tuition reimbursement, life insurance, individual and family health insurance, vision and dental plans, and a significant pension package through the Ohio Police and Fire Pension Fund.

117.    In addition to pay and benefits, Columbus Police Officers have the option to provide security and traffic control services, usually referred to as "special duty pay," at the rate of $54.00 per hour, which services are a condition for a parade permit and outdoor events and are typically provided by Columbus Police Officers.

118.    The training received by Columbus Police Officers is based on the notion that being a police officer is an extremely dangerous profession, and stresses their security and safety above all else, especially their ability to use force whenever they feel threatened or perceive a threat to another.

119.    Although being an actual patrol officer is a relatively dangerous profession, with average deaths of 13.7 per 100,000 employees, according to the Bureau of Labor Statistics, it is nowhere nearly as dangerous as common occupations such as roofers (51.5), farmers (24.7). truck drivers (26.0), and groundskeepers (18.6); indeed, with fatal injuries in the amount of 44.3 per 100,000, trash and recycling collectors' jobs are more than three times as dangerous as a patrol officer's job.

120.    A reliable 2020 study demonstrates that only 4% of a police officer's time is generally spent on handling violent crime.  https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html

121.    Defendant City has resisted appointing a civilian review board for police officer activities; instead, all citizen complaints against officers are handled by the Columbus Police Division's Internal Affairs Bureau.

122.    The Internal Affairs Bureau routinely dismisses citizen complaints against its officers as unfounded, almost always believing the statements of officers over that of citizens.

123.    The Internal Affairs Bureau is motivated to dismiss citizen complaints as unfounded because finding against the Officer or Officers might subject the City to civil liability.

124.    Even when citizen complaints of violence are sustained, over the years the Columbus Police Division has meted out disproportionately minor discipline for violent acts, such as written reprimand and short suspensions.

125.    In turn, this custom of failing to discipline establishes standards which the union for Columbus Police Officers invoke to persuade arbitrators to reverse serious discipline as inconstant with past disciplinary standards.

126.    Defendant City and Chief know that it is nearly impossible to fire a Columbus Police Officer for use of excessive force.

127.    Per their union contract with Defendant City, Columbus Police Officers are indemnified for any damages (except punitive damages) awarded due to a claim of excessive force, and Defendant City provides free legal representation to officers accused of excessive force.

128.    Defendant City and Chief knew before the demonstrations which started on May 28, 2020, that Columbus Police Officers faced little or no disincentive from engaging in

excessive use of force and regularly failed to comply with the letter or spirit of training and policies on use of force, handling demonstrations, and retaliating for speech they hated.

129. Within the Columbus Police Division, it is an unspoken rule that, regardless of whatever violent acts a police officer may witnesses another officer doing, criminal charges will not be brought against that officer.

130. In the City of Columbus, misdemeanor offenses are prosecuted by the Columbus City Attorney, and felony offenses are prosecuted by the Franklin County Prosecutor's Office.

131. Both the Columbus City Attorney's Office and the Franklin County Prosecutor's Office have an unwritten rule that no criminal charges are to be brought against police officers for acts of violence committed against citizens while in uniform.

132. This unwritten rule applies regardless of the egregiousness of the offense or the strength of the evidence of the officer committing the offenses.

133. Incidents of violence which would cause a regular citizen to be charged with assault, battery, or other crimes of violence are not charged against police officers for the sole reason that they are police officers.

134. It is common knowledge among Columbus Police Officers that, with the possible exception of deadly violence videotaped by citizens, they are immune from any prosecution for acts of violence committed within the City of Columbus.

135. The combination of a toothless disciplinary policy, indemnification from civil liability, and practical immunity from criminal prosecution, creates a perfect storm in which Columbus Police Officers know that there will nearly always be no repercussions to them for violent acts.

136.    With regard to all but one recent police killings (a shooting of a white woman by an African-American officer), the Columbus Police Division did not issue significant discipline for any of the officers involved, and no criminal charges were filed against the officers.

137.    For example, in April of 2017, one of the officers who shot Henry Green, Officer Zachary Rosen, was caught on videotape stomping on the head of a handcuffed and helpless African-American suspect who was lying on the sidewalk.

138.    Despite the fact that Officer Rosen had plainly committed an act of felonious assault that could have killed or grievously injured the suspect, the Columbus City Attorney's Office and Franklin County Prosecutor's office declined to bring criminal charges against Officer Rosen solely because of the fact he was a police officer.

139.    On June 14, 2017, then-Columbus Police Chief Kim Jacobs determined that an appropriate punishment for Officer Rosen stomping on the head of a helpless individual was a 24-hour suspension and recommended this punishment to Columbus Public Safety Director Ned Pettus.

140.    In July of 2017, Public Safety Director Pettus rejected the recommendation of Chief Jacobs and terminated Officer Rosen's employment.

141.    Infuriated that one of their members had been terminated for kicking a helpless African-American suspect in the head, the Columbus Fraternal Order of Police ("FOP") Lodge No. 9 unanimously approved a no-confidence vote in Columbus Mayor Andrew Ginther, Public Safety Director Pettus, and then-City Council President Zach Klein.

142.    In announcing the no-confidence vote, FOP President Jason Pappas stated: "We want to send the message that we've lost faith. It demonstrates to those individuals that we no

33

longer have confidence in their ability to lead. Unless they make significant changes by funding

us and staffing us and supporting our officers who are out there day in and day out, that we will

not have confidence in their ability to lead us or this city."

143.    In March 2018, an arbitrator rescinded Safety Director Pettus's termination and

reinstated Officer Rosen to his patrol officer position with full back pay.

144.    In May 2018, Defendant City paid a $30,000.00 settlement to the individual

whose head Officer Rosen had stomped on.

145.    This settlement came from public tax dollars, not from Officer Rosen, Defendant

City provided free legal representation to Officer Rosen throughout the process.

