## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TAMARA K. ALSAADA, *et al.* | : | |
| | : | Civil Action No. 2:20cv3431 |
| Plaintiffs, | : | |
| | : | CHIEF JUDGE MARBLEY |
| v. | : | |
| | : | MAGISTRATE JUDGE JOLSON |
| THE CITY OF COLUMBUS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs, by and through undersigned counsel, hereby move, pursuant to Fed.R.Civ.P. 65, for a preliminary injunction (1) restraining Defendants from using non-lethal force, including tear gas, pepper spray, flash-bang grenades, rubber bullets, wooden pellets, batons, body slams, pushing or pulling, or kettling, on nonviolent protesters to enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, and/or misdemeanors that were not committed with actual or imminently threatened physical harm or property destruction; (2) requiring Defendants to recognize that, for purposes of the injunction, "nonviolent protestors" includes individuals who are chanting, verbally confronting police, sitting, holding their hands up when approaching police, occupying streets or sidewalks, and/or passively resisting police orders; (3) requiring Defendants to enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, or misdemeanor enforcement, to the extent practicable, through citations or arrests, based on probable cause that an individual has committed a violation; (4) prohibiting the Defendants from the infliction of pain to punish or deter "nonviolent protestors" and limiting infliction of pain on any protestor when incidental to a use of force necessary for preventing crimes committed with

actual or imminently threatened physical harm or property destruction and/or arresting, based on probable cause, an individual who allegedly committed such an offense; (5) requiring Defendants to ensure that body and vehicle cameras are in good working order and used during every interaction with "nonviolent protesters" and badge numbers and/or identity cards are prominently displayed in each such interaction, even when riot gear is being worn; (6) requiring Defendants to recognize that individuals legitimately displaying "press," "media," "reporter," "paramedic," "medic," "legal observer," or similar words and/or symbols are permitted to be present in a position enabling them to record at protests and/or to intervene to assist individuals who appear to have been injured, and that all individuals, regardless of their occupation or non-violent activity, are permitted to record at protests or whenever any police officer interacts with the public; and (7) requiring the City of Columbus (hereinafter "City") and its Division of Police (hereinafter "CDP") to request that mutual aid law enforcement personnel cooperating with them adhere to the foregoing restraints or standards on use of non-lethal force and enforcement, infliction of pain, cameras and identification, and recognition of "nonviolent protestors" and individuals assisting or observing them.

This motion is predicated on Plaintiffs' strong likelihood of success in proving that Defendants violated the First, Fourth, and Fourteenth Amendments in using excessive force against Plaintiffs and other nonviolent protestors and punishing them for assembling and exercising their freedom of expression in an attempt to discourage that assembly and expression. Plaintiffs are being chilled from engaging in such assembly and expression by their fear that Defendants would respond with more excessive force and infliction of pain.

Given the ample law enforcement alternatives that would be available to Defendants to preserve public order, prevent injury, and protect property if an injunction were issued, and the

public interest in assemblies in public fora and expression on a matter of such public concern as racist practices in the way police treat minorities, the balance of equities tip sharply in favor of granting this injunction. Plaintiffs lack an adequate remedy at law to prevent use of excessive infliction of pain and retaliatory infliction of pain.

Plaintiffs' motion is supported by the accompanying memorandum; the video and pictures contained in their First Amended Complaint; Defendants' answer; testimony and argument that will be presented at an evidentiary hearing; and judicial notice, pursuant to Fed.R.Evid. 201(b), of facts either generally known within the Southern District or readily and accurately determined from sources whose accuracy cannot reasonably be questioned.

Pursuant to Fed.R.Civ.P. 65(c), Plaintiffs request that the security amount "proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined" be considered zero in light of the contents of the injunction.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

**I.     Background**

In direct response to the killing of George Floyd on May 25, 2020, *First Amended Complaint* (hereinafter "FAC"), ¶ 1, Doc. #:2, PAGEID #: 84, "[s]tarting on May 28, 2020, in Columbus, Ohio, Plaintiffs, along with hundreds of thousands in cities, states, and countries, took to the streets to demonstrate against excessive use of force by police, saying the names of Black men and women who had recently been killed by police or vigilantes; chanting that 'Black Lives Matter,' 'No Justice, No Peace,' 'I can't breathe,' 'Hands up, Don't Shoot,' and 'Whose Streets? Our Streets'; and expressing their outrage at the militarization of police forces, the disparate impact on minority communities of law enforcement priorities, and a pattern or practice of governments at all levels tolerating systemic racism and failing to adopt effective policies or

implement adequate training, supervision, and discipline of law enforcement officers." *FAC*, ¶ 2, Doc. #:2, PAGEID #: 84.

Plaintiffs joined "a multi-racial group" of protestors, and the vast majority of those protestors were "dedicated to nonviolent protest, including civil disobedience of traffic, parade, and mass-gathering regulations, to generate urgent widespread public attention to the historic and continuing police violence directed overwhelmingly at communities and people of color condoned by mostly White police supervisors and administrators." *FAC*, ¶ 3, Doc. #:2, PAGEID #: 84. The subject of their assembly and expression was a matter of the utmost public concern. They sought "to bring a halt to the endemic racism infecting America's law enforcement and justice systems and the general tolerance of excessive force routinely administered by police officers against arrestees, regardless of innocence or guilt, and especially against citizens who question an officer's actions." *FAC*, ¶ 4, Doc. #:2, PAGEID #: 84.

Sensing that they were the targets of the protests, CDP officers "were angered by the civil disobedience they observed, the message of the protests, and the criticisms and denunciation they heard." *FAC*, ¶ 6, Doc. #:2, PAGEID #: 85. They "had received minimal and ineffective training from Defendants City and CDP Chief and were subject to vague, ineffective, and rarely enforced policies regarding the need to handle protesters without using force or using the least amount of non-lethal force necessary." *FAC*, ¶ 7, Doc. #:2, PAGEID #: 85.

The response of the CDP officers to the protests was indiscriminate non-lethal force "against nonviolent protestors who were standing in the streets, from which vehicular traffic had already been blocked and eliminated by police, or on sidewalks, chanting, and holding signs and posing no threat of violence or property destruction, typically without giving audible warnings to their targets, and targeting clearly-identifiable journalists, medical assistants, and legal observers

4

who were there peaceably to assist protestors." *FAC*, ¶ 8, Doc. #:2, PAGEID #: 85. The CDP officers "purposely used excessive force to punish one or more Plaintiffs and other demonstrators, to deter them from continuing to protest and others from joining a protest with which they disagreed, and to reclaim the streets." *FAC*, ¶ 10, Doc. #:2, PAGEID #: 85.

The reaction of the CDP officers contrasted dramatically with the restraint they exercised a month before "when demonstrators, some of whom openly carried weapons and engaged in hate speech while violating statewide social-distancing and mask mandates, protested the COVID-19 lockdown at and around the Statehouse." *FAC*, ¶ 12, Doc. #:2, PAGEID #: 86. The same contrast occurred with the reaction to "the intense mass protests and public rallies in 2011 by public employee unions (including their own) against the effort to restrict collective bargaining rights." *FAC*, ¶ 12, Doc. #:2, PAGEID #: 98.

"On May 29 and 30, a similar dynamic occurred; a curfew from 10:00 p.m. to 6:00 a.m. was imposed on May 30; and public indignation at the broadcasts on social media and local and national television of the demonstrations and reports and pictures or video sent to reportcpd@columbus.gov ultimately convinced the Columbus Mayor, who had initially falsely described what had been happening and excused the police use of force, to limit the use of tear gas and, on June 1, 2020, denounce excessive force by police officers." *FAC*, ¶ 15, Doc. #: 2, PAGEID #: 86.

