**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAMARA K. ALSAADA, *et al.* | : | |
| | : | Civil Action No. 2:20cv3431 |
| Plaintiffs, | : | |
| | : | CHIEF JUDGE MARBLEY |
| v. | : | |
| | : | MAGISTRATE JUDGE JOLSON |
| THE CITY OF COLUMBUS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**FOP'S MOTION TO INTERVENE**

**COMBINED TABLE OF CONTENTS AND SUMMARY**

I. Overview ............................................................................................. 2

*Stupak–Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000)................. 4
*Jansen v. City of Cincinnati*, 904 F.2d 336, 339-40 (6th Cir.1990).......... 4

II. Argument …………….......................................................................... 6

  A. Impairment of FOP Interests Is Purely Speculative ……..…….. 6

  *Bay Mills Indian Cmty. v. Snyder*, 720 Fed.Appx. 754, 758 (6th Cir. 2018) 9
  *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) 10

  B. FOP Offers a Skewed View of the CBA and Ignores Its Ability to
    Protect Its Interest through the Grievance Process ……..…….. 16

      1. The "Past Practices" Provision Gives the City Unilateral
        Authority to Determine Its Scope and Is Subject to Dispute
        Only through Negotiation and Arbitration, Not Court Action.… 18

      2. The CBA's Structure Makes It Clear that the Subject
        Matter of This Action Does Not Implicate Anything
        within the Scope of "Past Practices." ……..…….. 19

      3. The CBA Cannot Limit this Court's Ability
        to Apply Federal Civil Rights Laws and Constitutional Principles 22

      4. The Contract Specifies Exactly What FOP and
        the City Are to Do Where a Lawsuit Implicates the CBA. 23

C.  Current Party-Defendants More than Adequately Protect FOP's
Cognizable ........................................................................................... 25

*Ark Encounter, LLC v. Stewart*, 311 F.R.D. 414, 426 (E.D. Ky. 2015)          25

D.  The Two Unreported Decisions FOP Appended to its Motion
Are Inapposite.................................................................................... 27

E.  Participation as *Amicus Curiae* Will Adequately Protect
FOP's Interests................................................................................... 30

*Truesdell v. Meier*, No. 3:19-CV-00066-GFVT, 2020 WL
1991402, *5 (E.D. Ky. Apr. 27, 2020........................................................ 37

III. <u>Conclusion</u> ........................................................................................... 39

## I.      <u>Overview</u>

The Fraternal Order of Police Capital City Lodge No. 9 (FOP) would have a legitimate argument for intervention if its legal interests—its interest in the ability to enforce the terms of its contract with the City of Columbus—were implicated, rather than its advocacy goals.  But that is not so here.  As discussed below, FOP's collective bargaining agreement (CBA) with the City assigns virtually every question at issue to management prerogative, acknowledges the authority of this Court to invalidate contractual provisions that run afoul of civil rights laws, and makes provision for a variety of responses (none of which involves the intervention it seeks) when a lawsuit implicates the CBA's terms.

The real interest of FOP in this action is a political interest, or a rooting interest, rather than a legitimate, legally cognizable interest that would justify allowing its full intervention as a party to this action.  FOP claims the safety of its members could be affected by any alterations to the use of force standards and types of weaponry deployed in crowd control situations by the Columbus Division of Police (CDP).  But FOP's members are not alone in that regard.

The safety of everyone in Columbus, and everyone who might visit Columbus, is affected whenever the CDP's use of force standards and weaponry change—arguably to a far greater degree than that of the officers who are ***using*** that force and those weapons against them.  A fear that a policy change might affect one's safety cannot be sufficient to allow intervention in a federal lawsuit between a specific group of people who have suffered injuries in fact and those who inflicted those injuries.

Instead, a group or individual who wishes to advocate for or against such a change has a far more appropriate role available in these proceedings:  participation as *amicus curiae*.  FOP's interests and those of the City and individual Defendants are so closely aligned that its proposed Answer, to the extent it addresses Plaintiffs' factual allegations at all, is indistinguishable from that of the actual Defendants whose actions are at issue.  FOP's interests could adequately be served, therefore, by having its voice heard as an *amicus curiae* in support of the City and individual Defendants.

Yet, in its motion to intervene, FOP seeks to be a party-defendant ***as to each and every issue before the Court*** with the full right to discovery, including depositions, requests for production of documents, requests for admissions, and interrogatories; to filing motions; to submitting lay and expert witness testimony and exhibits; to cross-examining Plaintiffs' and the City's witnesses; to objecting and arguing throughout the proceedings; to being awarded costs; and to appealing.  When applied to the CBA and FOP's proposed Answer, the standards and precedent governing intervention compel rejection of its motion.

FOP's motion is, however, superficially appealing.  After all, FOP submits two unreported opinions in support of intervention; invokes a CBA "past practices" provision that purportedly freezes every formal and informal policy of the CDP in place; imagines a threat to

officer health and safety as well as the duty to enforce laws; and declares solidarity with its member/officers who have been sued individually or maligned generally by Plaintiffs. Closer inspection reveals the defects in its motion.

The constant theme of FOP's citations is that Fed.R.Civ.P. 24 is liberally construed in favor of potential intervenors, the burden of showing satisfaction of Rule elements is minimal, and motions should be granted almost as a matter of course. That starting point does not, however, translate to granting FOP's motion. After starting there, *Stupak–Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000), held: "But this does not mean that Rule 24 poses no barrier to intervention at all." However expansively the Sixth Circuit enforces Rule 24 "does not mean that any articulated interest will do." *Coal. To Defend Affirmative Action v. Granholm*, 501 F.3d 775, 780 (6th Cir. 2007) (citations omitted).

Citing *Jansen v. City of Cincinnati*, 904 F.2d 336, 339-40 (6th Cir.1990), *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, No. 2:16-CV-524, 2016 WL 4269080, at *2 (S.D. Ohio Aug. 15, 2016), recognized a limit on expansive interpretation: "But the Court must balance these considerations against the public's and the litigants' interest in the expedient resolution of claims, which militates against measures such as the joinder of intervenors that increase the complexity and cost of a suit."

Ultimately, "[t]he proposed intervenor must prove each of the [Rule 24(a)] four factors; failure to meet one of the criteria will require that the motion to intervene be denied." *United States v. Michigan*, 424 F.3d 438, 443 (6th Cir.2005) (quoting *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir.1989)). *See also M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-CV-755, 2020 WL 1853216, at *2 (S.D. Ohio Apr. 13, 2020) ("Failure to allege a direct and substantial interest in the subject of the litigation is alone fatal to Erie's claim for intervention as of right. The Court

4

will also address, however, Erie's arguments relating to its ability to protect its asserted interests through other channels.").

For intervention as a matter of right, Rule 24(a)(2) requires that the non-party "claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). *Jansen*, 904 F.2d at 340, established four key criteria: (1) the motion to intervene is timely; (2) the proposed intervenors have a significant legal interest in the subject matter of the pending litigation; (3) the disposition of the action may impair or impede the proposed intervenors' ability to protect their legal interest; and (4) the parties to the litigation cannot adequately protect the proposed intervenors' interest.

For permissive intervention, Rule 24(b)(1) mandates that the proposed intervenor "must establish that the motion for intervention is timely and alleges at least one common question of law or fact." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005). Upon that showing, "the district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors to determine whether, in the court's discretion, intervention should be allowed." *Id.*

To date, FOP's motion has not caused any delay in proceedings. Consequently, Plaintiffs will not focus on the timeliness factor. Nonetheless, Plaintiffs submit that FOP's characterization of the date of Plaintiffs' Motion for a Preliminary Injunction as the relevant standard for measuring timeliness is wrong.

The Complaint and the Amended Complaint listed identical reforms Plaintiffs were seeking, and those were months later exported to their Motion for a Preliminary Injunction. As

of today, more than a dozen depositions have been taken, voluminous discovery and public record materials produced, and preparation nearly completed for the Preliminary Injunction hearing a few days from now.

