IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada,                :
et al.,
                                  :
        Plaintiffs,
                                  : Case No. 2:20-cv-3431
        vs.                         Judge Marbley
                                  : Magistrate Judge Jolson
City of Columbus,
Ohio, et al.,                     :

        Defendants.               :


- - - - -

DEPOSITION OF MAYOR ANDREW GINTHER
VIA VIDEOCONFERENCE

- - - - -


Taken at Columbus City Hall
90 W. Broad Street
Columbus, OH 43215
January 27, 2021, 10:04 a.m.


- - - - -

Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

1          A P P E A R A N C E S
2
    ON BEHALF OF PLAINTIFFS:
3
        The Gittes Law Group
4       723 Oak Street
        Columbus, OH 43205-1011
5       By Frederick M. Gittes, Esq.
           Jeffrey P. Vardaro, Esq.
6          (Via videoconference)
7       and
8       Walton + Brown, LLP
        395 East Broad Street, Ste. 200
9       Columbus, OH 43215
        By Chanda L. Brown, Esq.
10         Sean L. Walton, Esq.
           (Via videoconference)
11
        and
12
        Marshall and Forman, LLC
13      250 Civic Center Drive, Ste. 480
        Columbus, OH 43215
14      By John S. Marshall, Esq.
           Madeline J. Rettig, Esq.
15         Helen M. Robinson, Esq.
           (Via videoconference)
16      and
17      Kitrick, Lewis & Harris Co., LPA
        445 Hutchinson Avenue
18      Columbus, OH 43235
        By Mark Kitrick
19         (Via videoconference)
20
21
22
23
24

1
          A P P E A R A N C E S
2
3   ON BEHALF OF DEFENDANTS:
4       Columbus City Attorney's Office
        77 North Front Street, 4th Floor
5       Columbus, OH 43215
        By Westley M. Phillips, Esq.
6          Stephen J. Steinberg, Esq.
           (Via videoconference)
7
8   ALSO PRESENT:
9       Tamara Alsaada (Via videoconference)
        Torrie Ruffin (Via videoconference)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1              Wednesday Morning Session
2              January 27, 2021, 10:04 a.m.
3              - - - - -
4       S T I P U L A T I O N S
5              - - - - -
6       It is stipulated by counsel in attendance that
7   the deposition of Mayor Andrew Ginther, a witness
8   herein, called by the Plaintiffs for
9   cross-examination, may be taken at this time by
10  the notary pursuant to notice and subsequent
11  agreement of counsel that said deposition may be
12  reduced to writing in stenotypy by the notary,
13  whose notes may thereafter be transcribed out of
14  the presence of the witness; that proof of the
15  official character and qualification of the notary
16  is waived.
17             - - - - -
18
19
20
21
22
23
24

1                    I N D E X
2   Examination By                          Page
3   Mr. Gittes - Cross                         6
4
    Plaintiffs' Exhibits                    Page
5
    Exhibit 5 - Affidavit of Mark E. Lang     62
6
    Exhibit 101 - Video                      105
7
    Exhibit 103 - Video                      117
8
    Exhibit 106 - Video                      122
9
    Exhibit 108 - Video                      115
10
11
12
13
14
15
16
17
18
19
20
21
22   (Exhibits attached electronically. Hard copies were
     never in Spectrum's possession.)
23
24

1    THE REPORTER: Before I swear the
2  witness, would counsel please identify themselves
3  for the record, state who they represent, identify
4  who else is in the room with them, and express
5  your stipulation that this deposition may take
6  place with a remote administration of the oath and
7  remote reporting of the deposition.
8    MR. GITTES: Yes. I will speak for the
9  plaintiffs' counsel. I am Fred Gittes. Chanda
10  Brown, Sean Walton, Jeff Vardaro, Mattie Rettig,
11  at least those are the other plaintiffs' attorneys
12  I see present. And we all agree to the remote
13  taking of this deposition and the swearing or
14  giving of the oath remotely.
15    MR. PHILLIPS: Wes Phillips. I'm here
16  with Steve Steinberg. We represent the defendants
17  in this case. And we also stipulate to the remote
18  taking of the deposition.
19    - - - - -
20    MAYOR ANDREW GINTHER
21  being first duly sworn, testifies and says as
22  follows:
23    - - - - -
24

1    CROSS-EXAMINATION
2  BY MR. GITTES:
3  Q.    Thank you. Could you state your name
4  for the record, please.
5  A.    Sure. Andy Ginther.
6  Q.    Thank you, Mayor. My name is Fred
7  Gittes as you heard. I will probably be asking
8  you most if not all the questions today. I'm not
9  sure we've ever met before. So let me say it's --
10  I wish I'd met you under other circumstances, but
11  it's good to meet you.
12  A.    Good to meet you.
13  Q.    Have you been in depositions before?
14  A.    Never in my official capacity. I was
15  one -- I was in one involving a -- witnessing a
16  car accident on South High Street, and that was
17  many, many years ago. But, no, this is the first
18  time I've been part of a deposition.
19  Q.    Okay. Well, I'm going to go through
20  some, you know, procedures and rules. And first
21  of it is that if I ask you a question that you
22  don't understand for any reason, do you know that
23  you can interrupt me -- well, not interrupt.
24  After the question is over, if it's not clear, you

1  can ask me to explain it and I will do my best to
2  clarify it. Is that okay?
3  A.    Yes.
4  Q.    And will do you that for me if you
5  don't understand something?
6  A.    Yes.
7  Q.    Also if you do answer a question that
8  I've asked you, we're going to assume that you
9  understood the question unless you tell us
10  otherwise. Fair enough?
11  A.    Yes.
12  Q.    This is also not a memory test.
13  Although this case doesn't -- there will be some
14  questions that go back some years, but most of it
15  is relatively recent. But do you know that as we
16  go along if you realize that you forgot something
17  or that you said something in response to an
18  earlier question that was incorrect, that you can
19  interrupt me even in the middle of a question to
20  let me know, Fred, I just realized I made a
21  mistake and you can correct it? Do you know that
22  now?
23  A.    Yes.
24  Q.    And will you do that for us as we go

1  through?
2  A.    Yes.
3  Q.    Okay. Do you have any particular
4  questions for me about the process?
5  A.    No. But if I have any along the way,
6  I'll make sure to ask you.
7  Q.    Please do.
8    All right. Now, let me also ask you
9  some questions that will be obvious to you why we
10  ask.
11    Are you suffering from my medical
12  condition or taking any medications or drugs that
13  would affect your ability to testify accurately
14  and truthfully?
15  A.    No.
16  Q.    Do you have anything going on in your
17  life that would prevent you from testifying
18  truthfully and accurately?
19  A.    No.
20  Q.    Sitting here today, you feel fit and
21  ready to testify?
22  A.    I do.
23  Q.    Okay. Did you have a chance to prepare
24  for the deposition?

1 A. Yes. As well as you can be for
2 something you've never been through before.
3 Q. Okay. Did you meet with counsel for
4 the City and your office?
5 A. Yes.
6 Q. Okay. And when was the most recent
7 time you met with them?
8 A. I think that -- was that last week,
9 Wes? I think that was last week.
10 Q. I will let you ask Wes questions, but
11 I'll be surprised if he answers them.
12 A. Okay.
13 Q. But feel free.
14 And about how long did you spend
15 talking? I don't want to know anything about what
16 was discussed, just how much time?
17 A. I don't know. 45 minutes.
18 Q. And did you have any other meetings
19 related to this case in preparation for your depo,
20 not just the case in general?
21 A. No.
22 Q. Okay. Did you review any documents,
23 videos or other records before coming today?
24 A. Yes.

1 Q. Okay. Can you tell me what those were?
2 A. I think the exhibits that we may be
3 discussing today, as well as going back and
4 looking at statements and press releases and those
5 types of things revolving -- you know, at about
6 the same time as this case involves.
7 Q. So statements while the demonstrations
8 were going on?
9 A. That's correct.
10 Q. Basically during the summer of 2020?
11 A. Yes.
12 Q. Okay. Well, that's good. I'm glad you
13 had a chance to review that material because we
14 are going to go over some of it today.
15 A. Okay.
16 Q. I want to keep this very brief because
17 I know you have a heavy schedule. So I do need to
18 ask a little about your background very briefly.
19 A. Uh-huh.
20 Q. Other than being the Mayor, going back
21 a little bit, what has your career or profession
22 been?
23 A. Well, majored in political science and
24 worked in communications, public relations, served

1 on the Board of Education for six years, Council
2 for eight, last four as president, elected and
3 re-elected as Mayor.
4 Q. So would you -- and I am asking you to
5 describe it. Would you describe your profession
6 or occupation, what, for the last 12, 15 years as
7 holding public office and doing public service?
8 A. Yeah. When I was council president, I
9 worked part-time at the Children's Hunger
10 Alliance, so I was also in nonprofit service.
11 Q. And I think you said you did some work
12 for a company?
13 A. Yeah. Well, I worked for -- I worked
14 for Triumph Communications for probably 10 or 11
15 years. And we worked on political campaigns,
16 nonprofit ad efforts, mostly communications, PR,
17 and consulting work.
18 Q. Okay. And roughly what period of time
19 was that?
20 A. That would have been 2001 -- 2000 the
21 2010, 2000 to 2011 time frame. And then worked at
22 the Hunger Alliance until I was elected Mayor.
23 Q. Okay. Thank you.
24 Have you ever been convicted of a

1 crime, excluding any traffic offenses?
2 A. No.
3 Q. Have you ever personally been sued?
4 A. I don't -- no. No. I'm sorry. When
5 you say "personally," I was thinking in my public
6 role. But, no, not personally.
7 Q. Okay. And any lawsuits you've been
8 involved in your public role, it's been in your --
9 you weren't sued personally, you were just sued
10 officially as the Mayor?
11 A. I'm not sure as Mayor. But I might
12 have been sued as a member of the Board of
13 Education and City Council.
14 Q. Uh-huh.
15 A. I just don't know for sure.
16 Q. Have you ever filed a lawsuit yourself?
17 A. No.
18 Q. All right. Now moving forward, how
19 would you describe your duties as Mayor related to
20 the Columbus Police Department?
21 A. I believe that the Safety Director and
22 myself are the civilian oversight of the Division
23 of Police.
24 Q. Would you agree that ultimately the

1  Chief works for the Safety Director and you?
2  A.       And the people of Columbus, yes.
3  Q.       Yes.  But through you?
4  A.       Yes.
5  Q.       And the Safety Director is a person
6  that you select under your authority as Mayor?
7  A.       That is correct.
8  Q.       Tell me how you handle that
9  responsibility generally.  I'll break it down for
10  you.
11        First of all, the Safety Director
12  reports to you on a monthly, weekly, daily basis?
13  Give us some idea of how that works.
14  A.       Well, it all depends obviously what's
15  going on.  We're in very regular contact when
16  there are, you know, major issues facing the
17  community, issues involving safety.  But we are in
18  a regular cadence of meeting and talking at least
19  once or twice a month with both the Safety
20  Director and the Chief.
21  Q.       Do they give you written reports?
22  A.       Not generally.  But the Chief has
23  provided updates in writing specifically on
24  reforms, changes and implementation of the Safety

1  Advisory Commission recommendations and the Matrix
2  regulation, kind of status updates.
3  Q.       And what form do those communications
4  take, e-mails, memos?
5  A.       No.  Yeah.  Just paper copies are
6  shared at times during those briefings.
7  Q.       And where are they stored?
8  A.       I believe that -- I'd have to check who
9  maintains public records for the Mayor's office.
10  I don't know if that would be Kendall Sours in
11  consultation with, you know, the rules of keeping
12  public records.
13  Q.       Do you know whether those
14  communications particularly, well, during the time
15  of the demonstrations and immediately before and
16  after have been provided to your attorneys?
17  A.       I don't know that.
18  Q.       Okay.  Would you do me a favor and
19  check with your staff to see if that's happened?
20  A.       Sure.
21        MR. PHILLIPS:  Fred --
22        MR. GITTES:  Just let Wes know.
23        MR. PHILLIPS:  Fred, could you just
24  send that to us in writing, because I --

1        MR. GITTES:  Yeah.  One of us will send
2  a reminder.
3        MR. PHILLIPS:  Thanks.
4  BY MR. GITTES:
5  Q.       What about the Chief -- I mean, the
6  Safety Director?  I think what you were describing
7  was from the Chief, those communications?
8  A.       Written reports or updates, yes.  I
9  generally do not meet with the Chief unless the
10  Safety Director is present, since he has direct
11  supervision and oversight of the Chief.  But the
12  written reports that I described were given by the
13  Chief.  The Safety Director often gives oral
14  updates, verbal updates and status reports at our
15  weekly cabinet meetings as well as our meetings
16  with -- he meets with me when I meet with the Fire
17  Chief and with the Police Chief.
18  Q.       And does someone take notes of those
19  meetings?
20  A.       Of our cabinet meetings or --
21  Q.       Yeah.
22  A.       -- of our --
23  Q.       Both.
24  A.       You know, I don't know.  I don't know.

1  I can check.
2  Q.       Yes.  Would you check and then let Wes
3  know?  And we'll send a reminder.
4  A.       Sure.
5  Q.       Okay.
6        MR. PHILLIPS:  And, Fred, that's fine
7  for all of these questions.  But for anything
8  you're going to want, it will help us if you just
9  send it in writing to me.
10        MR. GITTES:  Yeah.  Yeah.  As I just
11  said, we would do.
12        MR. PHILLIPS:  Thanks.
13  BY MR. GITTES:
14  Q.       How do you go about monitoring?  I
15  mean, do you attempt on your own, besides meeting
16  with the Chief and the Safety Director, do you
17  personally do things to interact with the command
18  and police officers in Columbus?
19  A.       Sure.  I mean, I meet with officers all
20  the time.  I meet with community members all the
21  time asking how our officers are doing.  That's
22  part of my job in my role with civilian oversight.
23  Q.       Just tell me a little bit about those
24  meetings.  I mean, when you meet with officers, is

1  it by happenstance?  Do you have scheduled
2  weekly --
3  A.      It's both.  It's both.  I generally
4  seek out officers when I see them out and about or
5  at community events.  Obviously, this is all
6  prepandemic.  A lot of these community events
7  aren't happening now, but before the pandemic.
8  But even when I see officers out and about, I've
9  been doing a couple of roll calls, not many, where
10 we have an exchange.  And then I have sought out
11 and scheduled meetings particularly with officers
12 of color to hear their perspectives on what's
13 going on within the Division of Police and met
14 with a group, the National Organization of Black
15 Law Enforcement, NOBLE, and other groups like
16 that.
17 Q.      When was the last time you had a
18 meeting like that with black officers?
19 A.      We can get you an exact date.  But I
20 would think about a month or so ago.
21 Q.      Okay.  And does anybody keep notes
22 about those conversations?  Do you keep notes
23 about things you learned or information they
24 shared?

1  A.      It's generally staff that accompany me
2  on those would, things to follow-up on and
3  questions that need to be answered.
4        MR. GITTES:  Okay.  We'll send a
5  letter, Wes.
6  BY MR. GITTES:
7  Q.      But would you check and see if those
8  notes are maintained and who has them and let Wes
9  know so he'll know what I'm writing about?
10 A.      Sure.
11 Q.      Okay.  Do you have such group meetings
12 separately for white officers?
13 A.      Not exclusively.  But --
14 Q.      What about women on the department?
15 A.      Not a female only meeting, no.
16 Q.      Okay.  And what is your goal?  Are you
17 just trying to get feedback about the department?
18 A.      I think for the most part is do my job,
19 you know, with respect to civilian oversight and
20 make sure that our division is meeting and
21 exceeding our community's expectations and
22 learning more from folks who feel like we may be
23 falling short, things we need to improve upon,
24 things we need to change.

1  Q.      Do you know -- well, let me ask you
2  this about the councilmembers.  Do you have --
3  other than council, you know, formal council
4  meetings, do you have any regular discussions or
5  interactions with them about the police
6  department?
7  A.      Yes.  I have a regular standing meeting
8  with the council president and meet probably at
9  least once or twice a month with the other
10 councilmembers.  And certainly police is part of
11 this, so is everything from water and sewer to
12 planning and zoning to everything under the sun.
13 Q.      And are those sessions -- first of all,
14 are they public?
15 A.      No.  When I just meet with one
16 individual member, no.
17 Q.      And do you or does someone for you take
18 notes of those conversations so you can follow-up?
19 A.      Probably, but I don't know for sure.  I
20 do not -- I don't keep notes or take notes at
21 those meetings.
22 Q.      Is there a particular staff member that
23 goes to you -- to those meetings?
24 A.      Generally, the Chief of Staff or Deputy

1  Chief of Staff.
2  Q.      And who are they?
3  A.      The Chief of Staff is Ken Paul.  And I
4  have three Deputy Chiefs of Staff, Kate Pishotti,
5  Kimber Perfect and Dawn Tyler Lee.
6  Q.      And they've all been working for you
7  during the last year or so?
8  A.      Last several years, yes.
9  Q.      Several years.  Okay.
10       THE REPORTER:  Fred, Mark Kitrick is
11 trying to get into the deposition.
12       MR. GITTES:  Yes.  Yes.  He is counsel
13 in the case.
14       Hey, Mark.
15       MR. KITRICK:  Good morning.
16 BY MR. GITTES:
17 Q.      Okay.  Mr. Mayor, let's talk a little
18 bit about the councilmembers.  I just want to know
19 your personal experience with them.  Have you
20 found Shannon Hardin to be a truthful person in
21 your dealings with him?
22 A.      Yes.
23       THE REPORTER:  I'm sorry, Fred.  Justin
24 Horn has entered the waiting room.

1          MR. GITTES: Justin Horn is the
2     plaintiff. Yes.
3     BY MR. GITTES:
4     Q.        Not that you essentially have to agree
5     with them all the time, but do you trust his
6     judgment? Do you appreciate his thoughts?
7     A.        Yes.
8     Q.        He's somebody that you give weight to
9     when he's giving you advice or suggestions?
10    A.        Yes.
11    Q.        What about Liz Brown? Same questions.
12    Have you found her to be truthful and honest?
13    A.        Yes.
14    Q.        And do you respect her opinions and
15    judgment?
16    A.        Yes.
17    Q.        And she's somebody you would consult
18    with and give weight to?
19    A.        Yes.
20    Q.        And how about Rob Dorans?
21    A.        Yes.
22    Q.        Same questions.
23    A.        Yes. Yes. Yes on all fronts. Yeah.
24    I mean, the answer is yes for all the

1     councilmembers.
2     Q.        Okay. Now I want to switch for a
3     little bit to talk about your authority over the
4     Columbus Police Department more specifically. Is
5     it your understanding as Mayor that you ultimately
6     can order a chief of police to do something,
7     subject to any limitations of law and the
8     contract? Ultimately, you can compel by order or
9     instruction the Chief to change a policy, change a
10    practice, correct a problem that you perceive
11    subject to --
12    A.        Yes.
13    Q.        Okay.
14          (A short recess is taken.)
15    BY MR. GITTES:
16    Q.        Okay. Sorry for the interruptions,
17    Mayor.
18    A.        That's all right.
19    Q.        Have you exercised such authority since
20    you've been Mayor?
21    A.        Yes.
22    Q.        And what have you used that authority
23    to instruct the Chief to do?
24    A.        Well, there probably have been a number

1     of times. The time probably most relevant to this
2     case was around the directive I gave him to change
3     our use of chemical agents and pepper spray and
4     those types of things in the early days of the
5     protests last summer.
6     Q.        Okay. And we'll be talking about that.
7     I'm just curious, is there anything else that
8     you've specifically instructed him to do since
9     you've been Mayor?
10    A.        I'm sure there are. And I can give
11    some thought to that. That might be one of those
12    that I come back to --
13    Q.        Sure.
14    A.        -- when I give some additional thought.
15    But, yes, there have been a number of times where
16    I've encouraged or directed him to change
17    policies, procedures, or the way things are
18    handled.
19    Q.        Absent an instruction from you, is it
20    your understanding under the process here in
21    Columbus that the Chief may implement policy
22    changes through their own internal division
23    processes?
24    A.        Yes.

1     Q.        And have you been informed about how
2     the process works? And it's not my desire to go
3     through the whole thing. I just want to make sure
4     we're discussing the same process. That there are
5     -- there's, like, a policy committee that works on
6     language, the language is shared with officers and
7     commanders and then they give feedback and
8     ultimately something is sent to the Chief. And
9     the Chief either approves it or sends it back for
10    more work. And then finally the Chief signs off
11    on it and that's it, it's a policy?
12    A.        That sounds accurate.
13    Q.        Okay. To your knowledge with respect
14    to policies unrelated to discipline, obviously
15    wages and so forth, but totally concerned with
16    police tactics, training, equipment, does the FOP
17    have any authority to limit or prevent you or the
18    Chief from implementing policies about those
19    matters?
20    A.        Based on what I know and understand
21    without being a labor lawyer or a master of the
22    contract, I believe that's accurate.
23    Q.        Let's just take as an example the
24    policy you mentioned earlier about the use of --

1 was it pepper spray or crowd control techniques?
2 A.    Yeah.  Yep.
3 Q.    That you talked to the Chief about?
4 A.    Uh-huh.
5 Q.    Did you have to pass that by the FOP?
6 A.    No.
7 Q.    Were they even involved with it?
8 A.    No.
9 Q.    Have they objected to it?
10 A.    I don't know.
11 Q.    Have you been made aware of any
12 grievance or claim that --
13 A.    No.
14 Q.    -- it was illegally or improperly
15 implemented?
16 A.    No.
17 Q.    Give me one second here.  Sorry.
18 A.    Sure.
19 Q.    Have you ever known at any time during
20 the four years you've been -- well, the time
21 you've been Mayor, has the FOP demanded to be
22 allowed to participate in decisions or share
23 decision-making authority about equipment,
24 weaponry, individual officer tactics or group

1 tactics in the field?
2 A.    Maybe repeat that again.  I'm sorry.
3 Q.    I'm just trying to find out if the FOP
4 has ever attempted or claimed since you've been
5 Mayor that they have any authority to make
6 decisions or have input into decisions as a union
7 on the equipment the department buys and provides
8 for them?  Let's take them one at a time.
9 A.    Yeah.  Yeah.  Not that I'm aware of.
10 Q.    Okay.  The field tactics used?
11 A.    Not that I'm aware of.
12 Q.    And the manner in which crowd control,
13 because that's what we're talking about here,
14 weapons and tactics are applied in the field?
15 A.    Not that I'm aware of.
16 Q.    Okay.  I'm sorry.  Hang on a second.
17 A.    Sure.
18 Q.    And that is because -- and that's
19 consistent with your understanding that the FOP
20 has no contractual right as to those areas in the
21 department --
22 A.    That is my understanding.
23 Q.    -- in the operation of the department?
24     Let's talk about the rule change you

1 mentioned earlier.  What was the process?  How did
2 it start?  Did it start with you?  Did you
3 initiate the initial contact?
4 A.    Yes.
5 Q.    Okay.  Tell me about that.  When was
6 it?
7 A.    If I remember correctly, it was of that
8 first weekend of protests, I believe it was Sunday
9 morning that I called the chief and directed him
10 to change the policy that what I witness, saw and
11 heard on that Saturday in particular did not meet
12 my or the community's expectations.
13 Q.    Just to make it clear, that Sunday
14 would have been May 31st?
15 A.    I think that's correct.
16 Q.    I'm sorry.  The reason I'm having to
17 look down is my -- this is the way I get notes or
18 suggestions.  I have to leave the phone on, so
19 it's a little bit of a distraction.
20 A.    No worries.
21 Q.    So that would have been Sunday,
22 May 31st?
23 A.    Uh-huh.
24 Q.    And you called the Chief; is that what

1 happened?  Or you scheduled a meeting?
2 A.    That is correct.
3 Q.    Called?
4 A.    Yes.
5 Q.    And as best as you can remember, what
6 is it that you said to him?
7 A.    Exactly what I just said.
8 Q.    Well, did you make a specific proposal
9 for what the rule should say?
10 A.    That, you know, pepper spray, chemical
11 agents, should not be used on nonviolent
12 protesters and our approach and engagement had to
13 change.
14 Q.    Did you have anybody on your staff or
15 have the City Attorney's Office draft anything for
16 you?
17 A.    No.
18 Q.    Okay.  What was his reaction?
19 A.    He understood and that he would do what
20 I asked him to do.
21 Q.    You mention that what prompted you to
22 do this is things you saw, heard and were told
23 about the demonstrations, right?
24 A.    That is correct.

1  Q.    Did you go yourself to any --
2  A.    No.
3  Q.    -- of the --
4  A.    No, not that Saturday.  But I did march
5  with protesters and did visit with protesters for
6  a number of times over those few weeks, but not
7  that Saturday.
8  Q.    When you say you visited, you mean
9  visit with them at the demonstrations or --
10 A.    That's correct.
11 Q.    Okay.
12 A.    That's correct.  Yes.  And there were a
13 number of groups that were part of the protest
14 that we did meet with, you know, during those
15 times as well.
16 Q.    Based on your conversations and
17 observations and meetings, was it clear to you
18 that there was not any single group that was in
19 charge of these protests?
20 A.    That is my understanding.
21 Q.    So there were a lot of different groups
22 and a lot of just people who came down to exercise
23 their right to make it clear what their views were
24 and what their concerns were about racism and the

1  police?
2  A.    That is correct.
3  Q.    And you knew from even -- well, maybe I
4  should ask you.  Did you know from the beginning
5  that what these protests were about what people
6  felt were totally unjustified killings of black
7  individuals by police officers and the concern
8  that police are not held accountable for using
9  excessive force which is disproportionally used
10 against people of color?
11 A.    What's your question?  I'm sorry.
12 Q.    Did you understand that's what the
13 protests were about?
14 A.    Yes.  And systemic racism in general.
15 But those things in particular, yes.
16 Q.    So based on your conversations with the
17 Chief, he also understood that the protests were
18 not just about racism in general but particularly
19 racism and what the protesters to believe was
20 excessive and deadly force being visited upon
21 people of color?
22 A.    I think you'd have to ask the Chief
23 that.  But I believe that to be the case.
24 Q.    Well, based on your conv -- I'm asking

1  you, Mayor, and I appreciate that comment.
2  Because that's exactly the right thing to say if I
3  don't make it clear.
4        I'm asking for your understanding based
5  on your conversations with him.  Would you say
6  based on things he said to you that he understood
7  the police themselves, the department, was a
8  target of the protests because of concern about
9  racism in the Columbus, Ohio police department?
10 A.    Yes.  I think that's an accurate
11 statement.
12 Q.    So let's go back to your discussion.  I
13 think you've told me what you initially told him
14 over the phone.  What was the next step after you
15 told him you wanted a change about the use of
16 chemical agents, as best you remember?
17 A.    Yeah.  As best I remember, I think he
18 issued a new policy, directive within the next
19 couple of days.  I don't remember the exact date.
20 Q.    Okay.  I'm going to come back to that.
21 But let's talk a little more about the
22 demonstrations.  Based on what you saw and your
23 discussions with people involved in the
24 demonstrations, would you agree with me that by

1  far and away most if not close to all of the
2  people who participated in protests were peaceful?
3  They were not there to be violent?
4  A.    Yes.  Overwhelmingly peaceful protest.
5  There were other elements, but overwhelmingly
6  folks protesting were there peacefully.
7  Q.    And I assume -- you know what that word
8  means, so I'm going to -- I'll drop that one.
9        You learned during your conversations
10 as the protests proceeded that the violence in
11 terms of looting and I believe some fires were
12 set, windows were broken, for the most part -- and
13 I am asking you if this is your understanding from
14 your conversation with police department
15 officials, most of that happened late in the
16 evenings and mostly on the first night or two of
17 the protests?
18 A.    That's a very general statement.  But I
19 think for the most part that's accurate.
20 Q.    And isn't it also true that the
21 individuals who engaged in the looting and setting
22 fires were relative compared to the number of
23 people who were in the day coming out,
24 demonstrating, protesting very few in number?

1   A.      You're saying that folks --
2   Q.      Who did the damage?
3   A.      That did the damage were small in
4   number compared to other folks that were
5   protesting.  That's an accurate -- that's my
6   understanding.
7   Q.      Did the Chief or anybody else in the
8   CPD give you any idea of what that number was?
9   Was it 10, 20, 40 people they concluded were doing
10  most of the destruction?
11  A.      I was never given a number.  But as
12  you've described, it was a small number of folks
13  that were breaking the law and damaging public and
14  private property.
15  Q.      Also didn't they tell you -- and when I
16  say they, I'm talking about officials or
17  representatives of the police department -- that
18  of the people doing damage or violence, many of
19  them were repeaters?  So like they may have done
20  something on Thursday night the first day of the
21  protests and they were back at it again on another
22  night?
23  A.      That, I do not remember.  They could
24  have told me that and I don't recall that

1   specifically, that there were multiple repeat
2   offenders.
3   Q.      Okay.  Give me some idea of as best you
4   can remember when you were actually at protest
5   activities during this summer period.
6   A.      So I believe that the first protest I
7   was part of was organized I think by the faith
8   community and the NAACP.  And we marched from
9   St. Paul AME to Shiloh Baptist.  I think that was
10  Sunday afternoon, Sunday evening.  And then I
11  probably went to a half a dozen -- I went a half a
12  dozen times to different protests and events.  One
13  that -- a few that were organized at City Hall, so
14  multiple, multiple times.  But the first one that
15  I participated in was that Sunday afternoon.
16  Q.      And on the 31st, was that a march that
17  went through downtown?
18  A.      No.  St. Paul AME is on the near east
19  side, and they marched to Shiloh which is near The
20  Urban League also there in that King-Lincoln
21  neighborhood.
22  Q.      Did you go to any of the activities in
23  the downtown area?  You said something was at City
24  Hall.  But I mean, in terms of just in the area

1   outside --
2   A.      On that Sunday or during the --
3   Q.      Any time?
4   A.      Yes.  Multiple times.
5   Q.      And you would walk around and see what
6   was going on?
7   A.      Yes.  Talk to protesters, march with
8   protesters, talk with police officers.
9   Q.      And did any of those times include the
10  first few days, the first weekend, for example?
11  A.      I'd have to go back and double-check.
12  I think it was the following week when I was
13  downtown multiple times.  I would have to go back
14  and check.  I don't remember if I was downtown
15  that Saturday and Sunday.
16  Q.      Did you personally see any conduct that
17  you thought was out of line while you were at a
18  demonstration?
19  A.      No.
20  Q.      Did you --
21  A.      Nothing -- I didn't see any.
22  Q.      I mean that for officers or protesters.
23  A.      Yeah.  No illegal activities that I
24  witnessed.

1   Q.      Okay.  Well, I didn't use the word
2   "illegal" because I'm not asking you to make a
3   judgment about any criminal act.  I'm just asking
4   anything that you thought, wow, that shouldn't be
5   happening or why is that --
6   A.      Not that --
7   Q.      -- happening?
8   A.      Not that I witnessed while I was at the
9   protest.
10  Q.      Did you see conduct that you thought
11  was out of line in the news or through other
12  sources while the demonstrations were going on?
13  A.      Yes.
14  Q.      And what kind --
15  A.      That's --
16  Q.      What kind of things did you see?
17  A.      I thought an inappropriate use of
18  force.  I thought an overly aggressive use of
19  force, specifically on that Saturday, and that's
20  why I called the Chief on Sunday morning to change
21  our policy around the use of chemical agents and
22  pepper spray and changing the way we were engaging
23  with and dealing with peaceful protesters.
24  Q.      What is it that you saw?  What do you

1 -- when you say you saw improper use, what was it
2 that you're referring to?
3 A.      I thought that we were overly
4 aggressive with keeping people out of the street,
5 overwhelmingly peaceful protesters who happened to
6 be in the roadway.  Some of them were -- pepper
7 spray was used and other chemical agents when they
8 were nonviolent and were peaceful.  And there were
9 obviously lots of videos, pictures, news accounts
10 of interactions with police during that first
11 weekend, which I called out and said was
12 inappropriate and unacceptable, and gave people an
13 opportunity to share those pictures and videos and
14 stories both with internal affairs or if they felt
15 more comfortable going outside the chain of
16 command, to share those at reportcpd@columbus.gov.
17 Q.      Did you see in any of the coverage or
18 subsequently images of the officers on that
19 Saturday or other times on Sunday later on
20 spraying -- not just spraying individuals who were
21 in the street or standing right off the curb, but
22 spraying people on sidewalks?
23 A.      I don't remember specifically on
24 sidewalks.  There were certainly people that were

1 struck with the use of chemical agents and pepper
2 spray that I saw that were standing on sidewalks
3 but near someone that had been in the roadway.
4 But not that I can recall, you know, protesters on
5 the sidewalks that were being approached and
6 chemical agents being used.
7 Q.      Have you learned or were you -- well,
8 do you know what a canine spray canister is used
9 by officers?
10 A.      What's the question?
11 Q.      Are you aware that in crowd situations
12 there's a larger device that's used to spray
13 chemical agents for crowd control?
14 A.      I don't know that.  But I have to
15 assume that --
16 Q.      Well, in any of the images that you've
17 seen during the time of the protests, have you
18 seen -- I'm trying to hold up my hands large --
19 A.      Yeah.
20 Q.      This is not going to be -- a larger
21 canister as opposed to the small pepper spray
22 device?
23 A.      I don't remember specifically seeing
24 those.  Mostly what I witnessed and saw and was

1 shared with me were smaller canisters and
2 dispersement methods.  But if you say we have
3 them, I assume we have them.
4 Q.      No.  No.  I'm just asking what you saw.
5 And I'm going to be asking about other videos you
6 watched just to see what you've observed.  And by
7 the way, I must have been corrected.  It's a
8 Mark 9 they call the spray.
9 A.      Okay.  I wouldn't have known the
10 difference.  But I appreciate you --
11 Q.      So any other observations?  Any other
12 personal observations that you had through the
13 news or media about anything that you thought was
14 improper or just not good police behavior?
15 A.      I think I've shared --
16 Q.      Okay.
17 A.      -- you know, what I saw, what I
18 remember, what I heard.
19 Q.      Okay.  I want to just walk a little bit
20 about when was the first time you became aware
21 that there were going to be protests in Columbus?
22 A.      I think that very first -- it was that
23 Thursday.  I think what we were seeing obviously
24 across the country after the murder of George

1 Floyd, what we saw, you know, taking shape in
2 cities around the country.  So I think that would
3 have been that Thursday, Thursday night.  I think
4 that's accurate.
5 Q.      And were you alerted to that by Chief
6 Quinlan or any other police department officials?
7 A.      I'm sure I talked to Chief Quinlan.
8 But I think we also saw what was happening in
9 cities around the country and the world and
10 assumed and were anticipating the same type of
11 protests taking place here in Columbus.  But I'm
12 sure I talked to both the Safety Director and the
13 Chief of Police on that Thursday.
14 Q.      When you say "that Thursday," in the
15 morning?  In the afternoon?
16 A.      I don't remember.  I'm sure -- I'd have
17 to go back and check.
18 Q.      Okay.  At the time you were talking to
19 them, did they indicate they had already started
20 working on a plan for how to handle the
21 demonstrations because they had become aware of
22 the social media indications that there were going
23 to be demonstrations?
24 A.      Yes.

1  Q.      Okay.  Tell me what you can remember as
2  best you can about what they said their plan was.
3  A.      You know, primarily informed by
4  previous protests and history of dealing with
5  protests, informed by lessons learned and -- but,
6  yeah, nothing more specific than that I can
7  remember.
8  Q.      So after you talked to them, your
9  expectation was that they would have whatever
10  their normal preplan ready and the officers and
11  commanders would have in place what they were to
12  do and as best they could what to expect?
13  A.      That is correct.
14  Q.      By this time, in May of 2020, you had
15  already received the Matrix report, hadn't you?
16  A.      Yes.
17  Q.      And just independent of the report, you
18  yourself had reached the conclusion that there was
19  a problem of racism in the Columbus Police
20  Department, hadn't you?
21  A.      What I consistently say is systemic
22  racism is everywhere in our society and that the
23  Division of Police is no exception to that.  What
24  the Matrix report, you know, really documented

1  with empirical evidence and data is the
2  disparities and the experiences of
3  African-American officers, women, LGBTQ officers
4  and how they were treated internally and what they
5  witnessed in interactions between the Division of
6  Police and the public.
7  Q.      More specifically didn't the Matrix
8  report indicate that among other things,
9  70 percent of black officers in the Division of
10  Police, I should say black officers and staff, had
11  reported witnessing discrimination in the
12  Division?  Do you recall that in the report?
13  A.      I do, yes.
14  Q.      Now, and it also indicated that about
15  29 percent of officers in general, not, you know,
16  white and black and whatever national origin, the
17  whole diverse, to the extent it is diverse, group
18  of employees there reported observing, witnessing
19  discrimination.  Do you recall that?
20  A.      I do.
21  Q.      That's a pretty high percentage for a
22  law enforcement agency, isn't it?
23  A.      Any percentage to me is unacceptable
24  and too high.  I don't know how that compares to

1  other law enforcement agencies.  But as the Mayor
2  of this City, that is unacceptable.
3  Q.      Well, it's approaching one out of every
4  three employees reporting that, right?
5  A.      Yes.
6  Q.      Did you check to see how many actual
7  discrimination complaints had been filed with IAB
8  after the Matrix report came out?
9  A.      I do not remember doing it.
10  Q.      Did you ask the Chief to do it?
11  A.      No.
12  Q.      If I told you there were hardly any
13  internal complaints of discrimination filed by
14  officers, white or black, would you know whether
15  that's true?
16  A.      I wouldn't know that was true without
17  checking.  But as you know, one of the reasons we
18  created the EEO position in the director's office
19  was to give folks within Public Safety the ability
20  to go outside the chain of command to report and
21  share information about discrimination, harassment
22  and otherwise.  So I know that many officers and
23  firefighters have been reluctant to report racism
24  and discrimination for fear of retribution.

