IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada,          :
et al.,

                            :
        Plaintiffs,
                            : Case No. 2:20-cv-3431
        vs.                   Judge Marbley
                            : Magistrate Judge Jolson
City of Columbus,
Ohio, et al.,               :

        Defendants.         :


- - - - -

30(b)(6) DEPOSITION OF JENNIFER KNIGHT
VIA VIDEOCONFERENCE

- - - - -


Taken at The City of Columbus Division of Police
120 Marconi Blvd
Columbus, OH 43215
February 2, 2021, 10:00 a.m.


- - - - -

Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

```
 1            A P P E A R A N C E S
 2
     ON BEHALF OF PLAINTIFFS:
 3
            The Gittes Law Group
 4          723 Oak Street
            Columbus, OH 43205-1011
 5          By Jeffrey P. Vardaro, Esq.
                (Via videoconference)
 6
            and
 7
            Walton + Brown, LLP
 8          395 East Broad Street, Ste. 200
            Columbus, OH 43215
 9          By Sean L. Walton, Esq.
                (Via videoconference)
10
            and
11
            Marshall and Forman, LLC
12          250 Civic Center Drive, Ste. 480
            Columbus, OH 43215
13          By Madeline J. Rettig, Esq.
                Helen M. Robinson, Esq.
14              (Via videoconference)
15
     ON BEHALF OF DEFENDANTS:
16
            Columbus City Attorney's Office
17          77 North Front Street, 4th Floor
            Columbus, OH 43215
18          By Alana Valle Tanoury, Esq.
                Westley M. Phillips, Esq.
19              (Via videoconference)
20
     ALSO PRESENT:
21
            Torrie Ruffin (Via videoconference)
22          Justin Horn (Via videoconference)
23
24
```

```
 1                 I N D E X
 2   Examination By                         Page
 3   Mr. Walton - Cross                        6
 4
     Plaintiff's Exhibits                   Page
 5
     Exhibit 5 - Affidavit of Mark E. Lang with   94
 6       attachments
 7   Exhibit 7 - Matrix Consulting Group report,  92
         8-19-19
 8
     Exhibit 111 - Civil Disorder Grenadier   57
 9       Training video, 8-22-18
10
11
12
13
14
15
16
17
18
19
20
21
     (Exhibits attached electronically. Hard copies were
22   never in Spectrum's possession.)
23
24
```

```
 1              Tuesday Morning Session
 2              February 2, 2021, 10:00 a.m.
 3              - - - - -
 4          S T I P U L A T I O N S
 5              - - - - -
 6       It is stipulated by counsel in attendance that
 7   the deposition of Jennifer Knight, a witness
 8   herein, called by the Plaintiffs for
 9   cross-examination, may be taken at this time by
10   the notary pursuant to notice and subsequent
11   agreement of counsel that said deposition may be
12   reduced to writing in stenotypy by the notary,
13   whose notes may thereafter be transcribed out of
14   the presence of the witness; that proof of the
15   official character and qualification of the notary
16   is waived.
17              - - - - -
18
19
20
21
22
23
24
```

```
 1       THE REPORTER:  Before I swear the
 2   witness, would counsel please identify themselves
 3   for the record, state who they represent, identify
 4   who else is in the room with them, and express
 5   your stipulation that this deposition may take
 6   place with a remote administration of the oath and
 7   remote reporting of the deposition.
 8       MR. WALTON:  All right.  Sean Walton on
 9   behalf of plaintiffs.  Also here on behalf of
10   plaintiffs are Jeff Vardaro and Mattie Rettig, and
11   no one else is in the room with -- with me.  And I
12   stipulate to the deposition.
13       MR. PHILLIPS:  Wes Phillips and Alana
14   Tanoury for the defendants.  And we also stipulate
15   that this can take place virtually.
16              - - - - -
17          JENNIFER KNIGHT
18   being first duly sworn, testifies and says as
19   follows:
20              - - - - -
21          CROSS-EXAMINATION
22   BY MR. WALTON:
23   Q.    All right.  Good morning again, Deputy
24   Chief.
```

1  A.      Good morning.
2  Q.      And what's the shorthand there?  Is it
3  just, like, Chief or Deputy Chief?  What do I call
4  you?
5  A.      So as long as the real chief is not in
6  the room, just say chief, that's appropriate.
7  Q.      All right.  That is much, much easier.
8          All right.  So we've been here before,
9  so I know that you're an old pro at depositions.
10  But I'll still go through, you know, some of the
11  Zoom ground rules.  Just allow clear, audible
12  responses.  Yes-or-no answers.  You know, if you
13  need a break, let me know.  I definitely do not
14  want to hold you if you have to take -- take a
15  quick break.
16         And are you under the influence of any
17  drugs or medications that would impair your
18  ability to testify truthfully and accurately
19  today?
20  A.      No, I'm not.
21  Q.      Okay.  And when were you last deposed?
22  A.      Oh, I'm -- honestly, I can't recall.
23  It's been a couple weeks I believe.
24  Q.      Okay.

1  A.      But I can't recall the exact date.
2  Q.      Okay.  What case or matter was that in?
3  A.      I believe the most recent one was in
4  the McFadden case.
5  Q.      Okay.  I'm not sure if you've testified
6  as a 30(b)(6) witness before.  Do you know?
7  A.      I do not know.
8  Q.      Okay.  Well, this is a deposition
9  pursuant to Federal Rule of Civil Procedure
10  30(b)(6).  And can we stipulate that you have been
11  designated by the City to testify about -- there
12  are two topics.  I'll read them both.  One, the
13  Columbus Division of Police planning for handling
14  possible and/or publically announced
15  demonstrations after the killing of George Floyd
16  on May 23rd, 2020.  And you're designated for
17  other operational periods, as opposed to Deputy
18  Chief Woods who is designated for the dayshift of
19  May 28th and May 30th.
20         And the second topic is topic No. 19,
21  the category such as SWAT as law enforcement
22  personnel, whether employed by Columbus Division
23  of Police or mutual aid entities cooperating with
24  the Columbus Division of Police at the protest in

1  late May and early June 2020.  The circumstances
2  for deploying each category, the individuals with
3  the authority to deploy and/or direct the
4  personnel in each category and/or the street,
5  intersection or the specific location where each
6  category was deployed.  And again the same other
7  operational periods time frame.
8          MR. PHILLIPS:  And, Sean, just so we
9  can clarify for the record --
10         MR. WALTON:  Uh-huh.
11         MR. PHILLIPS:  -- Deputy Chief Woods
12  has the entire day of May 28th and the daytime
13  shift of May 30th and she has the other times.  So
14  she does not have the nighttime shift on May 28th
15  either.
16         MR. WALTON:  Okay.  All right.
17  Appreciate that clarification.  All right.  You're
18  right, that's my mistake there.
19  BY MR. WALTON;
20  Q.      And is that something that we can
21  stipulate to, Chief?
22  A.      I believe so, yes.
23  Q.      Okay.  Are you clear about the matters
24  on which you have been designated to testify?

1  A.      I believe so, yes.
2  Q.      Okay.  And the matter was described
3  sufficiently for you to have reasonable notice
4  about it?
5  A.      Correct.
6  Q.      And also to enable you to prepare for
7  this deposition?
8  A.      To the best of my ability.
9  Q.      Okay.  And you consent to testifying on
10  behalf of the City, correct?
11  A.      Correct.
12  Q.      Okay.  Are you aware that this
13  deposition seeks whatever facts are known to the
14  City or that are reasonably -- excuse me,
15  reasonably available to it.  In other words, you
16  understand that you may answer not only based on
17  your personal knowledge or experience but also on
18  what you have read or been told or understand the
19  City's position to be?
20  A.      I do.
21  Q.      Okay.  And in light of your job duties
22  and experience, do you consider yourself
23  knowledgeable about facts known to the City or
24  that are reasonably available to it on these

1  topics?
2  A.     Yes.
3  Q.     And have you attempted to become more
4  knowledgeable about facts known to the City or
5  that are reasonably available to it on these
6  topics?
7  A.     Yes, I have.
8  Q.     Okay.  And what have you done to
9  prepare for this deposition?
10  A.     I have reviewed all of the exhibits
11  provided to me.
12  Q.     Okay.  And are those exhibits numbered
13  or identified in any way?
14  A.     They are numbered.  I believe 1 through
15  24.
16  Q.     Okay.  And did you review those on your
17  own or with counsel or anyone else?
18  A.     I reviewed those independently.
19  Q.     And have you reviewed anything else in
20  preparation for today's deposition?
21  A.     I don't recall reviewing anything other
22  than the exhibits and the videos provided to me.
23  Q.     And if you could, if you could just for
24  your name -- excuse me.  For the record, please

1  state your name and your current title with the
2  Columbus Division of Police.
3  A.     Absolutely.  My name is Jennifer Lee
4  Knight, K-N-I-G-H-T.  My current rank and title is
5  deputy chief of the community services
6  subdivision.
7  Q.     Could you explain that role?  You know,
8  what your responsibilities are?
9  A.     Yes, sir.  As a deputy chief, I am the
10  supervisor over three bureaus, that would be the
11  training bureau, the property crimes bureau and
12  community response bureau for the Division of
13  Police.  I have three commanders and all of their
14  subordinates under my command.  I am part of
15  executive staff, that would be six deputy chiefs
16  and including the chief of police.
17  Q.     And how long have you been in this
18  current role?
19  A.     I was actually promoted in May, on the
20  3rd of May in 2020 to this role.  I served in a
21  limited acting environment for about 14 to 15
22  months prior to that date in the same position.
23  Q.     Okay.  And that's the community safety
24  subdivision; is that right?

1  A.     Community services.
2  Q.     Community services.
3         Is that a new subdivision or a new
4  title?
5  A.     Yes, sir.  We reorganized in 2019, late
6  2019, about July or August.  I was previously the
7  acting deputy chief over patrol north subdivision.
8  And once we reorganized, I no longer had patrol
9  bureaus and it became an outward facing
10  subdivision.  So training and community services
11  has a lot of outward facing elements and that
12  additional -- that new subdivision was created by
13  Chief Quinlan.
14  Q.     And do the patrol subdivisions still
15  exist?
16  A.     Yes, sir, they do.
17  Q.     Okay.  You were just placed in a new
18  role?
19  A.     Yes, sir.
20  Q.     Okay.  And you said May 3rd, 2020; is
21  that right?
22  A.     Yes.  Correct.
23  Q.     Okay.  So going back to the protests
24  last May and June, you would have been in the

1  current role, correct?
2  A.     Yes.
3  Q.     Okay.  All right.  I'll go ahead and
4  jump into the first topic here.  The Columbus
5  Division of Police planning for handling possible
6  and/or publically announced demonstrations after
7  the killing of George Floyd on May 23rd, 2020.
8  And prior to May 23rd, 2020, did the Columbus
9  Division of Police have any type of group or set
10  of personnel assigned to plan for policing
11  demonstrations in Columbus?
12  A.     Policing demonstrations are either
13  handled -- handled one of two ways if we have
14  advanced notice of those.  Either by the zone
15  commander and lieutenant over the area that the
16  demonstration is anticipated to occur.  Or it
17  could be by the emergency operations center
18  personnel.  The emergency management unit is a
19  small unit that handles preplanned events,
20  including protest-type events.
21  Q.     And is there a preference on
22  which set of staff handles that?
23  A.     Typically if it's considered to be a
24  smaller event in an area of patrol, a lot of times

1  on campus we have those types of events that are
2  smaller protests or demonstrations, and those are
3  typically handled at a smaller level. Anything
4  large scale that would require a marshalling of
5  resources outside of a zone would occur probably
6  in the emergency management unit if we have enough
7  notice to do a preplanned event.
8  Q.    Okay. And when was the EOC
9  established?
10  A.    You mean overall or in May?
11  Q.    Overall.
12  A.    It's been around for at least 20 years.
13  So I can't recall when it was actually
14  established. But the EOC has been operating for
15  the majority of my career at least.
16  Q.    Okay. And is it a standing unit or is
17  it because you asked originally. I mean, is it --
18  like, is it ever not active?
19  A.    So the EOC, we always have personnel
20  assigned to that unit. It is a very small unit.
21  I think it consists of a sergeant and maybe two --
22  two officers, two to three officers. I'm not
23  entirely sure. It is always those officers and
24  that supervisor are always assigned and always

1  working on long-term planning and emergency
2  preparedness for the division. When the EOC
3  becomes active, typically they assign additional
4  personnel that are trained in the EOC when it
5  becomes fully operational. But the smaller group
6  is always assigned.
7       (Torrie Ruffin enters deposition.)
8  Q.    And prior to May 23rd, 2020, when did
9  the EOC become operational or was it after that
10  date?
11  A.    You mean fully operational for the
12  events that occurred over the summer?
13  Q.    Correct.
14  A.    So I believe that on May 28th, the
15  emergency management unit personnel was in the EOC
16  or brought into the EOC at some point. But it was
17  not fully operational with all of the staff and
18  resources until I believe the 30th.
19  Q.    And do you know who made the decision
20  to make the EOC fully operational on the 30th?
21  A.    I think we were attempting to get those
22  resources into that unit on the 29th. I worked
23  actually the 29th of May, and we were attempting
24  to get all the resources there. It's typically

1  staffed with fire personnel and representatives of
2  any of our other jurisdictions or partners in the
3  area. And it took a little bit of time to do
4  that, a couple days. It is also staffed with
5  communication personnel, so we have to divert
6  those individuals -- during the pandemic we had to
7  divert them to the EOC from our communications
8  center. So we were partially staffed with the
9  regular emergency management unit on the 28th and
10  the 29th. And we were fully staffed I believe the
11  30th.
12  Q.    And was that a decision that Chief
13  Quinlan would have made?
14  A.    Deputy chiefs and the Chief can all
15  make that decision. Once we identified the need
16  for the additional resources, we -- I believe that
17  was probably the 28th and the 29th that we were
18  attempting to fully staff it. So I don't recall
19  who exactly made the decision, but we would have
20  all made the decision to bring the EOC into full
21  operations during those days.
22  Q.    And who was on the regular staff of the
23  EOC?
24  A.    So I do know the sergeant is Matt

1  Weekley, and his name is W-E-E-K-L-E-Y. And I do
2  not know who the officers that are assigned to the
3  EOC would be. It is not under my command.
4  Q.    And did you have any conversations with
5  anyone regarding making the EOC fully operational
6  leading up to May 30th?
7  A.    Yes. I was attempting to get assigned
8  dispatchers on May 29th, that would be the second
9  operational period that I was the incident
10  commander. I was attempting to get those
11  resources in there that night. It would have been
12  beneficial to have those resources in advance but
13  sometimes that takes a little time. And
14  especially the dispatching that occurs directly
15  from the emergency operations center during a
16  large scale event. But due to the pandemic, we
17  had to get those individuals from communications,
18  ensure it was a safe environment and bring them
19  into the EOC which is very close in quarters. So
20  we were attempting to do that all of the 29th.
21  Q.    And were you directed by anyone to do
22  that or was that a decision that you made?
23  A.    I can't recall if I was directed, but I
24  would have made that decision regardless.

1  Q.    Okay.  And why is that?
2  A.    Because it's beneficial to have all the
3  resources and a fully operational EOC during a
4  large scale event.
5  Q.    Is that something that you've been
6  trained regarding or is that based on your own
7  experience?
8  A.    Experience and training.
9  Q.    Tell me why it's beneficial based on
10  your experience and training to have it fully
11  operational?
12  A.    The incident commander is located in
13  the EOC.  In the EOC we also have downlinks from
14  the helicopters so we have visuals.  Having the
15  radio dispatch from that location means that we're
16  having everyone that is working that event or
17  managing that event, including logistics and
18  staffing and all of the partners that are assigned
19  to the event like fire personnel and things like
20  that, all of that occurs out of one location.  It
21  is -- it's designed for efficiency, to ensure that
22  we're able to communicate with each other right
23  there and make flexible and quick decisions
24  regarding how we deploy resources.

1  Q.    And was that period of May 28th through
2  May 30th, 2020, was that your first experience in
3  the EOC?
4  A.    No, sir.
5  Q.    Okay.  What previous experience had you
6  had in the EOC?
7  A.    I was fully trained as a supervisor in
8  the EOC as a sergeant.  So I had handled those
9  types of large scale events and assisted in the
10  EOC since I was a sergeant, and that would have
11  been in -- oh, a long time ago.  I think it's 2006
12  when I became a sergeant, so I was fully trained
13  in that period of time.  I also responded to the
14  EOC and assisted in a variety of capacities as a
15  lieutenant, as a commander and as a deputy chief.
16  Q.    Okay.  And what did that training
17  consist of?  I know it was a long time ago.
18  A.    It was actually a long time ago.  And
19  so it was a course to ensure that we were fully
20  briefed on the ICS system.  It was a mult -- it
21  was an online course for the foundation of that
22  training and then it was in person courses.  We
23  took multiple ICS courses and we were fully
24  trained in NIMS management, that's National

1  Incident Management System.  And that is how we
2  operate, so I received that training as a
3  supervisor, as a sergeant.  We have had some
4  additional training throughout the years as a
5  lieutenant and as a commander.  So that's the
6  training that we received for the emergency
7  operations center.  But I've also had experience
8  operating during large scale events.  I have been
9  assigned to the EOC and outside the EOC as kind of
10  a liaison to the EOC for a multitude of events
11  including Red, White & BOOM! on a regular basis
12  and some of the other preplanned events that the
13  City actually utilizes the EOC for on a regular
14  basis.
15  Q.    I believe you mentioned the ICS.  What
16  does that stand for?
17  A.    You caught me off guard on that one.  I
18  just -- we so often refer -- it's Incident -- you
19  caught me off guard on that one honestly.  I can't
20  remember.  We just refer to it as ICS so much that
21  I really don't even pay attention to what the
22  acronym stands for.
23      But the ICS system is designed to
24  organize large scale events and multiple events.

1  So the ICS system is a national system of federal
2  design to how you handle large scale events and
3  how you respond to major disasters.  That ICS
4  system also includes a variety of training for
5  specific positions within the ICS system and it
6  guides supervisors in how to organize and staff
7  large events.
8  Q.    Just so I'm fully understanding, is it
9  like -- is it a program, is it an ongoing -- like
10  I said, what is it?
11  A.    It's actually a -- it's actually a
12  system and structure for major disasters, large
13  scale events and how we're expected to operate.
14  We are ICS compliant at the Division of Police, so
15  they have a listing of forms that are consistent
16  across the board.  We attempt to use all of those
17  forms for all of our large scale events.
18      It's a reporting system.  So those
19  forms are -- so we're not creating additional
20  forms and everything's consistent.  We use ICS
21  forms.  We ensure that any plans that we do in
22  advance are compliant so that they have the
23  appropriate structures designated through ICS,
24  which is I believe Incident Command System, now

1  that my brain is a little more awake. So it is a
2  -- and what it allows an agency to do is it allows
3  an agency to have consistency from event to event.
4  And it allows a consistency in reporting, in
5  structuring and ensures that we are building in
6  all of the things to a large scale event that we
7  would need, and that would be logistics and safety
8  officers and teams of individuals and that they're
9  properly supervised. It also allows for if we
10  have multiple events creating another ICS
11  structure that works in tandem so our resources
12  are properly distributed.
13  Q.    So does someone come in and train you
14  regarding the ICS, the Incident Command System?
15  A.    So the Division of Police has had
16  specific ICS classes in the past for lieutenants
17  and commanders and sergeants. Lieutenants are
18  required to have a minimum of so many ICS courses,
19  and I honestly can't remember how many courses it
20  was. You have a list that you have to complete
21  that we want our lieutenants to make sure they get
22  early on after they've been promoted. We have
23  individuals from the outside that can come in and
24  teach ICS. Some of the ICS training is created in

1  online modules as well so we can have ICS
2  briefings that way so that they can brief us on
3  additional ICS training. But a lot of the ICS
4  training that I received was early on in my
5  career, and that ICS training was in person at the
6  time. We didn't really have an online -- a robust
7  online component. I would believe now most of the
8  ICS would be on online type training for
9  supervisors.
10  Q.    I appreciate that.
11      Is there any individual that is in
12  charge of the ICS, any one individual?
13  A.    You mean in the Division of Police or
14  the federal government?
15  Q.    Sorry about that. In the Columbus
16  Division of Police.
17  A.    No. There's no one individual in
18  charge of ICS. Every supervisor is expected that
19  they will create an ICS plan, compliant plan if
20  they're drafting an incident action plan or for
21  any specific event. I was the commander over
22  Zone 4 which had OSU, so every OSU football game
23  that was an at home game, we would create an ICS
24  compliant response for off-campus incidents,

1  housing, parties, things like that. So everyone
2  is expected to be able to manage their incident
3  action plans that they create to be ICS compliant.
4  There's no one individual in charge of ensuring
5  that. And then those are all forwarded to the
6  emergency operations center, the emergency
7  management unit will house those typically and
8  store those. And if we have any additional
9  questions or need for resources, that would be
10  where we would marshal those resources from.
11  Q.    All right. And just to go back a
12  little bit. I believe you said that you also had
13  EOC training as a lieutenant and commander. Do
14  you recall when your last training was?
15  A.    No, I'm afraid I don't.
16  Q.    Okay. And would it have been, like,
17  over, like, five years ago?
18  A.    I do not know that. I worked with the
19  ICS system for a long time, so I think I've taken
20  every -- earlier on in my career, I took every ICS
21  class that was available. So I wouldn't have any
22  additional courses that I would be required to
23  take or that I would need to take. I can't
24  remember when the last time I would have had any

1  kind of ICS brief update or anything like that. I
2  just can't recall. I'm sorry.
3  Q.    And just to make sure I'm clear here.
4  I asked about EOC training. And so EOC is ICS
5  training?
6  A.    EOC training is ICS training, but it is
7  also additional training for individuals that are
8  going to be specifically assigned to the EOC. And
9  that is what happens if something -- you know, a
10  major event or a major disaster happens and you
11  have to be responding to the EOC to provide
12  support, what is your role, what does that role
13  require? How do you turn the lights on? How do
14  you contact people? How do you get a hold of our
15  partners? What is a call down list of individuals
16  that need to be notified, supervisors that need to
17  be notified? So it's basically how you would
18  operate the EOC and spin it up for the chain of
19  command. So you not only receive ICS training but
20  you also receive training in how to operate the
21  EOC effectively and make the phone calls to get
22  the resources into the EOC, including
23  communications personnel.
24  Q.    Okay. And you're not sure when you

1  last had that EOC training? Was it over five
2  years, under?
3     A.    So I can't remember the last time I had
4  ICS training. But I would not have needed EOC
5  training since about the time I was a sergeant
6  because I am actually an incident commander now.
7  So I don't turn the lights on anymore. I show up
8  once the lights are turned on and I do that
9  portion of the job. So I'm not running the EOC.
10  I am in charge of the incident.
11     Q.    And the ICS, that's you said designed
12  to organize large scale events. That's not
13  specific to protests or riots, though, right?
14     A.    No. No. It actually originally was
15  designed for major disasters.
16     Q.    Okay. And you said that the EOC is
17  opened up for different events like Red, White &
18  BOOM! What other types of events is the EOC opened
19  up for?
20     A.    So it's usually where we need a
21  multitude of resources, not just division
22  resources but City resources, and we work with our
23  outside partners. So I believe for The Columbus
24  Marathon is one of those that typically we open up

1  the EOC for. I think the Pride Parade that we had
2  every June is something -- May or June, I can't
3  remember the exact date. But the Pride Parade
4  because that required so many division and outside
5  resources. Usually just those larger events that
6  the City puts on every single year. You know, it
7  used to be one of those things that we had when
8  Michigan was actually a good team, we used to open
9  it for the OSU-Michigan game. But we haven't had
10  to really do that for quite a while now and I'm
11  hoping never -- we won't ever again.
12     Q.    You must know that I'm a Michigan fan,
13  huh?
14     A.    Okay. I confess, I kind of do.
15     Q.    So going back to May 23rd, 2020 when
16  George Floyd was killed, when did you first become
17  aware that there may be protests in Columbus?
18     A.    So I don't -- I think that was one of
19  those things where we were advised at executive
20  staff that we may have protests. There was
21  nothing definitive, there was no intel that I was
22  aware of that this was an absolute. At best after
23  the 23rd, I think we anticipated some marches,
24  some things like that.

1     It didn't happen in our city. So if it
2  had happened in our city, we would have been
3  anticipating larger scale protests. I first
4  became aware that this was more than just a normal
5  expectation for some protests or some marches
6  downtown, and that would have been around the 28th
7  when -- that was the first night of large scale
8  response.
9     Q.    And were you actually working on the
10  28th?
11     A.    I was working during the day on the
12  28th. I'm not in charge of a patrol group, so --
13  I was aware that they were preparing for some
14  protests downtown because additional intelligence
15  was coming in that they anticipated larger
16  numbers. I was aware that the division was trying
17  to marshal some resources. And I was aware that
18  Mike Woods, Deputy Chief Woods was actually going
19  to be the incident commander that night.
20     Q.    And were there any formal discussions
21  between executive staff regarding the planning for
22  May 28th?
23     A.    So I believe executive staff was
24  briefed based on what we anticipated -- the

1  numbers that we anticipated and what Deputy Chief
2  Woods was bringing in as far as resources for the
3  night. I think we had a briefing sometime that
4  day, but I can't recall exactly what time and what
5  information was put out in addition to just a
6  basic briefing about how he was planning to
7  respond to what we thought was going to be a
8  larger group of individuals.
9     Q.    And what do you recall --
10     MR. PHILLIPS: Sean, just one second.
11  Remember, she doesn't have the 28th. But I get
12  that these impact the other questions that she
13  does have. So I just wanted to say it for the
14  record, but --
15     MR. WALTON: Yep. I appreciate that.
16     (Helen Robinson enters deposition.)
17  BY MR. WALTON:
18     Q.    Do you recall what you were briefed on
19  or what that communication was?
20     A.    No. I don't recall the details of that
21  meeting.
22     Q.    Okay. Do you know if there were any
23  documents or records of that meeting?
24     A.    No, I don't. I'm not aware of what

1  exactly was created if anything.
2  Q.      All right.  And outside of that
3  briefing with the executive staff, are you aware
4  of any -- strike that.
5          Outside of the briefing with the
6  executive staff, did you have any communications
7  with anyone regarding the planning for May 28th?
8  A.      I can't recall exactly.  If it was
9  requested to utilize any of my personnel, I can't
10  recall exactly.  But I'm sure I would have made
11  any of my personnel available if that was
12  necessary.  So outside of that briefing, I can't
13  recall if I had any other conversations.
14  Q.      And do you recall what Chief Quinlan
15  said the planned response was for that first
16  night?
17  A.      No, I can't recall.
18  Q.      You said that intelligence was received
19  regarding increased numbers of people coming out;
20  is that correct?
21  A.      Yes.  I believe we were getting
22  information that there was more than just a small
23  group of individuals, that the groups were growing
24  in size.  I do not have any of the intelligence

1  units under my command.  But typically that will
2  be in the form of social media and things like
3  that where we were identifying individuals that
4  are interested in coming and so we can kind of
5  anticipate sometimes the size of the crowd.  And
6  that information was indicating from what I recall
7  that the crowds were going to be larger than
8  expected.
9  Q.      And that's generally discussed via
10  e-mail, correct?
11  A.      Not necessarily.  Again, I don't have
12  the intelligence units under my command, so it
13  would not have come through me in an e-mail.  That
14  would be something where if Mike Woods was the
15  incident commander that he would have briefed
16  executive staff or the chief or somebody related
17  to what intelligence and where it was coming from.
18  Q.      Okay.  But would that briefing would
19  have -- would that briefing have been in person or
20  via Zoom or via e-mail?
21  A.      Probably not Zoom at that point.  And
22  it could -- he would have most likely briefed
23  executive staff that day or come to our offices
24  and said this is what I'm seeing, this is -- I may

1  need additional staffing or personnel.  I can't
2  recall if we had an executive staff meeting that
3  day to talk about that.  But it probably would not
4  have come via e-mail to us.
5  Q.      Okay.  And you've mentioned the role of
6  incident commander a few times.  Could you explain
7  what that role is for me?
8  A.      Yeah.  So the incident commander is the
9  ranking person in charge of the event.  So that
10  individual is in charge of the resources, getting
11  the resources needed and deploying those resources
12  generally, identifying supervisors that will
13  command from the field.  They are responsible for
14  ensuring that we have the appropriate additional
15  resources that we need from outside.  So if a
16  decision is made to ask for mutual aid in any way,
17  we would be doing that as well.  The rules of
18  engagement are typically established by the
19  incident commander for a specific event.  So, you
20  know, what our goals are, those are typically
21  identified by the incident commander, what the
22  goals are.  And the incident commander is
23  responsible for ensuring that that information is
24  given to the commanders that are in charge of

1  running roll call briefings as well.  The incident
2  commander makes higher level, 30,000 foot
3  decisions related to how we -- how we continue to
4  respond to an ongoing event.  The incident
5  commander communicates with the rest of executive
6  staff and briefs the chief.  And basically the
7  incident commander is the decision-maker on site
8  in the EOC for a variety of decisions.
9  Q.      And would the incident commander be the
10  final decision-maker?
11  A.      In most cases the incident commander,
12  because decisions have to be made then, is the
13  final decision-maker and is responsible for making
14  those decisions.  While we're not in a position to
15  be on the street and making smaller decisions in a
16  circumstance that's occurring outside the EOC,
17  those are made by supervisors that are tasked with
18  deploying personnel and responding to incidents
19  that occur on the street.  The incident commander
20  typically is ensuring that command staff have the
21  goals of the event and the rules of engagement for
22  the officers on the street.
23  Q.      And you mentioned the supervisors in
24  the field.  What's the chain of command, you know,

1   from the incident commander on down?
2   A.      Okay.  So the incident commander is
3   typically a deputy chief.  For a smaller event,
4   the incident commander can be a commander or a
5   lieutenant.  In many cases lieutenants can be the
6   incident commander for something smaller.  So it's
7   not necessarily rank related.  But for a large
8   scale event, it's usually a deputy chief.  And
9   then the deputy chief has commanders under their
10  command and those commanders have several field
11  forces which are run by lieutenants, and
12  lieutenants are the operational component.  So
13  typically the lieutenants are the ones out on the
14  street making those decisions.  Under the
15  lieutenant is somewhere between five and six
16  sergeants.  And under the sergeant is somewhere
17  between 8 and 12 to 14 maybe officers.
18  Q.      And so you mentioned the lieutenants
19  being out in the street.  Are the commanders also
20  in the EOC?
21  A.      It depends on the event.  So if a
22  commander is the incident commander, then a
23  commander would be in the EOC and lieutenants
24  would be on the street.  Commanders are sometimes

1   out in the street, but they have multiple
2   lieutenants, so they can't be everywhere, and they
3   don't have as much of an overview of the
4   individuals under their command.  So as a
5   commander, I have been deployed out into the
6   street with my lieutenants, but I have multiple
7   forces at that point, so I have to be able to
8   spread myself between those lieutenants and all of
9   those field forces.  So it doesn't always happen
10  that way, but commanders can be operationally out
11  in the street to do those events.
12  Q.      And as the decision is made about who
13  those commanders and lieutenants and sergeants and
14  officers are, is there any system established or
15  is that up to the incident commander?
16  A.      Could you clarify that a little bit so
17  I know exactly what you're asking?
18  Q.      Yep.  Absolutely.
19          Who decides who is involved in the
20  incident response?  Who picks the officers and the
21  supervisors involved?
22  A.      So they don't necessarily pick them,
23  it's who's available for an event that isn't
24  preplanned.  For a preplanned event, we can select

1   who we want.  And that's done based on staffing,
2   who's available.  It is not necessarily the
3   incident commander making that decision, although
4   they can make some special requests if they want
5   to use particular commanders.
6           The EOC when they handle staffing for a
7   large scale event, they are typically plugging
8   people in based on their availability and what
9   position they need for that particular thing.  So
10  it isn't necessarily the incident commander.  In a
11  very small event where it is a lieutenant or
12  commander and it's more related to a specific area
13  of the city and then the EOC is not operational,
14  the incident commander, whether a lieutenant or
15  commander, has the opportunity to pick which
16  groups they wanted to use for that and which
17  supervisors based on their availability as well.
18  Q.      And so for a preplanned event, who
19  would be the individuals selecting who's chosen,
20  is that the incident commander or the commander
21  for a large scale event?
22  A.      For a large scale event, it is going to
23  be the EOC that's coordinating that.  Because it's
24  going to be across subdivisions, across bureaus,

1   they're going to determine who's available and
2   then they're going -- they have a staffing chart.
3   So they have so many field forces to fill and so
4   many supervisors and positions, they are going to
5   go ahead and just plug in individuals based on
6   availability.  And I -- if I am the incident
7   commander, I am not making those selections.
8   Q.      That staffing chart, is that just like
9   a diagram and you plug in names, or are there
10  actual, like, roles assigned in that staffing
11  chart?
12  A.      So it's more like a roster.  So when
13  you're creating a field force, a lieutenant has a
14  field force and maybe -- and the lieutenant will
15  have an aide, so that is, you know, somebody
16  that's driving the lieutenant or providing them
17  with the paperwork that they need or helping with
18  communications, that's an actual role.  But the
19  rest of the individuals in that particular field
20  force, five to six sergeants likely, they may have
21  a bike sergeant, for example, and they put a bike
22  sergeant in there, and then they put all bike
23  officers under that sergeant so it is sort of like
24  a role -- a particular role in a lot of cases.

1 But it is a roster that they are plugging in
2 names.
3 Q.      Aside from availability, are there any
4 criteria that are used when filling out the
5 staffing chart?
6 A.      Yes.  So we want to make sure that if
7 we're using a specific unit that has special
8 training, the bike officers would be a prime
9 example, we're not going to put a nonbike trained
10 officer into a bike or bike position with a bike
11 unit if it's going to be deployed in that way.
12         There are specific roles that the
13 division has specialized training for, so we're
14 going to ensure that we do not put somebody in
15 that role that doesn't have those qualifications.
16 For example, the mounted unit or a grenadier
17 position which actually supports a field force.
18 Those positions have special training and so the
19 only people that we should be putting in there are
20 trained for those positions.
21 Q.      And aside from that special training
22 and availability, are there any other factors that
23 are considered?
24 A.      I mean, those officers need to not be

1 on a restricted duty assignment.  So anybody
2 that's injured or sick or anything like that in
3 restricted duty cannot be in a field force.  If
4 there's any additional reasons why we can't use
5 that person, we would not use that person.  The
6 EOC is going to coordinate all of those things.
7 So when they're plugging individuals in and
8 notifying supervisors of their assignment and
9 notifying the supervisors and the personnel as
10 well, they're -- any supervisor over a unit will
11 contact the EOC if there's special issues that we
12 can't put somebody in there for whatever reason.
13 Q.      And do the staffing needs change based
14 on the type of -- the type of event?
15 A.      Absolutely.
16 Q.      And how do they change?
17 A.      Well, like I stated, they -- the event
18 can be very small, and it could be a protest of 10
19 to 12 people.  And so there may be no additional
20 need for outside staffing and it can be handled on
21 a very small scale.  The larger the event, the
22 more resources that we need, that's how staffing
23 changes and fluctuates.  When we have something
24 like we did over the summer where it's sustained

1 for a long period of time, in a lot of cases we
2 have to make sure that we're properly rotating
3 people to give them rest and things like that.  So
4 if they're coming to an event, we want to make
5 sure that we're not working the officers over a
6 long period of time without rest.  Not just
7 officers, but our equipment has to be -- and we
8 have to ensure our equipment is up to speed, our
9 horses can't get tired, all of those things have
10 to be considered when we're staffing a large scale
11 event.
12 Q.      And also with regard to a large scale
13 event, do the staffing needs change based on the
14 type of large scale event?  For example, Red,
15 White & BOOM! as opposed to a protest?
16 A.      Yes.  Or the role of the staffing
17 within that.  So for Red, White & BOOM! for
18 example, we have a lot of our officers and youth
19 services or in missing and exploited children
20 unit, they would be assigned to an event.  But for
21 Red, White & BOOM! we have missing children's
22 booths everywhere, so their role in that event is
23 to staff those missing children booths and things
24 like that.  So depending on the event, the roles

1 change and for what we need to occur at that
2 particular event.
3 Q.      Is there a set policy regarding what
4 those needs are or is it discretionary and up to a
5 supervisor?
6 A.      So there's no real set policy because
7 every event is a little different.  And the needs
8 and mission and the mission inside the overall
9 mission changes with every event.  For example,
10 The Columbus Marathon, which is a very
11 resource-heavy event, we need more officers to man
12 traffic posts to maintain traffic and things like
13 that.  So that's where those resources would go.
14 So every event is slightly different.  And with
15 every event, we have to anticipate and plan what
16 we will need to make that event successful.
17 Q.      So going back to May 28th through
18 May 30th, 2020, when did you first become involved
19 with the actual planning of the protest response?
20 A.      So when I came in to work Friday
21 morning the 29th, we were briefed on some of the
22 things that had occurred the night before, the
23 number of protesters that were downtown, some of
24 the response, and we were anticipating those

1  numbers to continue that night because many people
2  were remaining in downtown.  So when I came in
3  that day, I was aware that I would likely be the
4  incident commander for that night.  So we
5  immediately were working on getting resources to
6  assist us at the division, ensuring that we had
7  staff to properly staff as many field forces as we
8  anticipated needing.  So we were already working
9  on those resources, pulling those into the
10  emergency operations center.  And there was a
11  meeting scheduled at headquarters that day with
12  Franklin County Sheriff's Office representatives
13  and the Ohio Highway Patrol representatives that
14  handle the statehouse area where many people were.
15  And they were there, so we wanted to talk to them
16  about what are -- you know, what their response
17  was, how we could ensure that we were responding
18  together because we're covering some of the same
19  area, what we needed.  So that meeting occurred on
20  Friday, and I was in that meeting and asking, you
21  know, what they were going to be responding with,
22  what their mission was, what their goals were,
23  what staffing they had available.  And we were
24  just kind of communicating between us and having a

1  conversation about how we were going to respond
2  that evening.
3  Q.      And where was that meeting held and who
4  led that meeting?
5  A.      So that meeting was held on the -- in
6  the chief's conference room on the 8th floor.  I
7  believe that meeting was originally set up by Mike
8  Woods, Chief Woods that morning or that night
9  before when he felt that we needed to have an
10  opportunity to discuss how we were going to
11  respond that night.  And Chief Woods had been
12  working for about 20 hours, so he went home and I
13  led that meeting.  It was a conversation as much
14  as anything.  I did not take notes.  But I wanted
15  to know what did you see from last night?  What do
16  you feel are the areas that you need to protect or
17  what resources are you going to have available?
18  Can you assist us if we need any additional
19  resources?  Will you be available to put a
20  representative in the emergency operations center
21  and when will that be?  So we were just kind
22  of coordinating with what resources we had at that
23  moment, what we anticipated to have in a few hours
24  and how they -- just kind of conveying how we

1  anticipated having to respond and coordinating our
2  efforts as much as possible.
3  Q.      Okay.  And just so I understand the
4  hierarchy or the interplay there, you have three
5  different law enforcement agencies and you led the
6  meeting.  So was this a Columbus Division of
7  Police led effort, or I guess how does that work
8  with regard to jurisdiction?
9  A.      So some of these areas we have kind of
10  a concurrent jurisdiction, but, you know, it
11  spills across one jurisdiction into another.  So
12  OSP who's responsible for protecting the
13  statehouse and their grounds there, a lot of this
14  was occurring on, you know, on statehouse grounds,
15  but on Columbus as well.  So these are large
16  crowds in the street, on the sidewalk, on the
17  lawn, up on the statehouse area.  So really this
18  is a coordination.  These are individuals that
19  lead different agencies and we are coordinating
20  our efforts to the best of our ability.  And
21  Franklin County was there as well because any --
22  you know, obviously any arrests that we would
23  make, they would need to be involved in that
24  because we don't want to make any kind of mass

1  arrests in any situation without notifying them
2  and planning with them, if we can avoid surprising
3  them with a large number of arrests.
4          Remember, we are in a pandemic, so jail
5  populations are reduced.  We have all of the
6  pandemic requirements that we have to try to keep
7  in place.  We are asking for a representative to
8  be in the EOC that day and over the next few days
9  if possible, so they have to allocate personnel to
10  that.  And so we're just basically coordinating in
11  that, no one is particularly outranking anyone
12  else in this meeting.
13  Q.      All right.  That is helpful.  You
14  mentioned that you asked -- asked the folks in the
15  meeting -- well, strike that.
16          You were in the meeting, and who else
17  was actually in the meeting?  What individuals
18  were in the meeting?
19  A.      So I wish I could recall exactly who
20  was in that meeting, but I just -- I can't.  It
21  was one of those let's get together, let's talk
22  about it.  It was leaders from OSP and leaders
23  from Franklin County Sheriff's Office, and I
24  cannot remember who else would have been in that

1  meeting at the time.
2  Q.        Do you recall who was there from the
3  Columbus Division of Police?
4  A.        Myself and -- I think I was the only
5  deputy chief in that meeting.  I do not believe
6  Quinlan was in that meeting.  He may have briefly
7  stepped into that meeting and then stepped out.  I
8  don't believe -- there may have been another
9  sergeant that is an administrative sergeant on the
10  floor or somebody taking notes, but I don't recall
11  anyone.  I believe this was just a conversation
12  between myself and the other individuals that had
13  resources that they were going to have to dedicate
14  to this.
15  Q.        And just in terms of the rank of the
16  individuals that were there from the other
17  agencies, do you recall the rank?  I mean, it
18  wasn't, like, Sheriff Baldwin, was it?
19  A.        I do not believe he was in there.  I --
20  I think, but I am not 100 percent sure that Chief
21  Deputy Gilbert was there likely or somebody that,
22  you know, would have been designated by Sheriff
23  Baldwin.  But I do not believe the sheriff was in
24  that meeting.

1  Q.        Okay.  And you mentioned asking what
2  they saw from the previous night and what areas
3  were needed to protect and coordinating resources?
4  A.        Uh-huh.
5  Q.        If you could, just give me everything
6  that you can recall that was discussed in the
7  meeting between you.
8  A.        To be honest, I can't remember
9  specifics.  But it was just a sharing of those
10  things.  You know, what areas are you concerned
11  about?  What resources do you have?  You know, is
12  there any critical infrastructure that we should
13  be concerned about?  How can we assist each other?
14  And how -- what resources can you provide in the
15  EOC so that we can open those lines of
16  communication for the entire event?
17  Q.        What do you recall the feedback being
18  from the previous night?
19  A.        I can't recall specifics.  I was not on
20  hand for that night, so I have no firsthand
21  knowledge of what occurred.  I was aware that the
22  crowds were larger than anticipated.  That there
23  was some violence in the crowds.  I didn't know
24  the extent to which that violence occurred.  I do

1  know that we anticipated similar sized or larger
2  crowds for Friday.  And I didn't really have a lot
3  of details as to what occurred that night on
4  Thursday night, other than we knew that we had to
5  get additional resources in for Friday.
6  Q.        Do you recall what resources the
7  Franklin County Sheriff's Office requested?
8  A.        No.  I don't recall specifics.
9  Q.        Okay.  Did you make the decision based
10  on that conversation that morning to make any
11  adjustments or changes from the previous night?
12  A.        Other than adding additional resources,
13  I don't believe I made a decision to make any
14  changes or adjustments from the night before.  But
15  I'm not aware of everything that was in place the
16  night before because I was not an incident
17  commander and I was not at work.
18  Q.        What additional resources do you recall
19  authorizing?
20  A.        So I requested more resources which
21  would mean personnel and field forces.  We -- I
22  was requesting additional personnel to the
23  emergency operations center, which we were trying
24  to fully gear up and activate, so that those

1  individuals can look at staffing and logistics and
2  equipment and things like that.  So I was also
3  requesting to try to get communications personnel
4  assigned to the EOC so we could communicate, do
5  communications for the event directly in the EOC.
6  I was asking for representatives from other
7  agencies.  We were looking at additional traffic
8  resources outside of the Division of Police.  I
9  can't remember if we actually got them that day.
10  But we were looking at those resources as well.
11  Most of what we were trying to do was increase the
12  number of available personnel for the division for
13  that night.
14  Q.        And in the process of getting those
15  resources or calling in that personnel, were there
16  any requests regarding any specific type of
17  personnel?
18  A.        I can't recall a request for something
19  specific.  It is likely I was looking at a variety
20  of things, including, you know, is the mounted
21  unit available, how many bike officers and how
22  many field force bike units do we have, things
23  like that.  I don't recall exactly what resources,
24  but those are typically the resources that I'm

1 asking for and making sure that we have.  And our
2 mounted unit, which is one of the units that is
3 highly effective with larger crowds, it is a force
4 multiplier.  So, you know, we have -- I don't
5 remember exactly how many horses we have.  But we
6 work with outside agencies for large scale events,
7 so we bring in the horses to create a larger
8 mounted unit response.  So it is very possible
9 that that was the day I was asking for can any
10 other agencies that have mounted units that work
11 with us regularly respond so that we can make sure
12 that those resources are available and that we
13 have the ability to rest the horses and things
14 like that.
15 Q.       Why are mounted units more effective?
16 A.       So the mounted unit, the horses have
17 the ability to move large groups of individuals
18 very -- much more efficiently than officers.  And
19 one horse can probably take the place of an entire
20 police unit on foot if they're trying to move a
21 crowd in most cases.  So when we deploy the
22 mounted unit, which we do for a lot of large
23 events, we use those in conjunction with the field
24 force and to move crowds at some point.  So what

1 we've noticed is the mounted unit is very
2 effective in -- you know, let's say we want to
3 push a crowd to a certain location, the mounted
4 unit trains this way and is effective moving that
5 crowd in a variety of ways.  The crowds have a
6 tendency to just automatically move from -- away
7 from a horse, and so that's very helpful.  It
8 reduces the need to have officers be in close
9 proximity to a volatile crowd in a lot of cases.
10 So that way we're not putting officers in a
11 position to be within a foot or so of protesters
12 that may be angry and may be aggressive.  The
13 horses can just kind of go to the front of the
14 line and people tend to back away naturally from
15 the horses.  So that's what we've seen and that
16 resource has been very effective for us in the
17 past.
18 Q.       Okay.  You said that the horses -- or
19 that people tend to move naturally away from
20 horses.  Is there any training or planning in the
21 event that people do not move away from the horses
22 as they approach them?
23 A.       So I'm not a mounted unit officer.  So
24 I know they train on crowd control regularly.  So

1 that's not something I would be an expert in or
2 could speak to.  But I do know that the mounted
3 unit trains tactics as a group, as individuals on
4 a regular basis.
5 Q.       And in addition to the mounted units or
6 the bike patrols, would you have made any request
7 for any additional SWAT officers?
8 A.       I do not -- so assigning SWAT to a
9 large scale event is not unusual.  I can't recall
10 if SWAT was assigned that day or I assigned them
11 that day.  I can't recall when that happened.  But
12 it would not be unusual to have SWAT assigned to a
13 large scale event, a variety of events, even
14 nonprotest event, it is a normal course of
15 business for any large scale event to have SWAT
16 assigned in some capacity.
17          MR. PHILLIPS:  Sean, just so we're
18 clear what she is disclosed on.  When it comes to
19 the deployment part, subsection 19 of the topics,
20 the SWAT deployment person designated for those
21 answers was Paul Ohl.
22          MR. WALTON:  Correct.  And so, you
23 know, that question is regarding the planning and
24 her planning for the protest response on her

1 shift.
2          MR. PHILLIPS:  Right.  And, you know,
3 I'm -- that's why I didn't object.  I'll let you
4 ask the question.  I just want it to be noted on
5 the record because sometimes with 30(b)(6)s they
6 get a little confusing when you get the transcript
7 back.
8          MR. WALTON:  Right.  Much appreciated.
9 BY MR. WALTON:
10 Q.       And then Chief Knight, would you have
11 made a request for more grenadier trained
12 officers?
13 A.       It would be normal for me to -- I can't
14 recall exactly making that request that day.  But
15 when we're structuring a field force having a
16 grenadier available in that field force is
17 something that we -- we strive to do.  Whether we
18 need them or not, we are trying to have grenadiers
19 available.
20 Q.       And for what purpose is that?
21 A.       The grenadier's role is to provide
22 munitions for the lieutenant that is leading that
23 field force if they need to deploy something.  So
24 the grenadier has a large pack that they carry.

1   All of those are on the grenadier. The grenadier
2  is special trained, especially trained in what
3  every piece of ordnance is, how it should be
4  deployed and assists the lieutenant in that
5  deployment.
6  Q.     And just, you know, because you are in
7  the role that you are in, have you had any -- any
8  training as a grenadier yourself?
9  A.     No. I've not had an opportunity to be
10  trained as a grenadier.
11  Q.     Okay. And that morning when you came
12  in, did you have any conversations with Chief
13  Woods?
14  A.     I believe I did. I just don't know
15  what details those conversations entailed. I
16  don't have any specifics.
17  Q.     Okay. Generally, what do you recall
18  discussing as you met with Chief Woods that
19  morning?
20  A.     I believe he conveyed the crowds were
21  larger than normal, that they were aggressive
22  crowds, that officers were being -- they were
23  throwing frozen water bottles and other bricks and
24  related items, that they were engaging the police

1  in an aggressive manner. They were larger than
2  normal I believe that night. He had to deploy
3  some ordnance, I do not recall exactly what. But
4  it was the basics that we needed to prepare to
5  have additional personnel for Friday night, and we
6  needed to coordinate with other agencies so that
7  we could attempt to start getting better prepared
8  for those types of large sustained crowds.
9  Q.     And based on that conversation, you --
10  based on that conversation as well as your
11  conversation with the other law enforcement
12  representatives, you decided that more resources
13  were needed?
14  A.     Yes. I spent Friday working on getting
15  additional resources and standing up the emergency
16  operations center.
17  Q.     Okay. And going back to the
18  grenadiers, do you have any grenadier supervisor
19  training?
20  A.     Yes. We have basic grenadier
21  supervisor training at some point. I can't recall
22  exactly when I've had it. I have not actually
23  been in a position to utilize the grenadier
24  because I am in the EOC now in my role. So I

1  don't need to have specific understanding of how a
2  lieutenant would utilize a grenadier, although we
3  have had some supervisor training on that. The
4  grenadier training is provided to supervisors I
5  believe on a regular basis when they get promoted
6  to ensure they understand how the grenadier works,
7  what the grenadier can do as far as providing them
8  with ordnance that they need and so that training
9  is available. Yes.
10       MR. PHILLIPS: And I'll object to that
11  question being outside of the scope. But she's
12  answered it already.
13  BY MR. WALTON:
14  Q.     Okay. Did that knowledge of the -- did
15  your supervisor training with regard to grenadiers
16  assist in your planning of your response that day?
17  A.     I believe so.
18  Q.     Okay. And that's based on the fact
19  that you understand what they do and how they
20  operate?
21  A.     Yes.
22  Q.     Okay. Would that training have been in
23  the past few years or -- I guess at what point did
24  you receive that training?

1  A.     Like I stated, I can't recall exactly
2  when I'd received that training. I'm just aware
3  that I have had training on the grenadier.
4  Q.     Okay. Do you recall if it was from
5  officer -- I'm not sure if I'm pronouncing it
6  right, but Gagnon?
7  A.     I believe it was. I think there was a
8  video of him that I saw at some point that went
9  through -- that was grenadier training that I
10  viewed. I think he's one of our subject matter
11  experts that does train grenadiers, so it's likely
12  from Officer Gagnon.
13  Q.     And that morning after you spoke with
14  Chief Woods and the other law enforcement agencies
15  -- actually, let me show you one exhibit here.
16       I get to test my --
17       MR. VARDARO: Sean, I can if you want
18  me to --
19       MR. WALTON: Even better. I appreciate
20  that, Jeff. Very clutch.
21  BY MR. WALTON:
22  Q.     All right. This is Exhibit 111. Can
23  you see it there?
24  A.     Yes.

1   Q.      And can you identify the title there?
2   A.      Civil Disorder Grenadier Training,
3   Presented By Officer John Gagnon.
4   Q.      And that date is August 22nd, 2018?
5   A.      Correct.
6   Q.      And do you recall if this is the video
7   that you saw based on that date?  And we can show
8   it to you just so you can confirm if you recall
9   seeing any of this.
10         (Video started.)
11         MR. GAGNON:  This is to familiarize all
12  the supervisors whether you plan on getting
13  involved in a civil disorder event or not with the
14  new weapons and the new rounds that we're putting
15  out on the street probably Friday.  So these
16  weapons and these rounds will be out there and we
17  want everyone to know when they're going to be
18  used, how they're going to be used and what you
19  might expect if some -- someone else is using them
20  and you see or hear them.
21         (Video stopped.)
22  A.      Okay.  That looks familiar.  I just
23  couldn't tell you exactly when I saw it.
24  Q.      Okay.  I appreciate that.  And I'll

1   note that we showed you 39 seconds of the video.
2   The video is one hour and 20 minutes.  But, yeah,
3   that video looks familiar to you, so that's
4   helpful.
5          All right.  So moving on a bit.  Based
6   on your meetings that morning and your
7   understanding of what was needed, was there any
8   consensus reached on how to handle the protesters
9   during your time as incident commander that day?
10  A.      Are you talking first operational
11  period did we have a consensus or second
12  operational period?
13  Q.      The first operational period that you
14  were in charge of.
15  A.      Okay.
16  Q.      Which would have been May --
17  A.      I don't think I was officially in
18  charge of the first operational period on the
19  29th.  But coming out of that meeting, I think
20  that we weren't necessarily looking for consensus.
21  We didn't all have to agree on a specific -- you
22  know, anything specific other than we were looking
23  at what resources we had, how we could assist each
24  other.

1   Q.      And just to clarify there, do you know
2   who was in charge on May 29th?
3   A.      So I believe that because I was at work
4   and I was having those meetings, I may be listed
5   as the incident commander on the first operational
6   period and the second where we were actually -- I
7   was in the EOC.
8          The first operational period on the
9   29th I was actually having meetings, attempting to
10  ensure that we were getting resources and
11  anticipating being the incident commander for that
12  night.  So I don't know if we even needed an
13  incident commander during the day, but I was the
14  deputy chief on site and available that day.
15  Q.      And so based on those meetings you had
16  and the fact that you were going to be the
17  incident commander that night, did you make any
18  plans that night regarding how you planned to
19  respond to the protest?
20  A.      Can you be more specific?  What plans?
21  Q.      Yep.  Did you make any decisions with
22  regard to what types of force may be used that
23  evening?
24  A.      So use of -- when it comes to use of

1   force, a lot of times those are -- that decision
2   making is given to lieutenants in the field.
3   Those lieutenants are able to identify violations
4   and respond according to policy.  So I am not
5   seeing those violations.  What we want for rules
6   of engagement are to -- our goals are to protect
7   individuals' First Amendment rights and to ensure
8   that because the First Amendment does not protect
9   unlawful violent or destructive behavior, that we
10  are responding to any aggressive behavior, any
11  property destruction, any assaults or other
12  violent behavior.
13         That -- how an individual lieutenant
14  responds, they are expected to respond according
15  to policy.  So I don't recall if I made any
16  additional decisions and put that information out
17  prior to the second operational period that we
18  would be responding any differently than our
19  policy suggests.
20  Q.      And when you say regarding policies,
21  you're referring to written Columbus Division of
22  Police policies?
23  A.      Yes.  2.01, which is our use of force
24  policy.

1  Q.       And outside of the use of force, did
2  you make any decisions on how you planned to
3  respond that night based on the conversations that
4  you had the morning of May 29th?
5  A.       My goal was consistent with how the
6  Division typically responds, it was to make sure
7  that we were protecting the First Amendment rights
8  of those that were downtown protesting and that we
9  were ensuring the safety of the public.  Because
10 that's a Friday afternoon, ensuring the safety of
11 the motoring public, if they're in the streets and
12 around the statehouse area, that's kind of ground
13 zero for the City of Columbus.  So it typically
14 has a lot of traffic and so we want to make sure
15 that we're protecting the motoring public or
16 anyone else downtown during that period of time.
17 So our goal is to do that and protect both
18 individuals and property.
19 Q.       And with officers expected to respond
20 according to policy, if an officer is faced with a
21 specific circumstance that may not be outlined by
22 policy, are they then expected to rely on their
23 training?
24 A.       Yes.  They rely on their training and

1  policy.  Typically in a field force situation
2  though those decisions are made by supervisors
3  because we have to operate as a group.
4  Q.       Okay.  And just so I understand, so a
5  supervisor being a lieutenant makes the decision
6  on what types of force are used in the field?
7  A.       Not necessarily.  An officer is not
8  precluded if faced with a situation that would
9  meet policy, an officer is not prohibited from
10 responding until a supervisor is notified.  But
11 typically in a field force situation, a unit is
12 led by a sergeant and several units are led by a
13 lieutenant.  And so the lieutenant is going to be
14 there at the location in most cases, evaluating
15 the crowd size, looking at whether or not the
16 crowd is becoming aggressive and violent
17 determining whether the crowd is creating a public
18 safety hazard and making decisions when to move
19 crowds and those types of things because they are
20 standing right there with the sergeants.  So
21 officers are not precluded from -- from responding
22 to something that occurs.  But typically a
23 sergeant or a lieutenant is making those
24 decisions.

1  Q.       There's no requirement that a sergeant
2  make that decision for an officer, correct?
3  A.       No, there is not.
4  Q.       Okay.  And there's no requirement that
5  the sergeant check with their supervisor prior to
6  authorizing any use of force, correct?
7  A.       Correct.  They are expected to respond
8  according to training and policy.
9  Q.       Okay.  What standard equipment is given
10 to a Columbus Division of Police officer?
11 A.       Quite a bit.  Actually, quite a bit.
12 So they have their regular uniform, their duty
13 belts, everything that is on their duty belt
14 including their firearm, a canister of mace,
15 handcuffs, additional magazines and rounds.  I'm
16 touching my waist as I kind of think about this.
17 Usually they have a flashlight or some form of
18 light that they utilize.  They have their
19 identification, their badge, their hat, their hat
20 badge.  Most officers that work in a patrol
21 environment have been assigned a body-worn camera
22 so they have that equipment as well.  They have a
23 retractable type baton or asp that they utilize or
24 they have a Taser that they're utilizing as well.

1  So they have a variety of that equipment.  They
2  have a bulletproof vest that they wear.  The
3  additional equipment that they may have with them
4  is they are -- officers are provided riot gear to
5  protect them during a situation that has become
6  violent from bottles being thrown.  As much as
7  possible they have a helmet, they have a gas mask,
8  they have all of the equipment related to that as
9  well.  Officers are assigned a lot of other
10 equipment like coats for winter and summer and
11 things like that.
12        Bike officers are assigned different
13 equipment specific to the bicycle.  Mounted unit
14 officers are assigned equipment specific to their
15 positions.  When you get into those special
16 assignments, you're going to get additional
17 equipment specific to that assignment as well.
18        (Justin Horn enters deposition.)
19 BY MR. WALTON:
20 Q.       And leading up to the night of
21 May 29th, or just to clarify, leading up to the
22 point where the incident began on May 29th, was
23 any additional equipment made available to
24 officers?

1   A.      I can't recall what specifically would
2   you be talking about.
3   Q.      I mean, you mentioned the standard
4   equipment there.  I mean, anything like tear gas
5   or other munitions?
6   A.      It depends on the specific unit.  I
7   can't speak for things like the SWAT unit or any
8   units like that.  I don't know if any specific
9   additional equipment may have been issued in some
10  of the field forces.  I -- I don't know exactly.
11  The standard stuff was what we were operating
12  with.  We operate with that equipment.  The
13  lieutenants have a variety of equipment in the
14  back of their vehicles, so they operate with that
15  equipment regularly.  So I don't know if there was
16  any additional equipment that needed to be issued
17  for that particular event.
18  Q.      And who would make that -- that
19  decision?
20  A.      It depends on the equipment.
21          MR. WALTON:  Okay.  All right.  I
22  actually need a quick break.  Maybe say 10
23  minutes?
24          THE WITNESS:  Sounds good.

1           (A short recess is taken.)
2   BY MR. WALTON:
3   Q.      All right.  Chief Knight, you're good?
4   A.      Yes, I am.  Thank you.
5   Q.      Okay.  All right.  We are back on the
6   record.
7           And I wanted to go back and ask another
8   question about the grenadiers.  Are grenadiers the
9   only ones who -- the only ones who actually use
10  the munitions or -- excuse me, or do they
11  distribute them to the rest of the field force as
12  well?
13  A.      So grenadiers are not the only ones
14  that are authorized to carry or utilize that.  It
15  was designed to be more efficient and ensure that
16  individual was assigned to a lieutenant.  But we
17  -- we may not necessarily have grenadiers for
18  every single field force.  So it's designed to
19  provide more efficiency and make sure that is
20  available.  But, no, they are not the only ones
21  authorized in the Division of Police to carry.
22  Q.      Okay.  All right.  And so leading up to
23  your initial shift as incident commander on the
24  29th, not the morning but the evening, did you

1   make any changes or limit the protest response in
2   any way, as opposed to the typical policy?
3   A.      No.  I made no changes to policy.
4   Q.      And so getting into your role as
5   incident commander officially at that point, how
6   did that shift start?  Like does it start with a
7   roll call or how does that incident commander
8   shift start?
9   A.      So the incident commander typically
10  takes over -- I think our operational periods were
11  12 hours.  So I would take over somewhere around
12  5:00 or 6:00 in the evening and would run until
13  the next morning.  We usually have some type of
14  roll call.  The incident commander is not
15  necessarily present for that.  That is often run
16  by commanders over entire groups.  So I cannot
17  recall if I was present for those roll calls that
18  we would have had.  Roll calls can be formal in
19  nature or informal with a lieutenant and a
20  commander and that information dispersed to their
21  troops.  So I can't recall if we had formal or
22  informal roll calls at that juncture.
23  Q.      Do you recall who the commander was
24  that night?

1   A.      No, I don't.
2   Q.      Okay.  And so you did not speak to the
3   officers as a group that night or that evening?
4   A.      Again, I can't remember if it was a
5   formal or informal roll call.  There are roll
6   calls that sometimes the incident commander,
7   myself or other incident commanders will come into
8   the predeployment briefing and we may say a few
9   words or we may answer some questions.  But I
10  cannot recall if I was in those briefings that
11  night or if they were informal or formal.
12  Q.      Would you have had a briefing with the
13  commander directly?
14  A.      I would have had an informal briefing
15  with the commander directly when we went into the
16  EOC, where we would have asked basic questions
17  which are normal when you come in for a new
18  operational period, what happened during the last
19  operational period?  What resources do we have?
20  Kind of a briefing from anyone in the EOC to
21  determine if we need additional resources, where
22  we are at that point in time and what information
23  do we have that will allow us to anticipate what
24  we can expect over the next 12 hours.

1  Q.     Were you actually in the EOC the entire
2  time or did you ever go out into the field?
3  A.     That night, I don't believe I went out
4  into the field.  I believe I was extremely busy in
5  the EOC that entire time attempting to provide
6  what support and direction I could from the EOC.
7  Going out into the field is a difficult thing to
8  do because you lose that 30,000 foot view and you
9  don't have the same communication ability with all
10 the resources.  So I believe that night I stayed
11 in the EOC.
12 Q.     And did you speak to Chief Quinlan for
13 a briefing prior to that evening shift beginning?
14 A.     I don't recall.  I'm sorry.
15 Q.     Had you reviewed any videos or any
16 other reports from the previous night?
17 A.     I don't recall reviewing anything
18 specifically.  But I -- I would have gone in and
19 determined, you know, if there was any additional
20 information from the prior operational period or
21 the prior evening.  So I would have asked
22 questions, that would be normal.  But I don't
23 recall any specific forms or videos that I might
24 have looked at.

1  Q.     So did you give any specific
2  instructions to anyone in your chain of command
3  that evening as it related to any changes in
4  policies or tactics in the protest response that
5  night?
6         MR. PHILLIPS:  I'll object to the scope
7  of the question.  But you can answer.
8  A.     I don't recall changing -- giving any
9  instructions about changing any policy that night.
10 Q.     Okay.  And the roll call prior to any
11 of these shifts, are those recorded at all?
12 A.     I don't believe those are recorded.
13 Q.     In your previous question you mentioned
14 no changes in policy.  What about tactics?
15 A.     So I wasn't on duty the night before
16 when Deputy Chief Woods was operating, so I don't
17 know if there was any specific changes in tactics
18 that -- between the night that I worked and the night that he worked
19 night that I worked and the night that he worked
20 prior to that.  So I really don't know exactly
21 what specific tactics he may have utilized or
22 employed.  But I was operating consistent with the
23 tactics that I have used in the past or the
24 policies that we were operating under.

1  Q.     Okay.  And do you recall or are you
2  aware of any dates where there were changes in
3  policies or tactics with regard to the response to
4  protesters?
5  A.     Any --
6         MR. PHILLIPS:  I object, beyond the
7  scope of this deposition.  But you can answer.
8  Q.     With regard to the planning for the
9  protest, were there any changes in policies or
10 tactics?  And if so, what date and what changes
11 were made?
12 A.     Our policy was -- over the next few
13 days evolved as city leaders required us to make
14 some changes to our policies.  And our -- and
15 requested changes to some of the tactics that we
16 had been using.  I can't remember exactly what day
17 that actually occurred.  But I can tell you that
18 our response evolved and our tactics evolved as we
19 received input from city leaders.
20 Q.     And prior to that input from city
21 leaders, did any of the policies or tactics change
22 or evolve?
23 A.     No.
24         MR. PHILLIPS:  Objection.  Objection

1  beyond the scope.  But go ahead and answer.
2  Q.     With regard to planning?
3  A.     With regard --
4  Q.     Prior to the changes that were required
5  from city leaders, were there any changes to
6  policies or tactics?
7  A.     So tactics are something that are
8  flexible in a lot of cases.  We utilize certain
9  units as a tactic, so those were evolving with
10 every operational period.  But all of that was
11 within the policy that we were operating under.
12 So whether or not we used the bikes in a certain
13 capacity, the bike response team in a certain
14 capacity or whether or not we were utilizing soft
15 uniforms for certain approaches and our riot gear
16 for certain approaches, when we would use that.
17 All of those tactics are within our policies and
18 they had a tendency to evolve from one operational
19 period to the next because we were wanting to make
20 sure that we were constantly looking at how we
21 could improve our response.  And we are reacting
22 in a lot of situations to what the crowds'
23 behavior is.  So we have to constantly modify our
24 tactics to be effective.

1  Q.      And who would the decision-maker be
2  with regard to any changes or modifications in
3  tactics?
4  A.      So it depends on the level of change.
5  Something by -- deploying somebody in a line as
6  opposed to a triangle formation, that is a
7  decision that would be made at a lower level by a
8  lieutenant over a specific field force based on a
9  reaction to how the crowd is evolving.  So what
10 specific tactics they're using on the street is at
11 the discretion of the supervisors based on their
12 training and experience and within policy as well.
13 Whether or not -- larger scale tactics like
14 whether or not we're going to pull all of our
15 resources out of an area or whether or not we're
16 going to deploy an entire field force to another
17 location where there's some types of threats,
18 those are decisions that are made in the EOC
19 because we have to move resources around in a lot
20 of cases like pieces on a chess board.  So those
21 types of decisions would be decisions made by the
22 incident commander.
23 Q.      And are you aware of any shift and --
24 any shift at the EOC level with regard to what

1  type of behavior would warrant a certain type of
2  response from police officers?
3         MR. PHILLIPS:  Objection.  Beyond the
4  scope.  But you can answer.
5  Q.      With regard to planning, are you aware
6  of any shift at the EOC level with regard to what
7  type of protester behavior would warrant certain
8  types of police response?
9  A.      So again we operate consistent with
10 policy.  So if I don't have anything specific,
11 it's not a question I can necessarily answer
12 because it's so broad.  But we operate in
13 accordance with policy, so it depends.  But our
14 response like I said was evolving over a period of
15 days when we were originally operating under our
16 policy and we were receiving additional guidance
17 from city leaders that our response, they were not
18 -- they were not pleased with our response or the
19 crowds' reaction to our response in some cases.
20 So with those additional -- that additional input,
21 our policy which is what we were operating under,
22 our tactics were evolving over that period.
23 Q.      Okay.  And in what ways were the
24 tactics evolving for planning purposes?

1  A.      So for planning purposes, where we
2  would -- where we would have deployed a lot of
3  field forces visibly out there to deal with some
4  of the violent or destructive behavior and put
5  them on the street as a visible force, we actually
6  pulled resources back and at some point allowed
7  destructive behavior to occur if it didn't rise to
8  a certain level of violence where we believed
9  people might be harmed.  So we would not have
10 normally done that.  We would pull our resources
11 back and we would remain staged at police
12 headquarters.  That's not a tactic we were used to
13 using.  And so that's an adjustment that was made
14 after several days is to pull those resources back
15 and not have any visible presence on the street.
16 Q.      Did you agree with that change?
17 A.      That's a difficult question to answer.
18 I am operating under the belief that we are
19 supposed to protect property as well as persons
20 while still ensuring that we're protecting First
21 Amendment rights.  But First Amendment rights do
22 not protect against the unlawful or violent or
23 destructive behavior which we were seeing during
24 the course of this.  So removing our officers from

1  the street, not protecting -- not protecting
2  people and businesses against unlawful behavior in
3  my opinion was not appropriate.  But, again, I am
4  not the sole authority in how we respond.  So I
5  work at the pleasure of the Chief of Police and
6  the Mayor of the City and the Safety Director.  So
7  when a decision is made that we will pull back, I
8  am required to -- I am required to make sure that
9  we pull back.
10 Q.      Did you become aware of any activities
11 by officers during the course of the protest that
12 required planning in order to avoid overuse of
13 force or ensuring they follow policies better?
14 A.      No specific instances that I was aware
15 of during the course of planning.
16 Q.      In general did you become aware of any
17 actions by officers during the course of the
18 protests that required -- sorry about that.
19        In general were there any activities by
20 officers during the course of the protest that
21 required planning in order to avoid overuse of
22 force or ensuring they follow policies better?
23        MR. PHILLIPS:  Objection.  Asked and
24 answered.  But you can go ahead and answer it.

1 A.     I don't remember any specific
2 circumstances, as I stated, of situations that
3 occurred that we would have to address during the
4 planning phase.  I just can't recall any specific
5 circumstances.
6 Q.     You did say that your -- that you made
7 improvements based on -- I don't want to put words
8 in your mouth here.  But you did have
9 conversations with the protesters, correct?
10 A.     Yes, I did.
11 Q.     And you had actually meetings with
12 protesters as well?
13 A.     Yes, I did.
14 Q.     Do you recall how many of those
15 meetings you had?
16 A.     So I first went out into the crowds I
17 believe on the 1st.  I believe it was the 1st of
18 June was the first day that they had identified
19 maybe a leader in one of the larger groups that we
20 could contact.  We had been trying to identify a
21 coalesced leadership to have a conversation, but
22 we were unable to do that.  When that occurred, I
23 had somebody come to the EOC and say I think we've
24 identified a leader.  We've been watching this

1 individual, he seems to have a large group of
2 individuals and he appears to be a leader of the
3 group.  Came to me directly and said would you
4 like to talk to him?  And I said let me get my
5 hat.
6        I immediately grabbed my hat and went
7 out with just one or two other officers.  No riot
8 gear, no anything, into a sea of protesters to
9 talk to this individual to see if we can open the
10 lines of communication.  That then resulted in a
11 long conversation, a conversation with the crowd
12 that was surrounding him, hundreds of people, and
13 a commitment to meet him at Broad and High the
14 following day and to continue to do that to
15 continue the conversation.  At some point during
16 the course of these protests, we moved that
17 conversation from Broad and High to a table, and
18 representatives from his group, I believe it was
19 called Black Freedom, and myself and some of my
20 staff.
21 Q.     What type of feedback did you get about
22 the police response to protesters?
23 A.     So it depends on who I was talking to
24 in that group of individuals.  So I got a

1 different answer about the police response from
2 everyone.  My goal was to communicate why we do
3 the things that we do in these types of situations
4 and to give them an idea of how they can protest
5 and get their message heard more peacefully.  So
6 that they can ensure that the goals are met for
7 their organization which is having their message
8 heard and exercising their First Amendment rights,
9 and the goals for everyone else can also be met,
10 protecting the citizen, ensuring a reasonable flow
11 of traffic, protecting businesses from destructive
12 behavior.  My goal was to open those lines of
13 communication and explain that.  Everyone I talked
14 to in that group had a little different take on
15 it.  But allowing us -- having the opportunity to
16 communicate with them directly seemed to reduce
17 the amount of tension between the police and those
18 larger groups out there.  Now, there were several
19 groups, this was only one of several hundred
20 people.  But he had appeared to be the coalesced
21 leader of this group.  And so we made commitments
22 standing on the corner of Broad and High that if
23 -- if you can keep your people from destroying
24 businesses, then the police and -- and out of the

1 street as much as possible for a reasonable flow
2 of traffic, then I will attempt to pull back the
3 police resources.  So it was an incremental thing,
4 and it was very beneficial to be able to speak one
5 on one with their leadership.
6 Q.     Do you recall someone yelling out at
7 you or expressing fear of being tear gassed or,
8 you know, other shouts about overly aggressive
9 actions and unprovoked bullying and attacks
10 against peaceful protesters by police?
11 A.     There was a lot of shouting at me, some
12 of it was rather explicit.  So there was a variety
13 of people shouting at me regularly.  So I can't
14 recall an exact person or exactly what they said.
15 But their concern as a group was stated that they
16 didn't want the police to respond with tear gas or
17 any other things.  And I stated our concerns that
18 we would like traffic and individuals traveling in
19 and out of Columbus to be unaccosted and our
20 officers to not be attacked and businesses to not
21 be damaged.  So we stated our concerns and they
22 stated their concerns.
23 Q.     Do you recall telling those protesters
24 that day that the division was looking into

1 officers who were out of line in their actions the
2 past few nights?
3 A.    I don't recall that specific statement.
4 Q.    Okay.  Yeah, that's -- that's just a
5 quote from a Columbus Monthly article about it
6 from you.
7 A.    Did they interview me or was that
8 something that -- well, I don't remember being
9 interviewed specifically by Columbus Monthly, and
10 so I can't tell you if I made that statement at
11 all.
12 Q.    Okay.  No problem there.
13     Did you take anything from those
14 conversations with protesters back and implement
15 any improvements for planning purposes?
16 A.    So, yes, actually, I exchanged cell
17 phone number with the individual there.  And I
18 said I will do my very best if you can pull your
19 people back and get them to be less violent and as
20 many as you can and try to not attack the police,
21 I will make an attempt to step back our resources
22 and pull our resources back as well.  I did not
23 want to put officers out there on the street to
24 confront protesters if there was not a need for

1 them.  I would rather have them staged back at the
2 headquarters if I could.  My officers were
3 exhausted.  So my goal was to get them to step
4 down the violence and we would step down the
5 response.
6 Q.    And if I represented to you that in
7 that Columbus Monthly article it does say that you
8 were -- or that the division is looking into
9 officers who were out of line in their actions the
10 past few nights, would that be consistent with
11 information that you had at that point?
12 A.    So I can't tell you exactly.  It was an
13 information dump over a period of days.  So I
14 can't tell you exactly what information I had.
15 But my response to protesters if they're yelling
16 at me that the police did this and the police did
17 that, my response would typically be if you have a
18 complaint against the actions of the police, we
19 will look into it.  That is within our policy,
20 that is what we do, we investigate complaints from
21 citizens.  I don't remember anything specific
22 being told.  But my response to that was if you
23 have concerns about the police response, make
24 those concerns known to us and we will ensure that

1 we investigate those.
2 Q.    And you mentioned the changes that were
3 required by city leaders.  What were those changes
4 exactly?
5 A.    So I'm going to paraphrase.  The city
6 leaders were concerned with our use of what they
7 termed as tear gas or lachrymator or the use of
8 any chemical agent, they were concerned by that.
9 That was conveyed to deputy chiefs through the
10 chief.  I did not speak to anyone personally that
11 I recall.  They wanted to eliminate the use of
12 chemical agents in our response and so we were
13 advised at some point I believe that we were
14 ordered to no longer use chemical agents, and they
15 were specifically referring to CS at some point.
16 I think originally they didn't understand the
17 difference between OC and CS, and they just stated
18 any chemical agents.  Officers are issued belt
19 mace, which is OC, and taking that away from
20 officers eliminates an entire level of low level
21 use of force.  So there was that discussion about
22 how we do that.  It was eventually dictated that
23 the use of CS was no longer appropriate and an
24 emergency policy was put in place somewhere around

1 June 17th I believe, and we disseminated that
2 information and I removed CS from our arsenal for
3 ordnance so that no CS was available after the
4 date that we indicated that officers were no
5 longer -- officers and supervisors were no longer
6 able to utilize that as a response.
7 Q.    And so how did you disseminate that
8 information through the chain of command?
9 A.    I did not disseminate that information.
10 That came from the chief's office, and he was in
11 communication with city leaders.  That came from
12 the chief's office, and it was disseminated
13 through I think a division wide e-mail maybe at
14 some point, which is normal.  But more
15 importantly, that was conveyed at all roll calls
16 at some point.  I believe I communicated directly
17 to my supervisors in training where ordnance is
18 actually staffed and said please removed all CS
19 from that, and police removed CS from lieutenant
20 vehicles that have that, and that was taken care
21 of as well.  But I -- I don't -- I did not
22 necessarily disseminate that because that was a
23 chief's order and was disseminated from his
24 office.

1  Q.      Okay.  And was that sent to the entire
2  force the same day, that June 17th date?
3  A.      I can't remember exactly how that was
4  disseminated at that point.
5  Q.      Okay.  Do you recall if there was a
6  delay in announcing that at roll calls or if it
7  happened instantly?
8  A.      Nothing in government happens
9  instantly.  So we were doing our very best to
10 convey that information as quickly as possible.
11 And I cannot state whether or not there was any
12 delay at any point in the division.  But we were
13 doing our very best to make sure that was
14 disseminated.
15 Q.      Okay.  So within a day or two most
16 likely?
17 A.      I would believe so.
18 Q.      Okay.  And how did that impact your
19 planning for the next protest?
20 A.      I can't remember exactly once that was
21 disseminated how that impacted our planning.  I
22 can speak generally as to how I would -- I
23 responded to our inability to use a critical
24 component of our field force response.

1  Q.      Please do.
2  A.      So I need to explain why we use CS
3  briefly.  CS is used almost exclusively for crowd
4  control, and it is a best practice.  It's lighter
5  than air, so it rises and carries with the wind.
6  And it actually can reduce, significantly reduce
7  the potential for hand-to-hand kind of contact
8  with a large protest group.  So we deploy that
9  from a distance, either a rolled canister or some
10 other mechanism.  CS is deployed from a distance,
11 that way officers do not have to get in -- up
12 close to a crowd to be able to deploy those
13 things.  And that is designed to move crowds.  It
14 is -- we carry OC, which is heavier than air and
15 falls on our belts, that is designed for -- and a
16 Mark 9 which has OC in it, that is designed for
17 smaller groups.  It has to -- you almost have to
18 make contact with the facial area for that to be
19 effective, whereas CS can disperse and move an
20 entire -- a much larger crowd.  So we use CS
21 almost exclusively for larger crowds where
22 something like a belt mace or a Mark 9 would not
23 be as effective.   So that's kind of what we do.
24 If we don't have the use of CS for crowd control,

1  it disables our ability to use a low level use of
2  force.  Deployment of chemical agent is a Level 2
3  use of force, it's very low.  And our goal is
4  continually to use the lowest level to affect our
5  mission, our mission.  So it eliminates -- almost
6  eliminates what we can use for crowd control.  We
7  used CS for crowd control for many, many years,
8  very, very effectively.  And so eliminating that
9  from what we can deploy means that we have to
10 utilize other tactics to move or separate a crowd
11 and those other tactics may result in a much
12 higher level use of force than a Level 2.
13 Q.      You mentioned that it's a best
14 practice.  Who is that determined by?
15 A.      So our subject matter experts in the
16 area, probably some that we've identified for this
17 particular case, individuals that are specially
18 trained in identifying best practices, looking
19 across the United States to determine what is a
20 good crowd control method, those types of things,
21 they would be better individuals to ask that
22 question to.
23       But we have been using CS for a long
24 period of time very, very effectively, and it is

1  something that a lot of agencies, large agencies,
2  small agencies use for crowd control and have used
3  for many years.  It is something that we train
4  with under our OPOTA standards.  So OPOTA is Ohio
5  Peace Officer Training commission, actually does
6  our state training plan for field force response
7  and the use of CS as a low level way to move
8  crowds, disperse crowds and gain control is
9  something that we're taught.
10 Q.      Is there any concern with using that CS
11 spray in a crowd and impacting peaceful protesters
12 who are not warranting that level of force?
13       MR. PHILLIPS:  Objection, outside the
14 scope.  But she can go ahead and answer.
15 Q.      With regard to planning, is there any
16 concern with deploying that level of force against
17 peaceful protesters who do not warrant that level
18 of response?
19 A.      So we always recognize that a large
20 crowd that has become violent doesn't necessarily
21 include every -- the violence isn't necessarily
22 being committed by every individual in a crowd.
23 If you have 1,000 people not -- typically we don't
24 have 1,000 violent people, that is something that

1  we always consider in planning. How is the best
2  way to ensure we limit exposure to individuals
3  that are attempting to protest peacefully? So
4  that's always something that we build into the
5  planning model. But the problem with a crowd that
6  is partially violent and partially peaceful is
7  that any movement of the crowd or dispersal of the
8  crowd may include individuals that are not being
9  violent having some kind of, you know, mace or OC
10  or CS, having some type of exposure to that.
11  There's no way to deploy CS in a crowd of 1,000
12  people that has become violent and it only affect
13  the individuals that have committed violent
14  behavior. So we do consider that in the planning
15  process, but our goal is to disperse and move the
16  crowd.
17       One of the things that we do to ensure
18  that individuals are aware is we -- we don't
19  deploy it without ensuring that we have given
20  several loud commands for the dispersal of the
21  individuals, letting them know that we are going
22  to have to utilize some crowd control measures.
23  We tell them that we are going to do these things,
24  we are not trying to hide our hand in any way. We

1  want to give all of these individuals that are
2  peaceful an opportunity to leave the area prior to
3  exposure. So that is one of the things that we
4  can do to ensure that we limit the exposure for
5  those individuals that are in that crowd that's
6  turned violent that are wanting to still be
7  peaceful.
8  Q.    And just to be clear, does the Columbus
9  Division of Police policy limit the use of CS
10  spray to individuals who are violent? Or does the
11  policy, does it allow the use against more
12  individuals?
13       MR. PHILLIPS: Objection, outside the
14  scope of this deposition. You can answer.
15  A.    So our policy -- which policy are we
16  talking about specifically? 2.01 and the one that
17  was in -- I would like to speak directly to the
18  policy if I could. You're probably talking about
19  either 2.01 or 2.04 in May and early June prior to
20  any changes, correct?
21  Q.    Correct.
22  A.    Could you point to specific exhibits so
23  that I can reference the policy and answer
24  questions specifically?

1  Q.    Yep. For sure. I'll share my screen
2  here and point you to Exhibit 7.
3  A.    Okay. I thought Exhibit 7 was the
4  Matrix stuff?
5  Q.    Yes. So it has reference to --
6  A.    Oh.
7  Q.    -- the policy here. So I would -- the
8  first page, and do you see that Report on the
9  Police Division Operational Review, the Matrix
10  report?
11  A.    Uh-huh.
12  Q.    And I'm going to page 20 -- oops. I'm
13  going to page 21. There we go, Pillar 2 - Policy
14  and Oversight. And it references 2.04 in that
15  paragraph, the first paragraph.
16  A.    Yeah. That's not our -- I mean, that's
17  the Matrix report which isn't our specific policy.
18  But I can answer questions related to that if
19  you'd like.
20  Q.    Okay. Yeah. And my question is here
21  in the Matrix report, it states that that
22  "directive 2.04 'Chemical Agents and Intermediate
23  Weapon Regulation' should be reviewed to match
24  best practices."

1       And so just to back up. You're
2  familiar with this report, correct?
3  A.    Yeah. It's very extensive. But, yes,
4  I've read it.
5  Q.    Okay. Were you familiar with the
6  report's representation regarding directive 2.04?
7  A.    I'm not sure exactly what the
8  recommendation was.
9  Q.    Okay. Here, I'll back up and I will
10  show you the actual use of force directive, and
11  then we can come back to the Matrix report there.
12       MR. PHILLIPS: And, Sean, I'm just
13  going to object. I think this is pretty far
14  outside the scope of planning or deployment which
15  she is disclosed to talk about today.
16       MR. WALTON: Right. And I mean we're
17  talking about the change in policy and how that
18  impacted the directive to officers going forward
19  in their response, and she indicated that it
20  limited the officers and, you know, so I'm trying
21  to keep it to planning, just a roundabout way.
22       MR. PHILLIPS: I know you're trying.
23  I'm just saying that sometimes you're -- this is
24  crossing over into other subjects that she is not

1   disclosed to talk about.
2          MR. WALTON: Yep.
3          MR. PHILLIPS: If it relates to
4   planning or deployment, that's fine.
5          MR. WALTON: Yep. I'll do my best to
6   limit it. I'm not trying to get outside the scope
7   here.
8   BY MR. WALTON:
9   Q.      All right. So I'm going to pull up
10  Exhibit 5 here. Can you see that, Chief Knight?
11  A.      Yeah. Mark Lang --
12  Q.      Yes. It says Affidavit of Mark Lang,
13  but there's also the directives in here. So on
14  page 49 we have directive 2.04.
15  A.      Okay. Page 49. Let me get to that as
16  well. Ah, yes.
17  Q.      Okay. And you wanted to speak to the
18  directives. So you can direct me to maybe what
19  you want to read off or speak to.
20  A.      So what is your specific question
21  regarding this directive?
22  Q.      My question is because you mentioned
23  the intermingling of violent protesters and
24  nonviolent protesters and the use of CS spray to

1   disperse the crowd. And my question was did that
2   policy at that time limit you to using it against
3   nonviolent -- excuse me, violent protesters? I
4   guess I'm asking for clarity on what the directive
5   allowed there.
6   A.      Okay. So --
7          MR. PHILLIPS: I'll object for it being
8   outside the scope. But you can go ahead and
9   answer.
10  A.      So sworn personnel were actually
11  allowed to -- encountering a group of people, and
12  so sometimes that means three and sometimes that
13  means larger, engaged in unlawful conduct are
14  guided by the use of force directive which is
15  2.01, and -- when they use chemical spray. But if
16  it is used, we try to direct it at persons
17  participating in the violent conduct and not in
18  the group in general if we can. So that
19  encounter, it depends on the number of people.
20         Like so if you're encountering a group
21  of five individuals, it is easier to guide the use
22  of chemical spray towards a single individual. If
23  you have 1,000 individuals, and you're not able to
24  identify because the crowd is surrounding, you're

1   not able to identify who the violent individuals
2   are, but you know that violence is continually
3   occurring in their groups within that crowd, our
4   goal is to not affect, if we can help it, everyone
5   else.
6          So our directives are designed to
7   provide that information. We want you to direct
8   it at individuals if you can identify who is
9   participating in the violence in a large group and
10  not the group in general if you can help it. But
11  the problem is, you know, depending on the size of
12  the group, that's not always -- that's not always
13  something that you can do.
14         So the use of CS specifically is
15  designed to be rolled towards a group that have
16  demonstrated violence and continued violence,
17  rolled towards that section of the group and
18  disperse the crowd if we can.
19         The use of OC is much more targeted.
20  So if we identify individuals that are violent or
21  unlawful and those individuals can be identified,
22  then OC is a little more targeted and we're able
23  to use that.
24  Q.      And looking at page 2 of 5 of directive

1   2.04, No. 5.
2   A.      Uh-huh.
3   Q.      It says here, "If exigent circumstances
4   exist, such as individuals creating a risk to
5   safety or a hazard, sworn personnel may use their
6   Division-issued chemical spray to disperse a
7   non-violent congregation of individuals who are
8   not complying with lawful commands."
9   A.      Correct.
10  Q.      Is that an accurate reading of the
11  policy at that time?
12  A.      Yes, it is.
13  Q.      Okay. And so given that -- I'll stop
14  sharing the exhibits here. And I will pull the
15  Matrix report back up, Exhibit 7. And going back
16  to page 21, were you aware of the recommendation
17  here in Pillar 2, Policy and Oversight, that is
18  referring to directive 2.04, that this directive
19  -- it's like the fourth line from the bottom in
20  that first paragraph under Pillar 2. "This
21  directive and the subsequent use of force
22  continuum, allow the use of a chemical agent on
23  non-violent or 'dead weight' protesters. Use of
24  force without an aggressive act is low threshold

1  for the use of chemical agents and contrary to
2  practices in many large agencies (e.g. Chicago and
3  New York as well as Cincinnati)."
4       Are you aware of that aspect of this
5  report?
6       MR. PHILLIPS: Objection.
7  A.   Yes.
8       MR. PHILLIPS: I think it's outside the
9  scope of this deposition. But you can answer.
10 A.   Yes. I'm actually -- I remember
11 reading this. I am aware of that. I'm not saying
12 that every single agency across the United States
13 agrees with us. But I can tell you other large
14 agencies do use chemical agents on nonviolent
15 protesters in certain circumstances. So most
16 agencies that use that have -- require a warning
17 like we do, minimum of I believe three times, to
18 ensure that those individuals have an opportunity
19 to leave the roadway or to comply with orders or
20 whatever they're being told.
21 Q.   Okay. And so with respect to planning,
22 was this aspect of -- was this aspect of the
23 Matrix report discussed by yourself with any
24 individuals, and that's with regard to any of the

1  dates that you were incident commander?
2  A.   I'm --
3  Q.   Or that you're --
4  A.   I do not believe that we discussed the
5  Matrix suggestions. We were operating consistent
6  with our already in operation policy at the time.
7  So I don't believe we discussed what the Matrix
8  suggestions were during the planning phase.
9  Q.   All right. And let's see. I'll stop
10 sharing.
11      And going back to that June 17th
12 directive, were there any written instructions
13 regarding that directive that were given to
14 officers that explained the new directive?
15 A.   I believe there was communication
16 division wide. I believe that there was some type
17 of written direction, but I don't remember if it
18 was in the form of potentially a PowerPoint at a
19 briefing or a verbal review of the change in
20 policy. But it was disseminated as quickly as
21 possible. But I believe there was at least a
22 division wide e-mail alerting division personnel.
23 Q.   And do you recall if you were the
24 incident commander for the June 21st protest? I

1  believe that was Father's Day.
2  A.   June 21st of 2020?
3  Q.   Yes.
4  A.   I don't recall. I'm sorry.
5  Q.   Okay. It was a Sunday. Okay. So
6  either way, do you recall after that directive
7  coming out, city leaders, certain city leaders
8  issuing statements that they believed that actions
9  of the officers were in violation of that new
10 directive?
11      MR. PHILLIPS: Objection. Outside the
12 scope of this deposition. She can go ahead.
13 A.   I don't recall specifically if I was
14 aware city leaders were advising us that they saw
15 behavior outside the scope of that. I do not
16 recall specifics.
17 Q.   Okay. Did you believe that after that
18 directive was put into place, were you aware of
19 any violations of that new directive?
20      MR. PHILLIPS: Objection. Outside the
21 scope of this deposition. You can go ahead and
22 answer.
23 A.   I don't recall any specific instances
24 of individuals that were accused of violating that

1  directive after it changed.
2  Q.   Okay. And for planning purposes, are
3  you aware of any additional steps that were taken
4  to ensure that officers followed that new
5  directive?
6  A.   Like I stated earlier, with the removal
7  of CS, that was something that I ensured occurred
8  to -- we briefed field forces for many days after
9  the change to ensure that everyone was aware that
10 we are -- we're clearly advising our personnel of
11 the change. Typically when changes occur to
12 policy in the division, we have an opportunity to
13 properly vet it, to communicate that to our
14 personnel to train them on the change, an
15 opportunity to provide them with the language so
16 that they can view it and acknowledge that they
17 understand the change. We did not have the
18 ability to do that. It was dictated and it
19 occurred basically very quickly and not consistent
20 with how we typically change policy and train
21 officers. So we made a point of ensuring that we
22 communicated that to the field forces in the
23 following operational periods after that date.
24 Q.   With regard to planning, did you feel

1 that you did not have an opportunity to properly
2 vet that change and to communicate it to your
3 personnel to train them on that change?
4 A.     I believe when you have 2,000 people
5 that you're responsible for that our current
6 processes are very effective.  We basically from
7 one day to the next changed a very -- a policy
8 that we'd used for years that the officers were
9 very familiar with.  So I would have much
10 preferred an opportunity to discuss, vet, and
11 ensure the language was something that everyone
12 was familiar with and that we had the opportunity
13 to train.  We did not have that luxury, so our
14 goal was to communicate repeatedly to personnel as
15 much as possible to ensure that that information
16 was given to them.
17 Q.     At any point in the planning of the
18 protest response, did you become aware that
19 officers did not fully understand the new policy?
20 A.     I don't recall if I became aware of
21 that.  I don't think -- I think the manner in
22 which the policy was quickly changed, that would
23 be something that I would want to guard against
24 and try to take every step I could to ensure that

1 everyone understood.  But, again, across multiple
2 operational periods a very -- a big change in a
3 policy like that to ensure that officers
4 understand the language and know how to react
5 differently than they had been trained prior, we
6 would want to have training and every opportunity
7 to instill that new policy in officers before they
8 were placed in an operational environment.
9 Q.     Once the new policy change went into
10 effect, would that have made the use of CS spray
11 under the old policy, would that have -- strike
12 that.  I don't want to confuse you here.
13       Once the new directive went into
14 effect, would that have made the use of CS spray
15 under the same circumstances of the old policy,
16 could that have resulted in an excessive use of
17 force?
18       MR. PHILLIPS:  Objection.  Outside the
19 scope of this deposition.  That really does not go
20 into either of those categories.
21       MR. WALTON:  Okay.  Well, I'll make it
22 fit because its purpose is to fit in.
23 BY MR. WALTON:
24 Q.     With regard to planning the response to

1 the protest -- all right.  Strike that.  Let's --
2 let's take a break.  I -- I need about 10 minutes.
3 A.     Okay.
4       MR. PHILLIPS:  Sure.
5       (A short recess is taken.)
6 BY MR. WALTON:
7 Q.     All right.  I want to go to -- still
8 discussing planning here, but did you -- did you
9 review any after action reports in the course of
10 your planning for future protests?
11 A.     Any after action related to this
12 summer, did I review any after actions?
13 Q.     Yes.  For purposes of planning your
14 response to future protests or are you aware of
15 the after action reports?
16 A.     I'm aware of the after action.  And I
17 would have reviewed them, not necessarily the
18 forms but potentially the individuals in the EOC
19 would have briefed me on the prior operational
20 period too.
21 Q.     Okay.  And did those after action
22 reports factor into your planning at all?
23 A.     Yes.  Every prior operational period,
24 that information was relevant to how we planned

1 for subsequent operational periods.
2 Q.     Okay.  And at some point did you become
3 aware that there was an issue with the body-worn
4 cameras?
5 A.     Yes.
6 Q.     Okay.  Do you recall at what point you
7 became aware of that?
8 A.     It was in the first few days I believe,
9 but I -- I don't know for sure exactly what day
10 and what operational period we became aware that
11 the problem with the body-worn cameras was an
12 issue.  We could not attach them to the outside of
13 the riot gear that officers had been issued.  The
14 riot gear was issued to officers and then later on
15 the body cameras became a piece of equipment.  So
16 they weren't designed for that and we became aware
17 of that.
18 Q.     And were any steps taken to correct
19 that issue for future protests?
20 A.     Yes.  Actually, when we became aware
21 that that was an issue, we had an -- at an
22 executive staff briefing or a meeting of executive
23 staff, we actually strategized about how to
24 resolve that issue as quickly as possible.  The

1  purchase of equipment is typically how we'd
2  respond to something like that.  But we needed to
3  respond more quickly, so we were looking at
4  opportunities to put something together
5  immediately, something where we had the resources
6  to put them on every officer if we could that was
7  issued a body camera that was actually wearing
8  riot gear.  So we looked at different
9  opportunities to do that so that we could make
10  that correction immediately.
11  Q.      Did you review any civilian complaints
12  or use of force reports in planning the protest
13  response?
14  A.      I can't recall if I reviewed specific
15  reports.
16  Q.      Okay.  Did you become aware of any
17  systematic problems?
18  A.      With what in particular?
19  Q.      With the police response to protesters?
20  A.      You mean the use of force or in
21  equipment?  What specifically --
22  Q.      With regard to your review of the after
23  action reports or any complaints or any evidence,
24  any video evidence, did you come across anything

1  that you felt was important to address in your
2  planning?
3  A.      Like I said, every operational period
4  we were trying to make adjustment from the
5  beginning until the very end.  Every operational
6  period there was minor or larger in adjustments to
7  make that operational period more successful.  So
8  we were constantly making adjustments and
9  responding to the things that we were seeing as
10  far as tactics, policy.  Everything that we were
11  doing was a constant evolution to improve our
12  response.
13  Q.      What adjustments do you recall any
14  incident commander or anyone in the Division of
15  Police making as a result of those reviews?
16  A.      Like I said, there were so many
17  adjustments, some very minute, some larger.  One
18  of the adjustments that occurred was the body
19  camera, body-worn camera adjustments, how to label
20  and identify officers in a field force.  This was
21  something that we -- this was identified by our
22  supervisors as well that they couldn't really in
23  the gear identify individuals and they needed
24  badge numbers displayed because those were covered

1  up.  So these are all adjustments we were making
2  with equipment as we moved through operational
3  periods.  Those types of things we were adjusting
4  to changes in policy that were handed down to us.
5  So we were making those adjustments as well.  We
6  were adjusting to the level of violence in the
7  crowds.
8          At some point we noticed that the
9  crowds during the daylight hours we learned were
10  mostly peaceful at some point in June.  And the
11  crowds at night became more violent, appeared to
12  evolve a little differently, and their tactics
13  were different at night.  So we responded to that
14  observation as well and made changes to how we
15  actually deployed personnel and responded.
16          One of the things that I personally
17  noticed was the night -- at night or in the
18  evenings, that group of individuals being more
19  violent were also attempting to take over
20  freeways.  That's not something we were typically
21  seeing during daylight hours.  So in the planning
22  phase we would respond by insuring that we
23  identify the freeways as critical infrastructure
24  and they needed to be defended because of the

1  potential for a loss of human life and to ensure
2  that those crowds if they moved towards the
3  freeway in an effort to take over a freeway area,
4  that we were deploying personnel in front of that
5  to ensure that we could turn those crowds if
6  possible.  That required a different use of
7  resources than we would use for other activities
8  that were occurring during the day.  Those are
9  examples of some of the changes that we made
10  during the planning phase.
11  Q.      Okay.  Do you have any other examples
12  of changes that you made?
13  A.      I can't think of --
14  Q.      Does it matter --
15  A.      If you have a specific question, I can
16  try to respond to it.
17  Q.      Okay.  So with regard to the night
18  crowds, how else were their tactics different?
19  A.      So those groups, the crowds at night
20  tended to be more violent and also more mobile.
21  Where the daytime crowds tended to spend most of
22  their time on or around the statehouse grounds.
23  If they marched as a large group, they would
24  march typically around a block area.  In fact, one

1  day I -- or one or two days I actually marched
2  with them, and they would go around the block, so
3  we were able to better contain them later on in
4  those subsequent weeks because they remained in a
5  more static location.
6      The groups at night had a tendency to
7  be more violent, they were very well equipped,
8  they had spotters that we weren't aware of right
9  away that were identifying what resources we had
10  and communicating with them our movements. They
11  were -- they would divide our resources more
12  effectively. In those later days in June they
13  would divide our resources at night more
14  effectively knowing that we were stretching field
15  forces across the city and in other locations. So
16  we would get threats against Polaris and Easton.
17  We would be made aware of threats that the crowds
18  were going to that location, or there were people
19  on site, and we would have to divert resources
20  from downtown and send them to that location. So
21  an entire field force to defend an aggressive
22  crowd at Easton and protect the businesses and
23  protect the citizens in that location required
24  that we load up gear and people and equipment and

1  drive to that location. So they were better at
2  dividing our resources and they were also more
3  interested in remaining mobile. So the planning
4  phase would require us to be more prepared to
5  respond to a mobile field force -- with mobile
6  field forces to crowd movement. The freeways
7  again were especially critical for us. And so
8  defending the freeways requires a tremendous
9  amount of resources, and that was something that
10  we dealt with mostly at night.
11  Q.      And you mentioned several times there
12  that the night crowds were more violent. Do you
13  have examples of how they were violent?
14  A.      So at some point the daylight crowds,
15  and this was actually after -- for the most part
16  after I started talking to the individuals in the
17  crowd, so that would be after maybe the first --
18  first of June, in several days after that as
19  we saw the level of violence in the crowd start to
20  diminish slightly, we didn't see constant violence
21  against the police, we were able to go out there
22  without a large group of individuals protecting us
23  and talk to them. So what we saw was, you know, a
24  gradual stepdown in the level of violence during

1  the daylight crowds. At night, those seemed to
2  continue. So those individuals at night seemed to
3  be consistently more violent in throwing rocks,
4  bottles, frozen water bottles, shooting commercial
5  grade fireworks at officers, exhibiting violence
6  on a more consistent basis, attempting to engage
7  officers and get a response by officers. So that
8  was just something that we observed over multiple
9  operational periods, kind of a difference at some
10  point between the crowds. Although there were
11  individuals identified that were there for both
12  the daylight and the nighttime protests, and
13  groups that were there, it was a general -- it was
14  a general stepdown of violence related to the
15  daylight operational periods from the protesters.
16  Q.      And over the course of the protest, did
17  you begin to review video for planning purposes
18  and responding to future protests?
19  A.      I don't think I reviewed any video that
20  I can recall for planning purposes. I may have,
21  but generally for planning purposes, I wasn't
22  reviewing anything like body cam video. I may
23  have reviewed some video related to, you know,
24  crowd movements from the downlink which was really

1  what I looked at mostly, which is the helicopter
2  down -- kind of gives us a broad picture of crowd
3  movement. I was more interested in crowd
4  movements, the size of the crowds and that
5  information for planning purposes as opposed to
6  individual videos.
7  Q.      And you mentioned before that you met
8  with protesters and spoke to them and made
9  improvements based on that. If you have answered
10  it already, I apologize. But do you recall any
11  specific feedback that officers were acting
12  outside of policy or using force excessively or
13  any other complaints from citizens?
14      MR. PHILLIPS: Objection. Outside the
15  scope. You can answer.
16  A.      So --
17      MR. WALTON: And -- to -- hold on, hold
18  on. Wes, you know, again, it's -- we're trying --
19  we're trying to determine here, you know, how to
20  get the response from, you know, the division as
21  they make changes in policy and changes in
22  planning. And so some of these questions, I mean,
23  they're just kind of necessary to get to the
24  planning question. It's -- you know, it's not

1 meant to fish for information, it's meant to try
2 to stay within the scope. So I just want to
3 clarify there.
4     MR. PHILLIPS: And that's fine. I
5 mean, my objection is noted. But she can answer
6 the question.
7     MR. WALTON: Okay.
8 A.    Could you repeat the question now,
9 please.
10 Q.    Yep. For sure.
11     You mentioned that you met with
12 protesters and spoke to them about, you know,
13 their concerns, you made improvements based on
14 that feedback. Do you recall any feedback
15 specifically regarding any officers that were
16 acting outside of policy or any allegations of
17 police misconduct?
18 A.    I --
19     MR. PHILLIPS: Objection. You can go
20 ahead and answer.
21 A.    Okay. Thank you.
22     I'm sure that when I'm having
23 conversations at Broad and High with several
24 hundred people that there's people telling me

1 these things. One thing that I know is that the
2 protesters don't understand what our policy is.
3 In fact, they rarely understood their First
4 Amendment rights. So they didn't realize that
5 they could not act in an unlawful or violent
6 manner and still, you know, be able to peacefully
7 protest. So they did not understand their First
8 Amendment rights.
9     They certainly didn't understand what
10 our specific policy was. They had a lot of
11 concerns about our response, but I can't remember
12 anything specific. Those would be conveyed to me
13 and I would assure them that if there's something
14 that's outside of policy, that the Division will
15 investigate it, and to make sure that they provide
16 us with the specifics of that incident if that's
17 what was going on. But I wasn't able to respond
18 to those at Broad and High because, you know,
19 individuals would come up and say, well, this
20 officer did this, they -- that information, I
21 can't investigate it there. I'm not operating in
22 a capacity to do that.
23     But I did refer individuals if they had
24 concerns to internal affairs, which is the

1 mechanism for investigation with the Division of
2 Police. I don't remember who I referred and I
3 don't remember what specific circumstances they
4 were discussing. But generally their concerns
5 were met with an acknowledgment that we were -- we
6 were out there and operating within policy to the
7 best of my knowledge, and if they had concerns,
8 there was a mechanism for them to have those
9 concerns addressed.
10 Q.    And speaking of IAB. You spent some
11 time in IAB, correct?
12 A.    Yes, I did.
13 Q.    Okay. How long were you in IAB and
14 what was your role?
15 A.    I was the commander of internal affairs
16 for a period of almost three years, between two
17 and a half and three years.
18 Q.    And I believe earlier you stated that
19 your training and experience helps guide your role
20 as an incident commander, correct?
21 A.    Correct.
22 Q.    And based on that experience in IAB,
23 would you agree that there are often allegations
24 of excessive force made by citizens against

1 officers?
2     MR. PHILLIPS: Objection. Outside the
3 scope of this deposition.
4     MR. WALTON: Your objection is noted.
5     THE WITNESS: Should I answer?
6     MR. PHILLIPS: You can go ahead and
7 answer. But it's outside the scope of this
8 deposition.
9 A.    So I don't necessarily agree with the
10 characterization that this often occurs. When we
11 consider the totality of the number of contacts
12 officers have and the amount of complaints that we
13 have on a yearly basis related to use of force,
14 it's minimal. So given the number of contacts
15 officers have and the amount of complaints of
16 excessive use of force that come in to internal
17 affairs and are investigated, that's actually a
18 very small number. So I am aware that the
19 Division of Police has people that believe that
20 officers responded inappropriately or used
21 excessive force, we investigated those thoroughly
22 at internal affairs, and I think the numbers
23 related to how many that was on a yearly basis are
24 available.

1  Q.      Okay.  Would you agree that those
2  allegations, they occur -- strike that.
3          Would you agree that those allegations
4  are received from citizens more often than from
5  officers?
6          MR. PHILLIPS:  Objection.  Outside the
7  scope of this deposition.  But you can answer.
8  BY MR. WALTON:
9  Q.      And we're still talking about your
10 experience and how that frames your response to --
11 or your planning for the protest response.
12 A.      Okay.  So you're asking if the internal
13 affairs receives more complaints of excessive
14 force from citizens or from officers within the
15 Division?
16 Q.      Correct.
17 A.      I would say it is more typical to
18 receive a complaint of excessive force from a
19 citizen who doesn't necessarily understand whether
20 the force used was excessive or not.  So it would
21 -- typically, internal affairs would investigate
22 any citizen complaint.  However, if an officer
23 observed another officer and believed that officer
24 had excessive force, that would not be a citizen

1  I'm not aware of as far as a problem in a planning
2  process.
3  Q.      Okay.  And so just to generalize the
4  misconduct more, let's not focus on excessive
5  force but allegations of complaints of officers
6  using rude or discourteous conduct.  Would you say
7  that those were frequent complaints from citizens
8  against officers during your time in IAB?
9          MR. PHILLIPS:  Objection.  Outside of
10 the scope.  You can answer.
11 A.      I believe rudeness or discourteous
12 behavior is the most common complaint internal
13 affairs regularly gets.  I think that's been
14 consistent not just during my tenure but the
15 tenure of other commanders in internal affairs.
16 That is one of the most common complaints that
17 comes into internal affairs that requires
18 investigation.
19 Q.      In the course of planning, were the
20 complaints being raised against officers by
21 citizens discussed or factored into the planning
22 of future protest response?
23         MR. PHILLIPS:  Objection.  You can
24 answer.

1  complaint and would not necessarily be
2  investigated by internal affairs.  So I couldn't
3  speak to those particular numbers because that
4  would become an administrative investigation that
5  could be handled by the chain of command if an
6  officer brought that to the notice of a
7  supervisor.
8  Q.      Okay.  And weren't you aware at the
9  time you were helping plan this protest response
10 that it is extremely rare for Columbus Division of
11 Police officers to report any other officer using
12 excessive force?
13         MR. PHILLIPS:  Objection.  You can
14 answer.
15 A.      I don't think I considered that in the
16 planning process, that it is rare for officers to
17 report other officers' uses of force.  I don't
18 think it necessarily was relevant to the planning
19 process.
20 Q.      And why was it not relevant?
21 A.      The number of times officers don't
22 report almost a negative, it can't be quantified
23 anyways, so I'm not sure I'm aware of a problem.
24 And I wouldn't necessarily consider something that

1  A.      Okay.  I'm not sure I know what you're
2  trying to ask.  Did I consider potential
3  complaints or complaints that are coming in at the
4  time as we're planning the next operational
5  period?
6  Q.      Correct.
7  A.      So I wasn't aware of a huge number of
8  complaints coming in at the time to internal
9  affairs.  We would anticipate with a response of
10 this magnitude that there would be a slight uptick
11 in internal affairs complaints from citizens.  But
12 I'm not aware of any enormous numbers outside the
13 norm.  And so I didn't necessarily -- because I'm
14 not aware of a real problem or a significant issue
15 because of complaints coming in that haven't been
16 investigated, I'm not necessarily making any
17 significant adjustments for planning.  My planning
18 is more focused on mission and policy and
19 resources and deployment.
20 Q.      Okay.  And for planning purposes, based
21 on your experience in IAB, you're also aware of
22 credible allegations of racial profiling by
23 officers, correct?
24         MR. PHILLIPS:  Objection.  You can

1 answer.
2 A.     So if the question is have there ever
3 been credible allegations during my career or just
4 my tenure in IAB?
5 Q.     No. I'm saying that you are aware of
6 officers specifically in Zone 5, seventh precinct,
7 who as a result of an investigation were found to
8 have racially profiled against a black citizen?
9          MR. PHILLIPS: Objection. Outside the
10 scope. But none of these outside
11 the scope answers are binding on the City of
12 Columbus. You can go ahead.
13          MR. WALTON: And to clarify, we're
14 talking about the -- your planning based on your
15 experience with the Columbus Division of Police.
16 And we're also talking about citizen complaints
17 that were coming in in real-time.
18 BY MR. WALTON:
19 Q.     So again my question is that you were
20 aware of officers specifically in Zone 5, seventh
21 precinct who as a result of an investigation were
22 found to have racially profiled a black citizen?
23          MR. PHILLIPS: Objection. Outside the
24 scope. You can go ahead and answer.

1 A.     So I'm struggling to answer that
2 relative to planning purposes, because I -- I
3 don't think I considered any specific
4 investigations that occurred three years prior or
5 whatever to when my actual tenure in internal
6 affairs was. I don't think I considered any
7 specific investigations as I'm planning for a
8 large scale division response to the events that
9 occurred in 2020. I struggle to answer exactly
10 how you want me to respond to how I -- how I
11 considered that during the planning phase.
12 Q.     But you were aware of the investigation
13 that I'm referring to, correct?
14 A.     Yes, I am aware of it.
15 Q.     Okay. And the investigator in that
16 case found that there were two officers that were
17 stopping black citizens and he believed that it
18 was racial profiling, correct?
19          MR. PHILLIPS: Objection. Outside the
20 scope. You can answer it.
21 A.     I believe that those allegations in
22 that particular case were sustained by the
23 investigator, yes.
24 Q.     Okay. And I believe that you've

1 testified previously that you -- that you agreed
2 with that investigator's findings?
3 A.     Yes, I did.
4          MR. PHILLIPS: Objection. Objection.
5 Outside the scope. You can answer.
6 Q.     So given your knowledge of racial
7 profiling being present within the Columbus
8 Division of Police, did that factor into your
9 planning in the protesters' response, specifically
10 as protesters were demanding racial justice?
11 A.     So a specific allegation that was
12 sustained against two officers when I was
13 responsible for well over 1,000 in deployment, it
14 would not have weighed into my planning for a
15 large scale event. So I -- because of my
16 knowledge of a specific instance and an
17 investigation involving two officers, it didn't
18 weigh into my overall planning for that event.
19 Q.     Okay. And that investigation, the
20 investigator -- and I believe you may have as well
21 took -- took your findings to Chief Jacobs because
22 you believed that it was more than just those two
23 officers, correct?
24          MR. PHILLIPS: Objection. Outside the

1 scope. You can answer.
2 A.     Yes. I was concerned that it may
3 involve additional officers and that was conveyed
4 to Chief Jacobs at the time.
5 Q.     Okay. All right. But that experience
6 did not factor into your planning for the protest
7 here, correct?
8 A.     Not something involving two specific
9 officers that occurred years before.
10 Q.     And I don't want to harp on it. But
11 you did discuss the fact that you believed that it
12 involved more officers, correct?
13 A.     Yes. But I didn't say how many. And I
14 don't think this was a pervasive issue across the
15 Division.
16 Q.     Do you recall about how many officers
17 may have been implicated?
18 A.     So there were only two that received
19 sustained allegations in that. So speculating as
20 to additional officers that were not investigated,
21 I don't feel comfortable doing that. I conveyed
22 that it might be additional officers on that
23 particular precinct at the time, but we did not
24 investigate those additional officers.

1  Q.      And why did you not investigate those
2  officers?
3  A.      Because Chief Jacobs indicated that we
4  didn't have evidence or a complainant to validate
5  any evidence against those additional officers
6  that would warrant an investigation.  It was
7  merely a perception that there may be additional
8  misconduct at the time.
9  Q.      Okay.  And you disagreed with Chief
10  Jacobs' decision there because you felt that there
11  was evidence that needed to be investigated,
12  correct?
13          MR. PHILLIPS:  Objection.  Outside the
14  scope.  You can answer.
15  A.      Yes, I disagreed.
16  Q.      Okay.  All right.  So I had a question
17  regarding the Fraternal Order of Police with
18  regard to your planning.  Did you consult with the
19  FOP with regard to any tactics or policies that
20  you engaged in in the course of the protest
21  response?
22  A.      I don't recall ever consulting with
23  them about tactics or anything like that.  I don't
24  recall doing that.  I would not need to consult

1  with the FOP regarding tactics typically.
2  Q.      All right.  So there was no requirement
3  to discuss any of that with them, correct?
4  A.      No.
5  Q.      Okay.  And did you ever receive any
6  directive from Chief Quinlan or anyone else to
7  review any of the Baker & Hostetler investigation
8  as you planned a response for future protests
9  going forward?
10          MR. PHILLIPS:  Objection, but you can
11  answer.
12  A.      So the question so I'm clear is did I
13  review anything at Baker & Hostetler prior to
14  planning for an operational period?
15  Q.      Correct.
16  A.      I don't think Baker & Hostetler was
17  engaged at that point.  I may be wrong, but I
18  would not have -- I would not have reviewed
19  something that an outside firm was looking at,
20  even if they had been at that time, to perform the
21  planning operations for the Division.
22  Q.      Has the Columbus Division of Police had
23  any planning meetings or discussions regarding
24  future protest response, responses since that May,

1  June 2020 period?
2  A.      Yes.
3  Q.      Do you recall the general time frame of
4  when those discussions occurred?
5  A.      Prior to the election, we were
6  preparing for election week.  And so we had
7  several planning meetings.  I can't recall exactly
8  when and how.  But we were discussing the upcoming
9  election and making preparations to ensure that we
10  had appropriate staffing and an adequate response.
11  Q.      I lost my audio.  Can you hear me?
12  A.      Yes.
13  Q.      Okay.  I think I'm good now.
14          Can you hear me?
15  A.      Yes.
16  Q.      Okay.  All right.  I have real-time
17  here so I know what you said.
18          And so at any point -- at any point
19  since the Baker & Hostetler investigation began,
20  have you reviewed any of that information with the
21  purpose of planning future protests?
22  A.      I don't think I've used any of the
23  Baker & Hostetler investigations for the purpose
24  of planning.  But I haven't -- I've been involved

1  peripherally in the planning from a deputy chief
2  perspective.  But I have -- my personnel were not
3  involved in the actual response during the
4  election for the most part.  So I was not the lead
5  person planning, that would be Deputy Chief Woods.
6  Q.      Are you aware of any directives for you
7  or any other deputy chiefs to review any of the
8  Baker & Hostetler investigation and consider it
9  for future planning purposes?
10  A.      So I don't recall that occurring, if
11  anyone advised us to review actual investigations
12  of specific incidents investigated by Baker &
13  Hostetler for the purposes of planning future
14  response.  I don't think so, but I don't recall
15  that ever happening since this summer.
16  Q.      Okay.  And again with regard to the
17  FOP, were there any discussions with regard to the
18  type of equipment that officers were provided
19  during the protest?
20          MR. PHILLIPS:  Objection.  Outside the
21  scope.  You can answer.
22  Q.      Planning --
23  A.      I'm sure there was discussions with the
24  FOP regarding equipment.  One of the things that

1 the union does regularly is ensure that officers
2 have the equipment that they need, that they're --
3 the equipment is something that provides for the
4 safety of the officers and the safety of the
5 public.
6         Equipment is something the union gets
7 involved with on a regular basis, and there are
8 certain pieces of equipment that are contractual
9 based on a clothing distribution on a yearly
10 basis. So I -- I would believe that it's
11 possible. I don't recall any specific
12 circumstances where the union was discussing --
13 excuse me, discussing equipment and making any
14 specific requests.
15         But we did have equipment issues
16 relative to how we were placing the body cameras
17 on the outside of things. And so it wouldn't
18 surprise me if the union was requesting additional
19 equipment for officers to ensure that that
20 equipment would be properly affixed to the riot
21 equipment as well. So they do get involved in
22 that, but I cannot recall any specific
23 circumstances.
24 Q.        And do you know who would actually have

1 those conversations with the FOP if they did
2 occur?
3 A.        If they did occur --
4         MR. PHILLIPS: Objection. Objection,
5 outside the scope. You can answer.
6 A.        If those did occur, they could contact
7 the chief or a deputy chief, that would be normal.
8 The union will contact the chief or the deputy
9 chiefs directly when they believe an issue has
10 arisen relative to the safety on of their
11 membership. So that's a very likely way that it
12 would have occurred if it happened.
13 Q.        But you're not aware of any of those
14 conversations happening with respect to the
15 handling or planning of the protest response?
16 A.        I can't recall any.
17 Q.        And generally after major actions or
18 large events such as this related to crowd control
19 and police reactions of this magnitude, how does
20 the department evaluate those events or actions
21 for purposes of planning and training related to
22 planning?
23 A.        So it's a variety of ways. It may be
24 something where we have a debrief in person, those

1 are very helpful so that individuals can share
2 some of the suggestions they have to do a better
3 job next time or what some of the things, tactics
4 that they saw that we need to be aware of. But
5 most often that information is shared in e-mails
6 or after action reports. That is part of the ICS.
7 I think that's a specific form in the ICS, and I
8 think it might be a 2-14, but I'm not 100 percent
9 sure. That form is filled out and/or it's sent
10 via e-mail to the emergency operations center and
11 the emergency management unit personnel actually
12 gather all that information and create something
13 that would be available for after action review.
14 Q.        And you mentioned that you met prior to
15 the election regarding protest planning, correct?
16 A.        Yes.
17 Q.        Was that just one meeting?
18 A.        I can't recall exactly how many. But I
19 believe it happened over several days where it
20 would -- we have executive staff meetings multiple
21 times a week, whenever necessary. And so that was
22 the forum in which we had those discussions
23 between the chief and the deputy chiefs about how
24 we were planning a response and what we were going

1 to utilize personnel for, whether or not we had
2 enough staffing to support it depending on how
3 many days it lasted, if it was just a single day
4 election response or if it was necessary that we
5 respond over several days, if protests were
6 scheduled or it was just something to make sure
7 the public and the poll locations were properly
8 protected. But it occurred over several different
9 days at executive staff type meetings and it was
10 just a briefing on some of the things that we were
11 looking at.
12 Q.        Okay. And I'm going to actually go
13 ahead and switch topics now. And this topic will
14 not take as long, so we'll see if we can get out
15 of here.
16         But I'll go ahead and just restate this
17 topic. It is the category such as SWAT law
18 enforcement personnel, whether employed by CDP or
19 mutual aid entities cooperating with CDP at the
20 protest of late May and early June 2020. The
21 circumstances for deploying each category, the
22 individuals with the authority to deploy and/or
23 direct the personnel in each category and/or the
24 street, intersection or specific location where

1  each category was deployed.  And again you're
2  listed for the other operational periods besides
3  May 28th and the May 30th daytime shift.
4      And --
5      MR. PHILLIPS:  And, Sean, just to be
6  clear, she is not designated to speak on behalf of
7  SWAT.
8      MR. WALTON:  Yep.  I appreciate that.
9  BY MR. WALTON:
10 Q.      Okay.      So you're speaking to the categories of
11 personnel.  So who made the decision as to what
12 categories of law enforcement officers were
13 present at the protest?
14 A.      So it wasn't a single person in most
15 cases that decided this is what we're going to
16 need, as this was -- as we were building up our
17 resources, we tend to plan for -- try to get as
18 many resources as possible.  It would be nice if
19 we didn't need those resources, but getting them
20 to the location and identifying those resources
21 was part of something that we were attempting to
22 do over a course of the first few days.
23      For any large scale protest, we try to
24 use the mounted unit, so that is a normal course

1  of business for us.  Most of what we used for the
2  protests from the Division of Police were units or
3  resources that we use for every large scale
4  protest, it's not unusual for us to make sure that
5  they're available and have them there.  Whether we
6  need them or not is dictated by the environment
7  and the things that are occurring.
8      The things that we did not normally use
9  during the course of business for regular protest
10 response or large scale events would be mutual aid
11 to the extent that we used it for this particular
12 incident or ongoing incident.  So mutual aid is
13 something that we utilize when our resources are
14 getting stretched too thin or we are exhausting
15 our resources and -- and this was one of those
16 cases.  That means that we had mutual aid for a
17 variety of surrounding jurisdictions, OSP,
18 Franklin County.  And at one point when a
19 declaration of emergency was declared by the
20 Mayor, we had the National Guard come.  And I
21 think that occurred probably by Sunday or Monday
22 where we had the National Guard engaged by the
23 first weekend that this was occurring.  So it's
24 not a single decision.  This is something that

1  evolves over time.  But there are certain
2  resources that we use with almost every large
3  scale protest response hoping that we don't
4  necessarily need all those resources we -- because
5  it takes so long to get those resources on site
6  and available and ready to be deployed, we would
7  rather have those resources and not use them.
8  Q.      And what categories of law enforcement
9  officers were present?
10 A.      Okay.  Are you asking who we had from
11 what jurisdictions, how many people we had as
12 resources or rank or --
13 Q.      It's a mix of everything.  I mean,
14 we're talking about, you know, SWAT, mounted units
15 and so on, but then also, you know, outside
16 jurisdictions.  So all of the officers that were
17 present, those categories of officers.
18      MR. PHILLIPS:  And, Sean, I've got to
19 repeat myself.  She is not designated to speak on
20 behalf of the deployment of SWAT, so --
21      MR. WALTON:  Right.  She's designated
22 to speak to the categories of -- of, you know, who
23 was actually present and the circumstances for
24 deploying each category.  So I guess are you

1  saying that she cannot give the circumstances for
2  why certain people were deployed?  Just that
3  general answer?
4      MR. PHILLIPS:  No.  So the question --
5  specifically she's designated to talk about the
6  deployment of everyone except SWAT.  And Paul Ohl
7  is designated to talk about the deployment of
8  SWAT.
9      MR. WALTON:  Okay.  And that -- I'll
10 strike that question.
11 BY MR. WALTON:
12 Q.      More specifically, aside from SWAT,
13 could you just identify the circumstances that
14 would lead to deploying the different categories
15 of CDP officers?
16 A.      So our goal was to get those resources
17 available.  So I can't -- I don't have the exact
18 list of outside jurisdictions that we utilized for
19 mutual aid.  And that is probably somewhere in the
20 emergency operations center documents in the IAP
21 potentially or the after action to list those.  I
22 don't know exactly where those are.  So our goal
23 was to get -- marshal all of our internal
24 resources that we had available.  In the first day

1  to two days, we didn't really know how much we
2  would need. So we had -- we went to a Phase 2
3  mobilization I believe on Friday, which was the
4  29th. And then a Phase 3 mobilization over the
5  weekend to bring in those additional resources.
6  So we were using at some point all the resources
7  the Division had available, and we were still
8  exhausting those resources, so we used mutual aid
9  at that point. All of the resources that we had
10  available that could respond were responding,
11  whether or not we deployed them or not was based
12  on individual circumstances and operational
13  periods for that time. But we used as many
14  resources as the Division has available and we
15  continued to use those over a course of weeks.
16  Q.     And was there any effort to deploy
17  certain forces in certain areas of the city?
18  A.     Absolutely. A strategic deployment of
19  resources is very important. One of the resources
20  that I strategically deployed on a regular basis
21  was the bike officers. The bike officers are
22  speciality trained in additional response. They
23  receive yearly training since 2015 I believe twice
24  a year. They get BRRT, which is Bicycle Rapid

1  Response Team training, because they handle --
2  they are a lot of times our frontline for our
3  handling large crowds. They have a certain degree
4  of mobility, so deployment of them is more
5  efficient and effective in a lot of cases where we
6  need that degree of mobility. So, yes, I was
7  trying to be as strategic as possible in a
8  deployment of resources.
9       Mounted unit is another example of a
10  resource that we had available that we attempted
11  to deploy strategically.
12       Traffic, our traffic control unit,
13  which utilized a lot of outside jurisdictions on
14  mutual aid is, another example of the strategic
15  deployment of personnel. They are specially
16  trained to handle traffic enforcement, create
17  bubbles to shut down roadways rapidly. And they
18  were able to very effectively detour large crowds
19  away from the freeway. That's something that
20  officers on foot would not have had the ability to
21  effectively do. So, yes, we had -- our different
22  units were used very strategically during the
23  course of the unrest.
24  Q.     Were there any preexisting agreements

1  with agencies providing mutual aid about when they
2  would come in and under what circumstances?
3  A.     So we have mutual aid agreements. I --
4  I can't tell you the list of agencies. That's
5  available, I'm sure, through a public record. But
6  we have preexisting agreements with our
7  surrounding agencies for mutual aid. And that is
8  something that we have had for many years and we
9  will -- we will respond to assist them just like
10  they would respond to assist us when we need
11  assistance.
12  Q.     Okay. And if they are responding to
13  assist you, would that make the Division of Police
14  be I guess the highest up in the chain of command
15  there? Like would they be under your direction?
16  A.     So under mutual aid agreements, I am
17  not their immediate supervisor. But we are able
18  to deploy them to provide assistance under their
19  supervision. So we identify ways where we could
20  use mutual aid agreements and individuals from
21  outside jurisdictions. We identify how we could
22  effectively use them and we deploy those
23  strategically. And one of the most common cases
24  we used during the summer was actually allowing

1  mutual aid to assist our traffic control units.
2  They worked together regularly for things like
3  motorcades and stuff like that. So they would be
4  pulled in and utilized for traffic control, that
5  is something where they are shutting down an off
6  ramp or something like that where it's a strategic
7  deployment of that personnel. They're not
8  deployed inside a field force within the Division
9  of Police, but we're using them strategically in a
10  manner that is consistent with how we've used them
11  in the past and also a manner consistent with what
12  their experience level is. So that is how we
13  consider how to deploy individuals that we are
14  utilizing for mutual aid.
15  Q.     And outside of traffic control, in what
16  other ways did mutual aid agencies work in tandem
17  with Division of Police officers?
18  A.     So we utilized the -- a really good
19  example is how we used The Highway Patrol because
20  that area is, you know -- our jurisdictions are
21  right there and they overlap in that area right
22  there. And so utilizing them for areas around the
23  statehouse, we divided the city into sectors. And
24  because they were -- because the protesters were

1 dividing our resources, we divided the city into
2 sectors and we gave field forces areas of
3 responsibility. That made us more effective in
4 our deployment of personnel and it also gave --
5 you know, a sector of responsibility was much
6 easier for us to manage. So what we decided to do
7 since we didn't have the resources to cover the
8 entire area where our personnel were dispersed, we
9 gave an entire sector close to this -- including
10 the statehouse area to the Highway Patrol. And
11 they had a field force of about 70, potentially 80
12 officers that they assisted in mutual aid, and
13 that sector was their area of responsibility.
14 They had a supervisor inside the EOC, and we were
15 able to monitor what was going on in that sector
16 visually from a downlink. And so if -- if we had
17 a large group over there that had become violent,
18 they were able to respond to that. That was an
19 effective use of mutual aid and staffing for a
20 large group of people. What we didn't typically
21 do was we didn't integrate them into a field force
22 of our officers. While we all receive a baseline
23 of training in how to respond to these things, we
24 want to avoid doing that because response is

1 better if you're working with people from your own
2 agency. So we tried to keep those agencies not --
3 separate unless we gave an agency like OSP an
4 entire sector. We did not do that with the other
5 small jurisdictions, they didn't have the manpower
6 to support something like that. But they did
7 support us very effectively in traffic control on
8 the outer perimeter of downtown.
9 Q.       And so in that scenario, the OSP
10 officers had a supervisor in EOC?
11 A.       Yes. They had a supervisor in the EOC
12 and they were able to communicate with the
13 incident commander directly through their
14 supervisor. You know, I think we have some radio
15 channels in common, and so we had dispatchers also
16 in the EOC, so communication between OSP and CPD
17 was pretty effective. And once we had sectors
18 designated and individual field forces in charge
19 of that sector security, that was a much more
20 efficient way of deploying personnel.
21 Q.       And just to be clear, the supervisor in
22 the EOC was an OSP supervisor, not a CDP
23 supervisor, correct?
24 A.       Correct.

1 Q.       And in situations where nonCDP officers
2 were working and, you know, for example had a
3 sector like you just said, what rules of
4 engagement were spelled out for those nonCDP
5 officers?
6 A.       So typically we -- so are you talking
7 about the potentially OSP?
8 Q.       Correct. Yep.
9 A.       So we were attempting -- I mean, we
10 were trying to convey what our rules of engagement
11 were for that particular operational period, what
12 our goals were as well, what our mission was, and
13 then we would convey that directly to OSP. We
14 were trying to remain consistent across the board
15 and on the same page. I thought we were very
16 effective in doing that because of our daily
17 communication across operational periods with a
18 supervisor for them inside of the EOC. Our
19 officers if they are in contact with any other
20 agency or the National Guard, our officers are
21 required to adhere to all their rules, policies
22 and directives. So that other individual isn't
23 their supervisor, we typically don't deploy them
24 closely together unless it's a situation where

1 they are guarding a location, a static location,
2 and they're just providing security for that
3 location. So one of the things that occurred
4 regularly during this was threats against
5 infrastructure, threats against other locations,
6 threats against police headquarters and threats
7 against city hall. We used the National Guard to
8 guard those locations so that we could deploy our
9 field forces in their entirety to protest response
10 and crowd control. Those static locations --
11 unless they were being physically encroached upon
12 by a large crowd, those static locations were
13 better handled by individuals and equipment from
14 the National Guard or from some of our mutual aid
15 partners that had the ability to do that.
16 Q.       Okay. And based on your understanding
17 of CDP policies, the mutual aid agreements per CDP
18 policies states the senior police officer who was
19 in charge of the political subdivision which
20 requested such assistance shall have full charge
21 and authority over any assisting equipment and
22 personnel responding to such request. So is that
23 inconsistent with your understanding?
24 A.       No. Actually, that's consistent. But

1  when put into practice, we have direct
2  communication with their supervisors and so we're
3  coordinating our efforts together. While I'm the
4  incident commander over the entire event and I
5  have the ability to do those things, we recognize
6  that their policies and procedures and some of
7  those smaller policies that they deal with may not
8  be exactly the same as ours, so that communication
9  is critical. Where I can deploy those individuals
10  and say, okay, I want you -- as OSP, I want OSP to
11  handle this sector, I am making those decisions at
12  that level. However, their supervisors are part
13  of that field force and they are handling things
14  consistent with our goals and mission as the
15  Division of Police, but that's communicated and we
16  continue to communicate those objectives to that
17  group. I am not -- I am not on site to supervise
18  them and I cannot hold them directly to my
19  policies and procedures. But I am directing where
20  we deploy those individuals and the mission and
21  rules of engagement with which we are operating.
22  Q.    Was there any concern that there may
23  have been discrepancies in policy like you
24  mentioned that resulted in a violation of CDP

1  policy?
2  A.    I'm not aware of any specific instances
3  that occurred. But as an incident commander,
4  you're always aware that when you bring in mutual
5  aid there -- some of their policies may not be the
6  same as ours. So you're always aware of those
7  factors and you try to deploy them in a manner
8  that would not create issue with those -- any
9  minor discrepancies in policies between
10  jurisdictions.
11      MR. WALTON: I need about a 10-minute
12  break, maybe 2:00, and we'll see if I can finish
13  up.
14      MR. PHILLIPS: Great.
15      THE WITNESS: Okay.
16      (A short recess is taken.)
17  BY MR. WALTON:
18  Q.    All right. Chief Knight, going back to
19  the previous topic about mutual aid. For example,
20  if there's a Clinton Township officer and they're
21  providing mutual aid downtown and they start
22  firing into a crowd, the Columbus Police have the
23  ability to stop them, correct? Because they --
24  because of the policy that states that the senior

1  police officer who's in charge of that political
2  subdivision has full charge and authority?
3  A.    Yes.
4  Q.    I have no further questions.
5      MR. PHILLIPS: All right. She will
6  read.
7      (Signature not waived.)
8      - - - - -
9      Thereupon, the foregoing proceedings
10      concluded at 2:01 p.m.
11      - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

1  State of Ohio     :     C E R T I F I C A T E
    County of Franklin: SS
2
      I, Stacy M. Upp, a Notary Public in and for the
3  State of Ohio, certify that Jennifer Knight was by
    me duly sworn to testify to the whole truth in the
4  cause aforesaid; testimony then given was reduced
    to stenotype in the presence of said witness,
5  afterwards transcribed by me; the foregoing is a
    true record of the testimony so given; and this
6  deposition was taken at the time and place
    specified on the title page.
7
      Pursuant to Rule 30(e) of the Federal Rules of
8  Civil Procedure, the witness and/or the parties
    have not waived review of the deposition
9  transcript.
10    I certify I am not a relative, employee,
    attorney or counsel of any of the parties hereto,
11  and further I am not a relative or employee of any
    attorney or counsel employed by the parties hereto,
12  or financially interested in the action.
13    IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my seal of office at Columbus, Ohio, on
14  February 15, 2021.
15
16
17
18
19
20
21  Stacy M. Upp, Notary Public - State of Ohio
    My commission expires August 6, 2021.
22
23
24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line      Correction or Change      Reason Code

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

I, Jennifer Knight, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.
Date_____Signature_____
The witness has failed to sign the deposition
within the time allowed.
Date_____Signature_____

Ref: SU301366JK  S-SU P-BW

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

| Page/Line | Correction or Change | Reason Code |
|-----------|---------------------|-------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

I, Jennifer Knight, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date _2/16/2021_ Signature _Jennifer J Knight_

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU301366JK  S-SU P-BW

**Exhibits**

**301366 Exhibit 5**
4:5 94:10

**301366 Exhibit 7**
4:7 92:2,3 97:15

___

**1**

**1** 10:14
**1,000** 89:23,24
90:11 95:23
124:13
**10** 39:18 66:22
104:2
**10-minute** 147:11
**100** 46:20 132:8
**111** 57:22
**12** 34:17 39:19
68:11 69:24
**14** 11:21 34:17
**15** 11:21
**17th** 85:1 86:2
99:11
**19** 7:20 52:19
**1st** 78:17

___

**2**

**2** 88:2,12 92:13
96:24 97:17,20
138:2
**2,000** 102:4
**2-14** 132:8
**2.01** 61:23 91:16,
19 95:15
**2.04** 91:19 92:14,
22 93:6 94:14
97:1,18
**20** 14:12 43:12
59:2 92:12
**2006** 19:11
**2015** 138:23
**2018** 58:4
**2019** 12:5,6
**2020** 7:16 8:1
11:20 12:20 13:7,
8 15:8 19:2 27:15
41:18 100:2
123:9 128:1
133:20
**21** 92:13 97:16
**21st** 99:24 100:2
**22nd** 58:4
**23rd** 7:16 13:7,8
15:8 27:15,23
**24** 10:15
**28th** 7:19 8:12,14
15:14 16:9,17
19:1 28:6,10,12,
22 29:11 30:7
41:17 134:3

___

**29th** 15:22,23
16:10,17 17:8,20
41:21 59:19 60:2,
9 62:4 65:21,22
67:24 138:4
**2:00** 147:12
**2:01** 148:10

___

**3**

**3** 138:4
**30(b)(6)** 7:6,10
**30(b)(6)s** 53:5
**30,000** 33:2 70:8
**30th** 7:19 8:13
15:18,20 16:11
17:6 19:2 41:18
134:3
**39** 59:1
**3rd** 11:20 12:20

___

**4**

**4** 23:22
**49** 94:14,15

___

**5**

**5** 94:10 96:24 97:1
122:6,20
**5:00** 68:12

___

**6**

**6:00** 68:12

___

**7**

**7** 92:2,3 97:15
**70** 142:11

___

**8**

**8** 34:17
**80** 142:11
**8th** 43:6

___

**9**

**9** 87:16,22

___

**A**

**ability** 6:18 9:8
44:20 50:13,17
70:9 88:1 101:18
139:20 145:15
146:5 147:23
**able** 18:22 24:2
35:7 61:3 81:4
85:6 87:12 95:23
96:1,22 110:3
111:21 115:6,17
139:18 140:17
142:15,18 143:12

___

**about** 7:11 8:23
9:4,23 10:4 11:21
12:6 23:15 25:4
26:5 29:6 32:3
35:12 42:16 43:1,
12 45:22 47:11,
13 64:16 66:2
67:8 71:9,14
77:18 79:21 80:1
81:8 82:5 83:23
84:21 91:16,18
93:15,17 94:1
104:2 105:23
114:12 115:11
118:9 122:14,16
125:16 126:23
132:23 136:14
137:5,7 140:1
142:11 144:7
147:11,19
**absolute** 27:22
**Absolutely** 11:3
35:18 39:15
138:18
**accordance** 75:13
**according** 61:4,
14 62:20 64:8
**accurate** 97:10
**accurately** 6:18
**accused** 100:24
**acknowledge**
101:16
**acknowledgment**
116:5
**acronym** 20:22
**across** 21:16
36:24 44:11
88:19 98:12
103:1 106:24
110:15 125:14
144:14,17
**act** 97:24 115:5
**acting** 11:21 12:7
113:11 114:16
**action** 23:20 24:3
104:9,11,15,16,
21 106:23 132:6,
13 137:21
**actions** 77:17
81:9 82:1 83:9,18
100:8 104:12
131:17,20
**activate** 48:24
**active** 14:18 15:3
**activities** 77:10,
19 109:7
**actual** 37:10,18
41:19 93:10
123:5 129:3,11
**actually** 11:19
14:13 15:23
19:18 20:13
21:11 26:6,14
27:8 28:9,18
38:17 45:17 49:9
55:22 57:15 60:6,
9 64:11 66:22
67:9 70:1 72:17
76:5 78:11 82:16

___

85:18 87:6 89:5
95:10 98:10
105:20,23 106:7
108:15 110:1
111:15 117:17
130:24 132:11
133:12 136:23
140:24 145:24
**adding** 48:12
**addition** 29:5 52:5
**additional** 12:12
15:3 16:16 20:4
21:19 23:3 24:8,
22 25:7 28:14
32:1,14 39:4,19
43:18 48:5,12,18,
22 49:7 52:7
55:5,15 61:16
64:15 65:3,16,23
66:9,16 69:21
70:19 75:16,20
101:3 125:3,20,
22,24 126:5,7
130:18 138:5,22
**address** 78:3
107:1
**addressed** 116:9
**adequate** 128:10
**adhere** 144:21
**adjusting** 108:3,6
**adjustment** 76:13
107:4
**adjustments**
48:11,14 107:6,8,
13,17,18,19
108:1,5 121:17
**administration**
5:6
**administrative**
46:9 119:4
**advance** 17:12
21:22
**advanced** 13:14
**advised** 27:19
84:13 129:11
**advising** 100:14
101:10
**affairs** 115:24
116:15 117:17,22
118:13,21 119:2
120:13,15,17
121:9,11 123:6
**affect** 88:4 90:12
96:4
**Affidavit** 94:12
**affixed** 130:20
**afraid** 24:15
**after** 7:15 13:6
15:9 22:22 27:22
57:13 76:14 85:3
100:6,7 101:1,8,
23 104:9,11,12,
15,16,21 106:22
111:15,16,17,18
131:17 132:6,13
137:21
**afternoon** 62:10

___

**again** 5:23 8:6
27:11 31:11 69:4
75:9 77:3 103:1
111:7 113:18
122:19 129:16
134:1
**against** 76:22
77:2 81:10 83:18
89:16 91:11 95:2
102:23 110:16
111:21 116:24
120:8,20 122:8
124:12 126:5
145:4,5,6,7
**agencies** 44:5,19
46:17 49:7 50:6,
10 55:6 57:14
89:1,2 98:2,14,16
140:1,4,7 141:16
143:2
**agency** 22:2,3
98:12 143:2,3
144:20
**agent** 84:8 88:2
97:22
**agents** 84:12,14,
18 92:22 98:1,14
**aggressive** 51:12
54:21 55:1 61:10
63:16 81:8 97:24
110:21
**ago** 19:11,17,18
24:17
**agree** 59:21 76:16
116:23 117:9
118:1,3
**agreed** 124:1
**agreements**
139:24 140:3,6,
16,20 145:17
**agrees** 98:13
**Ah** 94:16
**ahead** 13:3 37:5
73:1 77:24 89:14
95:8 100:12,21
114:20 117:6
122:12,24
133:13,16
**aid** 7:23 32:16
133:19 135:10,
12,16 137:19
138:8 139:14
140:1,3,7,16,20
141:1,14,16
142:12,19
145:14,17 147:5,
19,21
**aide** 37:15
**air** 87:5,14
**Alana** 5:13
**alerting** 99:22
**all** 5:8,23 6:7,8
8:16,17 10:10
11:13 13:3 15:17
16:14,20 17:20
18:2,18,20 21:16,
17 22:6 24:5,11
30:2 35:8 37:22
39:6 40:9 45:5,13

54:1 57:22 58:11
59:5,21 65:8
66:21 67:3,5,22
70:9 71:11 73:10,
17 74:14 82:11
85:15,18 91:1
94:9 99:9 104:1,
7,22 108:1 125:5
126:16 127:2
128:16 132:12
136:4,16 137:23
138:6,9 142:22
144:21 147:18
148:5

**allegation** 124:11

**allegations**
114:16 116:23
118:2,3 120:5
121:22 122:3
123:21 125:19

**allocate** 45:9

**allow** 6:11 69:23
91:11 97:22

**allowed** 76:6
95:5,11

**allowing** 80:15
140:24

**allows** 22:2,4,9

**almost** 87:3,17,21
88:5 116:16
119:22 136:2

**already** 42:8
56:12 99:6
113:10

**also** 5:9,14 9:6,17
16:4 18:13 19:13
20:7 21:4 22:9
24:12 25:7,20
34:19 40:12 49:2
80:9 94:13
108:19 109:20
111:2 121:21
122:16 136:15
141:11 142:4
143:15

**although** 36:3
56:2 112:10

**always** 14:19,23,
24 15:6 35:9
89:19 90:1,4
96:12 147:4,6

**am** 11:9,14 26:6,
10 37:6,7 46:20
55:24 61:4 67:4
76:18 77:3,8
98:11 117:18
123:14 140:16
146:11,17,19

**Amendment** 61:7,
8 62:7 76:21 80:8
115:4,8

**amount** 80:17
111:9 117:12,15

**and/or** 7:14 8:3,4
13:6 132:9
133:22,23

**angry** 51:12

**announced** 7:14
13:6

**announcing** 86:6

**another** 22:10
44:11 46:8 67:7
74:16 118:23
139:9,14

**answer** 9:16 69:9
71:7 72:7 73:1
75:4,11 76:17
77:24 80:1 89:14
91:14,23 92:18
95:9 98:9 100:22
113:15 114:5,20
117:5,7 118:7
119:14 120:10,24
122:1,10,24
123:1,9,20 124:5
125:1 126:14
127:11 129:21
131:5 137:3

**answered** 56:12
77:24 113:9

**answers** 6:12
52:21 122:11

**anticipate** 31:5
41:15 69:23
121:9

**anticipated** 13:16
27:23 28:15,24
29:1 42:8 43:23
44:1 47:22 48:1

**anticipating** 28:3
41:24 60:11

**any** 6:16 10:13
13:9 16:2 17:4
21:21 23:11,12,
21 24:8,21,24
28:20 29:22 30:4,
6,9,11,13,24
32:16 35:14 38:3,
22 39:4,10 43:18
44:21,22,24 45:1
47:12 48:10,13
49:16 50:9 51:20
52:6,7,15 54:7,
12,16 55:18 58:9
59:7 60:17,21
61:10,11,15,18
62:2 64:6 65:23
66:7,8,16 68:1,2
70:15,19,23 71:1,
3,8,9,10,17 72:2,
5,9,21 73:5 74:2,
23,24 75:6 76:15
77:10,16,19 78:1,
4 81:17 82:15
84:8,18 86:11,12
89:10,15 90:7,24
91:20 98:23,24
99:12 100:19,23
101:3 102:17
104:9,11,12
105:18 106:11,
16,23,24 107:13
109:11 112:19
113:10,13
114:14,15,16
118:22 119:11
121:12,16 123:3,
6 126:5,19 127:3,
5,7,23 128:18,20,
22 129:6,7,17
130:11,13,22
131:13,16 134:23
138:16 139:24

144:19 145:21
146:22 147:2,8

**anybody** 39:1

**anymore** 26:7

**anyone** 10:17
17:5,21 30:7
45:11 46:11
62:16 69:20 71:2
84:10 107:14
127:6 129:11

**anything** 10:19,21
14:3 25:1 30:1
39:2 43:14 59:22
66:4 70:17 75:10
79:8 82:13 83:21
106:24 112:22
115:12 126:23
127:13

**anyways** 119:23

**apologize** 113:10

**appeared** 80:20
108:11

**appears** 79:2

**appreciate** 8:17
23:10 29:15
57:19 58:24
134:8

**appreciated** 53:8

**approach** 51:22

**approaches**
73:15,16

**appropriate** 6:6
21:23 32:14 77:3
84:23 128:10

**are** 5:10 6:16 7:12
8:23 9:12,13,14,
24 10:5,12,14
11:8 13:12 14:1,
2,24 15:4 17:2
18:18 21:14,15,
19,22 22:5,12,17
24:5 25:7 26:8
30:3 31:4 32:13,
18,20,22,24
33:17 34:11,12,
13,19,24 35:14
36:7 37:4,9 38:1,
3,4,12,19,22,23
41:4 42:16 43:16,
17 44:15,18,19
45:4,5,7 47:10
49:24 50:12,15
53:18 54:1,6,7
59:10 61:1,3,6,
10,14 62:22 63:2,
6,12,19,21 64:7
65:4,9,12,14
67:5,8,13,14,20
69:5,17,22 71:11,
12 72:1 73:7,17,
21 74:18,23 75:5
76:18 80:6 84:18
88:17 89:12 90:3,
8,18,21,23,24
91:1,5,6,10,15
95:13 96:2,6,20
97:7 98:4 101:2,
10 102:6 104:14
108:1 109:8
116:23 117:17,23
118:4 121:3

122:5,11 129:6
130:7,8 132:1
135:7,13,14
136:1,10,24
137:22 138:21
139:2,5 140:12,
17 141:5,13,20
144:6,19,20
145:1 146:12,13,
21

**area** 13:15,24
16:3 36:12 42:14,
19 44:17 62:12
74:15 87:18
88:16 91:2 109:3,
24 141:20,21
142:8,10,13

**areas** 43:16 44:9
47:2,10 138:17
141:22 142:2

**arisen** 131:10

**around** 14:12
28:6 62:12 68:11
74:19 84:24
109:22,24 110:2
141:22

**arrests** 44:22
45:1,3

**arsenal** 85:2

**article** 82:5 83:7

**aside** 38:3,21
137:12

**ask** 32:16 53:4
67:7 88:21 121:2

**asked** 14:17 25:4
45:14 69:16
70:21 77:23

**asking** 35:17
42:20 45:7 47:1
49:6 50:1,9 95:4
118:12 136:10

**asp** 64:23

**aspect** 98:4,22

**assaults** 61:11

**assign** 15:3

**assigned** 13:10
14:20,24 15:6
17:2,7 18:18 20:9
25:8 37:10 40:20
49:4 52:10,12,16
64:21 65:9,12,14
67:16

**assigning** 52:8

**assignment** 39:1,
8 65:17

**assignments**
65:16

**assist** 42:6 43:18
47:13 56:16
59:23 140:9,10,
13 141:1

**assistance**
140:11,18 145:20

**assisted** 19:9,14
142:12

**assisting** 145:21

**assists** 54:4

**assure** 115:13

**attach** 105:12

**attack** 82:20

**attacked** 81:20

**attacks** 81:9

**attempt** 21:16
55:7 81:2 82:21

**attempted** 10:3
139:10

**attempting** 15:21,
23 16:18 17:7,10,
20 60:9 70:5 90:3
108:19 112:6
134:21 144:9

**attention** 20:21

**audible** 6:11

**audio** 128:11

**August** 12:6 58:4

**authority** 8:3 77:4
133:22 145:21
148:2

**authorized** 67:14,
21

**authorizing** 48:19
64:6

**automatically**
51:6

**availability** 36:8,
17 37:6 38:3,22

**available** 9:15,24
10:5 24:21 30:11
35:23 36:2 37:1
42:23 43:17,19
49:12,21 50:12
53:16,19 56:9
60:14 65:23
67:20 85:3
117:24 132:13
135:5 136:6
137:17,24 138:7,
10,14 139:10
140:5

**avoid** 45:2 77:12,
21 142:24

**awake** 22:1

**aware** 9:12 27:17,
22 28:4,13,16,17
29:24 30:3 42:3
47:21 48:15 57:2
72:2 74:23 75:5
77:10,14,16
90:18 97:16 98:4,
11 100:14,18
101:3,9 102:18,
20 104:14,16
105:3,7,10,16,20
106:16 110:8,17
117:18 119:8,23
120:1 121:7,12,
14,21 122:5,20
123:12,14 129:6
131:13 132:4
147:2,4,6

**away** 15:6,14,19,
21 84:19 110:9
139:19

**B**

back 12:23 24:11
27:15 41:17
51:14 53:7 55:17
66:14 67:5,7
76:6,11,14 77:7,9
81:2 82:14,19,21,
22 83:1 93:1,9,11
97:15 99:11
147:18

badge 64:19,20
107:24

Baker 127:7,13,16
128:19,23 129:8,
12

Baldwin 46:18,23

based 9:16 18:6,9
28:24 36:1,8,17
37:5 39:13 40:13
48:9 55:9,10
56:18 58:7 59:5
60:15 62:3 74:8,
11 78:7 113:9
114:13 116:22
121:20 122:14
130:9 138:11
145:16

baseline 142:22

basic 29:6 55:20
69:16

basically 25:17
33:6 45:10
101:19 102:6

basics 55:4

basis 20:11,14
52:4 56:5 112:6
117:13,23 130:7,
10 138:20

baton 64:23

be 9:19 11:10,15
13:17,23 17:3,8
22:7 23:8 24:2,3,
9,22 25:8,11,16,
17 27:7,17 28:19
29:7 31:2,7,14
32:17 33:9,12,15
34:4,5,23,24
35:2,7,10 36:19,
23,24 38:8,11,19,
24 39:3,18,19,20
40:7,10,20 42:3,
21 43:19,21
44:23 45:8 47:8,
13 51:8,11,12
52:1,12 53:4,13
54:3,9 58:16,17,
18 60:4,16,20,22
61:18 62:21
63:13 66:2,16
67:15 68:18
70:22 73:24 74:1,
7,21 76:9 79:2
80:9,20 81:4,19,
20,21 82:19
83:10,17 87:12,
18,23 88:21 91:6,
8 92:23 96:15,21
102:23 108:24
109:20 110:7,17
111:4,17 112:3

115:6,12 118:24
119:1,5,22
121:10 125:22
126:7,11 127:17
129:5 130:20
131:7,23 132:4,8,
13 134:5,18
135:10 136:6
139:7 140:14,15
141:3 143:21
146:8 147:5

became 12:9
19:12 28:4
102:20 105:7,10,
15,16,20 108:11

because 14:17
18:2 26:6 27:4
28:14 33:12
36:23 41:6 42:1,
18 44:21,24
48:16 53:5 54:6
55:24 60:3 61:8
62:9 63:3,19 70:8
73:19 74:19
75:12 85:22
94:22 95:24
103:22 107:24
108:24 110:4
115:18 119:3
121:13,15 123:2
124:15,21 126:3,
10 136:4 139:1
141:19,24 142:24
144:16 147:23,24

become 10:3 15:9
27:16 41:18 65:5
77:10,16 89:20
90:12 102:18
105:2 106:16
119:4 142:17

becomes 15:3,5

becoming 63:16

been 6:8,23 7:10
8:24 9:18 11:17
12:24 14:12,14
17:11 18:5 19:11
20:8 22:22 24:16
28:2,6 31:19 35:5
43:11 45:24 46:8,
22 51:16 55:23
56:22 59:16
64:21 66:9 72:16
78:20,24 88:23
103:5 105:13
120:13 121:15
122:3 125:17
127:20 128:24
146:23

before 5:1 6:8 7:6
41:22 43:9 48:14,
16 71:15 103:7
113:7 125:9

began 65:22
128:19

begin 112:17

beginning 70:13
107:5

behalf 5:9 9:10
134:6 136:20

behavior 61:9,10,
12 73:23 75:1,7
76:4,7,23 77:2

80:12 90:14
100:15 120:12

being 5:18 34:19
47:17 54:22
56:11 60:11 63:5
65:6 81:7 82:8
83:22 89:22 90:8
95:7 98:20
108:18 120:20
124:7 145:11

belief 76:18

believe 6:23 7:3
8:22 9:1 10:14
15:14,18 16:10,
16 20:15 21:24
23:7 24:12 26:23
28:23 30:21 43:7
46:5,8,11,19,23
48:13 54:14,20
55:2 56:5,17 57:7
60:3 70:3,4,10
71:12 78:17
79:18 84:13 85:1,
16 86:17 98:17
99:4,7,15,16,21
100:1,17 102:4
105:8 116:18
117:19 120:11
123:21,24 124:20
130:10 131:9
132:19 138:3,23

believed 76:8
100:8 118:23
123:17 124:22
125:11

belt 64:13 84:18
87:22

belts 64:13 87:15

beneficial 17:12
18:2,9 81:4

besides 134:2

best 9:8 27:22
44:20 82:18 86:9,
13 87:4 88:13,18
90:1 92:24 94:5
116:7

better 55:7 57:19
77:13,22 88:21
110:3 111:1
132:2 143:1
145:13

between 28:21
34:15,17 35:8
42:24 46:12 47:7
71:18 80:17
84:17 112:10
116:16 132:23
143:16 147:9

beyond 72:6 73:1
75:3

bicycle 65:13
138:24

big 103:2

bike 37:21,22
38:8,10 49:21,22
52:6 65:12 73:13
138:21

bikes 73:12

binding 122:11

bit 16:3 24:12
35:16 59:5 64:11

black 79:19
122:8,22 123:17

block 109:24
110:2

board 21:16 74:20
144:14

body 105:15
106:7 107:18
112:22 130:16

body-worn 64:21
105:3,11 107:19

BOOM 20:11
26:18 40:15,17,
21

booths 40:22,23

both 7:12 62:17
112:11

bottles 54:23 65:6
112:4

bottom 97:19

brain 22:1

break 6:13,15
66:22 104:2
147:12

bricks 54:23

brief 23:2 25:1

briefed 19:20
28:24 29:18
31:15,22 41:21
101:8 104:19

briefing 29:3,6
30:3,5,12 31:18,
19 69:8,12,14,20
70:13 99:19
105:22 133:10

briefings 23:2
33:1 69:10

briefly 46:6 87:3

briefs 33:6

bring 16:20 17:18
50:7 138:5 147:4

bringing 29:2

broad 75:12
79:13,17 80:22
113:2 114:23
115:18

brought 15:16
119:6

BRRT 138:24

bubbles 139:17

build 90:4

building 22:5
134:16

bulletproof 65:2

bullying 81:9

bureau 11:11,12

bureaus 11:10
12:9 36:24

business 52:15
135:1,9

businesses 77:2

80:11,24 81:20
110:22

busy 70:4

but 6:10 7:1 9:17
14:14 15:5,16
16:19 17:12,16,
23 20:7,23 23:3
25:6,19 26:4,22
27:3,9 29:4,11,14
30:10 31:1,18
32:3 34:7 35:1,6,
10 37:18 38:1
40:7,20 43:14
44:10,15 45:20
46:10,20,23 47:9
48:14 49:10,24
50:5 52:2,11
53:14 55:3 56:11
57:6 59:2,19
60:13 63:10,22
67:16,20,24 69:9
70:18,22 71:7,22
72:7,17 73:1,10
75:4,12,13 76:21
77:3,24 78:8,21
80:15,20 81:15
83:15,22 85:14,
21 86:12 88:23
89:14 90:5,15
92:18 93:3 94:13
95:8,15 96:2,10
98:9,13 99:17,20,
21 103:1 104:8,
18 105:9 106:2
112:21 113:10
114:5 115:11,17,
23 116:4 117:7
118:7 120:5,14
121:11 122:10
123:12 125:5,10,
13,23 127:10,17
128:8,24 129:2,
14 130:15,22
131:13 132:4,8,
18 133:8,16
134:19 136:1,15
138:13 140:5,17
141:9 143:6
145:24 146:15,19
147:3

**C**

call 6:3 25:15 33:1
68:7,14 69:5
71:10

called 79:19

calling 49:15

calls 25:21 68:17,
18,22 69:6 85:15
86:6

cam 112:22

came 41:20 42:2
54:11 79:3 85:10,
11

camera 64:21
106:7 107:19

cameras 105:4,
11,15 130:16

campus 14:1

can 5:15 7:10 8:9,
20 16:14 22:23

23:1,2 31:4 34:4,
5 35:10,24 36:4
39:18,20 43:18
45:2 47:6,13,14,
15 49:1 50:9,11,
19 51:13 56:7
57:17,22 58:1,7,8
60:20 68:18
69:24 71:7 72:7,
17 75:4,11 77:24
79:9 80:4,6,9,23
82:18,20 86:22
87:6,19 88:6,9
89:14 91:4,14,23
92:18 93:11
94:10,18 95:8,18
96:4,8,10,13,18,
21 98:9,13
100:12,21 101:16
109:15 112:20
113:15 114:5,19
117:6 118:7
119:13 120:10,23
121:24 122:10,
12,24 123:20
124:5 125:1
126:14 127:10
128:11,14 129:21
131:5 132:1
133:14 146:9
147:12

**can't** 6:22 7:1
14:13 17:23
20:19 22:19
24:23 25:2 26:3
27:2 29:4 30:8,9,
12,17 32:1 35:2
39:4,12 40:9
45:20 47:8,19
49:9,18 52:9,11
53:13 55:21 57:1
66:1,7 68:21 69:4
72:16 78:4 81:13
82:10 83:12,14
86:3,20 106:14
109:13 115:11,21
119:22 128:7
131:16 132:18
137:17 140:4

**canister** 64:14
87:9

**cannot** 39:3 45:24
68:16 69:10
86:11 130:22
137:1 146:18

**capacities** 19:14

**capacity** 52:16
73:13,14 115:22

**care** 85:20

**career** 14:15 23:5
24:20 122:3

**carries** 87:5

**carry** 53:24 67:14,
21 87:14

**case** 7:2,4 88:17
123:16,22

**cases** 33:11 34:5
37:24 40:1 50:21
51:9 63:14 73:8
74:20 75:19
134:15 135:16
139:5 140:23

**categories** 103:20
134:10,12 136:8,
17,22 137:14

**category** 7:21 8:2,
4,6 133:17,21,23
134:1 136:24

**caught** 20:17,19

**CDP** 133:18,19
137:15 143:22
145:17 146:24

**cell** 82:16

**center** 13:17 16:8
17:15 20:7 24:6
42:10 43:20
48:23 55:16
132:10 137:20

**certain** 51:3 73:8,
12,13,15,16 75:1,
7 76:8 98:15
100:7 130:8
136:1 137:2
138:17 139:3

**certainly** 115:9

**chain** 25:18 33:24
71:2 85:8 119:5
140:14

**change** 39:13,16
40:13 41:1 72:21
74:4 76:16 93:17
99:19 101:9,11,
14,17,20 102:2,3
103:2,9

**changed** 101:1
102:7,22

**changes** 39:23
41:9 48:11,14
68:1,3 71:3,14,17
72:2,9,10,14,15
73:4,5 74:2 84:2,
3 91:20 101:11
108:4,14 109:9,
12 113:21

**changing** 71:8,9

**channels** 143:15

**characterization**
117:10

**charge** 23:12,18
24:4 26:10 28:12
32:9,10,24 59:14,
18 60:2 143:18
145:19,20 148:1,
2

**chart** 37:2,8,11
38:5

**check** 64:5

**chemical** 84:8,12,
14,18 88:2 92:22
95:15,22 97:6,22
98:1,14

**chess** 74:20

**Chicago** 98:2

**chief** 5:24 6:3,5,6
7:18 8:11,21
11:5,9,16 12:7,13
16:12,14 19:15
28:18 29:1 30:14
31:16 33:6 34:3,
8,9 43:8,11 46:5,

20 53:10 54:12,
18 57:14 60:14
67:3 70:12 71:16
77:5 84:10 94:10
124:21 125:4
126:3,9 127:6
129:1,5 131:7,8
132:23 147:18

**chief's** 43:6
85:10,12,23

**chiefs** 11:15
16:14 84:9 129:7
131:9 132:23

**children** 40:19,23

**children's** 40:21

**chosen** 36:19

**Cincinnati** 98:3

**circumstance**
33:16 62:21

**circumstances**
8:1 78:2,5 97:3
98:15 103:15
116:3 130:12,23
133:21 136:23
137:1,13 138:12
140:2

**citizen** 80:10
118:19,22,24
122:8,16,22

**citizens** 83:21
110:23 113:13
116:24 118:4,14
120:7,21 121:11
123:17

**city** 7:11 9:10,14,
23 10:4 20:13
26:22 27:6 28:1,2
36:13 62:13
72:13,19,20 73:5
75:17 77:6 84:3,5
85:11 100:7,14
110:15 122:11
138:17 141:23
142:1 145:7

**City's** 9:19

**civil** 7:9 58:2,13

**civilian** 106:11

**clarification** 8:17

**clarify** 8:9 35:16
60:1 65:21 114:3
122:13

**clarity** 95:4

**class** 24:21

**classes** 22:16

**clear** 6:11 8:23
25:3 52:18 91:8
127:12 134:6
143:21

**clearly** 101:10

**Clinton** 147:20

**close** 11:19 51:8
87:12 142:9

**closely** 144:24

**clothing** 130:9

**clutch** 57:20

**coalesced** 78:21
80:20

**coats** 65:10

**Columbus** 7:13,
22,24 11:2 13:4,
8,11 23:15 26:23
27:17 41:10 44:6,
15 46:3 61:21
62:13 64:10
81:19 82:5,9 83:7
91:8 119:10
122:12,15 124:7
127:22 147:22

**come** 22:13,23
31:13,23 32:4
69:7,17 78:23
93:11 106:24
115:19 117:16
135:20 140:2

**comes** 52:18
60:24 120:17

**comfortable**
125:21

**coming** 28:15
30:19 31:4,17
40:4 59:19 100:7
121:3,8,15
122:17

**command** 11:14
17:3 21:24 22:14
25:19 31:1,12
32:13 33:20,24
34:10 35:4 71:2
85:8 119:5
140:14

**commander**
13:15 17:10
18:12 19:15 20:5
23:21 24:13 26:6
28:19 31:15 32:6,
8,19,21,22 33:2,
5,7,9,11,19 34:1,
2,4,6,22,23 35:5,
15 36:3,10,12,14,
15,20 37:7 42:4
48:17 59:9 60:5,
11,13,17 67:23
68:5,7,9,14,20,23
69:6,13,15 74:22
99:1,24 107:14
116:15,20 143:13
146:4 147:3

**commanders**
11:13 22:17
32:24 34:9,10,19,
24 35:10,13 36:5
68:16 69:7
120:15

**commands** 90:20
97:8

**commercial** 112:4

**commission** 89:5

**commitment**
79:13

**commitments**
80:21

**committed** 89:22
90:13

**common** 120:12,
16 140:23 143:15

**communicate**
18:22 49:4 80:2,
16 101:13 102:2,
14 143:12 146:16

**communicated**
85:16 101:22
146:15

**communicates**
33:5

**communicating**
42:24 110:10

**communication**
16:5 29:19 47:16
70:9 79:10 80:13
85:11 99:15
143:16 144:17
146:2,8

**communications**
16:7 17:17 25:23
30:6 37:18 49:3,5

**community** 11:5,
12,23 12:1,2,10

**complainant**
126:4

**complaint** 83:18
118:18,22 119:1
120:12

**complaints** 83:20
106:11,23 113:13
117:12,15 118:13
120:5,7,16,20
121:3,8,11,15
122:16

**complete** 22:20

**compliant** 21:14,
22 23:19,24 24:3

**comply** 98:19

**complying** 97:8

**component** 23:7
34:12 86:24

**concern** 81:15
89:10,16 146:22

**concerned** 47:10,
13 84:6,8 125:2

**concerns** 81:17,
21,22 83:23,24
114:13 115:11,24
116:4,7,9

**concluded** 148:10

**concurrent** 44:10

**conduct** 95:13,17
120:6

**conference** 43:6

**confess** 27:14

**confirm** 58:8

**confront** 82:24

**confuse** 103:12

**confusing** 53:6

**congregation**
97:7

**conjunction**
50:23

**consensus** 59:8,
11,20

consent 9:9

consider 9:22
90:1,14 117:11
119:24 121:2
129:8 141:13

considered 13:23
38:23 40:10
119:15 123:3,6,
11

consist 19:17

consistency 22:3,
4

consistent 21:15,
20 62:5 71:22
75:9 83:10 99:5
101:19 112:6
120:14 141:10,11
144:14 145:24
146:14

consistently
112:3

consists 14:21

constant 107:11
111:20

constantly 73:20,
23 107:8

consult 126:18,24

consulting
126:22

contact 25:14
39:11 78:20 87:7,
18 131:6,8
144:19

contacts 117:11,
14

contain 110:3

continually 88:4
96:2

continue 33:3
42:1 79:14,15
112:2 146:16

continued 96:16
138:15

continuum 97:22

contractual 130:8

contrary 98:1

control 51:24
87:4,24 88:6,7,20
89:2,8 90:22
131:18 139:12
141:1,4,15 143:7
145:10

conversation
43:1,13 46:11
48:10 55:9,10,11
78:21 79:11,15,
17

conversations
17:4 30:13 54:12,
15 62:3 78:9
82:14 114:23
131:1,14

convey 86:10
144:10,13

conveyed 54:20
84:9 85:15
115:12 125:3,21

conveying 43:24

cooperating 7:23
133:19

coordinate 39:6
55:6

coordinating
36:23 43:22 44:1,
19 45:10 47:3
146:3

coordination
44:18

corner 80:22

correct 9:5,10,11
12:22 13:1 15:13
30:20 31:10
52:22 58:5 64:2,
6,7 78:9 91:20,21
93:2 97:9 105:18
116:11,20,21
118:16 121:6,23
123:13,18 124:23
125:7,12 126:12
127:3,15 132:15
143:23,24 144:8
147:23

correction 106:10

could 10:23 11:7
13:17 31:22 32:6
35:16 39:18
42:17 45:19 47:5
49:4 52:2 55:7
59:23 70:6 73:21
78:20 83:2 91:18,
22 102:24 103:16
105:12 106:6,9
109:5 114:8
115:5 119:5
131:6 137:13
138:10 140:19,21
145:8

couldn't 58:23
107:22 119:2

counsel 5:2 10:17

County 42:12
44:21 45:23 48:7
135:18

couple 6:23 16:4

course 19:19,21
52:14 76:24
77:11,15,17,20
79:16 104:9
112:16 120:19
126:20 134:22,24
135:9 138:15
139:23

courses 19:22,23
22:18,19 24:22

cover 142:7

covered 107:24

covering 42:18

CPD 143:16

create 23:19,23
24:3 50:7 132:12
139:16 147:8

created 12:12
22:24 30:1

creating 21:19
22:10 37:13

63:17 97:4

credible 121:22
122:3

crimes 11:11

criteria 38:4

critical 47:12
86:23 108:23
111:7 146:9

CROSS-
EXAMINATION
5:21

crossing 93:24

crowd 31:5 50:21
51:3,5,9,24
63:15,16,17 74:9
79:11 87:3,12,20,
24 88:6,7,10,20
89:2,11,20,22
90:5,7,8,11,16,22
91:5 95:1,24
96:3,18 110:22
111:6,17,19
112:24 113:2,3
131:18 145:10,12
147:22

crowds 31:7
44:16 47:22,23
48:2 50:3,24 51:5
54:20,22 55:8
63:19 78:16
87:13,21 89:8
108:7,9,11 109:2,
5,18,19,21
110:17 111:12,14
112:1,10 113:4
139:3,18

crowds' 73:22
75:19

CS 84:15,17,23
85:2,3,18,19
87:2,3,10,19,20,
24 88:7,23 89:7,
10 90:10,11 91:9
94:24 96:14
101:7 103:10,14

current 11:1,4,18
13:1 102:5

_____

D

daily 144:16

damaged 81:21

date 7:1 11:22
15:10 27:3 58:4,7
72:10 85:4 86:2
101:23

dates 72:2 99:1

day 8:12 28:11
29:4 31:23 32:3
42:3,11 45:8 49:9
50:9 52:10,11
53:14 56:16 59:9
60:13,14 72:16
78:18 79:14
81:24 86:2,15
100:1 102:7
105:9 109:8
110:1 133:3
137:24

daylight 108:9,21
111:14 112:1,12,
15

days 16:4,21 45:8
72:13 75:15
76:14 83:13
101:8 105:8
110:1,12 111:18
132:19 133:3,5,9
134:22 138:1

dayshift 7:18

daytime 8:12
109:21 134:3

dead 97:23

deal 76:3 146:7

dealt 111:10

debrief 131:24

decided 55:12
134:15 142:6

decides 35:19

decision 15:19
16:12,15,19,20
17:22,24 32:16
35:12 36:3 48:9,
13 61:1 63:5 64:2
66:19 74:7 77:7
126:10 134:11
135:24

decision-maker
33:7,10,13 74:1

decisions 18:23
33:3,8,12,14,15
34:14 60:21
61:16 62:2 63:2,
18,24 74:18,21
146:11

declaration
135:19

declared 135:19

dedicate 46:13

defend 110:21

defendants 5:14

defended 108:24

defending 111:8

definitely 6:13

definitive 27:21

degree 139:3,6

delay 86:6,12

demanding
124:10

demonstrated
96:16

demonstration
13:16

demonstrations
7:15 13:6,11,12
14:2

department
131:20

depending 40:24
96:11 133:2

depends 34:21
66:6,20 74:4
75:13 79:23
95:19

deploy 8:3 18:24
50:21 53:23 55:2
74:16 87:8,12
88:9 90:11,19
133:22 138:16
139:11 140:18,22
141:13 144:23
145:8 146:9,20
147:7

deployed 8:6 35:5
38:11 54:4 76:2
87:10 108:15
134:1 136:6
137:2 138:11,20
141:8

deploying 8:2
32:11 33:18 74:5
89:16 109:4
133:21 136:24
137:14 143:20

deployment
52:19,20 54:5
88:2 93:14 94:4
121:19 124:13
136:20 137:6,7
138:18 139:4,8,
15 141:7 142:4

deposed 6:21

deposition 5:5,7,
12 7:8 9:7,13
10:9,20 15:7
29:16 65:18 72:7
91:14 98:9
100:12,21 103:19
117:3,8 118:7

depositions 6:9

deputy 5:23 6:3
7:17 8:11 11:5,9,
15 12:7 16:14
19:15 28:18 29:1
34:3,8,9 46:5,21
60:14 71:16 84:9
129:1,5,7 131:7,8
132:23

described 9:2

design 21:2

designated 7:11,
16,18 8:24 21:23
46:22 52:20
134:6 136:19,21
137:5,7 143:18

designed 18:21
20:23 26:11,15
67:15,18 87:13,
15,16 96:6,15
105:16

destroying 80:23

destruction 61:11

destructive 61:9
76:4,7,23 80:11

details 29:20 48:3
54:15

determine 37:1
69:21 88:19
113:19

determined 70:19
88:14

determining
63:17

**detour** 139:18

**diagram** 37:9

**dictated** 84:22
101:18 135:6

**did** 10:16 13:8
15:8 17:4 19:16
27:16 30:6 39:24
41:18 43:14,15
48:9 54:12,14
56:14,23 59:11
60:17,21 62:1
67:24 68:6 69:2
70:2,12 71:1
72:21 76:16
77:10,16 78:6,8,
10,13 79:21 82:7,
13,22 83:16
84:10 85:7,9,21
86:18 95:1
100:17 101:17,24
102:1,13,18,19
104:8,12,21
105:2 106:11,16,
24 112:16 115:7,
20,23 116:12
121:2 124:3,8
125:6,11,23
126:1,18 127:5,
12 130:15 131:1,
3,6 135:8 141:16
143:4,6

**didn't** 23:6 28:1
47:23 48:2 53:3
59:21 76:7 81:16
84:16 111:20
115:4,9 121:13
124:17 125:13
126:4 134:19
138:1 142:7,20,
21 143:5

**difference** 84:17
112:9

**different** 26:17
41:7,14 44:5,19
65:12 80:1,14
106:8 108:13
109:6,18 133:8
137:14 139:21

**differently** 61:18
103:5 108:12

**difficult** 70:7
76:17

**diminish** 111:20

**direct** 8:3 94:18
95:16 96:7
133:23 146:1

**directed** 17:21,23

**directing** 146:19

**direction** 70:6
99:17 140:15

**directive** 92:22
93:6,10,18 94:14,
21 95:4,14 96:24
97:18,21 99:12,
13,14 100:6,10,
18,19 101:1,5
103:13 127:6

**directives** 94:13,
18 96:6 129:6
144:22

**directly** 17:14
49:5 69:13,15
79:3 80:16 85:16
91:17 131:9
143:13 144:13
146:18

**Director** 77:6

**disables** 88:1

**disagreed** 126:9,
15

**disaster** 25:10

**disasters** 21:3,12
26:15

**disclosed** 52:18
93:15 94:1

**discourteous**
120:6,11

**discrepancies**
146:23 147:9

**discretion** 74:11

**discretionary**
41:4

**discuss** 43:10
102:10 125:11
127:3

**discussed** 31:9
47:6 98:23 99:4,7
120:21

**discussing** 54:18
104:8 116:4
128:8 130:12,13

**discussion** 84:21

**discussions**
28:20 127:23
128:4 129:17,23
132:22

**disorder** 58:2,13

**dispatch** 18:15

**dispatchers** 17:8
143:15

**dispatching**
17:14

**dispersal** 90:7,20

**disperse** 87:19
89:8 90:15 95:1
96:18 97:6

**dispersed** 68:20
142:8

**displayed** 107:24

**disseminate** 85:7,
9,22

**disseminated**
85:1,12,23 86:4,
14,21 99:20

**distance** 87:9,10

**distribute** 67:11

**distributed** 22:12

**distribution** 130:9

**divert** 16:5,7
110:19

**divide** 110:11,13

**divided** 141:23
142:1

**dividing** 111:2
142:1

**division** 7:13,22,
24 11:2,12 13:5,9
15:2 21:14 22:15
23:13,16 26:21
27:4 28:16 38:13
42:6 44:6 46:3
49:8,12 61:21
62:6 64:10 67:21
81:24 83:8 85:13
86:12 91:9 92:9
99:16,22 101:12
107:14 113:20
115:14 116:1
117:19 118:15
119:10 122:15
123:8 124:8
125:15 127:21,22
135:2 138:7,14
140:13 141:8,17
146:15

**Division-issued**
97:6

**do** 6:3,13 7:6,7
9:20,22 12:14,16
14:7 15:19 16:3,
24 17:1,20,21
21:21 22:2 24:13,
18 25:13,14 26:8
27:10,14 29:9,18,
22 30:14,24
35:11 38:14
39:13,16 40:13
43:15 46:2,5,17,
19,23 47:11,17,
24 48:6,18 49:4,
11,22 50:22
51:21 52:2,8
53:17 54:17 55:3,
18 56:7,19 57:4
58:6 60:1 62:17
67:10 68:23
69:19,23 70:8
72:1 76:21 78:14,
22 79:14 80:2,3
81:6,23 82:18
83:20 84:22 86:5
87:1,11,23 89:17
90:14,17,23 91:4
92:8 94:5 96:13
98:14,17 99:4,23
100:6,15 101:18
105:6 106:9
107:13 109:11
111:12 113:10
114:14 115:22
125:16 128:3
130:21,24 132:2
134:22 139:21
142:6,21 143:4
145:15 146:5

**documents** 29:23
137:20

**does** 8:14 20:16
22:13 25:12
29:13 44:7 57:11
61:8 68:6,7 83:7
89:5 91:8,10,11
103:19 109:14
130:1 131:19

**doesn't** 29:11
35:9 38:15 89:20
118:19

**doing** 32:17 86:9,
13 107:11 125:21
126:24 142:24
144:16

**don't** 10:21 16:18
20:21 24:15 26:7
27:18 29:20,24
31:11 35:3,22
44:24 46:8,10
48:8,13 49:23
50:4 54:14,16
56:1 59:17 60:12
61:15 66:8,10,15
69:1 70:3,9,14,
17,22 71:8,12,16,
20 75:10 78:1,7
82:3,8 83:21
85:21 87:24
89:23 90:18 99:7,
17 100:4,13,23
102:20,21 103:12
105:9 112:19
115:2 116:2,3
117:9 119:15,17,
21 123:3,6
125:10,14,21
126:22,23 127:16
128:22 129:10,14
130:11 136:3
137:17,22 144:23

**done** 10:8 36:1
76:10

**down** 25:15 34:1
83:4 108:4 113:2
139:17 141:5

**downlink** 112:24
142:16

**downlinks** 18:13

**downtown** 28:6,
14 41:23 42:2
62:8,16 110:20
143:8 147:21

**drafting** 23:20

**drive** 111:1

**driving** 37:16

**drugs** 6:17

**due** 17:16

**duly** 5:18

**dump** 83:13

**during** 16:6,21
17:15 18:3 20:8
28:11 59:9 60:13
62:16 65:5 69:18
76:23 77:11,15,
17,20 78:3 79:15
99:8 108:9,21
109:8,10 111:24
120:8,14 122:3
123:11 129:3,19
135:9 139:22
140:24 145:4

**duties** 9:21

**duty** 39:1,3 64:12,
13 71:15

---

**E**

---

**e-mail** 31:10,13,
20 32:4 85:13
99:22 132:10

**e-mails** 132:5

**e.g** 98:2

**each** 8:2,4,5
18:22 47:13
59:23 133:21,23
134:1 136:24

**earlier** 24:20
101:6 116:18

**early** 8:1 22:22
23:4 91:19
133:20

**easier** 6:7 95:21
142:6

**Easton** 110:16,22

**effect** 103:10,14

**effective** 50:3,15
51:2,4,16 73:24
87:19,23 102:6
139:5 142:3,19
143:17 144:16

**effectively** 25:21
88:8,24 110:12,
14 139:18,21
140:22 143:7

**efficiency** 18:21
67:19

**efficient** 67:15
139:5 143:20

**efficiently** 50:18

**effort** 44:7 109:3
138:16

**efforts** 44:2,20
146:3

**either** 8:15 13:12,
14 87:9 91:19
100:6 103:20

**election** 128:5,6,9
129:4 132:15
133:4

**elements** 12:11

**eliminate** 84:11

**eliminates** 84:20
88:5,6

**eliminating** 88:8

**else** 5:4,11 10:17,
19 45:12,16,24
58:19 62:16 80:9
96:5 109:18
127:6

**emergency** 13:17,
18 14:6 15:1,15
16:9 17:15 20:6
24:6 42:10 43:20
48:23 55:15
84:24 132:10,11
135:19 137:20

**employed** 7:22
71:22 133:18

**enable** 9:6

**encounter** 95:19

**encountering**
95:11,20

**encroached**
145:11

**end** 107:5

enforcement 7:21
44:5 55:11 57:14
133:18 134:12
136:8 139:16

engage 112:6

engaged 95:13
126:20 127:17
135:22

engagement
32:18 33:21 61:6
144:4,10 146:21

engaging 54:24

enormous 121:12

enough 14:6
133:2

ensure 17:18
18:21 19:19
21:21 38:14 40:8
42:17 56:6 60:10
61:7 67:15 80:6
83:24 90:2,17
91:4 98:18 101:4,
9 102:11,15,24
103:3 109:1,5
128:9 130:1,19

ensured 101:7

ensures 22:5

ensuring 24:4
32:14,23 33:20
42:6 62:9,10
76:20 77:13,22
80:10 90:19
101:21

entailed 54:15

enters 15:7 29:16
65:18

entire 8:12 47:16
50:19 68:16 70:1,
5 74:16 84:20
86:1 87:20
110:21 142:8,9
143:4 146:4

entirely 14:23

entirety 145:9

entities 7:23
133:19

environment
11:21 17:18
64:21 103:8
135:6

EOC 14:8,14,19
15:2,4,9,15,16,20
16:7,20,23 17:3,
5,19 18:3,13
19:3,6,8,10,14
20:9,10,13 24:13
25:4,6,8,11,18,
21,22 26:1,4,9,
16,18 27:1 33:8,
16 34:20,23 36:6,
13,23 39:6,11
45:8 47:15 49:4,5
55:24 60:7 69:16,
20 70:1,5,6,11
74:18,24 75:6
78:23 104:18
142:14 143:10,
11,16,22 144:18

equipment 40:7,8

49:2 64:9,22
65:1,3,8,10,13,
14,17,23 66:4,9,
12,13,15,16,20
105:15 106:1,21
108:2 110:24
129:18,24 130:2,
3,6,8,13,15,19,
20,21 145:13,21

equipped 110:7

especially 17:14
54:2 111:7

established 14:9,
14 32:18 35:14

evaluate 131:20

evaluating 63:14

even 20:21 52:13
57:19 60:12
127:20

evening 43:2
60:23 67:24
68:12 69:3 70:13,
21 71:3

evenings 108:18

event 13:24 14:7
17:16 18:4,16,17,
19 22:3,6 23:21
25:10 32:9,19
33:4,21 34:3,8,21
35:23,24 36:7,11,
18,21,22 39:14,
17,21 40:4,11,13,
14,20,22,24 41:2,
7,9,11,14,15,16
47:16 49:5 51:21
52:9,13,14,15
58:13 66:17
124:15,18 146:4

events 13:19,20
14:1 15:12 19:9
20:8,10,12,24
21:2,7,13,17
22:10 26:12,17,
18 27:5 35:11
50:6,23 52:13
123:8 131:18,20
135:10

eventually 84:22

ever 14:18 27:11
70:2 122:2
126:22 127:5
129:15

every 23:18,22
24:20 27:2,6
41:7,9,14,15 54:3
67:18 73:10
89:21,22 98:12
102:24 103:6
104:23 106:6
107:3,5 135:3
136:2

everyone 18:16
24:1 58:17 80:2,
9,13 96:4 101:9
102:11 103:1
137:6

everything 47:5
48:15 64:13
107:10 136:13

everything's
21:20

everywhere 35:2
40:22

evidence 106:23,
24 126:4,5,11

evolution 107:11

evolve 72:22
73:18 108:12

evolved 72:13,18

evolves 136:1

evolving 73:9
74:9 75:14,22,24

exact 7:1 27:3
81:14 137:17

exactly 16:19
29:4 30:1,8,10
35:17 45:19
49:23 50:5 53:14
55:3,22 57:1
58:23 66:10
71:20 72:16
81:14 83:12,14
84:4 86:3,20 93:7
105:9 123:9
128:7 132:18
137:22 146:8

example 37:21
38:9,16 40:14,18
41:9 139:9,14
141:19 144:2
147:19

examples 109:9,
11 111:13

except 137:6

excessive 103:16
116:24 117:16,21
118:13,18,20,24
119:12 120:4

excessively
113:12

exchanged 82:16

exclusively 87:3,
21

excuse 9:14
10:24 67:10 95:3
130:13

executive 11:15
27:19 28:21,23
30:3,6 31:16,23
32:2 33:5 105:22
132:20 133:9

exercising 80:8

exhausted 83:3

exhausting
135:14 138:8

exhibit 57:15,22
92:2,3 94:10
97:15

exhibiting 112:5

exhibits 10:10,12,
22 91:22 97:14

exigent 97:3

exist 12:15 97:4

expect 58:19
69:24

expectation 28:5

expected 21:13
23:18 24:2 31:8
61:14 62:19,22
64:7

experience 9:17,
22 18:7,8,10
19:2,5 20:7 74:12
116:19,22 118:10
121:21 122:15
125:5 141:12

expert 52:1

experts 57:11
88:15

explain 11:7 32:6
80:13 87:2

explained 99:14

explicit 81:12

exploited 40:19

exposure 90:2,10
91:3,4

express 5:4

expressing 81:7

extensive 93:3

extent 47:24
135:11

extremely 70:4
119:10

---

**F**

faced 62:20 63:8

facial 87:18

facing 12:9,11

fact 56:18 60:16
109:24 115:3
125:11

factor 104:22
124:8 125:6

factored 120:21

factors 38:22
147:7

facts 9:13,23 10:4

falls 87:15

familiar 58:22
59:3 93:2,5
102:9,12

familiarize 58:11

fan 27:12

far 29:2 56:7
93:13 107:10
120:1

Father's 100:1

fear 81:7

federal 7:9 21:1
23:14

feedback 47:17
79:21 113:11
114:14

feel 43:16 101:24
125:21

felt 43:9 107:1
126:10

few 32:6 43:23
45:8 56:23 69:8
72:12 82:2 83:10
105:8 134:22

field 32:13 33:24
34:10 35:9 37:3,
13,14,19 38:17
39:3 42:7 48:21
49:22 50:23
53:15,16,23 61:2
63:1,6,11 66:10
67:11,18 70:2,4,7
74:8,16 76:3
86:24 89:6 101:8,
22 107:20
110:14,21 111:5,
6 141:8 142:2,11,
21 143:18 145:9
146:13

fill 37:3

filled 132:9

filling 38:4

final 33:10,13

findings 124:2,21

fine 94:4 114:4

finish 147:12

fire 16:1 18:19

firearm 64:14

fireworks 112:5

firing 147:22

firm 127:19

first 5:18 13:4
19:2 27:16 28:3,7
30:15 41:18
59:10,13,18 60:5,
8 61:7,8 62:7
71:18 76:20,21
78:16,18 80:8
92:8,15 97:20
105:8 111:17,18
115:3,7 134:22
135:23 137:24

firsthand 47:20

fish 114:1

fit 103:22

five 24:17 26:1
34:15 37:20
95:21

flashlight 64:17

flexible 18:23
73:8

floor 43:6 46:10

flow 80:10 81:1

Floyd 71:5 13:7
27:16

fluctuates 39:23

focus 120:4

focused 121:18

folks 45:14

follow 77:13,22

followed 101:4

following 79:14
101:23

follows 5:19

**foot** 33:2 50:20
51:11 70:8
139:20

**football** 23:22

**FOP** 126:19 127:1
129:17,24 131:1

**force** 37:13,14,20
38:17 39:3 49:22
50:3,24 53:15,16,
23 60:22 61:1,23
62:1 63:1,6,11
64:6 67:11,18
74:8,16 76:5
77:13,22 84:21
86:2,24 88:2,3,12
89:6,12,16 93:10
95:14 97:21,24
103:17 106:12,20
107:20 110:21
111:5 113:12
116:24 117:13,
16,21 118:14,18,
20,24 119:12,17
120:5 141:8
142:11,21 146:13

**forces** 34:11 35:7,
9 37:3 42:7 48:21
66:10 76:3 101:8,
22 110:15 111:6
138:17 142:2
143:18 145:9

**foregoing** 148:9

**form** 31:2 64:17
99:18 132:7,9

**formal** 28:20
68:18,21 69:5,11

**formation** 74:6

**forms** 21:15,17,
19,20,21 70:23
104:18

**forum** 132:22

**forward** 93:18
127:9

**forwarded** 24:5

**found** 122:7,22
123:16

**foundation** 19:21

**fourth** 97:19

**frame** 8:7 128:3

**frames** 118:10

**Franklin** 42:12
44:21 45:23 48:7
135:18

**Fraternal** 126:17

**Freedom** 79:19

**freeway** 109:3
139:19

**freeways** 108:20,
23 111:6,8

**frequent** 120:7

**Friday** 41:20
42:20 48:2,5
55:5,14 58:15
62:10 138:3

**front** 51:13 109:4

**frontline** 139:2

---

**frozen** 54:23
112:4

**full** 16:20 145:20
148:2

**fully** 15:5,11,17,
20 16:10,18 17:5
18:3,10 19:7,12,
19,23 21:8 48:24
102:19

**further** 148:4

**future** 104:10,14
105:19 112:18
120:22 127:8,24
128:21 129:9,13

---

**G**

**Gagnon** 57:6,12
58:3,11

**gain** 89:8

**game** 23:22,23
27:9

**gas** 65:7 66:4
81:16 84:7

**gassed** 81:7

**gather** 132:12

**gave** 142:2,4,9
143:3

**gear** 48:24 65:4
73:15 79:8
105:13,14 106:8
107:23 110:24

**general** 77:16,19
95:18 96:10
112:13,14 128:3
137:3

**generalize** 120:3

**generally** 31:9
32:12 54:17
86:22 112:21
116:4 131:17

**George** 7:15 13:7
27:16

**get** 15:21 17:7,10,
17 22:21 25:14,
21 29:11 40:9
45:21 48:5 49:3
53:6 56:5 57:16
65:15,16 79:4,21
80:5 82:19 83:3
87:11 94:6,15
110:16 112:7
113:20,23 130:21
133:14 134:17
136:5 137:16,23
138:24

**get all** 15:24

**gets** 120:13 130:6

**getting** 30:21
32:10 42:5 49:14
55:7,14 58:12
60:10 68:4
134:19 135:14

**Gilbert** 46:21

**give** 40:3 47:5
71:1 80:4 91:1
137:1

---

**given** 32:24 61:2
64:9 90:19 97:13
99:13 102:16
117:14 124:6

**gives** 113:2

**giving** 71:8

**go** 6:10 13:3
24:11 37:5 41:13
51:13 67:7 70:2
73:1 77:24 89:14
92:13 95:8
100:12,21 103:19
104:7 110:2
111:21 114:19
117:6 122:12,24
133:12,16

**goal** 62:5,17 80:2,
12 83:3 88:3
90:15 96:4
102:14 137:16,22

**goals** 32:20,22
33:21 42:22 61:6
80:6,9 144:12
146:14

**going** 12:23 25:8
27:15 28:18 29:7
31:7 36:22,24
37:1,2,4 38:9,11,
14 39:6 41:17
42:21 43:1,10,17
46:13 55:17
58:17,18 60:16
63:13 65:16 70:7
74:14,16 84:5
90:21,23 92:12,
13 93:13,18 94:9
97:15 99:11
110:18 115:17
127:9 132:24
133:12 134:15
142:15 147:18

**gone** 70:18

**good** 5:23 6:1
27:8 66:24 67:3
88:20 128:13
141:18

**got** 49:9 79:24
136:18

**government**
23:14 86:8

**grabbed** 79:6

**grade** 112:5

**gradual** 111:24

**Great** 147:14

**grenadier** 38:16
53:11,16,24 54:1,
8,10 55:18,20,23
56:2,4,6,7 57:3,9
58:2

**grenadier's** 53:21

**grenadiers** 53:18
55:18 56:15
57:11 67:8,13,17

**ground** 6:11
62:12

**grounds** 44:13,14
109:22

**group** 13:9 15:5
28:12 29:8 30:23

---

52:3 63:3 69:3
79:1,3,18,24
80:14,21 81:15
87:8 95:11,18,20
96:9,10,12,15,17
108:18 109:23
111:22 142:17,20
146:17

**groups** 30:23
36:16 50:17
68:16 78:19
80:18,19 87:17
96:3 109:19
110:6 112:13

**growing** 30:23

**guard** 20:17,19
102:23 135:20,22
144:20 145:7,8,
14

**guarding** 145:1

**guess** 44:7 56:23
95:4 136:24
140:14

**guidance** 75:16

**guide** 95:21
116:19

**guided** 95:14

**guides** 21:6

---

**H**

**had** 12:8 16:6
17:17 19:5,6,8
20:3,7 22:15
23:22 24:12,24
26:1,3 27:1,7,9
28:2 29:3 30:13
32:2 41:22 42:6,
23 43:11,22
46:12 48:4 54:7,9
55:2,22 56:3 57:3
59:23 60:15 62:4
68:18,21 69:12,
14 70:15 72:16
73:18 78:11,15,
18,20,23 80:14,
20 83:11,14
102:12 103:5
105:13,21 106:5
110:6,8,9 115:10,
23 116:7 118:24
126:16 127:20,22
128:6,10 132:22
133:1 135:16,20,
22 136:10,11
137:24 138:2,7,9
139:10,20,21
140:8 142:11,14,
16,17 143:10,11,
15,17 144:2
145:15

**half** 116:17

**hall** 145:7

**hand** 47:20 90:24

**hand-to-hand**
87:7

**handcuffs** 64:15

**handed** 108:4

**handle** 21:2 36:6
42:14 59:8 139:1,

---

16 146:11

**handled** 13:13
14:3 19:8 39:20
119:5 145:13

**handles** 13:19,22

**handling** 7:13
13:5 131:15
139:3 146:13

**happen** 28:1 35:9

**happened** 28:2
52:11 69:18 86:7
131:12 132:19

**happening**
129:15 131:14

**happens** 25:9,10
86:8

**harmed** 76:9

**harp** 125:10

**has** 8:12,13 12:11
14:14 22:15 34:9
36:15 37:13 38:7,
13 40:7 51:16
53:24 62:14 65:5
87:16,17 89:20
90:12 92:5
117:19 127:22
131:9 138:14
148:2

**hat** 64:19 79:5,6

**have** 6:14 7:10
8:14,24 9:3,18
10:3,7,8,10,19
11:13,17 12:24
13:9,13 14:1,6,19
16:5,13,19 17:4,
11,12,24 18:2,10,
13,14 19:10 20:3,
8 21:15,22 22:3,
10,18,20,22 23:1,
6 24:8,16,21,24
25:11 26:4 27:20
28:2,6 29:11,13
30:6,10,24 31:11,
13,15,19,22 32:4,
14 33:12,20
34:10 35:1,3,5,6,
7 37:2,3,15,20
38:15,18 39:23
40:2,8,9,18,21
41:15 43:9,17,23
44:4,9 45:5,6,9,
24 46:6,8,13,22
47:11,20 48:2
49:22 50:1,4,5,
10,13,16 51:5,8
52:6,12,15 53:10,
18 54:7,12,16
55:5,18,20,22
56:1,3,22 57:3
59:11,16,21 63:3
64:12,17,18,21,
22,24 65:1,2,3,7,
8 66:9,13 67:17
68:13,18 69:1,12,
14,16,19,23 70:9,
18,21,24 71:21,
23 73:23 74:19
75:10 76:2,9,15
78:3,8,21 79:1
83:1,17,23 85:20
87:11,17,24 88:9,
23 89:2,23,24

90:13,19,22
94:14 95:23
96:15 98:16,18
101:12,17 102:1,
4,9,13 103:6,10,
11,14,16 104:17,
19 109:11,15
110:19 111:13
112:20,23 113:9
116:8 117:12,13,
15 122:2,8,22
124:14,20 125:17
126:4 127:18
128:16,20 129:2
130:2,15,24
131:12,24 132:2,
20 135:5 136:7
137:17 139:3,20
140:3,6,8 142:7
143:5,14 145:20
146:1,5,23
147:22 148:4

**haven't** 27:9
121:15 128:24

**having** 18:14,16
42:24 44:1 53:15
60:4,9 80:7,15
90:9,10 114:22

**hazard** 63:18 97:5

**headquarters**
42:11 76:12 83:2
145:6

**hear** 58:20
128:11,14

**heard** 80:5,8

**heavier** 87:14

**held** 43:3,5

**helen** 29:16

**helicopter** 113:1

**helicopters** 18:14

**helmet** 65:7

**help** 96:4,10

**helpful** 45:13 51:7
59:4 132:1

**helping** 37:17
119:9

**helps** 116:19

**here** 5:9 6:8 13:4
25:3 57:15 78:8
92:2,7,20 93:9
94:7,10,13 97:3,
14,17 103:12
104:8 113:19
125:7 128:17
133:15

**hide** 90:24

**hierarchy** 44:4

**High** 79:13,17
80:22 114:23
115:18

**higher** 33:2 88:12

**highest** 140:14

**highly** 50:3

**Highway** 42:13
141:19 142:10

**hold** 6:14 25:14
113:17 146:18

**home** 23:23 43:12

**honest** 47:8

**honestly** 6:22
20:19 22:19

**hoping** 27:11
136:3

**Horn** 65:18

**horse** 50:19 51:7

**horses** 40:9 50:5,
7,13,16 51:13,15,
18,20,21

**Hostetler** 127:7,
13,16 128:19,23
129:8,13

**hour** 59:2

**hours** 43:12,23
68:11 69:24
108:9,21

**house** 24:7

**housing** 24:1

**how** 11:17 18:24
20:1 21:2,3,6,13
22:19 25:13,14,
17,20 29:6 33:3
39:16,22 42:17
43:1,10,24 44:7
47:13,14 49:21
50:5 54:3 56:1,6,
19 58:18 59:8,23
60:18 61:13 62:2,
5 68:5,7 73:20
74:9 77:4 78:14
80:4 84:22 85:7
86:3,18,21,22
90:1 93:17
101:20 103:4
104:24 105:23
106:1 107:19
108:14 109:18
111:13 113:19
116:13 117:23
118:10 123:10
125:13,16 128:8
130:16 131:19
132:18,23 133:2
136:11 138:1
140:21 141:10,
12,13,19 142:23

**However** 118:22
146:12

**huge** 121:7

**human** 109:1

**hundred** 80:19
114:24

**hundreds** 79:12

_____

**I**

**IAB** 116:10,11,13,
22 120:8 121:21
122:4

**IAP** 137:20

**ICS** 19:20,23
20:15,20,23 21:1,
3,5,14,20,23
22:10,14,16,18,
24 23:1,3,5,8,12,
18,19,23 24:3,19,
20 25:1,4,6,19

26:4,11 132:6,7

**idea** 80:4

**identification**
64:19

**identified** 10:13
16:15 32:21
78:18,24 88:16
96:21 107:21
112:11

**identify** 5:2,3 58:1
61:3 78:20 95:24
96:1,8,20 107:20,
23 108:23 137:13
140:19,21

**identifying** 31:3
32:12 88:18
110:9 134:20

**immediate** 140:17

**immediately** 42:5
79:6 106:5,10

**impact** 29:12
86:18

**impacted** 86:21
93:18

**impacting** 89:11

**impair** 6:17

**implement** 82:14

**implicated** 125:17

**important** 107:1
138:19

**importantly** 85:15

**improve** 73:21
107:11

**improvements**
78:7 82:15 113:9
114:13

**inability** 86:23

**inappropriately**
117:20

**incident** 17:9
18:12 20:1,18
21:24 22:14
23:20 24:2 26:6,
10 28:19 31:15
32:6,8,19,21,22
33:1,4,7,9,11,19
34:1,2,4,6,22
35:15,20 36:3,10,
14,20 37:6 42:4
48:16 59:9 60:5,
11,13,17 65:22
67:23 68:5,7,9,14
69:6,7 74:22
99:1,24 107:14
115:16 116:20
135:12 143:13
146:4 147:3

**incidents** 23:24
33:18 129:12

**include** 89:21
90:8

**includes** 21:4

**including** 11:16
13:20 18:17
20:11 25:22
49:20 64:14
142:9

**inconsistent**
145:23

**increase** 49:11

**increased** 30:19

**incremental** 81:3

**independently**
10:18

**indicated** 85:4
93:19 126:3

**indicating** 31:6

**individual** 23:11,
12,17 24:4 32:10
61:13 67:16 79:1,
9 82:17 89:22
95:22 113:6
138:12 143:18
144:22

**individuals** 8:2
16:6 17:17 22:8,
23 25:7,15 29:8
30:23 31:3 35:4
36:19 37:5,19
39:7 44:18 45:17
46:12,16 49:1
50:17 52:3 62:18
79:2,24 81:18
88:17,21 90:2,8,
13,18,21 91:1,5,
10,12 95:21,23
96:1,8,20,21
97:4,7 98:18,24
100:24 104:18
107:23 108:18
111:16,22 112:2,
11 115:19,23
132:1 133:22
140:20 141:13
145:13 146:9,20

**individuals'** 61:7

**influence** 6:16

**informal** 68:19,22
69:5,11,14

**information** 29:5
30:22 31:6 32:23
61:16 68:20
69:22 70:20
83:11,13,14 85:2,
8,9 86:10 96:7
102:15 104:24
113:5 114:1
115:20 128:20
132:5,12

**infrastructure**
47:12 108:23
145:5

**initial** 67:23

**injured** 39:2

**input** 72:19,20
75:20

**inside** 41:8 141:8
142:14 144:18

**instance** 124:16

**instances** 77:14
100:23 147:2

**instantly** 86:7,9

**instill** 103:7

**instructions** 71:2,
9 99:12

**insuring** 108:22

**integrate** 142:21

**intel** 27:21

**intelligence** 28:14
30:18,24 31:12,
17

**interested** 31:4
111:3 113:3

**Intermediate**
92:22

**intermingling**
94:23

**internal** 115:24
116:15 117:16,22
118:12,21 119:2
120:12,15,17
121:8,11 123:5
137:23

**interplay** 44:4

**intersection** 8:5
133:24

**interview** 82:7

**interviewed** 82:9

**into** 13:4 15:16,22
16:20 17:19
25:22 35:5 38:10
42:9 44:11 46:7
65:15 68:4 69:7,
15 70:2,4,7 78:16
79:8 81:24 83:8,
19 90:4 93:24
100:18 103:9,13,
20 104:22
120:17,21 124:8,
14,18 125:6
141:23 142:1,21
146:1 147:22

**investigate** 83:20
84:1 115:15,21
118:21 125:24
126:1

**investigated**
117:17,21 119:2
121:16 125:20
126:11 129:12

**investigation**
116:1 119:4
120:18 122:7,21
123:12 124:17,19
126:6 127:7
128:19 129:8

**investigations**
123:4,7 128:23
129:11

**investigator**
123:15,23 124:20

**investigator's**
124:2

**involve** 125:3

**involved** 35:19,21
41:18 44:23
58:13 125:12
128:24 129:3
130:7,21

**involving** 124:17
125:8

**is** 5:4,11 6:2,5,7
7:8,18,20 8:20

11:3,4,24 12:3,20
13:16,18,21
14:16,17,18,20,
23 15:6 16:4,24
17:1,3,19 18:1,5,
6,12,16,21 20:1,
23 21:1,8,9,10,24
22:1,2,24 23:11,
18 24:2 25:4,6,9,
12,15 26:16,18,
24 30:20 31:24
32:7,8,10,16,22,
23 33:7,12,13,20
34:2,15,16,22
35:12,14,15,19
36:2,11,13,20,22
37:8,15,23 38:1
39:6 40:8,22
41:3,4,7,10,14
44:18 45:11,13
46:9 47:11 49:19,
20 50:2,3,8 51:1,
4,20 52:9,14,18,
23 53:16,20,21,
22 54:2,3 56:4,9
57:22 58:4,6,11,
19 59:2 61:2,23
62:17,20 63:7,9,
10,11,13,16,17,
23 64:3,9,13 65:4
67:1,19 68:14,15
70:7 73:23 74:6,
9,10 75:21 76:14
77:7 80:7 83:8,
19,20 84:19
85:14,17 87:3,4,
10,13,14,15,16
88:2,3,14,19,24
89:3,4,8,10,15,24
90:1,6,15,18 91:3
92:20 93:13,15,
23,24 94:20,22
95:14,16,21,24
96:2,4,8,11,14,
19,22 97:10,12,
17,24 103:22
104:5 106:1
113:1 114:5
115:1,2,24 117:4
118:17 119:10,16
120:12,16 121:18
122:2,19 127:12
130:1,3,6 132:5,
6,9 133:17 134:6,
15,24 135:6,12,
24 136:19 137:7,
19 138:19,24
139:4,9,14 140:7
141:5,10,12,19,
20 142:24 145:22
146:9 147:16

**isn't** 35:23 36:10
89:21 92:17
144:22

**issue** 105:3,12,
19,21,24 121:14
125:14 131:9
147:8

**issued** 66:9,16
84:18 105:13,14
106:7

**issues** 39:11
130:15

**issuing** 100:8

---

**items** 54:24

---

## J

**Jacobs** 124:21
125:4 126:3

**Jacobs'** 126:10

**jail** 45:4

**Jeff** 5:10 57:20

**Jennifer** 5:17 11:3

**job** 9:21 26:9
132:3

**John** 58:3

**July** 12:6

**jump** 13:4

**juncture** 68:22

**June** 8:1 12:24
27:2 78:18 85:1
86:2 91:19 99:11,
24 100:2 108:10
110:12 111:18
128:1 133:20

**jurisdiction** 44:8,
10,11

**jurisdictions** 16:2
135:17 136:11,16
137:18 139:13
140:21 141:20
143:5 147:10

**just** 6:3,6,11 8:8
10:23 12:17
20:18,20 21:8
24:11 25:2,3
26:21 27:5 28:4
29:5,10,13 30:22
37:5,8 40:6 42:24
43:21,24 44:3
45:10,20 46:11,
15 47:5,9 51:6,13
52:17 53:4 54:6,
14 57:2 58:8,22
60:1 63:4 65:21
78:4 79:7 82:4
84:17 91:8 93:1,
12,21,23 112:8
113:23 114:2
120:3,14 122:3
124:22 132:17
133:3,6,10,16
134:5 137:2,13
140:9 143:21
144:3 145:2

**justice** 124:10

**justin** 65:18

---

## K

**K-N-I-G-H-T** 11:4

**keep** 45:6 80:23
93:21 143:2

**killed** 27:16

**killing** 7:15 13:7

**kind** 20:9 25:1
27:14 31:4 42:24
43:21,24 44:9,24
51:13 62:12
64:16 69:20 87:7,
23 90:9 112:9

---

113:2,23

**knew** 48:4

**Knight** 5:17 11:4
53:10 67:3 94:10
147:18

**know** 6:9,10,12,
13 7:6,7 11:7
15:19 16:24 17:2
19:17 24:18 25:9
27:6,12 29:22
32:20 33:24
35:17 37:15
42:16,21 43:15
44:10,14,22
46:22 47:10,11,
23 48:1 49:20
50:4 51:2,24
52:2,23 53:2
54:6,14 58:17
59:22 60:1,12
66:8,10,15 70:19
71:17,20 81:8
90:9,21 93:20,22
96:2,11 103:4
105:9 111:23
112:23 113:18,
19,20,24 114:12
115:1,6,18 121:1
128:17 130:24
136:14,15,22
137:22 138:1
141:20 142:5
143:14 144:2

**knowing** 110:14

**knowledge** 9:17
47:21 56:14
116:7 124:6,16

**knowledgeable**
9:23 10:4

**known** 9:13,23
10:4 83:24

---

## L

**label** 107:19

**lachrymator** 84:7

**Lang** 94:11,12

**language** 101:15
102:11 103:4

**large** 14:4 17:16
18:4 19:9 20:8,24
21:2,7,12,17 22:6
26:12 28:7 34:7
36:7,21,22 40:10,
12,14 44:15 45:3
50:6,17,22 52:9,
13,15 53:24 55:8
79:1 87:8 89:1,19
96:9 98:2,13
109:23 111:22
123:8 124:15
131:18 134:23
135:3,10 136:2
139:3,18 142:17,
20 145:12

**larger** 27:5 28:3,
15 29:8 31:7
39:21 47:22 48:1
50:3,7 54:21 55:1
74:13 78:19
80:18 87:20,21
95:13 107:6,17

---

**last** 6:21 12:24
24:14,24 26:1,3
43:15 69:18

**lasted** 133:3

**late** 8:1 12:5
133:20

**later** 105:14
110:3,12

**law** 7:21 44:5
55:11 57:14
133:17 134:12
136:8

**lawful** 97:8

**lawn** 44:17

**lead** 44:19 129:4
137:14

**leader** 78:19,24
79:2 80:21

**leaders** 45:22
72:13,19,21 73:5
75:17 84:3,6
85:11 100:7,14

**leadership** 78:21
81:5

**leading** 17:6
53:22 65:20,21
67:22

**learned** 108:9

**least** 14:12,15
99:21

**leave** 91:2 98:19

**led** 43:4,13 44:5,7
63:12

**Lee** 11:3

**less** 82:19

**let** 6:13 53:3
57:15 79:4 94:15

**let's** 45:21 51:2
99:9 104:1,2
120:4

**letting** 90:21

**level** 14:3 33:2
74:4,7,24 75:6
76:8 84:20 88:1,
2,4,12 89:7,12,
16,17 108:6
111:19,24 141:12
146:12

**liaison** 20:10

**lieutenant** 13:15
19:15 20:5 24:13
34:5,15 36:11,14
37:13,14,16
53:22 54:4 56:2
61:13 63:5,13,23
67:16 68:19 74:8
85:19

**lieutenants** 22:16,
17,21 34:5,11,12,
13,18,23 35:2,6,
8,13 61:2,3 66:13

**life** 109:1

**light** 9:21 64:18

**lighter** 87:4

**lights** 25:13 26:7,

---

8

**like** 6:3 14:18
18:19 21:9 24:1,
16,17 25:1 26:17
27:24 31:2 37:8,
10,12,23 39:2,17,
24 40:3,24 41:12
46:18 49:2,23
50:14 57:1 65:10,
11 66:4,7,8 68:6
74:13,20 75:14
79:4 81:18 87:22
91:17 92:19
95:20 97:19
98:17 101:6
103:3 106:2
107:3,16 111:18
112:22 126:23
140:9,15 141:2,3,
6 143:3,6 144:3
146:23

**likely** 31:22 37:20
42:3 46:21 49:19
57:11 86:16
131:11

**limit** 68:1 90:2
91:4,9 94:6 95:2

**limited** 11:21
93:20

**line** 51:14 74:5
82:1 83:9 97:19

**lines** 47:15 79:10
80:12

**list** 22:20 25:15
137:18,21 140:4

**listed** 60:4 134:2

**listing** 21:15

**little** 16:3 17:13
22:1 24:12 35:16
41:7 53:6 80:14
96:22 108:12

**load** 110:24

**located** 18:12

**location** 8:5
18:15,20 51:3
63:14 74:17
110:5,18,20,23
111:1 133:24
134:20 145:1,3

**locations** 110:15
133:7 145:5,8,10,
12

**logistics** 18:17
22:7 49:1

**long** 6:5 11:17
19:11,17,18
24:19 40:1,6
79:11 88:23
116:13 133:14
136:5

**long-term** 15:1

**longer** 12:8 84:14,
23 85:5

**look** 49:1 83:19

**looked** 70:24
106:8 113:1

**looking** 49:7,10,
19 59:20,22

---

63:15 73:20 81:24 83:8 88:18 96:24 106:3 127:19 133:11

**looks** 58:22 59:3

**lose** 70:8

**loss** 109:1

**lost** 128:11

**lot** 12:11 13:24 23:3 37:24 40:1, 18 44:13 48:2 50:22 51:9 61:1 62:14 65:9 73:8, 22 74:19 76:2 81:11 89:1 115:10 139:2,5, 13

**loud** 90:20

**low** 84:20 88:1,3 89:7 97:24

**lower** 74:7

**lowest** 48:2

**luxury** 102:13

---

**M**

**mace** 64:14 84:19 87:22 90:9

**made** 15:19 16:13,19,20 17:22,24 30:10 32:16 33:12,17 35:12 48:13 52:6 53:11 61:15 63:2 65:23 68:3 72:11 74:7,18,21 76:13 77:7 78:6 80:21 82:10 101:21 103:10,14 108:14 109:9,12 110:17 113:8,21 114:13 116:24 134:11 142:3

**magazines** 64:15

**magnitude** 121:10 131:19

**maintain** 41:12

**major** 21:3,12 25:10 26:15 131:17

**majority** 14:15

**make** 15:20 16:15 18:23 22:21 25:3, 21 36:4 38:6 40:2,4 41:16 44:23,24 48:9,10, 13 50:11 60:17, 21 62:2,6,14 64:2 66:18 67:19 68:1 72:13 73:19 77:8 82:21 83:23 86:13 87:18 103:21 106:9 107:4,7 115:15 133:6 135:4 140:13

**makes** 33:2 63:5

**making** 17:5 33:13,15 34:14

36:3 37:7 50:1 53:14 61:2 63:18, 23 107:8,15 108:1,5 121:16 128:9 130:13 146:11

**man** 41:11

**manage** 24:2 142:6

**management** 13:18 14:6 15:15 16:9 19:24 20:1 24:7 132:11

**managing** 18:17

**manner** 55:1 102:21 115:6 141:10,11 147:7

**manpower** 143:5

**many** 22:18,19 27:4 34:5 37:3,4 42:1,7,14 49:21, 22 50:5 78:14 82:20 88:7 89:3 98:2 101:8 107:16 117:23 125:13,16 132:18 133:3 134:18 136:11 138:13 140:8

**Marathon** 26:24 41:10

**march** 109:24

**marched** 109:23 110:1

**marches** 27:23 28:5

**Mark** 87:16,22 94:11,12

**marshal** 24:10 28:17 137:23

**marshalling** 14:4

**mask** 65:7

**mass** 44:24

**match** 92:23

**Matrix** 92:4,9,17, 21 93:11 97:15 98:23 99:5,7

**Matt** 16:24

**matter** 7:2 9:2 57:10 88:15 109:14

**matters** 8:23

**Mattie** 5:10

**may** 5:5 7:16,19 8:1,12,13,14 9:16 11:19,20 12:20, 24 13:7,8 14:10 15:8,14,23 17:6,8 19:1,2 27:2,15, 17,20 28:22 30:7 31:24 37:20 39:19 41:17,18 46:6,8 51:12 59:16 60:2,4,22 62:4,21 65:3,21, 22 66:9 67:17 69:8,9 71:21 88:11 90:8 91:19

97:5 112:20,22 124:20 125:2,17 126:7 127:17,24 131:23 133:20 134:3 146:7,22 147:5

**maybe** 14:21 34:17 37:14 66:22 78:19 85:13 94:18 111:17 147:12

**Mayor** 77:6 135:20

**Mcfadden** 7:4

**mean** 14:10,17 15:11 23:13 38:24 46:17 48:21 66:3,4 92:16 93:16 106:20 113:22 114:5 136:13 144:9

**means** 18:15 88:9 95:12,13 135:16

**meant** 114:1

**measures** 90:22

**mechanism** 87:10 116:1,8

**media** 31:2

**medications** 6:17

**meet** 63:9 79:13

**meeting** 29:21,23 32:2 42:11,19,20 43:3,4,5,7,15 44:6 45:12,15,16, 17,18,20 46:1,5, 6,7,24 47:7 59:19 105:22 132:17

**meetings** 59:6 60:4,9,15 78:11, 15 127:23 128:7 132:20 133:9

**membership** 131:11

**mentioned** 20:15 32:5 33:23 34:18 45:14 47:1 66:3 71:13 84:2 88:13 94:22 111:11 113:7 114:11 123:14 146:24

**merely** 126:7

**message** 80:5,7

**met** 54:18 80:6,9 113:7 114:11 116:5 132:14

**method** 88:20

**Michigan** 27:8,12

**might** 58:19 70:23 76:9 125:22 132:8

**Mike** 28:18 31:14 43:7

**minimal** 117:14

**minimum** 22:18 98:17

**minor** 107:6 147:9

**minute** 107:17

**minutes** 59:2 66:23 104:2

**misconduct** 114:17 120:4 126:8

**missing** 40:19,21, 23

**mission** 41:8,9 42:22 88:5 121:18 144:12 146:14,20

**mistake** 8:18

**mix** 136:13

**mobile** 109:20 111:3,5

**mobility** 139:4,6

**mobilization** 138:3,4

**model** 90:5

**modifications** 74:2

**modify** 73:23

**modules** 23:1

**moment** 43:23

**Monday** 135:21

**monitor** 142:15

**Monthly** 82:5,9 83:7

**months** 11:22

**more** 10:3 22:1 28:4 30:22 36:12 37:12 39:22 41:11 48:20 50:15,18 53:11 55:12 60:20 67:15,19 80:5 85:14 91:11 96:19,22 106:3 107:7 108:11,18 109:20 110:5,7, 11,13 111:2,4,12 112:3,6 113:3 118:4,13,17 120:4 121:18 124:22 125:12 137:12 139:4 142:3 143:19

**morning** 5:23 6:1 41:21 43:8 48:10 54:11,19 57:13 59:6 62:4 67:24 68:13

**most** 7:3 23:7 31:22 33:11 49:11 50:21 63:14 64:20 86:15 98:15 109:21 111:15 120:12,16 129:4 132:5 134:14 135:1 140:23

**mostly** 108:10 111:10 113:1

**motorcades** 141:3

**motoring** 62:11, 15

**mounted** 38:16 49:20 50:2,8,10, 15,16,22 51:1,3, 23 52:2,5 65:13 134:24 136:14 139:9

**mouth** 78:8

**move** 50:17,20,24 51:6,19,21 63:18 74:19 87:13,19 88:10 89:7 90:15

**moved** 79:16 108:2 109:2

**movement** 90:7 111:6 113:3

**movements** 110:10 112:24 113:4

**moving** 51:4 59:5

**much** 6:7 20:20 35:3 43:13 44:2 50:18 53:8 65:6 81:1 87:20 88:11 96:19 102:9,15 138:1 142:5 143:19

**mult** 19:20

**multiple** 19:23 20:24 22:10 35:1, 6 103:1 112:8 132:20

**multiplier** 50:4

**multitude** 20:10 26:21

**munitions** 53:22 66:5 67:10

**must** 27:12

**mutual** 7:23 32:16 133:19 135:10, 12,16 137:19 138:8 139:14 140:1,3,7,16,20 141:1,14,16 142:12,19 145:14,17 147:4, 19,21

**myself** 35:8 46:4, 12 69:7 79:19 136:19

---

**N**

**name** 10:24 11:1, 3 17:1

**names** 37:9 38:2

**national** 19:24 21:1 135:20,22 144:20 145:7,14

**naturally** 51:14,19

**nature** 68:19

**necessarily** 31:11 34:7 35:22 36:2, 10 59:20 63:7 67:17 68:15 75:11 85:22 89:20,21 104:17

117:9 118:19
119:1,18,24
121:13,16 136:4
**necessary** 30:12
113:23 132:21
133:4

**need** 6:13 16:15
22:7 24:9,23
25:16 26:20 32:1,
15 36:9 37:17
38:24 39:20,22
41:1,11,16 43:16,
18 44:23 51:8
53:18,23 56:1,8
66:22 69:21
82:24 87:2 104:2
126:24 130:2
132:4 134:16,19
135:6 136:4
138:2 139:6
140:10 147:11

**needed** 26:4
32:11 42:19 43:9
47:3 55:4,6,13
59:7 60:12 66:16
106:2 107:23
108:24 126:11

**needing** 42:8

**needs** 39:13
40:13 41:4,7

**negative** 119:22

**never** 27:11

**new** 12:3,12,17
58:14 69:17 98:3
99:14 100:9,19
101:4 102:19
103:7,9,13

**next** 45:8 68:13
69:24 72:12
73:19 86:19
102:7 121:4
132:3

**nice** 134:18

**night** 17:11 28:7,
19 29:3 30:16
41:22 42:1,4
43:8,11,15 47:2,
18,20 48:3,4,11,
14,16 49:13 55:2,
5 60:12,17,18
62:3 65:20 68:24
69:3,11 70:3,10,
16 71:5,9,15,18,
19 108:11,13,17
109:17,19 110:6,
13 111:10,12
112:1,2

**nights** 82:2 83:10

**nighttime** 8:14
112:12

**NIMS** 19:24

**non-violent** 97:7,
23

**nonbike** 38:9

**noncdp** 144:1,4

**none** 122:10

**nonprotest** 52:14

**nonviolent** 94:24
95:3 98:14

**norm** 121:13

**normal** 28:4 52:14
53:13 54:21 55:2
69:17 70:22
85:14 131:7
134:24

**normally** 76:10
135:8

**north** 12:7

**note** 59:1

**noted** 53:4 114:5
117:4

**notes** 43:14 46:10

**nothing** 27:21
86:8

**notice** 9:3 13:14
14:7 119:6

**noticed** 51:1
108:8,17

**notified** 25:16,17
63:10

**notifying** 39:8,9
45:1

**number** 41:23
45:3 49:12 82:17
95:19 117:11,14,
18 119:21 121:7

**numbered** 10:12,
14

**numbers** 28:16
29:1 30:19 42:1
107:24 117:22
119:3 121:12

---

## O

**oath** 5:6

**object** 53:3 56:10
71:6 72:6 93:13
95:7

**objection** 72:24
75:3 77:23 89:13
91:13 98:6
100:11,20 103:18
113:14 114:5,19
117:2,4 118:6
119:13 120:9,23
121:24 122:9,23
123:19 124:4,24
126:13 127:10
129:20 131:4

**objectives** 146:16

**observation**
108:14

**observed** 112:8
118:23

**obviously** 44:22

**OC** 84:17,19
87:14,16 90:9
96:19,22

**occur** 13:16 14:5
33:19 41:1 76:7
101:11 118:2
131:2,3,6

**occurred** 15:12
41:22 42:19
47:21,24 48:3

**occurring** 33:16
44:14 96:3 109:8
129:10 135:7,23

**occurs** 17:14
18:20 63:22
117:10

**off** 20:17,19 94:19
141:5

**off-campus** 23:24

**office** 42:12 45:23
48:7 85:10,12,24

**officer** 38:10
51:23 57:5,12
58:3 62:20 63:7,9
64:2,10 89:5
106:6 115:20
118:22,23 119:6,
11 145:18 147:20
148:1

**officers** 14:22,23
17:2 22:8 33:22
34:17 35:14,20
37:23 38:8,24
40:5,7,18 41:11
49:21 50:18 51:8,
10 52:7 53:12
54:22 62:19
63:21 64:20 65:4,
9,12,14,24 69:3
75:2 76:24 77:11,
17,20 79:7 81:20
82:1,23 83:2,9
84:18,20 85:4,5
87:11 93:18,20
99:14 100:9
101:4,21 102:8,
19 103:3,7
105:13,14 107:20
112:5,7 113:11
114:15 117:1,12,
15,20 118:5,14
119:11,16,21
120:5,8,20
121:23 122:6,20
123:16 124:12,
17,23 125:3,9,12,
16,20,22,24
126:2,5 129:18
130:1,4,19
134:12 136:9,16,
17 137:15 138:21
139:20 141:17
142:12,22 143:10
144:1,5,19,20

**officers'** 119:17

**offices** 31:23

**officially** 59:17
68:5

**often** 20:18 68:15
116:23 117:10
118:4 132:5

**oh** 6:22 19:11
92:6

**Ohio** 42:13 89:4

**Ohl** 52:21 137:6

**old** 6:9 103:11,15

**once** 12:8 16:15
26:8 86:20 103:9,
13 143:17

**one** 5:11 7:3,12
13:13 18:20
20:17,19 23:12,
17 24:4 26:24
27:7,18 29:10
44:11 45:11,21
50:2,19 57:10,15
59:2 73:18 78:19
79:7 80:19 81:4,5
90:17 91:3,16
102:7 107:17
108:16 109:24
110:1 115:1
120:16 129:24
132:17 135:15,18
138:19 140:23
145:3

**ones** 34:13 67:9,
13,20

**ongoing** 21:9
33:4 135:12

**online** 19:21 23:1,
6,7,8

**only** 9:16 25:19
38:19 46:4 67:9,
13,20 80:19
90:12 125:18

**oops** 92:12

**open** 26:24 27:8
47:15 79:9 80:12

**opened** 26:17,18

**operate** 20:2
21:13 25:18,20
56:20 63:3 66:12,
14 75:9,12

**operating** 14:14
20:8 66:11 71:16,
22,24 73:11
75:15,21 76:18
99:5 115:21
116:6 146:21

**operation** 99:6

**operational** 7:17
8:7 15:5,9,11,17,
20 17:5,9 18:3,11
34:12 36:13
59:10,12,13,18
60:5,8 61:17
68:10 69:18,19
70:20 73:10,18
92:9 101:23
103:2,8 104:19,
23 105:1,10
107:3,5,7 108:2
112:9,15 121:4
127:14 134:2
138:12 144:11,17

**operationally**
35:10

**operations** 13:17
16:21 17:15 20:7
24:6 42:10 43:20
48:23 55:16
127:21 132:10
137:20

**opinion** 77:3

**OPOTA** 89:4

**opportunities**
106:4,9

**opportunity** 36:15
43:10 54:9 80:15
91:2 98:18
101:12,15 102:1,
10,12 103:6

**opposed** 7:17
40:15 68:2 74:6
113:5

**order** 77:12,21
85:23 126:17

**ordered** 84:14

**orders** 98:19

**ordnance** 54:3
55:3 56:8 85:3,17

**organization** 80:7

**organize** 20:24
21:6 26:12

**originally** 14:17
26:14 43:7 75:15
84:16

**OSP** 44:12 45:22
135:17 143:3,9,
16,22 144:7,13
146:10

**OSU** 23:22

**OSU-MICHIGAN**
27:9

**other** 7:17 8:6,13
9:15 10:21 16:2
18:22 20:12
26:18 29:12
30:13 38:22
46:12,16 47:13
48:4,12 49:6
50:10 54:23 55:6,
11 57:14 59:22,
24 61:11 65:9
66:5 69:7 70:16
79:7 81:8,17
87:10 88:10,11
93:24 98:13
109:7,11 110:15
113:13 119:11,17
120:15 129:7
134:2 141:16
143:4 144:19,22
145:5

**out** 18:20 29:5
30:19 34:13,19
35:1,5,10 38:4
46:7 58:15,16
59:19 61:16 70:2,
3,7 74:15 76:3
78:16 79:7 80:18,
24 81:6,19 82:1,
23 83:9 100:7
111:21 116:6
132:9 133:14
144:4

**outer** 143:8

**outlined** 62:21

**outranking** 45:11

**outside** 14:5 20:9
22:23 26:23 27:4
30:2,5,12 32:15
33:16 39:20 49:8

50:6 56:11 62:1
89:13 91:13
93:14 94:6 95:8
98:8 100:11,15,
20 103:18 105:12
113:12,14 114:16
115:14 117:2,7
118:6 120:9
121:12 122:9,10,
23 123:19 124:5,
24 126:13 127:19
129:20 130:17
131:5 136:15
137:18 139:13
140:21 141:15

outward 12:9,11

over 11:10 12:7
13:15 15:12
23:21 24:17 26:1
39:10,24 40:5
45:8 68:10,11,16
69:24 72:12 74:8
75:14,22 83:13
93:24 108:19
109:3 112:8,16
124:13 132:19
133:5,8 134:22
136:1 138:4,15
142:17 145:21
146:4

overall 14:10,11
41:8 124:18

overlap 141:21

overly 81:8

Oversight 92:14
97:17

overuse 77:12,21

overview 35:3

own 10:17 18:6
143:1

_____

**P**
_____

p.m. 148:10

pack 53:24

page 92:8,12,13
94:14,15 96:24
97:16 144:15

pandemic 16:6
17:16 45:4,6

paperwork 37:17

Parade 27:1,3

paragraph 92:15
97:20

paraphrase 84:5

part 11:14 52:19
111:15 129:4
132:6 134:21
146:12

partially 16:8 90:6

participating
95:17 96:9

particular 36:5,9
37:19,24 41:2
66:17 88:17
106:18 119:3
123:22 125:23
135:11 144:11

particularly 45:11

parties 24:1

partners 16:2
18:18 25:15
26:23 145:15

past 22:16 51:17
56:23 71:23 82:2
83:10 141:11

patrol 12:7,8,14
13:24 28:12
42:13 64:20
141:19 142:10

patrols 52:6

Paul 52:21 137:6

pay 20:21

Peace 89:5

peaceful 81:10
89:11,17 90:6
91:2,7 108:10

peacefully 80:5
90:3 115:6

people 25:14
30:19 36:8 38:19
39:19 40:3 42:1,
14 51:14,19,21
76:9 77:2 79:12
80:20,23 81:13
82:19 89:23,24
90:12 95:11,19
102:4 110:18,24
114:24 117:19
136:11 137:2
142:20 143:1

per 145:17

percent 46:20
132:8

perception 126:7

perform 127:20

perimeter 143:8

period 17:9 19:11,
13 40:1,6 59:11,
12,13,18 60:6,8
61:17 62:16
69:18,19 70:20
73:10,19 75:14,
22 83:13 88:24
104:20,23 105:10
107:3,6,7 116:16
121:5 127:14
128:1 144:11

periods 7:17 8:7
68:10 101:23
103:2 105:1
108:3 112:9,15
134:2 138:13
144:17

peripherally
129:1

person 19:22 23:5
31:19 32:9 39:5
52:20 81:14
129:5 131:24
134:14

personal 9:17

personally 84:10
108:16

personnel 7:22
8:4 13:10,18

14:19 15:4,15
16:1,5 18:19
25:23 30:9,11
32:1 33:18 39:9
45:9 48:21,22
49:3,12,15,17
55:5 95:10 97:5
99:22 101:10,14
102:3,14 108:15
109:4 129:2
132:11 133:1,18,
23 134:11 139:15
141:7 142:4,8
143:20 145:22

persons 76:19
95:16

perspective 129:2

pervasive 125:14

phase 78:4 99:8
108:22 109:10
111:4 123:11
138:2,4

Phillips 5:13 8:8,
11 29:10 52:17
53:2 56:10 71:6
72:6,24 75:3
77:23 89:13
91:13 93:12,22
94:3 95:7 98:6,8
100:11,20 103:18
104:4 113:14
114:4,19 117:2,6
118:6 119:13
120:9,23 121:24
122:9,23 123:19
124:4,24 126:13
127:10 129:20
131:4 134:5
136:18 137:4
147:14 148:5

phone 25:21
82:17

physically 145:11

pick 35:22 36:15

picks 35:20

picture 113:2

piece 54:3 105:15

pieces 74:20
130:8

Pillar 92:13 97:17,
20

place 5:6,15 45:7
48:15 50:19
84:24 100:18

placed 12:17
103:8

placing 130:16

plaintiffs 5:9,10

plan 13:10 23:19,
20 41:15 58:12
89:6 119:9
134:17

planned 30:15
60:18 62:2
104:24 127:8

planning 7:13
13:5 15:1 28:21
29:6 30:7 41:19
45:2 51:20 52:23,

24 56:16 72:8
73:2 75:5,24 76:1
77:12,15,21 78:4
82:15 86:19,21
89:15 90:1,5,14
93:14,21 94:4
98:21 99:8 101:2,
24 102:17 103:24
104:8,10,13,22
106:12 107:2
108:21 109:10
111:3 112:17,20,
21 113:5,22,24
118:11 119:16,18
120:1,19,21
121:4,17,20
122:14 123:2,7,
11 124:9,14,18
125:6 126:18
127:14,21,23
128:7,21,24
129:1,5,9,13,22
131:15,21,22
132:15,24

plans 21:21 24:3
60:18,20

please 5:2 10:24
85:18 87:1 114:9

pleased 75:18

pleasure 77:5

plug 37:5,9

plugging 36:7
38:1 39:7

point 15:16 31:21
35:7 50:24 55:21
56:23 57:8 65:22
68:5 69:22 76:6
79:15 83:11
84:13,15 85:14,
16 86:4,12 91:22
92:2 101:21
102:17 105:2,6
108:8,10 111:14
112:10 127:17
128:18 135:18
138:6,9

Polaris 110:16

police 7:13,23,24
11:2,13,16 13:5,9
21:14 22:15
23:13,16 44:7
46:3 49:8 50:20
54:24 61:22
64:10 67:21 75:2,
8 76:11 77:5
79:22 80:1,17,24
81:3,10,16 82:20
83:16,18,23
85:19 91:9 92:9
106:19 107:15
111:21 114:17
116:2 117:19
119:11 122:15
124:8 126:17
127:22 131:19
135:2 140:13
141:9,17 145:6,
18 146:15 147:22
148:1

policies 61:20,22
71:4,24 72:3,9,
14,21 73:6,17
77:13,22 126:19

144:21 145:17,18
146:6,7,19 147:5,
9

policing 13:10,12

policy 41:3,6
61:4,15,19,24
62:20,22 63:1,9
64:8 68:2,3 71:9,
14 72:12 73:11
74:12 75:10,13,
16,21 83:19
84:24 91:9,11,15,
18,23 92:7,13,17
93:17 95:2 97:11,
17 99:6,20
101:12,20 102:7,
19,22 103:3,7,9,
11,15 107:10
108:4 113:12,21
114:16 115:2,10,
14 116:6 121:18
146:23 147:1,24

political 145:19
148:1

poll 133:7

populations 45:5

portion 26:9

position 9:19
11:22 33:14 36:9
38:10,17 51:11
55:23

positions 21:5
37:4 38:18,20
65:15

possible 7:14
13:5 44:2 45:9
50:8 65:7 81:1
86:10 99:21
102:15 105:24
109:6 130:11
134:18 139:7

posts 41:12

potential 87:7
109:1 121:2

potentially 99:18
104:18 137:21
142:11 144:7

Powerpoint 99:18

practice 87:4
88:14 146:1

practices 88:18
92:24 98:2

precinct 122:6,21
125:23

precluded 63:8,
21

predeployment
69:8

preexisting
139:24 140:6

preference 13:21

preferred 102:10

preparation 10:20

preparations
128:9

prepare 9:6 10:9
55:4

prepared 55:7
111:4
preparedness
15:2
preparing 28:13
128:6
preplanned 13:19
14:7 20:12 35:24
36:18
presence 76:15
present 68:15,17
124:7 134:13
136:9,17,23
Presented 58:3
pretty 93:13
143:17
previous 19:5
47:2,18 48:11
70:16 71:13
147:19
previously 12:6
124:1
Pride 27:1,3
prime 38:8
prior 11:22 13:8
15:8 61:17 64:5
70:13,20,21
71:10,20 72:20
73:4 91:2,19
103:5 104:19,23
123:4 127:13
128:5 132:14
pro 6:9
probably 14:5
16:17 31:21 32:3
50:19 58:15
88:16 91:18
135:21 137:19
problem 82:12
90:5 96:11
105:11 119:23
120:1 121:14
problems 106:17
Procedure 7:9
procedures
146:6,19
proceedings
148:9
process 49:14
90:15 119:16,19
120:2
processes 102:6
profiled 122:8,22
profiling 121:22
123:18 124:7
program 21:9
prohibited 63:9
promoted 11:19
22:22 56:5
pronouncing 57:5
properly 22:9,12
40:2 42:7 101:13
102:1 130:20
133:7

property 11:11
61:11 62:18
76:19
protect 43:16
47:3 61:6,8 62:17
65:5 76:19,22
110:22,23
protected 133:8
protecting 44:12
62:7,15 76:20
77:1 80:10,11
111:22
protest 7:24
39:18 40:15
41:19 52:24
60:19 68:1 71:4
72:9 77:11,20
80:4 86:19 87:8
90:3 99:24
102:18 104:1
106:12 112:16
115:7 118:11
119:9 120:22
125:6 126:20
127:24 129:19
131:15 132:15
133:20 134:13,23
135:4,9 136:3
145:9
protest-type
13:20
protester 75:7
protesters 41:23
51:11 59:8 72:4
78:9,12 79:8,22
81:10,23 82:14,
24 83:15 89:11,
17 94:23,24 95:3
97:23 98:15
106:19 112:15
113:8 114:12
115:2 124:10
141:24
protesters' 124:9
protesting 62:8
protests 12:23
14:2 26:13 27:17,
20 28:3,5,14
77:18 79:16
104:10,14 105:19
112:12,18 127:8
128:21 133:5
135:2
provide 25:11
47:14 53:21
67:19 70:5 96:7
101:15 115:15
140:18
provided 10:11,
22 56:4 65:4
129:18
provides 130:3
providing 37:16
56:7 140:1 145:2
147:21
proximity 51:9
public 62:9,11,15
63:17 130:5
133:7 140:5
publically 7:14

13:6
pull 74:14 76:10,
14 77:7,9 81:2
82:18,22 94:9
97:14
pulled 76:6 141:4
pulling 42:9
purchase 106:1
purpose 53:20
103:22 128:21,23
purposes 75:24
76:1 82:15 101:2
104:13 112:17,
20,21 113:5
121:20 123:2
129:9,13 131:21
pursuant 7:9
push 51:3
put 29:5 37:21,22
38:9,14 39:12
43:19 61:16 76:4
78:7 82:23 84:24
100:18 106:4,6
146:1
puts 27:6
putting 38:19
51:10 58:14

——————

Q

qualifications
38:15
quantified 119:22
quarters 17:19
question 52:23
53:4 56:11 67:8
71:7,13 75:11
76:17 88:22
92:20 94:20,22
95:1 109:15
113:24 114:6,8
122:2,19 126:16
127:12 137:4,10
questions 24:9
29:12 69:9,16
70:22 91:24
92:18 113:22
148:4
quick 6:15 18:23
66:22
quickly 86:10
99:20 101:19
102:22 105:24
106:3
Quinlan 12:13
16:13 30:14 46:6
70:12 127:6
quite 27:10 64:11
quote 82:5

——————

R

racial 121:22
123:18 124:6,10
racially 122:8,22
radio 18:15

143:14
raised 120:20
ramp 141:6
rank 11:4 34:7
46:15,17 136:12
ranking 32:9
Rapid 138:24
rapidly 139:17
rare 119:10,16
rarely 115:3
rather 81:12 83:1
136:7
reached 59:8
react 103:4
reacting 73:21
reaction 74:9
75:19
reactions 131:19
read 7:12 9:18
93:4 94:19 148:6
reading 97:10
98:11
ready 136:6
real 6:5 41:6
121:14
real-time 122:17
128:16
realize 115:4
really 20:21 23:6
27:10 44:17 48:2
71:20 103:19
107:22 112:24
138:1 141:18
reason 39:12
reasonable 9:3
80:10 81:1
reasonably 9:14,
15,24 10:5
reasons 39:4
recall 6:22 7:1
10:21 14:13
16:18 17:23
24:14 25:2 29:4,
9,18,20 30:8,10,
13,14,17 31:6
32:2 45:19 46:2,
10,17 47:6,17,19
48:6,8,18 49:18,
23 52:9,11 53:14
54:17 55:3,21
57:1,4 58:6,8
61:15 66:1 68:17,
21,23 69:10
70:14,17,23 71:8
72:1 78:4,14
81:6,14,23 82:3
84:11 86:5 99:23
100:4,6,13,16,23
102:20 105:6
106:14 107:13
112:20 113:10
114:14 125:16
126:22,24 128:3,
7 129:10,14
130:11,22 131:16
132:18

receive 25:19,20
56:24 118:18
127:5 138:23
142:22
received 20:2,6
23:4 30:18 57:2
72:19 118:4
125:18
receives 118:13
receiving 75:16
recent 7:3
recess 67:1 104:5
147:16
recognize 89:19
146:5
recommendation
93:8 97:16
record 5:3 8:9
10:24 29:14 53:5
67:6 140:5
recorded 71:11,
12
records 29:23
Red 20:11 26:17
40:14,17,21
reduce 80:16 87:6
reduced 45:5
reduces 51:8
refer 20:18,20
115:23
reference 91:23
92:5
references 92:14
referred 116:2
referring 61:21
84:15 97:18
123:13
regard 40:12 44:8
56:15 60:22 72:3,
8 73:2,3 74:2,24
75:5,6 89:15
98:24 101:24
103:24 106:22
109:17 126:18,19
129:16,17
regarding 17:5
18:6,24 22:14
28:21 30:7,19
41:3 49:16 52:23
60:18 61:20 93:6
94:21 99:13
114:15 126:17
127:1,23 129:24
132:15
regardless 17:24
regular 16:9,22
20:11,13 52:4
56:5 64:12 130:7
135:9 138:20
regularly 50:11
51:24 66:15
81:13 120:13
130:1 141:2
145:4
Regulation' 92:23
related 31:16 33:3

**34:**7 36:12 54:24
65:8 71:3 92:18
104:11 112:14,23
117:13,23
131:18,21

**relates** 94:3

**relative** 123:2
130:16 131:10

**relevant** 104:24
119:18,20

**rely** 62:22,24

**remain** 76:11
144:14

**remained** 110:4

**remaining** 42:2
111:3

**remember** 20:20
22:19 24:24 26:3
27:3 29:11 45:4,
24 47:8 49:9 50:5
69:4 72:16 78:1
82:8 83:21 86:3,
20 98:10 99:17
115:11 116:2,3

**remote** 5:6,7

**removal** 101:6

**removed** 85:2,18,
19

**removing** 76:24

**reorganized** 12:5,
8

**repeat** 114:8
136:19

**repeatedly** 102:14

**report** 92:8,10,17,
21 93:2,11 97:15
98:5,23 119:11,
17,22

**report's** 93:6

**REPORTER** 5:1

**reporting** 5:7
21:18 22:4

**reports** 70:16
104:9,15,22
106:12,15,23
132:6

**represent** 5:3

**representation**
93:6

**representative**
43:20 45:7

**representatives**
16:1 42:12,13
49:6 55:12 79:18

**represented** 83:6

**request** 49:18
52:6 53:11,14
145:22

**requested** 30:9
48:7,20 72:15
145:20

**requesting** 48:22
49:3 130:18

**requests** 36:4
49:16 130:14

**require** 14:4
25:13 98:16
111:4

**required** 22:18
24:22 27:4 72:13
73:4 77:8,12,18,
21 84:3 109:6
110:23 144:21

**requirement** 64:1,
4 127:2

**requirements**
45:6

**requires** 111:8
120:17

**resolve** 105:24

**resource** 51:16
139:10

**resource-heavy**
41:11

**resources** 14:5
15:18,22,24
16:16 17:11,12
18:3,24 22:11
24:9,10 25:22
26:21,22 27:5
28:17 29:2 32:10,
11,15 39:22
41:13 42:5,9
43:17,19,22
46:13 47:3,11,14
48:5,6,12,18,20
49:8,10,15,23,24
50:12 55:12,15
59:23 60:10
69:19,21 70:10
74:15,19 76:6,10,
14 81:3 82:21,22
106:5 109:7
110:9,11,13,19
111:2,9 121:19
134:17,18,19,20
135:3,13,15
136:2,4,5,7,12
137:16,24 138:5,
6,8,9,14,19 139:8
142:1,7

**respect** 98:21
131:14

**respond** 21:3
29:7 33:4 43:1,11
44:1 50:11 60:19
61:4,14 62:3,19
64:7 77:4 81:16
106:2,3 108:22
109:16 111:5
115:17 123:10
133:5 138:10
140:9,10 142:18,
23

**responded** 19:13
86:23 108:13,15
117:20

**responding** 25:11
33:18 42:17,21
61:10,18 63:10,
21 107:9 112:18
138:10 140:12
145:22

**responds** 61:14
62:6

**response** 11:12

23:24 28:8 30:15
35:20 41:19,24
42:16 50:8 52:24
56:16 68:1 71:4
72:3,18 73:13,21
75:2,8,14,17,18,
19 79:22 80:1
83:5,15,17,22,23
84:12 85:6 86:24
89:6,18 93:19
102:18 103:24
104:14 106:13,19
107:12 112:7
113:20 115:11
118:10,11 119:9
120:22 121:9
123:8 124:9
126:21 127:8,24
128:10 129:3,14
131:15 132:24
133:4 135:10
136:3 138:22
139:1 142:24
145:9

**responses** 6:12
127:24

**responsibilities**
11:8

**responsibility**
142:3,5,13

**responsible**
32:13,23 33:13
44:12 102:5
124:13

**rest** 33:5 37:19
40:3,6 50:13
67:11

**restate** 133:16

**restricted** 39:1,3

**result** 88:11
107:15 122:7,21

**resulted** 79:10
103:16 146:24

**retractable** 64:23

**Rettig** 5:10

**review** 10:16 92:9
99:19 104:9,12
106:11,22 112:17
127:7,13 129:7,
11 132:13

**reviewed** 10:10,
18,19 70:15
92:23 104:17
106:14 112:19,23
127:18 128:20

**reviewing** 10:21
70:17 112:22

**reviews** 107:15

**right** 5:8,23 6:7,8
8:16,17,18 11:24
12:21 13:3 18:22
24:11 26:13 30:2
45:13 53:2,8
57:6,22 59:5
63:20 66:21 67:3,
5,22 93:16 94:9
99:9 104:1,7
110:8 125:5
126:16 127:2
128:16 136:21
141:21 147:18

148:5

**rights** 61:7 62:7
76:21 80:8 115:4,
8

**riot** 65:4 73:15
79:7 105:13,14
106:8 130:20

**riots** 26:13

**rise** 76:7

**rises** 87:5

**risk** 97:4

**roadway** 98:19

**roadways** 139:17

**Robinson** 29:16

**robust** 23:6

**rocks** 112:3

**role** 11:7,18,20
12:18 13:1 25:12
32:5,7 37:18,24
38:15 40:16,22
53:21 54:7 55:24
68:4 116:14,19

**roles** 37:10 38:12
40:24

**roll** 33:1 68:7,14,
17,18,22 69:5
71:10 85:15 86:6

**rolled** 87:9 96:15,
17

**room** 5:4,11 6:6
43:6

**roster** 37:12 38:1

**rotating** 40:2

**roundabout** 93:21

**rounds** 58:14,16
64:15

**rude** 120:6

**rudeness** 120:11

**Ruffin** 15:7

**Rule** 7:9

**rules** 6:11 32:17
33:21 61:5 144:3,
10,21 146:21

**run** 34:11 68:12,
15

**running** 26:9 33:1

---

**S**

**safe** 17:18

**safety** 11:23 22:7
62:9,10 63:18
77:6 97:5 130:4
131:10

**said** 12:20 21:10
24:12 26:11,16
30:15,18 31:24
51:18 75:14 79:3,
4 81:14 82:18
85:18 107:3,16
128:17 144:3

**same** 8:6 11:22
42:18 70:9 86:2
103:15 144:15

146:8 147:6

**saw** 47:2 57:8
58:7,23 100:14
111:19,23 132:4

**say** 6:6 29:13 51:2
61:20 66:22 69:8
78:6,23 83:7
115:19 118:17
120:6 125:13
146:10

**saying** 93:23
98:11 122:5
137:1

**says** 5:18 94:12
97:3

**scale** 14:4 17:16
18:4 19:9 20:8,24
21:2,13,17 22:6
26:12 28:3,7 34:8
36:7,21,22 39:21
40:10,12,14 50:6
52:9,13,15 74:13
123:8 124:15
134:23 135:3,10
136:3

**scenario** 143:9

**scheduled** 42:11
133:6

**scope** 56:11 71:6
72:7 73:1 75:4
89:14 91:14
93:14 94:6 95:8
98:9 100:12,15,
21 103:19 113:15
114:2 117:3,7
118:7 120:10
122:10,11,24
123:20 124:5
125:1 126:14
129:21 131:5

**screen** 92:1

**sea** 79:8

**Sean** 5:8 8:8
29:10 52:17
57:17 93:12
134:5 136:18

**second** 7:20 17:8
29:10 59:11 60:6
61:17

**seconds** 59:1

**section** 96:17

**sector** 142:5,9,13,
15 143:4,19
144:3 146:11

**sectors** 141:23
142:2 143:17

**security** 143:19
145:2

**see** 43:15 57:23
58:20 79:9 92:8
94:10 99:9
111:20 133:14
147:12

**seeing** 31:24 58:9
61:5 76:23 107:9
108:21

**seeks** 9:13

**seemed** 80:16

112:1,2

seems 79:1

seen 51:15

select 35:24

selecting 36:19

selections 37:7

send 110:20

senior 145:18
147:24

sent 86:1 132:9

separate 88:10
143:3

sergeant 14:21
16:24 19:8,10,12
20:3 26:5 34:16
37:21,22,23 46:9
63:12,23 64:1,5

sergeants 22:17
34:16 35:13
37:20 63:20

served 11:20

services 11:5
12:1,2,10 40:19

set 13:9,22 41:3,6
43:7

seventh 122:6,20

several 34:10
63:12 76:14
80:18,19 90:20
111:11,18 114:23
128:7 132:19
133:5,8

shall 145:20

share 92:1 132:1

shared 132:5

sharing 47:9
97:14 99:10

sheriff 46:18,22,
23

Sheriff's 42:12
45:23 48:7

shift 8:13,14 53:1
67:23 68:6,8
70:13 74:23,24
75:6 134:3

shifts 71:11

shooting 112:4

short 67:1 104:5
147:16

shorthand 6:2

should 38:19
47:12 54:3 92:23
117:5

shouting 81:11,
13

shouts 81:8

show 26:7 57:15
58:7 93:10

showed 59:1

shut 139:17

shutting 141:5

sick 39:2

sidewalk 44:16

signature 148:7

significant
121:14,17

significantly 87:6

similar 48:1

since 19:10 26:5
127:24 128:19
129:15 138:23
142:7

single 27:6 67:18
95:22 98:12
133:3 134:14
135:24

sir 11:9 12:5,16,
19 19:4

site 33:7 60:14
110:19 136:5
146:17

situation 45:1
63:1,8,11 65:5
144:24

situations 73:22
78:2 80:3 144:1

six 11:15 34:15
37:20

size 30:24 31:5
63:15 96:11
113:4

sized 48:1

slight 121:10

slightly 41:14
111:20

small 11:19 14:20
30:22 36:11
39:18,21 89:2
117:18 143:5

smaller 13:24
14:2,3 15:5 33:15
34:3,6 87:17
146:7

social 31:2

soft 73:14

sole 77:4

some 6:10 15:16
20:3,12 22:24
27:23,24 28:5,13,
17 36:4 41:21,23
42:18 44:9 47:23
50:24 52:16 55:3,
21 56:3 57:8
58:19 64:17 66:9
68:13 69:9 72:14,
15 74:17 75:19
76:3,6 79:15,19
81:11 84:13,15
85:14,16 87:9
88:16 90:9,10,22
99:16 105:2
107:17 108:8,10
109:9 111:14
112:9,23 113:22
116:10 132:2,3
133:10 138:6
143:14 145:14
146:6 147:5

somebody 31:16
37:15 38:14

39:12 46:10,21
74:5 78:23

someone 22:13
58:19 81:6

something 8:20
18:5 25:9 27:2
31:14 34:6 39:23
49:18 52:1 53:17,
23 63:22 73:7
74:5 82:8 87:22
89:1,3,9,24 90:4
96:13 101:7
102:11,23 106:2,
4,5 107:21
108:20 111:9
112:8 115:13
119:24 125:8
127:19 130:3,6
131:24 132:12
133:6 134:21
135:13,24 139:19
140:8 141:5,6
143:6

sometime 29:3

sometimes 17:13
31:5 34:24 53:5
69:6 93:23 95:12

somewhere
34:15,16 68:11
84:24 137:19

sorry 23:15 25:2
70:14 77:18
100:4

sort 37:23

Sounds 66:24

speak 52:2 66:7
69:2 70:12 81:4
84:10 86:22
91:17 94:17,19
119:3 134:6
136:19,22

speaking 116:10
134:10

special 36:4 38:7,
18,21 39:11 54:2
65:15

speciality 138:22

specialized 38:13

specially 88:17
139:15

specific 8:5 21:5
22:16 23:21
26:13 32:19
36:12 38:7,12
49:16,19 56:1
59:21,22 60:20
62:21 65:13,14,
17 66:6,8 70:23
71:1,17,21 74:8,
10 75:10 77:14
78:1,4 82:3 83:21
91:22 92:17
94:20 100:23
106:14 109:15
113:11 115:10,12
116:3 123:3,7
124:11,16 125:8
129:12 130:11,
14,22 132:7
133:24 147:2

specifically 25:8
66:1 70:18 82:9
84:15 91:16,24
96:14 100:13
106:21 114:15
122:6,20 124:9
137:5,12

specifics 47:9,19
48:8 54:16
100:16 115:16

speculating
125:19

speed 40:8

spelled 144:4

spend 109:21

spent 55:14
116:10

spills 44:11

spin 25:18

spoke 57:13
113:8 114:12

spotters 110:8

spray 89:11 91:10
94:24 95:15,22
97:6 103:10,14

spread 35:8

staff 11:15 13:22
15:17 16:18,22
21:6 27:20 28:21,
23 30:3,6 31:16,
23 32:2 33:6,20
40:23 42:7 79:20
105:22,23 132:20
133:9

staffed 16:1,4,8,
10 85:18

staffing 18:18
32:1 36:1,6 37:2,
8,10 38:5 39:13,
20,22 40:10,13,
16 42:23 49:1
128:10 133:2
142:19

staged 76:11 83:1

stand 20:16

standard 64:9
66:3,11

standards 89:4

standing 14:16
55:15 63:20
80:22

stands 20:22

start 55:7 68:6,8
111:19 147:21

started 58:10
111:16

state 5:3 11:1
86:11 89:6

stated 39:17 57:1
78:2 81:15,17,21,
22 84:17 101:6
116:18

statehouse 42:14
44:13,14,17
62:12 109:22
141:23 142:10

statement 82:3,10

statements 100:8

states 88:19
92:21 98:12
145:18 147:24

static 110:5
145:1,10,12

stay 114:2

stayed 70:10

step 82:21 83:3,4
102:24

stepdown 111:24
112:14

stepped 46:7

steps 101:3
105:18

still 6:10 12:14
76:20 91:6 104:7
115:6 118:9
138:7

stipulate 5:12,14
7:10 8:21

stipulation 5:5

stop 97:13 99:9
147:23

stopped 58:21

stopping 123:17

store 24:8

strategic 138:18
139:7,14 141:6

strategically
138:20 139:11,22
140:23 141:9

strategized
105:23

street 8:4 33:15,
19,22 34:14,19,
24 35:1,6,11
44:16 58:15
74:10 76:5,15
77:1 81:1 82:23
133:24

streets 62:11

stretched 135:14

stretching 110:14

strike 30:4 45:15
103:11 104:1
118:2 137:10

strive 53:17

structure 21:12
22:11

structures 21:23

structuring 22:5
53:15

struggle 123:9

struggling 123:1

stuff 66:11 92:4
141:3

subdivision 11:6,
24 12:3,7,10,12
145:19 148:2

subdivisions
12:14 36:24

**subject** 57:10
88:15

**subjects** 93:24

**subordinates**
11:14

**subsection** 52:19

**subsequent**
97:21 105:1
110:4

**successful** 41:16
107:7

**such** 7:21 97:4
131:18 133:17
145:20,22

**sufficiently** 9:3

**suggestions**
99:5,8 132:2

**suggests** 61:19

**summer** 15:12
39:24 65:10
104:12 129:15
140:24

**Sunday** 100:5
135:21

**supervise** 146:17

**supervised** 22:9

**supervision**
140:19

**supervisor** 11:10
14:24 19:7 20:3
23:18 39:10 41:5
55:18,21 56:3,15
63:5,10 64:5
119:7 140:17
142:14 143:10,
11,14,21,22,23
144:18,23

**supervisors** 21:6
23:9 25:16 32:12
33:17,23 35:21
36:17 37:4 39:8,9
56:4 58:12 63:2
74:11 85:5,17
107:22 146:2,12

**support** 25:12
70:6 133:2 143:6,
7

**supports** 38:17

**supposed** 76:19

**sure** 7:5 14:23
22:21 25:3,24
30:10 38:6 40:2,5
46:20 50:1,11
57:5 62:6,14
67:19 73:20 77:8
86:13 92:1 93:7
104:4 105:9
114:10,22 115:15
119:23 121:1
129:23 132:9
133:6 135:4
140:5

**surprise** 130:18

**surprising** 45:2

**surrounding**
79:12 95:24
135:17 140:7

**sustained** 39:24
55:8 123:22
124:12 125:19

**SWAT** 7:21 52:7,
8,10,12,15,20
66:7 133:17
134:7 136:14,20
137:6,8,12

**swear** 5:1

**switch** 133:13

**sworn** 5:18 95:10
97:5

**system** 19:20
20:1,23 21:1,4,5,
12,18,24 22:14
24:19 35:14

**systematic**
106:17

———————

**T**

**table** 79:17

**tactic** 73:9 76:12

**tactics** 52:3 71:4,
14,17,21,23 72:3,
10,15,18,21 73:6,
7,17,24 74:3,10,
13 75:22,24
88:10,11 107:10
108:12 109:18
126:19,23 127:1
132:3

**take** 5:5,15 6:14
24:23 43:14
50:19 68:11
80:14 82:13
102:24 104:2
108:19 109:3
133:14

**taken** 24:19 67:1
85:20 101:3
104:5 105:18
147:16

**takes** 17:13 68:10
136:5

**taking** 46:10
84:19

**talk** 32:3 42:15
45:21 79:4,9
93:15 94:1
111:23 137:5,7

**talked** 80:13

**talking** 59:10 66:2
79:23 91:16,18
93:17 111:16
118:9 122:14,16
136:14 144:6

**tandem** 22:11
141:16

**Tanoury** 5:14

**targeted** 96:19,22

**Taser** 64:24

**tasked** 33:17

**taught** 89:9

**teach** 22:24

**team** 27:8 73:13
139:1

**teams** 22:8

**tear** 66:4 81:7,16
84:7

**tell** 18:9 58:23
72:17 82:10
83:12,14 90:23
98:13 140:4

**telling** 81:23
114:24

**tend** 51:14,19
134:17

**tended** 109:20,21

**tendency** 51:6
73:18 110:6

**tension** 80:17

**tenure** 120:14,15
122:4 123:5

**termed** 84:7

**terms** 46:15

**test** 57:16

**testified** 7:5 124:1

**testifies** 5:18

**testify** 6:18 7:11
8:24

**testifying** 9:9

**Thank** 67:4
114:21

**there** 6:2 7:11
8:18 13:21 15:24
17:11 18:23
23:11 27:17,20,
21 28:20 29:22
30:22 35:14 37:9,
22 38:3,12,19,22
39:12,19 41:3
42:10,15 44:4,13,
21 46:2,8,16,19,
21 47:12,22
49:15 51:20 57:7,
23 58:1,16 59:7
60:1 63:14,20
64:3 66:4,15 69:5
70:19 71:17 72:2,
9 73:5 76:3 77:19
80:18 81:11,12
82:12,17,23,24
84:21 86:5,11
89:10,15 92:13
93:11 95:5 99:12,
15,16,21 105:3
107:6,16 110:18
111:11,21
112:10,11,13
114:3 115:21
116:6,8,23
121:10 122:2
123:16 125:18
126:7,10 127:2
129:17,23 130:7
135:5 136:1
138:16 139:24
140:15 141:21,22
142:17 146:22
147:5

**there's** 23:17 24:4
39:4,11 41:6
64:1,4 74:17
90:11 94:13
114:24 115:13
147:20

**Thereupon** 148:9

**these** 9:24 10:5
29:12 44:9,15,18
58:15,16 71:11
79:16 80:3 90:23
91:1 108:1
113:22 115:1
122:10 142:23

**thin** 135:14

**thing** 36:9 70:7
81:3 115:1

**things** 18:19 22:6
24:1 27:7,19,24
31:2 39:6 40:3,9,
23 41:12,22
47:10 49:2,20,22
50:13 63:19
65:11 66:7 80:3
81:17 87:13
88:20 90:17,23
91:3 107:9 108:3,
16 115:1 129:24
130:17 132:3
133:10 135:7,8
141:2 142:23
145:3 146:5,13

**think** 14:21 15:21
19:11 24:19 27:1,
18,23 29:3 46:4,
20 57:7,10 59:17,
19 64:16 68:10
78:23 84:16
85:13 93:13 98:8
102:21 109:13
112:19 117:22
119:15,18 120:13
123:3,6 125:14
129:14 132:7,8
135:21 143:14

**thoroughly**
117:21

**those** 10:12,16,18
13:14 14:1,2,23
15:21 16:6,21
17:10,12,17 19:8
21:16,18 24:5,7,
8,10 26:24 27:5,
7,19 32:11,20
33:14,17 34:10,
14 35:8,9,11,13
37:7 38:15,18,20,
24 39:6 40:9,23
41:4,13,24 42:9
45:21 47:9,15
48:24 49:10,14,
24 50:12,23
52:20 54:1,15
55:8 60:4,15
61:1,3,5 62:8
63:2,19,23 65:15
68:17 69:10
71:11,12 73:9,17
74:18,20 75:20
76:14 78:14
80:12,17 81:23
82:13 83:24 84:1,
3 87:12 88:11,20
91:5 96:21 98:18
103:20 104:21
107:15,24 108:3,
5 109:2,5,8,19
110:4,12 112:1,2
115:12,18 116:8

**thought** 29:7 92:3
144:15

**threats** 74:17
110:16,17 145:4,
5,6

**three** 11:10,13
14:22 44:4 95:12
98:17 116:16,17
123:4

**threshold** 97:24

**through** 6:10
10:14 19:1 21:23
31:13 41:17 57:9
84:9 85:8,13
108:2 140:5
143:13

**throughout** 20:4

**throwing** 54:23
112:3

**thrown** 65:6

**Thursday** 48:4

**time** 8:7 16:3
17:13 19:11,13,
17,18 23:6 24:19,
24 26:3,5 29:4
40:1,6 46:1 59:9
62:16 69:22 70:2,
5 88:24 95:2
97:11 99:6
109:22 116:11
119:9 120:8
121:4,8 125:4,23
126:8 127:20
128:3 132:3
136:1 138:13

**times** 8:13 13:24
32:6 61:1 98:17
111:11 119:21
132:21 139:2

**tired** 40:9

**title** 11:1,4 12:4
58:1

**today** 6:19 93:15

**today's** 10:20

**together** 42:18
45:21 106:4
141:2 144:24
146:3

**told** 9:18 83:22
98:20

**took** 16:3 19:23
24:20 124:21

**117:21 118:1,3**
119:3 120:7
123:21 124:22
125:24 126:1,5
128:4 131:1,6,13,
20,24 132:22
134:19,20 135:15
136:4,5,7,17
137:16,21,22
138:5,8,15
140:22 143:2
144:4 145:8,10,
12 146:5,7,9,11,
16,20 147:6,8

**though** 26:13
63:2

topic 7:20 13:4
133:13,17 147:19
topics 7:12 10:1,6
52:19 133:13
torrie 15:7
totality 117:11
touching 64:16
towards 95:22
96:15,17 109:2
Township 147:20
traffic 41:12 49:7
62:14 80:11 81:2,
18 139:12,16
141:1,4,15 143:7
train 22:13 51:24
57:11 89:3
101:14,20 102:3,
13
trained 15:4 18:6
19:7,12,24 38:9,
20 53:11 54:2,10
88:18 103:5
138:22 139:16
training 11:11
12:10 18:8,10
19:16,22 20:2,4,6
21:4 22:24 23:3,
4,5,8 24:13,14
25:4,5,6,7,19,20
26:1,4,5 38:8,13,
18,21 51:20 54:8
55:19,21 56:3,4,
8,15,22,24 57:2,
3,9 58:2 62:23,24
64:8 74:12 85:17
89:5,6 103:6
116:19 131:21
138:23 139:1
142:23
trains 51:4 52:3
transcript 53:6
traveling 81:18
tremendous
111:8
triangle 74:6
tried 143:2
troops 68:21
truthfully 6:18
try 45:6 49:3
82:20 95:16
102:24 109:16
114:1 134:17,23
147:7
trying 28:16 48:23
49:11 50:20
53:18 78:20
90:24 93:20,22
94:6 107:4
113:18,19 121:2
139:7 144:10,14
turn 25:13 26:7
109:5
turned 26:8 91:6
twice 138:23
two 7:12 13:13
14:21,22 79:7
86:15 110:1

116:16 123:16
124:12,17,22
125:8,18 138:1
type 13:9 23:8
39:14 40:14
49:16 64:23
68:13 75:1,7
79:21 90:10
99:16 129:18
133:9
types 14:1 19:9
26:18 55:8 60:22
63:6,19 74:17,21
75:8 80:3 88:20
108:3
typical 68:2
118:17
typically 13:23
14:3 15:3,24 24:7
26:24 31:1 32:18,
20 33:20 34:3,13
36:7 49:24 62:6,
13 63:1,11,22
68:9 83:17 89:23
101:11,20 106:1
108:20 109:24
118:21 127:1
142:20 144:6,23

_____

U

Uh-huh 8:10 47:4
92:11 97:2
unable 78:22
unaccosted 81:19
understand 9:16,
18 44:3 56:6,19
63:4 84:16
101:17 102:19
103:4 115:2,7,9
118:19
understanding
21:8 56:1 59:7
145:16,23
understood 103:1
115:3
uniform 64:12
uniforms 73:15
union 130:1,6,12,
18 131:8
unit 13:18,19
14:6,16,20 15:15,
22 16:9 24:7
38:7,11,16 39:10
40:20 49:21 50:2,
8,16,20,22 51:1,
4,23 52:3 63:11
65:13 66:6,7
132:11 134:24
139:9,12
United 88:19
98:12
units 31:1,12
49:22 50:2,10,15
52:5 63:12 66:8
73:9 135:2
136:14 139:22
141:1
unlawful 61:9
76:22 77:2 95:13

96:21 115:5
unless 143:3
144:24 145:11
unprovoked 81:9
unrest 139:23
until 15:18 63:10
68:12 107:5
unusual 52:9,12
135:4
up 17:6 25:18
26:7,17,19,24
35:15 40:8 41:4
43:7 44:17 48:24
55:15 65:20,21
67:22 87:11 93:1,
9 94:9 97:15
108:1 110:24
115:19 134:16
140:14 147:13
upcoming 128:8
update 25:1
upon 145:11
uptick 121:10
use 21:16,20
36:5,16 39:4,5
50:23 60:24
61:23 62:1 64:6
67:9 73:16 84:6,
7,11,14,21,23
86:23 87:2,20,24
88:1,3,4,6,12
89:2,7 91:9,11
93:10 94:24
95:14,15,21
96:14,19,23 97:5,
21,22,23 98:1,14,
16 103:10,14,16
106:12,20 109:6,
7 117:13,16
134:24 135:3,8
136:2,7 138:15
140:20,22 142:19
used 27:7,8 38:4
58:18 60:22 63:6
71:23 73:12
76:12 87:3 88:7
89:2 95:16 102:8
117:20 118:20
128:22 135:1,11
138:8,13 139:22
140:24 141:10,19
145:7
uses 119:17
using 38:7 58:19
72:16 74:10
76:13 88:23
89:10 95:2
113:12 119:11
120:6 138:6
141:9
usually 26:20
27:5 34:8 64:17
68:13
utilize 30:9 55:23
56:2 64:18,23
67:14 73:8 85:6
88:10 90:22
133:1 135:13
utilized 71:21
137:18 139:13

141:4,18
utilizes 20:13
utilizing 64:24
73:14 141:14,22

_____

V

validate 126:4
Vardaro 5:10
57:17
variety 19:14 21:4
33:8 49:19 51:5
52:13 65:1 66:13
81:12 131:23
135:17
vehicles 66:14
85:20
verbal 99:19
very 14:20 17:19
36:11 39:18,21
41:10 50:8,18
51:1,7,16 57:20
81:4 82:18 86:9,
13 88:3,8,24 93:3
101:19 102:6,7,9
103:2 107:5,17
110:7 117:18
131:11 132:1
138:19 139:18,22
143:7 144:15
vest 65:2
vet 101:13 102:2,
10
via 31:9,20 32:4
132:10
video 57:8 58:6,
10,21 59:1,2,3
106:24 112:17,
19,22,23
videos 10:22
70:15,23 113:6
view 70:8 101:16
viewed 57:10
violating 100:24
violation 100:9
146:24
violations 61:3,5
100:19
violence 47:23,24
76:8 83:4 89:21
96:2,9,16 108:6
111:19,20,24
112:5,14
violent 61:9,12
63:16 65:6 76:4,
22 82:19 89:20,
24 90:6,9,12,13
91:6,10 94:23
95:3,17 96:1,20
108:11,19 109:20
110:7 111:12,13
112:3 115:5
142:17
virtually 5:15
visible 76:5,15
visibly 76:3

visually 142:16
visuals 18:14
volatile 51:9

_____

W

W-E-E-K-L-E-Y
17:1
waist 64:16
waived 148:7
Walton 5:8,22
8:10,16,19 29:15,
17 52:22 53:8,9
56:13 57:19,21
65:19 66:21 67:2
93:16 94:2,5,8
103:21,23 104:6
113:17 114:7
117:4 118:8
122:13,18 134:8,
9 136:21 137:9,
11 147:11,17
want 6:14 22:21
36:1,4 38:6 40:4
44:24 51:2 53:4
57:17 58:17 61:5
62:14 78:7 81:16
82:23 91:1 94:19
96:7 102:23
103:6,12 104:7
114:2 123:10
125:10 142:24
146:10
wanted 29:13
36:16 42:15
43:14 67:7 84:11
94:17
wanting 73:19
91:6
warning 98:16
warrant 75:1,7
89:17 126:6
warranting 89:12
was 7:2,3 8:6 9:2
11:19 12:6,12
14:8,13 15:9,15,
16 16:12 17:22
17:7,9,10,18,20,
23 19:1,2,7,10,
12,17,18,19,20,
21,22 22:20 23:4,
5,21,23 24:14,21
26:1,5,14 27:2,8,
16,18,20,21,22
28:4,7,11,13,15,
16,17,18,23 29:2,
5,6,7,19 30:1,8,
11,15,18,22 31:6,
14,17 42:3,10,17,
20,22 43:3,5,7,13
44:6,14,21 45:17,
20,21,22 46:2,4,
6,11,18,19,21,23
47:6,9,19,21,23
48:15,16,17,22
49:2,6,11,19 50:9
52:10,21 55:4
57:4,7,9 59:7,17
60:2,3,4,7,9 62:3
62:5,6 65:22
66:11,15 67:15,
16 68:17,23 69:4,

weigh 124:18

weighed 124:14

weight 97:23

well 7:8 23:1
32:17 33:1 36:17
39:10,17 44:15,
21 45:15 49:10
55:10 64:22,24
65:9,17 67:12
74:12 76:19
78:12 82:8,22
85:21 94:16 98:3
103:21 107:22
108:5,14 110:7
115:19 124:13,20
130:21 144:12

went 43:12 57:8
69:15 70:3 78:16
79:6 103:9,13
138:2

were 6:21 12:17
15:21,23 16:8,10,
17 17:20,21
19:19,23 27:19
28:9,13,20 29:18,
22 30:21,23 31:3,
7 41:21,23,24
42:2,5,8,14,15,
17,21,22,23 43:1,
10,21 45:16,18
46:13,16 47:3,22
48:23 49:7,10,11,
15 54:20,21,22,
24 55:1,13 59:14,
22 60:6,10,16
62:7,8,9 66:11
68:10 69:11 70:1
71:24 72:2,9,11
73:4,5,9,11,14,
19,20 75:15,16,
17,18,21,22,23
76:12,23 77:19
78:22 80:18 82:1
83:2,8,9 84:2,3,6,
8,12,13,15 85:4,5
86:9,12 93:5
95:10 97:16 99:1,
5,8,12,13,23
100:9,14,18,24
101:3 102:8
103:8 105:18
106:3 107:4,8,9,
10,16,24 108:1,3,
4,5,6,9,13,19,20
109:4,8,18 110:3,
7,9,11,14,18
111:1,2,7,12,13,
21 112:10,11,13
113:11 114:15
116:4,5,6,13
119:9 120:7,19
122:7,17,19,21
123:12,16,22
124:10 125:18,20
128:5,8 129:2,17,
18 130:16 132:24
133:5,7,10
134:12,16,21
135:2 136:9,16
137:2 138:6,7,10
139:18,22,24
141:24 142:8,14,
18 143:12 144:2,
4,9,10,11,12,14,
15 145:11,12

weren't 59:20
105:16 110:8
119:8

Wes 5:13 113:18

whatever 9:13
39:12 98:20
123:5

whenever 132:21

whereas 87:19

whether 7:22
36:14 53:17
58:12 63:15,17
73:12,14 74:13,
14,15 86:11
118:19 133:1,18
135:5 138:11

while 27:10 33:14
76:20 142:22
146:3

White 20:11 26:17
40:15,17,21

why 18:1,9 39:4
50:15 53:3 80:2
87:2 119:20
126:1 137:2

wide 85:13 99:16,
22

will 23:19 24:7
31:1 32:12 37:14
39:10 41:16
43:19,21 58:16
69:7,23 77:7 81:2
82:18,21 83:19,
24 93:9 97:14
115:14 131:8
133:13 140:9
148:5

wind 87:5

winter 65:10

wish 45:19

within 21:5 40:17
51:11 73:11,17
74:12 83:19
86:15 96:3 114:2
116:6 118:14
124:7 141:8

without 40:6 45:1
90:19 97:24
111:22

witness 5:2 7:6
66:24 117:5
147:15

won't 27:11

Woods 7:18 8:11
28:18 29:2 31:14
43:8,11 54:13,18
57:14 71:16
129:5

words 9:15 69:9
78:7

work 26:22 41:20
44:7 48:17 50:6,
10 60:3 64:20
77:5 141:16

worked 15:22
24:18 71:18,19
141:2

working 15:1
18:16 28:9,11
40:5 42:5,8 43:12
55:14 143:1
144:2

works 22:11 56:6

would 5:2 6:17
11:10,15 12:24
14:4,5 16:13,19
17:3,8,11,24
19:10 22:7 23:7,
8,23 24:9,10,16,
22,23,24 25:17
26:4 28:2,6 30:10
31:13,14,15,18,
19,22 32:3,17
33:9 34:23,24
36:19 38:8 39:5
40:20 41:13 42:3
44:22,23 45:24
46:22 48:21 52:1,
6,12 53:10,13
56:2,22 59:16
61:18 63:8 66:1,
18 68:11,12,18
69:12,14,16
70:18,21,22
73:16 74:1,7,21
75:1,7 76:2,9,10,
11 78:3 79:3
81:18 83:1,4,10,
17 86:17,22
87:22 88:21
91:17 92:7 102:9,
22,23 103:6,10,
11,14 104:17,19
108:22 109:7,23
110:2,11,13,16,
17,19 111:4,17
115:12,13,19
116:23 118:1,3,
17,20,21,24
119:1,4 120:6
121:9,10 124:14
126:6,24 127:18
129:5 130:10,20,
24 131:7,12
132:13,20 134:18
135:10 136:6
137:14 138:2
139:20 140:2,10,
13,15 141:3
144:13 147:8

wouldn't 24:21
119:24 130:17

written 61:21
99:12,17

wrong 127:17

wasn't 46:18
71:15 112:21
115:17 121:7
134:14

watching 78:24

water 54:23 112:4

way 10:13 23:2
32:16 35:10
38:11 51:4,10
68:2 87:11 89:7
90:2,11,24 93:21
100:6 131:11
143:20

ways 13:13 51:5
75:23 131:23
140:19 141:16

Weapon 92:23

weapons 58:14,
16

wear 65:2

wearing 106:7

week 128:6
132:21

weekend 135:23
138:5

Weekley 17:1

weeks 6:23 110:4
138:15

youth 40:18

———————
Z
———————

zero 62:13

zone 13:14 14:5
23:22 122:6,20

Zoom 6:11 31:20,
21

———————
Y
———————

year 27:6 138:24

yearly 117:13,23
130:9 138:23

years 14:12 20:4
24:17 26:2 56:23
88:7 89:3 102:8
116:16,17 123:4
125:9 140:8

yelling 81:6 83:15

Yes-or-no 6:12

York 98:3

10 70:4,19 71:16,
17,22 72:12
73:10 75:14
76:13 77:3,14
78:17,18 79:12,
18,23 80:2,12,19
81:3,4,11,12,15,
24 82:7,24 83:3,
12,22 84:9,21,22,
23,24 85:3,10,12,
15,20,22,23 86:1,
3,5,11,13,20
91:17 92:3 93:8
95:1 98:22 99:15,
16,18,20,21
100:1,5,13,18
101:7,9,18
102:11,12,14,16,
22 104:24 105:3,
8,11,14,21 106:6,
7 107:1,6,11,18,
20,21 108:17
111:9,15,23
112:8,13,24
113:3 115:10,17
116:8,14,15
117:23 118:20
119:18,20 123:6,
18 124:11,22
125:2,3,14 126:6,
11 127:2,16,19
129:4,23 130:12,
18 132:17,21
133:3,4,6,9
134:1,16,21
135:15,19,23
136:23 137:16,23
138:3,11,16,21
139:6 140:24
142:5,13,15,18,
21 143:17,19,22
144:12 145:4,18
146:22

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line          Correction or Change          Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Jennifer Knight, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date 2/16/2021 Signature _Jennifer J Knight_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: SU301366JK  S-SU P-BW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

TAMARA K. ALSAADA, et al.,

        Plaintiffs,

    v.

CITY OF COLUMBUS, et al.,

        Defendants.

Case No. 2:20-cv-3431

Chief Judge Algenon L. Marbley

Magistrate Judge Kimberly A. Jolson

## AFFIDAVIT OF MARK E. LANG

I, MARK E. LANG, being first duly cautioned and sworn, do hereby swear, under penalty of perjury, that I have personal knowledge of the facts stated in this affidavit; that I am competent to testify to those facts; and that I will testify as follows if I am called to testify at any hearing or trial in the above-captioned civil action.

1.      I am currently employed by the City of Columbus, Division of Police ("CPD"). I am the Commander for the Training Bureau, which is under the Community Services Subdivision of the CPD.

2.      All CPD officers receive training on both the use of force and civil disorders during basic training.

3.      During a six-month, 1,000-plus-hour basic recruit training program that is required of all CPD officers, recruits are trained, instructed, and taught on (1) the safe, proper, and effective use of non-lethal force, lethal force, and firearms; (2) the law and legal limits applicable thereto; and (3) the CPD's own use-of-force directive.

4.      Recruits also receive training, instruction, and education on topics such as community diversity, the inappropriateness of biased-based (e.g., racial) profiling, crisis intervention, de-escalation techniques, and civil disorders.

5.      The basic training program includes specific training on civil disorders, including training on balancing First Amendment rights and the need to protect public safety and property.



PLAINTIFF'S
EXHIBIT
5

6. CPD's basic recruit training program meets, and often exceeds, the State of Ohio's requirements for basic law enforcement training.

7. Following basic training, new CPD officers must complete the Division's Field Training Officer (FTO) program. They spend about fifteen weeks going through four phases of one-on-one training with veteran officers who observe, evaluate, and record the new officers' performance in the field and offer additional advice, training, instruction, and correction (if necessary).

8. All CPD officers continue to receive frequent, updated, and regularly-scheduled training, instruction, and education.

9. All sworn officers receive the Emergency Operations Manual and Directives Manual, and are required to certify that they have reviewed them.

10. The Emergency Operations Manual provides directives with respect to field force operations, including riot gear, formations, and equipment; civil disturbance tactics; mass arrest procedures; and operating guidelines for pepper spray and riot control munitions. The relevant sections of the Emergency Operations Manual —which were in effect at the time of the subject Protests—are attached hereto as Exhibit A.

11. The Directives Manual provides the Division's Use of Force Directive 2.01, Chemical Agents and Intermediate Use of Force Directive 2.04, Gas Guns and Grenades Directive 2.05, and Body Worn Camera Directive 11.07. The relevant sections of the Directives Manual— which were in effect at the time of the subject Protests—are attached hereto as Exhibit B.

12. Pursuant to Directive 2.04, sworn officers are not permitted to carry chemical spray until training and qualification standards have been satisfied. They are required to "demonstrate proficiency with chemical spray once each calendar year."

13. While in the training academy, officers get sprayed with pepper spray so they understand the effects.

14. Supervisors and officers who use riot control munitions, such as gas guns for wooden or sponge bullets, receive additional "grenadier" training on the use of such munitions.

15. In 2017, supervisors received specialized training on Crowd Management and Control.

FURTHER AFFIANT SAYETH NAUGHT

Mark E. Lang

Sworn to before me and subscribed in my presence on January 13, 2021.

_Tina A. Hundley_

Notary Public - State of Ohio

**TINA A. HUNDLEY**
Notary Public, State of Ohio
My Commission Expires 10-30-2021

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>1.1 |
|---|---|---|
| | REVISED<br>Mar. 30, 2016 | TOTAL PAGES<br>6 |
| **Definitions** | | |



**Alternate Emergency Operations Center**

A location other than the primary EOC that will be activated during an incident if the primary EOC becomes inoperable.

**Assembly Point**

A location outside an evacuation area which can accommodate a large number of vehicles and persons to serve as the initial gathering point for those who must be evacuated from the area of an incident.

**Available Reserve**

On-duty police personnel who can be re-assigned from their regular duties and committed to an emergency operation.

**CBRNE**

An acronym for *"chemical, biological, radiological, nuclear, or explosive,"* *and used in* this context*,* refers to *such items* being used as a terrorist weapon of mass destruction.

**Crisis Management**

The measures *taken* to identify, acquire, and plan the use of resources needed to anticipate, prevent, and/or resolve a terrorist threat or incident. The FBI is the lead federal agency for crisis management.

**Cold/Safe/Support Zone**

The secured area where equipment and personnel directly support an incident.

**Consequence Management**

The measures *taken* to alleviate the damage, loss, hardship or suffering caused by emergencies, to include protecting public health and safety, restoring essential government services, and providing emergency relief to affected governments, businesses, and individuals. Implementation is under the primary jurisdiction of the affected state and local governments. FEMA is designated as the lead federal agency and provides support to the state when required.

**Contamination**

The process whereby a person or piece of equipment has contact with a toxin or hazardous substance.

**Decontamination (DECON)**

A process by which the contaminants are cleansed from the patient, victim, rescuer, and equipment.

**Dirty Bomb/Radiological Dispersion Device (RDD)**

An explosive device that is able to disperse radiological agents.

**Disaster**

Any event that causes significant human and economic loss, requires a response beyond the scope of any single agency or service, and requires resources beyond those locally available.

**Emergency**

An incident that threatens or actually does inflict damage to property, injury, or loss of life.

**Emergency Management Agency (EMA)**

A government agency designated to provide assistance with planning, ***preparation,*** mitigation, response, and recovery to an emergency incident. The county EMA will assist when city resources are exhausted during an emergency response. The state EMA will assist when and if county resources are exhausted. Likewise, federal EMA will assist if the governor of the state declares a state of emergency.

**Emergency Notification Guide (ENG)**

A manual used in the Communications Center to reference when notifying key personnel of major incidents or events, ***which*** is maintained and updated by the ***Communications Bureau***.

**Emergency Operations Center (EOC)**

A fixed facility used as a base of operations for bringing personnel and resources together to manage and coordinate the response to major events, incidents, or disasters.

**Emergency Response Routes**

Designated roadways that are left open during an emergency to provide necessary entrance and exit routes for emergency response personnel and equipment.

**Evacuation**

The displacement of people in response to an emergency. The procedures include the moving of people from an affected area and ***their*** return when the incident is complete.

**Event**

A planned, non-emergency activity usually requiring a Division response and Incident Action Plan.

**Field Force**

A unit of sworn personnel led by a police lieutenant and divided into several squads used to respond to and control large crowds **and**/or civil disorder.

**Field Prisoner Processing Area (FPPA)**

Facility used during major events or civil disturbances to complete prisoner paperwork and secure property prior to being transported to the Slating Area.

**Hazardous Material (HAZMAT)**

Substances or materials which pose either a potential or actual risk to life, health, or property if released because of their chemical, physical, or biological nature.

**Hot Zone**

The area containing the actual hazard. Exposure to hazardous materials in this area is likely to cause injury or death. Only personnel with the proper level of personal protective equipment **(PPE)** may enter this area. Only certified hazardous material technicians will usually work within this area.

**Incident**

An occurrence, natural or human caused, that requires an emergency response to protect life and property. **This m**ay include major disasters, emergencies, terrorist attacks, fires, floods, hazardous materials spills, aircraft accidents, tornadoes, public health and medical emergencies, and other occurrences requiring emergency response.

**Incident Action Plan (IAP)**

A written plan containing general objectives reflecting the overall strategy for managing an incident or special event. Includes identification of operational resources and assignments. **This m**ay also include attachments that provide direction and important information for management of the incident during one or more operational periods.

**Incident Commander**

The ranking person responsible for the command and control of an incident. Depending on the type of incident, this may be a police or fire official.

**Incident Command Post**

The area near an incident site where the Incident Commander and staff gather to coordinate and direct emergency operations. A large incident may need multiple functional command posts to handle separate geographical areas or functions of the incident.

**Incident Command System (ICS)**

A standardized organizational system used to manage an emergency, disaster, or event.

**Infectious Material**

Any substance capable of causing infection *that* may be transmitted to others *with or* without actual contact.

**Inner Perimeter**

The area at a disaster scene that contains the Hot *and* Warm Zones. *The inner perimeter represents the closest and smallest perimeter to the incident.*

**Joint Information Center (JIC)**

A fixed location where the public information officers from each *participating entity* will work to coordinate media releases regarding the incident. The JIC works in conjunction with the EOC and Incident Commander and provides unified, accurate, and timely information to the public.

**Joint Operations Center (JOC)**

A fixed location established by the Federal Bureau of Investigation to *coordinate law enforcement criminal investigative efforts in response to* a terrorist attack or incident.

**Operational Period**

Time scheduled for execution of a given set of operational actions as specified in the IAP *that* may be of various lengths of time.

**Outer Perimeter**

The outer-most area of a secured disaster or crime scene*, which includes the Cold Zone*. Most response, recovery, and support functions are conducted within this area.

**Personal Protective Equipment (PPE)**

Equipment that is worn, such as hoods, air-purifying respirators (gas masks), NBC gas mask filters, N95 particle masks, hazardous materials suits, Nitrile gloves and boots, etc. by a person to protect *him or her* from contamination.

**Point of Dispensing**

A location where emergency medical countermeasures will be dispensed to the public.

**Point of Distribution**

A location where emergency supplies and equipment will be distributed during a disaster.

### Point Event

An incident that occurs in a relatively limited geographic area.

### Riot Gear

Issued protective equipment *to be* used during a civil disturbance, including gas mask, helmet with face shield, shin guards, forearm guards, and chest protector *(if issued).*

### Riot Equipment

The specialized equipment used during a riot or civil disturbance*, including* batons, shields, weapons*,* and munitions.

### Secondary Device

A device that is placed *in a specific location* in order to maim or destroy first-response personnel. It detonates after the main charge has exploded and first-response personnel have gathered on the scene.

### Shelter

A facility that provides food and shelter to evacuees during an emergency. These facilities are usually operated by the American Red Cross, which also maintains a list of the evacuees housed in the location.

### Shelter-in-Place

When evacuation is not a viable option, protection can be provided by securing persons inside a fixed facility and discontinuing external air exchange until the exterior environment is deemed safe.

### Slating Area

An area designated in an IAP *that is* staffed by sworn and Identification Unit personnel *and serves* as the processing point for those persons arrested during major incidents, events*,* or mass arrest situations. Personnel from the Franklin County Sheriffs Office and Clerk of Courts may also be assigned to the site.

### Special Needs

The accommodations for individuals with limited capacity who require certain equipment, physical assistance*,* or environmental surroundings to accomplish normal functional ability.

### Squad

A response team normally consisting of one sergeant and seven officers.

### Staging Area

A site established for the temporary location of available resources. Any location in which personnel, supplies, and equipment may be temporarily housed or parked while awaiting operational assignment.

**State of Emergency Declaration**

When an event overwhelms the responding entities, exhausting available resources, the designated government official may declare a state of emergency. This will provide availability of additional resources from the next governing level.

**Warm Zone**

A buffer area surrounding the Hot Zone where decontamination occurs.

**Weapons of Mass Destruction (WMD)**

See CBRNE.

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>4.1 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>11 |
| **Field Force Operations** | | |



## I. Field Force

A. The Division of Police's organizational structure of the field force is flexible**,** with the composition based on the designated function at the time of deployment. ***The field force size and composition varies but generally includes four to six squads (5 to 10 officers in each) and is led by a lieutenant. The team is capable of managing large-scale operations including crowd management, enforcement, and general police presence for the purpose of maintaining order and preserving the peace***.

***B. The Incident Commander will establish the commander's intent and the Rules of Engagement (ROE) and communicate them clearly to personnel assigned to the field force.***

*C.* Field forces are deployed at the direction of the Incident Commander to perform various tasks associated with civil disorder or major events. Typical functions of a field force may include security of a geographical area or resource, high visibility patrols, providing escort to fire or other critical resources, mass arrest**,** and/or other functions required to restore order and provide security.

*D.* Field force deployment is dictated by mission assignment. The field force may be deployed intact as an entire force or broken down by squad into particular functional or geographic areas. Each squad may then be broken down into small teams of two or four officers each. The squad leader is responsible for the operation and conduct of his or her squad. The field force provides an organized response to an incident. Individual actions are discouraged except in life-threatening circumstances. For safety reasons, officers are not assigned as a one-officer unit when deployed in a field force assignment.

*E.* Assigned equipment varies with the field force mission. For example, securing a geographic area may not require additional equipment**,** *but* clearing an area of demonstrators may require the use of shields, batons**,** and riot control munitions.

*F.* Depending on the mission, a field force may be mobile in vehicles, on foot**,** or assigned to a static location. The configuration of mobile field forces depends on the availability of transportation resources. The field force may be transported in its entirety by bus, or squads may be assigned to two or four-officer cruisers.

## II. Field Force Organization

A. Field Force Leader

1. The Field Force Leader is a police lieutenant *who* is responsible for the planning, operation, and conduct of the field force. The Field Force Leader directs squad leaders on mission requirements and deployment methods and reports to the Operations *Chief* or Incident Commander as appropriate. The radio call number series 4100 through 4999 is designated for emergency operations use. The Field Force Leader is designated by the appropriate corresponding number, *for example,* field force 1 is 4100, field force 2 is 4200, etc.

   a. A *staff of one sergeant and two officers* is *generally* assigned to the *F*ield *F*orce *L*eader. *The sergeant* performs duties as the aide to ensure documentation of field force activities, monitor radio traffic, and request equipment replacement for the field force as needed. The remaining two officers may perform duties as video officers, using video cameras to record field force activities, or as security officers for field force vehicles and equipment when deployed.

B. Field Force Squad

1. The squad is the basic element of the field force. Typically four to six squads are assigned to each field force. Additional squads may be assigned to a field force when staffing is available, but the field force will not exceed nine squads. Each squad consists of one police sergeant and *5 to 10* police officers.

2. Squads may be assigned specific tasks within the field force such as security, arrest teams, or deployment of riot control munitions.

   a. *A squad of trained grenadiers may be assigned to operate less-lethal munition launchers and deploy other less-lethal weapons.*

   b. *A squad may be assigned as the arrest team. The decision to arrest is made by the Field Force Leader, and the responsibilities of the arrest team include:*

      (1) *Making arrests*

      (2) *Restraining and searching arrestees*

      (3) *Moving arrestees to the PTV*

      (4) *Extricating trapped officers or specific suspects as directed by the Field Force Leader*

      (5) *Securing specific persons or assets as directed by the Field Force Leader*

3. Squads are designated by the appropriate field force number and numerical sequence within the field force: 4110, 4120, 4130, 4140, 4150, and 4160.

    ***4.*** Equipment assigned to the squad varies depending on the mission and may include shields and batons, gas guns, and riot control munitions. The type and number of vehicles assigned to each squad is based upon the mission and method of deployment.

C. Arrest Vehicle

***At least one PTV with two officers should be assigned to each field force.*** The PTV officers are responsible for transporting arrestees from the operational area to the Field Prisoner Processing Area or Slating Area as appropriate. During large events, PTVs may be required to work independent of their assigned field force providing prisoner transportation where needed. The PTVs are designated with corresponding field force numbers***, for example,*** 4108 for field force 1, 4208 for field force 2, etc.

D. Video Officer

    1. The video officer needs to be assigned directly to the *F*ield *F*orce *L*eader to accurately record ***crowd and field force activities, including*** the cause and effect of the field force response to the incident. The video officer must ensure he or she is positioned with the *F*ield *F*orce *L*eader to document the activities of the crowd identified and the deployment orders given to the squad leaders. The video officer then records the field force response and the actions of the crowd.

      a. It is imperative that the video officer record all the identified activities leading up to the deployment of the field forces, squads, ***and*** munitions, ***as well as*** the conduct of the crowd and officers during deployment. ***Recordings made*** during field force operations are evidence and could be used in court to prove or defend the Division's actions during an incident. ***Refer to the "Property and Evidence Handling" directive as necessary.***

E. Field Force Deployment

    1. A field force may be activated at the direction of a lieutenant or higher, or as designated by an event plan. According to the incident or event, a single field force or several field forces may be activated. During an emergency activation of a field force, the zone lieutenant notifies Communications Bureau personnel of the number of personnel needed and the designated staging location. Personnel will respond to the designated location and be formed into a field force and deployed at the direction of the *F*ield *F*orce *L*eader.

    ***2.*** During a major event, field forces are assigned designated reporting times and locations. Field force personnel are notified of their assignments, reporting times*,* and locations prior to the event.

*3.* Numerous field forces may be deployed at the same time in response to an incident or special event. Field forces may work in conjunction with each other or operate independently in separate geographic areas to perform specific tasks. When two or more field forces are activated*,* a police commander or higher is assigned as the Incident Commander.

*4.* During field force deployment, additional units may also be activated to support the incident or event and may include staging/prisoner processing/ slating areas and/or Mounted, SWAT, or Traffic units.

F.  Radio Call Numbers

1.  The field force is assigned a basic series of call numbers. As each squad is further broken down into smaller teams of officers, the number series changes slightly to reflect the number of individual units and ensures accountability for officer safety.

a.  The numbering matrix for each field force is the same. The second number designates the field force. For example, 4100 designates field force 1, 4200 designates field force 2, etc.

b.  The call numbers for the field force are as follows:

| | | |
|---|---|---|
| 4100 | Field Force 1 Leader | Lieutenant |
| 4101 | Aide to Field Force Leader | *Sergeant* |
| 4102 | Video/*Staff* Officer | |
| 4103 | Video/*Staff* Officer | |
| 4108 | PTV | Two Officers |
| 4110 | 1st Squad Sergeant | |
| 4111- 4117 | 1st Squad Officers | |
| 4120 | 2nd Squad Sergeant | |
| 4121- 4127 | 2nd Squad Officers | |
| 4130 | 3rd Squad Sergeant | |
| 4131- 4137 | 3rd Squad Officers | |
| 4140 | 4th Squad Sergeant | |
| 4141- 4147 | 4th Squad Officers | |
| 4150 | 5th Squad Sergeant | |
| 4151- 4157 | 5th Squad Officers | |
| 4160 | 6th Squad Sergeant | |
| 4161- 4167 | 6th Squad Officers | |

2.  As field forces are added, follow the same organizational structure. A number designates each field force, with each squad assuming that field force's number. *For e*xample*,* field force 2 is 4200, 1st squad is 4210, 2nd squad is 4220; field force 3 is 4300, 1st squad is 4310, 2nd squad 4320, etc.

### G. Field Force Equipment

1. Each member assigned to a field force is required to have his or her Division-issued **personal** protective equipment **(PPE) and riot control gear** with him or her. In addition, personnel are encouraged to have their flashlight and inclement weather gear. Additional equipment may be assigned to the field force as the mission and situation dictates. These items include, but are not limited to, the following:

   a. Riot batons
   b. Protective Shields
   c. 37mm**/40mm** gas guns (single shot and rotary)
   d. Shotguns
   e. Riot control munitions (gas and smoke grenades)
   f. Radios
   g. Video cameras
   h. Bullhorns
   i. Flex cuffs
   j. Arrest stickers

2. **The Columbus Division of Fire should be notified prior to the dispersal of any chemical riot control munitions during training or an actual riot situation.**

3. Field Force Kit – Each field force is provided a field force kit **by the on-duty patrol lieutenants** containing items necessary to organize and operate a field force, document field force activities, and process arrestees.

   a. Each patrol zone is assigned a field force kit that is maintained by the zone lieutenants. Patrol zone lieutenants are responsible to **maintain the** equipment and munitions listed on the Zone Lieutenant Munitions/Equipment Checklist, form U-10.127**, and after each deployment to restock items as necessary.** The first shift Patrol zone lieutenant shall inspect the field force kits **quarterly.**

   b. The riot van contains **sufficient quantities of grenades (smoke and chemical agent), wooden multiple baton shells, and 37mm/40mm gas guns. These items are used for general deployment and to replenish kits maintained in the vehicles of zone lieutenants.**

   c. **The ORD-2 vehicle contains smaller quantities of the equipment carried in the riot van as well as flex cuffs and cuff cutters.**

   d. **Ordnance Unit personnel shall inspect the supplies and update the checklist quarterly for both the riot van and ORD-2 and restock items as necessary.**

4. Personnel assigned to field force duty shall wear the uniform of the day.

H. Field Force *Formations*

    **1. *Line Formation***

        **a.** The following is the basic configuration of a field force in a line formation. ***The line formation is used to provide security across a frontage or to move a crowd in a single direction.***

```
                  111111222222333333444444
                    1L    2L    3L    4L
                        LT/Aide(s)
                        555555  5L
                        666666  6L
                           PTV
```

---

| | |
|---|---|
| 1,2,3,4,5,6 | Indicates officers in their assigned squads. |
| 1L, 2L, etc. | Indicates the squad leader (sergeant) of each squad. |
| LT | Indicates the *F*ield *F*orce *L*eader, a police lieutenant. |
| Aide(s) | Indicates the leader's aide(s) and the video officers. |
| *5L* | ***Indicates the location of the arrest team.*** |
| *6L* | ***Indicates the location of the grenadiers.*** |
| *PTV* | Indicates the PTV assigned to the field force. |

    **2. *Wedge Formation***

        **a. *The Wedge Formation is movement used to split or disperse a crowd.***

```
                        1 2
                      1     2
                    1         2
                  1  1L   2L  2
                1               2
               3                  4
              3  3L        4L   4
             3                    4
            3                      4
           3                        4
                   LT/Aide(s)
                    55555  5L
                    66666  6L
                       PTV
```

**3. Box Formation**

   **a. The Box Formation is used to provide security by surrounding a person or resource.**

```
2 2 2 2 2 3 3 3 3
1    2L    3L    4
1                4
1    1L    4L    4
1                4
1    LT/Aide(s)  4
     55555
      5L
     66666
      6L
      PTV
```

**4. Column(s) Formation**

   **a. Columns are used to provide a formation for the rapid movement of a Field Force.**

```
        1    3
        1    3
   1L   1    3   3L
        1    3
        1    3
        2    4
        2    4
   2L   2    4   4L
        2    4
        2    4
        5    6
        5    6
   5L   5    6   6L
        5    6
        5    6
      LT/Aide(s)
        PTV
```

*I.* *Field Force Communication*

1. *The field force's actions and movements will be at the specific direction of the Field Force Leader by verbal commands, audible signals, and/or hand and arm signals. If time permits, the forms of communication should be discussed and rehearsed in the Staging Area prior to the field force deployment.*

   a. *Verbal commands are delivered by the Field Force Leader and echoed by all members of the field force.*

   b. *Preparatory commands alert the field force of the next action and that the command of execution is forthcoming.*

   c. *Commands of execution direct the field force to immediately take the action.*

   (1) *Audible signals may be given in lieu of verbal commands or hand and arm signals as it may be difficult to see or hear. The following three signals maybe given by blast(s) on an air horn, vehicle horn, or whistle:*

   (a) *One blast – Stop*

   (b) *Two blasts – Go/Move*

   (c) *Three blasts – Warning signal (Horses, Gas, or Emergency)*

   (2) *Hand And Arm Signals*

   (a) *Field Force Key*



TEAM MEMBERS

PLATOON LEADER     GRENADIER     SQUAD LEADER

*(b) Line Formation*



*(c) Wedge Formation*



*(d) Box Formation*



*(e) Column(s) Formation*



SQUAD
LEADER



PLATOON
LEADER

*J.* Vehicle Operations

1. Emergency Equipment – Vehicle emergency lights and sirens *should be* used during field force response and movement as directed by the field force leader *and in conjunction with the "Emergency Vehicle Operations" directive.*

2. Speed – The objective of the field force is to arrive at the scene as an organized unit. When responding, field force vehicles remain close to continue through intersections uninterrupted while still maintaining a safe distance between vehicles. The response speed of the field force is determined by the Field Force Leader.

3. Lane Changes – During lane changes of the entire field force, the Field Force Leader instructs the last vehicle to "block left" or "block right." The last vehicle then moves into the designated lane, blocking approaching traffic *and* allowing the remainder of the field force to change lanes as the lane clears of traffic.

4. Windows – Vehicle windows should be rolled up to reduce the potential of personnel being struck by objects thrown at the vehicles.

5. Parking – Upon arrival, field force vehicles are parked in squad order to allow for a rapid and orderly response from the vehicles. Personnel remain in their vehicles until directed to exit by the Field Force Leader.

6. Keys – Keys are left in the field force vehicles to avoid being lost and to allow for a rapid exit of the area if required. It may be necessary to assign field force officers to provide security for the vehicles.

7. *Mounted and Bicycle Units:*

   a. *The Mounted and Bicycle Units may be used to supplement the field forces based on the availability of resources.*

   b. *As directed by the Field Force Leader, the Bicycle Units may be deployed to assist in the management of lawful crowds, protestors, and/or demonstrators.*

   c. *At the discretion of the Field Force Leader, Bicycle Units may be used as a rapid response team to contain, disrupt, and/or monitor unlawful violent crowds and to secure areas cleared by personnel to maintain control of ground gained.*

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.2 |
| | REVISED Dec. 30, 2019 | TOTAL PAGES 5 |
| **Civil Disturbance Tactics** | | |



## I. Purpose

The purpose of this section is to define the types of civil disturbances and to provide direction in planning and implementing the appropriate police response to effectively manage and control the situation. This section will provide the guideline for tactics that may be used by field forces and other emergency response forces.

## II. Definitions

A. Civil Disturbance – Any situation such as a demonstration, strike, riot, celebration, and/or public panic, which has the potential of causing injury to persons or damage to property.

B. Peaceful Demonstration – An event with the purpose of expressing views and opinions in a peaceful manner.

C. Planned Events – Activities with pre-notification, either formal or informal, where large numbers of persons gather or attend, or unique security or traffic measures are required. Examples of planned events include parades, sporting events, dignitary protection, and civic and cultural events.

**D. Riot – A course of disorderly conduct with four or more people with purpose to:**

   **1. Commit or facilitate the commission of a misdemeanor;**

   **2. Intimidate a public official or employee into taking or refraining from official action;**

   **3. Hinder, impede, or obstruct a function of government or orderly process of administration or instruction at an educational institution, or to interfere with or disrupt lawful activities carried on at such institution; or**

   **4. Do an act with unlawful force or violence, even though such act might otherwise be lawful.**

**E.** Spontaneous Events – Events that may create a threat to public health, safety, or order and occur without sufficient notice to allow comprehensive planning.

## III. Operations and Tactics

*A. The following operational objectives, which are consistent with the National Response Plan and the National Incident Management System, should be considered:*

1. *Monitoring of the crowd's progress and development and gauging the intent of the crowd. Monitoring includes passive observation and communication with ground leaders.*

2. *Ensuring containment of the area.*

3. *Separating passive resistors, peaceful demonstrators, and agitators to make dispersion during critical incidents easier.*

4. *Causing participants, spectators, and emergency responding units to disperse as necessary. A key to dispersion is to ensure avenues of egress are available and communicated.*

5. *Arresting individuals during a civil disturbance only as necessary.*

6. *Restoring the affected area to its normal state as soon as possible at the conclusion of the event.*

*B.* Peaceful Demonstrations

1. A peaceful demonstration is viewed as a legally acceptable manner of expressing an opinion. The right to protest, when done according to law, is embedded in the spirit of the Constitution. The role of the Division of Police during a demonstration is to protect the rights of peaceful demonstrators, to protect the rights of the public, *and address any public safety concerns resulting from the demonstration.* The physical make-up of a particular group of demonstrators is as diverse as the agenda and cause of the group. It is not uncommon to observe demonstrators representing a multitude of different factions. It is often an opportunity to be seen and heard, regardless of the advertised cause.

2. Peaceful demonstrations often bring people of opposing views. It is not uncommon for counter demonstrators to agitate and taunt peaceful demonstrators and police. A peaceful demonstration may evolve and change in nature if it is not managed properly. Officers should remain neutral when faced with groups of differing causes. When faced with agitators, officers must project a calm, professional image. Professional agitators are trained to provoke officers into overreacting. A peaceful group can be enraged by inappropriate police conduct.

3. A police representative should make contact with the formal or informal leader of the group. It should be conveyed that the Division respects the rights of the group to exercise their First Amendment rights. Permits must be inspected and the leader will be informed that they are expected to abide by all laws regarding the obstruction of sidewalks or streets. Failure

to follow the permit guidelines, disruptive behavior, property damage, or violence will not be tolerated. The group's actions will determine the police response. Demonstrators may be warned, cited, or arrested as appropriate. The *Incident Commanders* should familiarize themselves with any information regarding the group, their agenda, and tactics when planning the response to the event.

**C.** Civil Disturbance

1. A civil disturbance, or riot, usually results in violent confrontation, property damage, and injury. The violence may be directed towards opposing groups, police, or the public in general. Verbal taunting may escalate into violent behavior resulting in objects being thrown, property damage, vehicle or building fires, looting, and assaults.

2. Civil disturbance can result from a specific incident or a series of related or unrelated events. This may include police actions, court rulings, social conditions, or events from out of control celebrations.

   a. This type of violence can be the result of a specific incident or after a series of events, such as a police action or a court ruling that is perceived to be unfair or biased.

   b. Common elements of campus disturbances *may be* excessive amounts of alcohol, a large volume of people in the somewhat confined area (typical of the off campus housing district), loud music, and the propensity of young people in the area to use cell phones *and social media* to communicate with each other, providing an instant network of information concerning the locations of the parties.

**D.** Impromptu Disturbances

The initial response of the police and the community to an impromptu or spontaneous disturbance is critical. Once a "flashpoint" of violence involving groups of people displaying criminal behavior is identified, the first responders should take quick and decisive action to diffuse the situation and avoid escalation. Most incidents occur unexpectedly, which does not give the Division the advantage of preferred manpower levels or the establishment of a command staff. In these situations it is imperative that on duty personnel assume their responsibilities as first responders, keeping in mind that the primary objective is the safety of citizens affected by the disturbance, specifically to prevent the loss of life. Initial steps will include establishing a perimeter around the affected area to prevent additional rioters from assembling and to keep bystanders from harm. If immediate action is warranted, such as arrests or crowd dispersal, and it can be accomplished safely with available personnel, it should be taken. A staging area should be designated and a supervisor assigned to organize additional units into a field force.

***E.*** Control Strategies

1. Strategies should be implemented in a coordinated Division-wide effort ***consistent with Division policies.*** Tactics will vary depending upon the situation; however, in all cases, Division personnel should respond ***as trained and in a*** controlled manner.

2. Preventing a disturbance from becoming a riot through proactive initiatives and citizen contacts should be the goal of supervisors***.***

3. ***All actions including arrests should be accomplished as a team. An officer should not act independently in an unruly crowd as this can lead to unsuccessful and dangerous operations.***

4. It should be noted that the number of people attending a ***large gathering*** has the potential to grow into an unruly crowd very quickly. ***Disturbances may also be the result of protests or marches.*** The street and sidewalks may be blocked, disrupting the flow of traffic and creating the potential for violent confrontations and property destruction.

5. ***The following actions should be considered during a disturbance:***

   ***a. T***he ranking supervisor should request officers to respond to a designated staging area, don riot gear, and prepare to deploy as a field force.

   ***b.*** Responding officers should not report directly to the scene unless an emergency situation exists and they are ordered to do so. Normally, the field force should not be assembled within view of the crowd.

   ***c.*** A perimeter should be established and officers already at the scene should attempt to disperse the crowd by giving clear verbal orders and taking appropriate enforcement action. If the crowd becomes violent or confrontational, ***the dispersal order should be given promptly and repeatedly.***

***F.*** ***The Division has a variety of resources which may enhance the ability to respond to a disturbance. All available resources should be considered when determining the appropriate response, including:***

1. ***Mobile Field Force(s)***

2. ***Mounted Unit***

3. ***Arrest/Rescue Teams***

4. ***Bicycle Rapid Response Teams***

5. ***Motorcycles/Traffic Control Unit***

6. ***Field Prisoner Processing Areas***

7. ***Visible video surveillance***

8. ***Medical support units***

9. ***Pre-positioned/Designated Protest Areas***

10. *Pre-placed barriers*

11. *SWAT*

12. *Observation/Counter Sniper Teams*

13. *Riot control munitions*

14. *Alternative traffic plans, including ingress/egress routes*

15. *Specialized equipment and vehicles such as enhanced public address/acoustic devices, passenger buses, light trailers, observation towers, fire trucks, and armored vehicles.*

G. *Enforcement Action*

1. *If it becomes necessary to take enforcement action, sworn personnel should consider the elements of offenses against the public peace, which may include but are not limited to:*

   a. *Inciting Violence*

   b. *Riot*

   c. *Aggravated Riot*

   d. *Failure to Disperse*

   e. *Noise Ordinance*

   f. *Disorderly Conduct*

      (1) *Blocking the Roadway*

   g. *Open Container Violations*

   h. *Prohibitions Under 21 (underage use and possession of alcohol)*

   i. *Misconduct at an Emergency*

   j. *Open Burning*

      (1) *If an arrest is made for this violation, collect all evidence including accelerant and notify Columbus Division of Fire. The arson investigators are responsible for the securing of evidence in special containers, processing, and filing charges.*

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.3 |
|---|---|---|
| | REVISED Dec. 30, 2019 | TOTAL PAGES 6 |
| **Mass Arrest Procedures** | | |



## I. Purpose

There will be times when Division of Police *personnel* arrest a *large* amount of people during a protest, rally, or other activity. This section outlines the Division's procedures for making mass arrests. The procedures may be used during planned protests or rallies or in response to a spontaneous *event*. During a mass arrest situation, the primary concern should be the safety of the public and officers involved. For additional information, refer to the *"Arrests and Warrants" and "Transport and Slating"* directive*s*.

## II. Pre-Arrest Procedures

A. If the demonstration is peaceful and police actions are not immediately necessary, the Incident Commander should:

1. Determine the size and nature of the demonstration. Attempt to identify and interview leaders to ascertain their plans. Determine if demonstrators intend to be arrested.

2. Determine the name, address, and phone number of the property owner or agent where the incident is occurring, when appropriate. Contact the Homeland Security Section for any available information regarding the group.

3. Determine if the property owner/agent wants arrests to be made if demonstrators are committing a crime *and the incident occurs on private property*. If the property owner desires arrests to be made, determine if the owner will serve as the primary prosecution witness (list as a witness on the Arrest Information, form U-10.100) or if they will designate an agent to serve as the prosecution witness to be subpoenaed to court. Ensure that the appropriate *i*ncident *r*eport is taken from the property owner/agent.

4. Before any arrests are made, select the proper charges(s) that may be used for the event. If time permits, brief supervisors and participating officers on *the* items listed above.

5. Before mass arrests are made, ensure the following items are present at the demonstration site*:*

   a. Arrest Information and *criminal* complaint forms

   b. Cameras and video recording equipment

   c. Clipboards

d. Arrest stickers

e. Staplers and extra staples

f. Property bags

g. **Flex cuffs**

**h.** Needle-nose pliers or wirecutters (to cut plastic cuffs)

**i.** Bullhorn or other sound amplification device

(1) **The Long Range Acoustic Device (LRAD) may be deployed as appropriate to convey warnings or as a distraction device as outlined in Section V.**

**j.** Bolt-cutter or other cutting devices

**6.** Designate a Field Prisoner Processing Area and staff if required to process a large amount of persons prior to their transportation to the Slating Area. **The Field Prisoner Processing Area will provide workspace to complete arrest paperwork and the fingerprinting and photographing process completed by Identification Unit personnel.**

**7.** Designate a Slating Area and staff to process the arrestees. The Slating Area may be staffed by various units and agencies including the Franklin County Sheriff's Office and the Clerk of Court**s**.

## III. Demonstration Procedures

A. A **sworn** supervisor will make contact with the property owner or agent regarding arrest procedures if protestors are on private property. **A sworn supervisor will determine the appropriate course of action if demonstrators are in a public area or roadway to ensure they are not creating a public safety hazard.**

B. Prior to contact with the demonstrators, police personnel will be briefed on arrest, use of force, transportation**,** and paperwork procedures **as directed by the Incident Commander.**

C. **If exigent circumstances exist, such as demonstrators creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of demonstrators who are not complying with lawful commands. Refer to the "Chemical Agents and Intermediate Weapons Regulations" directive as necessary.**

D. A **sworn** supervisor will read a dispersal warning **using a bullhorn or amplification device** to the demonstrators **prior to arrests being made.** The warning **should** be read **three (3)** times **to notify the demonstrators that they are committing a violation of law and they may be arrested if they fail to comply with the order to disperse. Three**

*warnings are preferred; however, action may be taken after one or two warnings if there is an immediate need to stop dangerous behavior.* All warnings **and arrests should** be recorded using video recording equipment.

1. The *first official dispersal command* reads:

   *"AN EMERGENCY EXISTS ON AND AROUND (give location, for example: Chittenden & Indianola). YOU ARE ORDERED TO IMMEDIATELY LEAVE THE (AREA JUST DESCRIBED)/ (ROADWAY) BY THE ORDER OF (on-scene ranking supervisor). IF YOU REMAIN IN THE (AREA)/(ROADWAY) JUST DESCRIBED, REGARDLESS OF YOUR PURPOSE, YOU WILL BE IN VIOLATION OF COLUMBUS CITY CODE AND OHIO REVISED CODE - DISORDERLY CONDUCT, AND THE POLICE WILL REMOVE YOU FROM THIS (SPECIFIED AREA)/(ROADWAY). CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED TO MOVE YOU FROM THIS (SPECIFIED AREA)/ (ROADWAY), AND YOU ARE SUBJECT TO BEING ARRESTED AND PROSECUTED. THE FOLLOWING ROUTES OF DISPERSAL ARE AVAILABLE (describe available exit areas). YOU MUST LEAVE THE (SPECIFIED AREA)/(ROADWAY) NOW, AND YOU MAY NOT RETURN UNTIL THE EMERGENCY HAS CEASED."*

2. *The second warning reads:*

   *"THIS IS AN EMERGENCY SITUATION...AN EMERGENCY EXISTS IN THIS LOCATION (give location); LEAVE THE (SPECIFIED AREA)/(ROADWAY) IMMEDIATELY. CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED. IF YOU REFUSE TO LEAVE THE (SPECIFIED AREA)/(ROADWAY), YOU ARE SUBJECT TO ARREST. LEAVE THE (SPECIFIED AREA)/ (ROADWAY) IMMEDIATELY.*

3. *For the final warning, repeat the second warning and add:*
   *"THIS IS YOUR FINAL WARNING."*

4. *The Incident Commander or his or her designee should record the following information when these announcements are made.*
   *Day: _____ Date: ____/____/____ Location: _____*
   *Time of 1st Warning: __:__ (Wait approximately 5 minutes before reading 2nd warning)*
   *Time of 2nd Warning: __:__ (Wait approximately 2 minutes before reading 3rd warning)*
   *Time of 3rd Warning: __:__ (Make arrests/deploy chemical agents)*

**E.** *If on private property,* have the owner/agent attempt to gain entry into the building through the demonstrators who are blocking the door *after the warning is read, if it is safe to do so.* If the owner/agent is unable to gain entry, arrest procedures will be implemented at the direction of the Incident Commander.

**F.** *Each arrest team will consist of four officers.* At the direction of the Incident Commander, officers will begin to arrest individuals *who are* violati*ng* law.

**G.** Prisoners will be walked to the transport vehicles where a photograph of the prisoner and arresting officer will be taken and the Arrest Information form completed. *For non-ambulatory prisoners, refer to Section I,F of the "Transport and Slating" directive.*

**H.** If the demonstrator refuses to walk to the prisoner transport vehicle, he or she will be carried in an appropriate manner to the transport vehicle by the arrest team. Individuals who refuse to walk or *who* show other passive resistance may be charged with resisting arrest. The arresting officer will describe in the narrative of the Arrest Information form how the individual resisted arrest. *For example,* "Subject went limp and would not walk, requiring officers to carry the arrestee to the transporting vehicle."

**I.** All property will be removed from the arrestee and placed in a bag with the names of the arrestee and arresting officer printed on it.

**J.** The transporting officers will ensure the Arrest Information form, photographs, and other required paperwork are completed and property secured by the arresting officer(s) prior to transporting the individual.

## IV. Processing Procedures

A. If a Field Prisoner Processing Area is being utilized, prisoners will be transported to the Field Prisoner Processing Area where necessary paperwork will be completed. *As appropriate, prisoners will then be processed through the Slating Area, if one is activated.*

B. Depending on pre-established procedures for the event, prisoners may be summonsed at the Field Prisoner Processing Area or may be processed through the Slating Area *prior to being issued a* summons or slated at the appropriate county jail.

**C.** The Incident Commander will decide prior to initiating mass arrests whether to slate or summons individuals. The decision will be based on the type of protest, method of protest and resistance, number of potential arrestees, and available jail space. All individuals involved in an assault, resisting arrest, or other violent crime or felony will be slated. Felonies will be processed through the appropriate investigative unit.

**D.** If mass arrests are anticipated, the Franklin County Jail supervisor will be notified prior to the event*, or as soon as practical for spontaneous events.*

## V. Long Range Acoustic Device

A. The LRAD is an acoustic hailing device used to send messages and warning tones over longer distances or at a higher volume than normal loudspeakers. The LRAD is used for long-range communications in a variety of applications and as a means of non-lethal, non-kinetic crowd control.

   1. The LRAD's high output sound and directionality can be used to hail, warn, and notify clearly and intelligibly at distances of 250 meters (820 feet) or more.

B. The LRAD shall only be operated by sworn personnel who have satisfactorily completed the appropriate annual training.

C. The LRAD may be used to:

   1. Communicate to large crowds during parades, festivals, and sporting events;

   2. Conduct SWAT operations;

   3. Communicate to demonstrators and disperse or redirect crowds prior to deployment of chemical agents;

   4. Communicate with barricaded subjects;

   5. Make announcements when serving high risk warrants; or

   6. Evacuate neighborhoods or communicate lifesaving information to citizens during emergencies and disasters.

D. During an incident of civil unrest, the Incident Commander may request that the LRAD be delivered to be used as the amplification device to convey warnings to the demonstrators as outlined in Section III,D.

   1. Whenever possible, prerecorded messages should be used. Prerecording ensures that messages are appropriately worded and clearly broadcasted to maximize the effectiveness of communications.

   2. If demonstrators do not comply approximately two minutes after the second warning is read, the Incident Commander may order that the LRAD Warning Tone be used. Use of the LRAD Warning Tone as a distraction device shall be documented as a Level 0 Use of Force. Refer to the "Use of Force" directive as necessary.

   3. The Warning Tone should be used in 2-5 second bursts for maximum effectiveness.

*E. Operators of the LRAD shall ensure no targeted subjects, bystanders, or personnel are occupying the applicable "TONE" or "VOICE-TONE HAZARD AREAS" before engagement in "TONE" or "VOICE" mode.*

*1. The Tone Generator produces the loudest output from the LRAD. The Incident Commander or designee operating the LRAD will gauge safe stand-off distances utilizing a range finder prior to using the "TONE" mode. Time, distances, and location shall be documented by the Incident Commander or a designee.*

*F. Operators of the LRAD shall wear hearing protection. Other personnel in the area when the LRAD is being operated should also wear ear protection, such as soft foam inserts.*

## VI. Juvenile Offenders

Juveniles arrested during a demonstration will be processed according to *the* Division Directives.

## VII. Crime Scene Preservation

If a crime scene is involved in the event, the scene will be secured and the appropriate investigative unit and Crime Scene Search Unit will be required to process the scene.

## VIII. Legal Advisor

The Division Legal Advisor will be notified of a protest or other event involving mass arrests. The Division Legal Advisor may respond to the scene, Field Prisoner Processing Area, or Slating Area to provide legal assistance if necessary.

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.4 |
|---|---|---|
| | REVISED Jul. 30, 2019 | TOTAL PAGES 6 |
| **Riot Control Munitions** | | |



## I. Purpose

A. This section provides Division personnel with a reference for riot control munitions currently in stock for use in various situations. None of the munitions listed **shall** be used by Division personnel unless properly trained and certified by the Ordnance Unit. The section is divided into three parts outlining munitions for the following types of situations:

1. First Responders
2. Field Force Operations
3. Tactical Situations

B. Each part of this section will outline the following details of riot control munitions:

1. Proper application
2. Construction
3. Operation
4. Effective range
5. Type of agents or projectiles
6. Discharge times

## II. Delivery Method Options

A. 37mm/40mm Gas Gun

1. 37mm Super-Sock™ bean bag round
2. 40mm wood baton round
3. 40mm sponge round
4. 40mm warning/signaling munitions

B. Aerosol Canister

OC agent

C. Grenade

OC/CS agent

D. Unless otherwise specified, all 40mm gas guns and related munitions shall be securely stored in the lieutenant's office. The items shall be stored in a soft carrying case and transferred to a lieutenant's vehicle when needed for deployment, training, or inspection. The items shall be returned at the completion of the event/incident.

## III. First Responder

A. 37mm/40mm Gas Gun

1. Proper *a*pplication: Designed for crowd control or barricade situations, both indoors and outdoors.
2. Construction: Metal and plastic revolving cylinder or single shot*, **both*** with or without a collapsible stock, ***and*** with optic sight.
3. Operation: May be used in double or single-action depending on the weapon.
4. Effective range: 50 yards on breech lock sight, 75 and 100 ***yards*** on rear leaf sight.
5. Type of agents or projectiles: 37mm or 40mm projectiles in single shot and six or four-shot rotary version.
6. Discharge times: Zero discharge time.



Four-Shot 40mm Rotary Gas Gun



Single-Shot 40mm Gas Gun

B. 37mm Super-Sock™ Bean Bag Round

1. Proper application: Fired from the 37mm gas gun. ***Shall not be fired at the head unless the use of deadly force is reasonable.***
2. Construction: Balloon filled with silica sand contained in a plastic 37mm plastic shell.
3. Operation: Direct-fire deployment from the 37mm gas gun. Use as an intermediate impact weapon, targeting the extremities.
4. Effective range: 60 feet.
5. Type of agents or projectiles: Balloon filled with silica sand contained in a plastic 37mm plastic shell.
6. Discharge times: Not applicable.



37mm Super-Sock Bean Bag Round

## IV. Field Force Operations

A. 40mm Wood Baton Round

1. Proper *a*pplication: For outdoor use in riot control situations without the use of chemical agents when the crowd must be dispersed quickly and efficiently. ***This is not a direct-fire munition.***
2. Construction: 3 wood projectiles loaded in a 4.8 inch casing.
3. Operation: Fire from a 40mm gas gun at the ground in front of the crowd and the wood projectiles skip-fire into the crowd's feet and lower legs.
4. Effective *r*ange: 30 to 60 feet.
5. Type of agents or projectiles: 3 wood projectiles loaded in a 4.8 inch casing.
6. Discharge times: Zero discharge time.



40mm Wood Baton Round

B. 40mm Sponge Round (40MM eXact iMpact™ Sponge Round)

1. Proper *a*pplication: For use in riot control situations for the incapacitation or control of an aggressive, non-compliant subject. ***Shall not be fired at the head unless the use of deadly force is reasonable.***

2. Construction: A plastic body with a foam (sponge) nose.

3. Operation: Direct-impact deployment from a 40mm gas gun. Use as an intermediate impact weapon targeting the extremities.

4. Effective *r*ange: 5 to 120 feet.

5. Type of agents or projectiles: A plastic body with a foam (sponge) nose which is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

6. Discharge times: Zero discharge time.



40mm Sponge Round

C. 40mm Warning/Signaling Munitions

1. Proper *a*pplication: For outdoor use in riot control situations to direct movement of a crowd.

2. Construction: A plastic body.

3. Operation: Fire from a 40mm gas gun, directed over the heads of a crowd to direct movement. The munition is designed to travel 100 meters and deflagrate 20 feet above the target when the launcher is held at a 15 degree elevation angle.

4. Effective *r*ange: 100 meters.

5. Type of agents or projectiles: A plastic body which produces 170 decibels of sound, 5 million candelas of light, and deflagrates at a distance of 100 meters ***with a CS irritant payload***.

6. Discharge times: Zero discharge time.



40mm Warning/Signaling Round

D. MK-9 Aerosol

1. Proper *a*pplication: Aerosol sprays in a dispersed pattern, creating a contaminated area that causes unruly crowds to move.
2. Construction: Aluminum case, plastic handle, and discharge trigger.
3. Operation: Spray above crowd, letting agent fall on to them or directly into face, nose, and mouth area.
4. Effective range: 10 to 15 feet.
5. Type of agents or projectiles: OC Aerosol spray.
6. Discharge times: Average of 18 to 20 half-second bursts.



MK-9 Aerosol

## V. Tactical Situations

A. OC Grenade

1. Proper *a*pplication: All indoor situations, as well as outdoor situations where the use of pyrotechnic munitions is not feasible and minimal contamination is desired.
2. Construction: High-impact ABS plastic or *m*etal *c*anister.
3. Operation: Following fuse delay, a $CO_2$ cartridge, located in the center of the grenade, discharges. Fuse type: M201A1 – 1.5 to 2 second time of detonation.
4. Effective range: 35 feet, hand-thrown only.
5. Type of agents or projectiles: *M*icropulverized OC agent with an effective volume of 2,000 cubic feet.
6. Discharge time: Instantaneous.



OC Grenades

B. Rubber Ball Blast Grenade

1. This device is a payload system for CS only and there are no projectiles inside the device.

2. Proper *a*pplication: Crowd management for indoor and outdoor operations and tactical deployment situations.

3. Construction: Rubber ball grenade body.

4. Operation: Following an initial 1.5 second fuse delay, followed by another half-second delay, the grenade combines loud report and flash with effects of chemical agents. Fuse type: M201A1 – 1.5 to 2 second time of detonation.

5. Effective range: 35 feet, hand-thrown only.

6. Type of agents or projectiles: *M*icropulverized CS agent with an effective volume of 2,000 cubic feet.

7. Discharge time: Instantaneous.

8. Ordnance *unit* personnel shall be responsible for the storage of this device and the device will only be issued when approved by a *l*ieutenant for a specific event or incident.

9. Personnel deploying this device shall log its use as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF) as outlined in the "Gas Guns and Grenades" directive.



Rubber Ball Blast

## VI. Warning

A. Personnel deploying chemical agents and riot munitions *shall* read the warning labels on these devices before deployment.

B. Nomex gloves should be worn when deploying chemical agents.

C. International color codes

1. Yellow…..Smoke

2. Red….......CN

3. Blue….......CS

4. Orange....OC

*Note: The Division does not use or store CN agents.*

| Columbus Police Division Directive | EFFECTIVE<br>Aug. 01, 1987 | NUMBER<br>2.01 |
|---|---|---|
| | REVISED<br>Dec. 30, 2017 | TOTAL PAGES<br>11 |
| **Use of Force** | | |



## I. Definitions

A. Use of Force

The exertion of energy or the **actions of** personnel in the performance of their duties used to direct or control another's movements or actions. A use of force **may be implemented** to control resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property*.*

B. Use of Force Levels of Control

1. Levels of Control used by the Division of Police **for reporting purposes** are:

Level 0: Officer presence, verbal and non-verbal commands, searching, handcuffing, sparking a taser for compliance, **and using** flashbangs and multiple baton rounds as diversions

Level 1: Empty hand control, pressure points, grounding techniques, and joint manipulations

Level 2: Use of chemical spray

Level 3: Use of electronic device (electronic custody belt, taser or **Electronic Control Weapon (ECW)**)

Level 4: Hard empty hand control (strike/punch/kick)

Level 5: Use of impact weapon (baton/flashlight)

Level 6: Police K-9 bite

Level 7: Less lethal weapons (beanbag/multiple baton rounds

Level 8: Deadly force

C. Deadly Force

Any force which carries a substantial risk that it will proximately result in the death of any person.

D. Injury

1. For the purposes of this directive, injuries are classified as:

a. Minor Injury

An injury that does not require transport to a medical facility.

b. Serious Injury

An injury that requires transport to a medical facility for treatment.

Note: If a Division supervisor classifies an injury as minor, refusal at the county jail does not require a *Use of Force-Injury to Prisoner* administrative investigation.

E. Taser Application

One full or partial five-second cycle of the taser.

## II. Policy Statements

A. General

1. *When reasonable, sworn personnel should try to de-escalate a situation by using trained techniques, such as building rapport, communication skills, taking cover, etc. This is not an all inclusive list.*

2. It is well established that police officers may use force to effect an arrest, to defend themselves, or to defend others. An officer should not desist from any official duty merely because resistance is offered. Police officers shall not use more force than is reasonable in a particular incident.

3. Factors to be considered when determining the reasonableness of a use of force are:

   a. The severity of the crime at issue.

   b. Whether the *subject* poses an immediate threat to the safety of the officer or others.

   c. Whether the *subject* is actively resisting arrest.

   d. Whether the *subject* is attempting to evade arrest by flight.

4. *Force may be used during a medical emergency if:*

   a. *The person experiencing a medical emergency is incapable of making a rational decision under the circumstances and poses an immediate threat of serious harm to himself, herself, or others.*

   b. *Some degree of force is reasonably necessary to minimize the immediate threat.*

   c. *The force being used is reasonably necessary under the circumstances.*

5. *Sworn personnel should take into consideration an unarmed person's known mental health status prior to using force.*

6. Officers shall use their training to guide them through a use of force incident. The preferred response to resistance and aggression is a trained technique *reasonable for the circumstances*. However, during a situation involving the infliction or threatened infliction of serious physical harm, the use of an untrained response, *such as neck restraints,* while not normally authorized, may be reasonable to end the threat and survive the encounter. The proper exertion of physical force used to control *the subject* shall be consistent with Division policy.

7. All uses of force shall be reported consistent with Division policies. Involved personnel shall notify an available on-duty Division supervisor in the following descending order:

   a. The*ir* immediate supervisor*;*

   b. Another sworn supervisor within their chain of command*; or*

   c. Any other sworn Division supervisor, who may personally conduct the investigation or may notify a supervisor in the involved officer's chain of command to conduct the investigation.

8. The Internal Affairs Bureau (IAB) shall forward a monthly report to the Training Bureau that summarizes all Level 2 through Level 8 Use of Force Reports, form U-10.128, received.

9. The Training Bureau shall review the monthly summary of Use of Force Reports received from IAB along with the original Levels 0 and 1 Use of Force Reports to monitor techniques for their effectiveness and to make approved changes in trained techniques and lesson plans.

10. All sworn Division personnel shall receive annual in-service training in the Division's use of force policy.

11. Division supervisors conducting use of force investigations shall photograph involved persons as detailed in the Supervisor's Manual.

12. Restrictions on Supervisors Conducting Investigations

    a. Division supervisors who actively participate in or order a use of force shall not conduct any subsequent investigation. This restriction does not apply to tactical situations, **for example, those involving** SWAT, In-Tac, or field forces.

    b. When a Division supervisor is prohibited from conducting the investigation, the involved supervisor's immediate supervisor or, if unavailable, another Division supervisor of a higher rank than the involved supervisor shall be contacted. The contacted supervisor may conduct the investigation or may assign it to an alternate supervisor.

13. If requested, IAB shall conduct an administrative investigation.

Note: Personnel who are the focus of a criminal investigation may invoke their constitutional rights. This does not apply if the investigation is strictly administrative in nature. Information compelled from the focus employee in an administrative investigation shall not be shared with, or in any manner released to, any unit conducting a criminal investigation, except as pursuant to the Ohio Public Records Act.

14. **Sworn personnel shall not use any force for a retaliatory or punitive purpose.**

B. Deadly Force

1. Sworn personnel may use deadly force when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm.

2. Sworn personnel may use deadly force upon a human being to prevent escape when there is probable cause to believe that the **subject** poses an immediate threat of serious physical harm to others.

3. Sworn personnel **not in a vehicle** should avoid positioning themselves in the path of a moving vehicle **or in a position vulnerable to being struck if the vehicle were suddenly moved**.

   a. Sworn personnel in the direct path **or a position vulnerable to being struck by** a moving vehicle should attempt to take evasive action to avoid being struck by the vehicle.

   b. Sworn personnel may only fire a weapon at the driver or occupant of a moving vehicle when there is an articulable, reasonable belief that the subject poses an immediate threat of death or serious physical harm to himself, herself, or others.

   c. *Sworn personnel should not extend their displayed firearm inside the passenger compartment of an occupied vehicle.*

   d. *Sworn personnel should avoid reaching into a vehicle and position(s) that make them vulnerable to being dragged.*

4. If reasonable, sworn personnel should give a verbal warning of the intention to use deadly force.

5. While sworn personnel have an affirmative duty to use that degree of force reasonable to protect human life, the use of deadly force is not reasonable merely **to** protect property interests. Only under circumstances where it is reasonable to believe an infliction or threatened infliction of serious physical harm to human life exists is the use of deadly force justified.

6. The use of deadly force by sworn personnel should not create a danger to the public that outweighs the benefits of its use.

7. Sworn personnel shall not fire a warning shot unless there is justification to use deadly force **and should ensure:**

   a. *There are no bystanders in the line of fire or that could move into the line of fire; and*

   b. *The backstop is reasonably likely to contain or stop the discharged bullet.*

8. Facts unknown to sworn personnel at the time deadly force is used cannot be considered in determining whether the involved personnel acted in conformity with this policy.

9. Investigations of uses of force resulting in death shall be forwarded to the county prosecutor in the county in which the incident occurred. That prosecutor will determine if the case will be presented to a grand jury.

### C. Use of Firearm Against Dangerous Animals

1. *Sworn personnel being threatened or attacked by a dangerous animal should attempt to use trained techniques and/or intermediate weapons before using a firearm to protect themselves or another person. If these attempts fail to halt the animal's attack, and when left with no alternative other than to use a firearm, sworn personnel should determine whether the backstop is able to control and contain any projectiles that may not find their intended mark or that may ricochet. Consider the presence of individuals and their actions relative to the proximity of the dangerous animal. Grassy and/or dirt areas are the preferred location for a backstop.*

2. *Sworn personnel shall not fire or deploy a weapon at a dangerous animal unless the animal poses an imminent threat to personnel or others, use of the weapon is reasonable, and the risk to human life is minimized.*

3. *Sworn personnel shall not use a firearm to prevent or disrupt an animal attacking another animal.*

*Note: Pets are deemed to be property, and a firearm is not to be used to protect property.*

## III. Procedures

A. Level of Control 0 (Sparking a Taser for Compliance) or Level of Control 1 with No Injury

1. Involved Personnel

   Complete a Use of Force Report and forward it to your immediate supervisor by the end of your shift or by the beginning of your next shift if the incident occurred outside of assigned duty hours. If your immediate supervisor is unavailable, forward the report to any on-duty supervisor within your chain of command.

2. Investigating Supervisor

   a. Review and sign the Use of Force Report.

   b. Forward the report directly to IAB.

   c. Forward a copy of the report to the immediate supervisor of the involved personnel.

3. Internal Affairs Bureau

   Forward the original Use of Force Report to the Training Bureau.

B. Level of Control 0 or 1 with a Complaint of an Injury Caused by the Response - No Serious Physical Harm to a Human

1. Involved Personnel

   a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty Division supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Minor Injury

      (1) Complete a Data Processing Worksheet, form U-10.164, *and* attach the Use of Force Report; a copy of the Arrest Information, form U-10.100; and any photographs taken.

      (2) Forward the packet directly to IAB.

      (3) Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. Serious Injury

      (1) Complete an Injury to Prisoner administrative investigation and a Data Processing Worksheet. Attach the Use of Force Report and a copy of the Arrest Information form.

      (2) Forward the packet through the chain of command to IAB.

3. Internal Affairs Bureau

    a. If applicable, record the incident in the involved personnel's IAB database *record*.

    b. Maintain a file copy of the Use of Force Report.

    c. Forward the original Use of Force Report to the Training Bureau.

C. Level of Control 2

1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. If the *subject* is being arrested or issued a summons:

      (1) Ensure that the arresting personnel include the facts necessitating the use of chemical spray and details of the decontamination/treatment rendered in the narrative section of the Arrest Information form.

      (2) Include a brief statement indicating justification for the use of chemical spray, the effectiveness of the chemical spray, and details of the decontamination process and treatment rendered on the Use of Force Report.

    (3) Ensure that an "X" is placed in both the *"Chemical Spray"* box on the top left corner and the *"Use of Force"* box on the top right corner on the front of the Arrest Information form.

    (4) Complete a Data Processing Worksheet, attach the Use of Force Report and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

  d. If no arrest is made, add comments to the back of the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

  e. If circumstances indicate that the use of chemical spray was not within Division policy, complete an investigation as indicated on the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

  f. For a Level of Control 2 against a handcuffed subject:

    (1) Identify and interview the following:

      (a) Involved Division personnel

      (b) All available witnesses

      (c) The subject upon whom chemical spray was used

    (2) Review and sign the Use of Force Report.

    (3) Complete an administrative investigation.

    (4) Complete a Data Processing Worksheet*;* attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation*;* and forward the packet through the involved personnel's chain of command to IAB.

3. Commander

  Make a final determination for Level of Control 2 *(*not against a hand-cuffed **subject***)* unless deviation from progressive discipline and/or departmental charges are recommended. Forward the investigative packet to IAB.

4. Deputy Chief

  a. Make a final determination for Level of Control 2 against a handcuffed subject unless deviation from progressive discipline and/or departmental charges are recommended.

  b. Forward the investigative packet to IAB.

  c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

5. Internal Affairs Bureau

  a. Record the incident in the involved personnel's IAB database **record**.

  b. Maintain the original Use of Force Report.

D. Level of Control 3

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately notify, or cause notification of, an on-duty supervisor.

c. Complete a Use of Force Report and a Use of Taser Report, form U-10.128T, and give them to the investigating supervisor.

2. Investigating Supervisor

a. Identify and interview the following:

(1) Involved Division personnel

(2) All available witnesses

(3) The subject upon whom the taser was used

b. Review and sign the Use of Force Report and the Use of Taser Report.

c. Complete the Data Processing Worksheet; attach the Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form; and forward the packet through the involved personnel's chain of command to IAB.

d. For a Level of Control 3 against a handcuffed subject, when three or more cycles of the taser are applied to one subject, when one taser is applied to multiple subjects during the same incident, or when multiple tasers are applied to the same subject:

(1) Complete an administrative investigation.

(2) Attach the administrative investigation to the Data Processing Work-sheet, Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

3. Deputy Chief

a. Make a final determination for Level of Control 3 unless deviation from progressive discipline and/or departmental charges are recommended.

b. Forward the investigative packet to IAB.

c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

4. Internal Affairs Bureau

a. Record the incident in the involved personnel's IAB database **record**.

b. Maintain the original Use of Force Report.

E. Level of Control 4 through 7

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately notify, or cause notification of, an on-duty supervisor.

c. Complete a Use of Force Report and give it to the investigating supervi-sor.

2. Investigating Supervisor

a. Identify and interview the following:

(1) Involved Division personnel

(2) All available witnesses

(3) The subject upon whom the use of force was used

b. Review the Use of Force Report.

c. Complete an administrative investigation.

d. Complete a Data Processing Worksheet; attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation; and forward the packet through the involved personnel's chain of command to IAB.

3. Deputy Chief

a. Make a final determination for Levels of Control 4 through 7 unless deviation from progressive discipline and/or departmental charges are recommended.

b. Forward the investigative packet to IAB.

c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

4. Internal Affairs Bureau

a. Record the incident in the involved personnel's IAB database *record*.

b. Maintain the original Use of Force Report.

F. Use of Force Resulting in Serious Physical Harm to or Death of a Human

Note: If the use of force involves the discharge of a firearm other than a gas gun, follow the procedures set forth in the "Discharged Firearms" directive. If the use of force involves the discharge of a gas gun, follow the procedures set forth in the "Gas Guns and Grenades" directive.

1. Involved Personnel

a. Cause any needed medical aid to be rendered.

b. Immediately cause Communications Bureau personnel to be notified.

c. Secure the scene.

2. Communications Bureau

a. Dispatch personnel to render assistance or to secure the scene.

b. Notify the **Columbus Division of Fire and those listed on the Emergency Notification Guide.**

Note: The Investigative Duty Desk will contact the Critical Incident Response Team.

3. Officer Support Team

Provide the involved personnel with any assistance, information, or other support they may desire.

Note: Officer Support Team members are subject to being subpoenaed to attend legal proceedings and testify to what they are told by the involved personnel. Therefore, Officer Support Team members are cautioned not to discuss the incident.

4. Critical Incident Response Team

   a. Conduct a criminal investigation.

   b. Advise personnel who are the focus of the investigation of their constitutional rights.

   Note: The involved personnel may invoke their constitutional rights at any time during the criminal investigation.

   c. Complete the Use of Force Report and Data Processing Worksheet and attach both to the original investigative packet.

   d. File the original investigative packet.

   e. Forward copies of the investigative packet as follows:

   (1) One copy to the appropriate county prosecutor

   (2) Three copies to the Firearms/Police-Involved Death Review Board if a firearm was used or *if* death occurred under circumstances involving a police action

5. Firearms/Police-Involved Death Review Board

   a. Review all information concerning the incident.

   b. Determine whether the police action was within Division policy.

   c. Prepare and forward a summary of the findings, together with the original investigative packet, the Use of Force Report, and *the* Data Processing Worksheet, through the involved personnel's chain of command to the deputy chief.

   Note: If there is a dissenting opinion between the Firearms/Police-Involved Death Review Board members, the dissenting member will include a letter of finding with the investigative packet and route it through the involved personnel's chain of command to the Chief of Police.

6. Immediate Supervisor

   a. Review the entire investigative packet and make recommendations.

   b. Forward the investigative packet through the chain of command.

7. Chain of Command

   Review the entire investigative packet and make recommendations.

8. Deputy Chief

   a. Review the investigative packet.

   b. Make a final determination concerning the incident unless deviation from progressive discipline and/or departmental charges are recommended.

   Note: If the recommendation of the deputy chief is in disagreement with the finding of the Firearms/Police-Involved Death Review Board, forward the investigative packet to the Chief of Police.

   c. Forward the investigative packet to IAB.

   d. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

9. Chief of Police

   a. Make the final determination when a recommendation to bypass progressive discipline is made.

   b. Make a final determination if there are dissenting opinions **between** the Firearms/Police-Involved Death Review Board and the involved personnel's deputy chief.

   c. Cause the involved personnel to be notified of the determination.

10. Internal Affairs Bureau

   a. Record the disposition of the incident in the involved personnel's IAB database.

   b. Maintain the original Use of Force Report.

| Columbus Police Division Directive | EFFECTIVE<br>Mar. 30, 2012 | NUMBER<br>2.04 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>5 |
| **Chemical Agents and Intermediate Weapons Regulations** | | |



## I. Definitions

A. ***Conducted Energy Weapon*** (hereafter referred to as taser)

An intermediate weapon not intended to replace firearms or self-defense techniques. The taser is designed to temporarily immobilize a violent or potentially violent subject. When applied correctly, the taser generates an electrical current that ***disrupts*** the neuromuscular and sensory nervous system, incapacitating the subject.

B. Close-Quarter Probe Deployment

A method in which the user deploys the taser on a subject in "Probe" mode, ***then*** places the taser at another position on the subject's body as distant as possible from the initial contact point, and rocks the taser forward and backward.

C. Drive-Stun

A function in which the taser is held directly against the subject's body, causing localized pain, but does not override the subject's motor responses.

## II. Policy Statements

A. Chemical Agents

1. Sworn personnel shall carry only those chemical agents that have been authorized by the Chief of Police.

2. Sworn personnel shall not carry chemical spray until training and qualification standards have been satisfied. Sworn personnel shall demonstrate proficiency with chemical spray once each calendar year.

3. Sworn personnel may use chemical spray to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, to prevent escape, or to prevent or stop the commission of a criminal offense.

   a. Sworn personnel should not use chemical spray on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

   b. Supervisors investigating incidents in which chemical spray has been used against a handcuffed person shall comply with the applicable procedures detailed in the Supervisor's Manual and the "Use of Force" directive.

4. The use of a chemical agent deployed by a 37mm or 40mm gas gun *or chemical agent grenade* being thrown or rolled requires the approval of a lieutenant or higher authority.

   a. A SWAT lieutenant may designate a lower-ranking SWAT officer to give such an order.

   b. A sergeant acting as a zone lieutenant *should* not give such approval.

5. *If exigent circumstances exist, such as individuals creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of individuals who are not complying with lawful commands.* Prior to deployment of the chemical spray, at least *three* notifications should be made to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order.

   a. The notifications should be made in a manner which the participants in the crowd should reasonably be able to hear and understand.

   b. The notifications and subsequent deployment of chemical spray in crowd control situations should be audio/video-recorded when possible.

6. Sworn personnel encountering a group of people, some of whom are engaged in *unlawful* conduct, shall be guided by the "Use of Force" directive when determining whether to use chemical spray. If chemical spray is used, it should be directed at the persons participating in the violent conduct, not at the group in general. The *encounter* should be audio/video-recorded when possible.

7. Sworn personnel deploying a chemical agent shall make a reasonable effort to decontaminate exposed persons once the situation is under control. Decontamination may include exposure to fresh air, flushing the eyes with fresh water, or seeking medical attention.

B. Intermediate Weapons

1. Sworn personnel shall carry only those intermediate weapons authorized by the Chief of Police. The approved intermediate weapons are:

   a. A flashlight not to exceed 15" in length

   b. The issued tactical baton

   c. The approved taser

2. Sworn personnel shall not carry an intermediate weapon until training and qualification standards for that weapon have been satisfied. Sworn personnel shall requalify once each calendar year with each intermediate weapon they are authorized to carry.

3. Sworn personnel may use an intermediate weapon to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, or to prevent or stop the commission of a criminal offense.

4. Sworn personnel should not use an intermediate weapon on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

5. Intermediate weapons are not a substitute for deadly force.

6. It is recommended that sworn personnel have an approved intermediate weapon and a restraint device available when in possession of a firearm while off duty.

7. Sworn personnel shall complete a Use of Force Report, form U-10.128, when an intermediate weapon is used on a subject.

8. Sworn personnel shall complete the Personal Advanced Taser Agreement, form J-10.112, and obtain approval from the Defensive Tactics Unit (DTU) prior to carrying a personally owned taser. Personally owned tasers may be carried while working regular duty, special duty, or off duty as an intermediate weapon. Division-owned tasers that are not personally assigned shall only be used for regular duty.

9. Sworn personnel shall not target the head, face, neck, or groin with the taser in probe mode.

10. Sworn personnel should not intentionally target the chest area above the sternum when deploying the taser in probe mode when possible.

11. Sworn personnel may target the neck or groin with the taser in drive-stun mode.

12. Sworn personnel should consider training and the following when determining whether to use the taser:

   a. Subject's age

   b. Subject's weight

   c. Subject's obvious physical disabilities

   d. Subjects who are in a position where a fall may cause substantial injury or death

   e. Whether the subject is exhibiting signs or symptoms of mental illness

13. Sworn personnel should not use the taser in drive-stun mode for pain compliance if it is likely to be ineffective due to intoxication or signs or symptoms of mental illness.

14. Sworn personnel should not use the taser on small children, infirm or elderly individuals, obviously pregnant females, or subjects who are in control of a motor vehicle.

15. Sworn personnel shall not deploy the taser on subjects known to have come in contact with flammables or in environments where flammables are obviously present.

16. Sworn personnel shall not use the taser on a fleeing subject who committed a minor misdemeanor as a primary offense, unless the subject is posing an articulable threat to the officer or to another citizen.

Note: Failure to Comply and/or Obstructing Official Business violations ***arising solely from the act of fleeing from a minor misdemeanor*** are not justification for using the taser.

17. Sworn personnel shall properly store the taser when it is not in use. Once the taser is issued, sworn personnel shall not leave the taser unattended.

18. Sworn personnel shall not change or modify the taser.

19. Sworn personnel shall contact a DTU supervisor for replacement of any taser that is not safe or functioning properly. Only a DTU supervisor shall repair the taser or accessories.

20. Sworn personnel shall not remove the Digital Power Magazine (DPM) from the taser unit. Once the DPM read-out reaches 20% or less, personnel should have the DPM replaced. The DPM shall only be replaced by a DTU supervisor.

21. Taser ***unintentional*** discharges

   a. Sworn personnel shall notify an on-duty supervisor and record the incident on the Taser Log Sheet, form S-70.113.

   (1) If a subject is struck, sworn personnel shall complete a Use of Force Report and follow the applicable procedures outlined in the "Use of Force" directive.

   (2) If no subject is struck, sworn personnel shall ensure that the probes and cartridges are destroyed.

   (3) The supervisor shall conduct an administrative investigation when an incident occurs at a location other than a police facility, or at a police facility when a suspect or arrestee is present.

22. Taser deployment

   a. Sworn personnel choosing to deploy a taser shall confirm that the weapon selected is a taser and not a firearm.

   b. Only cartridges marked "25 FEET" or "XP" shall be used in the taser.

   c. When feasible, sworn personnel should communicate to the subject that the taser is going to be deployed to attempt to gain compliance. This can be communicated to the subject by removing the air cartridge, displaying the laser on the subject, and "sparking" the taser unit.

   Note: When the taser is "sparked" for compliance, sworn personnel shall complete a Use of Force Report.

   d. If possible, personnel should give the loud verbal command, "Taser! Taser! Taser!" prior to firing the taser.

   e. Sworn personnel may use the taser in the drive-stun mode to gain control of suspects displaying active resistance. The drive-stun mode shall not be used with a live air cartridge in place.

f. Sworn personnel should attempt to control and handcuff the subject under power during the window of opportunity the taser cycle provides.

g. Sworn personnel should consider moving on to another force option if unable to control and handcuff under power.

23. Taser post-use

a. Any subject upon whom the taser is used, in either probe or drive-stun mode, shall be examined by EMS personnel and shall remain under observation by sworn personnel until slated or released.

b. Sworn personnel shall request an EMS unit to respond to the scene to remove any probes that have penetrated the skin or to care for wounds caused by probes that penetrated but fell out. Sworn personnel shall not remove the probes.

(1) If the subject is transported to a medical facility, sworn personnel shall ride in the medic unit and remain with the subject until further medical attention has been offered.

(2) Sworn personnel shall call EMS personnel to the scene if any signs or symptoms of medical distress become evident.

c. Sworn personnel shall provide the subject with the Taser Aftercare form, S-70.112.

d. Sworn personnel shall treat the taser cartridge, wires, and probes as evidence and shall secure and submit them to the Property Control Unit for two years. This does not apply to **unintentional** discharges when no subject is struck **or when used against an animal**. Probes that have penetrated the skin should be treated as a biohazard and proper universal health precautions should be taken when handling and packaging them.

24. Taser dataport

a. Only zone lieutenants, a DTU supervisor, and Internal Affairs Bureau supervisors shall access the taser's USB dataport.

b. Taser dataport settings shall only be set or adjusted by a DTU supervisor.

25. Each unit assigned a taser shall maintain a Taser Log Sheet that shall include:

a. Tasers assigned to the unit;

b. Taser cartridge serial numbers assigned to the unit; and

c. Spent taser cartridge serial numbers with the date fired, the officer's name and badge number, and the taser serial number from which it was fired.

26. When the Taser Log Sheet indicates four cartridges remain assigned to a unit, the first shift supervisor shall obtain replacements through DTU.

27. Completed Taser Log Sheets shall be forwarded to DTU for retention.

| Columbus Police Division Directive | EFFECTIVE Jul. 30, 2000 | NUMBER 2.05 |
| | REVISED Jul. 30, 2019 | TOTAL PAGES 3 |
| **Gas Guns and Grenades** | | |



## I. Introduction

A. Gas guns and grenades are used to deploy projectiles, distraction devices, and chemical agents that are not designed to be lethal, but have the potential to cause injury or death.

B. Chemical agents in the form of aerosol canisters that are thrown and spray devices worn on the gun belt that are not deployed by the ignition of a primer are excluded from the provisions of this directive.

## II. Definitions

A. Bean bag round

Also referred to as a flexible baton round, a bean bag round contains a cloth bag filled with silica sand and is fired from a gas gun. It is designed for direct impact on a targeted subject.

B. Flashbang

A non-bursting detonation device that emits light and sound when deployed.

C. Gas gun

A 37mm or 40mm single-barrel or rotary-style firearm used to deploy projectiles, distraction devices, and chemical agents.

D. Gas round

Any of a variety of rounds fired from a gas gun that release chemical agents or projectiles containing chemical agents.

E. Less-lethal weapons and ordnance

This includes gas guns, grenades, bean bag rounds, and multiple baton rounds, which have the potential to cause death, though they are not designed to be lethal.

F. Multiple baton round

A high velocity round containing **wood** projectiles fired from a gas gun. It is designed to be skip-fired (ricocheted off a hard surface) toward a targeted subject or to be used as a distraction device (deployed through and breaking a window). ***Operational exceptions may be made in a critical situation in which the use of deadly force is justified.***

G. Rubber Ball Blast Grenade

A combination irritant and diversion device that delivers three stimuli for psychological and physiological effect: light, sound, and chemical agent.

H. Sponge Round

A plastic body with a foam nose which is spin-stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

I. Warning/Signaling Munitions

A plastic body which produces 170 decibels of sound, emits 5 million candelas of light, and **deflagrates** at a distance of 100 meters with a CS irritant payload.

## III. Policy Statements

A. **Authorized sworn personnel shall only carry and use those gas guns and grenades that have been approved by the Chief of Police.**

**B.** The Division's use of force policy shall **guide** the **use of** gas guns and grenades; therefore, any discharge of a gas gun or detonation of a grenade (excluding flashbangs **and multiple baton rounds used as a diversion**) shall be a Level 7 use of force.

**C.** Only **sworn personnel** who have satisfactorily completed annual specialty impact and gas munitions training are permitted to possess**,** deploy**, or order the deployment of** these munitions in the field.

**D.** Supervisors shall issue the order to use a gas gun or grenade only when reasonable based upon the totality of the circumstances, which should include an evaluation of the need to use the device(s) weighed against the danger they pose to the suspect or others.

**E.** Division personnel shall give a verbal warning that the use of a less-lethal weapon and/or projectile is imminent when practical.

## IV. Procedures

A. Use of Gas Guns and Grenades

 1. Zone Lieutenant

 a. Ensure that the zone has at least one gas gun available for use at all times.

 b. Determine whether to use a gas gun or grenade immediately or call for SWAT.

 c. Issue the order to use the gas gun or grenade. Such an order may be given via electronic or radio communications.

 2. SWAT or **Drug Interdiction** Section Lieutenant

 a. Determine when a gas gun or grenade is to be used.

 b. Issue the order to deploy the weapon.

 (1) The order may be given via electronic or radio communications.

 (2) Designate a lower-ranking SWAT or **Drug House Interdiction** officer to give the order when necessary.

 3. Personnel assigned to possess or use a gas gun or grenade

 a. Maintain the gas gun or grenade in good working order.

**b. Contact the Ordnance Unit for any needed maintenance or repair.**

**c.** Use a gas gun or grenade only on the order of a lieutenant, higher-ranking personnel, *or* the SWAT or *Drug Interdiction* Section Lieutenant's designee.

Note: Sergeants deploying beanbag rounds are not required to obtain prior approval.

**d.** Do not fire a gas gun or detonate a grenade without the assistance of a cover officer with a firearm.

4. Ordnance Unit Personnel

Resupply personnel with gas guns, grenades, and less-lethal ordnance at the direction of a lieutenant or higher-ranking supervisor.

B. Reporting and Investigation of Deployment

1. Investigating personnel

a. Comply with the "Discharged Firearms" directive and forward a copy of the administrative investigation to the Legal Advisor when:

(1) A human subject is struck and serious physical harm as defined in the Ohio Revised Code results.

(2) A human subject is struck and death results.

b. Comply with the "Use of Force" directive and forward a copy of the administrative investigation to the Legal Advisor when:

(1) No human subject is struck.

(2) A human subject is struck and not injured.

(3) A human subject is struck, and the resulting injury does not amount to serious physical harm as defined in the Ohio Revised Code.

(4) A human subject is struck and flees the scene in an unknown condition.

2. Internal Affairs Bureau

a. Maintain required records of uses of force.

b. When the involved personnel are ordered by a supervisor to fire a gas gun or detonate a grenade, categorize the incident as an ordered use of force for purposes of the Employee Action Review System.

3. Personnel detonating explosive devices that must be logged as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF)

a. Be aware of the reporting requirement for devices such as the Defense Technology Corporation of America Distraction Device.

b. Report the use of force as required by the "Use of Force" directive.

c. Complete a Distraction Device Deployment report, form U-11.102, and forward it directly to the 1st Shift Ordnance Unit.

4. 1st Shift Ordnance Unit

Maintain a log of all explosive devices as required by ATF.

| Columbus Police Division Directive | EFFECTIVE Mar. 12, 2002 | NUMBER 11.02 |
| | REVISED Jun. 30, 2018 | TOTAL PAGES 5 |
| **Cruiser Video System (CVS)** | | |



## I. Introduction

The principal purpose of a **CVS** is to collect evidence **that** may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. The Division's use of a recording system provides documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to prove that Division personnel will be held accountable for their actions and provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

**A** recording which may be used **as evidence to document an incident** as it pertains to an enforcement action/**adversarial** encounter.

Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

**A** recording, whether accidental or intentional, which has no evidentiary or administrative value.

Examples of non-evidence: accidental/incidental recording, equipment checks, training, and CVS recordings triggered by the speed of the cruiser. This is not an all-inclusive list.

3. Permanent

**A** recording to be kept indefinitely.

Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel operating a CVS-equipped unit shall record all investigatory stops, traffic and pedestrian stops, suspected OVI stops, and when engaged in emergency vehicle operations from the beginning of the action.

   1. Recording of an event shall not be stopped until the enforcement action or incident has ended or as directed by a sworn Division supervisor.

B. When the CVS unit is used while effecting an arrest, personnel shall check the CVS box on the Arrest Information, form U-10.100, and shall indicate the unit (50, R50, etc.) and officer(s) who recorded the incident in the narrative section.

C. The driver, or probationary officer in an FTO unit, shall wear the body microphone in the CVS microphone pouch and shall turn on the body microphone when exiting the marked unit anytime the CVS is recording.

Note: When wearing a body-worn camera, the body microphone is not required to be worn.

D. Sworn personnel shall add the letter "V" after the clearance code of a run if a CVS is used.

E. Upon inquiry, sworn personnel shall inform citizens *that* the CVS is recording. Personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

F. Sworn personnel shall complete the required training prior to operating the CVS.

G. Sworn personnel may use the CVS to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken, such as the signing of a Consent to Search, form I-26.102, or Constitutional Rights, form I-20.109. Personnel may use the CVS to supplement, but not replace the use of, any required forms.

H. Sworn personnel should not use the CVS to record routine patrol duties unless there is a reasonable belief the recording could benefit the Division.

I. Sworn personnel are not required to use the CVS to record while working traffic control.

J. Sworn personnel shall ensure the CVS backseat camera is activated anytime a person is placed in the rear of their marked unit.

K. All recorded images and audio recordings made on the CVS are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

L. Personnel shall not tamper with, erase, delete, alter, or destroy any original recorded section of video or audio.

M. Division personnel shall classify all CVS recordings consistent with Division training **and policy**. Personnel shall not intentionally classify a video inappropriately or knowingly take actions to prevent a recording from being viewed or downloaded.

N. CVS audio/video recordings shall be maintained by PoliceNET and the Department of Technology **(DOT)** pursuant to the City of Columbus approved Records Retention Schedule.

O. Division personnel needing to hold a CVS recording longer than the required Records Retention Schedule shall reclassify the recording as permanent within the CVS.

   1. When the recording no longer needs to be maintained, reclassify it appropriately.

P. Supervisory and investigative review of CVS recordings

   1. Supervisors wishing to request a copy of a CVS recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

   2. All CVS recordings are subject to review by a police supervisor or investigator at any time while the recording is in the CVS in the marked unit.

   3. Supervisors and the involved chain of command wishing to review a CVS recording shall conduct the review on a Division computer.

      a. Supervisors shall login to the secured CVS server with their Division-issued password.

      b. After being uploaded to the secured server, Division supervisors will have access to all cruiser videos unless access has been archived due to an investigative purpose.

   4. Supervisors shall document the review of CVS recordings related to incidents under investigation **on the Incident Video Review, form U-10.197. Supervisors** shall **address** the relevant portion(s) of the recording **within the administrative investigation** to be reviewed by the chain of command **as necessary**.

Q. Supervisors using CVS recordings for an investigative purpose shall review or reclassify the recordings**,** as appropriate, **and** in accordance with established law, Division policy, and applicable **CBA**.

**R.** Public Records Unit personnel shall process all CVS requests for police personnel, court personnel, subpoenas, discovery, or preservation of evidence and all requests made pursuant to the Ohio Public Records Act.

Note: In the event a CVS recording cannot be located, Public Records Unit personnel **shall** contact PoliceNET for further investigation.

**S.** Sworn personnel may be ordered by a sworn Division supervisor or Critical Incident Response Team personnel to return to headquarters to immediately download video/evidence.

**T.** Sworn personnel shall report malfunctioning CVS equipment as soon as practical, but prior to the end of the shift, to their immediate on-duty supervisor.

**U.** Sworn supervisors who are informed or otherwise become aware of malfunctioning CVS equipment shall ensure the equipment is taken for authorized repair as soon as practical and as follows:

1. Communications Shop for repairs to the camera, docking station, Digital Video Recorder, microphone, or connections.

2. PoliceNET Unit/DOT for memory card or video/network problems with the CVS.

## IV. Procedures

A. CVS

1. Prior to marking in-service, sworn personnel using a CVS:

   a. Login with the username, area/zone, shift, and unit number using the provided drop-down menu.

   b. Ensure the body microphone is synchronized.

2. Keep the CVS powered-up during the tour.

3. Upon completion of a CVS recording, stop the recording, classify it appropriately, and place only the incident number in the "Case File Number" field.

4. Logoff at the end of the tour and return the body microphone to the appropriate charging cradle.

5. Upload video as often as practical.

6. In exigent circumstances, supervisors shall contact PoliceNET personnel to remove the memory card from a CVS if the video cannot be uploaded by the normal uploading process.

Note: In certain circumstances, DOT may add additional memory cards until a time when the video can be uploaded.

B. Supervisors Conducting Random Reviews

1. *R*eview randomly selected CVS recordings on a regular basis. The incidents should be no more than 30 days old.

**2.** Forward completed Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review*,* form ***U-10.193,*** to the bureau commander when there are areas of concern, for example, ***user*** error***(s)*** or observations of misconduct, etc.

C. Bureau Commander

1. Forward ***the*** Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review form with ***user*** error***(s)*** through the chain of command to the immediate supervisor of the officer(s) who made the recording.

2. If potential misconduct is discovered within the recording, determine the appropriate course of action.

D. Immediate Supervisor

1. Ensure sworn personnel who created the CVS recording correct the error.

2. If directed by the chain of command, complete an administrative investigation and send a copy *of the Cruiser Video System (CVS)/ Body-Worn Camera (BWC) Supervisory Review form* to the Patrol Administration Section.

E. Patrol Administration Section

1. File completed Cruiser Video System (CVS)/*Body-Worn Camera (BWC)* Supervisory Review forms.

2. Track results annually to determine compliance/training needs.

| Columbus Police Division Directive | EFFECTIVE Dec. 30, 2016 | NUMBER 11.07 |
|---|---|---|
| | REVISED Jun. 30, 2018 | TOTAL PAGES 7 |
| **Body-Worn Camera (BWC)** | | |

 

## I. Introduction

The principal purpose of a BWC system is to collect evidence *that* may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. It can also provide documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

   *A* recording which may be used *as evidence to document an incident* as it pertains to an enforcement action/*adversarial* encounter.

   Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

   *A* recording, whether accidental or intentional, which has no evidentiary or administrative value.

   Examples of non-evidence: accidental/incidental recording, equipment checks, and training. This is not an all-inclusive list.

3. Permanent

   *A* recording to be kept indefinitely.

   Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel who are assigned an individual BWC shall, at the beginning of their shift, ensure the BWC is fully charged, operable, and all previous video recordings have been uploaded.

B. Sworn personnel shall use only Division-issued BWCs.

C. All recorded images and audio recordings made on the BWC are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

D. BWCs shall be worn in the location and manner required by the assignment.

E. BWCs are not required for special duty work, and the City will not compensate personnel for travel time or uploading/charging the BWC.

   1. BWCs may be used for City overtime if personnel have a charged BWC and its use on City overtime does not interfere with the BWC being uploaded or charged for their regularly assigned tour of duty or as ordered by a supervisor.

F. BWC use shall be documented on all appropriate paperwork and in the electronic reporting system.

   1. Sworn personnel shall add the letter "V" after the clearance code of a run when a BWC is used.

G. Activation

   1. Sworn personnel shall activate the BWC at the start of an enforcement action or at the first reasonable opportunity to do so. Enforcement actions shall be recorded unless otherwise prohibited. Enforcement actions shall consist of:

      a. Calls for service and self-initiated activity

      b. All investigatory stops

      c. Traffic and pedestrian stops

      ***Note: Activate the BWC at the start of a pursuit.***

      d. Suspected OVI stops

      e. Uses of force

      f. Arrests

      g. Forced entries

   2. Sworn personnel shall activate the BWC when an encounter becomes adversarial, or its use would be appropriate and/or valuable to document an incident unless otherwise prohibited.

   ***3. Patrol Administration Section and Special Weapons and Tactics personnel shall comply with their respective Standard Operating Procedures.***

H. Sworn personnel wearing a BWC should announce when they are recording as close to the start of the encounter as possible unless it is unsafe, impractical, or unnecessary.

   1. Sworn personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

I. Sworn personnel shall continue recording until the enforcement activity or encounter has ended, or they are ordered/permitted to stop recording by a sworn supervisor.

Note: When reviewing BWC footage from an incident, sworn personnel must stop recording to view and/or upload the video.

J. BWC recordings may be used to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken.

K. The BWC shall not be used to record non-work-related personal activities where personnel have a reasonable expectation of privacy, such as inside locker rooms, dressing rooms, or restrooms, unless a criminal offense has occurred.

L. The BWC shall not be intentionally activated to record privileged communication or conversations of fellow Division personnel during routine, non-enforcement-related activities with or without their knowledge.

M. The BWC shall not be used:

1. To gather intelligence information solely based on First Amendment protected speech, associations, or religion;

2. During a strip search or body cavity search; or

3. During a Lethality Assessment Screen.

Note: If the BWC was previously activated during an incident, sworn personnel do not need a supervisor's approval to deactivate the BWC for any of the above-listed reasons.

N. The BWC shall not be used if ordered by a sworn supervisor.

1. To preserve privacy and dignity, a sworn supervisor may grant approval to not record or *to* deactivate the BWC for certain people or places.

2. Explicit approval shall be given verbally over the radio or in an operations plan.

O. Sworn personnel may deactivate the BWC:

*1. W*hen gathering information from a confidential informant or source.

*2. W*ithout explicit supervisor approval when *not in the presence of suspects or citizens and* speaking with the Division's legal advisor, covert/investigative personnel, a supervisor, or other sworn personnel.

*3. While engaged in guard duty inside a hospital; however, if an encounter becomes adversarial and/or enforcement action becomes necessary, the BWC shall be activated as soon as practical.*

*4. Sworn personnel shall deactivate the BWC after securing weapons and entering the door into the prisoner processing area of the Franklin County Sheriff's Office Corrections Centers.*

**a. The preferred course of action is to allow sheriff's office personnel to handle any problem associated with a prisoner. If Division personnel are forced to take enforcement action, they shall activate the BWC as soon as practical.**

*P.* If sworn personnel do not activate the BWC, the battery is exhausted/depleted, or the recorder malfunctions, they shall document the reason(s) on the appropriate paperwork, in the CAD, and/or in the electronic reporting system.

*Q.* If sworn personnel do not record the entire contact, justification shall be expressed verbally on the BWC before turning it off when it is safe and practical to do so.

*R.* Sworn personnel should re-activate the BWC if they re-engage suspects/citizens.

*S.* Sworn personnel may be ordered by a sworn supervisor to relinquish their BWC.

*T.* All digital data shall be uploaded as directed and shall be classified and stored in a secure database that allows limited access. Sworn personnel shall upload video footage prior to going on leave, except when permission is granted by the chain of command designating an alternate time for uploading. If sworn personnel become incapable of uploading the video, the chain of command will make arrangements for uploading all video footage.

*U.* Personnel shall not tamper with, erase, alter, or destroy any original recorded section of video or audio.

  1. The appropriate authority designated by the Chief of Police will determine proper action for recordings captured by inadvertent BWC activation when it is otherwise prohibited.

*V.* Personnel shall classify all recordings consistent with Division training **and policy**. Personnel shall not knowingly classify a video inappropriately or take other inappropriate actions to prevent a recording from being viewed or uploaded or to alter retention periods.

*W.* BWC recordings shall be securely stored and maintained pursuant to the City of Columbus Division of Police Records Retention Schedule. All stored recordings are subject to release in accordance with Ohio's public records laws.

  1. Supervisors investigating/managing an incident or sworn personnel wanting to view video in the mobile environment should follow the procedures outlined on the Division's intranet.

*X.* Sworn personnel may review video footage of an incident in which they were involved prior to completing a report or making a statement to help ensure accuracy. Sworn personnel should not use the fact that a recording was made as a reason to give a less detailed description of *an* incident.

**Y.** A supervisor may view BWC video footage for the purpose of investigations, training, reviews, inquiries, civil claims, or litigation. This may include *random reviews or* recordings brought to the supervisor's attention that may lead to *positive corrective action or* discipline as outlined in the applicable collective bargaining agreement (CBA).

**Z.** Supervisory and investigative review of BWC recordings

1. BWC recordings are subject to review at any time once the recording is uploaded to the server.

2. Supervisors and the involved chain of command wishing to review a BWC recording shall conduct the review on a Division computer.

   a. Supervisors shall log in to the secured server with their Division-issued password.

   b. After being uploaded to the secured server, Division supervisors will have access to BWC recordings unless access has been restricted due to an investigative purpose.

3. Supervisors and investigative personnel wishing to request a copy of a BWC recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

4. Supervisors shall document the review of BWC recordings related to incidents under investigation *on the Incident Video Review, form U-10.197. Supervisors* shall *address* the relevant portion(s) of the recording *within the administrative investigation* to be reviewed by the chain of command *as necessary*.

5. Supervisors should conduct random reviews of BWC recordings to ensure videos are classified appropriately and to use the observations for open discussion and training.

6. Supervisors using BWC recordings for an investigative purpose shall review or reclassify BWC recordings as appropriate and in accordance with established law, Division policy, and the applicable CBA.

**AA.** Sworn personnel who have been issued a BWC and who transfer to an assignment that is not assigned a BWC shall return all issued equipment, including any assignment-specific take home chargers, to PoliceNET personnel.

**BB.** Division personnel who are assigned to use or otherwise be involved with BWC equipment must complete mandatory training. This training includes proper operation and care, policies and procedures, and limitations of BWC footage. Additional training shall be provided periodically to ensure the continued effective use of the system and equipment and to incorporate changes, updates, and other revisions in policies or equipment.

1. *Sworn personnel transferring into a unit where BWCs have been deployed shall contact Advanced Training Unit and PoliceNET personnel for training and issuance of a BWC as soon as practical.*

## IV. Procedures

A. Sworn Personnel

1. Classify the recordings as appropriate.

2. Notify your supervisor of any known malfunctioning or lost/damaged equipment.

3. Mark 10-23T for technology repair.

4. Replace or turn in the BWC for repairs to the PoliceNET Unit as soon as possible.

   a. Obtain a replacement BWC from the PoliceNET Unit. If the PoliceNET Unit is closed, obtain a replacement from the Patrol Administration Sergeant. The replacement BWC becomes the sworn *employee's* Division-issued BWC.

B. Investigating Supervisor

1. Determine if the malfunctioning or lost/damaged equipment was the result of normal wear and tear or negligence, and follow the procedures outlined in the "Lost, Damaged, or Malfunctioning Property" directive.

C. PoliceNET Personnel/Patrol Administration Sergeant

1. Collect malfunctioning or damaged equipment and replace it immediately.

D. Chief of Police

1. Appoint specific Division personnel to meet annually to review policy and collect data concerning BWC usage, including when video footage is used in criminal prosecutions, internal affairs matters, civilian complaints, injuries and assaults on sworn personnel, use of force incidents, and any associated costs.

*E. Supervisors Conducting Random Reviews*

1. *Review randomly selected BWC recordings on a regular basis. The incidents should be no more than 30 days old.*

2. *Forward the completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review, form U-10.193, to the bureau commander when there are areas of concern, for example, user error(s) or observations of misconduct, etc.*

*F. Bureau Commander*

1. *Forward the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form with user error(s) through the chain of command to the immediate supervisor of the officer(s) who made the recording.*

2. *If potential misconduct is discovered within the recording, determine the appropriate course of action.*

**G. Immediate Supervisor**

    **1. Ensure sworn personnel who created the BWC recording correct the error.**

    **2. If directed by the chain of command, complete an administrative investigation and send a copy of the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form to the Patrol Administration Section.**

**H. Patrol Administration Section**

    **1. File completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review forms.**

    **2. Track results annually to determine compliance/training needs.**

# Report on the Police Division Operational Review

COLUMBUS, OHIO



**August 19, 2019**

EX 7

# Table of Contents

1.    **Introduction and Executive Summary**                              **1**

2.    **Columbus and 21st Century Policing**                              **16**

3.    **Community Views on Policing in Columbus**                        **34**

4.    **Employee Views on the Division of Police**                       **44**

5.    **Patrol North and South Subdivisions**                            **68**

6.    **Strategic Response Bureau**                                     **102**

7.    **Investigative Subdivision**                                      **109**

8.    **Homeland Security Subdivision**                                  **159**

9.    **Support Services Subdivision**                                   **180**

10.   **Administrative Subdivision**                                     **196**

11.   **Office of the Chief of Police**                                  **223**

      **Attachment A – Profile of the Division of Police**               **226**

      **Attachment B – Results of the Community Survey**                 **292**

# 1 Introduction and Summary

The following report documents the results of the Operations Review of the Columbus Division of Police. It summarizes months of effort by the consulting team, employees of the Division of Police, City staff and the community working together since the Winter of 2018-19. This study comes at a critical time for law enforcement in the United States generally, and in Columbus specifically. The importance of the partnership and bonds between police and the community are now recognized. This study was designed to evaluate the efforts which the City and the Division have made in recent years to improve these connections and to identify opportunities for improvement now and in the future.

## 1.    Study Scope of Work

In the City of Columbus, persistent questions about the quality of community engagement and community relations have gone hand-in-hand with questions about the number, type and deployment of police resources to work efficiently and effectively with the community. However, this study also provided the opportunity to evaluate the Columbus Division of Police on an even broader scale.  As a result, the scope of this project was comprehensive and included:

•      How does the Department prioritize police/community relations and direct their efforts toward implementation of quality partnerships with the community.

•      Are community relations all encompassing, including:

    –      Recruitment and selection of personnel who 'fit' this service model.
    –      Training of new staff; annual training of existing employees in community support.
    –      How policies support community support and reflect these concepts.
    –      The supervisory and management systems to ensure that this is a priority and is consistent in service delivery.

•      Does the Division have the resources it needs to efficiently and effectively provide the broad range of reactive response and proactive community support needed?

•      Are management systems used to control operations and ensure that the Division of Police and community goals are met.

This assessment is intended to be a blueprint for the choices available to the City and the Division of Police to be more effective in its service to the community.

EX 7

## 2.      Introduction to the Methodologies Used in the Study

To understand and evaluate these issues, the project team embarked on a thorough assessment of the Columbus Division of Police (CDP).  The principal approaches utilized by the project team in this study included, but were not limited to, the following:

·      **Internal Interviews** – members of the project team individually interviewed almost 200 Division of Police and Department of Public Safety executive staff, management, supervisory and line employees as part of this study. These interviews were valuable to thoroughly understand the functionality of the Division as well as to learn first-hand of issues.

·      **Additional Employee Input** – individual interviews were supplemented by an anonymous online survey to further elicit views within the scope of this study. Over 1,000 CDP employees took the opportunity to participate in this process. The project team also conducted 10 focus group meetings with different groups of employees (e.g., representatives from patrol, communications, etc.).

·      **Community Input** – the community provided input to members of the project team through eight (8) community meetings in different neighborhoods throughout the City as well as through a community survey in which over 600 participated.

·      **Data Collection** – the project team collected a wide variety of external and internal data documenting the staffing, structure, operations and organization, including:

    –      CDP staffing, deployments and scheduling
    –      Documentation reflecting operations
    –      Various performance information

These data were summarized in a 'descriptive profile' of the CDP, circulated for accuracy and returned to the project team.

Throughout this process, the project team reviewed project progress, facts, findings, and conclusions with the Mayor's Office and the management team of the Division of Police and the Department of Public Safety.

## 2.      Summary of Recommendations.

In this report the project team provides its evaluation and analysis of the staffing, key operations, and services provided by the Columbus Division of Police and, where appropriate, makes recommendations for improvements.

The table below provides a summary list of every recommendation made in this report:

EX 7

on the Police Division Operational Review

COLUMBUS, OHIO

**Community Policing**

The Division needs to develop a prioritized plan to implement 21st Century Policing concepts as recommended throughout this report.

The CDP needs to continue to work on building community trust.

The CDP should increase training on de-escalation and procedural Justice.

The CDP should adopt an Early Warning/Intervention program.

The CDP should update their Bias Based Policing Directive to reflect the City Charter language.

The CDP should reduce supervisory spans of control to provide more effective and immediate supervision.

The CDP should increase training on policies.

The CPD should address the concerns raised on the employee and community surveys relating to bias both internally and externally.

The preceding broad recommendations on Community and 21st Century policing are supported by specific recommendations in subsequent chapters of the report. To be effective Community and 21st Century policing should be supported throughout the organization.

**Patrol North and South Subdivisions**

Reduce the number of two-officer cars by requiring officers to deploy individually if sufficient vehicles are available.

Establish a standardized minimum ratio of serviceable patrol vehicles to the number of patrol officers by zone, using the shift with the highest staffing total to do so (including mid watch overlaps).

By ceasing the deployment of two-person cars in patrol, current resources are sufficient to reach a proactivity level of **35%** after accounting for turnover.

– If the practice of deploying two-person officers is continued, 970 officer positions would be required to reach 35%, an increase of 53 from current authorized levels.

In order to reach a proactivity level of **40%** after accounting for turnover, 993 officer positions should be authorized in regular patrol roles, an increase of 76 positions from the number currently allocated to patrol.

Matrix Consulting Group

Page 3

EX 7

–   This recommendation is contingent upon ceasing the deployment of two-officer cars, but does not factor in other staffing recommendations that impact patrol.

–   If the practice of deploying two-person officers continues, 1,051 officer positions would be required, an increase of 134 over current authorized staffing levels.

In the future, the number of officers assigned to patrol should not be allowed to fall below a basic minimum of 871 filled positions. If necessary, positions should be reallocated to maintain this level unless analysis shows that workload has decreased.

Independent of other recommendations and using current staffing levels, reallocate patrol officers (using current staffing) among the five zones based on workload in order to eliminate disparities patrol service levels, assigning the 871 filled patrol officer positions and 917 authorized staffing levels as follows:

·   Zone 1: 168 officers (filled), 177 authorized positions
·   Zone 2: 190 officers (filled), 200 authorized positions
·   Zone 3: 203 officers (filled), 214 authorized positions
·   Zone 4: 159 officers (filled), 167 authorized positions
·   Zone 5: 151 officers (filled), 159 authorized positions

Revise patrol district and cruiser district boundaries by the end of 2020 in order to reflect recent growth and service environment changes.

Increase the number of sergeants allocated to the patrol zones by 17 authorized positions in order to keep supervisory spans of control for all watches at or below a ratio of nine officers per sergeant.

**Strategic Response Bureau**

Reduce the number of officers assigned to the Mounted Unit to four (4) authorized positions, down from seven (7).

Create the Crime Analyst Supervisor classification, assigning one (1) FTE position to the role.

Transfer the four (4) officers assigned to the Truancy Unit to regular patrol roles, assigning two (2) officers each to Zone 2 and Zone 3.

**Investigative Subdivision**

Ensure Unit Sergeants are consistently reviewing and screening cases for their detective staff.  This should be accomplished in all Subdivision Units.  Inactive cases identified by the Sergeant can be distributed to detectives for pattern/trend recognition, but should be notably classified as such.

EX 7

Throughout CDP, formalize the case screening process using a documented solvability factor methodology that includes a 12-point criteria checklist, or similar, on all assigned detective cases.

Formalize a detective caseload prioritization system beyond the "three category screening priority" currently in use in some units.

To help better balance workload among detectives, use a detective caseload prioritization system as part of the case assignment process using a 7-priority system, or similar, as a framework. Use the priority system to help balance workloads among detectives both numerically and in level of case sophistication.

Develop a consistent approach to identifying and recording active and inactive cases among all Subdivision investigative units. This will help resolve workload imbalances and develop a clearer picture on resource needs to address active workloads.

Based on a new case management philosophy to be finalized by CDP, eliminate assigning certain "lower priority" case types and other kinds of low solvability, misdemeanor reports, to detectives either centrally or in "zones."

Re-visit the existing use of the PremierOne software solution as a case management system and identify methods for further consistent utilization among all detective units. If the CMS is inadequate, explore definitive work-arounds to be universally applied or alternatively another software solution.

Include in the Subdivisions existing Standard Operating Procedures (SOP) all important investigative work-related protocols discussed herein including the further formalization of the case management process.

Maintain the existing Commander, Lieutenant, and Sergeant management and supervision structure in the Investigations Subdivision.

Assign 30 detectives to the Homicide Unit to provide homicide and other investigative support services currently undertaken. This is one (1) position less than existing staffing levels.

Assign 10 detectives to each of the three shifts.

Maintain four (4) Cold Case detectives. Revise the cold case homicide process such that after one year of an "inactive investigation," the homicide is assigned to the cold case files for potential Cold Case Unit follow-up based on the cold case scoring sheet.

EX 7

Through effective case management, balance caseload among all homicide detectives, particularly related to the number of homicides per year. This caseload balance issue needs to be of primary concern for the Investigative Subdivision, particularly for person-related crimes.

Assign 19 detectives to the Assault Unit to provide investigative support services currently undertaken. This is one position above existing staffing levels.

Develop consistent reporting on the workloads assigned to each detective in order to facilitate effective case management processes.

Re-visit the staffing by shift in Assault upon understanding total workloads for each detective within each shift.

Assign 30 detectives to the Robbery Unit to provide investigative support services currently undertaken. This is eleven (11) positions above existing staffing levels.

Alternatively, create a Major Crimes Section combining Robbery and Assault Units as described in this report. Total staffing contingent for this Section would be 46 detectives, seven (7) positions above existing staffing levels in the separate robbery and assault units.

Re-visit the staffing by shift in Robbery upon understanding total workloads for each detective within each shift.

Given the sophistication of many of these person crime types, similar to Homicide and Economic Crimes, consider requiring 'Exceptional Qualifications' for all major person crime detective assignments excluding the Family Crimes Section.

Maintain existing staffing in the Gun Crimes Unit of 11 officers, and 1 Property and Evidence Technician. Fill the currently vacant Office Assistant II position.

Maintain existing staffing in Digital Forensics of 6 detective positions. In the future upon any expansion, consider hiring civilian digital forensic technicians to augment capabilities; blended sworn and civilian staff in such a unit is consistent with practices often seen.

Reduce officer staffing in the CSSU from 16 positions to 9 positions, a reduction of 7 assigned positions.

Maintain existing civilian staff of 6 positions in the Evidence Recovery Unit.

EX 7

Consolidate CSSU and the Evidence Recovery Unit into a "Crime Scene Investigations Unit" composed of 15 civilian and sworn staff across three shifts; blended sworn and civilian staff in such a unit is consistent with practices often seen.

Assign 3 sergeants to this new CSI Unit; a reduction of 1 sergeant now assigned to CSSU and the Evidence Recovery Unit.

Fully cross-train all CSI staff to respond to all scenes for evidence collection purposes.

Maintain existing authorized staffing levels in the Investigative / Administrative Section.

Assign 32 detectives to the Sexual Assault Units to provide sex assault and other investigative support services currently undertaken. This is one (1) position more than existing staffing levels.

Given the sophistication of many of these sex crime types, similar to Homicide and Economic Crimes, requiring 'Exceptional Qualifications' for these detective assignments is strongly encouraged.

As part of caseload balancing among detectives, assign one detective to each Unit to maintain a Cold Case active backlog.  As a result, new caseloads should not be assigned beyond 5 cases monthly.

Assign 13 detectives to the Physical Abuse Units to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.

Maintain existing staffing in the Unit for the CIA and Office Assistant.

Assign 3 detectives to the Exploited Children Unit to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.

Assign 8 detectives to the Missing Persons Unit to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.

Re-allocate Cold Case work from the specifically assigned detective to the newly assigned sexual assault Cold Case "specialists." Re-distribute Unit work among all eight detectives accordingly.

Assign 10 detectives to the core Domestic Violence investigation to provide the support services currently undertaken. This is two (2) positions above existing detective staffing assignments.

EX 7

Continue to assign 2 detectives exclusively to stalking cases resulting in a Domestic Violence detective staffing contingent of 12 positions.

Assign 24 detectives to the Burglary Units to provide the support services currently undertaken. This is three (3) positions below existing detective staffing assignments.

In lieu of distributing detectives equally between North and South and the two shifts, distribute the 24 detectives among the locales/shift based on actual caseload. This will require effective case management tracking.

Track proactive time efforts and outcomes for the Generalist Crime Unit, in addition to caseload tracking as part of effective case management. This will help determine the appropriate staffing size for the unit.

Continue to assign 7 detectives to the Generalist Crime Unit to provide the support services currently undertaken. This is equivalent to existing detective staffing assignments. This staff contingent should be revised after enhanced workload tracking efforts are undertaken.

Assign 13 detectives to the Economic Crimes and Fraud and Forgery Units to provide the support services currently undertaken. This is six (6) positions less than existing staffing levels.

Continue to assign the three (3) detectives to the Organized Retail Task Force.

Continue to staff the Auto Theft Unit with up to 13 detectives; this is equivalent to existing staffing levels. If less proactive Auto Theft efforts are undertaken, the Unit can be downsized.

Assign 24 detectives to the Narcotics Units B through E to provide the support services currently undertaken. This is equivalent to existing staffing levels and within the norms of specialized proactive units in large policing agencies.

Assign 6 detectives to the Pharmaceutical Unit to provide the support services currently undertaken. This is equivalent to existing staffing levels.

Assign 20 detectives to the In-Tac Unit to provide the support services currently undertaken. This is one (1) detective position above existing staffing levels.

Ensure equivalent training and equipment opportunities are provided to all Division specialized weapons teams including CDP SWAT and In-Tac operations.

EX 7

Maintain existing staffing levels in the regionalized task forces of HIDTA, DEA, and HTTF of 16 detective positions.

Maintain existing authorized staffing levels in the Narcotics Administrative Section.

**Homeland Security Subdivision**

Maintain the current staffing level of 2 officers assigned to the JTTF.

Add 3 officer positions (transfer) to CTU for a total of 3 Officers, 4 Detectives and a sergeant assigned to the CTU for a total of 8 personnel.

Maintain current staffing 3 officers assigned to the Mayor's Security Detail.

Add a sergeant to the Mayor's Security Detail to reduce the span of control.

Maintain current staffing of 3 SWAT teams (1 Sergeant and 7 officers).

Add second armored vehicle to the SWAT fleet.

Maintain current staffing of 1 Sergeant assigned to SWAT Training

Add 1 K9 Sergeant and 1 K9 officer to the K9 unit for a total of 2 Sergeants and 8 Officers.

Transfer 3 Officers from Unit A to CTU reducing current staffing of unit A by 3 officers leaving a total of 1 Sergeant and 8 Officers assigned.

Maintain current authorized staffing of Unit B of 1 sergeant and 7 Officers.

Maintain current staffing of 2 Sergeants 15 Officers.

Allow unit to overstaff in anticipation of retirements so that the unit does not go below 90% of authorized pilot staff.

Maintain current staffing of 1 Sergeant and 2 officers assigned to Safety and Maintenance.

Based on staffing calculations for dispatcher and call-taker staff, authorize 105 positions composed of 75 dispatchers and 30 call-taker positions for the Communications Bureau. This accommodates appropriate workload, fixed posts and reasonable turnover. This is an increase above existing staff of three (3) positions.

Retain supervision and support services staffing levels in the

EX 7

Communication Bureau at the current 16 positions.

Upon potential future consolidation with Fire, consider fully civilianizing the City's dispatch operations. This will require a future 911 consolidation study in order to best facilitate operational transition.

Increase the contact frequency (citations, warnings, etc.) for traffic enforcement units.

Increase the involvement of patrol units in traffic enforcement.

| | |
|---|---|
| **Support Services Subdivision** | Add 1 Sergeant to the Court Liaison Section |

Add a civilian fleet coordinator position to assist in the management of the CDP fleet.

Maintain current authorized staffing of 2 civilians in the photo lab.

Maintain current authorized staffing of 3 civilians in the print shop

Add a non-sworn afternoon shift supervisor to property control to reduce the span of control. This supervisor should be given administrative tasks as well.

Maintain the sergeant as the day shift and overall unit supervisor.

Add a non-sworn position to address the backlog of items to be disposed.

Conduct audit of items that are eligible for destruction or could be returned to an owner.

Change the Mid-watch Sergeant position to a full-time day shift Impound Unit supervisor.

Add a non-sworn afternoon shift supervisor position to the Impound Unit with additional administrative tasks.

Improve the surface conditions of the impound lot.

Maintain current authorized staffing of the DNA Section

Maintain current authorized staffing of the Drug Identification Section

Maintain current authorized staffing of the Firearm Section

Maintain current authorized staffing of the Quality Assurance Section

EX 7

Transition the Technical Services Bureau to all non-sworn personnel.

Add two positions to the current authorized staffing of the Records Section to increase the ability to keep current with reduced use of overtime.

Work with the city administration to make an exception to the two-pay period wait before posting critical positions.

Maintain current staffing in Identification, but work with the city administration to by-pass the two-pay period wait before posting openings.

**Administrative Subdivision**

CDP should continue to ensure the right leadership is in place within the Training Bureau to continue executing 21st Century Policing concepts in all aspects of recruitment and in-service training.

Redirect training efforts and develop clear training measures that include specific elements of 21st Century Policing into all aspects of training.

Utilize community members to provide cultural awareness education during recruitment and in-service training.

CDP should hold Citizen Police Academy for respective minority communities to build awareness of police practices, create understanding and build relationships.

Officers should be assessed on their ability to proactively engage with all sectors of the community.

Initiate a collaborative approach to training mandates with OPOTA to address the increasing workload in the interest of state-wide training.

Maintain the high calibre field training program with a concerted effort to increase diversity within the FTO ranks.

CDP and the FOP should evaluate the training framework and assess the validity of the probationary period with a view to increasing it one-year post academy training.

Continue to emphasize de-escalation training and increase training regarding interactions with individuals in mental crisis.

EX 7

CDP must address the significant disparity of use of force against minority residents by continuing intense training, education, monitoring and reporting on use of force within the Division.

CDP should maintain its exemplary firearms training and continue to share its training principles and, for example, Use of Force statistics with the community in meetings, reports and through social media.

Provide ongoing operational leadership development across the Division for both sworn and civilian members.

Institute a formal mentorship program within the Division.

Enlist community members in sharing cultural perspective with members of CDP on an ongoing basis. This community engagement should be facilitated through the use of a neutral third party.

CDP should take efforts to fill the vacant HR manager position with someone trained in human resource management and assess where the position should be placed within the Public Safety Framework.

CDP should prioritize technology advancements in HR practices such as time keeping and payroll functions.

To enhance its sworn recruiting efforts and create opportunities for greater diversity in the Division, CDP should align the Recruiting Unit within the Human Resources Bureau and work with the Civil Service Commission to achieve those goals, as well as expedite the process.

CDP and FOP should work to create a more sustainable and beneficial rotational model for sworn members.

Assess the workload of the Industrial Hygienist and provide support to maximize the positive impact of the program.

Review all directives relative to member wellbeing and align with best practices and 21st Century policing principles.

CDP should work with the FOP to implement an enhanced merit based promotion system where seniority plays a reasonable role.

All stakeholders should work to institute a holistic, merit based promotional and transfer system within CDP.

CDP should review its background investigation processes and implement face to face interviews for references where practical.

Adopt a Division wide policy ensuring effective utilization of PowerDMS for document distribution and training where appropriate.

EX 7

Continue to maintain a strong accreditation focus.

CDP should undertake a rigorous effort to review existing policy and align them with 21st Century Police principles with associated operating guidelines.

Examine ways to have meaningful engagements with the community and enact appropriate policies based on feedback.

Ensure clear policy and understanding relative to the role of Staff Inspections across the Division.

CDP and the City should make a concerted effort to streamline work processes in the area of Fiscal Management and ensure financial systems are compatible.

Work to institute streamlining measures in grants application and ensure staff have the associated financial training.

Work to establish stable funding for critical areas of police operations independent of grants.

**Office of the Chief of Police**        Transfer 2 Sergeants' positions from IAB to patrol to reduce spans of control in patrol.

Maintain current authorized Administrative Sergeant staffing in IAB.

### Recommended Net Changes to Authorized Staffing Levels

The following table provides a summary of the net position changes for each subdivision as a result of the recommendations made in the report. All figures represent the difference from the authorized (budgeted) staffing levels, rather than the number of positions that are currently filled. The changes are represented by year as a proxy for priority with 2020 representing changes of immediate need through lower priority recommended changes over the subsequent three (3) years.

These recommendations are independent of the many management changes recommended in the Division.

EX 7

| Subdivision | Type | 2020 (Immediate) | 2021 (High) | 2022 (Med.) | 2023 (Low) | 4YR +/- |
|---|---|---|---|---|---|---|
| **Patrol (incl. SRB)** | Officer[1] | 18 | 17 | 17 | 17 | 69 |
| | Sergeant | 4 | 4 | 4 | 3 | 15 |
| | Command | | | | | 0 |
| | Civilian | 1 | | | | 1 |
| | **Total** | **23** | **21** | **21** | **20** | **85** |
| **Investigative** | Officer | | -6 | | | -6 |
| | Detective | 4 | 2 | | | 6 |
| | Sergeant | | | | | 0 |
| | Command | | | | | 0 |
| | Civilian | 1 | | | | 1 |
| | **Total** | **5** | **-4** | **0** | **0** | **1** |
| **Homeland Security** | Officer | | | 1 | | 1 |
| | Sergeant | 1 | | 1 | | 2 |
| | Command | | | | | 0 |
| | Civilian | | 3 | | | 3 |
| | **Total** | **1** | **3** | **2** | **0** | **6** |
| **Support Services** | Officer | | -7 | | | -7 |
| | Sergeant | | | | | 0 |
| | Command | | | | | 0 |
| | Civilian | 2 | 10 | 1 | 1 | 14 |
| | **Total** | **2** | **3** | **1** | **1** | **7** |

---

[1]The numbers shown for patrol officers include the reduction of 3 officer positions from the Mounted Unit and 4 officer positions transferred from the Truancy Unit. After accounting for these recommendations, the net number of additional positions needed in patrol is 72, rather than the 79 positions stated in the recommendation. Likewise, transferring 2 sergeants from the office of the chief impacts the net number of patrol sergeant positions needed.

EX 7

| Subdivision | Type | 2020 (Immediate) | 2021 (High) | 2022 (Med.) | 2023 (Low) | 4YR +/- |
|---|---|---|---|---|---|---|
| **Administrative** | Officer | | | | | 0 |
| | Sergeant | | | | | 0 |
| | Command | | | | | 0 |
| | Civilian | | | | | 0 |
| | **Total** | **0** | **0** | **0** | **0** | **0** |
| **Office of the Chief** | Officer | | | | | 0 |
| | Sergeant | -2 | | | | -2 |
| | Command | | | | | 0 |
| | Civilian | | | | | 0 |
| | **Total** | **-2** | **0** | **0** | **0** | **-2** |
| **_All Subdivisions_** | **Total** | **29** | **23** | **24** | **21** | **97** |
| | Officer | 22 | 6 | 18 | 17 | 63 |
| | Sergeant | 3 | 4 | 5 | 3 | 15 |
| | Command | 0 | 0 | 0 | 0 | 0 |
| | Civilian | 4 | 13 | 1 | 1 | 19 |

EX 7

# 2 Analysis of Community and 21st Century Policing

The Project Team reviewed the Columbus Division of Police efforts at Community Policing, Community Engagement and implementation of 21st Century policing concepts. The review focused on key areas of police interactions with members of the community, the Division's support of the concepts and the specific actions of the Division. In order to review CDP, we used the following guidelines to evaluate activities: Support for Community Policing, through daily activities and initiatives; Community engagement Activities and Implementation of 21st Century Policing Concepts.

The concepts discussed in this chapter set the stage for the comprehensive evaluation of operations of and services provided by the Division of Police and places these services within a context of the leading thought on effective policing. It provides a set of strategies and aspirational goals. There are specific recommendations in other sections of this report in support of these strategies and goals.

## 1 What is Community Policing, Community Engagement and 21st Century Policing?

### (1) Community Policing

Community policing is not one thing an agency does, it is all the activities in which an agency is involved. There are several avenues a division can take to implement community policing, but it is clear from many examples that for community policing to succeed it must be woven into the fabric of the organization. Community policing cannot be merely a guiding principle, it must be part of every action the agency takes. Community policing recognizes that officers are responsible to the community; rather than an "us" and "them" approach, it is a "we" "working together" system in which the community helps to define the problem and the police work with and through the community to resolve the issue.

The U.S. Department of Justice Office of Community Oriented Policing Services (COPS Office) defines community policing as:

"*A philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and the fear of crime.*"

Community policing programs should comprise three key components:

EX 7

- **Community Partnerships** – Collaborative partnerships between the law enforcement agency and the individuals and organizations they serve to develop solutions to problems and increase trust in police.

- **Organizational Transformation** – The alignment of organizational management, structure, personnel, and information systems to support community partnerships and proactive problem solving.

- **Problem Solving** – The process of engaging in the proactive and systematic examination of identified problems to develop and evaluate effective responses.

This definition and key elements have acceptance in many communities throughout the United States, large cities included, and therefore need to be considered. As a result, until a process is developed in Columbus to best 'fit' the City, this is an effective starting point.

As a result of the holistic nature of effective community policing, the Matrix Consulting Group has been evaluating how these concepts permeate everything that the Columbus Division of Police does, including:

- **Training** is also very important as it sets the tone for what officers are expected to do.  Training officers to be successful in community policing will help them develop partnerships in the future that are mutually beneficial to the division and the community.  For many agencies, academies teach new recruits in the use of force and law, but very few in problem solving or forming community partnerships.  The lack of emphasis on community policing when officers are new may make it harder to lay the foundation for an effective community policing organization.

- **Policies and procedures** must be crafted to support community policing.  If policies prohibit an officer from working with the community to resolve a community issue, then community policing will not flourish.  Policies that embrace problem solving in a collaborative environment help officers to achieve better partnerships.

- **Supervision** has a great impact on community policing.  Supervisors that have been successful at problem solving and working with the community are more likely to encourage and support working with the community through problem solving. Supervisors with community problem solving experience can be instrumental in developing younger officers into better community policing officers.

- **Transparency and accountability** are important parts of community policing. With the 24-hour news cycle, click ad revenue for news companies, and video recording at almost every police-community member interaction, the need for transparency is increased.  This means agencies must be able to respond to emerging issues quickly with as much information as they can release. This also means police agencies must have their own performance management plan and

EX 7

'push out' information through the media and social media to communicate with the community regarding issues and events to promote transparency and accountability.

- **Community engagement** is critical in developing a community policing strategy. It is an important activity to seek community input in many different forums – from initially defining strategy to regularly monitoring service efforts in meeting community goals. Community engagement is not limited to community meetings, it must include every police – community encounter. Community engagement helps police to discover what is important to a community and allows the community to help define what is important for its police division.

Each of these factors is important to a police agency that is effective at supporting its community. Each of these will be dealt with in this project. The staff resources needed for the division to be involved in community engagement in various patrol services is the subject of this first report for Columbus.

## (2)    21st Century Policing

Following several high-profile police incidents and growing public unrest, President Obama signed an executive order in late 2014, forming The President's Task Force on 21st Century Policing. It sought to find ways of improving police/community interactions.

In May 2015, the task force issued its report outlining Six Pillars of 21st Century Policing. The six pillars place paramount importance on building trust between police and the community in all aspects of police operations. Following are the six pillars identified by the task force:

President Obama's Task Force's Six Pillars of 21st Century Policing

1.    Building Trust and Legitimacy
2.    Policy and Oversight
3.    Technology and Social Media
4.    Community Policing and Crime Reduction
5.    Training and Education
6.    Officer Safety and Wellness

As can be seen from the six pillars, there is overlap between Community Policing, Community Engagement and 21st Century Policing. Each of these concepts embrace similar philosophies with the primary concept of building strong relationships with the community.

EX 7

In the following sections each of the core functions of CDP were evaluated on their adoption or integration of key concepts of community policing, community engagement and 21st Century Policing.

## 2 | Analysis of Division Administration

Community Policing, Community Engagement and 21st Century Policing are not just a set of techniques in which employees are trained and directed.  It needs to start with a philosophy and vision for the Division, one that involves the community in its creation and monitoring. A guiding principle so central and pervasive to an organization requires management effort directed towards it, together with measures for the Division and community members to use to determine its efficacy. This chapter of the report focuses on the Division Administration and its efforts toward community policing, community engagement and 21st Century Policing.

### (1)    Vision

The vision of a police agency is defined as what the division sees as the end result of its efforts, if achieved, or the end goal. The Columbus Division of Police has the following as its vision statement:

*United in a spirit of teamwork, the Columbus Division of Police will be a trustworthy, diverse, progressive, and community–minded organization devoted to providing excellent public service. We will be unyielding in purpose and dedicated to live by our Core Values, which reflect our genuine desire to care for the safety and well-being of our community and our employees.*

The vision statement outlines a community "minded" organization. This is in line with current policing strategies as the police should have the community in mind during all actions.  The vision incorporates trust and the care for the safety and well-being of the community.

The Columbus Division of Police has a strong vision statement that outlines a community "minded" organization, this is in line with current policing strategies as the police should have the community in mind during all actions.

### (2)    Mission

A mission statement is the "how" an agency will obtain its vision or the purpose for existing as an agency. Ideally a mission statement understands where an agency is today and focuses on how the agency will get to its end result. The Columbus Division of Police has the following mission statement:

EX 7

*We are in service with the purpose to protect, with the passion to persevere, and with the utmost pride in our performance.*

Though the mission statement is relevant, it does not include any mention of the community or public in its mission. Many police agencies include community in their mission statement or vision statement as these are the reason for existing.

## (3)    Core Values

The Columbus Division of Police has developed core values. Core values are the standards to which an organization holds itself accountable from the top down. The Core Values of the Columbus Division of Police are:

**Professionalism –** Demonstrating excellence with leadership, cooperation, dedication and attention to detail.

**Respect** – Demonstrating appreciation for human dignity, diversity, and individual rights while holding reverence for human life above all else.

**Integrity** – Consistently adhering to honesty and ethical behavior and accepting responsibility for our actions.

**Discipline –** Exhibiting proper conduct and self-control in the face of adversity through a commitment to training and organizational standards.

**Enthusiasm –** Serving with passion and a sense of urgency to make a difference in our community.

The core values are in line with common values of community policing oriented agencies.

## (4)    Implementing and Supporting 21st Century Policing

### *Pillar 1 – Building Trust and Legitimacy*

As indicated in the previous sections CDP administration is focused on building trust and legitimacy. The creation of the Strategic Response Bureau with an emphasis on community engagement, community policing and working directly with the community is indicative of the focus of building community trust and legitimacy. During project team interviews, community engagement was emphasized at all levels and throughout the organization. The work of the Community Response Teams and the Safe Streets Initiative are examples of building trust. The officers in these units are working directly with the community.

EX 7

CDP has initiated a body worn camera program in addition to its in-car camera program. This allows transparency and accountability. The body worn camera program is helping to resolve community complaints by providing more evidence to an investigation. This can help build trust with the community as was the case with a recent high profile incident.

A recent high profile use of force case that was aired on social media proved the value of body worn cameras and the CDP's work toward building trust and legitimacy, but also demonstrated that there is work to do to improve relationships with the community. The CDP publicly released the body worn camera video that provided transparency of the incident and the police response. The incident also demonstrated that some of the training and work on legitimacy at CDP has not taken hold on all members of the department.

### Pillar 2 – Policy and Oversight

CDP is a CALEA Accredited agency with up-to-date policies on critical issues facing police departments today. The Bias Based policing directive is current and covers an important aspect of policing. One directive 2.04 "Chemical Agents and Intermediate Weapons Regulations" should be reviewed to match best practice. Under section 5 the directive states "Sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of violators who are not moving. Prior to deployment of the chemical spray, at least two notifications should be made to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order. This directive and the subsequent use of force continuum, allow the use of a chemical agent on non-violent or "dead weight" protestors. The use of force without an aggressive act is low threshold for the use of chemical agents and contrary to practices in many large agencies (e.g., Chicago and New York as well as Cincinnati).

Providing oversight, the Internal Affairs Bureau is a direct report to the Chief's Office and has authority to initiate investigations. Internal Affairs is responsible for reviewing officer conduct involved in critical incidents as well as investigating complaints received on CDP employees. This includes assisting in the investigation of officer involved shootings, serious injuries resulting from vehicle pursuits, incidents resulting in serious injuries and death, and allegations of misconduct. The Bureau is located in the community and is open to receive complaints via phone, email or walk in. The hours are from 6am to 10pm which gives the community very good access. After hours, a patrol sergeant handles calls. Though a complaint can be taken via email, the website is not easy to navigate if a community member wished to make a complaint online as the website directs you to a phone number.

The Internal Affairs Bureau publishes an Annual Report that contains all complaint information and outcomes along with Bias Based Policing Complaints and Use of Force. There were 308 complaints in 2017.

EX 7

All use of force incidents are administratively investigated by an on duty supervisor who completes a report. The report is reviewed through the chain of command.

## Pillar 3 – Technology and Social Media

Social media is important as it allows an agency to connect outside of traditional news media. An agency can give a more complete description of events and present a full version of an event. Social media can also allow an agency to keep the community informed in real time as events unfold. The CDP is active in social media with numerous posts per day/week. The table below shows active followers of the Columbus Division of Police compared to some other jurisdictions:

| Agency | | Twitter | Facebook | Total | City Population | As % of Population* |
|---|---|---|---|---|---|---|
| Fort Worth (Texas) | Police | 173.600 | 251,162 | 424,762 | 741,206 | 57% |
| Cleveland (Ohio) | Police | 71,500 | 75,918 | 147,418 | 396,815 | 37% |
| Portland (Oregon) | Police | 183,800 | 67,891 | 251,691 | 583,776 | 43% |
| **Columbus (Ohio)** | **Police** | **39,900** | **127,622** | **167,522** | **787,033** | **21%** |

*Percentage of population does not indicate actual community residency.

As the table indicates CDP has the largest population base, but the lowest number of combined social media followers based as a percentage of population. Though active, CDP has opportunity to broaden its social media followers.

## Pillar 4 – Community Policing and Crime Reduction

As mentioned in previous sections, CDP administration is very supportive of community policing and has implemented crime reduction strategies "Safe Streets" that involve the community in partnership. These initiatives are supported at the administrative level and are supported with resources.

## Pillar 5 – Training and Education

Training and Education are supported and encouraged at all levels. CDP conducts its own basic academy and conducts annual training. Higher education is also supported and encouraged with most members of the command staff having at least a four-year degree and many with advanced degrees. Training at CDP focuses on both officer safety skills and community focused training from trauma, informed policing, to procedural justice training.

EX 7

The Administration has placed an emphasis on training that encourages a better understanding of the community and gives officers the skills to achieve better results. One example of this training is Crisis Intervention. The CDP has trained officers to specifically deal with people suffering from mental illness and has a directive 3.06 "Crisis Intervention Team and Guidelines for Interacting with Persons with a Mental Illness" that dictates appropriate response. The directive states: "The CIT is a collaboration between the Division of Police and mental health professionals and advocates in Franklin County. Training for CIT members includes the following topics: recognition of signs and symptoms of mental illness, verbal interaction with those who are in crisis to include de-escalation as appropriate, and the transport of persons in crisis to the proper location for care and assistance." This additional training helps officers more effectively work with people suffering from mental illness.

***Pillar 6 – Officer Safety and Wellness***

The CDP has developed the EARs system to help identify officers who may be displaying behavior that can be harmful to the officer's career and also to the police community relationship. EARs focuses on identifying patterns of behavior that, if caught in time, can be averted to avoid future problems. There are several triggers, such as use of sick time, use of force, and internal affairs complaints that initiate reviews. These reviews are held about every six months.

Since reviews are not automatically triggered like an early warning system, EARs is not as effective at early intervention.

CDP should adopt a "true" early warning/intervention system so the division can act quickly when potential issues are discovered. Early warning systems can be set so that if an officer is involved in more use of force incidents than is typical, it starts an internal review. Other triggers could be missing court, vehicle crashes, and community complaints all with specific thresholds that activate a review. In all cases a conversation with a supervisor is conducted, even if there is no evidence that any violation has occurred. Early intervention is outside of the discipline process and is meant to help address issues to improve officer performance. Outcomes could include counseling, additional training, temporary re-assignment or referral for mental health support. This does not mean an officer would not be subject to discipline from complaints or out of compliance use of force as these would be dealt with in the current discipline process.

The CDP does have a directive for members involved in traumatic events. The directive is designed to make sure members get the assistance they may need following a traumatic event. Directive 8.06 Personnel Involved in Traumatic Events states: "Involvement in a traumatic event may affect the ability of personnel to carry out their assigned duties. The Division recognizes the need to provide assistance to personnel involved in these incidents without unnecessarily limiting their availability to supervisors and investigators conducting administrative and criminal investigations. One such means

EX 7

of assistance is the Officer Support Team." The directive requires under section D – "The employee(s) directly involved shall attend a minimum of one counseling session with a licensed psychologist before returning to work. The employee's bureau commander/manager is responsible for ensuring the required counseling session is scheduled through the Employee Benefits Unit and completed. Additionally, under section E - Any employees indirectly involved and feeling the need to obtain counseling are strongly encouraged to do so.

This directive helps to ensure that members get help when they have been in or a witness to a traumatic incident. This is best practice and by codifying this in a directive, it indicates the administration is supportive of members' well-being.

The CDP is currently planning on creating a new Wellness Bureau to help address the health and welfare of officers. The intent of creating a new bureau is to make sure officers are supported and are able to receive resources to perform better to serve the public.

## (5)    Biased-Based Policing

Of critical importance to a law enforcement agency today, is the way in which it works to create an organizational culture of equal treatment in both explicit and implicit ways. This is true for the Columbus Division of Police too. The CDP Directive 3.07 prohibits biased based policing. Directive 3.07 states

*"Division personnel shall not engage in bias-based profiling, shall only stop or detain a person for an articulable reason, and shall advise that person of the reason for the stop or detention as soon as practical and prior to the termination of the contact. A person's race, ethnic background, gender, sexual orientation, religion, economic status, age, cultural group, or any other identifiable groups or any combination thereof shall not be a factor in determining probable cause for an arrest or reasonable suspicion for a stop, except when based on specific credible information containing a physical description of a suspect in a criminal or traffic offense."*

Though the directive meets current best practice, it does not mirror the Columbus City Charter equal protection section. The Directive should be updated to mirror the City Charter.

The CDP publishes an annual Racial Profiling Report that is factual and transparent. The report is meant to demonstrate the Division's commitment to providing law enforcement services and to enforcing the law equally and fairly without discrimination toward any group or individual. The report documents all reported profiling complaints.

Highlighting even negative information is essential to building public trust. The public wants police agencies to be open and honest, even if the information is not positive. Additionally, highlighting racial profiling complaints shows everyone in the organization that racial profiling complaints are a priority to the agency and that they will always be

EX 7

investigated. The 2016-2017 Internal Affairs Bureau Biased-Based Profile Report indicates there were 14 racial profiling complaints made. The table below depicts the disposition of racial profiling complaints.

| 2016-2017 Racial Profiling Complaints (Bias Based Policing) | |
| --- | --- |
| Total Complaints | 14 |
| Unfounded | 12 |
| Cancellation (No misconduct alleged) | 2 |

As the table indicates there were no founded racial profiling complaints. The CDP conducts thorough investigations on any reported bias-based policing and then releases an annual report. This is best practice because it shows that CDP is transparent in its investigation of potential racial profiling and it indicates to the community that these complaints are taken seriously.

## 3 | Patrol

Patrol is the function most likely to have interactions with the public and therefore is the most crucial aspect of any community policing, community engagements or 21st century policing integration. To evaluate patrol services in Columbus, we examined recent training, use of force and community engagement activities. These activities also incorporate 4 of the six pillars of 21st Century Policing (Building Trust and legitimacy, Policy and Oversight, Community Policing and Crime Reduction and Training and Education}.

### (1) Patrol Training

In addition to who and how you hire, how you train patrol officers, directly impacts how they serve the community. It can be said the most important tool officers have is their mind as it is used in every community member encounter. To have this tool in top performance, it must be developed and imprinted with the philosophy of the agency which should be derived from the community.

The project team reviewed the recent training that was given to patrol officers and found officers received:

- 6 hours Trauma-Informed Policing
- 6 hours Procedural Justice and Police Legitimacy
- 6 hours Informed Policing
- 6 hours Procedural Justice and Police Legitimacy
- 4 hours Ethics and Bias
- 2 hours Constitutional Law and Legal Updates

EX 7

Though an initial 30 hours of Procedural Justice, Bias and Ethics is small considering there is total of 1,177 hours of instruction, these topics are also re-enforced throughout other training and are also covered in some annual trainings.

Since 2013, officers have received a minimum of over 20 hours of face-to-face ethics and bias classroom training; four hours of de-escalation classroom training (this figure does not include training hours received in annual defensive tactics training), and six hours of classroom training focusing specifically on dealing with the mentally ill and those in crisis. These topics are also covered in annual defensive tactics training.

In 2017, personnel received two separate days of DT training. One day included lecture focusing on legal aspects of use of force, the use of force policy exam, the CED policy exam for CED-certified personnel, and live scenarios to demonstrate the practical application of force. The scenarios tested personnel on de-escalation techniques and dealing with the mentally ill, ambush situations, plain clothes response to a robbery in progress, and response to an active aggressor. The second day focused on training and application of a room clearing method for dealing with an active aggressor.

The topics covered are the most relevant in policing today.  The Columbus Division of Police Patrol Training is consistent with the most up to date training on working with the community currently available.  Much of the training is re-enforced through the use of scenario-based training.  Important to note is the CDP uses several "shoot don't shoot" scenarios where patrol officers must use verbal and tactical skills to try to resolve situations without the use of force. Using scenarios-based training helps officers to use skills learned to resolve scenarios and gives instructors an opportunity to give feedback immediately after the scenario to achieve better outcomes in the community.

Trauma informed policing and procedural justice training exposes officers to viewing situations from outside of just a criminal justice lens; by instructing them and introducing them to view situations with a better understanding of where some community members experience may impact their actions and to be aware of this in their interactions. The procedural justice training of six hours was much shorter; it is just part of the course of study to help officers better understand the community they serve.

In our review of training, we noted a mix of officer safety and communication and community training.  This is best practice as both skills are relevant to modern policing; however, a recent high profile use of force incident captured on a cell phone and body worn cameras, shows that there is still some work to do in the area of procedural justice and de-escalation; though this may have been a rare incident.

## (2)    Patrol and Community Policing/Engagement

As mentioned above, community engagement is the intentional act of developing relationships in the community.  In many organizations, this is delegated to specialty

EX 7

patrol units or command staff.  At CDP this is the responsibility of all units within the Division.  Patrol is specifically involved in several initiatives and there are some specialty units formed under the Special Response Bureau as well.  Some of the community engagement activities are listed below:

- Diversity and Inclusion Liaisons
- Community Liaison Unit
- Safe Streets Initiatives
- Community Response Teams
- Campus Walking Crew
- Teens and Police Service Academy (TAPS)
- Citizen Police Academy
- CDP Basketball Bootcamp

These community engagement activities reach all zones within CDP, with some of the engagement activities directed at areas of the community where relationships have been strained. Each of these activities is briefly described below:

**Diversity and Inclusion Liaisons**

The liaisons are officers who have cultural competency and a credible understanding of issues that affect LGBT, African-American and New American populations in Columbus. They are a visible and valuable resource to our community and are committed to serving all members in our community in a trustworthy and unbiased manner.  The liaisons will keep their current assignments in Patrol but they will also attend community meetings and communicate with community members through email and phone calls.[2]

**Community Liaison Unit**

Community Liaison Section falls under the Strategic Response Bureau.  The Community Liaison Section is divided into two units, North and South. The North Unit is composed of eight officers assigned to Patrol Zones 1 and 4. The South Unit encompasses Zones 2, 3, and 5 with twelve officers assigned. One Community Liaison Officer (CLO) is assigned to each of the 20 patrol precincts. The Community Liaison Section serves 324 community groups/block watches. The unit's mission is to provide law enforcement services to the assigned precincts by collaborating with the public to reduce incidents affecting quality of life issues. [2]

The Community Liaison Officers patrol their precincts, providing support and assistance to the patrol officers assigned to these areas. CLO patrolling initiatives are often through bicycle and foot patrols. The CLOs conduct presentations and demonstrations for community members, business groups, and schools on various topics and are deeply

---

[2] CDP -COMMUNITY ENGAGEMENT SUMMARY, August 2018.

EX 7

involved with National Night Out events. The CLO unit also resolved 927 "311" citizen requests for service. Within the last year, the CLOs conducted over 1,481 presentations and attended 2,204 meetings, including monthly block watch coordinators' meetings. These coordinators' meetings provided citywide information to the block watch leaders and led to innovative approaches to handling community issues[2]. The table below shows some of the reported performance measures for 2017:

| 2017 | |
| --- | --- |
| Block watch Meetings | 567 |
| Attendance | 12,755 |
| Community Meetings | 1,637 |
| Attendance | 55,872 |
| Community Contacts | 138,247 |
| Telephone Contacts | 15,949 |
| E-Mails | 104,366 |

**Safe Streets Initiatives**

In an effort to re-engage the community, reduce violent crime, and address epicenters of criminal activity, Zone 4 implemented a community-based enforcement project in the Linden area. The project was designed to utilize officers as the front line to identifying service needs for members of the community. Linden has been an area that has long faced challenges related to crime and neighborhood blight, and where officers have struggled to develop strong and lasting community/police relationships.[3]

The goal of the 2017 initiative was to further the mission by providing a visible uniformed presence for both enforcement and problem solving in areas where an increase in violence and criminal activity had been occurring.

- Officers served as the first line of communication for citizens needing police and other City services.
- Officers were tasked with addressing criminal activity and engaging other City divisions to resolve non-law enforcement related problems.
- Officers were assigned exclusively to the Linden area on bikes, and they were relieved from the responsibility of handling routine calls for service.
- Officers were required to make daily contacts with citizens and business owners, identify their areas of concern, and develop a plan to eliminate the activity or resolve the issues.
- Officers were tasked with identifying properties that had evolved into epicenters of crime and to work with Code Enforcement and the City Attorney's Office to develop cases that would result in a timely abatement and closure of the properties, as well as making criminal arrests for violations that could be prosecuted.

---

[3] CDP -COMMUNITY ENGAGEMENT SUMMARY, August 2018.

EX 7

All enforcement action would be driven by concerns brought forth by the Linden community, with the goal of addressing their concerns and providing noticeable results. [3]

The Table below shows some of the Safe Streets Initiative performance measures for 2017:

| 2017 | |
|---|---|
| Linden Safe Streets Meetings/Events | 84 |
| Parsons Ave. Corridor Meetings/Events | 23 |
| West Side Safe Streets Meetings/Events | 11 |
| Citizen contacts | 5,699 |

The safe streets initiative is an excellent example of a police community partnership where officers work directly with the community to resolve crime and livability issues.

**Community Response Teams**

Each of the five patrol zones has a designated team of one sergeant and ten officers to specifically respond to community needs. All CRT officers are assigned bikes, which enables them to be more approachable and encourages increased community engagement. CRT Officers are responsible for participating in community meetings and engagement opportunities, conducting directed patrol to address specific crime trends, as well as other activities not directly addressed by patrol personnel. Zone 4's CRT team is unique, as they focus their efforts in the area near the campus of The Ohio State University.[4]

The CRTs on bikes allow officers to hear, see and interact more with the community. This in turn allows for more communication and more opportunities to communicate. Vehicle based patrol is necessary for a speedy response, but it does not contribute as effectively to communication as does bike or foot patrols.

**Campus Walking Crew**

Officers assigned to the CWC, partner with The Ohio State University to deliver police services in the off-campus area. In addition, the CWC partners with local sororities and fraternities to ensure the safety and security of their students and residents. The CWC also assists with student move in day, where they discuss important safety issues with students and their families. In addition, CWC Officers play a critical role in Buckeye football game day safety, where they work throughout the evening and night hours to ensure the event is enjoyable and safe for all in attendance. [4]

---

[4] CDP -COMMUNITY ENGAGEMENT SUMMARY, August 2018.

EX 7

**Teens and Police Service Academy (TAPS)**

The TAPS Academy was created in Houston as a collaboration between the police and academies to find ways to build positive, interpersonal relationships between officers and youth 14 to 18 years old who were at risk of dropping out of school. The program was implemented in Columbus in 2014 and 2015 with the goal of fostering effective communication between youth and police officers, developing a better understanding of the police, and challenging the participants to set positive goals. The officers' participation is voluntary, and they become role models in the schools and for the participants in particular. In 2017, three members of Zone Five were part of this important community engagement program to expand the interpersonal relationship between the youth of our community and police officers.[5]

**The Citizen Police Academy**

The Citizen Police Academy is a free community education program intended to build lasting relationships between program participants and the Columbus Division of Police, with the ultimate goal of reducing crime and achieving the best police service in Columbus' communities. The program will give people an inside look at the values, philosophies, and operations of the Division, while at the same time, serving as an open forum for questions, discussion, and the exchange of ideas. Subject-matter experts from throughout the Division of Police provide instruction on topics, such as the function of patrol officers, ABCs of policing, defensive tactics, internal affairs, and the laws of arrest, search, and seizure. Both participants and Division personnel will be better able to dispel concerns and misconceptions, improving police and community rapport.[5]

**CDP Basketball Bootcamp**

The Columbus Division of Police is partnering with the youth of the community to establish a foundation of trust and mutual respect. Members of the Columbus Division of Police's basketball team, the Bulldogs, and the Recruiting Unit are interacting with high school student athletes, through joint work outs and attending games and other activities. This is an ongoing effort that hopes to establish a national basketball tournament with other agencies involved in similar programs.

The above activities are an example of the continuing community engagement work done by the Columbus Division of Police. The activities are varied and diverse and are effective at engaging many different communities within the service area of CDP. CDP has a high level of community engagement activities.

Several of the activities listed above would also be considered community policing as well. The Safe Streets Initiatives are directly linked to CDP community policing efforts.

---

[5] CDP -COMMUNITY ENGAGEMENT SUMMARY, August 2018.

EX 7

Each of these safe streets initiatives focuses on community driven problem identification and community driven enforcement efforts. Many of the issues addressed by the safe street's initiative would be classified as low-level quality of life issues. The officers involved in the Safe Streets initiatives work directly with the community to resolve these issues.

**(3)    Patrol Supervision**

A key component of community engagement, community policing and 21st Century Policing is line level supervision. If these concepts are not accepted or reinforced by line level supervision then they will not have universal support by police officers. Supervisors' attitude toward and support for any initiative is possibly the most important element in its adaptation and success. CDP has a large span of control for some patrol sergeants. Many of the spans are over 12 officers to 1 sergeant. PERF, IACP and others recommend no more than 7 to 9 officers per sergeant to allow for better supervision and more mentoring.

Lower spans of control allow sergeants to be responsive to more calls, observe officers' actions, and develop subordinates to train and mentor.

**(4)    Conclusions**

As part of the study of the Columbus Division of Police, the project team conducted internal and external surveys and focus groups. The findings of these surveys are detailed in subsequent chapters of report, but key findings of the surveys are that:

- While 74% of community members felt CDP is "doing a good job", only 61% of black respondents had the same perception.

- The internal employee survey showed that 70% of respondents felt CDP had an effective approach to community policing. This is lower than expected, but is consistent with the community survey.

- Consistent with the community survey black employees had a less positive view with 61% agreeing that CDP had a good relationship with the community compared with 80% overall.

- The internal employee survey showed that, overall, 29% of respondents witnessed discrimination in the previous 5 years and 20% have personally experienced discrimination in the previous 5 years, but 70% of respondents who identified as black saying they have witnessed discrimination and 30% of respondents who identified as black stated they have witnessed an officer discriminate against a member of the public.

EX 7

The high number of respondents that stated they experienced discrimination or witnessed officers discriminate against members of the public is a cause for concern.

The CDP has implemented community based policing at all levels and has implemented several elements of 21st Century policing.  There are policies against discrimination and there has been training on procedural justice.  Even with focus in these areas, the results of the community and employee survey indicate there is still work to do especially with communities of color.  A few high profile recent incidents also have shown a disconnect between policies, training and implementation.

To be effective at implementing policies and training at the officer level there must be constant re-enforcement of policies and training, as well as proper supervision that embodies the intent of policies and training.  In our interviews of top leadership the values of the CDP were often stated and it was notable that top leadership supports the policies and training; however, there is an apparent disconnect between the values and what is occurring both internally and externally.

To increase the connection between the stated values of the CDP and the officers, the leadership should increase training on policies, make sure policies are supported by front line leaders.  Front line leaders should have independent training where top leadership can stress the values of CDP and help front leaders to better reinforce those values. Additionally, there should be more training division wide on procedural justice and community policing.  Through the course of our analysis, we did note there are some areas of the department where there are large spans of control between supervisors and direct reports.  This could impact the daily support for the values of CDP.

The CDP should immediately follow up on the concerns raised on the community and employee surveys.  To do this, the CDP should develop both internal and external focus groups of persons of color to identify how the CDP can improve community relations and eliminate discrimination within the department.  These meetings should be facilitated through the assistance of a neutral third party. The CDP leadership must identify why people feel the way they do and then identify solutions to be implemented.

**Recommendations:**

**The CDP has to continue to work on building community trust.**

**The CDP should increase training on de-escalation and procedural Justice.**

**The CDP should adopt an Early Warning/Intervention program.**

**The CDP should update their Bias Based Policing Directive to reflect the City Charter language.**

EX 7

**The CDP should reduce spans of control to provide more effective and immediate supervision.**

**The CDP should increase training on policies**

**The CPD should address the concerns raised on the employee and community surveys relating to bias both internally and externally.**

**The preceding broad recommendations on Community and 21st Century policing are supported by specific recommendations in the following chapters.  To be effective, Community and 21st Century policing should be supported throughout the organization.**

EX 7

# 3 Community Views on Policing in Columbus

Critical to this study specifically, but also to the core of police community relations are the views of the public served and being protected. The project team reached out to the community to understand their views on the Columbus Division of Police in two ways – a community survey and through conduct of community focus group meetings in different neighborhoods of Columbus. This chapter summarizes the results of these outreach efforts.

## 1 | Community Survey

As part of a larger operational review for the City of Columbus, Matrix Consulting Group contracted with Public Values Research, an independent research and consulting firm, to conduct a public opinion survey with City of Columbus residents. The purpose of the research was to document community attitudes regarding the services provided by the Division of Police and to help identify perceived gaps in the quality of services provided. Specifically, the study addressed: (1) public satisfaction with the Columbus Police overall and across key measures; (2) perceived public safety citywide and within neighborhoods; (3) community engagement; and (4) interactions with officers.

Their findings reflect the content of 676 surveys conducted with residents of the City of Columbus, 18 years of age or older. The sample consisted of 350 RDD and listed telephone interviews and 326 online responses collected between March 27 and May 4, 2019. The telephone sample was provided by the Marketing Systems Group and the online sample was provided by Soapbox Sample. Surveys were conducted in English by Interviewing Service of America (ISA) and averaged 12 minutes in length. The margin of error for the sample as a whole was +/-4% at the 95% confidence interval, which was computed using the classical SRS formula and takes into account the design effects of weighting.

Key findings are summarized below for residents overall, followed by any observed differences by race, ethnicity, gender, or age. All reported differences by demographics or among groups is statistically significant at the 95% confidence level, unless otherwise noted.

The more detailed findings associated with this survey can be found in Attachment B at the conclusion of this report.

**Key Findings**

*Overall Attitudes towards the Columbus Division of Police*

EX 7

The majority of Columbus residents approve of the job the police are doing. Nearly three-fourths of all residents surveyed (74%) reported that they believe the Columbus Police are doing a "good" or "excellent" job overall.  These approval ratings were consistent across income categories and include one-third of residents (33%) who give the Columbus Division of Police the highest rating of excellent. Approximately 70% of residents reported that they are satisfied with the Columbus Police overall and view the Division favorably.

Nevertheless, views of the Division of Police are more divided compared to other municipal agencies.  For instance, more than nine-out-of-ten residents (94%) rate the Division of Fire as good or excellent and more than eight-out-of-ten (82%) give top ratings to the Department of Public Service.

Half of all residents surveyed (51%) reported that their opinion of the Columbus Police Division has not changed compared to 10 years ago; however, among those residents whose views had changed, their opinion had become "more favorable." Residents described a variety of reasons for changing their opinions. The most frequently cited reasons for a more favorable view were increased police presence/faster response time (8%) and better community/race relations (8%). The most frequently cited reason for a less favorable opinion were racial bias/excessive force (12%) and corruption (6%).

Most Columbus residents are confident in police conduct and accountability. Almost two-thirds of Columbus residents (64%) "agree" or "strongly agree" that police officers protect the rights of everyone in the community and make decisions that are good for all residents (63%). When misconduct does occur, the majority of Columbus residents (62%) believe officers are held accountable.

Views of the police vary significantly by race and ethnicity. Findings indicate that non-white and black residents give the Columbus Police substantially lower performance ratings overall compared to white residents. Eight-of-ten white residents surveyed (80%) reported that the Columbus Police are doing a good or excellent job overall, compared to 69% of non-white residents and 61% of black residents. Non-white and black residents also give the Columbus Police lower ratings across a number of specific measures. Half of the black residents surveyed (49%) said they believe police protect the rights of everyone in the community and 43% believe the police make decisions that are good for all residents, compared to approximately 70% of white residents who hold similar views. When misconduct does occur, 46% of black residents and 53% of non-white residents believe that officers are held accountable, compared to 70% of white residents.  No differences in overall police ratings were found by age, income, or gender.

*Perceptions of Public Safety*

The majority of Columbus residents feel safe in the City of Columbus and within their own neighborhoods. More than three-fourths of residents (77%) agree or strongly agree that

EX 7

they feel safe in the City of Columbus and more than eight-out-of-ten (81%) feel safe in their own neighborhood. Although the majority of residents have a positive perception of public safety, men, college-educated residents, and those earning more than $50,000 feel safer than others. The majority of Columbus residents believe crime in their neighborhood has "stayed about the same" (60%) or is "getting better" (22%). Only 16% believe crime is "getting worse" where they live. More than two-thirds of residents (69%) say the Columbus Police is "somewhat responsive" or "very responsive" in addressing public safety concerns.

Approximately two-thirds of residents report that police frequently patrol their neighborhoods and are responsive to public safety issues raised by their communities. Results were consistent regardless of income or race/ethnicity.

Non-white and black residents, however, feel less safe compared to white residents in the City of Columbus overall and within their own neighborhoods. Approximately 74% of non-white and 70% of black residents feel safe where they live compared to 84% of white residents.

Violent crimes and burglaries/theft are the top public safety concerns for Columbus residents. When asked to name all the public safety issues they were concerned about, approximately 60% of residents cited violent crime and theft. Violent crime was most often cited first when residents were asked to name all the public safety issues that were important to them.

The study found that men feel safer in the City of Columbus compared to women. Eight-in-ten men feel safe (81%) compared to approximately seven-in-ten women (73%), a statistically significant difference at the 90% confidence level.

*Community Policing*

Most Columbus residents consider their relationship with the Columbus Police to be positive, although residents are less likely to agree that the police understand the unique aspects of their community. Three-fourths of Columbus residents (75%) describe their relationship between the Columbus Police and their community as "very positive" or "somewhat positive," compared to less than two-thirds of residents (64%) who "agree" or "strongly agree" that the police understand their community.

A slight majority of residents believe that the Columbus Police values public input (61%) and makes it easy for community members to provide input (57%). Less than a third of residents (30%) surveyed know how to contact the community liaison officer assigned to their area. Just under one-quarter of residents surveyed (22%) reported that they regularly attend community meetings, most often through their Neighborhood Association (12%). Facebook was the most frequently cited platform for learning about the Columbus Police, mentioned by 19% of residents surveyed, followed by the Columbus Police

EX 7

Division website. Notably, 70% of residents reported that they do not follow the Columbus Police using any online platform.

Findings suggest that community engagement with black and non-white communities has been less successful than with other groups. Black residents and non-white residents in general were less likely than white residents to describe the relationship between their community and the Columbus Police Division as positive. Eight-out-of-ten white residents (80%) described their community's relationship with the Columbus Police as somewhat positive or very positive, compared to 59% of black residents and 67% of non-white residents in general. Black residents and non-white residents were also less likely than white residents to describe Columbus Police as knowledgeable about their communities. Only half of black residents surveyed (51%) and 57% of non-white residents agree or strongly agree that the Columbus Police understand their community, compared to more than two-thirds (69%) of white residents.

Black residents were less likely than white residents to report that the Columbus Police values input from their community. Approximately two-thirds of white residents (65%) believe the police value input from the community, compared to only half of black residents (51%). Moreover, black residents are less likely to agree that the Columbus Police make it easy for community members to provide feedback, 50% compared to 60% among white residents, a statistically significant difference at the 90% confidence level interactions with Columbus Police

The study found that based on personal experiences, the majority of residents agree that police are respectful and professional in their interactions with the public. Residents were first asked if they personally had any contact with the Columbus Police in the 12 months prior to the survey. Slightly more than one-third (35%) of residents reported that they had contact with police, most frequently as part of a service request (54%), followed by traffic stops (24%), community meetings (12%), and records requests (10%). Reflecting on their contact with Columbus Police, three-fourths of residents (76%) reported that they found that "all" or "most" officers treat them, their friends, and family with respect.

Perceptions regarding personal encounters with Columbus Police varied significantly by race/ethnicity, income and age. When asked to describe how well police treat residents based on their personal experience, 84% of white residents said all or most officers show them respect, compared to 63% among non-white residents. Residents with incomes above $50,000 were more likely than those with below median incomes to report that officers treat them with respect, 87% compared to 66%. In addition, older residents who had personal contact with the Columbus Police were more likely than younger residents to report that all or most officers show them respect. More than one-in-nine (91%) residents 65 years or older believe all or most officers treat them with respect compared to 68% of residents 18 to 34 and 79% of those between 35 and 64. (Sample size was not sufficient to analyze the views of black residents separately.)

EX 7

*Selecting a New Chief of Police*

The qualities residents value most in a new Chief are leadership skills, effective communication skills, being community oriented, and being knowledgeable about the City of Columbus.

Selecting a police chief who comes from a racially diverse background, while not ranked highly by residents overall, is a high priority for non-white residents, particularly African-Americans. More than three-fourths (76%) of black residents and 72% of non-whites in general ranked a diverse background as a top priority in the next Chief of Police (score of 4 or 5 on a scale of 1 to 5, where 5 is "extremely important,") compared to 59% of white residents.

### Summary

The study found that a majority of Columbus residents approve of the job the police are doing and feel safe in the City of Columbus and within their own neighborhoods. Most residents report that they frequently see police patrols in their neighborhood and believe the police are generally responsive to public safety issues brought up by their community. Moreover, based on personal experiences, most residents view police as respectful and professional in their interactions.

Despite these positive indicators, residents' views of the police vary significantly by race and ethnicity. Black residents, in particular, have more negative opinions of the Columbus Police compared to other groups across most measures including overall approval ratings, perceived safety, and perceptions of police accountability. Black and non-white residents are also less likely to report that they are treated with respect when they interact with police.

Finally, results indicate that community engagement with black and non-white communities has been less successful than with other groups. Black and non-white residents are less likely to describe their relationship with the Columbus Police as positive and are less likely to report that the police understand their communities or make it easy to provide input.

## 2  |  Community Focus Group Meetings

As part of the community outreach effort, the Matrix Consulting Group contracted with RAMA Consulting, a local firm specializing in community and stakeholder engagement to facilitate conversations in select neighborhoods on the current state of community/police relations, as well as possibilities for the future. The goal of the assessment was to gather data regarding the quality and effectiveness of police services to the community, including:

EX 7

- • The effectiveness of community engagement efforts
- • Responsiveness to the community
- • How proactive they are in working with the community and solving problems

In late June through early July 2019 seven (7) focus groups on community policing were held in select neighborhoods and for specific constituencies, as identified by the City of Columbus Mayor's Office. Through a targeted outreach effort, led by the City of Columbus Department of Neighborhoods, local community leaders, neighborhood liaisons, and block watch coordinators were invited to participate in small focus groups. To ensure productive conversations where all were able to contribute, each focus group was limited to 15 people. Participants were asked to discuss perceptions, challenges, and opportunities to improve the Columbus Police Department's relationship with their respective communities.

Participants were informed their feedback would be anonymous and summarized in a report that would be included in Matrix's overall findings. This document highlights key findings from the focus groups. The final outcome of the project will be a plan for the Mayor and the new Chief to use to guide the Division in more effective service delivery to the various communities that comprise Columbus.

**Key Themes**

Focus group participants had mixed perspectives on their individual and neighborhood perspectives on police/community relations, ranging from favorable to unfavorable. Less affluent and racially diverse neighborhoods were more likely to view their relationships as unfavorable. Several participants across all groups reflected on the lack of diversity in race and age in the focus groups, and suggested follow-up meetings involving residents less active in the community and from a younger demographic be conducted. Key themes were related to officer training (including crisis intervention and cultural competency), departmental transparency and accountability and a desire for more robust community engagement efforts and opportunities for positive interaction. Neighborhood-specific themes from each focus group are listed below. Comments are paraphrased with minimal wordsmithing to ensure the original intent of the focus group participants comments were captured.

### Southside/Southern Orchards

Key Themes:
- • **Training**
  - o Officers need more training that will empower them to have better interactions with the communities they serve. There needs to be a culture of training and positive evolution throughout the department.

EX 7

- **Community Engagement and Interaction**
  - o Officers have many demands on them that prevent them from spending more time in communities.
  - o Residents involved in Block watch organizations feel they have a positive relationship with police that includes open lines of communication.
  - o Residents with a negative perception of the police force are much less likely to call them or interact with them; in contrast, those who have a positive perception have frequent communication.
- **Officer Support**
  - o Officers suffering from mental health issues need avenues to get help that will not make them fear losing their job or being ostracized.
- **Transparency**
  - o There is a lack of transparency around norms for police interactions and a lack of accountability for officers.

Linden

Key Themes:
- **Community Engagement**
  - o Residents are concerned and frustrated that they feel they have to teach their black children do's and don'ts on how to interact with the police to stay alive or safe when parents with white children do not have to do this.
  - o Residents want to be more involved in the things that can create more leverage and change within the community.
  - o Community involvement - officers need to know the community and the community needs to know the officers to actually increase change.
- **Officer Support**
  - o The police are hiring new officers right after they come back from fighting wars and being in the military. They are still dealing with PTSD and now allowed to be armed dealing with civilians; that is not a safe thing.
- **Transparency**
  - o Residents are very interested in the process and how the information will be gathered and used from the additional focus groups being conducted.
  - o Residents have a large concern on if these series of focus groups will yield real results or if this is for show to say "we talked to the community"
- **Leadership**
  - o The new chief needs to be ready to make changes, put his foot down and just say "we aren't doing that anymore"

EX 7

## Hilltop

Key Themes:
- **Community Engagement**
  - The bike patrol officers are an improvement. More bike patrol or other on-foot officers should be present in neighborhoods to improve visibility and increase engagement with residents.
  - Top-down leadership and increased community engagement are needed.
- **Officer Support**
  - Police departments are understaffed. Increasing the number of precincts and widely spreading them will improve response times.
  - The justice system is a "revolving door." Individuals are arrested and then immediately released, creating low morale among the police force.
  - Social services taking the pressure off the police is important. Police officers are not social workers and should be available to respond to more crime and less mental health crises.
- **Transparency**
  - Response times for the Columbus Police Department are slow across the board. Several residents expressed that wait times are 30-40 minutes at minimum after a call is placed. Reports are inaccurate and/or scrubbed and do not reflect actual events.

## Clintonville

Key Themes:
*\* Note: Much of the conversation included higher-level topics, as residents have few interactions with police officers on a community level.*
- **Community Engagement**
  - In Clintonville, the relationship with police is neither good nor bad. It is a safe and desirable community to live and work in, and interactions with the police are not common.
  - In Weinland Park, the relationship with the police is not good. There is a lack of understanding on both the resident and police side of the relationship.
  - Police liaison officers are important, and more officers need to be engaging in the communities. Implement more social training and cross-over of policing and social work fields.

## Driving Park/German Village/Merion Village

Key Themes:
- **Training**
  - There needs to be more mandatory training surrounding culture, race, religion, immigrants, and self-care.

EX 7

- **Community Engagement**
  - o The overall relationship with the police seems to be positive. Residents would like to know their officers by name and have consistency with which officers are on duty and when.
  - o Increase community engagement efforts.
  - o Increase the overlap of community work, social services, and policing.
- **Officer Support**
  - o Officers are bogged down with paperwork and are spread too thin. The department needs to create more efficiencies to keep officers on the streets.

## Eastside

Key Themes:
- **Training**
  - o Officers need more trainings such as diversity and authority styled, to help better assess situations and deal with all types of residents
- **Community Engagement**
  - o There needs to be earlier exposure to police for children, so that negative perceptions and stereotypes do not plague their view of the police.
  - o Officers need to be more active in their communities and immersed into creating greater social capital and networks with the residents
- **Officer Support**
  - o Officers need viable spaces and opportunities to properly get their mental health checked and evaluated at multiple points throughout their careers.
- **Transparency**
  - o Response times need to be improved so that residents feel safer and that their neighborhoods are truly being protected and not forgotten about.

## Latino Community

Key Themes:
- **Training**
  - o Find a way to incentivize officers to get better trained with assisting residents
  - o Officers need to learn basic Spanish, and residents need to learn basic English. When things happen, residents tend to find that one resident who is bilingual and can translate for them.
- **Community Engagement**
  - o Cultural competency is low and causes conflicts
  - o Huge language barrier which causes misunderstandings to happen and confusion
  - o Respecting community members - they are treated less than equals since some are refugees and immigrants

EX 7

- o Lack of communication - the police don't engage the community to really gauge how they feel.
- o "Fear of my status" - If I call for help then my citizenship is now in question
- o The relationship needs to be built on both ends between the community and police officers.
- o There needs to be a mutual trust to see a decrease in crime and better policing
- o There are no more safe places in the community; Police and ICE are always around the schools, hospitals and churches
- o "Is the police here to help me or deport me?"
- o Increase the trust, decrease the fear
- **Officer Support**
  - o Residents feel it is some biased thinking and discrimination going on that there are no Latino officers. They have all heard stories of Latinos passing all the exams and trainings, but they always coincidently fail the final interview. The residents feel they are "blackballed" from joining the police force.

## Somali Community

Key Themes:
- **Training**
  - o Officers need more diversity trainings and methods on how to work with non-native speakers.
  - o There needs to be more officers in Columbus that reflect the large numbers of these minority groups
- **Community Engagement**
  - o Columbus Police Department needs to implement and find community events that officers can go to, so they can build networks and relationships in the communities.
  - o Officers need to be more active in their communities and play a role in changing the stereotypes associated with police officers.
  - o An interpreter line needs to be created to help residents who do not speak English during and after interactions with the police to improve lines of communication.

EX 7

# 4 Employee Views on the Division of Police

As part of the Matrix Consulting Group's study for the City of Columbus Division of Police, the project team distributed an anonymous survey to Division employees in order to gauge their opinions on a variety of topics relevant to the study. This survey generally asked three types of questions:

· **Multiple Choice Questions:** Respondents were presented with a number of multiple-choice questions, or statements where respondents indicated their level of agreement or disagreement with the statement. Response options were "strongly agree" (SA), "agree" (A), "disagree" (D), and "strongly disagree" (SD), and "No Opinion" (N/O). Respondents could also opt out of responding to the statement, in which case they were not counted among the responses received for that statement.
· **Ranking Choice Questions:** Respondents were asked to rank the quality of Division training on various topics and rank the desirability of traits to be found in a new police chief.
· **Open-Ended Response Question:** At the end of the survey, respondents were given space to provide opinions about the organization's most significant strengths and improvement opportunities in their own words.

The survey was distributed electronically to all 2,324 Division employees in March 2019. A total of 1,035 responses were received, in varying degrees of completion, for an overall response rate of 44.5%.

## 1.    Summary of Key Findings

While a more detailed analysis can be found in the sections below, the following bullet points summarize the key findings from the responses received to this survey:

· **Relationships with the Community:** Respondents generally believe that the Division of Police provides good service to the community and enjoys good relationships with City residents.
  - Black respondents are less likely to believe the Division has good relationships with City residents.
  - Civilian personnel and communications staff are less likely to feel respected by the community.

· **Division Culture:** Most respondents agree that the Division has a strong culture of respect and accountability.
  - Sworn management personnel have very high opinions of the Division's culture, while civilian line staff are less enthused

EX 7

- Black survey participants do not share the perception that the Division has a strong culture of respect and accountability.

- **Discrimination and Bias:** About 29% of respondents witnessed discrimination within the Division of Police, and 20% of respondents have personally experienced such discrimination.
  - Racial discrimination was the most common type listed, followed by gender discrimination.
  - Nearly 70% of Black respondents said that they have witnessed discrimination within the Division of Police, as opposed to less than a quarter of white respondents. Also, Black respondents were more than twice as likely to say that they experienced discrimination as white respondents.
  - About 8% of respondents claimed to have witnessed an officer demonstrate bias against a member of the public in the last five years. This number was much higher (nearly 30%) among Black respondents.

- **Staffing and Recruitment:** Staffing levels are a major concern for most staff, but there is more approval than disapproval for the Division's recruiting efforts.
  - Patrol personnel believe staffing and workload distribution are issues, and that they impact proactive time as well as response times to lower and medium priority calls.
  - Staffing and the allocation of personnel are also issues for respondents in the Investigations division.
  - Communications staff who responded to the survey unanimously believe that the staffing in that unit is insufficient to cover their assignments.

- **Workload:** More than half of staff consider themselves "often busy but generally able to keep up", while about a quarter believe that they are "always busy and never able to catch up".
  - Less than 20% of respondents claim to have the right balance of work or excess capacity.
  - Management staff tend to feel busier than line staff.
  - Respondents in the Investigations subdivision and the Office of the Chief feel busier than other respondents.

- **Training:** Respondents generally have high opinions of the training they received to excel at their work and work effectively with the community.
  - Sworn management and supervisory staff have better-than-average opinions of training, while civilian staff had comparatively poor opinions.
  - Black respondents have poorer-than-average opinions of the Division's implicit bias and cultural competency training.
  - Communications staff do not all share the rest of the Division's strongly positive opinions about their training

EX 7

- **Technology:** Opinions are split on the quality of the Division's technology. Administrative staff and the Chief's Office are pleased with it, while Investigations personnel are less so. A majority of Communications staff believe their technology has not kept up with the technological advances in emergency communications.

- **Fleet:** A majority of respondents believe the patrol fleet is not in good condition.

- **Civilianization:** There is mild support for civilianization among patrol staff, but line staff are more open to it than management and supervisors.

- **Choosing the Next Chief of Police:** Staff throughout the organization want the next chief to be a strong leader and an effective communicator.
  - Sensitivity to diversity and a diverse background are the least important characteristics to most respondents, but civilian personnel prioritize these more than average.
  - Black respondents view sensitivity to diversity and a diverse background as second only to leadership and effective communication in terms of importance for the next chief.

The following sections provide more detail for each of these observations.

## 2.      Survey Respondent Demographics

While the survey was anonymous, it asked respondents to indicate their current rank and assignment, years of service within the organization, and race/ethnicity. The following tables and charts summarize demographic data gleaned from these questions.

### (1)      Respondents were comprised of 80% Sworn staff and 20% Civilian staff.

Respondents were asked about their current rank, and whether they are sworn or civilian staff. About 80% of respondents are sworn staff, and about 78% of respondents are line level employees. The overlap of these two strong majorities accounts for 60% of total response volume in the "sworn officer – line level" category.

| Response | Count | Percentage |
|---|---|---|
| Sworn Officer - Lieutenant or Higher | 57 | 5.5% |
| Sworn Officer - Sergeant | 142 | 13.8% |
| Sworn Officer - Line Level | 622 | 60.3% |
| Civilian - Manager or Supervisor | 39 | 3.8% |
| Civilian - Line Employee | 171 | 16.6% |
| **Total** | **1,031** | **100.0%** |

EX 7

**(2)    Patrol staff comprise nearly half of all survey participants.**

Respondents were asked to identify which subdivision they are assigned. The following table summarizes the responses, of which 46.9% of staff are assigned to Patrol subdivisions.

| Response | Count | Percentage |
|---|---|---|
| Office of the Chief | 18 | 1.7% |
| Administrative Subdivision | 67 | 6.5% |
| Investigative Subdivision | 222 | 21.5% |
| Homeland Security - Communications | 42 | 4.1% |
| Homeland Security - Other | 65 | 6.3% |
| Support Services Subdivision | 137 | 13.3% |
| Patrol - North Subdivision | 218 | 21.1% |
| Patrol - South Subdivision | 266 | 25.8% |
| **Total** | **1,035** | **100.4%** |

**(3)    Division employees have an equitable distribution of work experience.**

Respondents were asked to identify how many years of service they have with the Division of Police, of which there was relatively equal representation for each of the five-year intervals offered as response options, as highlighted in the following table.

| Response | Count | Percentage |
|---|---|---|
| 0-5 years | 157 | 15.2% |
| 6-10 years | 172 | 16.7% |
| 11-15 years | 142 | 13.8% |
| 16-20 years | 160 | 15.5% |
| 21 years or more | 402 | 39.0% |
| **Total** | **1,033** | **100.2%** |

**(4)    Survey respondents were predominately White/Caucasian.**

Respondents were asked to indicate their race or ethnicity. White respondents formed the overwhelming majority, at 85%, with Black respondents representing 10% of the total volume. The remaining 5% was spread among Hispanic, Asian, Native American, Hawaiian, and other races/ethnicities, as summarized in the table below.

EX 7

| Response | Count | Percentage |
|---|---|---|
| White or Caucasian | 878 | 85.2% |
| Black or African American | 103 | 10.0% |
| Hispanic or Latino | 14 | 1.4% |
| Asian or Asian American | 3 | 0.3% |
| American Indian or Alaska Native | 8 | 0.8% |
| Native Hawaiian or other Pacific Islander | 3 | 0.3% |
| Other race or ethnicity | 39 | 3.8% |
| **Total** | **1,048** | **101.6%** |

Response distributions were comparable to the demographics of the Division workforce.

## 3.    Community Relations

Respondents were asked to indicate their level of agreement with five statements regarding their perception of the Division's relationship with the community. Overall, staff believe they provide a high level of service to the City and enjoy positive community relationships.

| # | Statement | SA | A | D | SD | N/O |
|---|---|---|---|---|---|---|
| 1 | The Columbus Division of Police provides high levels of law enforcement service to the City. | 47% | 45% | 6% | 1% | 1% |
| 2 | Our approach to providing 'community policing' is effective for Columbus. | 20% | 50% | 17% | 4% | 9% |
| 3 | Our Division has positive relationships with City residents. | 14% | 66% | 11% | 2% | 7% |
| 12 | Overall, I believe the community respects the work we do. | 13% | 64% | 15% | 5% | 3% |
| 14 | My work with the Columbus Division of Police is making a positive difference in the community. | 21% | 56% | 11% | 3% | 10% |

Although summary statistics suggest that employees believe the Division maintains a positive relationship with the community, there is less agreement from employees who are civilians, communications staff, and Black/African-American respondents. We highlight the following observations when we analyze response data by job class and demographic break down:

· **In Statement #3, Black respondents were less likely to believe the Division maintained good relationships with City residents.** Although 80% of all employees agreed with this statement overall, and only 13% of employees disagreed with this statement, agreement drops to 61%, and disagreement

EX 7

increases to 29% when we evaluate answers from respondents who identified as Black/African-American.

- **In Statement #12, civilian personnel and communications staff were less likely to feel respected by the community**. Overall, 77% of respondents agreed, and 20% disagreed, that the community respects their work. Communications staff, however, agreed just 57% of the time while disagreeing at a rate of 33%. Likewise, civilian staff (both managers and line staff) were less likely than sworn staff to agree with the statement, disagreeing at a rate of 28%.

## 4.    Adequacy of Training

Respondents were asked whether their training adequately prepared them for the job, of which each of the three statements on this topic received at least 75% agreement, and less than 15% disagreement, as summarized in the table below.

| # | Statement | SA | A | D | SD | N/O |
|---|---|---|---|---|---|---|
| 7 | I have received the training I need to excel at my work. | 27% | 57% | 11% | 3% | 2% |
| 8 | I receive the training I need to work effectively with the community. | 21% | 58% | 9% | 3% | 9% |
| 11 | I am trained and equipped to effectively work with diverse cultures and communities. | 22% | 56% | 11% | 3% | 8% |

We do highlight that in Statement #7, although overall responses indicated 79% agreement and 14% disagreement, agreement from Communications staff drops to 61% and disagreement increases to 26%.

## 5.    Performance and Promotions

Respondents were asked whether they agreed that their supervisors set clear expectations for performance, and whether the promotional process was fair. Overall, 86% of respondents agreed that their supervisor set clear expectations, while only 44% agreed that the promotional process is fair, as observed in the table below.

| # | Statement | SA | A | D | SD | N/O |
|---|---|---|---|---|---|---|
| 5 | My immediate supervisor sets clear expectations for my performance. | 41% | 45% | 7% | 5% | 2% |
| 9 | The promotional process is fair. | 8% | 36% | 21% | 15% | 20% |

EX 7

Although 36% of employees disagreed that the promotional process was fair, and 20% maintained no opinion, there were some differences when responses were analyzed by subdivision or rank.

- Agreement that the promotional process was fair was at 61% with staff from the Chief's Office, while 33% of staff disagreed with this statement.
- Homeland Security Communications staff agreed at a rate of 55%, with 29% disagreeing.
- Among sworn officers, those with higher ranks viewed the promotional process more favorably with Sergeants agreeing 59% of the time, and those with the rank of Lieutenant or higher agreeing 63% of the time.
- **Civilian management agreed** that the promotional process was fair **at a rate of 64%, while civilian line staff agreed just 38% of the time.**

## 6.    Organizational Culture

Respondents were asked several questions regarding organizational culture for respect and accountability. Overall, these statements received strong support from respondents; every statement was met with at least 70% agreement and no more than 18% disagreement.

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|-----|-----|-----|-----|-----|
| 10 | We have a culture of respect for others within the Columbus Division of Police. | 22% | 57% | 12% | 5% | 4% |
| 13 | If I witness a violation of policy, I can report that issue to my supervisor without fear of retaliation. | 33% | 46% | 8% | 6% | 6% |
| 15 | Columbus Division of Police leadership takes seriously allegations of discrimination within the Division. | 29% | 41% | 9% | 9% | 12% |
| 16 | Columbus Division of Police leadership takes allegations of bias or discrimination against community members seriously. | 34% | 47% | 4% | 3% | 12% |

Although employees were overall supporting of these statements indicating that there is a strong culture of respect and accountability, there were some variances when analyzing responses based on subdivision, rank, and job class.

- **Sworn staff with the Lieutenant rank or higher agreed with each of these four statements at a rate of 93% or higher, far above the average.**
- Compared to sworn staff, 66% of civilian line staff agreed with Statement #10, 60% agreed with Statement #13, and 57% agreed with Statement #15. While still positive, these percentages were below those of the Division overall, and far below those of sworn management.
- Statement #13 asked whether staff agreed that they felt comfortable reporting a policy violation without fear of retaliation. Overall, 77% of employees agreed and

EX 7

14% disagreed; however, Communications staff agreed with this statement just 57% of the time and disagreed 29% of the time.

While agreement was high for most statements in this section, the responses provided by respondents who identified as Black/African American reveal a different set of opinions.

- Overall, employees agreed 79% of the time with Statement #10 that there is a culture of respect for others within the Division; however, there was a split of 46% agreement and 46% disagreement among Black respondents.
- Overall, 70% of employees agreed with Statement #15, that the Division takes seriously allegations of internal discrimination; however, just 39% of Black respondents agreed, compared to 42% disagreement.
- Overall, there was 81% agreement from respondents over Statement #16, that Division leadership takes allegations of bias or discrimination against community members seriously; however, there was just 51% agreement among Black respondents, and 30% disagreement.

## 7.      Staffing and Recruitment

Respondents were asked whether staffing levels have kept up with the needs of the City, and whether the Division does a good job at finding qualified candidates for employment. We highlight the following observations:

- Only 9% of employees agreed that staffing levels have kept up with the needs of the City, while 87% disagreed.
- About 54% of employees agreed that the Division performs a good job at finding qualified candidates for employment, while 38% disagreed.

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|-----|-----|-----|-----|-----|
| 4 | In general, staffing levels have kept up with the needs of the City. | 2% | 7% | 29% | 58% | 4% |
| 6 | We do a good job finding qualified candidates for employment in the Columbus Division of Police. | 8% | 46% | 26% | 12% | 8% |

## 8.      Technology

Respondents were asked whether they maintained the technology needed to be efficient at their job. As the table shows, 51% of employees agreed with this statement, while 47% disagreed. When analyzed by subdivision, Investigations staff had the lowest level of agreement with this statement at 55% while 44% disagreed.

EX 7

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|-----|-----|-----|-----|-----|
| 17 | I have the technology I need to be efficient in my job. | 9% | 42% | 30% | 17% | 3% |

## 9. Quality of Training by Topic

The next section of the survey asked respondents to rate the quality of various types of training available to them through the Division of Police. The following table shows how frequently each training type was ranked as good, very good, acceptable, poor, or very poor. It also shows a weighted rating for each training type on a scale of 1-5, where 1 is very poor and 5 is very good.[6]

| Training Type | Very Good | Good | Acceptable | Poor | Very Poor | Weighted Rating |
|---------------|-----------|------|------------|------|-----------|-----------------|
| De-escalation | 21.8% | 37.4% | 22.6% | 2.7% | 1.5% | 3.88 |
| Crowd control | 20.7% | 32.9% | 23.5% | 5.0% | 1.6% | 3.79 |
| Implicit bias | 20.8% | 33.8% | 20.0% | 4.4% | 3.6% | 3.77 |
| Mental health first aid | 20.6% | 36.0% | 22.5% | 6.5% | 1.7% | 3.77 |
| Cultural competency | 16.0% | 32.5% | 24.1% | 9.3% | 2.1% | 3.60 |

As the table shows, "good" was the most common rating for all training types, with other responses mostly spread between "very good" and "acceptable". Staff generally have a positive opinion of the Division's training, with some more granular variations which are explored in the following points.

### (1) Management has a more favorable view of training while civilian staff viewed training less favorably.

Sworn supervisors and management tend to have better opinions of the Division's training than line staff. Civilian staff also tend to have a less favorable opinion of training (with the exception of the "crowd control" training category) than sworn personnel. The chart below shows a comparison of weighted averages on these same training-related questions, broken down by classification/rank.

---

[6] Because respondents could choose "no opinion", the percentages do not all add up to 100%. The weighted average takes this into account by presenting only the averages of those respondents who did make a selection.

EX 7



**(2)    Black respondents view the Division's Implicit Bias and Cultural Competency training less favorably.**

The chart below shows a comparison of weighted averages on the same training-related questions, broken down by the race/ethnicity of respondents.



As the chart shows, the overall weighted average corresponds closely with the responses of white survey participants, because an overwhelming majority of these participants were white. In regards to training on implicit bias and cultural competency, respondents who identified as Black/African-American produced a weighted average of about 3 ("acceptable"), while the average of white respondents (and the survey as a whole) was above 3.5, closer to 4 ("good"). Some other race/ethnicity groups, such as Native American or Alaska Native and Native Hawaiian or Pacific Islander, produced responses which differed greatly from the average, but the sample size of these groups was so small (less than 10, compared to over 100 Black respondents and several hundred white respondents) that it is impossible to determine a pattern based solely on these.

EX 7

## 10.      Discrimination and Bias

Respondents were asked about discrimination and bias within the Division of Police. These questions focused on instances of discrimination that respondents have witnessed or experienced, or instances of bias against members of the public. We summarize our observations in the following section.

### (1)      About 29% of respondents have witnessed discrimination within the Division.

The first question in this section asked respondents if they have witnessed discrimination within the Division of Police in the previous 5 years. The following table summarizes their responses.

| Response | Count | Percentage |
|---|---|---|
| Yes | 299 | 29.1% |
| No | 728 | 70.9% |
| **Total** | **1,027** | **100.0%** |

Of those who responded "yes", the following table summarizes the type of discrimination respondents indicated they have witnessed.

| Response | Count | Percentage |
|---|---|---|
| Racial | 204 | 46.8% |
| Gender | 117 | 26.8% |
| Sexual Orientation | 43 | 9.9% |
| Other | 72 | 16.5% |

In addition, nearly 70% of Black respondents said that they have witnessed discrimination within the Division of Police, as opposed to less than a quarter of white respondents. The following chart summarizes the volume of respondents who have witnessed discrimination by race/ethnicity.

EX 7



**Black Respondents Are More Likely To Have Witnessed Discrimination**

**(2)    About 20% of respondents have personally experienced discrimination within the Division of Police.**

Respondents were asked whether they have personally experienced discrimination within the Division of Police in the previous 5 years, of which nearly 20% responded "yes."

| Response | Count | Percentage |
|----------|-------|------------|
| Yes | 196 | 19.5% |
| No | 811 | 80.5% |
| **Total** | **1,007** | **100.0%** |

Of those who responded "yes", the following table summarizes the types of discrimination respondents claim to have witnessed, racial discrimination ranking as the most frequent form of discrimination.

| Response | Count | Percentage |
|----------|-------|------------|
| Racial | 110 | 45.1% |
| Gender | 61 | 25.0% |
| Sexual Orientation | 15 | 6.1% |
| Other | 58 | 23.8% |

In addition, Black respondents were more than twice as likely than white respondents to say they experienced discrimination. More than half of Black respondents said they have experienced discrimination within the Division, as observed in the following chart:

EX 7



(3)    **About 8% of respondents witnessed an officer demonstrate bias against toward members of the public.**

Respondents were asked to indicate "yes" or "no" to the following statement: "I have witnessed another officer demonstrate bias against a member of the public in the past five years." The following table summarizes their responses.

| Response | Count | Percentage |
|----------|-------|------------|
| Yes | 80 | 7.9% |
| No | 929 | 92.1% |
| **Total** | **1,009** | **100.0%** |

At almost 30%, Black respondents were much more likely to say that they have witnessed officer bias against a member of the public than white officers, as observed in the following chart:

EX 7



## 11.    Workload

Respondents were asked to indicate how heavy they believed their workload to be, relative to their capacity. The following table summarizes their responses.

| Response | Count | Percentage |
|---|---|---|
| I am always busy and can never catch up. | 263 | 25.6% |
| I am often busy but can generally keep up. | 576 | 56.1% |
| I have the right balance of work and time available. | 177 | 17.2% |
| I am often not very busy. | 11 | 1.1% |
| **Total** | **1,027** | **100.0%** |

More than half of staff consider themselves busy but able to keep up, while about a quarter believe that they are always busy. Less than 20% of respondents claim to have the right balance of work or excess capacity.

### (1)    Management tends to feel busier than line staff.

Management staff (both sworn and civilian) are more likely than line staff to say that they are always busy and unable to catch up. Sworn management staff of the Lieutenant rank or higher feel particularly busy; more than a third of these respondents said they never catch up. The following table summarizes their responses to this workload question, broken down by classification/rank.

EX 7

| Classification/Rank | Always Busy | Often Busy | Right Balance | Not Busy |
|---|---|---|---|---|
| Civilian - Line Employee | 19.5% | 58.6% | 19.5% | 2.4% |
| Civilian - Manager or Supervisor | 28.2% | 53.8% | 15.4% | 2.6% |
| Sworn Officer - Lieutenant or Higher | 35.1% | 45.6% | 17.5% | 1.8% |
| Sworn Officer - Line Level | 26.9% | 54.2% | 18.1% | 0.8% |
| Sworn Officer - Sergeant | 22.1% | 67.1% | 10.7% | 0.0% |

**(2)     Staff from Investigations and the Office of the Chief feel busier than other respondents.**

The Office of the Chief and the Investigative subdivision stand out from the other subdivisions as their perceived workload is much heavier than the others. While most groups had between 10-25% of respondents say they have the right balance of work and capacity, just 5.9% of Investigations staff and 0.0% of the Chief's Office made this selection. Likewise, while no other subdivision had more than 29% of staff claim to be always busy and unable to catch up, 38.9% of the Chief's Office and 49.8% of Investigations respondents selected this answer. The following table summarizes the responses to this workload question, broken down by current assignment.

| Current Assignment | Always Busy | Often Busy | Right Balance | Not Busy |
|---|---|---|---|---|
| Administrative Subdivision | 28.4% | 59.7% | 11.9% | 0.0% |
| Homeland Security - Communications | 23.8% | 59.5% | 14.3% | 2.4% |
| Homeland Security - Other | 18.5% | 56.9% | 23.1% | 1.5% |
| Investigative Subdivision | 49.8% | 43.8% | 5.9% | 0.5% |
| Office of the Chief of Police | 38.9% | 61.1% | 0.0% | 0.0% |
| Patrol - North Subdivision | 14.9% | 63.3% | 21.4% | 0.5% |
| Patrol - South Subdivision | 20.0% | 58.9% | 20.4% | 0.8% |
| Support Services Subdivision | 15.4% | 55.1% | 25.7% | 3.7% |

**12.     Patrol**

Respondents who indicated they are assigned to one of the Patrol subdivisions were directed to answer a specific set of questions. There were 459 participants in this section, and their answers are summarized in the following table.

EX 7

| # | Statement | SA | A | D | SD | N/O |
|---|---|---|---|---|---|---|
| 1 | Patrol staff resources are adequate to meet the needs in the City. | 1% | 14% | 34% | 51% | 1% |
| 2 | We have the proactive time needed to be engaged with the community on identified problems. | 2% | 12% | 45% | 39% | 2% |
| 3 | Patrol precincts have relatively the same amount of workload. | 1% | 9% | 31% | 57% | 1% |
| 4 | Back-up is timely, when needed. | 15% | 58% | 19% | 7% | 1% |
| 5 | Civilians could handle some of the work currently handled by sworn officers in the field. | 22% | 36% | 17% | 19% | 6% |
| 6 | Our response times to lower and medium priority calls are appropriate. | 5% | 35% | 36% | 20% | 4% |
| 7 | Our response times to high priority calls are appropriate. | 26% | 58% | 12% | 3% | 1% |
| 8 | Support from Forensics in the field meets our needs. | 4% | 39% | 31% | 10% | 16% |
| 9 | The crime analysis information provided to me is useful. | 16% | 57% | 12% | 7% | 9% |
| 10 | Our fleet is in good condition. | 2% | 31% | 30% | 35% | 3% |

Additional analyses are highlighted in the following observations for each statement:

- **Respondents believe staffing and workload distribution are issues. This is especially true of supervisors and management.** Statements #1, #2, and #3 dealt with the sufficiency of staffing and the distribution of workload among patrol precincts in the Division. They each received less than 15% agreement and at least 84% disagreement. Responses from personnel with the rank of sergeant, lieutenant, or higher offered even more disagreement and less agreement.
- Response times and support for emergencies are considered to be appropriate and timely. Statement #4 regarding the timeliness of backup, received 73% agreement and 23% disagreement; however, lieutenant-level staff and above agreed 60% of the time and disagreed 40% of the time. Statement #7, that response times to high priority calls are appropriate, received 84% agreement and just 15% disagreement.
- Participants believe response times to low and medium priority calls could be better. Statement #6, that response times to lower and medium priority calls are appropriate received 40% agreement and 56% disagreement overall. Among those who identified as sworn officers with the rank of lieutenant or higher, the responses were more extreme, with 16% agreement and 84% disagreement.
- Line staff are more open to civilianization than management and supervisors. Statement #5, that civilians could handle some of the work currently handled by sworn officers in the field received 58% agreement and 36% disagreement overall.

EX 7

Opinions were more ambivalent among sergeants (49% agreement, 41% disagreement), and split evenly among those at the rank of lieutenant or above (44% agreement, 44% disagreement).

- **Crime analysis information is considered to be more useful than support from the Forensics unit.** Statement #8, that support from Forensics in the field meets patrol needs, received 43% agreement and 41% disagreement. Statement #9, however, regarding the usefulness of crime analysis information provided to patrol, received 73% agreement and just 19% disagreement.
- A majority of respondents believe the patrol fleet is not in good condition. **Statement #10 said that the fleet is in good condition. It received 65% disagreement and just 33% agreement.**

## 13.    Investigations

Respondents who indicated that they are assigned to the Investigative subdivision were directed to a specific set of questions. There were 194 participants in this section. The following table summarizes their responses regarding each of the following statements.

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|----|----|----|----|----|
| 1 | We have the investigative staff we need to follow up on cases which have the potential to be solved. | 1% | 21% | 46% | 29% | 2% |
| 2 | Our approach to case management is effective in prioritizing our caseloads. | 4% | 54% | 27% | 10% | 6% |
| 3 | I regularly review my cases with my supervisor. | 11% | 56% | 19% | 5% | 8% |
| 4 | The allocation of sworn personnel among investigative units is appropriate. | 1% | 21% | 44% | 27% | 8% |
| 5 | Investigator call-outs are not unreasonably frequent. | 6% | 66% | 10% | 4% | 14% |
| 6 | We are effectively addressing proactive investigations (e.g., narcotics). | 3% | 33% | 24% | 18% | 23% |
| 7 | We screen out the right number of cases. | 3% | 38% | 25% | 14% | 21% |
| 8 | Caseloads seem about equal for all of the detectives in my unit. | 7% | 52% | 23% | 13% | 5% |
| 9 | I work a caseload which is reasonable given the type of investigations I handle. | 2% | 49% | 27% | 18% | 5% |
| 10 | When I had an investigative assignment I received the training I needed to be effective. | 14% | 58% | 13% | 11% | 3% |
| 11 | The crime analysis and intelligence support provided to me is useful to my work. | 27% | 48% | 9% | 10% | 7% |

Additional analyses are highlighted in the following observations for each statement:

EX 7

- **Staffing and the allocation of personnel is an issue for respondents**. Statement #1 said, "We have the investigative staff we need to follow up on cases which have the potential to be solved." It received just 22% agreement and 75% disagreement. Statement #4, that allocation of sworn personnel among investigative units is appropriate similarly received 22% agreement and 71% disagreement.

- **Respondents have mixed opinions on case volume and the distribution of caseload**. Statement #8 said, "Caseloads seem about equal for all of the detectives in my unit." It received a small majority of 59% agreement, compared to 36% disagreement. Statement #9 said "I work a caseload which is reasonable given the type of investigations I handle." This statement was met with a smaller majority of 51% agreement, compared to 45% disagreement.

- **Respondents have mixed opinions on the way the Division prioritizes investigations, but very few agree strongly that it is done well**. Statement #2, that the approach to case management is effective in prioritizing our caseloads, received 58% agreement and 37% disagreement. Statement #6, that the Division is effectively addressing proactive investigations such as narcotics, received 36% agreement and 42% disagreement. Statement #7 said, "We screen out the right number of cases". It received 41% agreement and 39% disagreement. Each of these three statements received no more than 4% "strongly agree" responses. Statements 6 and 7 both received over 20% "No Opinion" responses.

- **Most investigative staff feel that they have sufficient supervisory review time**. Statement #3 said: "I regularly review my cases with my supervisor." It received a majority of 67% agreement, compared to 24% disagreement.

- **Investigator call-outs are minimized within reason**. Statement #5, that investigator call-outs are not unreasonably frequent, received a strong majority of 72% agreement and just 14% disagreement.

- **Most respondents believe investigator training is effective**. Statement #10 said, "When I had an investigative assignment I received the training I needed to be effective". It received a majority of agreement, with 72% of respondents agreeing and 24% disagreeing.

- Investigators believe they receive useful help from other units in the Division. **Statement #11 said, "The crime analysis and intelligence support provided to me is useful to my work". The statement was met with 75% agreement and 19% disagreement.**

## 14.    Communications

Respondents who indicated that they are assigned to the Homeland Security Communications subdivision were directed to a specific set of questions. There were 39 participants, of which their responses to similar statements regarding staffing and service delivery are summarized in the following table.

EX 7

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|-----|-----|-----|-----|-----|
| 1 | We provide a high level of service to the officers we serve. | 44% | 46% | 8% | 3% | 0% |
| 2 | We provide a high level of service to the public. | 28% | 56% | 15% | 0% | 0% |
| 3 | Our current staffing levels are sufficient to cover all assignments. | 0% | 0% | 28% | 72% | 0% |
| 4 | Our communications equipment has kept up with changing technology for 911 environments. | 0% | 36% | 26% | 38% | 0% |

Overall, Communications staff believe they provide high levels of service to officers and the public, despite some outdated equipment and extremely insufficient staffing levels.

- Statement #1 and Statement #2 focused on the level of service provided by the communications staff to officers and members of the public. Both of these statements received overwhelming majorities of at least 84% agreement and no more than 15% disagreement.
- Statement #3, that current staffing levels are sufficient to cover all assignments, received zero agreeing responses. It was met with a unanimous majority of 100% disagreement, 72% of which was "strongly disagree".
- **Statement #4, regarding whether communications equipment has kept up with changing technology for 911 environments, received a somewhat negative response; 36% of respondents agreed, while 64% disagreed.**

## 15. Administrative Support

Respondents who indicated that they work in the Administration or Support Services subdivisions were directed to a specific set of statements to review. A total of 195 participants responded, of which their responses are shown in the table below.

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|-----|-----|-----|-----|-----|
| 1 | Sworn and civilian staff work well together. | 25% | 58% | 8% | 5% | 4% |
| 2 | I have adequate opportunity for career advancement in the Columbus Division of Police. | 12% | 33% | 25% | 15% | 14% |
| 3 | Staff in my unit have the right employee classifications for the work that we perform. | 17% | 48% | 18% | 11% | 6% |
| 4 | My unit has the right number of employees assigned to it. | 10% | 30% | 27% | 30% | 4% |
| 5 | Administrative support functions are appropriately organized. | 13% | 41% | 19% | 10% | 16% |

EX 7

| # | Statement | SA | A | D | SD | N/O |
|---|-----------|----|----|----|----|-----|
| 6 | We provide sufficient training to civilian personnel. | 11% | 43% | 20% | 12% | 14% |

Additional analyses are highlighted in the following observations for each statement:

- **Respondents believe sworn and civilian personnel work well together.** Statement #1 focused on the working relationship between sworn and civilian staff. It received a very strong majority of 83% agreement and just 13% disagreement.
- **Administrative staff are not convinced that their units have the right number of staff**. Statement #4 said, "My unit has the right number of employees assigned to it". The statement received more disagreement (57%) than agreement (40%), which is consistent with responses earlier in the survey regarding the insufficiency of staffing.
- **Respondents generally believe that administrative staff are properly classified and organized.** Statement #3, that staff have the right employee classifications for the work that they perform, received 65% agreement and 29% disagreement. Statement #5, that administrative support functions are appropriately organized, received 54% agreement and 29% disagreement.
- Staff have mixed opinions on the availability of career advancement, but are slightly more confident when it comes to receiving training. **Statement #2 said, "I have adequate opportunity for career advancement in the Columbus Division of Police". This statement received a thin plurality of 45% agreement and 40% disagreement. Statement #6, that the Division provides sufficient training to civilian personnel, was met with a small majority of 54% agreement and 32% disagreement.**

## 16. Desired Characteristics in the Next Chief

All survey respondents were asked to rank the importance of a number of characteristics for the next Chief of the Division of Police. The following table shows how frequently each characteristic was rated as least important, moderately important, and most important. It also shows a weighted total on a scale from 1-5, with 1 being least important, 3 being moderately important, and 5 being most important.

EX 7

| Characteristic | Most Important | Moderately Important | Least Important | Weighted Rating |
|---|---|---|---|---|
| Strong leader | 95.3% | 4.5% | 0.2% | 4.90 |
| Effective communicator | 85.4% | 14.2% | 0.4% | 4.70 |
| Knowledge of Columbus | 61.0% | 32.6% | 6.5% | 4.09 |
| Labor relations skills | 50.2% | 44.2% | 5.6% | 3.89 |
| Big city experience | 52.3% | 38.7% | 9.0% | 3.87 |
| Innovator | 48.4% | 42.8% | 8.7% | 3.79 |
| Community orientation | 36.9% | 51.8% | 11.3% | 3.51 |
| Consensus builder | 35.0% | 51.6% | 13.4% | 3.43 |
| Sensitive to diversity | 30.5% | 46.1% | 23.4% | 3.14 |
| Diverse background | 25.7% | 40.5% | 33.8% | 2.84 |

A number of observations can be drawn from this table, as outlined in the following points:

- **Respondents care about leadership, communication, and local knowledge**. As the table shows, strong leadership and effective communication are the most important factors to most staff (both achieved a weighted average close to 5), followed by a knowledge of Columbus. The desire for a strong leader and good communicator was very consistent; these were the top-rated traits across every assignment, division, and demographic group.

- Respondents care about many other traits, but not as much as the aforementioned ones. **Characteristics such as labor relations skills, big city experience, innovation, community orientation, and consensus building were rated as important, but no more than half of respondents considered them "very important".**

- Respondents as a whole are less concerned with sensitivity to diversity and a diverse background. **These two traits, respectively, were rated just above and below the midpoint of 3 ("moderately important"). Less than a third of respondents considered them "very important", and they received substantially greater numbers of "least important" responses than any other characteristics.**

EX 7

**(1)    Desired characteristics for the next Chief differed by class and rank.**

The following chart shows the weighted averages of priorities for characteristics of the next Chief, broken down by categories of classification and rank. Characteristics are shown only if a notable conclusion about respondent priorities or differences in priorities can be seen in the responses.



- Management personnel care less about labor relations ability and big city experience than line staff. This trend was consistent across sworn and civilian personnel.
- Civilian staff care more about community orientation, sensitivity to diversity, and a diverse background than sworn staff. B**oth management and line** civilian **staff rated these three characteristics as more important than sworn personnel did, particularly regarding the two diversity-related characteristics.**

**(2)    Preference for characteristics regarding community, sensitivity, and diversity differed by subdivision.**

The following chart shows the weighted averages of priorities for characteristics of the next Chief, broken down by respondents' current assignment. Characteristics are shown only if a notable conclusion about respondent priorities or differences in priorities can be seen in the responses.

EX 7



- The Chief's Office, Administration, Communications, and Support Services care more about Community Orientation than Patrol, Investigations, and Homeland Security personnel. As the chart shows, the weighted average for the characteristic of Community Orientation aligns closely with the largest respondent groups (Patrol and Investigations). Many other subdivisions, however, place a higher-than-average level of priority on this characteristic.
- Patrol, Investigations, and Homeland Security respondents place less emphasis on diversity than some of the smaller subdivisions. **The Communications and Support Services subdivisions, as well as the Administration subdivision, rated Sensitivity to Diversity and having a Diverse Background as more important than the large subdivisions. The Chief's Office places importance on Sensitivity to Diversity, but not necessarily on having a Diverse Background.**

**(3)    Black respondents prioritize diversity much more than other respondents.**

The following chart shows the weighted averages of priorities for characteristics of the next Chief, broken down by respondents' race/ethnicity. Characteristics are shown only if a notable conclusion about respondent priorities or differences in priorities can be seen in the responses.

EX 7



As the chart shows, respondents who identified as Black/African-American rated diversity issues as much more important than survey participants of any other race/ethnicity. Among most respondents, these were the two least important characteristics. Among Black respondents, they were behind only leadership and communication in terms of importance.

Black participants also tended to prioritize community orientation more than other participants. All of these differences from the weighted average may align with the indications earlier in the survey that Black respondents have a poorer opinion than others of the implicit bias and cultural competency training in the Division of Police.

EX 7

# 5 Patrol North and South Subdivisions

1.      **Analysis of Patrol Workloads**

The following sections provide analysis of patrol workload and other issues relating to the effectiveness of field services.

(1)     **CAD Analysis Methodology**

Our project team has calculated the community-generated workload of the division by analyzing incident records in the computer aided dispatch (CAD) database, covering the entirety of a period of one year from September 1, 2017 through August 31, 2018. For incidents to be identified as community-generated calls for service and included in our analysis of patrol, each of the following conditions needed to be met:

·       The incident must have been unique.

·       The incident must have first been first created within the period lasting from September 1, 2017 through August 31, 2018.

·       The incident must have involved at least one officer assigned to a regular patrol role, as identified by the individual unit codes of each response to the call. This does not include any specialized units, such as CRT or Campus Walkie Crew teams.

·       The incident response must have had a time stamp unit for the unit being dispatched, with an incident type that corresponds to a community-generated event (e.g., directed patrol or test calls are not included).

·       There must have been no major irregularities or issues with the data recorded for the incident that would prevent sufficient analysis, such as having no unit code or time stamp for the call closure.

·       All self-initiated activity was excluded.

After filtering through the data using the methodology outlined above, the remaining incidents represent the community-generated calls for service handled by CDP patrol units.

EX 7

**(2)    Calls for Service by Hour and Weekday**

The following table displays the total number of dispatched calls for service handled by patrol units by each hour and day of the week, based on the call creation time stamp recorded in CAD data:

**Dispatched Calls for Service by Hour and Weekday**

| Hour | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Total |
|------|-----|-----|-----|-----|-----|-----|-----|-------|
| **12am** | 2,781 | 2,028 | 1,926 | 1,902 | 1,900 | 2,111 | 2,649 | 15,297 |
| 1am | 2,506 | 1,640 | 1,476 | 1,569 | 1,500 | 1,677 | 2,302 | 12,670 |
| 2am | 2,300 | 1,316 | 1,249 | 1,249 | 1,346 | 1,537 | 2,039 | 11,036 |
| 3am | 2,010 | 1,155 | 942 | 1,052 | 1,025 | 1,270 | 1,738 | 9,192 |
| **4am** | 1,247 | 905 | 888 | 896 | 915 | 1,014 | 1,247 | 7,112 |
| 5am | 959 | 900 | 825 | 835 | 815 | 892 | 953 | 6,179 |
| 6am | 867 | 1,076 | 1,089 | 1,095 | 1,133 | 1,091 | 870 | 7,221 |
| 7am | 1,016 | 1,681 | 1,666 | 1,675 | 1,696 | 1,689 | 1,290 | 10,713 |
| **8am** | 1,372 | 2,098 | 2,192 | 2,120 | 2,131 | 2,259 | 1,726 | 13,898 |
| 9am | 1,817 | 2,432 | 2,441 | 2,318 | 2,385 | 2,409 | 2,013 | 15,815 |
| 10am | 2,234 | 2,418 | 2,477 | 2,447 | 2,397 | 2,418 | 2,374 | 16,765 |
| 11am | 2,422 | 2,644 | 2,590 | 2,513 | 2,548 | 2,708 | 2,619 | 18,044 |
| **12pm** | 2,774 | 2,642 | 2,692 | 2,614 | 2,647 | 2,853 | 2,810 | 19,032 |
| 1pm | 2,691 | 2,666 | 2,763 | 2,554 | 2,518 | 2,684 | 2,707 | 18,583 |
| 2pm | 2,720 | 2,746 | 2,722 | 2,704 | 2,659 | 2,988 | 2,726 | 19,265 |
| 3pm | 2,846 | 3,128 | 3,197 | 3,169 | 3,065 | 3,433 | 2,899 | 21,737 |
| **4pm** | 2,901 | 3,329 | 3,443 | 3,342 | 3,374 | 3,719 | 2,927 | 23,035 |
| 5pm | 2,961 | 3,513 | 3,455 | 3,493 | 3,400 | 3,687 | 2,893 | 23,402 |
| 6pm | 3,017 | 3,293 | 3,285 | 3,279 | 3,224 | 3,623 | 3,157 | 22,878 |
| 7pm | 2,977 | 2,992 | 2,952 | 3,107 | 3,041 | 3,317 | 2,998 | 21,384 |
| **8pm** | 3,057 | 2,895 | 2,969 | 2,889 | 2,999 | 3,169 | 3,085 | 21,063 |
| 9pm | 2,808 | 2,748 | 2,642 | 2,749 | 2,737 | 3,085 | 3,001 | 19,770 |
| 10pm | 2,628 | 2,457 | 2,427 | 2,481 | 2,525 | 2,980 | 3,087 | 18,585 |
| 11pm | 2,354 | 2,233 | 2,251 | 2,271 | 2,296 | 2,910 | 3,095 | 17,410 |
| Total | 55,265 | 54,935 | 54,559 | 54,323 | 54,276 | 59,523 | 57,205 | 390,086 |

As demonstrated in the table, weekends have a moderately lower workload during the late afternoon hours from 3:00PM to 6:00PM compared to the same period on weekdays, but have significantly more calls occurring during the late evening and early nighttime hours (typically between 9:00PM and 4:00AM).

EX 7

It is important to note that in the time period used for the dataset (365 days), there is one additional Friday compared to the other days of the week. This could account for a few thousand more calls, which partially but not entirely covers the difference between Friday and the days.

The following chart provides the same statistics for call activity by hour alone:

**Calls for Service by Hour and Weekday**



Calls for service peak around 5:00PM, falling at a relatively normal rate until 5:00AM, where it reaches the lowest level of activity.

## (4)      Most Common Types of Calls for Service

The following table provides the ten most common incident categories of calls for service handled by patrol units over the time period analyzed, as well as the average call handling time (HT)[7] for each:

---

[7] Handling time is defined as the total time in which a patrol unit was assigned to an incident. It is calculated as the difference between the recorded time stamps the unit being dispatched and cleared from the incident.

EX 7

**Most Common Dispatched Call for Service Categories**



| Incident Type | # CFS | HT |
|---|---|---|
| **DISTURBANCE** | 60,582 | 38.1 |
| **BURGLARY ALARM** | 34,919 | 19.7 |
| **UNKNOWN COMPLAINT** | 21,924 | 45.7 |
| **INFORMATION / ASSISTANCE** | 17,030 | 59.3 |
| **DOMESTIC VIOLENCE** | 16,802 | 77.6 |
| **DOMESTIC DISPUTE** | 15,605 | 43.7 |
| **AUTO CRASH – PROP DMG** | 14,672 | 80.6 |
| **SUSPICIOUS PERSON** | 14,578 | 31.1 |
| **THEFT REPORT** | 11,952 | 65.8 |
| **AUTO CRASH HIT SKIP-PROP DMG** | 10,383 | 77.7 |
| All Other Types | 171,639 | 52.7 |
| **Total** | **390,086** | **49.4** |

Disturbances are by far the most common call for service category, representing around 16% of all incidents. A number of trends can also be seen from the blue bars, which represent when each type of call is most likely to occur. Unsurprisingly, non-injury crashes spike at commute times, particularly in the evening. The vast majority of suspicious person calls occur during nighttime hours, as do unknown complaints calls. Domestic disputes and disturbances both peak during the evening hours.

**(5)     Analysis of Patrol Response Times**

The following table provides the average handling time and distribution of response times for community-generated calls for service with documented arrival times in the most common response time categories:

EX 7

**Distribution of Response Times[8] by Priority Level**



| Priority | # CFS | % | Avg. HT | Response Time (min.) |
|---|---|---|---|---|
| 1 | 7,000 | 2% | 78.1 | |
| 2 | 176,155 | 45% | 51.0 | |
| 3 | 147,032 | 38% | 45.7 | |
| 4 | 55,846 | 14% | 52.2 | |

Response times to Priority 1 calls are likely to be within 10 minutes, with flatter distributions for priority 2 and 3 calls, which combine for about 83% of all calls for service.

It is important to note that around 35% of all calls for service assigned priority levels 1 through 4 could not have their response time calculated, primarily because the incident did not have a documented arrival time. The quickest response time by a patrol officer was always used in calculating the average, regardless of whether that unit was considered the primary unit from a standpoint of handling time.

The next chart provides a different way of looking at response time performance, showing the likelihood that a call is responded to within a specified timeframe, focusing on priority levels 1, 2, 3, and 4:

---

[8] For clarification, we are defining response time as the time from the call creation time stamp recorded in CAD data (representing the time that the event was completed by the call taker and sent for dispatch) to the time when the first patrol officer arrives on scene. A minimum of one second (to remove data issues) is required, with no maximum time set.

EX 7



A number of observations can be made from the chart and how response times are visualized:

- The vast majority (86%) of **Priority 1** calls, the most severe major category, are responded to within 10 minutes.

- Likewise, over three quarters (78%) of **Priority 2** calls are responded to within 20 minutes.

- A similar percentage (76%) of **Priority 3** calls are responded to within 40 minutes.

It is important to not extrapolate too far from these findings, however, given that response times could be higher or lower for many reasons. In urban areas, the most common factor that delays response times beyond 30 minutes are other calls tying up resources, requiring calls to be held until an officer becomes available.

In situations where patrol proactivity is extraordinarily low (under 5-10% for specific hours, or less than 20-25% overall), it can be expected that queues of pending calls will build up frequently, and that responses to low priority calls in particular have longer response times.

EX 7

These issues are often expressed by relatively significant numbers of calls that have extreme response times of two hours or more. At even just one hour, we can assume that no resources were available to handle the call when it occurred. Low-priority calls for service will often bear the brunt of these issues, as resources are diverted to handle incoming higher-priority incidents.

In order to examine how often these extreme response times occur, the following table maps out the percentage of calls that are responded to within timeframes that extend beyond those of the previous chart. Lines have been drawn at the point where 99% (rounded) of calls have been responded to:

**% of CFS Responded to Within a Given Timeframe**

|  | Response Time | Priority 1 | Priority 2 | Priority 3 | Priority 4 |
|---|---|---|---|---|---|
| *Within…* | **1 hour** | 99.1% | 96.6% | 83.9% | 70.7% |
| | **2 hours** | 99.8% | 99.4% | 95.5% | 87.6% |
| | **3 hours** | 100.0% | 99.9% | 98.5% | 94.4% |
| | **4 hours** | 100.0% | 100.0% | 99.5% | 97.2% |
| | **5 hours** | 100.0% | 100.0% | 99.8% | 98.6% |
| | **6 hours** | 100.0% | 100.0% | 99.9% | 99.2% |
| | **7 hours** | 100.0% | 100.0% | 99.9% | 99.6% |
| | **8 hours** | 100.0% | 100.0% | 100.0% | 99.8% |
| | **9 hours** | 100.0% | 100.0% | 100.0% | 99.9% |
| | **10 hours** | 100.0% | 100.0% | 100.0% | 99.9% |
| | *Median* | 4.4 min. | 9.3 min. | 17.6 min. | 28.4 min. |
| | # of CFS | 7,000 | 176,155 | 147,032 | 55,846 |

Clearly, it is an exceptionally rare event for the highest-priority calls to take longer than an hour to be responded to. About 88% of Priority 4 calls are responded to within two hours, with that percentage jumping to 97% by the four-hour mark.

As demonstrated by the previous chart, most response times occur within a narrow range of values, such as 0-12 minutes for Priority 1 calls. However, the relatively small percentage of calls outside of that range are scattered across an extremely wide range; Priority 4 calls had at least one value above 10 hours. These outliers can greatly skew average response times.

To adjust for this and present a clearer and more realistic picture of patrol call answering, using median response times are a far more effective metric than average response time. By using the median, which takes the middle point at which there are an equal number of values above and below it, outliers are not able to skew the data as much as they would

EX 7

in an average. For instance, at many of times of the day in Columbus, the average response time, which is more skewed by outliers, is twice that of the median.

The following table examines median response times by hour, demonstrating that the lower-activity hours have around the same response times as the higher-activity hours:

**Median Response Time by Hour** *(All Priority Levels)*

| Hour | Median RT |
|------|-----------|
| **12am** | 8.8 |
| 1am | 8.1 |
| 2am | 7.8 |
| 3am | 7.8 |
| **4am** | 7.6 |
| 5am | 9.8 |
| 6am | 17.3 |
| 7am | 12.2 |
| **8am** | 10.3 |
| 9am | 10.4 |
| 10am | 10.2 |
| 11am | 11.4 |
| **12pm** | 11.4 |
| 1pm | 18.3 |
| 2pm | 28.0 |
| 3pm | 17.6 |
| **4pm** | 13.8 |
| 5pm | 13.8 |
| 6pm | 15.5 |
| 7pm | 15.1 |
| **8pm** | 12.1 |
| 9pm | 14.0 |
| 10pm | 20.7 |
| 11pm | 13.7 |
| **Overall** | **12.7** |

2:00PM, and 10:00PM are clear outliers, but it should be noted that these are shift change hours. 6:00AM is as well, though the jump is not as severe. Call activity does not change significantly during any of these times, and it is unlikely that the increase in response times is primarily due to workload.

## (6)  Geographic Concentrations of Calls for Service

The following map provides a visualization of where dispatched call for service hotspots occur, without weighting values for the number of backup unit responses, unit handling time, or the relative severity of calls:

EX 7



It is important to note that hotspot maps do not illustrate which areas have more or fewer calls, but rather where calls are geographically dense and closely concentrated.

Light gray shading in the background was used for the borders of the jurisdiction, which are relatively complex. Clearly, significant concentrations of patrol workload exist in the core of the city – particularly downtown, south of downtown, and to the west of the Scioto River.

## 2.    Analysis of Patrol Resource Needs

Analysis of the community-generated workload handled by patrol units is at the core of analyzing field staffing needs. Developing an understanding of where, when, and what types of calls are received provides a detailed account of the service needs of the community. By measuring the time used in responding and handling these calls, the staffing requirements for meeting the community's service needs can then be determined.

EX 7

To provide a high level of service, it is not enough for patrol units to function as call responders. Instead, officers must have sufficient time outside of community-driven workload to proactively address community issues, conduct problem-oriented policing, and perform other self-directed engagement activities within the community. As a result, patrol staffing needs are calculated not only from a standpoint of the capacity of current resources to handle workloads, but also their ability to provide a certain level of service beyond responding to calls.

With this focus in mind, the following sections examine the process used by the project team to determine the patrol resource needs of the Columbus Division of Police based on current workloads, staff availability, and service level objectives.

**(1)      Overview of the Resource Needs Analysis**

An objective and accurate assessment of patrol staffing requires analysis of the following three factors:

*i.*      The number of community-generated workload hours handled by patrol.

*ii.*     The total number of hours that patrol is on-duty and able to handle those workloads, based on current staffing numbers and net availability factors (e.g., leave, administrative time, etc.).

*iii.*    The remaining amount of time that patrol has to be proactive, which can also be referred to as "uncommitted" time.

This study defines the result of this process as, **patrol proactivity**, or the percentage of patrol officers' time in which they are *available and on-duty* that is *not* spent responding to community-generated calls for service. This calculation can also be expressed visually as an equation:

$$\frac{\text{Total Net Available Hours} - \text{Total CFS Workload Hours}}{\text{Total Net Available Hours}} = \text{\% Proactivity}$$

**The result of this equation is the overall level of proactivity in patrol**, which in turn provides a model for the ability of patrol units to be proactive given current resources and community-generated workloads. There are some qualifications to this, which include the following:

•        Optimal proactivity levels are a generalized target, and a single percentage should be applied to every agency. The actual needs of an individual agency vary based on a number of factors, including:

EX 7

- Other resources the division has to proactively engage with the community and address issues, such as a dedicated proactive unit.

- Community expectations and ability to support a certain level of service.

- Whether fluctuations in the workload levels throughout the day require additional or fewer resources to be staffed to provide adequate coverage.

• Sufficient proactivity at an overall level does not guarantee, based on workload patterns, and deployment schedules, that resources are sufficient throughout all times of the day and week.

Overall, based on the specialized and proactive resources available in the field, CDP should generally target an overall proactivity level of at least 35-40% as a minimum effective benchmark of patrol coverage.

## (2)    Patrol Unit Net Availability

In order to understand whether patrol workloads exceed the capacity to handle them, it is first important to better understand staff availability. Out of the total amount of time an individual is scheduled to work in a given year, a portion of those hours are not spent on duty. As officers take leave – including vacation, sick, administrative, injury, and any other type of leave – as well as any hours dedicated to on-duty court or training time, and all time spent on administrative tasks such as attending shift briefings.

The impact of each of these factors is determined through a combination of calculations made from CDP data and estimates based on the experience of the project team, which are then subtracted from the base number of annual work hours per position. The result represents the total **net available hours** of patrol officers, or the time in which they are on-duty and available to complete workloads and other activities in the field.

The table below outlines this process in detail, outlining how each contributing factor is calculated:

Factors Used to Calculate Patrol Net Availability

**Work Hours Per Year**

The total number of scheduled work hours for patrol officers, without factoring in leave, training, or anything else that takes officers away from normal on-duty work. This factor forms the base number from which other availability factors are subtracted from.

*Base number:* **2,080 scheduled work hours per year**

EX 7

**Total Leave Hours** (subtracted from total work hours per year)

Includes all types of leave, as well as injuries and military leave – anything that would cause officers that are normally scheduled to work on a specific day to instead not be on duty. As a result, this category excludes on-duty training, administrative time, and on-duty court time.

*Calculated from CDP data:* **317 hours of leave per year**

**On-Duty Court Time** (subtracted from total work hours per year)

The total number of hours that each officer spends per year attending court while on duty, including transit time. Court attendance while on overtime is not included in the figure.

Without any data recording on-duty court time specifically for patrol officers, the number of hours is estimated based on the experience of the project team.

*Estimated: 20* **hours of on-duty court time per year**

**On-Duty Training Time** (subtracted from total work hours per year)

The total number of hours that officers assigned to patrol roles spend per year in training that are completed while on-duty and not on overtime.

*Calculated from CDP data:* **59 hours of on-duty training time per year**

**Administrative Time** (subtracted from total work hours per year)

The total number of hours per year spent completing administrative tasks while on-duty, including briefing, meal breaks, and various other activities.

The number is calculated as an estimate by multiplying 90 minutes of time per shift times the number of shifts actually worked by officers in a year after factoring out the shifts that are not worked as a result of leave being taken. Because the units working an 8-hour shift are working more shifts per year (though still working the same number of scheduled hours), more time is spent on administrative tasks than in shift configurations with fewer shifts worked per year (such as 10 and 12-hour systems).

*Estimated:* **315 hours of administrative time per year**

EX 7

## Total Net Available Hours

After subtracting the previous factors from the total work hours per year, the remaining hours comprise the total *net available hours* for officers – the time in which they are available to work after accounting for all leave, on-duty training and court time, and administrative time. Net availability can also be expressed as a percentage of the base number of work hours per year.

*Calculated by subtracting the previously listed factors from the base number:*
**1,369 net available hours per officer**

CDP currently has 917 authorized (budgeted) officer positions assigned to regular patrol roles, does not include CRT teams, the Campus Walkie Crew (CWC), or other functions.

The 871 positions are assigned to one of five watches (including the day and evening mid-watches), working either an 8 or 10-hour shift. A certain percentage of the 871 officers deploy as two-officer units, riding in the same patrol vehicle. This may be done on an isolated basis for a shift, or more regularly, depending on the officer, zone, and staffing levels present that day. If staffing levels are particularly low for a shift, all officers may be required to ride in one-officer cars should a sufficient number of vehicles be available.

Regardless, the analysis of patrol resource availability focuses on the ability of patrol units to respond to calls for service and their associated workload. As such, the term 'patrol unit' is used in this chapter to refer to a patrol car – whether it is staffed by one or two officers. Because two officers are functioning as one patrol unit, this presents an impact on overall officer availability.

In order to adjust for this issue, the project team sampled patrol rosters on various days for all five zones to determine the percentage of patrol units that deploy as two-officer cars. Different days of the week and months were selected in order to adjust for seasonality and weekly variation in scheduled strength. Two-officer units were then counted by examining their cruiser assignments for a particular shift. FTO recruits were excluded, however, and instead the FTO trainer in the car was counted as a one-officer unit. It should be noted that the results of these calculations should not be interpreted as the exact percentage of units that deployed as two-officer cars, but rather an estimate for the typical rate of two-officer car deployments based on a limited sample of patrol rosters.

It is also worth pointing out that the percentage of officers deploying as two-person officers is not the same as the percentage of units that are two-person cars. While the end goal of the calculation is to determine the number of patrol *units*, the sample of rosters is first used to determine the percentage of *officers* that are two and one-person cars. These percentages are then applied against the total number of filled officer positions (871), and the number of officers in two-person cars is then divided by two, and added to the one-officer unit total to produce the total number of patrol units – whether staffed by one or two officers.

EX 7

The resulting figures are shown in the table below:

**Estimated Percentage of One and Two-Officer Units**
*(Based on Patrol Roster Samples)*

|  | # Ofc. | % Ofc. | # Unit | % Unit |
|---|---|---|---|---|
| **One-Officer Car** | 658 | 75.6% | 659 | 86.1% |
| **Two-Officer Car** | 213 | 24.4% | 106 | 13.9% |
| **Total** | **871** | **100.0%** | **765** | **100.0%** |

In total, about 86% of patrol units are one-officer cars and around 14% are two-officer cars, with the 871 filled officer positions translating to 765 patrol units. Of course, the percentages that were taken reflect patrol staffing on individual days within the sample period, and as a result, the numerical figures are simply expanding those percentages to the macro level.

In effect, the deployment of two-person units reduces the number of deployed patrol cars by approximately 12.2% overall. It is of course true, however, that **if the officers were not deploying as a two-officer unit, that a certain percentage of calls they respond to would have otherwise required an additional backup unit if only one officer was on scene.** *This and other considerations will be explored further in this chapter.*

The following table summarizes this calculation process, displaying how each net factor contributes to the overall net availability of patrol officers:

**Calculation of Patrol Unit Net Availability**

| | | |
|---|---|---|
| **Base Annual Work Hours** | | **2,080** |
| Total Leave Hours | – | 317 |
| On-Duty Training Hours | – | 59 |
| On-Duty Court Time Hours | – | 20 |
| Administrative Hours | – | 315 |
| **Net Available Hours Per Officer** | **=** | **1,369** |
| *(Number of Patrol Officers)* | | *871* |
| Adjusted to Number of Patrol Units | x | 765 |
| **Total Net Available Hours** | **=** | **1,047,023** |

EX 7

Overall, CDP patrol officers combine for 1,047,023 net available hours per year, representing the total time in which they are on duty and able to respond to community-generated incidents and be proactive in the field.

**(3)    Overview of Call for Service Workload Factors**

The previous chapter of the report examined various trends in patrol workload, including variations by time of day and of week, common incident types, as well as a number of other methods. This section advances this analysis, detailing the full extent of the resource demands that these incidents create for responding patrol personnel. Each call for service represents a certain amount of workload, much of which is not captured within the handling time of the primary unit. Some of these factors can be calculated directly from data provided by the division, while others must be estimated due to limitations in their measurability.

The following table outlines the factors that must be considered in order to capture the full scope of community-generated workload, providing an explanation of the process used to calculate each factor:

Factors Used to Calculate Total Patrol Workload

**Number of Community-Generated Calls for Service**

Data obtained from an export of CAD data covering a period of an entire year that has been analyzed and filtered in order to determine the number and characteristics of all community-generated activity handled by patrol officers.

The calculation process used to develop this number has been summarized in previous sections.

*Calculated from CDP data:* **390,086 community-generated calls for service**

**Primary Unit Handling Time** (multiplied by the rate)

The time used by the primary unit to handle a community-generated call for service, including time spent traveling to the scene of the incident and the duration of on-scene time. For each incident, this number is calculated as the difference between 'call cleared' time stamp and the 'unit dispatched' time stamp.

In the experience of the project team, the average handling time is typically between 30 and 42 minutes in agencies where time spent writing reports and transporting/booking prisoners is *not* included within the recorded CAD data time stamps. However, this information is included within the recorded CAD data time stamps for the vast majority of all dispatched calls for service.

EX 7

On average, CDP units spend 49.4 minutes handling a dispatched call for service. Compared to many large metropolitan police agencies, such a high average is not uncommon. There are likely many contributing factors and reasons for why handling time is so high, though one particularly important reason may be the extent of guard duties, which are inclusive of any workload involved in guarding a suspect, victim, or any other instance where direct supervision or watch of an officer is necessary.

*Calculated from CDP data:* **49.4 minutes of handling time per call for service**

**Number of Backup Unit Responses**

The total number of backup unit responses to community-generated calls for service - this number often varies based on the severity of the call, as well as the geographical density of the area being served. This number can also be expressed as the *rate* of backup unit responses to calls for service, and is inclusive of any additional backup units beyond the first. At 0.68 additional units beyond the primary officer call for service, the backup rate for CDP is relatively low for a large metropolitan police agency.

It should be noted that a response from a two-officer car is treated as one patrol unit. If a two-officer car is the only unit responding to a call for service, the backup rate is 0 for that call. This allows for two-person patrol units to be factored into unit availability instead of workload, which ensures that the results of the analysis accurately reflect whether incoming calls for service can be responded to without queueing.

*Calculated from CDP data:* **0.68 backup units per call for service**

**Backup Unit Handling Time** (multiplied by the rate)

The handling time for backup units responding to calls for service is calculated using the same process that was used for primary units, representing the time from the unit being dispatched to the unit clearing the call.

Because calls featuring backup unit responses tend to be more severe, and consequently may demand more extensive work from personnel on-scene, the average backup unit handling time can sometimes be higher than the overall average for primary units. This is the case for CDP patrol units, where the average handling time for backup units is higher (73.2 minutes) than the average handling time for primary units (49.4 units).

*Calculated from CDP data:* **73.2 minutes of handling time per backup unit**

**Number of Reports Written**

The total number of reports and other assignments relating to calls for service that have been completed by patrol units, estimated at one report written for every three calls for

EX 7

service. This includes any supporting work completed by backup units. In this case, the number has been calculated from CDP data, which tied incident numbers of reports to incident numbers of calls identified as community-generated calls for service

*Calculated from CDP data:* **0.29 reports written per call for service**

**Report Writing Time** (multiplied by the report writing rate)

The average amount of time it takes to complete a report or other assignment in relation to a call for service. Without any data detailing this specifically, report writing time must be estimated based on the experience of the project team. It is assumed that 45 minutes are spent per written report, including the time spent by backup units on supporting work assignments.

*Estimated:* **45.0 minutes per report**

**Total Workload Per Call for Service**

The total time involved in handling a community-generated call for service, including the factors calculated for primary and backup unit handling time, report writing time, and jail transport/booking time.

The product of multiplying this value by the calls for service total at each hour and day of the week is the number of hours of community-generated workload handled by patrol units – equating to approximately 727,463 total hours in the year of CAD data used for the analysis.

*Calculated from previously listed factors:* **111.9 total minutes of workload per call for service**

Each of the factors summarized in this section contribute to the overall picture of patrol workload – the total number of hours required for patrol units to handle community-generated calls for service, including primary and backup unit handling times, report writing time, and jail transport time.

These factors are summarized in the following table:

EX 7

**Summary of CFS Workload Factors**

|  | Value | % |
|---|---|---|
| **Total Number of Calls for Service** | **390,086** | 44% |
| Avg. Primary Unit Handling Time (min.) | 49.4 | |
| | | |
| **Backup Units Per CFS** | **0.68** | 44% |
| Avg. Backup Unit Handling Time (min.) | 73.2 | |
| | | |
| **Reports Written Per CFS** | **0.29** | 12% |
| Time Per Report (min.) | 45.0 | |
| | | |
| Avg. Workload Per Call (min.) | 111.9 | |
| **Total Workload Hours** | **727,463** | |

Overall, each call represents an average workload of approximately 111.9 minutes (rounded), including all time spent by the primary unit handling the call, the time spent by any backup units attached to the call, as well as any reports or other assignments completed in relation to the incident.

## (4)    Calculation of Overall Patrol Proactivity

Using the results of the analysis of both patrol workloads and staff availability, it is now possible to determine the remaining time in which patrol units can function proactively. The result can then function as a barometer from which to gauge the capacity of current resources to handle call workload demands, given objectives for meeting a certain service level.

The following table details the calculation process used by the project team to determine overall proactivity levels – the proportion of time that patrol officers have available outside of handling community-generated workloads:

**Calculation of Overall Patrol Proactivity**

| | | |
|---|---|---|
| Total Patrol Unit Net Available Hours | | 1,047,023 |
| Total Patrol Workload Hours | − | 727,463 |
| **Resulting # of Uncommitted Hours** | **=** | **319,559** |
| *Divided by total net available hours* | ÷ | 1,047,023 |
| **Overall Proactivity Level** | **=** | **30.5%** |

EX 7

At 30.5%, CDP is below the 35-40% minimum threshold range for patrol proactivity, demonstrating that at an overall level, resources are moderately insufficient to handle incoming community-generated workloads.

The following table provides a breakdown of how proactivity varies by hour and day of week due to fluctuations in call volume and the number of staff deployed at a particular time:

**Proactivity by Hour and Weekday**

| Time | # Units | S | M | T | W | Th | F | Sa | Overall |
|------|---------|-----|-----|-----|-----|-----|-----|-----|---------|
| 2am–6am | 141.6 | 44% | 63% | 67% | 65% | 66% | 60% | 46% | 58% |
| 6am–10am | 110.6 | 50% | 35% | 36% | 41% | 34% | 32% | 46% | 39% |
| 10am–2pm | 129.1 | 23% | 15% | 11% | 20% | 19% | 13% | 18% | 17% |
| 2pm–6pm | 164.0 | 29% | 10% | 4% | 14% | 12% | 6% | 29% | 15% |
| 6pm–10pm | 182.4 | 29% | 29% | 30% | 29% | 33% | 25% | 25% | 29% |
| 10pm–2am | 156.7 | 28% | 35% | 34% | 32% | 32% | 28% | 23% | 31% |
| Overall | 147.4 | 33% | 30% | 30% | 33% | 32% | 27% | 30% | **31%** |

Patrol proactivity is relatively well distributed, although it is insufficient during virtually the entire day. During the late morning and early afternoon hours, proactivity reaches critically low levels that typically reflect calls frequently queueing due to resources not being available to handle them. From 6:00PM to 2:00AM, proactivity largely remains below the effective threshold, although not significantly so.

The decreased proactivity on Fridays, which particularly affects the afternoon hours, can be explained by several thousand more calls occurring on that day than on other weekdays, as well as by the fact that there was one additional Friday included in the year of CAD data used than other days of the week. The drop in proactivity on Tuesdays during that same time of the day, however, is primarily due to scheduling. Given the current numbers assigned to the 76 different shift teams[9], there are slightly fewer officers on duty than there are on comparable weekdays.

**(5)    Additional Conclusions Regarding Patrol Proactivity and Resource Needs**

The overall patrol proactivity level should function as a barometer of potential resource capacity to handle workloads and be proactive, and different levels have varying implications for the effectiveness of an agency in being proactive at addressing public

---

[9] This does not include either the Campus Walking Crew (CWC) or CRT teams.

EX 7

safety issues and engaging with the community. These considerations can be summarized as follows:

• In agencies that are severely understaffed in patrol functions, and consequently have very little proactive time (**under 35% overall**), calls will frequently be held in queues as resources cannot handle the incoming workload. Proactivity also falls behind, as officers in such agencies would have little to no time to be proactive. When gaps do occur, the high rate of workload relative to available time can be a limiting factor on self-initiated generation, as officers avoid being tied up on a proactive activity such as a traffic stop in case priority calls for service occur.

• As proactivity increases (**around 35-45% overall**), the generation of self-initiated activity rapidly increases, as officers are able to deal with already-identified opportunities to proactively address issues in the community, some of which are prioritized and project-oriented engagements.

• Beyond those levels (**at least 45-50% overall**, depending on scheduling and deployment efficiency), the time available for proactive policing increases further, and opportunities to engage in self-initiated activity expand. However, the number of priority needs for self-initiated activity (e.g., addressing narcotics activity) also decrease. Despite this, no limitations exist on the time that can be spent on activities such as saturation/directed patrols and community engagement activities.

**(6)    Two-Officer Units and Impact on Patrol Response**

Two-officer units are deployed in all five zones – albeit inconsistently – representing only an estimated 13.9% of the patrol units deployed at any given time. Using a sample of data from the CDP's personnel management system, the project team examined percentages of units that were deployed as two-officer cars. For this analysis, FTO recruits were excluded and two-officer cars were identified by two officers on the same shift having identical values for their assigned cruiser, excluding those with no cruiser assignment listed.

The following tables present this analysis, showing the percentage of units deployed as one and two-officer cars by zone and shift:

EX 7

**Percentage of Patrol Units Deployed as One and Two-Officer Cars**
*(Sample of Personnel Roster Data)*

| | One-Officer Units | Two-Officer Units | | | One-Officer Units | Two-Officer Units |
|---|---|---|---|---|---|---|
| **Zone 1** | 87% | 13% | | **1st Watch** | 91% | 9% |
| **Zone 2** | 88% | 12% | | **2nd Watch** | 83% | 17% |
| **Zone 3** | 87% | 13% | | **3rd Watch** | 84% | 16% |
| **Zone 4** | 87% | 13% | | *Overall* | *86%* | *14%* |
| **Zone 5** | 81% | 19% | | | | |
| *Overall* | *86%* | *14%* | | | | |

Somewhat counterintuitively, there are no major differences in the number of officers assigned as two-officer units by zone, as all five have virtually the same percentage.

2nd and 3rd Watch two-officer units are nearly twice as common as 1st Watch two-officer units, suggesting that resource availability and/or call demands could be a factor. Alternatively, the difference may potentially be linked to the experience of the officers, as more senior officers are assigned to 1st Watch (which works daytime hours) than any other shift. It is also understood that a higher percentage of calls require one officer during the daytime hours in comparison to the nighttime hours. Vehicle availability could also be a limiting factor, as any officers without a vehicle would need to pair up with another officer.

Regardless, the implications are clear for the effects of two-officer cars on the rate at which calls can be responded to. A significant percentage of calls require only one patrol officer to be handled effectively. If two calls occur at the same time that each require one officer, it would take a two-officer car roughly twice as long to handle them both compared to two officers riding in separate cars.

Of course, decreasing the number of two-officer cars would also raise the backup rate, and consequently the total workload figure as well, but the impact on the number of patrol units in the field would greatly outweigh this effect.

If the deployment of two-officer cars was ceased entirely, conservative estimates (given variable effect on backup rate) suggest that proactive time would increase from 31.5% overall to 35.3%, significantly improving service levels – particularly in response to low-priority calls.

EX 7

**Recommendations:**

**Reduce the number of two-officer cars by requiring officers to deploy individually if sufficient vehicles are available.**

**Establish a standardized minimum ratio of serviceable patrol vehicles to the number of patrol officers by zone, using the shift with the highest staffing total to do so (including mid watch overlaps).**

## (7)     Accounting for Turnover in Staffing Calculations

To determine staffing needs, it is also critical for the typical rate of turnover to be considered. An agency will never be fully staffed, as there will always be vacancies occurring as a result of retirement, termination, and other factors. When these events occur, it takes a significant amount of time to recruit a new position, complete the hiring process, run an academy, and complete the FTO program before the individual becomes an on-duty officer. Given this consideration, agencies must always hire above the number needed to provide a targeted level of service.

The amount of 'buffer' that an agency requires should be based on the historical rate of attrition within patrol. Attrition can take many forms – if it is assumed that the majority of vacancies are carried in patrol staffing, a vacancy at the officer level in any other area of the organization would consequently remove one officer from regular patrol duties. Likewise, promotions would have the same effect, in that they create an open position slot in patrol. Not included, however, are positions that become vacant while the individual is still in the academy or FTO program, and they are not counted in our analysis as being part of 'actual' patrol staffing.

Given these considerations, **an additional 4.1% *authorized* (budgeted) positions should be added on top of the actual number currently filled (actual) positions in order to account for turnover** while maintaining the ability to meet the targeted proactivity level. The resulting figure can then be rounded to the nearest whole number, assuming that positions cannot be added fractionally. It is worth noting that the number of officers needed without turnover is fractional, as it is an intermediate step in the calculation process.

## (8)     Patrol Staffing Levels Required to Meet Service Level Objectives

After accounting for alternatives in deploying two-person units and turnover rate, the staffing needs for patrol officers can then be calculated using against the targeted level of proactivity. By staffing for a proactivity level of 40%, it ensures that patrol officers will have sufficient time to respond to community-generated calls for service while retaining relatively consistent proactive time. *Please see the notes following the table, as well as in the footnotes, for a detailed explanation of the factors used to estimate the effects of*

EX 7

*either keeping or eliminating two-officer unit deployment on patrol workload and staffing needs.*

### Calculation of Patrol Unit Staffing Needs (40% Proactivity)

|  |  | Current Deployment | No Two-Ofc. Units |
|---|---|---|---|
| Backup Rate |  | 0.68 | 0.79[10] |
| Total Workload Hours |  | 727,463 | 782,944 |
| Proactivity Target |  | 40.0% | 40.0% |
| **Unit Net Available Hours Needed** |  | **1,212,439** | **1,304,906** |
| Net Available Work Hours Per Unit | / | 1,369 | 1,369 |
| *Patrol Units Needed* | = | *886* | *953* |
| Staffing Multiplier Two-Person Units |  | 1.39x | 1.00x |
| Turnover |  | 4.1% | 4.1% |
| **Patrol Officer FTEs Needed** |  | **1,051** | **993** |

**Backup rate** calculations assume that for all responses to calls by two-person units – whether they were the primary or backup unit – that 50% of those would have required an additional officer to respond if it had been a one-officer unit.

The **staffing multiplier** for two-person units calculates the additional positions needed to maintain the current percentage of units deployed as two-person cars (approximately 13.92%, using roster data retrieved from LION). The estimates detailed in a previous section show that the 871 currently filled patrol officer positions translate to approximately 765 patrol units (including both one and two-officer units) after accounting for this issue. The same relative difference between the numbers (staffing level of times the number of patrol units) is applied to the number of patrol units needed

The turnover rate and staffing multipliers are applied in a sequential order. The number of patrol units needed is multiplied by the staffing multiplier (1.39 if two-person units are

---

[10] Impact of eliminating two-person units is calculated as follows:

– Personnel management system (LION) data was used to determine the percentage of two-person units (approximately 13.92%).

– This was multiplied against the estimated percentage of calls that the two-person units responded to that would have required an additional unit to respond should it have been a one-officer unit.

– This was calculated for all responses, including both primary and backup units.

EX 7

kept), and then that total is multiplied against the turnover rate. For a turnover rate of 4.1%, this would mean that the total is multiplied by 1.041 (rounded). The final total is then rounded up to the next whole number.

Ultimately, this analysis demonstrates that in order to reach a **proactivity level of 40%:**

- **If all patrol units deploy as one-officer cars:** 993 officer positions are required (an increase of 76). This includes the effect of estimated increases to backup unit rates under this scenario.

- **If current deployment practices continue,** which includes a mix of both one and two-officer cars: 1,051 officer positions are required, an increase of 134 over current authorized staffing levels.

Alternatively, if a lower and more attainable **proactively level of 35%** is targeted:

- **If all patrol units deploy as one-officer cars:** No additional staff are required. This includes the effect of estimated increases to backup unit rates under this scenario.

- **If current deployment practices continue,** which includes a mix of both one and two-officer cars: 970 officer positions are required, an increase of 53 over current authorized staffing levels.

*These numbers are presented independently of other staffing recommendations in this report.*

It is important to note that these recommendations provide the staffing levels required on an *overall* level. Resources should be allocated proportionally by time of day and day of week in order to balance proactive capabilities in an effective manner.

As resources are added in the future, it is critical that patrol proactivity not be allowed to fall lower than it is currently. In situations where retirements increase unexpectedly, academy classes are smaller, or desire grows to add more specialized units, this may require redeployment from other units or holding off on creating new ones in order to keep patrol staffing above this minimum level. Lowering patrol staffing further would result in adverse consequences for the service levels provided to citizens that request police response.

EX 7

**Recommendations:**

**By ceasing the deployment of two-person cars in patrol, current resources are sufficient to reach a proactivity level of 35% after accounting for turnover.**

· **If the practice of deploying two-person officers is continued, 970 officer positions would be required to reach 35%, an increase of 53 from current authorized levels.**

**In order to reach a proactivity level of 40% after accounting for turnover, 993 officer positions should be authorized in regular patrol roles, an increase of 76 positions from the number currently allocated to patrol.**

· **This recommendation is contingent upon ceasing the deployment of two-officer cars, but does not factor in other staffing recommendations that impact patrol.**

· **If the practice of deploying two-person officers continues, 1,051 officer positions would be required, an increase of 134 over current authorized staffing levels.**

**(8)     Patrol Proactivity by Zone**

While there is no need for patrol workload to be equally distributed across the five zones, the staffing levels assigned to each zone must be proportional to workload levels. If there are significant variations in this, then proactivity levels will differ greatly across each area. The following table provides these statistics for each zone, showing total workload, the number of patrol officers that are assigned, and the resulting overall proactivity levels:

EX 7

**Patrol Proactivity by Zone**

| | Total Workload Hours[11] | # Officers | # Patrol Units[12] | % Proactivity |
|---|---|---|---|---|
| **Zone 1** | 140,413 | 170 | 149 | **31.1%** |
| **Zone 2** | 158,304 | 170 | 149 | **22.4%** |
| **Zone 3** | 169,973 | 181 | 159 | **21.9%** |
| **Zone 4** | 132,747 | 173 | 152 | **36.2%** |
| **Zone 5** | 126,041 | 177 | 156 | **41.0%** |

Proactivity levels have been calculated for each zone using the same process that was used on an overall basis, and assumes that the average number of net available hours per officer is the same in each zone. Clearly, zones 4 and 5 have by far the highest proactivity levels at around 36.2%, and 41.0% respectively, while zones 2 and 3 are both below 23%. This indicates that fewer officers are allocated to these areas relative to the amount of workload.

This is a significant finding, as officers in zones 2 and 3 in particular are likely going from call to call with little proactive time, whereas ample proactive time exists in zones 4 and 5. **The experience of an officer in zones 2 and 3 is likely to be fundamentally different from an officer in zones 4 and 5.**

Strategies should be examined to address this issue and ensure that a sufficient number of officers are on duty in every zone. Although there may be resource deficiencies at an

---

[11] **Notes on Total Workload Figures:** The total workload numbers shown in this table differs from the totals that were previously shown in this chapter on an overall basis by approximately 14 hours (0.002%). This is caused by how handling time calculations are affected by incidents without recorded time stamps

In order to calculate the handling time portion of total workload on an overall basis, average handling time is multiplied by the number of incidents. Thus, calls without time stamps are all multiplied by the same average.

However, the proportion of calls without time stamps varies from zone, and each zone has a different average handling time. As a result, when handling time workloads are calculated by multiplying the number of dispatched calls for service by that zone's average, the workload hours contributed from each zone's calls missing time stamps will vary by a negligible amount from the totals they would have produced under an overall/citywide average.

[12] **Officer to Patrol Unit Conversions:** The number of officers has been translated into patrol units using the same methodology as before, using patrol roster data for a sample period to determine the number of two-person cars by area, and then expanding that sample across zone patrol staffing.

EX 7

overall level, **the issue of staffing imbalance among patrol zones is a fixable problem**.

The following table illustrates how resources can be aligned using a data-driven method, assigning officers based on the percentage of workload that the zone has:

**Reallocation Needed to Balance Patrol Service Levels**

|  | Current # of Officers | % of Workload | Balanced # of Officers *(Filled)* | Balanced # of Officers *(Authorized)* |
|---|---|---|---|---|
| **Zone 1** | 170 | 19.3% | 168 | 177 |
| **Zone 2** | 170 | 21.8% | 190 | 200 |
| **Zone 3** | 181 | 23.4% | 203 | 214 |
| **Zone 4** | 173 | 18.2% | 159 | 167 |
| **Zone 5** | 177 | 17.3% | 151 | 159 |

Under this scenario, patrol service levels would be relatively equalized across all five zones, eliminating the significant disparities that currently exist. It is important to note that these changes would not, however, address any resource deficiencies at an overall level.

**Recommendations:**

**Independent of other recommendations and using current staffing levels, reallocate patrol officers (using current staffing) among the five zones based on workload in order to eliminate disparities in patrol service levels, assigning the 871 filled patrol officer positions and 917 authorized staffing levels as follows:**

· **Zone 1: 168 officers (filled), 177 authorized positions**
· **Zone 2: 190 officers (filled), 200 authorized positions**
· **Zone 3: 203 officers (filled), 214 authorized positions**
· **Zone 4: 159 officers (filled), 167 authorized positions**
· **Zone 5: 151 officers (filled), 159 authorized positions**

**(9)    Geographic Hotspots and Workload Variation by Precinct**

The effectiveness of geographic deployment structures is paramount to the ability of patrol officers to have proactive time on a consistent basis. Even if proactivity is sufficient on an overall basis, if workload is poorly (i.e., unequally) distributed across each patrol precinct, then officers will have vastly different experiences from one another. Officers in precincts with less workload could have more proactive time than is needed to be effective, while officers in areas with more workload could have virtually none, and could

EX 7

be going from call to call. As a result, it is critical to examine whether significant variations exist in the calls for service handled by each individual patrol precinct.

In examining this issue, it is clear that workload does *not* vary significantly from precinct to precinct. The following map illustrates the level of inequality by shading each precinct according to whether its dispatched call for service total is higher or lower than the overall average:



Clearly, while four precincts have dispatched call for service totals that are somewhat higher or lower than the average, the workload is relatively well distributed on an overall basis. 16 out of 20 (80%) precincts have dispatched call totals that are within 20% of the average. No precincts are at least 40% higher or lower than the average. This is exceptional, and indicates a highly effective deployment structure on the basis of workload equalization. The result also reflects the fact that CDP realigned the boundaries of some precincts and cruiser districts within the last five years. It is critical to periodically

EX 7

revise patrol boundaries to ensure that they reflect growth and other changes to the service area that could potentially affect call for dispatched service workloads.

The process of revising patrol boundaries should be conducted by the end of 2020, marking five years since the last updates were made, and repeated every five years after.

**Recommendation: Revise patrol district and cruiser district boundaries by the end of 2020 in order to reflect recent growth and service environment changes.**

### (10)   Patrol First-Line Supervision

Ensuring that patrol has adequate supervision is critical to the effectiveness of patrol operations in the field. The following subsections provide an analysis of current supervision ratios in patrol, as well as any adjustments or additional staff requirements to address deficiencies.

### (10.1) Span of Control Targets

Staffing needs for patrol sergeants can be measured by span of control ratios, or the average number of officers that are supervised by a sergeant. Many of the key drivers of sergeant workloads include report review, use of force and pursuit review, and performance evaluations, scale directly with the number of officers that are assigned to a sergeant. Consequently, the more officers that are assigned per sergeant, the less time that sergeants are able to be out in the field directly supervising them. In general, no sergeant should supervise more than about 9 officers.

These targets should be adjusted based on the administrative duties that sergeants are required to handle. If sergeants handle more responsibilities with significant workloads than is typically the case, then the span of control that an agency should target for should be lower than normal, ensuring that sergeants supervise fewer officers.

### (10.2) Review of Current Patrol Spans of Control

Spans of controls for filled (current) staffing levels are close to those of authorized (budgeted) spans of control, and so for the purposes of determining staffing needs, this analysis focuses on authorized positions in order to present the calculations in clearer manner.

A maximum span of control of 1 sergeant for every 9 officers is set for every watch, with no minimum ratio added. Watches that exceed the 1:9 threshold are highlighted in red. The "+/- Sgt. Req." provides the number of additional sergeant positions that must be added to bring the span of control ratio down to 9.0 or below. It is also important to note that this analysis does not include CRT or CWC positions, and is focused on regular patrol roles only.

EX 7

The following table provides the current authorized (budgeted) sergeant and officer positions and span of control ratios for each watch group, as well as the number of additional sergeant positions that would be needed to reach a 1:9 supervisory ratio:

**Patrol Spans of Control and Required Staffing Adjustments**

|        | Watch    | # Sgt. | # Ofc. | Ratio | +/- Sgt. Req. |
|--------|----------|--------|--------|-------|---------------|
| **Zone 1** | A        | 6      | 40     | 6.7   | –             |
|        | Day Mid  | 1      | 14     | 14.0  | +1            |
|        | B        | 6      | 55     | 9.2   | +1            |
|        | C        | 6      | 44     | 7.3   | –             |
|        | Eve. Mid | 2      | 23     | 11.5  | +1            |
| **Zone 4** | A        | 6      | 40     | 6.7   | –             |
|        | Day Mid  | 1      | 12     | 12.0  | +1            |
|        | B        | 6      | 61     | 10.2  | +1            |
|        | C        | 6      | 44     | 7.3   | –             |
|        | Eve. Mid | 2      | 23     | 11.5  | +1            |
| **Zone 2** | A        | 6      | 40     | 6.7   | –             |
|        | Day Mid  | 1      | 13     | 13.0  | +1            |
|        | B        | 6      | 62     | 10.3  | +1            |
|        | C        | 6      | 44     | 7.3   | –             |
|        | Eve. Mid | 2      | 24     | 12.0  | +1            |
| **Zone 3** | A        | 6      | 40     | 6.7   | –             |
|        | Day Mid  | 1      | 14     | 14.0  | +1            |
|        | B        | 6      | 65     | 10.8  | +2            |
|        | C        | 6      | 44     | 7.3   | –             |
|        | Eve. Mid | 2      | 26     | 13.0  | +1            |
| **Zone 5** | A        | 6      | 42     | 7.0   | –             |
|        | Day Mid  | 1      | 12     | 12.0  | +1            |
|        | B        | 6      | 67     | 11.2  | +2            |
|        | C        | 6      | 44     | 7.3   | –             |
|        | Eve. Mid | 2      | 24     | 12.0  | +1            |
|        | **Total** | **105** | **917** | **8.7** | **+17**     |

Clearly, span of control issues are widespread in patrol. 15 of 25 watches do not have sufficient patrol supervisors. This particularly impacts operations when a sergeant is on leave, in training, or unavailable for any other reason, given that there is virtually no relief factor. Without adequate relief factors in place, any spans of control that are already above the targeted level will become greatly exacerbated when other supervisors are unavailable for a particular shift or string of shifts.

EX 7

This particularly affects how report review duties impact the ability of sergeants to be in the field. If a sergeant is usually in the field for 50-60% of their on-duty time, for instance, covering for another sergeant could in some instances diminish that time to just 20-25% of the shift.

As a result, it is critical to address any span of control issues, particularly as they reach severe levels of 1:12 or above. Without adequate supervision in the field, additional risks are likely to be created. Supervisors are responsible for holding officers accountable in regards to policy, their conduct on a shift, use of force and pursuit actions, and interaction with community members. It is by directly supervising responses to calls at the scene that they are able to ensure and provide direction and guidance on each of these areas, in addition to other mentoring and performance evaluation duties that take place between calls.

The presence of direct supervision in the field is a significant component of risk mitigation and management. To this point, maintaining adequate supervision in the field for every shift is essential not only from a perspective of operations management, as a means of mitigating risk and furthering community policing on a day-to-day basis.

As a result, the department should allocate an additional 17 sergeants to patrol supervision roles, assigning them to the watches with spans of control that currently rise above the target.

If the recommendations for the number of officers to be added – regardless of whether two-person cars are eliminated – the additional 17 sergeants would keep spans of control under the 1:9 ratio on an overall basis. Nonetheless, patrol rosters should be monitored to ensure that spans of control remain adequate for every watch.

**Recommendation: Increase the number of sergeants allocated to the patrol zones by 17 authorized positions in order to keep supervisory spans of control for all watches at or below a ratio of nine officers per sergeant.**

## 3.    Community Response Teams

The Community Response Team (CRT) is a proactive field unit that exists in four out of five zones. The teams provide targeted enforcement in areas identified as hotspots, investigates drug house complaints, and other activity, as directed by the sergeant, lieutenant, and zone commander. CRT units deploy in either a uniformed or plain clothes capacity, and may work on bikes. The time that the unit works in any of these capacities varies according to the needs and public safety issues present in each zone.

The following table provides the current authorized (budgeted) staffing levels for each of the CRT units, not including Zone 4's Campus Walking Crew:

EX 7

**CRT Staffing by Zone**

|         | Sergeants | Officers |
|---------|-----------|----------|
| **Zone 1** | 1 | 10 [13] |
| **Zone 2** | 1 | 10 |
| **Zone 3** | 1 | 10 |
| **Zone 4** | – | – |
| **Zone 5** | 1 | 10 |

Zone 4, which does not have a CRT contingent, instead has the Campus Walking Crew, a proactive unit that focuses on the University District, near the Ohio State University (OSU), and responds to complaints and proactively addresses problems. Unlike CRT, which heavily deploys officers in plain clothes, the Campus Walking Crew does not. OSU also funds overtime work to provide for additional proactive patrol.

The following table provides a comparison of the activity each CRT unit recorded in CAD over the one-year period used for the study, showing each incident type as a percentage of that zone's overall CRT activity. Cells are shaded darker according to whether each zone's percentage for that category was higher than for the other zones:

**CRT Activity by Type Relative to Other CRT Units**

| Incident Type | Zone 1 | Zone 2 | Zone 3 | Zone 5 |
|---------------|--------|--------|--------|--------|
| TRAFFIC VIOL./COMPLAINT | 53% | 18% | 18% | 25% |
| INFORMATION / ASSISTANCE | 9% | 14% | 11% | 10% |
| SUSPICIOUS PERSON | 6% | 15% | 10% | 9% |
| ERRAND | 1% | 14% | 6% | 5% |
| DISTURBANCE | 3% | 3% | 6% | 5% |
| WANTED FELON | 4% | 2% | 7% | 2% |
| HOUSE WATCH | 2% | 7% | 1% | 4% |
| PERSON WITH A GUN | 1% | 3% | 5% | 2% |
| UNKNOWN COMPLAINT | 2% | 1% | 2% | 2% |

---

[13] Zone 1 currently has 9 filled officer positions, reflecting a temporary vacancy.

EX 7

| Incident Type | Zone 1 | Zone 2 | Zone 3 | Zone 5 |
|---|---|---|---|---|
| SHOTS FIRED | 1% | 1% | 3% | 1% |
| BURGLARY ALARM | 1% | 0% | 2% | 3% |
| STRANDED MOTORIST | 1% | 2% | 1% | 2% |
| FIGHT | 1% | 1% | 2% | 1% |
| BURGLARY IN PROGRESS | 1% | 1% | 1% | 1% |
| NARCOTICS COMPLAINT | 1% | 1% | 2% | 1% |
| All Other Types | 16% | 19% | 22% | 26% |
| Total %[14] | 100% | 100% | 100% | 100% |
| **Total Incidents** | **797** | **936** | **2,372** | **1,730** |

Totals for each activity category have been omitted because the table does not show Zone 4, which has a Campus Walking Crew in place of a CRT Team. It should be also noted that the numbers comprise unique incidents only – if backup units responded to an event, they are not counted as additional incidents.

In examining CRT activity, it is evident that the Zone 1 team is a stark outlier among the group, with over 53% of the unit's activity being comprised of traffic enforcement. Traffic enforcement for Zone 5, which has the next-highest percentage at slightly less than half, actually conducts about the same total number of traffic enforcement actions, as their incident count is higher. Additionally, the chart shows that house watches are conducted significantly more often in Zone 2 than in other zones, and incidents categorized as Wanted Felon occur far more often in Zone 3 than in other zones.

Including the Campus Walking Crew, CRT teams comprise 52 officers and five sergeants. Relative to the number of officers assigned to regular patrol roles across the five zones, the CRT teams and Campus Walking Crew are 5.7% the size. This is within typical ranges for specialized proactive enforcement units in large metropolitan agencies with several patrol subdivisions. Moreover, 10 officers and 1 sergeant per CRT team - each unit is fully functional and able to conduct a wide variety of operations, even after accounting for officer availability.

Given these considerations, the current overall staffing and organizational model of the

---

[14] The percentages shown in the table are rounded for clarity. As a result, while the values used to create the table add up to 100%, the rounded numbers do not.

EX 7

CRT units should be maintained. However, some issues regarding consistency should be addressed. While it is vital that CRT teams be tailored to the priorities of each individual zone, to task the CRT teams in several zones to focus on activities such as proactive intelligence gathering, warrant apprehension, and surveillance, while another CRT team primarily conducts traffic stops, represents too wide of a departure in terms of work scope. Given that the other units are primarily oriented around crime suppression and investigative support, that should be the direction of all CRT units.

EX 7

# 6 Strategic Response Bureau

1.      **Community Liaison Section**

The Community Liaison Section is comprised of CLO (Community Liaison Office) North, CLO South, and the Mounted Unit. While the section is centrally organized as part of the Strategic Response Bureau, its work interfaces within each of the five patrol zones. The section is managed by a lieutenant and two office assistants.

**(1)      CLO North and South**

Each of the 20 community liaison officers (CLO) are assigned a precinct, that they are responsible for coordinating outreach, community engagement, and crime prevention solutions in that area. Officers coordinate abatements, organize neighborhood block watches, and perform outreach to elementary schools and middle schools, as the High School Resource Officer Unit only works with high schools. Officers also follow up on quality of life issues, such as loud music complaints, concerns raised over Nextdoor, an online social media platform for neighborhoods, and other issues.

Given that the roles of CLO North and CLO South are identical, the following section examines the two units together as a single function.

The following table provides the number of community engagement events that CLO officers attended over an eight-month period beginning in January 2018:

**Community Engagement Events by Precinct, Jan-Aug 2018**

| Zone | Precinct | # Events |
|------|----------|----------|
| **1** | 1 | 32 |
| | 6 | 41 |
| | 17 | 70 |
| | 18 | 64 |
| | *subtotal* | *(207)* |
| **2** | 9 | 85 |
| | 13 | 94 |
| | 14 | 68 |
| | 20 | 55 |
| | *subtotal* | *(302)* |
| **3** | 8 | 51 |
| | 10 | 102 |
| | 15 | 135 |
| | 19 | 71 |
| | *subtotal* | *(359)* |

EX 7

| Zone | Precinct | # Events |
|------|----------|----------|
| **4** | 2 | 43 |
| | 3 | 51 |
| | 4 | 43 |
| | 5 | 77 |
| | *subtotal* | *(214)* |
| **5** | 7 | 50 |
| | 11 | 68 |
| | 12 | 53 |
| | 16 | 114 |
| | *subtotal* | *(285)* |

While variation in the number of community events from precinct to precinct is extensive, it is not quite as significant between zones as a whole. Given that a sizable portion of the events that are recorded involve community organizations, if some precincts have varying numbers of active organizations, then the number of events that a CLO can attend will vary as well. Consequently, event attendance is not a reliable indicator of CLO workload.

This reflects the fact that the workload of CLOs is not easily tracked back to quantitative metrics. Much of their work is developing positive relationships in the community, communicating with neighborhood groups on local issues, and developing long-term solutions to problems that may often otherwise become recurring calls for patrol to handle. As a result, its effectiveness is a critical component of CDP's strategy in engaging with the community, and the practice of assigning 1 CLO per precinct is needed to facilitate that.

## (2)    Mounted Unit

The Mounted Unit is staffed by 1 sergeant, 6 officers, and 2 part-time laborer positions (one of which is currently filled), and is responsible for providing mounted (horseback) presence, primarily at community events and crowd control situations. According to the Community Engagement and Initiatives report, this includes OSU home football games, on-campus presence during OSU away games, the Special Olympics, Citizens' Police Academy, American Quarter Horse Congress and other horse shows, 'cops and kids' events, Touch a Truck event, Asian Fest, Latino Fest, half marathon, Jazz and Rib Fest, Red White and Boom, Columbus Crew (MLS) games, and other events. Additional usage outside of specific events includes deployment in neighborhoods as a crime deterrent.

The unit maintains 11 horses at the city-owned facility, and primarily works from 10:00AM to 6:00PM or 8:00AM to 4:00PM, varying by individual assigned to the unit. These hours are adjusted as needed in order to attend events as much as possible without incurring overtime usage. It is difficult to measure the unit's activity from CAD data, as only a handful of incidents have been recorded. According to other data from 2016, the Mounted Unit responded to around 230 events.

EX 7

Many cities around the country have either disbanded mounted patrol units or considered disbanding these units, typically over concern with the cost of maintaining a mounted patrol unit versus the value provided by the unit – something that is relatively intangible outside of tactical situations. While the Mounted Unit is able to provide a significant presence and visibility at crowd control situations and community events, their productivity is inherently limited by how many of these situations there are. Long-term challenges to be examined include any capital improvements that need to be made, as well as review of issues such as overtime and deployment frequency.

The Mounted Unit estimates that upwards of $80,000 per year is spent on non-personnel expenses, which includes medications, hay, farrier costs, vaccinations, maneuver/waste, and vet bills. Fortunately, the city owns the building that the horses are kept in, and so there are no lease fees to pay. The unit does not benefit from private 501(c)3 funding, and so all expenses are covered within budget. Personnel costs, however, are by far the largest cost for the unit, which retains 7 sworn and 2 part-time civilian positions.

Two years ago, the unit was tasked with finding a location for a new facility as concerns grew over the suitability of the current site in the future, particularly given watershed pollution issues. A number of sites were considered in the process, with costs being estimated for each. Ultimately, CDP made the decision to invest in the current facility. Given that the location of the facility is relatively near Downtown Columbus, the unit is able to quickly deploy to events. If the facility was moved to another location far outside of the central core of the city, the unit would be significantly less able to deploy in a timely manner to protest events.

Regardless, the most common deployment of the unit, and the majority of the time the unit spends in the field in an operational capacity, is to further community engagement and relations. Consequently, that function should be the primary focus in evaluating the unit's staffing needs. While additional horses provide for increased ability to function in other capacities, such as protests, there is a point at which the number of events that can be attended does not increase beyond a negligible amount. To this point, it is unlikely that with a more limited staffing level, that a significant impact would be made to the total of 230 events attended per year. With severe constraints in other areas of the department, including patrol, the department should reallocate a portion of the Mounted Unit's resources to address those issues, while maintaining nearly the same level of service in community engagement functions. By reducing the unit's staffing level from 1 sergeant and 7 officers to 1 sergeant and 4 officers, patrol resources may be augmented while retaining a highly capable mounted unit.

**Recommendation: Reduce the number of officers assigned to the Mounted Unit to four (4) authorized positions, down from seven (7).**

EX 7

## 2.        Zone Resource Section

The Zone Resource Section groups together comprise an array of different functions, including the Crime Analysis Unit, High School Resource Officer (HSRO) Unit, and the Juvenile Truancy Unit, which is organized by the HSRO Unit.

### (1)        Crime Analysis Unit

The Crime Analysis Unit is staffed by five crime analysts that report to a lieutenant, who also covers other functions as well. Each analyst is assigned to a patrol zone.

Progressing analytical capabilities forward requires expertise and skill development, supervision and leadership, and software. A supervisor should also be able to prioritize workloads of staff assigned to the unit and communicate with zone commanders if their requests cannot be met due to other demands. The supervisor should also be able to ensure that all analysts have similar capability levels, and be able to identify training needs, as well as opportunities for quality improvements. These roles require familiarity with the products, software, and skills utilized by crime analysts in their role.

Given that these skillsets require a time investment to acquire, it is detrimental to the unit for the supervisor to frequently rotate in and out of the assignment, which is often the case with a lieutenant position. Moreover, the unit is comprised entirely of civilian staff, and does not require a sworn manager.

These findings demonstrate that a new crime analyst supervisor position should be created to function as a lead/manager of the unit, completing analytical work as well as supervising the unit.

**Recommendation: Create the Crime Analyst Supervisor classification, assigning one (1) FTE position to the role.**

### (2)        High School Resource Officer Unit

The High School Resource Officer (HSRO) Unit is supervised by a sergeant, who manages both the HSRO program and the Truancy Unit.

### (2.1)   HSRO Program

The High School Resource Officer (HSRO) program provides a school resource officer in 18 high schools throughout the City of Columbus. Two officers are assigned in a relief capacity, filling in as needed, and providing extra programming. This is a relatively high level of service, ensuring that HSROs can be present even in cases where the normally assigned officer is out for leave or another reason. Outreach to elementary and middle schools is provided by CLOs (community liaison officers).

EX 7

It is not anticipated that any adjustments are needed to the current model of assigning one officer per high school, as current practices are effective and appear to meet the needs of the schools. Additional allocations should only be made if new high schools are constructed that would like to establish an HSRO at their school.

## (2.2)   Juvenile Truancy Unit

The Juvenile Truancy Unit enforces truancy laws throughout the CDP jurisdiction, working off of a combination of complaints and proactive patrol. Four officers are assigned to the unit, despite nine being formally authorized, and they work Monday through Friday from 8:30AM to 4:30PM. The unit was recently reorganized under the HSRO Unit, with personnel now reporting to one of two of that unit's sergeants.

A new school attendance law took effect for the 2017-18 school year, which changed how school districts deal with truancy. Around that same time, five officers were reassigned away from the unit. The following chart provides the number of unique incidents recorded in CAD during the period of time used in the analysis (September 1st, 2017 to August 31st, 2018) that Truancy Unit officers responded to in the year of data used in the analysis, summarizing each four-month period as a percentage of the annual total:

**Truancy Unit Activity Recorded in CAD**

| Year | Month | # | % |
|------|-------|------|------|
| **2017** | Sep | 165 | |
| | Oct | 189 | |
| | Nov | 112 | *40%* |
| | Dec | 65 | |
| **2018** | Jan | 75 | |
| | Feb | 94 | |
| | Mar | 135 | *31%* |
| | Apr | 114 | |
| | May | 148 | |
| | Jun | 93 | |
| | Jul | 53 | *29%* |
| | Aug | 90 | |
| | **Total** | **1,333** | |

On average, Truancy units were assigned 111.1 CAD incidents per month over the year of data used in the analysis. The last three months – June, July, and August – were all below average after the decrease in staffing levels. The activity levels largely match those of December through February, although this is presumably affected by winter vacations and perhaps colder temperatures.

EX 7

The differences in activity recorded by zone are illustrated by the following table:

**Truancy Unit CAD Incidents by Precinct**

|  | Precinct | # | % |
|---|---|---|---|
| **Zone 1** | 1 | 24 | 2% |
|  | 6 | 19 | 1% |
|  | 17 | 30 | 2% |
|  | 18 | 124 | 9% |
| **Zone 2** | 9 | 208 | 16% |
|  | 13 | 84 | 6% |
|  | 14 | 124 | 9% |
|  | 20 | 81 | 6% |
| **Zone 3** | 8 | 72 | 5% |
|  | 10 | 80 | 6% |
|  | 15 | 39 | 3% |
|  | 19 | 109 | 8% |
| **Zone 4** | 2 | 14 | 1% |
|  | 3 | 10 | 1% |
|  | 4 | 9 | 1% |
|  | 5 | 36 | 3% |
| **Zone 5** | 7 | 125 | 9% |
|  | 11 | 77 | 6% |
|  | 12 | 29 | 2% |
|  | 16 | 39 | 3% |
|  | **Total** | **1,333** |  |

Proximity and number of schools could be a significant factor, although it does not completely account for the differences in activity by area of the city. Around 37% of all Truancy Unit actions recorded in CAD took place in Zone 2, while Zone 4 recorded just 5%.

Regardless of the reasons for the differences in Truancy Unit activity by area of the city, the disparity is clear. At just four officers assigned to the unit, this also reflects the unit's limitations. Consequently, officers must prioritize which areas to cover more than they would have otherwise been needed under a fully staffed unit.

Given changes to the school attendance law during the 2017-18 school year that altered the school district's role in managing truancy issues, the work and focus of the unit has changed. This suggests that CDP's approach should change as well, particularly given the resource constraints that resulted in the unit's staffing diminishing. Rather than

EX 7

assigning a small number of officers to focus selectively on the limited area they can cover, the direction to enforce truancy laws can be given back to the patrol zones. This allows for comprehensive coverage, although this means that it will happen intermittently as call for service workloads dictate.

In examining the future of the unit beyond any immediate actions, it should be evaluated whether the decline in truancy unit staff has correlated to any changes in the rate of daytime burglaries during months that schools are in session. Ideally, this analysis should incorporate multiple years of data in order to mitigate natural variability. Additionally, any findings should consider long-term trends in potentially related crimes, such as daytime burglary rates. From 2013 to 2017, the average year-to-year change in total burglaries was +/- 1,000, although that number does not adjust for times that schools were in session. Given such a high degree of variability, it would be challenging to build a strong case that diminishing the unit's staffing levels affected the daytime burglary rate.

It is clear that such an analysis could shed more light on the topic and inform future decisions on whether a fully staffed Truancy Unit should be reestablished. However, at just four officers, and given the changes to the legislative framework for truancy management by the school districts, a new approach is warranted. The four existing officer positions in the Truancy Unit should be transferred to the patrol zones, with truancy management and enforcement becoming the responsibility of patrol as a whole – particularly during the morning hours where proactive time is relatively ample. Specifically, two officers should be transferred to Zone 2 and Zone 3, which have lowest staffing levels relative to workload, resulting in the least amount of proactive time available. Adding new resources to patrol will, at least in part, mitigate these issues.

This also resolves an additional issue relating to the span of control handled by the HSRO sergeants, who are also tasked with supervising the Juvenile Truancy Unit in addition to the HSROs. Even without the personnel assigned to the Truancy Unit, these sergeants each have 10 officers reporting to them. With the Truancy Unit officers added on, this represents an exceptionally high span of control.

**Recommendation: Transfer the four (4) officers assigned to the Truancy Unit to regular patrol roles, assigning two (2) officers each to Zone 2 and Zone 3.**

EX 7

# 7 Investigative Subdivision

The Investigative Subdivision is headed by a deputy chief, and includes four major bureaus, as described below:

The **Narcotics Bureau** is led by a commander and consists of two sections, each led by a lieutenant.  The two sections consist of the following:

- Operations Section
    - Investigative B Unit
    - Investigative C Unit
    - High Intensity Drug Trafficking Area (HIDTA) Task Force Unit
    - Drug Enforcement Agency (DEA) Task Force
    - Pharmaceutical Investigations Unit

- Investigative-Tactical (In-Tac) Section
    - In-Tac Administrative Unit
    - In-Tac Tactical Unit
    - Investigative D Unit
    - Investigative E Unit
    - Human Trafficking Task Force
    - Narcotics Administrative Unit

The **Crimes Against Persons Bureau** is led by a commander and consists of three sections, each led by a lieutenant.  The three sections consist of the following:

- Assault/Homicide Section
    - 1st Shift Homicide Unit
    - 2nd Shift Homicide Unit
    - 3rd Shift Homicide Unit
    - Homicide Cold Case Unit
    - 2nd Shift Assault Unit
    - 3rd Shift Assault Unit

- Robbery/Support Section
    - 1st Shift Robbery Unit
    - 2nd Shift Robbery Unit
    - 3rd Shift Robbery Unit
    - Gun Crimes Unit
    - 1st Shift Crime Scene Search Unit (CSSU)
    - 2nd Shift CSSU
    - 3rd Shift CSSU
    - Digital Forensics Unit

EX 7

- Investigative/Administrative Section
    - Task Force Unit
    - Administrative Support Unit

The ***Property Crimes Bureau*** is led by a commander and consists of two sections, each led by a lieutenant.  The sections consist of the following:

- Auto Theft/Economic Crime Section
    - 1st Shift Auto Theft Unit
    - Economic Crime Unit
    - 1st Shift Fraud/Forgery Unit
    - 2nd Shift Fraud/Forgery Unit
    - Organized Retail Crime Task Force

- Burglary Section
    - 1st Shift Burglary North Unit
    - 1st Shift Burglary South Unit
    - 2nd Shift Burglary North Unit
    - 2nd Shift Burglary South Unit
    - 3rd Shift General Property Crimes Unit
    - Property/Evidence Recovery Unit

The ***Special Victims Bureau*** is led by a commander and consists of two sections, each led by a lieutenant.  The sections consist of the following:

- Family Crimes Section
    - Physical Child Abuse Unit
    - Exploited Children Unit
    - Missing Children Unit
    - Domestic Violence Unit

- Sexual Assault Section
    - Sexual Assault A Unit
    - Sexual Assault B Unit
    - Sexual Assault C Unit
    - Sexual Assault D Unit
    - Sexual Assault E Unit

**(1)    Organization of Subdivision**

The following chart outlines the organization of the Investigative Subdivision:

EX 7



Each Bureau is led by a commander with each Section led by a Lieutenant.

## 1  |  Analysis of Investigative Workload

**(1)  The Investigative Subdivision Effectiveness Is Evaluated Differently Than the Patrol Subdivisions.**

A variety of factors impacting the investigative workloads must be considered when evaluating staffing requirements and related operational strength and opportunities for improvement. The workload and related information utilized in this chapter was obtained from numerous one-on-one interviews with CDP investigations management and supervisory staff and a variety of independent data collection efforts made by our project team with the assistance of the Department personnel.

The evaluation of staffing levels required by criminal investigations and supporting functions is more difficult than evaluating patrol staffing levels because, unlike field services, subjective and qualitative determinants of workload and work practices are more important. Patrol services have the benefit of several quantitative measures, such as calls

EX 7

for service, response time and proactive time, to assist in the evaluation of staffing requirements. Investigative services, given the nature of this work, have fewer such reliable measures. Factors making investigative analyses difficult include:

- The nature of the community itself is a factor in evaluating investigative workload and staffing needs. Citizen expectations translate into service levels impacting detectives in terms of what is investigated and how investigations are conducted.

- Approaches used to screen, assign, and monitor cases are different among law enforcement agencies.

- What is actually investigated varies by agency. The extent to which agencies assign misdemeanor level crime cases to detectives varies. Importantly, agencies screen cases assigned to detectives differently; one agency may assign a case perceived as "solvable" while another agency may not investigate such cases if there is perceived limited solvability and arrest potential.

- The extent to which patrol performs preliminary investigation varies widely and impacts detective caseloads.

- Work practices vary tremendously among agencies, relating to interviewing techniques, mix of telephone and in-person interviews, use of computer technologies, and the time devoted to clerical tasks.

- The nature of the caseload is also a critical factor to consider when examining quantitative factors relating to investigative activity. Each case is different in terms of workable leads, suspect description, and other available information. The way information in a single case combines with information on other cases (e.g. a case belonging to a crime series or crime pattern) also impacts investigative actions.

- Finally, additional duties and responsibilities performed by detectives beyond caseload work are impactful to staffing and operations. Such activities may include being a specialized trainer, assignment to support teams (e.g. SWAT) or various other administrative duties detracting from casework.

Collectively, these factors portray a different type of workload compared to patrol workload. Unlike patrol, investigative workload is more difficult to be converted into quantitative methodologies to arrive at required staffing levels. There are a variety of approaches, however, that can be used to devise an investigative staffing framework, which can then be used as a litmus test to determine potential staffing excesses or shortcomings.

EX 7

**(2)      The Approach to Investigations Evaluations.**

How business is uniquely conducted by CDP must be considered in an analysis. Investigative staffing requirements need to be examined from a variety of perspectives in order to obtain an overall portrait of staffing issues, case handling issues, and operational philosophies that have an impact on overall staffing needs. The project team performed the following steps in the analysis of the Investigative Subdivision to determine resource requirements.

·      Reviewed case management practices through interviews with unit supervisory and management staff and obtained available caseload data.

·      Examined other qualitative measures of workload, as appropriate, to determine the effectiveness of investigative services provided.

·      Examined organizational and supervisory spans of control.

These efforts are framed by the following approaches to investigative analysis.

**(2.1)  Case Management Philosophies are Inconsistent Throughout the Subdivision.**

CDP's Investigative Subdivision case management philosophy is quite varied dependent upon Bureau, Section, and in fact, supervisors overseeing staff.   There are several elements to an overall case management strategy that can be categorized into four distinct areas.  These include:

·      The case screening process.

·      The case assignment process.

·      The case investigative process.

·      The case closure process.

Case management has a notable impact on how investigations are conducted in a law enforcement agency, impacts overall efficiency and effectiveness, and can substantively influence staffing requirements.

Importantly, with respect to case management, is that the Investigative Subdivision readily admits minimal use of the current "case management" software PremierOne deployed at CDP.  Data is not regularly used from this database to manage, the software apparently lacks features to conduct effective case management, training on the system was not entirely adequate or timely, and essentially spreadsheets and other tracking

EX 7

mechanisms are more readily used to manage cases than a universal approach and consistent application of the software among all supervisors and detectives.

The key impacts are summarized as follows for each key case management area.

- **Case screening** – Case screening—the determination if a case should be investigated or not—is accomplished by different personnel in different ways. Dependent upon the investigative unit case screening will:

  - Be performed by the detectives who are either assigned the case directly, without comprehensive review from supervision, or "self-assign" based on a call-out, telephone call, etc.

  - Be performed by some unit sergeants.

  - Be performed, in some instances, using a "solvability approach" which includes: Category 1- Limited Solvability; Category 2- Some Evidence; Category 3- Concrete Evidence/Suspect. Category 3 and 2 cases are considered by CDP as solvable, the latter requiring additional work given minimal evidence, victim or witness materials.

  In conclusion, there is no consistent case screening methodology employed by the Investigative Subdivision.

- **Case assignment** – Case assignment strategies are similarly inconsistent and include different approaches that include:

  - The unit and/or shift sergeant tracking and allocating cases to individual detectives.

  - The unit detectives self-assigning workloads based on incoming cases (e.g. "it is your turn.").

  - The detective answering a telephone call, responding to the field, etc. and as a consequence inheriting the case.

  - Assigning misdemeanors, or not, for review in crime pattern and trend recognition.

  In sum, there is no formalized and consistent approach in case assignment strategy periodically resulting in an imbalance in workloads among detective staff.

- **Case investigations –** Based on case screening and case assignment approaches, what is being investigated, and how that is approached, also varies.

EX 7

By example, there are times in which detectives are called out in the field, and other times in which they are not, based on interpersonal communication with field personnel as opposed to consistent standard operating procedures; follow-up requirements with respect to formal documentation differ etc.

Case progress tracking recorded within the PremierOne case management software is inconsistent and overall minimal. This results in an inability to effectively track case investigative progress through the software system. Overall, additional tools should be employed to enhance what kinds of cases will be investigated, how they will be tracked, and to whom they are assigned.

• **Case closure –** A formal process by which cases are effectively managed includes a case closure component. To help facilitate manageable workloads, cases which no longer require near-term investigative efforts should be "closed" or "inactivated" in some fashion. CDP does not accomplish this consistently among the varied investigative sections.

In the absence of formalized case management, including a robust case management system (CMS) software solution, that is consistent with the Commission on Accreditation for Law Enforcement Agencies (CALEA), it is difficult to effectively manage the case and other workloads of CDP detectives. Such case management difficulties impact staffing requirements, to some degree. In effect, the lack of a comprehensive and formal case management approach will have an impact on perceived staffing needs as lack of formality typically requires greater resource investments.

**(2.2)   CDP Should Fully Standardize its Case Screening in a Subdivision SOP.**

The method for the Investigative Subdivision case screening is largely based on personnel judgment and different philosophies executed by individual work units. As noted, different personnel and different screening practices are executed throughout CDP. This should be formalized to ensure investigative consistency. To that end, each investigative unit should designate the Unit Sergeant to screen all cases. This is consistent with best practice.

Most present case screening practices have no formal way to help prioritize workloads. There is a "three category solvability approach" that is used by some units, but not all.  In order to ensure consistency throughout the CDP and help prioritize work for investigative follow-up, a formal case screening checklist with relevant solvability factors should be adopted. This is consistent with progressive case management philosophies as well as with the Commission on Accreditation for Law Enforcement Agencies (CALEA) case-screening system criteria (Section 42.1.2). The use of solvability factors is consistent with Section 42.1.2 which states, "The agency uses a case-screening system and specifies the criteria for continuing and/or suspending an investigative effort." This screening can take several forms. In the course of our research, the project team believes the following

EX 7

twelve-point process is most practical. If a crime report <u>has any one</u> of the solvability factors noted, it should be assigned for investigative follow-up. The twelve points are:

- Witnesses to the crime;

- Knowledge of the suspect's name;

- Knowledge of where the suspect can be located;

- Reasonable description of suspect;

- Identification of suspect possible;

- Property with traceable, identifiable characteristics, marks or numbers;

- Existence of a significant modus operandi;

- Presence of significant physical evidence;

- Reasonable description of the suspect's vehicle;

- Positive results from a crime scene evidence search;

- Belief that crime may be solved with publicity and/or reasonable additional investigative effort; and

- Strong possibility and/or opportunity for anyone, other than the suspect, to have committed the crime.

Effective case screening allows for the bulk of investigative resources to be dedicated to solvable cases deserving investigative resources. Solvability factors should be incorporated into a formal case screening process whereby the above list, or some derivative, is used as a "cover sheet" on all cases to determine whether it is an assignable case to a Detective for investigative follow-up. For those cases assigned, the suggested prioritization, as discussed subsequently, should be noted on the cover sheet.

**(2.3)   The Subdivision Should Formalize the Case Assignment Strategy.**

Once a case has been screened for solvability, based on those solvability factors checked, as well as a review of the qualitative case circumstances, the case should be prioritized for work based on a consistent approach.

Prioritization of workload has clearly been widely adopted in patrol services throughout the nation through a call priority classifications (e.g. Priority 1 "lights and sirens" rapid

EX 7

response), but the concept is used much less frequently in other law enforcement arenas. The project team believes case prioritization is an effective management tool to augment case screening and can be based on a "dollar amount" for property-related crimes, eliminating certain crime types from investigations by detectives (e.g. vandalisms), or other approaches.

CDP cases should be prioritized for work based on the following seven-priority rating, or similar approach. Case prioritization is an effective management tool to augment case screening by better formalizing assignments. The seven-priority rating approach described below is one method for prioritizing cases. The following assignment approach, based on priority, illustrates a well-regarded assignment method.

- **Priority 1** – Felony Crime with In-custody suspect or excellent chance of arrest.

- **Priority 2** – Misdemeanor Crime with an In-custody or excellent chance of arrest.

- **Priority 3** – Felony Crime with reasonable chance of arrest.

- **Priority 4** – Felony Crime with limited chance of arrest.

- **Priority 5** – Misdemeanor Crime with reasonable chance of arrest.

- **Priority 6** – Misdemeanor Crime with limited chance of arrest.

- **Priority 7** – Courtesy phone call based on no solvability factors.

This concept should be used by CDP as a framework for prioritizing workload, thereby focusing detective resources on the most important cases as well as balancing case assignments among staff. For example, one detective should not have a caseload composed mostly of Priority 1 and 2 cases while another has Priority 4 and 5 cases representing their workload. Adopting such a case assignment strategy can help facilitate better case management.

The intent of case prioritization is to focus detective resources on the most important cases. Once cases have been prioritized, any case not assigned to a detective as workable (given its lower priority) should be dispensed with (e.g. inactivated) in the most expeditious matter.

### (2.4) **As Part of Case Assignment, Workloads Should be Balanced Among Detectives.**

Part of the case assignment strategy is ensuring balanced workloads among the detective contingent. CDP has opportunity for improvement in this area. This can best be facilitated

EX 7

through better use of the PremierOne system and/or similar tracking (some unit's use a clipboard now) to ensure balanced active caseloads among staff.

**(2.5)  As Part of Case Closure, Cases Should be Consistently "Active" or "Inactive" Based on an Acceptable SOP.**

It is difficult to manage caseloads if staff and supervision do not know what cases are actually active or inactive.  Inactivating a case can be accomplished through a variety of means, with either sophisticated or simplified coding to better inform case managers. Inactive can actually result in a "closed" case based on arrest or exceptional means, but also can be inactive pending laboratory outcomes.  Regardless of the approach used, determining what caseload is active versus inactive should be done in a consistent fashion.

**(2.6)  CDP Should Re-Visit the Types of Cases Detectives Investigate to Potentially Allow for Investigative Focus on Higher Priority Crimes. This Can Result in Revised Staffing Levels.**

As noted earlier, there is not a consistent solution with regard to the types of crimes a law enforcement agency should investigate. While it is generally common practice for law enforcement to investigate solvable Part I crimes, even this is not universal. When considering Part II and other crime types, investigative efforts vary widely by agency. As discussed later in this report, CDP investigates various crime types that might better be suspended, particularly at the "zone" level where a variety of misdemeanor crimes are investigated. While each agency is different with respect to the kinds of cases assigned and under what circumstances, the following guidelines can facilitate further reducing potential case workloads.

•       Cases, regardless of type and with the exception of homicides, are not assigned and immediately suspended during case screening due to lack of real leads (solvability).

•       The cases are not assigned as they are lower priority and they do not elevate to a level deemed sufficient for an expenditure of detective resources (e.g. low value felony thefts).

•       Any misdemeanor cases will not be assigned unless there is a named suspect AND a cooperative victim.  Many of the burglary cases assigned fall within Category 3 and have a known suspect.

•       Case types will not be assigned in which the prosecutors have little interest in pursuing.

EX 7

In sum, CDP should revisit exactly what kinds of cases are to be assigned to detectives in the context of a new case management approach and expected service delivery to the community, with emphasis on reducing the number of unnecessary cases assigned.

In conclusion, a revision to the case management approach—to include revisions to case screening, case assignment, case investigation and case closure— can have a dramatic impact on detective staffing levels. Once case management principles have been revised, CDP should revisit detective staffing needs based on the recommendations provided in this report.

The following recommendations are made with regard to the case management process.

**Recommendations:**

**Ensure Unit Sergeants are consistently reviewing and screening cases for their detective staff. This should be accomplished in all Subdivision Units. Inactive cases identified by the Sergeant can be distributed to detectives for pattern/trend recognition, but should be notably classified as such.**

**Throughout CDP, formalize the case screening process using a documented solvability factor methodology that includes a 12-point criteria checklist, or similar, on all assigned detective cases.**

**Formalize a detective caseload prioritization system beyond the "three category screening priority" currently in use in some units.**

**To help better balance workload among detectives, use a detective caseload prioritization system as part of the case assignment process using a 7-priority system, or similar, as a framework. Use the priority system to help balance workloads among detectives both numerically and in level of case sophistication.**

**Develop a consistent approach to identifying and recording active and inactive cases among all Subdivision investigative units. This will help resolve workload imbalances and develop a clearer picture on resource needs to address active workloads.**

**Based on a new case management philosophy to be finalized by CDP, eliminate assigning certain "lower priority" case types and other kinds of low solvability, misdemeanor reports, to detectives either centrally or in "zones."**

**Re-visit the existing use of the PremierOne software solution as a case management system and identify methods for further consistent utilization among all detective units. If the CMS is inadequate, explore definitive work-arounds to be universally applied or alternatively another software solution.**

EX 7

**Include in the Subdivisions existing Standard Operating Procedures (SOP) all important investigative work-related protocols discussed herein including the further formalization of the case management process.**

## 2 | Analysis of Investigative Subdivision Staffing

### (1) Initial Caseloads Are a Foundational Determinant for Investigative Staffing Levels.

Investigative workload can employ a series of indicators to determine the extent to which core investigative staffing is adequate and general workload is appropriate. Performance against these metrics can ultimately influence resulting staffing requirements for detectives. Various research by our firm and others has been done with respect to efficiency and effectiveness metrics for investigative services.

With respect to developed metrics, comparative measures used to help determine investigative staffing, efficiency and effectiveness are summarized in the following table:

**Comparative Measures for Investigations**

| Comparative Measures | Comparative Industry Patterns |
|---|---|
| **Active cases assigned to "property" crimes Detectives (e.g., burglary/theft).** | 15 to 20 **active** cases per month based on a survey of dozens of law enforcement agencies performed by the Matrix Consulting Group over many years. Recent research in California and elsewhere suggests this range has been reduced to 12-15 cases as the complexity of evidence collection and testing has increased the overall time required to investigate a case. |
| **Active cases assigned to "person" crimes Detectives.** | 8 to 12 **active** cases per month based on the same survey. 3 to 5 active cases for complex person crimes such as felony assault (shootings) to include homicides. Domestic Violence (DV) cases vary widely dependent upon State mandates that result in varied workloads. Some DV Units can handle 20 to 30 cases per detective per month, whereas others can only handle DV caseloads typically attributed to the "felonious person crimes." For the same evidentiary reasons noted previously, person crime caseloads are often being lowered to 6-8 cases per month. |
| **Active cases assigned to sex crimes.** | Because of the sophisticated and sensitive nature of sex crimes, these specialized person crime cases have a lower **active** case range of 5-7 cases per month. |
| **Active cases assigned to White Collar Crimes Detectives (e.g., fraud).** | These have a broader range due to their varied complexity, from 10 to 20 **active** cases per month unless they are particularly difficult (e.g. embezzlement or high value) in which case the range is closer to 8-12 per month. |

EX 7

| Comparative Measures | Comparative Industry Patterns |
|---|---|
| **Active cases assigned to "generalist" crimes Detectives.** | 12 to 15 **active** cases per month based on the Matrix survey. Because of the sophisticated evidence-related processing noted previously, a lower range can result in 9-12 cases per month. |
| **Average hours dedicated to crime investigations by type of crime.** | Different studies over the past 30 years (Prummell; Gribble) have attempted to estimate an average number of hours worked for each investigation per crime type. These include: <br>• Burglary: 6-12 hours. (PERF 0.5-40) <br>• Robbery: 9-30 hours. (PERF: 1-60) <br>• Aggravated Assault/Battery: 4-25 hours. <br>• Homicide: 147 hours (PERF: 2-220) |
| **Maximum Investigations that Can be Handled** | Varied data from different sources has developed benchmarks based on the sophistication of certain crime types and the extensive time investment often required. A key example is one benchmark suggesting a single detective could handle no more relevant caseload than five (5) homicides annually. |

These initial metrics are used to establish a baseline or benchmarks for investigative staffing analysis.

## (2)    Introduction to Caseload Hour Requirements.

In order to provide further benchmarks for unit workload, the project team expanded the above framework and also uses hourly performance measures to estimate the number of new cases that can be effectively investigated by the typical detective in a month. These caseloads are derived from a combination of studies and our experience in conducting staffing and workload assessments for detective units in hundreds of departments throughout the United States. Because we work with a variety of clients we provide a case range. This is done to account for differences in resources available to detectives, e.g., dedicated crime scene response, forensic assistance and investigative case management techniques.

We have used broad categories – Person Crimes (Assault, Robbery, etc.), Person Crimes (Sex Assault and Sex Abuse), Person Crimes (Child Sex Assault, ICAC), Property Crimes, Financial Crimes, Traffic Crash Investigations, Domestic Violence, and Homicide because they have consistently shown to effectively differentiate investigative requirements that comprise the vast majority of detective workloads.

The following sections detail our reasoning for assigning each type of case a different number of investigative hours needed. It should be noted these are averaged based on our experience working with many departments.

EX 7

## (2.1)   Structure of the Case Type Breakdowns

Each case type is broken down into a number of subtasks, each with their own average time estimate. These estimates operate under the assumption that they are for *solvable* cases. Cases with low solvability, which are assumed to be screened out and not fully investigated as previously described, may not have as much case work associated with them (e.g., lack of DNA or other evidence, fewer interviews to conduct).

However, not all of the subtasks in each case type are performed in each investigation. As a result, a separate figure, the "% of Time Completed", estimates the proportion of cases that include this action. The average time estimate of each subtask is multiplied by the % of time they are completed, with the products added together into a single average time figure. In other words, the analysis is not using the case time if every possible action in performed in each case, but the composite of what the average case looks like.

*As an example, the following subtasks in an investigation (**not actual figures** – the table is shown for illustrative purposes):*

| Common Evidence/ Interviews | Approximate Time | % of Time Completed |
|---|---|---|
| DNA | **4 hours** | 50% |
| Interviews | **2 hour** | 100% |
| Cell Phones | **2 hours** | 50% |

Given that the DNA subtask is completed 50% of the time, the 4 hours it takes to complete the task only represents an average of 2 hours for the overall average case. In total, the three subtasks would combine for a total of **5 hours** of average case time as opposed to 8 hours if these three efforts were conducted 100% of the time.

## (2.2)   Person Crimes – Assault and Robbery

Person crimes are complex cases are that treated more seriously by the judicial system and tend to have more witnesses and evidence requiring more time in interviews and recovering and processing evidence than property crimes. We typically recommend no more than about 6 to 8 person crimes be assigned per detective per month.

EX 7

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **3 hours** (Includes submission and report) | 5% |
| Crime Scene Material (Evidence left by suspect) | Evidence to Property Control | **2 hours** (Includes Inspecting and writing report) | 5% |
| Cell Phones | Cell Phone Downloads | **3 hours** (Some phones take much longer) | 50% |
| Video | Review of video recovered from scene and BWC | **4 hours** (To review and write report) | 100% |
| Social Media/ Electronic Records/physical location | Warrants/ Subpoenas | **10 hours** (Includes reviewing and report writing) | 90% |
|  | Surveillance (Locating suspect) | **3 hours** (Includes report writing) | 50% |
| Victim Statement | Victim Interview | **3 hours** (Includes report writing) | 100% |
| Witnesses | Witness Interviews | **2 hours** (Includes report writing) | 40% |
| Suspect | Suspect Interview | **2 hours** (Longer if lodged -Includes report writing) | 40% |
| Total |  | 32 hours- *If all tasks completed* | |

**Based on the percentage for how often each subtask is completed, each solvable case equates to an average of approximately 20.9 hours.**

This list is not all inclusive and does not contain all elements of an investigation and not every person crime will have the same amount of evidence or interviews conducted. Included in these hours is the assumption that detectives will be using RMS searches, social media searches, checking association files, receiving informant information, and other investigative techniques (trackers, cell tower data, etc.) if available. Many cases will not require the number of hours listed, but some cases may require significantly more.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 6 to 8 new person crime cases a month. Using the above available work hours this reconciles to approximately **21 hours allotted per case.**

EX 7

**(2.3)   Person Crimes – Sex Assault and Sex Abuse**

Person crimes – Sex assault and abuse are even more complex cases that are treated more seriously by the judicial system and tend to have less witnesses and require more time in interviews, recovering and processing evidence than other person crimes. We generally recommend no more than 6 to 8 sex assault crimes be assigned per month.

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **3 hours** (Includes submission and report) | 30% |
| Crime Scene Material (Evidence left by suspect) | Evidence to Property Control | **2 hours** (Includes Inspecting and writing report) | 10% |
| Cell Phones | Cell Phone Downloads | **3 hours** (Some phones take much longer) | 50% |
| Video | Review of video recovered from scene and BWC | **2 hours** (To review and write report) | 100% |
| Social Media/ Electronic Records/physical location | Warrants/ Subpoenas | **10 hours** (Includes reviewing and report writing) | 90% |
| | Surveillance (Locating suspect) | **3 hours** (Includes report writing) | 50% |
| Sex Assault Kit | Sex Assault Exam | **3 hours** (Done by Hospital Staff, but a detective is required to be present at hospital and requires submission to lab) | 90% |
| Victim Statement | Victim Interview | **4 hours** Interviews are recorded (Includes report writing) | 100% |
| Witnesses | Witness Interviews | **2 hours** (Includes report writing) | 5% |
| Suspect | Suspect Interview | **4 hours** (Longer if lodged -Includes report writing) | 40% |
| Total | | 36 hours- *If all tasks completed* | |

This list is not all inclusive and does not contain all elements and not every child victim crime will have same amount of evidence or interviews conducted. Included in these hours is the assumption that detectives will be using RMS searches, social media searches, checking association files, receiving informant information and other

EX 7

investigative techniques (trackers, cell tower data, etc.), if available. Many cases will not require the number of hours listed, but some cases may require significantly more.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 6 to 8 new sex assault cases a month. **Using the above work hour estimates and the percentage of the time that each subtask is completed, this translates to approximately 23.5 hours per solvable case,** within the range of 6 to 8 new cases monthly.

### (2.4)   Person Crimes – Child Sex Assault, and Sex Abuse

Person crimes – Sex assault and crimes against children are even more complex cases that are treated more seriously by the judicial system and tend to have more witnesses and evidence, requiring more time in interviews and the recovering and processing of evidence than other person crimes. We generally recommend no more than 5 to 7 child victim crimes be assigned per month.

These cases generally involve the use of forensic interviewers who must be scheduled and the interviews tend to be lengthier.

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **3 hours** (Includes submission and report) | 5% |
| Crime Scene Material (Evidence left by suspect) | Evidence to Property Control | **2 hours** (Includes Inspecting and writing report) | 5% |
| Cell Phones | Cell Phone Downloads | **3 hours** (Some phones take much longer) | 50% |
| Video | Review of video recovered from scene and BWC | **2 hours** (To review and write report) | 100% |
| Social Media/ Electronic Records/ physical location | Warrants/ Subpoenas | **10 hours** (Includes reviewing and report writing) | 50% |
|  | Surveillance (Locating suspect) | **3 hours** (Includes report writing) | 70% |
| Sex Assault Kit | Sex Assault Exam | **3 hours** (Done by Hospital Staff, but a detective is required to be present at hospital and requires submission to lab) | 100% |

EX 7

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| Victim Statement | Victim Interview | **5 hours** Forensic Interview by Third Party Professional for Child victims (Includes report writing) | 100% |
| Witnesses | Witness Interviews | **2 hours** (Includes report writing) | 10% |
| Suspect | Suspect Interview | **4 hours** (Longer if lodged -Includes report writing) | 50% |
| Total | | 37 hours- *If all tasks completed* | |

**Using the case time estimates and the percentage of the time that each subtask is completed, this translates to approximately 21.1 hours allotted per solvable case.** This list is not all inclusive and does not contain all elements and not every child victim crime will have same amount of evidence or interviews conducted. Included in these hours is the assumption that detectives will be using RMS searches, social media searches, checking association files, receiving informant information and other investigative techniques (trackers, cell tower data, etc.), if available. Many cases will not require the number of hours listed, but some cases may require significantly more.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 5 to 7 child victim cases a month. Based on the available work hours, this also approximates the **21 hours estimated per case**.

**(2.5)   Homicide**

Homicides are complex cases and often require exhausted effort in the first 48 to 72 hours. They are typically worked in teams with 2 to 4 lead investigators assisted by other detectives and resources.

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **4 hours** (Includes submission and report) | 100% |
| Crime Scene Material (Evidence left by suspect) | Evidence to Property Control | **8 hours** (Includes Inspecting and writing report) | 100% |
| Cell Phones | Cell Phone Downloads | **20 hours** (Some phones take much longer) | 100% |

EX 7

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| Video | Review of video recovered from scene and BWC | **20 hours** (To review and write report) | 100% |
| Social Media / Electronic Records / Physical location | Warrants / Subpoenas / Review of Evidence Obtained | **110 hours** (Includes reviewing and report writing) | 100% |
| | Surveillance (Locating suspect) | **10 hours** (Includes report writing) | 100% |
| Post Mortem Exam | Autopsy performed by ME (Detectives observe; consult) | **6 hours** (Includes Inspecting and writing report) | 100% |
| Witnesses | Witness Interviews (Locating) | **20 hours** (Includes report writing) | 100% |
| Suspect | Suspect Interview | **12 hours** (Longer if lodged - Includes report writing) | 50% |
| | Consult with DA | **10 hours** | 100% |
| Total | | 220 hours- *If all tasks completed* | |

This list is not all inclusive and does not contain all elements and not every homicide will have same amount of evidence or interviews conducted. Included in these hours is the assumption that detectives will be using RMS searches, social media searches, checking association files, receiving informant information and other investigative techniques (trackers, cell tower data, etc.), if available. It also assumed that detectives work as a team and not all investigative hours will be worked by a single detective (*These are hours for lead detective only*). Many cases will not require the number of hours listed, but some cases may require significantly more.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 5 homicide cases a year as lead. **Using the case time estimates and the percentage of the time that each subtask is completed, this translates to approximately 214.0 hours allotted per solvable case.**

## (2.6)   Property Crimes

Property crime are typically much less complex than person crimes and therefore require less investigative work. They also tend to have much lower solvability rates (approximately 50% less solvable than person crimes). These types of cases typically do

EX 7

not require a detective to respond to a scene and are often handled as follow up a day or more after the occurrence.

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **1 hour** (Includes submission and report) | 5% |
| Crime Scene Material (Evidence left by suspect) | Phone consult / Evidence to Property Control | **1 hour** (Includes Inspecting and writing report) | 5% |
| Cell Phone | Cell Phone Download | **3 hours** (Includes Inspecting and writing report) | 10% |
| Video / BWC | Review of video recovered from scene and BWC | **3 hours** (To review and write report) | 50% |
| Social Media/ Electronic Records/physical location | Warrants/ Subpoenas | **20 hours** (Includes reviewing and report writing) | 50% |
|  | Surveillance (Locating suspect) | **3 hours** (To review and write report) | 30% |
| Victim Statement | Victim Interview | **1 hour** (Includes report writing) | 100% |
| Witnesses | Witness Interviews | **1 hour** (Includes report writing) | 10% |
| Suspect | Suspect Interview | **2 hours** (Longer if lodged -Includes report writing) | 20% |
| Total |  | 35 hours- *If all tasks completed* |  |

This list is not all inclusive and does not contain all elements and not every property crime will have same amount of evidence or interviews conducted. Victim interviews in property crimes are rarely first-hand witnesses to the crime occurrence, but rather simply report basic information on loss. Included in these hours is the assumption that detectives will be using RMS searches, pawn searches, checking association files, receiving informant information, and other investigative techniques (trackers, cell tower data, etc.), if available. Less than 25% of reported property crimes are typically solved.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 12 to 15 new property cases a month. **Using the above available work hours, and based on the case time estimates and percentage of the**

EX 7

**time that each subtask is completed, this translates to approximately 14.3 hours per solvable case.**

**(2.7)   Financial Crimes**

Financial crimes are very difficult cases to pursue and typically take longer to investigate as much of the evidence has to be subpoenaed or obtained with a search warrant. In addition, much of the evidence belongs to financial institutions and detectives must wait for them to comply with legal requests for information before they can proceed and this can take weeks to months depending on the type and amount of data requested. They also tend to have much lower solvability rates (approximately 50% less solvable than person crimes). These types of cases typically do not require a detective to respond to a scene and are often handled as follow up a day or more after the occurrence.

| Common Evidence /Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| DNA | Evidence to Crime Lab | **1 hour** (Includes Inspecting and writing report) | 5% |
| Crime Scene Material (Evidence left by suspect) | Evidence to Property Control | **2 hour** (Includes Inspecting and writing report) | 5% |
| Cell Phone | Cell Phone Download | **3 hours** (To review and write report) | 10% |
| Video/BWC | Review of video recovered from scene and BWC | **4 hours** (To review and write report) | 50% |
| Social Media/ Electronic Records/ physical location | Warrants/ Subpoenas/ Document review | **20 hours** (Includes reviewing and report writing) | 100% |
|  | Surveillance (Locating suspect) | **3 hour** (Includes report writing) | 30% |
| Victim Statement | Victim Interview | **1 hour** (Includes report writing) | 100% |
| Witnesses | Witness Interviews | **1 hours**(Includes report writing) | 10% |
| Suspect | Suspect Interview | **2 hours** (Longer if lodged -Includes report writing) | 20% |
| Total |  | 37 hours- *If all tasks completed* |  |

**Based on the percentage for how often each subtask is completed, each solvable case equates to an average of approximately 24 hours.**

EX 7

This list is not all inclusive and does not contain all elements and not every property crime will have the same amount of evidence or interviews conducted. Victim interviews in financial crimes are rarely first-hand witnesses to the crime occurrence, but rather simply report basic information on loss. Included in these hours is the assumption that detectives will be using RMS searches, checking association files, receiving informant information, and other investigative techniques (trackers, cell tower data, etc.), if available. Less than 25% of reported financial crimes are typically solved.

Through our experience over many studies we have found that a competent detective can efficiently work an average of 6 to 8 new financial cases a month.

**(2.8)   Domestic Violence**

Domestic Violence Crimes are unique in that victim and the suspect are known; however, victims may not be fully cooperative with the investigation. The safety of the victim also can be affected unlike many other investigative cases. These types of cases typically do not require a detective to respond to a scene and are often handled as follow up after initial investigation by patrol officers.

| Common Evidence/ Interviews | Common Processes | Approximate Time | % of Time Completed |
|---|---|---|---|
| Video/Pictures of injuries | Review of video/ pictures taken at the scene and BWC | **3 hours** (To review and write report | 100% |
| Social Media/ Electronic Records/ physical location | Warrants/ Subpoenas/ Document review | **4 hours** (Includes reviewing and report writing) | 50% |
| | Surveillance (Locating suspect) | **3 hours** (To review and write report) | 50% |
| Victim Statement | Victim Interview | **3 hours** (Includes report writing) | 50% |
| Witnesses | Witness Interviews | **1 hours** (Includes report writing) | 100% |
| Suspect | Suspect Interview | **2 hours** (Longer if lodged -Includes report writing) | 50% |
| Total | | 16 hours- *If all tasks completed* | |

This list is not all inclusive and does not contain all elements and not every property crime will have same amount of evidence or interviews conducted. Investigators may also be involved in working with DV advocates or arranging for services for the victim when needed.

EX 7

Through our experience over many studies we have found that a competent detective can efficiently work an average of 12 to 15 domestic violence cases a month. Using the above available work hours this translates to approximately **11 hours** allotted per case.

**(3)**      **Investigative Unit Staffing Analysis Overview**

CDP core detectives and supporting officers are assigned to a variety of units as detailed in the Profile deliverable. The staffing numbers reflected in this document are up to date, as of March 10, 2019; however, the currently filled numbers change frequently. The following graphic portrays actual staffing levels at the time of this report in the various units. For clarities sake, detective and officer position assigned cases will be defined as "Investigators" for purposes of these sections.



There are 315 detectives and officers actually assigned to these units as of March, 2019.

The importance of first line supervision cannot be understated; the professional literature on such staffing requirements is significant. Most law enforcement agencies, such as Columbus, rely on the sergeant position to provide direct supervision and supporting administrative services to personnel. Ratios of sergeants to staff typically run from 1:6 to 1:9 with a maximum ratio of 1:12. In sum, however, we will not recommend sergeant-to-staff ratios exceeding approximately 1:12 except in very unusual circumstances.

Additional supervision overview findings include:

EX 7

- The *Crimes Against Persons Bureau* is staffed with 117 detectives/officers and 14 sergeants resulting in a first-line supervision to staff ratio of 8.4.

- The *Property Crimes Bureau* is staffed with 73 detectives and 9 sergeants resulting in a first-line supervision to staff ratio of 8.1.

- The *Special Victims Bureau* is staffed with 65 detectives and 8 sergeants resulting in a first-line supervision to staff ratio of 8.1.

- The *Narcotics Bureau* is staffed with 65 detectives and 9 sergeants resulting in a first-line supervision to staff ratio of 7.2.

In sum, management and supervision levels in the existing Investigative Subdivision are appropriate.

**Recommendation: Maintain the existing Commander, Lieutenant, and Sergeant management and supervision structure in the Investigations Subdivision.**

**(4)     Unit Caseloads – Crimes Against Persons Bureau**

The following data reflect caseload information for the noted Bureau units.  Data may be multi-year or single year based on information provided by CDP.

**(4.1)   Caseload Information – Homicide Units**

The Homicide Units investigated the following number of homicides over the three-year period noted.



**# Homicides by Calendar Year**

EX 7

Importantly, the FBI suggests each investigator can handle a maximum of 5 homicides per year or an average of .4 cases per month. Using this metric exclusively, the following minimum number of detective personnel should be available to handle homicides exclusively.



**Number of Detectives Needed Exclusively for Homicide Investigation Based on FBI**

While homicides were on the rise over the three-year period, the average for the timeframe would result in the need for approximately 23 detectives to work exclusively homicide cases. Currently, as shown in a prior graphic, 31 detectives are assigned to homicide units.

Moreover, at 214 hours per homicide case average for a lead detective, and 143 homicides, estimated time investment in 2017 was over 30,600 hours or over 18 full-time equivalents (after annual leave considerations) dedicated exclusively to lead-detective efforts.

While this initial data may point to a staffing issue, notably homicides are not the only investigative efforts performed by these personnel:

· Based on data, homicide cases reflect only 21% of the cases assigned to Homicide Units' detectives[15]. Staff are occupied with other efforts to include suicides and suspicious deceased persons. Moreover, 12 of these detectives serve on the CIRT which investigates officer involved shootings and suspicious in-custody deaths (57 cases in the three-year period).

· Homicides per detective range from 2.3 cases per year to 4.7 cases per year, with an average caseload of 3.7 homicide cases per year.

· Homicide cases as a percentage of total cases assigned range from 7% to 37% of all cases assigned to individual detectives.

---

[15] This proportion based only on detectives assigned to the Units over the 3-year period.

EX 7

Given the total cases assigned to Homicide Units' detectives, overall staffing does not currently appear to be a significant issue; however, the distribution of cases among staff needs to be re-visited. As shown in the graphic below, there is a workload balance issue relative to homicide cases assigned, particularly given one homicide detective can act as a lead detective on five homicide cases annually per prior benchmarks (assuming no other key workloads).



**# of Detectives with Annual Homicide Caseload**

As noted, while overall staffing in homicide would be significant if homicides were the only cases investigated, this is not the case in CDP. At issue, however, is the workload balance between detectives as shown above. This is another illustration of a case management issue that should be resolved.

In addition to active homicides, the Investigative Subdivision has a Cold Case Unit, the size of which is generally a policy decision for the Department. Presently homicide detectives retain cold cases until retirement or transfer, at which point it is potentially assigned to the cold case files. This process should be revised such that after one year of an "inactive investigation," the homicide is assigned to the cold case files for potential Cold Case Unit follow-up.

**Recommendations:**

**Assign 30 detectives to the Homicide Unit to provide homicide and other investigative support services currently undertaken. This is one (1) position less than existing staffing levels.**

**Assign 10 detectives to each of the three shifts.**

EX 7

**Maintain four (4) Cold Case detectives. Revise the cold case homicide process such that after one year of an "inactive investigation," the homicide is assigned to the cold case files for potential Cold Case Unit follow-up based on the cold case scoring sheet.**

**Through effective case management, balance caseload among all homicide detectives, particularly related to the number of homicides per year. This caseload balance issue needs to be of primary concern for the Investigative Subdivision, particularly for person-related crimes.**

**(4.2)   Caseload Information – Assault Units**

The Assault Units investigated the following number of cases in 2017.



Data in the tables noted previously indicates that significant person crimes require an effort averaging 6-8 cases per detective per month. "Simpler" cases may require an effort of 8-12 cases per month. Based on the lower end of these metrics, the following is the estimated number of detective staff required per crime type:

EX 7



**Number of Detectives Needed for Investigations by Crime Type/Complexity - 2017**

Simple assault and 'Other' Crimes were calculated at an average of 8 cases per month per detective while the remaining more complicated crimes were calculated at 6 cases per month. This results in the distribution of detective requirements shown above, or a total of 16.9 detectives compared to 18 actually assigned now.
.
• In addition to caseloads assigned, Assault detectives also support Homicide Units, as necessary.

• Officer assaults can be particularly sophisticated depending upon circumstances, and staffing for this investigation may be under-estimated based on baseline metrics.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing. Using the 21 hours per case average for all but Officer Assaults and 'Other' (established at the "maximum" 32 hour average per case) results in a staffing contingent of 17.5 personnel (after annual leave considerations) compared to the 18 actually assigned now.

• Given the total cases assigned to Assault Units' detectives, overall staffing does not currently appear to be a significant issue. Unlike Homicide, more specific data relative to cases by detective was not provided. This issue will be discussed in the draft report.

• Unlike Homicide, more specific data relative to cases by detective was not provided.

EX 7

In the absence of detective-specific workload, it is not possible to determine workload balance issues among staff. Such information should be consistently captured and used to effectively conduct case management activities.

**Recommendations:**

**Assign 19 detectives to the Assault Unit to provide investigative support services currently undertaken. This is one position above existing staffing levels.**

**Develop consistent reporting on the workloads assigned to each detective in order to facilitate effective case management processes.**

**Re-visit the staffing by shift in Assault upon understanding total workloads for each detective within each shift.**

**(4.3)   Caseload Information – Robbery Units**

The Robbery Units investigated the following number of robbery and extortion cases (excluding banks) over the three-year period.



# Robberies by Calendar Year

Data in the table noted previously indicates that significant person crimes require an effort averaging 6-8 cases per detective per month; readily solvable cases may allow a detective to handle up to 12 cases monthly. The following is the estimated number of detective staff required for robbery based on an 8-cases per month workload:

EX 7



**Number of Detectives Needed Based on 8 Cases/Mo. per Detective**

The three-year average results in the requirement, based on the 8-case metric, of 27 detectives compared to 19 actually assigned now.

· In addition to caseloads assigned, detectives typically respond to the field to support Patrol.  Caseload metrics do not include this time-consuming activity.

· Given the total cases assigned to Robbery Units' detectives, personnel appear to be understaffed.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing.  Using the 21 hours per case average for all robberies results in a staffing contingent of 32 personnel (after annual leave considerations) compared to the 19 actually assigned now.

· Various data suggest the Robbery Unit is notably understaffed.

· Staffing shortcomings can be partially mitigated by re-examining person-crime units' organization.

Based on data, Robbery needs an additional 8-13 detectives to perform services.  Alternatively, a consolidation of "like units" can facilitate economies of scale in staffing.  The following is offered:

· Consolidate the Assault and Robbery Units under a Major Crimes Section.

· Staff with three watches—1st, 2nd and 3rd and a Mid-watch.  Assign one (1) sergeant to each shift including one "floater" to cover supervisor absenteeism.

EX 7

- Given the sophistication of many of these crimes, similar to Homicide and Economic Crimes require 'Exceptional Qualifications' to be considered for assignment.

- Based on caseload estimates, 46 detective personnel would be needed in the revised Major Crimes Section potentially distributed as follows:

    - 1st Shift Major Crimes Unit - 10
    - 2nd Shift Major Crimes Unit - 12
    - 3rd Shift Major Crimes Unit - 12
    - Mid-watch Major Crimes Unit - 12

In the event a Major Crimes Section is established, this should be under one Lieutenant.

**Recommendations:**

**Assign 30 detectives to the Robbery Unit to provide investigative support services currently undertaken. This is eleven (11) positions above existing staffing levels.**

**Alternatively, create a Major Crimes Section combining Robbery and Assault Units as described in this report. Total staffing contingent for this Section would be 46 detectives, seven (7) positions above existing staffing levels in the separate robbery and assault units.**

**Re-visit the staffing by shift in Robbery upon understanding total workloads for each detective within each shift.**

**Given the sophistication of many of these person crime types, similar to Homicide and Economic Crimes, consider requiring 'Exceptional Qualifications' for all major person crime detective assignments excluding the Family Crimes Section.**

**(5)     Support Section Specialized Investigations – Crimes Against Persons Bureau**

Gun Crimes and Digital Forensics are specialized supporting investigative units reporting to this Bureau. Relevant case-related or workload metrics are shown in the following graphic.

EX 7



Gun Crimes staff, composed of 11 officers, perform the above tasks in support of Patrol particularly in regard to gun arrest processing, submission of firearms for testing, and most recently, felony narcotics arrests processing (no data shown as not provided). In effect, the data suggest that approximately two key tasks are performed per officer, per work day, _excluding_ felony narcotics arrest processing.

In the absence of performance metric data such as narcotics arrests, assessing the staffing contingent is difficult, particularly given narcotics was recently assigned as a core duty of these personnel. As such, the existing staffing contingent is an appropriate default (particularly given processing of gun-related information is driven by a 10-day statute) until further performance-data can be captured.

Digital Forensics continues to evolve with an increase in staffing recently. Digital Forensics Detectives process digital forensics found in cell phones (95% of work), computer, tablets, and other electronic devices. Digital Forensics staff identify investigative materials and provide raw data, as requested by investigators. Generally, staffing levels in such an operation are a policy decision driven by how rapidly Administration wishes such items to be processed.

With respect to a recent comparison, the project team worked with the Fort Worth PD in the last year who had one of the most impressive Digital Forensic operations that we have seen, staffed with 7.5 personnel (compared to CDP's seven personnel). Notably, the population of Fort Worth and Columbus are near identical. Importantly, Fort Worth has one dedicated civilian digital investigator augmenting this operation; decisions with respect to civilianization of this activity is now of additional interest in law enforcement.

EX 7

**Recommendations:**

**Maintain existing staffing in the Gun Crimes Unit of 11 officers, and 1 Property and Evidence Technician.  Fill the currently vacant Office Assistant II position.**

**Maintain existing staffing in Digital Forensics of 6 detective positions.  In the future upon any expansion, consider hiring civilian digital forensic technicians to augment capabilities; blended sworn and civilian staff in such a unit is consistent with practices often seen.**

**(6)     CSSU and Property and Evidence Recovery Unit**

The Crime Scene Search Unit is within this Crimes Against Person Bureau in the noted Support Section.  The Evidence Recovery Unit is in the Property Crimes Bureau, Burglary Section.   Given the common field evidence retrieval roles, these units are discussed herein.

The Crime Scene Search Unit (CSSU) reports directly to this Bureau and Section Lieutenant and responds to various crime types to collect evidence, with alleged emphasis on person crimes evidence retrieval.   The graphic below shows evidence response by type.



This is further broken-down as follow:

EX 7

## 2017 CSSU Field Response by Specific Crime Type



Sixteen (16) sworn staff are assigned to the CSSU. Based on the 2017 metrics above, on average each CSSU officer responded to 100 scenes per year, or approximately 8.5 scenes per month.

- Based on leave, each staff work approximately 18 days on average monthly. This results in processing approximately one scene every two days.
- Based on the above, each scene processed is calculated at 16 work hours per scene. This is excessive particularly given the proportion of "Other."

With respect to the Evidence Recovery Unit, six (6) P&E Technicians emphasize property crime evidence retrieval including video acquisition and processed the following:

EX 7



**2017 P&E Response by Type**

Based on the 2017 metrics above, on average each Technician responded to nearly 500 scenes per year, or approximately 41 scenes per month—nearly five-times the response rate of their CSSU counterparts.

•    Based on leave, each staff work approximately 18 days on average monthly. This results in processing approximately two scenes every day.

•    Based on the above, each scene processed is calculated at approximately 3-4 hours per scene. This is a reasonable benchmark.

Whereas person crime evidence collection, particularly homicide, takes longer and is more sophisticated than property crime evidence collection and video retrieval, the difference in level of effort does not justify the substantive difference in evidence collection performance between the CSSU and Evidence Recovery Unit. Moreover, numerous police agencies throughout the nation have fully civilianized "Crime Scene Investigation" and as such, there are opportunities for operational revision.

In sum, the CSSU staffing contingent should be notably reduced, and all evidence collection consolidated under one "Crime Scene Investigation" Unit composed of both sworn and civilian personnel. This unit should be fully cross-trained whereby staff, both civilian and sworn, can collect the entire suite of person and property crime field evidence.

**Recommendations:**

**Reduce officer staffing in the CSSU from 16 positions to 9 positions, a reduction of 7 assigned positions.**

EX 7

**Maintain existing civilian staff of 6 positions in the Evidence Recovery Unit.**

**Consolidate CSSU and the Evidence Recovery Unit into a "Crime Scene Investigations Unit" composed of 15 civilian and sworn staff across three shifts; blended sworn and civilian staff in such a unit is consistent with practices often seen.**

**Assign 3 sergeants to this new CSI Unit; a reduction of 1 sergeant now assigned to CSSU and the Evidence Recovery Unit.**

**Fully cross-train all CSI staff to respond to all scenes for evidence collection purposes.**

**(7)     Investigative/Administrative Section – Crimes Against Persons Bureau**

This section includes staffing in various task forces, office support staff, and Criminal Intelligence Analysts.  Information provided through interviews generally substantiates the staffing allocations associated with these positions.

**Recommendation:  Maintain  existing  authorized  staffing  levels  in  the Investigative/Administrative Section.**

**(8)     Unit Caseloads – Special Victims Bureau**

The following data reflect caseload information for the noted Bureau units.  Data may be multi-year or single year based on information provided by CDP.

**(8.1)   Caseload Information – Sexual Assault Units**

Sexual Assault Units A and C work at the Center for Family Safety and Healing and are tasked with the investigation of alleged sexual abuse committed against victims age 15 years of age and under, as well as victims age 21 years of age or under that are developmentally delayed. Sexual Assault Units B, D and E investigate sexual offenses committed against victims aged 16 years old and over. Additionally, they investigate kidnappings, sexual battery, gross sexual imposition, voyeurism, public indecency, AMBER Alerts, and all serial sex crimes. The Sexual Assault Units investigated the following number of cases in 2016[16].

---

[16] 2017 Annual Report data was not available; 2018 PDF data was not in manageable analytic format.

EX 7



**2016 Total Caseload Assigned to Units**

Data in the table noted previously indicates that significant sex crimes require an effort averaging 5-8 cases per detective per month. Based on the lower end of these metrics, the following is the estimated number of detective staff required:

• Units A and C currently have assigned 15 detectives. Based on the 2016 metrics approximately 21 detectives are necessary to handle an average of 5 newly assigned cases per month.

• Units B, D and E currently have assigned 16 detectives. Based on the 2016 metrics approximately 20.5 detectives are necessary to handle an average of 5 newly assigned cases per month.

• Raising the case assignment range to seven (7) cases for all sexual assault detectives results in the need for 30 detectives compared to 31 assigned.

Given the total cases assigned to Sexual Assault Units' detectives, overall staffing does not currently appear to be a significant issue, though potentially slightly understaffed.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing. Using a 21-23.5 hours per case average for all sex crimes results in a staffing contingent of 31-35 personnel (after annual leave considerations) compared to the 31 actually assigned now.

EX 7

**Recommendations:**

**Assign 32 detectives to the Sexual Assault Units to provide sex assault and other investigative support services currently undertaken. This is one (1) position more than existing staffing levels.**

**Given the sophistication of many of these sex crime types, similar to Homicide and Economic Crimes, requiring 'Exceptional Qualifications' for these detective assignments is strongly encouraged.**

**As part of caseload balancing among detectives, assign one detective to each Unit to maintain a Cold Case active backlog.  As a result, new caseloads should not be assigned beyond 5 cases monthly.**

### (8.2)  Caseload Information – Physical Abuse Units

The Physical Abuse Unit investigates both child and elder abuse cases, and mental health cases; many complaints for child abuse are generated by child protective services (FCCS).  The following caseload metrics are provided:



2016 Total Caseload Assigned by Type

Caseload expectations can vary widely on these case types, ranging from the typical "person crime caseload" (8-12 cases per month) to misdemeanant domestic violence caseloads (20-30 per month).  As such, staffing ranges could also vary significantly. Assuming a caseload range of 12-20 per month per detective, staffing required in the physical abuse units would range from 8.5 to 14 detectives.  Given current staffing is 13 personnel, there appears to be no staffing issues of significance.

EX 7

**Recommendations:**

**Assign 13 detectives to the Physical Abuse Units to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.**

**Maintain existing staffing in the Unit for the CIA and Office Assistant.**

### (8.3)   Caseload Information – Exploited Children Unit

Three (3) detectives investigated 166 crimes related to exploited children in 2016.  This did not include those cases transferred to the regional ICAC operation.  This averages 4.6 cases per month assigned to each detective.  Given the nature of this sexual crime and the aforementioned benchmarks, there are no staffing issues in this unit.

**Recommendation: Assign 3 detectives to the Exploited Children Unit to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.**

### (8.4)   Caseload Information – Missing Persons Unit

The Missing Persons Unit investigates, coordinates, and responds to reports of missing persons, runaway children, and interference with custody incidents. The Missing Persons Unit works conjunctively with the National Center for Missing and Exploited Children (NCMEC), the Ohio Attorney General's Missing Children Clearinghouse (MCCH), and other law enforcement agencies to locate missing/runaway children and high-risk missing adults.   Caseload metrics are as follows:



2016 Total Caseload Assigned by Type

EX 7

Seven (7) detectives are currently assigned the above cases with an eighth detective assigned to "missing person cold cases." With respect to High Risk and Custody cases, average monthly cases per detective is 20.5 (4.9 +15.6, respectively). Other Reviewed cases workload is typically cursory requiring only minimal effort. Based on this kind of caseload, particularly with respect to identified High Risk cases, the Unit assignment strategy can be modestly revised.

**Recommendations:**

**Assign 8 detectives to the Missing Persons Unit to provide investigative support services currently undertaken. This is equivalent to existing detective staffing levels.**

**Re-allocate Cold Case work from the specifically assigned detective to the newly assigned sexual assault Cold Case "specialists." Re-distribute Unit work among all eight detectives accordingly.**

**(8.5)   Caseload Information – Domestic Violence Unit**

Reports investigated by the unit include domestic violence, violation of protection order, aggravated assault, menacing, assault, menacing by stalking, and felonious assault when a domestic relationship exists between the offender and victim. Caseload metrics are as follows:



**2016 Caseload by Type**

| Type | Count |
|---|---|
| DV Enhancement | 677 |
| Violation Protection Order | 430 |
| DV Violation of PO | 264 |
| DV Ag. Assault | 74 |
| Kidnap/Abduction | 49 |
| Other | 42 |

The above metrics do not include 266 stalking reports which are assigned to two (2) dedicated detectives in the DV Unit. Caseload benchmarks would be similar to that of the assault unit: a range of 12-15 cases per month (and up to 20 for minor misdemeanors or similar) per detective dependent upon case sophistication. Based on the assignment

EX 7

of eight (8) detectives to the above caseloads, an average of 16 cases per month per detective was assigned in 2016.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing. Using 11 hours per case average for the first three investigative types shown in the graph above, and 21 hours per case for the latter three investigative types shown in the graph above, results in a staffing contingent of 11 personnel (after annual leave considerations) compared to the 8+2 detectives actually assigned now.

**Recommendations:**

**Assign 10 detectives to the core Domestic Violence investigation to provide the support services currently undertaken. This is two (2) positions above existing detective staffing assignments.**

**Continue to assign 2 detectives exclusively to stalking cases resulting in a Domestic Violence detective staffing contingent of 12 positions.**

**(9)      Unit Caseloads – Property Crimes Bureau**

The following data reflect caseload information for the noted Bureau units. Data may be multi-year or single year based on information provided by CDP.

**(9.1)  Caseload Information – Burglary Units**

The Burglary Units investigate various property crimes to include burglary, felony theft, theft from the elderly, lost/stolen property, etc. In 2017, staff investigated the following number of cases, by category type (further described below).

EX 7



**2017 Burglary Cases by Solvability Category**

As noted earlier in this chapter, Category 3 and 2 cases are considered by CDP as solvable, the latter requiring additional work given minimal evidence, victim or witness materials.  Category 1 burglary crimes, representing 78% of crimes, were classified as non-solvable and are (appropriately) not assigned.

Based on case range data provided for burglary in the prior table, 12-15 cases per detective per month is workable.  Using the lower end of the range for Category 2 burglaries, and the upper end of the range for Category 3 burglaries, the following staffing estimates are noted:

EX 7



Based on data provided, the information suggests the need for approximately 18.5 detectives to work solvable burglary cases. Currently, as shown in a prior graphic, 27 detectives are assigned to burglary units. Obviously, some modest time is also spent reviewing Category 1 non-solvable cases for pattern and trend recognition. This would require resources above the 18.5 staff noted.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing. Using 14.3 hours per case average results in a staffing contingent of 24 personnel (after annual leave considerations) compared to the 27 detectives actually assigned now.

· Data suggest that the burglary units are overstaffed based on solvable caseloads.

· This is exacerbated by the fact that many law enforcement agencies further screen "Category 2" property crimes with limited solvability, such that only 85% to 90% of such property crimes are worked. Caseloads could be further reduced with more refined screening as classifying more cases From Category 2 to Category 1 could be possible.

· Overall staffing needs may also be impacted because these crimes are assigned to the shift in which they occur. All shifts are presently "balanced" with staffing irrespective of workload needs.

The various metrics suggest a modest reduction in burglary staffing is warranted.

EX 7

**Recommendations:**

**Assign 24 detectives to the Burglary Units to provide the support services currently undertaken. This is three (3) positions below existing detective staffing assignments.**

**In lieu of distributing detectives equally between North and South and the two shifts, distribute the 24 detectives among the locales/shift based on actual caseload.   This will require effective case management tracking.**

### (9.2)   Caseload Information – General Property Crimes Unit

The General Property Crimes Unit investigates overflow work from investigative units without a 3rd shift, to include fraud, forgery, auto theft, etc. The Unit also investigates all felony property-crime "on-view" arrests by Patrol and performs occasional proactive pattern surveillance.

Caseload metrics in 2017 for the General Property Crimes Unit was the investigation of 233 cases, processing of 233 arrests and other minimal supporting services (e.g. 5 search warrants issued.)   With respect to the former, the 233 cases fell in the following Categories.



General Crimes Case Categories Assignment - 2017

In sum, 83% or 194 cases (Category 3 and 2) were assigned to the seven (7) General Property Crime detectives in 2017.  This results in an average caseload of 2.3 cases per month per detective—well below the benchmark of 12-15 cases per month previously noted.  Despite additional work related to arrest support and proactive surveillance efforts, there appears to be a notable staffing issue in this "investigative unit."  In the absence of

EX 7

information on how proactive efforts are engaged, it is difficult to make a determination on staffing level requirements.  Thus, the size of this Unit is largely a policy decision.

Investigative units with significant proactive time need closer scrutiny to ensure appropriate use of resources and necessary staffing levels. As such, the roles and responsibilities and ultimate size of the General Property Crimes Unit should be revisited.

**Recommendations:**

**Track proactive time efforts and outcomes for the Generalist Crime Unit, in addition to caseload tracking as part of effective case management.  This will help determine the appropriate staffing size for the unit.**

**Continue to assign 7 detectives to the Generalist Crime Unit to provide the support services currently undertaken. This is equivalent to existing detective staffing assignments.  This staff contingent should be revised after enhanced workload tracking efforts are undertaken.**

**(9.3)   Caseload Information – White Collar Crimes:  Economic, Fraud/Forgery, and ORCTF Units**

CDP has sub-divided various "white collar" crime investigations into several units to include:

·      Economic Crimes Unit investigates major (felony) economic crimes to include embezzlement, theft from the elderly, public corruption, and mortgage fraud.

·      Fraud and Forgery Unit investigates various fraud and forgery crimes with banks being the victim typically and ultimately deciding on investigation.

·      The Organized Retail Crime Task Force (ORCTF) investigates high-end repeat criminals passing bad checks, forging documents, etc. Typically, caseload is influenced by requests for assistance from retail establishments.

The following reflects workloads for Economic, Fraud and Forgery units:

EX 7



Staffing levels for Economic Crimes and Fraud and Forgery Units is 7 and 12 detectives respectively.  Workload, therefore, equates to an average of 3.1 cases per month per detective for Economic Crimes and 2.2 cases per month per detective for Fraud and Forgery.  While data suggest more cases were worked than assigned exclusively in 2017, the average case per month is well below what our project team typically sees for "White Collar Crime" investigative units, and thus points to a notable overstaffing issue.

In addition to case ranges, an evaluation of staffing based on the aforementioned hours per case provides other data supporting adequate staffing.  While the average financial crime case was calculated at 24 hours, to demonstrate CDP's focus on economic crimes all cases were calculated at the maximum average of 37 hours per case resulting in a staffing contingent of 12.5 personnel (after annual leave considerations) compared to the 19 detectives actually assigned now.

The ORCTF is composed of 3 detectives with support from the Franklin County Sheriffs. These staff support the Central Ohio Organized Retail Crime Task Force and as such staffing levels are largely based on a commitment to this regional law enforcement effort.

**Recommendations:**

**Assign 13 detectives to the Economic Crimes and Fraud and Forgery Units to provide the support services currently undertaken. This is six (6) positions less than existing staffing levels.**

**Continue to assign the three (3) detectives to the Organized Retail Task Force.**

EX 7

**(9.4)  Caseload Information – Auto Theft Unit**

The Auto Theft Unit is multi-tasking in a variety of proactive and investigative methods to include:

- Auto Theft transitioned into a proactive unit from theft from bait vehicles, GPS tracking, etc.

- Three of 13 detectives are assigned vehicle identification number identification in the impound lot or unauthorized use of a motor vehicle investigation, or perform as a back-up detective.

- Unit operates undercover and also manages tracking of stolen cars, and theft from auto. Six detectives assigned generally to motor vehicle theft; four to proactive theft from vehicle.

Essentially 6 of 13 detectives are dedicated to investigative efforts while the remaining 7 are providing supporting functions.

Caseload information for 2017 is provided as follows:



An average of approximately 34 cases per month would be assigned to each of the six detectives dedicated to investigations.  This excludes any support provided by the other seven detectives.  Moreover, Motor Vehicle Theft crimes rarely require significant work until a suspect is identified or a vehicle recovered and impounded. The CDP has developed an Auto Theft Unit that can operate nimbly between proactive and reactive investigative efforts, and as such, despite caseload metrics, staffing in the Unit is apparently adequate to perform the necessary roles and responsibilities. This is further validated by the fact that the Auto Theft Unit was recognized as the Law Enforcement 'Investigator of the Year' by the *Ohio Auto Theft Investigators Association* in 2017. In

EX 7

effect, units that are not operating efficiently and effectively would not receive such regional recognition.

**Recommendation: Continue to staff the Auto Theft Unit with up to 13 detectives; this is equivalent to existing staffing levels. If less proactive Auto Theft efforts are undertaken, the Unit can be downsized.**

### (10)   Unit Workload – Narcotics Bureau

The following data reflect information for the Narcotics Bureau.

### (10.1) Narcotics Investigations Units

As a proactive unit, staffing can expand or contract based on the unique narcotic needs of Columbus, including support to multi-agency task forces. Because staffing levels in proactive units can flex tremendously, generally speaking they can be devised as a proportion of total investigative staff in a law enforcement agency.

Based on the aforementioned approach, the following table reflects the possible size of a Narcotics Units based upon the total line investigative staffing in a law enforcement agency. The range our project team has discovered is typically between 3% and 7% of the investigative workforce assigned to narcotics and/or a combined vice/narcotics unit.

| Narcotics (Officer) Staffing Analysis | | | |
|---|---|---|---|
| % of Investigative Line Staff | # of Investigative Line Staff | Resulting # of FTEs | # of FTEs Needed (Rounded) |
| 3% | 315 | 9.45 | 10 |
| 4% | 315 | 12.6 | 13 |
| 5% | 315 | 15.75 | 16 |
| 6% | 315 | 18.9 | 19 |
| 7% | 315 | 22.05 | 22 |

Currently the investigative/proactive narcotics units are staffed with 24 detectives (Detective Units B through E). This staffing level is only marginally above the 7% figure noted in the table above.

**Recommendation: Assign 24 detectives to the Narcotics Units B through E to provide the support services currently undertaken. This is equivalent to existing staffing levels and within the norms of specialized proactive units in large policing agencies.**

EX 7

## (10.2) Pharmaceutical Unit

This unit, composed of six (6) detectives, provides support for hospital drug theft, false paper and electronic prescriptions and related support to patrol personnel. Given there is no benchmark caseload metrics for such a proactive unit, and with limited information regarding performance in the 2017 annual report, it is difficult to assess staffing needs, particularly since in our project team's experience, no other law enforcement agency with which we have worked has had such a dedicated unit. Yet, with the opioid crisis a national epidemic, a dedicated unit with its own supervisor should be now be considered progressive.

**Recommendation: Assign 6 detectives to the Pharmaceutical Unit to provide the support services currently undertaken. This is equivalent to existing staffing levels.**

## (10.3) In-Tac

This unit provides high-risk narcotics operations, dynamic entries into facilities and vehicle stops. Other efforts include undercover officer oversight and protection, as well as surveillance. The nature of this operation is similar to SWAT deployments, and as such the size of the unit, at 19 personnel, is generally consistent with a composition that can undertake two operations in the City concurrently, though a high risk operation would require the entire staffing contingent.

**Recommendations:**

**Assign 20 detectives to the In-Tac Unit to provide the support services currently undertaken. This is one (1) detective position above existing staffing levels.**

**Ensure equivalent training and equipment opportunities are provided to all Division specialized weapons team including CDP SWAT and In-Tac operations.**

## (11)   Narcotics Bureau Task Forces

Task Force participation is generally a policy decision, and as such staffing recommendations often default to existing staff contingents unless extremely unusual in size or scope of work. The three task force units (HIDTA, DEA, HTTF) and 16 detective staff assigned are consistent with participation for a very large police agency.

**Recommendation: Maintain existing staffing levels in the regionalized task forces of HIDTA, DEA, and HTTF of 16 detective positions.**

EX 7

**(12)   Narcotics Administrative – Narcotics Bureau**

This section includes staffing to include office support staff and a Criminal Intelligence Analysts.  Information provided through interview generally substantiates the staffing allocations associated with these positions.

**Recommendation: Maintain existing authorized staffing levels in the Narcotics Administrative Section.**

**(13)   Vice Unit(s)**

While this operation was disbanded during the course of the study, the project team recommends in the near future staffing of such a unit be re-visited.  As noted earlier in this chapter, recent work with the Fort Worth PD, which serves a community almost equivalent to the size of Columbus, has a dedicated Vice Unit composed of 10 field staff plus one sergeant.  Moreover, another recent client, Kansas City, has a Vice Unit composed of 1 sergeant and 7 officers.  These are illustrations that vice operations for large law enforcement operations is common practice.

EX 7

## 8     Homeland Security Subdivision

The Homeland Security Subdivision is comprised of three distinctly functional Bureaus – Special Services (operational support functions), emergency communications and traffic. The assessment of these functional Bureaus follows.

## 1     Special Services Bureau

The **Special Services Bureau** is comprised of units that provide additional field support services for the Police Division and specialty support functions.  The bureau is led by a commander and consists of four sections that are led by lieutenants.  There is one Office Assistant to support the Bureau. The four sections have work units as follows:

· Homeland Security Section

   – Joint Terrorism Task Force (JTTF)
   – Counter Terrorism Unit (CTU)
   – Mayor's Security

· Special Weapons and Tactics (SWAT) Section

   – Gold, Red and Green Teams
   – Training Unit
   – Canine Unit

· Aviation Section

   – Day Mid-watch Helicopter Unit
   – Evening Mid-watch Helicopter Unit

· Intelligence Section

   – Criminal Intelligence Unit A
   – Criminal Intelligence Unit B

Within each of the four Sections are several operational units. The following organization chart provides an overview of the Special Services Bureau.

EX 7



## (1)      Analysis of Homeland Security Section

The Homeland Security Section Conducts terrorism investigations and provides dignitary protection for the Mayor and high-profile dignitaries.  The section is led by a Lieutenant and there is one crime analyst that supports the section. The units in this section are all detached as part of multiple jurisdictional task force or by assignment.

## (1.1)   Joint Terrorism Task Force (JTTF)

Two officers are assigned to JTTF which is operated by and overseen by the Federal Bureau of Investigation (FBI).  Officers assigned to JTTF conduct terrorism investigations that have the potential to impact Columbus or the region.  There are JTTFs operating in most major cities across the country.

The JTTF reported the following activities for 2017:

| 2017 | Number |
|---|---|
| Primary investigators for Guardian threat assessments | 13 |
| Assisted Guardian Threat assessments. | 21 |
| Primary case agent for active terror investigation (OSU) | 1 |
| Obtained telephone tracking court order related to an active terror investigation | 1 |
| Responded with JTTF reactive team | 9 |
| Cultivated and signed up sources related to both Domestic and International terrorism. | 7 |
| Conducted surveillance operations on open case investigations | 32 |

EX 7

| 2017 | Number |
|------|--------|
| Conducted FBI de-confliction requests from CTU & SRB | 41 |
| Responses to suspected terror/extremists' incidents at the request of CDP patrol officers | 11 |
| Made multiple contacts with local Somali community members securing continued cooperation with Mosque officials | N/A |
| Participated in multi-agency JHAT Teams for home football games for The Ohio State University, and the Crew Soccer Club playoff/finals matches | N/A |
| Conducted sub-station roll call visits | 40 |
| Initiated Federal investigation of bounty hunter with terror connection resulting in a conviction. | 1 |
| Conducted multi-agency briefings of the OSU terror incident in Virginia and North Carolina | 2 |

As the table above indicates the JTTF officers participated in or conducted a large number of activities.  Though actual hours are not kept for each of these activities, it is understood that one investigation of a terror suspect can take 100's of hours to conduct.  This includes 10 to 40 hours to obtain a search warrant, 100's of hours of surveillance and briefings.

The JTTF officers have been productive and the work they have performed has resulted in the furtherance of active terrorism investigations. Maintaining membership in the JTTF allows the city to be better prepared and informed on terrorism.

The benefit of having officers assigned to the JTTF cannot be measured in cases alone. Continued participation in the JTTF provides the police division and the city real time involvement in active threats to the community and also provides the JTTF with additional resources to perform complex, long term investigations.

**Recommendation: Maintain the current staffing level of 2 officers assigned to the JTTF.**

## (1.2)   Counter-Terrorism Unit (CTU)

The CTU is comprised of one Sergeant and four Detectives that work at the Statewide Terrorism Analysis and Crime Center (STACC).  The Sergeant also supervises the Mayor's detail. CTU provides critical infrastructure protection, through intelligence gathering activities, coordinates intelligence for large scale events and investigates criminal threats, using multiple resources.

The unit reported the following activities for 2017:

EX 7

| 2017 | Number |
|---|---|
| Cases opened on tips provided by law enforcement and the public | 136 |
| Maintained case folders with detailed progress | 82 |
| Worked the public events | 21 |
| Worked numerous Congressional Protective detail | N/A |
| Assisted the Mayor's Protection Detail | N/A |
| Joint Hazard Assessment Team operations conducted for large scale special events | 20 |

The CTU had more than 5 activities reported per week with many of the activities requiring multiple hours from all personnel assigned.

The CTU provides the CDP with access to additional investigative resources through the STACC that is beneficial to the City and CDP because of critical infrastructure and state government operations that are located in the City. CTU is a centralized resource that can follow up on tips from the public and because they are located within a STACC they also have regional partners and resources. The Chief has suggested transferring 3 officers from 1st shift CIU to CTU assist with additional investigations. It was noted during the project team interviews that cybercrime is on the rise and that there is need for additional support to investigate social media cases.

**Recommendation: Add 3 officer positions (transfer) to CTU for a total of 3 Officers, 4 Detectives and a sergeant assigned to the CTU for a total of 8 personnel.**

**(1.3)   Mayor's Security Detail**

The Mayor's security detail is comprised of 3 officers who provide security at various civic functions attended by the Mayor. The unit provides security at events during day and evenings as well as some weekend activities. The unit also investigates any threats received by the Mayor or their staff.

There are no performance metrics for Mayor's Security detail as the primary task is provide security to covers the hours of the Mayor's schedule which is greater than a normal 40-hour work week. The size of the security detail is determined by the security risk, the type of event, the number of protection hours needed and any active threats. When needed other personnel from the Homeland Security Section assist with protection duties.

There are 3 officers permanently assigned as the security and they are able to handle day to day operations as staffed. When there is a larger event or higher security risk, additional personnel from the Homeland Security Sub-division can be utilized. One issue that was brought during the course of our interviews was the sharing of a sergeant between the security detail and the detectives assigned to CTU. Additionally, the sergeant is located at the STACC and does not directly supervise the officers assigned

EX 7

to the detail. This creates a span of control of 1 to 8 which is still within maximum of 1 to 9 recommended for most units, however with adding 3 officer positions this would create a span of control of 1 to 11 which is not best practice, especially given the two different work sites.

**Recommendations:**

**Maintain current staffing 3 officers assigned to the Mayor's Security Detail.**

**Add a sergeant to the Mayor's Security Detail to reduce the span of control.**

**(2)     Analysis of the SWAT Section**

The SWAT Section consists of 3 SWAT teams, SWAT Training and Canine. The Section is led by a Lieutenant.  The SWAT section responds to barricades, active shooter and other dangerous events that require special tactics and weapons to resolve. They also conduct high risk search/arrest warrants. SWAT teams in CDP are full time assignments that work different shifts to provide 20 hours of coverage from 7am to 3am daily.  When not conducting training or responding to incidents the team searches for wanted subjects.

**(2.1)   SWAT Teams**

The three SWAT teams (Gold, Green and Red) consist of one sergeant and seven officers per team when fully staffed.  SWAT teams bring specialized equipment and training to help reduce the danger in high risk incidents.  SWAT reported these activities for 2017:

| 2017 Activities | Number |
|---|---|
| Hostage and/or Barricades | 46 |
| Search Warrant Service | 66 |
| Robbery Stakeouts | 19 |
| Long Term Surveillance | 9 |
| Felony Arrests | 266 |
| Felony Arrest Warrants Served | 420 |
| Misdemeanor Arrests | 33 |
| VIP/Witness Protection | 4 |
| Suicide Jumpers | 3 |
| Public Relations/Demos | 57 |
| Quick Reaction Force/ Overwatch/Crowd Control | 9 |
| **Total Activities** | **932** |

SWAT teams participated in or conducted a large number of activities. The teams responded to nearly one barricade incident a week and served an average of approximately one search warrant a week. When not conducting operations, members of the SWAT teams work to apprehend dangerous wanted subjects.  As shown below:

EX 7

| 2017 Arrests | Number |
|---|---|
| Murder | 37 |
| Felonious Assault | 60 |
| Aggravated Robbery/Robbery | 74 |
| Rape/Kidnapping/Sex | 78 |
| Aggravated Burg/Felony Theft | 68 |
| Aggravated Traffic/Felony Drugs | 62 |
| Felony Firearms Violations | 21 |
| Other Felony Arrests | 20 |
| **Total** | **420** |

As the table above indicates, the SWAT teams are very productive in making arrests of wanted subjects. In 2017, they arrested 37 murder suspects.

SWAT teams provide CDP with additional highly trained and equipped officers to deal with dangerous incidents. The additional training and equipment allow CDP to provide a safer approach to critical incidents and likely result in less use of force. Each team is comprised of fewer personnel (8) than is needed for search warrants or barricades which requires the call out of a second team for each barricade or search warrant. However, by having one team available during the busiest times of the day, a SWAT team can be on scene more rapidly and can establish containment and start operations.

The SWAT teams are very active and are assigned apprehension or duties in support of units when not training, serving search warrants or a call out. Each team is large enough to start an operation, though a barricade would require the activation of a second team in most cases.

An identified equipment need is a wheeled armored vehicle (Bearcat or similar vehicle). The SWAT unit has one Bearcat, but needs and uses a second one on approximately 75% of barricades. The second Bearcat is borrowed from the county which can delay response time, which could be crucial in an officer down or civilian down in a "hot" zone. The use of 2 bearcats is optimal because it allows the team to have protected Overwatch and containment of 2 sides of a structure and allows the teams to be moved into position with added protection. Though the county has been generous with the use of their Bearcat, this cannot be counted on if they are competing critical incidents.

**Recommendations:**

**Maintain current staffing of 3 SWAT teams (1 Sergeant and 7 officers).**

**Add second armored vehicle to the SWAT fleet.**

EX 7

## (2.2)  SWAT Training

One sergeant is assigned to SWAT training.  The sergeant also fills in for SWAT team sergeant vacations.  Each SWAT officer must receive at least 16 hours of training per month to meet the National Tactical Officers Association (NTOA) minimum standards. The SWAT Training Sergeant is responsible for coordinating Training for the SWAT Section. The SWAT Training Sergeant is also responsible for covering other SWAT Team leaders (Sergeants) when they are absent.  Many of these absences are planned, such as vacation or training, however this requires the training sergeant to perform important supervisory duties in addition to planning training.

During the course of our interviews the need for a full time officer assigned to assist with training and other logistics was made.  Though there are tasks and additional training that could be completed by adding an additional FTE to the training section, it seems there are current resources within the team that can be used to assist with these tasks which is the current case.

**Recommendation: Maintain current staffing of 1 Sergeant assigned to SWAT Training.**

### (2.3)   Canine

The Canine unit consists of one Sergeant and Eight Officers.  The unit is broken into four shifts to provide 20 hours of canine coverage.  The Canine Unit reported the following activities for 2017:

| 2017 Activities | Number |
|---|---|
| Non-accident citations | 80 |
| Misdemeanor arrests | 56 |
| Misdemeanor citations | 12 |
| Felony Arrests | 173 |
| Arrests Assists | 155 |
| Dispatched Runs | 4374 |
| Pick-Up Runs | 1856 |
| K-9 related Runs | 2720 |
| K-9 Demonstrations | 27 |
| Building Searches | 150 |
| Evidence Searches | 49 |
| Area Searches | 152 |
| **Total** | **9,804** |
| **Average per day** | **26.8** |

EX 7

As the table above indicates, the Canine Unit Officers participated in or conducted a large number of activities. The unit averaged 26.8 activities per day. These activities resulted in locating of wanted subjects, arrests and seizures which are noted in the table below:

| 2017 Arrests and Seizures | Number |
|---|---|
| K-9 Related Arrests | 127 |
| Handguns Seized | 32 |
| Cocaine | 17.983 kilos |
| Marijuana | 352.576 pounds |
| Crack Cocaine | 150.97 grams |
| Heroin | 20.871 kilos |
| Meth | 11.73 pounds |
| Oxycodone | 124 UD's |
| OxyContin | 20 UD's |
| Xanax | 10,000 UD's |
| THC Oil | 17.79 pounds |
| Cash | $ 1,422,079.00 |

The table above indicates Canine Officers have been productive and the work they have performed has resulted in 127 arrests, 32 handguns seized, large seizures of drugs and cash.

The Canine Unit adds additional abilities to CDP that cannot be replaced by additional officers or equipment. The Canine Unit adds officer safety by applying the canine to track and locate suspects' in conditions where normal searches would be higher risk. Additionally, canines are able to detect narcotics and other contraband in secret areas that makes searches more efficient and more successful. The Canine Unit shift hours cover the most active hours of the day 8am to 4am. With nine members, there are days when coverage is less or non-existent due to training, vacations or other absences.

The Chief has recently recommended adding 2 additional K9 officers to the unit to expand coverage hours. There is adequate space for additional K9s at the K9 facility, however this would create a span of control of 1 to 10 officers which is beyond best practice. K9 sergeants are typically K9 handlers as well and are able to fill shifts and perform administrative duties. Adding 1 K9 officer and 1 K9 sergeant would reduce the span of control to 1 to 5 and still provide additional shift coverage.

**Recommendation: Add 1 K9 Sergeant and 1 K9 officer to the K9 unit for a total of 2 Sergeants and 8 Officers.**

### (3)    Analysis of Intelligence Section

The Intelligence Section conducts criminal investigations into gang activity and organized crime, investigates threats and maintains CFR files. The section is led by a Lieutenant

EX 7

and there is one Intelligence Analyst and Code of Federal Regulations Officer that supports the section. The section is broken into 2 units – Unit A (1 Sergeant, 11 Officers and 1 Analyst) and Unit B (1 Sergeant and 7 Officers).

## (3.1) Workload CIU Team A

CIU Team A reported the following activities for 2017:

| 2017 | Number |
|------|--------|
| Cash seized | $24,657.00 |
| Firearms seized | 91 |
| Heroin seized | 40.5 grams |
| Crack Cocaine seized | 183.3 grams |
| Powder Cocaine seized | 158.7 grams |
| Marijuana seized | 112,136 gr. |
| Meth seized | 328 grams |
| Misc. Pills seized | 108 |
| Intelligence reports produced | 228 |
| Investigative reports written | 171 |
| Open Projects | 14 |
| Search Warrants (residence, DNA, vehicles and electronic devices) | 85 |
| Attended Community Events | 10+ |
| Responded to outside agency requests | 83 |

As the table above indicates the CIU Team A-Officers participated in or conducted a large number of activities. These seizures and warrants were targeted at criminal gang organizations operating within the City of Columbus. The team conducted on average 1.6 warrants a week. A warrant typically requires 4-6 to hours to write, but much longer to gather the evidence necessary to obtain one through informants or other evidence.

## (3.2) Workload CIU Team B

CIU Team B reported the following activities for 2017:

| 2017 | Number |
|------|--------|
| Cash seized | $110,389.00 |
| Firearms seized | 67 |
| Heroin seized | 568.7 grams |
| Crack Cocaine seized | 1718 grams |
| Powder Cocaine seized | 60.3 grams |
| Marijuana seized | 16.2 lbs. |
| Marijuana plants seized | 681 |
| Meth seized | 257 grams |
| Misc. Pills seized | 2207 |

EX 7

| 2017 | Number |
|---|---|
| Molly seized | 4.5 grams |
| Fentanyl doses seized | 21 |
| E-cigs with hash oil seized | 69 |
| Mushrooms seized | 98 grams |
| LSD seized | 5 |
| Search Warrants (residence, DNA, vehicles and electronic devices) | 33 |
| Felony Arrests | 177 |
| Misdemeanor Arrests | 19 |

As the table above indicates the CIU Team B-Officers participated in or conducted a large number of activities. These seizures and warrants were targeted at criminal gang organizations operating within the City of Columbus. The team made a significant number of felony arrests for the year.

The Criminal Intelligence Units are very proactive in investigating organized criminal gangs. Through their actions they have seized 158 firearms including 4 assault rifles. They also seized substantial amounts of narcotics, including opioids which are having a devastating effect on Americans and the Community of Columbus.

Though there are different theories on the effectiveness of drug enforcement, there is little debate about the negative impact organized criminal gangs and drug use are having on communities. Proactive enforcement of these activities can limit to some extent the impact on communities and safety.

As a proactive enforcement and investigative unit, there are no standard performance measures other than those listed above which vary greatly from community to community, based on numerous differences in staffing and number of criminal gangs operating within the jurisdiction. For our analysis we rely on number of activities and number of personnel assigned. With more people, enforcement numbers would be expected to climb and with diminished staff enforcement numbers would be expected to decline. The number of warrants and arrests establish that these units are actively investigating criminal gang activity.

The Chief has recommended transferring three of the officers from Unit A to CTU. This will accomplish two objectives: It will add investigative capacity to CTU where there is an identified need and it will reduce the span of control of unit A from 1 Sergeant to 11 officers (over recommended best practice ratio) to 1 Sergeant for 8 Officers which is within the recommended ration. CIU is a proactive unit and is successful at its current mission with current resources, however CTU has additional investigative needs that could be met with the transfer of personnel.

EX 7

**Recommendations:**

**Transfer 3 Officers from Unit A to CTU reducing current staffing of unit A by 3 officers leaving a total of 1 Sergeant and 8 Officers assigned.**

**Maintain current staffing of Unit B of 1 sergeant and 7 Officers.**

**(4)    Analysis of the Aviation Section (Helicopters)**

The Aviation Section conducts flight operations in support of patrol and investigative/ enforcement units. The section is led by a Lieutenant and is broken into 3 units, each led by Sergeant – Day Mid-watch Helicopter (1 Sergeant, 7 Officers), Evening Mid-watch Helicopter (1 Sergeant, 8 Officers) and Safety and Maintenance (1 Sergeant and 2 Officers). The section flies 16 hours per day weather permitting (12pm to 4am).

**(4.1)  Workload of 1st Watch and Mid-watch Helicopter**

The Aviation Section reported the following activities for 2017:

| 2017 | Number |
|---|---|
| Total Flight Hours | 5250 |
| Lost Flight Hours | 963 |
| Training Flight Hours | 247 |
| Total Dispatched Calls for Service | 4,457 |
| Total Requested | 391 |
| Foot Pursuits | 39 |
| Outside Agency Assists | 160 |
| Felony Arrests | 161 |
| Misdemeanor Arrests | 57 |
| Missing Person Recoveries | 26 |

As the table above indicates the Aviation Section participated in 4,457 calls for service where they rendered aid or assisted ground units. This represents an average of over 12 calls a day, though with weather or maintenance, they are not operational during all scheduled hours. The Aviation Section assisted with 218 arrests and provided flight coverage for 39 foot pursuits (data for vehicle pursuits was not provided).  Additionally, the Section assisted with 26 person recoveries (Elderly, dementia or endangered) an average 1 every two weeks.

The asset of an aviation unit increases officer safety because of the unique perspective helicopters can gain with spotlights and FLIR technology.  Using helicopters allows the safe tracking of fleeing subjects both in vehicles and on foot.  With this asset, ground units can concentrate on setting perimeters to more safely resolve these incidents.  Helicopters also assist in the recovery of discarded contraband and weapons as the flight observers

EX 7

are typically able to watch the movements of subjects where ground units are unable to do so safely.

The emerging practice of using drones to assist patrol is beneficial, but due to current limitations on flight times and response times helicopters are currently more effective for large agencies.

During the course of unit interviews, the project team learned that several pilots/officers are eligible to retire in the next few years.  It can take two years to fully train a new pilot which means there could be a shortage of trained pilots.

**Recommendations:**

**Maintain current staffing of 2 Sergeants 15 Officers.**

**Allow unit to overstaff in anticipation of retirements so that the unit does not go below 90% of authorized pilot staff.**

**(4.2)    Analysis of the Safety and Maintenance**

Safety and Maintenance is comprised of a sergeant and 2 officers and are responsible for training pilots, acquiring and maintaining certifications and scheduling aircraft maintenance. The safety officer ensures all pilots have appropriate training.  The safety officer is also responsible for training new pilots.  To obtain a commercial rating requires 500 hours of flying, which is required before a pilot can fly solo without an instructor (safety officer).  The maintenance officer schedules maintenance with a helicopter service vendor and the sergeant serves as a relief sergeant that supervises and covers flights.

The Aviation Section maintains a fleet of 5 helicopters (MD530 FF) which require regular maintenance.  The Aviation Section is housed in a facility with double hangers with adequate room for both a service hanger and flight hanger.

The project team learned through interviews that the helicopter maintenance vendor charges a premium for their services and the lead mechanic is near retirement age.  With this in mind, it may be less expensive to service aircraft in house.

Helicopters require routine inspections and maintenance that follow a manufacturer's specifications depending on the system or part to be maintained/inspected.  With 5 aircraft inspections, the required maintenance must be performed weekly (Calculated by flight hours).  Many parts on the helicopters have end of life hours which require the part be replaced at a set number of hours.

**Recommendation: Maintain current staffing of 1 Sergeant and 2 officers assigned to Safety and Maintenance.**

EX 7

## 2 | Communications Bureau

The *Communications Bureau* is comprised of the 911 Emergency Communications Center taking all public safety calls for service from the City of Columbus and dispatching for the Columbus Division of Police. The Communication Unit is the backbone for emergency call taking and dispatching efforts of the Police Division.

### (1) Analysis of Dispatch Functions

Developing an appropriate staffing model for a dispatch operation is not only critical to ensuring effective service to callers, but for the public safety agency being serviced. Our project team calculates dispatcher staffing needs through a models-based approach, using data obtained from CDP. Our team has reviewed and used a variety of dispatcher staffing models over the last several years. Indeed, as new information becomes available, these models are further modified to enhance their ability to assess the necessary staffing in a dispatch environment.

Data, as available from CDP, is influential in determining staff resource needs in an emergency communications environment includes the following:

- **CAD Events and Telephone Calls** - Key workload drivers for dispatch include the number of inbound telephone calls taken as well as the total number of Computer Aided Dispatch (CAD) events processed.

- **Staff Net Availability** - A critical workload element to determine staffing requirements is the amount of annual time available for dispatch personnel to perform their work, their "Net Availability". The Matrix Consulting Group uses net availability in our modeling and defines it as the number of hours that a dispatcher or call takers is available to perform their key roles and responsibilities after calculating the impact of such things as scheduled leave, sick leave, training time, meals and breaks, etc.

- **Turnover Rate** - While attrition is inherent in any profession, it's impact on emergency communications is a key factor that must be accounted for in order for staff modeling to be accurate. Dispatcher turnover nationally averages 17% to 19% according to the *Journal of Emergency Dispatch.*

- **Fixed Posts Required** - A fixed-post position is an assignment that is typically deployed every day, irrespective of workload. Typically, it is in reference to 24-hour, 7-day/week, 365- days/year deployment. The Matrix Consulting Group compares existing fixed-post deployment strategies against alternative deployment strategies based on workload and service-level modeling.

EX 7

- **APCO and Erlang-C Staffing Models** - The APCO Project RETAINS staffing model is an accepted methodology within the 911 industry, but it has its limitations; therefore, we augment our staffing analysis with adjustments to this model as well as utilization of Erlang-C (call-taking) methodologies.

In order to accurately model the workload and staff resources of dispatch operations, a number of important factors must be considered. It is not sufficient to base the staffing needs of the 911 Center on workload alone, as many key variables, such as average leave time and turnover rate as discussed above, are vastly different among agencies throughout the nation. In the last few years, the Association of Public Communication Officials (APCO) has published a staffing model as part of its Project RETAINS efforts, developed by the University of Denver Research Institute. There are three key drivers in the model:

These include:

- **Net (actual) Annual Staffing Availability** as shown earlier.

- **Average Processing Time:** A combination of average radio time and average task completion time per incident. These numbers, as available, are calculated from agency Computer-aided Dispatch (CAD) data and other sources. If these times are not calculable (due to either issues with the data, unknown variables, or other reasons) a normative value is used based on the experience of the project team in working with other similarly sized dispatch agencies. The highest normative value is used in the CDP calculation based on a workload range estimated at 2.5 to 3.5 minutes for each CAD transaction. Data provided by CDP appears to substantiate this estimate.

- **Agent Occupancy Rate:** Even after accounting for the net availability of dispatchers, the resulting number still does not represent an accurate picture of their ability to complete workload. It would be impossible for a dispatcher to spend 100% of his available time going from call to call without a break. Today, utilization targets are often set by agencies from around 50% to 65%, with APCO typically substantiating the former. Consequently, the 50% will be used for the CDP model.

In brief, the APCO project RETAINS staffing model is a generally good methodology with a few notable exceptions, but it is data intensive to the extent that many agencies do not possess the level of detail required to thoroughly complete the model. The Matrix Consulting Group, using the APCO model as a baseline, has made some slight revisions to the model and has developed some operational assumptions regarding particular types of work. These are discussed in the following sub-sections.

EX 7

**(2)    Dispatcher Staffing**

Based on available data, the following table shows workload drivers will be utilized to determine the Communications Bureau dispatcher staffing levels.   Where data is unavailable, national benchmarks and other similar information will be utilized.

During the course of our iterative process with the Communications Bureau, they provided additional graphical data with respect to the APCO RETAINS model.  This is replicated below:

**APCO Project RETAINS Staffing Model for Dispatchers Only**

| POLICE DISPATCHER STAFFING – 50% UTILIZATION RATE | |
|---|---|
| **Workload** | |
| Average Task Completion Time Per CAD Incident (in minutes) | ① 3.25 |
| Average Radio Time Per CAD Incident (in minutes) | Inc. |
| Average Total Processing Time Per CAD Incident (in minutes) | 3.25 |
| Avg. Hourly Processing Capability | ④ 18.5 |
| Total CAD Incidents | ② 646,672 |
| Workload Hours for Dispatchers | ③ 35,028 |
| **Net Availability** | |
| Net Annual Available Work Hours | 1,525 |
| Target Utilization Rate | ⑤ 50% |
| True Annual Availability (based on utilization rate) | ⑥ 763 |
| **Total Filled Positions Needed** | ⑦ 45.9 |
| **Turnover** | |
| Turnover Rate | ⑧ 17% |
| **Total Authorized Positions Needed** | ⑨ 53.7 |

① This is the average amount of time required to do all CAD incident processing, including radio time, typing, etc.  It is a benchmark based on other 911 agencies the project team has worked with.

② This was generated by creating an average from the total number of Dispatched and Self-Initiated Events in 2016 (648,653) and 2017 (644,690).

$$648,653+644,690/2 = 646,672$$

③ Using the previous average that was generated on ② (646,672) and multiplying it by the average total processing time per CAD Incident (in minutes) of 3.25, the value of 35,028 was generated.

④ This was calculated by taking the value of ② (646,672) and dividing it by the value of ③ (35,028)

EX 7

⑤     No source information was provided for these values.

⑥     This was calculated by taking the value of ⑤ (1,525) and multiplying it by the target utilization rate (50%)

⑦     This was calculated by taking the value of ③ (35,028) and dividing it by the value of ⑥ (763)

⑧     This is the national average that was used after citing "…nationally averages 17% - 19%"

⑨     This was calculated by multiplying the value in ⑦ (45.9) by the turnover rate (17%)

The above includes data based on the APCO RETAINS model for dispatchers exclusively. This does not incorporate the workloads associated with call-taking. In the Communications Bureau response to our initial analysis, they made important points:

- Workload for call-taking was not captured. This is correct, as such workload and related staffing is developed using the Erlang-C model, not the APCO Project RETAINS model. The Bureau attempted to use the APCO model to show overall workloads resulting in 121.5 total dispatchers and call-takers. This is not the intended use of the APCO model, but some important data elements were provided that prove useful.

- The Bureau operates on a fixed-post deployment as opposed to a workload based deployment. The number of positions needed for Dispatching is based on seven dispatching channels; five main channels and the comm channel (minimum of two) needing coverage 24/7/365 for 61,152 hours regardless of workload. According to the Bureau, two dispatchers must be available at all times to cover exigent tactical channels (SWAT, TERT, etc.) which adds an additional 17,472 hours of coverage that is needed. This brings the grand total to 78,624 dispatching workload hours.

- Net Hours Available was provided by the Bureau at 1,528 as opposed to 1,525. This would infinitesimally lower staffing required (as more resources are available), thus 1,525 will continue to be used in the model as an average.

Based on the APCO RETAINS model fixed-post calculation, to accommodate the fixed posts required as stipulated above requires 60.3 dispatcher positions. This is compared to the 53.7 positions necessary based on a CAD Incident workload model only.

**(3)    Call-taker Staffing**

Call taker staffing needs are not determined using the APCO RETAINS model, and are instead calculated with a different process. The Erlang-C formula provides an effective

EX 7

approach to modeling call staffing needs by considering actual inbound telephone call inputs and measuring these inputs against performance standards. In this case, the inbound call performance target being used is an updated performance metric originally based on National Emergency Number Association (NENA) requirements. The standard now is that 911 Centers should meet or exceed the minimum standard of **95%** of emergency calls being answered within **fifteen** seconds.

The Erlang formula is able to project the level of fixed post staffing necessary to meet these important performance benchmarks. It can provide an overall average requirement as well as an hour-to-hour requirement. The method, which has received support from APCO, is used for determining call-taker only positions.

**(3.1)   Inbound Telephone Call Workload Helps Drives Call-taker Requirements.**

Receiving calls occupies a notable portion of dispatcher/call taker workload, and as a result represents an important step in analyzing the staffing needs of a dispatch agency. Emergency and non-emergency calls can be handled differently, both in terms of the performance requirements for responding, as well as the staff members assigned to the complete the task. Data suggest the CDP handled an average of 1,239,511 inbound 911 emergency and seven-digit calls in 2016-17. For purposes of modeling, our project team takes a conservative approach whereby all inbound telephone calls, regardless of origin, are subject to call pick-up under the noted NENA emergency standard. Obviously most seven-digit lines do not need to be picked up as quickly as 911; nevertheless, employing this standard for all calls helps ensure an appropriate contingent of call-taker staff.

**(3.2)   Fixed-Post Call Staffing Calculation**

The following table details the results of the Erlang-C formula calculations for answering inbound calls, and is in part used to calculate the fixed-post staffing needs of the CDP Communications Bureau based on the performance standards provided:

### Inbound Call Workload Calculation Based on Erlang-C

| Category | Combined |
|---|---|
| Avg. Incoming call rate –calls (**per ½ hour**) | 70.75 |
| Avg. Call Duration (sec.) | 108 (1.8 minutes) |
| Target Answer Time (sec.) | 15 |
| Service Level Required | 95.0% |
| **Average** # of Fixed Post Call-takers Required for Incoming Calls | **8** |
| % chance call is answered in target time of 95% calls answered within 15 seconds | 95.32% |

EX 7

The Erlang-C modeling summary table shown above indicates 8 fixed posts positions (on average) are required over a 24-hour period to address inbound call workload at the noted standard.

### (3.3) Result of Call-Taker Fixed Post Calculations

The results of the fixed-post staffing calculations in the section are then used to determine the actual number of full-time staff needed to staff those call-taker positions, given the net availability and turnover rate calculated previously:

#### FTEs Needed for Fixed-Post Call Processing Requirements

| Category | Call Takers |
|---|---|
| Total # of Required Fixed-Post Positions | 8 |
| Net Annual Available Work Hours | 1,525 |
| Turnover Rate – Current CDP Dispatch | 17% |
| FTE Required for Call-taker Fixed Post Positions | 53.6 |

In summary, based upon the telephone-related workload data, the 911 Center needs 53.6 full-time equivalent call-taker positions to perform floor work based on the NENA performance metrics at 17% turnover. Excluding turnover and based exclusively on the eight (8) fixed posts and leave patterns, 45.8 call-taker positions are necessary.

### (3.4) Staffing Outcome

The following table summarizes the staffing needs based on different variables:

#### FTEs Needed by Position Type – Turnover 0% or 17%

| Position Type | No Turnover | 17% Turnover |
|---|---|---|
| Workload based Dispatcher | 45.9 | 53.7 |
| Fixed-Post based Dispatcher | 51.6 | 60.3 |
| Call-Takers at NENA Standard | 45.8 | 53.6 |
| **TOTAL Workload-Based** | **91.7** | **107.3** |
| **TOTAL Fixed-Post Based** | **97.4** | **113.9** |

Based on the existing staffing contingent of 75 dispatchers and 27 call-taker job classifications, this floor staffing contingent of 102 positions falls reasonably within the staffing ranges noted above between 0-17% turnover.

EX 7

**Recommendations:**

**Based on staffing calculations for dispatcher and call-taker staff, authorize 105 positions composed of 75 dispatchers and 30 call-taker positions for the Communications Bureau. This accommodates appropriate workload, fixed posts and reasonable turnover. This is an increase above existing staff of three (3) positions.**

**Retain supervision and support services staffing levels in the Communication Bureau at the current 16 positions.**

**Upon potential future consolidation with Fire, consider fully civilianizing the City's dispatch operations. This will require a future 911 consolidation study in order to best facilitate operational transition.**

## 3 | Traffic Bureau

The ***Traffic Bureau*** is comprised of the following functions:

- Traffic Operations Section
  - Freeway Patrol 1st Shift
  - Freeway Patrol 2nd Shift
  - Freeway Patrol 3rd Shift
  - Motorcycles 1st Shift
  - Motorcycles DMW

- Special Events Section
  - Accident Investigation Unit
  - Special Events Office
  - Event Management Unit
  - Special Duty Office

- Patrol Administration Section
  - Patrol Administration Unit 1st Shift
  - Patrol Administration Unit 2nd Shift
  - Patrol Administration Unit 3rd Shift

Traffic Operations Section units, including both freeway patrol and motorcycle units, are responsible for enforcement of traffic laws, abandoned autos, and hazard mitigation. Staffing for the Traffic Operations Section is shown in the table, below:

EX 7

| Freeway 1st Shift | 1 | Sergeant | • Freeway operations consists of three shifts, dedicated to vehicle enforcement, abandoned and broken down vehicles (arranging for tows), freeway closures and construction areas and other hazards.<br>• A 2nd shift officer handles stats and reporting, as well as grants.<br>• Two officers are trained and equipped for commercial vehicle enforcement.<br>• Staff are deployed throughout the five patrol zones. |
|---|---|---|---|
|  | 10 | Officers |  |
| Freeway 2nd Shift | 1 | Sergeant |  |
|  | 9 | Officers |  |
| Freeway 3rd Shift | 1 | Sergeant |  |
|  | 8 | Officers |  |
| Motorcycle 1st | 1 | Sergeant | • Motorcycle Units primarily perform traffic enforcement in neighborhoods and non-freeway arterials. They are also a primary pool for staff for dignitary visits. |
|  | 8 | Officers |  |
| Motorcycle DMW | 1 | Sergeant |  |
|  | 9 | Officers |  |

While citations written and warnings are not the only measure of the effectiveness and utilization, they are an important one. The table, below, portrays these data by unit for a 12 month period between September, 2017 and August, 2018.

| Traffic Operations Unit | Citations | Warnings | Total |
|---|---|---|---|
| Traffic Bureau / Freeway Patrol | 5,594 | 1,654 | 7,248 |
| Traffic Bureau / Special Events | 231 | 111 | 342 |
| Traffic Bureau / TCU Traffic Control Unit | 269 | 77 | 346 |

Portrayed on a per officer per shift basis shows that enforceable actions are relatively low in Columbus.

**Freeway Patrol Enforcement Statistics**

| | |
|---|---|
| Citations | 5,594 |
| Warnings | 1,654 |
| **Total** | **7,248** |
| *Avg. Per Officer* | *268.4* |
| *Avg. Per Officer Per Shift* | *1.57* |

Similar for the motor officers, when displayed on a per officer per shift basis enforceable actions are relatively low in Columbus:

EX 7

**Motor Unit Enforcement Statistics**

| | |
|---|---:|
| Citations | 269 |
| Warnings | 77 |
| **Total** | **346** |
| *Avg. Per Officer* | *20.4* |
| *Avg. Per Officer Per Shift* | *0.12* |

Overall traffic enforcement in a city is not just a function of dedicated staff assigned to a specialized function. To the extent that proactive time exists for patrol, traffic enforcement is an important part of traffic safety in neighborhoods and for the city in total. The table, below, portrays the contribution that patrol makes to traffic safety as measured by enforcement actions.

| Traffic Operations Unit | Citations | Warnings | Total |
|---|---:|---:|---:|
| Zone 1 Patrol Unit | 1,489 | 3,071 | 4,560 |
| Zone 2 Patrol Unit | 2,348 | 5,221 | 7,569 |
| Zone 3 Patrol Unit | 2,576 | 4,917 | 7,493 |
| Zone 4 Patrol Unit | 2,350 | 5,389 | 7,739 |
| Zone 5 Patrol Unit | 2,236 | 4,721 | 6,957 |
| **Totals** | 10,999 | 23,319 | 34,318 |
| Citations & Warnings Per Assigned Officer | | | 39.0 |
| Average Per Person Per Shift | | | 0.23 |

**Recommendations:**

**Increase the contact frequency (citations, warnings, etc.) for traffic enforcement units.**

**Increase the involvement of patrol units in traffic enforcement.**

EX 7

# 9  Support Services Subdivision

The Support Services Subdivision is headed by a deputy chief, and has four major bureaus, as summarized below:

The **Support Operations Bureau** is led by a commander and supported by three lieutenants.  The Support Operations Bureau is comprised of three sections:

- Court Liaison Section
  – Common Pleas Court Unit
  – Municipal Court unit

- Property Management Section
  – Impounding Unit
  – Property Control Unit

- Administrative Support Section
  – Photography Unit
  – Print Shop

The **Forensic Services Bureau (Crime Lab)** is comprised of four work sections that provide forensic lab services, in support of investigations.  The four work sections are:

- Drug Identification Section

- Firearms Section

- DNA Section

- Quality Assurance Section
  – Latent Print Comparison Unit
  – Latent Print Processing Unit
  – Questioned Documents Unit

The **Technical Services Bureau** is comprised of 1 sergeant (serves as Policenet Manager), seven officers and five analysts who manage all police specific IT functions and databases.  The unit coordinates repairs and service calls with the City of Columbus Department of Technology or product vendors.

The **Records Management Bureau**, is comprised of two sections led by a manager and supported by unit supervisors.  The bureau operates 24 hours a day, seven days a week. The bureau's two sections consist of:

EX 7

- Records Section
    – 1st Shift Records Unit
    – 2nd Shift Records Unit
    – 3rd Shift Records Unit
    – Public Records Unit
    – Telephone Reporting Unit
    – Records Support Unit

- Identification Section
    – 1st Shift Identification Unit
    – 2nd Shift Identification Unit
    – 3rd Shift Identification Unit

Within each of the four Bureaus are several operational units. The following organization chart provides an overview of the Support Services Subdivision.



Each of the bureaus is analyzed below:

EX 7

# 1 | Support Operations Bureau

The Support Operations Bureau is comprised of three sections: Administrative Support Section, Court Liaison Section and the Property Management Section. The Operations Support Bureau is led by a Commander supported by an Office Assistant and each section is led by a Lieutenant. Each of the sections is detailed below.

## (1) Analysis of the Court Liaison Section

The Court Liaison Section consists of two units: Common Pleas Court and Municipal Court, each staffed by a Sergeant, 10 Officers and an Office Assistant. The unit coordinates the appearance of officers to common pleas and municipal court. They appear in court on minor matters in lieu of bringing other officers in on overtime. Officers enter reports to the court and the juvenile officers handle juvenile matters and can arrange for transport. The fugitive officer locates offenders that fail to appear in court. All officers monitor court rooms and respond to take defendants into custody when requested.

## (1.1) Analysis of Court Liaison Section Workload

The primary responsibility of this section is to coordinate the appearance of officers in court and to try to avoid overtime expenditures for unnecessary court appearances. This is done in coordination with the prosecution office and the courts. Additionally, the sections handle paperwork issues and provide court security. The Court Liaison Section reported the following activities for 2017:

| 2017 | Number |
|---|---|
| Court Calls-Ins | 55,231 |
| O.V.I Packets (Drunk Driving) | 1,866 |
| Officers canceled for Grand Jury | 9,380 |
| Arraignment Presentations | 3,270 |
| Narcotics Case Presented | 1,016 |
| Narcotics Packets Completed | 1,094 |
| Lab Requests Processed | 800 |
| Property Disposition Slips | 1,657 |

As the table above indicates the Court Liaison Section conducts a large number of activities throughout the year. Court Liaison officers are able to reduce overtime costs for CDP. Unlike the prosecuting Attorney's office or courts, CDP incurs large overtime cost associated with arrests and the court process. Most of this cost is the payment of overtime for court appearances as part of the collective bargaining agreement. This is a similar cost experienced by other police agencies.

In many agencies court liaison officers are actually civilian positions because much what they do is clerical. However, in the Ohio local court systems non-case/arresting officers

EX 7

are able to present case evidence and be present at preliminary proceedings. This allows sworn officers to appear during straight time, conduct clerical duties and save significant overtime expenses. An internal cost estimate performed by the Court Liaison section estimates it saved CDP approximately $10.6 million in court related overtime in 2017.

Officers assigned to the Court Liaison Section perform other duties such as court room security on hi-profile cases, take subjects into custody per judge request and perform transports.  One officer handles juvenile related cases, and another certifies OVI machines.

During project team interviews, it was learned there is a large span of control for sergeants; 1 supervisor to approximately 10 direct reports.

Adding an additional sergeant would reduce the span of control and also add flexibility in coordinating and staffing court security when needed.

**Recommendation: Add 1 Sergeant to the Court Liaison Section**

**(1.2)   Administrative Support Section**

The Administrative Support Section is comprised of Fleet Coordinator, Print Shop, and Photo Lab.  The section is led by a Lieutenant who serves as the fleet coordinator and six civilian staff. The primary responsibility of the unit is to support other CDP Bureaus, Sections and Units.

The unit reported the following activities for 2017:

| 2017 Fleet | Number |
|---|---|
| New Vehicles up fitted and placed into service | 127 |
| New in car camera systems installed | 67 |
| **2017 DRMO / LESO** | |
| Asset deposits after disposition of Equipment | $43,360 |
| Year-end balance | $64,660 |
| **Photo Lab** | |
| Work orders processed | 5,946 |
| Proofs Printed | 4,507 |
| Compact Discs written | 2,388 |
| **Print shop** | |
| Copies/Impressions | 2,301,704 |
| Job Requests | 1,074 |
| Requests for Graphics | 252 |
| Assistance with processing video evidence | 449 |

EX 7

**(1.3)   Analysis of Fleet**

Coordinating the purchase of 127 vehicles and the up fitting required to meet the needs of CDP requires significant time and experience.  CDP has an existing fleet of several hundred vehicles with various uses and requirements.   Fleet Coordination does not require a law enforcement background, but does require specific fleet management training and software to save money and to optimize fleet usage.   Specific fleet needs and up fitting desired should be the responsibility of sworn members or end users, but the purchase, maintenance, up fitting and other fleet management should be conducted by a trained, experienced civilian fleet manager.

Some agencies have Fleet committees composed of sworn members from different areas within the department and members of the Training staff that teach emergency vehicle operations. The committee tests vehicles and equipment, make fleet and equipment recommendations that are then sent through the chain of command for approval; once approved, the fleet manager handles the purchase of the vehicles and any up fitting. Though sworn members are capable of successful fleet management, they tend to change assignments more often than civilian fleet managers.

The CDP is large organization with a number of specialty vehicles requiring knowledge of best fleet practices.  In the Chief's recent re-organization plan they have requested an additional officer to assist with the management of the fleet. In our analysis of tasks required on a yearly basis with coordinating up fitting and retiring of vehicles there is more work than one person can accomplish with other duties.   The coordination of fleet activities does not require law enforcement training or credentials.  The position requires fleet management experience to operate most efficiently.

**Recommendation: Add a civilian fleet coordinator position to assist in the management of the CDP fleet.**

**(1.4)   Analysis of DRMO / LESO**

CDP has taken advantage of the military surplus program where civilian and law enforcement agencies can obtain unneeded or out of service military equipment and vehicles.  CDP utilizes a part time person to coordinate the program.  This is a good approach as the work load would not likely be sufficient to support a full-time staff person over the duration of the program. The current activity is to inventory, decommission and properly discharge unneeded equipment.

This position has been eliminated during the course of this study and is no longer needed.

EX 7

## (1.5)  Analysis of Photo Lab

CDP operates its own photo lab employing two civilian staff.  The lab produces photos for court and investigations. The photos they produce are often graphic, crime scene photos that are considered evidence and must be safeguarded.  The photo lab processed 5,946 photo requests last year. In addition, they produced 2,388 compact discs (the lab stopped production of compact disks in mid-2017).  The use of compact discs for storage of video or pictures files is decreasing around the country as this is outdated technology.  Many agencies are no longer using compact discs and are relying on digital evidence management software that has sharable links or other ways to share files with the prosecutor, defense and courts.  This relies on the prosecutor and courts allowing the use of these systems for sharing evidentiary digital media.

Due to the nature of the photo exhibits produced this unique function is best done with internal staff.  The number of photos taken and stored as evidence will always require a support person to manage the database. The current use of photos in judicial proceedings must continue to be supported by CDP

**Recommendation: Maintain current authorized staffing of 2 civilians.**

## (1.6) Analysis of Print Shop

The Print Shop has 3 staff and produces most all documents used by CDP. In 2017 the Print Shop produced 2,301,704 copies which averages to 6,306 copies a day.  They also handled 1,074 job requests.   Some of the production produced by the Print Shop is confidential material that must be safeguarded.  This includes reproduction of case files for investigators.

The print shop manger processes video evidence using video evidence software along with a member of the photo lab.  Though these individuals are trained through LEVA (Law Enforcement Video Association), it is unusual to have a unit outside of investigations assigned to process video.

The City of Columbus also does in house printing and does not out source.  The project team was informed during interviews that outsourcing print jobs had been researched, though wages are lower for print employees at commercial print shops the paper costs are the same as CDP is paying and commercial print shops charge a markup that negates any employee wage savings especially on the large volume of print jobs CDP does per year.  Additionally, there is no way to be sure that employees working at a commercial print shop could be backgrounded.

The CDP currently produces approximately 6,308 copies per day to support operations. In the long term the CDP should work to reduce the quantity of paper used.

EX 7

**Recommendation: Maintain current authorized staffing of 3 civilians.**

### (2.1)   Analysis of the Property Management Section

The Property Management Section is led by a Lieutenant and consists of three units: Impounding, Property Control and Mid-watch each with specific functions.

Impounding consists of 1 sergeant 17 civilian personnel and is responsible for all city impounded vehicles which are brought to the impound lot.  Staff is required to notify owners within five days of receiving vehicles. The impound lot tower is staffed 24/7.

### (2.2)   Property Control

Property Control consists of 1 sergeant and 19 civilian personnel and is responsible for property and evidence taken in by CDP. The property room is open 24 hours a day for CDP personnel and all property received by officers must be brought directly to the property room.  The civilian property window is staffed 8:00AM - 5:00PM, M-F.  All items brought into property control is inventoried and entered into a record management system.  Police uniforms and equipment are also issued at property control.  Unneeded evidence or property is sold, returned to owner or destroyed as appropriate.

Mid-watch is a one-person unit consisting of a sergeant who supervises the property room and impound operations, determines which vehicles will be auctioned or scrapped, determines which unneeded evidence or property will be auctioned or destroyed and attends police auctions.

Property management is located at two different facilities, the property and evidence building, and the vehicle impound lot.  The property and evidence warehouse is near capacity as is the impound lot.  The property and evidence section is behind on the destruction or disposition of unneeded evidence or property.   The project team was informed through interviews that there is not sufficient staff to sort and prepare destruction orders so there is large backlog of firearms and drugs to be destroyed.  Additionally, a recent change in law mandates the keeping of all evidence that may have DNA evidence on it.  This has impacted what can be destroyed or disposed of and what must be retained.

Property control is an essential function of CDP.  The proper storage, retention and disposition of property requires significant resources and documentation.  CDP uses a sworn supervisor (Sergeant) and civilians to operate property control.  Many departments use only civilian personnel for all functions in property control, including supervision.  During interviews the project team learned that there was concern about not having armed law enforcement at the facility because they often have upset people in the lobby and they are worried patrol response times are too lengthy.

EX 7

Property control has a very large span of control with just one supervisor for 19 personnel. A Mid-watch supervises property control during afternoons, but also supervises the impound lot which is at a separate location. This creates a span of control of 2 sergeants to 32 or an average of 16 direct reports per sergeant.

Property control also has a backlog of items to be destroyed, but not enough staff to handle the administrative tasks required to properly dispose of property. To properly dispose of property takes approximately 15 minutes per item. There is no current estimate of the number of items that are eligible to be returned to owners or destroyed. The current facility is near capacity for storage.

**Recommendations:**

**Add a non-sworn afternoon shift supervisor to property control to reduce the span of control. This supervisor should be given administrative tasks as well.**

**Maintain the sergeant as the day shift and overall unit supervisor.**

**Add a non-sworn position to address the backlog of items to be disposed.**

**Conduct audit of items that can be destroyed or could be returned to an owner.**

**(2.3)   Impound Unit**

The vehicle impound lot has approximately 3,500 vehicles on the lot. The number fluctuates greatly, but nearly always stays above 3,000 vehicles (OSU football games and other city events increase the number of impounds for illegal parking). The impound lot is required by City code to contact owners within 7 days of a vehicle being impounded. However, the impound lot does not always meet the deadline.

Vehicle impound has a seven-person security (tower) post to monitor the lot. The fixed posts are to be staffed 24 hours a day, 7 days a week. Overtime is used to cover all shifts when there is a sick call in, vacation or other absence.

The impound lot is very large covering several acres and the tower posts do not allow for surveillance of all areas.   There is a video monitoring system as well, but that also has "blind spots."  The lot has had breaks in and reported thefts from vehicles in the past.

When a community member arrives to pick up their vehicle, they are allowed onto the lot unescorted because of the volume of visitors and the lack of personnel to escort them. Additionally, the impound lot has large muddy areas and many ruts which makes it hard to traverse. This is especially difficult for members with limited mobility. The lot is so uneven and muddy at times that at least one tow company decided it was no longer going

EX 7

to deliver or recover cars from the lot.  The lot surface does not protect the soil from contamination from vehicle fluids.

Vehicles that are not claimed or are on the lot as part of an investigative seizure are sold at auction or scrapped.  The auctions and scrapping are arranged by the Mid-watch sergeant who reviews vehicles to be sold or scrapped and then arranges the auction or scrap pick up.  They hold approximately 11 auctions a year.  The table below show the results of the auctions and the number of vehicles scrapped in 2017:

| 2017 Activities | Number |
|---|---|
| Auctions Held | 11 |
| Vehicles Sold | 1,010 |
| Revenue | $718,850 |
| Average per Vehicle | $709 |
| Seized Vehicles Sold | 6 |
| Revenue | $30,850 |
| Average per Vehicle | $5,141 |
| Vehicles Scrapped | 4,593 |
| Revenue from Scrapped Vehicles | $1,111,667 |
| Average per Vehicle | $242 |

As the table above indicates the Impound Unit received approximately $1,861,367 from the sale of vehicles in 2017.

The Impound Unit is responsible for processing all statements for vendor towing of impounded vehicles, though the Parking Violations Bureau, in a separate City Division, receives community member revenue for retrieval of their vehicles.  This arrangement adds to the work and resources of the Impound Unit, while revenue goes to an unrelated division.  The table below depicts some details of impound operations 2017:

| 2017 Arrests | Number |
|---|---|
| Total Impounds | 25,397 |
| Costs for Vendor Towing | $1,874,122 |
| **Average Cost per Vehicle Tow** | **$73** |

As the table above indicates the Impound Unit processes an average of 69 vehicles per day, based on the number of auctioned or scrapped vehicles that went unclaimed they must assist approximately 20,000 community members per year.

As stated above the Impound Unit must notify vehicle owners within 7 days of a vehicle being towed.  During the project team interviews it was noted that the unit does not always make that time line when there are large numbers of vehicles taken in at one time.

EX 7

The lot that is used for impound is unimproved with large ruts that are occasionally grated, though this still results in many uneven areas, this creates a liability for CDP because community members are allowed onto the lot.  Additionally, community members are allowed onto the lot unescorted and unsupervised.

The span of control for the impound Unit is 17 to 1 supervisor which is large span of control especially considering other duties assigned to the sergeant.  Adding an additional supervisor would reduce the span of control to approximately 1 supervisor to 7 direct reports.  An additional supervisor could also assist with notifying vehicle owners when there are an unusually large number of vehicles taken in and assist with lot supervision.

**Recommendations:**

**Change the Mid-watch Sergeant position to a fulltime day shift supervisor.**

**Add a non-sworn afternoon shift supervisor position to the Impound Unit with additional administrative tasks.**

**Improve the surface conditions of the impound lot.**

## 2 | Forensic Services Bureau

The Forensic Services Bureau is comprised of four work sections that provide forensic lab services. The four work sections are: DNA Section, Drug Identification Section, Firearms Section and the Quality Assurance Section including Latent Print Comparison, Latent Print Processing and Questioned Documents.  The Forensic Services Bureau is led by a Manager with supervisors for each section. The lab is an ANAB accredited lab.

### (1)   Analysis of the DNA Section

The DNA section collects (from materials submitted) and analyzes DNA evidence that can then be used to identify or confirm suspect(s).  The section consists of 10 Forensic Scientists.  The scientists process recovered DNA, document test results, enter results into a database, maintain a chain of custody and testify in court.

The section reported the following performance data for 2018:

| 2017 | Number |
|---|---|
| Cellular Material Collection | 275 |
| CODIS Match | 483 |
| DNA Analysis | 628 |
| DNA Analysis 2 | 704 |
| Male Screening | 125 |
| Serology Screening | 139 |

EX 7

Total processes conducted was 2,080 or approximately 40 a week.  As noted above, the work of the DNA section resulted in 483 CODIS matches meaning DNA processed matched a known individual in the system.  This is an average of 9.2 a week.

As of October 2018, there were 316 DNA analysis cases in backlog with most being 180 days or less in backlog.  The early identification of suspects may help prevent future crime by early apprehension of identified suspects.  Even with the backlog, the most current turnaround time for cases is approximately 34 days.  This is a much quicker turnaround time than we see at many other agencies.  DNA analysis of cases is done by priority and severity of crime. Though there is a backlog, these tend to be lower priority cases.

The DNA section has a manageable backlog and is able to process priority cases when needed with current staffing.

**Recommendation: Maintain current authorized staffing of the DNA Section**

 **(2) Analysis of the Drug Identification Section**

The Drug Identification Section consists of 10 scientists. The primary responsibility of the Drug Identification Section is to identify suspected narcotics seized by officers and investigators.  The analysts document test results, enter results into a database, maintain a chain of custody and testify in court.  The Section reported the following for 2017:

| 2017 | Number |
|---|---|
| Narcotics Received | 3,068 |
| Tests Completed | 3,050 |
| Total Backlog | 1,050 |

Similar to other sections in the Forensics Bureau testing is done by priority.  This is done by type of case and with investigator or prosecuting attorney input. Lower priority cases are placed into backlog as more important cases are tested.

The average turnaround time for drug test processing is 140 days as of October 2018. This is seven days longer than 2017.  The backlog of cases as of October 2018 is 1,146.

Though there is a backlog the unit is able to process drugs to meet judicial and case needs.  The unit able to process priority cases when needed.

**Recommendation: Maintain current authorized staffing of the Drug Identification Section**

EX 7

**(3)     Analysis of the Firearms Section**

The Firearms Section consists of 5 scientists and 1 police evidence technician. The primary responsibility of the Firearms Section is to properly identify firearms, perform operability testing, perform ballistic comparisons from shell casings and recovered bullets, and to analyze and enter recovered guns, spent casings and recovered bullets into a National Database (NIBIN). The database is used to link firearms to other crimes. Section reported the following activities for 2017:

| 2017 | Number |
|---|---|
| Firearms Received | 5,988 |
| NIBIN Entries | 3,863 |
| NIBIN Hit Confirmations | 375 |

The Firearms Section processes an average of 115 firearms a week or 23 per scientist. There were 375 NIBIN hit confirmations in 2017, this is more than 7 a week. The section has an average turnaround time for testing of 29 days. The Firearms Section had a reported backlog of 125 cases as of October 2018.

The work performed by Firearms Section is critical to reducing gun violence and many firearms are used in multiple assaults/homicides. Without scientific analysis of recovered firearms some felony assaults or homicides could go unlinked or unsolved.

Though there is a slight backlog the unit is able to process firearms to meet judicial and case needs. The unit able to process priority cases when needed.

**Recommendation: Maintain current authorized staffing of the Firearm Section**

**(4)     Analysis of the Quality Assurance Section**

The Quality Assurance Section ensures compliance with accreditation standards and laboratory policies, performs administration of Laboratory Information Management System (LIMS), performs latent print comparisons and documents test results, develops and lifts latent prints and performs questioned document hand writing comparisons. The section consists of 6 personnel. The analysts document test results, enter results into a database, maintain a chain of custody and testify in court. The section reported the following performance data for 2017:

| 2017 | Number |
|---|---|
| Latent Print Comparisons | 699 |
| Latent Print Comparisons AFIS Entry | 134 |
| Latent Print Processing | 289 |
| Latent Print Processing Methods | 107 |
| Questioned Document/Hand Writing Examinations | 15 |

EX 7

Like other processes in the lab, the identification of prints left at crime scenes assists with discovering the identity of a suspect. The latent print comparison unit completed 833 comparisons in 2017 or an average of 16 a week with 2 examiners. There were 396 latent print cases processed in 2017 and 15 questioned documents/handwriting documents examined.

The section reported a backlog of 577 latent print comparison cases and 121 latent print processing cases as of October 2017. The numbers above do not include work completed to maintain lab accreditation or data entry.

Though there is a slight backlog the unit is able to conduct latent print comparisons to meet judicial and case needs. The unit able to process priority cases when needed.

**Recommendation: Maintain current authorized staffing of the Quality Assurance Section**

## 3   |   Technical Services Bureau

The Technical Services Bureau is comprised of a manager, a sergeant, seven officers and 4 civilians. The Technical services Bureau is responsible for CDP specific technology such as RMS, in car and body worn cameras and other police technology related software and hardware. The sergeant is the Policenet supervisor and the 7 officers and 5 civilian personnel are direct reports. The City Technology is responsible for desktop support, intranet and other city-wide infrastructure and software.

**(1)      Analysis of Workload**

The major systems maintained by Policenet are Premier One (RMS), In Car Camera System, Watch Guard Body Worn Camera and Database and Power DMS.

The Technical Services Bureau provides technology services specific to police operations, while the City IT oversees the larger infrastructure. This is a common practice among large police organizations as the use of police specific technology requires expertise in systems that are not used citywide. In addition to daily maintenance of systems, servers and other applications, the technical Services Bureau reported the following service statistics:

| 2018 | Number |
|---|---|
| Tickets submitted by Police Department employees | 6,312 |
| Tickets resolved by Policenet | 329 |
| Tickets resolved by Columbus DoT | 5,983 |

EX 7

As the information indicates, the City Division of Technology resolves approximately 95% of technology related service tickets.  Many of these are password resets, desktop issues and application problems.

Policenet is staffed by 8 sworn and 5 non-sworn employees.  Many agencies limit the use of sworn employees to direct law enforcement services and supervision.  This is because sworn employees require additional training (up to 40 hours annually) to retain law enforcement credentials and then require job specific training to be proficient or authorized to service police technology.  Non-sworn employees are generally less expensive and do not require additional law enforcement training that is not required for the role or tasks assigned.

The Technical Services Bureau works on police specific hardware and software using a combination of sworn and non-sworn personnel.  As stated above the work conducted by this unit does not require law enforcement training.  Best practice is to use civilian personnel in roles where there is no law enforcement training or authority needed.

**Recommendation: Transition the Technical Services Bureau to all non-sworn personnel.**

## 4 │ Records Management Bureau

The Records Management Bureau is comprised of two sections: Records Section and the ID Section.  Both sections operate 24 hours a day. The Records Bureau is led by a Public Safety Manager supported by nine supervisors. Each of the sections is detailed below.

**(1)    Analysis of the Records Section**

The Records Section consists of six units: 1st Shift Records, 2nd Shift Records, 3rd Shift Records, Public Records, Telephone Reporting and Records Support.

The Records Unit (all three shifts) primary responsibilities include: correcting errors in officer submitted reports, entering data into the RMS (Premier One), Entering and removing LEADS entries, and responding to officers' calls for warrant checks, vehicle checks and missing persons.  There is a total of 3 supervisors and 28 Records Technicians (when fully staffed) assigned to the Records Unit.  The Records Unit operates 24 hours a day.

The Public Records Unit responds to both internal and external request for reports, CAD, audio and video.  The Public Records Unit consists of 1 supervisor, 5 management analysts, 2 office assistants and a property clerk (responsible for old records stored off site).

EX 7

The Telephone Report Unit handles phone in reports (voice mail, not live answer), performs transcription of phone in reports, enters reports into RMS and enters online reports from the CopLogic online reporting system. The unit consists 1 supervisor and 4 office assistants.

The Records Support Unit validates all division warrants, updates warrants and enters warrants into NCIC (National Database), seals reports, distributes court ordered record sealing throughout the Division. The unit consists of 1 supervisor and 6 records technicians.

The Records Section reported the following work performance data for 2017:

| 2017 | Number |
|------|--------|
| Public Records Requests Received and Processed | 3,540 |
| Franklin County Report Requests | 2,904 |
| Internal Audio Request | 4,350 |
| Internal Body Worn Camera Video Requests | 1,718 |
| Internal In Car Camera Video Requests | 2,973 |
| AWOL Reports Entered | 2,591 |
| LEADS Hit Sent | 5,063 |
| Teletype Entries | 15,230 |
| Impound and Repo Vehicles Entered | 32,777 |
| Phone calls made for Follow Up to Complete Reports | 3,094 |
| COPLOGIC Reports Entered | 12,163 |
| Accident Report Requests | 10,255 |

The records section has reported a significant workload. Many tasks such as removing warrants or responding to LEADS hits are time sensitive and must be accomplished 24 hours a day. With the full implementation of body worn cameras, the requests for videos has increased. The average video is approximately 14 minutes, though redaction takes 2 to 3 times the length of the video to perform. The unit has reported an increase in the use of online reporting and a decrease in phone in reports. The unit reports that they are generally caught up with data entry, but can get up to a week behind on occasion. There is no current backlog of public records requests.

Maintaining full staffing of the records section has been an issue. There has been turnover and it takes 6 months to a year to hire. The unit cannot post a position for 2 pay periods after the vacancy occurs, even when they are expecting a retirement or resignation. The Records Management Bureau spent approximately $500,000 in overtime to cover personnel shortages and to keep current.

The current city policy of requiring 2 pay periods to pass before posting a job opening along with a lengthy hiring process including a background checks results in long vacancies before a position is filled.

EX 7

**Recommendations:**

**Add two position to the current authorized staffing of the Records Section to increase the ability to keep current with reduced use of overtime.**

**Work with the city administration to make an exception to the two pay period wait before posting critical positions.**

### (2)    Analysis of the Identification Section

The Identification Section is responsible for the proper identifying of arrested subjects by obtaining prints from all arrested subjects, taking photos and obtaining DNA from subjects arrested for felonies.  They also obtain prints for police division applicants.  Prints are entered into AFIS and arrest charges are sent to the Ohio Bureau of Criminal Investigations for inclusion into the CCH.

The Identification Section Consists of 3 supervisors, 1 Office Assistant, and 19 Fingerprint Technicians when fully staffed.  The section works in three shifts and provides 24 hours a day service.  The Identification Section reported the following work performance data for 2017:

| 2017 | Number |
|---|---|
| Prisoners Processed | 9,958 |
| Municipal Court Subjects Printed | 4,167 |
| Citizens printed for background checks | 1,453 |
| Fingerprint records sealed by court | 3,711 |

The Fingerprint Section personnel processed 9,958 prisoners in 2017 which averages to 191 a week.  They processed an additional 5,620 fingerprints for Municipal Court and background checks.

The unit is able to keep up with the workload when fully staffed.

**Recommendation: Maintain current authorized staffing, but work with the city administration to by-pass the two period waiting period before posting openings.**

EX 7

# 10 Administrative Subdivision

The Administrative Subdivision provides critical support services to the Division of Police. It is headed by a deputy chief providing direction to, The Training Bureau, The Human Resources Bureau, The Professional Standards Bureau, and The Fiscal Management Bureau.

The Training Bureau is led by a commander and consists of the following three sections that are led by lieutenants:

· Basic Training Section
· Advanced Training Section
· Mental Health Lieutenant – Crisis Intervention Team (CIT) and Mobile Crisis Unit

The Human Resources Bureau is led by a civilian manager and is responsible for the personnel related matters of the Division as apportioned in the following five areas:

· Benefits Section
· Payroll Section
· Personnel and Staffing Section
· Industrial Hygiene Section
· Background Investigation Section

The Professional Standards Bureau is led by a commander and is charged with ensuring the ongoing professionalism of the Division of Police. The bureau ensures the best practices are researched and implemented within Division. The Bureau consists of the following three sections:

· Discipline-Grievance Section
· Accreditation Section
· Staff Inspections Section

The Fiscal Management Bureau is led by a civilian manager and consists of two sections tasked with overseeing financial matters of the Division.  The two sections of the bureau include:

· Fiscal Administration Section
· Fiscal Operations Section

The respective Bureau Sections are further divided into units tasked with related duties. The following organizational chart provides a visual of the alignment and breakdown of the Administrative Subdivision.

EX 7



Each Bureau, Section, and Unit within the Administrative Subdivision has specific responsibilities that serve the mandate of the Division of Police in its service to citizens of Columbus. The following will provide an analysis of staffing and observable outcomes as it relates to the ability of each area to carry out its duties in an efficient and productive manner.

## 1.    Analysis of Training Bureau

It would not be an exaggeration to say that Training is the most important aspect of an effective police organization. Training provides the initial inculcation of the principles the organization holds dear in serving the public and Training continues to reinforce those principles throughout the career of employees.  In attempting to address the growing chasm between police and community, contemporary experts identified Training and Education as one of the key pillars for success. Organizations must ensure effective practical training of its members throughout all phases of their career in order to be effective community ambassadors in the 21st century.

There are several ways to assess the quality of training provided by police academies. One is State or National training standards and the other is through accrediting bodies

EX 7

such as CALEA (Commission on Accreditation for Law Enforcement Agencies). In order to be accredited through CALEA, organizations must adhere to strict policies and operating procedures which are industry best practices and must undergo rigorous inspection of their policy manuals and operating procedures every three years in order to maintain accreditation.

The CDP received its initial accreditation through CALEA in 1999 and has been successful in being re-accredited every three years since. This accreditation history speaks to the level of professional excellence within the Division and the training provided through the Training Bureau. In addition to its excellent accreditation record through CALEA, the CDP also meets standards set by the OPOTA (Ohio Peace Officer Training Academy).  The Training provided by the Columbus Division of Police Training Bureau meets all state mandated and CALEA accreditation standards. The Training Bureau is staffed by forty-five sworn personnel and five civilians.

The following shows a distribution of staffing within the Bureau:

| Section | Sworn | Civilian |
|---|---|---|
| Administration | 1 Commander | 1 Business Manager<br>3 Office Assistant ll<br>2 P/T Security Specialist |
| Basic Training section | 1 Lieutenant<br>2 Sergeant<br>8 Officers<br>2 Field Training Officers (assigned per class) | |
| Advanced Training Section | 1 Lieutenant<br>4 Sergeant<br>21 Officers | 1 Office Assistant ll |
| Mental Health | 1 Lieutenant<br>4 officers | 5 Clinicians |
| Total | 45 | 12 |

## (1)    Administration and Leadership

The right leadership and training philosophy are critical in order for effective training and education to occur. The CDP Training Bureau is led by a senior police officer holding the rank of Commander. It is important that the Commander is someone who understands the critical role the Training Bureau plays in the day to day actions and understanding of a police officer's responsibility to the community, while appreciating the changing dynamics of community engagement in the 21st Century Policing paradigm.

The review team found the current Commander to be aware of the intricacies of adapting training to meet the emerging needs of policing. The Commander believes that the key to effective policing is modifying culture both by words and action and instilling a broad philosophy of community-based policing within the Division. To this end, the Bureau takes

EX 7

a multi-disciplinary approach to training inclusive of classroom training, scenario-based training, field training, and individual proficiency assessment. CDP is fortunate to have a state-of-the-art training facility which any law enforcement agency would welcome. The following four principles are foundational to all training provided by the CDP Training Bureau:

1.    Ethics
2.    Constitutional Policing
3.    Community Policing
4.    Policy

CDP incorporates a high degree of scenario-based training utilizing dynamic scenario rooms, shoot don't shoot, and state of the art video training system. All of these ensures CDP training meets best practice and remains current with a view to continuous improvement.

Based on our analysis of training philosophy and methods evident within the Training Bureau, the review concludes that leadership and administration with the Bureau is presently effective.

**Recommendation: CDP should continue to ensure the right leadership is in place within the Training Bureau to continue executing 21st Century Policing concepts in all aspects of recruit and in-service training.**

The following will provide a close look at specific training within the Bureau.

**(2)    Basic Training Section**

The Basic Training Section is led by a Lieutenant and comprised of the Recruit Training Unit and the Field Training Office.  The Recruit Training Unit is led by a sergeant and permanently staffed with 7 officers. Two additional officers are assigned to the unit per field training class. The Recruit Training Unit oversees the training of recruits in coordination with other units within the Training Bureau.

Training requirements for police officers in Ohio is overseen by the Ohio Peace Officer Training Commission (OPOTA) and the respective local municipalities.  OPOTA provides training facilities with a list of mandated courses annually, including the number of required hours of instruction in each course. The CDP adds their own required municipal training to the OPOTA courses which makes up the total training for CDP officers basic training. Currently, OPOTA directs 728 hours of training and the City of Columbus adds 449 local required hours, bringing the combined total to 1177hrs or 29 weeks of academy training for CDP officers.  The first full year of training is broken into the following:

•    29 weeks of Academy Training

EX 7

- 16 weeks of Field Training
- 7 weeks of Probation

The hours mandated by OPOTA addresses the critical aspects of operational excellence in policing with topics such as:

- Ethics and Professionalism
- Crimes Against Persons
- Media Relations
- Domestic Violence
- Crisis Intervention
- Handgun & Shotgun
- Subject Control Techniques
- First Aid & CPR
- Interviewing
- Stops and Approaches
- Traffic Investigations
- Crime Scene Management

In addition to the above, the OPOTA mandated instructional hours covers a myriad of strong policing basics. Based simply on the general topic headings, it is difficult to adequately appraise the detailed inclusion of 21st Century Police Principles within the OPOTA mandated hours of training. CDP trainers indicate that they infuse critical elements of 21st Century Policing throughout their curriculum, making it a common theme throughout, rather than a stand-alone lecture. This is in fact, a more holistic and meaningful way of adapting 21st Century Policing Principles into a training syllabus. Moreover, striving to achieve these goals is not a check list but a process of understanding community needs and the importance of police partnerships. Broad elements of these goals include:

- Trust building being articulated and demonstrated in recruit and in-service training.
- Training relative to the trust building with communities disproportionately affected by crime.
- Training to help officers understand the root causes of criminality in over represented populations.
- Greater emphasis on partnerships to reduce and prevent crime.

The basic training provided to recruits is critical in the formation of an officer's perspective on their roles and responsibilities within the community. Effective basic training sets the foundation for the ongoing development of an officer's holistic approach to policing and can determine ultimate success of a police organization in meeting community needs and expectations.

EX 7

In recent history, basic training has focused strongly on the reactive, authoritarian aspects of policing, to the detriment of holistic, community focused principles that build strong relationships between police and community.

To be effective in the 21st Century Policing paradigm, training should incorporate strong community policing principles of meaningful engagement and consultation with the community, strong emphasis on de-escalation training, and a general sense of protectors rather than warriors. Policing must be seen as a shared partnership with the community recognizing there are many alternatives to achieving a meaningful outcome, ones that often involve measures that look nothing like traditional policing.  Throughout this review process, it was strongly noted in individual interviews, on-line surveys, as well as in focus group discussions, that there is a strained relationship between police and members of minority communities. This sentiment was expressed by members of CDP as well as community members. There was also a strong desire expressed on both sides for renewed trust building.

The review team believes some of the discord comes from a general lack of cultural understanding where police are unaware of the background of those they are attempting to serve, while the community is also unaware of why police do the things they do. Recruit training may be an excellent opportunity to instill more cultural awareness by enlisting the aid of community members to share tangible cultural awareness with new officers in class, and further introduce officers into cultural groups that they may have never had the opportunity to interact with previously. Concurrently, CDP should enhance its Citizen's Police Academy and have sessions specifically focused on minority communities.

**Recommendations:**

**Redirect training efforts and develop clear training measures that include specific elements of 21st Century Policing into all aspects of training.**

**Utilize community members to provide cultural awareness education during recruit and in-service training.**

**CDP should hold Citizen Police Academy for respective minority communities to build awareness of police practices, create understanding and build relationships.**

**(3)    Current Elements of 21st Century Police Principles in Recruit Training**

There are typically two recruit classes per year with complement dependant on the need within CDP and training needs of external agencies as CDP trains recruits for other agencies as well. The training syllabus encompasses a variety of practical elements of operational policing which can be found in any standard police training syllabi. As can be attested to by the number of total hours on training, the CDP syllabus is robust and should instill operational excellence. Bearing in mind the intended cultural shift necessary to

EX 7

advance a 21st Century Policing mindset, we note the following portions of the CDP course of training:

| Topic | Hours |
|---|---|
| Ethics & Professionalism | 5 |
| Core Values | 1 |
| Community Diversity and Procedural Justice | 16 |
| Missing & Human Trafficking | 12 |
| Critical Incident Stress Awareness | 4 |
| Crisis Intervention | 20 |
| Physical fitness and conditioning | 40 |

As noted earlier, CDP instructors indicated knowledge of 21st Century Policing as articulated in President Obama's Task Force Report of 2014. However, it was noted during cross sectional interviews, that understanding was not widespread across the Division. There was an articulated desire amongst personnel for greater understanding and practical steps for applying the principles. The inclusion of the above topics in basic training is a good start. For change to truly take place, the way officers are instructed, assessed and rewarded must change. More emphasis should be placed on trust building during recruit training and FTOs should be assessing a recruit's ability to engage with the public in this manner. CDP is encouraged to continue the infusion of related topics within all aspects of basic and advanced training.

**Recommendations:**

**Officers should be assessed on their ability to proactively engage with all sectors of the community.**

**(4)     Training Bureau Has a High Graduation Rate**

The following shows the recruit classes for 2016 and 2017:

| Columbus Police Recruits Only | | # of Recruits | Graduated | % |
|---|---|---|---|---|
| 2016 | 2017 | | | |
| Recruit Class #124 | | 30 | 27 | 90.0 |
| Recruit Class #125 | | 30 | 28 | 93.3 |
| | Recruit Class #126 | 35 | 28 | 80.0 |
| | Recruit Class #127 | 38 | 33 | 86.8 |
| Outside Agency Recruits Only | | # of Recruits | Graduated | % |
| 2016 | 2017 | | | |
| Recruit Class #124 | | 5 | 5 | 100 |
| Recruit Class #125 | | 10 | 9 | 90 |
| | Recruit Class #126 | 7 | 7 | 100 |
| | Recruit Class #127 | 18 | 17 | 94.1 |
| Total Recruits (Columbus Police and Outside Agency Combined) | | | | |

EX 7

| 2016 | 2017 | # of Recruits | Graduated | % |
|------|------|---------------|-----------|---|
| Recruit Class #124 | | 35 | 32 | 91.4 |
| Recruit Class #125 | | 40 | 37 | 92.5 |
| | Recruit Class #126 | 42 | 35 | 83.3 |
| | Recruit Class #127 | 56 | 50 | 89.3 |

The table above shows that the Bureau is proficient in graduating a high percentage of recruits. It was noted that the Recruit Training Unit is challenged with meeting increasing mandated hours of instruction required by the Ohio Peace Officers Training Academy (OPOTA) standards. As policing becomes more complex in its daily operations, training is becoming increasingly time consuming with additional disciplines, procedures and community-oriented needs. The Bureau must find time within its 1160 allotted hours of training time to meet increasing training needs.

The following shows the required OPOTA training hours over the past 5 years.

| Year | OPOTA Mandated Training Hours |
|------|-------------------------------|
| 2013 | 568 |
| 2014 | 605 |
| 2015 | 618 |
| 2016 | 681 |
| 2017 | 695 |
| 2018 | 728 |
| **Total increase** | **28%** |

The table above shows there has been an increase of 28% in training demands over the 5-year period. This will necessitate future changes to recruit training with potential impacts on the field training and probationary period.

**Recommendation: Initiate a collaborative approach to training mandates with OPOTA to address the increasing workload in the interest of state-wide training.**

**(5)     Field Training Office**

The Field Training Office is staffed with one Sergeant and an Officer and are responsible for coordinating the Field Training Program.  The Field Training Office works to ensure each recruit is developed into an officer who can effectively function as a one-officer unit. The Field Training portion of the recruit training process consists of 16 weeks of supervised training by an experienced officer. During field training, the probationary officer is exposed to a variety of operational and administrative tasks that will test their ability to operate as independent officers. Probationary officers must meet minimum performance standards in order to progress to graduation. The field training officer is a critical link in the cultural indoctrination of a young officer. It is imperative that field training

EX 7

officers be of the highest caliber and demonstrate the truest ideals of CDP's vision and mission to the community and represent the broad spectrum of citizenry cultural representation.

The Training Bureau strives to increase the number of CDP field training officers with representation across all zones. The following depicts the complement of field training officers in 2016 and 2017 within the respective CDP Zones.

| Zone | 2016 | 2017 |
|------|------|------|
| 1 | 19 | 29 |
| 2 | 24 | 30 |
| 3 | 37 | 45 |
| 4 | 26 | 28 |
| 5 | 39 | 40 |
| Total | 145 | 172 |

The above denote an 18.6 percent increase in the number of field training officers from 2016 to 2017. The targeted increase in Zone 1 for 2017 is commendable as it was lagging behind the other zones in 2016.

Recognizing the importance of diversity, the Division is striving to ensure equitable ethnic representation within the FTO program. The following shows the gender and ethnic representation within the FTO program in 2016 and 2017.

| Gender 2016 | | Ethnicity 2016 | | | | |
|------|------|------|------|------|------|------|
| Female | Male | White | Black | Hispanic | Asian | Other |
| 15 | 130 | 134 | 8 | 2 | 1 | 0 |
| 10.34% | 89.66% | 92.41% | 5.52% | 1.38% | 0.69% | 0.0% |
| Gender 2017 | | Ethnicity 2017 | | | | |
| Female | Male | White | Black | Hispanic | Asian | Other |
| 18 | 154 | 157 | 12 | 0 | 3 | 0 |
| 10.47% | 89.53% | 91.28% | 6.95% | 0.00% | 1.745 | 0.0% |

The FTO program has a high turnover rate primarily due to promotions. Thirty-seven of the forty-seven officers promoted to sergeant since 2014 have been FTO's. This speaks well of the respect accorded the program which is not typical in many police agencies. It is not unusual for half of a promotion class to come from the FTO program. CDP has done an exemplary job instilling the value of the FTO program and thereby ensure new recruits are being trained by quality officers.

To further enhance the program, CDP should take steps to dramatically increase diversity within the FTO ranks. CDP should intentionally recruit female and minority officers into the FTO program in order to proactively achieve an equitable environment across the Division. As noted, FTOs become highly promotable which invariably impacts the leadership culture and in time, will help to transform the work environment. CDP should set firm strategic goals in this critical area.

EX 7

**Recommendation: Maintain the high calibre field training program with a concerted effort to increase diversity within the FTO ranks.**

**(6)     Probationary Period**

We have noted the increasing number of hours of recruit training in keeping with the evolving complexity of police work. There are limited number of weeks within a one-year cycle to conduct all required introductory training of police officers and still allow sufficient time for an effective probationary evaluation. At the present, CDP has a dwindling probationary period which currently sits at 7 weeks. It is becoming increasingly difficult to assess the suitability of an officer to operate independently within this narrow timeline. As the dynamics of policing evolve, it is important that the framework of training and evaluation evolve to ensure qualified officers are advance through the probationary period to becoming permanent officers. In some instances, police agencies have increased the probationary period for recruits to 2 years. This provides adequate time to evaluate an officer's abilities post academy training. We strongly recommend that CDP and the FOP work to adjust the probationary period for new officers to provide a meaningful probationary period of up one-year post academy training.

**Recommendation: CDP and the FOP should evaluate the training framework and assess the validity of the probationary period with a view to increasing it one-year post academy training.**

**2.     Advanced Training Section**

The Advanced Training Section is led by a Lieutenant and comprised of the Advanced Training Unit, Defensive Tactic and Ordnance.  The Advanced Training Section supports the mission of the Division by ensuring ongoing professional development through in-service and Electronic Roll Call Training, as well as job specific specialized training and supervisory development training for Division members.

The Advanced Training Unit is led by a Sergeant and staffed with eight officers. This unit provides ongoing training in all relevant areas of police operations and increasingly, in the emerging principles of 21st Century Policing. This training is conducted via roll call and active in-person training.  OPOTA has mandated twenty hours of Continuing Professional Training for all sworn officers in 2017. The Advanced Training Unit successfully completed this training in addition to equipping over five hundred members with body worn cameras.  Additionally, the Advanced Training Unit conducts approximately 8 Civilian Response to Active Shooter Events courses each month for both City and private business personnel. The unit is also responsible for running the Citizen Police Academy and coordinating the Civic Volunteer Corps. The unit is also tasked with developing training to address areas of deficiency for incumbent officers when identified in the corresponding chains of command. The work undertaken directly within the Advanced

EX 7

Training Unit ensures compliance with the State of Ohio regulations and the CALEA accreditation standards, all ensuring a high level of professionalism within the Division.

The Defensive Tactics Unit is led by a Sergeant and staffed with two officers. Defensive Tactics Unit focuses on many historic and emerging training needs such as de-escalation training, particularly as it relates to dealing with those in mental crisis. The unit conducts yearly training for incumbent officers and throughout the Academy for police recruits. The unit conducts several self-defense courses each month for City employees as well as private organizations. Upon request of other bureaus within the division, the unit conducts remedial training for any employee deemed deficient in an area under the unit's purview.

The Ordnance Unit operates in two shifts; a 1st shift and a Midwatch shift. The first shift is led by a Sergeant, with a complement of 6 officers and an Office Assistant ll. The Midwatch shift is staffed with a sergeant and 5 officers. The Ordnance Unit is responsible for training new recruits in proper use of firearms and the recertification of veteran officers. The unit is responsible for conducting five phases of firearms training per year for all sworn division personnel as well as offering multiple skills development courses. Ordnance also conducts all training and yearly requalification for patrol rifle operators and crowd control munitions training for all sergeants and lieutenants. Additionally, the unit is responsible for all repairs to division-owned firearms and maintenance of the range.

The Ordnance unit successfully trains in excess of 1800 officers in the regulatory use of all Division approved firearms annually. In addition to general training for all Division members, the unit conducts specialty training for SWAT and INTAC units.

The March 24th, 2017 Training Bureau annual report specifically references the work of national, state, and local task forces that were struck to address the growing divide between police and community nationally. The annual report states, "These task forces have resulted in an increase in training which directly falls to the Advance Training Unit. The members of this unit have responded in a highly professional manner as many hours have and will be added to the Division."

An awareness and acceptance of the work of the task force's which speaks poignantly to the principles of 21st Century Policing is paramount for police agencies to be successful community service providers going forward. CDP Advanced Training Unit is taking steps to ensure it meets the needs of the Division by incorporating strong community principles in all elements of its training.

Advance training includes state mandated coursed directed by OPOTA including:

- Constitutional Use of Force
- Human Trafficking
- Community Police Relations
- Crisis De-escalation

EX 7

In addition to the above state mandated courses, CDP require all personnel to take the following CALEA accreditation courses:

- Ethics
- Bias Based Profiling
- Blue Courage
- Dealing with persons with mental illness

In addition to classroom in-service training, Advanced Training also conducts roll call training via electronic dissemination. Each person has an individual sign in code and is responsible for watching the electronic material.  CDP has taken important steps to ensure Division members are increasingly trained in vital areas relative to effective community policing.

**(1)     Use of Force as It Relates to Community Policing**

Justified use of force is a pressing issue in modern policing. In recent history, the perceived unjustified use of force, many times leading to fatalities, has created significant discord and mistrust of police. A strong, transparent use of force policy and reporting processes are critical to the future of police and community relationships.
As an accredited police agency, CDP has a detailed use of force policy.

Stats show that CDP has seen a steady decline in the number of uses of force incidents over the time period 2013 – 2017.

| Year | 2017 | 2016 | 2015 | 2014 | 2013 |
|------|------|------|------|------|------|
| #of Incidents | 438 | 422 | 465 | 475 | 607 |

The primary force applied in order of frequency was:

1. Mace
2. Taser
3. Physical Strikes
4. **Firearms**

Unwarranted use of force has a detrimental impact on community trust building and is reflective of systemic cultural issues within an organization. CDP's statistical results indicate an increasing awareness of the necessity for justified force application and the relationship with trust between the Division and the community.

**Recommendation: Continue to emphasize de-escalation training and increase training regarding interactions with individuals in mental crisis.**

EX 7

**(2)    Demographic Disparity**

When examining use of force applications from a demographic perspective there was a clear and discernable disparity of application between "black" and "white" contacts. The following table shows the contrast over a five-year period as reported in CDP 2018 use of force analysis report.

| Year | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| Total | 438 | 422 | 465 | 475 | 607 |
| Black | 51.36% | 49.6% | 48.5% | 52.2% | 53.1% |
| White | 25.97% | 27.8% | 28.9% | 24.6% | 29.3% |
| All Others | 22.67% | 22.6% | 22.6% | 23.2% | 17.6% |

Most members of CDP and the community felt that relationships were relatively good between CDP and the community. In the citizen survey, 75% of respondents agree that the relationship between the police and community was "very positive" or "somewhat positive." 16% felt it was "somewhat negative or "very negative." When asked about the respect accorded citizens by members of CDP 43% believed "almost all officers show respect" while 32% said "most officers show respect."

While lauding the Division for strong community relationships, there were strong recommendations from members that more directed steps must be taken to strengthen understanding with minority communities. The above statistical data relative to use of force may begin to shed some light on the reality of that need.

It is important to note the openness and transparency that was exhibited by members of CDP when speaking to the sensitive issue of relationships with minority communities. The review team sensed a strong, sincere desire among members at all levels of the organization to productively address the systemic issues leading to the current reality. As one example of that desire for change, we note the following excerpt from the CDP 2018 use of force analysis report:

> *"For many years, the Columbus Division of Police has been committed to the concept that de-escalation is an integral part of officer safety. All personnel have many hours dedicated solely to the topic of de-escalation. However, the topic of verbal de-escalation has been included in many other courses including: Procedural Justice ad Police Legitimacy, Blue Courage, Trauma-Informed Policing, and yearly defensive tactics training."*

CDP had demonstrated a scholarly understanding of the practical need for effective de-escalation training as it relates to procedural justice and the best principles of 21st Century Policing in building trust and legitimacy in the broad community. It will be critical that ongoing training, education, monitoring and culturally relevant understanding is infused to address the disparity seen in the force application among various segments of the community.

EX 7

**Recommendation: CDP must address the significant disparity of use of force against minority residents by continuing intense training, education, monitoring and reporting on use of force within the Division.**

## (3)    Firearms Training

Deadly force encounters have been a primary driver of the call for police reform. The review team would like to highlight the following area of the CDP firearms training program which we believe exemplify some of the highest ideals of 21st Century Policing.

### (3.1) De-Escalation Before Force Escalation

It is critically important that police officers are exceptionally prepared to respond to a deadly force threat to protect the lives of citizens, as well as their own wellbeing. CDP officers receive extensive, high level training in live scenarios as well as video simulation. They are well prepared to respond to any threat that is presented. An integral part of their training regimen is a significant emphasis on de-escalation prior to the application of deadly force.  Deadly force is the last level in an escalating force continuum.  CDP's Use of Force directive states:

When reasonable, sworn personnel should try to de-escalate a situation by using trained techniques, such as building rapport, communication skills, taking cover,    etc.

It further adds that, " Police officers shall not use more force than is reasonable in a particular incident."

Every sworn member is required to complete this training annually. CDP is commended for its directive of de-escalation before escalation which undoubtedly results in the relative low average of 14.4 incidents of firearms use between 2015 - 2017.

In addition to their progressive stance on firearms training, CDP trainers continually assess training content in relation to the following:

- De-escalation training
- Body worn cameras
- Civilian Response to active Shooter Events
- Ethics and Bias
- Cultural Awareness

CDP's firearms and use of force training is critical to advancing the elements of 21st Century Policing and the Division should ensure this type of intentional approach is maintained.

EX 7

**Recommendation: CDP should maintain its exemplary firearms training and continue to share its training principles and Use of Force statistics with the community in meetings, reports and through social media.**

**(4)     Ongoing Leadership Development Would Be an Asset**

It was noted that there is little mid-level management leadership training and almost none as you move up and beyond the Commander rank.  There was a universal desire among CDP members for enhance leadership development at all levels. As noted earlier, an organization is only as good as the leadership in place. Operational policing tends to be reactionary in nature and only through dedicated leadership can one transform the operational culture within any organization.

The significant culture change required to create the collaborative environment for systemic shifts within any organization cannot be achieved through policy and accountability alone. A genuine cultural understanding must be nurtured through sustained, intentional formal and informal encounters between police and the community. This requires an enhanced level of leadership awareness and transference to the entire organization. Based on feedback received during the consultation process, the review team believes the environment is right within CDP and the community to begin this cultural shift through appropriate training, education, and ongoing engagement.  This requires dedicated leadership development predicated on the transformational aspects of 21st Century Policing and enhanced community engagement. This includes enlisting the participation of appropriate community members to assist in bridging the cultural leadership gap which leads to much of the discord between diverse communities and the police. There was a clear articulation of lack of understanding between the police and community, with a desire for clarity on both sides.

CDP should strive to meet the current desire within the membership for enhanced operational leadership development which will directly impact its ability to operate within the 21st Century Policing paradigm. In addition, a more formalized mentorship program would be an asset.

**Recommendations:**

**Provide ongoing operational leadership development across the Division for both Sworn and Civilian members.**

**Institute a formal mentorship program within the Division.**

**Enlist community members in sharing cultural perspective with members of CDP on an ongoing basis. This community engagement should be facilitated through the use of a neutral third party.**

EX 7

### 3.    Human Resources Bureau

The importance of Human Resource functions is often overlooked in many organizations with primary attention given to operations through a fiscal responsibility lens. HR functions are critical to the effective operation of any organization and increasingly so as we examine police through a community trust and responsibility lens. If an organization is going to serve the community with integrity and commitment, the internal HR functions under which the organization operates must engender a sense of caring and commitment to the employee. A healthy HR culture will inculcate the attributes necessary to foster a sense of professionalism, care and commitment to the community. CDP members interviewed had a general positive outlook on the HR functions within the Division. As might be expected, they saw areas for improvement.

The following depicts staffing within the Human Resources Bureau:

| Section | Sworn | Civilian |
|---|---|---|
| Administration | | 1 Manager |
| Benefits | | 1 HR Analyst |
| | | 2 HR Representative |
| | | 2 Payroll Clerk |
| Payroll | | 1 HR Analyst |
| | | 6 Payroll Clerk |
| Personnel and Staffing | | 1 HR Analyst |
| | | 2 HR Representative |
| | | 1 Office Assistant ll |
| Background Investigation | 2 Officers | 1 Public Safety Manager |
| | | 2 Civilian Investigators (retired officers) |
| | | 3 Civilian Polygraphers |
| | | 1 P/T HR Analyst |
| Industrial Hygiene | | 1 Industrial Hygienist |
| **Total** | **2** | **25** |

The Human Resources Bureau is overseen by a Civilian Manager and consists of five Sections that coordinate the personnel needs of the Division of Police.

The Human Resources Bureau has a high degree of interoperability with the Civil Service Commission regarding hiring of sworn officers in addition to liaising with other city entities regarding the personnel functions of the Division. Following are the five Sections within the Bureau:

- Benefits
- Payroll
- Personnel and Staffing
- Background Investigation
- Industrial Hygiene

EX 7

The Human Resources Bureau is currently without an HR Manager and is operating with an Acting/Manager. The Bureau has significant responsibilities that affect the healthy operation of the Division of Police and all efforts should be made to ensure its effective staffing and operating procedures. The previous head of HR was an attorney and though immensely academically qualified, the emerging intricacies of HR leadership demands individuals with HR specific training and qualifications. As of July 3rd, 2019, the HR Manager position is still vacant. CDP should take steps to fill the vacant position with someone having a clear understanding of the demands of 21st Century Policing as it impacts on the wellbeing of employees and ultimately the quality of service to citizens.

It was noted that there is a high degree of overlap between the Public Safety Director's Office and various Bureaus of CDP including:

· Human Resources Bureau
· Fiscal Management Bureau

As CDP looks to fill the vacant HR Manager position, it would be beneficial to assess potential benefits of better alignment of these key positions within the City's Public Safety framework to reduce duplication of work and streamline processes.

**Recommendation: CDP should take efforts to fill the vacant HR manager position with someone trained in human resource management and assess where the position should be placed within the Public Safety Framework.**

**(1)      HR Work Processes Can Be Improved**

Staff in Human Resources provide timely critical services to CDP members. In order for them to operate at optimal level, it is important their work processes be as efficient as possible. Preliminary analysis indicates significant manual work processes that have a negative impact on productivity. There were widespread reports of time keeping, payroll and reporting practices which are detrimental to the effective management of the Division. Pillar three of 21st Century Policing speaks to better utilization of technology to allow police agencies to interact with their communities and do their jobs effectively on a day to day basis. It is imperative that this principle is not seen as speaking only to the outward uniform police aspects of policing but be equally applied throughout organizations, including in administration and highly civilian areas such as HR.

Clerks in the Payroll and Benefits Sections still complete a significant portion of their work by hand on Excel spreadsheets. This information is then delivered to the city in paper form to allow for payment to employees. It was also reported that many interrelated systems are not integrated and cannot communicate electronically. In the age of technology, these types of work processes are antiquated and should be aggressively phased out by integrating appropriate technology.

EX 7

**Recommendation: CDP should prioritize technology advancements in HR practices such as time keeping and payroll functions.**

**(2)     Recruiting Should be Aligned Within Human Resources**

The recruiting and hiring of employees are primary responsibilities of the Human Resources function in many organizations. Within the police sector, recruiting and hiring is almost exclusively the purview of HR. In CDP, the Human Resources Bureau is tasked with the entire civilian hiring process but has limited responsibility in recruiting and hiring of sworn officers. The Recruiting Unit is situated outside of HR, within the Strategic Response Bureau.  It was difficult to find a plausible reason for this.

There are three entities who have significant responsibilities in sworn hiring of CDP officers. They are:
1.     Civil Service Commission
2.     Public Safety Director
3.     Columbus Division of Police

Much of the selection processed is underpinned by the Civil Service Commission. With the growing need for greater diversity it is advisable to continue the transparency of the selection process accorded by the involvement of these stakeholders.

Effective recruiting is the first step in getting a qualified, diverse applicant pool to the selection phase.

In February of 2018 CDP revised its recruitment Strategic Plan for increasing diversity in its ranks.

This includes:

- Customized recruiting aimed at attracting specific demographic groups
- Annual demographic focus groups
- Targeted media campaigns
- Specific community engagement opportunities

Each of the above is intended to speak to underrepresented cultural groups and increase diversity within the ranks of CDP. The majority of these efforts are led by the recruiting unit.

During recruiting, candidates are also interested in other vital aspects of the HR portfolio of an organization such as member care, benefits, sick leave etc. Undoubtedly, the recruiting process in CDP could benefit from the broader expertise and overarching support of the Human Resource Bureau. It is cumbersome and potentially unproductive to separate recruiting from the other aspects of human resources management.

EX 7

**Recommendation: To enhance its sworn recruiting efforts and create opportunities for greater diversity in the Division, CDP should align the Recruiting Unit within the Human Resources Bureau and work with the Civil Service Commission to achieve those goals as well as expedite the process.**

## (3)    Frequency of Officer Rotation Should be Evaluated

Organizational fatigue can occur from many different variables. The review team found that the frequency of officer rotation created significant work for HR who manages the transfer processes, which again, are substantially manual in nature. Officers have the ability to shift uniform assignments every 56 days, creating significant administrative workload for HR. At a time when communities are calling for greater engagement with officers, it is counterproductive to have such a high frequency of officer turn over. The review team believes CDP is committed to the best form of community engagement, enhancing customer service, while creating a more manageable workload for HR employees.  To further is cause, CDP should work with the FOP to address this part of the working agreement and create a more sustainable rotation model.

**Recommendation: CDP and FOP should work to create a more sustainable and beneficial rotational model for sworn members.**

## (4)    CDP Should Prioritize Member Wellness

For a police organization to effectively serve the public, every member of the organization must be well served in the area of mental and psychological services. Increasingly, emergency service personnel are experiencing greater rates of traumatic incidents which is adversely affecting their mental wellbeing. Left unaddressed, these impacts are sometimes reflected in poor community interactions and less than adequate service. The emotional health and wellbeing of employees is pillar six of the 21st Century Policing principles.

Though CDP has written directive regarding member care, the review team found there was significant room for enhancing the ability of this area to positively impact the well-being of CDP members. The size of the Division and volume of associated work dictates an enhancement in staffing to meet that need. Internally, the primary responsibility for member wellness rests with the Industrial hygienist who is responsible for a large list of significant responsibilities including:

- Injury prevention through employee education
- Drug Safety Program
- Person Protective Equipment
- Health and Wellness Initiatives
- Site Visits

EX 7

- Personal protective equipment measures and a variety of emergency response initiatives
- Responsible for fitness facilities
- Coordinates health screenings
- Ensures planning for fire and tornado drills
- Manages AED program and distribution of critical first aid supplies
- Manages compliance with Environmental Protection Agency regulations

All of the above duties performed by the lone Industrial Hygienist are of primary importance to ensure a healthy work environment, with some of them touching on the psychological impacts on employees. It is advisable that CDP examine the workload and determine the level of support required to maximize the positive impacts within this area.

**Recommendation: Assess the workload of the Industrial Hygienist and provide support to maximize the positive impact of the program.**

**(5)     Psychological Wellbeing Care Can be Enhanced**

The review team found that the culture relative to members psychological care can be enhanced. CDP Directive relative to Personnel Involved in Traumatic Events outlined the following:

> *"For the purpose of this Directive, a traumatic event is defined as an incident where serious injury or death has occurred as a result of a use of firearm, a police action, or the operation of a Division vehicle."*

The definition of a traumatic incident is narrow and does not meet the contemporary definition. The World Health Organization (WHO), describes a critical incident as:

> *"An event out of the range of normal experience – one which is sudden and unexpected, involves the perception of a threat to life and can include elements of physical and emotional loss. Often such events are sufficiently disturbing to overwhelm, or threaten to overwhelm, a person's coping capacity."*

Serious death or injury need not occur for an event to fall within the parameter of a critical incident. Dispatcher or Call Takers may become traumatized simply by dealing with someone on the phone and officers can be vicariously impacted by incidents of all types. It is possible that by narrowing the definition, CDP is missing the opportunity to provide psychological care to a large number of employees.  CDP is encouraged to review this policy and bring it in line with contemporary understanding of psychological trauma and the growing impact on emergency service personnel. In addition, CDP should strive to instill a stronger cultural understanding around the need for psychological care of members and mandate psychological assessment for all members involved in critical incidents. This is an industry best practice and would lead to destigmatizing accessing mental care.

EX 7

**Recommendation: Review all directives relative to member wellbeing and align with best practices and 21st Century policing principles.**

**(6)      The Promotion Process Should be Evaluated**

The practice of promoting officers after 3 years should be evaluated. Organizations are only as strong as their leaders. Leadership is comprised on many intrinsic abilities and learned skills developed with meaningful experience.  The fifth pillar of 21st Century Policing speaks to Training and Education. Training and Education is both formal, informal, and experiential. It takes time for an officer to develop the experiential skills, expertise, competence and confidence to step into a leadership role. Inexperienced officers become ineffective leaders if advance too early in their career. CDP's practice of promoting officers with as little as three years seniority should be evaluated as this may lead to a weakened leadership core which will adversely impact leadership across the Division in a myriad of detrimental ways.

**Recommendation: CDP should work with the FOP to implement an enhanced merit based promotion system where seniority plays a reasonable role.**

**(7)      Seniority Should Play a Limited Role in Transfers.**

While seniority plays a minimal role in the promotion process, it plays a major role in transfers and specialty assignments within CDP. This has a negative impact on operational effectiveness. The seniority-based system was consistently seen as an impediment to optimal functioning of the Division as it relates to HR practices and policies and undoubtedly impacts the entire organizational and leadership culture. There were widespread reports of unqualified individuals being placed in key roles based simply on seniority which resulted in inefficiency and frustration for many. This does not lead to an effective organization.

A seniority-based system is antiquated, breeds complacency, destroys morale and does not help the individual, CDP, or the City to achieve its best in providing quality service. A true merit-based system for promotions and transfers must be pursued if CDP is to become a 21st Century Policing organization.

The review team appreciates that this is a contractual issue but strongly suggests that the City/CDP and the FOP work to address this significantly detrimental element within the system. Addressing this issue is critical to the future of effective policing in the City of Columbus.

**Recommendation: All stakeholders should work to institute a holistic, merit based promotional and transfer system within CDP.**

EX 7

## (8) Background Investigation Process Should be Evaluated

When a police organization hires an officer, in most instances, that officer stays with the organization for an entire career. The hiring and training of an employee is the first step in ensuring a healthy organization providing exemplary service to the public.  It is imperative that police organizations thoroughly vet employees to ensure they are recruiting individuals of high moral character who understand their responsibility as public servants.

In examining the CDP hiring practices, the review team learned that background investigators conduct all interviews within police facilities. There is no face to face interview with references nor a visit to the home of intended employees. Though processes may vary within organizations, nothing replaces a face to face conversation where you can read the small nuances to answers. It is hard to appreciate that with such an important position all steps are not taken to ensure the character of intended hires by meeting with references in person where practical.

**Recommendation: CDP should review its background investigation processes and implement face to face interview for references where practicable.**

## 4. Professional Standards Bureau

Public Trust and Legitimacy is the first pillar in 21st Century Policing principles. Trust and legitimacy are foundational to the effective operation of police within the community and is derived from every aspect of an organization's intent and actions, internally and externally. Policies and operating procedures often dictate the actions of officers and civilians within police agencies.  It is critical that the policies and procedures strive to create an operating environment where trust and legitimacy are the ultimate outcome.

The responsibility for articulating the overarching operating principles of CDP resides with The Professional Standards Bureau.  The Bureau's mandate is to ensure the Division of Police is excelling in its continuous pursuit of excellence in all areas of operation. This includes ensuring policies and procedures are adhering to industry best practices, as attested to by the Commission on Accreditation for Law Enforcement Agencies (CALEA). The bureau is led by a commander and consists of three sections that are led by lieutenants.  The three sections consist of the following:

· Discipline-Grievance Section
· Accreditation Section
· Staff Inspections Section

The following shows the deployment of personnel within the Bureau:

EX 7

| Section | Sworn | Civilian |
|---|---|---|
| Administration | 1 Commander | |
| Discipline/Grievance Section | 2 Lieutenant | |
| Accreditation Section | 1 Lieutenant 1 Sergeant 3 Officers | 4 Management Analyst II |
| Staff Inspections Section | 2 Lieutenants | |
| **Total** | **10** | **4** |

## (1)    Analysis of the Professional Standards Bureau

The Professional Standards Bureau is relatively lean in staffing when compared to the importance of its mandate. The respective operational areas are operating at high level and has a good understanding of the importance of their tasks. The span of control within the Bureau is generous with a ratio of 1:2 to 1:5. Staff in the Bureau appear highly motivated and proud of their work. Bureau staff strive to ensure their recommendations are supported by strong research that aligns with 21st Century Policing Principles. An increase in de-escalation policy is a tangible evidence of that research and implementation.

## (2)    The Use of PowerDMS Should be Enhanced

As policy and procedures serves as a main conduit of operational practices, effective and timely dissemination of documentation is critical. The launch of PowerDMS has enhanced the ability to share information across the Division in a timely manner. Although this tool is proving useful, it is not fully adopted and widely utilized. The Division should make a concerted effort to ensure the benefits of PowerDMS are realized across the entire Division.

**Recommendation: Adopt a Division wide policy ensuring effective utilization of PowerDMS for document distribution and training where appropriate.**

## (3)    Continue Important Focus on Accreditation

Accreditation is the process through which organizations demonstrate professional accountability in their operating practices as attested to by an independent review body. Accredited organizations are generally operating within the best principles in their respective fields and undergo regular examination of their practices to maintain accredited status. In the area of law enforcement, the Commission on Accreditation for Law Enforcement Agencies (CALEA), is the international standard for police accreditation as recognized by the International Association of Chiefs of Police, National Sheriff's Association, National Organization of Black Law Enforcement Executives, and the Police Executive Research Forum. CALEA accreditation ensures strict professional accountability to best practices in operating procedures and enables agencies to

EX 7

demonstrate commitment to excellence in many areas of operations such as leadership and resource management, while reducing risk and liability by ensuring all areas of operations are operating under well research and attested practices.

CDP received its initial accreditation through CALEA in 1999 and has been successful reaccredited every three years since. Ensuring the Division maintains its accreditation status is a high priority for the Bureau. The Division undergoes its next CALEA assessment in 2021 and The Accreditation Unit is working to ensure new or revised standards introduced by CALEA in 2017 are effectively implemented in the Division. In addition to ensuring their own accreditation, the Accreditation Unit also represents the Division at mock assessments throughout the State of Ohio.  Accreditation through CALEA holds the Division to operating in compliance with policing "best practices" from a policy and procedure perspective.

**Recommendation: Continue to maintain a strong accreditation focus.**

**(4)     Research and Development Should Facilitate Broader Understanding of 21st Century Policing Concepts.**

As noted, the Professional Standards Bureau is responsible for ensuring CDP is adhering to the industry best practices through research and implementation. We have noted that policy development and operating procedures derived from that research has significant impact on the operational culture of an organization. In light of the emerging shift in the nature of policing predicated strongly on the 21st Century Policing Principles, The Research and Development Unit should undertake steps to bring additional policy enhancement to CDP, similar to working with the Mayor's Office in establishing Key Performance Indicators (KPI) for the Division.  We accept that culture change will not come strictly from policy directives, but we also appreciate that effective policy helps to create the right environment for change.

A resounding message throughout this review process was the lack of connection between police and community. There are many good examples of how police can take the lead in building this necessary bridge with the community. CDP should conduct research into this critical area of trust building and create a strategic action plan in collaboration with the community.  As best practices are discovered and developed, CDP should review existing policy and align with the new measures for policing. One way to accomplish this institutional shift in policy formation is through regular strategic engagements with the community encompassing many different feedback methods, such as surveys and focus group meetings. Feedback from the community should aid in formulating policies leading to increased public trust and legitimacy. This will ensure that CDP becomes the "best practice" for other organizations to follow as an accredited police agency.

EX 7

**Recommendations:**

**CDP should undertake a rigorous effort to review existing policy and align them with 21ˢᵗ Century Police principles with associated operating guidelines.**

**Examine ways to have meaningful engagements with the community and enact appropriate policies based on feedback.**

**(5)       Some Staff Inspections Functions Overlap with HR**

Staff Inspections provides a valuable service in ensuring the Division is operating effectively and maintaining a high degree of professionalism in appearance and conduct. The two lieutenants monitor compliance in areas such as:

- Staffing
- Vehicles
- Equipment
- Facilities

Through both formal and informal channels, Staff Inspections can expedite matters and rectify situations in a timely manner which allows operations to continue uninterrupted. They often identify and resolve safety issues and work to help educate employees on training matters by liaising with other CDP stakeholders. Due to the dynamic nature of their tasks, Staff Inspections often overlaps with the mandates of many other areas within the Division. Of note, is their involvement in Division staffing, providing recommendations on number of personnel in respective areas.

There were no specific indications that these practices posed current operational issues. This may simply be because of the personal presently occupying those roles and their manner of engaging with colleagues. The review team simply notes that there should be clarity and understanding around roles and responsibilities to ensure ongoing collegial relationships as personnel rotates in the positions.

**Recommendation: Ensure clear policy and understanding relative to the role of Staff Inspections across the Division.**

**5.       Fiscal Management Bureau**

Finances undergird operations in every police organization. Increasingly, organizations are called to show strong fiscal responsibility and account for practical expenditure of shrinking taxpayer dollars. The Fiscal Management Bureau oversees the financial matters of the Division, in partnership with key city offices such as:

- Public Safety Director's Office

EX 7

- City's Purchasing Office
- Department of Finance and Management
- City Auditor's Office
- City Attorney's Office
- Equal Business Opportunity Commission Office.

The following shows the assignment of personnel within the Bureau:

| Section | Sworn | Civilian |
|---|---|---|
| Administration | | 1 Fiscal Manager |
| Fiscal Administration | | 1 Management Analyst II |
| Grants | | 3 Management Analyst I |
| Seizure & Forfeiture | | 2 Management Analyst 1 |
| Fiscal Operations | | 1 Management Analyst II |
| | | 1 Fiscal Assistant |
| | | 3 Management Analyst 1 |
| **Total** | **0** | **12** |

Fiscal Management is a small Bureau that plays a significant role in the overall operations of the Division. Every area of the Division is impacted by the duties administered in the Bureau. The Bureau provides support to the CDP budget preparation and provides the financial information necessary for the key stakeholders to direct the financial operations of the Division. Key responsibilities include:

- Annual financial report preparation.
- Monitoring of the Division's General Fund Budget
- Monitoring of deposits and expenditures
- Prepare and analyze financial projections as needed
- Review and approve Division purchase orders
- Invoicing
- Main contact with vendors
- Oversees various allocation deposits
- Conduct analysis of spending trends
- Writing city ordinances to assist city council regarding grants

All of the above processes require a high degree of interoperability between the Division and noted key City partners.

**(1)    Work Processes**

It is critical that administrative processes between the Bureau and partner City offices operate in a streamline manner to ensure operational efficiency. Initial analysis suggests

EX 7

there is considerable room for improvement in workflow and automation within the Bureau and between partner city entities. The process of time keeping within the Division is primarily manual in nature. The Division payroll system does not communicate with the City system. Information must be entered into a spreadsheet and given to the city for data entry into their system. This copying from spreadsheet to spreadsheet is time consuming and inefficient.

Staff reported that there was good overall communication between the Bureau and respected city partners but note the lack of automation and systems integration posed unnecessary threat to greater efficiency. As noted elsewhere in this report, technology integration is a key to the future of effective policing in all spheres of operation. As responsible fiscal management is critical to the efficient operation of any public organization, it is incumbent that the City and CDP utilize technology to create efficiency and reduce the workload on employees.

**Recommendation: CDP and the City should make a concerted effort to streamline work processes in the area of Fiscal Management and ensure financial systems are compatible.**

**(2)     Grant Applications**

The Grants Unit has an important task in helping the Division access needed funding through grants applications. Grants Unit personnel assist Division members in searching out and applying for associated grants by completing and filing required paperwork. They monitor the process of the application and are integral in receiving awarded funds and ensuring accountability in distributing and tracking of grant expenditures. The Division applies for recurring grants to support initiatives in areas such as Traffic and Crime Lab training. Though awarded annually, there is no assurance that the grants will continue to be funded. This leaves the Division in a position of financial liability should grant funding be negatively impacted.

It was clear that some streamlining of processes would be an asset in addition to ensuring employees in this area have some financial/accounting background due to the nature of the work. As with many areas of review, the workload was deemed manageable if staffing was maintained during absences.

**Recommendations:**

**Work to institute streamlining measures in grants application and ensure staff have the associated financial training.**

**Work to establish stable funding for critical areas of police operations independent of grants.**

EX 7

# 11 Office of the Chief of Police

## Analysis of Internal Affairs Bureau

The Internal Affairs Bureau is headed by a Commander, and includes Administration, Administrative Unit and Investigative Unit.  Each shift is briefly described below and further detailed in the previously provided Profile deliverable:

The 1st Shift IAB Section is led by a Lieutenant and consists of two units: Administrative Unit and Investigative Unit.  The four Administrative Sergeants staff the complaint intake desk, serving as the first point of contact for complainants.  Additionally, the Administrative Sergeants perform the following tasks:

- Answers the complaint line
- Returns complaint line calls
- Receives in-person complaints
- Enters complaints into the PremierOne database.
- Gathers all information necessary to start an investigation.

The nine Investigative Sergeants are responsible for conducting investigations, as assigned, interviewing witnesses, complainants and focus officers, writing recommended findings on allegations, and attending chief and safety director hearings.

The two Office Assistants perform clerical duties and transcribe interviews, in support of the Bureau.

The 2nd Shift IAB Section is led by a Lieutenant and consists of 11 Investigative Sergeants. The ten Investigative Sergeants are responsible for conducting investigations, as assigned, interviewing witnesses, complainants and focus officers, writing recommended findings on allegations, and attending chief and safety director hearings.

**(1)     Analysis of Investigator Caseloads**

Internal affairs investigations are unique in that they have not only constitutional and labor agreement constraints they can have a tremendous impact on police-community relations. If internal affairs investigations are poorly conducted the community can lose faith in the department and they can also limit discipline or accountability.  Unlike criminal investigations, internal affairs complaints have timelines for completion, this is sometimes set by labor agreements, best practice or department goals.  In Columbus the labor agreement spells out a specific timeline for complaints which must be completed 180 days (with very limited exceptions such as an active criminal investigation).  The Internal Affairs Bureau investigated the following number of cases over the two-year period noted.

EX 7

| 2016 | |
|---|---|
| Number of Citizen Complaints Completed | 312 |
| Number Completed in 90 Days | 311 |
| Percentage Completed in 90 Days | 99.6% |
| 2017 | |
| Number of Citizen Complaints Completed | 253 |
| Number Completed in 90 Days | 253 |
| Percentage Completed in 90 Days | 100% |

CPD investigated all of their cases in under 90 days (50 day Civilian Timeline) which is remarkable when compared to other agencies. Many agencies have a 180 day investigation goal and many do meet that goal. To accomplish this goal the CPD has 20 full time investigative sergeants assigned to Internal Affairs Bureau and another 4 sergeants assigned to intake.

The following table shows the number of cases assigned per investigator in 2017:

| Total Cases | Number per Month | Number of Investigators | Avg # of Inv/ Investigator/Yr. | Avg # of Inv/ Investigator/Mo. |
|---|---|---|---|---|
| 253 | 21 | 20 | 12.6 | 1 |

The case counts for the first 10 months of 2018 was 211 or approximately 10.55 cases per investigator. This averages approximately 1 case per month.

In addition to community generated complaints IAB conducts internally initiated complaints. In 2016 (last year data that was provided) IAB conducted 19 internally generated investigations. This is on par with other agencies where approximately 50% of complaints are internally initiated. This is important as this indicates a department is holding its own employees accountable for upholding the standards (policies) for the department. When adding internally generated complaints the case count increases to approximately 2 cases per month per investigator.

In larger agencies such as CPD where IA investigators are fully dedicated to investigations 2 cases per month is on the low end of workable cases per investigator. Typical caseloads for standalone IA investigations is 2 to 6 per month, however CPD is very effective at meeting case closer rates within the allotted time.

IAB investigators have low caseloads and there is additional capacity with current staffing. The CDP has recommended reducing IAB investigative sergeant positions by two sergeants. Even with 2 less sergeants the caseloads would remain below 2 cases per month per sergeant which is still a very low caseload.

EX 7

**Recommendation: Transfer 2 Sergeants positions from IAB to patrol to reduce spans of control in patrol.**

**(2)      Analysis of Administrative Sergeant workloads**

CPD uses dedicated sergeants for intake of community generated complaints.   The sergeants are available by phone 6am to 10pm.  After hours complaints are handled by the patrol administrative sergeant.   In 2017, Administrative Sergeants handled 2673 intakes / calls or an average of 7.3 calls a day.  Each call is logged and calls that resort into a complaint are then prepared for further investigation.

Intake calls vary in length, but a call of 30 minutes is not unusual, especially when trying to decipher what has happened, when it happened and where it happened.  Sergeants have use various databases including CAD to very or establish the particular incident.

It is important to note that most calls do not result in a full investigation, but are often an important conduit of information to the community.  Many community members contact internal affairs to enquire about department policies, state laws or proper procedures. Once informed of polices, laws or procedures community members may have feel an investigation is not warranted.

As mentioned above, if a complaint is taken the Administrative sergeants must gather information to establish an investigation.   This includes intake sheets, establishing witness identities and contact information and attempting to identify involved officer(s).

Though call volume of 7 calls a day is low, each call can take 30 minutes or longer representing at least 3.5 hours of work per day for only intake calls only.  Additionally, CPD is committed to having intake available for 16 hours a day.   This allows the community greater access to IAB personnel and the ability to file a complaint after a standard 8am to 5pm work day.

IAB personnel also conducted more than 18 community engagement activities in 2017. This included volunteering at homeless and food pantries.

Administrative Sergeants are able handle intake calls with current staffing.  The IAB Administrative Sergeants have low call volumes per shift, which allows them to spend significant time with each complainant.  This is important because many complainants wish to be heard and the ability to spend time on the phone or in person with them may help complainants feel better about the process.  This also allows the intake sergeants to take time to thoroughly explain the process.

**Recommendation: Maintain current authorized Administrative Sergeant staffing.**

EX 7

# Attachment A: Profile of the Columbus Division of Police

## 1. Introduction

The following descriptive profile outlines the organization, structure, and staffing of the Columbus Division of Police. The information contained in the profile has been developed through a number of interviews conducted within the Division at all levels of the organization, including managers, supervisors, and line-level staff.

It is also important to note that the primary objective of this profile is to review and confirm our current understanding of the Division. Consequently, no analysis or findings are contained in this document. Instead, the report focuses on outlining the following items:

• The organizational structure of each area of the Division.

• Descriptions of the key functions and work areas of each organizational component. This document is not intended to reflect every important duty performed.

• The authorized (budgeted) and actual (currently filled) number of positions by rank or classification assigned to each unit. The staffing numbers reflected in this document are up to date, as of March 10, 2019; however, the currently filled numbers change frequently.

• The roles, objectives, and responsibilities of each unit are provided, though a detailed description of each position is not.

The profile was the first deliverable of this project; it served as a foundation for our assumptions regarding staffing and organizational characteristics of each functional area included in the scope of the study.

EX 7

## 2.  Office of the Chief of Police

The Office of the Chief of Police includes the Chief's Office, various support personnel, the Public Information Unit and the Internal Affairs Bureau.

**(1)      Organization**

The following chart outlines the organization of the Office of the Chief of Police, which has one unit and a bureau directly reporting to the chief:



**(2)      Staffing and Unit Descriptions**

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the Office of the Chief:

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| Office of the Chief | 1<br>1<br>1<br>1 | 1<br>1<br>1<br>1 | Chief of Police<br>Organizational Accountability Lieutenant<br>Aide to the Chief<br>Admin. Secretary | • The Chief of Police is the top executive of the agency.<br>• Organizational Accountability Lieutenant: created three years ago to ensure that 311 and other complaints were followed up on; also ensures that other timed commitments are met (e.g., policy reviews); and special projects from the Chief.<br>• Aide – Sergeant: Administrative Officer to the Chief handles correspondence, meeting logistics, legal and legislative updates, facility issues, general inquiries to the Chief, etc. |
| **Legal Advisors – City Attorney's Office** | | | | |
| Legal Advisor's Office | 1<br><br>1<br><br><br>1 | 1<br><br>1<br><br><br>1 | Section Chief<br><br>Police Legal Advisor<br><br>Police Legal Clerk | • Located in Police Headquarters, the Legal Advisor's Office consists of two attorneys and one legal clerk, who represent the Columbus City Attorney's Office.<br>• Provides legal consultation to the Office of the Chief of Police.<br>• Regularly provides training and disseminates information pertaining to legal matters that may impact the Division of Police. |
| **Public Information** | | | | |
| Public Information | 1<br>1<br>1 | 1<br>1<br>1 | Sergeant<br>Public Relations Specialist II<br>Crime Stoppers Coordinator | • Manages media relations for the Columbus Division of Police; prepares press releases and is the primary point of contact for the media.<br>• Manages the social media accounts of the Division, conducting outreach and communicating with the public on public safety issues.<br>• Manages the Crime Stoppers program and supports crime stoppers Board– reviews and refers tips, coordinates tips with the media, including social media. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| **Internal Affairs Bureau** | | | | |
| Administration | 1<br>0<br><br>1 | 1<br>1<br><br>1 | Commander<br>Administrative Lieutenant<br>Office Assistant. II | • Manages the Internal Affairs Bureau (IAB), which reports directly to the Office of the Chief of Police.<br><br>• Although this multi-shift position has not been filled in recent years, this lieutenant position would supervise the administrative sergeants and civilian personnel, assigned to 1st shift. Additionally, this lieutenant would address PremierOne administrative functions.<br><br>• The office assistant performs tasks associated with data entry, filing, answering phones, stocking supplies, fulfilling public records requests, and transcription. |
| 1st Shift Internal Affairs Bureau | 1<br>13<br>1 | 1<br>13<br>1 | Lieutenant<br>Sergeants<br>Office Assistant II | • Lieutenant provides management and oversight of the section and direct reports.<br><br>• Personnel assigned to the unit primarily work from 7:00AM - 3:00PM with variable hours. 1st shift IAB follows a five-day, eight-hour schedule, with workdays varying based on needs.<br><br>• IAB Sergeants progress all internal affairs cases, including those that originate from complaints, criminal allegations, and internal investigations.<br><br>• IAB Sergeants recommend findings at the conclusion of an IAB investigation, which are then submitted to the involved personnel's chain of command for review.  As needed, they attend chief and safety director hearings.<br><br>• Four Administrative Sergeants staff the complaint intake desk, serving as the first point of contact for complainants.  Additionally, the Administrative Sergeants perform the following tasks:<br><br>• Answers the complaint line<br>   o  Returns complaint line calls<br>   o  Receives in-person complaints<br>   o  Enters complaints into the PremierOne database.<br>• Gathers all information necessary to start an investigation.<br><br>  Two of the four administrative sergeants work 2:00 PM – 10:00 PM |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • The remaining nine sergeants are the primary investigators for IAB cases.<br><br>• The office assistant performs clerical duties and transcribe interviews, in support of the unit. |
| 2nd Shift Internal Affairs Bureau | 1<br><br>11 | 1<br><br>11 | Lieutenant<br><br>Sergeants | • Lieutenant provides management and oversight of the section and direct reports to this position.<br><br>• Personnel assigned to the unit have variable hours, but primarily work from 2:00PM - 12:00AM. 2nd Shift IAB follows a four-day, 10-hour schedule, with workdays varying, based on needs.<br><br>• There are no Administrative Sergeants assigned to 2nd shift – all are responsible for conducting investigations, as assigned, interviewing witnesses, complainants and focus officers, writing recommended findings on allegations, and attending chief and safety director hearings. |

EX 7

# 3. Patrol North Subdivision

The Patrol North Subdivision is headed by a deputy chief, and contains two zones that are each led by a commander position. Additionally, the Patrol North Subdivision contains the Strategic Response Bureau, which includes the Community Liaison and Zone Resource Sections.

## (1) Organization

The following chart outlines the organization of the two zones and the Strategic Response Bureau, within the Patrol North Subdivision, which largely mirrors the structure of its counterpart, the Patrol South Subdivision:



## (2) Staffing and Unit Descriptions

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the subdivision. Please note that specific patrol assignments are detailed in the next section.

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| Administration | 1 | 1 | Deputy Chief | • The deputy chief is responsible for managing the subdivision and its assigned zones and sections. |
| | 1 | 1 | Administrative Secretary | • The administrative secretary supports the deputy chief and subdivision as a whole. |
| **Zone 1** | | | | |
| Administration | 1 | 1 | Commander | • The commander is responsible for administration of the patrol zone and all assigned personnel.<br>• Commanders set overall crime enforcement strategy, oversee the deployment of patrol resources and are a focal point for interfacing with the community. |
| A Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise A Company and Day Midwatch (DMW), and is responsible for watch command duties. |
| | 0 | 0 | Relief Lieutenant | |
| | 5 | 6 | Sergeants | • The Zone 1 Relief Lieutenant performs watch command duties on the days off of the regular Zones 1 and 4 A Company Lieutenants. |
| | 40 | 40 | Officers | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete.<br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed.<br>• A Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 6:00AM or 7:00AM, based on assigned precinct. |
| Day Midwatch | 1 | 1 | Sergeant | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift. |
| | 14 | 14 | Officers | • DMW, is a patrol unit that operates on a four-day, 10-hour schedule, which begins at 9:00AM. |
| B Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to the shift, and is responsible for watch command duties. |
| | 1 | 1 | General Relief Lieutenant | • The Zone 1 General Relief Lieutenant performs watch command duties throughout the city, as needed.  They often assume responsibilities of regular lieutenants who are off on leave, injury, or |
| | 6 | 6 | Sergeants | |
| | 50 | 55 | Officers | |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | Officers | training.  Further, they assist with administrative and operational tasks and planning and supervising zone events. <br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. <br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. <br>• B Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 2:00PM or 3:00PM, based on assigned precinct. |
| CRT 1 | 1 <br> 9 | 1 <br> 10 | Sergeant <br> Officers | • The sergeant has operational and administrative authority over all Community Response Team (CRT) Officers. <br>• CRT units are proactive enforcement units, functioning in both uniformed and plain clothes capacities to help facilitate community policing strategies. <br>• Provides targeted enforcement in areas identified as hotspots, investigates drug house complaints, and other activity, as directed by the sergeant, lieutenant, and zone commander. <br>• CRT 1 works four 10-hour shifts from 2:00 PM – 12:00 AM, with the ability to vary their hours, based on operational needs. <br>• Originally funded through a COPS program grant, which has since expired. <br>• Officers must have or obtain Law Enforcement Bicycle Association (LEBA) Certification. |
| C Company | 1 <br> 6 <br> 43 | 1 <br> 6 <br> 44 | Lieutenant <br> Sergeants <br> Officers | • One lieutenant is assigned to supervise C Company and Evening Midwatch (EMW), and is responsible for watch command duties. <br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. <br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • C Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 10:00PM or 11:00PM, based on assigned precinct. |
| Evening Midwatch | 2<br>23 | 2<br>23 | Sergeants<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• EMW comprises two patrol units that operate on a four-day,10-hour schedule, which begins at 7:00PM. |
| **Strategic Response Bureau** | | | | |
| Administration | 1<br>1 | 1<br>1 | Commander<br>Office Assistant II | • The commander is responsible for administration of the Strategic Response Bureau and all assigned personnel.<br>• Commanders set overall crime strategy, and are a focal point for interfacing with the community.<br>• The office assistant performs general clerical duties. |
| **Community Liaison Section** | 1<br>2 | 1<br>2 | Lieutenant<br>Office Assistant I | • Manages Community Liaison Officer(s) (CLO) North and South, and the Mounted Unit.<br>• The office assistant I position works Monday through Friday from 7:00AM - 3:30PM.<br>• Both office assistants perform general clerical duties.  In addition, one assistant addresses 311 complaints, and the other assists with payroll activities. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| CLO North | 1 | 1 | Sergeant | • Each CLO is assigned to a patrol precinct. |
| | 8 | 8 | Officers | • Officers coordinate abatements, organize neighborhood block watches, and perform outreach to elementary schools, as well as some middle schools. |
| | | | | • Officers also follow up on quality of life issues, such as loud music complaints, concerns raised over Nextdoor, a private communications platform for neighborhoods, and other issues. |
| | | | | • Officers work an eight-hour schedule with variable hours, which can be adjusted, as needed to attend community events. |
| CLO South | 1 | 1 | Sergeant | • Each CLO is assigned to a patrol precinct. |
| | 12 | 12 | Officers | • Officers coordinate abatements, organize neighborhood block watches, and perform outreach to elementary schools, as well as some middle schools. |
| | | | | • Officers also follow up on quality of life issues, such as loud music complaints, concerns raised over Nextdoor and other issues. |
| | | | | • Officers work an eight-hour schedule with variable hours, which can be adjusted, as needed to attend community events. |
| Mounted | 1 | 1 | Sergeant | • Hours are primarily 10:00AM–6:00PM or 8:00AM–4:00PM (varies by position), but are frequently adjusted and flexed, as needed to attend events, without using overtime. |
| | 6 | 6 | Officers | |
| | 1 | 2 | Laborer (PT) | |
| | | | | • Maintains 11 horses at the city-owned facility. |
| | | | | • Deploys for crowd control uses, community events, special events, and schools, as needed. |
| **Zone Resource Section** | 1 | 1 | Lieutenant | • Manages the Juvenile Truancy, Recruiting, Crime Analysis, Zone Investigations, School Investigations, and High School Resource Units. |
| High School Resource | 2 | 2 | Sergeants | • There are two High School Resource Units, North and South, each with one sergeant and 10 officers. |
| | 20 | 20 | Officers | • Each officer is assigned to one of 18 schools, with two officers functioning in a relief capacity. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • Officers assigned to the unit receive a weeklong training on relevant legal information, mental health crisis response, and other topics. |
| Juvenile Truancy | 4 | 9 | Officers | • Recently reorganized under the High School Resource Unit.<br>• Enforces truancy laws, through complaint and proactive patrol.<br>• Works a five-day, 10-hour schedule that operates Monday through Friday from 8:30AM - 4:30PM.<br>• Officers assigned to the unit report directly to one of two High School Resource Unit Sergeants. |
| Recruiting | 1<br>3 | 1<br>4 | Sergeant<br>Officers | • Responsible for recruiting efforts, including attending job fairs, disseminating Division outreach information, and other activities relating to attracting sworn police applicants. |
| Crime Analysis | 4 | 5 | Crime Analyst I | • While the crime analysts are co-located, each is assigned to a specific zone, and is responsible for compiling statistics and providing analysis on emerging crime patterns.<br>• The crime analysts meet monthly in a crime strategies forum as part of a team with the commander, detectives, patrol supervisors, and other personnel.<br>• To develop familiarity with ongoing and emerging issues, crime analysts read reports from their zones. |
| Zone Investigations | 1<br>11 | 1<br>11 | Sergeant<br>Officers | • The sergeant supervises the school investigators.<br>• Officers investigate specific misdemeanor crimes, which may include, theft offenses, assault, menacing, trespassing, criminal damaging, telecommunications harassment, impersonating a police officer, and some bias/hate crimes.<br>• Each officer is assigned two precincts. |
| School Investigations | 2 | 2 | Officers | • Investigates crimes, predominately felonies, that occur in schools, working with the High School Resource Unit, as needed.<br>• Cases are assigned by school. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| **Zone 4** | | | | |
| Administration | 1 | 1 | Commander | • The commander is responsible for administration of the patrol zone and all assigned personnel.<br>• Commanders set overall crime enforcement strategy, oversee the deployment of patrol resources and are a focal point for interfacing with the community. |
| A Company | 1<br>6<br>40 | 1<br>6<br>40 | Lieutenant<br>Sergeants<br>Officers | • One lieutenant is assigned to supervise A Company and DMW, and is responsible for watch command duties.<br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete.<br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed.<br>• A Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 6:00AM or 7:00AM, based on the precinct assigned. |
| Day Midwatch | 1<br>12 | 1<br>12 | Sergeant<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• Day Midwatch, is a patrol unit that operates on a four-day, 10-hour schedule, which begins at 9:00AM. |
| B Company | 1<br>1<br>6<br>58 | 1<br>1<br>6<br>61 | Lieutenant<br>Relief Lieutenant<br>Sergeants<br>Officers | • One lieutenant is assigned to the shift, and is responsible for watch command duties.<br>• The Zone 4 Relief Lieutenant performs watch command duties on the days off of the regular Zones 1 and 4 B Company Lieutenants.<br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete.<br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • B Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 2:00PM or 3:00PM, based on precinct assigned. |
| C Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise C Company and EMW, and is responsible for watch command duties. |
| | 6 | 6 | Sergeants | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | 40 | 44 | Officers | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | | | | • C Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 10:00PM or 11:00PM, based on precinct assigned |
| Evening Midwatch | 2 | 2 | Sergeants | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift. |
| | 23 | 23 | Officers | • EMW comprises two patrol units that operate on a four-day, 10-hour schedule, with the shift beginning at 7:00PM. |
| Campus Walking Crew | 1 | 1 | Sergeant | • Patrols the University District, near the Ohio State University (OSU), responding to complaints and proactively addressing problems. |
| | 12 | 12 | Officers | • Works a four-day, 10-hour shift from Wednesday to Saturday, beginning at 7:00PM. One OSU Police Department Officer is embedded within the unit (not listed). |
| | | | | • As part of a joint initiative, OSU provides overtime funding for Columbus Division of Police Officers to address crime patterns in the University District. |
| | | | | • As a result of having the Campus Walking Crew, Zone 4 does not have a Community Response Team (CRT) assigned to it. |

# EX 7

# 4. Patrol South Subdivision

The Patrol South Subdivision is headed by a deputy chief, and contains three zones that are each led by a commander position.

## (1)    Organization

The following chart outlines the organization of the three patrol zones within the Patrol South Subdivision, which is similar to the structure of its counterpart, the Patrol North Subdivision:



## (2)    Staffing and Unit Descriptions

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the subdivision. Please note that specific patrol assignments are detailed in the next section.

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| Administration | 1 | 1 | Deputy Chief | • The deputy chief is responsible for managing the subdivision and its assigned zones and sections. |
| **Zone 2** | | | | |
| Administration | 1 | 1 | Commander | • The commander is responsible for administration of the patrol zone and all assigned personnel.<br>• Commanders set overall crime enforcement strategy, oversee the deployment of patrol resources and are a focal point for interfacing with the community. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| A Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise A Company and DMW, and is responsible for watch command duties |
| | 6 | 6 | Sergeants | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | 40 | 40 | Officers | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | | | | • A Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 6:00AM or 7:00AM, based on assigned precinct. |
| Day Midwatch | 1 | 1 | Sergeants | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift. |
| | 12 | 13 | Officers | • DMW is a patrol unit that operates on a four-day, 10-hour schedule, which begins at 9:00AM. |
| B Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to the shift, and is responsible for watch command duties. |
| | 1 | 1 | Relief Lieutenant | • The Zone 2 Relief Lieutenant performs watch command duties on the days off of the regular Zone 3 B Company Lieutenant. |
| | 1 | 1 | General Relief Lieutenant | • The Zone 2 General Relief Lieutenant, which is not a regular position, performs watch command duties throughout the city, as needed. They often assume responsibilities of regular lieutenants who are off on leave, injury, or training.  Further, they assist with administrative and operational tasks and planning and supervising zone events. |
| | 6 | 6 | Sergeants | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | 53 | 62 | Officers | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | | | | • B Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 2:00PM or 3:00PM, based on assigned precinct. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| CRT 2 | 1 | 1 | Sergeant | • The sergeant has operational and administrative authority over all Community Response Team (CRT) Officers. |
| | 10 | 10 | Officers | • CRT units are proactive enforcement units, functioning in both uniformed and plain clothes capacities to help facilitate community policing strategies. |
| | | | | • Provides targeted enforcement in areas identified as hotspots, investigates drug house complaints, and other activity, as directed by the sergeant, lieutenant, and zone commander. |
| | | | | • CRT 2 works five eight-hour shifts from 3:00 PM – 11:00 PM, with the ability to vary their hours, based on operational needs. |
| | | | | • Originally funded through a COPS program grant, which has since expired. |
| | | | | • Officers must have or obtain Law Enforcement Bicycle Association (LEBA) Certification. |
| C Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise C Company and EMW, and is responsible for watch command duties. |
| | 1 | 1 | Relief Lieutenant | • The Zone 2 Relief Lieutenant performs watch command duties on the days off of the regular Zones 1, 2, and 4 C Company Lieutenants. |
| | 5 | 6 | Sergeants | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | 42 | 44 | Officers | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | | | | • C Company personnel assigned to units on the eight-hour schedule work five days per week, with the shift beginning at either 10:00PM or 11:00PM, based on assigned precinct. |
| Evening Midwatch | 2 | 2 | Sergeants | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift. |
| | 23 | 24 | Officers | • EMW comprises two units that operate on a four-day, 10-hour schedule, which begins at 7:00PM. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| **Zone 3** | | | | |
| Administration | 1 | 1 | Commander | • The commander is responsible for administration of the patrol zone and all assigned personnel.<br>• Commanders set overall crime enforcement strategy, oversee the deployment of patrol resources and are a focal point for interfacing with the community. |
| A Company | 1<br>1<br>6<br>39 | 1<br>1<br>6<br>40 | Lieutenant<br>Relief Lieutenant<br>Sergeants<br>Officers | • One lieutenant is assigned to supervise A Company and DMW, and is responsible for watch command duties<br>• The Zone 3 Relief Lieutenant performs watch command duties on the days off of the regular Zones 3 and 5 A Company Lieutenants.<br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete.<br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed.<br>• A Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 6:00AM or 7:00AM, based on assigned precinct. |
| Day Midwatch | 1<br>14 | 1<br>14 | Sergeant<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• DMW, is a patrol unit that operates on a four-day, 10-hour schedule, which begins at 9:00AM. |
| Marine Park | 2 | 4 | Officers | • Patrols parks and waterways within the City of Columbus, principally Griggs Reservoir.<br>• Part of planning efforts for "Red, White and Boom" downtown, as well as boat races on the Scioto River.<br>• Interfaces with other agencies and private organizations to identify and address issues in the parks and waterways.<br>• The Marine Park Officers report to the 15 Precinct A Company Sergeant. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| B Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to the shift, and is responsible for watch command duties. |
| | 6 | 6 | Sergeants | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | 64 | 65 | Officers | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | | | | • B Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 2:00PM or 3:00PM, based on assigned precinct. |
| CRT 3 | 1 | 1 | Sergeant | • The sergeant has operational and administrative authority over all Community Response Team (CRT) Officers. |
| | 10 | 10 | Officers | • CRT units are proactive enforcement units, functioning in both uniformed and plain clothes capacities to help facilitate community policing strategies. |
| | | | | • Provides targeted enforcement in areas identified as hotspots, investigates drug house complaints, and other activity, as directed by the sergeant, lieutenant, and zone commander. |
| | | | | • CRT 3 works five eight-hour shifts from 3:00 PM – 11:00 PM, with the ability to vary their hours, based on operational needs. |
| | | | | • Originally funded through a COPS program grant, which has since expired. |
| | | | | • Officers must have or obtain Law Enforcement Bicycle Association (LEBA) Certification. |
| C Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise C Company and EMW, and is responsible for watch command duties. |
| | 1 | 1 | Relief Lieutenant | • The Zone 3 Relief Lieutenant performs watch command duties on the days off of the regular Zones 3 and 5 C Company Lieutenants. |
| | 5 | 6 | Sergeants | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | 40 | 44 | Officers | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • C Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 10:00PM or 11:00PM, based on assigned precinct. |
| Evening Midwatch | 2<br>24 | 2<br>26 | Sergeants<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• EMW comprises two units that operate on a four-day, 10-hour schedule, which begins at 7:00PM. |
| **Zone 5** | | | | |
| Administration | 1 | 1 | Commander | • The commander is responsible for administration of the patrol zone and all assigned personnel.<br>• Commanders set overall crime enforcement strategy, oversee the deployment of patrol resources and are a focal point for interfacing with the community. |
| A Company | 1<br>6<br>42 | 1<br>6<br>42 | Lieutenant<br>Sergeants<br>Officers | • One lieutenant is assigned to supervise A Company and DMW, and is responsible for watch command duties<br>• Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete.<br>• Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed.<br>• A Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 6:00AM or 7:00AM, based on assigned precinct. |
| Day Midwatch | 1<br>11 | 1<br>12 | Sergeant<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• DMW is a patrol unit that operates on a four-day, 10-hour schedule, which begins at 9:00AM. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| B Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to the shift, and is responsible for watch command duties. |
| | 1 | 1 | Relief Lieutenant | • The Zone 5 Relief Lieutenant performs watch command duties on the days off of the regular Zones 2, and 5 B Company Lieutenants. |
| | 6 | 6 | Sergeants | |
| | 59 | 67 | Officers | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | | | | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |
| | | | | • B Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 2:00PM or 3:00PM, based on assigned precinct. |
| CRT 5 | 1 | 1 | Sergeant | • The sergeant has operational and administrative authority over all Community Response Team (CRT) Officers. |
| | 10 | 10 | Officers | • CRT units are proactive enforcement units, functioning in both uniformed and plain clothes capacities to help facilitate community policing strategies. |
| | | | | • Provides targeted enforcement in areas identified as hotspots, investigates drug house complaints, and other activity, as directed by the sergeant, lieutenant, and zone commander. |
| | | | | • CRT 5 works five eight-hour shifts from 3:00 PM – 11:00 PM, with the ability to vary their hours, based on operational needs. |
| | | | | • Originally funded through a COPS program grant, which has since expired. |
| | | | | • Officers must have or obtain Law Enforcement Bicycle Association (LEBA) Certification. |
| C Company | 1 | 1 | Lieutenant | • One lieutenant is assigned to supervise C Company and EMW, and is responsible for watch command duties. |
| | 5 | 6 | Sergeants | |
| | 43 | 44 | Officers | • Patrol sergeants function as the first-line supervisors for patrol officers and review all reports they complete. |
| | | | | • Patrol officers and sergeants respond to emergency incidents and other calls for service, completing reports as needed. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Roles and Responsibilities |
|---|---|---|---|---|
| | | | | • C Company personnel are assigned to units on the eight-hour schedule and work five days per week, with the shift beginning at either 10:00PM or 11:00PM, based on assigned precinct. |
| Evening Mid-Watch | 2<br>22 | 2<br>24 | Sergeants<br>Officers | • Midwatch sergeants have administrative authority over midwatch officers, while the regular precinct sergeants maintain operational authority over midwatch officers assigned to their precinct for the shift.<br>• Evening Mid-Watch comprises two units that operate on a four-day, 10-hour schedule, which begins at 7:00PM. |

## (3)     Patrol Shift Schedule

The following table provides a detailed shift schedule of all regular patrol units, including assignment, start and end times, and the number of officers allocated (actual/filled) positions):

### Current Patrol Schedule and Assignments

| Zone | Company | Team | Start | End | # Officers (Filled) | # Officers (Auth.) |
|---|---|---|---|---|---|---|
| **Zone 1** | **A** | 1 | 7 AM | 3 PM | 10 | 10 |
| | | 6 | 7 AM | 3 PM | 10 | 10 |
| | | 17 | 6 AM | 2 PM | 10 | 10 |
| | | 18 | 6 AM | 2 PM | 10 | 10 |
| | | Day Mid | 9 AM | 7 PM | 14 | 14 |
| | **B** | 1 | 3 PM | 11 PM | 11 | 13 |
| | | 6 | 3 PM | 11 PM | 13 | 13 |
| | | 17 | 2 PM | 10 PM | 10 | 13 |
| | | 18 | 2 PM | 10 PM | 16 | 16 |
| | | CRT1 | 2 PM | 12 AM | 9 | 10 |
| | **C** | 1 | 11 PM | 7 AM | 11 | 11 |
| | | 6 | 11 PM | 7 AM | 10 | 11 |
| | | 17 | 10 PM | 6 AM | 11 | 11 |
| | | 18 | 10 PM | 6 AM | 11 | 11 |
| | | Evening Mid (1) | 7 PM | 5 AM | 13 | 13 |
| | | Evening Mid (2) | 7 PM | 5 AM | 10 | 10 |

EX 7

| Zone | Company | Team | Start | End | # Officers (Filled) | # Officers (Auth.) |
|------|---------|------|-------|-----|---------------------|--------------------|
| **Zone 4** | **A** | 2 | 7 AM | 3 PM | 10 | 10 |
| | | 3 | 7 AM | 3 PM | 10 | 10 |
| | | 4 | 6 AM | 2 PM | 10 | 10 |
| | | 5 | 6 AM | 2 PM | 10 | 10 |
| | | Day Mid | 9 AM | 7 PM | 12 | 12 |
| | **B** | 2 | 3 PM | 11 PM | 14 | 15 |
| | | 3 | 3 PM | 11 PM | 13 | 13 |
| | | 4 | 2 PM | 10 PM | 14 | 16 |
| | | 5 | 2 PM | 10 PM | 17 | 17 |
| | **C** | 2 | 11 PM | 7 AM | 10 | 11 |
| | | 3 | 11 PM | 7 AM | 10 | 11 |
| | | 4 | 10 PM | 6 AM | 10 | 11 |
| | | 5 CWC | 10 PM | 6 AM | 10 | 11 |
| | | CWC | 7 PM | 5 AM | 12 | 12 |
| | | Evening Mid (1) | 7 PM | 5 AM | 12 | 12 |
| | | Evening Mid (2) | 7 PM | 5 AM | 11 | 11 |
| **Zone 5** | **A** | 7 | 6 AM | 2 PM | 10 | 10 |
| | | 11 | 6 AM | 2PM | 10 | 10 |
| | | 12 | 7 AM | 3 PM | 10 | 10 |
| | | 16 | 7 AM | 3 PM | 12 | 12 |
| | | CRT 5 | 3 PM | 11 PM | 10 | 10 |
| | | Day Mid | 9 AM | 7 PM | 11 | 12 |
| | **B** | 7 | 2 PM | 10 PM | 16 | 17 |
| | | 11 | 2 PM | 10 PM | 16 | 17 |
| | | 12 | 3 PM | 11 PM | 16 | 17 |
| | | 16 | 3 PM | 11 PM | 11 | 16 |
| | **C** | 7 | 10 PM | 6 AM | 11 | 11 |
| | | 11 | 10 PM | 6 AM | 11 | 11 |
| | | 12 | 11 PM | 7 AM | 11 | 11 |
| | | 16 | 11 PM | 7 AM | 10 | 11 |
| | | Evening Mid (1) | 7 PM | 5 AM | 10 | 12 |
| | | Evening Mid (2) | 7 PM | 5 AM | 12 | 12 |

EX 7

| Zone | Company | Team | Start | End | # Officers (Filled) | # Officers (Auth.) |
|------|---------|------|-------|-----|---------------------|--------------------|
| **Zone 2** | **A** | 9 | 6 AM | 2 PM | 10 | 10 |
| | | 13 | 7 AM | 3 PM | 10 | 10 |
| | | 14 | 7 AM | 3 PM | 10 | 10 |
| | | 20 | 6 AM | 2 PM | 10 | 10 |
| | | Day Mid | 9 AM | 7 PM | 12 | 13 |
| | **B** | 9 | 2 PM | 10 PM | 15 | 17 |
| | | 13 | 3 PM | 11 PM | 16 | 18 |
| | | 14 | 3 PM | 11 PM | 13 | 13 |
| | | 20 | 2 PM | 10 PM | 9 | 14 |
| | | CRT 2 | 2 PM | 10 PM | 10 | 10 |
| | **C** | 9 | 10 PM | 6 AM | 11 | 11 |
| | | 13 | 11 PM | 7 AM | 11 | 11 |
| | | 14 | 11 PM | 7 AM | 9 | 11 |
| | | 20 | 10 PM | 6 AM | 11 | 11 |
| | | Evening Mid (1) | 7 PM | 5 AM | 12 | 12 |
| | | Evening Mid (2) | 7 PM | 5 AM | 11 | 12 |
| **Zone 3** | **A** | 8 | 6 AM | 2 PM | 9 | 10 |
| | | 10 | 6 AM | 2 PM | 10 | 10 |
| | | 15 | 7 AM | 3 PM | 10 | 10 |
| | | 19 | 7 AM | 3 PM | 10 | 10 |
| | | Day Mid | 9 AM | 7 PM | 14 | 14 |
| | **B** | 8 | 2 PM | 10 PM | 17 | 17 |
| | | 10 | 2 PM | 10 PM | 17 | 17 |
| | | 15 | 3 PM | 11 PM | 13 | 14 |
| | | 19 | 3 PM | 11 PM | 17 | 17 |
| | | CRT 3 | 2 PM | 10 PM | 10 | 10 |
| | **C** | 8 | 10 PM | 6 AM | 10 | 11 |
| | | 10 | 10 PM | 6 AM | 11 | 11 |
| | | 15 | 11 PM | 7 AM | 9 | 11 |
| | | 19 | 11 PM | 7 AM | 10 | 11 |
| | | Evening Mid (1) | 7 PM | 5 AM | 12 | 13 |
| | | Evening Mid (2) | 7 PM | 5 AM | 12 | 13 |

## (4)    Zone and Precinct Map

The following map provides an overview of the CPD deployment structure.  All zones and corresponding precincts are color coded.

EX 7

**CPD Patrol Zones and Precincts**



Each zone contains four precincts, for a total of 20 precincts across the entire city. The precincts are then further subdivided into cruiser districts, which form the smallest level of geographic accountability for patrol officers.

EX 7

# 5. Investigative Subdivision

The Investigative Subdivision is headed by a deputy chief, and includes four major bureaus, as described below:

The **Narcotics Bureau** is led by a commander and consists of two sections, each led by a lieutenant. The two sections consist of the following:

- Operations Section
    - Investigative B Unit
    - Investigative C Unit
    - High Intensity Drug Trafficking Area (HIDTA) Task Force Unit
    - Drug Enforcement Agency (DEA) Task Force
    - Pharmaceutical Investigations Unit

- Investigative-Tactical (In-Tac) Section
    - In-Tac Administrative Unit
    - In-Tac Tactical Unit
    - Investigative D Unit
    - Investigative E Unit
    - Human Trafficking Task Force
    - Narcotics Administrative Unit

The **Crimes Against Persons Bureau** is led by a commander and consists of three sections, each led by a lieutenant. The three sections consist of the following:

- Assault/Homicide Section
    - 1st Shift Homicide Unit
    - 2nd Shift Homicide Unit
    - 3rd Shift Homicide Unit
    - Homicide Cold Case Unit
    - 2nd Shift Assault Unit
    - 3rd Shift Assault Unit

- Robbery/Support Section
    - 1st Shift Robbery Unit
    - 2nd Shift Robbery Unit
    - 3rd Shift Robbery Unit
    - Gun Crimes Unit
    - 1st Shift Crime Scene Search Unit (CSSU)
    - 2nd Shift CSSU
    - 3rd Shift CSSU
    - Digital Forensics Unit

EX 7

- Investigative/Administrative Section
  - Task Force Unit
  - Administrative Support Unit

The **_Property Crimes Bureau_** is led by a commander and consists of two sections, each led by a lieutenant. The sections consist of the following:

- Auto Theft/Economic Crime Section
  - 1st Shift Auto Theft Unit
  - Economic Crime Unit
  - 1st Shift Fraud/Forgery Unit
  - 2nd Shift Fraud/Forgery Unit
  - Organized Retail Crime Task Force
- Burglary Section
  - 1st Shift Burglary North Unit
  - 1st Shift Burglary South Unit
  - 2nd Shift Burglary North Unit
  - 2nd Shift Burglary South Unit
  - 3rd Shift General Property Crimes Unit
  - Property/Evidence Recovery Unit

The **_Special Victims Bureau_** is led by a commander and consists of two sections, each led by a lieutenant. The sections consist of the following:

- Family Crimes Section
  - Physical Child Abuse Unit
  - Exploited Children Unit
  - Missing Children Unit
  - Domestic Violence Unit
- Sexual Assault Section
  - Sexual Assault A Unit
  - Sexual Assault B Unit
  - Sexual Assault C Unit
  - Sexual Assault D Unit
  - Sexual Assault E Unit

## (1)     Organization

The following chart outlines the organization of the Investigative Subdivision:

EX 7



## (2)    Staffing and Unit Descriptions

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each section and work unit in the Investigative Sub-Division.

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Administration | 1 | 1 | Deputy Chief | • The deputy chief is responsible for managing the subdivision and its assigned bureaus. |
| | 1 | 1 | Admin. Secretary | • The administrative secretary supports the deputy chief and subdivision as a whole. |
| **Narcotics Bureau** | | | | |
| Administration | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and field support. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | | • Supervises lieutenants who oversee functional sections.<br>• Provides policy, procedure and broader management oversight for proactive investigative crimes (e.g. narcotics). |
| **Operations Section** | 1 | 1 | Lieutenant | • One lieutenant oversees the Operations Section of Narcotics, which includes the High Intensity Drug Trafficking Area (HIDTA) Task Force and Pharmaceutical Unit. |
| Narcotics Investigative | 2<br>6<br>6 | 2<br>6<br>7 | Sergeants<br>Detective Unit B<br>Detective Unit C | • Two sergeants provide direct supervision over narcotics investigative units.<br>• Unit B works 11:00 AM – 7:00 PM and Unit C works 6:00 PM – 2:00 AM. Both units regularly vary their hours to accommodate investigative activities.<br>• Investigates drug trafficking operations. Cases are generated by citizen complaints and information gathered from patrol personnel and confidential informants. Investigators interact with prosecutors to enhance cases and get additional information. |
| High Intensity Drug Trafficking Area (HIDTA) Task Force | 1<br>9 | 1<br>9 | Sergeant<br>Detectives Unit A | • This regional HIDTA Task Force is currently overseen by a sergeant, focuses on longer term drug related regional problems to include package interdiction, bulk cash, etc. This includes staff of four to five partnering agencies.<br>• Operations based on MOU with Ohio Bureau of Criminal Investigations.<br>• Columbus provides the unit supervisor for this task force. |
| Drug Enforcement Agency (DEA) Task Force | 3 | 4 | Detectives | • Columbus Division of Police Detectives work in the capacity of Federal DEA Agents, under a signed memorandum of understanding to combat drug trafficking and seize assets from drug traffickers.<br>• Report to a DEA agent who acts as their operations supervisor.<br>• Works with other federal and local agencies, as well as with local and federal prosecutors. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Pharmaceutical | 1<br>6 | 1<br>6 | Sergeant<br>Detectives | • Unit operates on three shifts: 8:00 AM – 4:00 PM, 10:00 AM – 6:00 PM, and 2:00 PM – 10:00 PM,<br>• This unit provides support for hospital drug theft, false paper and electronic prescriptions and related support to patrol personnel.  Unit operates on a split shift. |
| **Investigative Tactical (In-Tac) Section** | 1 | 1 | Lieutenant | • One lieutenant oversees the Investigative Tactical Section, which includes In-Tac (Tactical), Investigative D and E Units, and the In-Tac Administrative Unit. |
| In-Tac Tactical and Administrative | 2<br>19 | 2<br>22 | Sergeants<br>Detectives | • One sergeant provides tactical (field) oversight, and one sergeant provides administrative support for tactical action plans, etc.  Operates 5:00 PM -1:00 AM but are on-call.<br>• Primary tasks are high-risk narcotics operations, dynamic entries into facilities and vehicle stops.<br>• Performs undercover officer oversight and protection, as well as surveillance. |
| Investigative | 2<br>6<br>6 | 2<br>6<br>6 | Sergeants<br>Detectives Unit D<br>Detectives Unit E | • Two sergeants provide supervision over narcotics units operating on two shifts.<br>• Investigates, regularly based on complaint, proactively long-term mid-dealer narcotics crimes to include investigations and confidential informant (CI) use. |
| Human Trafficking Task Force(HTTF) | 1<br>4 | 1<br>4 | Sergeant<br>Detectives | • One sergeant acts as "Director" of the Human Trafficking Task Force (HTTF) and provides direct supervision over operations, reporting directly to the Commander.<br>• The HTTF includes other partners, such as the Ohio Investigative Unit (OIU), the Franklin County Sheriff's Office (FCSO), the Department of Homeland Security, an analyst from the Office of the Ohio Attorney General, and a Salvation Army advocate.<br>• The unit is designed to help remove at-risk youth from organized prostitution activities, providing necessary social services, as well as interdiction of perpetrators. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Narcotics Administrative | 1 | 1 | Officer Manager | • The Narcotics Administration Section is an eclectic grouping of services. Various work efforts and units include: |
| | 2 | 2 | Office Assistant II | • One office manager, oversees administrative functions and related staff, and is composed of office and fiscal assistants. Further, the office manager programs identification cards, addresses building maintenance issues, assists with 311 and Crime Stopper information and entry, assigns and ensures maintenance of narcotics vehicles, and addresses Division cell phone issues. |
| | 1 | 1 | Fiscal Assistant | |
| | 1 | 1 | Criminal Intelligence Analyst | |
| | | | | • Office assistants field telephone calls, address 311 complaints and Crime Stopper tips, perform time keeping tasks, type search warrants, and assist with grand jury packets and other paperwork for the detectives. |
| | | | | • The fiscal assistant maintains bank accounts, completes expense letters, balances ledgers, and conducts audits of financial records. |
| | | | | • The criminal intelligence analyst disseminates information, collects and reviews information from various sources, enters information into appropriate databases, assists detectives in their investigative duties, and maintains a working relationship with other analysts throughout the Division. |
| | | | | • One criminal intelligence analyst is assigned directly to the commander, but also provides support throughout the various sections. |
| **Crimes Against Persons Bureau** | | | | |
| **Administration** | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and field support. |
| | | | | • Supervises lieutenants who oversee functional sections. |
| | | | | • Provides policy, procedure and broader management oversight for crimes against persons (e.g. homicide) crimes. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Assault / Homicide Section** | 1 | 1 | Lieutenant | • The Assault / Homicide Section is overseen by one lieutenant, and is composed of six separate units: 1st, 2nd and 3rd shift Homicide, 2nd and 3rd Shift Assault, and a Homicide Cold Case Unit. Each unit is supervised by a sergeant. |
| Homicide 1st,2nd,3rd Shifts, and Cold Case | 4<br>10<br>10<br>12<br>4 | 4<br>10<br>10<br>12<br>4 | Sergeants<br>Detectives 1st shift<br>Detectives 2nd shift<br>Detectives 3rd shift<br>Detectives Cold Case | • Three units are assigned 24/7 on 7:00 AM-3:00 PM (1st shift), 3:00 PM-11:00 PM, and 11:00 PM-7:00 AM shifts.<br>• The Cold Case Unit is assigned four detectives and investigates cold cases, based on the cold case scoring sheet.<br>• Investigates homicides, suicides and suspicious deceased persons.<br>• Investigates with entire available shift, to include initial on-scene response by sergeant.<br>• 12 homicide detectives serve on the Critical Incident Response Team (CIRT). Efforts include: "…to ensure a standardized and consistent investigation of all police-involved shootings, in custody deaths, and **other** investigations as ordered by the Crimes Against Persons Bureau Chain of Command, and to complete these investigations in an efficient and timely manner." |
| Assault 2nd and 3rd Shifts | 2<br>10<br>8 | 2<br>10<br>8 | Sergeants<br>Detectives 2nd shift<br>Detectives 3rd shift | • The 2nd and 3rd Shift Assault Units are overseen by one lieutenant, as noted above.<br>• DMW works 9:00 AM – 5:00 PM, 2nd shift works 3:00 PM – 11:00 PM, and 3rd Shift works 11:00 PM – 7:00 AM. DWM are included with the 2nd shift Unit numbers.<br>• One sergeant is assigned 2nd shift personnel, while the other is assigned 3rd shift personnel.<br>• With the exception of domestic violence related incidents, detectives investigate all felonious assaults, discharged weapon offenses, and assault on police and fire personnel.<br>• Detectives provide periodic assistance to Homicide Units.<br>• Generally, investigates in teams of three or more, to include initial on-scene response by the sergeant. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Robbery/Support Section** | 1 | 1 | Lieutenant | • The Robbery/Support Section is overseen by one lieutenant, and is comprised of the 1st, 2nd, and 3rd Shift Crime Scene Search Units (CSSU), the 1st, 2nd, and 3rd Shift Robbery Units, the Gun Crimes Unit, and the Digital Forensics Unit.  Each unit is supervised by a sergeant. |
| Robbery 1st, 2nd, and 3rd Shifts | 3<br>6<br>6<br>7 | 3<br>6<br>6<br>7 | Sergeants<br>Detectives 1st shift<br>Detectives 2nd shift<br>Detectives 3rd shift | • The three Robbery Units are assigned 7:00 AM-3:00 PM, 3:00 PM-11:00 PM, and 11:00 PM-7:00 AM, including some mid-watch assignments for seven day coverage.<br>• Investigates all robberies and extortion—victim and business-related—that have any solvability, excluding banks (accomplished by task force officers).<br>• Detectives typically respond to the field to support patrol officers' robbery response. |
| Gun Crimes | 1<br>11<br>1<br>0 | 1<br>11<br>1<br>1 | Sergeant<br>Officers<br>Prop. & Evid. Tech.<br>Office Assistant II | • The Gun Crimes Unit of the Robbery / Support Section is overseen by one lieutenant, as noted above.<br>• Unit is 24/7 and assigned a midwatch shift.<br>• Investigates arrests by patrol, where the suspect was arrested for possession of a firearm, reviews gun packets and processes felony narcotics patrol arrests.<br>• Must process gun-related arrests within 10-days, per statute.<br>• Property and evidence technician provides support with respect to gun processing-serial # check, preliminary testing and preparation for lab firing. |
| Crime Scene Search Unit (CSSU) 1st, 2nd, and 3rd Shifts | 3<br>6<br>5<br>5 | 3<br>6<br>5<br>5 | Sergeants<br>CSSU Officers 1st shift<br>CSSU Officers 2nd shift<br>CSSU Officers 3rd shift | • The CSSUs are overseen by one lieutenant, as noted above, and is composed of three separate CSSUs, 1st, 2nd and 3rd Shifts.  Each unit is supervised by a sergeant.<br>• The three CSSUs are assigned 7:00 AM – 3:00 PM, 3:00 PM-11:00 PM, and 11:00 PM-7:00 AM.<br>• The CSSUs, consist of sworn staff who respond to homicides, felonious assaults police shootings and higher profile sexual assaults and robberies.  They use various evidence collection techniques, including a |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | | product used to capture three dimensional measurements, manufactured by Leica. |
| *Digital Forensics* | 1<br>6 | 1<br>6 | Sergeant<br>Detectives | • The Digital Forensics Unit of the Robbery / Support Section is overseen by one lieutenant, as noted above.<br>• Digital Forensics Detectives process digital forensics found in cell phones (95% of work), computer, tablets, and other electronic devices.<br>• Digital Forensics staff identify investigative materials and provide raw data, as requested by investigators. |
| **Investigative/Administrative Section** | 1 | 1 | Lieutenant | • The Investigations Administration Section is an eclectic grouping of services overseen by one lieutenant who has various ancillary duties, such as fleet maintenance, juvenile tracking report, database manager, etc. |
| Task Force Officers | 6 | 7 | Officers | • Six task force officers collaborate with the Bureau of Alcohol Tobacco and Firearms, the Federal Bureau of Investigations, and the United States Marshals Service to support regional efforts, related to crimes against persons. |
| Administrative Support Unit | 1<br>4<br>4<br>2 | 1<br>5<br>4<br>2 | Office Manager<br>Office Assistant I<br>Office Assistant II<br>Criminal Intelligence Analysts | • One office manager overseeing administrative functions and related staff is composed of office assistant I and II positions.<br>• Office assistants field bureau telephone calls, provide transcription for homicide and assault (three allocated to assist), support gun crimes (one allocated to assist), perform time keeping efforts for the bureau, and related activities.<br>• Two criminal intelligence analysts assigned directly to the Investigative/Administrative Lieutenant but provide support throughout the various sections. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Property Crimes Bureau** | | | | |
| **Administration** | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and field support.<br>• Supervises lieutenants who oversee functional sections.<br>• Provides policy, procedure and broader management oversight for property crimes (e.g. auto theft). |
| **Auto Theft/Economic Crime Section** | 1<br>1<br>1 | 1<br>1<br>1 | Lieutenant<br>Office Assistant I<br>Criminal Intel Analyst | • One lieutenant oversees the Auto Theft, Economic Crimes, and Fraud/Forgery Units, as well as the Officers assigned to the Central Ohio Organized Retail Crimes Task Force (COORCTF).<br><br>• The office assistant provides secretarial services for the Economic Crime Section, to include: typing, transcriptions, timekeeping, and other clerical tasks.<br><br>• The criminal intelligence analyst provides investigative assistance to both the Economic Crimes Section and the Burglary Section, to include: crime pattern analysis, suspect identification, extensive database usage, social media investigation, and other investigative assistance, upon request of sworn personnel. |
| Auto Theft | 1<br>13 | 1<br>13 | Sergeant<br>Detectives | • One sergeant provides direct supervision over the Auto Theft Unit operating on various hours from 6:00AM - 6:00PM.<br>• Auto Theft transitioned into a proactive unit composed of theft from bait vehicles, GPS tracking, etc.<br>• Three of 13 detectives are assigned vehicle identification number identification in the impound lot or unauthorized use of a motor vehicle investigation, or perform as back-up detective.<br>• Unit operates undercover and also manages tracking of stolen cars, and theft from auto. Six detectives assigned generally to motor vehicle theft; four to proactive theft from vehicle. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Economic Crime | 1<br>7 | 1<br>7 | Sergeant<br>Detectives | • One sergeant provides direct supervision over economic crimes.<br>• Investigates major (felony) economic crimes to include embezzlement, theft from the elderly, public corruption, mortgage fraud, and other "white collar" crimes, etc. |
| Fraud / Forgery<br>1st and 2nd Shifts | 1<br>8<br>4 | 1<br>9<br>4 | Sergeant<br>Detectives 1st shift<br>Detectives 2nd shift | • One sergeant provides direct supervision over fraud and forgery operating on two shifts.<br>• Investigates various fraud and forgery crimes with bank being victim typically and deciding on investigation. Sends checks to Task Force. |
| Organized Retail CrimeTask Force | 3<br>See | 3<br>Desc | Detectives<br>Franklin County Sheriff's Deputy | • Three detectives report directly to the Lieutenant and provide support to the Retail Crime Task Force.<br>• Central Ohio Retail Crime Task Force (COORCTF) includes support from one Sheriff's Office detective. The COORCTF falls under the Ohio Organized Crime Investigations Commission.<br>• The task force investigates high-end repeat criminals passing bad checks, forging documents, etc. Typically, caseload is influenced by requests for assistance from retail establishments. |
| **Burglary Section** | 1<br>1 | 1<br>1 | Lieutenant<br>Office Assistant I | • One lieutenant oversees the operations of the Burglary Section, providing management and oversight.<br>• The office assistant provides secretarial services for the Burglary Section, to include: typing, transcriptions, timekeeping, and other clerical tasks. |
| Burglary<br>1st and 2nd Shifts/<br>North and South | 4<br>14<br>13 | 4<br>14<br>14 | Sergeants<br>Detectives Burg North<br>Detectives Burg South | • Four sergeants provide direct supervision over the burglary units. The sergeants are location based with two sergeants each covering a shift at their location.<br>• Location-based units operate on a four-day, 10-hour schedule on 1st and 2nd shifts.<br>• Cases are assigned by the shift in which they occur.<br>• Property-related felony crimes (e.g. burglary) are investigated by these units, based on a Category 1 through Category 3 rating. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| General Property Crimes | 1<br>7 | 1<br>7 | Sergeant<br>Detectives Generalist | • The General Property Crimes Unit investigates overflow work from units without a 3rd shift, to include fraud, forgery, auto theft, etc. Also, investigates all felony property-crime "on-view" arrests by Patrol and some proactive pattern surveillance.<br>• Misdemeanor property crimes are generally investigated at the "Zone" level in Patrol though by SRB. |
| Property and Evidence Recovery | 1<br>6<br>4 | 1<br>6<br>5 | Sergeant<br>Property & Evid. Tech.<br>Detectives | • One sergeant provides direct supervision over Property and Evidence (Recovery).<br>• Civilian Property and Evidence Technicians recover property and related evidence from the field, including video, processing scenes (e.g. fingerprints).<br>• Detectives review pawn shop prints (59 locations), to identify potential stolen property and open related cases. They use LEADS Online and NCIC. |
| **Special Victims Bureau** | | | | |
| **Administration** | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and field support.<br>• Supervises lieutenants who oversee functional sections.<br>• Provides policy, procedure and broader management oversight for special victims (e.g. sex assault) crimes. |
| **Family Crimes Section** | 1 | 1 | Lieutenant | • Family Crimes is overseen by a lieutenant, and is composed of four separate units: Physical Abuse, Exploited Children, Missing Persons, and Domestic Violence. |
| Physical Abuse | 1<br>7<br>6<br>1<br>1 | 1<br>7<br>6<br>1<br>2 | Sergeant<br>Detectives A Squad<br>Detectives B Squad<br>Criminal Intel Analyst<br>Office Assistant I | • The Physical Abuse Unit investigates child and elder abuse cases, and mental health cases; many complaints for child abuse are generated by child protective services.<br>• The criminal intelligence analyst is assigned to Family Crimes Lieutenant, but supports the entire SV Bureau. However, this analyst provides the most assistance to the Exploited Children Unit.<br>• The office assistant positions screen and reconfirm physical abuse, order supplies and support detectives. Transcribing is performed by the vacant position. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Exploited Children | 1<br><br>3 | 1<br><br>3 | <br><br>Sergeant (supervises both the Exploited Children Unit and Missing Persons Unit<br><br>Detectives | • The Exploited Children Unit, is supervised by a sergeant who reports to the Family Crimes Section Lieutenant.<br>• Three detectives focus on pandering, obscenity, pornography and malicious sexting.   One position was abolished and that detective was assigned to the Internet Crimes Against Children Task Force. |
| Missing Persons | 8 | 8 | Detectives | • Seven detectives investigate missing person reports to include adults and children, but their focus is on runaways, group home departures, and Alzheimer departures.<br>• One detective is assigned to cold case missing persons. |
| Domestic Violence | 1<br>10 | 1<br>10 | Sergeant<br>Detectives | The Domestic Violence Unit is supervised by a sergeant who reports to the Family Crimes Section Lieutenant.<br>• The Domestic Violence Unit investigates felony domestic violence incidents, to include rider charges, such as felonious assault, kidnapping and violation of protection orders.<br>• Patrol officers investigate misdemeanor domestic violence incidents.  If possible, Domestic Violence Unit Detectives assist with felony offenses.<br>• Two 1st shift detectives are dedicated exclusively to stalking cases.<br>• 3rd Shift Domestic Violence covers for high-risk missing persons.<br>• The Domestic Violence Unit is housed in the Franklin County Municipal Courthouse to work directly with domestic violence advocates and prosecutors. |
| **Sexual Assault Section** | 1 | 1 | Lieutenant | • The Sexual Assault Section, overseen by one lieutenant, and is comprised of the A, B, C, D, and E, Sexual Assault Units. Each unit is directly supervised by a sergeant. |
| Sexual Assault Units A, B, C, D, and E | 5<br>7<br>4<br>8 | 5<br>7<br>5<br>8 | Sergeants<br>Detectives A Squad<br>Detectives B Squad<br>Detectives C Squad | • B, D, E Units provide 24/7 coverage, 7:00 AM – 3:00 PM, 3:00 PM – 11:00 PM, and 11:00 PM – 7:00 AM, respectively.<br>• B, D, E Units investigate, including detective field response to all sex crimes with victims 16 years of age and older; |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | 5 | 5 | Detectives D Squad | caseload also includes public indecency, molestation, etc., to include misdemeanor or felonious crimes. |
| | 7 | 7 | Detectives E Squad | |
| | 1 | 1 | Office Assistant II | • A and C Units are located at the Center for Family Safety and Healing (CFSH) which is affiliated with Nationwide Children's Hospital.  These detectives investigate, including detective field response to all sex crimes with victims younger than 16 years of age. |
| | 1 | 1 | Office Assistant I | • Adult cold case sexual assaults are reviewed by two third shift detectives.  This is done on an overtime basis. |
| | | | | • An office assistant II is assigned to the CFSH and reports directly to the Sexual Assault Section Lieutenant.  An office assistant I is assigned to Police Headquarters and reports to the Sexual Assault B Sergeant.  These office assistants answer phones, manage records, transcribe audio recordings provided by detectives from the Special Victims Bureau and Robbery Detectives. |

EX 7

# 6.  Homeland Security Subdivision

The Homeland Security Subdivision is headed by a deputy chief, and has three major bureaus as summarized below:

The **Special Services Bureau** is comprised of units that provide additional field support services for the Police Division and specialty support functions.  The bureau is led by a commander and consists of four sections that are led by lieutenants.  The four sections have work units as follows:

- Homeland Security Section
    - Joint Terrorism Task Force (JTTF)
    - Counter Terrorism Unit (CTU)
    - Mayor's Security

- Special Weapons and Tactics (SWAT) Section
    - Gold, Red and Green Teams
    - Training Unit
    - Canine Unit

- Aviation Section
    - Day Midwatch Helicopter Unit
    - Evening Midwatch Helicopter Unit

- Intelligence Section
    - Criminal Intelligence Unit A
    - Criminal Intelligence Unit B

The **Communications Bureau** is comprised of the 911 Emergency Communications Center taking all public safety calls for service from the City of Columbus and dispatching for the Columbus Division of Police.

The **Traffic Bureau** is comprised of the following:

- Traffic Operations Section
    - Freeway Patrol 1st Shift
    - Freeway Patrol 2nd Shift
    - Freeway Patrol 3rd Shift
    - Motorcycles 1st Shift
    - Motorcycles DMW
    - Commercial Vehicle Enforcement Unit

- Special Events Section
    - Accident Investigation Unit

EX 7

- - Special Events Office
  - Event Management Unit
  - Special Duty Office

- Patrol Administration Section
  - Patrol Administration Unit 1st Shift
  - Patrol Administration Unit 2nd Shift
  - Patrol Administration Unit 3rd Shift

**(1)    Organization**

The following chart outlines the organization of the Homeland Security Subdivision:



EX 7

### (2) Staffing and Unit Descriptions

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the subdivision.

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Administration | 1<br>1 | 1<br>1 | Deputy Chief<br>Admin. Secretary | • The deputy chief is responsible for managing the subdivision and its assigned bureaus.<br>• The administrative secretary supports the Homeland Security Subdivision and Patrol South Subdivision Deputy Chiefs . |
| **Special Services Bureau** | | | | |
| **Administration** | 1<br>1 | 1<br>1 | Commander<br>Office Assistant II | • Provides administrative oversight, leadership, advocacy, customer interface and field support.<br>• Supervises lieutenants who oversee functional sections.<br>• Provides policy, procedure and broader management oversight for the bureau.<br>•  The office assistant performs clerical duties for the bureau. |
| **Homeland Security Section** | 1<br>1 | 1<br>1 | Lieutenant<br>Criminal Intelligence Analyst | • Administrative oversight and leadership.<br>• Coordinates activities of the section.<br>• The criminal intelligence analyst develops intelligence from multiple sources and assists with investigations. |
| Joint Terrorism Task Force (JTTF) | 2 | 2 | Officers | • Conducts terrorism investigations, as part of a multiple jurisdictional task force, managed by the Federal Bureau of Investigation. |
| Counter Terrorism Unit (CTU) | 1<br>4 | 1<br>4 | Sergeant<br>Detectives | • The sergeant provides administrative oversight for both CTU and the mayor's security detail.<br>• The unit works at the Statewide Terrorism Analysis and Crime Center (STACC).<br>• Provides critical infrastructure protection, through intelligence gathering activities.<br>• Coordinates intelligence for large scale events.<br>• Investigates criminal threats, using multiple resources. |
| Mayor's Security | 3 | 3 | Officers | • The mayor's security provides dignitary protection for the mayor at various events.<br>• Investigates or refers threats. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Special Weapons and Tactics (SWAT) Section** | 1 | 1 | Lieutenant | • Administrative oversight and leadership of the section.<br>• Supervises unit sergeants.<br>• Serves as critical incident command on SWAT operations. |
| SWAT Gold | 1<br>7 | 1<br>7 | Sergeant<br>Officers | • Works 7:00AM - 3:00PM (S/M off)<br>• Responds to barricades and active shooter incidents.<br>• Provides extra security at large public events, as well as dignitary protection.<br>• Executes search warrants.<br>• Executes arrest warrants and performs fugitive apprehension. |
| SWAT Green | 1<br>7 | 1<br>7 | Sergeant<br>Officers | • Works 7:00 PM - 3:00AM (S/S off)<br>• Responds to barricades and active shooter incidents.<br>• Provides extra security at large public events, as well as dignitary protection.<br>• Executes search warrants.<br>• Executes arrest warrants and performs fugitive apprehension. |
| SWAT Red | 1<br>6 | 1<br>7 | Sergeant<br>Officers | • Works 6:00PM - 2:00AM (F/S off)<br>• Responds to barricades and active shooter incidents.<br>• Provides extra security at large public events, as well as dignitary protection.<br>• Executes search warrants.<br>• Executes arrest warrants and performs fugitive apprehension. |
| SWAT Training | 1 | 1 | Sergeant | • Conducts and arranges training for the unit.<br>• Maintains training records.<br>• Covers team sergeants' vacations and absences. |
| Canine | 1<br>8 | 1<br>8 | Sergeant<br>Officers | • The unit is broken into four shifts: 8:00AM - 3:00PM, 2:00PM - 9:00PM, 7:00PM - 2:00AM and 9:00PM - 4:00AM.<br>• All canine units are dual purpose (tracking and narcotics detection).<br>• The unit provides support to patrol and responds to calls for service. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Aviation Section (Helicopter)** | 1 | 1 | Lieutenant (pilot) | • Administrative oversight and leadership of the section<br>• Supervises sergeants. |
| Day Midwatch Helicopter | 1<br>7 | 1<br>7 | Sergeant (pilot)<br>Officers(Pilots) | • Works two hour flights, starting at 12:00 PM.<br>• Provides air support for patrol operations.<br>• Responds to critical incidents, where air support would be advantageous.<br>• Responds to vehicle and foot pursuits.<br>• Searches for lost /endangered individuals |
| Evening Midwatch Helicopter | 1<br>8 | 1<br>8 | Sergeant (pilot)<br>Officers (pilots) | • Works two hour flights, starting at 8:00PM.<br>• Provides air support for patrol operations.<br>• Responds to critical incidents, where air support would be advantageous.<br>• Responds to vehicle and foot pursuits.<br>• Searches for lost /endangered individuals |
| Safety and Maintenance | 1<br>1<br>1 | 1<br>1<br>1 | Sergeant (pilot)<br>Safety & Training Officer (pilot)<br>Maintenance Ofc. (pilot) | • The relief sergeant covers flights and supervisor responsibilities.<br>• The safety officer ensures all pilots have appropriate training.  The safety officer is also responsible for training new pilots.<br>• The maintenance officer coordinates maintenance on the five aircraft. |
| **Intelligence Section** | 1 | 1 | Lieutenant | • Administrative oversight and leadership of the Criminal Intelligence Section.<br>• Coordinates unit activities. |
| Criminal Intelligence Unit A | 1<br>10<br>1<br><br>1 | 1<br>10<br>1<br><br>1 | Sergeant<br>Officers<br>Code of Federal Regulations (CFR) officer<br>Intelligence Analyst | • Works various hours (scheduled 1:00PM - 9:00PM) with S/M off.<br>• Conducts criminal investigations into gang activity and organized crime.<br>• Investigates threats.<br>• Maintains CFR files. |
| Criminal Intelligence Unit B | 1<br>7 | 1<br>7 | Sergeant<br>Officers | • Works various hours (scheduled 1:00PM - 9:00PM) with W/Th off.<br>• Conducts criminal investigations into gang activity and organized crime.<br>• Investigates threats. |
| **Communications Bureau** | | | | |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Administration** | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and field support.<br>• Supervises one lieutenant who oversees functional units.<br>• Provides policy, procedure and broader management oversight. |
| **Operations Section** *(Communications)* | 1<br>11<br>1<br>1<br>1<br>2<br>75<br>27 | 1<br>11<br>1<br>1<br>1<br>2<br>-<br>- | Lieutenant<br>Shift Supervisors<br>Quality Assurance/Quality Control Supervisor<br>Computer Aided Dispatch (CAD)/Geographic Information System(GIS) Supervisor<br>Training Supervisor<br>CAD/GIS Technicians<br>911 Dispatchers<br>911 Call-takers | • One lieutenant oversees 14 Emergency Communications Specialists (supervisors) and effectively acts as the 911 floor manager.<br>• Answers all 911 and ten digit calls and transfers fire and emergency medical service calls to the Division of Fire and outside agencies. Serves as the primary public safety answering point. Handles approximately 1.3 million total calls.<br>• Operates 24/7 on three eight-hour shifts: 6:30AM-2:30PM, 2:30PM-10:30PM, 10:30PM-6:30AM, with supervisors starting ½ hour earlier. Includes additional two midwatch shifts for call-takers.<br>• Dispatches emergency police calls and provides information to officers and other support personnel, as requested.<br>• Coordinates multi-agency emergency dispatch operations.<br>• Three (supervisors) are assigned QA/QI, training, and CAD/GIS duties.<br>• Operation does not carry an "authorized staffing level." |
| **Traffic Bureau** | | | | |
| **Administration** | 1 | 1 | Commander | • Provides administrative oversight, leadership, advocacy, customer interface and support.<br>• Supervises three lieutenants who oversee the Traffic Operations, Special Events and Patrol Administration Sections.<br>• Provides policy, procedure and broader management oversight. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Traffic Operations Section** | 1 | 1 | Lieutenant | • The lieutenant oversees the section and its operations, deployments and services, and supervises five unit sergeants. The lieutenant also leads the new risk and experience based deployment effort (ATAC).<br>• Oversees the OVI Countermeasures Program, dignitary motorcades, and grants management. |
| | 1 | 1 | Office Assistant | |
| Freeway 1st Shift | 1 | 1 | Sergeant | • Freeway operations consists of three shifts, dedicated to vehicle enforcement, abandoned and broken down vehicles (arranging for tows), freeway closures and construction areas and other hazards.<br>• A 2nd shift officer handles stats and reporting, as well as grants.<br>• Two officers are trained and equipped for commercial vehicle enforcement.<br>• Staff are deployed throughout the five patrol zones. |
| | 10 | 10 | Officers | |
| Freeway 2nd Shift | 1 | 1 | Sergeant | |
| | 9 | 9 | Officers | |
| Freeway 3rd Shift | 1 | 1 | Sergeant | |
| | 8 | 8 | Officers | |
| Motorcycle 1st | 1 | 1 | Sergeant | • Motorcycle Units primarily perform traffic enforcement in neighborhoods and non-freeway arterials. They are also a primary pool for staff for dignitary visits. |
| | 8 | 8 | Officers | |
| Motorcycle DMW | 1 | 1 | Sergeant | |
| | 9 | 9 | Officers | |
| Commercial Vehicle Enforcement | 2 | 2 | Officers | • Enforces federal motor carrier safety regulations, hazardous material regulations, and state and local ordinances associated with commercial motor vehicles. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Special Events Section** | 1 | 1 | Lieutenant | • A lieutenant oversees the section and is responsible for overall direction, performance, and daily operations of the Special Events Unit, Accident Investigation Unit, and Special Duty Office. The lieutenant directly supervises two sergeants, one management analyst II, an office assistant II, and indirectly supervises 14 officers.<br>• Duties and tasks include:<br> • Works with various groups to maintain effective community and public relations.<br> • Works with contractors and other city departments to alleviate traffic issues.<br> • Plans and supervises special events, such as races, parades, and festivals within the city.<br> • Reviews and approves block party, liquor, and parade applications.<br> • Prepares operation and strategic plans for the Event Management and Accident Investigation Units.<br> • Ensures the Special Duty Office is effective, efficient, and conforms to policy. |
| *Accident Investigation* | 1<br>12 | 1<br>12 | Sergeant<br>Officers | • Accident Investigation personnel work three shifts / seven days per week.<br>• Responds to and investigates fatal, possible fatal, and hit skip traffic crashes<br>• Interviews subjects and witnesses<br>• Collects and processes evidence.<br>• Prepares investigative cases for prosecution<br>• Issues citations |
| *Special Events* | 2<br>1 | 2<br>1 | Officers<br>Office Assistant II | • Special Events Unit personnel coordinate activities associated with events throughout the city. They also perform the following tasks:<br> • Traffic control logistics and planning.<br> • Ensures proper permits have been issued for events.<br> • Coordinates with other city departments and private and public agencies, throughout the city and region.<br> • Addresses complaints associated with events. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| *Event Management* | 1<br>2 | 1<br>2 | Sergeant<br>Officers | • Event Management Unit personnel provide support and planning activities for large events. They also perform the following tasks:<br> • Engages in activities associated with preparedness, response, and training for natural and man-made disasters.<br> • Coordinates with local, regional, and national public and private entities.<br> • Operates and maintains the Emergency Operations Center (EOC).<br> • Completes after action reports for major incidents. |
| *Special Duty* | 1 | 1 | Management Analyst II | • The Special Duty Management Analyst II assists in the planning associated with smaller events, as well as manages the off duty needs to staff special events and dignitary protections. |
| **Patrol Administration Section** | 1 | 1 | Lieutenant | • Lieutenant oversees the section and its operations, and management of filling positions throughout the Division for staff absent, due to various leaves and injuries, primarily for the Patrol Subdivisions.<br>• Manages modified leave assignments including officers who perform telephone reporting functions, while in a restricted duty capacity.<br>• The number of positions to fill each day varies, but is often around 60.<br>• Also works closely with human resources.<br>• The section also manages the patrol scheduling system.<br>• The section also manages and calls in for overtime assignments.<br>• The Lieutenant also has special project duties (e.g., GPS in patrol units) and building maintenance issues. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| *Patrol Administration 1st Shift* | 2<br>3<br>2<br>1<br>3 | 2<br>3<br>2<br>1<br>3 | Sergeants<br>Officers<br>Officers (City Hall)<br>Mail Specialist<br>Office Assistant II | • Staff provides 24 / 7 coverage.<br>• Section oversees the modified duties of staff assigned who are utilized for a number of duties – hospital, city hall reception, special projects, citizen questions.<br>• Five officers are assigned to 1st Shift Patrol Administration.  They provide staffing for Columbus City Hall, and the information desk at Police Headquarters.<br>• "Unassigned" officers report to the Patrol Administration Section for long term disabilities, leaves of absences, etc.  This number is in constant flux. |
| *Patrol Administration 2nd Shift* | 2<br><br>3 | 2<br><br>3 | Sergeants (incl. relief)<br>Officers | • Section oversees the modified duties of staff assigned who are utilized for a number of duties – hospital, city hall reception, special projects, citizen questions.<br>• Three officers are assigned to 2nd Shift Patrol Administration. |
| *Patrol Administration 3rd Shift* | 2<br><br>3 | 2<br><br>3 | Sergeants (incl. relief)`<br>Officers | • Section oversees the modified duties of staff assigned who are utilized for a number of duties – hospital, city hall reception, special projects, citizen questions.<br>• Three officers are assigned to 3rd Shift Patrol Administration. |

EX 7

# 7. Support Services Subdivision

The Support Services Subdivision is headed by a deputy chief, and has four major bureaus, as summarized below:

The **Support Operations Bureau** is led by a commander and supported by three lieutenants. The Support Operations Bureau is comprised of three sections:

- Court Liaison Section
  - Common Pleas Court Unit
  - Municipal Court Unit

- Property Management Section
  - Impounding Unit
  - Property Control Unit

- Administrative Support Section
  - Photography Unit (Photo Lab)
  - Print Shop

The **Forensic Services Bureau** **(Crime Lab)** is comprised of four work sections that provide forensic lab services, in support of investigations. The four work sections are:

- Drug Identification Section

- Firearms Section

- DNA Section

- Quality Assurance Section
  - Latent Print Comparison Unit
  - Latent Print Processing Unit
  - Questioned Documents Unit

The **Technical Services Bureau** is comprised of 1 sergeant (serves as Policenet Manager), seven officers and five analysts who manage all police specific IT functions and databases. The unit coordinates repairs and service calls with the City of Columbus Department of Technology or product vendors.

The **Records Management Bureau**, is comprised two sections is led by a manager and supported by unit supervisors. The bureau operates 24 hours a day, seven days a week. The bureau's two sections consist of:

- Records Section

EX 7

- o 1st Shift Records Unit
- o 2nd Shift Records Unit
- o 3rd Shift Records Unit
- o Public Records Unit
- o Telephone Reporting Unit
- o Records Support Unit

- Identification Section
  - o 1st Shift Identification Unit
  - o 2nd Shift Identification Unit
  - o 3rd Shift Identification Unit

**(1)      Organization**

The following chart outlines the organization of the Support Services Subdivision:



EX 7

**(2)    Staffing and Unit Descriptions**

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the subdivision.

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Support Operations Bureau** | | | | |
| **Administration** | 1<br>1 | 1<br>1 | Commander<br>Office Assistant II | • Provides administrative oversight, leadership, advocacy, customer interface and field support.<br><br>• Oversees activities associated with the maintenance of Division of Police facilities, as well as the construction of new and remodeling of existing facilities.<br>• Provides policy, procedure and broader management oversight.<br>• OAII provides a variety of support services to commander including clerical, administrative, and special project efforts. |
| **Court Liaison Section** | 1 | 1 | Lieutenant | • Administrative oversight and leadership of the section.<br>• Supervises sergeants.<br>• Coordinates section activities |
| Common Pleas | 1<br>10<br>1 | 1<br>10<br>1 | Sergeant<br>Officers<br>Office Assistant I | • The unit coordinates the appearance of officers to common pleas court.<br>• Officers enter reports to the court.<br>• The juvenile officers handle juvenile matters and can arrange for transport.<br>• The fugitive officer locates offenders that fail to appear in court. |
| Municipal | 1<br>10<br>1 | 1<br>10<br>1 | Sergeant<br>Officers<br>Office Assistant I | • The unit coordinates the appearance of officers to municipal court.<br>• Officers enter reports to the court.<br>• All officers monitor court rooms and respond to take defendants into custody when requested. |
| **Property Management Section** | 1 | 1 | Lieutenant | • Administrative oversight and leadership of the section.<br>• Supervises Sergeants.<br>• Coordinates section activities.<br>• The office assistant performs clerical functions, in support of the section. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Impounding | 1 | 1 | Sergeant | • All city impounded vehicles are brought to the impound lot.<br>• Staff is required to notify owners within five days.<br>•  The impound lot tower is staffed 24/7 |
| | 1 | 1 | Office Assistant II | |
| | 6 | 6 | Office Assistant I | |
| | 4 | 5 | Security Specialists | |
| | 4 | 4 | Vehicle Inspector | |
| | 2 | 2 | Equipment Operator | |
| Property Control | 1 | 1 | Sergeant | • The property room is open 24 hours a day and all property received by officers must be brought directly to the property room.<br>• The civilian property window is staffed 8:00AM- 5:00PM, M-F<br>• All property must be inventoried and entered into the report management system.<br>• The store keepers are responsible for police uniform and equipment issuance.<br>• All unneeded evidence or property is purged. |
| | 1 | 1 | Office Assistant II | |
| | 1 | 1 | Office Assistant I | |
| | 2 | 2 | Store Keepers | |
| | 15 | 15 | Police Property Clerks | |
| Midwatch | 1 | 1 | Sergeant | • The midwatch sergeant supervises the property room and impound operations.<br>• Determines which vehicles will be auctioned or scrapped.<br>•  Determines which unneeded evidence or property will be auctioned or destroyed.<br>• Attends police auctions. |
| **Administrative Support Section** | 1 | 1 | Lieutenant (Fleet Coordinator) | • Administrative oversight and leadership of the section.<br>• Supervises the Photo Lab Manager and Print Shop Supervisor.<br>• Assists Fleet Management in the coordination of logistics related to maintenance, after market-equipment up-fitting, decontamination, decommissioning, and other responsibilities of Division fleet assets.<br>• The Administrative Support Section Lieutenant serves as the Division's point of contact for the Defense Reutilization Marketing Office (DRMO) and Law Enforcement Support Office (LESO) programs.  As the point of contact the Administrative Support Section Lieutenant completes all paperwork related to the programs, coordinates and assists in all |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | | audits, properly disposes of DRMS/LESO property, and maintains inventory accountability of such items. |
| Print Shop | 1<br>1<br>1 | 1<br>1<br>1 | Supervisor<br>Print Services Specialist<br>Print Services Technician | • Prints all Division of Police publications and forms.<br>• Coordinates publications /documents for special events.<br>• Produces reports<br>• Processes video evidence for the investigative units and court. |
| Photo Lab | 1<br>1 | 1<br>1 | Manager<br>Photographic Technician | • Prints all investigative photos for detectives and prosecutors.<br>• Assists with photos for Division of Police publications. |
| **Forensic Services Bureau (Crime Lab)** | | | | |
| **Administration** | 1 | 1 | Manager | • Administrative oversight and leadership of the Crime Laboratory<br>• Supervises section supervisors. |
| **DNA Section** | 1<br><br>9 | 1<br><br>9 | Forensic Scientist III (Supervisor)<br>Forensic Scientist II | • Processes recovered DNA<br>• Documents test results<br>• Testifies in court<br>• Enters results into database.<br>• Maintains chain of custody. |
| **Drug Identification Section** | 1<br><br>6<br>3 | 1<br><br>6<br>3 | Forensic Scientist III (Supervisor)<br>Forensic Scientist II<br>Forensic Scientist I | • Performs drug identification tests<br>• Documents test results<br>• Testifies in court<br>• Enters results into database.<br>• Maintains chain of custody. |
| **Firearms Section** | 1<br><br>4<br>1 | 1<br><br>4<br>1 | Forensic Scientist III (Supervisor)<br>Forensic Scientist II<br>Police Evidence Technician | • Identifies firearms<br>• Performs operability tests.<br>• Performs ballistic comparisons from shell casings and recovered bullets.<br>• Documents test results.<br>• Enters results into database.<br>• Maintains chain of custody.<br>• Testifies in court |
| **Quality Assurance Section** | 1<br>1 | 1<br>1 | Forensic Scientist III (Supervisor)<br>Data Management Coordinator | • Ensures compliance with accreditation standards and laboratory policies.<br>• Administration of Laboratory Information Management System (LIMS). |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Latent Print Comparison | 0<br>3 | 1<br>4 | Latent Print Supervisor<br>Latent Print Examiners | • Performs latent print comparisons.<br>• Documents test results<br>• Enters results into database.<br>• Maintains chain of custody. |
| Latent Print Processing | 1 | 1 | Police Evidence Technician | • Develops and lifts latent prints.<br>• Documents test results<br>• Enters results into database<br>• Maintains chain of custody |
| Questioned Documents | 1 | 1 | Forensic Scientist II*<br><br>*also represented in the drug identification section numbers | • Performs questioned handwriting/document comparisons.<br>• Documents test results<br>• Enters results into database<br>• Maintains chain of custody<br>• Testifies in court |
| **Technical Services Bureau** | | | | |
| **Administration** | 0 | 1 | Manager | • Administrative oversight and leadership of the bureau<br>• Coordinates bureau activities.<br>• Manages bureau budget.<br>• Manager and/or sergeant liaise daily with the city's Department of Technology on technology needs and repairs.<br>• This position is currently vacant |
| Policenet Administration | 1 | 1 | Sergeant | • Administrative oversight and leadership of Policenet operations.<br>• Coordinates unit activities.<br>• Coordinates software and hardware purchases. |
| Policenet | 7<br>4<br>1 | 7<br>4<br>1 | Officers<br>Information system Analysts<br>Programmer Analyst | • The unit works various shifts covering from 6:30AM - 11:30PM and are on call for outages. The unit provides seven day a week coverage.<br>• Provides support to the report management system (PremierOne) and IT functions, databases and programs.<br>• Manages the body worn camera and cruiser video systems.<br>• Supports the plate reader database. |
| **Records Management Bureau** | | | | |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Administration** | 1 | 1 | Public Safety Manager | • Administrative oversight and leadership of the bureau<br>• Provides policy, procedure, and broader management oversight. |
| **Records Section** | 1 | 1 | Management Analyst II | • Administrative oversight and leadership of records section.<br>• Coordinates unit activities. |
| 1st Shift | 1<br>10 | 1<br>10 | Supervisor<br>Records Technicians | • Works 7:00AM - 3:00PM with various days off (records is open 24/7).<br>• Corrects reporting and coding errors.<br>• Enters data into PremierOne RMS<br>• Enters and removes LEADS entries<br>• Responds to officer calls for warrant checks, vehicle searches, and missing persons. |
| 2nd Shift | 1<br>10 | 1<br>10 | Supervisor<br>Records Technicians | • Works 3:00PM - 11:00PM with various days off (records is open 24/7).<br>• Corrects reporting and coding errors.<br>• Enters data into PremierOne RMS.<br>• Enters and removes LEADS entries<br>• Responds to officer calls for warrant checks, vehicle searches, and missing persons. |
| 3rd Shift | 1<br>8 | 1<br>8 | Supervisor<br>Records Technicians | • Works 11:00PM - 7:00AM with various days off (records is open 24/7).<br>• Correct reporting and coding errors.<br>• Enters data into Premier One RMS.<br>• Enters and removes LEADS entries<br>• Responds to officer calls for warrant checks, vehicle searches, and missing persons. |
| Telephone Reporting Unit | 1<br>4 | 1<br>4 | Supervisor<br>Office Assistant I | • Transcribes telephone reports.<br>• Makes call backs to complete reports.<br>• Enters data into RMS.<br>• Enters reports from Coplogic online reporting system. |
| Records Support (Validations) | 1<br>5 | 1<br>5 | Supervisor<br>Records Technicians | • Validates all Division warrants and continues to validate on a set schedule.<br>• Updates warrants.<br>• Enters Warrants into NCIC. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| Public Records | 1<br>5<br>2<br><br>1 | 1<br>6<br>2<br><br>1 | Supervisor<br>Management Analyst I<br>Office Assistant I<br><br>Property Clerk | • Responsible for responding to public records requests.<br>• Provides copies of police reports and computer aided dispatch data.<br>• Responsible for producing audio/video recordings, including redactions.<br>• Office assistants log and distribute public record requests and handle prosecutor requests for cruiser video.<br>• The property clerk manages records stored at the property facility. |
| **Identification Section**<br>1st shift | 1<br>6<br>1<br>1 | 1<br>7<br>1<br>1 | Supervisor<br>Fingerprint Techs<br>Fingerprint Specialist<br>Office Assistant I | • Works 7:00AM - 3:00PM with various days off.<br>• Obtains prints from all arrested subjects.<br>• Obtains prints for police applicants.<br>• Enters prints into the Automated Fingerprint Identification System (AFIS).<br>• Takes photos of arrestees<br>• Obtains DNA from felony arrestees<br>• Sends arrest charges to the Ohio Bureau of Criminal Investigation for inclusion on Computerized Criminal History (CCH)<br>• Updates local CCH<br>• Fingerprint specialist oversees and manages the AFIS and mugshot databases and liaisons between vendors and other police agencies that use the Division's AFIS system. |
| 2nd Shift | 1<br>6 | 1<br>6 | Supervisor<br>Fingerprint Techs | • Works 3:00PM – 11:00PM, with various days off.<br>• Obtains prints from all arrested subjects.<br>• Obtains prints for police applicants.<br>• Enters prints into AFIS.<br>• Takes photos of arrestees<br>• Obtains DNA from felony arrestees<br>• Sends arrest charges to the Ohio Bureau of Criminal Investigation for inclusion on CCH<br>• Updates local CCH |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| 3rd Shift | 1 | 1 | Supervisor | • Works 11:00PM – 7:00AM with various days off. |
| | 4 | 6 | Fingerprint Techs | • Obtains prints from all arrested subjects. |
| | 2 | 0 | Fingerprint Techs (Trng) | • Obtains prints for police applicants. |
| | | | **Entry level position*** | • Enters prints into AFIS. |
| | | | | • Takes photos of arrestees |
| | | | | • Obtains DNA from felony arrestees |
| | | | | • Sends arrest charges to the Ohio Bureau of Criminal Investigation for inclusion on CCH |
| | | | | • Updates local CCH |

EX 7

# 8. Administrative Subdivision

The Administrative Subdivision is headed by a deputy chief, and has a variety of supporting functions to the Division, including key bureaus, as well as other support, such as fiscal services and administrative functions.

The **Training Bureau** is responsible for the timely and effective education and training of new recruits, while ensuring the ongoing professional development of senior officers within the Division of Police.  The bureau is led by a commander and consists of three sections that are led by lieutenants.  The        three sections consist of the following:

- Basic Training Section
    - Recruit Training Unit
    - Field Training Unit
- Advanced Training Section
    - Advanced Training Operations Unit
    - Advanced Training Administrative Unit
    - Defensive Tactics Unit
    - Ordnance 1st Shift
    - Ordnance Midwatch
- Mental Health Lieutenant - Crisis Intervention Team (CIT) and Mobile Crisis Unit

The **Human Resources Bureau** consists of five sections and is overseen by a civilian manager.  This bureau is responsible for managing many of the essential people related functions of the organization including; benefits, payroll, staffing, civilian hiring, background investigations for all personnel, as well as assisting criminal investigation with polygraph examinations.  The bureau consists of the following sections:

- Benefits Section
- Payroll Section
- Personnel and Staffing Section
- Industrial Hygiene Section
- Background Investigation Section

The **Professional Standards Bureau's** mandate is to ensure the Division of Police is excelling in its continuous pursuit of excellence in all areas of operation. This includes ensuring policies and procedures are adhering to industry best practices, as attested to by the Commission on Accreditation for Law Enforcement Agencies (CALEA) Accreditation and monitoring and auditing Division compliance. The bureau is led by a commander and consists of three sections that are led by lieutenants.  The three sections consist of the following:

- Discipline-Grievance Section
- Accreditation Section

EX 7

- ₒ Accreditation Unit
  - ₒ Research and Development Unit
- Staff Inspections Section

The **Fiscal Management Bureau** consists of two sections and is overseen by a civilian manager.  The bureau is responsible for activities associated with budget development, contract management, seizures and forfeitures and grants.  The bureau's two sections consist of the following:

- Fiscal Administration Section
  - ₒ Grants Unit
  - ₒ Seizure & Forfeiture Unit
- Fiscal Operations Section

**(1)    Organization**

The following chart outlines the organization of the Administrative Subdivision:



EX 7

## (2)     Staffing and Unit Descriptions

The following table provides current ("Curr.") and authorized/budgeted ("Auth.") staffing levels for each unit within the subdivision.

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Training Bureau** | | | | |
| **Administration** | 1<br>1<br><br>3 | 1<br>1<br><br>3 | Commander<br>Business Manager<br>Office Assistant ll<br>Part time Security<br> Specialist | • Responsible for administrative oversight and leadership of the bureau.<br>• Ensures training standards are aligned with 21st Century Policing Principles.<br>• Ensures recruit training is carried out, according to state, CALEA and Division of Police mandates.<br>• Ensures in-service training meets state, CALEA and Division of Police mandates.<br>• Business manager schedules outside training/room rentals.<br>• Ensures OPOTC certified instructors are maintained.<br>• Instrumental in enhancing the Division's online training presence. |
| **Basic Training Section** | 1 | 1 | Lieutenant | • Oversees all administrative and operational aspects of the Basic Training Section.<br>• Ensures effective academic and practical training of recruits.<br>• Ensures effective field training program for recruits.<br>• Ensures the training standards comport with CALEA standards.<br>• Trains officers from outside agencies.<br>• Delivers recruit classroom training.<br>• Delivers recruit scenario training<br>• Serves as OPOTA School Commander.<br>• Coordinates OPOTA application physical fitness testing. |
| Recruit Training | 1<br>7<br>2 | 1<br>7<br>2 | Sergeant<br>Officers<br>Field Training Officers (assigned per class) | • Oversees all aspects of basic training for recruits.<br>• Delivers recruit classroom training.<br>• Delivers recruit practical scenario training.<br>• Monitors, evaluates, and documents recruit performance.<br>• Coordinates recruit training with relevant units, such as Defensive Tactics and Ordnance.<br>• Trains officers from outside agencies. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | | • Maintains all recruit training records. |
| Field Training Office | 1<br>1 | 1<br>1 | Sergeant<br>Officer | • Administers the Field Training Officer (FTO) program to ensure training excellence of probationary officers.<br>• Oversees selection process for FTOs<br>• Administers training of FTOs.<br>• Provides annual training for all FTOs.<br>• Maintains all FTO records. |
| **Advanced Training Section** | 1 | 1 | Lieutenant | • Provides administrative and operational oversight to all aspects of the Advanced Training Section.<br>• Ensures training is specific and topical.<br>• Ensures mandated training is delivered and ensure all officers have completed training.<br>• Oversees the Citizen Police Academy.<br>• Ensures use of force re-certification.<br>• Ensures driver training re-certification. |
| Advanced Training Operations | 1<br>6 | 1<br>6 | Sergeant<br>Officers | • Directly administers in-service training to Division members.<br>• Employs in class and roll call training. |
| Advanced Training Administrative | 2 | 2 | Officers | • Administers the entrepreneurial training program.<br>• Ensures mandated training is delivered and ensures all officers have completed training.<br>• Acts as liaison with OPOTA.<br>• Maintains all division Advanced Training records.<br>• Ensures employees maintain training and certification through audits and records maintenance. |
| Defensive Tactics | 1<br>2 | 1<br>2 | Sergeant<br>Officers/instructors | • Administers recruit and in-service defensive tactics training.<br>• Educates civilian groups on use of force tactics and policies. |
| *Ordnance 1st Shift* | 1<br>6<br>1 | 1<br>6<br>1 | Sergeant<br>Officers<br>Office Assistant II | • Administers recruit firearms training.<br>• Administers in-service firearms training.<br>• Administers firearms qualifications |
| *Ordnance Midwatch* | 1<br>5 | 1<br>5 | Sergeant<br>Officers | • Administers recruit firearms training.<br>• Administers in-service firearms training.<br>• Administers firearms qualifications |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Mental Health Lieutenant** - *Crisis Intervention Team/Mobile Crisis Unit* | 1 4 5 | 1 4 5 | Lieutenant Officers Civilian Clinicians | • Mobile Crisis Unit pilot program started June 2018. Responds to mental health related incidents. <br>• Operates 2:00 PM – 12:00 AM Officers are temporarily assigned from patrol. <br>• Trains recruits and senior officers in mental health crisis intervention techniques. <br>• Trains and supplies officers with Narcan and automated external defibrillators. <br>• Five civilians are external employees. <br>• Oversees the Division's involvement with the Rapid Response Emergency Addiction and Crisis Team (RREACT). The RREACT provides follow-up to individuals who have overdosed, to include getting them set up with treatment and other basic resources to assist them on their path to recovery. Currently, the Division provides one officer Monday – Friday, 4:00 PM – 9:00 PM. |
| **Human Resources Bureau** | | | | |
| **Administration** | 0 | 1 | Human Resources Manager | • The Human Resources Manager is responsible for administrative oversight and leadership of the bureau. <br>• The position is currently vacant. <br>• Ensures bureau priorities are met in accordance with Division-wide mandate. <br>• Supervises six full time and one part-time direct reports. |
| **Benefits Section** | 1 1 2 | 1 2 2 | Human Resource Analyst Human Resource Representatives Payroll Clerks | • Responsible for dealing with matters related to health benefits. <br>• Communicates with external partners, relative to benefit/leave requests. <br>• Handles Family and Medical Leave Act (FMLA) requests. <br>• Monitors injury leave, restricted duty, and sick leave usage. <br>• Processes, tracks, and compiles reports on benefit requests/usage. <br>• Maintains the timesheets for the Human Resources and Fiscal Management Bureaus. |
| **Payroll Section** | 1 6 | 1 6 | Human Resource Analyst | • Ensures efficient and timely remuneration of employees. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | Payroll Clerks | • Enters Division payroll data into the city's payroll system.<br>• Tracks and updates sick leave usage.<br>• Monitors all aspects of pay, relative to injury/sick leave adjustments.<br>• Monitors records for tuition and other authorized reimbursements.<br>• Ensures payments for contractual benefits, such as uniform allowance, physical fitness pay, and unused holiday hours pay. |
| **Personnel & Staffing Section** | 1<br>2<br>1 | 1<br>2<br>1 | Human Resource Analyst<br>Human Resource Representatives<br>Office Assistant ll | • Tasked with civilian hiring.<br>• Responsible for effective Division-wide sworn staffing.<br>• Handles position transfers.<br>• Assists with oral boards for sworn hires.<br>• Responsible for employee orientation.<br>• Tracks and maintains employee records. |
| **Industrial Hygienist** | 1 | 1 | Hygienist | • Significant responsibility for employee health, through proactive, preventative education.<br>• Educates employees on healthy lifestyles and oversees the Division's Drug Free Safety Program, personal protective equipment measures, blood exposure control plan, and a variety of emergency planning and response initiatives.<br>• Tracks injuries to personnel and devises proactive measures to reduce injuries.<br>• Responsible for fitness facilities.<br>• Coordinates health screenings.<br>• Ensures planning for fire and tornado drills.<br>• Manages AED program and distribution of critical first aid supplies.<br>• Coordinates testing for occupational exposure to noise and lead, based on assignment.<br>• Manages compliance with Environmental Protection Agency regulations. |
| **Background Investigation Section** | 1<br>2<br>2<br><br>1<br>1 | 1<br>2<br>2<br><br>3<br>1 | Public Safety Manager<br>Officers<br>Public Safety Analysts - Civilian (Retired Officers)<br>Polygraphist - Civilian<br>Polygraphist – 480 Temp | • Conducts pre-employment polygraphs for police and fire applicants.<br>• Conducts background investigations, including candidate interviews, criminal record checks, reference checks, financial |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | 1 | 1 | (civ)<br><br>Part time Human Resources Representative | • checks, and associated personnel interviews.<br>• Conducts polygraphs for criminal investigations, as time permits.<br>• Documents findings and prepares reports for the oral board. |
| **Professional Standards Bureau** | | | | |
| **Administration** | 1 | 1 | Commander | • The commander is responsible for the administrative oversight and leadership of the bureau.<br>• Ensures bureau priorities are met in accordance with Division wide mandate.<br>• Regularly attends executive staff meetings.<br>• Supervises five lieutenants. |
| **Discipline/ Grievance Section** | 2 | 2 | Lieutenants | • Staffed by two lieutenants. The current lieutenants have law degrees, but this is not a requirement of the position; a law degree is an exceptional qualification for the position.<br>• High level of involvement in discipline/grievance processes.<br>• Reviews major disciplinary cases to identify strengths and weaknesses.<br>• Works with the union and represents the chief at hearings. |
| **Accreditation Section** | 1 | 1 | Lieutenant | • Provides administrative oversight to the Accreditation and Research and Development Units and serves as the Division's Accreditation Manager. |
| Accreditation (Unit) | 2 | 2 | Management Analyst II | • Ensures Division meets accreditation standards, mandated by CALEA.<br>• Works closely with the Research & Development Unit.<br>• Aids in policy development and establishment of "best practices" within the Division. |
| Research & Development | 1<br>3<br>2 | 1<br>3<br>2 | Sergeant<br>Officers<br>Management Analyst II | • Ensures research is conducted on best practices and brought to the attention of appropriate Division personnel.<br>• Ensures procedures, forms, and policies are reviewed and revised accordingly. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| | | | | • Distributes updated publications in paper format and through PowerDMS a document management solution.<br>• Assists with internal and external requests for information, research, and statistics.<br>• Conducts analysis for annexation requests.<br>• Works closely with the Accreditation Unit.<br>• Aids in policy development and establishment of best practices within the Division. |
| **Staff Inspections Section** | 2 | 2 | Lieutenants | • Ensures compliance with best practice policies through routine inspections and evaluations.<br>• Ensures equipment, standard operating procedures, and facilities are meeting requirements.<br>• Assists in ensuring adequate and efficient Division-wide staffing plans are implemented.<br>• Identifies issues, which may be systemic and allow for proactive training.<br>• Responsible for administrative oversight of Division personnel assigned to positions within the Fraternal Order of Police, including approving leave, training, etc. |
| **Fiscal Management Bureau** | | | | |
| **Administration** | 1 | 1 | Fiscal Manager | • Manages the Fiscal Management Bureau; takes lead responsibility for internal coordination of budget development; works closely with the Department of Public Safety and the Department of Finance and Management. |
| **Fiscal Administration Section** | 1 | 1 | Management Analyst II | • Assists with developing the operating and capital budgets, as well as other annual financial reports.  Oversees the Grants and Seizure/Forfeiture Units. |
| Grants | 3 | 3 | Management Analyst I | • Researches, develops and manages grants. |
| Seizure & Forfeiture | 2 | 2 | Management Analyst I | • Performs the accounting necessary for asset seizures and forfeitures. |

EX 7

| Unit/Section | Curr. | Auth. | Position | Unit Description |
|---|---|---|---|---|
| **Fiscal Operations Section** | 1 | 1 | Management Analyst II | • Manages contracts, processes legislation, monitors funding related to the budget, as it relates to procurement, and supervises the Fiscal Operations Section. |
| | 1 | 1 | Fiscal Assistant | • Processes accounts payable and receivable, invoices, purchase orders, and travel reimbursements. |
| | 3 | 3 | Management Analyst I | • Assists in procurement, formal bidding, accounts payable and receivable, processes purchase orders and engages in vendor relations activities. |

EX 7

## Attachment B

# Columbus, Ohio Community Survey
# Columbus Division of Police
# Final Report

Submitted to:

**Matrix Consulting Group, Inc.**

**June 2019**

Submitted by:



EX 7

# EXECUTIVE SUMMARY

## *Overview*

As part of a larger operational review for the City of Columbus, Matrix Consulting Group contracted with Public Values Research, an independent research and consulting firm, to conduct a public opinion survey with City of Columbus residents. The purpose of the research was to document community attitudes regarding the services provided by the Division of Police and to help identify perceived gaps in the quality of services provided. Specifically, the study addressed: (1) public satisfaction with the Columbus Police overall and across key measures; (2) perceived public safety citywide and within neighborhoods; (3) community engagement; and (4) interactions with officers.

The findings presented in this report reflect the content of 676 surveys conducted with residents of the City of Columbus, 18 years of age or older. The sample consisted of 350 RDD and listed telephone interviews and 326 online responses collected between March 27 and May 4, 2019. The telephone sample was provided by the Marketing Systems Group and the online sample was provided by Soapbox Sample. Surveys were conducted in English by Interviewing Service of America (ISA) and averaged 12 minutes in length. The margin of error for the sample as a whole was +/-4% at the 95% confidence interval, which was computed using the classical SRS formula and takes into account the design effects of weighting.

Key findings are summarized below for residents overall, followed by any observed differences by race, ethnicity, gender, or age. All reported differences by demographics or among groups is statistically significant at the 95% confidence level, unless otherwise noted.

## *Key Findings*

### *Overall Attitudes towards the Columbus Division of Police*

- **The majority of Columbus residents approve of the job the police are doing.** Nearly three-fourths of all residents surveyed (74%) reported that they believe the Columbus Police are doing a "good" or "excellent" job overall. These approval ratings were consistent across income categories and include one-third of residents (33%) who give the Columbus Division of Police the highest rating of excellent. Approximately 70% of residents reported that they are satisfied with the Columbus Police overall and view the Division favorably.

- Nevertheless, views of the Division of Police are more divided compared to other municipal agencies. For instance, more than nine-out-of-ten residents (94%) rate

EX 7

the Division of Fire as good or excellent and more than eight-out-of-ten (82%) give top ratings to the Department of Public Service.

- Half of all residents surveyed (51%) reported that their opinion of the Columbus Police Division has not changed compared to 10 years ago; however, among those residents whose views had changed, their opinion had become "more favorable." Residents described a variety of reasons for changing their opinions. The most frequently cited reasons for a more favorable view were increased police presence/faster response time (8%) and better community/race relations (8%). The most frequently cited reason for a less favorable opinion were racial bias/excessive force (12%) and corruption (6%).

- **Most Columbus residents are confident in police conduct and accountability.** Almost two-thirds of Columbus residents (64%) "agree" or "strongly agree" that police officers protect the rights of everyone in the community and make decisions that are good for all residents (63%). When misconduct does occur, the majority of Columbus residents (62%) believe officers are held accountable.

- **Views of the police vary significantly by race and ethnicity.** Findings indicate that non-white and black residents give the Columbus Police substantially lower performance ratings overall compared to white residents. Eight-of-ten white residents surveyed (80%) reported that the Columbus Police are doing a good or excellent job overall, compared to 69% of non-white residents and 61% of black residents. Non-white and black residents also give the Columbus Police lower ratings across a number of specific measures. Half of the black residents surveyed (49%) said they believe police protect the rights of everyone in the community and 43% believe the police make decisions that are good for all residents, compared to approximately 70% of white residents who hold similar views. When misconduct does occur, 46% of black residents and 53% of non-white residents believe that officers are held accountable, compared to 70% of white residents. No differences in overall police ratings were found by age, income, or gender.

_Perceptions of Public Safety_

- **The majority of Columbus residents feel safe in the City of Columbus and within their own neighborhoods.** More than three-fourths of residents (77%) agree or strongly agree that they feel safe in the City of Columbus and more than eight-out-of-ten (81%) feel safe in their own neighborhood. Although the majority of residents have a positive perception of public safety, men, college-educated residents, and those earning more than $50,000 feel safer than others. The majority of Columbus residents believe crime in their neighborhood has "stayed about the same" (60%) or is "getting better" (22%). Only 16% believe crime is "getting worse" where they live. More than two-thirds of residents (69%) say the

EX 7

Columbus Police is "somewhat responsive" or "very responsive" in addressing public safety concerns.

- **Approximately two-thirds of residents report that police frequently patrol their neighborhoods and are responsive to public safety issues raised by their communities.** Results were consistent regardless of income or race/ethnicity.

- **Non-white and black residents, however, feel less safe compared to white residents in the City of Columbus overall and within their own neighborhoods.** Approximately 74% of non-white and 70% of black residents feel safe where they live compared to 84% of white residents.

- **Violent crimes and burglaries/theft are the top public safety concerns for Columbus residents.** When asked to name all the public safety issues they were concerned about, approximately 60% of residents cited violent crime and theft. Violent crime was most often cited first when residents were asked to name all the public safety issues that were important to them.

- The study found that men feel safer in the City of Columbus compared to women. Eight-in-ten men feel safe (81%) compared to approximately seven-in-ten women (73%), a statistically significant difference at the 90% confidence level.

*Community Policing*

- **Most Columbus residents consider their relationship with the Columbus Police to be positive, although residents are less likely to agree that the police understand the unique aspects of their community.** Three-fourths of Columbus residents (75%) describe their relationship between the Columbus Police and their community as "very positive" or "somewhat positive," compared to less than two-thirds of residents (64%) who "agree" or "strongly agree" that the police understand their community.

- **A slight majority of residents believe that the Columbus Police values public input (61%) and makes it easy for community members to provide input (57%).** Less than a third of residents (30%) surveyed know how to contact the community liaison officer assigned to their area. Just under one-quarter of residents surveyed (22%) reported that they regularly attend community meetings, most often through their Neighborhood Association (12%). Facebook was the most frequently cited platform for learning about the Columbus Police, mentioned by 19% of residents surveyed, followed by the Columbus Police Division website. Notably, 70% of residents reported that they do not follow the Columbus Police using any online platform.

EX 7

- **Findings suggest that community engagement with black and non-white communities has been less successful than with other groups.** Black residents and non-white residents in general were less likely than white residents to describe the relationship between their community and the Columbus Police Division as positive. Eight-out-of-ten white residents (80%) described their community's relationship with the Columbus Police as somewhat positive or very positive, compared to 59% of black residents and 67% of non-white residents in general. Black residents and non-white residents were also less likely than white residents to describe Columbus Police as knowledgeable about their communities. Only half of black residents surveyed (51%) and 57% of non-white residents agree or strongly agree that the Columbus Police understand their community, compared to more than two-thirds (69%) of white residents.

- **Black residents were less likely than white residents to report that the Columbus Police values input from their community.** Approximately two-thirds of white residents (65%) believe the police value input from the community, compared to only half of black residents (51%). Moreover, black residents are less likely to agree that the Columbus Police make it easy for community members to provide feedback, 50% compared to 60% among white residents, a statistically significant difference at the 90% confidence level.

*Interactions with Columbus Police*

- **The study found that based on personal experiences, the majority of residents agree that police are respectful and professional in their interactions with the public.** Residents were first asked if they personally had any contact with the Columbus Police in the 12 months prior to the survey. Slightly more than one-third (35%) of residents reported that they had contact with police, most frequently as part of a service request (54%), followed by traffic stops (24%), community meetings (12%), and records requests (10%). Reflecting on their contact with Columbus Police, three-fourths of residents (76%) reported that they found that "all" or "most" officers treat them, their friends, and family with respect.

- **Perceptions regarding personal encounters with Columbus Police varied significantly by race/ethnicity, income and age.** When asked to describe how well police treat residents based on their personal experience, 84% of white residents said all or most officers show them respect, compared to 63% among non-white residents. Residents with incomes above $50,000 were more likely than those with below median incomes to report that officers treat them with respect, 87% compared to 66%. In addition, older residents who had personal contact with the Columbus Police were more likely than younger residents to report that all or most officers show them respect. More than one-in-nine (91%) residents 65 years or older believe all or most officers treat them with respect compared to 68% of residents 18 to 34 and 79% of those between 35 and 64. (Sample size was not sufficient to analyze the views of black residents separately.)

EX 7

*Selecting a New Chief of Police*

- The qualities residents value most in a new Chief are leadership skills, effective communication skills, being community oriented, and being knowledgeable about the City of Columbus.

- **Selecting a police chief who comes from a racially diverse background, while not ranked highly by residents overall, is a high priority for non-white residents, particularly African-Americans.** More than three-fourths (76%) of black residents and 72% of non-whites in general ranked a diverse background as a top priority in the next Chief of Police (score of 4 or 5 on a scale of 1 to 5, where 5 is "extremely important,") compared to 59% of white residents.

## Summary

The study found that a majority of Columbus residents approve of the job the police are doing and feel safe in the City of Columbus and within their own neighborhoods. Most residents report that they frequently see police patrols in their neighborhood and believe the police are generally responsive to public safety issues brought up by their community. Moreover, based on personal experiences, most residents view police as respectful and professional in their interactions.

Despite these positive indicators, residents' views of the police vary significantly by race and ethnicity. Black residents, in particular, have more negative opinions of the Columbus Police compared to other groups across most measures including overall approval ratings, perceived safety, and perceptions of police accountability. Black and non-white residents are also less likely to report that they are treated with respect when they interact with police.

Finally, results indicate that community engagement with black and non-white communities has been less successful than with other groups. Black and non-white residents are less likely to describe their relationship with the Columbus Police as positive and are less likely to report that the police understand their communities or make it easy to provide input.

EX 7

# INTRODUCTION

As part of a larger operational review for the City of Columbus, Matrix Consulting Group contracted with Public Values Research, an independent research and consulting firm, to conduct a public opinion survey with City of Columbus residents. The purpose of the research was to document community attitudes regarding the services provided by the Division of Police and to help identify perceived gaps in the quality of services provided. Specifically, the study addressed: (1) public satisfaction with the Columbus Police; (2) perceived public safety citywide and within neighborhoods; (3) community engagement; and (4) interactions with officers.

The remainder of this report presents the survey methodology and findings that emerged from the data analyses and is organized as follows:

- The **Methodology** section, which describes data collection and statistical methods;
- Detailed **Findings**;
- **Summary**; and,
- The **Appendices,** which include the survey instrument with frequencies and a demographic profile of residents surveyed compared to population estimates.

# METHODOLOGY

**Overview**

The findings presented in this report reflect the content of a combined sample of telephone and online surveys administered by Interviewing Service of America (ISA) between March 27 and May 4, 2019, with a sample of 676 adults, 18 years of age or older, living in the City of Columbus. The sample consisted of 350 RDD and listed telephone interviews and 326 online responses. The telephone sample was provided by the Marketing Systems Group and the online sample was provided by Soapbox Sample. Surveys were conducted in English and averaged 12 minutes in length.

The margin of error for the entire sample (both telephone and online responses combined) was computed using the classical SRS formula. The overall margin of error was +/-4% at the 95% confidence interval, which takes into account the design effects of weighting. Estimates based on subgroups within the sample will have larger margins of error. Although the sample consists of some responses that were obtained through nonprobability sampling techniques, the margin of error presented here assumes that the weighted estimates are approximately unbiased. This assumption of approximate unbiasedness is based on our assertion that any differences between the survey sample and the target population are corrected by weighting on demographics characteristics, however, no additional analysis was conducted to validate this assertion.

EX 7

**Weighting**

Post-stratification weights were calculated by raking (an iterative proportional fitting algorithm). The data were weighted for age, race, and gender. From weighting alone, the design effect of the survey was 1.30 and the design factor was 1.14. Of the 676 total completions, 632 had adequate item responses for all weighting variables. The weight for the remaining 44 cases were set to the mean weight of 1 in order to preserve cases. Weights were based on population parameters for the City of Columbus in Ohio from the U.S. Census Bureau 2017 American Community Survey 5-Year Estimates.

**Statistical Comparisons**

Statistical tests were conducted for all comparative analyses to determine whether responses varied by gender, race/ethnicity, income, or age. All reported differences were statistically significant at the 95 percent confidence level, unless otherwise noted.[17] The margin of error for these comparisons was not adjusted for design effects.

## Report Organization

This report has been organized around the following topic areas:

- General satisfaction with the Columbus Division of Police;
- Perceived public safety;
- Perceptions regarding community policing;
- Interactions with Columbus Police; and,
- Priorities for selecting a new Chief of Police.

The next section of this report presents study findings.

---

[17] A statistically significant difference means that the difference between groups is not by chance, and that a real difference in perceptions exists. A 95% confidence level means if the study were conducted repeatedly, 95 times out of 100 the results would be the same for any given question +/-5 percentage points.

EX 7

# FINDINGS

## General Satisfaction with the Columbus Police Division

***Overall Performance Ratings***

Public confidence in the Columbus Division of Police was measured using a series of questions in which residents were asked how they would rate the Columbus Police overall and across specific attributes, including whether officers protect the rights of everyone in the community and are held accountable for their actions. **Overall, the survey found that, the majority of Columbus residents have confidence in the Columbus Division of Police, although there were important differences by race and ethnicity.** Nearly three-fourths of all residents surveyed (74%) reported that they believe the Columbus Police are doing a "good" or "excellent" job overall. These approval ratings were consistent among men and women and across age and income categories. One-third of residents (33%) give the Columbus Division of Police the highest rating of excellent.

Residents, however, give the Division of Police lower ratings compared to other City departments and divisions, including the Columbus Division of Fire and the Columbus Department of Public Service. More than nine-out-of-ten residents (94%) rated the Division of Fire as good or excellent and more than eight-out-of-ten (82%) give top ratings to the Department of Public Service, as seen in **Figure 1.**



**Figure 1: Overall Performance Ratings**
**Colmbus Division of Police Compared to Other City Departments**
*Overall ratings for the Columbus Division of Fire, Columbus Department of Public Service, and Columbus Division of Police (n=676)*

*Figure based on Q2: "When it comes to [name of department], do you think they are doing an excellent, good, only fair, or poor job?" Don't know/Refused not charted.

EX 7

Approximately 70% of residents reported that they are satisfied with the Columbus Police overall and view the Division favorably. See **Figure 2.**



**Figure 2: Overall Satisfaction and Favorability Ratings
Columbus Police Division**

*Proportion of residents who are satisfied with police performance overall and have a favorable view of the division (n=676)*

*Figure based on Q9 and Q13: "I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree: I am satisfied with the overall performance of the Columbus Police Division. I have a favorable view of the Columbus Police Division." Don't know/refused not charted.

EX 7

Residents were asked if their opinions about the Columbus Police had changed over time. **Half of all residents surveyed (51%) reported that their opinion of the Columbus Police Division has not changed compared to 10 years ago; however, among those residents whose views had changed, their opinion had become "more favorable."** Residents described a variety of reasons for changing their opinions. The most frequently cited reasons for a more favorable opinion were increased police presence/faster response time (8%) and better community/race relations (8%). The most frequently cited reason for a less favorable opinion were racial bias/excessive force (12%) and corruption (6%). See **Figure 3.**



**Figure 3:  Favorability Ratings Compared to 10 Years Ago**
*Proportion of residents who say their opinion of the Columbus Police Division is more favorable, less favorable, or about the same (n=676)*

About the Same — 51%
More Favorable — 27%
Less Favorable — 19%

*Figure based on Q3: "Compared to 10 years ago, is your opinion of the Columbus Police Division more favorable, less favorable, or about the same." Don't know/refused not charted.

EX 7

### *Ratings across Key Indicators*

In addition to providing overall ratings, residents were asked to rate police job performance across several key indicators. Results are presented in **Figure 4**. **Findings suggest that the majority of Columbus residents are confident in police conduct and accountability.** Almost two-thirds of Columbus residents (64%) "agree" or "strongly agree" that police officers protect the rights of everyone in the community and make decisions that are good for all residents (63%). **When misconduct does occur, the majority of Columbus residents (62%) believe officers are held accountable.**



**Figure 4: Ratings of Police Performance across Key Indicators**
*Residents were read statements about the Columbus Police and asked if they strongly agree, agree, disagree, or strongly disagree (n=676)*

*Protects the rights of everyone in the community*
- Strongly Agree: 23%
- Agree: 41% — **64%**
- Disagree: 19%
- Strongly Disagree: 8% — **27%**

*Make decisions that are good for everyone in the community*
- Strongly Agree: 21%
- Agree: 42% — **63%**
- Disagree: 17%
- Strongly Disagree: 9% — **26%**

*Held accountable for their actions*
- Strongly Agree: 21%
- Agree: 40% — **62%**
- Disagree: 17%
- Strongly Disagree: 12% — **29%**

Legend: ■ Strongly Agree ■ Agree ■ Disagree ■ Strongly Disagree

*Figure based on Q10, Q11, Q14: "I'm going to read some statements about the Columbus Police. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree…" Don't know/refused not charted.*

EX 7

## Differences by Race and Ethnicity

**While the majority of residents have confidence in the Columbus Police, views varied significantly by race and ethnicity.** Findings indicate that non-white and black residents give the Columbus Police lower ratings overall compared to white residents. Eight-of-ten white residents surveyed (80%) reported that the Columbus police were doing a good or excellent job overall, compared to 69% of non-white residents and 61% of black residents, as seen in **Figure 5**.



**Figure 5: Overall Performance Ratings, Columbus Police Division by Race/Ethnicity**

*Ratings of overall performance for the city as a whole (n=676)*

*Figure based on Q2: "When it comes to [name of department], do you think they are doing an excellent, good, only fair, or poor job?" Unweighted sample size was 462 for white residents, 190 for all non-white residents combined, including Latinos, and 130 for black residents. Non-white residents and black residents gave lower performance ratings compared to white residents. Don't know/Refused not charted.

EX 7

Non-white and black residents also give the Columbus Police lower ratings across a number of specific measures. Only half of the black residents surveyed (49%) said they believe police protect the rights of everyone in the community and 43% believe the police make decisions that are good for all residents, compared to approximately 70% of white residents who hold similar views. When misconduct does occur, 46% of black residents and 53% of non-white residents believe that the officers are held accountable, compared to 70% of white residents. Responses are presented in **Figure 6**. No differences in overall police ratings were found by age or income (no chart).



**Figure 6: Ratings of Police Performance across Key Indicators by Race/Ethnicity**

*Proportion of residents who agree or strongly agree with statements regarding police conduct and accountability*

*Figure based on Q10, Q11, Q14: "I'm going to read some statements about the Columbus Police. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree …" Unweighted sample size was 462 for white residents, 190 for all non-white residents combined, including Latinos, and 130 for black residents. Non-white residents and black residents gave the Police Division lower overall performance ratings compared to white residents on all measures. Don't know/refused not charted.

*Contact with Police and Overall Ratings*

**Residents who had contact with Columbus Police gave the division slightly lower overall ratings compared to residents who had not had contact.** A total of 70% of residents who had contact with the Columbus Police gave the Division a rating of good or excellent, compared to 77% among residents who did not have an interaction, a statistical difference at the 90% confidence level. Among residents who had contact with the police, 30% rated the police as "only fair" or "poor," compared to 20% among the general population. The survey did not distinguish between formal and informal police contact.

EX 7

## Perceived Public Safety

### *Perceived Safety Citywide and within Neighborhoods*

In addition to overall police performance, the survey measured residents' perceptions of public safety. **The study found that most residents feel safe in the City of Columbus and within their own neighborhood.** More than three-fourths of residents (77%) "agree" or "strongly agree" that they feel safe in the City of Columbus and more than eight-out-of-ten (81%) feel safe in their own neighborhood, as seen in **Figure 7**. The majority of residents have a positive perceptions of public safety, although men, college-educated residents, and those earning more than $50,000 feel safer than others.

**Approximately two-thirds (66%) of residents agree or strongly agree that police frequently patrol their neighborhood.** Results were consistent regardless of income or race/ethnicity.



**Figure 7: Perceptions of Public Safety**
*Overall safety in the City of Columbus as a whole and safety within neighborhoods (n=676)*

*Figure based on Q4 and Q5: "In general, I feel safe in the City of Columbus?" "In general, I feel safe in my neighborhood?" Don't know/refused not charted.

EX 7

**Figure 8** presents public perceptions regarding crime rates within neighborhoods. **The majority of Columbus residents believe crime in their neighborhood has "stayed about the same" (60%) or is "getting better" (22%).** Notably, 16% believe crime is "getting worse" where they live.



Figure 8: Perceived Crime Rates Within Neighborhoods
*Proportion of residents who say crime in their neighborhood is "getting better," "getting worse" or is "about the same" (n=676)*

*Figure based on Q20: "Do you think crime in your neighborhood is getting better, worse, or has stayed about the same?" Don't know/refused not charted.

In addition, more than two-thirds of residents (69%) say the Columbus Police is "somewhat responsive" or "very responsive" in addressing public safety concerns, as seen in **Figure 9.**



Figure 9: Perceived Responsiveness of Police to Public Safety Issues
*Residents rated how responsive the Columbus Police have been in addressing public safety issues (n=676)*

*Figure based on Q21: "When public safety issues are brought up by the community, how responsive has the Columbus Police Division been in addressing them?" Don't know/Refused not charted.

EX 7

To better understand residents' safety concerns, respondents were asked what they thought were the most important public safety issues facing their community. Results are presented in **Figure 10. Violent crimes and burglaries/theft were the most frequently cited public safety concerns, each mentioned by approximately 60% of all residents surveyed.** Residents most often cited violent crime first when asked to name all the public safety issues that were important to them.



**Figure 10: Most Important Public Safety Issues**
*Residents were asked to name the most important public safety issues facing their community (n=676)*

*Figure based on Q19: "What do you think are the most important public safety issues for the Columbus Police to address in your community?" The difference between first mentions for violent crime and first mentions for burglaries was statistically significant. Don't Know/Refused not charted.

EX 7

### *Differences by Race, Ethnicity, and Gender*

While overall perceptions of public safety were high, significant differences were found along racial and ethnic lines. **Non-white and black residents feel less safe compared to white residents in the City of Columbus overall and within their own neighborhoods.** Approximately 70% of non-white and black residents agree that they feel safe in the city of Columbus compared to 80% of white residents. In their own neighborhoods, 74% of non-white residents and 70% of black residents feel safe, compared to 84% of white residents. Results are presented in **Figures 11** and **12**.



*Figure based on Q4: "I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree. In general, I feel safe in the City of Columbus." Don't know/refused not charted.



*Figure based on Q5: "I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree. In general, I feel safe in my neighborhood." Don't know/Refused not charted.

EX 7

In addition to racial/ethnic differences, the study found that men feel safer in the City of Columbus compared to women. Eight-in-ten men feel safe (81%) compared to approximately seven-in-ten women (73%), a statistically significant difference at the 90% confidence level. Moreover, women were more concerned about a variety of public safety issues compared to men, including prostitution, homelessness, noise and disorderly conduct, and burglary and theft. Notably, women were not more concerned than men about violent crime.

**Despite differences in perceptions of public safety, both white and non-white residents reported that the police were responsive in addressing public safety concerns raised by their communities**. In addition, non-white residents were as likely as white residents to report seeing frequent police patrols in their neighborhoods. Notably, non-white residents were more likely than white residents to report that crime in their neighborhood had improved (30% compared to 17% respectively).

## Community Policing

### *Relationship between Columbus Police and Local Communities*

In exploring residents' perceptions of community policing efforts, residents were asked about their relationship with the Columbus Police. Results are presented for residents citywide followed by an analysis of differences by race and ethnicity. **Overall, the survey found that the majority of Columbus residents consider the relationship between their community and the Columbus Police to be positive, although residents are less likely to agree that police understand the unique aspects of their community.** Three-fourths of Columbus residents (75%) describe their relationship between the Columbus Police and their community as "very positive" or "somewhat positive," and just under two-thirds of residents (64%) "agree" or "strongly agree" that the police understand their community. Results are presented in **Figures 13** and **14.**

EX 7



Figure 13: Overall Relationship between the Columbus Division of Police and Local Communities (n=676)

*Figure based on Q15: "Overall, how would you describe the relationship between the Columbus Police and your community? Very Positive, Somewhat Positive, Somewhat Negative, or Very Negative."



Figure 14: Police Understanding of Local Communities
*Proportion of residents who strongly agree, agree, disagree, or strongly disagree that the Columbus Police understand unique aspects of their community (n=676)*

*Figure based on Q8: "I'm going to read some statements about the Columbus Police division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree: The Columbus Police Division understands the unique aspects of my community." Don't know/Refused not charted.

Next, residents were asked if it were easy for people from their community to give input and make suggestions to the police. Results are shown in **Figure 15. The survey found that more than half of all residents (61%) "agree" or "strongly agree" that the Columbus Police value public input and make it easy for community members to provide feedback.** Despite these positive ratings, less than a third of residents (30%) surveyed know how to contact the community liaison officer assigned to their area.

EX 7



**Figure 15: Value and Ease of Public Input**
*Residents who strongly agree, agree, disagree, or strongly disagree that the Columbus Police values public input and makes the process easy (n=676)*

*Figure based on Q6: I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree.*

### Community Meetings

To help measure community engagement, the survey asked residents if they attended two or more community meetings through their Neighborhood Association, the Columbus City Council, the Police Commission, or other organization. **Just under one-quarter of residents surveyed (22%) reported that they regularly attend community meetings, most often through their Neighborhood Association (12%), as seen in Figure 16.**



**Figure 16: Participation in Community Meetings**
*Residents who reported attending at least two community meetings with the following organizations (n=676)*

*Figure based on Q26: "In the last year, have you attended two or more meetings for any of the following organizations?" Don't know/Refused not charted.*

### Online Platforms

EX 7

Residents were asked if they followed the Columbus Police on Facebook, Twitter, Instagram, or the Columbus website. **As seen in Figure 17, Facebook was the most frequently cited platform for learning about the Columbus Police, mentioned by 19% of residents surveyed, followed by the Columbus Police Division website.** Notably, 70% of residents reported that they do not use any of these online platforms to follow police activity.



*Figure based on Q25: "Do you follow the Columbus Police on any of the following online platforms?" Don't know/refused not charted.

### *Differences by Race and Ethnicity*

**Although the majority of residents surveyed characterize the relationship between their communities and the Columbus Police Division as positive, findings suggest that community engagement with black and other non-white communities could be improved.** Black and non-white residents in general were less likely than white residents to describe the relationship between their community and the Columbus Police Division as positive. Eight-out-of-ten (80%) white residents described their community's relationship with the Columbus Police as somewhat positive or very positive, compared to 59% of black residents and 67% of non-white residents in general, as seen in **Figure 18**.

EX 7



**Figure 18: Overall Relationship between the Columbus Division of Police and Local Communities, by Race/Ethnicity**

*Proportion of residents who describe their overall relationship with Columbus Police as very positive or somewhat positive (n=676)*

*Figure based on Q15: "Overall, how would you describe the relationship between the Columbus Division of Police and the neighborhood where you live? Very positive, somewhat positive, somewhat negative, or very negative?"

**Unweighted sample size was 462 for white residents, 190 for non-white residents, and 130 for black residents. Don't know/refused not charted.

**Black residents and non-white residents in general were also less likely than white residents to describe the Columbus Police as knowledgeable about their communities.** Half of black residents surveyed (51%) and 57% of non-white residents "agree" or "strongly agree" that the Columbus Police understands their community, compared to more than two-thirds (69%) of white residents. Results are presented in **Figure 19**.

EX 7



**Figure 19: Police Understanding of
Local Communities, by Race/Ethnicity**
*Proportion of residents who agree that the Columbus Police understand
the unique aspects of their community (n=676)*

White — Strongly Agree 23%, Agree 46%, total **69%**
Non-White — Strongly Agree 15%, Agree 41%, total **57%**
Black — Strongly Agree 11%, Agree 40%, total **51%**

■ Strongly Agree   ■ Agree

*Figure based on Q8: I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you strongly agree, agree, disagree, or strongly disagree: The Columbus Police division understands the unique aspects of my community." **Unweighted sample size was 462 for white residents, 190 for non-white residents, and 130 for black residents. Don't know/refused not charted.

**Figures 20** and **21** show differences along racial lines regarding the perceived value and ease of providing feedback to the Police Division. **Black residents were less likely than white residents to report that the Columbus Police values input from their community.** Approximately two-thirds of white residents (65%) believe the police value input from the community, compared to only half of black residents (51%). Moreover, black residents were less likely to agree that the Columbus Police makes it easy for community members to provide feedback, 50% compared to 60% among white residents, a statistically significant difference at the 90% confidence level. Observed differences between white residents and non-white residents (as a whole) were not statistically significant.

EX 7



**Figure 20: Perceived Value of Public Input by Race/Ethnicity**

*Proportion of residents who agree that the Columbus Police value public input from their community (n=676)*

*Figure based on Q7: The Columbus Police Division values input from the community." Don't know/refused not charted



**Figure 21: Ease of Providing Public Input by Race/Ethnicity**

*Proportion of residents who agree that the Columbus Police make it easy to provide input (n=676)*

*Figure based on Q6: The Columbus Police Division makes it easy for community members to provide input. Don't know/refused not charted.

## Interactions with Columbus Police

### *Type of Contact and Overall Impressions based on Personal Experiences*

In addition to documenting general impressions, the survey was designed to gauge public perceptions of the Columbus Police based on personal interactions. Residents were first

EX 7

asked if they personally had any contact with the Columbus Police in the 12 months prior to the survey. Slightly more than one-third (35%) of residents reported that they had contact with police, most frequently as part of a service request (54%), followed by traffic stops (24%), community meetings (12%), and records requests (10%).

**Based on their personal experiences with the Columbus Police, three-fourths (76%) of residents believe that "all" or "most" officers treat them, their friends, and family with respect.** Results are presented in **Figure 22.**



*Figure based on Q24: "Based on your personal experience, how many of the Columbus Police officers you encounter treat you, your friends, and your family members with respect?" Don't know/refused not charted.

*Differences by Race, Ethnicity, Income, and Age*

**Perceptions regarding personal encounters with Columbus Police varied significantly by race/ethnicity, income and age.** When asked to describe how well police treat residents based on their personal experience, 84% of white residents said all or most officers show them respect, compared to 63% of non-white residents (see **Figure 23**). Residents with incomes above $50,000 were more likely than those with below median incomes to report that officers treat them with respect, 87% compared to 66%. In addition, older residents who had personal contact with the Columbus Police were more likely than younger residents to report that all or most officers show them respect. More

EX 7

than one-in-nine (91%) of residents 65 years or older believe all or most officers treat them with respect compared to 68% of residents 18 to 34 and 79% of those between 35 and 64. (Sample size was not sufficient to analyze the view of black residents separately.)



**Figure 23: Respect Shown by the Columbus Division of Police by Race/Ethnicity**
*Ratings among white, non-white, and black residents who had personal contact with the Columbus Police (n=225)*

White: 48% All show respect, 36% Most show respect — 84%
Non-White: 36% All show respect, 27% Most show respect — 63%

■ All show respect   ■ Most show respect

*Figure based on Q24: "Based on your personal experience, how many of the Columbus Police officers you encounter treat you, your friends, and your family members with respect?" Don't know/refused not charted.**Unweighted sample size was 159 for white residents and 57 for non-white residents.

## Selecting a New Chief of Police

Finally, residents were asked what qualities are most important to them in selecting a new Chief of Police. Results are presented in **Table 1**. **The qualities residents value most in a new Chief are leadership skills, effective communication skills, being community oriented, and being knowledgeable about the City of Columbus.**

**Coming from a diverse background, while not ranked highly by residents overall, was a high priority for non-white residents, particularly African-Americans.** More than three-fourths (76%) of black residents and 72% of non-whites in general ranked a diverse background as a top priority in the next Chief of Police (score of 4 or 5 on a scale of 1 to 5, where 5 is "Extremely Important,") compared to 59% of white residents (no chart).

EX 7

**Table 1: Most Important Qualities**
**Next Chief of the Columbus Police Division (n=676)**

| | Not at all Important | 2 | 3 | 4 | Extremely Important | Top Score of 4 or 5 |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | | | | 5 | |
| **Leadership skills** | 2% | 2% | 7% | 16% | 74% | **89%** |
| **Effective Communicator** | 2% | 1% | 8% | 19% | 70% | **89%** |
| **Community Oriented** | 2% | 1% | 10% | 21% | 65% | **86%** |
| **Knowledgeable about Columbus** | 3% | 1% | 10% | 23% | 63% | **86%** |
| | | | | | | |
| **Brings new ideas** | 3% | 1% | 14% | 29% | 52% | **80%** |
| **Sensitive to diversity** | 4% | 2% | 15% | 22% | 55% | **77%** |
| **Can build consensus** | 2% | 2% | 16% | 28% | 48% | **77%** |
| **Big city experience** | 2% | 3% | 18% | 27% | 48% | **76%** |
| **Labor relations skills** | 3% | 3% | 19% | 32% | 43% | **75%** |
| | | | | | | |
| **Comes from diverse background** | 8% | 5% | 21% | 23% | 42% | **65%** |

Top Priorities (Leadership skills, Effective Communicator)

Tier 2 Priorities (Community Oriented, Knowledgeable about Columbus, Brings new ideas, Sensitive to diversity)

Low Priority (Can build consensus)

*Figure based on Q16: "The City will be selecting a new Chief of Police in the coming months. I'd like to ask you some questions about the qualities you think are most important in the next Chief. On a scale of 1 to 5, where 1 is "not at all important" and 5 is "extremely important," how important is it that you that the next Chief…?"

## SUMMARY

The study found that a majority of Columbus residents approve of the job the police are doing and feel safe in the City of Columbus and within their own neighborhoods. Most residents report that they frequently see police patrols in their neighborhood and believe the police are generally responsive to public safety issues brought up by their community. Moreover, based on personal experiences, most residents view police as respectful and professional in their interactions.

Despite these positive indicators, residents' views of the police vary significantly by race and ethnicity. Black residents, in particular, have more negative opinions of the Columbus Police compared to other groups across most measures including overall approval ratings, perceived safety, and perceptions of police accountability. Black and non-white

EX 7

residents are also less likely to report that they are treated with respect when they interact with police.

Finally, results indicate that community engagement with black and non-white communities has been less successful than with other groups. Black and non-white residents are less likely to describe their relationship with the Columbus Police as positive and are less likely to report that the police understand their communities or make it easy to provide input.

EX 7

**Columbus Ohio**
**Columbus Police Community Survey Final**
**Weighted Frequencies (n=676)**

INTRODUCTION

Hello. We are conducting a survey with people in your area about the City of Columbus and the Columbus Police Division and need your opinions to improve services. Your answers will be anonymous.

        01   willing to continue
        02   refusal
        03   call back <at specific time>
        04   call back <no specific time>
        05   no answer
        06   busy
        07   answering machine
        08   disconnected number
        09   language barrier (not English)
        10   business number
        11   fax machine

***SCREENER QUESTIONS***

Landline

1. May I speak with the [youngest/oldest] adult at home who is 18 years or older?
        1    Yes, I am that person (continue interview)
        2    Yes, transferring to the person (restart intro)
        3    Not available now (If person who answered is an adult, continue interview. If person
is who       answered is under 18 arrange a call-back)
        9    Refused (terminate)

Cell Phone

1a. Since you are on a cell phone, I can call you back if you are driving or doing anything else that requires
     your full attention. Can you talk safely and privately now, or not?
        1    Yes
        2    Not right now (try and arrange a time to call-back)
        9    Refused (terminate)

1b. Are you 18 years or older? (n=676 unweighted)
        1    Yes 100%
        2    No (terminate)

All Respondents

EX 7

1c. What city do you live in? (n=676 unweighted)
      1    City of Columbus 100%
      2    Other (Terminate)
      9    Don't know/refused (Terminate)


1d. How many years have you lived in Columbus? (n=676 unweighted) mean=25 years; median 20 years.

0-9 years 29%        10-19 years 16%        20-29 years 18%        30 years or more 37%

1e. What is your zip code? [**Record 5 digit zip code. Zip code list to be provided**]

1f. So we can represent everyone in the community, can you please tell me what racial or ethnic group you most identify with? (n=676 unweighted)
      1    Hispanic/Latino 6%
      2    Black/African American 27%
      3    Asian-American 5%
      4    White/Caucasian 55%
      5    Other racial or ethnic background (specify) 4%
      9    Refused (Don't Read) 4%


PERCEPTIONS OF POLICE JOB PERFORMANCE OVERALL

**I'd like to ask you some questions about services provided by the City of Columbus and how good of a job you think they're doing.**

2. First, when it comes to the [**INSERT ITEM**] do you think they are doing an excellent, good, only fair, or poor job overall? How about [**INSERT ITEM**], do you think they are doing an excellent, good, only fair, or poor job overall? What about [**INSERT ITEM**]? [**DO NOT ROTATE**]

**SCALE:**
      1    Excellent
      2    Good
      3    Only Fair
      4    Poor
      9    Don't know/Refused (Don't read)

**ITEMS:** (n=676 unweighted)
      a.    Columbus Division of Fire 94% good/excellent; 3% only fair/poor
      b.    Columbus Department of Public Service, including trash collection 82% good/excellent; 16% only fair/poor
      c.    Columbus Division of Police 74% good/excellent; 24% only fair/poor.
            Ratings of Police Division varied by race/ethnicity:
            White=80% good/excellent; Non-White=69% good/excellent; AA=61% good/excellent.

EX 7

3. Compared to 10 years ago, is your opinion of the Columbus Police Division "More Favorable," "Less Favorable," or "About the Same"? (n=676) No statistical differences by race/ethnicity.

    1   More favorable 27%
    2   Less favorable 19%
    3   About the same 51%
    9   Refused (Don't Read) 2%

3a. [**ASK ONLY IF Q3= punch 1 or 2**] Please tell me briefly why your opinion of the Columbus Police has changed? (n=280 unweighted)

PERCEPTIONS OF POLICE JOB PERFORMANCE IN SPECIFIC AREAS

**I'm going to read some statements about the Columbus Police Division. For each one, please tell me whether you Strongly Agree, Agree, Disagree, or Strongly Disagree. [ROTATE stems] (n=676 unweighted)**

| | | Strongly Agree | Agree | Strongly Agree/Agree | Disagree | Strongly Disagree | Don't Know |
|---|---|---|---|---|---|---|---|
| 4 | In general, I feel safe in the City of Columbus (White =80% Agree/Strongly Agree; NW=71%; AA=68%) | 23% | 54% | 77% | 14% | 5% | 4% |
| 5 | In general, I feel safe in my neighborhood (White = 84% Agree/Strongly Agree; NW=74%; AA=70%) | 31% | 49% | 81% | 11% | 5% | 3% |
| 6 | The Columbus Police Division makes it easy for community members to provide input (White =60% Agree/Strongly Agree; AA=50%, signif at 90% confidence level) | 19% | 39% | 57% | 13% | 8% | 21% |
| 7 | The Columbus Police Division values input from the community (White =65% Agree/Strongly Agree; AA=51%) | 18% | 43% | 61% | 16% | 5% | 17% |
| 8 | The Columbus Police Division understands the unique aspects of my community (White =69% Agree/Strongly Agree; | 19% | 44% | 64% | 18% | 6% | 13% |

EX 7

| | | Strongly Agree | Agree | Strongly Agree/Agree | Disagree | Strongly Disagree | Don't Know |
|---|---|---|---|---|---|---|---|
| | NW=57%, AA=51%) | | | | | | |
| 9 | I am satisfied with the overall performance of the Columbus Police Division (White=78% Agree/Strongly Agree; NW=61%; AA=55%) | 23% | 48% | 71% | 17% | 6% | 6% |
| 10 | I trust the leaders of the Columbus Police Division to make decisions that are good for everyone in the community. (White=70% Agree/Strongly Agree; NW=53%; AA=43%) | 21% | 42% | 63% | 17% | 9% | 11% |
| 11 | I am confident that Columbus Police officers are held accountable for their actions (White=70% Agree/Strongly Agree; NW=53%; AA=46%) | 21% | 40% | 62% | 17% | 12% | 9% |
| 12 | I frequently see police patrols in my neighborhood (no diff by race/ethnicity) | 24% | 42% | 66% | 21% | 8% | 5% |
| 13 | I have a favorable view of the Columbus Police Division (White=75% Agree/Strongly Agree; NW=63%; AA=56%) | 24% | 46% | 70% | 16% | 6% | 8% |
| 14 | The Columbus Police Division protects the rights of everyone in the community (White=69% Agree/Strongly Agree; NW=59%; AA=49%) | 23% | 41% | 64% | 19% | 8% | 9% |

PERCEPTIONS OF COMMUNITY POLICING

**The following questions are about the relationship between the Columbus Police and your community.**

15. Overall, how would you describe the relationship between the Columbus Police and the neighborhood where you live? (n=676 unweighted)
1   Very Positive 30%
2   Somewhat Positive 45%
3   Somewhat Negative 9%

EX 7

4    Very Negative 7%
9    Don't Know/Refused (Don't read) 10%
White=80% very or somewhat positive; Non-White = 67%; AA= 59%.

16. The City will be selecting a new Chief of Police in the coming months. I'd like to ask you some questions about the qualities you think are Most Important in the next Chief. On a scale of 1 to 5, where 1 is "Not at All Important" and 5 is "Extremely Important," how important is it to you that the next Chief … **[ROTATE STEMS]**
(n=676 unweighted)

| | Not at all Important | | | | Extremely Important | Top Score of 4 or 5 | Don't Know |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | |
| a) Is knowledgeable about Columbus | 3% | 1% | 10% | 23% | 63% | 86% | <1 |
| b) Has big city experience | 2% | 3% | 18% | 27% | 48% | 76% | 1% |
| c) Comes from a diverse background 76% of AA gave top rating of 4 or 5 compared 72% all Non-White residents and 59% of White residents | 8% | 5% | 21% | 23% | 42% | 65% | 2% |
| d) Is sensitive to diversity | 4% | 2% | 15% | 22% | 55% | 77% | 2% |
| e) Is community oriented | 2% | 1% | 10% | 21% | 65% | 86% | 1% |
| f) Has labor relations skills | 3% | 3% | 19% | 32% | 43% | 75% | 1% |
| g) Has leadership skills | 2% | 2% | 7% | 16% | 74% | 89% | 1% |
| h) Brings new ideas | 3% | 1% | 14% | 29% | 52% | 80% | 1% |
| i) Is an effective communicator | 2% | 1% | 8% | 19% | 70% | 89% | 1% |
| J) Can build consensus | 2% | 2% | 16% | 28% | 48% | 77% | 2% |

17. CUT

18. Do you know how to contact the community liaison officer assigned to your area? (n=676 weighted)
1   Yes 30%

EX 7

2   No 70%
9   Refused (don't read)

19. What do you think are the most important public safety issues for the Columbus Police to address in your community? [**Do Not Read. Probe <u>Once</u>: "Anything else?" Record first mention.**] (n=676 unweighted)
1   Burglaries and theft 19% first mentions; 60% total mentions
2   Disorderly conduct/noise 3% first mentions; 25% total mentions
3   Domestic violence 5% first mentions; 39% total mentions
4   Gang activity 8% first mentions; 41% total mentions
5   Homelessness-related issues 9% first mention; 40% total mentions
6   Prostitution 3% first mentions; 27% total mentions
7   Traffic issues 6% first mentions; 28% total mentions
8   Vandalism and graffiti 2% first mention; 26% total mentions
9   Violent crime 25% first mention; 58% total mentions
10  Other (specify) _____ 12% first mention; 19% total
11  Don't Know/Refused (don't read) 6% total

20. Do you think crime in your neighborhood is getting better, worse, or has stayed about the same?
(n=676 unweighted)
1   Better 22%
2   Worse 16%
3   About the Same 60%
4   Don't Know/Refused (don't read) 2%
17% of Whites thought crime was getting better; compared to 30% of Non-Whites.

21. When public safety issues are brought up by the community, how responsive has the Columbus Police Division been in addressing them? (n=676 unweighted) No differences by race/ethnicity.
1   Very responsive 26%
2   Somewhat responsive 42%      } 69%
3   Not very responsive 10%
4   Not at all responsive 4%      } 14%
9   Don't Know/Refused (don't read) 17%

<u>INTERACTIONS WITH COLUMBUS POLICE</u>

**I'd like to hear about your experiences with the Columbus Police.**

22. In the last 12 months, have you <u>personally</u> had any contact with the Columbus Police, in-person, over the phone, or in some other way? (n=676 weighted)
1   Yes 35%
2   No **[SKIP TO Q25]** 65%
9   Don't know/Refused **[SKIP TO Q25]** <1%

EX 7

23. Which of the following best describes the kind of contact you had the Columbus Police? (Check all that apply.) (n=225 unweighted)
   1   Service request 54%
   2   Records request 10%
   3   Traffic ticket 24%
   4   Community meeting or presentation 12%
   5   Other _____ 23% (mostly specific service requests)

24. Based on your personal experience, how many of the Columbus Police officers you encounter treat you, your friends, and your family members with respect? Would you say… [READ LIST. RECORD ONE RESPONSE.]
   (n=225 unweighted)
   1   Almost all officers show respect 43%  } 76
   2   Most officers show respect 32%
   3   About the same show respect as do not show respect 9%
   4   Most officers do <u>not</u> show respect 5%  } 11%
   5   Almost none of the officers show respect 6%
   9   Don't know/Doesn't Apply [DO NOT READ] 4%

## COMMUNICATION CHANNELS

25. Do you follow the Columbus Police on any of the following online platforms? (READ. CHECK ALL THAT APPLY) [INTERVIEWER INSTRUCTION: Wait for a response after reading each item] (n=676 unweighted)
   1   Facebook 19%
   2   Twitter 6%
   3   Instagram 4%
   4   Columbus Police website 9%
   5   None of the above (do not read) 70%
   9   Don't know/refused (do not read) 2%

26. In the last year, have you attended two or more meetings for any of the following organizations? [**ROTATE**]
   (n=676 unweighted)
   1   Rotary, Kiwanis, or other service organization? 2%
   2   The Police Commission 2%
   3   Your Neighborhood Association 12%
   4   The Columbus City Council 5%
   5   Other group (specify) 1%
   6   None of the above (do not read) 78%
   9   Don't know/refused (do not read) 1%

## DEMOGRAPHICS

Finally, I'd like to ask you a few general questions to make sure we have a representative sample. Your answers are anonymous.

EX 7

27. What year were you born?  _____  _____   _____  _____  [Subtract from 2019 to calculate age]
(n=676 unweighted)
18-34 years 39%
35-54 years 31%
55-64 years 13%
65 years and older 14%
Refused 3%

28. What is the highest level of schooling you've completed? (Don't Read) (n=676 unweighted)
1   Grades 1-8 1%
2   Grades 9-11 3%
3   High School Graduate/GED 27%
4   Some College/Vocational Training 29%
5   College Graduate 31%
6   Post Graduate/Professional School 8%
9   Refused 1%

29. How many people live in your household? _____ (for weighting purposes)
(n=676 unweighted)
mean = 3 people

30. I am going to read some categories of household income. Please stop me when I reach the category of your total 2018 annual household income, before taxes: (for weighting purposes) (n=676 unweighted)
01   Less than $10,000 9%
02   $10,000 to under $20,000 8%
03   $20,000 to under $30,000 10%
04   $30,000 to under $40,000 10%
05   $40,000 to under $50,000 10%
06   $50,000 to under $75,000 15%
07   $75,000 to under $100,000 10%
08   $100,000 to under $150,000 10%
09   $150,000 to under $200,000 2%
10   More than $200,000 1%
99   Refused (DON'T READ) 14%

31. Male or Female  (n=676 unweighted)
1   Male 48%
2   Female 52%

**That concludes our survey. Thank you very much for your time.**

EX 7

**Demographic Profile of Residents Surveyed**
**Compared to U.S. Census Population Estimates for the City of Columbus, Ohio**

| Population Characteristic | U.S. Census Population Estimates | Unweighted Sample | Weighted Sample |
|---|---|---|---|
| Male | 48.7% | 46.1% | 48.4% |
| Female | 51.3% | 53.9% | 51.6% |
| | | | |
| White/Caucasian | 56.8% | 70.9% | 57.4% |
| Black/African American | 27.9% | 19.9% | 27.7% |
| Hispanic/Latino | 6.0% | 2.5% | 6.0% |
| Asian American | 5.2% | 3.1% | 5.0% |
| Other | 4.1% | 3.7% | 4.0% |
| | | | |
| 18 – 24 years of age | 15.2% | 8.7% | 14.7% |
| 25 – 34 years of age | 26.5% | 17.2% | 25.6% |
| 35 – 44 years of age | 16.9% | 14.5% | 16.7% |
| 45 – 54 years of age | 15.4% | 11.6% | 15.1% |
| 55 – 64 years of age | 13.4% | 16.5% | 13.6% |
| 65 – 74 years of age | 7.5% | 16.2% | 8.0% |
| 75 + years of age | 5.1% | 15.2% | 6.3% |

Weights for age, race and gender were generated based on population parameters for the City of Columbus in Ohio from the U.S. Census Bureau 2017 American Community Survey 5-Year Estimates.

EX 7

EX 7