146.    To eliminate the pattern or practice of excessive use of force and retaliating for

speech they hated by Defendant City Police Officers and mutual aid law enforcement personnel

cooperating with them, structural reform, modified policies, and civilian monitoring should, in

addition to other policies and practices that may be deemed necessary after further discovery of

the facts, include:

> a.      Creation of a civilian review board empowered, funded, and staffed to
> receive complaints from individuals who believe they have been the victims of
> excessive use of force and/or retaliation for their speech; to investigate those
> complaints; and to recommend discipline which the Director of the Department of
> Public Safety must mete out absent clear and convincing evidence that the Board
> based the recommendation on inaccurate facts.
>
> b.      Prohibition of the use by Defendant City Division of Police and/or mutual
> aid law enforcement personnel cooperating with the Division of tear gas, rubber

34

bullets, wooden pellets, pepper spray, flashbang grenades, kettling, chokeholds, strangleholds, no-knock warrants, and pressure or weight on the neck, back, or hip of a prone suspect.

c.      Maintenance of body and vehicle cameras in good working order and use of those cameras during any interaction with a civilian.

d.      Prominent display of badge numbers and/or identity cards whenever a police officer interacts with the public.

e.      Recognition that individuals legitimating displaying "press," "media," "reporter," "paramedic," "medic," or similar words and/or symbols are permitted to be present in a position enabling them to record at protests and/or to intervene to assist individuals who appear to have been injured and that all individuals, regardless of their occupation or non-violent activity, are permitted to record at protests or whenever an police officer interacts with the public.

f.      Commitment to affirmative action in recruitment, selection, retention, and promotion to ensure that at all ranks minority officers have more than a token presence.

g.      Training and adoption of policies on the use of batons, Tasers, firearms, and physical force that emphasize use of the least force necessary and then only after de-escalation and disengagement have been attempted, a clearly understood oral warning given, and a purpose other than punishing the target exists, with deadly force as the very last resort after other efforts to prevent serious bodily injury or death have been exhausted, and, unless imminent serious bodily injury

or death is reasonably perceived, never to prevent flight or property damage, and expose how stereotyping, implicit bias, and racism affect an officer's perception of an individual and the level of threat that individual poses.

h.      Contracting with and/or employing unarmed intervention specialists required to be used in responding to calls involving intoxication, drug use or abuse, mental health crises, teenagers or children, vandalism, and/or the homeless.

i.      Mandating that (i) any officer who witnesses what he or she believes in good faith to be an excessive use of force or retaliation must stop or attempt to stop another officer from that use of force or retaliation and report in detail within 24 hours that conduct to both the Division Chief and the Internal Affairs Bureau, and explain what steps the officer took to intervene in use of force or retaliation; and that (ii) any officer who uses force must prepare and file with superiors an incident report within eight hours detailing the amount of force used, his or her perception of the justification for that force to be used, the known or suspected injury to the suspect, the witnesses to that use of force, and any recordings from body and vehicle cameras, cell telephones, and/or other surveillance cameras.

j.      Inventory of Division equipment, assessing which equipment is more appropriate for use by the military during war than by police officers, and discarding such equipment.

k.      Screening applicants to determine whether they have been suspected of using excessive force in employment, military, and/or social settings and either

affirmatively ensure that the suspicion was unfounded or reject the applicant, and re-screen officers every three years for psychological fitness.

l.      Documenting each suspected use of excessive force by an officer; placing a copy of the suspicion, investigation, and resolution in the officer's file and preserving for ten years in a separate file the original or an electronic counterpart along with exhibits, drawings, recordings, and other evidence; making the entire file available to the Civilian Review Board and any prospective employer; and considering the entire file in making retention, assignment, and/or promotion decisions.

m.      Engaging in focused deterrence of serious crime by analyzing the specific blocks in neighborhoods and known individuals who have engaged in criminal activity and can reasonably be anticipated to do so again and allocating enforcement priority and referrals for social services accordingly.

n.      Scheduling meetings in predominantly minority neighborhoods to listen to civilian concerns; to acknowledge that past law enforcement practices, starting with the roots of modern policing in Southern States as slave patrols and later the enforcement of Jim Crow segregation, proceeding through acquiescence in lynching, racist mobs, and/or Ku Klux Klan activities, and culminating in the disproportionate focus on minorities in the war on drug use and abuse and related traffic stops, have created a rift which must be healed; and to discuss steps which might contribute to that healing.

o.     Payment for individual officers to have professional liability insurance but then requiring an officer to pay any premium increase attributed to that officer's improper use of force and/or retaliation and conditioning continued employment on being insured.

p.     Appoint and pay for the employment of an independent monitor to oversee and ensure the successful implementation of the above steps.

**E.     Mistreatment of Plaintiff Tamara K. Alsaada**

147.     On May 30, 2020, Ms. Alsaada, in her position as Organizing Director for the People's Justice Project, showed up to a Black Lives Matter rally organized in front of the Ohio Statehouse with the goal of helping to lead the rally and to advocate for police reform.

148.     Ms. Alsaada did not plan the event; however, given her role in the community she was looked at to help provide a voice for the event.

149.     While Ms. Alsaada and other members of the People's Justice Project were speaking on the microphone, protestors at the rally came to Ms. Alsaada and informed her that protestors were being arrested by Columbus Police Officers without justification.

150.     Again, due to her role as a respected community organizer, even serving on Mayor Ginther's Community Safety Advisory Commission, Ms. Alsaada and others walked over to the intersection of Broad and High to help resolve any pending conflicts.

151.     Ms. Alsaada saw Deputy Chief Michael Woods standing near the intersection, who she knew from her time on the Mayor's Community Safety Advisory Commission.

152.     Ms. Alsaada noticed there were lines of police officers at the intersection on bicycles, on horseback, and in riot gear.

153.    Ms. Alsaada asked Deputy Chief Woods who was being arrested, and he informed her that no one was being arrested.

154.    Ms. Alsaada asked Deputy Chief Woods to have the officers clear a path so that she could walk through and continue to address the topic of arrestees, and he subsequently had the officers allow her through.