The reaction of the CDP officers achieved their primary objective: peaceful protestors have been chilled from exercising their constitutional rights to assembly and expression. For example, an underage protestor, Plaintiff S.L.C., and his uncle, Plaintiff J. Horn, returned home to Hamilton County the evening of May 30, 2020, and did not return again for any protests" after being tear-gassed and hurt. *FAC*, ¶ ¶ 264-66; 270, Doc. #: 2, PAGEID #: 133. "The way in

which [Plaintiff] Weldon was mistreated and the incidents of excessive use of force she observed generated so much anxiety and fear of being harmed that she became physically ill, including vomiting after the incident on June 1, and discontinued going to protests."  *FAC*, ¶ 698, Doc. #: 2, PAGEID #: 195.

Meanwhile, the catalyst for such assembly and expression persists.  "For years, African-Americans have been the victims of police and vigilante use of deadly excessive force, and Plaintiffs and the other demonstrators have said the victims' names during their protests."  *FAC*, ¶ 60, Doc. #:2, PAGEID #: 93.  "Those names include Tamir Rice, a 12-year-old African-American killed in 2015 by a Cleveland Police Officer when the child was carrying a pellet gun; Breonna Taylor, an African-American Emergency Medical Technician, shot eight times on March 13, 2020, by officers of the Louisville Metro Police Department who were executing a no-knock warrant at her residence; Michael Brown, an unarmed African-American teenager, fatally shot in 2014 by a Ferguson, Missouri police officer; Eric Garner, an African-American whose cry, "I can't breathe," was repeated by George Floyd, fatally choked in 2014 by a New York City police officer who was arresting him for selling loose cigarettes; Philando Castile, an African-American elementary school cafeteria worker shot five times during a 2016 traffic stop by a St. Paul, Minnesota police officer; and Trayvon Martin and Ahmaud Arbery, young African-Americans killed by vigilantes, one of whom was a former police officer."  *FAC*, ¶ 61, Doc. #:2, PAGEID #: 93-94.

The pattern of excessive use of force continues to grab the nation's headlines and fuel protests.  Recently, more names have been added: Walter Wallace Jr. in Philadelphia; Rayshard Brooks in Atlanta; Mike Ramos in Austin; Daniel Prude in Rochester, Dijon Kizzee in Los Angeles, Jacob Blake in Kenosha and the vigilante killing of two peaceful protestors there, and

Kevin Peterson, Jr. near Portland.  There is no reason to believe that the protests will end so long as the excessive force continues.

Plaintiffs have alleged six claims and seek declaratory and injunctive relief as well as compensatory damages, punitive damages from Defendants sued in their individual capacity,[1] costs, and attorneys' fees.  Plaintiffs have demanded a jury trial on all issues triable to a jury. The six claims are:

(1)     Violation of the Fourth and Fourteenth Amendments by the use of excessive force by police during peaceful protests and the deliberate indifference of the City and CPD in "the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from using excessive force in circumstances to those involving the protests[.]"  *FAC*, ¶¶ 711-12, Doc. #:2, PAGEID #: 196.

(2)     Violation of the First and Fourteenth Amendments "[b]y [officers] punishing one or more Plaintiffs for assembling and exercising their freedom of expression and attempting to discourage assembly and expression of Plaintiffs and other protestors" and the deliberate indifference of the City and CPD in "the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from retaliating against speakers and speech they hated[.]"  *FAC*, ¶¶ 713-14, Doc. #:2, PAGEID #: 197.

(3)     Gross negligence by the Chief and officers through "their willful, wanton, and reckless acts or omissions, including but not limited to, using excessive force, punishing protestors for their assembly and speech, seeking to discourage protestors, and/or failing to adopt effective policies or adequately train, supervise, and discipline police officers," all with "gross

---

[1] The Chief of the Columbus Police Division and a sergeant and officers (collectively referred to as "officers") have been sued in their individual, as well as official, capacities.

negligence in dereliction of their duty to preserve and protect the citizens and residents of the City of Columbus and Franklin County." *FAC*, ¶ 717, Doc. #:2, PAGEID #: 197.

(4)     Battery by the Chief and officers in "their willful, wanton, and reckless acts or omissions, including but not limited to, engaging in, authorizing, and ratifying excessive force and unlawful arrest and seizure[.]" *FAC*, ¶ 719, Doc. #:2, PAGEID #: 197.

(5)     Malicious prosecution by two officers, acting with ill will toward protestors and the protest, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and the common law of the State of Ohio by their "initiating criminal prosecutions when there was a lack of probable cause for criminal prosecution, falsely concocting such cause, and depriving Plaintiffs Nadia Lynch and Demetrius Burke of liberty before the prosecutions were resolved in their favor[.]" *FAC*, ¶ 720, Doc. #:2, PAGEID #: 198.

(6)     Liability, pursuant to R.C. 2307.60, for damages inflicted by the criminal acts of the Chief and officers in "their willful, wanton, and reckless acts or omissions constituting criminal acts, including the battery prohibited by R.C. 2903.13 and the knowing interference with Plaintiffs' civil rights prohibited by R.C. 2921.45[.]" *FAC*, ¶ 723, Doc. #:2, PAGEID #: 198.

Plaintiffs' motion focuses on the first two claims.  Issuing the requested injunction will not preclude Defendants from challenging Plaintiffs' allegations on those claims or their other four claims or affect the Plaintiffs' damages claims.  What an injunction will do, however, is uphold now in Columbus an American tradition of peaceful protestors safely using the public forums of streets and sidewalks to engage in free speech and assembly — whether  to counter-protest against the Ku Klux Klan, to fuel the civil rights movement, to end the Vietnam War, or to condemn police racism and violence.

## II.     **Procedural History**

On July 8, 2020, 13 Plaintiffs commenced this litigation against the City of Columbus, the Chief of the Columbus Police Division, five named police officers, and unknown John and Jane Doe police officers.[2]  *Complaint and Jury Demand*, Doc #:1, PAGEID #: 1, *et seq.*  Before service, Plaintiffs exercised their right under Fed.R.Civ.P.15, to file First Amended Complaint and Jury Demand, Doc #: 2, PAGEID #: 83, *et seq.* on September 16, 2020.  Currently, a total of 26 Plaintiffs are suing the original Defendants plus two more named police officers.  After service, Defendants filed their Answers on November 4, 2020, Doc. # 4, PAGEID #: 209 . Plaintiffs then moved for a preliminary injunction.