FOP had ample notice from the outset of this litigation of the same supposed threat to its interests it now relies upon in its motion. Extensive media coverage, including live-streamed interviews and discussion about the reasons for pursuit of the case, attended commencement of this litigation. Stressed throughout was that Plaintiffs were seeking injunctive relief related to weapons use and crowd control policies and tactics. Additional publicity and coverage occurred when the pending complaint was amended to add 13 more plaintiffs. Most of the individual Defendants are FOP members. No doubt barely a week went by before FOP digested the Complaint.

## II.  Argument

### A.  Impairment of FOP Interests Is Purely Speculative.

The main bases for intervention are a single clause regarding past practices in the CBA and speculation that whatever injunctive relief the Court orders will violate one or more rights FOP members have by virtue of the CBA, leaving them with insufficient force to protect themselves from nonviolent protesters. Both on its own terms and in the context of other CBA clauses, that single clause warrants, at most, granting FOP the right to appear as an *amicus curiae* to ensure that the Court is aware of any actual conflict with the CBA.

This lawsuit seeks damages and injunctive relief for the use of excessive and/or retaliatory force against protesters in late May and June. Plaintiffs have not sued FOP. Plaintiffs have not alleged a single CBA provision is unconstitutional, facially or as applied. Plaintiffs see

no FOP barrier to damages and injunctive relief.  Only by contriving a purely speculative conflict with the CBA does FOP have any cognizable interest warranting intervention.

The Rule 24 standard is not so flimsy.  FOP must show "a direct, significant legally protectable interest" in the subject matter of the litigation, *United States v. Detroit Int'l Bridge Co.*, 7 F.3d 497, 501 (6th Cir. 1993), sufficient "to make it a real party in interest in the transaction which is the subject of the proceeding." *Providence Baptist Church v. Hillandale Committee, Ltd.*, 425 F.3d 309, 317 (6th Cir.2005) (citation omitted).

FOP's indirect, purely speculative interest does not suffice.  FOP asserts that Plaintiffs have requested "remedies that impact the collective bargaining agreement and collective-bargaining rights of the named Defendants, who are also members of the FOP."  Doc #14, PAGEID #: 613.  It claims that the injunctive relief "would effectively curtail or eliminate nearly any use of force by the Columbus Division of Police [CDP] * * * on 'non-violent protestors' of which their definition includes individuals occupying the street (without a permit) and individuals passively resisting orders." *Id.*  In turn, both CDP officers and those of mutual aid agencies, many of whom are also represented by FOP, would allegedly have their "health and safety" imperiled and "past practices" modified. *Id.* at 614.

This translates, the FOP argues, into "an immediate and vital interest in the subject matter of this litigation." *Id.*  Addressing the elements of Rule 24(a) intervention, the FOP dilutes that hyperbole: "The disposition of this case may impair or impede, as a practical matter, the FOP's ability to protect its interests.  * * * A decision favorable to the Plaintiffs in this case plainly could impact several provisions of the FOP Contract."  Doc #14, PAGEID #:  619.

FOP also invokes Rule 24(b), asserting common questions of fact "related to the use of force by FOP members" and law on "whether the Plaintiffs are entitled to a remedy that would alter, amend, or contravene specific provisions [of the CBA]." Doc #14, PAGEID #: 622-23.

Ignoring the grievance, arbitration, and Ohio statutory framework for public employees' unions, FOP cites the Rule 24 policy against a multiplicity of suits and submits that "it would defeat the purpose of the rule to force the FOP to subsequently litigate the effects upon its Contract that result from the instant case." Doc #14, PAGEID #: 623.

In fact, FOP blatantly seeks to transcend a role in this litigation that directly pertains to the CBA. This Court has the power to condition intervention on an FOP role that so pertains to the CBA. Under Rule 24, "courts are not faced with an all-or-nothing choice between grant or denial: Rule 24 also provides for limited-in-scope intervention. See Fed.R.Civ.P. 24, advisory committee's note, 1966 amendments ('Intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.')." *United States v. City of Detroit*, 712 F.3d 925, 931–33 (6th Cir. 2013). *Accord Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 963, n.1 (6th Cir. 2009) ("Federal courts have the authority to apply appropriate conditions or restrictions on an intervention as of right.").

Conditioning any FOP participation, whether as an intervenor or an *amicus curiae*, on its input about the CBA is consistent with this Court's role in the type of civil rights and tort action Plaintiffs have brought. *See, e.g., United States v. Tennessee,* 260 F.3d 587, 593 (6th Cir.2001) ("[S]hould CMRA hope, through intervention, to obtain higher rates and fewer obligations for community providers, this forum is not the appropriate forum to seek such relief."); *S.H. v. Stickrath,* 251 F.R.D. 293, 302 (S.D.Ohio 2008) (finding that a factor against intervention was

the exclusive jurisdiction of the state employment-relations board over a claim of violation of CBA rights).

FOP's proposed Answer demonstrates that it is piling on to support the City and individual Defendants, rather than asserting its own interests. "[P]leading similar responses" does not establish that a proposed intervenor shares a common question of law or fact. *Bay Mills Indian Cmty.*, 720 Fed.Appx. at 757. "[I]f that were true, any party wishing to intervene to support one side of a lawsuit could simply reiterate the pleadings of that side and thus meet the 'common question' requirement. Permissive intervention cannot be interpreted so broadly." *Id.* at 757–58. *Accord Kirsch v. Dean*, 733 Fed.Appx. 268, 279 (6th Cir. 2018) ("[W]e have previously rejected the suggestion that a proposed intervenor seeking to submit a filing that 'substantially mirror[s] the positions advanced' by one of the parties has necessarily identified a common question of law or fact.") (quoting *Bay Mills*).

Plaintiffs assume that FOP sincerely believes that the City and individual Defendants did not engage in excessive or retaliatory force. Its interests on this point are identical to the current party-defendants. To justify intervention FOP could not assert those interests – though as the analysis below of its proposed Answer reflects, that is precisely what FOP has done – and instead had to manufacture a threat to the CBA. *Kirsch*, 733 Fed.Appx. at 279 (citation omitted), held: "[A] proposed intervenor may not inject itself into a lawsuit under Rule 24(b) where, like here, it has no interest in a factual or legal dispute between the parties, but instead is merely concerned that resolution of the parties' claims might have collateral consequences for the proposed intervenor's independent interests. Such orthogonal concerns do not raise common questions of fact or law."

The "inquiry into the substantiality of the claimed interest is necessarily fact-specific." *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997). *Accord Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) (internal quotations and citation omitted). That inquiry demands an intensive review of FOP's interests.

The best measure of FOP's interests in becoming a party-defendant is the proposed Answer it seeks to file. Rule 24 explicitly requires that the proposed intervenor "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). The most obvious place in FOP's proposed Answer to identify its claims or defenses is the Affirmative Defenses.

The first affirmative defense is that Plaintiffs have failed to state any claims upon which relief can be stated. As the below inventory of the proposed Answer demonstrates, Plaintiffs never stated any claims against the FOP. In ¶ 1 (emphasis noted) of its proposed Answer, FOP refers to that point: "In response to the allegations contained in Paragraph 1 of the Amended Complaint, FOP states that the events occurred, but ***FOP denies any involvement in the events***." The first affirmative defense thus involves a Fed.R.Civ.P. 12(b)(6) motion that only the City and individual defendants could bring. That motion tests the merits, not remedies, and FOP's interests are identical in this regard to those of the City and individual defendants and raise no distinctive interests pertaining to the FOP.

The second affirmative defense is that Plaintiffs have failed to mitigate alleged damages. Yet Plaintiffs have not sought a single penny from the FOP, and only the City and individual defendants are exposed to a damages award. Whatever interest the FOP has in injunctive relief does not extend to damages. Again, FOP's interests are identical in this regard to those of the City and individual defendants and raise no distinctive interests pertaining to the FOP.