1  Q.      And as of today, to your knowledge, I
2  -- well, let me back that up.  Do you remember the
3  Matrix report also made the statement that there
4  was a disconnect between CPD policy and
5  implementation?  Do you recall that?
6  A.      Not specifically.  But it sounds --
7  that sounds right to me.
8  Q.      And they highlighted some examples that
9  have become very notorious in the press lately
10  about recent, and I'll be polite and call them
11  killings, others might use stronger words.  Did it
12  trouble you after you read that report that law
13  enforcement officers were themselves experiencing
14  discrimination and the people who saw it who were
15  their brothers and sisters on the department
16  weren't reporting it to anybody?
17  A.      Yes.
18  Q.      Would you agree with me that if the
19  policies, including the new policy that has been
20  adopted at your request -- and we're going to get
21  into that in more detail later.  If officers and
22  supervisors don't report deviations from the
23  policies, it's very, very difficult to ensure that
24  the policies are carried out, that the behavior is

1  consistent with the policies.
2         MR. PHILLIPS: Objection. You can
3  answer. You can answer.
4  A.      I'm sorry. What was the question?
5  Q.      If the officers in the field who see
6  misconduct, excessive use of force or improper
7  crowd control techniques that can hurt people or
8  cause them great pain or worse injury don't report
9  it, it's going to be very, very difficult for the
10  Department to implement old or new policies?
11         MR. PHILLIPS: Objection. You can
12  answer.
13         THE WITNESS: So I'm supposed to answer
14  or -- okay.
15         MR. PHILLIPS: Yeah. Yeah.
16  A.      I believe that everything must be done
17  to make sure there is compliance with our policies
18  and procedures, some of which is sharing and
19  reporting by fellow officers. But also one of the
20  reasons that body-worn cameras were such a high
21  priority for me in my first term was to have
22  evidence as well, that video evidence of
23  interactions with police and the public. So I
24  think my response would be, yes. And more than

1  just relying on officers reporting that
2  information is important to maintain the trust
3  from the public.
4  Q.      Okay. Let me just follow-up on this
5  since we're on all this right now.
6         You became aware -- and I don't want to
7  take the time to discuss how. But certainly by
8  the time of the Baker & Hostetler press conference
9  you held, you had learned that a substantial
10  number or proportion of the officers did not have
11  functioning body cams during the protest, didn't
12  you?
13  A.      I don't know how you would qualify
14  "substantial." So I mean, you know, I don't know
15  what that means. But there were a number of
16  officers that did not have their body-worn cameras
17  on and being used in the early days of the
18  protest. It's one of the reasons I directed the
19  Chief to make sure that we outfitted officers with
20  equipment where they could be used and to make
21  sure the badge numbers were clearly visible moving
22  forward.
23  Q.      Well, didn't the Baker & Hostetler
24  investigation or the lawyers working on it

1  indicate to you that one of the big problems they
2  had among others was they couldn't identify a lot
3  of the officers and a lot of the officers didn't
4  have their body cams on?
5  A.      That is correct.
6  Q.      How many officers have been disciplined
7  for not having operating body cams?
8  A.      I don't know the precise number.
9  Q.      Have any?
10  A.      I'd have to check. I don't know.
11  Q.      Well, when's the last time you spoke to
12  the -- I'm going to call them the B&H people just
13  to make it easy. When is the last time you spoke
14  to them?
15  A.      Sometime ago. They represent the City
16  with negotiations with the FOP. So I spoke with
17  them not about these investigations but spoke with
18  them about preparation for FOP negotiations most
19  recently, and that was a few weeks ago.
20  Q.      I'm sorry. I do not want to pry into
21  negotiations. I'd love to, to be honest, but
22  that's not what this case is about. Any time I
23  ask you about conversations with B&H, I'm just
24  asking about information they're giving you about

1  the status of their investigation.
2  A.      Got it.
3  Q.      All right.
4         MR. PHILLIPS: And, Mayor Ginther, the
5  conversations about the negotiations would be
6  attorney/client privilege, so don't answer on
7  those. I don't think you're going to -- I don't
8  think he's going to ask about it, but it would be
9  privileged.
10         THE WITNESS: Thank you.
11  BY MR. GITTES:
12  Q.      B&H is still doing investigations,
13  right?
14  A.      Yes.
15  Q.      The last I heard, and please correct me
16  if I'm wrong, other than a recommendation of a
17  discipline for an officer who failed to do a use
18  of force report, no other recommendation of a
19  found complaint has been reported by Baker &
20  Hostetler; is that correct?
21  A.      I do not know if that's accurate.
22  Q.      Okay.
23  A.      But I can check and confirm that.
24  Q.      Well, sitting here today, other than --

1  just -- whether it was a month ago or whatever,
2  whenever the last time you were told whether or
3  not they had found misconduct, do you know of any,
4  other than the one I mentioned about not doing a
5  use of force report?
6  A.    No.
7  Q.    Have you reviewed videos from those
8  officers who did have body cameras at any time
9  since the demonstrations?
10  A.    So you're saying review body-worn
11  camera footage?
12  Q.    Yeah.
13  A.    I don't believe so.
14  Q.    Have you reviewed the videos that you
15  -- I know that you had a website created so
16  citizens and people who were at the demonstrations
17  could put up videos.
18  A.    Uh-huh.  Yes.
19  Q.    Or actually I think the City put out
20  videos seeking help also to recognize --
21  A.    That's correct.
22  Q.    -- some officers.
23        Are you aware as of today whether any
24  officer, supervisor or commander reported any

1  other officer or supervisor for any misconduct or
2  excessive force against protesters?
3  A.    I'm not aware of any.
4  Q.    Do you know of any -- and I'm now
5  asking based on your interactions with police
6  officers in all the public positions you've had
7  and during your years as Mayor, have you ever
8  become aware or been told of an officer or
9  supervisor who reported excessive force of any
10  kind by another officer or supervisor against a
11  black citizen?
12  A.    I'm not sure I have any specific
13  examples of that.  But I do know of officers that
14  have reported other officers using excessive
15  force.  But I don't know the race of the
16  individual where the allegations were made.
17  Q.    As best you can recall, how many
18  occasions have you ever heard of an officer
19  reporting another officer's excessive use of
20  force?
21  A.    Probably throughout all of my years a
22  dozen.
23  Q.    Okay.  And did any of those result in
24  significant discipline to your knowledge?

1  A.    I don't remember the outcomes of each
2  of the cases.  I'd have to go back and check to
3  see what happened.
4  Q.    You have also recognized that police
5  brutality against black and brown people exists
6  and it exists in the Columbus Police Department,
7  right?
8  A.    Yes.
9  Q.    Okay.  And you --
10  A.    I've said those things, yes.
11  Q.    Have you monitored any of the court
12  cases that have been filed against the Columbus
13  Police Department by officers for discrimination?
14  A.    What do you mean by "monitored"?
15  Q.    I mean, have you been made aware that
16  there have been suits filed, settlements paid --
17  A.    Yes.
18  Q.    -- and/or verdicts?
19  A.    Yes.
20        MR. PHILLIPS:  And, Fred, before you go
21  further in this line of questioning, I just want
22  to remind the Mayor that any conversations you may
23  have had with anybody at the City Attorney's
24  Office would be privileged.

1  BY MR. GITTES:
2  Q.    Okay.  I'm not asking you, and please
3  don't -- I'm asking about knowledge you have about
4  things that I believe are public, not about your
5  conversations with attorneys.
6  A.    Got it.
7  Q.    In your role, do you know if any of the
8  individuals who -- when I say individuals,
9  officers including supervisors, who were involved
10  in the discrimination connected to those cases who
11  were disciplined for the discrimination after the
12  results of the case?
13  A.    Well, I believe in a couple of cases,
14  we attempted to discipline and in some cases
15  punish and fire officers who we then were ordered
16  to hire back through arbitration and the appeals
17  process.
18  Q.    Okay.  Can you tell me -- and I am
19  talking about employment discrimination cases
20  where black officers or supervisors, their case
21  was about discrimination against fellow or sister
22  officers.  You're telling me you're aware of a
23  case where someone was fired for that conduct?
24  A.    Now I have to go back and remember the

1 cases. I'm not sure, I think the issue involving
2 Moore, he was being disciplined and fired for
3 something other than discrimination and harassment
4 but was reinstated. So I guess specific to your
5 question has anybody been fired or disciplined
6 specifically for racial discrimination or
7 harassment, I am not aware.
8 Q. Well, since you mentioned Sergeant
9 Moore, let me ask you another question that
10 pertains to that.
11 You became aware, did you not, that
12 Sergeant Moore, who discriminated against and
13 retaliated against Officer Shaw --
14 A. Uh-huh.
15 Q. -- and actually confirmed the
16 retaliation in an IAP interview, was never charged
17 with retaliation or discrimination, right?
18 A. That is correct.
19 Q. And even though all that information
20 went up the entire chain of command in a very
21 extensive investigatory report by IAB Sergeant
22 Decker, all the way to the Chief, all that
23 Sergeant Moore got was a nondisciplinary
24 counseling. Do you recall that?

1 MR. PHILLIPS: Objection. You can
2 answer.
3 A. I recall that.
4 Q. And in that situation, wasn't it among
5 the very few times that the chain of command --
6 another officer -- actually multiple officers
7 ultimately confirmed race discrimination to IAB
8 and through the chain of command. It's one of the
9 few times that they actually had the temerity to
10 do it, to report it, and essentially no serious
11 action was taken about it?
12 MR. PHILLIPS: Objection. You can
13 answer.
14 Q. Is that an accurate statement?
15 A. Why don't you repeat the statement.
16 I'm not sure. Is it a question or a statement?
17 I'm not sure.
18 Q. I want to ask you if you would agree
19 with this statement.
20 A. Okay.
21 Q. That in the Shaw case --
22 A. Okay.
23 Q. -- it was established that it's one of
24 the few times that officers confirmed to IAB

1 various kinds of discrimination, race
2 discrimination by a Columbus sergeant which
3 including threats of violence and epithets and
4 retaliation to keep black officers out of a unit,
5 a thorough report of all of that information
6 confirming that conduct went up through the chain
7 of command, all the deputy chiefs to the chief,
8 and they did not charge Sergeant Moore formal
9 departmental charges with retaliating or
10 discriminating against Shaw?
11 A. Yes.
12 Q. And that's not like a decade ago or two
13 decades ago, that was right toward the end of
14 Chief -- just went black on her name -- Jacobs.
15 Chief Jacobs' tenure, correct? That's when all
16 that happened? Mayor, I think you're frozen.
17 There you go. Did you hear my question?
18 A. I did not.
19 Q. Okay. Do you know what, I see we've
20 been going for a little over an hour. I would
21 like to take a short break. How about five
22 minutes?
23 A. Sure.
24 MR. GITTES: And, Stacy, can we get a

1 breakout room? Just for the lawyers. And to the
2 plaintiffs who are listening, we have a process
3 where the lawyers can talk in a separate
4 confidential Zoom room so that we can -- they can
5 make suggestions and give me other thoughts and
6 then we'll come back on. You're not going to be
7 able to be in that with us. So just hang on,
8 we'll be back.
9 MR. PHILLIPS: So, Fred, 11:20?
10 MR. GITTES: Yeah. That's great.
11 (A short recess is taken.)
12 BY MR. GITTES:
13 Q. All right. Mr. Mayor, I'm going to
14 jump back not necessarily to exactly where we
15 were, but -- or maybe it is.
16 Were you aware that the Shaw case, the
17 one we discussed involving Sergeant Moore, that
18 that whole decision about discipline went up
19 through Deputy Chief Quinlan's division?
20 A. That's my understanding.
21 Q. Okay. And you understand that he
22 recommended nonformal discipline, in fact no
23 discipline at all for what happened?
24 A. That is my understanding.

1  Q.    Chief Quinlan at the moment is in his
2  probationary period; is that correct?
3  A.    That is correct.
4  Q.    So I'm going to go through a -- this is
5  sort of a hypothetical, but not really.
6      Once a new chief comes in subject to
7  your intervening, a new chief has the authority to
8  implement new policies related to field tactics,
9  how to use and what types of equipment to use,
10  also has a lot of discretion about what kind of
11  equipment to buy, all those kinds of things,
12  excluding contractually controlled discipline or
13  contractually controlled benefits and wage?
14  A.    That is correct.
15  Q.    Okay.
16  A.    That's my understanding.
17  Q.    This is not a suggestion of any
18  outcome, but you're going to have to run for
19  office again if you choose to, right?
20  A.    Is that a question for me or my wife
21  and daughter?
22  Q.    Actually, if you want to consult them
23  now, let's hear it.  Big news.
24  A.    Mayors -- the people of Columbus elect

1  Mayors every four years, four-year terms, and they
2  decide who the mayor is.
3  Q.    And when is your next term up or this
4  term up?
5  A.    My current term ends in 2023.
6  Q.    And at that point, a new mayor would
7  have the authority to eliminate the change in the
8  policy that you asked and got Quinlan to implement
9  or add new policies that you haven't even thought
10  about?
11  A.    Yes, I think that's accurate.
12  Q.    Okay.  Actually, my co-counsel asked me
13  to do something, and I was going to wait until
14  later, but let's just get it done now.
15      MR. GITTES: Jeff, would you mind
16  putting up the exhibit with the -- a couple of the
17  exhibits with the rules that we talked about in
18  our breakout.
19  A.    You guys are going to make me put on my
20  glasses.
21  Q.    I got mine on.  It's only fair.
22  A.    If you see my wife, you make sure to
23  tell her I was wearing my glasses.
24  Q.    All right.  Mayor, I understand from

1  your testimony that you have seen previously to
2  today the exhibits that we shared.  And I don't
3  know, I'll ask you, did you see the affidavits
4  that were filed by the City in their response to
5  our motion?
6  A.    Yeah.  I think all the documents I've
7  had now -- I haven't memorized them, but I did
8  review them.
9  Q.    I think it was either --
10      MR. GITTES:  Wes, you can correct me.
11  I think Officer Lang -- I'm sorry, Lieutenant Lang
12  or somebody else had a whole bunch of documents
13  attached to their affidavit, which included
14  policies.  And here you can see the affidavit of
15  Lieutenant Lang.  And all I want to ask -- and we
16  can kind of scroll through these slowly.  You'll
17  have to tell Jeff how to do it.  I want to make
18  sure that you have seen the documents regarding
19  policies and the operations manuals related to
20  emergencies which includes riots, crowd control, a
21  lot of that kind of stuff, crisis management.  And
22  this is the front page of the operations
23  management.  I'm going to ask you a very general
24  question about it.

1  A.    I hope so.
2  Q.    I've talked about field tactics, field
3  operations.  This is one that addresses those and
4  emergency situations.  Do you recall just seeing
5  that this document was among those things?
6  A.    Yes.
7  Q.    Okay.  Again, this is all training,
8  tactics, kind of stuff.
9      MR. GITTES:  Why don't you go ahead and
10  go to the next one, Jeff.
11  Q.    And this is more of the same policies
12  and procedures about tactics and civil
13  disturbances.  And why don't you -- this is mass
14  arrest procedures.  Then you'll see there's even
15  specific policies, instructions, about munitions
16  involved in riot control.  And then of course
17  there are use of force directions just generally
18  at the Division, and they cover a myriad of
19  situations, police dogs, all kinds of weapons.
20  And I am sure that you've heard of the levels of
21  force that are in these policies.
22      MR. GITTES:  Okay, Jeff.  Go ahead.
23  BY MR. GITTES:
24  Q.    And then here's the one on chemical

1  agents that we'll talk about a little more later,
2  2.04.  And this is the policy where a change was
3  made at your request; is that correct?
4  A.     I believe so.
5         MR. GITTES: Okay. Jeff.
6  BY MR. GITTES:
7  Q.     Again, I'm going to zoom through these.
8  You see the same kind of stuff for different
9  weapons.  Next one.  This is about video systems
10  in the cruisers.  Then we got the body cam
11  provisions governing their use.  Okay.  And then
12  we have another one, a separate one, last exhibit
13  which we'll try to do just as fast.  And that's of
14  the actual policies.
15         MR. VARDARO:  Okay.  Fred.
16         MR. GITTES:  I've already covered it.
17         MR. VARDARO:  First of all, you didn't
18  identify that exhibit.  Can we just get on the
19  record that that's Exhibit 5.
20         MR. GITTES:  Thank you, Jeff.  I'm
21  sorry.  Yeah, for the record, that's Plaintiff's
22  Exhibit 5.
23         MR. VARDARO:  And then I don't know
24  which exhibit that you want me to --

1         MR. GITTES:  Well, I think these will
2  suffice for our purposes.
3  BY MR. GITTES:
4  Q.     So, Mayor, we talked about this
5  earlier.  I just want to make it clear we were
6  talking about exhibit -- the kinds of things,
7  everything that's in Exhibit 5 about tactics,
8  weapons, the kind of weapons that are to be used
9  by officers, the body cameras, the purchase of the
10  body cameras, cruiser cameras, actually the
11  cruisers themselves, all of these policies about
12  tactics, use of chemical, when to use them, how to
13  use them, when not to use them are not a subject
14  of the collective bargaining agreement.
15  A.     That's my understanding.
16  Q.     And you do not have to -- you may
17  choose to, but you have no obligation to bargain
18  with or discuss them with the FOP.
19  A.     That's my understanding and that's what
20  we've done.
21  Q.     Okay.  And to your knowledge since
22  you've been mayor and to the extent you know,
23  there has never been a grievance filed by the FOP
24  about what equipment was purchased, what tactics

1  were described or choice of trainers or choice of
2  weapons that you know of from the FOP?
3  A.     It may be the only thing they haven't
4  grieved.  But as far as I'm aware, no.
5  Q.     Okay.  All right.  Thank you.
6         Let me go back because it kind of
7  relates to what we're going to get into shortly
8  for the rest of the deposition.  To your
9  knowledge, other than Lieutenant Melissa
10  McFadden -- do you know that name?
11  A.     I do.  I've met her.  I know her.
12  Q.     Okay.  Have you read her book by the
13  way?
14  A.     I have not.
15  Q.     Other than Lieutenant McFadden who was
16  charged and recommended for termination by Chief
17  Jacobs for alleged discrimination, isn't it true
18  that no other officer in the Division has been
19  formally charged or fired for acts of race
20  discrimination?
21         MR. PHILLIPS:  Objection.  You can
22  answer.
23  A.     Fred, could you repeat the question?  I
24  apologize.

1         MR. GITTES:  Stacy, why don't you just
2  read that back.
3         (The record is read as requested.)
4  A.     Not that I'm aware of.
5  Q.     And just for the record, Lieutenant
6  McFadden is black, right?
7  A.     That is correct.
8  Q.     Have you looked at the lawsuit in this
9  case?
10  A.     I don't know if the actual lawsuit was
11  included in the materials that I reviewed
12  beforehand.  I think so.  I don't know.
13  Q.     Did you -- well, I'll tell you why I'm
14  asking.
15  A.     Okay.
16  Q.     We have -- the Amended Complaint has a
17  list of all the individuals who are suing about
18  what happened to them at the protests.
19  A.     Okay.
20  Q.     And I just wondered if you knew any of
21  them personally?
22  A.     Could you go through the names or maybe
23  show the names on the screen?  I could probably --
24  Q.     Well, you wouldn't be able to read

1  them.
2  A.      Okay.
3  Q.      I don't know if it's -- if there's,
4  like, 26 or 27 of them.  So let me ask -- I'll
5  just pick out a few at random.
6          But one I know has been active on a --
7  on the task force, Tammy Alsaada.  Do you know
8  Tammy?
9  A.      I know Tammy.  I've known Tammy for a
10 long time.
11 Q.      Okay.  And is she a person that you
12 have found to be trustworthy?
13 A.      Yes.
14 Q.      And to your knowledge, she's never been
15 untruthful with you?
16 A.      No.
17 Q.      And do you give weight to her thoughts
18 and opinions and advice?
19 A.      Yes.
20 Q.      And based on what you heard, was she a
21 good participant in the task force, an active
22 participant?
23 A.      Yes.
24 Q.      And by the way, for the record, what

1  was the name of that task force I think that Janet
2  Jackson headed up.
3  A.      It's the Safety Advisory Commission.
4  Q.      Okay.
5  A.      We've had a number of different groups,
6  but I believe -- I don't believe Tammy
7  participated on the chief's advisory council or
8  the civilian review board working group.  I
9  believe she served on the Safety Advisory
10 Commission.
11 Q.      Okay.  Thank you.  I have to be honest
12 with you, I haven't sorted them all out myself.
13 So thank you.
14 A.      Sure.
15 Q.      I'm just going to read quickly some
16 other names.  Demetrius Burke?
17 A.      That name does not ring a bell.
18 Q.      Talon Garth?
19 A.      No.
20 Q.      Randy Kegler?
21 A.      That name sounds familiar to me.
22 Q.      Do you have any idea why?
23 A.      I might have met with Randy during the
24 protests.

1  Q.      Okay.
2  A.      If it's the same Randy I'm thinking of.
3  Q.      Okay.
4  A.      I'm not sure if I ever knew Randy's
5  last name.
6  Q.      All right.  Do you know a person by the
7  name of Darrell Mullen?
8  A.      Not that I can recall or connect, no.
9  Q.      Andrew Fahmy?
10 A.      No.
11 Q.      Summer Schultz?
12 A.      No.
13 Q.      Leeanne Pagliaro?
14 A.      No.
15 Q.      Torrie Ruffin?
16 A.      That sounds familiar to me, but I can't
17 -- I don't remember.
18 Q.      Do you know what I think I'm going to
19 do to save time?  We will be taking at least one
20 more break.  Is there a way I could e-mail you and
21 Wes this list of names?
22 A.      Sure.
23 Q.      And then you can eyeball them --
24         MR. VARDARO:  Hey, Fred.

1  Q.      -- and when we come back, you can let
2  us know.
3          MR. VARDARO:  Hey, Fred, I can pop the
4  Amended Complaint up on the screen.  It's got the
5  list of names right at the top.
6          MR. GITTES:  I'd rather we do it off --
7  you know, when we're taking a break so we don't
8  use up a lot of time.
9          MR. VARDARO:  Okay.
10         MR. GITTES:  Okay.  Thanks.
11         MR. PHILLIPS:  Fred, you don't have to
12 send me an e-mail.  I'll send the e-mail over
13 right now, all right.  So you can just keep going.
14         MR. GITTES:  Okay.
15         MR. PHILLIPS:  I'll send the Amended
16 Complaint over.
17 BY MR. GITTES:
18 Q.      Okay.  There was another name.  Do you
19 know a Stephanie Garlock?
20 A.      That name does not sound familiar to
21 me.
22 Q.      Okay.  Now, I want to go back to the
23 process for changes in Mayors and Chiefs.  As I
24 understand it now because of a change in the

1  charter some years ago, Chiefs have a specific
2  tenure, right?
3  A.      That is correct.  I believe the
4  charter, you are able to appoint a chief to two
5  5-year terms after a year of probation.
6  Q.      And what is -- what is Chief Quinlan's
7  status in that system?
8  A.      He's ending his year of probation.
9  Q.      So the way that -- and this is my
10  understanding, so I could be wrong.
11       So once he makes it through that year,
12  you don't have the authority to terminate him
13  except for cause, of course, for five years; is
14  that right?
15  A.      You know, I'd have to look exactly at
16  the charter.  But I think -- I can tell you the
17  way I interpret the charter.
18  Q.      Yeah.  What is your --
19  A.      If the Chief isn't meeting my, the
20  Director or the community's expectations, change
21  will be made.  But, you know, the charter is the
22  charter and it says what it says.  But I do not
23  believe as the Mayor that the Chief of Police or
24  the Chief of Fire serve five-year terms without

1  oversight and accountability and decisions made by
2  the chief executive.
3  Q.      Okay.  Maybe my question wasn't good.
4  I'm not asking about your oversight.  I understand
5  that you -- no question, you are those two chiefs'
6  boss and you can give them orders, right?  I mean,
7  there's no dispute about that.
8  A.      That is correct.
9  Q.      I'm asking you whether once the
10  probationary period is over, do you -- your
11  understanding, because I'm asking your
12  understanding.  You believe you can terminate
13  either chief without having to prove some specific
14  kind of cause under the charter?
15  A.      Yeah.  I'd have to look at the charter.
16  I think there were a couple of things that you
17  could determine and terminate a chief based on I
18  think it's --
19  Q.      That's all right.  You don't have to
20  spell them out.
21  A.      Yeah.  I think it's insubordination and
22  a couple of other conditions.
23  Q.      Okay.  So you -- I'm sorry.  Don't mean
24  to speak over you.

1       So you understand that once the
2  probationary period is over, for a five-year
3  period you don't have the discretion just to say,
4  look, this isn't working out, so long.  You have
5  to follow the charter and you have to be able to
6  establish whatever the charter says allows you to
7  terminate him; is that correct?
8  A.      Well, the charter says what it says.
9  Q.      Okay.
10  A.      I don't believe there's any chief of
11  police in America that can do her or his job if
12  they have lost the confidence of the Mayor and the
13  Safety Director.
14  Q.      Well, that may be true as a practical
15  matter.  I'm just asking you about your
16  understanding of your ultimate power in the
17  situation that a chief doesn't care whether you
18  support.
19  A.      That would be a very strict legal
20  interpretation of the charter.
21  Q.      You recall Chief Jackson, right?
22  A.      I do.
23  Q.      Do you remember how there was an effort
24  to get him to leave?  He was charged by the Safety

1  Director.  This is quite a while ago.  And he
2  didn't leave, did he?
3  A.      That was a long, long time ago.
4  Q.      Okay.  All right.  Unfortunately, I'm
5  old enough to remember a long, long time ago.  All
6  right.  Let's just move along here.  Thanks.
7       So getting back to the demonstrations,
8  I want to get our heads back where it's Thursday,
9  the first day of the demonstrations.  You've
10  talked to the Chief and maybe other people in the
11  department.  They've alerted to you that
12  demonstrations are coming.  They've told you they
13  have -- have or working on the plan for the demos
14  that are about to start.
15       I want to ask if you had a discussion
16  with him about a topic, and here is the topic.
17  We've already talked about the fact that you were
18  aware that there is racism in the Columbus Police
19  Department as you put it like there is everywhere
20  in this country.  You knew that the protests were
21  targeting the police department and the racism
22  that exists there and its consequences for people
23  of color.  And you knew that it was likely that
24  some of the officers, at least some and maybe

1  quite a few would resent what the protests were
2  about, might harbor supremacist ideas or feelings.
3  And at least historically very few if any officers
4  have ever been disciplined for using force or not
5  following proper procedures related to individuals
6  who are people of color and strongly disagree with
7  people who want to defund the police or limit
8  their authority.
9        Did you talk about the fact that you
10 have a police department that you know at least
11 some officers feel in the ways I've just
12 described, who were going to be policing an event
13 which is against or critical of the department?
14       MR. PHILLIPS:  I object to the form of
15 the question.  And you can answer the question.
16 BY MR. GITTES:
17 Q.    Well, I want to make sure you
18 understand what I'm asking because that was long,
19 and I understand that.
20       Essentially I want to know, did you and
21 the Chief talk about the dynamic of the police
22 policing a protest which was very critical of the
23 police?
24 A.    No.  We did not speak to that dynamic.

1  Q.    Okay.  Did you personally harbor any
2  concerns about whether some of the officers might
3  be more aggressive because of who was doing the
4  protests and the subject of the protests?
5  A.    Maybe repeat that question, Fred.
6  Q.    Did you personally harbor concerns
7  about the fact of the police being more
8  aggressive, at least some of them, because of who
9  the protesters were and what they were protesting
10 about?
11 A.    Well, certainly with the number of
12 officers that we have, you know, the history,
13 that's always a concern.  Oftentimes officers have
14 to deal with groups whether they're white
15 supremacists, white nationalists or civil rights
16 organizers, where they may be interacting with
17 people that they disagree with.  And I think
18 that's always a concern.  So, yes, I was aware.
19 Q.    And you may not have thought about it.
20 I'm not trying to imply you did or didn't.
21 A.    Uh-huh.
22 Q.    I just want to know.
23 A.    Yes, sir.
24 Q.    Did you think, did it occur to you to

1  discuss with Quinlan the fact that his -- the
2  Department he has spent years in has never fired
3  an officer for discriminating against even their
4  colleagues of color, except for McFadden, which
5  she wasn't fired, the Safety Director put a stop
6  to that.  I just want to remind you of that.  She
7  didn't actually get fired.  But she was charged
8  and recommended to be terminated.  And the fact
9  that relative -- certainly in terms of the
10 thousands and thousands of interactions, did it
11 concern you that very few police officers have
12 reported other police officers' misconduct for use
13 of force?  And lastly, by this time -- correct me
14 if I'm wrong -- you also knew from the Matrix
15 report that most of the people in the department
16 acknowledged with the Matrix people they'd seen
17 discrimination but they didn't report it.  Did --
18       MR. PHILLIPS:  I --
19 Q.    Did you put that together and express
20 concerns to Quinlan about it?
21       MR. PHILLIPS:  I object to the form of
22 the question.  And you can answer the question if
23 you can.
24 Q.    And, Mayor, let me say again, I don't

1  want you to answer any question you don't
2  understand.  Did you understand what I'm asking
3  you?
4  A.    I believe so.  In essence, did I raise
5  with the Chief my concern of how protesters that
6  some officers may not agree with and based on
7  history how that interaction would take place?
8  Q.    Along with a concern that there was not
9  a pattern or history of officers who see
10 discrimination or misconduct reporting it.  They
11 just don't.
12 A.    Well, yeah, I've been very --
13       MR. PHILLIPS:  And hold on one second.
14 I object to the form of the question.  You can
15 answer the question.
16 A.    You know, I've been very clear that we
17 have to change the culture within the Division of
18 Police.  And that's based on history, fact, the
19 Matrix report, the safety advisory commission
20 recommendations, feedback, history of these cases
21 and lack of complaints and oversight and action.
22 So we are in the process of attempting to change
23 that culture, but we clearly are not there yet.
24 And because there is an issue with culture, that

1  is something that is always on my mind.
2  Q.    And I thank you for that answer.  But
3  I'm being more specific in terms of time.
4         Did you actually discuss those topics
5  with the Chief during that first weekend?
6  A.    No.
7  Q.    Okay.  I'm going to use a word, but
8  please disregard my choice of words.  Were you
9  shocked, surprised or stunned to learn that -- I
10  don't know the number, but that some number of
11  officers didn't have operating body cams for this
12  demonstration, given the issues we've been talking
13  about today?
14         MR. PHILLIPS:  I object to the form of
15  the question.  You can answer.
16  A.    Yes.
17  Q.    Okay.  Have you ever found out how that
18  would happen?
19  A.    Based on what I knew at the time and
20  have come to know, sometimes it was an issue just
21  of where that camera would be fastened or put on
22  an officer's gear, depending on the situation that
23  they were dealing with.  You know, and a lot of
24  the gear that was issued at the time hadn't

1  contemplated the use in the wearing of body-worn
2  cameras, I know that was one issue.  But my guess
3  is that there were several different reasons why
4  that didn't take place.
5  Q.    Did you become aware from your
6  discussions that it wasn't just a one-day thing?
7  That even after the first day when -- you know,
8  the cameras are monitored, right?  There are some
9  checks on the feeds they're getting, right?
10  A.    That is correct.
11  Q.    So wasn't it apparent from what you
12  were told after the first day that some number of
13  officers didn't have operating body cams?
14  A.    That is correct.
15  Q.    But it didn't get fixed right away, did
16  it?
17  A.    I'd have to go back and look at the
18  timing.  But if you -- if you determined real
19  quick to be within 24 hours, I think that's an
20  accurate statement.
21  Q.    Okay.  What is your understanding of
22  when all officers had operating body cams?
23  A.    When they were initially issued in my
24  first term or --

1  Q.    No.  No.  I mean during the protests.
2  When was this problem, the various causes for the
3  problem --
4  A.    I'd have to go back and look at the
5  exact date.  I'm thinking roughly a week.  But
6  maybe it was longer than that.
7  Q.    Okay.
8  A.    I don't remember the specific date.
9  Q.    Okay.  Who were you talking to about
10  that or, you know, how did it come to your
11  attention?
12  A.    Who did I talk to about addressing it
13  and fixing it?
14  Q.    No.  How did you find out that that was
15  going on?
16  A.    From the public, from the news
17  accounts, from what was being shared, and even the
18  chief and officers once they discovered it.
19  Q.    Okay.  I'm now going to switch gears
20  again.  I want to talk a little bit about the
21  Baker Hostetler decision.  What led -- first of
22  all, was it your decision to hire B&H to do
23  investigations?
24  A.    Yes.  You know, we had an existing

1  relationship with them and we -- with the amount
2  of pictures, videos and other things that were
3  coming in to assistant director -- is it Bourke?
4  I think it's Assistant Director Bourke's office
5  through the reportcpd@columbus.gov e-mail address.
6  We knew we were going to have to have a
7  significant amount of help to look into and
8  determine those things that should be investigated
9  and either administrative or potentially criminal
10  charges be considered.
11  Q.    Who made that decision?
12  A.    On choosing Baker & Hostetler or --
13  Q.    On getting outside help.
14  A.    I think ultimately that was a
15  recommendation that came from the Director of
16  Public Safety.  And it was a decision, a
17  recommendation I supported and talked to
18  councilmembers about.
19  Q.    Actually, the next question I'm going
20  to ask you just reminded me of something I didn't
21  ask you before.
22         So I apologize, I'll come back to this
23  topic.  But let's go back to the policy changes
24  that you talked to Quinlan about and that he

1  implemented at your direction after the first part
2  of the demos.  Are you with me?
3  A.        Yes.
4  Q.        Okay.  Did you get any resistance or
5  push back from Chief Quinlan or any others in the
6  chain of command about the policy change?
7  A.        I only spoke to Chief Quinlan.
8  Q.        And did he disagree with you?  Did
9  he --
10  A.        No.
11  Q.        -- resist it?
12  A.        No.
13  Q.        Did he agree with you?
14  A.        I didn't ask.
15  Q.        Okay.  Did he spontaneously say, great
16  idea, I think you're right on target?  Or was he
17  just silent and said okay and went away?
18  A.        He told me he understood my directive
19  and would implement it.
20  Q.        Okay.
21  A.        There wasn't a whole lot of
22  conversation about it.
23  Q.        All right.  He didn't give you any pros
24  and cons or anything like that?

1  A.        I didn't ask for them.
2  Q.        Okay.  But he didn't volunteer any?
3  A.        That is correct.
4  Q.        All right.  Now, let's go back to Baker
5  & Hostetler.  Did you get any resistance,
6  blowback, pushback, whatever term you want to use,
7  about the Safety Director and your decision to
8  have outside investigators assist in investigating
9  what happened at the demonstrations?
10  A.        From whom?  I get blowback every day in
11  my job.
12  Q.        Okay.  That's a good question.  I'm
13  sorry.
14  A.        For what I do and do not do.  But from
15  whom?
16  Q.        Yes.  You're right.  I'm sorry.
17           From the chain of command or officers
18  in the police department?
19  A.        I didn't speak to any of them about it.
20  And I never received any pushback from the Chief.
21  Q.        And did the Safety Director ever
22  indicate that he got any resistance to --
23  A.        No, not that I'm aware of.
24  Q.        Okay.  Now, my understanding of the

1  decision -- well, was the decision based on
2  personnel concerns about having the number of
3  people necessary in internal affairs to do the
4  investigations?
5  A.        Well, as you know, Fred, there are a
6  lot of people that I work for that don't have
7  confidence in the police investigating themselves.
8  And so there are folks that don't feel confident
9  about filing complaints with internal affairs, but
10  there are some that do.  And so I believe my job
11  in representing everybody was to make sure they
12  had multiple ways to share complaints, concerns
13  and questions, one within the chain of command and
14  one outside the chain of command, and that's why
15  we did what we did.
16  Q.        One thing that confused me is that if I
17  -- and please tell me if I'm wrong.  The
18  understanding of B&H's role is that whatever
19  investigation and product they produced, it was
20  going to be reviewed and considered by the police
21  department; isn't that -- wasn't that the plan?
22  A.        Maybe repeat that.  I don't know if I
23  understood it or --
24  Q.        My understanding was that although you

1  were going outside of the department and IA for
2  investigative assistance from B&H, and they were
3  going to make recommendations about whether
4  something was not sustained, sustained or
5  unfounded, those recommendations would go through
6  the normal division processes?
7  A.        I believe that the Safety Director's
8  office was involved with this as well, which would
9  make it a little different.  But I would have to
10  double-check that and confirm that.  I'm not sure.
11  Q.        Okay.  Well, let me ask you a few other
12  questions about it.
13  A.        Sure.
14  Q.        And these are based -- and I am just
15  being up front about it.
16  A.        Yeah.
17  Q.        My questions are based on things that I
18  read in the press and in conversations with
19  individuals I represented who were to be
20  interviewed by Baker & Hostetler.  Okay?
21  A.        Okay.
22  Q.        My understanding was the time limits in
23  the contract for investigations for potential
24  discipline were -- that B&H was required to comply

1  with them; is that correct?
2  A.      That is correct.
3  Q.      Why were they told they had to -- do
4  you remember what the time sequence is under the
5  standard IA?
6  A.      I don't.  I think it was rooted in the
7  contract, I believe, the amount of time that
8  investigations could take place or when they
9  needed to be wrapped up.
10  Q.      But isn't there a catch-all exception
11  for investigations in terms of the time limit that
12  if anything being investigated is a potential
13  criminal offense that the time limit which I -- by
14  memory, and, please, I don't mean to say this as a
15  fact, but I believe it's, like, 90 days or
16  something like that.  Wes may know better than
17  either of us.
18         But isn't there a provision in the
19  contract that you were advised of that if any of
20  the matters being investigated could be a criminal
21  offense that that shorter time limit is stayed or
22  it doesn't apply until the investigation is
23  completed?
24  A.      I don't remember that specifically.

1  But that very well may have happened.  I don't
2  remember that specifically.
3  Q.      Well, let me ask you a different
4  question.  Didn't you understand when you were
5  having discussions with the Safety Director about
6  Baker & Hostetler that spraying somebody when they
7  have not committed an offense or using a baton or
8  a bicycle to hit, strike or push someone so that
9  they get hurt or they're injured or other uses of
10  force against a member of the public which is
11  objectively unreasonable can be a crime?  Could be
12  assault, for example?
13         MR. PHILLIPS:  I'll object to the
14  extent it asks for a legal conclusion.  You can
15  answer the best that you can.
16  BY MR. GITTES:
17  Q.      My question is did you discuss that
18  provision?
19  A.      No.
20  Q.      Okay.  So you and the Safety Director
21  did not have any conversations about whether the
22  -- well, let me back up.
23         Most of the citizen complaints that
24  came in were about the use of force, weren't they?