155.    As Ms. Alsaada and others walked through the line of officers in order to continue peacefully discussing any arrestees, Columbus Police Officers without notice, without any warning, and without any provocation, began to assault Ms. Alsaada and others with an onslaught of pepper spray.

156.    Ms. Alsaada fell to the ground due to the assault and was unable to breathe or see.

157.    Ms. Alsaada was carried to the corner of road and High where she was administered medical attention by volunteer medics.

158.    Ms. Alsaada and numerous others suffered injuries and trauma due to the unprovoked assault by Columbus Police Officers.

**F.    Mistreatment of Plaintiff Demetrius Burke**

159.    On Wednesday, June 3, 2020, late at night, Mr. Burke was inside his apartment near the intersection of East Starr Avenue and North 9th Street when he heard sirens and a commotion outside.

160.    Mr. Burke's motorcycle was then parked in his apartment complex's parking lot.

161.    Because he was concerned that whatever was going on outside would cause damage to his motorcycle, Mr. Burke went outside to get his motorcycle and move it to a garage provided by his apartment complex.

162.    When he reached his motorcycle, Mr. Burke observed police officers walking north on North 9th Street and decided to ask the officers what was going on.

163.    Because he is an African-American male, Mr. Burke was concerned that the police would act violently towards him and so he turned on his cellphone camera and filmed as he approached the officers.

164.    Mr. Burke was aware that the City of Columbus had imposed a 10:00 p.m. curfew on all residents in public areas and so he was careful to remain on his own property and not step into the street while approaching the Columbus Police Officers.

165.    Mr. Burke's cellphone video clearly shows that he remained on the grass at all times and did not enter the street.

166.    Below is a true and accurate copy of that video (double click to play or click 20200603_003718.mp4).



167. When he was within speaking distance of the Columbus Police Officers, Mr. Burke asked, "What's happening"?

168. A Columbus Police Officer, later identified as Defendant Kenneth Kirby, approached Mr. Burke and answered, "I'm sure you know you're out after curfew, right?"

169.    Mr. Burke responded, "I live right here, I'm on my property."

170.    Defendant Kirby then said, "You're standing on the street, come here."

171.    Mr. Burke protested that he was "right here, I'm on the grass."

172.    Defendant Kirby then stated that "it doesn't matter, you're under arrest" and falsely told another officer that Mr. Burke was standing in the street.

173.    An officer then used a zip tie to restrain Mr. Burke's hands behind his back.

174.    Mr. Burke was then transported to a nearby fire station being used to process individuals who had been arrested during the George Floyd protests.

175.    From the fire station, Mr. Burke was taken to the Jackson Pike Correctional center, where he was placed in a cell with other arrested individuals.

176.    In the cell where Mr. Burke was detained, there were many individuals who had been arrested for issues not related to the protest, including felonies and violent crimes.

177.    During his time in the cell, Mr. Burke witnessed an intensely violent fight, which was terrifying and put him at risk of physical harm.

178.    Mr. Burke remained in the cell until early afternoon when his friend posted bail for him.

179.    On Tuesday, June 9, 2020, Mr. Burke's curfew violation charges were dismissed as part of the blanket dismissal of curfew violations.

**G.**    **Mistreatment of Plaintiff Bernadette Calvey**

180.    On May 30, 2020, Ms. Calvey was in the Short North area, accompanied by a roommate.

42

181.    Although Ms. Calvey had not intended to participate in a protest, she and her roommate were walking in the vicinity of Second Avenue and High Street when they heard protestors nearby.

182.    They walked in the direction of the protests to see what was going on and potentially join the protest since they agreed with the message against police brutality and racism.

183.    Ms. Calvey was aware that there had been a curfew imposed that evening, but it was approximately 9:00 p.m., she was not far from her residence, and the curfew would not start for another hour.

184.    As Ms. Calvey approached the protest, it appeared peaceful, though Columbus Police Officers were massed in the street approximately 50 feet away from where she was standing.

185.    The Columbus Police Officers were shouting at the protestors and began firing projectiles at them at close range.

186.    Within moments of approaching the protest, Ms. Calvey was struck in the face by a projectile that, upon information and belief, was a wooden pellet.

187.    The wooden pellet split open her chin and caused excruciating pain.

188.    The round that hit Ms. Calvey in the hand had been directly fired at her with the intention of hitting her and had not been "skip-fired" off the ground.

189.     A   true   and   accurate   picture   of   her   injury   the   morning   after   is   below:



190. Ms. Calvey and her roommate fled down a side alley, where she received water and bandages from a group of protestors.

191. Ms. Calvey was forced to miss two days of work due to her facial injury and remained unable to chew solid food for approximately a week due to the pain in her jaw.

192. The projectile wound has created a prominent scar on Ms. Calvey's chin, which appears to be permanent.

**H.**   **Mistreatment of Plaintiff Stephanie Carlock**

193. In the late afternoon of Saturday, May 30, 2020, near the Statehouse, around Broad and High Streets, Ms. Carlock joined friends who were protesting against police brutality and racism.

194. When Ms. Carlock arrived at the protest, non-emergency traffic had been rerouted, and she and others were standing stationary in the crosswalk across High Street.

195. Many Columbus Police Officers were there dressed in riot gear, but no announcements were made and no orders were given.

196. While Ms. Carlock was standing stationary in the crosswalk, a Columbus Police Officer in riot gear sprayed her in the face with pepper spray at close range with no provocation, causing Ms. Carlock intense pain and affecting her vision.

197. Columbus Police Officers began pushing the crowd of people in which Ms. Carlock was standing with their riot shields and telling them to leave.

198. A van rolled up and many Columbus Police Officers or Franklin County Sheriff's Office Deputies left the van and began firing projectiles at the crowd.