## III.   Standards for Preliminary Injunction

Four factors control the Court's discretion to grant a preliminary injunction: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017).  While a strong likelihood of success is the crucial factor, *see, e.g., Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually

---

[2] In their investigation, Plaintiffs have found that many officers had their identities or badge numbers blocked from view.  The BakerHostetler investigation commissioned by the City lamented just such an impediment to accountability.  *Law firm says it found 'challenges' in investigating use of force actions by officers during protests*, https://www.10tv.com/article/news/local/city-releases-findings-in-review-of-columbus-police-actions-during-protest (downloaded Nov. 2, 2020) ("BakerHostetler said in nearly every case where an allegation was 'not sustained' they could not identify the officers because of riot gear covering badge numbers and names and not every officer had a body camera.").

fatal."), all four must be balanced, rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

Irreparable harm is nearly as crucial as the success factor: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22-24 (2008) (emphasis in original). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

During the protests Plaintiffs' expression was largely stopped in its tracks as medical assistance from being sprayed or hit by non-lethal weapons was sought. *See, e.g., Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *4 ("The use of less-lethal, crowd control weapons has already stifled some speech even if momentarily."). As in Columbus, Seattle authorities who witnessed what the police were doing "announced a temporary ban on tear gas" and criticized the officers' treatment of peaceful protestors. *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *5. "These actions strongly suggest that the City had overstepped, causing protesters undue hardship." *Id.*

Beyond that, the chilling effect is pronounced. When "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). As *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *3 (W.D. Wash. June 12, 2020), recognized, "The mere threat of harm, without further action, can have a chilling effect." The standard is whether police use of excessive force and retaliatory infliction of pain "would chill a person of ordinary firmness from continuing to protest." *Id.* That standard is an objective one

and does not "allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  The similar chilling effect in Denver established irreparable harm in *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020): "Peaceful demonstrators' legitimate and credible fear of police retaliation is silencing their political speech—the very speech most highly valued under the First Amendment."

The chilling effect is actually doubly harmful.  Plaintiffs and other peaceful protestors are naturally disinclined to expose themselves to police excessive use of force and retaliatory infliction of pain.  A small minority of protestors is, however, so provoked by how the police treated peaceful protestors that they want to use reciprocal force, destroy property, and disrupt the daily lives of residents.  Unless an injunction assures Plaintiffs and other peaceful protestors that they will be treated in a manner consistent with the First, Fourth, and Fourteenth Amendments to the United States Constitution, that small minority of protestors will essentially take over the protests, with greater violence, destruction, and disruption.

While polarizing protestors versus the police in that way serves the political values of some, it is no way to run a democracy.  In contrast, ground rules for safe protests are essential to assembly and expression that criticizes law enforcement.  Only when the targets of assembly and expression are restrained from overreacting can constitutional rights be guaranteed.

Nor has the time between filing their action and seeking injunctive relief estopped Plaintiffs from showing that the harm is irreparable.  *See, e.g., Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").  Plaintiffs have painstakingly

11

reviewed hours and hours of body camera footage recently produced by the City; dissected a nearly infinite amount of social media postings and videos; interviewed more than 50 witnesses; scrutinized the investigation and report the City commissioned from BakerHostetler; and made extensive, often futile, public records requests. Plaintiffs have taken seriously their burden of proof, but chilling their speech constitutes irreparable harm whenever it occurs.

Courts that have considered injunctive relief against police use of excessive force and retaliation against protestors similarly situated to Plaintiffs have carefully balanced the primary interests:

> The Court takes a short detour before analyzing these factors to stand with many of its sister courts in recognizing the following underlying principles: demonstrators have a right to protest the actions of the police and other members of the government without fear of government retaliation; police officers, especially in their duty to protect person and property, have difficult and often dangerous jobs that require them to make split-second decisions; and just as not all protestors seek destruction, not all officers seek violence. The Court must thus balance the need to protect the sacred rights of speech and assembly from interference and retaliation with that of police to respond appropriately when the safety of the officers and the City's citizens are threatened. "This Court recognizes the difficulty in drawing an enforceable line that permits police officers to use appropriate means in response to violence and destruction of property but that also does not chill free speech or abuse those who wish to exercise it." *Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*, No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *2 (W.D. Wash. June 12, 2020); *see also Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291 (D. Colo. 2020).

*Breathe v. City of Detroit*, No. 20-12363, 2020 WL 5269789, at *2 (E.D. Mich. Sept. 4, 2020).

Making that balance, *Breathe* recognized that "the relief that Plaintiffs request leaves open all lawful options for police to use reasonable force when necessary to defend against a threat and to make arrests when supported by probable cause." *Id.* at *5. In turn, that Court accurately assessed the cost-benefit: "And any possible benefit police officers could gain from deploying chemical agents, projectiles, or striking weapons against demonstrators who pose no

threat and are not resisting lawful commands is outweighed by the irreparable harm peaceful protestors would face." *Id.*

The public interest in vindicating constitutional rights is paramount. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quotation marks and citation omitted). That public interest does not vary across geographic boundaries, and the issuance of injunctive relief in similar contexts indicates such relief should be issued at bar. *See, e.g., Breathe*; *Don't Shoot Portland*, 2020 WL 3078329, at *4–5; *Black Lives Matter Seattle*, 2020 WL 3128299, at *5; *Abay*, 445 F. Supp.3d at 1294; *Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2020 WL 4584185, at *17 (N.D. Cal. Aug. 10, 2020).

Plaintiffs realize that the balance is not an easy one to make. *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *3, provided a persuasive scale: "[T]he Court acknowledges that it is difficult to balance these public safety concerns and constitutional rights. But the Court holds that the balance here tips in favor of Plaintiffs, and other peaceful protesters, who were engaging in and may continue to engage in their constitutional right to protest."

## IV. <u>Policies on Paper</u>

For years, CDP policies have been a trail of broken promises. On paper, the policies seem at first blush facially reasonable. In practice, though, officers have either blatantly violated the policies or strategically used their discretion under the policies to undermine the promises.

The CDP policies on use of deadly force have been breached more than honored. During the period from 2013 through 2019, CDP officers "killed 27 African-Americans, including in 2016 Henry Green, age 23, who was killed by plainclothes officer in the predominantly Black neighborhood of South Linden, and three months later, 13-year-old Tyre King." *FAC*, ¶ 141,

Doc. #:2, PAGEID #: 113.  "African-Americans make up 28% of the population of the City of Columbus, but during that period constituted half (varying between 49% and 53% since 2013) of the use-of-force incidents."  *FAC*, ¶ 142, Doc. #:2, PAGEID #: 114.

The Internal Affairs Bureau is notorious for being ineffectual and "routinely dismisses citizen complaints against its officers as unfounded, almost always believing the statements of officers over that of citizens."  *FAC*, ¶ 153, Doc. #:2, PAGEID #: 115.  "Even when citizen complaints of violence are sustained, over the years the Columbus Police Division has meted out disproportionately minor discipline for violent acts, such as written reprimand and short suspensions."  *FAC*, ¶ 155, Doc. #:2, PAGEID #: 115.  The City's collective bargaining agreement nearly precludes discharging an officer who has violated the CDP policies.  *See FAC*, ¶¶ 156-58, Doc. #:2, PAGEID #: 116.  Criminal charges are even rarer.  *FAC*, ¶¶ 159-65, Doc. #:2, PAGEID #: 116-17.

Even policies on paper issued by this Court have been flouted.  Directly firing knee knockers or rubber or wooden bullets have along been deemed excessive use of force, *Otero v. Wood*, 316 F. Supp. 2d 612, 621-22 (S.D. Ohio 2004), yet that force was used against some Plaintiffs.  Firing those weapons at all was excessive, and even negligent targeting should have been avoided.

Nor have the policies prohibiting discrimination and promising equal employment opportunity been enforced the way they are written.  The history of employment bias against African-American candidates was described in *Police Officers for Equal Rights v. City of Columbus, Ohio*, 916 F.2d 1092, 1103 (6th Cir. 1990).  The overwhelming non-minority composition of the higher CDP ranks has worsened, rather than improved.