The third affirmative defense is a combination: Plaintiffs lack standing to seek declaratory or injunctive relief, though, if they did, they would not be entitled to such relief. Standing and entitlement are related merits issues.  From its status as a party to the CBA, FOP has no interest different from the City and individual defendants on Plaintiffs' standing and entitlement in general.  The speculation that any declaratory or injunctive relief granted by this Court would impair FOP interests is addressed further below.  Importantly, confining FOP to participation as an *amicus curiae*, which is analyzed thoroughly below, would serve its interests in the CBA.

The fourth affirmative defense mounts another damages defense: "FOP acted in good faith at all relevant times herein consistent with applicable state and federal laws."  The fact that Plaintiffs have neither sued FOP nor asserted that a single provision of the CBA is unconstitutional makes one wonder what FOP's good faith, if any, has to do with this litigation.

The final affirmative defense is a placeholder: "FOP hereby reserves its right to supplement its affirmative defenses as discovery proceeds."  That placeholder lacks any legal purpose.  Fed.R.Civ.P. 15 and pretrial scheduling orders govern amending pleadings.  FOP's boilerplate does not circumvent either the Rule or this Court's orders.  Nor does it create a distinctive interest that only intervention could protect.

Plaintiffs have also inventoried the factual portion of FOP's proposed Answer.  Identical language, apart from the numbered paragraph in the Amended Complaint to which an Answer responds, is used in two variations throughout.  The inventory irrefutably establishes that FOP has no business becoming a party-defendant.

The first variation is: "The allegations contained in Paragraph [##] of the Amended Complaint are not directed at FOP and therefore no response is required.  To the extent a

response is required, FOP lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in Paragraph [##] of the Amended Complaint."

The second variation is: "The allegations contained in Paragraph [##] of the Amended Complaint are not directed at FOP and therefore no response is required. To the extent a response is required, FOP denies the allegations contained in Paragraph [##] of the Amended Complaint."  While both variations begin with the same observation – the Amended Complaint directs no allegations at FOP – they end in either a lack of knowledge or information phrase or a denial.

The phrase that the allegations were not directed at FOP appears *642* separate times.

The phrase admitting to a lack of knowledge or information appears *372* separate times.

There were a few paragraphs of the FOP Answer that provided a glimpse of its position beyond denial.  In nearly all those paragraphs, FOP does not confine itself to its role as an exclusive bargaining representative but instead adds its voice to the assertions about facts made by its members.  For example, ¶ 314 reads: "In response to the allegations contained in Paragraph 314 of the Amended Complaint, FOP states that members of the crowd threw various objects at officers, including water bottles, chunks of concrete, and rocks, and launched fireworks at officers."  The City and individual Defendants hardly need a third-party's rendition of the facts to add to their own, and repetition of assertions does not warrant intervention. FOP's confusion of its primary justification for intervening – preserve and protect the CBA – with its desire to advocate for its members exemplifies why allowing intervention as a party would be ill-advised.

As the above inventory reveals, throughout the Answer the refrain is that "[t] he allegations contained in Paragraph [##] of the Amended Complaint are not directed at FOP and

therefore no response is required."  The allegations in ¶ 314 of the Complaint are no more directed at FOP than nearly all the other allegations: "At this point, a few individuals in the back of the huge crowd, who were not among those sitting close to the SWAT officers, threw several water bottles at them."  The FOP wants to intermeddle, not just intervene.

This propensity is particularly unwarranted because in the preceding two paragraphs about Plaintiff's Garth's actions, the FOP lacked information sufficient to respond, while it denied the allegation in ¶311 of the Complaint: "Because there was no vehicular traffic on Broad or High Streets, there was no reason for the protestors to be removed from the streets."

The pattern is unmistakable.  In ¶13, FOP volunteers: "FOP states that many demonstrators acted lawfully and peacefully, but others engaged in unlawful, violent acts."  In ¶17, it adds: "FOP states that all Plaintiffs enjoy the rights contained in the First Amendment." In ¶60, it boasts "FOP states that it opposes racism and excessive uses of force."  In ¶64, it repeats that boast.  In ¶68, it conditionally admits the obvious: "FOP states that, upon information and belief, Black Lives Matter has demonstrated for causes such as racial and criminal justice."

In ¶¶76; 77, "FOP denies that Plaintiffs are fully and accurately quoting R.C. 2917.04(B) in its entirety."  ¶87 regarded politically motivated police misconduct, and it added its view: "FOP states that many media outlets reported on the ongoing dispute between Ms. Clifford and President Trump pertaining to the affair and non-disclosure agreement."  Similarly, it provided insight in ¶94: "FOP states that a baton, like any use of force, has the potential to cause pain or injury."

In ¶141, it described past use of force: "FOP states that: (a) two Columbus police officers shot and killed a 23-year-old African-American male named Henry Green on June 6, 2016 in the

neighborhood of South Linden; (b) the neighborhood of South Linden is predominantly Black; and (c) a Columbus police officer shot and killed a 13-year-old African-American male named Tyre King on September 14, 2016."

After admitting in ¶146 to the salary range of CDP officers, ¶147 started a run of FOP comments: "FOP states that benefits are based on a collective bargaining agreement ('CBA') between the City of Columbus and FOP."  One of those benefits was the subject of ¶148: "FOP states that Columbus Police Officers receive special duty pay based upon a CBA between the City of Columbus and FOP."

The nature of policing caught FOP's attention in ¶¶149-51: "FOP states that policing can be very dangerous, and that officer safety is very important.  * * * FOP states that policing can be very dangerous, and that other professions can be dangerous as well. * * * FOP states that time spent on violent crime will vary depending on multiple factors, and that policing can be very dangerous and that dealing with violent crime is especially dangerous."

Paragraph 158 described one of the perquisites police officers have, and FOP justified it: "FOP states that an Ohio political subdivision's duty to defend and indemnify its employees is statutorily defined by the Ohio Revised Code."  In ¶171, FOP responded to an allegation about discipline: "FOP states that Director Pettus terminated Rosen's employment but an arbitrator reinstated Rosen with full back pay and benefits less a 24-hour suspension initially issued by Chief Jacobs."  In ¶173, it quibbled: "FOP states that Mr. Pappas did provide the statement, but FOP denies that the statement represents Mr. Pappas' entire quote."

These scattered statements give a sense of the narrow, limited, and partisan input FOP would provide as a party-defendant.  ¶284 carries its members' banner: "FOP states that Columbus Division of Police ("CPD") officers gave warnings before using any force that is at

14

issue in this lawsuit." ¶457 made the same point: "FOP states that CPD Officers gave reasonable warnings and provided reasonable opportunities to comply before using force." Then ¶458 added for emphasis: "FOP states that CPD Officers gave reasonable warnings and provided reasonable opportunities to comply before using force." Notably, the lack of sufficient information to plead or a bald denial accompanies nearly every response to a Plaintiff's specific allegations.

In ¶523, the input was barely discernible: "FOP states that some officers wore black helmets, masks, and uniforms." While in ¶604, the allegation was undeniable and unavoidable: "FOP states that the City-wide curfew was rescinded on June 6, 2020."

Even when FOP admits the allegations in the Complaint, it offers nothing of distinctive substance and exceeds its primary purpose. For example, ¶ 480 of the proposed Answer reads: "The allegations contained in Paragraph 480 of the Amended Complaint are not directed at FOP and therefore no response is required. To the extent a response is required, FOP admits the allegations contained in Paragraph 480 of the Amended Complaint." The allegation the FOP magnanimously admits was, "The sun was out, and the area around Mr. Kaigler was well lit." The same result obtained regarding Plaintiff Lynch in ¶531: "FOP admits that the area was well lit." The allegation, though, was: All of these events took place in an open, well lit, and relatively calm area." Amended Complaint, ¶531.