1  A.      Yes.  I think there were complaints of
2  language, force, disrespectful tone.  There were a
3  number of different complaints.  But, yes, use of
4  force was one of them.
5  Q.      Would it be fair to say that most of
6  the complaints were made by people who saw some
7  form of force, whether it was chemical weapons or
8  what do they call them, multi -- baton --
9  ammunition or physical striking?
10  A.      I believe --
11  Q.      Most of them are about that?
12  A.      I believe that's accurate.
13  Q.      And didn't you know or yourself believe
14  that use of force by an officer can be an assault?
15         MR. PHILLIPS:  I object to the extent
16  that you're asking for a legal conclusion.  You
17  can answer the best you can.
18  A.      Yeah.  You know, the best I can answer
19  as a nonlawyer and understanding of criminal law
20  is anybody out -- exercising or acting outside of
21  policy, procedure and legal guidance could be
22  considered a crime.
23  Q.      Okay.  To your knowledge, did you or
24  anyone else that you know of try to get an

1  extension for the B&H investigation?  From the
2  union, from FOP, just get them to agree, look,
3  there's too much stuff here, we got camera
4  problems, we've got other problems, we need more
5  time?
6  A.      If I remember correctly, I believe that
7  the investigators, the lawyers, had asked for
8  additional time in a number of cases and were
9  denied or blocked by the FOP.  I believe I'm
10  recalling that correctly.
11  Q.      Okay.  After that happened, did you
12  consult with anybody whether there was any way
13  around their unwillingness to agree to an
14  extension?  I'm not asking you --
15  A.      Yeah.
16  Q.      -- who or what.  Just did you consult
17  anybody?
18         MR. PHILLIPS:  Well --
19  A.      I believe --
20         MR. PHILLIPS:  Hold on one second.
21  Fred, I'm going to object to that if the answer is
22  going to be about attorneys, because that was a
23  content based question.  So other than attorneys,
24  you can answer the question.  And please don't

1 talk about any conversations you had with
2 attorneys.
3          MR. GITTES:  I'll phrase it a different
4 way.
5 BY MR. GITTES:
6 Q.      After you were informed that the union
7 would not agree to extend the investigation time,
8 did you talk to any attorneys, period?
9 A.      Yes.
10 Q.      Not what you talked to them about.  Did
11 you talk to them?
12 A.      I'm sorry?
13 Q.      Did you talk with attorneys any time
14 after you learned that --
15 A.      Yes.
16 Q.      -- they'd refused?
17 A.      Yes.
18 Q.      Okay.  After that and after having
19 talked to some lawyers, did you take any further
20 action to get or change the time limits on B&H?
21 A.      Not that I can recall.
22 Q.      Did you instruct or ask anybody else to
23 do it?
24 A.      Not that I recall.

1 Q.      Now, another question about the B&H
2 report.  Under the procedures they were working
3 on, they were to follow the same paradigm that's
4 used by IAB in terms of sustain, not sustain,
5 unfounded, right?
6 A.      I believe that's correct.  That's
7 accurate, yes.
8 Q.      Did you learn at least by the time in
9 September when you had the press conference about
10 their work, September 2020, do you recall learning
11 that in some cases where they couldn't identify
12 which officer was involved in the complaint, did
13 you learn that they were treating the complaint as
14 unfounded simply because they couldn't get an
15 officer to provide a response?
16 A.      Your question is did I know that --
17 Q.      Yes.
18 A.      -- and understand that?
19 Q.      Yes.
20 A.      Yes.
21 Q.      Let me ask you about that for a second.
22 Why would a complaint -- let's say a citizen says
23 an officer, I don't know who it was, walked up to
24 me with a -- I'm going to try and use the right

1 terminology.  I even made a list so I could do
2 that.  I've got to find where I put it.  Give me a
3 second.  A baton round shot from a 40 millimeter
4 launcher, that's -- I call them wooden bullets,
5 you know, those weapons that they use to shoot
6 the --
7 A.      Yes.
8 Q.      -- projectiles?  Reported to B&H that
9 she had been shot in the face or was hit in the
10 face by such a weapon.  Couldn't identify the
11 officer.  Why would that be unfounded?  There was
12 no one denied or disputed it because they couldn't
13 be identified.  Why wouldn't that simply be not
14 sustained?  You know, they decided they couldn't
15 make a finding because there was nobody to make a
16 finding against.
17 A.      I'm not sure I'm qualified to answer
18 that question.  I don't -- I don't know the answer
19 to that question.
20 Q.      Do you see why that might be perplexing
21 to the public?
22 A.      Sure.
23          MR. PHILLIPS:  I'll object.  But you
24 can answer.  Yeah.

1 A.      Yeah.  Absolutely.
2 Q.      Do you know in how many instances where
3 civilians reported what they thought was excessive
4 force or there are videos of officers doing things
5 that appear on the video to be unjustified that
6 there would be an unfounded conclusion?
7          MR. PHILLIPS:  I'll object.  You can
8 answer.
9 A.      The question was how -- if I --
10 Q.      Do you understand how that conclusion
11 could be reached, given let's say there's a video
12 showing an officer spraying somebody in the face,
13 nothing going on, no indication of any reason to
14 do it, why would that be unfounded?
15 A.      I don't know the answer to that
16 question.
17 Q.      Do you understand that it gives the
18 impression -- I'm asking for your reactions
19 personally.  That it suggests to you that they
20 assumed the person reporting it or the video were
21 not true or they were false?
22          MR. PHILLIPS:  I object.  You can
23 answer.
24 A.      You're referring that -- to the Baker &

1  Hostetler team?
2  Q.     Yeah.  For them to make a finding that
3  a witness who filed a complaint said they were
4  sprayed or shot or whatever it was and/or other
5  people witnessed that happening --
6  A.     Uh-huh.
7  Q.     -- that if it's stamped unfounded, like
8  it didn't happen because there's no evidence --
9  A.     Uh-huh.
10  Q.     -- that that means Baker & Hostetler
11  must have been presuming that the person who
12  complained or reported it wasn't being truthful?
13         MR. PHILLIPS:  Objection.
14  A.     That's a -- I think -- that would be a
15  question for Baker & Hostetler you're asking me to
16  respond to.
17  Q.     Well, I'm asking you --
18  A.     A presumption of what Baker & Hostetler
19  felt and why they did what they did.  And I'm just
20  not qualified to speak to that.
21  Q.     Okay.  I'm asking you -- I'm not asking
22  you for a legal opinion.  I'm not asking you as an
23  investigator.  I'm asking you as the Mayor who is
24  responsible for all the ultimate product here.  If

1  I came to you and said I don't know his name, but
2  this officer beat me up and here's the scar --
3  A.     Uh-huh.
4  Q.     -- and I have some medical records to
5  show I went to the hospital.  And they say who's
6  the officer?  I don't know.  They can't find the
7  officer.  They go unfounded.  Doesn't that suggest
8  I must have made it up?
9         MR. PHILLIPS:  Objection.  You can
10  answer if you can.
11  A.     I certainly could understand somebody's
12  perspective or belief that an unfounded finding
13  would have them believe that they were not
14  believed.  I understand what you're saying.
15  Q.     Now, in your September 2020 -- I think
16  it was on the 15th of September if I remember
17  correctly.  You reported in the press conference,
18  and I want to try to find -- you said -- or you
19  announced that a number of egregious, and that was
20  the word that was used, cases were being turned
21  over for prosecution.
22       First of all, can you tell me how many
23  cases were turned over for prosecution?
24  A.     I can't.  I know that the Baker &

1  Hostetler team was handling the administrative
2  investigations and a retired FBI agent was
3  handling the criminal investigations.  But I can't
4  remember the exact number right now.
5  Q.     And who is supervising -- who is the --
6  the FBI -- it's Mr. Wozniak is his name, right?
7  A.     Yes, sir.
8  Q.     Have you met him?
9  A.     I have not.
10  Q.     Who is he reporting to?
11  A.     I believe the Safety Director.
12  Q.     Okay.  Were you aware that individuals
13  like me who were representing some of the injured
14  parties in those criminal investigations were
15  advised that an outside attorney from Cincinnati,
16  a Cincinnati city attorney was going to be
17  supervising him?
18  A.     I was not aware of that.  I -- no.
19  Q.     All right.  Were you aware at any time
20  that an outside attorney unrelated to the City was
21  to be responsible for making the decision about
22  whether prosecutions would happen?
23  A.     I don't have specific recollection of
24  that.

1  Q.     Do you know now that there is a former
2  county prosecutor who is now working -- a Franklin
3  County prosecutor who's now working as the lawyer
4  with Mr. Wozniak and evaluating the cases?
5  A.     No.  I'm not aware of that.
6  Q.     Okay.  So you've not talked to the
7  Safety Director about the criminal side
8  investigations?
9  A.     Not recently.  You know --
10  Q.     When?
11  A.     -- in the last couple of months, yeah.
12  Q.     Okay.  So you spoke about it in
13  September.  We're now over four months since that
14  event or that press conference.  Have any criminal
15  prosecutions been filed?
16  A.     Not that I'm aware of.
17  Q.     When you talked to the safety director
18  two months ago, I mean, what was the update that
19  you got?
20  A.     On criminal prosecutions or --
21  Q.     Yes.  On criminal -- on the status of
22  the criminal investigation.
23  A.     I don't really recall a whole lot of
24  information other than the number of cases that

1    Baker & Hostetler had handled, the number of cases
2    that were being forwarded to Mr. Wozniak for
3    criminal investigations, but not a whole lot more
4    than that.
5    Q.    And since then you've not been advised
6    that there are any prosecutions imminent?
7    A.    Not that I'm aware of.
8    Q.    On the other hand, do you know how many
9    prosecutions there were of protesters?
10    A.    No, I do not.
11    Q.    You know there were more than one or
12    two or three or four or five or six, right?
13    A.    I'm not aware of any number.  But I
14    take your word for it.
15    Q.    So you never asked to see how many
16    protesters were arrested and/or charged?
17    A.    I did not.
18    Q.    Okay.  Any particular reason you
19    didn't?
20    A.    No.
21    Q.    Are you aware that many of the charges
22    were dismissed?
23    A.    I think I do remember reading that,
24    hearing that.  And I think potentially speaking to

1    the city attorney about that.
2    Q.    Were you aware that in some instances
3    -- for example, in a case where it was alleged
4    that the female protester had assaulted a police
5    officer and injured him, charges were dismissed
6    after video demonstrated that in fact the officer
7    had tackled the person who was charged and she was
8    injured?
9         MR. PHILLIPS:  I --
10    A.    I'm not --
11         MR. PHILLIPS:  Objection.  You can
12    answer if you can.
13    A.    Yeah.  I'm not aware of that specific
14    case.
15    Q.    Do you know whether any officer at any
16    -- at any time during any of these depositions --
17    I mean these demonstrations or since the
18    demonstration has been charged or even
19    investigated for having made false criminal
20    charges?
21    A.    Not that I'm aware of.
22    Q.    In terms of -- in light -- I'm sorry.
23    In light of everything we've talked about so far
24    today, would you agree with me that one of the

1    most important -- not the only, but among the most
2    important uses of body cams is to help assure
3    whether or not officers are actually following
4    department policies?
5    A.    That is -- I would agree that that is
6    one of the rationales and reasons and
7    justifications for investigating the amount of
8    money the public has and to buy more cameras.
9    Q.    Would you agree with me, Mr. Mayor,
10    that in light of the past history we've talked
11    about where very few officers feel safe or
12    comfortable or for whatever reason don't report
13    inappropriate use of force or discrimination, that
14    that would make it even a greater priority to use
15    body cams which might, not always, but might
16    reveal some incidences of officer misconduct?
17         MR. PHILLIPS:  I object to the form of
18    the question.  But you can answer.
19    A.    Body-worn cameras and the use of
20    body-worn cameras are very important to me.
21    They've been a top priority.  And there are a
22    variety of reasons and rationale, and so I agree.
23    Q.    And do you know of -- let's just take
24    what happened in the spring of 2020.  Do you know

1    whether there's been any systematic -- other than
2    some instances when citizens made a complaint, do
3    you know of any ongoing systematic review of what
4    body cam footage there was to see whether the
5    policy that was implemented or changed or the old
6    policy was actually being followed?  Let's take
7    that first.
8    A.    I want to make sure I understand your
9    question.  Are you -- I mean, there are a couple
10    different reviews going on.  Obviously, Baker &
11    Hostetler, the Mr. Wozniak's work, and then former
12    U.S. Attorney Carter Stewart is working with the
13    Glenn College on, you know, a very -- you know,
14    for lack of better words, maybe an after-action
15    report and review of the City's response as a
16    whole.  Are you speaking to any one of those
17    things or -- I'm unsure --
18    Q.    No.  I'm wondering whether the
19    Department -- because you know I -- you're not in
20    control of the Glenn review, are you?  That's an
21    independent --
22    A.    That's correct.
23    Q.    -- kind of scholarly review?
24    A.    Uh-huh.

1  Q.      But just in terms of the operation of
2  the City's police department, is there any -- I'm
3  sorry.  I'm interrupting myself.
4         How long have we had body cams in use?
5  A.      I believe that we implemented them in
6  my first year as mayor or at least started the
7  implementation in 2016.  I'm not sure they were
8  completely implemented and put in place all in
9  '16, but certainly early in '17.  And then since
10 then we have added body-worn cameras to S.W.A.T.
11 officers, they had not had them before last year
12 and the Chief added them to the group wearing
13 body-worn cameras.
14 Q.      So what I'm talking to you about is is
15 there any systematic -- and I know if there's a
16 complaint and there's body cam, they're going to
17 look at it for the complaint.  But in terms of,
18 you know, after-action reports, you -- I think you
19 used that phrase a second ago.
20 A.      Uh-huh.
21 Q.      Is there any system in place now so
22 that if an event happens like demonstrations,
23 there is a review if not of all of the body cams
24 to see whether officers or particular units or

1  young officers -- you know, to analyze whether
2  officers are complying with policy and training or
3  they are violating either criminal laws or
4  policies that would lead to discipline.  And I'm
5  going to --
6         So I don't care whether it's, like,
7  random sampling, but it's systematic so that it
8  may help with policy changes or anything like
9  that.  Do you know if that's going on?
10 A.      Not that I'm aware of.  There have been
11 additional policy changes even more recently that
12 now require that cameras be turned on regardless
13 of the call for service.  But not of a system -- a
14 compliance system that you're discussing, I'm not
15 aware of that existing.
16 Q.      Okay.  And the current reviews, putting
17 aside the Glenn College, are to look into
18 discipline or criminal action based on reported
19 complaints, right?
20 A.      That is correct.  Unless there are
21 investigations going on.  Because as I said
22 earlier, people can send complaints to internal
23 affairs and to reportcpd@columbus.gov, so there
24 may be some investigations taking place at

1  internal affairs regarding what happened during
2  the protests in addition to Baker & Hostetler and
3  Mr. Wozniak.
4  Q.      Mr. Mayor, based on our depositions
5  we've taken earlier this week, our understanding
6  is that internal affairs are not -- in fact they
7  had started some investigations related to the
8  protests, but they were all ordered to stop and
9  everything related to the demonstrations are going
10 to Baker & Hostetler.  Is that --
11 A.      Okay.
12 Q.      -- incorrect?
13        MR. PHILLIPS:  Objection.  You can
14 answer.
15 A.      Yeah.  It -- you know, they -- if that
16 is the case, I accept that.
17 Q.      Okay.  And maybe this is just my
18 memory, but I want to make sure it's clear.
19 Whatever Baker & Hostetler concludes, putting
20 aside cases that are sent to Wozniak, whatever
21 Baker & Hostetler finds regarding the complaints,
22 that could lead to internal department discipline,
23 that ultimate decision about whether or not there
24 will be discipline will be made either by the

1  safety director with the input of the chain of
2  command, but it -- they will not be bound by Baker
3  & Hostetler's recommendation?
4  A.      No.  I think ultimately that
5  determination will be made by the Safety Director.
6  Q.      Okay.  And you don't know whether the
7  Safety Director will have it go through the chain
8  of command?
9  A.      I do not.
10 Q.      Okay.  Now, I'd like to show you some
11 videos and ask you some questions about them.
12 Oop.  This is the wrong list.
13        MR. GITTES:  Jeff, can we start with
14 Exhibit 101?
15 Q.      All right.  Let's pause for a second.
16 I want to help to save time.  And this is a very
17 short clip.
18        MR. GITTES:  And, Jeff, will you focus
19 on Aleta?
20 BY MR. GITTES:
21 Q.      Do you see the woman who's facing the
22 two officers?  She's right there.  But she's got
23 black hair down her black?
24 A.      Yes.

1 Q. Okay. Just so you know, that's a
2 person named Aleta Mixon, who is a plaintiff in
3 our case.
4 A. Okay.
5 Q. And this is a social media video. This
6 is right near Broad and High. You may recognize
7 the bus stop there --
8 A. Yes.
9 Q. -- which is on Broad Street.
10 A. Uh-huh.
11 Q. And I would like you to watch what
12 happens.
13 (Video played.)
14 UNIDENTIFIED SPEAKER: This lady has
15 done nothing. They have done nothing wrong.
16 They've done nothing wrong. They did nothing
17 wrong. Are you kidding me? They did nothing
18 wrong.
19 (Video stopped.)
20 BY MR. GITTES:
21 Q. Okay. Would you like to see that
22 again?
23 A. Yes.
24 (Video started.)

1 UNIDENTIFIED SPEAKER: This lady has
2 done nothing. This lady has done nothing. They
3 have done nothing wrong. They did nothing wrong.
4 They did nothing wrong. Are you kidding me? They
5 did nothing wrong.
6 (Video stopped.)
7 MR. GITTES: Okay. Would you go back
8 to the beginning, Jeff.
9 BY MR. GITTES:
10 Q. So first of all, as he rolls a little
11 bit forward in a second. I just want to point out
12 that that spray -- I -- and I -- make sure I'm
13 getting the right phrase. Is it a Mark 9. I
14 believe, is the larger chemical spray I mentioned.
15 And you can -- and you can see she's sprayed at a
16 later moment when she turns and she's talking to
17 them. And stop. I think you passed it Jeff. I
18 may be wrong.
19 Okay. First of all, in this little
20 interaction here, you don't see her striking,
21 hitting or doing anything to threaten those
22 officers, do you?
23 A. I do not.
24 MR. GITTES: Okay. Go ahead, Jeff.

1 BY MR. GITTES:
2 Q. Right there. Do you see the spray?
3 She gets sprayed?
4 (Video started).
5 Q. Do you see --
6 (Video stopped.)
7 Q. All right. Keep going slowly.
8 (Video started.)
9 UNIDENTIFIED SPEAKER: This lady has --
10 (Video stopped.)
11 BY MR. GITTES:
12 Q. Okay. Did you see spray that time? I
13 know it happens quickly.
14 A. Yes.
15 MR. GITTES: Okay. Keep going, Jeff.
16 (Video started.)
17 UNIDENTIFIED SPEAKER: She's done
18 nothing. This lady has done nothing. They have
19 done nothing wrong.
20 (Video stopped.)
21 BY MR. GITTES:
22 Q. Right there. That one right in her
23 face? Do you want to see it again?
24 A. I'm sorry. What -- did you have a

1 question?
2 Q. Did you see that spray just a moment
3 ago right in her face?
4 A. Yes. Yes.
5 Q. Okay. And you see that she's walking
6 away?
7 A. Yes.
8 (Video started.)
9 UNIDENTIFIED SPEAKER: They did nothing
10 wrong. They did --
11 (Video stopped.)
12 BY MR. GITTES:
13 Q. And then they follow her and spray her
14 again, all right?
15 A. Yes.
16 Q. Okay. And by the way, this video, this
17 social media video is up on your -- on your --
18 when I say your, the city's website. Had you seen
19 this before?
20 A. So --
21 Q. Well, I don't know this particular one.
22 There is actually a body cam.
23 A. Yeah. I've seen a lot of videos. I
24 can't remember this one specifically.

1  Q.    Okay.  Now, a couple of questions.  I
2  will represent to you to my knowledge --
3        MR. GITTES:  Would you back it up to
4  the beginning, Jeff.
5  BY MR. GITTES:
6  Q.    There are three officers right there,
7  are there not?
8  A.    I think so.
9  Q.    One, two, three.
10  A.    Okay.
11  Q.    To my --
12  A.    Okay.
13  Q.    Do you have any knowledge that any of
14  those officers reported the officer who sprayed?
15  A.    I'm not aware of that.
16  Q.    Based on your understanding just so I
17  know of the new revised rule, officers are still
18  allowed to use chemical weapons relating to crowds
19  or situations if individuals are refusing orders
20  and engaging in what is termed egregious conduct.
21  Are you familiar with the new policy?
22  A.    I am.
23  Q.    Do you know --
24  A.    We're --

1  Q.    Do you know the one --
2  A.    We're speaking --
3  Q.    Just by the way, I want to make it
4  clear, this is before.  This is, like, the --
5  A.    Yeah.
6  Q.    -- 30th or the 29th, so it's before the
7  new policy.  And I want to ask -- I'll ask you
8  about the old policy in a second.
9  A.    Okay.
10  Q.    But I'm using this -- hang on one
11  second.  I'm sorry.  I just got corrected.  I used
12  the word "egregious."  The word in the policy is
13  "aggressive."
14  A.    Yes.
15  Q.    "Aggressive conduct."
16  A.    Yeah.  My general sense and
17  understanding is that, you know, changing the
18  policy from pepper spray chemical agents on
19  nonviolent crowds was permissible before the
20  policy change and it is no longer permissible
21  under the policy change is a layman's
22  understanding of the policy change.
23  Q.    Yeah.  Now at this point do you see any
24  crowd around her?

1  A.    I do not.
2  Q.    And she's sprayed again as she's
3  walking away.
4  A.    That is correct.
5  Q.    And, you know, I'm not asking you --
6  just based on your own observations, does it
7  appear like she is leaving the area, walking away
8  from where the police are?
9  A.    That's what I see.
10  Q.    Okay.  She's also on the sidewalk,
11  right?
12  A.    Yes.
13  Q.    I'm trying to find my list of exhibits.
14  Oh, here they are.  Okay.
15  A.    And can we take another break around
16  1:00?
17  Q.    Absolutely.
18  A.    It doesn't need to be right this
19  second, but --
20  Q.    This is a actually good time.  I
21  wouldn't mind getting a cup of coffee, so I'm
22  going to take advantage of your request.  Let's --
23  can we make it 10 minutes since we're not going to
24  be taking a lunch break or anything?

1  A.    Yeah.  Now, nobody told me I wasn't
2  going to get to eat lunch today.
3  Q.    Do you need to?  I mean if you have
4  a --
5  A.    No, I'm all right.  I'll survive
6  another hour or two.
7  Q.    All right.  That sounds good.  Thanks.
8        (A short recess is taken.)
9  BY MR. GITTES:
10  Q.    All right.  Mr. Mayor, I want to go
11  back because I did forget to kind of ask an
12  important question about the video we watched, and
13  in deference to Wes, I'm going to phrase it
14  nonlegally.
15  A.    Okay.
16  Q.    Having watched that clip of Aleta
17  Mixon, can you tell us in your personal opinion
18  whether that was an appropriate use of force by
19  the officer?
20  A.    Not knowing, you know, what led up to
21  it, what was going on, the back and forth.  But
22  just simply witnessing that, I would not agree
23  that that was an acceptable response.
24  Q.    Let me ask you one other thing.  Even

1 though I will represent to you it's not the case,
2 even if she was mouthing off to the officers and
3 saying -- you know, I could make up examples, I'm
4 sure you can in your own mind, would that change
5 your opinion?
6 A.    No.
7 Q.    Okay.  All right.  A couple quick clean
8 up questions I forgot to ask.  I am going to try
9 to move this along so that Mr. Hardin isn't too
10 delayed.
11         Do you know whether Baker & Hostetler
12 was provided chain of command letters and any
13 chain reports submitted by officers up the chain
14 of --
15 A.    I'm not aware of that.
16 Q.    Do you know whether or not -- well,
17 never mind.  I'll skip that.
18         Well, I'll ask you just in case you
19 know.  Has anyone told you whether or not Baker &
20 Hostetler or anybody else has made an attempt to
21 match up use of force reports to videos?
22 A.    I'd have to ask them.  I'm not aware of
23 that.
24 Q.    Okay.  I'm going to say something un --

1 not to you, Mr. Mayor.  Sorry.
2         MR. GITTES:  John, remind me to say
3 something to you when this is done about a couple
4 things.
5         MR. MARSHALL:  Okay.
6         MR. GITTES:  Thanks.
7 BY MR. GITTES:
8 Q.    Now, I'd like to have you take a look
9 at another clip.  Again it's short.  It is
10 Exhibit 108.
11         MR. VARDARO:  Sorry.  Fred, did you say
12 you wanted 108 or 103?
13         MR. GITTES:  108.  108.  103 is going
14 to be next I believe -- well, no.  108 is what I
15 want at the moment.  I realize I said something
16 else in the breakout room.  But I reserve the
17 right to change my mind.
18 BY MR. GITTES:
19 Q.    So for the record, Jeff has put
20 Exhibit 108 on the screen.  So, Mr. Mayor, if you
21 wouldn't mind just watch this.
22         (Video started.)
23         UNIDENTIFIED SPEAKER:  What the fuck?
24         UNIDENTIFIED SPEAKER:  Sorry.

1         (Video stopped.)
2 BY MR. GITTES:
3 Q.    Do you want to see it again?
4 A.    Yes, please.
5         (Video started.)
6         UNIDENTIFIED SPEAKER:  What the fuck?
7         UNIDENTIFIED SPEAKER:  Sorry.
8         (Video stopped.)
9 BY MR. GITTES:
10 Q.    Is that enough?
11 A.    Yes, sir.
12 Q.    Okay.  My question to you -- first of
13 all, have you ever seen it before?
14 A.    I don't believe so.
15 Q.    In your view based on what you saw in
16 that video, in your opinion, is that an
17 appropriate use of force by the officer under any
18 policy?
19         MR. PHILLIPS:  I'll object.  But you
20 can answer.
21 A.    Well, I think clearly that would be
22 inappropriate under the current policy that I
23 directed change to.  And I'd have to reread the
24 old policy.  But that seems like an inappropriate

1 use of force regardless of policy, but certainly
2 under the policy change that I made.
3 Q.    To your knowledge, and I understand you
4 may have no idea.  I'm just asking just in case.
5 Do you know whether any of those officers standing
6 there in that line watching their colleague spray
7 those two gentleman as they knelt reported it?
8 A.    I'm not aware.
9         MR. GITTES:  Okay.  Jeff, do you want
10 to go to 103 now?  I'm sorry.  I'm --
11         MR. VARDARO:  Can you see it?
12         THE WITNESS:  Yes.
13         MR. GITTES:  Yes.
14 BY MR. GITTES:
15 Q.    Okay.  Is this 103?  Yeah, I guess it
16 is.  Okay.  This one is a little bit longer but
17 not much.
18 A.    Okay.
19         (Video started.)
20         UNIDENTIFIED SPEAKER:  These protesters
21 are unarmed and the police are shooting their
22 little fun bullets at them.  Look at it.  Look at
23 it.  Coming out with their hands up.
24         UNIDENTIFIED SPEAKER:  (Inaudible)

1  motherfucker.
2      UNIDENTIFIED SPEAKER:  Don't shoot.
3      UNIDENTIFIED SPEAKER:  Hands up.
4      UNIDENTIFIED SPEAKER:  What the --
5  (inaudible) --
6      (Video stopped.)
7  BY MR. GITTES:
8  Q.      Would you like to see it again?
9  A.      Please.
10      (Video started.)
11      UNIDENTIFIED SPEAKER:  These protesters
12  are unarmed and the police are shooting their
13  little fun bullets at them.  Look at it.  Look at
14  it.  Coming out with their hands up.
15      UNIDENTIFIED SPEAKER:  (Inaudible)
16  motherfucker.
17      UNIDENTIFIED SPEAKER:  Don't shoot.
18      UNIDENTIFIED SPEAKER:  What the
19  (inaudible) --
20      (Video stopped.)
21  BY MR. GITTES:
22  Q.      Have you seen it enough?
23  A.      Yes, sir.
24  Q.      Okay.  Based on your viewing and your

1  opinion, was that appropriate action under the
2  existing or prior policies of your administration?
3      MR. PHILLIPS:  Objection.  You can
4  answer.
5  A.      I do not believe that that was
6  appropriate based on the change in policy that I
7  directed and made change.
8  Q.      What about under the old policy?
9  A.      I don't believe so.
10  Q.      Would you agree with me that there was
11  really -- first of all, I didn't see any objects
12  being thrown at those officers, did you?
13  A.      I did not witness that.
14  Q.      Did you see those -- the individuals
15  who were -- I think eventually there were three of
16  them, make any threatening gestures or engage in
17  any --
18  A.      I did not.
19  Q.      -- threatening conduct?
20      Did you see any reason why, one, two,
21  three, four of the officers couldn't just go over
22  and place them under arrest if they thought there
23  was an offense occurring?
24  A.      I'm sorry.  Repeat the question.

1  Q.      Yes.
2      Could you see any reason why officers
3  one, two, three or four of them, whatever,
4  couldn't walk over and indicate if they didn't
5  leave, if that was the desire of the officers,
6  that if they didn't, they would arrest them?
7  A.      Yeah.  There certainly were lots of
8  different ways that situation could have been
9  handled and should have been handled.
10  Q.      Well, that video also reminded me that
11  I had forgotten to ask you about traffic.  During
12  the years you've been Mayor and in fact the years
13  you've lived in Columbus, it is not that unusual
14  to redirect traffic for events, demonstrations,
15  emergency, from the downtown area, is it?
16  A.      I wouldn't say it is a regular
17  occurrence, a usual occurrence.  I think that's
18  right, unusual.  I think, you know, it would -- it
19  is not unusual.
20  Q.      And I mean when -- you know, I realize
21  there were no permits this time.
22  A.      Uh-huh.
23  Q.      But people actually can get permits to
24  march down the street or demonstrate, and the

1  City, the police department has plans in place to
2  redirect traffic so that they don't have to go --
3  they can get where they want -- they need to be
4  without going around the statehouse or certain
5  portions of downtown, right?
6  A.      That is correct.
7  Q.      And it's done for the Jazz -- you know,
8  Boom, you know, July 4th celebrations, all kinds
9  of things, right?
10  A.      Yes.
11  Q.      And it's also my understanding that --
12  I think like maybe recently somebody told me there
13  was some kind of spill on the interstate and there
14  could have been dangerous chemicals and the police
15  have plans in place to quickly block off traffic
16  to avoid them going -- people going into the
17  dangerous area from the downtown ramps or in the
18  location of a dangerous fire or spill, right?
19  A.      That is correct.
20  Q.      And in what you saw there, there was no
21  traffic even -- I mean, if the traffic wanted to
22  go through, there were armed officers on both
23  sides of the intersection blocking the street,
24  right?

1  A.      That's correct.  I didn't see any
2  traffic that was impeded.
3  Q.      Okay.  Well, even if there was traffic,
4  the officers would be in the way, wouldn't they?
5  A.      Yes.
6          MR. GITTES:  Okay.  Now I'd like to go
7  to -- I guess it's -- one second here.  Huh.
8  Sorry.  There it is.  106.  I think it's -- it's
9  either 105 or 106.  Jeff, do you recognize it's
10 one of those two.
11         MR. VARDARO:  You want the one with the
12 sidewalk or without the sidewalk?
13         MR. GITTES:  With the sidewalk.
14         MR. VARDARO:  Okay.  I'm going to pull
15 up 106.
16         MR. GITTES:  Okay.
17 BY MR. GITTES:
18 Q.      Okay.  For the record, Your Honor, we
19 have put Exhibit 106 and we're going to play it
20 for you.  It's about 14 seconds.
21         (Video started.)
22         UNIDENTIFIED SPEAKER:  Get out of the
23 street.  Clear the street.
24         UNIDENTIFIED SPEAKER:  Get the fuck off

1  me, you mother --
2          (Video stopped.)
3  BY MR. GITTES:
4  Q.      Okay.  I want to particularly -- and
5  we're going the show it to you again because I
6  know it's hard.  There's a lot of movement going
7  on, so I want to make sure you get a chance to
8  look at it.  But I want you to particularly note
9  the officer toward the stairs -- this is at the
10 corner of Broad and High, and you see the people
11 standing there.
12         MR. GITTES:  Right now stop.  Just hang
13 on, Jeff.  Go back one frame.  Yeah.
14 BY MR. GITTES:
15 Q.      You see these people except for a
16 couple of them are just barely off the curb,
17 they're standing on the sidewalk in front of the
18 steps that go down to the parking garage under the
19 statehouse?
20 A.      Yes, sir.
21 Q.      Okay.  I want you to watch the officer
22 at the end of the line and what he does.
23         MR. GITTES:  Okay.  Go ahead, Jeff.
24         (Video started.)

1          UNIDENTIFIED SPEAKER:  Get out of the
2  street.  Clear the street.  Get out of the street.
3          MR. GITTES:  Do you see him turning
4  towards the sidewalk and spraying all of those
5  people on the sidewalk?
6          (Video stopped.)
7  Q.      Mayor, did you see that?
8  A.      I did.  Could you play it one more
9  time, please.
10 Q.      Yes.  Absolutely.
11 A.      Now I know what you're looking at.
12         (Video started.)
13         UNIDENTIFIED SPEAKER:  Clear the
14 street.  Get out of the street.  Out of the
15 street.
16         UNIDENTIFIED SPEAKER:  Out of the road.
17         UNIDENTIFIED SPEAKER:  Get the fuck off
18 me, you mother --
19         (Video stopped.)
20 BY MR. GITTES:
21 Q.      Do you want to see it again?
22 A.      No.  I think that -- that's good.
23 Q.      Now, based on what you saw, under your
24 -- under the policy and I guess I'll just focus on

1  the newer policy.  Or any -- I'll just ask you
2  under any policy, in your opinion was that an
3  appropriate use of chemical mace?
4  A.      No.
5          MR. PHILLIPS:  Objection.  You can
6  answer.
7  A.      Certainly not under the current policy.
8  Q.      Okay.  Okay.  I think that's -- we'll
9  stop with the videos now because I -- Wes made me
10 promise I'd get done faster than I might have.
11         MR. PHILLIPS:  We have rotated, Fred.
12 BY MR. GITTES:
13 Q.      Well, you know, I've been asked to
14 clarify.  Initially when I asked you the question
15 I said under any policy, so I -- you said
16 initially yes.  And then you said certainly under
17 the current policy.  Wouldn't -- in your opinion,
18 was that an inappropriate use of force even under
19 the past policy?
20         MR. PHILLIPS:  Objection.  You can
21 answer.
22 A.      Well, I guess what you're -- are you
23 asking me if it's in violation of policy and then
24 -- I mean, because if you ask a question about any

1 policy, I -- I want to make sure I'm answering
2 your question.
3 Q.      Sure.
4 A.      So are you asking me if I personally
5 feel like that's appropriate regardless of the
6 policy?
7 Q.      Yes.
8 A.      Because there are policies that would
9 warrant, that would support potentially that
10 action.
11         But as a person, as an individual, I
12 believe that response was inappropriate and it is
13 in violation of the policy change that I made.
14 Q.      Well, for just a moment, let's look --
15 I just want to understand as to the prior policy,
16 what would make you think personally that it was
17 not inappropriate under that policy?
18 A.      Well, I think one of the major changes
19 we made is to the use of force or the use of
20 pepper spray and chemical agents on peaceful
21 protesters and folks that might be aggressive or
22 violent.
23         Clearly, what we saw there were
24 peaceful protesters on the sidewalk who were

1 sprayed indiscriminately.  That's in clear
2 violation of the policy change we made.
3 Q.      Okay.  But under the old policy, how
4 would it be okay for an officer to spray people on
5 a sidewalk who are peaceful who you didn't -- you
6 know, did you see anybody throwing anything at the
7 officers or threatening them who were on the
8 sidewalk?
9 A.      One of the reasons we changed the
10 policy was to make absolutely clear and certain
11 when and if officers could use pepper spray and
12 chemical agents.  There may be an argument that
13 someone could make that this might have been
14 justified under the former policy.  We wanted to
15 remove all doubt and correct and clarify by
16 instituting this new policy.
17 Q.      Okay.  But you're the Mayor of the
18 city?
19 A.      I am.
20 Q.      Based on what you saw that happened, do
21 you believe it was justified or appropriate?
22 A.      No.
23 Q.      Okay.  Now, and I want to also ask
24 another question.  Even with the -- well, never

1 mind.  I'll come back to it at the very end.
2         I want to ask you, have you ever gone
3 to protests as a protester?
4 A.      I'm sure.  I was raised by some very
5 politically active parents.  I'm trying to
6 remember when my first protest might have been.
7 Q.      Well, let's --
8 A.      I was probably in a stroller or, you
9 know --
10 Q.      I was just going to qualify my
11 question.
12 A.      -- in a backpack.
13 Q.      Did you ever go to -- I'm asking if you
14 ever went to a protest when you had reached the
15 age of reason, which I will barely say includes
16 teenagers.
17 A.      So have I participated in protests
18 before, yes.
19 Q.      Okay.  And may I ask how old are you?
20 A.      45.
21 Q.      Okay.  My math is not fast enough.  Did
22 you participate in any antiwar protests or was
23 that too early?
24 A.      Not antiwar.  My dad was a Vietnam War

1 veteran and joined the Veterans Against the War
2 when he returned, and he and my mom were very
3 active in that movement.  But I wasn't born until
4 '75, so my guess is other military operations and
5 military activities my parents participated in, I
6 would have been around.
7 Q.      How about you as an -- you know, in
8 your later youth, were you involved in any civil
9 rights protests or discrimination, desegregation,
10 any of that kind of stuff in the '80s or --
11 A.      Probably more so in the '90s as a
12 college student.  And, you know, divestment
13 movements with South Africa and apartheid and, you
14 know, those types of things.  And then studied
15 peace and global studies -- or went on a peace and
16 global studies forum travel program to northern
17 Ireland in college, so I was part of a Corrymeela
18 reconciling community there in northern Ireland or
19 involved in different activities in peacemaking.
20 Q.      Well, let me -- and I take it just from
21 what you just said and your education, you have
22 certainly seen videos and films going back into
23 the '60s, '70s, '80s and '90s of civil rights
24 protests, civil rights marches where police hosed,

1 used dogs, used chemical weapons?
2 A.     I have.
3 Q.     Okay.  And you've seen that in many
4 cases like in some Martin Luther King marches and
5 other very famous civil rights leaders where the
6 protesters were not violent at all but they still
7 were subjected to force?
8 A.     All over the world, yes.
9 Q.     A good point.  True.
10       The reason I'm asking you about this is
11 in some of the after-action reports and comments
12 by officers and commanders in the CPD, there are
13 references to the fact that they knew there were
14 -- and I am not trying to suggest the actual
15 words, but I'm trying to get as close as I can.
16 They believed these were -- there were elements of
17 highly organized protesters who were there for
18 other purposes.  And they remarked upon the fact
19 that they saw people who had face masks on, you
20 know, to resist the chemical spray.  They even
21 commented on the fact there were medics there who
22 had water and cleansers and so forth, and they
23 remarked upon individuals having shields or other
24 protective devices.