46

199.    Ms. Carlock and her companions then moved to the Statehouse lawn, but mounted Columbus Police Officers approached and used their horses to push the crowd out of the Statehouse area.

200.    Ms. Carlock moved onto Broad Street and began walking east, with mounted Columbus Police Officers following the crowd and using their horses to push it further down Broad Street.

201.    Ms. Carlock and her companions reached the intersection of Broad Street and Fifth Street and were standing on the sidewalk, next to the plaque recognizing the site of the first Wendy's restaurant.

202.    Columbus Police Officers were still pushing the crowd, and Ms. Carlock and others were asking them where they wanted the protestors to go.

203.    Instead of answering and directing the crowd, the mounted Columbus Police Officers rode their horses onto the sidewalk and began pushing their horses into the crowd.

204.    Ms. Carlock was struck by the legs of horses purposely being ridden into her and other protestors.

205.    Ms. Carlock and others in the crowd continued to walk to the next corner, at which point they were confronted by Columbus Police Officers on bicycles.

206.    These officers cornered the crowd against a building, on the sidewalk, and deployed tear gas, causing Ms. Carlock to choke and cough and have difficulty breathing.

207.    Ms. Carlock and others asked the officers why they were tear-gassing a peaceful crowd on a sidewalk, and, instead of answering, the officers laughed while the protestors choked on the gas.

47

208.   Ms. Carlock fled and rejoined protestors in another area.

209.   The following evening, Sunday, May 31, at around 8 p.m., Ms. Carlock and a friend went to the Short North area of Columbus, walking down High Street toward downtown, on the sidewalk, seeking to join another protest against police brutality and racism.

210.   Ms. Carlock was aware there was a curfew of 10:00 p.m. that evening, but it was still 40 minutes before curfew (approximately 9:20 p.m.), when the group she was in approached the intersection of High Street and Spring Street.

211.   Ms. Carlock and the protestors she had joined were peaceful, walking on the public sidewalk, and not disobeying any orders from law enforcement.

212.   As Ms. Carlock neared Spring Street, a black van pulled up and Columbus Police Officers in riot gear jumped out.

213.   Without warning, the officers began shooting projectiles and tear gas at the crowd.

214.   Ms. Carlock was once again exposed to tear gas, affecting her breathing and causing her to choke and cough.

**I.**     **Mistreatment of Plaintiff Andrew Fahmy**

215.   On June 1, 2020, Mr. Fahmy and a friend went to downtown Columbus to participate in the protests.

216.   They arrived at the Statehouse at 7:00 p.m. and then participated in a march north on High Street along with several thousand other protestors.

217.   Eventually, at approximately 10:20 p.m., the march reached the intersection of Lane Avenue and High Street just north of The Ohio State University.

48

218.    By the time the march had reached Lane Avenue, the number of marchers had dwindled considerably and the march seemed to be coming to an end.

219.    As the marchers approached Lane Avenue on High Street, Columbus Police Officers wearing riot gear approached the marchers from the south.

220.    When the Columbus Police Officers were within approximately 15 feet of the remaining marchers, they began spraying pepper spray.

221.    The pepper spraying caused the remaining marchers to run in all directions.

222.    Mr. Fahmy retreated east on Lane Avenue along with many other marchers.

223.    The Columbus Police Officers then formed a line across Lane Avenue approximately 200 feet east of High Street facing east.

224.    Mr. Fahmy and other protestors got out their phones and began filming the Columbus Police Officers, who were approximately 20 feet away.

225.    None of the protestors was behaving violently or throwing anything at the Columbus Police Officers.

226.    Mr. Fahmy then observed the Columbus Police Officers preparing to fire tear gas canisters.

227.    Before Mr. Fahmy could move out of the way, the Columbus Police Officers shot tear gas canisters directly into the crowd.

228.    Mr. Fahmy was hit in the leg with a canister, which fractured his fibula, causing severe pain, and requiring treatment; true and accurate pictures of his injuries, including an x-ray of the fracture, are shown below.





J.   **Mistreatment of Plaintiff Talon Garth**

229.   On May 31, 2020, Mr. Garth attended a downtown protest of police abuse.

230.   In the early evening, along with hundreds of other protestors, Mr. Garth was standing in the street at the intersection of Broad and High Streets.

231.   That intersection and several blocks had long been closed that evening to vehicular traffic.

232.   While Mr. Garth was standing at the intersection, a Columbus Division of Police Armored Vehicle with the word acronym SWAT painted on the side pulled into the intersection and stopped.

233.   After the armored SWAT vehicle stopped, a team of officers disembarked from it.

234.   The SWAT officers began to tell the crowd standing at Broad and High Street to move.

235.   Prior to the arrival of the SWAT officers, the protest at Broad and High had been peaceful, with no violence or attacks on property.

236.   Prior to the arrival of the SWAT officers, protestors at Broad and High had maintained a good relationship with Ohio Highway Patrol Officers stationed at the Statehouse.

237.   Because there was no vehicular traffic on Broad or High Streets, there was no reason for the protestors to be removed from the streets.

238.   After being told to move, Mr. Garth and more than 100 other protestors close to the SWAT officers sat down on the street in an act of passive resistance.

239.   Mr. Garth was then approximately ten feet away from the SWAT Officers.

240.     At this point, a few individuals in the back of the huge crowd, who were not among those sitting close to the SWAT officers, threw several water bottles at them.

241.     It was obvious that the bottles had not been thrown by Mr. Garth or any of the protestors sitting in front of the SWAT officers.

242.     Nevertheless, the SWAT Officers immediately took deliberate aim and began firing wooden pellets directly into the peaceful seated protestors who were sitting directly in front of them.

243.     The wooden pellets were around the size of pill bottles.

244.     Mr. Garth was struck by a total of ten wooden pellets, one on each knee, four on his right leg, one on his right thigh, one in the arm, and one in the back of his head.