The City commissioned Matrix Consulting Group to study the CDP's community relations, primarily with minority areas, and, on August 29, 2019, it delivered a comprehensive report.  The report, at 31, found a disparity in the perception of the CDP: While 74% of community members felt CDP is 'doing a good job', only 61% of black respondents had the same perception."  The result of an internal CDP survey depicted a similar disparity: "The internal employee survey showed that, overall, 29% of respondents witnessed discrimination in the previous 5 years and 20% have personally experienced discrimination in the previous 5 years, but 70% of respondents who identified as black saying they have witnessed discrimination and 30% of respondents who identified as black stated they have witnessed an officer discriminate against a member of the public."  *Id.*

Most damning, the study referred to publicized incidents involving minority citizens and concluded, *Id.* at 32: "A few high profile recent incidents also have shown a disconnect between policies, training and implementation."  The recommendations confirmed this disconnection:

> In our interviews of top leadership the values of the CDP were often stated and it was notable that top leadership supports the policies and training; however, there is an apparent disconnect between the values and what is occurring both internally and externally.
>
> To increase the connection between the stated values of the CDP and the officers, the leadership should increase training on policies, make sure policies are supported by front line leaders. Front line leaders should have independent training where top leadership can stress the values of CDP and help front leaders to better reinforce those values.

*Id.*

On June 17, 2020, CDP revised its "Chemical Agents and Intermediate Weapons Regulations, **effective March 12, 2021**.  The revision was made in response to the events giving rise to this lawsuit, https://www.dispatch.com/story/news/politics/county/2020/06/16/columbus-mayor-ginther-bans-tear-gas-limits-pepper-spray-use-by-police/112824756/, but the regulations

remain fundamentally flawed in their application to peaceful protestors who are either completely obeying the law or engaging in civil disobedience by occupying streets and sidewalks. These projected policy changes also do nothing to address the fact that a substantial amount of the conduct experienced by the Plaintiffs violated the CDP policies that already exist on paper but are vague, incomplete, or routinely disregarded by officers throughout the CDP chain of command.

On tear gas, the regulations prohibit its "use to disperse crowds." II.A.1. Tear gas apparently was permitted to be used to disperse crowds *and, until March 12, 2021*, will continued to be permitted to be used to disperse crowds.

Indeed, the Matrix Report, at 21, called out CDP in August 2019 for its policy:

> One directive 2.04 "Chemical Agents and Intermediate Weapons Regulations" should be reviewed to match best practice. Under section 5 the directive states "Sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of violators who are not moving. . . . This directive and the subsequent use of force continuum allow the use of a chemical agent in non-violent or "dead weight" protesters. The use of force without an aggressive act is low threshold for the use of chemical agents and contrary to practice in many large agencies (e.g. Chicago and New York as well as Cincinnati).

On pepper or other chemical sprays, CDP officers are allowed to carry them only upon satisfying "training and qualification standards" and annually "demonstrate proficiency." II.A.2. Of course, the excessive use of force and infliction of pain against Plaintiffs and other peaceful protestors was done efficiently and effectively, and deployment, rather than the ability in using, is at stake in this lawsuit.

The Policy, II.A.3, then addresses deployment: "Sworn personnel may use chemical spray to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, to prevent escape, or to prevent or stop the commission

of a criminal offense." The last phrase is a huge exception that would permit deployment against peaceful protestors engaging in the civil disobedience of speaking and assembly in streets and thereby committing a misdemeanor.

The Policy does address, in II.A.5, crowd control, though it does not reconcile that section with the earlier one: "Sworn personnel shall not use their Division-issued chemical spray to disperse a congregation of individuals unless the congregation is engaging in aggressive or violent actions towards officers or others." The reality is that CDP officers will uniformly testify that they considered loud name-calling and crowds of peaceful protestors standing in the street and even at times on sidewalks to be "engaging in aggressive" actions. The Policy does not define "aggressive," nor does it even impose an objective standard: "reasonably perceive to be engaging."

Procedural steps, which were missing during the events underlying this lawsuit, are added by the policy. II.A.5. "[A]t least three notifications should be made when possible to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order." The "when possible" is one of those exceptions CDP officers are bound to invoke. The "notifications" are required to be made loudly and be comprehensible by the crowd. II.A.5.a. Deployment must be "audio/video recorded when possible." II.A.5.b. The "when possible" is yet another significant exception.

Controlled-access highways, conceivably meaning freeways, are appropriate for "chemical irritants to clear [or prevent] a congregation of people." If CDP construed such highways to include streets it has blocked off, though, the restriction is meaningless.

In another seeming departure from policies in effect for the events underlying this lawsuit, indiscriminate use of chemical irritants is addressed in II.A.6: "Sworn personnel encountering a group of people, some of whom are engaged in unlawful conduct, shall be guided by the 'Use of Force' directive when determining whether to use chemical spray. If chemical spray is used, it should be directed at the persons participating in the violent conduct, not at the group in general. The encounter should be audio/video-recorded when possible."  The CDP are also required, II.A.7, to "make a reasonable effort to decontaminate exposed persons once the situation is under control."  Intermediate weapons, such as a flashlight, technical baton, or taser are also addressed, largely subject to the same policies.  II.B.

The fundamental flaw is that CDP are given non-lethal means to disperse peaceful protestors whose only crime, if any, is assembly on streets in violation of a traffic control misdemeanor.  The potential for abuse is shown in the pictures and videos and by testimony.  Unless enjoined, CDP will continue to use force – painful and even injurious – rather than issue citations.

On November 11, 2020, Columbus City Attorney Zach Klein and Defendant Chief Quinlan announced "a recent policy change issued by the Columbus Division of Police related to the process of arresting and incarcerating individuals who commit nonviolent misdemeanors, such as theft or trespassing."  (available through columbus@public.govdelivery.com)  While promising to prosecute regardless of arrest or summons, they explained: "Individuals who have little or no recent criminal history should not be arrested and immediately taken to jail for committing a nonviolent misdemeanor. Instead, these individuals should be detained, identified, and issued a summons with a court date to be prosecuted."  Among the exceptions in this policy is one for an individual who "is a known repeat or serial offender and arrest is deemed necessary

to stop the conduct[.]"  A Q&A was included in the announcement, but did not address crowd control over peaceful demonstrators, including some who have engaged in civil disobedience.

Unlike an injunction that exposes Defendants to a contempt citation and remedies such as appointment of a Special Master if it is violated, the new, improved policies are ephemeral. They resemble – and may have been adopted to give the appearance of -- Defendants' announcing that for some uses of force they will no longer violate the Constitution.  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'"  *Id.* at 289, n. 10 (*citing United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

The City of Mesquite had repealed "the objectionable language" in an ordinance challenged under the First Amendment, but that repeal "would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated."  *Id.* at 289. Defendants have not truly repealed the very policies in effect during the protests, instead attempting to add a gloss that, if faithfully followed, conceivably could ensure protection of some constitutional rights.  *Accord Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) ("Voluntary cessation of the alleged illegal conduct does not, as a general rule, moot a case.").

In their FAC, Plaintiffs have challenged a pattern and practice of unconstitutional conduct, not a single, particular City or CDP policy.  Defendants' new policies do not, therefore, parallel cases in which a statute, regulation, or ordinance is challenged as unconstitutional and then repealed or amended.  "[R]epeal or amendment of a challenged statute while a case is

19

pending . . . usually eliminates [the] requisite case-or-controversy because a statute must be analyzed . . . in its present form," and, "the Supreme Court has routinely declared moot those claims effectively nullified by statutory amendment pending appeal." *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997).