The same dynamic occurs in ¶582 of the proposed Answer: "The allegations contained in Paragraph 582 of the Amended Complaint are not directed at FOP and therefore no response is required. To the extent a response is required, FOP admits the allegations contained in Paragraph 582 of the Amended Complaint." The paragraph in the Amended Complaint alleged that Mayor

Ginther had instituted a city-wide curfew.  The FOP was at least willing to admit unconditionally that a lawsuit had been filed against the curfew.  ¶603.

If there are witnesses known to FOP who have unique knowledge about the circumstances surrounding the use of force against nonviolent protesters, nothing prevents FOP from informing the City and individual Defendants of their identity—and the City and/or individual Defendants will no doubt call them, as they have every incentive to do so in their own defense.  Becoming a party-defendant is neither required for nor appropriate to providing such testimony.

If FOP has expert testimony which satisfies the Federal Rules of Evidence, then the Defendants may put that testimony forward so it can be subjected, if appropriate, to a *Daubert* motion and hearing.  But to allow intervention so that a third party can submit facts beyond the primary justification for its intervention perverts Rule 24.  *See Davis v. Lifetime Capital, Inc.*, 560 Fed.Appx. 477, 491 (6th Cir. 2014) ("If a third party seeks merely an opportunity to present an argument or expertise, participation as an *amicus curiae* may adequately protect its interests.") (citation omitted).

Any intervention must, therefore, be confined to issues directly pertinent to the CBA, in contrast to issues of fact which did not involve FOP and on which it simply wants to chime in, magnifying the testimony of its members who are Defendants and defending the City and its officials on the absence of excessive and/or retaliatory force.  In other words, the scope of intervention should not exceed the justification for intervention.  Participating as an *amicus curiae* could ensure that congruency by allowing FOP to inform the Court on potential conflict with the CBA

### B. FOP Offers a Skewed View of the CBA and Ignores Its Ability to Protect Its Interest through the Grievance Process

A critical aspect of intervention is that "the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention[.]" *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007).  FOP has not alleged, not could it, that the grievance process has failed to protect its interests in the past.

As a District Court recently explained, "The Court, however, is less suited to resolve collective bargaining disputes than the mechanisms established specifically for these disputes. For instance, the state court is better positioned to handle a breach-of-contract dispute, because the dispute arises under state contract law, and because a breach-of-contract lawsuit would be focused solely on the CBA rather than the CBA being a small part of a massive lawsuit." *United States v. City of Albuquerque,* No. CIV 14-1025 JB\SMV, 2020 WL 3129825, at *79 (D.N.M. June 12, 2020) (concluding that bound by Tenth Circuit not to consider alternative protection, so not "writing on a clean slate").

That Court explained that "both state and municipal ordinances protect the CBA, and both systems have established detailed procedures to handle these sorts of disputes. Moreover, the bargaining table is the logical place for Albuquerque and the Officers Association to resolve disputes over the collective bargaining agreement." *Id.*  In the Sixth Circuit, *Boggess v. Price*, 2005 WL 1385943, *5 (6th Cir. June 10, 2005), protective mechanisms other than intervention were canvassed, and the Court concluded "the proposed intervenors need not take part in the current litigation to preserve their potential right to distribution of those damages. If necessary, they may instead fight for their share of the total damages when and where those damages are distributed." *See also Penman v. Correct Care Sols., LLC,* No. 518CV00058TBRLLK, 2020 WL 6318509, at *6 (W.D. Ky. Oct. 28, 2020) ("This [alternative] further demonstrates that Mr. Penman's ability to protect his interest would not be impaired in the absence of intervention.").

If the City changes past practices, exercises its management rights, or modifies directives, the CBA establishes the alternative forum of grievance/arbitration for FOP to protect its interests. The FOP's interest in past practices that are unconstitutional as applied does not deserve protection; its interest in constitutional past practices is fully protected by the grievance process; and its interests in defending the constitutionality of past practices can sufficiently be served by allowing it to participate as an *amicus curiae*. Intervention is an inappropriate method when the alternative method is both available and presumably effective.

          1.     The "Past Practices" Provision Gives the City Unilateral Authority to Determine Its Scope and Is Subject to Dispute Only through Negotiation and Arbitration, Not Court Action.

In relying on the "past practices" provision, FOP treats the provision as a freeze on CDP change and a bulwark against judicial relief that affects the entire range of current CDP practices. That is not at all what the "past practices" provision says, let alone how that provision must be interpreted in the context of the provisions in the CBA addressing "Management Rights" and "Directives." Accurately understood, this basis for intervention disintegrates: FOP lacks the very interest on which it relies.

Article 2.7 of the CBA is headed, "Past Benefits and Practices." The first sentence lends itself to FOP's interpretation: "The City agrees to continue all existing practices and benefits during the term of this Contract." The rest of the paragraph undermines FOP's interpretation. First, the CDP Chief and City Public Safety Director "shall determine all past practices and benefits." In other words, the Chief and Director can determine, for example, that this paragraph refers to employee practices and compensation, rather than how police use chemical and less-lethal force.

Second, the ultimate remedy the FOP bargained for was the grievance/arbitration process. An effort by the FOP to seek injunctive relief in a court to stop the City from altering an alleged past practice would be barred. Instead, FOP may seek only "a final and binding decision by an arbitrator as to whether or not a past practice or benefit exists." Art. 2.7.

Third, an intermediate remedy the City and FOP bargained for was ongoing negotiation: "Nothing herein precludes the parties, through the Labor Relations Committee process, from discussing whether a past practice or benefit exists." *Id.*

The Past Practices provision thus only freezes the City and CDP subject to their unilateral thaw. FOP agreed to the typical remedy in labor relations: negotiation and the grievance/ arbitration process. Intervening in a civil rights and tort lawsuit to prevent injunctive relief which conceivably could change a past practice is beyond the pale.

> 2. The CBA's Structure Makes It Clear that the Subject Matter of This Action Does Not Implicate Anything within the Scope of "Past Practices."

Like any contract, the provisions of the CBA, including the "Past Practices" provision, must be read together, in their full context. Here, the remainder of the CBA makes it abundantly clear that the City and FOP never intended the "Past Practices" provision to prevent updates to the CDP's policies and procedures addressing issues like use of force standards and munitions. In fact, the CBA specifically places such decisions entirely in the hands of management.

Article 7.1 is headed, "Management Rights." Subject to conditions in the CBA that are not implicated here, "the City retains the right and responsibility, regardless of the frequency of exercise, to operate and manage its affairs in each and every respect." That section then lists specific rights and responsibilities, including: "(I) To determine the location, methods, means and sworn personnel by which operations are to be conducted; (J) To change or eliminate existing methods of operation, equipment, or facilities; (K) To create, modify or delete

departmental rules and regulations; * * * (O) To specify and determine where, when, and how members will use tools, vehicles, supplies, equipment, uniform clothing and protective gear." Those specific rights and responsibilities considerably overlap with the interests FOP asserts to justify intervention.

The remarkable interpretation FOP asserts is that the Past Practices provision nullifies any exercise of management power that changes past practices or benefits. What was retained, under that view, concerns only new practices or benefits. Whatever "means" were used to conduct operations had to be retained, whatever "equipment" had been supplied had to continue to be supplied, whatever way "protective gear" had been used was etched in stone. That is an unreasonable interpretation of ¶7.1—a more specific provision of the contract than the "Past Practices" provision, and one that amplifies management's unilateral right to define the scope of that provision.

Again, though, this Court is not the proper forum for making that interpretation. ¶7.1 ends with a critical sentence: "The exercise of management rights that allegedly violate specific provisions of this Contract are subject to the Grievance Procedure." If the City and CDP alter practices covered in the Management Rights provision, FOP may pursue the grievance process— though only if some specific provision of the contract (*i.e.*, something far more detailed than the "Past Practices" section) conflicts. But, as discussed in the next subsection, if this Court enjoins such past practices that, as applied, violated the Fourth Amendment ban on excessive force or the First Amendment ban on retaliatory force, whatever the CBA provides must yield.