1       Now, the reason I'm asking you that is
2 based on what you've seen historically and maybe
3 even on your trips and your own participation in
4 demonstrations, wouldn't it be reasonable for
5 anybody who's going to a protest, especially one
6 against police about the police's racism, to think
7 about being prepared for being sprayed, shot at,
8 or otherwise and to have some protection against
9 it?
10       MR. PHILLIPS: I'll object to the form
11 of the question.  But he can answer.  And I will
12 say this about the answer -- and, Fred, I don't
13 think this is going to cause this.  I don't know
14 if the Mayor is -- gets confidential information
15 kind of similar to what we were talking about
16 yesterday.  I don't think this -- I know you're
17 not asking for that, but --
18       MR. GITTES: No.  I'm -- okay.
19       MR. PHILLIPS: Right.  But I do want to
20 object to the form of the question.  But he can
21 answer.
22 BY MR. GITTES:
23 Q.     Well, let me make it clear again.  I'm
24 basing this question on comments in the records of

1 the CPD.  They don't refer to some secret plot
2 that they've discovered through intelligence.
3 It's strictly remarking on what the protesters
4 were wearing and what they had with them.
5       Do you think just using common sense
6 that a police officer can conclude that a
7 protester who has some water or other -- or
8 someone volunteers to come to clean peoples' faces
9 and eyes if they're sprayed or they have a mask on
10 because they're concerned about being sprayed, or
11 they're worried about being shot with wooden
12 bullets, that that's a basis to conclude they were
13 part of an organized plot to do criminal activity?
14       MR. PHILLIPS: I'll object.  But you
15 can answer.
16 A.     My conclusion -- I generally draw my
17 conclusions based on actions, not on speech.  And
18 so there was violence, there was vandalism, there
19 was rioting, there was destruction of public and
20 private property.  But there were also significant
21 numbers of peaceful protesters that were demanding
22 action, change and justice.
23 Q.     And many of those peaceful protesters
24 might have had a mask on, right?

1 A.     We're in the midst of a global
2 pandemic, I sure as hell hope so.
3 Q.     No.  I mean one of those plastic facial
4 masks that would also prevent spray from going in
5 their eyes, right?
6 A.     Yeah.  I mean, if you --
7 Q.     If you see --
8 A.     Based on people that have had
9 experience, I can understand why people would have
10 taken those precautions.
11 Q.     And the fact that a medic might be
12 present, you know, a para -- you know, not
13 certified medics, although just so you know some
14 people have some training without being a
15 certified paramedic.
16 A.     Sure.
17 Q.     Just the fact that medics who share the
18 beliefs and concerns of the protesters are there
19 ready to help people, that doesn't mean there's
20 some -- they're some part of some organized plot,
21 does it?
22       MR. PHILLIPS: Objection.  You can
23 answer.
24 A.     No.  And there's a history as you

1 mentioned of nurses from churches and places of
2 worship throughout the years catering to
3 protesters who encountered violence historically
4 here and around the world. There's history to
5 support that notion.
6 Q.    I also want to talk about another
7 subject that's come up in the testimony and
8 reports here. There have been -- there were
9 definitely some -- there's definitely some video
10 showing some individuals with -- and, you know,
11 I've -- with weapons. A long gun, maybe
12 semiautomatic guns. I think I know your position
13 about this, but I think it's pertinent to this
14 case. Given the Ohio legislature's predilection
15 to passing increasing legislation permitting
16 individuals to carry weapons, even concealed
17 weapons, and brandish them and have them open and
18 visible, has the police department indicated to
19 you how or whether it's even possible to make a
20 determination that the presence of people with
21 weapons would indicate that the protest is no
22 longer peaceful or it has to be treated as
23 dangerous to the officers?
24 A.    Can you repeat the question, Fred? I

1 want to make sure I'm answering it.
2 Q.    Okay. Well, let's take it step by
3 step.
4        I'm sure and I know -- well, I
5 shouldn't assume it. You don't agree with some of
6 the legislation that has been passed about the
7 right to carry weapons, do you?
8 A.    Stand your ground, taking away the
9 City's ability to take action on assault weapons,
10 dangerous and reckless, yes.
11 Q.    Okay. In this demonstration -- this is
12 not the only one, but in this demonstration, at
13 least in one instance that I'm aware of one of the
14 reasons that was given for requiring S.W.A.T.
15 intervention and which -- and then it led to use
16 of both chemical and nonchemical weapons was that
17 there were a couple of individuals who were
18 protesters, at least they appeared to be, who had
19 weapons with them. And they brandished them, you
20 know, it was visible.
21 A.    Uh-huh.
22 Q.    Given the current law in Ohio, that
23 that is legal, right? You know, there's some
24 restrictions.

1 A.    As much as I disagree with it, you are
2 correct. It is legal.
3 Q.    So would you agree with me that at
4 least in Ohio absent some other indication of a
5 planned violent act, that it's not appropriate for
6 the police just to assume that because people are
7 there with weapons that means they must get
8 S.W.A.T. involved or it's a factor in determining
9 that it's a dangerous protest?
10        MR. PHILLIPS: I object to the form of
11 the question. But you can answer.
12 A.    I go -- you know, I go back to what I
13 said earlier. I make judgments based on actions
14 not speech. And, you know, unfortunately, the
15 right to carry, brandish arms is the law of the
16 State of Ohio. And there's nothing that I would
17 surmise from the presence of firearms that's
18 connected to violence unless there were actions or
19 history of that individual doing that that would
20 lead me to that conclusion.
21 Q.    Or related tweets I think, you know,
22 things that would be an indicator. Okay.
23        Okay. Thank you, Your Honor.
24        I want to ask you if you have been made

1 aware of whether any protest leaders -- and I mean
2 that, you know, like some of the leaders of some
3 of the organizations that joined and encouraging
4 people to go down there, and you know I believe
5 that Tammy Alsaada, for example, their
6 organization did social media encouragement. Are
7 you aware of any of the leaders who encouraged
8 people, announced the protests, being arrested by
9 the police during protests?
10 A.    I am not.
11 Q.    Okay. Were you made aware of whether
12 or not there were undercover officers present
13 during the demonstrations?
14 A.    I don't know for sure. But I'd -- I
15 think it's safe to assume that they were. But I
16 can confirm that and circle back with you, but I
17 assume they were.
18 Q.    Okay. And when you circle back, I'm
19 going to reserve the right to discuss that with
20 you if and when you can.
21 A.    Uh-huh.
22 Q.    I'd like to know what you can learn
23 about what the purpose of that was.
24 A.    Okay.

1  Q.    I'm not -- if it's about undercover
2  drug investigations or --
3  A.    Sure.
4  Q.    You know, obviously I don't care and I
5  don't need to know.  But I'm trying to find out
6  whether or not that was some kind of routine
7  related to demonstrations.
8  A.    Okay.
9  Q.    Now, another thing I want to ask about
10  is kind of a -- it became a national comment, so
11  that's why I'm going to ask you about it.
12       Do you remember a Tweet that you did or
13  made -- I think it was a post on your Twitter
14  account about a bus that was known as Buttercup
15  for a juggling group that was --
16  A.    I do remember that.
17  Q.    -- in the Columbus.
18       I don't know if you know Senator Rubio
19  picked up on your Tweet and became -- it got
20  circulated nationally.  Did you know that?
21  A.    Please do not tell my family that.
22  Q.    Okay.  All right.
23       As you may recall, you Tweeted that
24  they found -- that the police discovered, I used

1  that -- that's your word, I'm using that word.
2  That this bus had a hatchet in it, it had what
3  they described as rocks, and other items that they
4  suggested were weapons and that it was -- the bus
5  was registered in Vermont and they basically
6  represented at least in publically that, see, they
7  were outside agitators who had come in with
8  weapons?
9  A.    I remember this, yeah.
10  Q.    Did you later learn what -- learn more
11  about the people who had that bus and what
12  happened?
13  A.    I do.  You may have to refresh my
14  memory.  But it was not what was being reported
15  and shared with us at that time when that social
16  media post was made.
17  Q.    Well, let me go through some details
18  and see if it refreshes your memory.
19  A.    Yeah.
20  Q.    In fact, they were a -- somebody gave
21  me a better term to describe this.  But they were
22  juggling clowns.
23  A.    Yeah.
24  Q.    And they go to festivals and they also

1  go to places where there's demonstrations and
2  stuff that they agree with.  They had -- the bus
3  is a home and they call it Buttercup.  And so they
4  had a hatchet because they use wood in the stove.
5  The rocks were actual, you know, crystalline, you
6  know, like decorative crystal that people have in
7  their houses.  And the sticks or whatever they
8  were referred to as were things that they juggled.
9       And in the police report -- and I want
10  to know if you learned what I'm telling you.  The
11  police reported that they blocked traffic, which
12  is why they discovered all of this.  But in fact
13  they were stopped by the police as they pulled out
14  on to Broad Street and cited -- they were stopped
15  by the police as they pulled out because they --
16  because of traffic problems.  And then they had a
17  conversation with them and demanded to go inside
18  the bus and then everything happened after that.
19  And they actually temporarily, as I understand it
20  -- well, that's what happened.  Did you learn all
21  that afterwards?
22       MR. PHILLIPS:  I object to the form of
23  the question.  You can answer the best that you
24  can.

1  A.    Yeah.  I don't remember all of those
2  details.  But I remember the general sense of your
3  statement and question.
4  Q.    I would like to know who was it who
5  told you that -- conveyed to you the particular
6  officer that they were outside organizers,
7  agitators, whatever the term was and they had the
8  bus that had weapons in it?
9  A.    It was information that came from the
10  division that came up the chain of command.  I
11  think I remember an instance or two where I spoke
12  about this directly with the Chief and then a few
13  days after that with the City Attorney.
14  Q.    You know, I know you're going to be
15  shocked, but I think I may be done, if I can have
16  -- give me, like, five minutes to meet with
17  co-counsel, and I am sure I can get this wrapped
18  up certainly not much after 2:00.  Okay?
19  A.    Okay.
20       MR. PHILLIPS:  Perfect.  All right.
21  We'll see you at 1:50.
22       (A short recess is taken.)
23  BY MR. GITTES:
24  Q.    Okay.  I'm going to jump right in to

1  get this done.  Thanks for your patience,
2  Mr. Mayor.  We should be on target here time-wise.
3       Just very quickly, regarding Buttercup
4  the bus, I don't think I actually asked you if you
5  could remember the specific person who related
6  that information to you?
7  A.    I believe it was the Chief.
8  Q.    Okay.
9  A.    I'm not certain of that.  But I am
10  pretty positive it was the Chief.
11  Q.    And it would be fair to say now in
12  hindsight that the information you were given was
13  inaccurate and certainly exaggerated in terms of
14  weapons?
15       MR. PHILLIPS:  Objection.  You can
16  answer.
17  A.    Yeah.  Based on what we know now, it
18  certainly was incomplete.
19  Q.    Okay.  Another question I had for you
20  is toward -- and I can give you the particular
21  statements if you want.  You were interviewed on
22  television I believe a couple of times?
23  A.    Once or twice.
24  Q.    Yeah.  Once or twice.

1       But specifically I think it was, like,
2  in June.  I think I've got quotes on, like, June
3  21, 23, 24, all --
4  A.    Okay.
5  Q.    -- related to the new policy and the
6  demos.
7  A.    Yeah.
8  Q.    And you indicated in those interviews
9  in essence that there had been compliance with the
10  policy and that there were no other improper uses
11  of chemical weapons.  What I would like to ask you
12  is were those statements --
13  A.    I don't -- I don't remember saying
14  that, that there weren't any --
15  Q.    Okay.  Well, let me look at the quotes
16  I got, and maybe I'm misconstruing them.
17       This is one that was on WOSU radio.
18  A.    Uh-huh.
19  Q.    It would have been June 22nd, I
20  believe.  And it's -- you said based on what I
21  know now and what was shared with me with the
22  Division of Police, I believe that officers were
23  within the policy change.
24  A.    That was after an incident on Father's

1  Day; is that correct?  That's different from what
2  we're --
3  Q.    I --
4  A.    The original -- I think so.  That would
5  have been a comment in reference to an incident
6  that had took place on Father's Day I believe when
7  shields were thrown -- when scooters were thrown
8  at officers, when shields were thrown at officers.
9  I think that's what that quote is responding to.
10  Q.    Okay.
11  A.    The use of chemical agents, pepper
12  spray were used when officers were assaulted and
13  harmed.
14  Q.    Let me approach this a different way.
15       First of all, the information you got
16  regarding that incident, did it come from the
17  Division of Police?
18  A.    What --
19  Q.    About the incident you just said you
20  were talking about.
21  A.    On Father's Day?
22  Q.    Yeah.
23  A.    Yeah.  And from videos and so forth,
24  public reporting.

1  Q.    There are -- I see a couple of others.
2  You said -- and maybe it's all about the same
3  thing.  Ginther -- this is a quote from you, this
4  is all part of WOSU reporting.  Ginther said he
5  believes officers used spray, pepper spray
6  specifically against people who became violent.
7  But that his office wants to hear from protesters
8  about experience.
9       So it sounds like you were getting
10  other reports, it's multiple.  I'm just trying to
11  find out did you personally observe on video --
12  did you base this statement on your own inquiries,
13  your own viewing of documents or did you base this
14  statement on what the Division was telling you?
15  A.    Both.
16  Q.    Both.
17       So can you tell me what this referred
18  to about people who became violent?  What people
19  were you talking about?  This would have been --
20  A.    Father's Day.  Yeah.  There were
21  individuals that had thrown scooters at officers.
22  Q.    I'm sorry.  You froze, Mayor, so we'll
23  have to wait.
24  A.    Two agents were used not -- based on

1  the policy change that I made and the Chief
2  implemented, I think, you know, a lot of the
3  images and so forth and discussion here has been
4  more about the indiscriminate use of those agents.
5  Part of the change and direction I gave to the
6  Chief is obviously this can't be used on
7  nonviolent protesters, only when protesters become
8  aggressive or violent. And it can't be used
9  indiscriminately, it needs to be targeted at those
10  who were part of or committing the violence or
11  vandalism. That's what these comments on the --
12  after Father's Day that --
13  Q.    Okay.
14  A.    -- you're asking about.
15  Q.    So the comments I saw were really about
16  a specific incident or moment?
17  A.    A specific day, yes.
18  Q.    Yes. Okay.
19        Did you ask for or get any other
20  reports or reviews about whether there was
21  compliance, wasn't compliance or anything else
22  regarding the handling of demonstrations after
23  June 17th, other than this one occasion or day
24  that you mentioned?

1  A.    Well, there were ongoing briefings that
2  were taking place for me, councilmembers, the
3  Safety Director, with the Chief and his leadership
4  during this period, that's where probably most of
5  the information that I received came from. But
6  obviously people were calling me, sending things
7  to me, sharing things through social media and
8  then all the -- the news reports and accounting at
9  the time.
10  Q.    Okay. So you were getting information
11  from the Division on a, you know, periodic basis?
12  A.    Yes.
13  Q.    I take it you relied on that
14  information?
15  A.    Yes.
16  Q.    And then you said people from outside
17  the Division, I'm guessing is that members of the
18  public?
19  A.    Yes.
20  Q.    I mean, were they -- there was a
21  website up. Wasn't it up in June? The city
22  website asking for people to send in information
23  or assist in identifying people?
24  A.    Yeah. The city e-mail address

1  reportcpd@columbus.gov was set up I think after
2  that very first weekend. I'd have to go back and
3  look at the timeline for all of the reasons that
4  we talked about earlier.
5  Q.    So when you say you were getting
6  information from other people, was it through that
7  site or you're talking about beyond --
8  A.    Yeah. Some. Some. People on the
9  street, people I would meet when I go out and join
10  protests, officers on the street, members of the
11  public, members of the faith community. As you
12  remember, there were a significant amount of
13  activity and engagement from the greater
14  community, and as Mayor, I --
15  Q.    I --
16  A.    -- receive a lot of that.
17  Q.    So I guess I'm curious to ask that
18  during the days that followed, because the
19  demonstrations took -- to smaller and larger
20  extents, continued for a while. Did individual
21  people tell you they saw some things that they
22  found disturbing?
23  A.    Yes.
24  Q.    And were you in a position if you're,

1  you know, walking around with them, I'm just
2  asking you, did you take notes or did you ask them
3  to do something or you were just kind of taking it
4  in?
5  A.    Well, I was listening to them and
6  hearing them and encouraging them to share that
7  information either through IA or report CPD.
8  Q.    But other than them letting you know
9  this personally, whether or not their concerns
10  about things they found disturbing or they thought
11  were wrong, you relied on the Division's process
12  to report back to you or to B&H or whatever was
13  appropriate based on those complaints?
14  A.    Yeah. And the Director.
15  Q.    And the Director.
16        Well, Mr. Mayor, I don't -- I believe
17  those are all the questions I have.
18  A.    Okay.
19  Q.    Is there anything that you feel like
20  you should add to or correct about anything I've
21  asked you about that you can think of at the
22  moment?
23  A.    I haven't talked for four hours
24  straight in a long time. I think I've covered

Page 150

everything I need to.
Q. Okay. Well, thank you very much. And I would request -- we're going to order this deposition. And I would request that you arrange with your counsel to review it and sign.
MR. PHILLIPS: He'll read. And we will take a copy if they order.
MR. GITTES: Thank you. Stay safe. And everybody I guess I'll be seeing all of you again shortly.
THE WITNESS: Thank you. Be well.
(Signature not waived.)
- - - - -
Thereupon, the foregoing proceedings concluded at 2:03 p.m.
- - - - -

Page 151

State of Ohio : C E R T I F I C A T E
County of Franklin: SS

I, Stacy M. Upp, a Notary Public in and for the State of Ohio, certify that Mayor Andrew Ginther was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on February 9, 2021.

____________________________________________
Stacy M. Upp, Notary Public - State of Ohio
My commission expires August 6, 2021.

Page 152

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling 2-Word Omitted 3-Wrong Word
4-Clarification 5-Other (Please explain)

| Page/Line | Correction or Change | Reason Code |
| --- | --- | --- |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |
| ______ | ______________________________ | _______ |

I, Mayor Andrew Ginther, have read the entire transcript of my deposition taken in this matter, or the same has been read to me. I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date_________Signature________________________

The witness has failed to sign the deposition within the time allowed.

Date_________Signature________________________

Ref: SU301271AG S-SU P-BW

**Exhibits**

**301271 Exhibit 00**
**5** 5:5 62:19,22
63:7

---

**1**

**10** 12:14 34:9
112:23
**101** 105:14
**103** 115:12,13
117:10,15
**105** 122:9
**106** 122:8,9,15,19
**108** 115:10,12,13,
14,20
**11** 12:14
**11:20** 57:9
**12** 12:6
**14** 122:20
**15** 12:6
**15th** 95:16
**16** 102:9
**17** 102:9
**17th** 146:23
**1:00** 112:16
**1:50** 141:21

---

**2**

**2.04** 62:2
**20** 34:9
**2000** 12:20,21
**2001** 12:20
**2010** 12:21
**2011** 12:21
**2016** 102:7
**2020** 11:10 42:14
91:10 95:15
100:24
**2023** 59:5
**21** 143:3
**22nd** 143:19
**23** 143:3
**24** 79:19 143:3
**26** 66:4
**27** 66:4
**29** 43:15
**29th** 111:6
**2:00** 141:18
**2:03** 150:15

---

**3**

**30th** 111:6
**31st** 28:14,22
35:16

---

**4**

**40** 34:9 92:3
**45** 10:17 128:20
**4th** 121:8

---

**5**

**5** 62:19,22 63:7
**5-year** 70:5

---

**6**

**60s** 129:23

---

**7**

**70** 43:9
**70s** 129:23
**75** 129:4

---

**8**

**80s** 129:10,23

---

**9**

**9** 40:8 107:13
**90** 86:15
**90s** 129:11,23

---

**A**

**ability** 9:13 44:19
135:9
**absent** 24:19
136:4
**absolutely** 93:1
112:17 124:10
127:10
**accept** 104:16
**acceptable**
113:23
**accident** 7:16
**accompany** 19:1
**account** 138:14
**accountability**
71:1
**accountable** 31:8
**accounting** 147:8
**accounts** 38:9
80:17
**accurate** 25:12,22
32:10 33:19 34:5
41:4 49:21 55:14
59:11 79:20
88:12 91:7
**accurately** 9:13,
18
**acknowledged**
76:16

**act** 37:3 136:5
**acting** 88:20
**action** 55:11
77:21 90:20
103:18 119:1
126:10 132:22
135:9
**actions** 132:17
136:13,18
**active** 66:6,21
**activities** 35:5,22
36:23 129:5,19
**activity** 132:13
148:13
**acts** 64:19
**actual** 44:6 62:14
65:10 130:14
140:5
**ad** 12:16
**add** 59:9 149:20
**added** 102:10,12
**addition** 104:2
**additional** 24:14
89:8 103:11
**address** 81:5
147:24
**addresses** 61:3
**addressing** 80:12
**administration**
6:6 119:2
**administrative**
81:9 96:1
**adopted** 45:20
**advantage** 112:22
**advice** 22:9 66:18
**advised** 86:19
96:15 98:5
**advisory** 15:1
67:3,7,9 77:19
**affairs** 38:14 84:3,
9 103:23 104:1,6
**affect** 9:13
**affidavit** 60:13,14
**affidavits** 60:3
**Africa** 129:13
**African-american**
43:3
**after-action**
101:14 102:18
130:11
**afternoon** 35:10,
15 41:15
**age** 128:15
**agencies** 44:1
**agency** 43:22
**agent** 96:2
**agents** 24:3 29:11
32:16 37:21 38:7
39:1,6,13 62:1
111:18 126:20
127:12 144:11

145:24 146:4
**aggressive** 37:18
38:4 75:3,8
111:13,15 126:21
146:8
**agitators** 139:7
141:7
**agree** 6:12 13:24
22:4 32:24 45:18
55:18 77:6 82:13
89:2,13 90:7
99:24 100:5,9,22
113:22 119:10
135:5 136:3
140:2
**agreement** 63:14
**ahead** 61:9,22
107:24 123:23
**alerted** 41:5 73:11
**allegations** 51:16
**alleged** 64:17
99:3
**Alliance** 12:10,22
**allowed** 26:22
110:18
**Alsaada** 66:7
137:8
**AME** 35:9,18
**Amended** 65:16
69:4,15
**America** 72:11
**ammunition** 88:9
**amount** 81:1,7
86:7 100:7
148:12
**analyze** 103:1
**and/or** 52:18 94:4
98:16
**Andrew** 6:20 68:9
**Andy** 7:5
**announced** 95:19
137:8
**answering** 126:1
135:1
**answers** 10:11
**anticipating**
41:10
**antiwar** 128:22,24
**apartheid** 129:13
**apologize** 64:24
81:22
**apparent** 79:11
**appeals** 53:16
**appeared** 135:18
**applied** 27:14
**apply** 86:22
**appoint** 70:4
**approach** 29:12
144:14

**approached** 39:5
**approaching** 44:3
**approves** 25:9
**arbitration** 53:16
**area** 35:23,24
112:7 120:15
121:17
**areas** 27:20
**argument** 127:12
**armed** 121:22
**arms** 136:15
**arrange** 150:4
**arrest** 61:14
119:22 120:6
**arrested** 98:16
137:8
**asks** 87:14
**assault** 87:12
88:14 135:9
**assaulted** 99:4
144:12
**assist** 83:8
147:23
**assistance** 85:2
**assistant** 81:3,4
**assume** 8:8 33:7
39:15 40:3 135:5
136:6 137:15,17
**assumed** 41:10
93:20
**assure** 100:2
**attached** 60:13
**attempt** 17:15
114:20
**attempted** 27:4
53:14
**attempting** 77:22
**attention** 80:11
**attorney** 96:15,
16,20 99:1
101:12 141:13
**Attorney's** 29:15
52:23
**attorney/client**
49:6
**attorneys** 6:11
15:16 53:5 89:22,
23 90:2,8,13
**authority** 14:6
23:3,19,22 25:17
26:23 27:5 58:7
59:7 70:12 74:8
**avoid** 121:16
**aware** 26:11 27:9,
11,15 39:11
40:20 41:21 47:6
50:23 51:3,8
52:15 53:22 54:7,
11 57:16 64:4
65:4 73:18 75:18
79:5 83:23 96:12,
18,19 97:5,16
98:7,13,21 99:2,
13,21 103:10,15

110:15 114:15,22
117:8 135:13
137:1,7,11

---

**B**

B&h 48:12,23
49:12 80:22 85:2,
24 89:1 90:20
91:1 92:8 149:12
B&h's 84:18
back 8:14 11:3,20
24:12 25:9 32:12,
20 34:21 36:11,
13 41:17 45:2
52:2 53:16,24
57:6,8,14 64:6
65:2 69:1,22
73:7,8 79:17 80:4
81:22,23 82:5
83:4 87:22 107:7
110:3 113:11,21
123:13 128:1
129:22 136:12
137:16,18 148:2
149:12
background
11:18
backpack 128:12
badge 47:21
Baker 47:8,23
49:19 80:21
81:12 83:4 85:20
87:6 93:24 94:10,
15,18 95:24 98:1
101:10 104:2,10,
19,21 105:2
114:11,19
Baptist 35:9
barely 123:16
128:15
bargain 63:17
bargaining 63:14
base 145:12,13
based 25:20
30:16 31:16,24
32:4,6,22 51:5
66:20 71:17 77:6,
18 78:19 84:1
85:14,17 89:23
103:18 104:4
110:16 112:6
116:15 118:24
119:6 124:23
127:20 131:2
132:17 133:8
136:13 142:17
143:20 145:24
149:13
basically 11:10
139:5
basing 131:24
basis 14:12
132:12 147:11
baton 87:7 88:8
92:3
beat 95:2
beginning 31:4
107:8 110:4

behavior 40:14
45:24
belief 95:12
beliefs 133:18
believed 95:14
130:16
believes 145:5
bell 67:17
benefits 58:13
bicycle 87:8
big 48:1 58:23
bit 11:21 17:23
21:18 23:3 28:19
40:19 80:20
107:11 117:16
black 18:14,18
31:6 43:9,10,16
44:14 51:11 52:5
53:20 56:4,14
65:6 105:23
block 121:15
blocked 89:9
140:11
blocking 121:23
blowback 83:6,10
board 12:1 13:12
67:8
body 47:11 48:4,7
50:8 62:10 63:9,
10 78:11 79:13,
22 100:2,15
101:4 102:4,16,
23 109:22
body-worn 46:20
47:16 50:10 79:1
100:19,20
102:10,13
book 64:12
Boom 121:8
born 129:3
boss 71:6
bound 105:2
Bourke 81:3
Bourke's 81:4
brandish 134:17
136:15
brandished
135:19
break 14:9 56:21
68:20 69:7
112:15,24
breaking 34:13
breakout 57:1
59:18 115:16
briefings 15:6
147:1
briefly 11:18
Broad 106:6,9
123:10 140:14
broken 33:12
brothers 45:15
brown 6:10 22:11

52:5
brutality 52:5
bullets 92:4
117:22 118:13
132:12
bunch 60:12
Burke 67:16
bus 106:7 138:14
139:2,4,11 140:2,
18 141:8 142:4
Buttercup 138:14
140:3 142:3
buy 58:11 100:8
buys 27:7

---

**C**

cabinet 16:15,20
cadence 14:18
call 40:8 45:10
48:12 88:9 92:4
103:13 140:3
called 28:9,24
29:3 37:20 38:11
calling 147:6
calls 18:9
cam 62:10 101:4
102:16 109:22
camera 50:11
78:21 89:3
cameras 46:20
47:16 50:8 63:9,
10 79:2,8 100:8,
19,20 102:10,13
103:12
campaigns 12:15
cams 47:11 48:4,
7 78:11 79:13,22
100:2,15 102:4,
23
canine 39:8
canister 39:8,21
canisters 40:1
capacity 7:14
car 7:16
care 72:17 103:6
138:4
career 11:21
carried 45:24
carry 134:16
135:7 136:15
Carter 101:12
case 6:17 8:13
10:19,20 11:6
21:13 24:2 31:23
48:22 53:12,20,
23 55:21 57:16
65:9 99:3,14
104:16 106:3
114:1,18 117:4
134:14
cases 52:2,12
53:10,13,14,19
54:1 77:20 89:8

91:11 95:20,23
97:4,24 98:1
104:20 130:4
catch-all 86:10
catering 134:2
celebrations
121:8
certified 133:13,
15
chain 38:15 44:20
54:20 55:5,8 56:6
82:6 83:17 84:13,
14 105:1,7
114:12,13 141:10
chance 9:23
11:13 123:7
Chanda 6:9
change 19:24
23:9 24:2,16
27:24 28:10
29:13 32:15
37:20 59:7 62:2
69:24 70:20
77:17,22 82:6
90:20 111:20,21,
22 114:4 115:17
116:23 117:2
119:6,7 126:13
127:2 132:22
143:23 146:1,5
changed 101:5
127:9
changing 37:22
111:17
charge 30:19 56:8
charged 54:16
64:16,19 72:24
76:7 98:16 99:7,
18
charges 56:9
81:10 98:21 99:5,
20
charter 70:1,4,16,
17,21,22 71:14,
15 72:5,6,8,20
check 15:8,19
17:1,2 19:7 36:14
41:17 44:6 48:10
49:23 52:2
checking 44:17
checks 79:9
chemical 24:3
29:10 32:16
37:21 38:7 39:1,
6,13 61:24 63:12
88:7 107:14
110:18 111:18
125:3 126:20
127:12 130:1,20
135:16 143:11
144:11
chemicals 121:14
chief 14:1,20,22
16:5,7,9,11,13,17
17:16 20:24 21:1,
3 23:6,9,23 24:21
25:8,9,10,18 26:3
28:9,24 31:17,22
34:7 37:20 41:5,

7,13 44:10 47:19
54:22 56:7,14,15
57:19 58:1,6,7
64:16 70:4,6,19,
23,24 71:2,13,17
72:10,17,21
73:10 74:21 77:5
78:5 80:18 82:5,7
83:20 102:12
141:12 142:7,10
146:1,6 147:3
chief's 67:7
chiefs 21:4 56:7
69:23 70:1
chiefs' 71:5
Children's 12:9
choice 64:1 78:8
choose 58:19
63:17
choosing 81:12
churches 134:1
Cincinnati 96:15,
16
circle 137:16,18
circulated 138:20
circumstances
7:10
cited 140:14
cities 41:2,9
citizen 51:11
87:23 91:22
citizens 50:16
101:2
city 10:4 13:13
29:15 35:13,23
44:2 48:15 50:19
52:23 60:4 96:16,
20 99:1 121:1
127:18 141:13
147:21,24
city's 101:15
102:2 109:18
135:9
civil 61:12 75:15
129:8,23,24
130:5
civilian 13:12
17:22 19:19 67:8
civilians 93:3
claim 26:12
claimed 27:4
clarify 8:2 125:14
127:15
clean 114:7 132:8
cleansers 130:22
clear 7:24 28:13
30:17,23 32:3
63:5 77:16
104:18 111:4
122:23 124:2,13
127:1,10 131:23
clip 105:17
113:16 115:9
close 33:1 130:15

clowns 139:22

co-counsel 59:12 141:17

coffee 112:21

colleague 117:6

colleagues 76:4

collective 63:14

college 101:13 103:17 129:12,17

color 18:12 31:10, 21 73:23 74:6 76:4

Columbus 13:20 14:2 17:18 23:4 24:21 32:9 40:21 41:11 42:19 52:6, 12 56:2 58:24 73:18 120:13 138:17

comfortable 38:15 100:12

command 17:17 38:16 44:20 54:20 55:5,8 56:7 82:6 83:17 84:13, 14 105:2,8 114:12 141:10

commander 50:24

commanders 25:7 42:11 130:12

comment 32:1 138:10 144:5

commented 130:21

comments 130:11 131:24 146:11,15

commission 15:1 67:3,10 77:19

committed 87:7

committee 25:5

committing 146:10

common 132:5

communications 11:24 12:14,16 15:3,14 16:7

community 14:17 17:20 18:5,6 35:8 129:18 148:11,14

community's 19:21 28:12 70:20

company 12:12

compared 33:22 34:4

compares 43:24

compel 23:8

complained 94:12

complaint 49:19 65:16 69:4,16 91:12,13,22 94:3 101:2 102:16,17

complaints 44:7, 13 77:21 84:9,12 87:23 88:1,3,6 103:19,22 104:21 149:13

completed 86:23

completely 102:8

compliance 46:17 103:14 143:9 146:21

comply 85:24

complying 103:2

concealed 134:16

concern 31:7 32:8 75:13,18 76:11 77:5,8

concerned 25:15 132:10

concerns 30:24 75:2,6 76:20 84:2,12 133:18 149:9

conclude 132:6, 12

concluded 34:9 150:15

concludes 104:19

conclusion 42:18 87:14 88:16 93:6, 10 132:16 136:20

conclusions 132:17

condition 9:12

conditions 71:22

conduct 36:16 37:10 53:23 56:6 110:20 111:15 119:19

conference 47:8 91:9 95:17 97:14

confidence 72:12 84:7

confident 84:8

confidential 57:4 131:14

confirm 49:23 85:10 137:16

confirmed 54:15 55:7,24

confirming 56:6

confused 84:16

connect 68:8

connected 53:10 136:18

cons 82:24

consequences 73:22

considered 81:10 84:20 88:22

consistent 27:19 46:1

consistently 42:21

consult 22:17 58:22 89:12,16

consultation 15:11

consulting 12:17

contact 14:15 28:3

contemplated 79:1

content 89:23

continued 148:20

contract 23:8 25:22 85:23 86:7, 19

contractual 27:20

contractually 58:12,13

control 26:1 27:12 39:13 46:7 60:20 61:16 101:20

controlled 58:12, 13

conv 31:24

conversation 33:14 82:22 140:17

conversations 18:22 20:18 30:16 31:16 32:5 33:9 48:23 49:5 52:22 53:5 85:18 87:21 90:1

conveyed 141:5

convicted 12:24

copies 15:5

copy 150:7

corner 123:10

correct 8:21 11:9 14:7 23:10 28:15 29:2,24 30:10,12 31:2 42:13 48:5 49:15,20 50:21 54:18 56:15 58:2, 3,14 60:10 62:3 65:7 70:3 71:8 72:7 76:13 79:10, 14 83:3 86:1,2 91:6 101:22 103:20 112:4 121:6,19 122:1 127:15 136:2 144:1 149:20

corrected 40:7 111:11

correctly 28:7 89:6,10 95:17

Corrymeela 129:17

council 12:1,8 13:13 20:3,8 67:7

councilmembers 20:2,10 21:18 23:1 81:18 147:2

counsel 6:2,9 10:3 21:12 150:5

counseling 54:24

country 40:24 41:2,9 73:20

county 97:2,3

couple 18:9 32:19 53:13 59:16 71:16,22 97:11 101:9 110:1 114:7 115:3 123:16 135:17 142:22 145:1

court 52:11

cover 61:18

coverage 38:17

covered 62:16 149:24

CPD 34:8 45:4 130:12 132:1 149:7

created 44:18 50:15

crime 13:1 87:11 88:22

criminal 37:3 81:9 86:13,20 88:19 96:3,14 97:7,14, 20,21,22 98:3 99:19 103:3,18 132:13

crisis 60:21

critical 74:13,22

CROSS-EXAMINATION 7:1

crowd 26:1 27:12 39:11,13 46:7 60:20 111:24

crowds 110:18 111:19

cruiser 63:10

cruisers 62:10 63:11

crystal 140:6

crystalline 140:5

culture 77:17,23, 24

cup 112:21

curb 38:21 123:16

curious 24:7 148:17

current 59:5 103:16 116:22 125:7,17 135:22

_____

D

dad 128:24

daily 14:12

damage 34:2,3,18

damaging 34:13

dangerous 121:14,17,18 134:23 135:10 136:9

Darrell 68:7

data 43:1

date 18:19 32:19 80:5,8

daughter 58:21

Dawn 21:5

day 33:23 34:20 73:9 79:7,12 83:10 144:1,6,21 145:20 146:12, 17,23

days 24:4 32:19 36:10 47:17 86:15 141:13 148:18

deadly 31:20

deal 75:14

dealing 37:23 42:4 78:23

dealings 21:21

decade 56:12

decades 56:13

decide 59:2

decided 92:14

decision 57:18 80:21,22 81:11, 16 83:7 84:1 96:21 104:23

decision-making 26:23

decisions 26:22 27:6 71:1

Decker 54:22

decorative 140:6

defendants 6:16

deference 113:13

defund 74:7

delayed 114:10

demanded 26:21 140:17

demanding 132:21

Demetrius 67:16

demonstrate 120:24

demonstrated 99:6

demonstrating 33:24

demonstration 36:18 78:12 99:18 135:11,12

demonstrations 11:7 15:15 29:23 30:9 32:22,24 37:12 41:21,23 50:9,16 73:7,9,12 83:9 99:17 102:22 104:9 120:14 131:4 137:13 138:7 140:1 146:22 148:19

demos 73:13 82:2
143:6

denied 89:9 92:12

department 13:20
19:14,17 20:6
23:4 27:7,21,23
32:7,9 33:14
34:17 41:6 42:20
45:15 46:10 52:6,
13 73:11,19,21
74:10,13 76:2,15
83:18 84:21 85:1
100:4 101:19
102:2 104:22
121:1 134:18

departmental
56:9

depending 78:22

depends 14:14

depo 10:19

deposition 6:5,7,
13,18 7:18 9:24
21:11 64:8 150:4

depositions 7:13
99:16 104:4

deputy 20:24 21:4
56:7 57:19

describe 12:5
13:19 139:21

describing 16:6

desegregation
129:9

desire 25:2 120:5

destruction 34:10
132:19

detail 45:21

details 139:17
141:2

determination
105:5 134:20

determine 71:17
81:8

determined 79:18

determining
136:8

deviations 45:22

device 39:12,22

devices 130:24

difference 40:10

difficult 45:23
46:9

direct 16:10

directed 24:16
28:9 47:18
116:23 119:7

direction 82:1
146:5

directions 61:17

directive 24:2
32:18 82:18

directly 141:12

director 13:21
14:1,5,11,20
16:6,10,13 17:16

41:12 70:20
72:13 73:1 76:5
81:3,4,15 83:7,21
87:5,20 96:11
97:7,17 105:1,5,7
147:3 149:14,15

director's 44:18
85:7

disagree 74:6
75:17 82:8 136:1

discipline 25:14
49:17 51:24
53:14 57:18,22,
23 58:12 85:24
103:4,18 104:22,
24

disciplined 48:6
53:11 54:2,5 74:4

disconnect 55:9

discovered 80:18
132:2 138:24
140:12

discretion 58:10
72:3

discriminated
54:12

discriminating
56:10 76:3

discrimination
43:11,19 44:7,13,
21,24 45:14
52:13 53:10,11,
19,21 54:3,6,17
55:7 56:1,2
64:17,20 76:17
77:10 100:13
129:9

discuss 47:7
63:18 76:1 78:4
87:17 137:19

discussed 10:16
57:17

discussing 11:3
25:4 103:14

discussion 32:12
73:15 146:3

discussions 20:4
32:23 79:6 87:5

dismissed 98:22
99:5

disparities 43:2

dispersement
40:2

disproportionally
31:9

dispute 71:7

disputed 92:12

disregard 78:8

disrespectful
88:2

distraction 28:19

disturbances
61:13

disturbing 148:22
149:10

diverse 43:17

divestment
129:12

division 13:22
18:13 19:20
24:22 42:23 43:5,
9,12 57:19 61:18
64:18 77:17 85:6
141:10 143:22
144:17 145:14
147:11,17