245.     A wooden pellet also struck Mr. Garth in the foot, fracturing his fourth metatarsal bone.

246.     True and accurate pictures of his leg and foot injuries are below.





247.    Mr. Garth had to seek medical attention for his fractured foot and has been required to wear a walking boot while it heals.

248.    In addition to breaking his foot, the wooden pellets caused severe lacerations to his shins and other parts of his body, many of which are likely to cause permanent scarring.

249.    As a proximate result of his injuries, Mr. Garth has been unable to work since the incident and has suffered significant lost income.

**K.    Mistreatment of Plaintiff Eva Heyer**

250.    Around 7:00 p.m. on May 28, 2020, Ms. Heyer joined a group of protestors in a march from the King-Lincoln area of Columbus to downtown Columbus, where she and approximately 100 other protestors continued protesting in the intersection of Broad and High.

251.    At approximately 8:35 p.m., shortly after the group arrived at that intersection, Columbus Police Officers in regular uniforms of white shirts and trousers formed a line north of the intersection to prevent protestors from marching north up High.

252.    Columbus Police Officers had blocked off the intersection with four vehicles and were also blocking sidewalks north of the intersection.

253.    Prior to the arrival of the Columbus Police Officers, the protest has been peaceful.

254.    Upon their arrival, though, some of the Columbus Police Officers became aggressive with protestors, and, as truly and accurately depicted in the video posted at https://www.youtube.com/watch?v=npXL2-NT1Zs pepper spray was used on small sections of the protestors and one protestor was punched. A true and accurate copy of that video is provided below (double click to play or click the link).

56



255.    Because of the placement of the police cars and the way streets and sidewalks were blocked, protestors began to feel that they were being pinned in the intersection.

256.    At around 10:00 p.m., most of the Columbus Police Officers who had been keeping order were replaced with Officers wearing riot gear.

257.    Columbus Police Officers then announced that an emergency had been declared and the protestors had to disperse.

258.    From what Ms. Heyer observed, the vast majority of the protestors had remained peaceful, shouting chants, including profanity, singing, carrying protest signs, and making gestures such as keeping their hands up or sitting down.

259.    Two African-American protestors had megaphones and were leading the chants and singing.

260.    One of the chants was, "Whose streets?  Our streets."

57

261.    Apart from the desire of Columbus Police Officers to regain control of the streets, there was no apparent emergency.

262.    Traffic on Broad and High had long been diverted.

263.    Columbus Police Officers had blocked off the intersection with four vehicles and were also blocking sidewalks north of the intersection.

264.    The sidewalks south of the intersection were crowded with protestors and complying with the dispersal order was difficult due to the crowds being wedged in and unable to move.

265.    Ms. Heyer observed Columbus Police Officers shaking pepper-spray cans and expected that they were going to use them on the protestors.

266.    Because she was directly in the line of fire, Ms. Heyer removed her contact lenses and put them in her pocket.

267.    Ms. Heyer was pepper-sprayed and, though she blocked most of it with the sign she was carrying, was hit in her eyes and moved to the rear for medical attention.

268.    Protestors soon reported hearing a Columbus Police Officer point at the two African-American protestors with megaphones and telling the Officers to neutralize them.

269.    A call came for "white" protestors to link arms into a human chain to shield the two African-American protestors.

270.    Ms. Heyer re-entered the intersection to join the human chain, and she stood about a foot away from a Columbus Police Officer.

271.    At that time, Ms. Heyer was linking arms with other protestors, and neither she nor they were touching Columbus Police Officers or pushing forward.

58

272.    The Columbus Police Officer in front of Ms. Heyer raised his pepper-spray can less than three feet away from her eyes and sprayed her.

273.    The pepper spray hurt Ms. Heyer so much that she bent over to touch her face and eyes and protestors helped her move to sit down and get medical attention; her eyes were completely swollen shut, and she could not see for ten minutes or so.

274.    Ms. Heyer attended another day of protest on May 30, 2020 on Broad Street downtown, where she was ultimately injured by wooden pellets shot at and/or near protestors who were standing and chanting about twenty-feet away from a line of police.

L.    **Mistreatment of Plaintiff Randy Kaigler**

275.    On Friday, May 29, 2020, at approximately 7:30 p.m., Plaintiff Kaigler was driving through downtown Columbus when he observed a peaceful protest in process near the intersection of Broad and High Streets.

276.    Because he believed in the message of the protest, Mr. Kaigler decided to join it, parking his car and proceeding on foot towards the intersection of Broad and High Streets.

277.    While walking to the protest, Mr. Kaigler observed a group of Columbus Police Officers standing on Broad Street across the street from the Ohio Statehouse.

278.    The Columbus Police Officers observed by Mr. Kaigler did not appear to be engaged in crowd-control activities or carrying crowd-control paraphernalia but rather were milling around a cruiser with ample room in the street to move.

279.    When Mr. Kaigler observed the Columbus Police Officers, Broad Street was closed to vehicle traffic and officers and protestors were in the street.

280.    The protest was loud but peaceful.

281.    Upon seeing the Columbus Police Officers, Mr. Kaigler decided to make a political statement: he walked within approximately five feet of them, stopped and raised his arms in a "hands up, don't shoot" position and stated to the officers "I can't breathe."

282.    The "hands up, don't shoot" gesture originated at protests after the August 9, 2014, shooting of Michael Brown in Ferguson, Missouri, and displayed a common sign of submission which communicated that a suspect was not presenting a threat and, like Brown's alleged conduct, should not be shot.

283.    The statement "I can't breathe" is a reference to the 2014 killing of Eric Garner and 2020 killing of George Floyd.

284.    The Columbus Police Officers who observed and heard Mr. Kaigler knew the origin and meaning of those phrases.

285.    The sun was out, and the area around Mr. Kaigler was well lit.

286.    Mr. Kaigler did not have any sort of weapon, and his empty hands were clearly visible to the officers.

287.    Mr. Kaigler's political statement did not cause any alarm or concern about their safety for the group of Columbus Police Officers; indeed, when Mr. Kaigler was pepper-sprayed, the other Columbus Police Officers appeared nonchalant.