In the different context at bar, Defendants' actions do not clearly establish that there is "'no reasonable expectation that the alleged violation will recur[.]'" *Speech First, Inc.*, 939 F.3d at 767–68 (quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)). To the contrary, the indiscriminate use of excessive force in retaliation for the message Plaintiffs and other peaceful protestors were conveying makes recurrence highly likely. Rather than the possibility of repeated use of a chokehold against the same plaintiff, *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), the same protestors on the same streets and sidewalks are exceedingly likely, absent an injunction, to suffer the same injuries and constitutional violations. Unlike where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Akers v. McGinnis,* 352 F.3d 1030, 1035 (6th Cir. 2003) (citation omitted), subsequent events involving police use of deadly force against minorities have virtually guaranteed recurrence.

Moreover, "the party asserting mootness bears the '"heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to start up again.'" *Id.* (quoting *Jones v. City of Lakeland,* 224 F.3d 518, 529 (6th Cir.2000)). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), surveyed mootness precedent and explained that "the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent[.]" That stringent standard is that "[a] case might become moot if subsequent events made it absolutely

clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Friends of the Earth, Inc.*, 528 U.S. at 189 (*quoting Concentrated Phosphate Export Assn.*, 393 U.S. at 203).

While "government officials receive more solicitude on this point than do private parties," their past behavior is not immune to scrutiny. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473–74 (6th Cir. 2008) (internal quotations and citations omitted). The burden remains on government officials, it is just "lower," *Speech First*, 939 F.3d at 767, and still requires proof that the voluntary cessation "appears genuine," *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (citations omitted), and renders an injunction unnecessary.

The policy changes in *Wise v. City of Portland*, No. 3:20-CV-01193-IM, 2020 WL 5231486, at *10 (D. Or. Sept. 2, 2020), included a temporary restraining order prohibiting the use of tear gas "to disperse crowds where there is no or little risk of injury," a policy conditioning its use on "a serious and immediate threat to life safety, and there is no other viable alternative for dispersal," and a statewide law allowing tear gas to be used only when the circumstances constituted a riot under Or. Rev. Stat. § 166.015, and only after announcements are made and sufficient time is allowed for persons to leave the area. The City's and CDP's changes barely approach those.

Beyond that, protests of the sort Plaintiffs engaged in are triggered by events, tend to last for a relatively short period, and belong to the category of issues that are "capable of repetition, yet evading review." *Sosna v. Iowa*, 419 U.S. 393 (1975), surveyed the mootness doctrine and relied on *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911), for that category.

The Interstate Commerce Commission order being challenged there had but a short duration, precluding, as a practical matter, litigation over its validity even though a future order subject to the same challenge might be issued.

*In re Search of Fair Fin.*, 692 F.3d 424, 428 (6th Cir. 2012) (quoting *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 530 (6th Cir.2001), recognized this category, beginning with the general mootness principle that "a federal court has no authority 'to declare rules of law that cannot affect the matter at issue[.]'" *In re Search of Fair Fin.*, 692 F.3d at 428, held: "This exception to mootness enables federal courts to keep jurisdiction where (1) the challenged action is too short in duration to be fully litigated prior to its expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action in the future." The Court found "jurisdiction to consider the First Amendment right of access to the documents sealed here," which related to search warrants in pending criminal matters. *Id.* at 429. In the same way, this Court has jurisdiction to issue a preliminary injunction, and Plaintiffs should not be forced to risk harm by recurrence of the use of excessive force and retaliatory infliction of pain.

## V.   <u>Argument</u>

### A.   <u>Plaintiffs Have a Strong Likelihood of Success on the Use of Excessive Force In Violation of the Fourth and Fourteenth Amendments.</u>

The constitutionality of the use of force described by the Plaintiffs and other witnesses is governed by Fourth Amendment standards because nearly everyone was a suspect who had not been arrested when force was used. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). The use of non-lethal force constitutes a seizure. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (officer shot individual with a beanbag propellant, indicating he was "the direct target of police conduct" and the force was "intended to stop [the plaintiff] from coming any closer"). *See*

*Terry v. Ohio*, 392 U.S. 1, 16 (1967) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime.").

Objective reasonableness is the global standard under *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Each use "must be judged from the perspective of a reasonable officer on the scene," *id.* at 396, allowing for the fact that police officers often make split-second decisions in "tense, uncertain, and rapidly evolving" circumstances.  *Id.* at 397.

A balancing is done of the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" with the guiding factors being the severity of the crime, the potential threat from the individual, and any attempt to resist or evade arrest.  *Id.* at 396.  *Accord Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).

The existence of a crowd of protestors does not change the key Fourth Amendment measure: "[T]his Court has repeatedly emphasized that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force." *Edrei v. Maguire*, 892 F.3d 525, 540–42 (2nd Cir. 2018), *cert. denied*, 139 S. Ct. 2614 (2019).  "Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations."  *Id.* (citing *Nelson v. City of Davis*, 685 F.3d 867, 882–83 (9th Cir. 2012); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289–90 (10th Cir. 2008); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 59–62 (1st Cir. 2008); *Darrah v. City of Oak Park*, 255 F.3d 301, 306–08 (6th Cir. 2001); *Duran v. Sirgedas*, 240 Fed.Appx. 104, 112–13 (7th Cir. 2007) (summary order); *Piper v. City of Elmira*, 12 F.Supp.3d 577, 589–96 (W.D.N.Y. 2014)).

The testimony, pictures, and video footage in *Breathe*, 2020 WL 5269789, at *2–3, track what happened in Columbus: a line of Detroit police officers suddenly deployed tear gas, advanced on the crowd, used batons and physical force, and pursued "individuals who are running or walking away from the chaos, apparently not posing any threat, and violently shoving them into the ground or a building." The Court concluded: "These videos, buttressed by the testimonial evidence, establish[] that at least some Plaintiffs have a likelihood of success on their claims that the DPD used excessive force against them." *Id.* at *3.

Videos provide probative evidence of what actually happened. *See, e.g.*, *Otero*, 316 F. Supp. 2d at 618 ("The north side video survives, and dramatic evidence from that video was the basis for the City paying $900,000 to Alicia Harvey (formerly Alicia Davis), who was blinded in one eye after having been shot with rubber sting ball rounds on April 29, 2001."). The videos and testimony at bar depict the same situation which occurred in Oakland: "Plaintiffs have submitted sworn declarations and video footage showing that some of the force used by OPD officer, or OPD's mutual aid partners, was aimed at peaceful protestors who did not pose a threat to the officers or the public at large and were not engaging in illegal activity. As to a number of the incidents described in Plaintiffs' declarations, it is not clear that the crowd was refusing to disperse as there is evidence that they may have been given insufficient time to respond or no warnings at all, or they could not hear the warnings. There is also evidence that some demonstrators were unable to disperse in order to comply with officers' commands and/or to avoid violating curfew because they were trapped in an area with no accessible means of egress." *Anti Police-Terror Project*, 2020 WL 4584185, at *14.

Although *Abdur-Rahim v. City of Columbus, Ohio*, No. 19-4253, 2020 WL 5033411, at *3 (6th Cir. Aug. 26, 2020), analyzed only qualified immunity and did not pursue the *Graham*

analysis, the severity of the crime matters. There, the Court distinguished firing beanbag propellants at point blank range, without provocation, at an individual's chest, as in *Ciminillo*, from deploying "pepper spray directly at a lingering individual blocking an intersection after forty-five minutes of dispersal orders and warnings, followed by a general spray over a crowd." *Abdur-Rahim*, 2020 WL 5033411, at *3. The conduct of Plaintiffs resembles the former rather than latter situation: the crime they were suspected of committing was occupying streets which had no traffic and were being used for peaceful assembly and expression. Rather than 45 minutes of orders and warnings, there were either none or a few seconds worth.