Article 7 is not the only clarification of what the City and CDP can and cannot change without FOP consent. Article 14.1, "Rules and Directives," is even more specific. ¶14.1 begins with a promise to reduce to writing and disseminate "work rules and Division Directives . . .

[seven days] in advance of their enforcement," but other than that procedural requirement, no substantive restriction is imposed.  The only substantive restriction on altering directives once again comes in the form of the right of FOP or its members to file a grievance, and that restriction is once again limited in scope to circumstances where the change to a directive "is in violation of this Contract, or has not been applied or interpreted uniformly to all members."  *Id.* In other words, there is no blanket right of FOP to negotiate new directives, and even its right to file a grievance must be based on some other, specific aspect of the CBA.

It is clear that no such aspect of the CBA would be implicated by any change sought in the Plaintiffs' motion for preliminary injunction.  For instance, both sides have addressed in discussing that motion a recent modification of Directive 2.04 on chemical agents.  They have also discussed the unchanged directives on use of rubber and wooden bullets, bicycles, and related force.  None of these topics are subject to collective bargaining.  For instance, the FOP has suggested in its filing that the ban on tear gas for crowd control endangers its members, yet *Plaintiffs are unaware of, and FOP does not mention, any grievance over that modification.*

The bottom line is that the City and CDP are not restrained in modifying the policies, such as use of chemical and less-lethal force, rubber and wooden bullets, and bicycles as battering rams, that Plaintiffs have attacked.  The Past Practices provision also does not restrict the City from modifying such policies or making a determination that they are not within the scope of that provision.   All three provisions—Past Practices, Management Rights, and Directives—subject the City to a grievance process (in which this Court plays no role), but none of them substantively limits the discretion of the City and CDP.  Rather than use the remedies it bargained for in the CBA—and in fact, very likely *because* it knows those remedies have no

applicability to the policies that are at issue—FOP seeks to intervene in this action to prevent any court-ordered modification of CDP policies.

> 3.  The CBA Cannot Limit this Court's Ability to Apply Federal Civil Rights Laws and Constitutional Principles.

None of the provisions discussed above in any way restricts the judicial relief this Court might order upon a determination of unconstitutional conduct.  The principle that CBA provisions are trumped by injunctive relief to remedy constitutional violations is enshrined in federal precedent.  *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 203 (1944) ("[I]t is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious.").  *Accord Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2478, 2486 (2018) ("We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views.  * * * This [agency fees] procedure violates the First Amendment and cannot continue.").

The same supremacy is mandated by the Ohio Revised Code.  R.C. §4117.10(A)(1)(a) establishes that "civil rights" laws "prevail over conflicting provisions of agreements between employee organizations and public employers."  FOP lacks a protectable interest in CBA provisions that enable use of excessive and/or retaliatory force.  *See S.H.*, 251 F.R.D. at 302 ("Because the stipulated injunction remedies a host of unconstitutional conditions of confinement at ODYS facilities, by Ohio law its implementation prevails over competing statutory or contractual obligations to OCSEA. The rational is simple: the constitutional rights of incarcerated youth to adequate health care and education, saying nothing of their right to be free

from violence and abuse, trump the statutory and contractual rights of the prison staff to determine the terms and conditions of their employment.").

If the City and FOP followed a consistent practice of censoring all speech by a police officer on a matter of public concern as conduct unbecoming whenever the speech exposed corruption or other misconduct, neither would dare to argue to this Court that the Past Practices provision prevented judicial relief enjoining that practice.  The past practices of the FOP and police departments have included racial and sex segregation, retaliation against civil rights and antiwar protesters, and use of unconstitutional deadly force.  Courts have not hesitated to vindicate civil rights, *see, e.g., Tennessee v. Garner*, 471 U.S. 1 (1985), and, upon the requisite showing of excessive and/or retaliatory force against nonviolent protesters, injunctive relief against past practices may be ordered.

     4.    The Contract Specifies Exactly What FOP and the City Are to Do Where a Lawsuit Implicates the CBA.

Such an order would not, however, judicially alter the Past Practices provision.  Such an order would operate independently of that provision.  Indeed, the CBA anticipates litigation and provides an approach for the parties to protect their interests—an approach that has nothing to do with FOP intervention.  Article 2.3(A) of the CBA provides that "[t]his Contract shall be subject to all applicable law(s)."  Then, Article 2.3(B) refers to litigation where the City or FOP, but not both, is a party and "any party seeks a determination from the tribunal which would interpret, invalidate, restrain, or apply to a set of facts affecting any provision of this Contract[.]"  The bargained-for duty also stated:  "the City . . . shall notify the other of the proceeding within a reasonable period of time."

Next, Article 2.3(C) addresses an injunction and preserves severability: "Should any part of this Contract be held invalid by operation of law or by any tribunal of competent jurisdiction,

or should compliance with or enforcement of any part of this Contract be restrained by any such tribunal pending a final determination as to its validity, such invalidation or temporary restraint shall not invalidate or affect the remaining portions hereof[.]" Finally, Article 2.3(D) concerns "invalidation of any portion" of the CBA and provides the process for "an attempt to modify the invalidated provisions by good faith negotiations" or the CBA's dispute resolution procedure.

Notably, intervention is not mentioned—for instance, there is no provision requiring the City or FOP to consent to a motion by the other to intervene in an action implicating a CBA provision. Instead, the City and FOP bargained to protect their interests by triggering negotiations and the CBA's processes for resolving disputes.

In any event, as discussed above, a collision is exceedingly unlikely at bar. Plaintiffs have not challenged a single CBA provision. Beyond that, a reasonable interpretation of the CBA evaporates any threat to the interest FOP asserts.

Read together, the CBA's provisions establish that CDP past practices and benefits may be changed and that the substantive actions of the CDP's officers here—their standards for using force and the munitions and other force deployed against the Plaintiffs—are entirely within management's prerogatives to change, as are the CDP's applicable directives. Although these provisions acknowledge FOP's ability to question such changes, the remedy is limited to the grievance and arbitration process, and even that remedy is available only where (unlike here) a modification of a policy or practice would actually conflict with some separate contractual right of FOP or its members. In all other cases, the most the City must do is provide minimal advance notice of any policy changes. FOP can far exceed its right to that notice here, and even insert itself more substantively into the decision-making process than it is entitled to under the contract, by participating in an amicus capacity.

## C. Current Party-Defendants More than Adequately Protect FOP's Cognizable Interests.

"[P]roposed intervenors bear the burden of demonstrating inadequate representation." *Purnell v. City of Akron*, 925 F.2d 941, 949 (6th Cir. 1991).  Three main factors are considered: (1) whether there is collusion between the representative and an opposing party; (2) whether the representative fails in the fulfillment of its duty; and (3) whether the representative has an interest adverse to the proposed intervenor.  *Id.* at 949–50 (citing *Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1227–28 (6th Cir.1984)).

In applying those factors, a practical reality is that "[w]hen a proposed intervenor and an existing party to the suit share the same ultimate objective in the litigation, courts presume that the existing party adequately represents the intervener's interests."  *State v. United States Envtl. Prot. Agency*, 313 F.R.D. 65, 69 (S.D. Ohio 2016).  The presumption is rebutted upon a showing "that there is substantial doubt about whether [the intervener's] interests are being adequately represented by an existing party."  *Bds. of Trs. of the Ohio Laborers' Fringe Benefit Programs v. Ford Dev. Corp.*, No. 2:10–cv–140, 2010 WL 3365927, at *4 (S.D.Ohio Aug. 20, 2010).