Division's 149:11

document 61:5

documented
42:24

documents 10:22
60:6,12,18
145:13

dogs 61:19 130:1

Dorans 22:20

double-check
36:11 85:10

doubt 127:15

downtown 35:17,
23 36:13,14
120:15 121:5,17

dozen 35:11,12
51:22

draft 29:15

draw 132:16

drop 33:8

drug 138:2

drugs 9:12

duly 6:21

duties 13:19

dynamic 74:21,24

———

E

e-mail 68:20
69:12 81:5
147:24

e-mails 15:4

earlier 8:18 25:24
28:1 63:5 103:22
104:5 136:13
148:4

early 24:4 47:17
102:9 128:23

east 35:18

easy 48:13

eat 113:2

education 12:1
13:13 129:21

EEO 44:18

effort 72:23

efforts 12:16

egregious 95:19
110:20 111:12

elect 58:24

elected 12:2,22

elements 33:5

130:16

eliminate 59:7

emergencies
60:20

emergency 61:4
120:15

empirical 43:1

employees 43:18
44:4

employment
53:19

encountered
134:3

encouraged
24:16 137:7

encouragement
137:6

encouraging
137:3 149:6

end 56:13 123:22
128:1

ending 70:8

ends 59:5

enforcement
18:15 43:22 44:1
45:13

engage 119:16

engaged 33:21

engagement
29:12 148:13

engaging 37:22
110:20

ensure 45:23

entered 21:24

entire 54:20

epithets 56:3

equipment 25:16
26:23 27:7 47:20
58:9,11 63:24

essence 77:4
143:9

essentially 22:4
55:10 74:20

establish 72:6

established 55:23

evaluating 97:4

evening 35:10

evenings 33:16

event 74:12 97:14
102:22

events 18:5,6
35:12 120:14

eventually 119:15

evidence 43:1
46:22 94:8

exact 18:19 32:19
80:5 96:4

exaggerated
142:13

examples 45:8
51:13 114:3

exceeding 19:21

exception 42:23
86:10

excessive 31:9,20
46:6 51:2,9,14,19
93:3

exchange 18:10

excluding 13:1
58:12

exclusively 19:13

executive 71:2

exercise 30:22

exercised 23:19

exercising 88:20

exhibit 59:16
62:12,18,19,22,
24 63:6,7 105:14
115:10,20 122:19

exhibits 11:2
59:17 60:2
112:13

existing 80:24
103:15 119:2

exists 52:5,6
73:22

expect 42:12

expectation 42:9

expectations
19:21 28:12
70:20

experience 21:19
133:9 145:8

experiences 43:2

experiencing
45:13

explain 8:1

express 6:4 76:19

extend 90:7

extension 89:1,14

extensive 54:21

extent 43:17
63:22 87:14
88:15

extents 148:20

eyeball 68:23

eyes 132:9 133:5

———

F

face 92:9,10
93:12 108:23
109:3 130:19

faces 132:8

facial 133:3

facing 14:16
105:21

fact 57:22 73:17
74:9 75:7 76:1,8
77:18 86:15 99:6
104:6 120:12
130:13,18,21
133:11,17 139:20
140:12

factor 136:8
Fahmy 68:9
failed 49:17
fair 8:10 59:21
88:5 142:11
faith 35:7 148:11
falling 19:23
false 93:21 99:19
familiar 67:21
68:16 69:20
110:21
family 138:21
famous 130:5
fast 62:13 128:21
fastened 78:21
faster 125:10
Father's 143:24
144:6,21 145:20
146:12
favor 15:18
FBI 96:2,6
fear 44:24
feedback 19:17
25:7 77:20
feeds 79:9
feel 9:20 10:13
19:22 74:11 84:8
100:11 126:5
149:19
feelings 74:2
fellow 46:19
53:21
felt 31:6 38:14
94:19
female 19:15 99:4
festivals 139:24
field 27:1,10,14
46:5 58:8 61:2
filed 13:16 44:7,
13 52:12,16 60:4
63:23 94:3 97:15
filing 84:9
films 129:22
finally 25:10
find 27:3 80:14
92:2 95:6,18
112:13 138:5
145:11
finding 92:15,16
94:2 95:12
finds 104:21
fine 17:6
fire 16:16 53:15
70:24 121:18
firearms 136:17
fired 53:23 54:2,5
64:19 76:2,5,7
firefighters 44:23
fires 33:11,22
fit 9:20

five-year 70:24
72:2
fixed 79:15
fixing 80:13
Floyd 41:1
focus 105:18
124:24
folks 19:22 33:6
34:1,4,12 44:19
84:8 126:21
follow 72:5 91:3
109:13
follow-up 19:2
20:18 47:4
footage 50:11
101:4
FOP 25:16 26:5,
21 27:3,19 48:16,
18 63:18,23 64:2
89:2,9
force 31:9,20
37:18,19 46:6
49:18 50:5 51:2,
9,15,20 61:17,21
66:7,21 67:1 74:4
76:13 87:10,24
88:2,4,7,14 93:4
100:13 113:18
114:21 116:17
117:1 125:18
126:19 130:7
foregoing 150:14
forget 113:11
forgot 8:16 114:8
forgotten 120:11
form 15:3 74:14
76:21 77:14
78:14 88:7
100:17 131:10,20
136:10 140:22
formal 20:3 56:8
formally 64:19
forum 129:16
forward 13:18
47:22 107:11
forwarded 98:2
found 21:20 22:12
49:19 50:3 66:12
78:17 138:24
148:22 149:10
four-year 59:1
frame 12:21
123:13
Franklin 97:2
Fred 6:9 7:6 8:20
15:21,23 17:6
21:10,23 52:20
57:9 62:15 64:23
68:24 69:3,11
75:5 84:5 89:21
115:11 125:11
131:12 134:24
free 10:13
front 60:22 85:15
123:17

fronts 22:23
froze 145:22
frozen 56:16
fuck 115:23 116:6
122:24 124:17
fun 117:22 118:13
functioning 47:11

---
G
---

garage 123:18
Garlock 69:19
Garth 67:18
gave 24:2 38:12
139:20 146:5
gear 78:22,24
gears 80:19
general 10:20
31:14,18 33:18
43:15 60:23
111:16 141:2
generally 14:9,22
16:9 18:3 19:1
20:24 61:17
132:16
gentleman 117:7
George 40:24
gestures 119:16
Ginther 6:20 7:5
49:4 145:3,4
Gittes 6:8,9 7:2,7
15:22 16:1,4
17:10,13 19:4,6
21:12,16 22:1,3
23:15 49:11 53:1
56:24 57:10,12
59:15 60:10 61:9,
22,23 62:5,6,16,
20 63:1,3 65:1
69:6,10,14,17
74:16 87:16 90:3,
5 105:13,18,20
106:20 107:7,9,
24 108:1,11,15,
21 109:12 110:3,
5 113:9 115:2,6,
7,13,18 116:2,9
117:9,13,14
118:7,21 122:6,
13,16,17 123:3,
12,14,23 124:3,
20 125:12
131:18,22 141:23
150:8
give 14:13,21
22:8,18 24:10,14
25:7 26:17 34:8
35:3 44:19 57:5
66:17 71:6 82:23
92:2 141:16
142:20
giving 6:14 22:9
48:24
glad 11:12
glasses 59:20,23
Glenn 101:13,20
103:17

global 129:15,16
133:1
goal 19:16
good 7:11,12
11:12 21:15
40:14 66:21 71:3
83:12 112:20
113:7 124:22
130:9
governing 62:11
great 46:8 57:10
82:15
greater 100:14
148:13
grievance 26:12
63:23
grieved 64:4
ground 135:8
group 18:14
19:11 26:24
30:18 43:17 67:8
102:12 138:15
groups 18:15
30:13,21 67:5
75:14
guess 54:4 79:2
117:15 122:7
124:24 125:22
129:4 148:17
150:9
guessing 147:17
guidance 88:21
gun 134:11
guns 134:12
guys 59:19

---
H
---

hair 105:23
half 35:11
Hall 35:13,24
hand 98:8
handle 14:8 41:20
handled 24:18
98:1 120:9
handling 96:1,3
146:22
hands 39:18
117:23 118:3,14
hang 27:16 57:7
111:10 123:12
happen 78:18
94:8 96:22
happened 15:19
29:1 33:15 38:5
52:3 56:16 57:23
65:18 83:9 87:1
89:11 100:24
104:1 127:20
139:12 140:18,20
happening 18:7
37:5,7 41:8 94:5
happenstance
18:1

harassment
44:21 54:3,7
harbor 74:2 75:1,
6
hard 123:6
Hardin 21:20
114:9
harmed 144:13
hatchet 139:2
140:4
he'll 19:9 150:6
headed 67:2
heads 73:8
hear 18:12 56:17
58:23 145:7
heard 7:7 28:11
29:22 40:18
49:15 51:18
61:20 66:20
hearing 98:24
149:6
heavy 11:17
held 31:8 47:9
hell 133:2
Hey 21:14 68:24
69:3
high 7:16 43:21,
24 46:20 106:6
123:10
highlighted 45:8
highly 130:17
hindsight 142:12
hire 53:16 80:22
historically 74:3
131:2 134:3
history 42:4 75:12
77:7,9,18,20
100:10 133:24
134:4 136:19
hit 87:8 92:9
hitting 107:21
hold 39:18 77:13
89:20
holding 12:7
home 140:3
honest 22:12
48:21 67:11
Honor 122:18
136:23
hope 61:1 133:2
Horn 21:24 22:1
hosed 129:24
hospital 95:5
Hostetler 47:8,23
49:20 80:21
81:12 83:5 85:20
87:6 94:1,10,15,
18 96:1 98:1
101:11 104:2,10,
19,21 114:11,20
Hostetler's 105:3

hour 56:20 113:6
hours 79:19
149:23
houses 140:7
Hunger 12:9,22
hurt 46:7 87:9
hypothetical 58:5

**I**

IA 85:1 86:5 149:7
IAB 44:7 54:21
55:7,24 91:4
IAP 54:16
idea 14:13 34:8
35:3 67:22 82:16
117:4
ideas 74:2
identified 92:13
identify 6:2,3 48:2
62:18 91:11
92:10
identifying
147:23
illegal 36:23 37:2
illegally 26:14
images 38:18
39:16 146:3
immediately
15:15
imminent 98:6
impeded 122:2
implement 24:21
46:10 58:8 59:8
82:19
implementation
14:24 45:5 102:7
implemented
26:15 82:1 101:5
102:5,8 146:2
implementing
25:18
imply 75:20
important 47:2
100:1,2,20
113:12
impression 93:18
improper 38:1
40:14 46:6
143:10
improperly 26:14
improve 19:23
inaccurate 142:13
inappropriate
37:17 38:12
100:13 116:22,24
125:18 126:12,17
inaudible 117:24
118:5,15,19
incidences
100:16
incident 143:24
144:5,16,19

146:16
include 36:9
included 60:13
65:11
includes 60:20
128:15
including 45:19
53:9 56:3
incomplete
142:18
incorrect 8:18
104:12
increasing 134:15
independent
42:17 101:21
indication 93:13
136:4
indications 41:22
indicator 136:22
indiscriminate
146:4
indiscriminately
127:1 146:9
individual 20:16
26:24 51:16
126:11 136:19
148:20
individuals 31:7
33:21 38:20 53:8
65:17 74:5 85:19
96:12 110:19
119:14 130:23
134:10,16 135:17
145:21
information 18:23
44:21 47:2 48:24
54:19 56:5 97:24
131:14 141:9
142:6,12 144:15
147:5,10,14,22
148:6 149:7
informed 25:1
42:3,5 90:6
initial 28:3
initially 32:13
79:23 125:14,16
initiate 28:7
injured 87:9 96:13
99:5,8
injury 46:8
input 27:6 105:1
inquiries 145:12
inside 140:17
instance 135:13
141:11
instances 93:2
99:2 101:2
instituting 127:16
instruct 23:23
90:22
instructed 24:8
instruction 23:9
24:19

instructions
61:15
insubordination
71:21
intelligence 132:2
interact 17:17
interacting 75:16
interaction 77:7
107:20
interactions 20:5
38:10 43:5 46:23
51:5 76:10
internal 24:22
38:14 44:13 84:3,
9 103:22 104:1,6,
22
internally 43:4
interpret 70:17
interpretation
72:20
interrupt 7:23
8:19
interrupting
102:3
interruptions
23:16
intersection
121:23
interstate 121:13
intervening 58:7
intervention
135:15
interview 54:16
interviewed 85:20
142:21
interviews 143:8
investigated 81:8
86:12,20 99:19
investigating
83:8 84:7 100:7
investigation
47:24 49:1 84:19
86:22 89:1 90:7
97:22
investigations
48:17 49:12
80:23 84:4 85:23
86:8,11 96:2,3,14
97:8 98:3 103:21,
24 104:7 138:2
investigative 85:2
investigator
94:23
investigators
83:8 89:7
investigatory
54:21
involved 13:8
26:7 32:23 53:9
61:16 85:8 91:12
129:8,19 136:8
involves 11:6
involving 7:15
14:17 54:1 57:17

Ireland 129:17,18
issue 54:1 77:24
78:20 79:2
issued 32:18
78:24 79:23
issues 14:16,17
78:12
items 139:3

**J**

Jackson 67:2
72:21
Jacobs 56:14
64:17
Jacobs' 56:15
Janet 67:1
Jazz 121:7
Jeff 6:10 59:15
60:17 61:10,22
62:5,20 105:13,
18 107:8,17,24
108:15 110:4
115:19 117:9
122:9 123:13,23
job 17:22 19:18
72:11 83:11
84:10
John 115:2
join 148:9
joined 129:1
137:3
judgment 22:6,15
37:3
judgments
136:13
juggled 140:8
juggling 138:15
139:22
July 121:8
jump 57:14
141:24
June 143:2,19
146:23 147:21
justice 132:22
justifications
100:7
justified 127:14,
21
Justin 21:23 22:1

**K**

Kate 21:4
keeping 15:11
38:4
Kegler 67:20
Ken 21:3
Kendall 15:10
kidding 106:17
107:4
killings 31:6
45:11

Kimber 21:5
kind 15:2 37:14,
16 51:10 58:10
60:16,21 61:8
62:8 63:8 64:6
71:14 101:23
113:11 121:13
129:10 131:15
138:6,10 149:3
kinds 56:1 58:11
61:19 63:6 121:8
King 130:4
King-lincoln
35:20
Kitrick 21:10,15
knelt 117:7
knew 31:3 65:20
68:4 73:20,23
76:14 78:19 81:6
130:13
knowing 113:20
knowledge 25:13
45:1 51:24 53:3
63:21 64:9 66:14
88:23 110:2,13
117:3

**L**

labor 25:21
lack 77:21 101:14
lady 106:14
107:1,2 108:9,18
Lang 60:11,15
language 25:6
88:2
large 39:18
larger 39:12,20
107:14 148:19
lastly 76:13
late 33:15
launcher 92:4
law 18:15 23:7
34:13 43:22 44:1
45:12 88:19
135:22 136:15
laws 103:3
lawsuit 13:16
65:8,10
lawsuits 13:7
lawyer 25:21 97:3
lawyers 47:24
57:1,3 89:7 90:19
layman's 111:21
lead 103:4 104:22
136:20
leaders 130:5
137:1,2,7
leadership 147:3
League 35:20
learn 78:9 91:8,13
137:22 139:10
140:20

learned 18:23
33:9 39:7 42:5
47:9 90:14
140:10

learning 19:22
91:10

leave 28:18 72:24
73:2 120:5

leaving 112:7

led 80:21 113:20
135:15

Lee 21:5

Leeanne 68:13

legal 72:19 87:14
88:16,21 94:22
135:23 136:2

legislation 134:15
135:6

legislature's
134:14

lessons 42:5

letter 19:5

letters 114:12

letting 149:8

levels 61:20

LGBTQ 43:3

Lieutenant 60:11,
15 64:9,15 65:5

life 9:17

light 99:22,23
100:10

limit 25:17 74:7
86:11,13,21

limitations 23:7

limits 85:22 90:20

list 65:17 68:21
69:5 92:1 105:12
112:13

listening 57:2
149:5

lived 120:13

Liz 22:11

location 121:18

long 10:14 66:10
72:4 73:3,5 74:18
102:4 134:11
149:24

longer 80:6
111:20 117:16
134:22

looked 65:8

looting 33:11,21

lost 72:12

lot 18:6 30:21,22
48:2,3 58:10
60:21 69:8 78:23
82:21 84:6 97:23
98:3 109:23
123:6 146:2
148:16

lots 38:9 120:7

love 48:21

lunch 112:24
113:2

Luther 130:4

_____

**M**

_____

mace 125:3

made 8:20 26:11
45:3 51:16 52:15
62:3 70:21 71:1
81:11 88:6 92:1
95:8 99:19 101:2
104:24 105:5
114:20 117:2
119:7 125:9
126:13,19 127:2
136:24 137:11
138:13 139:16
146:1

maintain 47:2

maintained 19:8

maintains 15:9

major 14:16
126:18

majored 11:23

make 9:6 19:20
25:3 27:5 28:13
29:8 30:23 32:3
37:2 46:17 47:19,
20 48:13 57:5
59:19,22 60:17
63:5 74:17 84:11
85:3,9 92:15 94:2
100:14 101:8
104:18 107:12
111:3 112:23
114:3 119:16
123:7 126:1,16
127:10,13 131:23
134:19 135:1
136:13

makes 70:11

making 96:21

management
60:21,23

manner 27:12

manuals 10:14

march 30:4 35:16
36:7 120:24

marched 35:8,19

marches 129:24
130:4

Mark 21:10,14
40:8 107:13

MARSHALL
115:5

Martin 130:4

mask 132:9,24

masks 130:19
133:4

mass 61:13

master 25:21

match 114:21

material 11:13

materials 65:11

math 128:21

Matrix 15:1 42:15,
24 43:7 44:8 45:3
76:14,16 77:19

matter 72:15

matters 25:19
86:20

Mattie 6:10

mayor 6:20 7:6
11:20 12:3,22
13:10,11,19 14:6
21:17 23:5,17,20
24:9 26:21 27:5
32:1 44:1 49:4
51:7 52:22 56:16
57:13 59:2,6,24
63:4,22 70:23
72:12 76:24
94:23 100:9
102:6 104:4
113:10 115:1,20
120:12 124:7
127:17 131:14
142:2 145:22
148:14 149:16

Mayor's 15:9

Mayors 58:24
59:1 69:23

Mcfadden 64:10,
15 65:6 76:4

means 33:8 47:15
94:10 136:7

media 40:13
41:22 106:5
109:17 137:6
139:16 147:7

medic 133:11

medical 9:11 95:4

medications 9:12

medics 130:21
133:13,17

meet 7:11,12 10:3
16:9,16 17:19,20,
24 20:8,15 28:11
30:14 141:16
148:9

meeting 14:18
17:15 18:18
19:15,20 20:7
29:1 70:19

meetings 10:18
16:15,19,20
17:24 18:11
19:11 20:4,21,23
30:17

meets 16:16

Melissa 64:9

member 13:12
20:16,22 87:10

members 17:20
147:17 148:10,11

memorized 60:7

memory 8:12
86:14 104:18
139:14,18

memos 15:4

mention 29:21

mentioned 25:24
28:1 50:4 54:8
107:14 134:1
146:24

met 7:9,10 10:7
18:13 64:11
67:23 96:8

methods 40:2

middle 8:19

midst 133:1

military 129:4,5

millimeter 92:3

mind 59:15 78:1
112:21 114:4,17
115:17,21 128:1

mine 59:21

minutes 10:17
56:22 112:23
141:16

misconduct 46:6
50:3 51:1 76:12
77:10 100:16

misconstruing
143:16

mistake 8:21

Mixon 106:2
113:17

mom 129:2

moment 58:1
107:16 109:2
115:15 126:14
146:16 149:22

money 100:8

monitored 52:11,
14 79:8

monitoring 17:14

month 14:19
18:20 20:9 50:1

monthly 14:12

months 97:11,13,
18

Moore 54:2,9,12,
23 56:8 57:17

morning 21:15
28:9 37:20 41:15

mother 123:1
124:18

motherfucker
118:1,16

motion 60:5

mouthing 114:2

move 73:6 114:9

movement 123:6
129:3

movements
129:13

moving 13:18
47:21

Mullen 68:7

multi 88:8

multiple 35:1,14

36:4,13 55:6
84:12 145:10

munitions 61:15

murder 40:24

myriad 61:18

_____

**N**

_____

NAACP 35:8

named 106:2

names 65:22,23
67:16 68:21 69:5

national 18:14
43:16 138:10

nationalists 75:15

nationally 138:20

necessarily 57:14

needed 86:9

negotiations
48:16,18,21 49:5

neighborhood
35:21

newer 125:1

news 37:11 38:9
40:13 58:23
80:16 147:8

night 33:16 34:20,
22 41:3

NOBLE 18:15

nonchemical
135:16

nondisciplinary
54:23

nonformal 57:22

nonlawyer 88:19

nonlegally 113:14

nonprofit 12:10,
16

nonviolent 29:11
38:8 111:19
146:7

normal 42:10 85:6

northern 129:16,
18

note 123:8

notes 16:18
18:21,22 19:8
20:18,20 28:17
149:2

notion 134:5

notorious 45:9

number 23:24
24:15 30:6,13
33:22,24 34:4,8,
11,12 47:10,15
48:8 67:5 75:11
78:10 79:12 84:2
88:3 89:8 95:19
96:4 97:24 98:1,
13

numbers 47:21
132:21

nurses 134:1

---

## O

oath 6:6,14
object 74:14
76:21 77:14
78:14 87:13
88:15 89:21
92:23 93:7,22
100:17 116:19
131:10,20 132:14
136:10 140:22
objected 26:9
Objection 46:2,11
55:1,12 64:21
94:13 95:9 99:11
104:13 119:3
125:5,20 133:22
142:15
objectively 87:11
objects 119:11
obligation 63:17
observations
30:17 40:11,12
112:6
observe 145:11
observed 40:6
observing 43:18
obvious 9:9
occasion 146:23
occasions 51:18
occupation 12:6
occur 75:24
occurrence
120:17
occurring 119:23
offenders 35:2
offense 86:13,21
87:7 119:23
offenses 13:1
office 10:4 12:7
15:9 29:15 44:18
52:24 58:19 81:4
85:8 145:7
officer 26:24
49:17 50:24 51:1,
8,10,18 54:13
55:6 60:11 64:18
76:3 88:14 91:12,
15,23 92:11
93:12 95:2,6,7
99:5,6,15 100:16
110:14 113:19
116:17 123:9,21
127:4 132:6
141:6
officer's 51:19
78:22
officers 17:18,19,
21,24 18:4,8,11,
18 19:12 25:6
31:7 36:8,22
38:18 39:9 42:10
43:3,9,10,15
44:14,22 45:13,

21 46:5,19 47:1,
10,16,19 48:3,6
50:8,22 51:6,13,
14 52:13 53:9,15,
20,22 55:6,24
56:4 63:9 73:24
74:3,11 75:2,12,
13 76:11 77:6,9
78:11 79:13,22
80:18 83:17 93:4
100:3,11 102:11,
24 103:1,2
105:22 107:22
110:6,14,17
114:2,13 117:5
119:12,21 120:2,
5 121:22 122:4
127:7,11 130:12
134:23 137:12
143:22 144:8,12
145:5,21 148:10
officers' 76:12
official 7:14
officially 13:10
officials 33:15
34:16 41:6
Oftentimes 75:13
Ohio 32:9 134:14
135:22 136:4,16
one-day 79:6
ongoing 101:3
147:1
Oop 105:12
open 134:17
operating 48:7
78:11 79:13,22
operation 27:23
102:1
operations 60:19,
22 61:3 129:4
opinion 94:22
113:17 114:5
116:16 119:1
125:2,17
opinions 22:14
66:18
opportunity 38:13
opposed 39:21
oral 16:13
order 23:6,8
150:3,7
ordered 53:15
104:8
orders 71:6
110:19
organization
18:14 137:6
organizations
137:3
organized 35:7,13
130:17 132:13
133:20
organizers 75:16
141:6
origin 43:16

original 144:4
outcome 58:18
outcomes 52:1
outfitted 47:19
overly 37:18 38:3
oversight 13:22
16:11 17:22
19:19 71:1,4
77:21
overwhelmingly
33:4,5 38:5

---

## P

p.m. 150:15
Pagliaro 68:13
paid 52:16
pain 46:8
pandemic 18:7
133:2
paper 15:5
para 133:12
paradigm 91:3
paramedic 133:15
parents 128:5
129:5
parking 123:18
part 7:18 17:22
19:18 20:10
30:13 33:12,19
35:7 82:1 129:17
132:13 133:20
145:4 146:5,10
part-time 12:9
participant 66:21,
22
participate 26:22
128:22
participated 33:2
35:15 67:7
128:17 129:5
participation
131:3
parties 96:14
pass 26:5
passed 107:17
135:6
passing 134:15
past 100:10
125:19
patience 142:1
pattern 77:9
Paul 21:3 35:9,18
pause 105:15
peace 129:15
peaceful 33:2,4
37:23 38:5,8
126:20,24 127:5
132:21,23 134:22
peacefully 33:6
peacemaking
129:19

people 14:2 30:22
31:5,10,21 32:23
33:2,23 34:9,18
38:4,12,22,24
45:14 46:7 48:12
50:16 52:5 58:24
73:10,22 74:6,7
75:17 76:15,16
84:3,6 88:6 94:5
103:22 120:23
121:16 123:10,15
124:5 127:4
130:19 133:8,9,
14,19 134:20
136:6 137:4,8
139:11 140:6
145:6,18 147:6,
16,22,23 148:6,8,
9,21
peoples' 132:8
pepper 24:3 26:1
29:10 37:22 38:6
39:1,21 111:18
126:20 127:11
144:11 145:5
perceive 23:10
percent 43:9,15
percentage
43:21,23
Perfect 21:5
141:20
period 12:18 35:5
58:2 71:10 72:2,3
90:8 147:4
periodic 147:11
permissible
111:19,20
permits 120:21,23
permitting 134:15
perplexing 92:20
person 14:5 21:20
66:11 68:6 93:20
94:11 99:7 106:2
126:11 142:5
personal 21:19
40:12 113:17
personally 13:3,5,
6,9 17:17 36:16
65:21 75:1,6
93:19 126:4,16
145:11 149:9
personnel 84:2
perspective 95:12
perspectives
18:12
pertains 54:10
pertinent 134:13
Phillips 6:15
15:21,23 16:3
17:6,12 46:2,11,
15 49:4 52:20
55:1,12 57:9
64:21 69:11,15
74:14 76:18,21
77:13 78:14
87:13 88:15
89:18,20 92:23
93:7,22 94:13

95:9 99:9,11
100:17 104:13
116:19 119:3
125:5,11,20
131:10,19 132:14
133:22 136:10
140:22 141:20
142:15 150:6
phone 28:18
32:14
phrase 90:3
102:19 107:13
113:13
physical 88:9
pick 66:5
picked 138:19
pictures 38:9,13
81:2
Pishotti 21:4
place 6:6 41:11
42:11 77:7 79:4
86:8 102:8,21
103:24 119:22
121:1,15 144:6
147:2
places 134:1
140:1
plaintiff 22:2
106:2
Plaintiff's 62:21
plaintiffs 57:2
plaintiffs' 6:9,11
plan 41:20 42:2
73:13 84:21
planned 136:5
planning 20:12
plans 121:1,15
plastic 133:3
play 122:19 124:8
played 106:13
plot 132:1,13
133:20
point 59:6 107:11
111:23 130:9
police 13:20,23
16:17 17:18
18:13 20:5,10
23:4,6 25:16
31:1,7,8 32:7,9
33:14 34:17 36:8
38:10 40:14 41:6,
13 42:19,23 43:6,
10 46:23 51:5
52:4,6,13 61:19
70:23 72:11
73:18,21 74:7,10,
21,23 75:7 76:11,
12 77:18 83:18
84:7,20 99:4
102:2 112:8
117:21 118:12
121:1,14 129:24
131:6 132:6
134:18 136:6
137:9 138:24
140:9,11,13,15
143:22 144:17

---

police's 131:6

policies 24:17
25:14,18 45:19,
23,24 46:1,10,17
58:8 59:9 60:14,
19 61:11,15,21
62:14 63:11
100:4 103:4
119:2 126:8

policing 74:12,22

policy 23:9 24:21
25:5,11,24 28:10
32:18 37:21 45:4,
19 59:8 62:2
81:23 82:6 88:21
101:5,6 103:2,8,
11 110:21 111:7,
8,12,18,20,21,22
116:18,22,24
117:1,2 119:6,8
124:24 125:1,2,7,
15,17,19,23
126:1,6,13,15,17
127:2,3,10,14,16
143:5,10,23
146:1

polite 45:10

political 11:23
12:15

politically 128:5

pop 69:3

portions 121:5

position 44:18
134:12 148:24

positions 51:6

positive 142:10

post 138:13
139:16

potential 85:23
86:12

potentially 81:9
98:24 126:9

power 72:16

PR 12:16

practical 72:14

practice 23:10

precautions
133:10

precise 48:8

predilection
134:14

prepandemic
18:6

preparation 10:19
48:18

prepare 9:23

prepared 131:7

preplan 42:10

presence 134:20
136:17

present 6:12
16:10 133:12
137:12

president 12:2,8
20:8

press 11:4 45:9
47:8 85:18 91:9
95:17 97:14

presuming 94:11

presumption
94:18

pretty 43:21
142:10

prevent 9:17
25:17 133:4

previous 42:4

previously 60:1

primarily 42:3

prior 119:2
126:15

priority 46:21
100:14,21

private 34:14
132:20

privilege 49:6

privileged 49:9
52:24

probation 70:5,8

probationary 58:2
71:10 72:2

problem 23:10
42:19 80:2,3

problems 48:1
89:4 140:16

procedure 88:21

procedures 7:20
24:17 46:18
61:12,14 74:5
91:2

proceeded 33:10

proceedings
150:14

process 9:4 24:20
25:2,4 28:1 53:17
57:2 69:23 77:22
149:11

processes 24:23
85:6

produced 84:19

product 84:19
94:24

profession 11:21
12:5

program 11:2

projectiles 92:8

promise 125:10

prompted 29:21

proper 74:5

property 34:14
132:20

proportion 47:10

proposal 29:8

pros 82:23

prosecution
95:21,23

prosecutions
96:22 97:15,20

98:6,9

prosecutor 97:2,3

protection 131:8

protective 130:24

protest 30:13
33:4 35:4,6 37:9
47:11,18 74:22
128:6,14 131:5
134:21 136:9
137:1

protester 99:4
128:3 132:7

protesters 29:12
30:5 31:19 36:7,
8,22 37:23 38:5
39:4 51:2 75:9
77:5 98:9,16
117:20 118:11
126:21,24 130:6,
17 132:3,21,23
133:18 134:3
135:18 145:7
146:7

protesting 33:6,
24 34:5 75:9

protests 24:5
28:8 30:19 31:5,
13,17 32:8 33:2,
10,17 34:21
35:12 39:17
40:21 41:11 42:4,
5 65:18 67:24
73:20 74:1 75:4
80:1 104:2,8
128:3,17,22
129:9,24 137:8,9
148:10

prove 71:13

provide 91:15

provided 14:23
15:16 114:12

provision 86:18
87:18

provisions 62:11

pry 48:20

public 11:24 12:7
13:5,8 15:9,12
20:14 34:13 43:6
44:19 46:23 47:3
51:6 53:4 80:16
81:16 87:10
92:21 100:8
132:19 144:24
147:18 148:11

publically 139:6

pull 122:14

pulled 140:13,15

punish 53:15

purchase 63:9

purchased 63:24

purpose 137:23

purposes 63:2
130:18

push 82:5 87:8

pushback 83:6,20

put 50:17,19

59:19 73:19 76:5,
19 78:21 92:2
102:8 115:19
122:19

putting 59:16
103:16 104:19

_____

Q

qualified 92:17
94:20

qualify 47:13
128:10

question 7:21,24
8:7,9,18,19 31:11
39:10 46:4 54:5,9
55:16 56:17
58:20 60:24
64:23 71:3,5
74:15 75:5 76:22
77:1,14,15 78:15
81:19 83:12 87:4,
17 89:23,24 91:1,
16 92:18,19 93:9,
16 94:15 100:18
101:9 109:1
113:12 116:12
119:24 125:14,24
126:2 127:24
128:11 131:11,
20,24 134:24
136:11 140:23
141:3 142:19

questioning
52:21

questions 7:8
8:14 9:4,9 10:10
17:7 19:3 22:11,
22 84:13 85:12,
17 105:11 110:1
114:8 149:17

quick 79:19 114:7

quickly 67:15
108:13 121:15
142:3

Quinlan 41:6,7
58:1 59:8 76:1,20
81:24 82:5,7

Quinlan's 57:19
70:6

quote 144:9 145:3

quotes 143:2,15

_____

R

race 51:15 55:7
56:1 64:19

racial 54:6

racism 30:24
31:14,18,19 32:9
42:19,22 44:23
73:18,21 131:6

radio 143:17

raise 77:4

raised 128:4

ramps 121:17

random 66:5
103:7

Randy 67:20,23
68:2

Randy's 68:4

rationale 100:22

rationales 100:6

re-elected 12:3

reached 42:18
93:11 128:16

reaction 29:18

reactions 93:18

read 45:12 64:12
65:2,3,24 67:15
85:18 150:6

reading 98:23

ready 9:21 42:10
133:19

real 79:18

realize 8:16
115:15 120:20

realized 8:20

reason 7:22 28:16
93:13 98:18
100:12 119:20
120:2 128:15
130:10 131:1

reasonable 131:4

reasons 44:17
46:20 47:18 79:3
100:6,22 127:9
135:14 148:3

recall 34:24 39:4
43:12,19 45:5
51:17 54:24 55:3
61:4 68:8 72:21
90:21,24 91:10
97:23 138:23

recalling 89:10

receive 148:16

received 42:15
83:20 147:5

recent 8:15 10:6
45:10

recently 48:19
97:9 103:11
121:12

recess 23:14
57:11 113:8
141:22

reckless 135:10

recognize 50:20
106:6 122:9

recognized 52:4

recollection
96:23

recommendation
49:16,18 81:15,
17 105:3

recommendations
15:1 77:20 85:3,5

recommended
57:22 64:16 76:8

reconciling
129:18

**record** 6:3 7:4
62:19,21 65:3,5
66:24 115:19
122:18

**records** 10:23
15:9,12 95:4
131:24

**redirect** 120:14
121:2

**refer** 132:1

**reference** 144:5

**references**
130:13

**referred** 140:8
145:17

**referring** 38:2
93:24

**reforms** 14:24

**refresh** 139:13

**refreshes** 139:18

**refused** 90:16

**refusing** 110:19

**registered** 139:5

**regular** 14:15,18
20:4,7 120:16

**regulation** 15:2

**reinstated** 54:4

**related** 10:19
13:19 58:8 60:19
74:5 104:7,9
136:21 138:7
142:5 143:5

**relates** 64:7

**relating** 110:18

**relations** 11:24

**relationship** 81:1

**relative** 33:22
76:9

**releases** 11:4

**relevant** 24:1

**relied** 147:13
149:11

**reluctant** 44:23

**relying** 47:1

**remarked** 130:18,
23

**remarking** 132:3

**remember** 28:7
29:5 32:16,17,19
34:23 35:4 36:14
38:23 39:23
40:18 41:16 42:1,
7 44:9 45:2 52:1
53:24 68:17
72:23 73:5 80:8
86:4,24 87:2 89:6
95:16 96:4 98:23
109:24 128:6
138:12,16 139:9
141:1,2,11 142:5
143:13 148:12

**remind** 52:22 76:6
115:2

**reminded** 81:20
120:10

**reminder** 16:2
17:3

**remote** 6:6,7,12,
17

**remotely** 6:14

**remove** 127:15

**repeat** 27:2 35:1
55:15 64:23 75:5
84:22 119:24
134:24

**repeaters** 34:19

**report** 42:15,17,
24 43:8,12 44:8,
20,23 45:3,12,22
46:8 49:18 50:5
54:21 55:10 56:5
76:15,17 77:19
91:2 100:12
101:15 140:9
149:7,12