288.    After Mr. Kaigler made his statement, one of the officers, later identified as Defendant Gitlitz, casually drew a canister of mace or pepper spray and, without audible warning, sprayed Mr. Kaigler directly in the face at point blank range.

289.    This true and accurate copy of a photograph posted by @Cheesemaman accurately depicts Defendant Gitlitz pepper-spraying Mr. Kaigler:



290.    After he was sprayed, Mr. Kaigler was blinded, could not breathe, and was in intense pain.

291.    Other protestors around Mr. Kaigler assisted him to a first-aid station, where his eyes were rinsed.

**M.    Mistreatment of Plaintiff Rebecca Lamey**

292.    On May 31, 2020, Ms. Lamey, along with two friends, participated in a peaceful protest for hours.

293.    At 7:54 p.m., Columbus Police Officers abruptly decided to stop the protest.

294.    At that point, Ms. Lamey and other protestors were on their knees, with their hands up, on the sidewalk.

295.    Columbus Police Officers ordered the protestors to leave and appeared to be ready to use force against them.

296.    Protestors started running in fear of the force, with some getting knocked down and trampled.

297.    Ms. Lamey and her two friends hung back to avoid getting separated or knocked down.

298.    Ms. Lamey was filming on her cellphone, which she was holding well above her waist, and walking backwards while keeping an eye on her friends.

299.    A Columbus Police Officer turned the corner and, without warning, shot a wooden pellet at Ms. Lamey, hitting her hand, knocking the cellphone to the ground.

62

300.    When Ms. Lamey bent over to pick up her cellphone, she was shot four more times; around the same time, her friend was hit by wooden pellets in the back of the head, neck, and upper arm.

301.    Based on the location where the wooden pellet hit Ms. Lamey, it must have been directly fired at her, rather than "skip-fired" off the ground.

302.    Ms. Lamey and a friend ran to a building half a block away, and he left the stairs there to get some ice for her injury.

303.    Moments after the friend returned with the ice and applied it to Ms. Lamey's hand, he screamed, "Get behind the pillar!," as several unmarked vans approached.

304.    The van doors opened and two Columbus Police Officers opened fire with wooden pellets on Ms. Lamey, her friend, and two others, striking them.

305.    A true and accurate video of the moment Ms. Lamey was hit by the wooden pellets    (double    click    to    play    or    click https://www.dropbox.com/s/dmu6uucrkhxmkim/Video.MOV?dl=0)    and    true    and    accurate pictures of the swelling on Ms. Lamey's hand and wrist and a wooden pellet which had been fired by Columbus Police Officers are below.

 



306. The swelling took so long to go down and the pain remained so bad that Ms. Lamey went to an Emergency Room a few days later, had X-rays, and learned that no bones were broken.

307. Ms. Lamey has not yet recovered the full use of her hand.

**N.  Mistreatment of Plaintiff Nadia Lynch**

308. On Saturday, May 30, 2020, at approximately 11:30 a.m., Ms. Lynch was attending the protest at the intersection of Broad and High Streets in downtown Columbus.

309. The intersection had been taken over by Columbus Police Officers, who had formed a box at the intersection with lines of officers facing protestors.

310.   The intersection had long been closed to vehicular traffic that afternoon, and many Columbus Police Officers were milling around in the middle of the street.

311.   The Columbus Police Officers facing the protestors were wearing black helmets, black gas masks, and black military style tactical clothing.

312.   Ms. Lynch stepped up to greet other protestors on the other side of the police line, taking a photo of other protestors and displaying the sign she had brought to the event.

313.   Columbus Police Officers then began forming a line with their bicycles right next to Ms. Lynch, and she realized she was in a bad position.

314.   Ms. Lynch then decided to go around and started walking back to her group of friends.

315.   Ms. Lynch was grabbed by the backpack she was wearing by Defendant Officer Holly Kanode and thrown down to the ground, causing her head to hit the ground.

316.   Three or more officers began to attack Ms. Lynch.

317.   Ms. Lynch laid there, while they placed her hands behind her back and zip-tied them.

318.   Before using force on her, no officer ever said anything to Ms. Lynch or yelled any commands.

319.   All of these events took place in an open, well lit, and relatively calm area.

320.   Ms. Lynch did not at any time pose a threat to a police officer or resist arrest.

321.   Ms. Lynch was grabbed so quickly that, even if an order had been given to her, she would not have had time to comply with it.

322.    Ms. Lynch was then arrested and taken to Jackson Pike where she was slated and spent two hours in jail before she bonded out.

323.    Ms. Lynch suffered physical injuries due to the assault and damage to her physical property.

324.    Defendant Kanode had Ms. Lynch arrested for disorderly conduct and resisting arrest and later formally filed those criminal charges.

325.    In order to charge Ms. Lynch with resisting arrest, Defendant Kanode falsely swore, under oath, that Ms. Lynch grabbed an officer and took him to the ground.

326.    In addition to her false charges, Officer Kanode further submitted a police report with the ludicrous claim that Ms. Lynch had grabbed an unknown Officer by his riot gear and threw him to the ground.

327.    Video footage of the incident conclusively and accurately shows that Ms. Lynch never engaged in any such conduct and that Officer Kanode's account was a complete fabrication.

328.    In order to charge Ms. Lynch with disorderly conduct, Defendant Kanode falsely swore, under oath, that Ms. Lynch had thrown water-filled bottles at police officers.

329.    Video footage of the incident conclusively and accurately shows that Ms. Lynch never engaged throwing bottles; a true and accurate copy of the video is shown below (double click to play or click https://www.dropbox.com/s/nr6t9y2ph8yydv7/IMG_0113.mov?dl=0).



330.    When she charged Ms. Lynch, Defendant Kanode was aware that she had used excessive force in arresting her.

331.    Defendant Kanode falsified criminal charges to justify and cover up her excessive use of force against Ms. Lynch.