Indeed, for purposes of qualified immunity, *Abdur-Rahim*, 2020 WL 5033411, at *3, discounted precedent from other jurisdictions that reflect excessive use of force. While that precedent does not control the qualified immunity analysis, it certainly informs this Court's impression of Plaintiffs' likelihood of success for purposes of injunctive relief. *See e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 882–83 (9th Cir. 2012) (officers unreasonably fired pepper ball projectiles at a crowd when they did not first issue dispersal orders in a manner that the crowd could hear or warn that they would use force and they could have used other means to disperse the crowd); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289–90 (10th Cir. 2008) (officers unreasonably shot repeated rounds of pepper balls at protestor lying in the street); *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (officers unreasonably shot protestor with pepper rounds, then "grabbed him, thrust him to the ground, and forcibly escorted him through a cloud of tear gas"); *Asociación de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 59–60 (1st Cir. 2008) (officers unreasonably used pepper spray without warning, sprayed individuals lying on the ground, and grabbed and kicked an individual suffering the effects of the spray); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1129–30 (9th Cir. 2002) (officers

25

unreasonably used pepper spray on gathering of fewer than ten protestors when officers already had control over the protestors and could have painlessly dispersed them through other means).

This precedent demonstrates that what the CDP officers did constituted excessive force. Just as in Oakland, the non-lethal force used by the CDP was certainly force: "The types of force that was used by OPD against protesters in this case – chemical agents, less lethal projectiles such as rubber bullets and flashbang grenades – constitute significant force." *Anti Police-Terror Project*, 2020 WL 4584185, at *13. *See also Edrei*, 892 F.3d at 529–31 ("[W]e hold that purposefully using a LRAD [long-range acoustic device] in a manner capable of causing serious injury to move non-violent protesters [against the police killing of Eric Garner] to the sidewalks violates the Fourteenth Amendment under clearly established law.").

In the Sixth Circuit, the constitutionality of pepper spray also depends on warning and resistance. For example, *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009), held that "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." In *Atkins v. Twp. of Flint*, 94 Fed.Appx. 342, 349 (6th Cir. 2004), unreasonable force was found when an officer pepper sprayed an arrestee without telling him he was under arrest, why he was under arrest, or that what he did was a crime.

More generally, the Sixth Circuit has stated that "there is a very limited class of circumstances when the use of pepper spray is proper, including when the detainee is unsecured, acting violently, and posing a threat to himself or others." *Cabaniss v. City of Riverside*, 231 Fed.Appx. 407, 413 (6th Cir. 2007). There, the suspect was sitting without restraints in the backseat of a cruiser and repeatedly smashed his head against the glass barrier; police reasonably used pepper spray to protect the suspect from self-harm. Nothing close to a countervailing reason for using pepper spray can be found at bar.

Plaintiffs recognize that *Allen v. City of Toledo*, No. 3:09-CV-366, 2011 WL 3875376, at *21 (N.D. Ohio Sept. 1, 2011), upheld use of pepper spray when "a dangerous exigency justified the use of pepper spray to quell the crowd" and the spray was used "in a good faith effort to restore discipline and order."  At bar, not only did the crowd consist of peaceful protestors who had not lost discipline, but indiscriminate spraying at close range in the eyes and faces of those protestors was the antithesis of a good-faith effort.  It provoked and injured in a bad faith effort to punish.  *See Lucha Unida de Padres y Estudiantes v. Green*, No. CV-18-00085-TUC-RM, 2020 WL 3574593, at *13 (D. Ariz. July 1, 2020) ("Viewing the facts in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that the protest was peaceful and only became unruly because of the way in which Defendants intervened.") (immigrants' rights protest rally).  *Cf. Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 ("Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs.").

The prevailing rule in the Sixth Circuit is that police may not use force against suspects who are offering, at most, passive resistance.  *Goodwin v. City of Painesville*, 781 F.3d 314, 329 (6th Cir. 2015).  As this Court held in *Otero*, 316 F. Supp. 2d at 627, "[w]hile Defendants unquestionably had a legitimate interest in dispersing the crowd that had gathered along Norwich Avenue, a reasonable jury could find that they did so more harshly than was necessary. Plaintiff has presented evidence that the crowd was peaceful and compliant, with only isolated occurrences of people throwing bottles and other items."

The totality of circumstances establishes objective unreasonableness.  "[I]t is unreasonable to use pepper spray, projectile bean bags, and pepper ball projectiles against individuals 'who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.'"  *Black Lives Matter Seattle-King Cty.*, 2020 WL

3128299, at *4 (quoting *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012)). Plaintiffs were not rioting, they were protesting. *Abay*, 445 F. Supp. 3d at 1292 ("These are peaceful demonstrators, journalists, and medics who have been targeted with extreme tactics meant to suppress riots, not to suppress demonstrations."). Not only were "inadequate warnings" of the use of non-lethal force given, but "people present in the area were [also] not warned that they had been declared to be part of a riot or that force would be used against them if they failed to disperse." *Otero*, 316 F. Supp. 2d at 624.

Pepper spray in particular was used unreasonably. As *Lucha Unida de Padres y Estudiantes*, 2020 WL 3574593, at *15, held, "a reasonable factfinder could conclude that Defendants [officers'] use of pepper spray—including the way they used it (direct spraying to the face), spraying individuals without first giving specific verbal direction to those individuals, spraying individuals who posed no immediate threat to the officers, and repeated spraying—was unreasonable under the circumstances."

The indiscriminate tear gassing was similarly unreasonable. Shooting wooden or rubber bullets in a way that hit peaceful protesters directly, rather than after bouncing off pavement, is likewise punitive under the circumstances. Shooting wooden or rubber bullets against peaceful protestors itself posed too great a risk of injury in light of the absence of violence.

It cannot be over emphasized that the cases from our Circuit and others regarding the unjustified and illegal use of pepper spray applies equally to more violent and more dangerous use of other forms of non-lethal weapons in response to peaceful demonstrations and protests. The constitutional and statutory prohibitions concerning the use of pepper spray need to be applied with special rigor when, as in this case, police employ tear gas, rubber bullets, wooden pellets, flash grenades, and striking weapons such as batons against peaceful protesters.

It also must be emphasized that the discussion of case law in this memorandum relating to the limits on use of force in cases involving civil disobedience by protesters is not intended to distract from or minimize the fact that many of the Plaintiffs were not engaging in civil disobedience or unlawful conduct of any kind.  Some were attacked by police as they were leaving locations as ordered or just leaving the protests on their own.  Others were not in streets, interfering with traffic, disobeying communicated police orders, resisting an arrest, or throwing anything at officers.  Yet they were sprayed, gassed, struck with pellets or other weapons, blinded, and/or otherwise assaulted by the unlawful and excessive force authorized and employed by Defendants.

**B.** **Plaintiffs Have Demonstrated a Strong Likelihood of Success in Proving their First and Fourteenth Amendment Rights Were Violated by Retaliatory Infliction of Pain.**

To prove retaliation, Plaintiffs must show that their protected assembly and expression was a "substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  But-for causation need not be proven; however, Defendants could then rebut the Plaintiffs by showing that they would have done the same even without a retaliatory motive. *Id.* at 1038.

The elements of this claim are: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between" the first two elements, *i.e.* "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*).

The Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2nd Cir. 2006) (citing *Cox v. Louisiana,* 379 U.S. 536, 550 (1965)).