The existence of "a slight difference in interests . . . does not necessarily show inadequacy, if they both seek the same outcome."  *Jansen*, 904 F.2d at 343.  *Ark Encounter, LLC v. Stewart*, 311 F.R.D. 414, 426 (E.D. Ky. 2015), applied this principle: "While proposed intervenors' perspective is different from that of the Commonwealth, they have not demonstrated their contribution to the litigation will add unique value such that intervention is necessary."  In *Ark Encounter*, the proposed intervenors claimed that "they will more 'zealously advance' the argument" over a constitutional violation, but, as the FOP at bar, "they do not identify how they would actually present different arguments that would contribute to the litigation in a way that would require intervention."  *Id.*

25

While the interests need not be wholly adverse, *Jansen*, 904 F.2d at 343, FOP essentially claims that an employer and union intrinsically have sufficiently adverse interests.  As shown above in the analysis of FOP's proposed Answer, that assumption should be rejected at bar.  "A disagreement over litigation strategy, however, does not establish inadequate representation." *State*, 313 F.R.D. at 69.  Unions do not automatically satisfy Rule 24.  Because some purely speculative impact on a CBA can always be conceived, the mere assertion of such an interest must be closely scrutinized to avoid giving unions a free pass to becoming a party through intervention.

There is no doubt that the City and individual Defendants can adequately protect FOP's interests in the health and safety of police officers.  FOP identifies its members as individual Defendants, and the City is obviously committed to the health and safety of its police officers.  The conflict with the CBA alleged by the FOP is illusory.  There has been no collusion whatsoever between the Plaintiffs and the City or individual Defendants, against whom the Plaintiffs are seeking damages, costs, and attorneys' fees.  The Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction exemplifies adversariness.

The notion that the City and individual Defendants have failed in their duty to protect FOP's cognizable interests is fatuous.  All injunctive relief is being opposed by the City and individual Defendants.  Whatever portion of such relief might conceivably affect the CBA is well guarded by the reluctance of the City to budge an inch on its CDP practices beyond changes already made and, as detailed earlier, subject to FOP challenge through a grievance process.

Rather than having adverse interests, the City and individual Defendants are aligned: FOP's proposed Answer consistently takes the same position as the City and individual Defendants and volunteers to justify the force used even while recognizing that no allegation was

made against the FOP.  The proposed Answer fails to identify adverse interests or even to allege in what way the CBA is threatened, let alone how, to what extent, and where the interests diverge.  *See State*, 313 F.R.D. at 70-71 ("And although the Farm Bureau suggests that it might advance arguments that Plaintiffs would neglect or decline to make, the Farm Bureau does not specifically identify any such argument.  * * *  [A]lthough the Farm Bureau and the Environmental Groups have argued that they might present arguments different from those that the existing parties would present, neither of the proposed intervenors has identified a distinct argument that it might advance").

FOP and the City and individual Defendants "share the same ultimate objective in this litigation," and FOP has not "overcome a presumption of adequate representation by showing that there is substantial doubt as to whether its interests are being adequately represented" by the City and individual Defendants.  *State*, 313 F.R.D. at 69.

### D.  The Two Unreported Decisions FOP Appended to its Motion Are Inapposite.

Quite unlike the two opinions the FOP appended in support of its motion, FOP's interests are purely speculative, not even addressed in its proposed Answer, based on a woeful misreading of the CBA, and adequately protected both by the current Defendants and its alternatives to intervention.  In *United States v. City of Columbus*, 2:99-CV-1097, at 4 (S.D. Ohio, Feb. 7, 2000) (Magistrate Judge King), filed as Doc #: 14-5, PAGEID #: 1047, the FOP contended that a proposed consent decree conflicted with at least 44 sections of the CBA and violated the City's duty to bargain over proposed changes.

At bar, there is no proposed consent decree.  Not a single CBA section has been affected or threatened.  The City has not used this litigation to avoid any duty to bargain.  Beyond all that, there, the United States conceded that the Past Practices CBA provision "would be impacted by

the grant of any relief in action."  Here, Plaintiffs do not so concede and, instead, have shown above that injunctive relief would not likely have any effect on the CBA provision FOP invokes.

In *United States v. City of Columbus,* 2:99-CV-1097, at 5, Doc #: 14-5, PAGEID #: 1048 (footnote omitted), Magistrate Judge King reasoned that, "[t]o the extent that §2.7 confers rights and expectations upon the FOP and its members, those rights and expectations are placed directly at issue by the allegations of the complaint."  No reference was made to any Management Rights or Rules and Directives CBA provisions.  Nor was the point discussed that, at least as now written, the Past Practices provision is procedural, not substantive, conferring only the right and expectation of the grievance process.

Consequently, the reasoning at 6 there is unpersuasive here: "Such a decision may preclude enforcement of the clause by the FOP; at a minimum, should the United States prevail, the defendant city may very well be subjected to a substantial risk of inconsistent obligations to the FOP."  FOP enforcement of Past Practices is through the grievance process, but until an actual conflict, like the proposed consent decree there, any impact on enforcement is unmeasurable.

Magistrate King did observe, at 8, that the interests of employers and unions "are unlikely to be entirely congruent or coextensive."  The very next sentence was: "Under the circumstances presented in this case, and in light of the fact that neither of the existing parties to the litigation opposes intervention by the FOP, the court concludes that the FOP has met the final test for intervention as of right under F.R.Civ.P. 24(a) (2)."  *Id.*  Plaintiffs oppose FOP intervention at bar, and the circumstances are quite different.

Responding to the original parties' position that intervention should be limited to protecting the CBA, Magistrate King made a salient observation, at 8-9: "It is also

unquestionably true that the only legally protectable interest justifying the FOP's intervention in the case is its defense of its rights under the CBA. In theory, FOP's participation in the litigation can be no greater than its interest." She then punted application of that theory until "the context of an actual dispute" over FOP's actions as a party-defendant. *Id.*

In *Shreve v. Franklin County, Ohio*, Case No. 2:10-cv-644, 1 (S.D. Ohio, Jan. 25, 2011) (Judge Sargus), intervention was permitted in a "class action seek[ing] to enjoin an alleged pervasive practice of sheriff's deputies at the Franklin County, Ohio, Corrections Centers subjecting prisoners to excessive force through the use of stun guns manufactured by TASER International, Inc."

Unlike the FOP at bar, its predecessor precisely identified, at 4, its interests: "Specifically, the FOP points to the prayer for relief of the United States' Complaint in Intervention, which, inter alia, requests the Court to appoint an expert 'to monitor, review, and oversee all uses of force involving deployment of tasers by Franklin County Sheriffs corrections deputies and to recommend appropriate discipline and conduct training of deputies where warranted.'" Judge Sargus accepted FOP's focus – "should this relief be granted, it will impact certain provisions in the CBA, including a provision prohibiting the change by the Sheriff of 'past practices' not specifically covered by the CBA in the absence of good faith negotiations, provisions of the CBA governing the discipline of deputies, and provisions of the CBA guaranteeing the FOP negotiating rights for matters affecting deputy working conditions and safety." *Id.*

Judge Sargus added, at 6, in distinguishing *Alston v. Coughlin*, 109 F.R.D. 609 (S.D.N.Y. 1986), which denied intervention in a prison overcrowding case where the plaintiffs "neither allege defects in the seniority-based assignment system nor seek to change that system," because

"[t]he FOP has pointed to specific provisions of the CBA that could be affected should the relief sought by Plaintiffs be granted, whereas, in *Alston*, there was no direct connection between the overcrowding of the prison and the seniority rights of the corrections staff."  FOP's position at bar resembles *Alston*.

Thus, not only were substantive CBA provisions invoked, but there was also a single target – injunctive relief appointing an expert monitor to oversee use of force – which differs from FOP's generic focus at bar.  Judge Sargus reasoned, at 7, that FOP "should be heard" before CBA provisions were "vitiated."  Plaintiffs explain, in the next subsection, that FOP should indeed be heard, but as an *amicus curiae* rather than a party-defendant.  Above Plaintiffs have shown that not a single CBA provision would be "vitiated" by injunctive relief at bar.