**reportcpd@
columbus.gov**
81:5 103:23
148:1

**reportcpd@
columbus.gov.**
38:16

**reported** 43:11,18
49:19 50:24 51:9,
14 76:12 92:8
93:3 94:12 95:17
103:18 110:14
117:7 139:14
140:11

**REPORTER** 6:1
21:10,23

**reporting** 6:7 44:4
45:16 46:19 47:1
51:19 77:10
93:20 96:10
144:24 145:4

**reports** 14:12,21
16:8,12,14
102:18 114:13,21
130:11 134:8
145:10 146:20
147:8

**represent** 6:3,16
48:15 110:2
114:1

**representatives**
34:17

**represented**
85:19 139:6

**representing**
84:11 96:13

**request** 45:20
62:3 112:22
150:3,4

**requested** 65:3

**require** 103:12

**required** 85:24

**requiring** 135:14

**reread** 116:23

**resent** 74:1

**reserve** 115:16
137:19

**resist** 82:11
130:20

**resistance** 82:4
83:5,22

**respect** 19:19
22:14 25:13

**respond** 94:16

**responding** 144:9

**response** 8:17
46:24 60:4 91:15
101:15 113:23
126:12

**responsibility**
14:9

**responsible**
94:24 96:21

**rest** 64:8

**restrictions**
135:24

**result** 51:23

**results** 53:12

**retaliated** 54:13

**retaliating** 56:9

**retaliation** 54:16,
17 56:4

**retired** 96:2

**retribution** 44:24

**Rettig** 6:10

**returned** 129:2

**reveal** 105:14

**review** 10:22
11:13 50:10 60:8
67:8 101:3,15,20,
23 102:23 150:5

**reviewed** 50:7,14
65:11 84:20

**reviews** 101:10
103:16 146:20

**revised** 110:17

**revolving** 11:5

**rights** 75:15
129:9,23,24
130:5

**ring** 67:17

**riot** 61:16

**rioting** 132:19

**riots** 60:20

**road** 124:16

**roadway** 38:6
39:3

**Rob** 22:20

**rocks** 139:3 140:5

**role** 13:6,8 17:22
53:7 84:18

**roll** 18:9

**rolls** 107:10

**room** 6:4 21:24
57:1,4 115:16

**rooted** 86:6

**rotated** 125:11

**roughly** 12:18
80:5

**round** 92:3

**routine** 138:6

**Rubio** 138:18

**Ruffin** 68:15

**rule** 27:24 29:9
110:17

**rules** 7:20 15:11
59:17

**run** 58:18

---

**S**

**S.W.A.T.** 102:10
135:14 136:8

**safe** 100:11
137:15 150:8

**safety** 13:21 14:1,
5,11,17,19,24
16:6,10,13 17:16
41:12 44:19 67:3,
9 72:13,24 76:5
77:19 81:16 83:7,
21 85:7 87:5,20
96:11 97:7,17
105:1,5,7 147:3

**sampling** 103:7

**Saturday** 28:11
30:4,7 36:15
37:19 38:19

**save** 68:19 105:16

**scar** 95:2

**schedule** 11:17

**scheduled** 18:1,
11 29:1

**scholarly** 101:23

**Schultz** 68:11

**science** 11:23

**scooters** 144:7
145:21

**screen** 65:23 69:4
115:20

**scroll** 60:16

**Sean** 6:10

**seconds** 122:20

**secret** 132:1

**seek** 18:4

**seeking** 50:20

**select** 14:6

**semiautomatic**
134:12

**Senator** 138:18

**send** 15:24 16:1
17:3,9 19:4
69:12,15 103:22
147:22

**sending** 147:6

**sends** 25:9

**sense** 111:16
132:5 141:2

**separate** 57:3
62:12

**separately** 19:12

**September** 91:9,
10 95:15,16
97:13

**sequence** 86:4

**sergeant** 54:8,12,
21,23 56:2,8
57:17

**serve** 70:24

**served** 11:24 67:9

**service** 12:7,10
103:13

**sessions** 20:13

**set** 33:12 148:1

**setting** 33:21

**settlements** 52:16

**sewer** 20:11

**Shannon** 21:20

**shape** 41:1

**share** 26:22
38:13,16 44:21
84:12 133:17
149:6

**shared** 15:6 18:24
25:6 40:1,15 60:2
80:17 139:15
143:21

**sharing** 46:18
147:7

**Shaw** 54:13 55:21
56:10 57:16

**shields** 130:23
144:7,8

**Shiloh** 35:9,19

**shocked** 78:9
141:15

**shoot** 92:5 118:2,
17

**shooting** 117:21
118:12

**short** 19:23 23:14
56:21 57:11
105:17 113:8
115:9 141:22

**shorter** 86:21

**shortly** 64:7
150:10

**shot** 92:3,9 94:4
131:7 132:11

**show** 65:23 95:5
105:10 123:5

**showing** 93:12
134:10

**side** 35:19 97:7

**sides** 121:23

**sidewalk** 112:10
122:12,13 123:17
124:4,5 126:24
127:5,8

sidewalks 38:22, 24 39:2,5
sign 150:5
signature 150:12
significant 51:24 81:7 132:20 148:12
signs 25:10
silent 82:17
similar 131:15
simply 91:14 92:13 113:22
single 30:18
sir 75:23 96:7 116:11 118:23 123:20
sister 53:21
sisters 45:15
site 148:7
sitting 9:20 49:24
situation 55:4 72:17 78:22 120:8
situations 39:11 61:4,19 110:19
skip 114:17
slowly 60:16 108:7
small 34:3,12 39:21
smaller 40:1 148:19
social 41:22 106:5 109:17 137:6 139:15 147:7
society 42:22
somebody's 95:11
sort 58:5
sorted 67:12
sought 18:10
sound 69:20
sounds 25:12 45:6,7 67:21 68:16 113:7 145:9
sources 37:12
Sours 15:10
South 7:16 129:13
speak 6:8 71:24 74:24 83:19 94:20
SPEAKER 106:14 107:1 108:9,17 109:9 115:23,24 116:6,7 117:20, 24 118:2,3,4,11, 15,17,18 122:22, 24 124:1,13,16, 17
speaking 98:24

specific 29:8 42:6 51:12 54:4 61:15 70:1 71:13 78:3 80:8 96:23 99:13 142:5 146:16,17
specifically 14:23 23:4 24:8 35:1 37:19 38:23 39:23 43:7 45:6 54:6 86:24 87:2 109:24 143:1 145:6
speech 132:17 136:14
spell 71:20
spend 10:14
spent 76:2
spill 121:13,18
spoke 48:11,13, 16,17 82:7 97:12 141:11
spontaneously 82:15
spray 24:3 26:1 29:10 37:22 38:7 39:2,8,12,21 40:8 107:12,14 108:2, 12 109:2,13 111:18 117:6 126:20 127:4,11 130:20 133:4 144:12 145:5
sprayed 94:4 107:15 108:3 110:14 112:2 127:1 131:7 132:9,10
spraying 38:20,22 87:6 93:12 124:4
spring 100:24
St 35:9,18
Stacy 56:24 65:1
staff 15:19 19:1 20:22,24 21:1,3,4 29:14 43:10
stairs 123:9
stamped 94:7
Stand 135:8
standard 86:5
standing 20:7 38:21 39:2 117:5 123:11,17
start 28:2 73:14 105:13
started 41:19 102:6 104:7 106:24 108:4,8, 16 109:8 115:22 116:5 117:19 118:10 122:21 123:24 124:12
state 6:3 7:3 136:16
statehouse 121:4 123:19

statement 32:11 33:18 45:3 55:14, 15,16,19 79:20 141:3 145:12,14
statements 11:4,7 142:21 143:12
status 15:2 16:14 49:1 70:7 97:21
Stay 150:8
stayed 86:21
Steinberg 6:16
step 32:14 135:2, 3
Stephanie 69:19
steps 123:18
Steve 6:16
Stewart 101:12
sticks 140:7
stipulate 6:17
stipulation 6:5
stop 76:5 104:8 106:7 107:17 123:12 125:9
stopped 106:19 107:6 108:6,10, 20 109:11 116:1, 8 118:6,20 123:2 124:6,19 140:13, 14
stored 15:7
stories 38:14
stove 140:4
straight 149:24
street 7:16 38:4, 21 106:9 120:24 121:23 122:23 124:2,14,15 140:14 148:9,10
strict 72:19
strictly 132:3
strike 87:8
striking 88:9 107:20
stroller 128:8
stronger 45:11
strongly 74:6
struck 39:1
student 129:12
studied 129:11
studies 129:15,16
stuff 60:21 61:8 62:8 89:3 129:10 140:2
stunned 78:9
subject 23:7,11 58:6 63:13 75:4 134:7
subjected 130:7
submitted 114:13
subsequently 38:18

statement 32:11
substantial 47:9, 14
sued 13:3,9,12
suffering 9:11
suffice 63:2
suggest 95:7 130:14
suggested 139:4
suggestion 58:17
suggestions 22:9 28:18 57:5
suggests 93:19
suing 65:17
suits 52:16
summer 11:10 24:5 35:5 68:11
sun 20:12
Sunday 28:8,13, 21 35:10,15 36:2, 15 37:20 38:19
supervising 96:5, 17
supervision 16:11
supervisor 50:24 51:1,9,10
supervisors 45:22 53:9,20
support 72:18 126:9 134:5
supported 81:17
supposed 46:13
supremacist 74:2
supremacists 75:15
surmise 136:17
surprised 10:11 78:9
survive 113:5
sustain 91:4
sustained 85:4 92:14
swear 6:1
swearing 6:13
switch 23:2 80:19
sworn 6:21
system 70:7 102:21 103:13,14
systematic 101:1, 3 102:15 103:7
systemic 31:14 42:21
systems 62:9

———
T
———

tackled 99:7
tactics 25:16 26:24 27:1,10,14 58:8 61:2,8,12 63:7,12,24

taking 6:13,18 9:12 41:1,11 68:19 69:7 103:24 112:24 135:8 147:2 149:3
talk 21:17 23:3 27:24 32:21 36:7, 8 57:3 62:1 74:9, 21 80:12,20 90:1, 8,11,13 134:6
talked 26:3 41:7, 12 42:8 59:17 61:2 63:4 73:10, 17 81:17,24 90:10,19 97:6,17 99:23 100:10 148:4 149:23
talking 10:15 14:18 24:6 27:13 34:16 41:18 53:19 63:6 78:12 80:9 102:14 107:16 131:15 144:20 145:19 148:7
Talon 67:18
Tammy 66:7,8,9 67:6 137:5
target 32:8 82:16 142:2
targeted 146:9
targeting 73:21
task 66:7,21 67:1
team 94:1 96:1
techniques 26:1 46:7
teenagers 128:16
television 142:22
telling 53:22 140:10 145:14
temerity 55:9
temporarily 140:19
tenure 56:15 70:2
term 46:21 59:3,4, 5 79:24 83:6 139:21 141:7
termed 110:20
terminate 70:12 71:12,17 72:7
terminated 76:8
termination 64:16
terminology 92:1
terms 33:11 35:24 59:1 70:5,24 76:9 78:3 86:11 91:4 99:22 102:1,17 142:13
test 8:12
testifies 6:21
testify 9:13,21
testifying 9:17
testimony 60:1 134:7

thing 25:3 32:2
64:3 79:6 84:16
113:24 138:9
145:3

things 11:5 17:17
18:23 19:2,23,24
24:4,17 29:22
31:15 32:6 37:16
43:8 52:10 53:4
58:11 61:5 63:6
71:16 81:2,8
85:17 93:4
101:17 115:4
121:9 129:14
136:22 140:8
147:6,7 148:21
149:10

thinking 13:5 68:2
80:5

thought 24:11,14
36:17 37:4,10,17,
18 38:3 40:13
59:9 75:19 93:3
119:22 149:10

thoughts 22:6
57:5 66:17

thousands 76:10

threaten 107:21

threatening
119:16,19 127:7

threats 56:3

throwing 127:6

thrown 119:12
144:7,8 145:21

Thursday 34:20
40:23 41:3,13,14
73:8

time 7:18 10:7,16
11:6 12:18,21
15:14 17:20,21
18:17 22:5 24:1
26:19,20 27:8
36:3 39:17 40:20
41:18 42:14 47:7,
8 48:11,13,22
50:2,8 66:10
68:19 69:8 73:3,5
76:13 78:3,19,24
85:22 86:4,7,11,
13,21 89:5,8
90:7,13,20 91:8
96:19 99:16
105:16 108:12
112:20 120:21
124:9 139:15
147:9 149:24

time-wise 142:2

timeline 148:3

times 15:6 24:1,
15 30:6,15 35:12,
14 36:4,9,13
38:19 55:5,9,24
142:22

timing 79:18

today 7:8 9:20
10:23 11:3,14
45:1 49:24 50:23
60:2 78:13 99:24
113:2

told 29:22 32:13,
15 34:24 44:12
50:2 51:8 73:12
79:12 82:18 86:3
113:1 114:19
121:12 141:5

tone 88:2

top 69:5 100:21

topic 73:16 81:23

topics 78:4

Torrie 68:15

totally 25:15 31:6

traffic 13:1
120:11,14 121:2,
15,21 122:2,3
140:11,16

trainers 64:1

training 25:16
61:7 103:2
133:14

travel 129:16

treated 43:4
134:22

treating 91:13

trips 131:3

Triumph 12:14

trouble 45:12

true 33:20 44:15,
16 64:17 72:14
93:21 130:9

trust 22:5 47:2

trustworthy 66:12

truthful 21:20
22:12 94:12

truthfully 9:14,18

turned 95:20,23
103:12

turning 124:3

turns 107:16

Tweet 138:12,19

Tweeted 138:23

tweets 136:21

Twitter 138:13

Tyler 21:5

type 41:10

types 11:5 24:4
58:9 129:14

---

U

U.S. 101:12

Uh-huh 11:19
13:14 26:4 28:23
50:18 54:14
75:21 94:6,9 95:3
101:24 102:20
106:10 120:22
135:21 137:21
143:18

ultimate 72:16
94:24 104:23

ultimately 13:24
23:5,8 25:8 55:7

81:14 105:4

un 114:24

unacceptable
38:12 43:23 44:2

unarmed 117:21
118:12

undercover
137:12 138:1

understand 7:22
8:5 25:20 31:12
57:21 59:24
69:24 71:4 72:1
74:18,19 77:2
87:4 91:18 93:10,
17 95:11,14
101:8 117:3
126:15 133:9
140:19

understanding
23:5 24:20 27:19,
22 30:20 32:4
33:13 34:6 57:20,
24 58:16 63:15,
19 70:10 71:11,
12 72:16 79:21
83:24 84:18,24
85:22 88:19
104:5 110:16
111:17,22 121:11

understood 8:9
29:19 31:17 32:6
82:18 84:23

unfounded 85:5
91:5,14 92:11
93:6,14 94:7
95:7,12

UNIDENTIFIED
106:14 107:1
108:9,17 109:9
115:23,24 116:6,
7 117:20,24
118:2,3,4,11,15,
17,18 122:22,24
124:1,13,16,17

union 27:6 89:2
90:6

unit 56:4

units 102:24

unjustified 31:6
93:5

unreasonable
87:11

unrelated 25:14
96:20

unsure 101:17

untruthful 66:15

unusual 120:13,
18,19

unwillingness
89:13

update 97:18

updates 14:23
15:2 16:8,14

Urban 35:20

usual 120:17

---

V

vandalism 132:18
146:11

Vardaro 6:10
62:15,17,23
68:24 69:3,9
115:11 117:11
122:11,14

variety 100:22

verbal 16:14

verdicts 52:18

Vermont 139:5

veteran 129:1

Veterans 129:1

video 46:22 62:9
93:5,11,20 99:6
106:5,13,19,24
107:6 108:4,6,8,
10,16,20 109:8,
11,16,17 113:12
115:22 116:1,5,8,
16 117:19 118:6,
10,20 120:10
122:21 123:2,24
124:6,12,19
134:9 145:15

videos 10:23
38:9,13 40:5
50:7,14,17,20
81:2 93:4 105:11
109:23 114:21
125:9 129:22
144:23

Vietnam 128:24

view 116:15

viewing 118:24
145:13

views 30:23

violating 103:3

violation 125:23
126:13 127:2

violence 33:10
34:18 56:3
132:18 134:3
136:18 146:10

violent 33:3
126:22 130:6
136:5 145:6,18
146:8

visible 47:21
134:18 135:20

visit 30:5,9

visited 30:8 31:20

volunteer 83:2

volunteers 132:8

---

W

wage 58:13

wages 25:15

wait 59:13 145:23

waiting 21:24

waived 150:12

walk 36:5 40:19
120:4

walked 91:23

walking 109:5
112:3,7 149:1

Walton 6:10

wanted 32:15
115:12 121:21
127:14

War 128:24 129:1

warrant 126:9

watch 106:11
115:21 123:21

watched 40:6
113:12,16

watching 117:6

water 20:11
130:22 132:7

ways 74:11 84:12
120:8

weapon 92:10

weaponry 26:24

weapons 27:14
61:19 62:9 63:8
64:2 88:7 92:5
110:18 130:1
134:11,16,17,21
135:7,9,16,19
136:7 139:4,8
141:8 142:14
143:11

wearing 59:23
79:1 102:12
132:4

website 50:15
109:18 147:21,22

week 10:8,9 36:12
80:5 104:5

weekend 28:8
36:10 38:11 78:5
148:2

weekly 14:12
16:15 18:2

weeks 30:6 48:19

weight 22:8,18
66:17

Wes 6:15 10:9,10
15:22 17:2 19:5,8
60:10 68:21
86:16 113:13
125:9

when's 48:11

white 19:12 43:16
44:14 75:14,15

wife 58:20 59:22

windows 33:12

witnessed 36:24
37:8 39:24 43:5
94:5

witnessing 7:15
43:11,18 113:22

woman 105:21

women 19:14
43:3

---

**wondered** 65:20

**wondering** 101:18

**wood** 140:4

**wooden** 92:4 132:11

**word** 33:7 37:1 78:7 95:20 98:14 111:12 139:1

**words** 45:11 78:8 101:14 130:15

**work** 12:11,17 25:10 84:6 91:10 101:11

**worked** 11:24 12:9,13,15,21

**working** 21:6 41:20 47:24 67:8 72:4 73:13 91:2 97:2,3 101:12

**works** 14:1,13 25:2,5

**world** 41:9 130:8 134:4

**worried** 132:11

**worries** 28:20

**worse** 46:8

**worship** 134:2

**WOSU** 143:17 145:4

**wow** 37:4

**Wozniak** 96:6 97:4 98:2 104:3, 20

**Wozniak's** 101:11

**wrapped** 86:9 141:17

**writing** 14:23 15:24 17:9 19:9

**written** 14:21 16:8,12

**wrong** 49:16 70:10 76:14 84:17 105:12 106:15,16,17,18 107:3,4,5,18 108:19 109:10 149:11

_____
**Y**
_____

**year** 21:7 70:5,8, 11 102:6,11

**years** 7:17 8:14 12:1,6,15 21:8,9 26:20 51:7,21 59:1 70:1,13 76:2 120:12 134:2

**yesterday** 131:16

**young** 103:1

**youth** 129:8

_____
**Z**
_____

**zoning** 20:12

**zoom** 57:4 62:7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TAMARA K. ALSAADA, et al.,

        Plaintiffs,

  v.

CITY OF COLUMBUS, et al.,

        Defendants.

Case No. 2:20-cv-3431

Chief Judge Algenon L. Marbley

Magistrate Judge Kimberly A. Jolson

## AFFIDAVIT OF MARK E. LANG

I, MARK E. LANG, being first duly cautioned and sworn, do hereby swear, under penalty of perjury, that I have personal knowledge of the facts stated in this affidavit; that I am competent to testify to those facts; and that I will testify as follows if I am called to testify at any hearing or trial in the above-captioned civil action.

1.     I am currently employed by the City of Columbus, Division of Police ("CPD"). I am the Commander for the Training Bureau, which is under the Community Services Subdivision of the CPD.

2.     All CPD officers receive training on both the use of force and civil disorders during basic training.

3.     During a six-month, 1,000-plus-hour basic recruit training program that is required of all CPD officers, recruits are trained, instructed, and taught on (1) the safe, proper, and effective use of non-lethal force, lethal force, and firearms; (2) the law and legal limits applicable thereto; and (3) the CPD's own use-of-force directive.

4.     Recruits also receive training, instruction, and education on topics such as community diversity, the inappropriateness of biased-based (e.g., racial) profiling, crisis intervention, de-escalation techniques, and civil disorders.

5.     The basic training program includes specific training on civil disorders, including training on balancing First Amendment rights and the need to protect public safety and property.


PLAINTIFF'S
EXHIBIT
5

6.      CPD's basic recruit training program meets, and often exceeds, the State of Ohio's requirements for basic law enforcement training.

7.      Following basic training, new CPD officers must complete the Division's Field Training Officer (FTO) program. They spend about fifteen weeks going through four phases of one-on-one training with veteran officers who observe, evaluate, and record the new officers' performance in the field and offer additional advice, training, instruction, and correction (if necessary).

8.      All CPD officers continue to receive frequent, updated, and regularly-scheduled training, instruction, and education.

9.      All sworn officers receive the Emergency Operations Manual and Directives Manual, and are required to certify that they have reviewed them.

10.     The Emergency Operations Manual provides directives with respect to field force operations, including riot gear, formations, and equipment; civil disturbance tactics; mass arrest procedures; and operating guidelines for pepper spray and riot control munitions. The relevant sections of the Emergency Operations Manual —which were in effect at the time of the subject Protests—are attached hereto as Exhibit A.

11.     The Directives Manual provides the Division's Use of Force Directive 2.01, Chemical Agents and Intermediate Use of Force Directive 2.04, Gas Guns and Grenades Directive 2.05, and Body Worn Camera Directive 11.07. The relevant sections of the Directives Manual— which were in effect at the time of the subject Protests—are attached hereto as Exhibit B.

12.     Pursuant to Directive 2.04, sworn officers are not permitted to carry chemical spray until training and qualification standards have been satisfied. They are required to "demonstrate proficiency with chemical spray once each calendar year."

13.     While in the training academy, officers get sprayed with pepper spray so they understand the effects.

14.     Supervisors and officers who use riot control munitions, such as gas guns for wooden or sponge bullets, receive additional "grenadier" training on the use of such munitions.

15.     In 2017, supervisors received specialized training on Crowd Management and Control.

FURTHER AFFIANT SAYETH NAUGHT

Mark E. Lang

Sworn to before me and subscribed in my presence on January 13, 2021.

_Tina A. Hundley_

Notary Public - State of Ohio

**TINA A. HUNDLEY**
Notary Public, State of Ohio
My Commission Expires 10-30-2021

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>1.1 |
|---|---|---|
| | REVISED<br>Mar. 30, 2016 | TOTAL PAGES<br>6 |
| **Definitions** | | |



### Alternate Emergency Operations Center

A location other than the primary EOC that will be activated during an incident if the primary EOC becomes inoperable.

### Assembly Point

A location outside an evacuation area which can accommodate a large number of vehicles and persons to serve as the initial gathering point for those who must be evacuated from the area of an incident.

### Available Reserve

On-duty police personnel who can be re-assigned from their regular duties and committed to an emergency operation.

### CBRNE

An acronym for *"chemical, biological, radiological, nuclear, or explosive," and used i*n this context*,* refers to *such items* being used as a terrorist weapon of mass destruction.

### Crisis Management

The measures *taken* to identify, acquire, and plan the use of resources needed to anticipate, prevent, and/or resolve a terrorist threat or incident. The FBI is the lead federal agency for crisis management.

### Cold/Safe/Support Zone

The secured area where equipment and personnel directly support an incident.

### Consequence Management

The measures *taken* to alleviate the damage, loss, hardship or suffering caused by emergencies, to include protecting public health and safety, restoring essential government services, and providing emergency relief to affected governments, businesses, and individuals. Implementation is under the primary jurisdiction of the affected state and local governments. FEMA is designated as the lead federal agency and provides support to the state when required.

**Contamination**

The process whereby a person or piece of equipment has contact with a toxin or hazardous substance.

**Decontamination (DECON)**

A process by which the contaminants are cleansed from the patient, victim, rescuer, and equipment.

**Dirty Bomb/Radiological Dispersion Device (RDD)**

An explosive device that is able to disperse radiological agents.

**Disaster**

Any event that causes significant human and economic loss, requires a response beyond the scope of any single agency or service, and requires resources beyond those locally available.

**Emergency**

An incident that threatens or actually does inflict damage to property, injury, or loss of life.

**Emergency Management Agency (EMA)**

A government agency designated to provide assistance with planning, *preparation,* mitigation, response, and recovery to an emergency incident. The county EMA will assist when city resources are exhausted during an emergency response. The state EMA will assist when and if county resources are exhausted. Likewise, federal EMA will assist if the governor of the state declares a state of emergency.

**Emergency Notification Guide (ENG)**

A manual used in the Communications Center to reference when notifying key personnel of major incidents or events, *which* is maintained and updated by the *Communications Bureau*.

**Emergency Operations Center (EOC)**

A fixed facility used as a base of operations for bringing personnel and resources together to manage and coordinate the response to major events, incidents, or disasters.

**Emergency Response Routes**

Designated roadways that are left open during an emergency to provide necessary entrance and exit routes for emergency response personnel and equipment.

**Evacuation**

The displacement of people in response to an emergency. The procedures include the moving of people from an affected area and *their* return when the incident is complete.

**Event**

> A planned, non-emergency activity usually requiring a Division response and Incident Action Plan.

**Field Force**

> A unit of sworn personnel led by a police lieutenant and divided into several squads used to respond to and control large crowds **and/**or civil disorder.

**Field Prisoner Processing Area (FPPA)**

> Facility used during major events or civil disturbances to complete prisoner paperwork and secure property prior to being transported to the Slating Area.

**Hazardous Material (HAZMAT)**

> Substances or materials which pose either a potential or actual risk to life, health, or property if released because of their chemical, physical, or biological nature.

**Hot Zone**

> The area containing the actual hazard. Exposure to hazardous materials in this area is likely to cause injury or death. Only personnel with the proper level of personal protective equipment **(PPE)** may enter this area. Only certified hazardous material technicians will usually work within this area.

**Incident**

> An occurrence, natural or human caused, that requires an emergency response to protect life and property. **This m**ay include major disasters, emergencies, terrorist attacks, fires, floods, hazardous materials spills, aircraft accidents, tornadoes, public health and medical emergencies, and other occurrences requiring emergency response.

**Incident Action Plan (IAP)**

> A written plan containing general objectives reflecting the overall strategy for managing an incident or special event. Includes identification of operational resources and assignments. **This m**ay also include attachments that provide direction and important information for management of the incident during one or more operational periods.

**Incident Commander**

> The ranking person responsible for the command and control of an incident. Depending on the type of incident, this may be a police or fire official.

**Incident Command Post**

> The area near an incident site where the Incident Commander and staff gather to coordinate and direct emergency operations. A large incident may need multiple functional command posts to handle separate geographical areas or functions of the incident.

**Incident Command System (ICS)**

A standardized organizational system used to manage an emergency, disaster, or event.

**Infectious Material**

Any substance capable of causing infection *that* may be transmitted to others *with or* without actual contact.

**Inner Perimeter**

The area at a disaster scene that contains the Hot *and* Warm Zones. *The inner perimeter represents the closest and smallest perimeter to the incident.*

**Joint Information Center (JIC)**

A fixed location where the public information officers from each *participating entity* will work to coordinate media releases regarding the incident. The JIC works in conjunction with the EOC and Incident Commander and provides unified, accurate, and timely information to the public.

**Joint Operations Center (JOC)**

A fixed location established by the Federal Bureau of Investigation to *coordinate law enforcement criminal investigative efforts in response to* a terrorist attack or incident.

**Operational Period**

Time scheduled for execution of a given set of operational actions as specified in the IAP *that* may be of various lengths of time.

**Outer Perimeter**

The outer-most area of a secured disaster or crime scene, *which includes the Cold Zone*. Most response, recovery, and support functions are conducted within this area.

**Personal Protective Equipment (PPE)**

Equipment that is worn, such as hoods, air-purifying respirators (gas masks), NBC gas mask filters, N95 particle masks, hazardous materials suits, Nitrile gloves and boots, etc. by a person to protect *him or her* from contamination.

**Point of Dispensing**

A location where emergency medical countermeasures will be dispensed to the public.

**Point of Distribution**

A location where emergency supplies and equipment will be distributed during a disaster.

### Point Event

An incident that occurs in a relatively limited geographic area.

### Riot Gear

Issued protective equipment *to be* used during a civil disturbance, including gas mask, helmet with face shield, shin guards, forearm guards, and chest protector *(if issued)*.

### Riot Equipment

The specialized equipment used during a riot or civil disturbance*, including* batons, shields, weapons*,* and munitions.

### Secondary Device

A device that is placed *in a specific location* in order to maim or destroy first-response personnel. It detonates after the main charge has exploded and first-response personnel have gathered on the scene.

### Shelter

A facility that provides food and shelter to evacuees during an emergency. These facilities are usually operated by the American Red Cross, which also maintains a list of the evacuees housed in the location.

### Shelter-in-Place

When evacuation is not a viable option, protection can be provided by securing persons inside a fixed facility and discontinuing external air exchange until the exterior environment is deemed safe.

### Slating Area

An area designated in an IAP *that is* staffed by sworn and Identification Unit personnel *and serves* as the processing point for those persons arrested during major incidents, events*,* or mass arrest situations. Personnel from the Franklin County Sheriffs Office and Clerk of Courts may also be assigned to the site.

### Special Needs

The accommodations for individuals with limited capacity who require certain equipment, physical assistance*,* or environmental surroundings to accomplish normal functional ability.

### Squad

A response team normally consisting of one sergeant and seven officers.

### Staging Area

A site established for the temporary location of available resources. Any location in which personnel, supplies, and equipment may be temporarily housed or parked while awaiting operational assignment.

**State of Emergency Declaration**

When an event overwhelms the responding entities, exhausting available resources, the designated government official may declare a state of emergency. This will provide availability of additional resources from the next governing level.

**Warm Zone**

A buffer area surrounding the Hot Zone where decontamination occurs.

**Weapons of Mass Destruction (WMD)**

See CBRNE.

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>4.1 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>11 |
| **Field Force Operations** | | |



## I. Field Force

A. The Division of Police's organizational structure of the field force is flexible, with the composition based on the designated function at the time of deployment. ***The field force size and composition varies but generally includes four to six squads (5 to 10 officers in each) and is led by a lieutenant. The team is capable of managing large-scale operations including crowd management, enforcement, and general police presence for the purpose of maintaining order and preserving the peace.***

B. ***The Incident Commander will establish the commander's intent and the Rules of Engagement (ROE) and communicate them clearly to personnel assigned to the field force.***

C. Field forces are deployed at the direction of the Incident Commander to perform various tasks associated with civil disorder or major events. Typical functions of a field force may include security of a geographical area or resource, high visibility patrols, providing escort to fire or other critical resources, mass arrest, and/or other functions required to restore order and provide security.

D. Field force deployment is dictated by mission assignment. The field force may be deployed intact as an entire force or broken down by squad into particular functional or geographic areas. Each squad may then be broken down into small teams of two or four officers each. The squad leader is responsible for the operation and conduct of his or her squad. The field force provides an organized response to an incident. Individual actions are discouraged except in life-threatening circumstances. For safety reasons, officers are not assigned as a one-officer unit when deployed in a field force assignment.

E. Assigned equipment varies with the field force mission. For example, securing a geographic area may not require additional equipment, *but* clearing an area of demonstrators may require the use of shields, batons, and riot control munitions.

F. Depending on the mission, a field force may be mobile in vehicles, on foot, or assigned to a static location. The configuration of mobile field forces depends on the availability of transportation resources. The field force may be transported in its entirety by bus, or squads may be assigned to two or four-officer cruisers.

## II. Field Force Organization

A. Field Force Leader

1. The Field Force Leader is a police lieutenant *who* is responsible for the planning, operation, and conduct of the field force. The Field Force Leader directs squad leaders on mission requirements and deployment methods and reports to the Operations *Chief* or Incident Commander as appropriate. The radio call number series 4100 through 4999 is designated for emergency operations use. The Field Force Leader is designated by the appropriate corresponding number, *for example,* field force 1 is 4100, field force 2 is 4200, etc.

   a. A *staff of one sergeant and two officers* is *generally* assigned to the *F*ield *F*orce *L*eader. *The sergeant* performs duties as the aide to ensure documentation of field force activities, monitor radio traffic, and request equipment replacement for the field force as needed. The remaining two officers may perform duties as video officers, using video cameras to record field force activities, or as security officers for field force vehicles and equipment when deployed.

B. Field Force Squad

1. The squad is the basic element of the field force. Typically four to six squads are assigned to each field force. Additional squads may be assigned to a field force when staffing is available, but the field force will not exceed nine squads. Each squad consists of one police sergeant and *5 to 10* police officers.

2. Squads may be assigned specific tasks within the field force such as security, arrest teams, or deployment of riot control munitions.

   a. *A squad of trained grenadiers may be assigned to operate less-lethal munition launchers and deploy other less-lethal weapons.*

   b. *A squad may be assigned as the arrest team. The decision to arrest is made by the Field Force Leader, and the responsibilities of the arrest team include:*

   (1) *Making arrests*

   (2) *Restraining and searching arrestees*

   (3) *Moving arrestees to the PTV*

   (4) *Extricating trapped officers or specific suspects as directed by the Field Force Leader*

   (5) *Securing specific persons or assets as directed by the Field Force Leader*

3. Squads are designated by the appropriate field force number and numerical sequence within the field force: 4110, 4120, 4130, 4140, 4150, and 4160.

    **4.** Equipment assigned to the squad varies depending on the mission and may include shields and batons, gas guns, and riot control munitions. The type and number of vehicles assigned to each squad is based upon the mission and method of deployment.

C. Arrest Vehicle

***At least one PTV with two officers should be assigned to each field force.*** The PTV officers are responsible for transporting arrestees from the operational area to the Field Prisoner Processing Area or Slating Area as appropriate. During large events, PTVs may be required to work independent of their assigned field force providing prisoner transportation where needed. The PTVs are designated with corresponding field force numbers***, for example,*** 4108 for field force 1, 4208 for field force 2, etc.

D. Video Officer

    1. The video officer needs to be assigned directly to the *F*ield *F*orce *L*eader to accurately record ***crowd and field force activities, including*** the cause and effect of the field force response to the incident. The video officer must ensure he or she is positioned with the *F*ield *F*orce *L*eader to document the activities of the crowd identified and the deployment orders given to the squad leaders. The video officer then records the field force response and the actions of the crowd.

      a. It is imperative that the video officer record all the identified activities leading up to the deployment of the field forces, squads, ***and*** munitions, ***as well as*** the conduct of the crowd and officers during deployment. ***Recordings made*** during field force operations are evidence and could be used in court to prove or defend the Division's actions during an incident. ***Refer to the "Property and Evidence Handling" directive as necessary.***

E. Field Force Deployment

    1. A field force may be activated at the direction of a lieutenant or higher, or as designated by an event plan. According to the incident or event, a single field force or several field forces may be activated. During an emergency activation of a field force, the zone lieutenant notifies Communications Bureau personnel of the number of personnel needed and the designated staging location. Personnel will respond to the designated location and be formed into a field force and deployed at the direction of the *F*ield *F*orce *L*eader.

    **2.** During a major event, field forces are assigned designated reporting times and locations. Field force personnel are notified of their assignments, reporting times*,* and locations prior to the event.

**3.** Numerous field forces may be deployed at the same time in response to an incident or special event. Field forces may work in conjunction with each other or operate independently in separate geographic areas to perform specific tasks. When two or more field forces are activated, a police commander or higher is assigned as the Incident Commander.

**4.** During field force deployment, additional units may also be activated to support the incident or event and may include staging/prisoner processing/ slating areas and/or Mounted, SWAT, or Traffic units.

F. Radio Call Numbers

1. The field force is assigned a basic series of call numbers. As each squad is further broken down into smaller teams of officers, the number series changes slightly to reflect the number of individual units and ensures accountability for officer safety.

a. The numbering matrix for each field force is the same. The second number designates the field force. For example, 4100 designates field force 1, 4200 designates field force 2, etc.

b. The call numbers for the field force are as follows:

| 4100 | Field Force 1 Leader | Lieutenant |
|------|---------------------|------------|
| 4101 | Aide to Field Force Leader | *Sergeant* |
| 4102 | Video/*Staff* Officer | |
| 4103 | Video/*Staff* Officer | |
| 4108 | PTV | Two Officers |
| 4110 | 1st Squad Sergeant | |
| 4111- 4117 | 1st Squad Officers | |
| 4120 | 2nd Squad Sergeant | |
| 4121- 4127 | 2nd Squad Officers | |
| 4130 | 3rd Squad Sergeant | |
| 4131- 4137 | 3rd Squad Officers | |
| 4140 | 4th Squad Sergeant | |
| 4141- 4147 | 4th Squad Officers | |
| 4150 | 5th Squad Sergeant | |
| 4151- 4157 | 5th Squad Officers | |
| 4160 | 6th Squad Sergeant | |
| 4161- 4167 | 6th Squad Officers | |

2. As field forces are added, follow the same organizational structure. A number designates each field force, with each squad assuming that field force's number. *For e*xample, field force 2 is 4200, 1st squad is 4210, 2nd squad is 4220; field force 3 is 4300, 1st squad is 4310, 2nd squad 4320, etc.