332.    When she falsified charges against Ms. Lynch, Defendant Kanode was aware that being convicted of a charge involving an assault on an officer could lead to significant imprisonment, a large fine, and a debilitating criminal record.

**O.       Mistreatment of Plaintiff Aleta Mixon**

333.    On the evening of Friday, May 29, 2020, Ms. Mixon was aware that her oldest daughter, who is 20 years old, was attending a protest against police brutality in downtown Columbus.

334.    After dropping a younger daughter at a different event, Ms. Mixon learned that the protests her oldest daughter was attending might become dangerous.

335.    Ms. Mixon unsuccessfully attempted to contact her daughter by telephone and drove toward downtown Columbus.

336.    Ms. Mixon had trouble driving to the vicinity where she believed her daughter was and ultimately, around 9:00 p.m., parked her car on State Street, near the Ohio Statehouse.

337.    Ms. Mixon left her vehicle to attempt to find her daughter and saw that Columbus Division of Police officers in riot gear were massing in the street.

338.    Ms. Mixon approached a white female officer who was not in riot gear and was standing separate from the officers who were massing and began to ask the female officer for assistance in locating her daughter.

339.    As the female officer was about to reply to her request, a white male Columbus Police officer charged toward her and sprayed her in the face with pepper spray.

340.    The female officer confronted the male officer and said words to the effect of, "Why the fuck did you do that? She was just asking for help."

341.    Ms. Mixon began screaming from the pain of the pepper spray and calling for relief.

342.    Two white male officers then approached and sprayed Ms. Mixon again.

343.    Ms. Mixon fell to a seated position on the ground from the effects of the pepper spray, and she was sitting out of the street, on the sidewalk, still calling for help.

344.    One of the white male officers continued spraying her, and she attempted to stand.

345.    As Ms. Mixon attempted to stand up, the officer shoved her off the sidewalk and over the curb.

346.    Ms. Mixon felt intense pain and a snap in her leg.

347.    The officer who had shoved Ms. Mixon then stood over her and told her, "That's what you get for your protest, bitch," and he stepped hard on her knee, before walking away.

348.    Another white male officer who had not been involved in the use of excessive force arrived and assisted Ms. Mixon, calling an ambulance and giving her advice for dealing with the effects of the spray.

349.    Ms. Mixon was transported to Grant Hospital, where she was given X-rays and told she needed emergency surgery due to critical tears in a major tendon in her leg.

350.    The X-rays also showed that Ms. Mixon's kneecap had been shattered, with multiple fractures in the bone.

70

351.    Ms. Mixon's surgery was delayed until May 31, 2020, due to the urgent medical needs of others injured in the protests.

352.    Ms. Mixon was hospitalized until Tuesday, June 2, 2020, after which she was released, with significant restrictions on her mobility.

353.    Ms. Mixon is uncertain whether she will recover full use of her leg, and she expects to be unable to work for a period of several months or longer; true and accurate picture of her leg post-surgery, including permanent scarring, is shown below.



**P.**     **Mistreatment of Plaintiff Darrell Mullen**

354.     On Tuesday, June 2, 2020, at around 1:30 a.m., Darrell Mullen was walking by himself northbound on the sidewalk on the east side of North High Street.

355.     Mr. Mullen was walking home from a friend's house on Oakland Avenue to his residence on Findley Avenue.

356.     On May 30, 2020, Columbus Mayor Andrew Ginther had issued an executive order instituting a city-wide curfew which required most residents to remain indoors from 10 p.m. to 6 a.m. and was to remain in effect until he rescinded it.

357.     The executive order stated that being outside in violation of the curfew was an unspecified degree misdemeanor.

358.     As of the time that Mr. Mullen was walking home, North High Street was deserted.

359.     Near the intersection of High Street and Oakland Avenue, Mr. Mullen observed four or five police cars drive past him going northbound on High Street.

360.     Upon observing the police cars, Mr. Mullen made no effort to flee and continued walking northbound on High Street.

361.     Mr. Mullen then observed at least one of the police cars execute a U-turn and drive towards him.

362.     Again, Mr. Mullen made no attempt to flee and watched the police vehicle drive up to him.

363.     At this point, a Columbus Police Officer, later identified as Thomas Hammel, got out of the police cruiser and began running at Mr. Mullen.

364.    At no time did any Columbus Police Officer order Mr. Mullen to stop, give Mr. Mullen any verbal commands, or inform Mr. Mullen that he was under arrest.

365.    Instead, Officer Hammel violently tackled Mr. Mullen, taking him face down on the sidewalk, and then applied pressure to the back of his head, grinding his face into the pavement.

366.    Shortly after that tackling, two more officers got on top of Mr. Mullen and began striking his back and legs with their knees.

367.    Mr. Mullen was quickly handcuffed, but officers continued to apply pressure to his back and legs, with Officer Hammel continuing to apply pressure to the back and side of his neck, pushing his face into the ground and preventing him from talking.

368.    When he was finally able to talk, Mr. Mullen told the officers that he had just been walking home, and Officer Hammel replied, "I know exactly where you live, is your girlfriend out of jail yet?"

369.    As a proximate result of the excessive use of force, Mr. Mullen suffered facial abrasions, bruising, and a significant injury to his leg that left him unable to walk.

370.    A true and accurate picture of his facial injuries is below:



371.    Mr. Mullen was then charged with violating curfew and taken to jail.

372.    Because of his leg injury, when Mr. Mullen arrived at the jail he was checked out by a nurse, who placed him in a wheelchair and recommended x-rays.

373.    When Mr. Mullen was released later that day at approximately 1:00 p.m., he was released on crutches.

374.    Mr. Mullen was not charged with resisting arrest.

375.    All charges against Mullen were subsequently dismissed.

376.    Mr. Mullen has been unable to use his injured leg and as a result has been unable to work or care for himself.

377.    On Friday, June 5, 2020, a lawsuit was filed against Defendant City alleging that the indefinite, city-wide curfew was unconstitutional.