Defendants have argued, citing Columbus Code of Ordinances § 2333.04(A)(1)–(2), that Plaintiffs were not engaged in protected assembly or expression because that ordinance makes it an offense to "[o]bstruct a highway [or] street . . . to which the public or substantial group of the public has access," and to "[d]isobey[ ] a reasonable request or order to move issued by a person the actor knows to be or is informed is, a peace officer or a person with authority to control the use of the premise when the request/order is made."  In turn, "obstruct" means "to render impassable or render passage unreasonably inconvenient or hazardous." *Id.* at § 2333.04(B). This crime is a misdemeanor of the fourth degree. *Id.* at § 2333.04(C).

*Abdur-Rahim*, 425 F. Supp. 3d 935, 952-53 (S.D. Ohio 2019), *aff'd in part, rev'd in part*, 2020 WL 5033411 (6th Cir. 2020), accepted that argument on facts which involved standing in an intersection and disobeying orders to disperse.  The rationale was that "[t]he City of Columbus has an interest in, and a responsibility to, keep the public streets open and free of hazards." *Id.* at 952.  There, the CDP's Incident Action Plan set keeping the streets open as a goal.  *Id.*

At bar the CDP decided to block off traffic from the intersections and streets where the protestors were.  They had no intention of allowing traffic through and no counterbalancing need, therefore, to enforce their obstruction ordinance.  Nor did they make clear their dispersal orders before the use of non-lethal and painful force.  It is palpably pretextual to argue that they were just trying to keep the streets and sidewalks open.

Precedent recognizes that freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom," but that it "must be balanced against the state's responsibility to protect **other important** rights." *Springola v. Vill. of Granville*, 39 Fed.Appx. 978, 982 (6th Cir. 2002) (emphasis added). In blocking off traffic, the CDP decided to honor the public forums of the streets and sidewalks where the peaceful protests occurred, and that decision precludes them from turning around and asserting pretextually that their use of force was all about allowing ingress and egress for traffic and non-protestors. "[E]ven if the protestors did violate the law by entering the roadway and obstructing traffic, Defendants have not shown that their actions to restrict the Plaintiffs' First Amendment rights survive the 'exacting scrutiny' to which restrictions on First Amendment rights to political speech and assembly are subject." *Lucha Unida de Padres y Estudiantes*, 2020 WL 3574593, at *18 (citation omitted).

"The Supreme Court has long held that public streets are traditional public fora." *Brindley v. City of Memphis, Tennessee*, 934 F.3d 461, 465 (6th Cir. 2019). The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Indeed, "streets and parks" have for "time out of mind . . . been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Satawa v. Macomb Cty. Rd. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012) (citation and internal quotation marks omitted).

What the Plaintiffs were doing was protesting an issue of pressing public concern. Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed.*

*Election Com'n*, 572 U.S. 185, 203 (2014).  That safeguard "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Id.* (internal citations omitted).

For that reason, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotations and citation omitted)).  Political speech, especially that involving controversial issues, is "the essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).  That protection extends to assembly.  "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).

Quite simply, "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." *Abay*, 445 F. Supp. 3d at 1291.

The presumption that streets are traditional public forums means that "[n]o particularized inquiry into the precise nature of a specific street is necessary" because "all public streets are held in the public trust and are properly considered traditional public fora." *Frisby*, 487 U.S. at 481.  *Accord Dean v. Byerley*, 354 F.3d 540, 549–50 (6th Cir. 2004) ("The Supreme Court considers streets . . . to be public fora for purposes of First Amendment scrutiny" and further analysis is unnecessary.).

Courts recognize four types of fora: (1) the traditional public forum, (2) the designated public forum, (3) the limited public forum, and (4) the nonpublic forum. *Miller v. City of Cincinnati*, 622 F.3d 524, 534–36 (6th Cir. 2010).  "Restrictions on speech in traditional

or designated public fora receive strict scrutiny, which means they must be 'necessary to serve a compelling state interest' and 'narrowly drawn to achieve that interest.'" *Brindley*, 934 F.3d at 467 (quoting *Miller*, 622 F.3d at 534) (citations and internal quotation marks omitted). Restricting speech in a limited or nonpublic forum need, however, be "reasonable in light of the purpose served by the forum and . . . viewpoint neutral." *Miller,* 622 F.3d at 535 (citation and internal quotation marks omitted).

Like the Seattle protestors, Plaintiffs "exercised their right on public fora." *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *3. The location was "Seattle streets, often right outside the police precinct on Capitol Hill." *Id.*

On the facts before the Court and the controlling legal standards, traffic control is neither a sufficiently important governmental interest to counterbalance the Plaintiffs' right to engage in core First Amendment activities on Columbus streets nor was it narrowly served by indiscriminate use of non-lethal force without clear warnings to disperse.

Plaintiffs understand that violent protestors, particularly any who destroyed property, present a different counterbalance to traffic control. As *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996), established, "the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." And, as discussed above, a number of the Plaintiffs were not only peaceful but were also not engaged in civil disobedience or any illegal conduct at all. Some were actually attacked by the Defendants or pursuant to the Defendants' policies and/or orders as they were leaving or even complying with the Defendants' orders.

As for whether a motivating factor was the message and tone of the peaceful protestors against sincerely and reasonably perceived systemic racism in the police force, the overreaction of the CDP officers is hardly explained by any other motivation. As in *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *4, "The use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that SPD's actions were substantially motivated by Plaintiffs' protected First Amendment activity."

The police overreaction is telling because it impeaches the assertion of a legitimate, non-retaliatory motivation of preventing crime. *See, e.g., Don't Shoot Portland*, 2020 WL 3078329, at *3 ("These incidents demonstrate that preventing criminal activity near the Justice Center was not the sole purpose of PPB's use of force. Instead, officers may have been substantially motivated by an intent to interfere with Plaintiffs' constitutionally protected expression.").

Differential treatment of demonstrators further impeaches such a purpose. CPD did not confront demonstrators who openly carried firearms or trespassed on public property at the Statehouse. In stark contrast to the demonstrations giving rise to this action, CPD did nothing to escalate tension. The kid-glove treatment of demonstrators with whom CDP officers agreed is glaring evidence of the most likely motivation.

> **C.**     **Plaintiffs Have a Strong Likelihood of Success in Proving that, Through Their Actions and Omissions, the City and CDP Have Adopted a Policy or Custom of Encouraging Police Officers to Use Excessive Force Against Nonviolent Protestors and Retaliate Against their Assembly and Expression by Inflicting Pain on Them.**

This Court may issue a preliminary injunction against CDP officers without running afoul of the elimination of vicarious liability under 42 U.S.C. § 1983 by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The officers' own liability for using excessive force and retaliatory infliction of pain justifies an injunction.

Plaintiffs seek a broader preliminary injunction, though, and must show a strong likelihood of success on proving that "execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  The evidence reveals that CDP officers were given marching orders to quell the protests, not just to prevent a riot, and those orders came from the official policymakers for the CDP.  They were armed with military-grade equipment and had a green light to spray away, gas indiscriminately, aim high with wooden pellets and rubber bullets, and inflict pain as a deterrent.  The very exuberance and expanse of pepper spraying and use of other types of crowd control weapons belies any notion that individual officers were acting on a lark rather than implementing CDP policies as their superiors had articulated and enforced them.

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Shorts v. Bartholomew*, 255 Fed.Appx. 46, 57 (6th Cir. 2007) (citation omitted).  *Accord Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999).  A "custom" is so permanent, widespread, or well-settled that it has the "force of law" and needs no formal approval.  *Doe v. Claiborne County*, 103 F.3d 495, 507–08 (6th Cir. 1996).