Each intervention motion depends on a "fact-specific" inquiry about the interests at stake. *Michigan State AFL–CIO*, 103 F.3d at 1245.  Thus, that FOP was permitted to intervene in two prior cases does not establish precedent that it is permitted to intervene at bar or in every case involving parties to its CBA and/or its members.  To the contrary, critical distinctions with those prior cases and what is now before the Court reinforce Plaintiffs' position that the FOP motion to intervene should be denied.

### E.  Participation as *Amicus Curiae* Will Adequately Protect FOP's Interests

The Sixth Circuit has repeatedly recognized that participation as *amicus curiae* may adequately serve the interests asserted by a putative intervenor.  Especially when the interests of the putative intervenor focus on any relief were constitutional violations found, the role of *amicus curiae* is perfectly suited for protecting its interests.  Relief is a matter of judicial discretion, and an *amicus curiae* can direct the Court to what it should consider in exercising that

discretion, including any conflict with a CBA or threat to the health and safety of its membership.

As the above inventory of FOP's proposed Answer reflects, the liability claims brought by the Plaintiffs have barely anything to do with the FOP, and the allegations about the compensation or benefits of police officers were only for background.  Plaintiffs have not alleged that the compensation or benefits should be changed or otherwise put in play the CBA provisions on them.

While FOP members are being sued and were using force against nonviolent protesters, ***no court has ever held that an association, union, or other membership may intervene simply because its members are being sued***.  This Court should not open the door to AARP (American Association of Retired People) participating as a party-plaintiff in Age Discrimination in Employment Act cases or the AAA (American Automobile Association) participating as a party-defendant in a collision personal injury, while the NAM (National Association of Manufacturers) participates in the defense of product liability claims, and the Retail Merchants Association does so for shoplifting.  *See, e.g., Bay Mills Indian Cmty. v. Snyder*, 720 Fed.Appx. 754, 758 (6th Cir. 2018) ("Allowing [overlapping statutory interpretation] to fulfill the 'common question' requirement would mean that any Indian tribe would be able to intervene whenever IGRA is implicated in any way—or, to analogize, it would allow any employer to intervene in any Title VII suit. Such an interpretation would be much too broad.").

For that matter, FOP's basis for intervention is a two-way street.  Under the FOP's approach, lacking virtually any specific factual or legal claims other than taking a position on the verity of the factual contentions of the present parties, any group such as the NAACP, Justice

Alliance, or Black Lives Matter whose members or leaders attended the demonstration would be able to dispute facts, call witnesses, and present purported experts.

Indeed, they could intervene in every wrongful arrest or excessive force case because the claims of the plaintiff or defendants could lead to judicial determinations abandoning or limiting constitutional remedies for the excessive use of force.  Whether they have a CBA or not, all protesters and police are impacted by judicial interpretations of the Constitution and federal law.  It's as if FOP believes a CBA gives it a greater interest and special authority to address the First and Fourth Amendment rights of individual citizens and members of civil rights organization than members of the public and citizen membership organizations themselves.

The contrived conflict with the CBA reduces FOP's interests to these political or rooting ones.  Without limiting such interventions to that of informative and interested *amici curia*, cases involving constitutional rights will become so cumbersome, expensive, and prolonged in many cases that the individuals who pursue concrete claims of injuries to their physical well-being and rights of free speech and against excessive force will likely be unable to sustain pursuit of their actions.

Moreover, the FOP is similarly situated to nearly all other unions that have the typical right to grieve changes during the life of a CBA in an employer's practices.  The Court's docket is replete with ERISA, employment discrimination and retaliation, and labor law claims that could alter practices, inducing the UAW (United Automobile, Aerospace, and Agricultural Workers of America); United Steelworkers (United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union), SEIU (Service Employees International Union); and Teamsters (International Brotherhood of Teamsters, Truck drivers, Warehouse Workers, and Miscellaneous Trades) to play the FOP

gambit.  Public employee unions, such as the NEA (National Education Association of the United States); AFSCME (American Federation of State, County, and Municipal Employees); and AFT (American Federation of Teachers), could also assert the right to participate in all constitutional cases.

This is not a hyperbolic floodgates argument: even without a past-practices provision, arbitrators consistently look to past practices to determine the rights of employees.  *See, e.g., Steelworkers v Warrior & Gulf*, 363 U.S. 574, 582 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law -- the practices of the industry and the shop -- is equally a part of the collective bargaining agreement, although not expressed in it.").  Indeed, the National Labor Relations Board has held that an employer violates the National Labor Relations Act (NLRA) "if it makes a material, substantial, and significant change regarding a mandatory subject of bargaining without first providing the union notice and a meaningful opportunity to bargain about the change to agreement or impasse, absent a valid defense."  *ABF Freight System, Inc.,* 369 NLRB No. 107 (June 19, 2020) (installing security cameras in break/locker rooms when CBA banned cameras that infringed on employees' right to privacy).

The NLRA even has its own past-practices provision: "[W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification [serves notice, offers to meet and confer, notifies government entities, and awaits at least 60 days]."  29 U.S.C.A. § 158(d).

Ohio law governing public employee collective bargaining parallels the NLRA.  R.C. § 4117.08(A) (immaterial exceptions omitted, emphasis noted), provides: "All matters pertaining

to wages, hours, or terms and other conditions of employment and ***the continuation, modification, or deletion of an existing provision*** of a collective bargaining agreement are subject to collective bargaining between the public employer and the exclusive representative[.]" Then, R.C. § 4117.08(C) (emphasis noted) cements the point: "The employer is not required to bargain on subjects reserved to the management and direction of the governmental unit except as ***affect*** wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement. A public employee or exclusive representative may raise a legitimate complaint or file a grievance based on the collective bargaining agreement."

FOP's past-practices CBA provision embeds a statutory duty common to every public employee union in Ohio, let alone public and private employee unions throughout the United States. If FOP can leverage that provision into grounds for intervention, then every other union could.

The FOP has no monopoly on a past-practices CBA provision. *See, e.g., CBA between U.S. Dept. of Education and American Federation of Government Employees, AFL-CIO, Council 252* ("§3:02.B. The Parties agree, as expressed in Article 2 (Force And Effect of Agreement, Duration of Agreement, and Negotiation of Subsequent Agreements), that the terms of this Agreement shall remain unchanged during its entire term except as provided by Article 2, or as may be required by law."), downloaded Feb. 6, 2021 from Collective Bargaining Agreement (aalj.org); *CBA between National Border Patrol Council and U.S. Customs and Border Protection* (D.1.: "The Agency shall present the changes it wishes to make to existing rules, regulations and existing practices to the Union. The Union will present its views and concerns (which must be responsive to either the proposed change or the impact of the proposed change)

within a set time after receiving notice from Management of the proposed change."), downloaded Feb. 6, 2021 from final-cba-cbp_nbpc-9.13.19.pdf (afge.org); *Fire Fighters Local No. 60 of Int'l Ass'n of Firefighters, AFL-CIO v. City of Scranton*, 937 A.2d 600, 601–02, 604 (Pa. Commw. Ct. 2007) ("The Union states that the collective bargaining agreement between the parties contains extremely broad and inclusive 'past practice' language that insulates those past practices from unilateral modification.") ("8. All past agreements between the parties, all prior arbitration awards between the parties including all of the provisions of said agreements and awards, *and all of the past practices of the City of Scranton which inure to the benefit of the bargaining unit* shall be continued, and are hereby incorporated by reference herein as fully as though the same were set forth at length, and are hereby made a part hereof, except as the same are specifically modified herein."); *Laborer's Int'l Union of N. Am., Local Union No. 860 v. Cuyahoga Cty. Common Pleas Court, Juvenile Div.*, 8th Dist. Cuyahoga No. CA-19-108096, 2019-Ohio-3190, ¶ 23 ("<u>Section 5.</u> In the event the Court determines modifications of the current applicable policies and procedures are necessary, the Court will notify the Union as soon as possible prior to implementation. To the extent any modification affects a mandatory term or condition of employment, the Court shall not implement any modification with respect to bargaining unit employees without first providing the Union fourteen (14) days advance notice.") (emphases omitted); *Ohio Patrolmen's Benevolent Assn. v. Findlay*, 2017-Ohio-2804, ¶ 21, 149 Ohio St. 3d 718, 724, 77 N.E.3d 969, 974 ("Article 10.02 requires the parties to add any proposed changes to the rules and regulations 'to the discussion agenda of the next Labor–Management Committee meeting,' and Article 10.03 generally requires the city to notify the OPBA of changes in writing at least 14 days prior to their proposed effective date.").