G. Field Force Equipment

1. Each member assigned to a field force is required to have his or her Division-issued ***personal*** protective equipment ***(PPE) and riot control gear*** with him or her. In addition, personnel are encouraged to have their flashlight and inclement weather gear. Additional equipment may be assigned to the field force as the mission and situation dictates. These items include, but are not limited to, the following:

   a. Riot batons
   b. Protective Shields
   c. 37mm***/40mm*** gas guns (single shot and rotary)
   d. Shotguns
   e. Riot control munitions (gas and smoke grenades)
   f. Radios
   g. Video cameras
   h. Bullhorns
   i. Flex cuffs
   j. Arrest stickers

2. ***The Columbus Division of Fire should be notified prior to the dispersal of any chemical riot control munitions during training or an actual riot situation.***

3. Field Force Kit – Each field force is provided a field force kit ***by the on-duty patrol lieutenants*** containing items necessary to organize and operate a field force, document field force activities, and process arrestees.

   a. Each patrol zone is assigned a field force kit that is maintained by the zone lieutenants. Patrol zone lieutenants are responsible to ***maintain the*** equipment and munitions listed on the Zone Lieutenant Munitions/Equipment Checklist, form U-10.127***, and after each deployment to restock items as necessary.*** The first shift Patrol zone lieutenant shall inspect the field force kits ***quarterly.***

   b. The riot van contains ***sufficient quantities of grenades (smoke and chemical agent), wooden multiple baton shells, and 37mm/40mm gas guns. These items are used for general deployment and to replenish kits maintained in the vehicles of zone lieutenants.***

   c. ***The ORD-2 vehicle contains smaller quantities of the equipment carried in the riot van as well as flex cuffs and cuff cutters.***

   d. ***Ordnance Unit personnel shall inspect the supplies and update the checklist quarterly for both the riot van and ORD-2 and restock items as necessary.***

4. Personnel assigned to field force duty shall wear the uniform of the day.

H. Field Force **Formations**

**1. Line Formation**

**a.** The following is the basic configuration of a field force in a line formation. **The line formation is used to provide security across a frontage or to move a crowd in a single direction.**

```
1111112222223333334444444
1L      2L      3L      4L
        LT/Aide(s)
        555555  5L
        666666  6L
            PTV
```

---

| 1,2,3,4,5,6 | Indicates officers in their assigned squads. |
| 1L, 2L, etc. | Indicates the squad leader (sergeant) of each squad. |
| LT | Indicates the *F*ield *F*orce *L*eader, a police lieutenant. |
| Aide(s) | Indicates the leader's aide(s) and the video officers. |
| *5L* | *Indicates the location of the arrest team.* |
| *6L* | *Indicates the location of the grenadiers.* |
| *PTV* | Indicates the PTV assigned to the field force. |

**2. Wedge Formation**

**a. The Wedge Formation is movement used to split or disperse a crowd.**



```
            1 2
          1     2
        1         2
      1  1L   2L  2
    1               2
   3                 4
  3   3L        4L   4
 3                    4
3                      4
3                        4

        LT/Aide(s)
        55555  5L
        66666  6L
           PTV
```

3. **Box Formation**

   a. **The Box Formation is used to provide security by surrounding a person or resource.**

```
2 2 2 2 2 3 3 3 3
1    2L    3L    4
1               4
1    1L    4L    4
1               4
1    LT/Aide(s) 4
       55555
        5L
       66666
        6L
        PTV
```

4. **Column(s) Formation**

   a. **Columns are used to provide a formation for the rapid movement of a Field Force.**

```
        1    3
        1    3
   1L   1    3   3L
        1    3
        1    3
        2    4
        2    4
   2L   2    4   4L
        2    4
        2    4
        5    6
        5    6
   5L   5    6   6L
        5    6
        5    6
      LT/Aide(s)
         PTV
```

*I. Field Force Communication*

    *1. The field force's actions and movements will be at the specific direction of the Field Force Leader by verbal commands, audible signals, and/or hand and arm signals. If time permits, the forms of communication should be discussed and rehearsed in the Staging Area prior to the field force deployment.*

      *a. Verbal commands are delivered by the Field Force Leader and echoed by all members of the field force.*

      *b. Preparatory commands alert the field force of the next action and that the command of execution is forthcoming.*

      *c. Commands of execution direct the field force to immediately take the action.*

      *(1) Audible signals may be given in lieu of verbal commands or hand and arm signals as it may be difficult to see or hear. The following three signals maybe given by blast(s) on an air horn, vehicle horn, or whistle:*

        *(a) One blast – Stop*

        *(b) Two blasts – Go/Move*

        *(c) Three blasts – Warning signal (Horses, Gas, or Emergency)*

      *(2) Hand And Arm Signals*

        *(a) Field Force Key*



TEAM MEMBERS

PLATOON LEADER    GRENADIER    SQUAD LEADER

*(b) Line Formation*



*(c) Wedge Formation*



### (d) Box Formation



### (e) Column(s) Formation





*J.* Vehicle Operations

1. Emergency Equipment – Vehicle emergency lights and sirens *should be* used during field force response and movement as directed by the field force leader *and in conjunction with the "Emergency Vehicle Operations" directive.*

2. Speed – The objective of the field force is to arrive at the scene as an organized unit. When responding, field force vehicles remain close to continue through intersections uninterrupted while still maintaining a safe distance between vehicles. The response speed of the field force is determined by the *F*ield *F*orce *L*eader.

3. Lane Changes – During lane changes of the entire field force, the *F*ield *F*orce *L*eader instructs the last vehicle to "block left" or "block right." The last vehicle then moves into the designated lane, blocking approaching traffic *and* allowing the remainder of the field force to change lanes as the lane clears of traffic.

4. Windows – Vehicle windows should be rolled up to reduce the potential of personnel being struck by objects thrown at the vehicles.

5. Parking – Upon arrival, field force vehicles are parked in squad order to allow for a rapid and orderly response from the vehicles. Personnel remain in their vehicles until directed to exit by the *F*ield *F*orce *L*eader.

6. Keys – Keys are left in the field force vehicles to avoid being lost and to allow for a rapid exit of the area if required. It may be necessary to assign field force officers to provide security for the vehicles.

7. *Mounted and Bicycle Units:*

   a. *The Mounted and Bicycle Units may be used to supplement the field forces based on the availability of resources.*

   b. *As directed by the Field Force Leader, the Bicycle Units may be deployed to assist in the management of lawful crowds, protestors, and/or demonstrators.*

   c. *At the discretion of the Field Force Leader, Bicycle Units may be used as a rapid response team to contain, disrupt, and/or monitor unlawful violent crowds and to secure areas cleared by personnel to maintain control of ground gained.*

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.2 |
|---|---|---|
| | REVISED Dec. 30, 2019 | TOTAL PAGES 5 |
| | **Civil Disturbance Tactics** | |



## I. Purpose

The purpose of this section is to define the types of civil disturbances and to provide direction in planning and implementing the appropriate police response to effectively manage and control the situation. This section will provide the guideline for tactics that may be used by field forces and other emergency response forces.

## II. Definitions

A. Civil Disturbance – Any situation such as a demonstration, strike, riot, celebration, and/or public panic, which has the potential of causing injury to persons or damage to property.

B. Peaceful Demonstration – An event with the purpose of expressing views and opinions in a peaceful manner.

C. Planned Events – Activities with pre-notification, either formal or informal, where large numbers of persons gather or attend, or unique security or traffic measures are required. Examples of planned events include parades, sporting events, dignitary protection, and civic and cultural events.

***D. Riot – A course of disorderly conduct with four or more people with purpose to:***

    ***1. Commit or facilitate the commission of a misdemeanor;***

    ***2. Intimidate a public official or employee into taking or refraining from official action;***

    ***3. Hinder, impede, or obstruct a function of government or orderly process of administration or instruction at an educational institution, or to interfere with or disrupt lawful activities carried on at such institution; or***

    ***4. Do an act with unlawful force or violence, even though such act might otherwise be lawful.***

***E.*** Spontaneous Events – *E*vents *that* may create a threat to public health, safety, or order and occur without sufficient notice to allow comprehensive planning.

## III. Operations and Tactics

*A. The following operational objectives, which are consistent with the National Response Plan and the National Incident Management System, should be considered:*

1. *Monitoring of the crowd's progress and development and gauging the intent of the crowd. Monitoring includes passive observation and communication with ground leaders.*
2. *Ensuring containment of the area.*
3. *Separating passive resistors, peaceful demonstrators, and agitators to make dispersion during critical incidents easier.*
4. *Causing participants, spectators, and emergency responding units to disperse as necessary. A key to dispersion is to ensure avenues of egress are available and communicated.*
5. *Arresting individuals during a civil disturbance only as necessary.*
6. *Restoring the affected area to its normal state as soon as possible at the conclusion of the event.*

*B.* Peaceful Demonstrations

1. A peaceful demonstration is viewed as a legally acceptable manner of expressing an opinion. The right to protest, when done according to law, is embedded in the spirit of the Constitution. The role of the Division of Police during a demonstration is to protect the rights of peaceful demonstrators, to protect the rights of the public, *and address any public safety concerns resulting from the demonstration.* The physical make-up of a particular group of demonstrators is as diverse as the agenda and cause of the group. It is not uncommon to observe demonstrators representing a multitude of different factions. It is often an opportunity to be seen and heard, regardless of the advertised cause.

2. Peaceful demonstrations often bring people of opposing views. It is not uncommon for counter demonstrators to agitate and taunt peaceful demonstrators and police. A peaceful demonstration may evolve and change in nature if it is not managed properly. Officers should remain neutral when faced with groups of differing causes. When faced with agitators, officers must project a calm, professional image. Professional agitators are trained to provoke officers into overreacting. A peaceful group can be enraged by inappropriate police conduct.

3. A police representative should make contact with the formal or informal leader of the group. It should be conveyed that the Division respects the rights of the group to exercise their First Amendment rights. Permits must be inspected and the leader will be informed that they are expected to abide by all laws regarding the obstruction of sidewalks or streets. Failure

to follow the permit guidelines, disruptive behavior, property damage, or violence will not be tolerated. The group's actions will determine the police response. Demonstrators may be warned, cited, or arrested as appropriate. The ***Incident Commanders*** should familiarize themselves with any information regarding the group, their agenda, and tactics when planning the response to the event.

**C.** Civil Disturbance

1. A civil disturbance, or riot, usually results in violent confrontation, property damage, and injury. The violence may be directed towards opposing groups, police, or the public in general. Verbal taunting may escalate into violent behavior resulting in objects being thrown, property damage, vehicle or building fires, looting, and assaults.

2. Civil disturbance can result from a specific incident or a series of related or unrelated events. This may include police actions, court rulings, social conditions, or events from out of control celebrations.

   a. This type of violence can be the result of a specific incident or after a series of events, such as a police action or a court ruling that is perceived to be unfair or biased.

   b. Common elements of campus disturbances ***may be*** excessive amounts of alcohol, a large volume of people in the somewhat confined area (typical of the off campus housing district), loud music, and the propensity of young people in the area to use cell phones ***and social media*** to communicate with each other, providing an instant network of information concerning the locations of the parties.

**D.** Impromptu Disturbances

The initial response of the police and the community to an impromptu or spontaneous disturbance is critical. Once a "flashpoint" of violence involving groups of people displaying criminal behavior is identified, the first responders should take quick and decisive action to diffuse the situation and avoid escalation. Most incidents occur unexpectedly, which does not give the Division the advantage of preferred manpower levels or the establishment of a command staff. In these situations it is imperative that on duty personnel assume their responsibilities as first responders, keeping in mind that the primary objective is the safety of citizens affected by the disturbance, specifically to prevent the loss of life. Initial steps will include establishing a perimeter around the affected area to prevent additional rioters from assembling and to keep bystanders from harm. If immediate action is warranted, such as arrests or crowd dispersal, and it can be accomplished safely with available personnel, it should be taken. A staging area should be designated and a supervisor assigned to organize additional units into a field force.

***E.*** Control Strategies

1. Strategies should be implemented in a coordinated Division-wide effort ***consistent with Division policies.*** Tactics will vary depending upon the situation; however, in all cases, Division personnel should respond ***as trained and in a*** controlled manner.

2. Preventing a disturbance from becoming a riot through proactive initiatives and citizen contacts should be the goal of supervisors***.***

3. ***All actions including arrests should be accomplished as a team. An officer should not act independently in an unruly crowd as this can lead to unsuccessful and dangerous operations.***

4. ***It*** should be noted that the number of people attending a ***large gathering*** has the potential to grow into an unruly crowd very quickly. ***Disturbances may also be the result of protests or marches.*** The street and sidewalks may be blocked, disrupting the flow of traffic and creating the potential for violent confrontations and property destruction.

5. ***The following actions should be considered during a disturbance:***

   a. ***T***he ranking supervisor should request officers to respond to a designated staging area, don riot gear, and prepare to deploy as a field force.

   b. Responding officers should not report directly to the scene unless an emergency situation exists and they are ordered to do so. Normally, the field force should not be assembled within view of the crowd.

   c. A perimeter should be established and officers already at the scene should attempt to disperse the crowd by giving clear verbal orders and taking appropriate enforcement action. If the crowd becomes violent or confrontational, ***the dispersal order should be given promptly and repeatedly.***

***F.*** ***The Division has a variety of resources which may enhance the ability to respond to a disturbance. All available resources should be considered when determining the appropriate response, including:***

1. ***Mobile Field Force(s)***

2. ***Mounted Unit***

3. ***Arrest/Rescue Teams***

4. ***Bicycle Rapid Response Teams***

5. ***Motorcycles/Traffic Control Unit***

6. ***Field Prisoner Processing Areas***

7. ***Visible video surveillance***

8. ***Medical support units***

9. ***Pre-positioned/Designated Protest Areas***

10. *Pre-placed barriers*
11. *SWAT*
12. *Observation/Counter Sniper Teams*
13. *Riot control munitions*
14. *Alternative traffic plans, including ingress/egress routes*
15. *Specialized equipment and vehicles such as enhanced public address/acoustic devices, passenger buses, light trailers, observation towers, fire trucks, and armored vehicles.*

G. *Enforcement Action*

1. *If it becomes necessary to take enforcement action, sworn personnel should consider the elements of offenses against the public peace, which may include but are not limited to:*

   a. *Inciting Violence*
   b. *Riot*
   c. *Aggravated Riot*
   d. *Failure to Disperse*
   e. *Noise Ordinance*
   f. *Disorderly Conduct*
      (1) *Blocking the Roadway*
   g. *Open Container Violations*
   h. *Prohibitions Under 21 (underage use and possession of alcohol)*
   i. *Misconduct at an Emergency*
   j. *Open Burning*
      (1) *If an arrest is made for this violation, collect all evidence including accelerant and notify Columbus Division of Fire. The arson investigators are responsible for the securing of evidence in special containers, processing, and filing charges.*

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.3 |
|---|---|---|
| | REVISED Dec. 30, 2019 | TOTAL PAGES 6 |
| **Mass Arrest Procedures** | | |



## I. Purpose

There will be times when Division of Police *personnel* arrest a *large* amount of people during a protest, rally, or other activity. This section outlines the Division's procedures for making mass arrests. The procedures may be used during planned protests or rallies or in response to a spontaneous *event.* During a mass arrest situation, the primary concern should be the safety of the public and officers involved. For additional information, refer to the *"Arrests and Warrants" and "Transport and Slating"* directive*s*.

## II. Pre-Arrest Procedures

A. If the demonstration is peaceful and police actions are not immediately necessary, the Incident Commander should:

1. Determine the size and nature of the demonstration. Attempt to identify and interview leaders to ascertain their plans. Determine if demonstrators intend to be arrested.

2. Determine the name, address, and phone number of the property owner or agent where the incident is occurring, when appropriate. Contact the Homeland Security Section for any available information regarding the group.

3. Determine if the property owner/agent wants arrests to be made if demonstrators are committing a crime **and the incident occurs on private property**. If the property owner desires arrests to be made, determine if the owner will serve as the primary prosecution witness (list as a witness on the Arrest Information, form U-10.100) or if they will designate an agent to serve as the prosecution witness to be subpoenaed to court. Ensure that the appropriate *i*ncident *r*eport is taken from the property owner/agent.

4. Before any arrests are made, select the proper charges(s) that may be used for the event. If time permits, brief supervisors and participating officers on *the* items listed above.

5. Before mass arrests are made, ensure the following items are present at the demonstration site*:*

   a. Arrest Information and *criminal* complaint forms

   b. Cameras and video recording equipment

   c. Clipboards

---

    d. Arrest stickers

    e. Staplers and extra staples

    f. Property bags

    g. ***Flex cuffs***

    ***h.*** Needle-nose pliers or wirecutters (to cut plastic cuffs)

    ***i.*** Bullhorn or other sound amplification device

        **(1) *The Long Range Acoustic Device (LRAD) may be deployed as appropriate to convey warnings or as a distraction device as outlined in Section V.***

    ***j.*** Bolt-cutter or other cutting devices

  **6.** Designate a Field Prisoner Processing Area and staff if required to process a large amount of persons prior to their transportation to the Slating Area. ***The Field Prisoner Processing Area will provide workspace to complete arrest paperwork and the fingerprinting and photographing process completed by Identification Unit personnel.***

  **7.** Designate a Slating Area and staff to process the arrestees. The Slating Area may be staffed by various units and agencies including the Franklin County Sheriff's Office and the Clerk of Court**s**.

## III. Demonstration Procedures

A. A ***sworn*** supervisor will make contact with the property owner or agent regarding arrest procedures if protestors are on private property. ***A sworn supervisor will determine the appropriate course of action if demonstrators are in a public area or roadway to ensure they are not creating a public safety hazard.***

B. Prior to contact with the demonstrators, police personnel will be briefed on arrest, use of force, transportation**,** and paperwork procedures ***as directed by the Incident Commander.***

**C.** ***If exigent circumstances exist, such as demonstrators creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of demonstrators who are not complying with lawful commands. Refer to the "Chemical Agents and Intermediate Weapons Regulations" directive as necessary.***

**D.** A ***sworn*** supervisor will read a dispersal warning ***using a bullhorn or amplification device*** to the demonstrators ***prior to arrests being made.*** The warning ***should*** be read ***three (3)*** times ***to notify the demonstrators that they are committing a violation of law and they may be arrested if they fail to comply with the order to disperse. Three***

*warnings are preferred; however, action may be taken after one or two warnings if there is an immediate need to stop dangerous behavior.* All warnings *and arrests should* be recorded using video recording equipment.

1. The *first official dispersal command* reads:

   *"AN EMERGENCY EXISTS ON AND AROUND (give location, for example: Chittenden & Indianola). YOU ARE ORDERED TO IMMEDIATELY LEAVE THE (AREA JUST DESCRIBED)/ (ROADWAY) BY THE ORDER OF (on-scene ranking supervisor). IF YOU REMAIN IN THE (AREA)/(ROADWAY) JUST DESCRIBED, REGARDLESS OF YOUR PURPOSE, YOU WILL BE IN VIOLATION OF COLUMBUS CITY CODE AND OHIO REVISED CODE - DISORDERLY CONDUCT, AND THE POLICE WILL REMOVE YOU FROM THIS (SPECIFIED AREA)/(ROADWAY). CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED TO MOVE YOU FROM THIS (SPECIFIED AREA)/ (ROADWAY), AND YOU ARE SUBJECT TO BEING ARRESTED AND PROSECUTED. THE FOLLOWING ROUTES OF DISPERSAL ARE AVAILABLE (describe available exit areas). YOU MUST LEAVE THE (SPECIFIED AREA)/(ROADWAY) NOW, AND YOU MAY NOT RETURN UNTIL THE EMERGENCY HAS CEASED."*

2. *The second warning reads:*

   *"THIS IS AN EMERGENCY SITUATION...AN EMERGENCY EXISTS IN THIS LOCATION (give location); LEAVE THE (SPECIFIED AREA)/(ROADWAY) IMMEDIATELY. CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED. IF YOU REFUSE TO LEAVE THE (SPECIFIED AREA)/(ROADWAY), YOU ARE SUBJECT TO ARREST. LEAVE THE (SPECIFIED AREA)/ (ROADWAY) IMMEDIATELY.*

3. *For the final warning, repeat the second warning and add:*
   *"THIS IS YOUR FINAL WARNING."*

4. *The Incident Commander or his or her designee should record the following information when these announcements are made.*
   Day:_____ Date:____/____/____ Location:_____
   *Time of 1st Warning: __:__ (Wait approximately 5 minutes before reading 2nd warning)*
   *Time of 2nd Warning: __:__ (Wait approximately 2 minutes before reading 3rd warning)*
   *Time of 3rd Warning: __:__ (Make arrests/deploy chemical agents)*

**E.** *If on private property,* have the owner/agent attempt to gain entry into the building through the demonstrators who are blocking the door *after the warning is read, if it is safe to do so.* If the owner/agent is unable to gain entry, arrest procedures will be implemented at the direction of the Incident Commander.

**F.** *Each arrest team will consist of four officers.* At the direction of the Incident Commander, officers will begin to arrest individuals *who are* violati*ng* law.

**G.** Prisoners will be walked to the transport vehicles where a photograph of the prisoner and arresting officer will be taken and the Arrest Information form completed. *For non-ambulatory prisoners, refer to Section I,F of the "Transport and Slating" directive.*

**H.** If the demonstrator refuses to walk to the prisoner transport vehicle, he or she will be carried in an appropriate manner to the transport vehicle by the arrest team. Individuals who refuse to walk or *who* show other passive resistance may be charged with resisting arrest. The arresting officer will describe in the narrative of the Arrest Information form how the individual resisted arrest. *For example,* "Subject went limp and would not walk, requiring officers to carry the arrestee to the transporting vehicle."

**I.** All property will be removed from the arrestee and placed in a bag with the names of the arrestee and arresting officer printed on it.

**J.** The transporting officers will ensure the Arrest Information form, photographs, and other required paperwork are completed and property secured by the arresting officer(s) prior to transporting the individual.

## IV. Processing Procedures

A. If a Field Prisoner Processing Area is being utilized, prisoners will be transported to the Field Prisoner Processing Area where necessary paperwork will be completed. *As appropriate, prisoners will then be processed through the Slating Area, if one is activated.*

B. Depending on pre-established procedures for the event, prisoners may be summonsed at the Field Prisoner Processing Area or may be processed through the Slating Area *prior to being issued a* summons or slated at the appropriate county jail.

**C.** The Incident Commander will decide prior to initiating mass arrests whether to slate or summons individuals. The decision will be based on the type of protest, method of protest and resistance, number of potential arrestees, and available jail space. All individuals involved in an assault, resisting arrest, or other violent crime or felony will be slated. Felonies will be processed through the appropriate investigative unit.

**D.** If mass arrests are anticipated, the Franklin County Jail supervisor will be notified prior to the event*, or as soon as practical for spontaneous events.*

## V. Long Range Acoustic Device

A. *The LRAD is an acoustic hailing device used to send messages and warning tones over longer distances or at a higher volume than normal loudspeakers. The LRAD is used for long-range communications in a variety of applications and as a means of non-lethal, non-kinetic crowd control.*

1. *The LRAD's high output sound and directionality can be used to hail, warn, and notify clearly and intelligibly at distances of 250 meters (820 feet) or more.*

B. *The LRAD shall only be operated by sworn personnel who have satisfactorily completed the appropriate annual training.*

C. *The LRAD may be used to:*

1. *Communicate to large crowds during parades, festivals, and sporting events;*

2. *Conduct SWAT operations;*

3. *Communicate to demonstrators and disperse or redirect crowds prior to deployment of chemical agents;*

4. *Communicate with barricaded subjects;*

5. *Make announcements when serving high risk warrants; or*

6. *Evacuate neighborhoods or communicate lifesaving information to citizens during emergencies and disasters.*

D. *During an incident of civil unrest, the Incident Commander may request that the LRAD be delivered to be used as the amplification device to convey warnings to the demonstrators as outlined in Section III,D.*

1. *Whenever possible, prerecorded messages should be used. Prerecording ensures that messages are appropriately worded and clearly broadcasted to maximize the effectiveness of communications.*

2. *If demonstrators do not comply approximately two minutes after the second warning is read, the Incident Commander may order that the LRAD Warning Tone be used. Use of the LRAD Warning Tone as a distraction device shall be documented as a Level 0 Use of Force. Refer to the "Use of Force" directive as necessary.*

3. *The Warning Tone should be used in 2-5 second bursts for maximum effectiveness.*

***E. Operators of the LRAD shall ensure no targeted subjects, bystanders, or personnel are occupying the applicable "TONE" or "VOICE-TONE HAZARD AREAS" before engagement in "TONE" or "VOICE" mode.***

   ***1. The Tone Generator produces the loudest output from the LRAD. The Incident Commander or designee operating the LRAD will gauge safe stand-off distances utilizing a range finder prior to using the "TONE" mode. Time, distances, and location shall be documented by the Incident Commander or a designee.***

***F. Operators of the LRAD shall wear hearing protection. Other personnel in the area when the LRAD is being operated should also wear ear protection, such as soft foam inserts.***

## VI. Juvenile Offenders

Juveniles arrested during a demonstration will be processed according to **the** Division Directives.

## VII. Crime Scene Preservation

If a crime scene is involved in the event, the scene will be secured and the appropriate investigative unit and Crime Scene Search Unit will be required to process the scene.

## VIII. Legal Advisor

The Division Legal Advisor will be notified of a protest or other event involving mass arrests. The Division Legal Advisor may respond to the scene, Field Prisoner Processing Area, or Slating Area to provide legal assistance if necessary.

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.4 |
|---|---|---|
| | REVISED Jul. 30, 2019 | TOTAL PAGES 6 |
| **Riot Control Munitions** | | |



## I. Purpose

A. This section provides Division personnel with a reference for riot control munitions currently in stock for use in various situations. None of the munitions listed **shall** be used by Division personnel unless properly trained and certified by the Ordnance Unit. The section is divided into three parts outlining munitions for the following types of situations:

   1. First Responders
   2. Field Force Operations
   3. Tactical Situations

B. Each part of this section will outline the following details of riot control munitions:

   1. Proper application
   2. Construction
   3. Operation
   4. Effective range
   5. Type of agents or projectiles
   6. Discharge times

## II. Delivery Method Options

A. 37mm/40mm Gas Gun

   1. 37mm Super-Sock™ bean bag round
   2. 40mm wood baton round
   3. 40mm sponge round
   4. 40mm warning/signaling munitions

B. Aerosol Canister

   OC agent

C. Grenade

   OC/CS agent

D. Unless otherwise specified, all 40mm gas guns and related munitions shall be securely stored in the lieutenant's office. The items shall be stored in a soft carrying case and transferred to a lieutenant's vehicle when needed for deployment, training, or inspection. The items shall be returned at the completion of the event/incident.

## III. First Responder

A. 37mm/40mm Gas Gun

1. Proper *a*pplication: Designed for crowd control or barricade situations, both indoors and outdoors.

2. Construction: Metal and plastic revolving cylinder or single shot*, both* with or without a collapsible stock, *and* with optic sight.

3. Operation: May be used in double or single-action depending on the weapon.

4. Effective range: 50 yards on breech lock sight, 75 and 100 *yards* on rear leaf sight.

5. Type of agents or projectiles: 37mm or 40mm projectiles in single shot and six or four-shot rotary version.

6. Discharge times: Zero discharge time.



Four-Shot 40mm Rotary Gas Gun



Single-Shot 40mm Gas Gun

B. 37mm Super-Sock™ Bean Bag Round

1. Proper application: Fired from the 37mm gas gun. ***Shall not be fired at the head unless the use of deadly force is reasonable.***

2. Construction: Balloon filled with silica sand contained in a plastic 37mm plastic shell.

3. Operation: Direct-fire deployment from the 37mm gas gun. Use as an intermediate impact weapon, targeting the extremities.

4. Effective range: 60 feet.

5. Type of agents or projectiles: Balloon filled with silica sand contained in a plastic 37mm plastic shell.

6. Discharge times: Not applicable.



37mm Super-Sock Bean Bag Round

## IV. Field Force Operations

A. 40mm Wood Baton Round

1. Proper application: For outdoor use in riot control situations without the use of chemical agents when the crowd must be dispersed quickly and efficiently. ***This is not a direct-fire munition.***

2. Construction: 3 wood projectiles loaded in a 4.8 inch casing.

3. Operation: Fire from a 40mm gas gun at the ground in front of the crowd and the wood projectiles skip-fire into the crowd's feet and lower legs.

4. Effective range: 30 to 60 feet.

5. Type of agents or projectiles: 3 wood projectiles loaded in a 4.8 inch casing.

6. Discharge times: Zero discharge time.



40mm Wood Baton Round

B. 40mm Sponge Round (40MM eXact iMpact™ Sponge Round)

1. Proper *a*pplication: For use in riot control situations for the incapacitation or control of an aggressive, non-compliant subject. ***Shall not be fired at the head unless the use of deadly force is reasonable.***

2. Construction: A plastic body with a foam (sponge) nose.

3. Operation: Direct-impact deployment from a 40mm gas gun. Use as an intermediate impact weapon targeting the extremities.

4. Effective *r*ange: 5 to 120 feet.

5. Type of agents or projectiles: A plastic body with a foam (sponge) nose which is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

6. Discharge times: Zero discharge time.



40mm Sponge Round

C. 40mm Warning/Signaling Munitions

1. Proper *a*pplication: For outdoor use in riot control situations to direct movement of a crowd.

2. Construction: A plastic body.

3. Operation: Fire from a 40mm gas gun, directed over the heads of a crowd to direct movement. The munition is designed to travel 100 meters and deflagrate 20 feet above the target when the launcher is held at a 15 degree elevation angle.

4. Effective *r*ange: 100 meters.

5. Type of agents or projectiles: A plastic body which produces 170 decibels of sound, 5 million candelas of light, and deflagrates at a distance of 100 meters ***with a CS irritant payload***.

6. Discharge times: Zero discharge time.



40mm Warning/Signaling Round

D. MK-9 Aerosol

1. Proper *a*pplication: Aerosol sprays in a dispersed pattern, creating a contaminated area that causes unruly crowds to move.
2. Construction: Aluminum case, plastic handle, and discharge trigger.
3. Operation: Spray above crowd, letting agent fall on to them or directly into face, nose, and mouth area.
4. Effective range: 10 to 15 feet.
5. Type of agents or projectiles: OC Aerosol spray.
6. Discharge times: Average of 18 to 20 half-second bursts.



MK-9 Aerosol

## V. Tactical Situations

A. OC Grenade

1. Proper *a*pplication: All indoor situations, as well as outdoor situations where the use of pyrotechnic munitions is not feasible and minimal contamination is desired.
2. Construction: High-impact ABS plastic or *m*etal *c*anister.
3. Operation: Following fuse delay, a $CO_2$ cartridge, located in the center of the grenade, discharges. Fuse type: M201A1 – 1.5 to 2 second time of detonation.
4. Effective range: 35 feet, hand-thrown only.
5. Type of agents or projectiles: *M*icropulverized OC agent with an effective volume of 2,000 cubic feet.
6. Discharge time: Instantaneous.

 

OC Grenades

B. Rubber Ball Blast Grenade

1. This device is a payload system for CS only and there are no projectiles inside the device.

2. Proper application: Crowd management for indoor and outdoor operations and tactical deployment situations.

3. Construction: Rubber ball grenade body.

4. Operation: Following an initial 1.5 second fuse delay, followed by another half-second delay, the grenade combines loud report and flash with effects of chemical agents. Fuse type: M201A1 – 1.5 to 2 second time of detonation.

5. Effective range: 35 feet, hand-thrown only.

6. Type of agents or projectiles: Micropulverized CS agent with an effective volume of 2,000 cubic feet.

7. Discharge time: Instantaneous.

8. Ordnance *unit* personnel shall be responsible for the storage of this device and the device will only be issued when approved by a *l*ieutenant for a specific event or incident.

9. Personnel deploying this device shall log its use as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF) as outlined in the "Gas Guns and Grenades" directive.



Rubber Ball Blast

## VI. Warning

A. Personnel deploying chemical agents and riot munitions *shall* read the warning labels on these devices before deployment.

B. Nomex gloves should be worn when deploying chemical agents.

C. International color codes

1. Yellow.....Smoke

2. Red..........CN

3. Blue..........CS

4. Orange....OC

***Note: The Division does not use or store CN agents.***

| Columbus Police Division Directive | EFFECTIVE Aug. 01, 1987 | NUMBER 2.01 |
| | REVISED Dec. 30, 2017 | TOTAL PAGES 11 |
| **Use of Force** | | |



## I. Definitions

A. Use of Force

The exertion of energy or the **actions of** personnel in the performance of their duties used to direct or control another's movements or actions. A use of force **may be implemented** to control resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property.

B. Use of Force Levels of Control

1. Levels of Control used by the Division of Police **for reporting purposes** are:

Level 0: Officer presence, verbal and non-verbal commands, searching, handcuffing, sparking a taser for compliance, **and using** flashbangs and multiple baton rounds as diversions

Level 1: Empty hand control, pressure points, grounding techniques, and joint manipulations

Level 2: Use of chemical spray

Level 3: Use of electronic device (electronic custody belt, taser or **Electronic Control Weapon (ECW)**)

Level 4: Hard empty hand control (strike/punch/kick)

Level 5: Use of impact weapon (baton/flashlight)

Level 6: Police K-9 bite

Level 7: Less lethal weapons (beanbag/multiple baton rounds

Level 8: Deadly force

C. Deadly Force

Any force which carries a substantial risk that it will proximately result in the death of any person.

D. Injury

1. For the purposes of this directive, injuries are classified as:

a. Minor Injury

An injury that does not require transport to a medical facility.

b. Serious Injury

An injury that requires transport to a medical facility for treatment.

Note: If a Division supervisor classifies an injury as minor, refusal at the county jail does not require a *Use of Force-Injury to Prisoner* administrative investigation.

E. Taser Application

One full or partial five-second cycle of the taser.

## II. Policy Statements

A. General

1. *When reasonable, sworn personnel should try to de-escalate a situation by using trained techniques, such as building rapport, communication skills, taking cover, etc. This is not an all inclusive list.*

2. It is well established that police officers may use force to effect an arrest, to defend themselves, or to defend others. An officer should not desist from any official duty merely because resistance is offered. Police officers shall not use more force than is reasonable in a particular incident.

3. Factors to be considered when determining the reasonableness of a use of force are:

   a. The severity of the crime at issue.

   b. Whether the *subject* poses an immediate threat to the safety of the officer or others.

   c. Whether the *subject* is actively resisting arrest.

   d. Whether the *subject* is attempting to evade arrest by flight.

4. *Force may be used during a medical emergency if:*

   a. *The person experiencing a medical emergency is incapable of making a rational decision under the circumstances and poses an immediate threat of serious harm to himself, herself, or others.*

   b. *Some degree of force is reasonably necessary to minimize the immediate threat.*

   c. *The force being used is reasonably necessary under the circumstances.*

5. *Sworn personnel should take into consideration an unarmed person's known mental health status prior to using force.*

6. Officers shall use their training to guide them through a use of force incident. The preferred response to resistance and aggression is a trained technique *reasonable for the circumstances*. However, during a situation involving the infliction or threatened infliction of serious physical harm, the use of an untrained response, *such as neck restraints,* while not normally authorized, may be reasonable to end the threat and survive the encounter. The proper exertion of physical force used to control *the subject* shall be consistent with Division policy.

7. All uses of force shall be reported consistent with Division policies. Involved personnel shall notify an available on-duty Division supervisor in the following descending order:

   a. The*ir* immediate supervisor*;*

   b. Another sworn supervisor within their chain of command*; or*

   c. Any other sworn Division supervisor, who may personally conduct the investigation or may notify a supervisor in the involved officer's chain of command to conduct the investigation.

8. The Internal Affairs Bureau (IAB) shall forward a monthly report to the Training Bureau that summarizes all Level 2 through Level 8 Use of Force Reports, form U-10.128, received.

9. The Training Bureau shall review the monthly summary of Use of Force Reports received from IAB along with the original Levels 0 and 1 Use of Force Reports to monitor techniques for their effectiveness and to make approved changes in trained techniques and lesson plans.

10. All sworn Division personnel shall receive annual in-service training in the Division's use of force policy.

11. Division supervisors conducting use of force investigations shall photograph involved persons as detailed in the Supervisor's Manual.

12. Restrictions on Supervisors Conducting Investigations

   a. Division supervisors who actively participate in or order a use of force shall not conduct any subsequent investigation. This restriction does not apply to tactical situations, *for example, those involving* SWAT, In-Tac, or field forces.

   b. When a Division supervisor is prohibited from conducting the investigation, the involved supervisor's immediate supervisor or*,* if unavailable, another Division supervisor of a higher rank than the involved supervisor shall be contacted. The contacted supervisor may conduct the investigation or may assign it to an alternate supervisor.

13. If requested, IAB shall conduct an administrative investigation.

Note: Personnel who are the focus of a criminal investigation may invoke their constitutional rights. This does not apply if the investigation is strictly administrative in nature. Information compelled from the focus employee in an administrative investigation shall not be shared with, or in any manner released to, any unit conducting a criminal investigation, except as pursuant to the Ohio Public Records Act.

14. *Sworn personnel shall not use any force for a retaliatory or punitive purpose.*

B. Deadly Force

1. Sworn personnel may use deadly force when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm.

2. Sworn personnel may use deadly force upon a human being to prevent escape when there is probable cause to believe that the **subject** poses an immediate threat of serious physical harm to others.

3. Sworn personnel **not in a vehicle** should avoid positioning themselves in the path of a moving vehicle **or in a position vulnerable to being struck if the vehicle were suddenly moved**.

   a. Sworn personnel in the direct path **or a position vulnerable to being struck by** a moving vehicle should attempt to take evasive action to avoid being struck by the vehicle.

   b. Sworn personnel may only fire a weapon at the driver or occupant of a moving vehicle when there is an articulable, reasonable belief that the subject poses an immediate threat of death or serious physical harm to himself, herself, or others.

   c. *Sworn personnel should not extend their displayed firearm inside the passenger compartment of an occupied vehicle.*

   d. *Sworn personnel should avoid reaching into a vehicle and position(s) that make them vulnerable to being dragged.*

4. If reasonable, sworn personnel should give a verbal warning of the intention to use deadly force.

5. While sworn personnel have an affirmative duty to use that degree of force reasonable to protect human life, the use of deadly force is not reasonable merely **to** protect property interests. Only under circumstances where it is reasonable to believe an infliction or threatened infliction of serious physical harm to human life exists is the use of deadly force justified.

6. The use of deadly force by sworn personnel should not create a danger to the public that outweighs the benefits of its use.

7. Sworn personnel shall not fire a warning shot unless there is justification to use deadly force **and should ensure:**

   a. *There are no bystanders in the line of fire or that could move into the line of fire; and*

   b. *The backstop is reasonably likely to contain or stop the discharged bullet.*

8. Facts unknown to sworn personnel at the time deadly force is used cannot be considered in determining whether the involved personnel acted in conformity with this policy.

9. Investigations of uses of force resulting in death shall be forwarded to the county prosecutor in the county in which the incident occurred. That prosecutor will determine if the case will be presented to a grand jury.

### *C. Use of Firearm Against Dangerous Animals*

1. *Sworn personnel being threatened or attacked by a dangerous animal should attempt to use trained techniques and/or intermediate weapons before using a firearm to protect themselves or another person. If these attempts fail to halt the animal's attack, and when left with no alternative other than to use a firearm, sworn personnel should determine whether the backstop is able to control and contain any projectiles that may not find their intended mark or that may ricochet. Consider the presence of individuals and their actions relative to the proximity of the dangerous animal. Grassy and/or dirt areas are the preferred location for a backstop.*

2. *Sworn personnel shall not fire or deploy a weapon at a dangerous animal unless the animal poses an imminent threat to personnel or others, use of the weapon is reasonable, and the risk to human life is minimized.*

3. *Sworn personnel shall not use a firearm to prevent or disrupt an animal attacking another animal.*

*Note: Pets are deemed to be property, and a firearm is not to be used to protect property.*

## III. Procedures

A. Level of Control 0 (Sparking a Taser for Compliance) or Level of Control 1 with No Injury

1. Involved Personnel

   Complete a Use of Force Report and forward it to your immediate supervisor by the end of your shift or by the beginning of your next shift if the incident occurred outside of assigned duty hours. If your immediate supervisor is unavailable, forward the report to any on-duty supervisor within your chain of command.

2. Investigating Supervisor

   a. Review and sign the Use of Force Report.

   b. Forward the report directly to IAB.

   c. Forward a copy of the report to the immediate supervisor of the involved personnel.

3. Internal Affairs Bureau

   Forward the original Use of Force Report to the Training Bureau.