378.    Hours after the lawsuit was filed, Mayor Ginther rescinded the curfew.

379.    On Tuesday, June 9, Columbus City Attorney Zach Klein dismissed all criminal charges for curfew violations brought under Mayor Ginther's executive order, which included the criminal charge brought against Mr. Mullen.

**Q.**     **Mistreatment of Plaintiff Heather Wise**

380.    On June 21, 2020, Ms. Wise went to downtown Columbus to participate in the protests.

381.    During previous incidents, Ms. Wise had been subjected to violence at the hands of Columbus Police Officers, however on her June 21, 2020 visit downtown she was subjected to especially gratuitous violence.

382.    At the corner of Broad and High, Ms. Wise was standing with a group of protestors who were holding shields to protect themselves from any potential police violence.

383.     Columbus Police Officers on bicycles approached the protestors and began to use their bodies as well as their bicycles as weapons against the protestors, physically assaulting the peaceful protestors.

384.     Ms. Wise was standing there at the intersection of Broad and High as Columbus Police Officers began pepper spraying the peaceful protestors.

385.     As some people dispersed, Ms. Wise was standing next to a Black woman who was being pepper sprayed and attempted to shield her.

386.     While attempting to protect her fellow peaceful protestor, Ms. Wise was assaulted by a Columbus Police Officer who used the space in between his thumb and index finger to press his hand into her throat and push her back.

387.     Near the same time, Ms. Wise was being assaulted by a Columbus Police Officer who was pushing his bicycle into her and others.

388.     Ms. Wise and others fell to the ground and Columbus Police Officers continued pepper spraying them as they lay there attempting to cover themselves.

389.     Columbus Police Officers then pulled out a vial of a brown liquid that they began pouring into the eyes and faces of Ms. Wise and others.

390.     Ms. Wise suffered bruising across her arms and legs in addition to injuries suffered from the pepper spray and the unknown substance.

## V.     CLAIMS FOR RELIEF

### A.     First Count: Violation of Fourth and Fourteenth Amendment Rights

391.     Paragraphs 1 through 390 above are realleged and incorporated herein.

392.    By using excessive force, Defendants Sergeant and Officers violated the privacy and bodily integrity protected by the Fourth and Fourteenth Amendments of one or more Plaintiffs.

393.    By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from using excessive force in circumstances similar to those involving the protests, Defendants City of Columbus and Chief caused the deprivation of civil rights and injuries to one or more Plaintiffs and thereby violated the Fourth and Fourteenth Amendments.

**B.**    **Second Count: Violation of First and Fourteenth Amendment Rights**

394.    Paragraphs 1 through 390 above are realleged and incorporated herein.

395.    By punishing one or more Plaintiffs for assembling and exercising their freedom of expression and attempting to discourage assembly and expression of Plaintiffs and other protestors, Defendants Sergeant and Officers violated their rights under the First and Fourteenth Amendments.

396.    By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from retaliating against speakers and speech they hated, Defendants City of Columbus and Chief caused one or more Plaintiffs to be punished for assembling and exercising their freedom of expression and caused the officers' attempt to discourage assembly and expression of one or more Plaintiffs and other protestors, and thereby violated the First and Fourteenth Amendments.

**C.**    **Third Count: Gross Negligence**

397.    Paragraphs 1 through 390 above are realleged and incorporated herein.

398.    By their willful, wanton, and reckless acts or omissions, including but not limited to, using excessive force, punishing protestors for their assembly and speech, seeking to discourage protestors, and/or failing to adopt effective policies or adequately train, supervise,

and discipline police officers, Defendants Chief, Sergeant, and Officers committed gross negligence in dereliction of their duty to preserve and protect the citizens and residents of the City of Columbus.

**D.     Fourth Count: Battery**

399.    Paragraphs 1 through 390 above are realleged and incorporated herein.

400.    By their willful, wanton, and reckless acts or omissions, including but not limited to, engaging in, authorizing, and ratifying excessive force and unlawful arrest and seizure, Defendants Chief, Sergeant, and Officers committed battery under the common law of the State of Ohio.

**E.     Fourth Count: Malicious Prosecution**

401.    Paragraphs 1 through 390 above are realleged and incorporated herein.

402.    By initiating criminal prosecutions against  when there was a lack of probable cause for criminal prosecution by falsely concocting such cause and depriving Plaintiffs Nadia Lynch and Demetrius Burke of liberty before the prosecution was resolved in their favor, Defendants Kanode and Kirby, acting with ill will toward protestors and the protest, violated Ms. Lynch's and Mr. Burke's rights under the Fourth and Fourteenth Amendments and the common law of the State of Ohio.

**VI.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally,

a.      declaring that they have violated their civil rights and/or Defendants Chief, Sergeant, and Officers have been grossly negligent toward them and/or one or more Defendants Officers maliciously prosecuted them;

b.      ordering such equitable relief as will make them whole for Defendants' unlawful conduct and ensure prospectively that they are protected from future similar conduct; costs; and reasonable attorneys' fees;

c.      awarding compensatory and, against Defendants Chief, Sergeant, and Officers, punitive damages in excess of $25,000; and

d.      granting such other relief as the Court may deem appropriate.

Respectfully submitted,

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

By: */s/ Edward R. Forman*
Edward R. Forman (0076651)
(eforman@marshallforman.com)
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

Frederick M. Gittes (0031444)
(fgittes@gitteslaw.com)
Jeffrey P. Vardaro (0081819)
(jvardaro@gitteslaw.com)
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
(swalton@waltonbrownlaw.com)

80

Chanda L. Brown (0081076)
(cbrown@waltonbrownlaw.com)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453

James D. McNamara (0002461)
(psilbach@yahoo.com)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and defenses triable to a jury.

By: /s/ *Edward R. Forman*___
Edward R. Forman (0076651)