Any one of four tests will suffice: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

In Columbus, a pattern or practice has long existed of flouting the letter or spirit of CDP policies against excessive use of force, favoring the right to protest, or racially discriminating. What happened to Plaintiffs and other protestors went beyond that pattern or practice because the Chief issued the policies the officers were implementing against Plaintiffs and other protestors. In this sense, the officers were just following orders—albeit quite thoroughly, willingly, and enthusiastically.

The Chief was a final policymaker on police practices. "[A] plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority." *Burgess*, 735 F.3d at 479. Under *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986), his policies expose Columbus to liability: when a "government's authorized decisionmakers" make "the decision to adopt [a] particular course of action," "it surely represents an act of official government 'policy'" and "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."

Thus, Plaintiffs are not attempting to hold Columbus or its officials vicariously liable for the violations of the First, Fourth, and Fourteenth Amendments by police officers. *See, e.g., Gregory v. City of Louisville,* 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior.*"). Instead, the City and Chief are liable for adopting and implementing a policy that violates those Amendments. *See, e.g., Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.,* 103 F.3d 495, 505–06 (6th Cir. 1996) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992)).

The objective reasonableness of the Fourth Amendment and the bar to retaliation by the First Amendment are omitted or obscured by the policies.  The natural, inevitable result is what happened: officers overreached because they may have thought they were complying with official policies on the use of the non-lethal force with which they were equipped against peaceful protestors who, at very most, were committing a misdemeanor by occupying public sidewalks and streets, and, in many cases, were not even doing that.  Plaintiffs have shown, therefore, a "direct causal link between the custom and the constitutional deprivation; that is, * * * the particular injury was incurred *because* of the execution of that policy." *Doe,* 103 F.3d at 508 (citation omitted).

While the Columbus Mayor and some city officials criticized what the officers did, the Chief effectively ratified their overreaction and continues to do so.  "[P]roof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 405 (1997).  "Similarly, the conclusion that the action taken or directed by the [municipality's] authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

As in Detroit, "the video and testimonial evidence presented by Plaintiffs suggests that, on at least one occasion, police have used physical violence, and tear gas and pepper spray against peaceful protestors without provocation, and city officials have done nothing to condemn these actions." *Breathe*, 2020 WL 5269789, at *5.  There and at bar, "[t]his evidence leads to the inference that Plaintiffs have a likelihood of success in establishing that unconstitutional conduct by police was carried out pursuant to an official policy or custom."

This Court recognized in *Otero*, 316 F. Supp. 2d at 628, that an informal policy is still a policy for purposes of *Monell*: "This order [permitting wooden baton rounds to be used before less dangerous alternatives] originated from the policy level of the City and therefore represents City policy, even though it is an unwritten policy." The policy there also did not require "extensive warnings" before the use of non-lethal force, *Id.*, which the testimony and video demonstrate happened to Plaintiffs and other protestors.

This Court also found ratification in *Otero*, 316 F. Supp. 2d at 629, based on "evidence that the City has a policy of dealing with citizen complaints in such a way as to virtually ensure that offending officers will not be disciplined for their misconduct." The failure to discipline officers known to have used non-lethal force indiscriminately against Plaintiffs and other protestors "thus constitutes a ratification by the City of the unconstitutional conduct that caused that injury." *Id.*

A similar overreaction by police occurred in Portland, and *Cantu v. City of Portland*, No. 3:19-CV-01606-SB, 2020 WL 2952972, at *5 (D.Or. June 3, 2020), persuasively analyzed the *Monell* issue by holding that the police had an "alleged custom or practice of using excessive force at protests" and did exactly that. Plaintiffs have alleged both such a pattern and that a failure to discipline contributed to unchecked excesses and systemic racism in the CPD. The officers overreacted in no small part because they were comforted by that custom.

*Cantu*, 2020 WL 2952972, at *5, also found the requisite custom in the orders given by superiors: "The Court finds that the complaint is sufficiently clear that Plaintiffs are alleging that the Supervising Officers authorized the PPB Officers to fire on the crowd, and they did, leading to the alleged constitutional injury." Starting with the Chief and his deputies, they were sufficiently high-ranking to constitute policymakers. *Id.* at *6 ("Plaintiffs allege that the

Supervising Officers calling the shots from the command center included either the Chief of Police, or deputies with similar authority.").

In contrast to *Abdur-Rahim*, 425 F. Supp. 3d at 957, where training on the safe use of mace was the City policy, Plaintiffs are alleging that policymakers actually encouraged the very use of force which was objectively unreasonably and tolerated the infliction of pain. The question is not whether the non-lethal force can be used constitutionally; the question is whether it was used unconstitutionally under custom or policies which permitted or encouraged that use. Plaintiffs have adduced overwhelming evidence answering in the affirmative that question.

*Abdur-Rahim*, 425 F. Supp. 3d at 958, also found insufficient evidence of a failure to discipline. That finding was based on eliminating excesses which occurred after the events there, though before the protests here: "However, two of the incidents, the Pride Parade on June 17, 2017, and the #FreeMasonique Demonstration on May 4, 2019 [protesting the arrest and murder charge against the girlfriend, Masonique Saunders, of Julius Ervin Tate, Jr., who was killed by CDP officers], occurred after the Rally for the 99%. These incidents may not be used to prove a pattern of events." That reduced prior events to a single, therefore insufficient, one: "the 614 Equality March on October 23, 2016." *Id.* At bar, leaving aside qualified immunity, the events giving rise to *Abdur-Rahim* provided further notice to the City and CPD that overreaction to protests was an ongoing problem and reflected further ratification of such excesses.

The FAC alleges a longstanding custom of ratifying excessive use of force by police, rather than disciplining officers and thereby protecting the public. That custom sent a clear message to the CPD officers who indiscriminately used non-lethal force to inflict pain on nonviolent protestors: do whatever you want with impunity. *Cf. Peatross v. City of Memphis*, 818 F.3d 233, 246 (6th Cir. 2016) ("Where internal investigations repeatedly yield only 'rubber

stamps' of approval for unconstitutional conduct, it sends the message that human beings are not being killed by accident—they are being killed by design.").

The pattern or practice at bar is thus far more pervasive and demonstrable than in *Abdur-Rahim*. This Court should not hesitate to prevent more instances of excessive use of force against protestors with whose messages police officers disagree.

## VI. <u>Conclusion</u>

The police use of excessive force was in retaliation for peaceful protest of racist practices Plaintiffs and others sincerely and reasonably perceived in the way police treated minorities. This retaliation clearly violated the First, Fourth, and Fourteenth Amendments to the United States Constitution. The balance of equities here is not close: the public is best served by ensuring that such excessive force and retaliation not be repeated. Plaintiffs' Motion for a Preliminary Injunction should therefore be granted. In light of the nature of the interests involved, a security bond should not be required. *Cf. Breathe v. City of Detroit*, No. 20-12363, 2020 WL 5269789, at *6 (E.D. Mich. Sept. 4, 2020) ("Because this is a non-commercial case, the balance of equities favor Plaintiffs, and there is no realistic likelihood of harm to Defendants from enjoining their conduct, the Court waives the security bond requirement.").

Respectfully submitted,

By: */s/ Edward R. Forman*
Edward R. Forman (0076651)
(eforman@marshallforman.com)
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780


Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

James D. McNamara (0002461)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com


## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed with the Court on this 7th day of

December, 2020, using the CM/ECF system, which will send notification of such filing to all

counsel of record. Parties may access this filing through the court's filing system.

By: /s/ Edward R. Forman
Edward R. Forman (0076651)