35

The speculation that this Court would blithely ignore the health and safety of police officers and impose such radical changes in the CDP's use of force and other directives that risks of that sort would arise is untoward.  Even to the extent this were a realistic concern, FOP's participation as an *amicus curiae* would be sufficient to guide the Court away from such a cliff.

*Stupak–Thrall*, 226 F.3d at 475, referred to Sixth Circuit precedent in stating, "We have held . . . that the concerns of an entity seeking intervention can be presented with complete sufficiency through [*amicus*] participation.").  Denial of intervention was upheld in *Bradley v. Milliken*, 828 F.2d 1186, 1194 (6th Cir. 1987), in part because "the district court has already taken steps to protect the proposed intervenors' interests by inviting [their counsel] to appear as *amicus curiae* in the case."  *Accord Penick v. Columbus Educ. Ass'n*, 574 F.2d 889, 890–91 (6th Cir. 1978) (affirming the district court's denial of a motion to intervene permissively or as of right but allowing the proposed intervenor to participate as *amicus curiae*); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir. 1975) (affirming the district court's denial of a motion for permissive intervention, noting that if the proposed intervenor "accepts the District Court's invitation to participate in the litigation as an *amicus curiae*," it would afford the organization "ample opportunity to give the court the benefit of its expertise"); *Thornton v. E. Tex. Motor Freight, Inc.*, 454 F.2d 197, 198 (6th Cir. 1972) (affirming the district court's denial of a motion to intervene permissively or as or right but allowing the proposed intervenor to participate as *amicus curiae*).

More recent precedent reaffirms this approach.  *See, e.g., Bay Mills Indian Cmty.*, 720 Fed.Appx. at 758 n. 1 ("An amicus brief would have been more appropriate in this situation[.]"); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 343 (6th Cir. 2007) (affirming denial of permissive intervention where district court "addressed the relevant criteria required by

Rule 24(b)" and allowed proposed intervenor to file an *amicus curiae* brief).  As *Blount-Hill v. Zelman*, 636 F.3d 278, 287–88 (6th Cir. 2011), recognized, "Although we hold that proposed Intervenors may not participate as parties in this litigation, proposed Intervenors are not without a voice—the district court previously permitted proposed Intervenors to appear as *amici curiae*[.]"  FOP utterly lacks any basis to suggest that is voice would go unheard in this Court.

The different impact on the efficiency and cost of litigation between participating as an *amicus curiae* and filling the role of a party is colossal.  *Stupak-Thrall*, 226 F.3d at 477, described that difference: "Appellants want to be parties so that they can file motions and appeals, rather than merely *amicus* briefs—that is, appellants want some say in deciding litigation tactics."  The inevitable result of becoming a party would be duplication and delay. *See, e.g., Truesdell v. Meier*, No. 3:19-CV-00066-GFVT, 2020 WL 1991402, *5 (E.D. Ky. Apr. 27, 2020) ("Allowing them to intervene when their interests and goals are so similar to that of PTS and the Cabinet would likely result in duplication of the Defendants' efforts, thus resulting in undue delay."); *State*, 313 F.R.D. at 71-72 ("Given that the Farm Bureau and the Environmental Groups share nearly identical interests, and arguments, with the existing parties, permitting those groups to intervene would unnecessarily complicate this case and delay the proceedings. The complications of permitting three additional parties to join the lawsuit would be especially burdensome at any hearings in this case—hearings at which five parties would need to present arguments, five parties would need to present witnesses, and five parties would need to conduct cross examinations."); *Ark Encounter, LLC*, 311 F.R.D. at 426 ("Allowing them to intervene when their interests and goals are so similar to that of the Commonwealth's would likely result in duplication of the Defendants' efforts, thus resulting in undue delay.").

The City and individual Defendants might have a slightly different perspective on what it takes to preserve and protect the health and safety of CDP officers, but FOP exaggerates by insinuating that the City's litigating posture would sacrifice health and safety or manipulate a lawsuit to gain from this Court what it could not at the bargaining table. *Truesdell*, 2020 WL 1991402, at *5, was persuaded by this point: "While proposed intervenor's perspective is different from that of the Cabinet or PTS, they have not demonstrated that their contribution to the litigation will add unique value such that intervention is necessary. Although proposed intervenor asserts that they share a much more diverse interest with its broad membership that is different than those of single provider [R. 47 at 10], they do not identify how they would actually present different arguments that would contribute to the litigation in a way that would require intervention.").

That Court also recognized the floodgates problem: "Coupled with the undue delay and prejudice that would result from multiple other affected entities with similar interests all seeking to intervene for the same reasons and under the same standard, the Court finds that allowing intervention in this case would not serve the interests of judicial economy." *Id.* (citing *Horrigan v. Thompson*, 229 F.3d 1152, 2000 WL 1234346, *9 (6th Cir. 2000) (table) ("[T]his court observed that in addition to the four factors derived from [Rule 24(a)(2)] itself, judicial economy is a relevant consideration in deciding a motion for ... intervention.") (citation omitted) (alteration in original).

Participation as an *amicus curiae* was deemed sufficient by that Court. *Truesdell*, 2020 WL 1991402, at *6 ("[T]o the extent that proposed intervenors do have a slightly different perspective from the Defendant, the Court will permit the putative intervenors, through counsel, to file a memorandum *amicus curiae* in support of their position. * * * Allowing the proposed

intervenor the opportunity to participate in the remaining proceedings as *amici curiae* will allow them to present their perspective and adequately address their concerns."). *Accord State*, 313 F.R.D. at 72 ("The Court welcomes, and will consider, amicus briefs submitted by the Farm Bureau or the Environmental Groups[;] joining the case as a party is a different—and more burdensome—matter."); *Ark Encounter, LLC*, 311 F.R.D. at 426; *Tiger Lily LLC v. United States Dep't of Hous. & Urban Dev.*, No. 2:20-CV-2692-MSN-ATC, 2020 WL 7658076, at *3 (W.D. Tenn. Oct. 21, 2020) ("Allowing NPI to participate as *amicus curiae* in this matter offers NPI an opportunity to present its claimed unique perspective to the Court without the complications associated with adding additional parties to this litigation.").

Indeed, permitting FOP to participate as an *amicus curiae* perfectly fits the customary role for membership organizations sincerely interested in the judicial fate of their members. "Classical participation as an amicus to brief and argue as a friend of the court was, and continues to be. a privilege within 'the sound discretion of the courts,' *see Northern Sec. Co. v. United States*, 191 U.S. 555 (1903); 4 Am.Jur.2d, Am.Cur § 4 at 113, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991) (citations omitted).

## III.    Conclusion

FOP naturally wants to influence the litigation strategy of the City and the individual Defendants, most of whom are its members.  That desire does not translate, however, into satisfaction of the Rule 24 standards.  For the reasons developed above, FOP's motion should be denied, and its participation restricted to the role of *amicus curiae* informing the Court about its views on the impact of injunctive relief.

By: /s/ *John S. Marshall*
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Edward R. Forman (0076651)
(eforman@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

James D. McNamara (0002461)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

## **<u>CERTIFICATE OF SERVICE</u>**

      This is to certify that a copy of the foregoing was filed with the Court on this 15th day of February, 2021 using the CM/ECF system, which will send notification of such filing to all counsel of record. Parties may access this filing through the court's filing system.

By: <u>*/s/ John S. Marshall*</u>
John S. Marshall (0015160)