B. Level of Control 0 or 1 with a Complaint of an Injury Caused by the Response - No Serious Physical Harm to a Human

1. Involved Personnel

   a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty Division supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Minor Injury

      (1) Complete a Data Processing Worksheet, form U-10.164, *and* attach the Use of Force Report; a copy of the Arrest Information, form U-10.100; and any photographs taken.

      (2) Forward the packet directly to IAB.

      (3) Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. Serious Injury

      (1) Complete an Injury to Prisoner administrative investigation and a Data Processing Worksheet. Attach the Use of Force Report and a copy of the Arrest Information form.

      (2) Forward the packet through the chain of command to IAB.

3. Internal Affairs Bureau

    a. If applicable, record the incident in the involved personnel's IAB database *record*.

    b. Maintain a file copy of the Use of Force Report.

    c. Forward the original Use of Force Report to the Training Bureau.

C. Level of Control 2

1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. If the *subject* is being arrested or issued a summons:

      (1) Ensure that the arresting personnel include the facts necessitating the use of chemical spray and details of the decontamination/treatment rendered in the narrative section of the Arrest Information form.

      (2) Include a brief statement indicating justification for the use of chemical spray, the effectiveness of the chemical spray, and details of the decontamination process and treatment rendered on the Use of Force Report.

   (3) Ensure that an "X" is placed in both the *"Chemical Spray"* box on the top left corner and the *"Use of Force"* box on the top right corner on the front of the Arrest Information form.

   (4) Complete a Data Processing Worksheet, attach the Use of Force Report and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

  d. If no arrest is made, add comments to the back of the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

  e. If circumstances indicate that the use of chemical spray was not within Division policy, complete an investigation as indicated on the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

  f. For a Level of Control 2 against a handcuffed subject:

   (1) Identify and interview the following:

    (a) Involved Division personnel

    (b) All available witnesses

    (c) The subject upon whom chemical spray was used

   (2) Review and sign the Use of Force Report.

   (3) Complete an administrative investigation.

   (4) Complete a Data Processing Worksheet*;* attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation*;*and forward the packet through the involved personnel's chain of command to IAB.

 3. Commander

  Make a final determination for Level of Control 2 *(*not against a hand-cuffed **subject)** unless deviation from progressive discipline and/or departmental charges are recommended. Forward the investigative packet to IAB.

 4. Deputy Chief

  a. Make a final determination for Level of Control 2 against a handcuffed subject unless deviation from progressive discipline and/or departmental charges are recommended.

  b. Forward the investigative packet to IAB.

  c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

 5. Internal Affairs Bureau

  a. Record the incident in the involved personnel's IAB database *record*.

  b. Maintain the original Use of Force Report.

D. Level of Control 3

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately notify, or cause notification of, an on-duty supervisor.

c. Complete a Use of Force Report and a Use of Taser Report, form U-10.128T, and give them to the investigating supervisor.

2. Investigating Supervisor

a. Identify and interview the following:

(1) Involved Division personnel

(2) All available witnesses

(3) The subject upon whom the taser was used

b. Review and sign the Use of Force Report and the Use of Taser Report.

c. Complete the Data Processing Worksheet; attach the Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form; and forward the packet through the involved personnel's chain of command to IAB.

d. For a Level of Control 3 against a handcuffed subject, when three or more cycles of the taser are applied to one subject, when one taser is applied to multiple subjects during the same incident, or when multiple tasers are applied to the same subject:

(1) Complete an administrative investigation.

(2) Attach the administrative investigation to the Data Processing Worksheet, Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

3. Deputy Chief

a. Make a final determination for Level of Control 3 unless deviation from progressive discipline and/or departmental charges are recommended.

b. Forward the investigative packet to IAB.

c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

4. Internal Affairs Bureau

a. Record the incident in the involved personnel's IAB database *record*.

b. Maintain the original Use of Force Report.

E. Level of Control 4 through 7

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately notify, or cause notification of, an on-duty supervisor.

c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

a. Identify and interview the following:

(1) Involved Division personnel

(2) All available witnesses

(3) The subject upon whom the use of force was used

b. Review the Use of Force Report.

c. Complete an administrative investigation.

d. Complete a Data Processing Worksheet; attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation; and forward the packet through the involved personnel's chain of command to IAB.

3. Deputy Chief

a. Make a final determination for Levels of Control 4 through 7 unless deviation from progressive discipline and/or departmental charges are recommended.

b. Forward the investigative packet to IAB.

c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

4. Internal Affairs Bureau

a. Record the incident in the involved personnel's IAB database **record**.

b. Maintain the original Use of Force Report.

F. Use of Force Resulting in Serious Physical Harm to or Death of a Human

Note: If the use of force involves the discharge of a firearm other than a gas gun, follow the procedures set forth in the "Discharged Firearms" directive. If the use of force involves the discharge of a gas gun, follow the procedures set forth in the "Gas Guns and Grenades" directive.

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately cause Communications Bureau personnel to be notified.

c. Secure the scene.

2. Communications Bureau

a. Dispatch personnel to render assistance or to secure the scene.

b. Notify the **Columbus Division of Fire and those listed on the Emergency Notification Guide.**

Note: The Investigative Duty Desk will contact the Critical Incident Response Team.

3. Officer Support Team

Provide the involved personnel with any assistance, information, or other support they may desire.

Note: Officer Support Team members are subject to being subpoenaed to attend legal proceedings and testify to what they are told by the involved personnel. Therefore, Officer Support Team members are cautioned not to discuss the incident.

4. Critical Incident Response Team

   a. Conduct a criminal investigation.

   b. Advise personnel who are the focus of the investigation of their constitutional rights.

Note: The involved personnel may invoke their constitutional rights at any time during the criminal investigation.

   c. Complete the Use of Force Report and Data Processing Worksheet and attach both to the original investigative packet.

   d. File the original investigative packet.

   e. Forward copies of the investigative packet as follows:

     (1) One copy to the appropriate county prosecutor

     (2) Three copies to the Firearms/Police-Involved Death Review Board if a firearm was used or *if* death occurred under circumstances involving a police action

5. Firearms/Police-Involved Death Review Board

   a. Review all information concerning the incident.

   b. Determine whether the police action was within Division policy.

   c. Prepare and forward a summary of the findings, together with the original investigative packet, the Use of Force Report, and *the* Data Processing Worksheet, through the involved personnel's chain of command to the deputy chief.

Note: If there is a dissenting opinion between the Firearms/Police-Involved Death Review Board members, the dissenting member will include a letter of finding with the investigative packet and route it through the involved personnel's chain of command to the Chief of Police.

6. Immediate Supervisor

   a. Review the entire investigative packet and make recommendations.

   b. Forward the investigative packet through the chain of command.

7. Chain of Command

   Review the entire investigative packet and make recommendations.

8. Deputy Chief

   a. Review the investigative packet.

   b. Make a final determination concerning the incident unless deviation from progressive discipline and/or departmental charges are recommended.

Note: If the recommendation of the deputy chief is in disagreement with the finding of the Firearms/Police-Involved Death Review Board, forward the investigative packet to the Chief of Police.

    c. Forward the investigative packet to IAB.

    d. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

9. Chief of Police

    a. Make the final determination when a recommendation to bypass progressive discipline is made.

    b. Make a final determination if there are dissenting opinions **between** the Firearms/Police-Involved Death Review Board and the involved personnel's deputy chief.

    c. Cause the involved personnel to be notified of the determination.

10. Internal Affairs Bureau

    a. Record the disposition of the incident in the involved personnel's IAB database.

    b. Maintain the original Use of Force Report.

| Columbus Police Division Directive | EFFECTIVE<br>Mar. 30, 2012 | NUMBER<br>2.04 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>5 |
| **Chemical Agents and Intermediate Weapons Regulations** | | |



## I. Definitions

A. ***Conducted Energy Weapon*** (hereafter referred to as taser)

An intermediate weapon not intended to replace firearms or self-defense techniques. The taser is designed to temporarily immobilize a violent or potentially violent subject. When applied correctly, the taser generates an electrical current that ***disrupts*** the neuromuscular and sensory nervous system, incapacitating the subject.

B. Close-Quarter Probe Deployment

A method in which the user deploys the taser on a subject in "Probe" mode, ***then*** places the taser at another position on the subject's body as distant as possible from the initial contact point, and rocks the taser forward and backward.

C. Drive-Stun

A function in which the taser is held directly against the subject's body, causing localized pain, but does not override the subject's motor responses.

## II. Policy Statements

A. Chemical Agents

1. Sworn personnel shall carry only those chemical agents that have been authorized by the Chief of Police.

2. Sworn personnel shall not carry chemical spray until training and qualification standards have been satisfied. Sworn personnel shall demonstrate proficiency with chemical spray once each calendar year.

3. Sworn personnel may use chemical spray to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, to prevent escape, or to prevent or stop the commission of a criminal offense.

   a. Sworn personnel should not use chemical spray on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

   b. Supervisors investigating incidents in which chemical spray has been used against a handcuffed person shall comply with the applicable procedures detailed in the Supervisor's Manual and the "Use of Force" directive.

4. The use of a chemical agent deployed by a 37mm or 40mm gas gun *or chemical agent grenade* being thrown or rolled requires the approval of a lieutenant or higher authority.

   a. A SWAT lieutenant may designate a lower-ranking SWAT officer to give such an order.

   b. A sergeant acting as a zone lieutenant *should* not give such approval.

5. *If exigent circumstances exist, such as individuals creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of individuals who are not complying with lawful commands.* Prior to deployment of the chemical spray, at least *three* notifications should be made to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order.

   a. The notifications should be made in a manner which the participants in the crowd should reasonably be able to hear and understand.

   b. The notifications and subsequent deployment of chemical spray in crowd control situations should be audio/video-recorded when possible.

6. Sworn personnel encountering a group of people, some of whom are engaged in *unlawful* conduct, shall be guided by the "Use of Force" directive when determining whether to use chemical spray. If chemical spray is used, it should be directed at the persons participating in the violent conduct, not at the group in general. The *encounter* should be audio/video-recorded when possible.

7. Sworn personnel deploying a chemical agent shall make a reasonable effort to decontaminate exposed persons once the situation is under control. Decontamination may include exposure to fresh air, flushing the eyes with fresh water, or seeking medical attention.

B. Intermediate Weapons

1. Sworn personnel shall carry only those intermediate weapons authorized by the Chief of Police. The approved intermediate weapons are:

   a. A flashlight not to exceed 15" in length

   b. The issued tactical baton

   c. The approved taser

2. Sworn personnel shall not carry an intermediate weapon until training and qualification standards for that weapon have been satisfied. Sworn personnel shall requalify once each calendar year with each intermediate weapon they are authorized to carry.

3. Sworn personnel may use an intermediate weapon to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, or to prevent or stop the commission of a criminal offense.

4. Sworn personnel should not use an intermediate weapon on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

5. Intermediate weapons are not a substitute for deadly force.

6. It is recommended that sworn personnel have an approved intermediate weapon and a restraint device available when in possession of a firearm while off duty.

7. Sworn personnel shall complete a Use of Force Report, form U-10.128, when an intermediate weapon is used on a subject.

8. Sworn personnel shall complete the Personal Advanced Taser Agreement, form J-10.112, and obtain approval from the Defensive Tactics Unit (DTU) prior to carrying a personally owned taser. Personally owned tasers may be carried while working regular duty, special duty, or off duty as an intermediate weapon. Division-owned tasers that are not personally assigned shall only be used for regular duty.

9. Sworn personnel shall not target the head, face, neck, or groin with the taser in probe mode.

10. Sworn personnel should not intentionally target the chest area above the sternum when deploying the taser in probe mode when possible.

11. Sworn personnel may target the neck or groin with the taser in drive-stun mode.

12. Sworn personnel should consider training and the following when determining whether to use the taser:

   a. Subject's age

   b. Subject's weight

   c. Subject's obvious physical disabilities

   d. Subjects who are in a position where a fall may cause substantial injury or death

   e. Whether the subject is exhibiting signs or symptoms of mental illness

13. Sworn personnel should not use the taser in drive-stun mode for pain compliance if it is likely to be ineffective due to intoxication or signs or symptoms of mental illness.

14. Sworn personnel should not use the taser on small children, infirm or elderly individuals, obviously pregnant females, or subjects who are in control of a motor vehicle.

15. Sworn personnel shall not deploy the taser on subjects known to have come in contact with flammables or in environments where flammables are obviously present.

16. Sworn personnel shall not use the taser on a fleeing subject who committed a minor misdemeanor as a primary offense, unless the subject is posing an articulable threat to the officer or to another citizen.

Note: Failure to Comply and/or Obstructing Official Business violations ***arising solely from the act of fleeing from a minor misdemeanor*** are not justification for using the taser.

17. Sworn personnel shall properly store the taser when it is not in use. Once the taser is issued, sworn personnel shall not leave the taser unattended.

18. Sworn personnel shall not change or modify the taser.

19. Sworn personnel shall contact a DTU supervisor for replacement of any taser that is not safe or functioning properly. Only a DTU supervisor shall repair the taser or accessories.

20. Sworn personnel shall not remove the Digital Power Magazine (DPM) from the taser unit. Once the DPM read-out reaches 20% or less, personnel should have the DPM replaced. The DPM shall only be replaced by a DTU supervisor.

21. Taser ***unintentional*** discharges

   a. Sworn personnel shall notify an on-duty supervisor and record the incident on the Taser Log Sheet, form S-70.113.

   (1) If a subject is struck, sworn personnel shall complete a Use of Force Report and follow the applicable procedures outlined in the "Use of Force" directive.

   (2) If no subject is struck, sworn personnel shall ensure that the probes and cartridges are destroyed.

   (3) The supervisor shall conduct an administrative investigation when an incident occurs at a location other than a police facility, or at a police facility when a suspect or arrestee is present.

22. Taser deployment

   a. Sworn personnel choosing to deploy a taser shall confirm that the weapon selected is a taser and not a firearm.

   b. Only cartridges marked "25 FEET" or "XP" shall be used in the taser.

   c. When feasible, sworn personnel should communicate to the subject that the taser is going to be deployed to attempt to gain compliance. This can be communicated to the subject by removing the air cartridge, displaying the laser on the subject, and "sparking" the taser unit.

   Note: When the taser is "sparked" for compliance, sworn personnel shall complete a Use of Force Report.

   d. If possible, personnel should give the loud verbal command, "Taser! Taser! Taser!" prior to firing the taser.

   e. Sworn personnel may use the taser in the drive-stun mode to gain control of suspects displaying active resistance. The drive-stun mode shall not be used with a live air cartridge in place.

   f. Sworn personnel should attempt to control and handcuff the subject under power during the window of opportunity the taser cycle provides.

   g. Sworn personnel should consider moving on to another force option if unable to control and handcuff under power.

23. Taser post-use

   a. Any subject upon whom the taser is used, in either probe or drive-stun mode, shall be examined by EMS personnel and shall remain under observation by sworn personnel until slated or released.

   b. Sworn personnel shall request an EMS unit to respond to the scene to remove any probes that have penetrated the skin or to care for wounds caused by probes that penetrated but fell out. Sworn personnel shall not remove the probes.

     (1) If the subject is transported to a medical facility, sworn personnel shall ride in the medic unit and remain with the subject until further medical attention has been offered.

     (2) Sworn personnel shall call EMS personnel to the scene if any signs or symptoms of medical distress become evident.

   c. Sworn personnel shall provide the subject with the Taser Aftercare form, S-70.112.

   d. Sworn personnel shall treat the taser cartridge, wires, and probes as evidence and shall secure and submit them to the Property Control Unit for two years. This does not apply to **unintentional** discharges when no subject is struck **or when used against an animal**. Probes that have penetrated the skin should be treated as a biohazard and proper universal health precautions should be taken when handling and packaging them.

24. Taser dataport

   a. Only zone lieutenants, a DTU supervisor, and Internal Affairs Bureau supervisors shall access the taser's USB dataport.

   b. Taser dataport settings shall only be set or adjusted by a DTU supervisor.

25. Each unit assigned a taser shall maintain a Taser Log Sheet that shall include:

   a. Tasers assigned to the unit;

   b. Taser cartridge serial numbers assigned to the unit; and

   c. Spent taser cartridge serial numbers with the date fired, the officer's name and badge number, and the taser serial number from which it was fired.

26. When the Taser Log Sheet indicates four cartridges remain assigned to a unit, the first shift supervisor shall obtain replacements through DTU.

27. Completed Taser Log Sheets shall be forwarded to DTU for retention.

| Columbus Police Division Directive | EFFECTIVE<br>Jul. 30, 2000 | NUMBER<br>2.05 |
|---|---|---|
| | REVISED<br>Jul. 30, 2019 | TOTAL PAGES<br>3 |
| **Gas Guns and Grenades** | | |



## I. Introduction

A. Gas guns and grenades are used to deploy projectiles, distraction devices, and chemical agents that are not designed to be lethal, but have the potential to cause injury or death.

B. Chemical agents in the form of aerosol canisters that are thrown and spray devices worn on the gun belt that are not deployed by the ignition of a primer are excluded from the provisions of this directive.

## II. Definitions

A. Bean bag round

Also referred to as a flexible baton round, a bean bag round contains a cloth bag filled with silica sand and is fired from a gas gun. It is designed for direct impact on a targeted subject.

B. Flashbang

A non-bursting detonation device that emits light and sound when deployed.

C. Gas gun

A 37mm or 40mm single-barrel or rotary-style firearm used to deploy projectiles, distraction devices, and chemical agents.

D. Gas round

Any of a variety of rounds fired from a gas gun that release chemical agents or projectiles containing chemical agents.

E. Less-lethal weapons and ordnance

This includes gas guns, grenades, bean bag rounds, and multiple baton rounds, which have the potential to cause death, though they are not designed to be lethal.

F. Multiple baton round

A high velocity round containing **wood** projectiles fired from a gas gun. It is designed to be skip-fired (ricocheted off a hard surface) toward a targeted subject or to be used as a distraction device (deployed through and breaking a window). ***Operational exceptions may be made in a critical situation in which the use of deadly force is justified.***

G. Rubber Ball Blast Grenade

A combination irritant and diversion device that delivers three stimuli for psychological and physiological effect: light, sound, and chemical agent.

H. Sponge Round

A plastic body with a foam nose which is spin-stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

I. Warning/Signaling Munitions

A plastic body which produces 170 decibels of sound, emits 5 million candelas of light, and **deflagrates** at a distance of 100 meters with a CS irritant payload.

## III. Policy Statements

A. ***Authorized sworn personnel shall only carry and use those gas guns and grenades that have been approved by the Chief of Police.***

***B.*** The Division's use of force policy shall **guide** the **use of** gas guns and grenades; therefore, any discharge of a gas gun or detonation of a grenade (excluding flashbangs **and multiple baton rounds used as a diversion**) shall be a Level 7 use of force.

***C.*** Only **sworn personnel** who have satisfactorily completed annual specialty impact and gas munitions training are permitted to possess**,** deploy**, or order the deployment of** these munitions in the field.

***D.*** Supervisors shall issue the order to use a gas gun or grenade only when reasonable based upon the totality of the circumstances, which should include an evaluation of the need to use the device(s) weighed against the danger they pose to the suspect or others.

***E.*** Division personnel shall give a verbal warning that the use of a less-lethal weapon and/or projectile is imminent when practical.

## IV. Procedures

A. Use of Gas Guns and Grenades

  1. Zone Lieutenant

    a. Ensure that the zone has at least one gas gun available for use at all times.

    b. Determine whether to use a gas gun or grenade immediately or call for SWAT.

    c. Issue the order to use the gas gun or grenade. Such an order may be given via electronic or radio communications.

  2. SWAT or **Drug Interdiction** Section Lieutenant

    a. Determine when a gas gun or grenade is to be used.

    b. Issue the order to deploy the weapon.

    (1) The order may be given via electronic or radio communications.

    (2) Designate a lower-ranking SWAT or **Drug House Interdiction** officer to give the order when necessary.

  3. Personnel assigned to possess or use a gas gun or grenade

    a. Maintain the gas gun or grenade in good working order.

  **b.** ***Contact the Ordnance Unit for any needed maintenance or repair.***

  **c.** Use a gas gun or grenade only on the order of a lieutenant, higher-ranking personnel, ***or*** the SWAT or ***Drug Interdiction*** Section Lieutenant's designee.

  Note: Sergeants deploying beanbag rounds are not required to obtain prior approval.

  **d.** Do not fire a gas gun or detonate a grenade without the assistance of a cover officer with a firearm.

 4. Ordnance Unit Personnel

  Resupply personnel with gas guns, grenades, and less-lethal ordnance at the direction of a lieutenant or higher-ranking supervisor.

B. Reporting and Investigation of Deployment

 1. Investigating personnel

  a. Comply with the "Discharged Firearms" directive and forward a copy of the administrative investigation to the Legal Advisor when:

   (1) A human subject is struck and serious physical harm as defined in the Ohio Revised Code results.

   (2) A human subject is struck and death results.

  b. Comply with the "Use of Force" directive and forward a copy of the administrative investigation to the Legal Advisor when:

   (1) No human subject is struck.

   (2) A human subject is struck and not injured.

   (3) A human subject is struck, and the resulting injury does not amount to serious physical harm as defined in the Ohio Revised Code.

   (4) A human subject is struck and flees the scene in an unknown condition.

 2. Internal Affairs Bureau

  a. Maintain required records of uses of force.

  b. When the involved personnel are ordered by a supervisor to fire a gas gun or detonate a grenade, categorize the incident as an ordered use of force for purposes of the Employee Action Review System.

 3. Personnel detonating explosive devices that must be logged as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF)

  a. Be aware of the reporting requirement for devices such as the Defense Technology Corporation of America Distraction Device.

  b. Report the use of force as required by the "Use of Force" directive.

  c. Complete a Distraction Device Deployment report, form U-11.102, and forward it directly to the 1st Shift Ordnance Unit.

 4. 1st Shift Ordnance Unit

  Maintain a log of all explosive devices as required by ATF.

| Columbus Police Division Directive | EFFECTIVE<br>Mar. 12, 2002 | NUMBER<br>11.02 |
|---|---|---|
| | REVISED<br>Jun. 30, 2018 | TOTAL PAGES<br>5 |
| **Cruiser Video System (CVS)** | | |



## I. Introduction

The principal purpose of a *CVS* is to collect evidence *that* may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. The Division's use of a recording system provides documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to prove that Division personnel will be held accountable for their actions and provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

*A* recording which may be used *as evidence to document an incident* as it pertains to an enforcement action/*adversarial* encounter.

Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

*A* recording, whether accidental or intentional, which has no evidentiary or administrative value.

Examples of non-evidence: accidental/incidental recording, equipment checks, training, and CVS recordings triggered by the speed of the cruiser. This is not an all-inclusive list.

3. Permanent

*A* recording to be kept indefinitely.

Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel operating a CVS-equipped unit shall record all investigatory stops, traffic and pedestrian stops, suspected OVI stops, and when engaged in emergency vehicle operations from the beginning of the action.

   1. Recording of an event shall not be stopped until the enforcement action or incident has ended or as directed by a sworn Division supervisor.

B. When the CVS unit is used while effecting an arrest, personnel shall check the CVS box on the Arrest Information, form U-10.100, and shall indicate the unit (50, R50, etc.) and officer(s) who recorded the incident in the narrative section.

C. The driver, or probationary officer in an FTO unit, shall wear the body microphone in the CVS microphone pouch and shall turn on the body microphone when exiting the marked unit anytime the CVS is recording.

Note: When wearing a body-worn camera, the body microphone is not required to be worn.

D. Sworn personnel shall add the letter "V" after the clearance code of a run if a CVS is used.

E. Upon inquiry, sworn personnel shall inform citizens *that* the CVS is recording. Personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

F. Sworn personnel shall complete the required training prior to operating the CVS.

G. Sworn personnel may use the CVS to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken, such as the signing of a Consent to Search, form I-26.102, or Constitutional Rights, form I-20.109. Personnel may use the CVS to supplement, but not replace the use of, any required forms.

H. Sworn personnel should not use the CVS to record routine patrol duties unless there is a reasonable belief the recording could benefit the Division.

I. Sworn personnel are not required to use the CVS to record while working traffic control.

J. Sworn personnel shall ensure the CVS backseat camera is activated anytime a person is placed in the rear of their marked unit.

K. All recorded images and audio recordings made on the CVS are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

L. Personnel shall not tamper with, erase, delete, alter, or destroy any original recorded section of video or audio.

M. Division personnel shall classify all CVS recordings consistent with Division training **and policy**. Personnel shall not intentionally classify a video inappropriately or knowingly take actions to prevent a recording from being viewed or downloaded.

N. CVS audio/video recordings shall be maintained by PoliceNET and the Department of Technology **(DOT)** pursuant to the City of Columbus approved Records Retention Schedule.

O. Division personnel needing to hold a CVS recording longer than the required Records Retention Schedule shall reclassify the recording as permanent within the CVS.

1. When the recording no longer needs to be maintained, reclassify it appropriately.

P. Supervisory and investigative review of CVS recordings

1. Supervisors wishing to request a copy of a CVS recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

2. All CVS recordings are subject to review by a police supervisor or investigator at any time while the recording is in the CVS in the marked unit.

3. Supervisors and the involved chain of command wishing to review a CVS recording shall conduct the review on a Division computer.

   a. Supervisors shall login to the secured CVS server with their Division-issued password.

   b. After being uploaded to the secured server, Division supervisors will have access to all cruiser videos unless access has been archived due to an investigative purpose.

4. Supervisors shall document the review of CVS recordings related to incidents under investigation **on the Incident Video Review, form U-10.197. Supervisors** shall **address** the relevant portion(s) of the recording **within the administrative investigation** to be reviewed by the chain of command **as necessary**.

Q. Supervisors using CVS recordings for an investigative purpose shall review or reclassify the recordings**,** as appropriate, **and** in accordance with established law, Division policy, and applicable **CBA**.

**R.** Public Records Unit personnel shall process all CVS requests for police personnel, court personnel, subpoenas, discovery, or preservation of evidence and all requests made pursuant to the Ohio Public Records Act.

Note: In the event a CVS recording cannot be located, Public Records Unit personnel **shall** contact PoliceNET for further investigation.

**S.** Sworn personnel may be ordered by a sworn Division supervisor or Critical Incident Response Team personnel to return to headquarters to immediately download video/evidence.

***T.*** Sworn personnel shall report malfunctioning CVS equipment as soon as practical, but prior to the end of the shift, to their immediate on-duty supervisor.

***U.*** Sworn supervisors who are informed or otherwise become aware of malfunctioning CVS equipment shall ensure the equipment is taken for authorized repair as soon as practical and as follows:

1. Communications Shop for repairs to the camera, docking station, Digital Video Recorder, microphone, or connections.
2. PoliceNET Unit/DOT for memory card or video/network problems with the CVS.

## IV. Procedures

A. CVS

1. Prior to marking in-service, sworn personnel using a CVS:
   a. Login with the username, area/zone, shift, and unit number using the provided drop-down menu.
   b. Ensure the body microphone is synchronized.
2. Keep the CVS powered-up during the tour.
3. Upon completion of a CVS recording, stop the recording, classify it appropriately, and place only the incident number in the "Case File Number" field.
4. Logoff at the end of the tour and return the body microphone to the appropriate charging cradle.
5. Upload video as often as practical.
6. In exigent circumstances, supervisors shall contact PoliceNET personnel to remove the memory card from a CVS if the video cannot be uploaded by the normal uploading process.

   Note: In certain circumstances, DOT may add additional memory cards until a time when the video can be uploaded.

B. Supervisors Conducting Random Reviews

1. ***R***eview randomly selected CVS recordings on a regular basis. The incidents should be no more than 30 days old.
2. Forward completed Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review***,*** form ***U-10.193,*** to the bureau commander when there are areas of concern, for example, ***user*** error***(s)*** or observations of misconduct, etc.

C. Bureau Commander

1. Forward ***the*** Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review form with ***user*** error***(s)*** through the chain of command to the immediate supervisor of the officer(s) who made the recording.
2. If potential misconduct is discovered within the recording, determine the appropriate course of action.

D. Immediate Supervisor

1. Ensure sworn personnel who created the CVS recording correct the error.

2. If directed by the chain of command, complete an administrative investigation and send a copy *of the Cruiser Video System (CVS)/ Body-Worn Camera (BWC) Supervisory Review form* to the Patrol Administration Section.

E. Patrol Administration Section

1. File completed Cruiser Video System (CVS)/*Body-Worn Camera (BWC)* Supervisory Review forms.

2. Track results annually to determine compliance/training needs.

| Columbus Police Division Directive | EFFECTIVE Dec. 30, 2016 | NUMBER 11.07 |
|---|---|---|
| | REVISED Jun. 30, 2018 | TOTAL PAGES 7 |

**Body-Worn Camera (BWC)**



## I. Introduction

The principal purpose of a BWC system is to collect evidence *that* may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. It can also provide documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

   *A* recording which may be used *as evidence to document an incident* as it pertains to an enforcement action/*adversarial* encounter.

   Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

   *A* recording, whether accidental or intentional, which has no evidentiary or administrative value.

   Examples of non-evidence: accidental/incidental recording, equipment checks, and training. This is not an all-inclusive list.

3. Permanent

   *A* recording to be kept indefinitely.

   Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel who are assigned an individual BWC shall, at the beginning of their shift, ensure the BWC is fully charged, operable, and all previous video recordings have been uploaded.

---

B. Sworn personnel shall use only Division-issued BWCs.

C. All recorded images and audio recordings made on the BWC are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

D. BWCs shall be worn in the location and manner required by the assignment.

E. BWCs are not required for special duty work, and the City will not compensate personnel for travel time or uploading/charging the BWC.

   1. BWCs may be used for City overtime if personnel have a charged BWC and its use on City overtime does not interfere with the BWC being uploaded or charged for their regularly assigned tour of duty or as ordered by a supervisor.

F. BWC use shall be documented on all appropriate paperwork and in the electronic reporting system.

   1. Sworn personnel shall add the letter "V" after the clearance code of a run when a BWC is used.

G. Activation

   1. Sworn personnel shall activate the BWC at the start of an enforcement action or at the first reasonable opportunity to do so. Enforcement actions shall be recorded unless otherwise prohibited. Enforcement actions shall consist of:

      a. Calls for service and self-initiated activity

      b. All investigatory stops

      c. Traffic and pedestrian stops

      ***Note: Activate the BWC at the start of a pursuit.***

      d. Suspected OVI stops

      e. Uses of force

      f. Arrests

      g. Forced entries

   2. Sworn personnel shall activate the BWC when an encounter becomes adversarial, or its use would be appropriate and/or valuable to document an incident unless otherwise prohibited.

   ***3. Patrol Administration Section and Special Weapons and Tactics personnel shall comply with their respective Standard Operating Procedures.***

H. Sworn personnel wearing a BWC should announce when they are recording as close to the start of the encounter as possible unless it is unsafe, impractical, or unnecessary.

   1. Sworn personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

I. Sworn personnel shall continue recording until the enforcement activity or encounter has ended, or they are ordered/permitted to stop recording by a sworn supervisor.

Note: When reviewing BWC footage from an incident, sworn personnel must stop recording to view and/or upload the video.

J. BWC recordings may be used to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken.

K. The BWC shall not be used to record non-work-related personal activities where personnel have a reasonable expectation of privacy, such as inside locker rooms, dressing rooms, or restrooms, unless a criminal offense has occurred.

L. The BWC shall not be intentionally activated to record privileged communication or conversations of fellow Division personnel during routine, non-enforcement-related activities with or without their knowledge.

M. The BWC shall not be used:

1. To gather intelligence information solely based on First Amendment protected speech, associations, or religion;

2. During a strip search or body cavity search; or

3. During a Lethality Assessment Screen.

Note: If the BWC was previously activated during an incident, sworn personnel do not need a supervisor's approval to deactivate the BWC for any of the above-listed reasons.

N. The BWC shall not be used if ordered by a sworn supervisor.

1. To preserve privacy and dignity, a sworn supervisor may grant approval to not record or *to* deactivate the BWC for certain people or places.

2. Explicit approval shall be given verbally over the radio or in an operations plan.

O. Sworn personnel may deactivate the BWC*:*

*1. W*hen gathering information from a confidential informant or source.

*2. W*ithout explicit supervisor approval when *not in the presence of suspects or citizens and* speaking with the Division's legal advisor, covert/investigative personnel, a supervisor, or other sworn personnel.

*3. While engaged in guard duty inside a hospital; however, if an encounter becomes adversarial and/or enforcement action becomes necessary, the BWC shall be activated as soon as practical.*

*4. Sworn personnel shall deactivate the BWC after securing weapons and entering the door into the prisoner processing area of the Franklin County Sheriff's Office Corrections Centers.*

      *a. The preferred course of action is to allow sheriff's office personnel to handle any problem associated with a prisoner. If Division personnel are forced to take enforcement action, they shall activate the BWC as soon as practical.*

**P.** If sworn personnel do not activate the BWC, the battery is exhausted/ depleted, or the recorder malfunctions, they shall document the reason(s) on the appropriate paperwork, in the CAD, and/or in the electronic reporting system.

**Q.** If sworn personnel do not record the entire contact, justification shall be expressed verbally on the BWC before turning it off when it is safe and practical to do so.

**R.** Sworn personnel should re-activate the BWC if they re-engage suspects/ citizens.

**S.** Sworn personnel may be ordered by a sworn supervisor to relinquish their BWC.

**T.** All digital data shall be uploaded as directed and shall be classified and stored in a secure database that allows limited access. Sworn personnel shall upload video footage prior to going on leave, except when permission is granted by the chain of command designating an alternate time for uploading. If sworn personnel become incapable of uploading the video, the chain of command will make arrangements for uploading all video footage.

**U.** Personnel shall not tamper with, erase, alter, or destroy any original recorded section of video or audio.

   1. The appropriate authority designated by the Chief of Police will determine proper action for recordings captured by inadvertent BWC activation when it is otherwise prohibited.

**V.** Personnel shall classify all recordings consistent with Division training *and policy*. Personnel shall not knowingly classify a video inappropriately or take other inappropriate actions to prevent a recording from being viewed or uploaded or to alter retention periods.

**W.** BWC recordings shall be securely stored and maintained pursuant to the City of Columbus Division of Police Records Retention Schedule. All stored recordings are subject to release in accordance with Ohio's public records laws.

   1. Supervisors investigating/managing an incident or sworn personnel wanting to view video in the mobile environment should follow the procedures outlined on the Division's intranet.

**X.** Sworn personnel may review video footage of an incident in which they were involved prior to completing a report or making a statement to help ensure accuracy. Sworn personnel should not use the fact that a recording was made as a reason to give a less detailed description of *an* incident.

**Y.** A supervisor may view BWC video footage for the purpose of investigations, training, reviews, inquiries, civil claims, or litigation. This may include **random reviews or** recordings brought to the supervisor's attention that may lead to **positive corrective action or** discipline as outlined in the applicable collective bargaining agreement (CBA).

**Z.** Supervisory and investigative review of BWC recordings

1. BWC recordings are subject to review at any time once the recording is uploaded to the server.

2. Supervisors and the involved chain of command wishing to review a BWC recording shall conduct the review on a Division computer.

   a. Supervisors shall log in to the secured server with their Division-issued password.

   b. After being uploaded to the secured server, Division supervisors will have access to BWC recordings unless access has been restricted due to an investigative purpose.

3. Supervisors and investigative personnel wishing to request a copy of a BWC recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

4. Supervisors shall document the review of BWC recordings related to incidents under investigation **on the Incident Video Review, form U-10.197. Supervisors** shall **address** the relevant portion**(s)** of the recording **within the administrative investigation** to be reviewed by the chain of command **as necessary**.

5. Supervisors should conduct random reviews of BWC recordings to ensure videos are classified appropriately and to use the observations for open discussion and training.

6. Supervisors using BWC recordings for an investigative purpose shall review or reclassify BWC recordings as appropriate and in accordance with established law, Division policy, and the applicable CBA.

**AA.** Sworn personnel who have been issued a BWC and who transfer to an assignment that is not assigned a BWC shall return all issued equipment, including any assignment-specific take home chargers, to PoliceNET personnel.

**BB.** Division personnel who are assigned to use or otherwise be involved with BWC equipment must complete mandatory training. This training includes proper operation and care, policies and procedures, and limitations of BWC footage. Additional training shall be provided periodically to ensure the continued effective use of the system and equipment and to incorporate changes, updates, and other revisions in policies or equipment.

1. **Sworn personnel transferring into a unit where BWCs have been deployed shall contact Advanced Training Unit and PoliceNET personnel for training and issuance of a BWC as soon as practical.**

## IV. Procedures

A. Sworn Personnel

1. Classify the recordings as appropriate.
2. Notify your supervisor of any known malfunctioning or lost/damaged equipment.
3. Mark 10-23T for technology repair.
4. Replace or turn in the BWC for repairs to the PoliceNET Unit as soon as possible.
   a. Obtain a replacement BWC from the PoliceNET Unit. If the PoliceNET Unit is closed, obtain a replacement from the Patrol Administration Sergeant. The replacement BWC becomes the sworn *employee's* Division-issued BWC.

B. Investigating Supervisor

1. Determine if the malfunctioning or lost/damaged equipment was the result of normal wear and tear or negligence, and follow the procedures outlined in the "Lost, Damaged, or Malfunctioning Property" directive.

C. PoliceNET Personnel/Patrol Administration Sergeant

1. Collect malfunctioning or damaged equipment and replace it immediately.

D. Chief of Police

1. Appoint specific Division personnel to meet annually to review policy and collect data concerning BWC usage, including when video footage is used in criminal prosecutions, internal affairs matters, civilian complaints, injuries and assaults on sworn personnel, use of force incidents, and any associated costs.

E. *Supervisors Conducting Random Reviews*

1. *Review randomly selected BWC recordings on a regular basis. The incidents should be no more than 30 days old.*
2. *Forward the completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review, form U-10.193, to the bureau commander when there are areas of concern, for example, user error(s) or observations of misconduct, etc.*

F. *Bureau Commander*

1. *Forward the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form with user error(s) through the chain of command to the immediate supervisor of the officer(s) who made the recording.*
2. *If potential misconduct is discovered within the recording, determine the appropriate course of action.*

**G. Immediate Supervisor**

1. *Ensure sworn personnel who created the BWC recording correct the error.*

2. *If directed by the chain of command, complete an administrative investigation and send a copy of the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form to the Patrol Administration Section.*

**H. Patrol Administration Section**

1. *File completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review forms.*

2. *Track results annually to determine compliance/training needs.*