IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada          :
et al.,
                           :

        Plaintiffs,
                           :

        vs.                    Case No. 2:20-cv-3431
                           :   Judge Marbley
City of Columbus,              Magistrate Judge Jolson
Ohio, et al.,              :

        Defendants.        :


- - - - -

30(b)(6) DEPOSITION OF LIEUTENANT PAUL OHL

VIA VIDEOCONFERENCE

- - - - -


Taken at City of Columbus
Division of Police SWAT
2609 McKinley Avenue
Columbus, OH 43204
January 26, 2021, 10:03 a.m.



- - - - -


Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

```
1              A P P E A R A N C E S
2
   ON BEHALF OF PLAINTIFFS:
3
        Marshall & Forman, LLC
4       250 Civic Center Drive, Ste. 480
        Columbus, OH 43215
5       By John S. Marshall, Esq.
             (Via videoconference)
6          Edward R. Forman, Esq.
             (Via videoconference)
7          Samuel M. Schlein, Esq.
             (Via videoconference)
8
9  ON BEHALF OF DEFENDANTS:
10     Columbus City Attorney's Office
       77 North Front Street
11     Columbus, OH 43215
       By Alana Valle Tanoury, Esq.
12          (Via videoconference)
13
14 ALSO PRESENT:
15     Rebecca Lamey - Plaintiff
            (Via videoconference)
16     Talon Garth - Plaintiff (Via videoconference)
17
18
19
20
21
22
23
24
```

```
1                I N D E X
2  Examination By                        Page
3  Mr. Marshall - Cross                    6
4
   Exhibits                              Page
5
   Exhibit 5 - Affidavit of Mark E. Lang   40
6
   Exhibit 102-B - Video Clip             125
7
   Exhibit 109 - Video Clip               129
8
   Exhibit 112 - Video Clip               87
9
10
11
12
13
14
15
16
17
18
19
20
21
22
   (Exhibits attached electronically.  Hard copies were
23 never in Spectrum's possession.)
24
```

```
1              Tuesday Morning Session
2              January 26, 2021, 10:03 a.m.
3                    - - - - -
4          S T I P U L A T I O N S
5                    - - - - -
6       It is stipulated by counsel in attendance that
7  the deposition of Lieutenant Paul Ohl, a witness
8  herein, called by the Plaintiffs for
9  cross-examination, may be taken at this time by
10 the notary pursuant to notice and subsequent
11 agreement of counsel that said deposition may be
12 reduced to writing in stenotypy by the notary,
13 whose notes may thereafter be transcribed out of
14 the presence of the witness; that proof of the
15 official character and qualification of the notary
16 is waived.
17                   - - - - -
18
19
20
21
22
23
24
```

```
1       THE REPORTER:  To start us off, would
2  counsel please introduce themselves for the
3  record, state who they represent, state who is in
4  the room with them, and also state their consent
5  to the remote administration of the oath, please.
6       MR. MARSHALL:  All right.  And I'll
7  introduce everyone on our side.  This is John
8  Marshall, and in separate rooms and -- nobody's in
9  any of these rooms but us -- is Ed Forman and Sam
10 Schlein, from my firm, representing Plaintiffs,
11 and we consent to the remote administration of the
12 deposition and the oath.
13      MS. TANOURY:  And Alana Tanoury,
14 representing Defendants.  And I am alone here in
15 my office, and I am the only attorney for
16 Defendants on the Zoom today.  And then we have
17 the witness, Mr. Ohl, Lieutenant Ohl.
18      Is Rebecca with the court reporters or
19 is she...
20      MR. MARSHALL:  She's one of our
21 clients.
22      MS. TANOURY:  Okay.
23      MR. MARSHALL:  And I believe she's
24 alone in the room, but she can tell us that.
```

1      All right.
2      - - - - -
3           LIEUTENANT PAUL OHL
4  being first duly sworn, testifies and says as
5  follows:
6           CROSS-EXAMINATION
7  BY MR. MARSHALL:
8  Q.      Lieutenant, can you hear me clearly?
9  A.      I can hear you very clearly, sir.
10  Q.      All right.  Good.  I'm going to -- tell
11  us your name first for the record.
12  A.      It's Paul, and last name is Ohl,
13  spelled O-h-l.
14  Q.      And you're presently a lieutenant and
15  the SWAT commander with the Columbus Division of
16  Police, correct?
17  A.      Correct.
18  Q.      When did you start your career with the
19  Columbus Division of Police?
20  A.      September 3rd, 1989.
21  Q.      And how long have you been the
22  lieutenant and commander of the SWAT team?
23  A.      Well, I've been a lieutenant for 18
24  years, coming on 19 years, and with SWAT for just

1  shy of nine years.
2  Q.      Before you became a lieutenant and
3  commander of SWAT, did you serve with SWAT as an
4  officer or a sergeant?
5  A.      Not with the Columbus Division of
6  Police SWAT.  I was a rifleman with OSU PD Special
7  Response Team prior to coming to Columbus.
8  Q.      Is OSU PD Special Response Team similar
9  in organization to the Columbus SWAT team?
10  A.      Similar in organization, but smaller.
11  Q.      Now, Lieutenant, this is a deposition
12  under a special rule of civil procedure called
13  30(b)(6).
14      MR. MARSHALL:  Alana, can we stipulate
15  that the lieutenant has been designated by the
16  City to testify about topic 19?
17      MS. TANOURY:  Yes, with respect to
18  SWAT.
19      MR. MARSHALL:  Right.  I understand.
20  19 is broader than SWAT.
21  Q.      I'm going to read what that topic is,
22  Lieutenant, into the record, and I understand that
23  you've been designated just with respect to SWAT.
24  A.      Okay.

1  Q.      So the topic is this:  The category,
2  such as SWAT of law enforcement personnel, whether
3  employed by CDP or mutual aid entities cooperating
4  with CDP at the protests in late May and early
5  June 2020, the circumstances for deploying each
6  category, the individuals with the authority to
7  deploy and/or direct the personnel in each
8  category and/or the street, intersection, or
9  specific location where each category was
10  deployed.
11      And, Lieutenant, you were designated to
12  speak about that topic with regard to the Columbus
13  Division of Police's SWAT team.  Do you understand
14  that?
15  A.      Yes.
16  Q.      Are you sufficiently clear about the
17  matters on which you've been designated to
18  testify?
19  A.      Thus far, yes.
20  Q.      Did you do anything to prepare for the
21  deposition today?
22  A.      I spoke with legal counsel, and that's
23  it.
24  Q.      Okay.  Did you review any documents or

1  look at any policies or anything like that?
2  A.      Just some basic policies we have here
3  with regard to civil disorder response.
4  Q.      When you say "we have here," do you
5  mean policies that are specific to the SWAT team
6  or do you mean general CDP policies?
7  A.      General policies for the Division of
8  Police, as well as SWAT policies.
9  Q.      The SWAT policies, can -- do you have
10  access to them at today's deposition?
11  A.      No.
12  Q.      And what SWAT policies are you
13  referring to?
14  A.      Most of them are with regard to
15  training we go through.  We have an extensive
16  training curriculum, which is constantly under
17  review.  Some of that review was a result of --
18  every year, we do an SOP review, and we amend
19  SOPs, and it's usually an extensive policy.  I
20  think our standard operating procedure manual is
21  in excess of 100 pages.  So I have to review that
22  every year and make amendments to that.
23  Q.      You're referring now to the CDP's SWAT
24  team's standard operating procedure manual; is

1  that right?
2  A.  Correct.  Which is under extensive
3  review at this time.
4  Q.  Is it under extensive review in part
5  because of the protests that occurred in May and
6  June?
7  A.  No.
8  Q.  Why is it under extensive review?
9  A.  Because it goes under extensive review
10  every December and January for amendments that
11  need to be made with regard to new equipment,
12  maybe there's some equipment we no longer use,
13  maybe there's policies and procedures that we have
14  changed throughout the year, and we put that in
15  writing at the end of the year.
16  Q.  The SOP manual, then, is in effect
17  until the review is completed and any changes are
18  made; is that right?
19  A.  Yes.  At times, we have to make some
20  type of an interim revision, and there's a
21  document that would go out to all involved parties
22  and training conducted on that change.  And then
23  that is inserted into the SOP during that yearly
24  review, but it's in effect prior to it being in

1  that manual.
2  Q.  All right.  I want to ask you some more
3  questions about both the policies -- the SWAT
4  policies, and the training.  Before I do, let me
5  cover some ground rules for today's deposition.
6  Have you had any trouble hearing me so
7  far?
8  A.  No.
9  Q.  The most important rule for me is that
10  you hear and understand my questions, and part of
11  the reason I say that, Lieutenant, is that I can't
12  promise that every question I'm going to ask is
13  going to be brilliant and perfectly clear.  I may
14  slip up from time to time.
15  A.  Sure.
16  Q.  If you have any problem either hearing
17  my question or you don't understand any part of
18  it, please have me say it again or explain it to
19  you before you give us an answer under oath.  Do
20  you understand that?
21  A.  Yes.
22  Q.  That's especially important because on
23  the topics you're designated here today to
24  testify, you're -- you are speaking on behalf of

1  the City of Columbus.  Do you understand that?
2  A.  Yes.
3  Q.  All right.  I ask all witnesses this
4  question:  Do you have any health condition or
5  take any medication that affects your memory?
6  A.  No.
7  Q.  Do you have any health issues or take
8  any medication that affects your ability to answer
9  questions truthfully?
10  A.  No.
11  Q.  We're not going to be together forever
12  today, but probably a few hours.  If at any time
13  during the deposition or at the end, you want to
14  add or change something, feel free to do so, all
15  right?
16  A.  Yes.
17  Q.  Let's go back to the training
18  curriculum.  You used the phrase "extended
19  training curriculum."  Is there a single document
20  that outlines that training curriculum for SWAT?
21  A.  Specific to -- or specific to civil
22  disorder or in general?
23  Q.  Well, in general first.
24  A.  We have -- all our training curriculum

1  is maintained by our training sergeant and is
2  administered to each officer when they come over
3  to the section.  In addition to that, we have
4  monthly training, a minimum of two days per month,
5  that are conducted on specific topics, and they
6  vary from month to month.
7  Q.  The topics --
8  A.  And --
9  Q.  The topics can be all kinds of things
10  that SWAT officers might experience?
11  A.  Correct.
12  Q.  For example, do you do occasional
13  training on the appropriate use of wooden batons
14  to deal with civil disorders?
15  A.  Yes.  We have a training that deals
16  with special ordinance.
17  Q.  Okay.  What are the types of special
18  ordinance on which SWAT officers get special
19  training?
20  A.  So they vary from -- all the way from
21  something such as OC spray --
22  Q.  Okay.
23  A.  -- to CS to OC vapor, impact munitions.
24  Q.  Okay.  What are the types of impact

1  munitions that you receive training on?
2  A.      Specifically, there are -- to my
3  recollection, there are three.  There are multiple
4  baton rounds, which are your wood baton rounds
5  fired from the 37-millimeter launcher.
6  Q.      Okay.
7  A.      There are 40-millimeter multiple baton
8  rounds, which are fired from a 40-millimeter
9  multiple launcher, and then there are impact
10  munitions that are direct-fire impact munitions,
11  which are called a sponge round, and there's a
12  variance of that specific sponge round.
13  Q.      Okay.  Does your SOP manual define or
14  prescribe when such munitions may be used and may
15  not be used?
16  MS. TANOURY:  Hey, John, I just want to
17  raise generally -- I think we're getting a little
18  outside of what -- the category and topic he was
19  designated for.
20  MR. MARSHALL:  Well, I don't agree, but
21  we're not going to be on this forever, so...
22  MS. TANOURY:  I just want to raise that
23  objection.
24  MR. MARSHALL:  Okay.

1  Q.      All right.  So does the SOP manual
2  prescribe when such impact munitions may be used
3  and not used?
4  A.      In concert with the training.  So there
5  are references to the training that the officers
6  receive, and, predominantly, the training is what
7  determines that.
8  Q.      Okay.  So going back to my earlier
9  question, I asked:  Was there a single training
10  manual?  And you were starting to answer that
11  question.  Explain what you mean by -- you know,
12  what -- if you were asked to provide to someone
13  all of the training materials that are used to
14  train SWAT officers, whether it's initial training
15  or monthly training or any other training, what
16  would that material look like?
17  A.      There are PowerPoint presentations,
18  there are lesson plans, and then we have
19  individual officers who are trainers that deliver
20  that material.
21  Q.      Those trainers follow the PowerPoint
22  presentations and lesson plans and then bring in
23  their own experience, I take it, to the training?
24  A.      That's correct.

1  Q.      Okay.  So I understand your terms, OC
2  spray, is that also called pepper spray?
3  A.      I believe it's congruent.  I believe
4  that that's what most people refer it to [sic] in
5  layman's terms.
6  Q.      And OC vapor, is that a vapor of the
7  same chemical?
8  A.      Correct.  It's a -- it's in a grenade
9  format, canister format, and, predominantly, we
10  utilize it if we have a suspect in an attic that
11  is refusing -- a dangerous suspect in an attic or
12  a small space --
13  Q.      Was --
14  A.      -- such as a room that's barricaded.
15  Q.      Was OC vapor deployed during any of the
16  May and June Black Lives Matter protests?
17  A.      I'd have to check the use of force
18  documents that were submitted.  I believe that it
19  was.  Not -- there weren't a tremendous amount of
20  deployments of it because we found that it wasn't
21  overly effective early on, because it's designed
22  to be deployed in a small space.
23  Q.      CS gas is also called tear gas?
24  A.      I believe that's layman's term for CS.

1  Q.      Okay.  Was CS gas deployed during the
2  May and June protests?
3  A.      Yes.
4  Q.      At some point, that policy changed in
5  terms of whether CS gas could be deployed in civil
6  disobedience or civil disorder situations,
7  correct?
8  MS. TANOURY:  John, I'm just going to
9  object.  I think we're going way off track from
10  the topic he was designated for.
11  MR. MARSHALL:  Yeah.  I'm not sure I
12  agree, but -- again, you know, we're here with
13  him.  But we can also bring him back in for
14  another deposition, but this will save time down
15  the road.
16  Q.      Lieutenant, do you recall that the
17  policy with respect to CS gas deployment was
18  changed at some point in the summer of 2020?
19  A.      I believe there was an order that came
20  out.  I don't believe it was put into a written
21  policy until later, but there was an order that
22  came out.
23  Q.      Do you remember approximately when that
24  order came out?

1 A. I don't remember precisely when that
2 came out.
3 Q. As lieutenant commander of SWAT, what
4 did you do to implement that order?
5 A. I just told everybody that we would not
6 use CS. We would use the other ordinance
7 available to us to accomplish what we were trying
8 to accomplish on the specific evening in question.
9 Q. And are you confident that CS gas was
10 not deployed after you gave that instruction to
11 the SWAT team?
12 A. Absolutely.
13 Q. Just to finish up quickly on the
14 training, the initial training that an incoming
15 officer -- well, first off, let me understand the
16 scope of the -- you know, the structure and scope
17 of the SWAT team itself. The Columbus Division of
18 Police website says as follows, and I just want to
19 check to see if this is out of date or incorrect.
20 A. Okay.
21 Q. But the division's website says that,
22 "The Columbus Division of Police SWAT team is one
23 of only 15 full-time SWAT teams within the United
24 States."

1 Do you believe that's still the case?
2 A. No.
3 Q. Do you know about how many are,
4 full-time SWAT teams there are?
5 A. No. But I think every major city has a
6 full-time element of SWAT.
7 Q. Okay.
8 A. I think there's -- that's a little bit
9 of a misconception.
10 Q. All right. It says -- the next
11 sentence from the city's or division's website
12 says, "The section was created in 1974 with the
13 primary mission of addressing hostage and
14 barricade situations."
15 Is that still the primary mission of
16 the Columbus SWAT?
17 A. I would say that there are a number of
18 primary missions, of which that is one.
19 Q. What are the other primary missions
20 other than hostage and barricade situations?
21 A. Service of high-risk arrest warrants,
22 service of any type of high-risk search warrant,
23 dignitary protection, response to active shooter
24 and terrorist incidents. Those are a handful just

1 to name the primary ones.
2 Q. In incidents of civil disobedience,
3 such as has been described occurring in the Black
4 Lives Matter protests in Columbus in May and June
5 of 2020, did that fit into the normal mission of
6 the SWAT team to address the situation?
7 A. We do support field force operations,
8 if requested.
9 Q. When was the first time SWAT was
10 deployed -- well, let's get some dates. I think
11 we all agree -- that is, in this litigation,
12 everybody agrees that the first protest -- George
13 Floyd was killed on May 25th of 2020; the first
14 protest in Columbus was on May 28th of 2020. Does
15 that sound right?
16 A. Correct.
17 Q. Was SWAT deployed on May 28th?
18 A. Yes.
19 Q. Was it -- do you remember what time of
20 day you were initially deployed, any part of your
21 team?
22 A. I was not here on that date. There was
23 a sergeant and, I believe, five or six officers
24 assigned to an armored vehicle with a long-range

1 acoustic device, and I believe they responded
2 sometime during the hours of darkness to make
3 dispersal announcements initially.
4 Q. Okay.
5 A. But I don't have the time.
6 Q. Do you know, from either your memory or
7 records you've reviewed whether, on May 28th, any
8 member of SWAT deployed any munitions or OC spray
9 or CS gas on the 28th?
10 A. I would have to review the use of force
11 documents and the ICS -- I believe it's form 214,
12 which is an activity log.
13 Q. Do you assemble those 214s into some
14 kind of summary report?
15 A. The supervisor who has the team
16 completed those, and on this evening, it was, I
17 believe, Sergeant Scott Bray.
18 Q. Spell his last name, please.
19 A. B, as in boy, r, as in Robert, a, as in
20 Adam, y, as in Young.
21 Q. Do you have available to you any kind
22 of summary report of the munitions of any kind
23 that were deployed by your SWAT team during the
24 Black Lives Matter protests? In other words, is

1  there any report of that?
2  A.      So all of our -- generally speaking,
3  the way the Division of Police works, every time
4  an officer uses force, the supervisor of that
5  officer conducts a use of force report.  However,
6  we were ordered not to conduct those
7  investigations and to have the officers who
8  complete -- who performed the use of force forward
9  those forms to Internal Affairs Bureau, which was
10  investigated by BakerHostetler.  All those uses of
11  force were investigated.
12  Q.      All right.  So the officers
13  themselves --
14  A.      And the -- just so you understand how
15  things worked, it all went to Internal Affairs
16  Bureau.
17  Q.      Okay.
18  A.      So the formal way that we do things was
19  null and void at that time.
20  Q.      Understood, yeah.  And I took the
21  deposition of Lieutenant Bernhardt yesterday, so I
22  understand that -- how that happened.
23          What you're saying to me is that
24  whatever use of force occurred in the field by

1  members of your SWAT team during the Black Lives
2  Matter protests, the officers themselves, whether
3  it's an officer or sergeant or whoever, filled out
4  a use of force report and submitted it to internal
5  affairs, who then turned it over to
6  BakerHostetler.  Is that your understanding?
7  A.      That's my understanding.
8  Q.      Okay.  Going back now to the structure
9  of the SWAT team before I finish up on the
10  training, according to the city's -- division's
11  website, it says, The section is currently staffed
12  with 26 full-time SWAT officers and 10 part-time
13  hostage negotiators who perform other police
14  functions throughout the division when not
15  actively involved in hostage negotiation duties.
16          That sounds like it's dated.  What does
17  -- how does -- what does the section staff -- how
18  is it staffed now?  What is the structure?
19  A.      So we have a lieutenant, which now we
20  have a second lieutenant.  But at that time, we
21  had one lieutenant, which is myself.  We have four
22  sergeants.  One is a training sergeant, and then
23  we have three team sergeants.  The teams are
24  broken down into green, which is our day shift,

1  and then gold and red, which work evening hours.
2  And also assigned to each team is what's called an
3  assistant team leader, which is a senior police
4  officer who has -- if you're familiar with the
5  military, he's like a warrant officer.  He's an
6  expert in --
7  Q.      Okay.
8  A.      -- in SWAT operations.
9  Q.      Got it.  So that would be someone who's
10  served for some period of time on SWAT and has
11  some experience and expertise?
12  A.      Correct.
13  Q.      All right.  Give me the names of the
14  sergeants.  Who's the training sergeant at the
15  present time?
16  A.      Training sergeant is James Morrow.
17  Q.      And how about the green, gold, and red
18  team sergeants, please?
19  A.      Green team sergeant is Sergeant Joseph
20  Podolski.
21  Q.      Spell that last name.  You can just do
22  it quickly.
23  A.      Okay.  It's P-o-d-o-l-s-k-i.
24  Q.      Okay.  Gold team?

1  A.      Gold team would -- at that time would
2  have been Sergeant Scott Bray.
3  Q.      All right.  Red?
4  A.      Red would be Sergeant Brian Bruce, who
5  moved on to another position.  He's no longer with
6  SWAT.
7  Q.      All right.  So you've given me the
8  names of the sergeants who were in charge of these
9  teams during the Black Lives Matter protests?
10  A.      Correct.
11  Q.      Let's make sure we're talking about the
12  same thing.  When I say "Black Lives Matter
13  protests," I'm talking about the protests that
14  occurred sparked by the killing of George Floyd,
15  but the protests that occurred beginning on
16  May 28th, 2020 and continued for a period of some
17  weeks thereafter --
18  A.      Correct.
19  Q.      -- during the summer of 2020.  Are you
20  with me?
21  A.      I'm tracking with you.
22  Q.      All right.  Good.  And who was the --
23  and the training sergeant who was -- you
24  mentioned, was that the one in place at the time?

1  A.      Correct.
2  Q.      And still in -- still is your training
3  sergeant?
4  A.      Yes.
5  Q.      All right.  Who were the team leads of
6  green, gold, and red during the time of the Black
7  Lives Matter protests?
8  A.      The team leaders or the assistant team
9  leaders?
10  Q.      I'm sorry.  Is that -- the team leaders
11  would be the sergeants, right?
12  A.      The team leaders are the sergeants,
13  which are --
14  Q.      Yeah.  The assistant team leaders is
15  what I meant, yes.
16  A.      The assistant team leader for green
17  would be David Thivener.
18  Q.      Spell that one for us.
19  A.      It's T-h-i-v-e-n-e-r.
20  Q.      Okay.  Gold?
21  A.      Howard Brenner, who is retired now.
22  Q.      Okay.  And who --
23  A.      Or no.  That was red.  Howard Brenner
24  was with red.

1  Q.      And who --
2  A.      And gold would be Troy Palmer.
3  Q.      Troy Palmer for red -- for gold, Howard
4  Brenner for red.  Who took over for Howard
5  Brenner?
6  A.      So Troy -- when Howard -- when Howie
7  left, Troy went to red.  So now Troy is the red
8  team leader, and Matt Springer is the gold team.
9  But Matt was not the assistant team leader at that
10  time for gold.
11  Q.      Understood.  Now, how many officers on
12  each team?
13  A.      There is seven.
14  Q.      Does that include the assistant team
15  leader?
16  A.      Yes.
17  Q.      All right.  So six, plus the assistant
18  team leader, and then a sergeant.  So eight
19  altogether on a team?
20  A.      That's correct.
21  Q.      Okay.  So that -- if my math is right,
22  that means you've got 24 SWAT -- field officers in
23  SWAT, approximately?
24  A.      Correct.  If everybody's there, we

1  don't have any job vacancies, and we don't have
2  people off due to medical procedures or illness.
3  Q.      Do you still have a hostage negotiators
4  part -- that work part-time for SWAT or...
5  A.      Yes.
6  Q.      Are they part of your full-time SWAT
7  team or they just come in and out if needed?
8  A.      They're collateral duty, so they would
9  work -- for example, if someone's a detective,
10  that's their primary function.  They might work
11  assault squad, and then they have a collateral
12  duty of being a hostage negotiator, so they go
13  through training.  They go through periodic
14  training.  They train with us.  And when they get
15  called out, generally speaking, on a
16  barricade-type situation or a suicidal jumper,
17  they respond.
18  Q.      Okay.  So then they'll join -- if the
19  SWAT team's deployed, they'll join the SWAT team
20  in that hostage or barricade situation?
21  A.      Correct.
22  Q.      Do you have relief officers when people
23  are out sick on vacation?
24  A.      No.

1  Q.      You just manage when people are out is
2  what you're saying?
3  A.      Correct.
4  Q.      Okay.  Do your SWAT officers have any
5  other duties within the division other than to
6  serve as a part of your SWAT team?
7  A.      No.
8  Q.      Back to the training.  First of all,
9  how does somebody get on SWAT team?  What are they
10  -- is there some kind of level of experience
11  that's required prior to joining SWAT?
12  A.      So there's a vacancy because someone
13  retires or moves on to another assignment.  We
14  post that.  People apply.  They are ranked by
15  seniority.  The job closes.  A list comes out.  We
16  go down the list.  We find out if people are still
17  interested in the job.  We have them come out.
18  They have to pass a firearms qualifications
19  standard, they have to pass a physical
20  qualifications standard, and then they have an
21  interview process with the team.
22  Q.      Okay.  And so if -- they're qualified
23  by seniority, interest, and the firearm and
24  physical qualifications, and then the interview

1 team makes the final decision about whether they
2 are to join SWAT, right?
3 A.    No.  The interview is just a process to
4 give them a realistic view of what the job is
5 about, because it's very demanding, and it can
6 cause extreme demands on family life.  It can
7 cause you to have to give up, you know,
8 extracurricular-type activities or hobbies, things
9 of that nature.  So we just want them to come in
10 with their eyes wide open, because we don't want
11 somebody to come over who is just going to be
12 there for a few months because we're investing a
13 lot of time and training into them.
14 Q.    How are, then, decisions made about who
15 gets the job?
16 A.    Ultimately, if they pass all the
17 qualifications, we give them 24 hours to digest
18 the interview process, and then we call them and
19 ask them if they would like to accept the job.
20 Q.    But if you've got multiple candidates
21 for one opening, how do you decide who gets the
22 job?
23 A.    Seniority.  It's the senior person who
24 passes all the requirements.

1 Q.    Thank you.  What's the initial training
2 like?  Describe it for me.
3 A.    So the initial training -- once they
4 come over, usually, their assistant team leader is
5 heavily involved in the training and coordinates
6 with Sergeant Morrow.  There's a -- we train by
7 job task.  So, for example -- this is getting kind
8 of in the weeds now, because this is very
9 elaborate about how this is organized.  We
10 identify job tasks that an officer is going to
11 perform.  For example, a containment officer on a
12 barricade situation.  Within that function, there
13 are multiple skills that that officer has to
14 complete prior to him being allowed to operate
15 autonomously in that function.
16 Q.    Okay.
17 A.    So he's kind of like a brand-new police
18 officer who's going through on-the-job training
19 during that -- could be three months, it could be
20 six months until somebody comes up to speed and is
21 functioning totally autonomously as a SWAT
22 officer.
23 Q.    Okay.  So you're saying that they might
24 not be in the field for up to three months?

1    MS. TANOURY:  John, I'm going to just
2 continue to object.  I think we're still getting
3 off topic from what we've designated him for.
4    MR. MARSHALL:  I hope to wrap this up
5 shortly.
6 Q.    But, Lieutenant, I was just trying --
7 is there a specific period that's just training?
8 In other words, you don't get to go out in the
9 field.
10 A.    Most of it is -- I would answer that
11 with "no."  As long as they are with a police
12 officer who is trained in that function, they can
13 be out in the field.  They might just be
14 observing.
15 Q.    Okay.
16 A.    They might just be learning.  They are
17 not operational in that job function, but it's
18 part of the learning process and part of the
19 training process.
20 Q.    So field training is a really important
21 part of the SWAT training is what you're saying?
22 A.    Yes, correct.
23 Q.    All right.  So, obviously, you're not
24 going to put a new officer out in a hostage

1 situation unless and until they've had sufficient
2 training in it?
3 A.    Correct.
4 Q.    Is it the training sergeant who's
5 responsible for determining that they've received
6 sufficient training to be functional in that job
7 duty?
8 A.    Yes.  The training sergeant
9 communicates with the team sergeant who has the
10 junior officer and the assistant team leader, and
11 each training block has to be signed off on by the
12 officer, the trainer who delivered the training,
13 and then at the end of the process, the training
14 sergeant reviews the entire manual -- the training
15 manual that they went through and signs off on
16 that officer as being operational.
17 Q.    All right.  And that was my earlier
18 question.  Is there a single thing called a
19 training manual that contains all of these
20 training blocks?
21 A.    There is a book that describes the
22 training blocks, but the materials as far as --
23 for example, a PowerPoint wouldn't be imbedded in
24 that manual.

1  Q.      All right.
2  A.      They would reference the PowerPoint,
3  but that PowerPoint would not be imbedded in that
4  manual.
5  Q.      All right.  If one wanted to assemble
6  all of the training materials that -- let's just
7  pick a point in time.  All of the training
8  materials that were used in SWAT, whether initial
9  training or monthly training, those would consist
10  of this training book, right, the PowerPoint
11  presentations, and lesson plans.  Would it include
12  anything else?
13  A.      Not off the top of my mind, that I can
14  think of.
15  Q.      Okay.  Well, I assume it -- I would
16  assume it would also include -- the SOP manual for
17  SWAT would be --
18  A.      Correct.
19  Q.      -- part of the training.  Okay.  But
20  the training book you're referring to is different
21  than the SOP manual, isn't it?
22  A.      Yes.
23  Q.      Okay.  Is that an officer's training
24  book?

1  A.      I think -- I believe it's called the
2  new officer training program.  I can't think of
3  it.  We changed it recently when we revised the
4  training program, and -- the entry-level officer
5  training program, I believe, is what it's called.
6  Q.      Entry-level officer training program.
7  And that's just for SWAT, right?  This is just for
8  SWAT?
9  A.      Purely for SWAT.
10  Q.      Okay.  So the universe -- I think I'm
11  about finished with the training part, but the
12  universe of training materials is what you think
13  is called the entry-level officer training
14  program, and that's a binder?
15  A.      Correct.
16  Q.      And then there's the SOP manual.  Is
17  the SOP manual a single binder?
18  A.      Yes.
19  Q.      It's a big, thick thing, I assume.
20  It's a single binder, right?
21  A.      It's 128 pages, I believe, or something
22  in that magnitude.
23  Q.      Okay.  And then there are PowerPoint
24  presentations and lesson plans that develop and

1  change over time, you know, as training
2  progresses.  Is that fair?
3  A.      Fair.
4  Q.      Okay.  Is that -- have I now described
5  the universe -- and the SOP, we talked about that.
6  So have I described the universe of specialized
7  training that SWAT does for both incoming officers
8  and on a regular basis?
9  A.      I believe that's inclusive.
10  Q.      Thanks.  In the Columbus Division's
11  website, it refers to SWAT dedicating -- it
12  says 20 to 25 percent of their time training.  Is
13  that a fair statement?
14  A.      I think that's a little -- I mean, it's
15  close to that.  I'd have to do the math on it,
16  because there are -- there is team-level training
17  and specialized teams that do training.  For
18  example, counter-snipers train once a month, and
19  they have to qualify more frequently than the
20  other officers because they have -- are assigned a
21  specialized firearm.  Munitions delivery, officers
22  who are specifically schooled in ordinance have
23  training.  Explosive breaching has training.  It
24  might be around 25 percent, give or take --

1  Q.      Okay.
2  A.      -- plus or minus a couple percent on
3  either side of that.
4  Q.      Yeah.  You know, it appears to me that
5  whatever was put on the city's -- division's
6  website is a bit dated, so these numbers may be
7  off.  The website also says designated snipers
8  train every week with their sniper weapons.  Is
9  that still true or is it -- what's the training
10  for snipers?
11  A.      I refer to them as counter-snipers,
12  and --
13       MS. TANOURY:  Sorry, lieutenant Ohl.
14  I'll state an objection to all of this.  I think
15  we're still going way off track, so continuing
16  objection.
17       MR. MARSHALL:  Okay.  Thanks.
18  Q.      I'm sorry.  Say that, Lieutenant.  I
19  didn't catch that.
20  A.      I said I refer to them as
21  counter-snipers, and they don't qualify once a
22  week.  I believe they qualify once a month, and
23  then they're required to check their zero on their
24  scope once a week.

1   Q.      What are -- what do you mean by
2   "counter-snipers"?  What -- why do you call them
3   that?
4   A.      Because to me, a sniper is a military
5   term that refers to somebody who's going out to
6   hunt an enemy.  We're not dealing with enemies;
7   we're dealing with people who are criminals,
8   citizens who have chosen a criminal path and have
9   become violent, and they're armed, and our job is
10  to serve as a countermeasure to that.
11  Q.      Got it.  Thank you.  The website also
12  says, all SWAT officers train biweekly with their
13  assigned M-4 .223 machine guns.  Is that a correct
14  statement?
15  A.      Did you say weekly?
16  Q.      Yeah.  I'm just reading from the
17  website.  It says, all SWAT officers train
18  biweekly with their assigned M-4 .223 machine
19  guns.
20  A.      That's not a requirement.  I think
21  there's probably officers who train every week
22  with it, and there might be officers who train
23  biweekly, and then there might be some that,
24  because of workload, might not get to it for three

1   weeks, per se.
2   Q.      All right.
3   A.      So it's kind of fluid.
4   Q.      Just two or three more training
5   questions here, and we'll move on to the next
6   topic.  If we were to try to determine what kind
7   of training SWAT receives in crowd control, would
8   that material be reflected in the universe of
9   training materials that we talked about earlier,
10  the SOP manual, the training book, PowerPoint
11  presentations, and lesson plans?  Would it be in
12  those things?
13  A.      Yes.
14  Q.      And I presume that your SWAT team does
15  train in crowd control, crowd control measures,
16  and so on?
17  A.      Yes.
18  Q.      Would the same be true for use of
19  impact munitions for use in crowd control or use
20  in civil disturbances, such as wood baton rounds,
21  sponge rounds, CS gas, OC spray, and so on?
22  A.      Yes.  And I believe that training is a
23  little bit more generalized.  It doesn't -- it
24  isn't specific to, per se, civil disorder

1   response.  It would just be training on those
2   munitions so they know the safe deployment of
3   those munitions.  They know the conditions in
4   which those munitions would be utilized.
5   Q.      I take it your SWAT team is required to
6   follow general division directives with respect to
7   such munitions?
8           MS. TANOURY:  Same objections.  We're
9   still going off track.
10  Q.      Do you understand my question?
11          I'll just -- actually, let's just look
12  at something, if you don't mind.  Do you have
13  Exhibit 5?
14  A.      Do I have it?
15  Q.      Yes.
16  A.      No.
17          MR. MARSHALL:  Alana, I thought that
18  we've asked the witnesses to be provided with the
19  exhibits that we send.
20  A.      I mean, I don't have it in front of me.
21  Q.      Right.
22  A.      I was e-mailed a number of documents.
23  Q.      Okay.  All right.  So --
24  A.      I mean, I can access it on my computer.

1   Q.      Thank you.  That's what I meant.
2   Sorry.  I thought you just weren't sent it.  My
3   bad.
4           Would you access it, please?  It's
5   Exhibit 5.  It begins with the affidavit of Mark
6   Lang.
7   A.      Yeah.  I have to log on to my computer
8   that's beside me here, so I have to leave the
9   screen to do that.
10  Q.      Okay.
11  A.      Okay.  You're referring to No. 5, which
12  is the affidavit of Mark Lang?
13  Q.      Yes.
14  A.      Okay.
15  Q.      And if you go -- and I apologize,
16  because it's not paginated.  But if you go -- I
17  can tell you how many pages in.  It's about 12
18  pages in.  You'll get to the Columbus police
19  emergency operations manual, riot control
20  munitions policy.
21          MS. TANOURY:  I think it's page 32 of
22  the PDF, if that helps.
23          MR. MARSHALL:  Yeah.  Thank you.  I
24  don't have -- I'm looking at the paper.  So,

1　sorry.  Thanks, Alana.
2　A.　　What's the number on the policy?
3　Q.　　4.4, riot control munitions.
4　A.　　Okay.  I'm looking for it.
5　Q.　　And Alana says it's page 32 on your
6　PDF.
7　A.　　What was it again?  4...
8　Q.　　4.4, riot control munitions.
9　A.　　I've got it.
10　Q.　　Thank you.  All right.  Is the SWAT
11　team required to follow these general police
12　division policies in addition to following its own
13　training and SOP manual?
14　A.　　We have some that differ because of the
15　environment we work in with regard to barricade
16　situations and dealing with individual or small,
17　you know, suspect teams.  So they may differ
18　slightly.
19　Q.　　Do you know --
20　A.　　And munitions are different.  We don't
21　have the same munitions as the -- that are
22　assigned to the field forces for civil disorder
23　response.
24　Q.　　What munitions are assigned to SWAT for

1　civil disorder response?
2　A.　　The only things that we use was -- we
3　used the CS prior to the order being delivered
4　that CS would not be used, and we primarily use a
5　-- it's not called burning, but it's a baffled
6　grenade so that if somebody would pick it up and
7　touch it, it wouldn't burn them and it wouldn't
8　start a fire.  We used the -- we tried the OC
9　aerosol, but -- because that was the first time
10　that we had utilized it in a civil disorder, which
11　we found it to be ineffective because it's
12　designed to be used in a closed environment.
13　Q.　　Yeah.  You're referring to the pepper
14　spray vapor?
15　A.　　Yeah.  Correct.
16　Q.　　Okay.  All right.  What else?
17　A.　　We use a -- the MK-9 OC fogger.
18　Q.　　What is that?
19　A.　　The best way to describe it is it looks
20　like a miniature fire extinguisher, and it has --
21　it's got a little handle on it, and it shoots a
22　stream of OC and it kind of spreads it out.  It's
23　like a -- it's like a fogger, so it creates a fog
24　of OC.

1　Q.　　Okay.  All right.  Do you use OC spray
2　itself?  It just shoots a direct spray?
3　A.　　Not the belt mace.  We don't carry
4　that.
5　Q.　　Okay.  But you carry the -- would every
6　member of the team have carried the OC fogger?
7　A.　　No, not every member.
8　Q.　　Okay.  But some members of each team?
9　A.　　Yes.
10　Q.　　What other munitions?
11　A.　　We have 37-millimeter multiple baton
12　rounds, which are the wood baton rounds.
13　Q.　　Okay.
14　A.　　And then we have the 40-millimeter
15　sponge round, which is the direct-impact round.
16　Q.　　The wood baton round is a skip-fire --
17　A.　　That's the multiple baton round.  It's
18　a skip-fired round.
19　Q.　　All right.  Is it always required to be
20　skip-fired?
21　A.　　The only time that it could be
22　direct-fired would be if there is a threat of
23　serious physical harm or death to persons.  So if
24　somebody was trying to, for example -- I'll throw

1　this out as an example.  If somebody's launching a
2　commercial-grade firework at officers, which is a
3　deadly ordinance, and they decided to use a
4　direct-impact munition in the form of that wood
5　baton round as a direct-fire round, in my opinion,
6　that would be justified.
7　Q.　　Yes.  Yeah, I saw you quoted as saying
8　that.  What do you mean by "commercial-grade
9　firework"?
10　A.　　So those would be the type of fireworks
11　that you would see at your fireworks shows that
12　are predominantly -- they're available to
13　citizens.  You can buy them.  They're like a
14　mortar-delivered round.
15　Q.　　All right.  You're not talking about
16　bottle rockets or firecrackers, are you?
17　A.　　It depends on the size of the bottle
18　rocket.  I mean, if we're just talking about the
19　little ones you can shoot, obviously, those can
20　cause serious physical harm or disfigurement if
21　they hit someone in the face.  So it depends.
22　It's situational.  The person delivering that
23　ordinance at that time has to make a judgment as
24　to whether that ordinance that's being directed at

1  them can result in serious physical harm or
2  disfigurement or death to a person.
3  Q.      If it's directed only at the SWAT
4  officers, would a small bottle rocket conceivably
5  cause serious physical harm or disfigurement?
6      MS. TANOURY:  Objection.
7  A.      That requires me to render an opinion.
8  Q.      So is the judgment call on the part of
9  each officer in the given situation based on their
10  training and experience?
11  A.      Correct.
12  Q.      So it's -- what you're saying is
13  there's a possibility of that.  That is,
14  possibility that the SWAT officer might have to
15  use a wood baton round in a direct-fire manner
16  even if it's a small bottle rocket being launched
17  at them?
18      MS. TANOURY:  Objection.
19  Q.      Do you understand the question?
20  A.      I understand what you're asking me to
21  say.  You're asking --
22  Q.      I'm just asking if it's ever possible
23  that --
24  A.      Anything's possible.  I mean, there's

1  -- you know, you're dealing with a number of
2  variables that come into play there.
3  Q.      All right.
4  A.      You're talking about distance, number,
5  the size of the ordinance.  I've seen bottle
6  rockets that are, in effect, an M-80 or an M-100
7  attached to a stick that have a propellant that
8  will fire them.  That's considered a bottle
9  rocket.
10  Q.      Okay.  All right.  No.  I understand
11  what you're saying.  By the way, do your SWAT
12  members always wear helmets when they're deployed?
13  A.      I'm sorry.  I didn't hear you.
14  Q.      Do the SWAT team always wear helmets
15  when they are deployed in the field?
16  A.      Yes.
17  Q.      All right.  And is there a standard
18  helmet --
19  A.      Let me clarify that.  If you're talking
20  about civil disorder, yes.
21  Q.      Okay.  So at the Black Lives Matter
22  protests, they're going to be wearing helmets?
23  A.      Yes.
24  Q.      And when were they -- when deployment

1  occurred -- I realize that the first time was --
2  deployment occurred, you weren't around.  That was
3  May 28th, when the group went out in -- with the
4  long-range acoustic devices you described.  But
5  whenever -- when SWAT was deployed during these
6  protests, was there a standard uniform and
7  equipment -- I realize different members carry
8  different kinds of ordinances, but I'm just
9  talking about uniform and helmet.  Was there a
10  standard uniform and helmet they were required to
11  wear in the field?
12  A.      Yes.  They would wear their uniform and
13  helmet that they would wear on either a search
14  warrant or barricade situation.
15  Q.      And describe to uniform for me.
16  A.      So it's a MultiCam trousers and shirt.
17  It was summertime, so they probably would be
18  wearing their -- what's referred to as a combat
19  shirt.  That's what the military calls it.  It's
20  got a solid-colored body in tan, and then the
21  sleeves are MultiCam.  It's a breathable uniform
22  to try to keep them cool.  And then they wear a
23  plate carrier over top of that with insignia that
24  identify them as police, and then they have --

1  there's a couple of areas on their uniform where
2  they have patches on the sleeves and their call
3  number.  And also on the back of their helmet,
4  they also have their call number on it, which are
5  all 500 series.
6  Q.      Call number, does that identify the
7  individual officers?
8  A.      Yes.
9  Q.      Okay.
10  A.      It's unique to that officer.
11  Q.      Are they wearing body armor?  That is,
12  to protect against bullets or other --
13  A.      Yes.
14  Q.      -- projectiles.
15  A.      Yes.
16  Q.      What is the -- what is the descriptor
17  for that standard-issue body armor for SWAT?  What
18  do you call it?
19  A.      There's two sets of body armors.  There
20  is soft armor, which is worn underneath the hard
21  armor.  The hard armor are plates that stop
22  high-caliber bullets.
23  Q.      All right.  And so are they wearing
24  that on their -- front and back of their torsos?

1  A.     Yes.
2  Q.     Is there body armor on the legs?
3  A.     No.
4  Q.     Is there projectile protection from the
5  helmets?
6  A.     It protects the -- from about the
7  forehead, and then it kind of scoops down and come
8  -- covers maybe about -- anywhere from about a
9  half or a quarter of the upper ear and then sweeps
10 down to the neck area in the back.
11 Q.     Okay.  So this is what all the SWAT
12 team would have been wearing when they were
13 deployed during the Black Lives Matter protests,
14 which you've described?
15 A.     Correct.
16 Q.     Were there any that wore black
17 uniforms?
18 A.     No.
19 Q.     All right.
20 A.     Not our SWAT team.
21 Q.     All right.  Yeah.  I'm going to -- the
22 SWAT teams that worked in conjunction with your
23 SWAT team, were they under your SWAT team's
24 command?

1  A.     So they have -- they worked with a team
2  of our officers, and they had a liaison with them.
3  Q.     Well, that's -- I understand that.  I'm
4  asking a different question, which is:  Who had
5  ultimate command of the other jurisdictions' SWAT
6  teams that joined you in helping to deal with the
7  protests?
8  A.     So they reported to our building.  So
9  they were under our command, and then whatever
10 sergeant they were assigned to made on-scene
11 decisions.  And we had briefings prior to them
12 deploying, and I would tell them, you know, what
13 the policies were, what rules of engagement were
14 that we were aware of through our EOC.
15 Q.     Did you have -- about how many days --
16 I know you probably can't give it to me exactly,
17 but about how many days did you deploy all or part
18 of your SWAT team during the protests?
19 A.     I would say -- I think nine, I believe.
20 Q.     And does that include the 28th, where
21 it was just the long-range acoustic device?
22 A.     Yes.
23 Q.     Were there points in time at which the
24 entire SWAT team was deployed?

1  A.     Yes.
2  Q.     Do you remember what days those were by
3  any chance?
4  A.     It started on Friday, which, I believe,
5  is the 29th, and it went through the following
6  weekend.  And there were times when we were just
7  on standby and we were not deployed, but the first
8  four days, Friday, Saturday, Sunday, and I believe
9  it was Monday -- I believe we did have deployments
10 during all of those days.
11 Q.     What other agencies sent SWAT teams to
12 assist?
13 A.     Delaware County, Fairfield County, and
14 Gahanna.
15 Q.     Did Franklin County Sheriff's Office
16 send a SWAT team?
17 A.     They were -- they had their own
18 mission, and they were operating independent of
19 our mission.
20 Q.     Okay.  Were there times that the teams
21 were together?
22 A.     I don't believe there were any times
23 when we came in contact -- like direct contact
24 during a -- carrying out a mission with Franklin

1  County.
2  Q.     All right.  How about --
3  A.     It --
4  Q.     -- the Ohio State Highway Patrol, did
5  they send any teams -- SWAT teams that you're
6  aware of?
7  A.     They were focused around the statehouse
8  and the Supreme Court building and any state
9  property, such as the state office tower.
10 Q.     Okay.
11 A.     We would communicate with their -- for
12 example, we had overwatch, and they had a sergeant
13 that was in charge of their overwatch.  So we
14 would coordinate with their overwatch so we
15 weren't creating redundancy.
16 Q.     The various other SWAT teams you
17 referred to, Franklin County, State Highway
18 Patrol, and the three -- Fairfield County and the
19 others that -- Delaware County and Gahanna, those
20 are the three you mentioned?
21 A.     Correct.
22 Q.     Are they all dressed differently?  In
23 other words, in the field, could you readily
24 distinguish your SWAT team members from them?

1  A.      We were the only ones that were wearing
2  all MultiCam.
3  Q.      All right.  So you call it "Cam," but
4  you're really talking about a light camouflage
5  that's tan and greenish.  Is that a fair
6  description?
7  A.      Yeah.  Different hues of brown, tan,
8  green.
9  Q.      Okay.  So that -- if we see that camo
10  with the helmet and so on in videos, that's
11  Columbus Division of Police SWAT?
12  A.      I would say so.  I'd have to observe
13  the video, but yes.
14  Q.      Yeah.  We've got a couple examples here
15  which we'll use in a minute.  I want to ask you
16  some other questions.
17      Let's go back to the riot control
18  munitions policy that I think you brought up.
19  A.      Sure.
20  Q.      You were mentioning there are some -- a
21  few differences, I think you said, between the way
22  impact munitions are used by the SWAT team versus
23  how they are used by the general force, right?
24  A.      Right.

1  Q.      Are there any differences in the use of
2  the 40-millimeter wood baton round that you're
3  aware of?
4  A.      We don't use 40-millimeter wood baton
5  rounds.  We have them available, but we do not use
6  them.
7  Q.      What do you -- do you use a wood baton
8  round?
9  A.      We use the 37-millimeter variety.
10  Q.      Okay.  Why do you use that versus
11  the 40?  What's --
12  A.      We just feel that they're a more
13  effective munition.
14  Q.      Why so?
15  A.      They contain five wood baton rounds
16  versus three.  They seem to -- they seem to be a
17  little bit more applicable in a close environment,
18  which crowd -- you know, crowd control-type
19  situations or civil disorder situations are
20  usually a little bit closer.
21  Q.      In other words, when you fire one --
22  when you discharge the gas -- it's fired from a
23  gas gun, right?
24  A.      Propellant.  Multi-launcher.

1  Q.      So when you fire it from the
2  multi-launcher and you skip-fire and it hits the
3  ground, it spreads into five wooden blocks, right?
4  A.      Yeah.
5      MS. TANOURY:  I'm going to object to
6  this.  Outside the scope.
7      MR. MARSHALL:  Okay.
8  Q.      Go ahead.  Go ahead, Lieutenant.
9  A.      Correct.  They're the size of a -- best
10  way to characterize them for a layperson to
11  understand, they look like a little wooden spool.
12  Q.      All right.  And so when you fire
13  the 37-millimeter, there are five of them that
14  skip and then spread out, right?
15  A.      Correct.
16  Q.      Okay.  Do you use the beanbag round?
17  A.      We do not.
18  Q.      At all?  SWAT doesn't use that at all?
19  A.      We don't use it anymore.
20  Q.      When did you stop using it?
21  A.      Probably 2014, maybe.
22  Q.      Okay.  Why did you stop using it?
23  A.      We think it's ineffective and that the
24  direct-impact munitions, the sponge rounds, are

1  much more effective.
2  Q.      All right.  Do you use
3  the 40-millimeter sponge round?
4  A.      Yes.
5  Q.      And I'm reading from the riot control
6  munitions.  It says, with respect to the
7  40-millimeter sponge rounds, shall not be used --
8  I'm sorry.  Shall not be fired at the head unless
9  use of deadly force is reasonable.
10  A.      Correct.
11  Q.      Is that the same policy that SWAT
12  follows?
13  A.      Correct.  And that comes directly from
14  the manufacturer.  I mean, the manufacturer has a
15  whole host of training and regulations as to how
16  these munitions are used.
17  Q.      There's also a 40-millimeter signaling
18  munition?
19  A.      We do not use that.
20  Q.      Okay.  Now, there's an MK-9 aerosol
21  listed here.  Do you uses that?
22  A.      That's that MK-9 I was talking about,
23  the fogger.
24  Q.      All right.  So that's the thing that

1  looks like a mini fire extinguisher --
2  A.      Correct.
3  Q.      -- that releases a fog of that pepper
4  spray, right?
5  A.      Correct.
6  Q.      And some of your team members carry
7  that?
8  A.      Yes.
9  Q.      And some of them used that in the Black
10  Lives Matter protests in certain situations?
11  A.      Yes.
12  Q.      Who makes the judgment call about
13  whether to use the MK-9 aerosol -- well, just
14  specific to the Black Lives Matter protests, how
15  are those decisions made about when to use it and
16  how to use it?
17  A.      Whoever's in control of that team on
18  the ground at the time of that incident.
19  Q.      So the sergeant or perhaps the
20  assistant team leader?
21  A.      Correct.  Or it might be the individual
22  officer, if it has degraded to the point where
23  they have to defend themselves.
24  Q.      All right.  Under what circumstances is

1  the MK-9 aerosol supposed to be used in a
2  situation like the Black Lives Matter protest?
3          MS. TANOURY:  Objection.
4  Q.      You can answer.
5  A.      I'm not sure I understand the question.
6  I could probably rattle off 100 different times
7  when it could be used.
8  Q.      Okay.  Fair enough.  That's what I'm
9  trying to get at.  That's why I'm asking the
10  question.
11  A.      I mean, it's situational as to what's
12  happening at the time.
13  Q.      Okay.  Give me a -- give me two
14  examples of where it's appropriate to use.
15          MS. TANOURY:  Same objection.
16  Q.      Go ahead.
17  A.      So my -- what I would determine as two
18  examples would be a large, violent crowd that is
19  throwing objects at the police and creates a
20  serious risk of physical harm to persons.
21  Q.      Okay.
22  A.      The other one would be, for example, if
23  a group of officers are attempting to get to
24  somebody to arrest them and a crowd is obstructing

1  the official business that they are trying to
2  carry out and they need to clear that crowd to get
3  to somebody who is engaging in criminal activity.
4  Q.      All right.  During the Black Lives
5  Matter protests, was it -- was the MK-9 aerosol
6  used to disperse crowds that weren't following
7  dispersal orders?
8  A.      That I observed?  No.  I didn't observe
9  that, personally.
10  Q.      Okay.  I understand.  And you were in
11  the field for most of these operations?
12  A.      I was everywhere, because I'm one
13  person monitoring two to three radio channels and
14  taking two to three -- operating two cell phones
15  at the same time.
16  Q.      Okay.
17  A.      So I have five communication devices
18  that I was responsible for, and so I don't know
19  where I was at at certain -- you know --
20  Q.      Okay.
21  A.      But I was in the field.
22  Q.      And you were in the field, and you were
23  going from team to team and wherever else you were
24  needed.  Is that fair?

1  A.      That's fair.
2  Q.      Okay.  Is it appropriate to use the
3  MK-9 aerosol to disperse a crowd that is not
4  following a dispersal order?
5          MS. TANOURY:  Objection.  This is
6  outside the scope.
7  Q.      Yeah.  I'm asking you based upon your
8  years of being the lieutenant of SWAT, as well as
9  your training and background.
10          MS. TANOURY:  Same objection.
11  Q.      Sorry.  Go ahead.  Do you understand my
12  question?
13  A.      Yes.
14  Q.      All right.  What's the answer?  I'm
15  sorry.
16  A.      Whoever is either utilizing the force
17  or ordering the force has to weigh whether the
18  dispersal creates or magnifies the problem that
19  they're trying to deal with.  For example, if that
20  crowd is sheltering criminals and is preventing
21  law enforcement from getting to the criminals,
22  then using an OC agent to disperse that crowd so
23  you can perform the function of arresting the
24  violators, that's justified.

1 Q. That, I understand. I'm limiting my
2 question to simply dispersal. Let's talk about
3 dispersal from an intersection that's blocking or
4 impeding the flow of traffic.
5 MS. TANOURY: John, I'm just going to
6 put -- do a standing objection to this whole line
7 of questioning as outside of the scope.
8 MR. MARSHALL: That's fine. I do think
9 that if there's anyone that's qualified to answer
10 the question with respect to SWAT, it would be
11 this gentleman, but I understand your objection.
12 Q. So, do you understand my question?
13 A. Yes.
14 Q. What's the answer?
15 A. I mean, I believe it could fall within
16 Section 2917.05, which is the force used to stop a
17 riot, to disperse persons involved in riotous
18 behavior, and I believe that people that are
19 occupying an intersection could be guilty of riot
20 or could -- there could be probable cause to
21 believe they're involved in riot. And if that's
22 the case, then by ORC section, you are allowed to
23 use the force that is reasonable to disperse those
24 persons.

1 Q. Would that force include use of
2 the 37-millimeter wood baton round?
3 A. It could. It depends, again, what the
4 situation is on the ground.
5 Q. Can the 37-millimeter wood baton round
6 be appropriately used by SWAT to disperse a
7 riotous crowd that's occupying an intersection?
8 A. Yes.
9 Q. Did you -- does SWAT also use the OC
10 grenade?
11 A. The aerosol grenade?
12 Q. If you look at the riot control, the --
13 I'm sorry -- the munitions document, on the same
14 page as the MK-9 aerosol, you see the little
15 picture of that, and then they've got pictures of
16 two of what they're calling OC grenades.
17 A. I'm paging through, so bear with me.
18 Q. Sure.
19 A. No. Ours are designated OC vapor, so I
20 believe they're different than this. I can't read
21 the number on this one --
22 Q. All right. So you --
23 A. -- to compare it to what we have, but
24 on face value, this doesn't look like the same

1 ordinance that we use.
2 Q. All right. And I think you said you
3 used your OC vapor grenades -- on what day did you
4 use them and then determine that they weren't
5 really effective because it wasn't a closed space?
6 When did you make --
7 A. It was early on. It was within the
8 first couple days. I can't point to a specific
9 day without referring to the U-10.128 use of force
10 reports that were turned in.
11 Q. Turned in to IAB?
12 A. Correct.
13 Q. But there were some of them that were
14 used in the first day or two of the protests, and
15 then it was determined they were ineffective; is
16 that right?
17 A. I would say yes, that's accurate.
18 Q. The next page of the same document has
19 the final device called the rubber ball blast
20 grenade, and this says, this device is a payload
21 system for CS only, and there are no projectiles
22 in the device. Do you use -- did you use, during
23 the protests, the rubber ball blast grenade that
24 contains CS gas?

1 A. I'm not certain of that.
2 Q. You did use CS gas until it was ordered
3 not to be used. How was it delivered?
4 A. It was delivered via a hand-toss
5 canister.
6 Q. So something like the grenade, but
7 maybe not this particular device?
8 A. Correct.
9 Q. Is that what you're saying?
10 A. It would have been a -- more than
11 likely, it would have been a metal-bodied CS
12 called a Tri-Chamber. That's the one that doesn't
13 heat, so it doesn't burn somebody if they try to
14 pick it up.
15 Q. In the open air, assuming there's, you
16 know, not -- it's not a windy day, but in the open
17 air, what is the effective range of a canister
18 like that? I mean, what area does it spread
19 effective CS gas?
20 A. Totally dependent on wind.
21 Q. Okay. Assume there's no wind.
22 A. It's probably going to start to -- and
23 I don't know that -- I mean, you're asking me to
24 kind of draw an opinion as to what that grenade's

1  going to do in a no-wind situation. I don't know
2  what, you know, volume that that grenade can
3  consume in open air.
4  Q.     I'm just trying to get some sense --
5  and I realize these are rough estimates,
6  Lieutenant. But in a no-wind situation, would a
7  CS canister disperse over 500 square feet, 1,000
8  square feet?
9  A.     I can give you, like, a radius. I
10  would say maybe -- if you took a 15-meter
11  to 20-meter circle.
12  Q.     Okay. That's helpful.
13  A.     I'm just talking from experience with
14  no wind, which is rare.
15  Q.     Okay. Now, we're talking about
16  the 37-millimeter baton -- wood baton round. In
17  the field, who makes the decision about whether to
18  deploy that weapon in a crowd control/civil
19  disobedience situation, like the Black Lives
20  Matter protests? Who's making those decisions in
21  the field?
22  A.     For SWAT?
23  Q.     Yes, for SWAT.
24  A.     So by the time we get there -- in other

1  words, by the time we arrive and -- are requested
2  and arrive on scene, generally speaking, in these
3  nine days that we were deployed, the situations
4  had degraded to the point of being violent, where
5  projectiles were being launched from the people
6  engaging in the protests and the civil disorder.
7  Fireworks were being fired. There was a whole
8  host. Molotov cocktails. I mean, I can go on and
9  on of what was being thrown at us.
10      By the time SWAT got there, these
11  incidents that degraded to that level, and the
12  individual officer was more than likely deploying
13  whatever ordinance they had to disperse that
14  crowd. And that crowd had been -- they didn't
15  just show up. That crowd had been told to
16  disperse multiple times via some form of a PA
17  system, be it our LRAD, a patrol LRAD, or a patrol
18  PA system of some sort. So they weren't just
19  showing up and delivering ordinance.
20  Q.     No. No. I didn't suggest that. I'm
21  just -- the answer you're giving me suggests that
22  in the areas in which you were asked to deploy --
23  SWAT was asked to deploy, someone had already made
24  a determination that the crowd needed to be

1  dispersed, including use of wood baton rounds and
2  other impact munitions. Is that a fair statement?
3  A.     I would say in most cases, yes, but I
4  wouldn't say that that's universally true in every
5  deployment.
6  Q.     Okay. Yeah. I'm just covering these
7  protests that we're talking about here, these
8  Black Lives Matter protests. And the majority of
9  them, you'd say that the determination had already
10  been made that the crowd had engaged in behavior
11  in which these -- it was appropriate to use these
12  impact munitions. Is that fair? The majority of
13  the situations. Maybe not every one.
14  A.     Yes.
15  Q.     If there was a situation in which SWAT
16  was present and a decision was -- had not been
17  made to do that -- in other words, there was not
18  immediate deployment of impact munitions required
19  -- who, then, on the ground was making those
20  decisions about whether to use, for example,
21  the 37-millimeter wood baton round?
22  A.     More than likely, that would be the
23  team leader, which would be a sergeant.
24  Q.     Okay. And then if the situation was

1  such that the sergeant or the assistant team
2  leader wasn't immediately present, were the
3  individual officers carrying those impact
4  munitions authorized to use them when appropriate?
5  A.     The sergeant would always be
6  immediately present, because every team had a
7  sergeant assigned to them.
8  Q.     Well, when you say "immediately
9  present," are they supposed to stick together
10  within a certain radius?
11  A.     Right. They're not going off on their
12  own; they're operating as a team. They should
13  have -- they should have visual on every member of
14  that team, and they should have -- they should not
15  be dispersed widely. There should probably be no
16  more than 15 feet -- 10 to 15 feet between every
17  person on that team.
18  Q.     All right. And the sergeant and/or
19  assistant team leader is supposed to maintain a
20  visual on that team at all times?
21  A.     He's tasked with being in control of
22  that team.
23  Q.     Okay. The communication that occurs
24  between that team are -- do they have headsets in

1  which they can get these communications?
2  A.      Yes.
3  Q.      So the sergeant can give orders on the
4  ground in situations, such as the protest
5  situations?
6  A.      Yes.
7  Q.      And the assistant team lead can also
8  communicate with everyone?
9  A.      Correct.
10  Q.      Can the individual officers on the team
11  communicate with everybody on the team?
12  A.      Yes.
13  Q.      Can an individual officer on the team
14  communicate with you, who's not present with that
15  team? Can they get in touch with you?
16  A.      Yes.
17  Q.      How do they do that?
18  A.      Just via radio. I'm monitoring the
19  channel they're operating on. I'm monitoring both
20  of the channels that are operational for -- out of
21  the emergency operations center. So --
22  Q.      Is your --
23  A.      -- I'm monitoring those channels.
24  Q.      Is your entire squad team on a single

1  channel or are the separate teams on their own
2  individual channels?
3  A.      In most instances, they were on the
4  same channel.
5  Q.      Can they divide it up in which you have
6  the red team on one channel and the gold team on
7  another?
8  A.      You could. There was -- for example,
9  there was two radio channels. I think they split
10  the city in half on certain nights, depending on
11  the level of activity, and there would be an
12  operations channel for, say, north and one for
13  south, whatever the line is that they drew.
14  Q.      Okay.
15  A.      But from -- more than likely, 95
16  percent of the time, SWAT communications about
17  SWAT operations would be on the same channel.
18  Q.      Okay. Were you present at Broad and
19  High on the 31st of May during the daylight hours
20  when the SWAT team sort of took control of the
21  intersection from the crowd? Were you there?
22  A.      I was not physically there.
23  Q.      Did you see any video of it?
24  A.      Yes.

1  Q.      What was the purpose of you looking at
2  the video? Was that to prepare for the deposition
3  or was that --
4  A.      No. That was in the BakerHostetler
5  investigation.
6  Q.      Okay. You were interviewed as part of
7  that investigation?
8  A.      I'm sorry?
9  Q.      You were interviewed during that
10  investigation?
11  A.      Yes.
12  Q.      Who interviewed you?
13  A.      I don't remember her name. It was a
14  female attorney for BakerHostetler.
15  Q.      Did she have blonde hair?
16  A.      I believe so.
17  MS. TANOURY: I object to this line of
18  questioning as outside the scope of his 30(b)(6)
19  deposition.
20  MR. MARSHALL: I understand.
21  Q.      Was it Jenni Edwards?
22  A.      I believe so.
23  Q.      Okay. Was it just you and Jenni
24  Edwards present during the interview?

1  A.      I had an attorney through the Fraternal
2  Order of Police.
3  Q.      Who was the attorney?
4  A.      Latham, and I can't think of Latham's
5  last name off the top to have my head.
6  Q.      All right. You saw some video of that
7  Broad and High exchange, but you weren't there at
8  the time, right?
9  A.      Correct.
10  Q.      What team was there?
11  A.      So that incident started when Sergeant
12  Jim Morrow, who was liaisoning with the Delaware
13  Tactical team -- their armored vehicle was coming
14  eastbound.
15  Q.      On Broad Street?
16  A.      On Broad Street. And they were trying
17  to get to a white SUV occupied by three black
18  males who had assault-style weapons --
19  Q.      Okay.
20  A.      -- to investigate whether there was an
21  illegal possession of those weapons or an illegal
22  transport of those weapons. And Sergeant Morrow
23  came on the radio and said that they had been
24  enveloped by a crowd, and somebody had blocked

1  them in with a vehicle and then laid down behind
2  the vehicle.
3  Q.     And so that was what generated the
4  clearing of the intersection; is that right?
5  A.     Correct.  And they were also taking
6  projectiles.
7  Q.     What projectiles?
8  A.     Water bottles, rocks.  Just those type
9  in general articles.
10  Q.     Okay.
11  A.     You'd have to ask Sergeant Morrow.  He
12  was there.
13  Q.     He was in charge of which team?
14  A.     He was liaisoning with a small element
15  from Delaware Tactical.
16  Q.     I'm sorry.  Is he a member of your SWAT
17  team or a member --
18  A.     Yeah.
19  Q.     Okay.  So he was liaisoning with
20  Delaware?
21  A.     Delaware.
22  Q.     And I think in the video that I saw,
23  there were some of your SWAT team members who also
24  came forward into the intersection and then went

1  off to deal with the crowd up north on High
2  Street.  Do you remember that part?
3  A.     So when Sergeant Morrow called for
4  assistance, the other two armored vehicles with
5  our SWAT team, and there was also a Fairfield
6  County team, and I believe Gahanna was there.
7  They came to the aid of those officers to disperse
8  the crowd --
9  Q.     Okay.
10  A.      -- that was violent.
11  Q.     Is there a standard issuance of impact
12  munitions, such as the 37-millimeter wood baton
13  round, for each team?  And as I remember your
14  description, you've got six officers, plus an
15  assistant team leader who's an officer, plus a
16  sergeant, so eight individuals on each team, red,
17  green, and gold, right?
18  A.     Yes.
19  Q.     All right.  I lost you there for a
20  second.
21  A.     Yes.
22  Q.     Within the team, how many of those
23  individuals are outfitted with the 37-millimeter
24  wood baton rounds?

1  A.     That would be up to the sergeant who
2  was deploying.  We only have a finite number of
3  launchers, so, obviously, we -- everyone doesn't
4  have a launcher, but that's up to the sergeant,
5  how many he's going to deploy --
6  Q.     What's the maximum --
7  A.      -- where they're going to be deployed.
8  Q.     I'm sorry.  What's the maximum number
9  they could deploy on a given team?
10  A.     The launchers?
11  Q.     The 37-millimeter wood baton round
12  launchers.  Right.
13  A.     I want to say three or four, if we had
14  them divided up evenly amongst the teams.
15  Q.     Meaning each team might only have one
16  or two?
17  A.     No.  I'm saying that each team may have
18  three to four of those launchers assigned to them.
19  Q.     All right.  How about the sponge round
20  launchers?
21  A.     The 40-millimeters?
22  Q.     Yes.
23  A.     There would probably be -- and, again,
24  this is fluid, because they could be deploying

1  a 40-millimeter that they're carrying with them.
2  So you could have the same officer that is
3  assigned a 37-millimeter and a 40-millimeter, and
4  he's made the decision or the team leader's made a
5  decision that the utilization of a direct-fire
6  impact sponge round is more effective in that
7  environment.
8  Q.     Okay.  And when you've got a crowd
9  that's close together that's riotous, what's the
10  more effective munition, the 37-millimeter wood
11  baton or the sponge round?
12         MS. TANOURY:  Objection.  This is
13  outside the scope.
14  Q.     Do you understand?
15  A.     I understand.  You're asking me to make
16  an analysis of something that I wasn't present to
17  witness.
18  Q.     Okay.  Fair enough.  So I just thought
19  there's a general answer to that question in your
20  training, like, well, if you've got a group that's
21  close together that's acting riotously, the best
22  impact ordinance to use is X, right?  But you're
23  saying it's fluid?
24  A.     Correct.

1  Q.      Every situation's different?

2  A.      It's fluid, and if it's just a -- you

3 know, if it's a -- in that particular situation,

4 having viewed that video, I would say that the

5 most effective use would be the 40 -- or

6 the 37-millimeter baton over the direct-impact.

7 Direct-impact is designed more for -- you have

8 identified somebody who is an agitator, a person

9 who is being violent.  And everybody else is

10 behaving themselves, and you're just going to, you

11 know, suppress that person's violent activity

12 until you can either get to them to arrest them or

13 they leave.

14  Q.      The sponge round is a single thing that

15 hits somebody, right?  It's a --

16  A.      Correct.

17  Q.      Whereas the wood baton is potentially

18 five spools, as you've described, and that --

19  A.      Correct.

20  Q.      -- could strike potentially five

21 different people, right?

22  A.      Right.

23  Q.      Other than the wood baton round, the

24 sponge round, and the OC aerosol, is there any

1 other impact munition that is routinely used by

2 SWAT?

3  A.      Routinely, no.  We do have a small

4 number of what are called -- they're similar to

5 the sponge round, but they have a small amount of

6 irritant, whether it's -- most of them are OC

7 irritant, and they also mark a person.  So they

8 would put a dye on that person so that they could

9 be identified at a latter time.

10  Q.      What are those called?

11  A.      I believe they're just called OC

12 marking rounds.

13  Q.      All right.  So they release a small

14 amount of chemical irritant, plus they mark

15 someone with dye?

16  A.      Correct.

17  Q.      And do they -- does that munition

18 release lots of those little pellets or balls --

19  A.      No.

20  Q.      -- at the same time?

21  A.      It's a single-impact munition.

22  Q.      Okay.  What's that used for, normally?

23  A.      That would be -- again, if you have an

24 agitator, you know, you're trying to identify

1 people who are inciting the violence within the

2 crowd.  You might direct one of those at that

3 person in an attempt to, one, stop their activity,

4 and, two, identify them for apprehension.

5  Q.      All right.  You also told me that on

6 the OC vapor, the little fire extinguisher -- not

7 the vapor -- the OC spray, the little fire

8 extinguisher that creates a fog of pepper spray,

9 that not every team member is given those, right?

10  A.      Correct.

11  Q.      In a crowd control situation or a

12 riotous situation, as we've been talking about,

13 can the sergeant give everybody one of those

14 little fire extinguishers of OC?

15  A.      Yes.  And they have a different

16 function than the impact munitions, obviously.

17  Q.      Right.  Do you know whether, in that

18 situation at Broad and High that we've been

19 talking about, everybody had the little canisters

20 of OC or not?

21  A.      No.

22  Q.      Some people would have, normally,

23 right?

24  A.      They would have access to them, yes.

1  Q.      Okay.  What other weaponry would a SWAT

2 officer normally be required to carry in that

3 situation?  So let -- they're on the scene at

4 Broad and High, the situation we've been talking

5 about, and they've got -- let's say they've got

6 the 37-millimeter wood baton round weapon with

7 them.  Does SWAT carry one that can discharge up

8 to four of those rounds or is it a single shot?

9  A.      So when I refer to a multi-launcher --

10  Q.      Yes.

11  A.      -- if it's a 37-millimeter

12 multi-launcher, it's kind of like a revolver.  So

13 there's a cylinder on it, and you can load -- you

14 can load six different pieces of ordinance, and,

15 usually, it consists that -- you're loading all 40

16 -- or all 37-millimeter multi-baton rounds, or,

17 for example, if we're on a barricade, we may put

18 what are called barricade projectiles in those.

19 The 40-millimeters are four rounds, I believe.

20  Q.      Okay.

21  A.      And you put -- the patrol ones are four

22 rounds; the ones we have are six rounds.

23  Q.      I see.  All right.  So if one of your

24 SWAT officers is carrying the 37-millimeter wood

1 baton round multi-launcher, they can launch up to
2 six rounds in rapid succession, right?
3 A. Yeah. I mean, "rapid" is --
4 Q. Well, depending on --
5 A. As rapid as that firearm can cycle.
6 Q. Yeah. It has to -- like the revolver,
7 the cartridge has to cycle into the cartridge
8 chamber, right?
9 A. Yeah. It's a little bit different in
10 that the trigger actuates the cylinder to release
11 and roll, and it's a big cylinder, so it's
12 obviously making a large turn.
13 Q. Okay.
14 A. So it's not like discharging a
15 revolver.
16 Q. So it might --
17 A. It takes some time.
18 Q. All right. So it might take a second
19 or two for each cartridge?
20 A. Correct.
21 Q. Okay. But you could discharge the
22 whole thing in just a few seconds. You could
23 discharge all six, if you felt it was necessary?
24 A. In probably 15 to 18 seconds, I would

1 say you could discharge the entire thing.
2 Q. All right. And that all six rounds
3 would mean 30 different projectiles being fired
4 hit-skipped, right?
5 A. Correct.
6 Q. Okay. And then do they carry more than
7 six rounds on their person, additional rounds,
8 normally?
9 A. They may or they may have access to
10 somebody who is loading for them, depending on the
11 environment, again. So they would just have that
12 amount on them, and they might have a bag that has
13 extra with them, and there could be up to 12 in
14 the bag.
15 Q. What other weaponry do they carry with
16 them?
17 A. So they're going to have their issued
18 pistol.
19 Q. All right.
20 A. They may have their M-4 with them.
21 Q. That's the machine gun?
22 A. Rifle.
23 Q. The rifle. But is it an automatic-fire
24 weapon?

1 A. It's select fire, so you can go from
2 safe to semi to fully auto.
3 Q. All right. So it can move from safe
4 mode to semi-automatic. That is, you have to pull
5 the trigger each time, right?
6 A. Correct.
7 Q. To release one round, and then you can
8 fire automatic as in a machine gun, right?
9 A. Correct.
10 Q. How many rounds does the M-4 hold?
11 A. Most magazines hold 30.
12 Q. Okay.
13 A. Some down -- the magazine is designed
14 to hold 30. I'll just answer it that way.
15 Q. Okay.
16 (Phone interruption.)
17 Pardon me. Sorry. I'll shut this off.
18 Were any of the SWAT teams -- did any
19 of them have their M-4 with them in these protest
20 situations?
21 A. That would be up to -- the sergeant may
22 assign certain officers to not take their M-4s at
23 all. The sergeant may assign everybody to take
24 their M-4s. But the purpose of assigning someone

1 an M-4 is to serve as a cover officer.
2 Q. In case of extreme --
3 A. Right.
4 Q. -- danger?
5 A. Right.
6 Q. Was there a cover officer in these
7 protest situations?
8 A. I don't know that for a fact, but I
9 would -- if they were following their training,
10 there should have been.
11 Q. The weapons that are kept in the
12 vehicle that each team has?
13 A. Correct.
14 Q. Does each team --
15 A. Each team has them in their vehicle.
16 Q. Does each team have a single vehicle
17 that it uses?
18 A. Yes. But they can vary. For example,
19 one -- you know, depending on what day was --
20 officers might be assigned to a different vehicle.
21 Q. What types of vehicles do the teams
22 have available?
23 A. So we have two Lenco BearCats, which
24 are armored vehicles.

1   Q.     Okay.  What else do you have?
2   A.     We have two vans.  You know, they're
3  just -- one is a high-top van.  Kind of looks like
4  a -- people refer to them as a Sprinter.  And then
5  we have another one that's just a regular
6  cargo-style van.
7   Q.     At that scene at Broad and High, where
8  you looked at the video with BakerHostetler, did
9  you see one of the BearCats?
10  A.     Yes.
11  Q.     Okay.
12  A.     The first BearCat I see in that video
13  is Delaware County's BearCat.
14  Q.     All right.  We can look at it in a
15  minute, and you can help me identify what's what.
16  That would be -- that would be helpful.
17        Do any of the impact munitions or
18  devices that you may deploy in a riotous crowd
19  situation -- do any of them result in shrapnel
20  being -- shrapnel occurring into the crowd?
21  A.     No.
22  Q.     Let's look at one video, and then I
23  might have some other questions.  And then we may
24  look at some others, but I think you can identify

1  -- maybe you can identify for me what SWAT team
2  this is in this particular video.
3        MR. MARSHALL:  And, Sam, will you
4  screen-share 112, Exhibit 112.
5        Alana, this is Exhibit 112.
6  Q.     We're going to screen-share this with
7  you, Lieutenant.
8  A.     Okay.
9  Q.     All right.
10        MR. SCHLEIN:  Should I --
11        MR. MARSHALL:  Yeah.  Sorry.  Don't
12  play it yet, yeah.  Don't play it yet.
13  Q.     Lieutenant, can you see a still picture
14  on a screen?
15  A.     Yes.
16  Q.     All right.  I'm going to tell you where
17  this is, and you -- well, first of all, can you
18  tell me where this is?  I know, but maybe you do,
19  too.
20  A.     No, I don't know.
21  Q.     Okay.  All right.  This is at the
22  corner of Russell Street and High in the Short
23  North.  Are you with me?
24  A.     Yes.

1   Q.     All right.  Can you identify -- before
2  we play the video, can you identify the officers
3  here?
4  A.     No.
5  Q.     Do you know whether this is Columbus
6  Division of Police officers?
7  A.     Yes.  They appear to be Columbus
8  police.
9  Q.     That's what we thought.  And they are
10  in what we call riot gear.  Is that what you call
11  it?
12  A.     Yes.
13  Q.     Okay.  And you see a Columbus Division
14  of Police cruiser there?
15  A.     Yes.
16  Q.     All right.  And I imagine there's no
17  way for you to tell us anything about these
18  particular officers other than you recognize them
19  as Columbus Division of Police officers.  Is that
20  fair?
21  A.     Correct.
22        MR. MARSHALL:  All right.  Sam, go
23  ahead and play the video.
24        (The video is played.)

1   Q.     All right.  Can you recognize -- and
2  we'll play it again.
3        MR. MARSHALL:  Sam, go back and play it
4  again, please.
5        (The video is played.)
6  Q.     All right.  Do you recognize the device
7  being used by that officer in spraying those two
8  people?
9  A.     It appears to be a -- could you run it
10  one more time?  It appears to be a MK-9, but I'd
11  like to look at it again.
12  Q.     Yeah.  Okay.
13        MR. MARSHALL:  Yeah.  Go ahead, Sam.
14        MS. TANOURY:  I would also object to
15  the extent that this doesn't involve SWAT.
16        (The video is played.)
17        MR. MARSHALL:  I understand.  I'm just
18  trying to see if he recognizes the officers and
19  the device.
20        Go ahead.  One more time, Sam.
21        (The video is played.)
22  A.     That's fine.  I saw it.
23  Q.     Is that a MK-9 aerosol?
24  A.     It appears to be, yes.

1  Q.      Okay.  All right.  Thanks.
2          MR. MARSHALL:  Let's go ahead and take
3  out the screen-share there.
4  Q.      A few questions about wooden baton
5  rounds, and then I think we'll take a break and
6  use the restroom and get water or whatever.  The
7  multi-launchers, when they are fired, do they
8  create a flash or smoke when they're fired?
9  A.      Yes.  I would say, yes.  That's
10 accurate.
11 Q.      All right.  So we've seen in some of
12 the videos SWAT officers and other officers firing
13 what we -- would appear to be wooden baton rounds,
14 because we see them -- in some instances, we see
15 them pointing it at the ground, and then we see
16 what appear to be projectiles firing hit-skip,
17 right?
18 A.      Yep.
19 Q.      Is there any other device that's fired
20 hit-skip other than the wooden baton rounds?
21 A.      Not that we -- not that we utilize.
22 Q.      Okay.  Based on your experience within
23 the division generally, is there any device you're
24 aware of that's fired hit-skip other than the

1  wooden baton round?
2          MS. TANOURY:  Objection.  It's outside
3  the scope.
4          MR. MARSHALL:  I agree.  It's outside
5  the scope.
6  Q.      But I just want to know whether you
7  have that experience.
8  A.      No.  I've been on the Division of
9  Police for almost 32 years, and the only ordinance
10 that I know that is fired -- skip-fired is the
11 multiple baton round.
12 Q.      Okay.  And in the videos we've seen,
13 there's sort of a momentary red flash and then a
14 bit of smoke that comes out of the gun when
15 they're fired.  Is that your experience with them?
16 A.      Yes.  They're propelled by black
17 powder.
18 Q.      What is the effective range of
19 the 37-millimeter wood baton rounds that SWAT
20 uses?
21 A.      For crowd control -- or civil disorder
22 response?
23 Q.      Yes.  Thank you.
24 A.      I'm not -- I don't utilize the

1  ordinance, so I'm not overly familiar with the
2  range.  I would say an extreme range would be
3  about 75 yards.
4  Q.      Okay.
5  A.      I wouldn't -- personally, I wouldn't
6  deploy them beyond that range.
7  Q.      In the riot control munitions book, it
8  says 30 to 60 feet.
9  A.      Yeah.  Like I said, I don't utilize the
10 rounds.  I've been removed from that function for
11 two decades.
12 Q.      Okay.
13 A.      So I'm not infinitely aware of the --
14 Q.      Fair enough.
15 A.      -- standards and --
16 Q.      I appreciate the qualification.
17 A.      I'm not a grenadier.  Let's put it that
18 way.
19 Q.      Yeah.  Let me ask you about grenadiers.
20 I'm glad you brought that up.  There was a
21 grenadier --
22          MS. TANOURY:  Objection.
23 Q.      -- program --
24          MR. MARSHALL:  I'm going to ask about

1  his relationship to SWAT, Alana.  I understand you
2  have an objection.
3  Q.      But the -- just generally, for context
4  of my questions, you have a grenadier -- the
5  division has a grenadier program where they train
6  officers to become grenadiers.  You're familiar
7  with that, generally?  I'm not asking you to speak
8  on behalf of the city about that.
9  A.      Yeah.  That was created a couple years
10 ago.
11 Q.      Just two years ago or three years ago
12 or so?
13 A.      I don't know exactly, because, again,
14 it was designed to train patrol officers in
15 grenadier functions and make them, you know --
16 expose them to the deployment of ordinance.
17 Q.      Okay.  Did you or members of SWAT play
18 any role in training those officers?
19 A.      No.
20 Q.      All right.  But there's a grenadier
21 program --
22 A.      I don't know if they consulted anyone
23 else, but I did not.
24 Q.      Okay.  And did any of your SWAT members

1  undergo that training?
2  A.      The division's grenadier program?  No.
3  Q.      All right.  There would have been no
4  need, because you would train them in those impact
5  munitions as part of SWAT training anyway, right?
6  A.      Correct.
7  Q.      Okay.  Do grenadiers ever serve on
8  SWAT?  That is, trained grenadiers serve on -- go
9  out on the field with SWAT?
10  A.      So, are you talking about patrol
11  grenadiers?
12  Q.      Well, are there -- other than patrol
13  grenadiers?
14  A.      So we train our own, and we have -- we
15  cross-train everyone in the deployment of
16  munitions, and then we have specialists that have
17  gone to additional training.  Sometimes it's
18  outside the Division of Police, and they have a
19  little higher knowledge -- or not a little.  They
20  have more extensive knowledge with regard to the
21  ordinance that we utilize.
22  Q.      Okay.  So to clear up my confusion
23  here, are all of the individuals who do this
24  munitions training part of the SWAT team or is the

1  cross-training done with people outside of the
2  SWAT team?
3  A.      So there's two -- excuse me.  There's
4  two different entities.  There's the grenadiers
5  that are -- were trained via the patrol or the
6  division's training program to -- and they're
7  specifically trained to deliver ordinance during
8  civil disorder instances, and then there is a
9  training program for SWAT -- for members of SWAT,
10  and it's an internal program for us --
11  Q.      Okay.
12  A.      -- to utilize ordinance in our
13  operations.
14  Q.      Right.  Don't all members of SWAT
15  receive some of that impact munitions training?
16  A.      Yes.
17  Q.      Okay.  And then some have additional
18  training, specialized training?
19  A.      Correct.
20  Q.      The patrol grenadier operation, as you
21  understand it -- and, again, this is -- this
22  question is outside the scope of your 30(b)
23  notices here.  The patrol grenadiers, those are
24  trained separately from SWAT by other individuals,

1  right?
2  A.      Yes.
3  Q.      I was asking:  Do any of those patrol
4  grenadiers go out on missions with SWAT?
5  A.      No.
6  Q.      Okay.  Do SWAT members ever go on
7  missions with grenadiers?
8  A.      No.  But let me make sure that I'm not
9  misunderstanding what you're saying.
10  Q.      Okay.
11  A.      There is the potential for a field
12  force grenadier and a SWAT grenadier to be at the
13  same location in a civil disorder response.
14  Q.      Of course.  And that probably happened
15  during the protests, right?
16  A.      Yes.
17  Q.      They would be under separate command,
18  right?
19  A.      Well, the field force commander who is
20  at scene was there first.  So SWAT doesn't just
21  show up and respond; we respond in support of
22  field force operations.
23  Q.      Right.  So --
24  A.      But, ultimately, the field force

1  commander is in charge of that response.
2  Q.      I see.  So they could tell the SWAT
3  sergeant, do this or do that, right?
4  A.      Correct.
5  Q.      All right.  Who was the field force
6  commander, if you recall, on that incident at
7  Broad and High that we've been talking about?
8  A.      There wasn't one --
9  Q.      Okay.  Why?
10  A.      -- until later.
11  Q.      Why was that; do you know?
12  A.      Because the field forces were not at
13  that location.  That was a spontaneous surrounding
14  of that vehicle -- of our vehicle, the Delaware
15  County BearCat.
16  Q.      Okay.
17  A.      That precipitated the response, and one
18  of the first things I asked for, is there a field
19  force in the area?  And there was not a field
20  force in the area, but my mobile units in their --
21  in the armored vehicles were close, so they
22  responded immediately to render assistance.
23  Q.      Was there one that -- more than one
24  mobile unit on SWAT that responded to that

1 situation?
2 A.      Yes.
3 Q.      Who were the two teams?
4 A.      I'd have to look, but I believe it was
5 red and gold.
6 Q.      Okay.
7 A.      And, again, you have to realize that
8 sometimes the officers mix between teams, because
9 there's three teams and there's only two vehicles.
10 So based on staffing, we could have had people
11 that were gone. I know we had one officer who was
12 on restricted duty for a shoulder injury. We had
13 one vacant assignment, so the teams weren't
14 operating at full strength. So we may have pulled
15 -- we also had officers assigned to overwatch. So
16 the -- on paper, if you look at who's assigned to
17 which team, you can't say that that was red team
18 or gold team. It's just a SWAT team at that time.
19 Q.      Okay. Are grenadiers uniformed
20 differently? In other words, if you look at these
21 videos, can you spot what you're calling division
22 patrol grenadiers?
23 A.      I don't know that.
24 Q.      Okay.

1          MR. MARSHALL: It's 11:46. Let's take
2 a break until noon. I'm guessing I don't have
3 more than about an hour or so. I mean, it could
4 go a little longer. Would folks be all right just
5 going right through rather than getting lunch? Is
6 that all right with everybody?
7 A.      That's fine with me.
8          MR. MARSHALL: Alana, is that okay with
9 you?
10          MS. TANOURY: As long as that's fine
11 with Lieutenant Ohl, that's fine with me.
12          MR. MARSHALL: All right. Craig, you
13 can survive?
14          THE REPORTER: Yeah. No problem at
15 all. That's fine.
16          MR. MARSHALL: All right. Good. Let's
17 break until noon. That's about 13 minutes. And
18 then we'll get started again.
19          (A short recess is taken.)
20 Q.      Who would be the person on SWAT team
21 who has the most expertise about the 37-millimeter
22 wooden baton rounds and questions like their
23 effective range, what happens when they're
24 skip-fired, you know, and so on -- you know,

1 questions like that? It sounds like you haven't
2 even fired one in some period of years, so who
3 would you go to with those questions?
4 A.      So there's a couple of officers we have
5 here who have been trained and have certifications
6 in the use of ordinance. There's a number of
7 them. At the time, Sergeant Brian Bruce, who's no
8 longer with SWAT. He went -- transferred to
9 another job. He has a pretty good level of
10 knowledge with that. Tim Halbakken, Rob Cutshaw,
11 Troy Palmer.
12 Q.      Okay.
13 A.      I mean, there's a number of people.
14 David Thivener, Eric Richards.
15 Q.      Okay. Is SWAT sometimes used just to
16 close off an area for -- to protect against
17 property damage or protect other officers from
18 potential violence? Do you engage in that kind of
19 deployment?
20 A.      Generally, no. We do have K-9
21 resources assigned to our section, and we can use
22 them to do that.
23 Q.      K-9 officers with -- obviously, with
24 the dogs who are not part of SWAT officially, but

1 you can call upon them in your operations?
2 A.      Correct.
3 Q.      Is that what you're saying?
4 A.      Correct. For example, we utilized them
5 as an -- on one particular night, the FBI's SWAT
6 team was designed to be an emergency medical
7 evacuation unit, and I assigned two K-9 officers
8 to serve as a uniform escort for the FBI armored
9 vehicle and the medics that would come in if there
10 was someone who was gravely injured and need to be
11 evacuated.
12 Q.      Okay. What day was that, that that
13 occurred?
14 A.      I believe that was either Saturday --
15 I'm looking at a calendar here. Saturday,
16 the 31st, or Sunday, the 1st of June. I believe
17 those dates are correct. It might have been both
18 of those days. It would be the 30th and 31st, one
19 of those two days for sure.
20 Q.      Okay. I asked you earlier about the
21 appropriate -- you know, the various circumstances
22 under which it was appropriate to use the wooden
23 baton rounds, the 37-millimeter wooden baton
24 rounds, and you gave me a couple of examples. Let

1  me ask some other examples and get your input. Is
2  it appropriate to use the wooden baton rounds to
3  clear protesters from the street who are blocking
4  traffic, assuming that they're doing no more than
5  just refusing to comply with the dispersal order?
6      MS. TANOURY: Objection. It's outside
7  the scope.
8  Q.   Do you understand the question?
9  A.   Yes. So if there -- all they're doing
10  -- just to clarify and make sure I understand,
11  there is no other activity other than they've --
12  they are blocking traffic in the street?
13  Q.   Well, they might be chanting, holding
14  up signs, you know. You know, there might be some
15  verbal stuff going on, where they're using chants
16  that protesters use and, you know, making noise,
17  milling around, blocking the street, but no other
18  activity than that. And then there's been a
19  dispersal order, but they don't get out of the
20  street.
21      MS. TANOURY: Same objection.
22  A.   Without any other information other
23  than they're just chanting in the middle of the
24  street, I would say that would not be the first

1  thing on the continuum that I would go to.
2  Q.   What would be the first thing on the
3  continuum?
4      MS. TANOURY: Same objection.
5  Q.   Go ahead.
6  A.   I would arrest -- I would call arrest
7  teams and make arrests.
8  Q.   And by starting to make arrests, you
9  could probably encourage others to follow the
10  dispersal order. Is that the technique?
11      MS. TANOURY: Same objection.
12  A.   I can't speak for what the people
13  engaged in the conduct -- how they would receive
14  that, but that's a possibility.
15  Q.   Yeah. I just mean if that's the
16  purpose. I understand you can't predict how a
17  particular person or persons is going to respond,
18  but by starting -- let's say you have a couple
19  hundred people in the street. They're doing no
20  more than blocking traffic and chanting and so on,
21  and they disobeyed a dispersal order to get out of
22  the street. Is one of the purposes of beginning
23  to make -- obviously, you can't arrest all 200 all
24  at once, right?

1  A.   Correct.
2  Q.   By beginning to make arrests, is part
3  of the purpose of doing that to encourage the rest
4  of the protesters to comply with the dispersal
5  orders?
6      MS. TANOURY: Objection.
7  Q.   Do you understand the question?
8  A.   I do.
9  Q.   Okay.
10  A.   My opinion is yes.
11  Q.   And would there be any point in time in
12  which use of the 37-millimeter baton rounds would
13  be appropriate in that example, assuming the
14  arresting process didn't work?
15      MS. TANOURY: Same objection.
16  A.   Yes, I understand the question. And,
17  again, if the arrest process -- if the -- if this
18  scenario that we're constructing, you're making an
19  arrest or mass arrests, the next step is what
20  feedback we receive from making those arrests --
21  Q.   Okay.
22  A.   -- which run a gamut of people saying,
23  I don't want to be arrested, and they leave, all
24  the way to violent resistance.

1  Q.   Okay.
2  A.   And that would kind of depend on what
3  took place.
4  Q.   I'm asking at what -- if there's no
5  violent resistance but the only thing that is
6  happening in response to initial arrests is
7  nothing -- in other words, the protesters don't
8  leave the street -- is there a point in time in
9  which the wooden baton rounds are appropriate or
10  do you try to use the CS spray before you use the
11  wooden baton rounds?
12      MS. TANOURY: Same objection.
13  A.   The OC?
14  Q.   Yes, the OC spray.
15  A.   So the -- yeah. I mean, the wood baton
16  rounds, if the arrests aren't working, they have
17  failed to disperse the crowd. Again, I'm just
18  speaking on my personal opinion as to how I would
19  handle something, not, per se, policy or what
20  someone else might do and given the facts that
21  you're relating to me. The scenario -- it's not even
22  the facts; the scenario you're relating to me.
23  Q.   Right. So I want you to talk about
24  what the SWAT officers are trained to do in that

1 circumstance, the circumstance that we've
2 described as one in which you've got protesters
3 who are chanting, but not otherwise doing any --
4 they're not doing anything unlawful other than
5 they're failing to comply with a dispersal order
6 to get out of the street. Are you with me?
7 A.      Correct. So the only night where we
8 were called in as a primary mechanism to conduct
9 dispersal orders was the first night.
10 Q.     The 28th?
11 A.     Correct.
12 Q.     And that's what -- you talked about
13 your team. They use the long-range acoustic
14 device?
15 A.     Correct.
16 Q.     Did they ever get out of the vehicle
17 and engage by using any impact weapons?
18 A.     I'd have to review the use of force
19 reports and the ICS 214 from that evening.
20 Q.     Okay. Do you know from memory whether
21 anything other than driving around in the vehicle
22 and making announcements on the device was done?
23 A.     There were -- can you say to again?
24 State that question --

1 Q.     Yeah. Other than -- if I understood
2 you right, was this long-range acoustic device
3 also sort of a shock system that would disturb or
4 scare people to get them to move? Is that what
5 that is?
6 A.     There's a tone function on that, and
7 there's -- we carry a laminated sheet that gives
8 the distances, the settings that whoever's
9 operating that LRAD refers to as far as setting it
10 up -- so that it's not dangerous to persons.
11 There is a tone function on that. We found the
12 tone function -- the tone function was utilized.
13 I couldn't tell you without referring to documents
14 specifically what dates, times, and locations
15 where it was utilized. I just know that it was
16 attempted, and it was ineffective.
17 Q.     Okay. But the tone function is
18 something that -- to put it really, perhaps, too
19 simplistically, it's a really loud noise that's
20 designed to get people to react and maybe stop
21 doing what they're doing. Is that what it's for?
22 A.     Well, it's designed to disperse people.
23 Q.     Yeah. Because they don't --
24 A.     It's designed to make it -- it's

1 designed to make it annoying for someone to occupy
2 an area.
3 Q.     Yeah. Because this really loud noise
4 is occurring and sort of blasting you with sound,
5 right?
6 A.     Well, I don't know how to characterize
7 it. You'd almost have to -- I've been exposed to
8 it before. It's kind of a -- higher pitched,
9 pulsating, probably a higher frequency. It's
10 annoying.
11 Q.     All right.
12 A.     I'll tell you that. It's annoying.
13 That's the only way I can describe it. It's
14 annoying.
15 Q.     I got it. Fair enough. That was
16 deployed at various times but was ineffective,
17 including on the first night, right?
18 A.     I don't know that it was deployed on
19 the first night. It may have been. Again, I'd
20 have to look at Sergeant Bray's after-action
21 report to say with certainty that it was utilized.
22 Q.     Do you know any other times it might
23 have been deployed?
24 A.     Yes. I believe it was deployed on the

1 second night, which, I think, was the 30th or
2 the 29th. No. The 29th.
3 Q.     29th. Right.
4 A.     On the 29th. And, again, it was
5 ineffective. I think they stopped using it
6 after --
7 Q.     Where was --
8 A.     -- the 29th or 30th, after trying it a
9 couple times. It was determined it was
10 ineffective.
11 Q.     Where was it deployed?
12 A.     I'd have to refer to the logs to give
13 you dates and times and locations.
14 Q.     Now, on the first night, the first
15 night is -- you're telling me that was the only
16 time that you recall SWAT being deployed in order
17 to just get people to comply with the dispersal
18 order, right?
19 A.     To my recollection, yes.
20 Q.     Now, from your memory, did any of the
21 members of SWAT who were deployed on the first
22 night use any other methods or weapons other than
23 the LRAD?
24 A.     Again, because I was not there on that

1  evening and the use of force reports did not go
2  through me -- they went directly to internal
3  affairs -- I would have to review the documents.
4  Q.     Okay.  Going back to my earlier
5  question, though, the scenario is you've got a
6  crowd in the street chanting, protesting, but
7  otherwise not doing anything violent or unlawful
8  other than occupying the street in violation of
9  the dispersal order.  Are you with me?
10  A.     Yes.
11  Q.     Is there a point in time in which use
12  of the OC spray is appropriate to try --
13          MS. TANOURY:  I'm going to object.
14  Q.     -- get the crowd to comply with a
15  dispersal order?
16          MS. TANOURY:  Sorry, John.  I didn't
17  mean to interrupt you there.  I thought you were
18  done with the question.
19          I'm going to object to outside the
20  scope of what he's already testified SWAT does.
21          MR. MARSHALL:  Okay.  Yeah.
22  Q.     I'm asking you about, you know -- based
23  on your training and experience with SWAT, is
24  there a time in which the use of the OC spray

1  canister that you've described is appropriate
2  under those circumstances?
3          MS. TANOURY:  And it's also outside of
4  the scope of what he's been designated to testify
5  on, so I'll object on that basis as well.
6          MR. MARSHALL:  Okay.
7  Q.     Lieutenant, do you understand the
8  question?
9  A.     I do.  So, again, it's the decision of
10  the field force commander that's there, and in
11  general, SWAT supports field force operations, and
12  they did not call for us to be deployed other than
13  on the first night, when our mission was purely to
14  make dispersal announcements.  We were only called
15  to move up and support field forces if field
16  forces were meeting violent resistance.
17  Q.     Okay.  As in the Broad and High
18  scenario where we were talking about where you recall
19  rocks -- or at least reports of rocks, water
20  bottles surrounding the Delaware vehicle, and then
21  this van with three individuals in it who had
22  weapons, right?
23  A.     Right.
24  Q.     But my hypothetical question, then, is

1  -- and it is a hypothetical question, and that is
2  that -- is there a point in time, based on your
3  training and experience with SWAT, that it is
4  appropriate to use OC spray on protesters who are
5  in the street protesting but not doing anything
6  unlawful other than refusing to comply with the
7  dispersal order?
8          MS. TANOURY:  Same objection.
9  A.     Again, that's -- from a SWAT
10  standpoint, we're not even going to respond to
11  that.  So we're not even going to be there.  So to
12  answer it from a SWAT perspective, I can't do
13  that, because I'm not even going to be called to
14  assist with people who are just refusing to move
15  out of the street.
16  Q.     Right.
17  A.     That's a field force -- that's tasked
18  to field forces.
19  Q.     All right.  Let's take a look at --
20  well, would your answer be the same if I asked you
21  that same hypothetical but instead of OC spray, I
22  was asking about 37-millimeter wooden batons?
23  Would you give us the same answer, which is SWAT
24  wouldn't even be called to deal with that?  Is

1  that your answer?
2  A.     Correct.
3  Q.     Okay.  Can you think of any reason why
4  SWAT officers would be using OC spray on
5  individual protesters?  What circumstances --
6  A.     Yes.
7  Q.     -- would that be --
8  A.     So if SWAT gets called to the scene by
9  a patrol field force and we respond or if a
10  situation has degraded to the point where it's
11  totally out of the control, which some of these
12  nights did, and you are going from one violent
13  altercation to another violent altercation, they
14  would use -- they could be using OC spray.  They
15  could be using multiple baton rounds.  They could
16  have been using CS gas up until the point when the
17  order was given not to utilize it.
18          They could have been using OC aerosol
19  grenades until they figured out that those weren't
20  very effective in the environment, in the open
21  environment.  They could be using impact
22  munitions, direct-fire impact munitions on
23  individuals who were identified as violent
24  offenders.

1  Q.    Okay.  If you -- if a SWAT officer
2  observes an individual committing a violent crime,
3  do they have the authority to arrest?
4  A.    Any Columbus police officer has the
5  authority to do arrest.  However, our mission in a
6  crowd control or a civil disorder situation, if
7  you take SWAT officers and have them arresting
8  people, because we're such a small team, you're
9  now taking a valuable tool and putting them on the
10  sideline for potentially one to two hours, and
11  you're destroying the team integrity.
12  Q.    All right.  So you -- unless it's
13  highly unusual circumstances, you don't want your
14  SWAT officers processing an arrest, right?  You
15  don't want that to happen?
16  A.    Correct.
17  Q.    But do they carry handcuffs in order to
18  get people disabled so that they can be processed
19  for arrest?
20  A.    Yes.
21  Q.    All right.  So let's say a SWAT officer
22  observes somebody committing a violent crime or a
23  property damage crime, and they want to -- they
24  want them to be arrested.  Can they secure them,

1  handcuff them, and then ask another officer to
2  process the arrest, to ask --
3  A.    No.  They have to return -- the
4  arresting officer has to return to the processing
5  area to sign the paperwork and to file the
6  criminal charge.
7  Q.    Okay.  So they would never even --
8  A.    They can't do that in lieu of them.
9  Q.    They would never do that?  They
10  wouldn't use their handcuffs to --
11  A.    They could, but they would then have to
12  accompany that arrested individual back to this
13  process and slating area to complete the
14  paperwork, and then --
15  Q.    Okay.
16  A.    -- they would have to find their way
17  back, and they would have to find transportation
18  to get to the slating area and back.
19  Q.    All right.
20  A.    So that's why there were designated
21  arrest teams to make arrests.
22  Q.    All right.  So what the SWAT officer
23  might do is point out someone and say, you know,
24  this person should be arrested to the arrest

1  teams, right?
2  A.    Correct.
3  Q.    Okay.  Do you do kettling operations?
4  Do you know what I mean by "kettling"?
5  A.    I believe so.  That's where individuals
6  are not allowed an avenue to disperse, and we do
7  not utilize those.
8  Q.    Okay.  That's not something SWAT's
9  involved in, correct?
10  A.    No.
11  Q.    I'm correct about that?  Sorry.  Just
12  so the record's clear.
13  A.    Yes.  We don't -- we do not engage in
14  that technique or tactic, if that's what --
15  Q.    You don't?
16  A.    -- you're asking.
17  Q.    Okay.  On May 30th, around 8 p.m.,
18  there was a mass arrest in the area of Russell
19  Street and High Street in the Short North, just
20  north of the I-670 cap.  Do you know if SWAT had
21  any involvement in that?
22  A.    Again, I'd have to look at the logs for
23  that date and time, because there were so many
24  different locations where we were involved.  I'm

1  not 100 percent certain.
2  Q.    I want to take a look at a video, and
3  I'm going to ask you if you can identify these as
4  the SWAT officers in this video.
5         MR. MARSHALL:  Sam, I think it's 107.
6  If you would, screen-share that.
7         (The video is played.)
8         MR. MARSHALL:  All right.  Let's stop
9  there.  Don't play it.
10         (The video is paused.)
11         MR. MARSHALL:  Sam, could you go back
12  to that, please.  The beginning.  You had a still
13  photo --
14         MR. SCHLEIN:  Yeah.  Sorry.  That was
15  actually the end of it.  It's now at the
16  beginning.
17         MR. MARSHALL:  Okay.  Let's go back to
18  the end for a second.  Thanks.
19  Q.    All right.
20  A.    It's blurry.
21  Q.    So do you recognize the buildings in
22  the background here, Lieutenant?
23  A.    No.
24  Q.    You recognize this as the --

1  A.    It's kind of blurry.  What I'm seeing
2  is very blurry.
3  Q.    Yeah.  It's blurry here, too, but do
4  you recognize the Ohio Supreme Court building?
5  A.    Yeah.
6  Q.    All right.  So this would be --
7  A.    Now that you mention that, yes.
8  Q.    This would be Front Street, probably?
9  A.    Okay.
10        MR. MARSHALL:  All right.  Sam, go
11  ahead and play the video.
12        (The video is played.)
13  Q.    Do you see the officers there --
14  A.    Yeah.
15  Q.    -- in camo?
16  A.    Yes.
17  Q.    Are those SWAT officers?
18  A.    They appear to be.
19  Q.    Okay.
20        MR. MARSHALL:  Sam, go back just a
21  little bit.
22        (The video is played.)
23  A.    I think I've seen this video before.
24  Q.    Yeah.  Is that --

1  A.    It's out of a -- I believe a complaint
2  that Rick Wozniak was investigating for the safety
3  director's office, and I forwarded him information
4  on that.
5  Q.    Okay.  Yeah.  I thought you might know
6  something about this.  That's why I brought it up.
7  Is that vehicle there one of the SWAT BearCats?
8  A.    Yes.
9  Q.    All right.  So those two people in camo
10  are SWAT officers?
11  A.    I would -- yeah.  I would say that
12  that's accurate based on the proximity.  Again,
13  it's very blurry, so I can't, with 100 percent
14  certainty, say, but that is our vehicle.
15  Q.    And you can at least see the uniforms
16  good enough to think that those are likely SWAT
17  officer uniforms, right?
18  A.    The video I saw that was sent to me by
19  Rick was much clearer than this video.
20  Q.    Okay.
21  A.    If they are the same videos, yes, those
22  are our personnel.
23  Q.    And what -- before we run through it,
24  what can you tell me you remember about this

1  incident?  First of all, were you present?  I'm
2  guessing not, but --
3  A.    What was the date on this?
4  Q.    This occurred on the 29th.
5  A.    Okay.  I was -- actually spent the
6  whole night at -- on Civic Center Drive between
7  Broad Street and -- I believe it's Town or Rich
8  Street, whichever has the connector bridge that
9  goes across the river there by COSI, with three of
10  my K-9 officers.  We had that entire city block
11  occupied with the four of us.
12  Q.    Okay.  You were protecting the
13  property --
14  A.    Yeah.
15  Q.    -- in that area?
16  A.    The west side of the Supreme Court
17  building.
18  Q.    Got it.  All right.  I understand.  So
19  you didn't see this particular incident, but you
20  were close by?
21  A.    Yeah.  I would have been, what, about a
22  block, two blocks, three blocks away, maybe, tops.
23  Q.    All right.  What do you know about this
24  incident?

1  A.    Not much.
2  Q.    All right.
3  A.    Again, the only thing I know about it
4  is Rick had a -- some time of an investigation out
5  of it for the safety director's office.  He was
6  working with Sergeant Dan Weaver from Internal
7  Affairs Bureau.
8  Q.    And do you know whether that
9  investigation's completed or there's been any
10  results?
11  A.    No.  Rick --
12        MS. TANOURY:  Objection.  Outside of
13  the scope.
14  Q.    Okay.  Go ahead.
15  A.    No.  Rick contacted me on this.  I had
16  forwarded some information to Dan Weaver, and I
17  think Rick contacted me in -- I want to say
18  September and said -- and he was still fuzzy on
19  the information.  And I told Rick that I had
20  forwarded information to Dan Weaver, but Rick had
21  not apparently got the information that was
22  forwarded to Dan Weaver.  So I don't know a lot
23  about it, but Rick was trying to figure out who
24  the officers were, and --

1  Q.      Were you ever able to figure out who
2  the officers were?
3          MS. TANOURY: Same objection.
4  Q.      Say again. Go ahead, Lieutenant. I'm
5  sorry. Go ahead.
6  A.      The -- I don't know who all the
7  officers were, no. I don't know. The only people
8  that I -- the only thing I can say is that this
9  incident originated out of a vehicle stop on the
10 investigation of somebody who was illegally
11 carrying an assault rifle in a vehicle.
12 Q.      Okay. So --
13 A.      I know that Rob Vass was the one, I
14 believe -- he's one of our SWAT officers who
15 turned in the rifle.
16 Q.      Rob -- spell the last name.
17 A.      V-a-s-s.
18 Q.      And do you if Vass is the one who --
19 let's go ahead and play the video, and you can see
20 it clearly enough -- at least we can here...
21         MR. MARSHALL: Sam, go ahead and play
22 from here.
23         (The video is played.)
24 Q.      You see the officers -- the one who

1  comes up with her thumb, she's -- they're both
2  recording the officers, and the officers are using
3  their OC spray.
4          MR. MARSHALL: Play it again. That's
5  what happens here.
6          (The video is played.)
7  Q.      So they're holding up their phones and
8  recording the officers, and then the SWAT officers
9  are using their OC spray. You can see it here.
10 A.      I see one officer, maybe, using OC.
11 Q.      Yes. Yes. One. The other one is not.
12 I agree. Do you know who the officer was who was
13 using his OC spray?
14 A.      I believe it was Palmer.
15 Q.      Palmer?
16 A.      Yeah.
17 Q.      Is that Sergeant Palmer?
18 A.      No.
19 Q.      Officer Palmer? Okay. Was Officer
20 Palmer disciplined?
21 A.      No.
22 Q.      Were there findings of --
23 A.      And, again, what happened was --
24         MS. TANOURY: Hold on, Lieutenant.

1  Hold on a second. I'm going to object. This is
2  outside of the scope of what he's been designated
3  to testify on.
4          MR. MARSHALL: Okay.
5  Q.      Lieutenant, go ahead.
6  A.      All these investigations were removed
7  from the chain of command.
8  Q.      Yes. No. I know.
9  A.      And so that -- but to my knowledge, we
10 have had no finding as to this incident, to the
11 best of my knowledge.
12 Q.      That's because --
13 A.      It would have to come back to me and
14 the sergeant of that officer for discipline, and
15 to my knowledge, I don't have any inkling of
16 whatever transpired with this investigation.
17 Q.      Okay. Did you speak to Palmer about
18 why he used the spray in this situation?
19         MS. TANOURY: Same objection.
20         You can answer.
21 A.      I never spoke to Palmer directly,
22 because that's interfering in the investigations
23 conducted by the investigating entity.
24 Q.      All right. Different question, then.

1  Do you know from any source what Palmer's reasons
2  were for why he used his OC spray in this
3  situation?
4          MS. TANOURY: Same objection.
5  Q.      Go ahead.
6  A.      I did ask his sergeant, Sergeant Bray,
7  and Sergeant Bray stated that, to his knowledge,
8  again, without investigating the incident and only
9  knowing that Palmer completed a U-10.128, use of
10 mace report, on this, that these officers were
11 attempting to conduct a vehicle stop on an armed
12 individual with an assault rifle, and they had
13 attempted to get these folks to disperse
14 peacefully, and they refused to disperse.
15 Q.      Okay. And that's what -- the
16 information you got from the sergeant, right?
17 A.      Correct.
18 Q.      Okay. That paperwork, again, was all
19 turned over to internal affairs and then on to
20 BakerHostetler, right?
21 A.      This specific one, I think, went to the
22 safety director's office for -- with Rick Wozniak.
23 Q.      Okay. Thanks.
24         MR. MARSHALL: Sam, can you play 102-B.

1           (The video is played.)
2      Q.     We're at Exhibit 102-B.
3           All right.  So, just keep going.
4      Q.     I may have a question for you here.
5           Is that -- so, hold on.
6           MR. MARSHALL:  Go back just a touch,
7      Sam, and then freeze it.
8           (The video is played.)
9           MR. MARSHALL:  No.  No.  I'm looking
10     for the identification of the officer who appears
11     in the bus stop area.
12           (The video is played.)
13           Stop.
14           (The video is paused.)
15     Q.     There may be more.  We'll have to look
16     at the video, but do you see this officer here in
17     the bus stop area?
18     A.     I do.
19     Q.     Is that the camo outfit of a SWAT
20     member?
21     A.     I can't tell, because, again, it's --
22     the video quality's poor.
23     Q.     Okay.  All right.  Fair enough.
24     A.     It may be clearer later on.

1      Q.     I think it is clearer later on.
2           MR. MARSHALL:  Go ahead and play it
3      out, Sam.
4           (The video is played.)
5           MR. MARSHALL:  Go back.
6           (The video is played.)
7           MR. MARSHALL:  All right.  Is the audio
8      available, Sam?
9           MR. SCHLEIN:  Yeah.  Just let me -- do
10     you want me to back it up to some point, John?
11           MR. MARSHALL:  Back it up to when we
12     see the individual come into the bus stop area,
13     and then from there, just play the audio.
14           (The video is played.)
15           MR. MARSHALL:  All right.  So, stop.
16           (The video is paused.)
17     Q.     Can you recognize this as a SWAT team
18     member?
19     A.     No.  It's so grainy and -- I mean, the
20     van looks somewhat familiar, but, again, it's --
21     on my end, it's really grainy.
22     Q.     Do you know anything about this
23     incident that you're seeing here?
24     A.     No.  Where's it at, and what's the date

1      on it?
2      Q.     This incident was at Broad -- or near
3      Broad and High on the 31st.
4      A.     No.
5           MR. SCHLEIN:  I'm going to take it out
6      of full screen and see if that clears things up a
7      little bit better.
8           THE WITNESS:  That's a little better.
9           MR. MARSHALL:  All right.  So, go ahead
10     from there.  Go ahead.
11           (The video is played.)
12     A.     We might have obstructions with the bus
13     stop, and then the guy in the maroon shirt,
14     because of the distance, is getting too gray.
15     Q.     Okay.
16     A.     So I can't --
17     Q.     So you can't affirmatively say?
18     A.     No, I couldn't.
19     Q.     All right.  If --
20     A.     I'm not familiar with that incident.
21     That's the first time I've seen this video.
22     Q.     All right.  If the individuals in that
23     incident said that that was an officer in the camo
24     of the SWAT team and this was on the 31st near

1      Broad and High, would you have any reason to
2      dispute?
3      A.     There was some individuals from
4      Fairfield County that would have been deployed on
5      the 31st that I believe had camo on, but, I mean,
6      other than that, getting it confused with the
7      Fairfield County units, that's the only thing that
8      I could say would dispute it.
9      Q.     Okay.
10     A.     But I've never seen this video until
11     now, and it's very grainy.
12     Q.     Fairfield County had camo just like
13     your camo or it was different camo?
14     A.     It was a little hodgepodge.  It's not
15     consistent.  They have -- you know, some of their
16     guys were wearing camo.  Some had, like, more of
17     an olive green.  It kind of varied.
18     Q.     Okay.
19     A.     Delaware Tactical has all olive green,
20     and I don't recall off the top of my head what
21     Gahanna was wearing on that evening.
22     Q.     All right.
23           MR. MARSHALL:  Sam, let's go to 109.
24           (The video is played.)

1  Q.      This is the -- I believe what we're
2  going to show you here now, Lieutenant, is the
3  Broad and High situation that we've been talking
4  -- we talked about earlier.
5  A.      Okay.
6          MR. MARSHALL:  So, Sam, go ahead and
7  start playing it.
8          (The video is played.)
9  Q.      All right.  So, first of all, do you
10  know...
11          MR. MARSHALL:  So just go ahead and
12  start for a second there and then stop.  Stop
13  there, Sam.  Stop the video.
14          (The video is paused.)
15          MR. MARSHALL:  Thanks.
16  Q.      Do you know, Lieutenant -- I know that
17  you remember that your teams were called to this
18  scene in part because I think you said there had
19  been a white van with individuals with weapons,
20  and you wanted -- you were asked to check that out
21  or be part of the -- be part of the situation
22  where it was checked out, right?
23  A.      It was a white SUV, like a Tahoe.
24  Q.      All right.  Do you see that anywhere in

1  this video?
2  A.      No.
3  Q.      Okay.  Were you aware that by the time
4  your team arrived, that SUV had left the scene?
5  A.      No.  Because there's a video that shows
6  that vehicle in the middle of the intersection at
7  Broad and High when that vehicle is surrounded.
8  Q.      When the white SUV is surrounded?
9  A.      No.  When the armored vehicle that's
10  trying to get to Broad and High to find that SUV
11  is surrounded --
12  Q.      Okay.
13  A.      -- there's a street cam video --
14  Q.      Yes.
15  A.      -- that shows those guys.
16  Q.      And that may have been earlier in this
17  same video.  I understand that.  My question was:
18  Do you believe that your teams arrived at the same
19  time as that SUV was still present at Broad and
20  High in the intersection?
21  A.      According to the videos I saw during
22  the BakerHostetler investigation, yes.
23  Q.      Okay.
24          MR. MARSHALL:  Sam, go ahead and play

1  further.
2          (The video is played.)
3          All right.  Go ahead and stop there.
4          (The video is paused.)
5  Q.      Do you know what's causing everybody to
6  -- so what we see in this video is a whole lot of
7  people just dispersing pretty quickly, right?
8  A.      Right.
9  Q.      At that point, do you know whether your
10  team is using any munitions?
11  A.      I see a little bit of smoke, so that's
12  an indication.  But without seeing officers
13  disperse the munitions, I can't say with 100
14  percent certainty what that smoke is from --
15  Q.      Right.
16  A.      -- because there's obviously a red semi
17  there.  Those armored vehicles are all diesel, so
18  there's a little bit of smoke that goes with
19  those.  But the volume of smoke leads me to
20  believe that some munitions had been dispensed.
21  Q.      The two black vehicles in the video --
22  do you see my cursor on your screen?
23  A.      No.  It --
24  Q.      It would only be Sam's.

1          MR. MARSHALL:  Sam, could you point out
2  the two black vehicles there.
3  A.      Yep.  That's the Delaware County
4  BearCat, and that one is our BearCat, too.
5  Q.      Okay.  So the Delaware County BearCat
6  is the one, who -- as you're looking the screen,
7  the one to the left, and the one to the right is a
8  Columbus -- your SWAT team's BearCat, right?
9  A.      Correct.
10  Q.      Okay.  All right.  Was it this Delaware
11  County BearCat that you say was surrounded
12  earlier?
13  A.      That's correct.
14  Q.      Okay.  All right.
15          MR. MARSHALL:  So, Sam, go ahead and
16  play.
17          (The video is played.)
18  Q.      All right.  Do you see people walking
19  away or running away?
20  A.      Yeah.
21  Q.      Most of them anyway?
22  A.      Yes.
23  Q.      Some of them have their hands up?
24  A.      Yeah.  It's convenient to get your

1    hands up after it's all gone to hell in a hand
2    basket.
3           MR. MARSHALL:  All right.  So, stop,
4    Sam.
5    Q.      All right.  I think we see your SWAT
6    team...
7           MR. MARSHALL:  Stop the video.
8           (The video is paused.)
9           MR. MARSHALL:  Use your cursor, Sam, to
10   show -- not this vehicle.  The SWAT team members.
11   Q.      Are those camo -- individuals in camo
12   on the screen near the black SUV here that's
13   sitting crosswise?  Are those Columbus SWAT team
14   members?
15   A.      I'd have to zoom in on them to say with
16   certainty, because right now, they're, like, about
17   a quarter inch in height.
18   Q.      All right.  As you play the video,
19   they'll become much clear in view.
20          MR. MARSHALL:  Go ahead and play, Sam.
21          (The video is played.)
22          MR. MARSHALL:  All right.
23          MS. TANOURY:  Did he just -- I didn't
24   see anything change on the video.  Did we play it?

1           MR. MARSHALL:  It's playing.  Do you
2    see it play?
3    A.      That's our BearCat there on the right.
4    Q.      Okay.  All right.  Now, you see --
5           MR. MARSHALL:  Stop.  Stop the video.
6           (The video is paused.)
7    Q.      Now do you see your SWAT team members?
8    A.      Right where that cursor's at?
9    Q.      Yes.
10   A.      Those appear -- again, they're like a
11   quarter inch tall.  So without zooming in on them
12   -- but they appear to be.
13   Q.      Okay.
14          MR. MARSHALL:  All right.  Just go
15   ahead and play.
16          (The video is played.)
17   Q.      Now, you see --
18          MR. MARSHALL:  Let's just stop the
19   video for a second.
20          (The video is paused.)
21   Q.      Do they appear to be firing down --
22   this would be north on High Street, where the
23   crowd is going, right?
24   A.      I can't tell due to the size of the --

1    what direction they're firing or what their -- I
2    mean, it's -- if I had the ability to zoom in on
3    it --
4    Q.      Okay.
5    A.      Let me see if I can zoom in on it.
6           No, I can't.
7    Q.      Okay.
8    A.      I can't use my zoom function on my
9    computer.
10   Q.      I don't know if we can do that or not
11   with this particular video.
12   A.      I've seen this video before, and there
13   are some Delaware County deputies and officers
14   that came out of the Delaware County BearCat, but
15   I can't individually point out who's who looking
16   at this video without zooming in and looking at
17   whether they have olive or whether it's camo,
18   because I can't distinguish camo on a
19   quarter-inch-size figure.
20   Q.      Okay.  Fair enough.
21          MR. MARSHALL:  Go ahead and finish the
22   video Sam.  Play it out.
23          (The video is played.)
24   A.      Hey, there goes a bottle.

1    Q.      Yeah, that guy threw a bottle.  Nobody
2    did anything about it, but -- all right.  And I
3    think it is going to zoom in a little closer on
4    some of the officers here.  We have some
5    knuckleheads in the middle of traffic there.
6    A.      Appropriate term.
7    Q.      And then coming up here on the upper
8    left-hand side of the screen, you'll see
9    individuals walking along, holding up their
10   phones.  Now, are those individuals...
11          MR. MARSHALL:  Put the cursor there,
12   Sam.
13   Q.      Can you identify those?  That clearly
14   looks like camo to me.  I don't know if you can
15   see it or not.
16   A.      I can't.  On my laptop, again, there
17   are --
18   Q.      All right.
19   A.      They're about three-eighths of an inch
20   now, but --
21   Q.      All right.  Well --
22   A.      -- without expanding that out and
23   looking at it, I can't distinguish whether that's
24   camo or not.

1   Q.     All right.  Well, it's either -- it's
2  got to be either Delaware County olive fatigues or
3  Columbus SWAT, because they're outfitted, and
4  they've got the impact weapons, right?
5   A.     More than likely, I would say, yes.
6   Q.     Okay.  All right.
7   A.     I could say with definity [sic] if I
8  could, like, expand it out, but I can't.
9   Q.     Yeah.
10   A.     I don't have the --
11   Q.     Yeah.  And I apologize.  We don't have
12  that set up right now.
13          MR. MARSHALL:  Go ahead.  Play the
14  video.
15          (The video is played.)
16   Q.     All right.  Are those your two BearCats
17  right there?
18   A.     Yes.
19   Q.     Okay.  All right.  Now can you
20  determine if those are Columbus SWAT?
21   A.     I would say -- again, the figures are
22  small, but I would -- I can't say with 100 percent
23  certainty, but 90 percent, yes.
24   Q.     Okay.  Fair enough.

1          MR. MARSHALL:  Go ahead and play.
2          (The video is played.)
3   Q.     All right.  So your BearCats are
4  getting in the intersection, and you see people
5  continuing to go up.  So we're looking north up
6  High Street now, aren't we?
7   A.     It appears that way.
8   Q.     Okay.
9   A.     I think this is a -- on the backside of
10  this BearCat, I saw a black vest.  That might be
11  Delaware County at the back of that one BearCat.
12   Q.     Okay.  But these -- the two guys in the
13  middle -- now, they see they're going to fire at
14  the people down the street?
15   A.     Yes.
16   Q.     Do you see that?  Okay.  All right.  Do
17  you know who that was?
18   A.     No.
19   Q.     Are you aware of whether -- I don't
20  think -- I don't think there was, but I just need
21  to ask you.  There were multiple individuals who
22  had fractured limbs as a result of being hit with
23  wooden batons.  Were any of your officers -- any
24  of your SWAT officers have a use of force in which

1  a person had a bone fracture as a result of a
2  wooden baton?
3   A.     Again, because they fled the scene,
4  there were -- and there were no arrests with
5  documented injuries, we can't connect a use of
6  force to any of those injuries.
7   Q.     Okay.  All right.  Now, is it -- are
8  you more than 90 percent certain about those two?
9  Are those two --
10   A.     They appear -- yeah.  They appear --
11  they're getting a little bigger as they move, you
12  know, up into the intersection.  Those appear to
13  be Columbus.
14   Q.     Okay.  The crowd is dispersed way up --
15  most of them way up --
16   A.     About to Gay Street, maybe.
17   Q.     Yeah, almost to Gay Street.  And then
18  some people, of course, went east on Broad.  Now,
19  there appears to be more smoke there, right?
20   A.     Yep.  Yes.
21   Q.     Are these your SWAT officers for sure
22  here?
23   A.     No, I don't believe so.  Not the three
24  that are right in the forefront of my screen.

1   Q.     Okay.  That's helpful.
2   A.     Those aren't our helmets.  We have camo
3  covers to our helmets.
4   Q.     Okay.  Do you know who that is, what
5  agency?
6   A.     Might be Fairfield, because I know
7  Delaware wears solid olive green.
8   Q.     Okay.  All right.  So --
9   A.     And then Fairfield's uniforms were a
10  little bit smattering of this and that.  They
11  weren't necessarily -- yeah.  That is -- so that's
12  Fairfield, because they have the yellow sheriff
13  markings on their -- the one guy right there that
14  turned --
15   Q.     Okay.
16   A.     -- had a sheriff marking.
17   Q.     I saw that.  Yeah.  Okay.  That's
18  helpful.  Thank you.
19          MR. MARSHALL:  All right.  Keep
20  playing, Sam.
21          (The video is played.)
22   Q.     I don't think there's much more of note
23  here on this particular clip, but how about right
24  here?  Are these your uniforms?  I see the camo on

1  the helmets.
2  A.     I would say yes, except I'm not sure of
3  the guy that's at the back of the BearCat.
4  Q.     Okay. Gotcha.
5  A.     But the four in the forefront and then
6  the one with the black vest on, that's -- I don't
7  know for 100 percent certainty, but we don't have
8  guys wearing black vests.
9  Q.     All right. So that's some other
10  agency --
11  A.     Yeah.
12  Q.     -- the black vests? Okay. Very good.
13        MR. MARSHALL: All right. Sam, you can
14  un-screen share there.
15  Q.     I really don't have that much more to
16  go, but let's take a break until 1. That's eight
17  minutes. And we'll get back on and get this
18  finished up, all right?
19  A.     Good enough.
20  Q.     Thanks.
21        (A short recess is taken.)
22  Q.     Lieutenant, I've just got a handful of
23  questions.
24        MR. MARSHALL: And I'll agree a lot of

1  these are outside the scope of the 30(b) notice,
2  but since I've got him here, this may save us
3  asking him questions down the road.
4        MS. TANOURY: Okay.
5  Q.     Are you aware, Lieutenant, that the --
6  one of the changes to division policy with respect
7  to levels of force appropriate to effectuate
8  dispersal orders -- are you aware that that was
9  changed during these protests or shortly after
10  most of the protests?
11        MS. TANOURY: Okay. John, I'll just
12  make my objection now and say that it's continuing
13  to the --
14        MR. MARSHALL: Okay.
15        MS. TANOURY: -- extent we're on this
16  topic.
17        MR. MARSHALL: All right. Thank you.
18  Q.     Do you know what I'm talking about,
19  Lieutenant, that there was a change to how
20  dispersal --
21  A.     Right.
22  Q.     -- orders are going to be enforced?
23  A.     Correct. So we got training on that
24  through our PowerDMS website.

1  Q.     Yeah. What do you recall -- I'm not
2  going to hold you to the specifics particularly,
3  but what do you recall generally about the
4  changes? What changes were made?
5  A.     You know, again, I can't give you
6  verbatim. I can give you, like, a general
7  overview of -- and, honestly, the changes to me
8  are not, per se, changes to the way I conduct
9  operations and people in my -- under my chain of
10  command conduct operations, but that purely people
11  who are exhibiting peaceful protests -- and all's
12  they're doing is, per se, coming out into a street
13  and occupying a street or an intersection, that
14  there will not be ordinance used to deploy -- to
15  disperse those people purely to remove them from
16  the roadway.
17  Q.     Right. And that's not what SWAT does
18  anyway --
19  A.     No.
20  Q.     -- as you described for me previously?
21        What do you do in a situation where...
22        MR. MARSHALL: And, again, this is not
23  within the scope of the 30(b) notice. I agree.
24  Q.     What do you do in the situation where

1  you've got 100 people and one person throws a
2  water bottle or a rock? How do you deal with
3  that?
4  A.     Are you asking for -- how I would deal
5  with it or --
6  Q.     Yes.
7  A.     -- my recommendations for how to deal
8  with it?
9  Q.     Yes, sir. How would you deal with it?
10  A.     Sure.
11        MS. TANOURY: Same objection.
12  Q.     Go ahead.
13  A.     So, obviously, the first thing to do is
14  to identify that person as the problem in the
15  group. Then you have to make a decision about
16  whether you can safely move into that group and
17  arrest that person or if there's some way that you
18  can conduct surveillance on that individual until
19  they remove themselves from the group and then it
20  becomes safe to arrest that person.
21  Q.     Okay. Thanks. Have you seen the
22  videos -- there are many of them, but one of them
23  actually has Councilman Hardin and Congresswomen
24  Beatty in the video -- where protesters are

1  stepping into the street, like putting one foot
2  into the street in violation of an order to stay
3  out of the street?  Have you seen any of those
4  videos?
5  A.       The only one that I recall seeing is
6  the one where Representative Beatty -- and I
7  believe that was on the statehouse grounds, if I'm
8  not mistaken.
9  Q.       Okay.
10  A.       I've seen that video.
11  Q.       What --
12  A.       But beyond that, I really haven't seen
13  that many videos.
14  Q.       Were any members of your SWAT team
15  present when Representative Beatty and Councilman
16  Hardin were at -- were pepper sprayed?
17  A.       No.
18  Q.       Let me check my notes.  I might be
19  done.
20          Does the -- do you, as the SWAT
21  commander, or sergeants who are leading the teams
22  have the authority to declare an emergency such
23  that an area needs to be cleared of persons?
24  A.       I think any police officer has the

1  authority to do that.
2  Q.       What would be -- just give me a couple
3  examples of circumstances of where that's
4  appropriate.
5  A.       For example, I'll give you one that I
6  was involved in.
7  Q.       Okay.
8  A.       On the evening of the 29th, when things
9  had gotten --
10          MS. TANOURY:  I'm going to -- sorry.
11  I'm going to object to the extent he's talking
12  about what he personally experienced and it's
13  outside the scope of the city's testimony.
14          MR. MARSHALL:  All right.  Thank you.
15  Q.       Go ahead, Lieutenant.  On the 29th?
16  A.       Correct.  So one of the issues that was
17  present was these large roving groups who were
18  breaking out windows and perpetrating violence on
19  officers and other people would be dispersed, and
20  then they would re-congregate, and then the whole
21  cycle would start over again.
22  Q.       Okay.
23  A.       So closing areas off to prevent them
24  from congregating and having to deal with the same

1  problem over and over again is a valid tactic.
2  Q.       Okay.
3  A.       So declaring an emergency, denying
4  access to an area so that you don't have to occupy
5  the same area twice and deal with the same issue
6  again is a valid instance where that would be --
7  you declare -- this area is closed due to a
8  state of emergency.
9  Q.       Okay.  That's a good example.  Did you
10  actually declare a state of emergency yourself or
11  did someone else do that on that night?
12  A.       Well, we -- the Supreme Court building
13  seemed to be a target of the protesters' ire, and
14  they had damaged it.  So I was across the river
15  with three of my K-9 officers, and we proceeded to
16  drive off 50 or 60 people who were doing criminal
17  damage and -- to the Supreme Court building.  And
18  we shut that block down and denied access to the
19  west side of the Supreme Court building.
20  Q.       Okay.  All right.  Lieutenant, I
21  appreciate your time today.  Those are all the
22  questions I have.
23          MR. MARSHALL:  Craig, this one, we will
24  order.

1          THE REPORTER:  Okay.
2          (A discussion is held off the record.)
3          MS. TANOURY:  And, Lieutenant, you'll
4  have an opportunity to review and sign your
5  deposition transcript.
6          THE WITNESS:  Okay.  Thank you.
7          (Signature not waived.)
8          - - - - -
9          Thereupon, the foregoing proceedings
10          concluded at 1:08 p.m.
11          - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

```
1   State of Ohio     :        C E R T I F I C A T E
    County of Franklin: SS
2
        I, Craig Ross, RPR, CRR, a Notary Public in and
3   for the State of Ohio, certify that Lieutenant Paul
    Ohl was by me duly sworn to testify to the whole
4   truth in the cause aforesaid; testimony then given
    was reduced to stenotype in the presence of said
5   witness, afterwards transcribed by me; the
    foregoing is a true record of the testimony so
6   given; and this deposition was taken at the time
    and place specified on the title page.
7
        Pursuant to Rule 30(e) of the Federal Rules of
8   Civil Procedure, the witness and/or the parties
    have not waived review of the deposition
9   transcript.
10      I certify I am not a relative, employee,
    attorney or counsel of any of the parties hereto,
11  and further I am not a relative or employee of any
    attorney or counsel employed by the parties hereto,
12  or financially interested in the action.
13      IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my seal of office at Columbus, Ohio, on
14  February 9, 2021.
15
16
17
18
19
20  _____
    Craig Ross, Notary Public - State of Ohio
21  My commission expires July 7, 2021.
22
23
24
```

```
        Witness Errata and Signature Sheet
           Correction or Change Reason Code
    1-Misspelling  2-Word Omitted  3-Wrong Word
      4-Clarification  5-Other (Please explain)
Page/Line     Correction or Change     Reason Code
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

I, Lieutenant Paul Ohl, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.
Date_____Signature_____
The witness has failed to sign the deposition
within the time allowed.
Date_____Signature_____
```

Ref: CR301270PO  S-CR P-AR

**Exhibits**

**301267 Exhibit 00
5** 4:5 40:13 41:5

---

**1**

**1** 142:16
**1,000** 66:7
**10** 23:12 69:16
**100** 9:21 59:6 117:1 119:13 132:13 138:22 142:7 145:1
**102-B** 125:24 126:2
**107** 117:5
**109** 129:23
**112** 87:4,5
**11:46** 99:1
**12** 41:17 83:13
**128** 35:21
**13** 99:17
**15** 18:23 69:16 82:24
**15-meter** 66:10
**18** 6:23 82:24
**19** 6:24 7:16,20
**1974** 19:12
**1989** 6:20
**1:08** 149:10
**1st** 101:16

---

**2**

**20** 36:12
**20-meter** 66:11
**200** 103:23
**2014** 56:21
**2020** 8:5 17:18 20:5,13,14 25:16, 19
**214** 21:11 106:19
**214s** 21:13
**223** 38:13,18
**24** 27:22 30:17
**25** 36:12,24
**25th** 20:13
**26** 23:12
**28th** 20:14,17 21:7,9 25:16 48:3 51:20 106:10
**2917.05** 62:16
**29th** 52:5 109:2,3, 4,8 120:4 147:8, 15

---

**3**

**30** 83:3 84:11,14 92:8
**30(b)** 95:22 143:1 144:23
**30(b)(6)** 7:13 72:18
**30th** 101:18 109:1,8 116:17
**31st** 71:19 101:16,18 128:3, 24 129:5
**32** 41:21 42:5 91:9
**37-millimeter** 14:5 44:11 55:9 56:13 63:2,5 66:16 68:21 75:12,23 76:11 77:3,10 78:6 81:6,11,16,24 91:19 99:21 101:23 104:12 112:22
**3rd** 6:20

---

**4**

**4** 42:7
**4.4** 42:3,8
**40** 55:11 78:5 81:15
**40-millimeter** 14:7,8 44:14 55:2,4 57:3,7,17 77:1,3
**40-millimeters** 76:21 81:19

---

**5**

**5** 40:13 41:5,11
**50** 148:16
**500** 49:5 66:7

---

**6**

**60** 92:8 148:16

---

**7**

**75** 92:3

---

**8**

**8** 116:17

---

**9**

**90** 138:23 140:8
**95** 71:15

---

**A**

**ability** 12:8 136:2
**Absolutely** 18:12
**accept** 30:19
**access** 9:10 40:24 41:4 80:24 83:9 148:4,18
**accompany** 115:12
**accomplish** 18:7, 8
**accurate** 64:17 90:10 119:12
**acoustic** 21:1 48:4 51:21 106:13 107:2
**acting** 77:21
**active** 19:23
**actively** 23:15
**activities** 30:8
**activity** 21:12 60:3 71:11 78:11 80:3 102:11,18
**actuates** 82:10
**Adam** 21:20
**add** 12:14
**addition** 13:3 42:12
**additional** 83:7 94:17 95:17
**address** 20:6
**addressing** 19:13
**administered** 13:2
**administration** 5:5,11
**aerosol** 43:9 57:20 58:13 59:1 60:5 61:3 63:11, 14 78:24 89:23 113:18
**affairs** 22:9,15 23:5 110:3 121:7 125:19
**affects** 12:5,8
**affidavit** 41:5,12
**affirmatively** 128:17
**after-action** 108:20
**agencies** 52:11
**agency** 141:5 142:10
**agent** 61:22
**agitator** 78:8 79:24
**agree** 14:20 17:12 20:11 91:4 123:12 142:24 144:23

---

**agrees** 20:12
**ahead** 56:8 59:16 61:11 88:23 89:13,20 90:2 103:5 118:11 121:14 122:4,5, 19,21 124:5 125:5 127:2 128:9,10 130:6, 11 131:24 132:3 133:15 134:20 135:15 136:21 138:13 139:1 145:12 147:15
**aid** 8:3 75:7
**air** 65:15,17 66:3
**Alana** 5:13 7:14 40:17 42:1,5 87:5 93:1 99:8
**all's** 144:11
**allowed** 31:14 62:22 116:6
**altercation** 113:13
**altogether** 27:19
**amend** 9:18
**amendments** 9:22 10:10
**amount** 16:19 79:5,14 83:12
**analysis** 77:16
**and/or** 8:7,8 69:18
**announcements** 21:3 106:22 111:14
**annoying** 108:1, 10,12,14
**anymore** 56:19
**Anything's** 46:24
**apologize** 41:15 138:11
**apparently** 121:21
**appears** 37:4 89:9,10,24 126:10 139:7 140:19
**applicable** 55:17
**apply** 29:14
**apprehension** 80:4
**appropriately** 63:6
**approximately** 17:23 27:23
**area** 50:10 65:18 97:19,20 100:16 108:2 115:5,13, 18 116:18 120:15 126:11,17 127:12 146:23 148:4,5,7
**areas** 49:1 67:22 147:23
**armed** 38:9 125:11

---

**armor** 49:11,17, 20,21 50:2
**armored** 20:24 73:13 75:4 85:24 97:21 101:8 131:9 132:17
**armors** 49:19
**arrest** 19:21 59:24 78:12 103:6,23 104:17,19 114:3, 5,14,19 115:2,21, 24 116:18 145:17,20
**arrested** 104:23 114:24 115:12,24
**arresting** 61:23 104:14 114:7 115:4
**arrests** 103:7,8 104:2,19,20 105:6,16 115:21 140:4
**arrive** 67:1,2
**arrived** 131:4,18
**articles** 74:9
**assault** 28:11 122:11 125:12
**assault-style** 73:18
**assemble** 21:13 34:5
**assign** 84:22,23
**assigned** 20:24 24:2 36:20 38:13, 18 42:22,24 51:10 69:7 76:18 77:3 85:20 98:15, 16 100:21 101:7
**assigning** 84:24
**assignment** 29:13 98:13
**assist** 52:12 112:14
**assistance** 75:4 97:22
**assistant** 24:3 26:8,14,16 27:9, 14,17 31:4 33:10 58:20 69:1,19 70:7 75:15
**assume** 34:15,16 35:19 65:21
**assuming** 65:15 102:4 104:13
**attached** 47:7
**attempt** 80:3
**attempted** 107:16 125:13
**attempting** 59:23 125:11
**attic** 16:10,11
**attorney** 5:15 72:14 73:1,3
**audio** 127:7,13

authority 8:6
114:3,5 146:22
147:1
authorized 69:4
auto 84:2
automatic 84:8
automatic-fire
83:23
autonomously
31:15,21
avenue 116:6
aware 51:14 53:6
55:3 90:24 92:13
131:3 139:19
143:5,8

**B**

back 12:17 15:8
17:13 23:8 29:8
49:3,24 50:10
54:17 89:3 110:4
115:12,17,18
117:11,17 118:20
124:13 126:6
127:5,10,11
139:11 142:3,17
background 61:9
117:22
backside 139:9
bad 41:3
baffled 43:5
bag 83:12,14
Bakerhostetler
22:10 23:6 72:4,
14 86:8 125:20
131:22
ball 64:19,23
balls 79:18
barricade 19:14,
20 28:20 31:12
42:15 48:14
81:17,18
barricade-type
28:16
barricaded 16:14
based 46:9 61:7
90:22 98:10
110:22 112:2
119:12
basic 9:2
basis 36:8 111:5
basket 134:2
baton 14:4,7
39:20 44:11,12,
16,17 45:5 46:15
55:2,4,7,15 63:2,
5 66:16 68:1,21
75:12,24 76:11
77:11 78:6,17,23
81:6 82:1 90:4,
13,20 91:1,11,19
99:22 101:23
102:2 104:12
105:9,11,15
113:15 140:2

batons 13:13
112:22 139:23
beanbag 56:16
bear 63:17
Bearcat 86:12,13
97:15 133:4,5,8,
11 135:3 136:14
139:10,11 142:3
Bearcats 85:23
86:9 119:7
138:16 139:3
Beatty 145:24
146:6,15
beginning 25:15
103:22 104:2
117:12,16
begins 41:5
behalf 11:24 93:8
behaving 78:10
behavior 62:18
68:10
belt 44:3
Bernhardt 22:21
big 35:19 82:11
bigger 140:11
binder 35:14,17,
20
bit 19:8 37:6
39:23 55:17,20
82:9 91:14
118:21 128:7
132:11,18 141:10
biweekly 18:1,
18,23
black 16:16 20:3
21:24 23:1 25:9,
12 26:6 47:21
50:13,16 58:9,14
59:2 60:4 66:19
68:8 73:17 91:16
132:21 133:2
134:12 139:10
142:6,8,12
blast 64:19,23
blasting 108:4
block 33:11
120:10,22 148:18
blocked 73:24
blocking 62:3
102:3,12,17
103:20
blocks 33:20,22
56:3 120:22
blonde 72:15
blurry 117:20
118:1,2,3 119:13
body 48:20 49:11,
17,19 50:2
bone 140:1
book 33:21 34:10,
20,24 39:10 92:7
bottle 45:16,17
46:4,16 47:5,8
136:24 137:1
145:2

bottles 74:8
111:20
boy 21:19
brand-new 31:17
Bray 21:17 25:2
125:6,7
Bray's 108:20
breaching 36:23
break 90:5 99:2,
17 142:16
breaking 147:18
breathable 48:21
Brenner 26:21,23
27:4,5
Brian 25:4 100:7
bridge 120:8
briefings 51:11
brilliant 11:13
bring 15:22 17:13
Broad 71:18 73:7,
15,16 80:18 81:4
86:7 97:7 111:17
120:7 128:2,3
129:1 130:3
131:7,10,19
140:18
broader 7:20
broken 23:24
brought 54:18
92:20 119:6
brown 54:7
Bruce 25:4 100:7
building 51:8 53:8
118:4 120:17
148:12,17,19
buildings 117:21
bullets 49:12,22
Bureau 22:9,16
121:7
burn 43:7 65:13
burning 43:5
bus 126:11,17
127:12 128:12
business 60:1
buy 45:13

**C**

calendar 101:15
call 30:18 38:2
46:8 49:2,4,6,18
54:3 58:12 88:10
101:1 103:6
111:12
called 7:12 14:11
16:2,23 24:2
28:15 33:18 35:1,
5,13 43:5 64:19
65:12 75:3 79:4,
10,11 81:18
106:8 111:14
112:13,24 113:8
130:17

calling 63:16
98:21
calls 48:19
cam 54:3 131:13
camo 54:9 118:15
119:9 126:19
128:23 129:5,12,
13,16 134:11
136:17,18
137:14,24 141:2,
24
camouflage 54:4
candidates 30:20
canister 16:9
65:5,17 66:7
111:1
canisters 80:19
cap 116:20
career 6:18
cargo-style 86:6
carried 44:6
carrier 48:23
carry 44:3,5 48:7
58:6 60:2 81:2,7
83:6,15 107:7
114:17
carrying 52:24
69:3 77:1 81:24
122:11
cartridge 82:7,19
case 19:1 62:22
85:2
cases 68:3
catch 37:19
category 8:1,6,8,9
14:18
causing 132:5
CDP 8:3,4 9:6
CDP's 9:23
cell 60:14
center 70:21
120:6
certainty 108:21
119:14 132:14
134:16 138:23
142:7
certifications
100:5
chain 124:7 144:9
chamber 82:8
chance 52:3
change 10:22
12:14 36:1
134:24 143:19
changed 10:14
17:4,18 35:3
143:9
channel 70:19
71:1,4,6,12,17
channels 60:13
70:20,23 71:2,9
chanting 102:13,
23 103:20 106:3

110:6
chants 102:15
characterize
56:10 108:6
charge 25:8 53:13
74:13 97:1 115:6
check 16:17
18:19 37:23
130:20 146:18
checked 130:22
chemical 16:7
79:14
chosen 38:8
circle 66:11
circumstance
106:1
circumstances
8:5 58:24 101:21
111:2 113:5
114:13 147:3
citizens 38:8
45:13
city 7:16 12:1
19:5 71:10 93:8
120:10
city's 19:11 23:10
37:5 147:13
Civic 120:6
civil 7:12 9:3
12:21 13:14 17:5,
6 20:2 39:20,24
42:22 43:1,10
47:20 55:19 67:6
91:21 95:8 96:13
114:6
clarify 47:19
102:10
clear 8:16 11:13
60:2 94:22 102:3
116:12 134:19
cleared 146:23
clearer 119:19
126:24 127:1
clearing 74:4
clears 128:6
clients 5:21
clip 141:23
close 36:15 55:17
77:9,21 97:21
100:16 120:20
closed 43:12 64:5
148:7
closer 55:20
137:3
closes 29:15
closing 147:23
cocktails 67:8
collateral 28:8,11
Columbus 6:15,
19 7:5,7,9 8:12
12:1 18:17,22
19:16 20:4,14
36:10 41:18
54:11 88:5,7,13,

19 114:4 133:8
134:13 138:3,20
140:13

**combat** 48:18

**command** 50:24
51:5,9 96:17
124:7 144:10

**commander** 6:15,
22 7:3 18:3 96:19
97:1,6 111:10
146:21

**commercial-grade**
45:2,8

**committing**
114:2,22

**communicate**
53:11 70:8,11,14

**communicates**
33:9

**communication**
60:17 69:23

**communications**
70:1 71:16

**compare** 63:23

**complaint** 119:1

**complete** 22:8
31:14 115:13

**completed** 10:17
21:16 121:9
125:9

**comply** 102:5
104:4 106:5
109:17 110:14
112:6

**computer** 40:24
41:7 136:9

**conceivably** 46:4

**concert** 15:4

**concluded** 149:10

**condition** 12:4

**conditions** 40:3

**conduct** 22:6
103:13 106:8
125:11 144:8,10
145:18

**conducted** 10:22
13:5 124:23

**conducts** 22:5

**confident** 18:9

**confused** 129:6

**confusion** 94:22

**congregating**
147:24

**Congresswomen**
145:23

**congruent** 16:3

**conjunction**
50:22

**connect** 140:5

**connector** 120:8

**consent** 5:4,11

**considered** 47:8

**consist** 34:9

**consistent** 129:15

**consists** 81:15

**constantly** 9:16

**constructing**
104:18

**consulted** 93:22

**consume** 66:3

**contact** 52:23

**contacted** 121:15,
17

**containment**
31:11

**context** 93:3

**continue** 32:2

**continued** 25:16

**continuing** 37:15
139:5 143:12

**continuum** 103:1,
3

**control** 39:7,15,
19 41:19 42:3,8
54:17 57:5 58:17
63:12 69:21
71:20 80:11
91:21 92:7
113:11 114:6

**control-type**
55:18

**control/civil**
66:18

**convenient**
133:24

**cool** 48:22

**cooperating** 8:3

**coordinate** 53:14

**coordinates** 31:5

**corner** 87:22

**correct** 6:16,17
10:2 13:11 15:24
16:8 17:7 20:16
24:12 25:10,18
26:1 27:20,24
28:21 29:3 32:22
33:3 34:18 35:15
38:13 43:15
46:11 50:15
53:21 56:9,15
57:10,13 58:2,5,
21 64:12 65:8
70:9 73:9 74:5
77:24 78:16,19
79:16 80:10
82:20 83:5 84:6,9
85:13 88:21 94:6
95:19 97:4 101:2,
4,17 104:1 106:7,
11,15 113:2
114:16 116:2,9,
11 125:17 133:9,
13 143:23 147:16

**COSI** 120:9

**Councilman**
145:23 146:15

**counsel** 5:2 8:22

**counter-snipers**
36:18 37:11,21
38:2

**countermeasure**
38:10

**County** 52:13,15
53:1,17,18,19
75:6 97:15 129:4,
7,12 133:3,5,11
136:13,14 138:2
139:11

**County's** 86:13

**couple** 37:2 49:1
54:14 64:8 93:9
100:4 101:24
103:18 109:9
147:2

**court** 5:18 53:8
118:4 120:16
148:12,17,19

**cover** 11:5 85:1,6

**covering** 68:6

**covers** 50:8 141:3

**Craig** 99:12
148:23

**create** 90:8

**created** 19:12
93:9

**creates** 43:23
59:19 61:18 80:8

**creating** 53:15

**crime** 114:2,22,23

**criminal** 38:8 60:3
115:6 148:16

**criminals** 38:7
61:20,21

**CROSS-
EXAMINATION**
6:6

**cross-train** 94:15

**cross-training**
95:1

**crosswise** 134:13

**crowd** 39:7,15,19
55:18 59:18,24
60:2 61:3,20,22
63:7 66:18 67:14,
15,24 68:10
71:21 73:24 75:1,
8 77:8 80:2,11
86:18,20 91:21
105:17 110:6,14
114:6 135:23
140:14

**crowds** 60:6

**cruiser** 88:14

**CS** 13:23 16:23,24
17:1,5,17 18:6,9
21:9 39:21 43:3,4
64:21,24 65:2,11,
19 66:7 105:10
113:16

**curriculum** 9:16
12:18,19,20,24

**cursor** 132:22
134:9 137:11

**cursor's** 135:8

**Cutshaw** 100:10

**cycle** 82:5,7
147:21

**cylinder** 81:13
82:10,11

---

**D**

**damage** 100:17
114:23 148:17

**damaged** 148:14

**Dan** 121:6,16,20,
22

**danger** 85:4

**dangerous** 16:11
107:10

**darkness** 21:2

**date** 18:19 20:22
116:23 120:3
127:24

**dated** 23:16 37:6

**dates** 20:10
101:17 107:14
109:13

**David** 26:17
100:14

**day** 20:20 23:24
64:3,9,14 65:16
85:19 101:12

**daylight** 71:19

**days** 13:4 51:15,
17 52:2,8,10 64:8
67:3 101:18,19

**deadly** 45:3 57:9

**deal** 13:14 51:6
61:19 75:1
112:24 145:2,4,7,
9 147:24 148:5

**dealing** 38:6,7
42:16 47:1

**deals** 13:15

**death** 44:23 46:2

**decades** 92:11

**December** 10:10

**decide** 30:21

**decided** 45:3

**decision** 30:1
66:17 68:16 77:4,
5 111:9 145:15

**decisions** 30:14
51:11 58:15
66:20 68:20

**declare** 146:22
148:7,10

**declaring** 148:3

**dedicating** 36:11

**defend** 58:23

**Defendants** 5:14,
16

**define** 14:13

**definity** 138:7

**degraded** 58:22
67:4,11 113:10

**Delaware** 52:13
53:19 73:12
74:15,20,21
86:13 97:14
111:20 129:19
133:3,5,10
136:13,14 138:2
139:11 141:7

**deliver** 15:19 95:7

**delivered** 33:12
43:3 65:3,4

**delivering** 45:22
67:19

**delivery** 36:21

**demanding** 30:5

**demands** 30:6

**denied** 148:14

**denying** 148:3

**depend** 105:2

**dependent** 65:20

**depending** 71:10
82:4 83:10 85:19

**depends** 45:17,21
63:3

**deploy** 8:7 51:17
66:18 67:22,23
76:5,9 86:18 92:6
144:14

**deployed** 8:10
16:15,22 17:1,5
18:10 20:10,17,
20 21:8,23 28:19
47:12,15 48:5
50:13 51:24 52:7
67:3 76:7 108:16,
18,23,24 109:11,
16,21 111:12
129:4

**deploying** 8:5
51:12 67:12 76:2,
24

**deployment**
17:17 40:2 47:24
48:2 68:5,18
93:16 94:15
100:19

**deployments**
16:20 52:9

**deposition** 5:12
7:11 8:21 9:10
11:5 12:13 17:14
22:21 72:2,19
149:5

**deputies** 136:13

**describe** 31:2
43:19 48:15
108:13

**describes** 33:21

**description** 54:6
75:14

**descriptor** 49:16

**designated** 7:15,
23 8:11,17 11:23
14:19 17:10 32:3
37:7 63:19 111:4

115:20 124:2

**designed** 16:21
43:12 78:7 84:13
93:14 101:6
107:20,22,24
108:1

**destroying**
114:11

**detective** 28:9

**determination**
67:24 68:9

**determine** 39:6
59:17 64:4
138:20

**determined** 64:15
109:9

**determines** 15:7

**determining** 33:5

**develop** 35:24

**device** 21:1 51:21
64:19,20,22 65:7
89:6,19 90:19,23
106:14,22 107:2

**devices** 48:4
60:17 86:18

**diesel** 132:17

**differ** 42:14,17

**differences** 54:21
55:1

**differently** 53:22
98:20

**digest** 30:17

**dignitary** 19:23

**direct** 8:7 44:2
52:23 80:2

**direct-fire** 14:10
45:5 46:15 77:5
113:22

**direct-fired** 44:22

**direct-impact**
44:15 45:4 56:24
78:6,7

**directed** 45:24
46:3

**direction** 136:1

**directives** 40:6

**directly** 57:13
110:2 124:21

**director's** 119:3
121:5 125:22

**disabled** 114:18

**discharge** 55:22
81:7 82:21,23
83:1

**discharging**
82:14

**discipline** 124:14

**disciplined**
123:20

**discussion** 149:2

**disfigurement**
45:20 46:2,5

**disobedience**
17:6 20:2 66:19

**disobeyed** 103:21

**disorder** 9:3
12:22 17:6 39:24
42:22 43:1,10
47:20 55:19 67:6
91:21 95:8 96:13
114:6

**disorders** 13:14

**dispensed** 132:20

**dispersal** 21:3
60:7 61:4,18
62:2,3 102:5,19
103:10,21 104:4
106:5,9 109:17
110:9,15 111:14
112:7 143:8,20

**disperse** 60:6
61:3,22 62:17,23
63:6 66:7 67:13,
16 75:7 105:17
107:22 116:6
125:13,14 132:13
144:15

**dispersed** 68:1
69:15 140:14
147:19

**dispersing** 132:7

**dispute** 129:2,8

**distance** 47:4
128:14

**distances** 107:8

**distinguish** 53:24
136:18 137:23

**disturb** 107:3

**disturbances**
39:20

**divide** 71:5

**divided** 76:14

**division** 6:15,19
7:5 8:13 9:7
18:17,22 22:3
23:14 29:5 40:6
42:12 54:11 88:6,
13,19 90:23 91:8
93:5 94:18 98:21
143:6

**division's** 18:21
19:11 23:10
36:10 37:5 94:2
95:6

**document** 10:21
12:19 63:13
64:18

**documented**
140:5

**documents** 8:24
16:18 21:11
40:22 107:13
110:3

**dogs** 100:24

**draw** 65:24

**dressed** 53:22

**drew** 71:13

**drive** 120:6

148:16

**driving** 106:21

**due** 28:2 135:24
148:7

**duly** 6:4

**duties** 23:15 29:5

**duty** 28:8,12 33:7
98:12

**dye** 79:8,15

---

**E**

**e-mailed** 40:22

**ear** 50:9

**earlier** 15:8 33:17
39:9 101:20
110:4 130:4
131:16 133:12

**early** 8:4 16:21
64:7

**east** 140:18

**eastbound** 73:14

**Ed** 5:9

**Edwards** 72:21,24

**effect** 10:16,24
47:6

**effective** 16:21
55:13 57:1 64:5
65:17,19 77:6,10
78:5 91:18 99:23
113:20

**effectuate** 143:7

**elaborate** 31:9

**element** 19:6
74:14

**emergency** 41:19
70:21 101:6
146:22 148:3,8,
10

**employed** 8:3

**encourage** 103:9
104:3

**end** 10:15 12:13
33:13 117:15,18
127:21

**enemies** 38:6

**enemy** 38:6

**enforced** 143:22

**enforcement** 8:2
61:21

**engage** 100:18
106:17 116:13

**engaged** 68:10
103:13

**engagement**
51:13

**engaging** 60:3
67:6

**entire** 33:14 51:24
70:24 83:1
120:10

**entities** 8:3 95:4

**entity** 124:23

**entry-level** 35:4,6,
13

**enveloped** 73:24

**environment**
42:15 43:12
55:17 77:7 83:11
113:20,21

**EOC** 51:14

**equipment** 10:11,
12 48:7

**Eric** 100:14

**escort** 101:8

**estimates** 66:5

**evacuated** 101:11

**evacuation** 101:7

**evening** 18:8
21:16 24:1
106:19 110:1
129:21 147:8

**evenly** 76:14

**everybody's**
27:24

**examples** 54:14
59:14,18 101:24
102:1 147:3

**excess** 9:21

**exchange** 73:7

**excuse** 95:3

**Exhibit** 40:13 41:5
87:4,5 126:2

**exhibiting** 144:11

**exhibits** 40:19

**expand** 138:9

**expanding** 137:22

**experience** 13:10
15:23 24:11
29:10 46:10
66:13 90:22 91:7,
15 110:23 112:3

**experienced**
147:12

**expert** 24:6

**expertise** 24:11
99:21

**explain** 11:18
15:11

**Explosive** 36:23

**expose** 93:16

**exposed** 108:7

**extended** 12:18

**extensive** 9:15,19
10:2,4,8,9 94:20

**extent** 89:15
143:15 147:11

**extinguisher**
43:20 58:1 80:6,8

**extinguishers**
80:14

**extra** 83:13

**extracurricular-
type** 30:8

**extreme** 30:6 85:2
92:2

**eyes** 30:10

---

**F**

**face** 45:21 63:24

**fact** 85:8

**facts** 105:20,22

**failed** 105:17

**failing** 106:5

**fair** 36:2,3,13 54:5
59:8 60:24 61:1
68:2,12 77:18
88:20 92:14
108:15 126:23
136:20 138:24

**Fairfield** 52:13
53:18 75:5 129:4,
7,12 141:6,12

**Fairfield's** 141:9

**fall** 62:15

**familiar** 24:4 92:1
93:6 127:20
128:20

**family** 30:6

**fatigues** 138:2

**FBI** 101:8

**FBI's** 101:5

**feedback** 104:20

**feel** 12:14 55:12

**feet** 66:7,8 69:16
92:8

**felt** 82:23

**female** 72:14

**field** 20:7 22:24
27:22 31:24 32:9,
13,20 42:22
47:15 48:11
53:23 60:11,21,
22 66:17,21 94:9
96:11,19,22,24
97:5,12,18,19
111:10,11,15
112:17,18 113:9

**figure** 121:23
122:1 136:19

**figured** 113:19

**figures** 138:21

**file** 115:5

**filled** 23:3

**final** 30:1 64:19

**find** 29:16 115:16,
17 131:10

**finding** 124:10

**findings** 123:22

**fine** 62:8 89:22
99:7,10,11,15

**finish** 18:13 23:9
136:21

**finished** 35:11
142:18

**finite** 76:2

**fire** 43:8,20 47:8
55:21 56:1,12
58:1 80:6,7,14
84:1,8 139:13

**firearm** 29:23
36:21 82:5

**firearms** 29:18

**firecrackers**
45:16

**fired** 14:5,8 55:22
57:8 67:7 83:3
90:7,8,19,24
91:10,15 100:2

**firework** 45:2,9

**fireworks** 45:10,
11 67:7

**firing** 90:12,16
135:21 136:1

**firm** 5:10

**fit** 20:5

**flash** 90:8 91:13

**fled** 140:3

**flow** 62:4

**Floyd** 20:13 25:14

**fluid** 39:3 76:24
77:23 78:2

**focused** 53:7

**fog** 43:23 58:3
80:8

**fogger** 43:17,23
44:6 57:23

**folks** 99:4 125:13

**follow** 15:21 40:6
42:11 103:9

**foot** 146:1

**force** 16:17 20:7
21:10 22:4,5,8,
11,24 23:4 54:23
57:9 61:16,17
62:16,23 63:1
64:9 96:12,19,22,
24 97:5,19,20
106:18 110:1
111:10,11 112:17
113:9 139:24
140:6 143:7

**forces** 42:22
97:12 111:15,16
112:18

**forefront** 140:24
142:5

**foregoing** 149:9

**forehead** 50:7

**forever** 12:11
14:21

**form** 21:11 45:4
67:16

**formal** 22:18

**Forman** 5:9

**format** 16:9

**forms** 22:9

**forward** 22:8
74:24

**forwarded** 119:3
121:16,20,22

**found** 16:20 43:11
107:11

**fracture** 140:1

**fractured** 139:22

**Franklin** 52:15,24
53:17

**Fraternal** 73:1

**free** 12:14

**freeze** 126:7

**frequency** 108:9

**frequently** 36:19

**Friday** 52:4,8

**front** 40:20 49:24
118:8

**full** 98:14 128:6

**full-time** 18:23
19:4,6 23:12 28:6

**fully** 84:2

**function** 28:10
31:12,15 32:12,
17 61:23 80:16
92:10 107:6,11,
12,17 136:8

**functional** 33:6

**functioning** 31:21

**functions** 23:14
93:15

**fuzzy** 121:18

---

**G**

**Gahanna** 52:14
53:19 75:6
129:21

**gamut** 104:22

**gas** 16:23 17:1,5,
17 18:9 21:9
39:21 55:22,23
64:24 65:2,19
113:16

**gave** 18:10
101:24

**Gay** 140:16,17

**gear** 88:10

**general** 9:6,7
12:22,23 40:6
42:11 54:23 74:9
77:19 111:11
144:6

**generalized** 39:23

**generally** 14:17
22:2 28:15 67:2
90:23 93:3,7
100:20 144:3

**generated** 74:3

**gentleman** 62:11

**George** 20:12
25:14

**give** 11:19 24:13
30:4,7,17 36:24
51:16 59:13 66:9
70:3 80:13
109:12 112:23
144:5,6 147:2,5

**giving** 67:21

**glad** 92:20

**gold** 24:1,17,24
25:1 26:6,20
27:2,3,8,10 71:6
75:17 98:5,18

**good** 6:10 25:22
99:16 100:9
119:16 142:12,19
148:9

**Gotcha** 142:4

**grainy** 127:19,21
129:11

**gravely** 101:10

**gray** 128:14

**green** 23:24
24:17,19 26:6,16
54:8 75:17
129:17,19 141:7

**greenish** 54:5

**grenade** 16:8 43:6
63:10,11 64:20,
23 65:6 66:2

**grenade's** 65:24

**grenades** 63:16
64:3 113:19

**grenadier** 92:17,
21 93:4,5,15,20
94:2 95:20 96:12

**grenadiers** 92:19
93:6 94:7,8,11,13
95:4,23 96:4,7
98:19,22

**ground** 11:5 56:3
58:18 63:4 68:19
70:4 90:15

**grounds** 146:7

**group** 48:3 59:23
77:20 145:15,16,
19

**groups** 147:17

**guessing** 99:2
120:2

**guilty** 62:19

**gun** 55:23 83:21
84:8 91:14

**guns** 38:13,19

**guy** 128:13 137:1
141:13 142:3

**guys** 129:16
131:15 139:12
142:8

---

**H**

**hair** 72:15

**Halbakken** 100:10

**half** 50:9 71:10

**hand** 134:1

**hand-toss** 65:4

**handcuff** 115:1

**handcuffs** 114:17
115:10

**handful** 19:24
142:22

**handle** 43:21
105:19

**hands** 133:23
134:1

**happen** 114:15

**happened** 22:22
96:14 123:23

**happening** 59:12
105:6

**hard** 49:20,21

**Hardin** 145:23
146:16

**harm** 44:23 45:20
46:1,5 59:20

**head** 57:8 73:5
129:20

**headsets** 69:24

**health** 12:4,7

**hear** 6:8,9 11:10
47:13

**hearing** 11:6,16

**heat** 65:13

**heavily** 31:5

**height** 134:17

**held** 149:2

**hell** 134:1

**helmet** 47:18
48:9,10,13 49:3
54:10

**helmets** 47:12,14,
22 50:5 141:2,3
142:1

**helpful** 66:12
86:16 141:1,18

**helping** 51:6

**helps** 41:22

**Hey** 14:16 136:24

**High** 71:19 73:7
75:1 80:18 81:4
86:7 87:22 97:7
111:17 116:19
128:3 129:1
130:3 131:7,10,
20 135:22 139:6

**high-caliber**
49:22

**high-risk** 19:21,
22

**high-top** 86:3

**higher** 94:19
108:8,9

**highly** 114:13

**Highway** 53:4,17

**hit** 45:21 139:22

**hit-skip** 90:16,20,
24

**hit-skipped** 83:4

**hits** 56:2 78:15

**hobbies** 30:8

**hodgepodge**
129:14

**hold** 84:10,11,14
123:24 124:1
126:5 144:2

**holding** 102:13
123:7 137:9

**honestly** 144:7

**hope** 32:4

**host** 57:15 67:8

**hostage** 19:13,20
23:13,15 28:3,12,
20 32:24

**hour** 99:3

**hours** 12:12 21:2
24:1 30:17 71:19
114:10

**Howard** 26:21,23
27:3,4,6

**Howie** 27:6

**hues** 54:7

**hundred** 103:19

**hunt** 38:6

**hypothetical**
111:24 112:1,21

---

**I**

**I-670** 116:20

**IAB** 64:11

**ICS** 21:11 106:19

**identification**
126:10

**identified** 78:8
79:9 113:23

**identify** 31:10
48:24 49:6 79:24
80:4 86:15,24
87:1 88:1,2 117:3
137:13 145:14

**illegal** 73:21

**illegally** 122:10

**illness** 28:2

**imagine** 88:16

**imbedded** 33:23
34:3

**immediately** 69:2,
6,8 97:22

**impact** 13:23,24
14:9,10 15:2
39:19 54:22 68:2,
12,18 69:3 75:11
77:6,22 79:1
80:16 86:17 94:4
95:15 106:17
113:21,22 138:4

**impeding** 62:4

**implement** 18:4

**important** 11:9,22 32:20

**inch** 134:17 135:11 137:19

**incident** 58:18 73:11 97:6 120:1, 19,24 122:9 124:10 125:8 127:23 128:2,20, 23

**incidents** 19:24 20:2 67:11

**inciting** 80:1

**include** 27:14 34:11,16 51:20 63:1

**including** 68:1 108:17

**inclusive** 36:9

**incoming** 18:14 36:7

**incorrect** 18:19

**independent** 52:18

**indication** 132:12

**individual** 15:19 42:16 49:7 58:21 67:12 69:3 70:10, 13 71:2 113:5 114:2 115:12 125:12 127:12 145:18

**individually** 136:15

**individuals** 8:6 75:16,23 94:23 95:24 111:21 113:23 116:5 128:22 129:3 130:19 134:11 137:9,10 139:21

**ineffective** 43:11 56:23 64:15 107:16 108:16 109:5,10

**infinitely** 92:13

**information** 102:22 119:3 121:16,19,20,21 125:16

**initial** 15:14 18:14 31:1,3 34:8 105:6

**initially** 20:20 21:3

**injured** 101:10

**injuries** 105:6

**injury** 98:12

**inkling** 124:15

**input** 102:1

**inserted** 10:23

**insignia** 48:23

**instance** 148:6

**instances** 71:3 90:14 95:8

**instruction** 18:10

**integrity** 114:11

**interest** 29:23

**interested** 29:17

**interfering** 124:22

**interim** 10:20

**internal** 22:9,15 23:4 95:10 110:2 121:6 125:19

**interrupt** 110:17

**interruption** 84:16

**intersection** 8:8 62:3,19 63:7 71:21 74:4,24 131:6,20 139:4 140:12 144:13

**interview** 29:21, 24 30:3,18 72:24

**interviewed** 72:6, 9,12

**introduce** 5:2,7

**investigate** 73:20

**investigated** 22:10,11

**investigating** 119:2 124:23 125:8

**investigation** 72:5,7,10 121:4 122:10 124:16 131:22

**investigation's** 121:9

**investigations** 22:7 124:6,22

**investing** 30:12

**involve** 89:15

**involved** 10:21 23:15 31:5 62:17, 21 116:9,24 147:6

**involvement** 116:21

**ire** 148:13

**irritant** 79:6,7,14

**issuance** 75:11

**issue** 148:5

**issued** 83:17

**issues** 12:7 147:16

J

**James** 24:16

**January** 10:10

**Jenni** 72:21,23

**Jim** 73:12

**job** 28:1 29:15,17 30:4,15,19,22 31:7,10 32:17 33:6 38:9 100:9

**John** 5:7 14:16 17:8 32:1 62:5 110:16 127:10 143:11

**join** 28:18,19 30:2

**joined** 51:6

**joining** 29:11

**Joseph** 24:19

**judgment** 45:23 46:8 58:12

**jumper** 28:16

**June** 8:5 10:6 16:16 17:2 20:4 101:16

**junior** 33:10

**jurisdictions'** 51:5

**justified** 45:6 61:24

K

**K-9** 100:20,23 101:7 120:10 148:15

**kettling** 116:3,4

**killed** 20:13

**killing** 25:14

**kind** 21:14,21,22 29:10 31:7,17 39:3,6 43:22 50:7 65:24 81:12 86:3 100:18 105:2 108:8 118:1 129:17

**kinds** 13:9 48:8

**knowing** 125:9

**knowledge** 94:19, 20 100:10 124:9, 11,15 125:7

**knuckleheads** 137:5

L

**laid** 74:1

**laminated** 107:7

**Lang** 41:6,12

**laptop** 137:16

**large** 59:18 82:12 147:17

**late** 8:4

**Latham** 73:4

**Latham's** 73:4

**launch** 82:1

**launched** 46:16 67:5

**launcher** 14:5,9 76:4

**launchers** 76:3, 10,12,18,20

**launching** 45:1

**law** 8:2 61:21

**layman's** 16:5,24

**layperson** 56:10

**lead** 70:7

**leader** 24:3 26:16 27:8,9,15,18 31:4 33:10 58:20 68:23 69:2,19 75:15

**leader's** 77:4

**leaders** 26:8,9,10, 12,14

**leading** 146:21

**leads** 26:5 132:19

**learning** 32:16,18

**leave** 41:8 78:13 104:23 105:8

**left** 27:7 131:4 133:7

**left-hand** 137:8

**legal** 8:22

**legs** 50:2

**Lenco** 85:23

**lesson** 15:18,22 34:11 35:24 39:11

**level** 29:10 67:11 71:11 100:9

**levels** 143:7

**liaison** 51:2

**liaisoning** 73:12 74:14,19

**lieu** 115:8

**lieutenant** 5:17 6:3,8,14,22,23 7:2,11,15,22 8:11 11:11 17:16 18:3 22:21 23:19,20, 21 32:6 37:13,18 56:8 61:8 66:6 87:7,13 99:11 111:7 117:22 122:4 123:24 124:5 130:2,16 142:22 143:5,19 147:15 148:20 149:3

**life** 30:6

**light** 54:4

**limbs** 139:22

**limiting** 62:1

**list** 29:15,16

**listed** 57:21

**litigation** 20:11

**Lives** 16:16 20:4 21:24 23:1 25:9, 12 26:7 47:21 50:13 58:10,14 59:2 60:4 66:19 68:8

**load** 81:13,14

**loading** 81:15 83:10

**location** 8:9 96:13 97:13

**locations** 107:14 109:13 116:24

**log** 21:12 41:7

**logs** 109:12 116:22

**long** 6:21 32:11 99:10

**long-range** 20:24 48:4 51:21 106:13 107:2

**longer** 10:12 25:5 99:4 100:8

**looked** 86:8

**lost** 75:19

**lot** 30:13 121:22 132:6 142:24

**lots** 79:18

**loud** 107:19 108:3

**LRAD** 67:17 107:9 109:23

**lunch** 99:5

M

**M-100** 47:6

**M-4** 38:13,18 83:20 84:10,19 85:1

**M-4S** 84:22,24

**M-80** 47:6

**mace** 44:3 125:10

**machine** 38:13,18 83:21 84:8

**made** 10:11,18 30:14 51:10 58:15 67:23 68:10,17 77:4 144:4

**magazine** 84:13

**magazines** 84:11

**magnifies** 61:18

**magnitude** 35:22

**maintain** 69:19

**maintained** 13:1

**major** 19:5

**majority** 68:8,12

**make** 9:22 10:19 21:2 25:11 45:23 64:6 77:15 93:15 96:8 102:10 103:7,8,23 104:2 107:24 108:1 111:14 115:21 143:12 145:15

**makes** 30:1 58:12 66:17

**making** 66:20 68:19 82:12 102:16 104:18,20 106:22

**males** 73:18

manage 29:1

manner 46:15

manual 9:20,24
10:16 11:1 14:13
15:1,10 33:14,15,
19,24 34:4,16,21
35:16,17 39:10
41:19 42:13

manufacturer
57:14

mark 41:5,12
79:7,14

marking 79:12
141:16

markings 141:13

maroon 128:13

Marshall 5:6,8,20,
23 6:7 7:14,19
14:20,24 17:11
32:4 37:17 40:17
41:23 56:7 62:8
72:20 87:3,11
88:22 89:3,13,17
90:2 91:4 92:24
99:1,8,12,16
110:21 111:6
117:5,8,11,17
118:10,20 122:21
123:4 124:4
125:24 126:6,9
127:2,5,7,11,15
128:9 129:23
130:6,11,15
131:24 133:1,15
134:3,7,9,20,22
135:1,5,14,18
136:21 137:11
138:13 139:1
141:19 142:13,24
143:14,17 144:22
147:14 148:23

mass 104:19
116:18

material 15:16,20
39:8

materials 15:13
33:22 34:6,8
35:12 39:9

math 27:21 36:15

Matt 27:8,9

Matter 16:16 20:4
21:24 23:2 25:9,
12 26:7 47:21
50:13 58:10,14
59:2 60:5 66:20
68:8

matters 8:17

maximum 76:6,8

Meaning 76:15

means 27:22

meant 26:15 41:1

measures 39:15

mechanism 106:8

medical 28:2
101:6

medication 12:5,8

medics 101:9

meeting 111:16

member 21:8
44:6,7 69:13
74:16,17 80:9
126:20 127:18

members 23:1
44:8 47:12 48:7
53:24 58:6 74:23
93:17,24 95:9,14
96:6 109:21
134:10,14 135:7
146:14

memory 12:5 21:6
106:20 109:20

mention 118:7

mentioned 25:24
53:20

mentioning 54:20

metal-bodied
65:11

methods 109:22

middle 102:23
131:6 137:5
139:13

military 24:5 38:4
48:19

milling 102:17

mind 34:13 40:12

mini 58:1

miniature 43:20

minimum 13:4

minus 37:2

minute 54:15
86:15

minutes 99:17
142:17

misconception
19:9

mission 19:13,15
20:5 52:18,19,24
111:13 114:5

missions 19:18,
19 96:4,7

mistaken 146:8

misunderstandin
g 96:9

mix 98:8

MK-9 43:17 57:20,
22 58:13 59:1
60:5 61:3 63:14
89:10,23

mobile 97:20,24

mode 84:4

Molotov 67:8

momentary 91:13

Monday 52:9

monitoring 60:13
70:18,19,23

month 13:4,6
36:18 37:22

monthly 13:4
15:15 34:9

months 30:12
31:19,20,24

Morrow 24:16
31:6 73:12,22
74:11 75:3

mortar-delivered
45:14

move 39:5 84:3
107:4 111:15
112:14 140:11
145:16

moved 25:5

moves 29:13

multi-baton 81:16

multi-launcher
55:24 56:2 81:9,
12 82:1

multi-launchers
90:7

Multicam 48:16,
21 54:2

multiple 14:3,7,9
30:20 31:13
44:11,17 67:16
91:11 113:15
139:21

munition 45:4
55:13 57:18
77:10 79:1,17,21

munitions 13:23
14:1,10,14 15:2
21:8,22 36:21
39:19 40:2,3,4,7
41:20 42:3,8,20,
21,24 44:10
54:18,22 56:24
57:6,16 63:13
68:2,12,18 69:4
75:12 80:16
86:17 92:7 94:5,
16,24 95:15
113:22 132:10,
13,20

mutual 8:3

_____

**N**

names 24:13 25:8

nature 30:9

necessarily
141:11

neck 50:10

needed 28:7
60:24 67:24

negotiation 23:15

negotiator 28:12

negotiators 23:13
28:3

night 101:5 106:7,
9 108:17,19
109:1,14,15,22
111:13 120:6
148:11

nights 71:10
113:12

no-wind 66:1,6

nobody's 5:8

noise 102:16
107:19 108:3

noon 99:2,17

normal 20:5

north 71:12 75:1
87:23 116:19,20
135:22 139:5

note 141:22

notes 146:18

notice 143:1
144:23

notices 95:23

null 22:19

number 19:17
40:22 42:2 47:1,4
49:3,4,6 63:21
76:2,8 79:4
100:6,13

numbers 37:6

_____

**O**

O-H-L 6:13

oath 5:5,12 11:19

object 17:9 32:2
56:5 72:17 89:14
110:13,19 111:5
124:1 147:11

objection 14:23
37:14,16 46:6,18
59:3,15 61:5,10
62:6,11 77:12
91:2 92:22 93:2
102:6,21 103:4,
11 104:6,15
105:12 112:8
121:12 122:3
124:19 125:4
143:12 145:11

objections 40:8

objects 59:19

observe 54:12
60:8

observed 60:8

observes 114:2,
22

observing 32:14

obstructing 59:24

obstructions
128:12

OC 13:21,23 16:1,
6,15 21:8 39:21
43:8,17,22,24
44:1,6 61:22
63:9,16,19 64:3
78:24 79:6,11
80:6,7,14,20
105:13,14
110:12,24 112:4,
21 113:4,14,18
123:3,9,10,13
125:2

occasional 13:12

occupied 73:17
120:11

occupy 108:1
148:4

occupying 62:19
63:7 110:8
144:13

occurred 10:5
22:24 25:14,15
48:1,2 101:13
120:4

occurring 20:3
86:20 108:4

occurs 69:23

offenders 113:24

office 5:15 52:15
53:9 119:3 121:5
125:22

officer 7:4 13:2
18:15 22:4,5 23:3
24:4,5 31:10,11,
13,18,22 32:12,
24 33:10,12,16
35:2,4,6,13 46:9,
14 49:10 58:22
67:12 70:13
75:15 77:2 81:2
85:1,6 89:7 98:11
114:1,4,21 115:1,
4,22 119:17
123:10,12,19
124:14 126:10,16
128:23 146:24

officer's 34:23

officers 13:10,18
15:5,14,19 20:23
22:7,12 23:2,12
27:11,22 28:22
29:4 36:7,20,21
38:12,17,21,22
45:2 46:4 49:7
51:2 59:23 69:3
70:10 75:7,14
81:24 84:22
85:20 88:2,6,18,
19 89:18 90:12
93:6,14,18 98:8,
15 100:4,17,23
101:7 105:24
113:4 114:7,14
117:4 118:13,17
119:10 120:10
121:24 122:2,7,
14,24 123:2,8
125:10 132:12
136:13 137:4
139:23,24 140:21
147:19 148:15

official 60:1

officially 100:24

Ohio 53:4 118:4

Ohl 5:17 6:3,12
37:13 99:11

olive 129:17,19
136:17 138:2
141:7

on-scene 51:10

on-the-job 31:18

open 30:10 65:15,
16 66:3 113:20

opening 30:21

operate 31:14

operating 9:20,24
52:18 60:14
69:12 70:19
98:14 107:9

operation 95:20

operational 32:17
33:16 70:20

operations 20:7
24:8 41:19 60:11
70:21 71:12,17
95:13 96:22
101:1 111:11
116:3 144:9,10

opinion 45:5 46:7
65:24 104:10
105:18

opportunity 149:4

ORC 62:22

order 17:19,21,24
18:4 43:3 61:4
73:2 102:5,19
103:10,21 106:5
109:16,18 110:9,
15 112:7 113:17
114:17 146:2
148:24

ordered 22:6 65:2

ordering 61:17

orders 60:7 70:3
104:5 106:9
143:8,22

ordinance 13:16,
18 18:6 36:22
45:3,23,24 47:5
64:1 67:13,19
77:22 81:14 91:9
92:1 93:16 94:21
95:7,12 100:6
144:14

ordinances 48:8

organization 7:9,
10

organized 31:9

originated 122:9

OSU 7:6,8

outfit 126:19

outfitted 75:23
138:3

outlines 12:20

overly 16:21 92:1

overview 144:7

overwatch 53:12,
13,14 98:15

———

P

P-O-D-O-L-S-K-I
24:23

p.m. 116:17
149:10

PA 67:16,18

pages 9:21 35:21
41:17,18

paginated 41:16

paging 63:17

Palmer 27:2,3
100:11 123:14,
15,17,19,20
124:17,21 125:9

Palmer's 125:1

paper 41:24 98:16

paperwork 115:5,
14 125:18

Pardon 84:17

part 10:4 11:10,17
20:20 28:4,6 29:6
32:18,21 34:19
35:11 46:8 51:17
72:6 75:2 94:5,24
100:24 104:2
130:18,21

part-time 23:12
28:4

parties 10:21

pass 29:18,19
30:16

passes 30:24

patches 49:2

path 38:8

patrol 53:4,18
67:17 81:21
93:14 94:10,12
95:5,20,23 96:3
98:22 113:9

Paul 6:3,12

paused 117:10
126:14 127:16
130:14 132:4
134:8 135:6,20

payload 64:20

PD 7:6,8

PDF 41:22 42:6

peaceful 144:11

peacefully 125:14

pellets 79:18

people 16:4 28:2,
22 29:1,14,16
38:7 62:18 67:5
78:21 80:1,22
86:4 89:8 95:1
98:10 100:13
103:12,19 104:22
107:4,20,22
109:17 112:14
114:8,18 119:9
122:7 132:7
133:18 139:4,14
140:18 144:9,10,
15 145:1 147:19
148:16

pepper 16:2 43:13
58:3 80:8 146:16

percent 36:12,24
37:2 71:16 117:1
119:13 132:14
138:22,23 140:8
142:7

perfectly 11:13

perform 23:13
31:11 61:23

performed 22:8

period 24:10
25:16 32:7 100:2

periodic 28:13

perpetrating
147:18

person 30:23
45:22 46:2 60:13
69:17 78:8 79:7,8
80:3 83:7 99:20
103:17 115:24
140:1 145:1,14,
17,20

person's 78:11

personal 105:18

personally 60:9
92:5 147:12

personnel 8:2,7
119:22

persons 44:23
59:20 62:17,24
103:17 107:10
146:23

perspective
112:12

phone 84:16

phones 60:14
123:7 137:10

photo 117:13

phrase 12:18

physical 29:19,24
44:23 45:20 46:1,
5 59:20

physically 71:22

pick 34:7 43:6
65:14

picture 63:15
87:13

pictures 63:15

pieces 81:14

pistol 83:18

pitched 108:8

place 25:24 105:3

Plaintiffs 5:10

plans 15:18,22
34:11 35:24
39:11

plate 48:23

plates 49:21

play 47:2 87:12
88:2,23 89:2,3
93:17 117:9
118:11 122:19,21
123:4 125:24
127:2,13 131:24
133:16 134:18,
20,24 135:2,15
136:22 138:13
139:1

played 88:24
89:5,16,21 117:7
118:12,22 122:23
123:6 126:1,8,12
127:4,6,14
128:11 129:24

130:8 132:2
133:17 134:21
135:16 136:23
138:15 139:2
141:21

playing 130:7
135:1 141:20

Podolski 24:20

point 17:4,18 34:7
58:22 64:8 67:4
104:11 105:8
110:11 112:2
113:10,16 115:23
127:10 132:9
133:1 136:15

pointing 90:15

points 51:23

police 6:16,19 7:6
9:8 18:18,22 23:2
23:13 24:3 31:17
32:11 41:18
42:11 48:24
54:11 59:19 73:2
88:6,8,14,19 91:9
94:18 114:4
146:24

Police's 8:13

policies 9:1,2,5,6,
7,8,9,12 10:13
11:3,4 42:12
51:13

policy 9:19 17:4,
17,21 41:20 42:2
54:18 57:11
105:19 143:6

poor 126:22

position 25:5

possession 73:21

possibility 46:13,
14 103:14

post 29:14

potential 96:11
100:18

potentially 78:17,
20 114:10

powder 91:17

Powerdms
143:24

Powerpoint
15:17,21 33:23
34:2,3,10 35:23
39:10

precipitated
97:17

precisely 18:1

predict 103:16

predominantly
15:6 16:9 45:12

prepare 8:20 72:2

prescribe 14:14
15:2

present 24:15
68:16 69:2,6,9
70:14 71:18
72:24 77:16
120:1 131:19

146:15 147:17

presentations
15:17,22 34:11
35:24 39:11

presently 6:14

presume 39:14

pretty 100:9 132:7

prevent 147:23

preventing 61:20

previously 144:20

primarily 43:4

primary 19:13,15,
18,19 20:1 28:10
106:8

prior 7:7 10:24
29:11 31:14 43:3
51:11

probable 62:20

problem 11:16
61:18 99:14
145:14 148:1

procedure 7:12
9:20,24

procedures 10:13
28:2

proceeded
148:15

proceedings
149:9

process 29:21
30:3,18 32:18,19
33:13 104:14,17
115:2,13

processed 114:18

processing
114:14 115:4

program 35:2,4,5,
6,14 92:23 93:5,
21 94:2 95:6,9,10

progresses 36:2

projectile 50:4

projectiles 49:14
64:21 67:5 74:6,7
81:18 83:3 90:16

promise 11:12

propellant 47:7
55:24

propelled 91:16

property 53:9
100:17 114:23
120:13

protect 49:12
100:16,17

protecting 120:12

protection 19:23
50:4

protects 50:6

protest 20:12,14
59:2 70:4 84:19
85:7

protesters 102:3,
16 104:4 105:7
106:2 112:4

113:5 145:24

**protesters'**
148:13

**protesting** 110:6
112:5

**protests** 8:4 10:5
16:16 17:2 20:4
21:24 23:2 25:9,
13,15 26:7 47:22
48:6 50:13 51:7,
18 58:10,14 60:5
64:14,23 66:20
67:6 68:7,8 96:15
143:9,10 144:11

**provide** 15:12

**provided** 40:18

**proximity** 119:12

**pull** 84:4

**pulled** 98:14

**pulsating** 108:9

**purely** 35:9
111:13 144:10,15

**purpose** 72:1
84:24 103:16
104:3

**purposes** 103:22

**put** 10:14 17:20
32:24 37:5 62:6
79:8 81:17,21
92:17 107:18
137:11

**putting** 114:9
146:1

———————

**Q**

**qualification**
92:16

**qualifications**
29:18,20,24
30:17

**qualified** 29:22
62:9

**qualify** 36:19
37:21,22

**quality's** 126:22

**quarter** 50:9
134:17 135:11

**quarter-inch-size**
136:19

**question** 11:12,17
12:4 15:9,11 18:8
33:18 40:10
46:19 51:4 59:5,
10 61:12 62:2,10,
12 77:19 95:22
102:8 104:7,16
106:24 110:5,18
111:8,24 112:1
124:24 126:4
131:17

**questioning** 62:7
72:18

**questions** 11:3,10
12:9 39:5 54:16
86:23 90:4 93:4
99:22 100:1,3

142:23 143:3
148:22

**quickly** 18:13
24:22 132:7

**quoted** 45:7

———————

**R**

**radio** 60:13 70:18
71:9 73:23

**radius** 66:9 69:10

**raise** 14:17,22

**range** 65:17 91:18
92:2,6 99:23

**ranked** 29:14

**rapid** 82:2,3,5

**rare** 66:14

**rattle** 59:6

**re-congregate**
147:20

**react** 107:20

**read** 7:21 63:20

**readily** 53:23

**reading** 38:16
57:5

**realistic** 30:4

**realize** 48:1,7
66:5 98:7

**reason** 11:11
113:3 129:1

**reasonable** 57:9
62:23

**reasons** 125:1

**Rebecca** 5:18

**recall** 17:16 97:6
109:16 111:18
129:20 144:1,3
146:5

**receive** 14:1 15:6
95:15 103:13
104:20

**received** 33:5

**receives** 39:7

**recently** 35:3

**recess** 99:19
142:21

**recognize** 88:18
89:1,6 117:21,24
118:4 127:17

**recognizes** 89:18

**recollection** 14:3
109:19

**recommendations**
145:7

**record** 5:3 6:11
7:22 149:2

**record's** 116:12

**recording** 123:2,8

**records** 21:7

**red** 24:1,17 25:3,4
26:6,23,24 27:3,
4,7 71:6 75:16

91:13 98:5,17
132:16

**redundancy**
53:15

**refer** 16:4 37:11,
20 81:9 86:4
109:12

**reference** 34:2

**references** 15:5

**referred** 48:18
53:17

**referring** 9:13,23
34:20 41:11
43:13 64:9
107:13

**refers** 36:11 38:5
107:9

**reflected** 39:8

**refused** 125:14

**refusing** 16:11
102:5 112:6,14

**regard** 8:12 9:3,
14 10:11 42:15
94:20

**regular** 36:8 86:5

**regulations** 57:15

**relating** 105:21,22

**relationship** 93:1

**release** 79:13,18
82:10 84:7

**releases** 58:3

**relief** 28:22

**remember** 17:23
18:1 20:19 52:2
72:13 75:2,13
119:24 130:17

**remote** 5:5,11

**remove** 144:15
145:19

**removed** 92:10
124:6

**render** 46:7 97:22

**report** 21:14,22
22:1,5 23:4
108:21 125:10

**reported** 51:8

**REPORTER** 5:1
99:14 149:1

**reporters** 5:18

**reports** 64:10
106:19 110:1
111:19

**represent** 5:3

**Representative**
146:6,15

**representing**
5:10,14

**requested** 20:8
67:1

**required** 29:11
37:23 40:5 42:11
44:19 48:10
68:18 81:2

**requirement**
38:20

**requirements**
30:24

**requires** 46:7

**resistance** 104:24
105:5 111:16

**resources** 100:21

**respect** 7:17,23
17:17 40:6 57:6
62:10 143:6

**respond** 28:17
96:21 103:17
112:10 113:9

**responded** 21:1
97:22,24

**response** 7:7,8
9:3 19:23 40:1
42:23 43:1 91:22
96:13 97:1,17
105:6

**responsible** 33:5
60:18

**rest** 104:3

**restricted** 98:12

**restroom** 90:6

**result** 9:17 46:1
86:19 139:22
140:1

**results** 121:10

**retired** 26:21

**retires** 29:13

**return** 115:3,4

**review** 8:24 9:17,
18,21 10:3,4,8,9,
17,24 21:10
106:18 110:3
149:4

**reviewed** 21:7

**reviews** 33:14

**revised** 35:3

**revision** 10:20

**revolver** 81:12
82:6,15

**Rich** 120:7

**Richards** 100:14

**Rick** 119:2,19
121:4,11,15,17,
19,20,23 125:22

**rifle** 83:22,23
122:11,15 125:12

**rifleman** 7:6

**riot** 41:19 42:3,8
54:17 57:5 62:17,
19,21 63:12
88:10 92:7

**riotous** 62:17
63:7 77:9 80:12
86:18

**riotously** 77:21

**risk** 59:20

**river** 120:9 148:14

**road** 17:15 143:3

**roadway** 144:16

**Rob** 100:10
122:13,16

**Robert** 21:19

**rock** 145:2

**rocket** 45:18 46:4,
16 47:9

**rockets** 45:16
47:6

**rocks** 74:8 111:19

**role** 93:18

**roll** 82:11

**room** 5:4,24 16:14

**rooms** 5:8,9

**rough** 66:5

**round** 14:11,12
44:15,16,17,18
45:5,14 46:15
55:2,8 56:16 57:3
63:2,5 66:16
68:21 75:13
76:11,19 77:6,11
78:14,23,24 79:5
81:6 82:1 84:7
91:1,11

**rounds** 14:4,8
39:20,21 44:12
55:5,15 56:24
57:7 68:1 75:24
79:12 81:8,16,19,
22 82:2 83:2,7
84:10 90:5,13,20
91:19 92:10
99:22 101:23,24
102:2 104:12
105:9,11,16
113:15

**routinely** 79:1,3

**roving** 147:17

**rubber** 64:19,23

**rule** 7:12 11:9

**rules** 11:5 51:13

**run** 89:9 104:22
119:23

**running** 133:19

**Russell** 87:22
116:18

———————

**S**

**safe** 40:2 84:2,3
145:20

**safely** 145:16

**safety** 119:2
121:5 125:22

**Sam** 5:9 87:3
88:22 89:3,13,20
117:5,11 118:10,
20 122:21 125:24
126:7 127:3,8
129:23 130:6,13
131:24 133:1,15
134:4,9,20
136:22 137:12
141:20 142:13

Sam's 132:24

Saturday 52:8
101:14,15

save 17:14 143:2

scare 107:4

scenario 104:18
105:21,22 110:5
111:18

scene 67:2 81:3
86:7 96:20 113:8
130:18 131:4
140:3

Schlein 5:10
87:10 117:14
127:9 128:5

schooled 36:22

scoops 50:7

scope 18:16
37:24 56:6 61:6
62:7 72:18 77:13
91:3,5 95:22
102:7 110:20
111:4 121:13
124:2 143:1
144:23 147:13

Scott 21:17 25:2

screen 41:9 87:14
128:6 132:22
133:6 134:12
137:8 140:24

screen-share
87:4,6 90:3 117:6

search 19:22
48:13

seconds 82:22,24

section 13:3
19:12 23:11,17
62:16,22 100:21

secure 114:24

select 84:1

semi 84:2 132:16

semi-automatic
84:4

send 40:19 52:16
53:5

senior 24:3 30:23

seniority 29:15,23
30:23

sense 66:4

sentence 19:11

separate 5:8 71:1
96:17

separately 95:24

September 6:20
121:18

sergeant 7:4 13:1
20:23 21:17 23:3,
22 24:14,16,19
25:2,4,23 26:3
27:18 31:6 33:4,
8,9,14 51:10
53:12 58:19
68:23 69:1,5,7,18
70:3 73:11,22
74:11 75:3,16

76:1,4 80:13
84:21,23 97:3
100:7 108:20
121:6 123:17
124:14 125:6,7,
16

sergeants 23:22,
23 24:14,18 25:8
26:11,12 146:21

series 49:5

serve 7:3 29:6
38:10 85:1 94:7,8
101:8

served 24:10

service 19:21,22

set 138:12

sets 49:19

setting 107:9

settings 107:8

share 142:14

sheet 107:7

sheltering 61:20

sheriff 141:12,16

Sheriff's 52:15

shift 23:24

shirt 48:16,19
128:13

shock 107:3

shoot 45:19

shooter 19:23

shoots 43:21 44:2

short 87:22 99:19
116:19 142:21

shortly 32:5 143:9

shot 81:8

shoulder 98:12

show 67:15 96:21
130:2 134:10

showing 67:19

shows 45:11
131:5,15

shrapnel 86:19,20

shut 84:17 148:18

shy 7:1

sic 16:4 138:7

sick 28:23

side 5:7 37:3
120:16 137:8
148:19

sideline 114:10

sign 115:5 149:4

signaling 57:17

signature 149:7

signed 33:11

signs 33:15
102:14

similar 7:8,10
79:4

simplistically
107:19

simply 62:2

single 12:19 15:9
33:18 35:17,20
70:24 78:14 81:8
85:16

single-impact
79:21

sir 6:9 145:9

sitting 134:13

situation 20:6
28:16,20 31:12
33:1 46:9 48:14
59:2 63:4 66:1,6,
19 68:15,24 78:3
80:11,12,18 81:3,
4 86:19 98:1
113:10 114:6
124:18 125:3
130:3,21 144:21,
24

situation's 78:1

situational 45:22
59:11

situations 17:6
19:14,20 42:16
55:19 58:10 67:3
68:13 70:4,5
84:20 85:7

size 45:17 47:5
56:9 135:24

skills 31:13

skip 56:14

skip-fire 44:16
56:2

skip-fired 44:18,
20 91:10 99:24

slating 115:13,18

sleeves 48:21
49:2

slightly 42:18

slip 11:14

small 16:12,22
42:16 46:4,16
74:14 79:3,5,13
114:8 138:22

smaller 7:10

smattering
141:10

smoke 90:8 91:14
132:11,14,18,19
140:19

sniper 37:8 38:4

snipers 37:7,10

soft 49:20

solid 141:7

solid-colored
48:20

somebody's 45:1

someone's 28:9

SOP 9:18 10:16,
23 14:13 15:1
34:16,21 35:16,
17 36:5 39:10
42:13

SOPS 9:19

sort 67:18 71:20
91:13 107:3
108:4

sound 20:15
108:4

sounds 23:16
100:1

source 125:1

south 71:13

space 16:12,22
64:5

sparked 25:14

speak 8:12 93:7
103:12 124:17

speaking 11:24
22:2 28:15 67:2
105:18

special 7:6,8,12
13:16,17,18

specialists 94:16

specialized 36:6,
17,21 95:18

specific 8:9 9:5
12:21 13:5 14:12
18:8 32:7 39:24
58:14 64:8
125:21

specifically 14:2
36:22 95:7
107:14

specifics 144:2

speed 31:20

spell 21:18 24:21
26:18 122:16

spelled 6:13

spent 120:5

split 71:9

spoke 8:22
124:21

sponge 14:11,12
39:21 44:15
56:24 57:3,7
76:19 77:6,11
78:14,24 79:5

spontaneous
97:13

spool 56:11

spools 58:18

spot 98:21

spray 13:21 16:2
21:8 39:21 43:14
44:1,2 58:4 80:7,
8 105:10,14
110:12,24 112:4,
21 113:4,14
123:3,9,13
124:18 125:2

sprayed 146:16

spraying 89:7

spread 56:14
65:18

spreads 43:22
56:3

Springer 27:8

Sprinter 86:4

squad 28:11
70:24

square 66:7,8

staff 23:17

staffed 23:11,18

staffing 98:10

standard 9:20,24
29:19,20 47:17
48:6,10 75:11

standard-issue
49:17

standards 92:15

standby 52:7

standing 62:6

standpoint
112:10

start 5:1 6:18 43:8
65:22 130:7,12
147:21

started 52:4 73:11
99:18

starting 15:10
103:8,18

state 5:3,4 37:14
53:4,8,9,17
106:24 148:8,10

stated 125:7

statehouse 53:7
146:7

statement 36:13
38:14 68:2

States 18:24

stay 146:2

step 104:19

stepping 146:1

stick 47:7 69:9

stipulate 7:14

stop 49:21 56:20,
22 62:16 80:3
107:20 117:8
122:9 125:11
126:11,13,17
127:12,15 128:13
130:12,13 132:3
134:3,7 135:5,18

stopped 109:5

stream 43:22

street 8:8 73:15,
16 75:2 87:22
102:3,12,17,20,
24 103:19,22
105:8 106:6
110:6,8 112:5,15
116:19 118:8
120:7,8 131:13
135:22 139:6,14
140:16,17
144:12,13 146:1,
2,3

strength 98:14

strike 78:20

structure 18:16 23:8,18

stuff 102:15

submitted 16:18 23:4

succession 82:2

sufficient 33:1,6

sufficiently 8:16

suggest 67:20

suggests 67:21

suicidal 28:16

summary 21:14, 22

summer 17:18 25:19

summertime 48:17

Sunday 52:8 101:16

supervisor 21:15 22:4

support 20:7 96:21 111:15

supports 111:11

supposed 59:1 69:9,19

suppress 78:11

Supreme 53:8 118:4 120:16 148:12,17,19

surrounded 131:7,8,11 133:11

surrounding 97:13 111:20

surveillance 145:18

survive 99:13

suspect 16:10,11 42:17

SUV 73:17 130:23 131:4,8,10,19 134:12

SWAT 6:15,22,24 7:3,6,9,18,20,23 8:2,13 9:5,8,9,12, 23 11:3 12:20 13:10,18 15:14 18:3,11,17,22,23 19:4,6,16 20:6,9, 17 21:8,23 23:1, 9,12 24:8,10 25:6 27:22,23 28:4,6, 19 29:4,6,9,11 30:2 31:21 32:21 34:8,17 35:7,8,9 36:7,11 38:12,17 39:7,14 40:5 42:10,24 46:3,14 47:11,14 48:5 49:17 50:11,20, 22,23 51:5,18,24 52:11,16 53:5,16, 24 54:11,22 56:18 57:11 61:8 62:10 63:6,9 66:22,23 67:10,

23 68:15 71:16, 17,20 74:16,23 75:5 79:2 81:1,7, 24 84:18 87:1 89:15 90:12 91:19 93:1,17,24 94:5,8,9,24 95:2, 9,14,24 96:4,6, 12,20 97:2,24 98:18 99:20 100:8,15,24 101:5 105:24 109:16,21 110:20,23 111:11 112:3,9,12,23 113:4,8 114:1,7, 14,21 115:22 116:20 117:4 118:17 119:7,10, 16 122:14 123:8 126:19 127:17 128:24 133:8 134:5,10,13 135:7 138:3,20 139:24 140:21 144:17 146:14,20

SWAT's 116:8

sweeps 50:9

sworn 6:4

system 64:21 67:17,18 107:3

----

**T**

T-H-I-V-E-N-E-R 26:19

tactic 116:14 148:1

Tactical 73:13 74:15 129:19

Tahoe 130:23

takes 82:17

taking 60:14 74:5 114:9

talk 62:2 105:23

talked 36:5 39:9 106:12 130:4

talking 25:11,13 45:15,18 47:4,19 48:9 54:4 57:22 66:13,15 68:7 80:12,19 81:4 94:10 97:7 111:18 130:3 143:18 147:11

tall 135:11

tan 48:20 54:5,7

Tanoury 5:13,22 7:17 14:16,22 17:8 32:1 37:13 40:8 41:21 46:6, 18 56:5 59:3,15 61:5,10 62:5 72:17 77:12 89:14 91:2 92:22 99:10 102:6,21 103:4,11 104:6, 15 105:12 110:13,16 111:3 112:8 121:12

122:3 123:24 124:19 125:4 134:23 143:4,11, 15 145:11 147:10 149:3

target 148:13

task 31:7

tasked 69:21 112:17

tasks 31:10

team 6:22 7:7,8,9 8:13 9:5 18:11, 17,22 20:6,21 21:15,23 23:1,9, 23 24:2,3,18,19, 24 25:1 26:5,8, 10,12,14,16 27:8, 9,12,14,18,19 28:7,19 29:6,9,21 30:1 31:4 33:9,10 39:14 40:5 42:11 44:6,8 47:14 50:12,20,23 51:1, 18,24 52:16 53:24 54:22 58:6, 17,20 60:23 68:23 69:1,6,12, 14,17,19,20,22, 24 70:7,10,11,13, 15,24 71:6,20 73:10,13 74:13, 17,23 75:5,6,13, 15,16,22 76:9,15, 17 77:4 80:9 85:12,14,15,16 87:1 94:24 95:2 98:17,18 99:20 101:6 106:13 114:8,11 127:17 128:24 131:4 132:10 134:6,10, 13 135:7 146:14

team's 9:24 28:19 50:23 133:8

team-level 36:16

teams 18:23 19:4 23:23 25:9 36:17 42:17 50:22 51:6 52:11,20 53:5,16 71:1 76:14 84:18 85:21 98:3,8,9,13 103:7 115:21 116:1 130:17 131:18 146:21

tear 16:23

technique 103:10 116:14

telling 109:15

term 16:24 38:5 137:6

terms 16:1,5 17:5

terrorist 19:24

testified 110:20

testifies 6:4

testify 7:16 8:18 11:24 111:4 124:3

testimony 147:13

thick 35:19

thing 25:12 33:18 35:19 57:24 78:14 82:22 83:1 103:1,2 105:5 121:3 122:8 129:7 145:13

things 13:9 22:15, 18 30:8 39:12 43:2 97:18 128:6 147:8

Thivener 26:17 100:14

thought 40:17 41:2 77:18 88:9 110:17 119:5

threat 44:22

three-eighths 137:19

threw 137:1

throw 44:24

throwing 59:19

thrown 67:9

throws 145:1

thumb 123:1

Tim 100:10

time 10:3 11:14 12:12 17:14 20:9, 19 21:5 22:3,19 23:20 24:10,15 25:1,24 26:6 27:10 30:13 34:7 36:1,12 43:9 44:21 45:23 48:1 51:23 58:18 59:12 60:15 66:24 67:1,10 71:16 73:8 79:9, 20 82:17 84:5 89:10,20 98:18 100:7 104:11 105:8 109:16 110:11,24 112:2 116:23 121:4 128:21 131:3,19 148:21

times 10:19 52:6, 20,22 59:6 67:16 69:20 107:14 108:16,22 109:9, 13

today 5:16 8:21 11:23 12:12 148:21

today's 9:10 11:5

told 18:5 67:15 80:5 121:19

tone 107:6,11,12, 17

tool 114:9

top 34:13 48:23 73:5 129:20

topic 7:16,21 8:1, 12 14:18 17:10 32:3 39:6 143:16

topics 11:23 13:5, 7,9

tops 120:22

torsos 49:24

totally 31:21 65:20 113:11

touch 43:7 70:15 126:6

tower 53:9

Town 120:7

track 17:9 37:15 40:9

tracking 25:21

traffic 62:4 102:4, 12 103:20 137:5

train 15:14 28:14 31:6 36:18 37:8 38:12,17,21,22 39:15 93:5,14 94:4,14

trained 32:12 94:8 95:5,7,24 100:5 105:24

trainer 33:12

trainers 15:19,21

training 9:15,16 10:22 11:4 12:17, 19,20,24 13:1,4, 13,15,19 14:1 15:4,5,6,9,13,14, 15,23 18:14 23:10,22 24:14, 16 25:23 26:2 28:13,14 29:8 30:13 31:1,3,5,18 32:7,19,20,21 33:2,4,6,8,11,12, 13,14,19,20,22 34:6,7,9,10,19, 20,23 35:2,4,5,6, 11,12,13 36:1,7, 12,16,17,23 37:9 39:4,7,9,10,22 40:1 42:13 46:10 57:15 61:7 77:20 85:9 93:18 94:1, 5,17,24 95:6,9, 15,18 110:23 112:3 143:23

transcript 149:5

transferred 100:8

transpired 124:16

transport 73:22

transportation 115:17

tremendous 16:19

Tri-chamber 65:12

trigger 82:10 84:5

trouble 11:6

trousers 48:16

Troy 27:2,3,6,7 100:11

true 37:9 39:18 68:4

truthfully 12:9

turn 82:12

turned 23:5
64:10,11 122:15
125:19 141:14

type 10:20 19:22
45:10 74:8

types 13:17,24
85:21

---

**U**

U-10.128 64:9
125:9

ultimate 51:5

ultimately 30:16
96:24

un-screen 142:14

undergo 94:1

underneath 49:20

understand 7:19,
22 8:13 11:10,17,
20 12:1 16:1
18:15 22:14,22
40:10 46:19,20
47:10 51:3 56:11
59:5 60:10 61:11
62:1,11,12 72:20
77:14,15 89:17
93:1 95:21 102:8,
10 103:16 104:7,
16 111:7 120:18
131:17

understanding
23:6,7

understood 22:20
27:11 107:1

uniform 48:6,9,
10,12,15,21 49:1
101:8

uniformed 98:19

uniforms 50:17
119:15,17 141:9,
24

unique 49:10

unit 97:24 101:7

United 18:23

units 97:20 129:7

universally 68:4

universe 35:10,12
36:5,6 39:8

unlawful 106:4
110:7 112:6

unusual 114:13

upper 50:9 137:7

utilization 77:5

utilize 16:10
90:21 91:24 92:9
94:21 95:12
113:17 116:7

utilized 40:4
43:10 101:4
107:12,15 108:21

utilizing 61:16

---

**V**

V-A-S-S 122:17

vacancies 28:1

vacancy 29:12

vacant 98:13

vacation 28:23

valid 148:1,6

valuable 114:9

van 86:3,6 111:21
127:20 130:19

vans 86:2

vapor 13:23 16:6,
15 43:14 63:19
64:3 80:6,7

variables 47:2

variance 14:12

varied 129:17

variety 55:9

vary 13:6,20
85:18

Vass 122:13,18

vehicle 20:24
73:13 74:1,2
85:12,15,16,20
97:14 101:9
106:16,21 111:20
119:7,14 122:9,
11 125:11 131:6,
7,9 134:10

vehicles 75:4
85:21,24 97:21
98:9 132:17,21
133:2

verbal 102:15

verbatim 144:6

versus 54:22
55:10,16

vest 139:10 142:6

vests 142:8,12

video 54:13 71:23
72:2 73:6 74:22
78:4 86:8,12,22
87:2 88:2,23,24
89:5,16,21 117:2,
4,7,10 118:11,12,
22,23 119:18,19
122:19,23 123:6
126:1,8,12,14,16,
22 127:4,6,14,16
128:11,21
129:10,24 130:8,
13,14 131:1,5,13,
17 132:2,4,6,21
133:17 134:7,8,
18,21,24 135:5,6,
16,19,20 136:11,
12,16,22,23
138:14,15 139:2
141:21 145:24
146:10

videos 54:10
90:12 91:12
98:21 119:21
131:21 145:22
146:4,13

---

view 30:4 134:19

viewed 78:4

violation 110:8
146:2

violators 61:24

violence 80:1
100:18 147:18

violent 38:9 59:18
67:4 75:10 78:9,
11 104:24 105:5
110:7 111:16
113:12,13,23
114:2,22

visual 69:13,20

void 22:19

volume 66:2
132:19

---

**W**

waived 149:7

walking 133:18
137:9

wanted 34:5
130:20

warrant 19:22
24:5 48:14

warrants 19:21

water 74:8 90:6
111:19 145:2

weapon 66:18
81:6 83:24

weaponry 81:1
83:15

weapons 37:8
73:18,21,22
85:11 106:17
109:22 111:22
130:19 138:4

wear 47:12,14
48:11,12,13,22

wearing 47:22
48:18 49:11,23
50:12 54:1
129:16,21 142:8

wears 141:7

Weaver 121:6,16,
20,22

website 18:18,21
19:11 23:11
36:11 37:6,7
38:11,17 143:24

weeds 31:8

week 37:8,22,24
38:21

weekend 52:6

weekly 38:15

weeks 25:17 39:1

weigh 61:17

west 120:16
148:19

whichever 120:8

white 73:17
130:19,23 131:8

---

whoever's 58:17
107:8

wide 30:10

widely 69:15

wind 65:20,21
66:14

windows 147:18

windy 65:16

witnesses 12:3
40:18

wood 14:4 39:20
44:12,16 45:4
46:15 55:2,4,7,15
63:2,5 66:16
68:1,21 75:12,24
76:11 77:10
78:17,23 81:6,24
91:19 105:15

wooden 13:13
56:3,11 90:4,13,
20 91:1 99:22
101:22,23 102:2
105:9,11 112:22
139:23 140:2

words 21:24 32:8
53:23 55:21 67:1
68:17 98:20
105:7

wore 50:16

work 24:1 28:4,9,
10 42:15 104:14

worked 22:15
50:22 51:1

working 105:16
121:6

workload 38:24

works 22:3

worn 49:20

Wozniak 119:2
125:22

wrap 32:4

writing 10:15

written 17:20

---

**Y**

yards 92:3

year 9:18,22
10:14,15

yearly 10:23

years 6:24 7:1
61:8 91:9 93:9,11
100:2

yellow 141:12

yesterday 22:21

Young 21:20

---

**Z**

zoom 5:16 134:15
136:2,5,8 137:3

zooming 135:11
136:16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TAMARA K. ALSAADA, et al.,

        Plaintiffs,

    v.

CITY OF COLUMBUS, et al.,

        Defendants.

Case No. 2:20-cv-3431

Chief Judge Algenon L. Marbley

Magistrate Judge Kimberly A. Jolson

---

## AFFIDAVIT OF MARK E. LANG

I, MARK E. LANG, being first duly cautioned and sworn, do hereby swear, under penalty of perjury, that I have personal knowledge of the facts stated in this affidavit; that I am competent to testify to those facts; and that I will testify as follows if I am called to testify at any hearing or trial in the above-captioned civil action.

1.      I am currently employed by the City of Columbus, Division of Police ("CPD").  I am the Commander for the Training Bureau, which is under the Community Services Subdivision of the CPD.

2.      All CPD officers receive training on both the use of force and civil disorders during basic training.

3.      During a six-month, 1,000-plus-hour basic recruit training program that is required of all CPD officers, recruits are trained, instructed, and taught on (1) the safe, proper, and effective use of non-lethal force, lethal force, and firearms; (2) the law and legal limits applicable thereto; and (3) the CPD's own use-of-force directive.

4.      Recruits also receive training, instruction, and education on topics such as community diversity, the inappropriateness of biased-based (e.g., racial) profiling, crisis intervention, de-escalation techniques, and civil disorders.

5.      The basic training program includes specific training on civil disorders, including training on balancing First Amendment rights and the need to protect public safety and property.


PLAINTIFF'S EXHIBIT 5

6. CPD's basic recruit training program meets, and often exceeds, the State of Ohio's requirements for basic law enforcement training.

7. Following basic training, new CPD officers must complete the Division's Field Training Officer (FTO) program. They spend about fifteen weeks going through four phases of one-on-one training with veteran officers who observe, evaluate, and record the new officers' performance in the field and offer additional advice, training, instruction, and correction (if necessary).

8. All CPD officers continue to receive frequent, updated, and regularly-scheduled training, instruction, and education.

9. All sworn officers receive the Emergency Operations Manual and Directives Manual, and are required to certify that they have reviewed them.

10. The Emergency Operations Manual provides directives with respect to field force operations, including riot gear, formations, and equipment; civil disturbance tactics; mass arrest procedures; and operating guidelines for pepper spray and riot control munitions. The relevant sections of the Emergency Operations Manual —which were in effect at the time of the subject Protests—are attached hereto as Exhibit A.

11. The Directives Manual provides the Division's Use of Force Directive 2.01, Chemical Agents and Intermediate Use of Force Directive 2.04, Gas Guns and Grenades Directive 2.05, and Body Worn Camera Directive 11.07. The relevant sections of the Directives Manual— which were in effect at the time of the subject Protests—are attached hereto as Exhibit B.

12. Pursuant to Directive 2.04, sworn officers are not permitted to carry chemical spray until training and qualification standards have been satisfied. They are required to "demonstrate proficiency with chemical spray once each calendar year."

13. While in the training academy, officers get sprayed with pepper spray so they understand the effects.

14. Supervisors and officers who use riot control munitions, such as gas guns for wooden or sponge bullets, receive additional "grenadier" training on the use of such munitions.

15. In 2017, supervisors received specialized training on Crowd Management and Control.

FURTHER AFFIANT SAYETH NAUGHT

Mark E. Lang

Sworn to before me and subscribed in my presence on January 13, 2021.

_Tina A. Hundley_
Notary Public - State of Ohio

**TINA A. HUNDLEY**
Notary Public, State of Ohio
My Commission Expires 10-30-2021

| | | |
|---|---|---|
| **Columbus Police Emergency Operations Manual** | EFFECTIVE<br>May 30, 2007 | SECTION<br>1.1 |
| | REVISED<br>Mar. 30, 2016 | TOTAL PAGES<br>6 |
| | **Definitions** | |



### Alternate Emergency Operations Center

A location other than the primary EOC that will be activated during an incident if the primary EOC becomes inoperable.

### Assembly Point

A location outside an evacuation area which can accommodate a large number of vehicles and persons to serve as the initial gathering point for those who must be evacuated from the area of an incident.

### Available Reserve

On-duty police personnel who can be re-assigned from their regular duties and committed to an emergency operation.

### CBRNE

An acronym for *"*chemical, biological, radiological, nuclear*,* or explosive*,"* *and used i*n this context*,* refers to *such items* being used as a terrorist weapon of mass destruction.

### Crisis Management

The measures *taken* to identify, acquire, and plan the use of resources needed to anticipate, prevent, and/or resolve a terrorist threat or incident. The FBI is the lead federal agency for crisis management.

### Cold/Safe/Support Zone

The secured area where equipment and personnel directly support an incident.

### Consequence Management

The measures *taken* to alleviate the damage, loss, hardship or suffering caused by emergencies, to include protecting public health and safety, restoring essential government services, and providing emergency relief to affected governments, businesses, and individuals. Implementation is under the primary jurisdiction of the affected state and local governments. FEMA is designated as the lead federal agency and provides support to the state when required.

**Contamination**

The process whereby a person or piece of equipment has contact with a toxin or hazardous substance.

**Decontamination (DECON)**

A process by which the contaminants are cleansed from the patient, victim, rescuer, and equipment.

**Dirty Bomb/Radiological Dispersion Device (RDD)**

An explosive device that is able to disperse radiological agents.

**Disaster**

Any event that causes significant human and economic loss, requires a response beyond the scope of any single agency or service, and requires resources beyond those locally available.

**Emergency**

An incident that threatens or actually does inflict damage to property, injury, or loss of life.

**Emergency Management Agency (EMA)**

A government agency designated to provide assistance with planning, *preparation,* mitigation, response, and recovery to an emergency incident. The county EMA will assist when city resources are exhausted during an emergency response. The state EMA will assist when and if county resources are exhausted. Likewise, federal EMA will assist if the governor of the state declares a state of emergency.

**Emergency Notification Guide (ENG)**

A manual used in the Communications Center to reference when notifying key personnel of major incidents or events, *which* is maintained and updated by the *Communications Bureau*.

**Emergency Operations Center (EOC)**

A fixed facility used as a base of operations for bringing personnel and resources together to manage and coordinate the response to major events, incidents, or disasters.

**Emergency Response Routes**

Designated roadways that are left open during an emergency to provide necessary entrance and exit routes for emergency response personnel and equipment.

**Evacuation**

The displacement of people in response to an emergency. The procedures include the moving of people from an affected area and *their* return when the incident is complete.

**Event**

> A planned, non-emergency activity usually requiring a Division response and Incident Action Plan.

**Field Force**

> A unit of sworn personnel led by a police lieutenant and divided into several squads used to respond to and control large crowds *and*/or civil disorder.

**Field Prisoner Processing Area (FPPA)**

> Facility used during major events or civil disturbances to complete prisoner paperwork and secure property prior to being transported to the Slating Area.

**Hazardous Material (HAZMAT)**

> Substances or materials which pose either a potential or actual risk to life, health*,* or property if released because of their chemical, physical, or biological nature.

**Hot Zone**

> The area containing the actual hazard. Exposure to hazardous materials in this area is likely to cause injury or death. Only personnel with the proper level of personal protective equipment *(PPE)* may enter this area. Only certified hazardous material technicians will usually work within this area.

**Incident**

> An occurrence, natural or human caused, that requires an emergency response to protect life and property. *This m*ay include major disasters, emergencies, terrorist attacks, fires, floods, hazardous materials spills, aircraft accidents, tornadoes, public health and medical emergencies, and other occurrences requiring emergency response.

**Incident Action Plan (IAP)**

> A written plan containing general objectives reflecting the overall strategy for managing an incident or special event. Includes identification of operational resources and assignments. *This m*ay also include attachments that provide direction and important information for management of the incident during one or more operational periods.

**Incident Commander**

> The ranking person responsible for the command and control of an incident. Depending on the type of incident*,* this may be a police or fire official.

**Incident Command Post**

> The area near an incident site where the Incident Commander and staff gather to coordinate and direct emergency operations. A large incident may need multiple functional command posts to handle separate geographical areas or functions of the incident.

**Incident Command System (ICS)**

A standardized organizational system used to manage an emergency, disaster, or event.

**Infectious Material**

Any substance capable of causing infection *that* may be transmitted to others *with or* without actual contact.

**Inner Perimeter**

The area at a disaster scene that contains the Hot *and* Warm Zones. *The inner perimeter represents the closest and smallest perimeter to the incident.*

**Joint Information Center (JIC)**

A fixed location where the public information officers from each *participating entity* will work to coordinate media releases regarding the incident. The JIC works in conjunction with the EOC and Incident Commander and provides unified, accurate, and timely information to the public.

**Joint Operations Center (JOC)**

A fixed location established by the Federal Bureau of Investigation to *coordinate law enforcement criminal investigative efforts in response to* a terrorist attack or incident.

**Operational Period**

Time scheduled for execution of a given set of operational actions as specified in the IAP *that* may be of various lengths of time.

**Outer Perimeter**

The outer-most area of a secured disaster or crime scene*, which includes the Cold Zone*. Most response, recovery, and support functions are conducted within this area.

**Personal Protective Equipment (PPE)**

Equipment that is worn, such as hoods, air-purifying respirators (gas masks), NBC gas mask filters, N95 particle masks, hazardous materials suits, Nitrile gloves and boots, etc. by a person to protect *him or her* from contamination.

**Point of Dispensing**

A location where emergency medical countermeasures will be dispensed to the public.

**Point of Distribution**

A location where emergency supplies and equipment will be distributed during a disaster.

### Point Event

An incident that occurs in a relatively limited geographic area.

### Riot Gear

Issued protective equipment **to be** used during a civil disturbance, including gas mask, helmet with face shield, shin guards, forearm guards, and chest protector **(if issued).**

### Riot Equipment

The specialized equipment used during a riot or civil disturbance**, *including*** batons, shields, weapons**,** and munitions.

### Secondary Device

A device that is placed **in a specific location** in order to maim or destroy first-response personnel. It detonates after the main charge has exploded and first-response personnel have gathered on the scene.

### Shelter

A facility that provides food and shelter to evacuees during an emergency. These facilities are usually operated by the American Red Cross, which also maintains a list of the evacuees housed in the location.

### Shelter-in-Place

When evacuation is not a viable option, protection can be provided by securing persons inside a fixed facility and discontinuing external air exchange until the exterior environment is deemed safe.

### Slating Area

An area designated in an IAP **that is** staffed by sworn and Identification Unit personnel **and serves** as the processing point for those persons arrested during major incidents, events**,** or mass arrest situations. Personnel from the Franklin County Sheriffs Office and Clerk of Courts may also be assigned to the site.

### Special Needs

The accommodations for individuals with limited capacity who require certain equipment, physical assistance**,** or environmental surroundings to accomplish normal functional ability.

### Squad

A response team normally consisting of one sergeant and seven officers.

### Staging Area

A site established for the temporary location of available resources. Any location in which personnel, supplies, and equipment may be temporarily housed or parked while awaiting operational assignment.

**State of Emergency Declaration**

When an event overwhelms the responding entities, exhausting available resources, the designated government official may declare a state of emergency. This will provide availability of additional resources from the next governing level.

**Warm Zone**

A buffer area surrounding the Hot Zone where decontamination occurs.

**Weapons of Mass Destruction (WMD)**

See CBRNE.

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>4.1 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>11 |
| **Field Force Operations** | | |



## I. Field Force

A. The Division of Police's organizational structure of the field force is flexible, with the composition based on the designated function at the time of deployment. ***The field force size and composition varies but generally includes four to six squads (5 to 10 officers in each) and is led by a lieutenant. The team is capable of managing large-scale operations including crowd management, enforcement, and general police presence for the purpose of maintaining order and preserving the peace.***

B. ***The Incident Commander will establish the commander's intent and the Rules of Engagement (ROE) and communicate them clearly to personnel assigned to the field force.***

C. Field forces are deployed at the direction of the Incident Commander to perform various tasks associated with civil disorder or major events. Typical functions of a field force may include security of a geographical area or resource, high visibility patrols, providing escort to fire or other critical resources, mass arrest, and/or other functions required to restore order and provide security.

D. Field force deployment is dictated by mission assignment. The field force may be deployed intact as an entire force or broken down by squad into particular functional or geographic areas. Each squad may then be broken down into small teams of two or four officers each. The squad leader is responsible for the operation and conduct of his or her squad. The field force provides an organized response to an incident. Individual actions are discouraged except in life-threatening circumstances. For safety reasons, officers are not assigned as a one-officer unit when deployed in a field force assignment.

E. Assigned equipment varies with the field force mission. For example, securing a geographic area may not require additional equipment, *but* clearing an area of demonstrators may require the use of shields, batons, and riot control munitions.

F. Depending on the mission, a field force may be mobile in vehicles, on foot, or assigned to a static location. The configuration of mobile field forces depends on the availability of transportation resources. The field force may be transported in its entirety by bus, or squads may be assigned to two or four-officer cruisers.

## II. Field Force Organization

A. Field Force Leader

1. The Field Force Leader is a police lieutenant **who** is responsible for the planning, operation, and conduct of the field force. The Field Force Leader directs squad leaders on mission requirements and deployment methods and reports to the Operations **Chief** or Incident Commander as appropriate. The radio call number series 4100 through 4999 is designated for emergency operations use. The Field Force Leader is designated by the appropriate corresponding number, **for example,** field force 1 is 4100, field force 2 is 4200, etc.

   a. A **staff of one sergeant and two officers** is **generally** assigned to the **F**ield **F**orce **L**eader. **The sergeant** performs duties as the aide to ensure documentation of field force activities, monitor radio traffic, and request equipment replacement for the field force as needed. The remaining two officers may perform duties as video officers, using video cameras to record field force activities, or as security officers for field force vehicles and equipment when deployed.

B. Field Force Squad

1. The squad is the basic element of the field force. Typically four to six squads are assigned to each field force. Additional squads may be assigned to a field force when staffing is available, but the field force will not exceed nine squads. Each squad consists of one police sergeant and **5 to 10** police officers.

2. Squads may be assigned specific tasks within the field force such as security, arrest teams, or deployment of riot control munitions.

   a. **A squad of trained grenadiers may be assigned to operate less-lethal munition launchers and deploy other less-lethal weapons.**

   b. **A squad may be assigned as the arrest team. The decision to arrest is made by the Field Force Leader, and the responsibilities of the arrest team include:**

   (1) **Making arrests**

   (2) **Restraining and searching arrestees**

   (3) **Moving arrestees to the PTV**

   (4) **Extricating trapped officers or specific suspects as directed by the Field Force Leader**

   (5) **Securing specific persons or assets as directed by the Field Force Leader**

3. Squads are designated by the appropriate field force number and numerical sequence within the field force: 4110, 4120, 4130, 4140, 4150, and 4160.

    **4.** Equipment assigned to the squad varies depending on the mission and may include shields and batons, gas guns, and riot control munitions. The type and number of vehicles assigned to each squad is based upon the mission and method of deployment.

C. Arrest Vehicle

***At least one PTV with two officers should be assigned to each field force.*** The PTV officers are responsible for transporting arrestees from the operational area to the Field Prisoner Processing Area or Slating Area as appropriate. During large events, PTVs may be required to work independent of their assigned field force providing prisoner transportation where needed. The PTVs are designated with corresponding field force numbers***, for example,*** 4108 for field force 1, 4208 for field force 2, etc.

D. Video Officer

    1. The video officer needs to be assigned directly to the *F*ield *F*orce *L*eader to accurately record ***crowd and field force activities, including*** the cause and effect of the field force response to the incident. The video officer must ensure he or she is positioned with the *F*ield *F*orce *L*eader to document the activities of the crowd identified and the deployment orders given to the squad leaders. The video officer then records the field force response and the actions of the crowd.

      a. It is imperative that the video officer record all the identified activities leading up to the deployment of the field forces, squads, ***and*** munitions, ***as well as*** the conduct of the crowd and officers during deployment. ***Recordings made*** during field force operations are evidence and could be used in court to prove or defend the Division's actions during an incident. ***Refer to the "Property and Evidence Handling" directive as necessary.***

E. Field Force Deployment

    1. A field force may be activated at the direction of a lieutenant or higher, or as designated by an event plan. According to the incident or event, a single field force or several field forces may be activated. During an emergency activation of a field force, the zone lieutenant notifies Communications Bureau personnel of the number of personnel needed and the designated staging location. Personnel will respond to the designated location and be formed into a field force and deployed at the direction of the *F*ield *F*orce *L*eader.

    **2.** During a major event, field forces are assigned designated reporting times and locations. Field force personnel are notified of their assignments, reporting times**,** and locations prior to the event.

3. Numerous field forces may be deployed at the same time in response to an incident or special event. Field forces may work in conjunction with each other or operate independently in separate geographic areas to perform specific tasks. When two or more field forces are activated, a police commander or higher is assigned as the Incident Commander.

4. During field force deployment, additional units may also be activated to support the incident or event and may include staging/prisoner processing/ slating areas and/or Mounted, SWAT, or Traffic units.

F. Radio Call Numbers

1. The field force is assigned a basic series of call numbers. As each squad is further broken down into smaller teams of officers, the number series changes slightly to reflect the number of individual units and ensures accountability for officer safety.

   a. The numbering matrix for each field force is the same. The second number designates the field force. For example, 4100 designates field force 1, 4200 designates field force 2, etc.

   b. The call numbers for the field force are as follows:

   | 4100 | Field Force 1 Leader | Lieutenant |
   | 4101 | Aide to Field Force Leader | *Sergeant* |
   | 4102 | Video/*Staff* Officer | |
   | 4103 | Video/*Staff* Officer | |
   | 4108 | PTV | Two Officers |
   | 4110 | 1st Squad Sergeant | |
   | 4111- 4117 | 1st Squad Officers | |
   | 4120 | 2nd Squad Sergeant | |
   | 4121- 4127 | 2nd Squad Officers | |
   | 4130 | 3rd Squad Sergeant | |
   | 4131- 4137 | 3rd Squad Officers | |
   | 4140 | 4th Squad Sergeant | |
   | 4141- 4147 | 4th Squad Officers | |
   | 4150 | 5th Squad Sergeant | |
   | 4151- 4157 | 5th Squad Officers | |
   | 4160 | 6th Squad Sergeant | |
   | 4161- 4167 | 6th Squad Officers | |

2. As field forces are added, follow the same organizational structure. A number designates each field force, with each squad assuming that field force's number. *For e*xample, field force 2 is 4200, 1st squad is 4210, 2nd squad is 4220; field force 3 is 4300, 1st squad is 4310, 2nd squad 4320, etc.

G. Field Force Equipment

1. Each member assigned to a field force is required to have his or her Division-issued ***personal*** protective equipment ***(PPE) and riot control gear*** with him or her. In addition, personnel are encouraged to have their flashlight and inclement weather gear. Additional equipment may be assigned to the field force as the mission and situation dictates. These items include, but are not limited to, the following:

   a. Riot batons
   b. Protective Shields
   c. 37mm***/40mm*** gas guns (single shot and rotary)
   d. Shotguns
   e. Riot control munitions (gas and smoke grenades)
   f. Radios
   g. Video cameras
   h. Bullhorns
   i. Flex cuffs
   j. Arrest stickers

2. ***The Columbus Division of Fire should be notified prior to the dispersal of any chemical riot control munitions during training or an actual riot situation.***

3. Field Force Kit – Each field force is provided a field force kit ***by the on-duty patrol lieutenants*** containing items necessary to organize and operate a field force, document field force activities, and process arrestees.

   a. Each patrol zone is assigned a field force kit that is maintained by the zone lieutenants. Patrol zone lieutenants are responsible to ***maintain the*** equipment and munitions listed on the Zone Lieutenant Munitions/Equipment Checklist, form U-10.127***, and after each deployment to restock items as necessary.*** The first shift Patrol zone lieutenant shall inspect the field force kits ***quarterly.***

   b. The riot van contains ***sufficient quantities of grenades (smoke and chemical agent), wooden multiple baton shells, and 37mm/40mm gas guns. These items are used for general deployment and to replenish kits maintained in the vehicles of zone lieutenants.***

   c. ***The ORD-2 vehicle contains smaller quantities of the equipment carried in the riot van as well as flex cuffs and cuff cutters.***

   d. ***Ordnance Unit personnel shall inspect the supplies and update the checklist quarterly for both the riot van and ORD-2 and restock items as necessary.***

4. Personnel assigned to field force duty shall wear the uniform of the day.

H. Field Force *Formations*

### 1. *Line Formation*

**a.** The following is the basic configuration of a field force in a line formation. *The line formation is used to provide security across a frontage or to move a crowd in a single direction.*

```
1111112222223333333444444
1L     2L     3L     4L
LT/Aide(s)
555555  5L
666666  6L
PTV
```

---

| | |
|---|---|
| 1,2,3,4,5,6 | Indicates officers in their assigned squads. |
| 1L, 2L, etc. | Indicates the squad leader (sergeant) of each squad. |
| LT | Indicates the *F*ield *F*orce *L*eader, a police lieutenant. |
| Aide(s) | Indicates the leader's aide(s) and the video officers. |
| *5L* | *Indicates the location of the arrest team.* |
| *6L* | *Indicates the location of the grenadiers.* |
| *PTV* | Indicates the PTV assigned to the field force. |

### 2. *Wedge Formation*

**a.** *The Wedge Formation is movement used to split or disperse a crowd.*



```
                1 2
             1       2
          1             2
        1  1L     2L  2
      1                   2
     3                     4
    3  3L          4L  4
     3                   4
      3                 4
       3               4
```

```
LT/Aide(s)
55555 5L
66666 6L
PTV
```

### 3. Box Formation

    **a. The Box Formation is used to provide security by surrounding a person or resource.**

```
2 2 2 2 2 3 3 3 3
1    2L    3L   4
1               4
1    1L    4L   4
1               4
1   LT/Aide(s)  4
      55555
       5L
      66666
       6L
       PTV
```

### 4. Column(s) Formation

    **a. Columns are used to provide a formation for the rapid movement of a Field Force.**

```
        1    3
        1    3
   1L   1    3  3L
        1    3
        1    3
        2    4
        2    4
   2L   2    4  4L
        2    4
        2    4
        5    6
        5    6
   5L   5    6  6L
        5    6
        5    6
      LT/Aide(s)
         PTV
```

*I. Field Force Communication*

    *1. The field force's actions and movements will be at the specific direction of the Field Force Leader by verbal commands, audible signals, and/or hand and arm signals. If time permits, the forms of communication should be discussed and rehearsed in the Staging Area prior to the field force deployment.*

    *a. Verbal commands are delivered by the Field Force Leader and echoed by all members of the field force.*

    *b. Preparatory commands alert the field force of the next action and that the command of execution is forthcoming.*

    *c. Commands of execution direct the field force to immediately take the action.*

    *(1) Audible signals may be given in lieu of verbal commands or hand and arm signals as it may be difficult to see or hear. The following three signals maybe given by blast(s) on an air horn, vehicle horn, or whistle:*

    *(a) One blast – Stop*

    *(b) Two blasts – Go/Move*

    *(c) Three blasts – Warning signal (Horses, Gas, or Emergency)*

    *(2) Hand And Arm Signals*

    *(a) Field Force Key*



TEAM MEMBERS

PLATOON LEADER    GRENADIER    SQUAD LEADER

*(b) Line Formation*



*(c) Wedge Formation*



### (d) Box Formation



### (e) Column(s) Formation





*J.* Vehicle Operations

1. Emergency Equipment – Vehicle emergency lights and sirens **should be** used during field force response and movement as directed by the field force leader **and in conjunction with the "Emergency Vehicle Operations" directive.**

2. Speed – The objective of the field force is to arrive at the scene as an organized unit. When responding, field force vehicles remain close to continue through intersections uninterrupted while still maintaining a safe distance between vehicles. The response speed of the field force is determined by the *F*ield *F*orce *L*eader.

3. Lane Changes – During lane changes of the entire field force, the *F*ield *F*orce *L*eader instructs the last vehicle to "block left" or "block right." The last vehicle then moves into the designated lane, blocking approaching traffic **and** allowing the remainder of the field force to change lanes as the lane clears of traffic.

4. Windows – Vehicle windows should be rolled up to reduce the potential of personnel being struck by objects thrown at the vehicles.

5. Parking – Upon arrival, field force vehicles are parked in squad order to allow for a rapid and orderly response from the vehicles. Personnel remain in their vehicles until directed to exit by the *F*ield *F*orce *L*eader.

6. Keys – Keys are left in the field force vehicles to avoid being lost and to allow for a rapid exit of the area if required. It may be necessary to assign field force officers to provide security for the vehicles.

7. *Mounted and Bicycle Units:*

   a. *The Mounted and Bicycle Units may be used to supplement the field forces based on the availability of resources.*

   b. *As directed by the Field Force Leader, the Bicycle Units may be deployed to assist in the management of lawful crowds, protestors, and/or demonstrators.*

   c. *At the discretion of the Field Force Leader, Bicycle Units may be used as a rapid response team to contain, disrupt, and/or monitor unlawful violent crowds and to secure areas cleared by personnel to maintain control of ground gained.*

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.2 |
|---|---|---|
| | REVISED Dec. 30, 2019 | TOTAL PAGES 5 |
| **Civil Disturbance Tactics** | | |



## I. Purpose

The purpose of this section is to define the types of civil disturbances and to provide direction in planning and implementing the appropriate police response to effectively manage and control the situation. This section will provide the guideline for tactics that may be used by field forces and other emergency response forces.

## II. Definitions

A. Civil Disturbance – Any situation such as a demonstration, strike, riot, celebration, and/or public panic, which has the potential of causing injury to persons or damage to property.

B. Peaceful Demonstration – An event with the purpose of expressing views and opinions in a peaceful manner.

C. Planned Events – Activities with pre-notification, either formal or informal, where large numbers of persons gather or attend, or unique security or traffic measures are required. Examples of planned events include parades, sporting events, dignitary protection, and civic and cultural events.

**D. Riot – A course of disorderly conduct with four or more people with purpose to:**

**1. Commit or facilitate the commission of a misdemeanor;**

**2. Intimidate a public official or employee into taking or refraining from official action;**

**3. Hinder, impede, or obstruct a function of government or orderly process of administration or instruction at an educational institution, or to interfere with or disrupt lawful activities carried on at such institution; or**

**4. Do an act with unlawful force or violence, even though such act might otherwise be lawful.**

**E.** Spontaneous Events – Events that may create a threat to public health, safety, or order and occur without sufficient notice to allow comprehensive planning.

## III. Operations and Tactics

*A. The following operational objectives, which are consistent with the National Response Plan and the National Incident Management System, should be considered:*

1. *Monitoring of the crowd's progress and development and gauging the intent of the crowd. Monitoring includes passive observation and communication with ground leaders.*

2. *Ensuring containment of the area.*

3. *Separating passive resistors, peaceful demonstrators, and agitators to make dispersion during critical incidents easier.*

4. *Causing participants, spectators, and emergency responding units to disperse as necessary. A key to dispersion is to ensure avenues of egress are available and communicated.*

5. *Arresting individuals during a civil disturbance only as necessary.*

6. *Restoring the affected area to its normal state as soon as possible at the conclusion of the event.*

*B.* Peaceful Demonstrations

1. A peaceful demonstration is viewed as a legally acceptable manner of expressing an opinion. The right to protest, when done according to law, is embedded in the spirit of the Constitution. The role of the Division of Police during a demonstration is to protect the rights of peaceful demonstrators, to protect the rights of the public, *and address any public safety concerns resulting from the demonstration.* The physical make-up of a particular group of demonstrators is as diverse as the agenda and cause of the group. It is not uncommon to observe demonstrators representing a multitude of different factions. It is often an opportunity to be seen and heard, regardless of the advertised cause.

2. Peaceful demonstrations often bring people of opposing views. It is not uncommon for counter demonstrators to agitate and taunt peaceful demonstrators and police. A peaceful demonstration may evolve and change in nature if it is not managed properly. Officers should remain neutral when faced with groups of differing causes. When faced with agitators, officers must project a calm, professional image. Professional agitators are trained to provoke officers into overreacting. A peaceful group can be enraged by inappropriate police conduct.

3. A police representative should make contact with the formal or informal leader of the group. It should be conveyed that the Division respects the rights of the group to exercise their First Amendment rights. Permits must be inspected and the leader will be informed that they are expected to abide by all laws regarding the obstruction of sidewalks or streets. Failure

to follow the permit guidelines, disruptive behavior, property damage, or violence will not be tolerated. The group's actions will determine the police response. Demonstrators may be warned, cited, or arrested as appropriate. The *Incident Commanders* should familiarize themselves with any information regarding the group, their agenda, and tactics when planning the response to the event.

**C.** Civil Disturbance

1. A civil disturbance, or riot, usually results in violent confrontation, property damage, and injury. The violence may be directed towards opposing groups, police, or the public in general. Verbal taunting may escalate into violent behavior resulting in objects being thrown, property damage, vehicle or building fires, looting, and assaults.

2. Civil disturbance can result from a specific incident or a series of related or unrelated events. This may include police actions, court rulings, social conditions, or events from out of control celebrations.

   a. This type of violence can be the result of a specific incident or after a series of events, such as a police action or a court ruling that is perceived to be unfair or biased.

   b. Common elements of campus disturbances *may be* excessive amounts of alcohol, a large volume of people in the somewhat confined area (typical of the off campus housing district), loud music, and the propensity of young people in the area to use cell phones *and social media* to communicate with each other, providing an instant network of information concerning the locations of the parties.

**D.** Impromptu Disturbances

The initial response of the police and the community to an impromptu or spontaneous disturbance is critical. Once a "flashpoint" of violence involving groups of people displaying criminal behavior is identified, the first responders should take quick and decisive action to diffuse the situation and avoid escalation. Most incidents occur unexpectedly, which does not give the Division the advantage of preferred manpower levels or the establishment of a command staff. In these situations it is imperative that on duty personnel assume their responsibilities as first responders, keeping in mind that the primary objective is the safety of citizens affected by the disturbance, specifically to prevent the loss of life. Initial steps will include establishing a perimeter around the affected area to prevent additional rioters from assembling and to keep bystanders from harm. If immediate action is warranted, such as arrests or crowd dispersal, and it can be accomplished safely with available personnel, it should be taken. A staging area should be designated and a supervisor assigned to organize additional units into a field force.

***E.*** Control Strategies

1. Strategies should be implemented in a coordinated Division-wide effort ***consistent with Division policies.*** Tactics will vary depending upon the situation; however, in all cases, Division personnel should respond ***as trained and in a*** controlled manner.

2. Preventing a disturbance from becoming a riot through proactive initiatives and citizen contacts should be the goal of supervisors***.***

3. ***All actions including arrests should be accomplished as a team. An officer should not act independently in an unruly crowd as this can lead to unsuccessful and dangerous operations.***

4. ***It*** should be noted that the number of people attending a ***large gathering*** has the potential to grow into an unruly crowd very quickly. ***Disturbances may also be the result of protests or marches.*** The street and sidewalks may be blocked, disrupting the flow of traffic and creating the potential for violent confrontations and property destruction.

5. ***The following actions should be considered during a disturbance:***

   *a.* ***T***he ranking supervisor should request officers to respond to a designated staging area, don riot gear, and prepare to deploy as a field force.

   *b.* Responding officers should not report directly to the scene unless an emergency situation exists and they are ordered to do so. Normally, the field force should not be assembled within view of the crowd.

   *c.* A perimeter should be established and officers already at the scene should attempt to disperse the crowd by giving clear verbal orders and taking appropriate enforcement action. If the crowd becomes violent or confrontational, ***the dispersal order should be given promptly and repeatedly.***

***F.*** ***The Division has a variety of resources which may enhance the ability to respond to a disturbance. All available resources should be considered when determining the appropriate response, including:***

1. ***Mobile Field Force(s)***

2. ***Mounted Unit***

3. ***Arrest/Rescue Teams***

4. ***Bicycle Rapid Response Teams***

5. ***Motorcycles/Traffic Control Unit***

6. ***Field Prisoner Processing Areas***

7. ***Visible video surveillance***

8. ***Medical support units***

9. ***Pre-positioned/Designated Protest Areas***

10. *Pre-placed barriers*

11. *SWAT*

12. *Observation/Counter Sniper Teams*

13. *Riot control munitions*

14. *Alternative traffic plans, including ingress/egress routes*

15. *Specialized equipment and vehicles such as enhanced public address/acoustic devices, passenger buses, light trailers, observation towers, fire trucks, and armored vehicles.*

G. **Enforcement Action**

1. *If it becomes necessary to take enforcement action, sworn personnel should consider the elements of offenses against the public peace, which may include but are not limited to:*

    a. *Inciting Violence*

    b. *Riot*

    c. *Aggravated Riot*

    d. *Failure to Disperse*

    e. *Noise Ordinance*

    f. *Disorderly Conduct*

      (1) *Blocking the Roadway*

    g. *Open Container Violations*

    h. *Prohibitions Under 21 (underage use and possession of alcohol)*

    i. *Misconduct at an Emergency*

    j. *Open Burning*

      (1) *If an arrest is made for this violation, collect all evidence including accelerant and notify Columbus Division of Fire. The arson investigators are responsible for the securing of evidence in special containers, processing, and filing charges.*

| Columbus Police Emergency Operations Manual | EFFECTIVE<br>May 30, 2007 | SECTION<br>4.3 |
|---|---|---|
| | REVISED<br>Dec. 30, 2019 | TOTAL PAGES<br>6 |
| **Mass Arrest Procedures** | | |



## I. Purpose

There will be times when Division of Police *personnel* arrest a *large* amount of people during a protest, rally, or other activity. This section outlines the Division's procedures for making mass arrests. The procedures may be used during planned protests or rallies or in response to a spontaneous *event.* During a mass arrest situation, the primary concern should be the safety of the public and officers involved. For additional information, refer to the *"Arrests and Warrants" and "Transport and Slating"* directive*s.*

## II. Pre-Arrest Procedures

A. If the demonstration is peaceful and police actions are not immediately necessary, the Incident Commander should:

1. Determine the size and nature of the demonstration. Attempt to identify and interview leaders to ascertain their plans. Determine if demonstrators intend to be arrested.

2. Determine the name, address, and phone number of the property owner or agent where the incident is occurring, when appropriate. Contact the Homeland Security Section for any available information regarding the group.

3. Determine if the property owner/agent wants arrests to be made if demonstrators are committing a crime *and the incident occurs on private property*. If the property owner desires arrests to be made, determine if the owner will serve as the primary prosecution witness (list as a witness on the Arrest Information, form U-10.100) or if they will designate an agent to serve as the prosecution witness to be subpoenaed to court. Ensure that the appropriate *i*ncident *r*eport is taken from the property owner/agent.

4. Before any arrests are made, select the proper charges(s) that may be used for the event. If time permits, brief supervisors and participating officers on *the* items listed above.

5. Before mass arrests are made, ensure the following items are present at the demonstration site*:*

   a. Arrest Information and *criminal* complaint forms

   b. Cameras and video recording equipment

   c. Clipboards

    d. Arrest stickers

    e. Staplers and extra staples

    f.  Property bags

    g. *Flex cuffs*

    *h.* Needle-nose pliers or wirecutters (to cut plastic cuffs)

    *i.*  Bullhorn or other sound amplification device

      *(1) The Long Range Acoustic Device (LRAD) may be deployed as appropriate to convey warnings or as a distraction device as outlined in Section V.*

    *j.*  Bolt-cutter or other cutting devices

  *6.* Designate a Field Prisoner Processing Area and staff if required to process a large amount of persons prior to their transportation to the Slating Area. *The Field Prisoner Processing Area will provide workspace to complete arrest paperwork and the fingerprinting and photographing process completed by Identification Unit personnel.*

  *7.* Designate a Slating Area and staff to process the arrestees. The Slating Area may be staffed by various units and agencies including the Franklin County Sheriff's Office and the Clerk of Court*s*.

## III. Demonstration Procedures

A. A *sworn* supervisor will make contact with the property owner or agent regarding arrest procedures if protestors are on private property. *A sworn supervisor will determine the appropriate course of action if demonstrators are in a public area or roadway to ensure they are not creating a public safety hazard.*

B. Prior to contact with the demonstrators, police personnel will be briefed on arrest, use of force, transportation*,* and paperwork procedures *as directed by the Incident Commander.*

*C. If exigent circumstances exist, such as demonstrators creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of demonstrators who are not complying with lawful commands. Refer to the "Chemical Agents and Intermediate Weapons Regulations" directive as necessary.*

*D.* A *sworn* supervisor will read a dispersal warning *using a bullhorn or amplification device* to the demonstrators *prior to arrests being made.* The warning *should* be read *three (3)* times *to notify the demonstrators that they are committing a violation of law and they may be arrested if they fail to comply with the order to disperse. Three*

*warnings are preferred; however, action may be taken after one or two warnings if there is an immediate need to stop dangerous behavior.* All warnings *and arrests should* be recorded using video recording equipment.

1. The *first official dispersal command* reads:

   *"AN EMERGENCY EXISTS ON AND AROUND (give location, for example: Chittenden & Indianola). YOU ARE ORDERED TO IMMEDIATELY LEAVE THE (AREA JUST DESCRIBED)/ (ROADWAY) BY THE ORDER OF (on-scene ranking supervisor). IF YOU REMAIN IN THE (AREA)/(ROADWAY) JUST DESCRIBED, REGARDLESS OF YOUR PURPOSE, YOU WILL BE IN VIOLATION OF COLUMBUS CITY CODE AND OHIO REVISED CODE - DISORDERLY CONDUCT, AND THE POLICE WILL REMOVE YOU FROM THIS (SPECIFIED AREA)/(ROADWAY). CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED TO MOVE YOU FROM THIS (SPECIFIED AREA)/ (ROADWAY), AND YOU ARE SUBJECT TO BEING ARRESTED AND PROSECUTED. THE FOLLOWING ROUTES OF DISPERSAL ARE AVAILABLE (describe available exit areas). YOU MUST LEAVE THE (SPECIFIED AREA)/(ROADWAY) NOW, AND YOU MAY NOT RETURN UNTIL THE EMERGENCY HAS CEASED."*

2. *The second warning reads:*

   *"THIS IS AN EMERGENCY SITUATION...AN EMERGENCY EXISTS IN THIS LOCATION (give location); LEAVE THE (SPECIFIED AREA)/(ROADWAY) IMMEDIATELY. CROWD CONTROL DEVICES, INCLUDING CHEMICAL AGENTS, MAY BE DEPLOYED. IF YOU REFUSE TO LEAVE THE (SPECIFIED AREA)/(ROADWAY), YOU ARE SUBJECT TO ARREST. LEAVE THE (SPECIFIED AREA)/ (ROADWAY) IMMEDIATELY.*

3. *For the final warning, repeat the second warning and add:*
   *"THIS IS YOUR FINAL WARNING."*

4. *The Incident Commander or his or her designee should record the following information when these announcements are made.*
   Day:_____ Date:____/____/____ Location:_____
   *Time of 1st Warning:* __:__ *(Wait approximately 5 minutes before reading 2nd warning)*
   *Time of 2nd Warning:* __:__ *(Wait approximately 2 minutes before reading 3rd warning)*
   *Time of 3rd Warning:* __:__ *(Make arrests/deploy chemical agents)*

**E.** ***If on private property,*** have the owner/agent attempt to gain entry into the building through the demonstrators who are blocking the door ***after the warning is read, if it is safe to do so.*** If the owner/agent is unable to gain entry, arrest procedures will be implemented at the direction of the Incident Commander.

**F.** ***Each arrest team will consist of four officers.*** At the direction of the Incident Commander, officers will begin to arrest individuals ***who are*** violati***ng*** law.

**G.** Prisoners will be walked to the transport vehicles where a photograph of the prisoner and arresting officer will be taken and the Arrest Information form completed. ***For non-ambulatory prisoners, refer to Section I,F of the "Transport and Slating" directive.***

**H.** If the demonstrator refuses to walk to the prisoner transport vehicle, he or she will be carried in an appropriate manner to the transport vehicle by the arrest team. Individuals who refuse to walk or ***who*** show other passive resistance may be charged with resisting arrest. The arresting officer will describe in the narrative of the Arrest Information form how the individual resisted arrest. ***For example,*** "Subject went limp and would not walk, requiring officers to carry the arrestee to the transporting vehicle."

**I.** All property will be removed from the arrestee and placed in a bag with the names of the arrestee and arresting officer printed on it.

**J.** The transporting officers will ensure the Arrest Information form, photographs, and other required paperwork are completed and property secured by the arresting officer(s) prior to transporting the individual.

## IV. Processing Procedures

A. If a Field Prisoner Processing Area is being utilized, prisoners will be transported to the Field Prisoner Processing Area where necessary paperwork will be completed. ***As appropriate, prisoners will then be processed through the Slating Area, if one is activated.***

B. Depending on pre-established procedures for the event, prisoners may be summonsed at the Field Prisoner Processing Area or may be processed through the Slating Area ***prior to being issued a*** summons or slated at the appropriate county jail.

**C.** The Incident Commander will decide prior to initiating mass arrests whether to slate or summons individuals. The decision will be based on the type of protest, method of protest and resistance, number of potential arrestees, and available jail space. All individuals involved in an assault, resisting arrest, or other violent crime or felony will be slated. Felonies will be processed through the appropriate investigative unit.

**D.** If mass arrests are anticipated, the Franklin County Jail supervisor will be notified prior to the event***, or as soon as practical for spontaneous events.***

## V. Long Range Acoustic Device

A. *The LRAD is an acoustic hailing device used to send messages and warning tones over longer distances or at a higher volume than normal loudspeakers. The LRAD is used for long-range communications in a variety of applications and as a means of non-lethal, non-kinetic crowd control.*

   1. *The LRAD's high output sound and directionality can be used to hail, warn, and notify clearly and intelligibly at distances of 250 meters (820 feet) or more.*

B. *The LRAD shall only be operated by sworn personnel who have satisfactorily completed the appropriate annual training.*

C. *The LRAD may be used to:*

   1. *Communicate to large crowds during parades, festivals, and sporting events;*
   2. *Conduct SWAT operations;*
   3. *Communicate to demonstrators and disperse or redirect crowds prior to deployment of chemical agents;*
   4. *Communicate with barricaded subjects;*
   5. *Make announcements when serving high risk warrants; or*
   6. *Evacuate neighborhoods or communicate lifesaving information to citizens during emergencies and disasters.*

D. *During an incident of civil unrest, the Incident Commander may request that the LRAD be delivered to be used as the amplification device to convey warnings to the demonstrators as outlined in Section III,D.*

   1. *Whenever possible, prerecorded messages should be used. Prerecording ensures that messages are appropriately worded and clearly broadcasted to maximize the effectiveness of communications.*
   2. *If demonstrators do not comply approximately two minutes after the second warning is read, the Incident Commander may order that the LRAD Warning Tone be used. Use of the LRAD Warning Tone as a distraction device shall be documented as a Level 0 Use of Force. Refer to the "Use of Force" directive as necessary.*
   3. *The Warning Tone should be used in 2-5 second bursts for maximum effectiveness.*

***E. Operators of the LRAD shall ensure no targeted subjects, bystanders, or personnel are occupying the applicable "TONE" or "VOICE-TONE HAZARD AREAS" before engagement in "TONE" or "VOICE" mode.***

   ***1. The Tone Generator produces the loudest output from the LRAD. The Incident Commander or designee operating the LRAD will gauge safe stand-off distances utilizing a range finder prior to using the "TONE" mode. Time, distances, and location shall be documented by the Incident Commander or a designee.***

***F. Operators of the LRAD shall wear hearing protection. Other personnel in the area when the LRAD is being operated should also wear ear protection, such as soft foam inserts.***

## VI. Juvenile Offenders

Juveniles arrested during a demonstration will be processed according to ***the*** Division Directives.

## VII. Crime Scene Preservation

If a crime scene is involved in the event, the scene will be secured and the appropriate investigative unit and Crime Scene Search Unit will be required to process the scene.

## VIII. Legal Advisor

The Division Legal Advisor will be notified of a protest or other event involving mass arrests. The Division Legal Advisor may respond to the scene, Field Prisoner Processing Area, or Slating Area to provide legal assistance if necessary.

| Columbus Police Emergency Operations Manual | EFFECTIVE May 30, 2007 | SECTION 4.4 |
|---|---|---|
| | REVISED Jul. 30, 2019 | TOTAL PAGES 6 |
| **Riot Control Munitions** | | |



## I. Purpose

A. This section provide**s** Division personnel with a reference for riot control munitions currently in stock for use in various situations. None of the munitions listed **shall** be used by Division personnel unless properly trained and certified by the Ordnance Unit. The section is divided into three parts outlining munitions for the following types of situations:

1. First Responders
2. Field Force Operations
3. Tactical Situations

B. Each part of this section will outline the following details of riot control munitions:

1. Proper application
2. Construction
3. Operation
4. Effective range
5. Type of agents or projectiles
6. Discharge times

## II. Delivery Method Options

A. 37mm/40mm Gas Gun

1. 37mm Super-Sock™ bean bag round
2. 40mm wood baton round
3. 40mm **s**ponge round
4. 40mm **w**arning/**s**ignaling **m**unitions

B. Aerosol Canister

   OC agent

C. Grenade

   OC/CS agent

D. Unless otherwise specified, all 40mm gas guns and related munitions shall be securely stored in the **l**ieutenant's office. The items shall be stored in a soft carrying case and transferred to a **l**ieutenant's vehicle when needed for deployment, training, or inspection. The items shall be returned at the completion of the event/incident.

## III. First Responder

A. 37mm/40mm Gas Gun

1. Proper *a*pplication: Designed for crowd control or barricade situations, both indoors and outdoors.

2. Construction: Metal and plastic revolving cylinder or single shot*, both* with or without a collapsible stock, *and* with optic sight.

3. Operation: May be used in double or single-action depending on the weapon.

4. Effective range: 50 yards on breech lock sight, 75 and 100 *yards* on rear leaf sight.

5. Type of agents or projectiles: 37mm or 40mm projectiles in single shot and six or four-shot rotary version.

6. Discharge times: Zero discharge time.



Four-Shot 40mm Rotary Gas Gun



Single-Shot 40mm Gas Gun

B. 37mm Super-Sock™ Bean Bag Round

1. Proper application: Fired from the 37mm gas gun. ***Shall not be fired at the head unless the use of deadly force is reasonable.***

2. Construction: Balloon filled with silica sand contained in a plastic 37mm plastic shell.

3. Operation: Direct-fire deployment from the 37mm gas gun. Use as an intermediate impact weapon, targeting the extremities.

4. Effective range: 60 feet.

5. Type of agents or projectiles: Balloon filled with silica sand contained in a plastic 37mm plastic shell.

6. Discharge times: Not applicable.



37mm Super-Sock Bean Bag Round

## IV. Field Force Operations

A. 40mm Wood Baton Round

1. Proper application: For outdoor use in riot control situations without the use of chemical agents when the crowd must be dispersed quickly and efficiently. ***This is not a direct-fire munition.***

2. Construction: 3 wood projectiles loaded in a 4.8 inch casing.

3. Operation: Fire from a 40mm gas gun at the ground in front of the crowd and the wood projectiles skip-fire into the crowd's feet and lower legs.

4. Effective range: 30 to 60 feet.

5. Type of agents or projectiles: 3 wood projectiles loaded in a 4.8 inch casing.

6. Discharge times: Zero discharge time.



40mm Wood Baton Round

B. 40mm Sponge Round (40MM eXact iMpact™ Sponge Round)

1. Proper *a*pplication: For use in riot control situations for the incapacitation or control of an aggressive, non-compliant subject. ***Shall not be fired at the head unless the use of deadly force is reasonable.***

2. Construction: A plastic body with a foam (sponge) nose.

3. Operation: Direct-impact deployment from a 40mm gas gun. Use as an intermediate impact weapon targeting the extremities.

4. Effective *r*ange: 5 to 120 feet.

5. Type of agents or projectiles: A plastic body with a foam (sponge) nose which is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

6. Discharge times: Zero discharge time.



40mm Sponge Round

C. 40mm Warning/Signaling Munitions

1. Proper *a*pplication: For outdoor use in riot control situations to direct movement of a crowd.

2. Construction: A plastic body.

3. Operation: Fire from a 40mm gas gun, directed over the heads of a crowd to direct movement. The munition is designed to travel 100 meters and deflagrate 20 feet above the target when the launcher is held at a 15 degree elevation angle.

4. Effective *r*ange: 100 meters.

5. Type of agents or projectiles: A plastic body which produces 170 decibels of sound, 5 million candelas of light, and deflagrates at a distance of 100 meters ***with a CS irritant payload***.

6. Discharge times: Zero discharge time.



40mm Warning/Signaling Round

D. MK-9 Aerosol

1. Proper *a*pplication: Aerosol sprays in a dispersed pattern, creating a contaminated area that causes unruly crowds to move.
2. Construction: Aluminum case, plastic handle, and discharge trigger.
3. Operation: Spray above crowd, letting agent fall on to them or directly into face, nose, and mouth area.
4. Effective range: 10 to 15 feet.
5. Type of agents or projectiles: OC Aerosol spray.
6. Discharge times: Average of 18 to 20 half-second bursts.



MK-9 Aerosol

## V. Tactical Situations

A. OC Grenade

1. Proper *a*pplication: All indoor situations, as well as outdoor situations where the use of pyrotechnic munitions is not feasible and minimal contamination is desired.
2. Construction: High-impact ABS plastic or *m*etal *c*anister.
3. Operation: Following fuse delay, a $CO_2$ cartridge, located in the center of the grenade, discharges. Fuse type: M201A1 – 1.5 to 2 second time of detonation.
4. Effective range: 35 feet, hand-thrown only.
5. Type of agents or projectiles: *M*icropulverized OC agent with an effective volume of 2,000 cubic feet.
6. Discharge time: Instantaneous.



OC Grenades

B. Rubber Ball Blast Grenade

1. This device is a payload system for CS only and there are no projectiles inside the device.

2. Proper application: Crowd management for indoor and outdoor operations and tactical deployment situations.

3. Construction: Rubber ball grenade body.

4. Operation: Following an initial 1.5 second fuse delay, followed by another half-second delay, the grenade combines loud report and flash with effects of chemical agents. Fuse type: M201A1 – 1.5 to 2 second time of detonation.

5. Effective range: 35 feet, hand-thrown only.

6. Type of agents or projectiles: *M*icropulverized CS agent with an effective volume of 2,000 cubic feet.

7. Discharge time: Instantaneous.

8. Ordnance *unit* personnel shall be responsible for the storage of this device and the device will only be issued when approved by a *l*ieutenant for a specific event or incident.

9. Personnel deploying this device shall log its use as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF) as outlined in the "Gas Guns and Grenades" directive.



Rubber Ball Blast

## VI. Warning

A. Personnel deploying chemical agents and riot munitions *shall* read the warning labels on these devices before deployment.

B. Nomex gloves should be worn when deploying chemical agents.

C. International color codes

1. Yellow…..Smoke

2. Red…........CN

3. Blue…........CS

4. Orange....OC

*Note: The Division does not use or store CN agents.*

| Columbus Police Division Directive | EFFECTIVE Aug. 01, 1987 | NUMBER 2.01 |
| --- | --- | --- |
| | REVISED Dec. 30, 2017 | TOTAL PAGES 11 |
| **Use of Force** | | |



## I. Definitions

A. Use of Force

The exertion of energy or the ***actions of*** personnel in the performance of their duties used to direct or control another's movements or actions. A use of force ***may be implemented*** to control resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property*.*

B. Use of Force Levels of Control

1. Levels of Control used by the Division of Police ***for reporting purposes*** are:

   Level 0:  Officer presence, verbal and non-verbal commands, searching, handcuffing, sparking a taser for compliance, ***and using*** flashbangs and multiple baton rounds as diversions

   Level 1:  Empty hand control, pressure points, grounding techniques, and joint manipulations

   Level 2:  Use of chemical spray

   Level 3:  Use of electronic device (electronic custody belt, taser or ***Electronic Control Weapon (ECW)***)

   Level 4:  Hard empty hand control (strike/punch/kick)

   Level 5:  Use of impact weapon (baton/flashlight)

   Level 6:  Police K-9 bite

   Level 7:  Less lethal weapons (beanbag/multiple baton rounds

   Level 8:  Deadly force

C. Deadly Force

Any force which carries a substantial risk that it will proximately result in the death of any person.

D. Injury

1. For the purposes of this directive, injuries are classified as:

   a. Minor Injury

      An injury that does not require transport to a medical facility.

   b. Serious Injury

      An injury that requires transport to a medical facility for treatment.

Note: If a Division supervisor classifies an injury as minor, refusal at the county jail does not require a *Use of Force-Injury to Prisoner* administrative investigation.

E. Taser Application

One full or partial five-second cycle of the taser.

## II. Policy Statements

A. General

1. ***When reasonable, sworn personnel should try to de-escalate a situation by using trained techniques, such as building rapport, communication skills, taking cover, etc. This is not an all inclusive list.***

2. It is well established that police officers may use force to effect an arrest, to defend themselves, or to defend others. An officer should not desist from any official duty merely because resistance is offered. Police officers shall not use more force than is reasonable in a particular incident.

3. Factors to be considered when determining the reasonableness of a use of force are:

   a. The severity of the crime at issue.

   b. Whether the ***subject*** poses an immediate threat to the safety of the officer or others.

   c. Whether the ***subject*** is actively resisting arrest.

   d. Whether the ***subject*** is attempting to evade arrest by flight.

4. ***Force may be used during a medical emergency if:***

   a. ***The person experiencing a medical emergency is incapable of making a rational decision under the circumstances and poses an immediate threat of serious harm to himself, herself, or others.***

   b. ***Some degree of force is reasonably necessary to minimize the immediate threat.***

   c. ***The force being used is reasonably necessary under the circumstances.***

5. ***Sworn personnel should take into consideration an unarmed person's known mental health status prior to using force.***

6. Officers shall use their training to guide them through a use of force incident. The preferred response to resistance and aggression is a trained technique ***reasonable for the circumstances***. However, during a situation involving the infliction or threatened infliction of serious physical harm, the use of an untrained response, ***such as neck restraints,*** while not normally authorized, may be reasonable to end the threat and survive the encounter. The proper exertion of physical force used to control ***the subject*** shall be consistent with Division policy.

7. All uses of force shall be reported consistent with Division policies. Involved personnel shall notify an available on-duty Division supervisor in the following descending order:

   a. The*ir* immediate supervisor*;*

   b. Another sworn supervisor within their chain of command*; or*

   c. Any other sworn Division supervisor, who may personally conduct the investigation or may notify a supervisor in the involved officer's chain of command to conduct the investigation.

8. The Internal Affairs Bureau (IAB) shall forward a monthly report to the Training Bureau that summarizes all Level 2 through Level 8 Use of Force Reports, form U-10.128, received.

9. The Training Bureau shall review the monthly summary of Use of Force Reports received from IAB along with the original Levels 0 and 1 Use of Force Reports to monitor techniques for their effectiveness and to make approved changes in trained techniques and lesson plans.

10. All sworn Division personnel shall receive annual in-service training in the Division's use of force policy.

11. Division supervisors conducting use of force investigations shall photograph involved persons as detailed in the Supervisor's Manual.

12. Restrictions on Supervisors Conducting Investigations

   a. Division supervisors who actively participate in or order a use of force shall not conduct any subsequent investigation. This restriction does not apply to tactical situations, *for example, those involving* SWAT, In-Tac, or field forces.

   b. When a Division supervisor is prohibited from conducting the investigation, the involved supervisor's immediate supervisor or*,* if unavailable, another Division supervisor of a higher rank than the involved supervisor shall be contacted. The contacted supervisor may conduct the investigation or may assign it to an alternate supervisor.

13. If requested, IAB shall conduct an administrative investigation.

Note: Personnel who are the focus of a criminal investigation may invoke their constitutional rights. This does not apply if the investigation is strictly administrative in nature. Information compelled from the focus employee in an administrative investigation shall not be shared with, or in any manner released to, any unit conducting a criminal investigation, except as pursuant to the Ohio Public Records Act.

14. ***Sworn personnel shall not use any force for a retaliatory or punitive purpose.***

B. Deadly Force

1. Sworn personnel may use deadly force when the involved personnel have reason to believe the response is objectively reasonable to protect themselves or others from the imminent threat of death or serious physical harm.

2. Sworn personnel may use deadly force upon a human being to prevent escape when there is probable cause to believe that the *subject* poses an immediate threat of serious physical harm to others.

3. Sworn personnel *not in a vehicle* should avoid positioning themselves in the path of a moving vehicle *or in a position vulnerable to being struck if the vehicle were suddenly moved*.

   a. Sworn personnel in the direct path *or a position vulnerable to being struck by* a moving vehicle should attempt to take evasive action to avoid being struck by the vehicle.

   b. Sworn personnel may only fire a weapon at the driver or occupant of a moving vehicle when there is an articulable, reasonable belief that the subject poses an immediate threat of death or serious physical harm to himself, herself, or others.

   c. *Sworn personnel should not extend their displayed firearm inside the passenger compartment of an occupied vehicle.*

   d. *Sworn personnel should avoid reaching into a vehicle and position(s) that make them vulnerable to being dragged.*

4. If reasonable, sworn personnel should give a verbal warning of the intention to use deadly force.

5. While sworn personnel have an affirmative duty to use that degree of force reasonable to protect human life, the use of deadly force is not reasonable merely *to* protect property interests. Only under circumstances where it is reasonable to believe an infliction or threatened infliction of serious physical harm to human life exists is the use of deadly force justified.

6. The use of deadly force by sworn personnel should not create a danger to the public that outweighs the benefits of its use.

7. Sworn personnel shall not fire a warning shot unless there is justification to use deadly force *and should ensure:*

   a. *There are no bystanders in the line of fire or that could move into the line of fire; and*

   b. *The backstop is reasonably likely to contain or stop the discharged bullet.*

8. Facts unknown to sworn personnel at the time deadly force is used cannot be considered in determining whether the involved personnel acted in conformity with this policy.

9. Investigations of uses of force resulting in death shall be forwarded to the county prosecutor in the county in which the incident occurred. That prosecutor will determine if the case will be presented to a grand jury.

*C. Use of Firearm Against Dangerous Animals*

1. *Sworn personnel being threatened or attacked by a dangerous animal should attempt to use trained techniques and/or intermediate weapons before using a firearm to protect themselves or another person. If these attempts fail to halt the animal's attack, and when left with no alternative other than to use a firearm, sworn personnel should determine whether the backstop is able to control and contain any projectiles that may not find their intended mark or that may ricochet. Consider the presence of individuals and their actions relative to the proximity of the dangerous animal. Grassy and/or dirt areas are the preferred location for a backstop.*

2. *Sworn personnel shall not fire or deploy a weapon at a dangerous animal unless the animal poses an imminent threat to personnel or others, use of the weapon is reasonable, and the risk to human life is minimized.*

3. *Sworn personnel shall not use a firearm to prevent or disrupt an animal attacking another animal.*

*Note: Pets are deemed to be property, and a firearm is not to be used to protect property.*

## III. Procedures

A. Level of Control 0 (Sparking a Taser for Compliance) or Level of Control 1 with No Injury

1. Involved Personnel

    Complete a Use of Force Report and forward it to your immediate supervisor by the end of your shift or by the beginning of your next shift if the incident occurred outside of assigned duty hours. If your immediate supervisor is unavailable, forward the report to any on-duty supervisor within your chain of command.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Forward the report directly to IAB.

    c. Forward a copy of the report to the immediate supervisor of the involved personnel.

3. Internal Affairs Bureau

    Forward the original Use of Force Report to the Training Bureau.

B. Level of Control 0 or 1 with a Complaint of an Injury Caused by the Response - No Serious Physical Harm to a Human

1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty Division supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Minor Injury

      (1) Complete a Data Processing Worksheet, form U-10.164, *and* attach the Use of Force Report; a copy of the Arrest Information, form U-10.100; and any photographs taken.

      (2) Forward the packet directly to IAB.

      (3) Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. Serious Injury

      (1) Complete an Injury to Prisoner administrative investigation and a Data Processing Worksheet. Attach the Use of Force Report and a copy of the Arrest Information form.

      (2) Forward the packet through the chain of command to IAB.

3. Internal Affairs Bureau

    a. If applicable, record the incident in the involved personnel's IAB database *record*.

    b. Maintain a file copy of the Use of Force Report.

    c. Forward the original Use of Force Report to the Training Bureau.

C. Level of Control 2

1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

    a. Review and sign the Use of Force Report.

    b. Forward a copy of the report to the immediate supervisor of the involved personnel.

    c. If the *subject* is being arrested or issued a summons:

      (1) Ensure that the arresting personnel include the facts necessitating the use of chemical spray and details of the decontamination/treatment rendered in the narrative section of the Arrest Information form.

      (2) Include a brief statement indicating justification for the use of chemical spray, the effectiveness of the chemical spray, and details of the decontamination process and treatment rendered on the Use of Force Report.

    (3) Ensure that an "X" is placed in both the *"Chemical Spray"* box on the top left corner and the *"Use of Force"* box on the top right corner on the front of the Arrest Information form.

    (4) Complete a Data Processing Worksheet, attach the Use of Force Report and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

d. If no arrest is made, add comments to the back of the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

e. If circumstances indicate that the use of chemical spray was not within Division policy, complete an investigation as indicated on the Use of Force Report, and forward it along with a Data Processing Worksheet through the involved personnel's chain of command to IAB.

f. For a Level of Control 2 against a handcuffed subject:

    (1) Identify and interview the following:

      (a) Involved Division personnel

      (b) All available witnesses

      (c) The subject upon whom chemical spray was used

    (2) Review and sign the Use of Force Report.

    (3) Complete an administrative investigation.

    (4) Complete a Data Processing Worksheet; attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation; and forward the packet through the involved personnel's chain of command to IAB.

3. Commander

Make a final determination for Level of Control 2 (not against a hand-cuffed **subject**) unless deviation from progressive discipline and/or departmental charges are recommended. Forward the investigative packet to IAB.

4. Deputy Chief

a. Make a final determination for Level of Control 2 against a handcuffed subject unless deviation from progressive discipline and/or departmental charges are recommended.

b. Forward the investigative packet to IAB.

c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

5. Internal Affairs Bureau

a. Record the incident in the involved personnel's IAB database **record**.

b. Maintain the original Use of Force Report.

D. Level of Control 3

  1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty supervisor.

    c. Complete a Use of Force Report and a Use of Taser Report, form U-10.128T, and give them to the investigating supervisor.

  2. Investigating Supervisor

    a. Identify and interview the following:

      (1) Involved Division personnel

      (2) All available witnesses

      (3) The subject upon whom the taser was used

    b. Review and sign the Use of Force Report and the Use of Taser Report.

    c. Complete the Data Processing Worksheet; attach the Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form; and forward the packet through the involved personnel's chain of command to IAB.

    d. For a Level of Control 3 against a handcuffed subject, when three or more cycles of the taser are applied to one subject, when one taser is applied to multiple subjects during the same incident, or when multiple tasers are applied to the same subject:

      (1) Complete an administrative investigation.

      (2) Attach the administrative investigation to the Data Processing Worksheet, Use of Force Report, Use of Taser Report, any photographs taken, and a copy of the Arrest Information form, and forward the packet through the involved personnel's chain of command to IAB.

  3. Deputy Chief

    a. Make a final determination for Level of Control 3 unless deviation from progressive discipline and/or departmental charges are recommended.

    b. Forward the investigative packet to IAB.

    c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

  4. Internal Affairs Bureau

    a. Record the incident in the involved personnel's IAB database *record*.

    b. Maintain the original Use of Force Report.

E. Level of Control 4 through 7

  1. Involved Personnel

    a. Cause any needed medical aid to be rendered.

    b. Immediately notify, or cause notification of, an on-duty supervisor.

    c. Complete a Use of Force Report and give it to the investigating supervisor.

2. Investigating Supervisor

  a. Identify and interview the following:

   (1) Involved Division personnel

   (2) All available witnesses

   (3) The subject upon whom the use of force was used

  b. Review the Use of Force Report.

  c. Complete an administrative investigation.

  d. Complete a Data Processing Worksheet; attach the Use of Force Report, a copy of the Arrest Information form, and the administrative investigation; and forward the packet through the involved personnel's chain of command to IAB.

3. Deputy Chief

  a. Make a final determination for Levels of Control 4 through 7 unless deviation from progressive discipline and/or departmental charges are recommended.

  b. Forward the investigative packet to IAB.

  c. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

4. Internal Affairs Bureau

  a. Record the incident in the involved personnel's IAB database **record**.

  b. Maintain the original Use of Force Report.

F. Use of Force Resulting in Serious Physical Harm to or Death of a Human

Note: If the use of force involves the discharge of a firearm other than a gas gun, follow the procedures set forth in the "Discharged Firearms" directive. If the use of force involves the discharge of a gas gun, follow the procedures set forth in the "Gas Guns and Grenades" directive.

1. Involved Personnel

  a. Cause any needed medical aid to be rendered.

  b. Immediately cause Communications Bureau personnel to be notified.

  c. Secure the scene.

2. Communications Bureau

  a. Dispatch personnel to render assistance or to secure the scene.

  b. Notify the ***Columbus Division of Fire and those listed on the Emergency Notification Guide.***

Note: The Investigative Duty Desk will contact the Critical Incident Response Team.

3. Officer Support Team

  Provide the involved personnel with any assistance, information, or other support they may desire.

Note: Officer Support Team members are subject to being subpoenaed to attend legal proceedings and testify to what they are told by the involved personnel. Therefore, Officer Support Team members are cautioned not to discuss the incident.

4. Critical Incident Response Team
   a. Conduct a criminal investigation.
   b. Advise personnel who are the focus of the investigation of their constitutional rights.

   Note: The involved personnel may invoke their constitutional rights at any time during the criminal investigation.

   c. Complete the Use of Force Report and Data Processing Worksheet and attach both to the original investigative packet.
   d. File the original investigative packet.
   e. Forward copies of the investigative packet as follows:
      (1) One copy to the appropriate county prosecutor
      (2) Three copies to the Firearms/Police-Involved Death Review Board if a firearm was used or *if* death occurred under circumstances involving a police action

5. Firearms/Police-Involved Death Review Board
   a. Review all information concerning the incident.
   b. Determine whether the police action was within Division policy.
   c. Prepare and forward a summary of the findings, together with the original investigative packet, the Use of Force Report, and *the* Data Processing Worksheet, through the involved personnel's chain of command to the deputy chief.

   Note: If there is a dissenting opinion between the Firearms/Police-Involved Death Review Board members, the dissenting member will include a letter of finding with the investigative packet and route it through the involved personnel's chain of command to the Chief of Police.

6. Immediate Supervisor
   a. Review the entire investigative packet and make recommendations.
   b. Forward the investigative packet through the chain of command.

7. Chain of Command
   Review the entire investigative packet and make recommendations.

8. Deputy Chief
   a. Review the investigative packet.
   b. Make a final determination concerning the incident unless deviation from progressive discipline and/or departmental charges are recommended.

   Note: If the recommendation of the deputy chief is in disagreement with the finding of the Firearms/Police-Involved Death Review Board, forward the investigative packet to the Chief of Police.

  c. Forward the investigative packet to IAB.

  d. Cause the involved personnel to be notified of the final determination when no discipline or progressive discipline not resulting in departmental charges is the result.

 9. Chief of Police

  a. Make the final determination when a recommendation to bypass progressive discipline is made.

  b. Make a final determination if there are dissenting opinions **between** the Firearms/Police-Involved Death Review Board and the involved personnel's deputy chief.

  c. Cause the involved personnel to be notified of the determination.

 10. Internal Affairs Bureau

  a. Record the disposition of the incident in the involved personnel's IAB database.

  b. Maintain the original Use of Force Report.

| Columbus Police Division Directive | EFFECTIVE Mar. 30, 2012 | NUMBER 2.04 |
|---|---|---|
| | REVISED Dec. 30, 2019 | TOTAL PAGES 5 |
| **Chemical Agents and Intermediate Weapons Regulations** | | |



## I. Definitions

A. ***Conducted Energy Weapon*** (hereafter referred to as taser)

An intermediate weapon not intended to replace firearms or self-defense techniques. The taser is designed to temporarily immobilize a violent or potentially violent subject. When applied correctly, the taser generates an electrical current that ***disrupts*** the neuromuscular and sensory nervous system, incapacitating the subject.

B. Close-Quarter Probe Deployment

A method in which the user deploys the taser on a subject in "Probe" mode, ***then*** places the taser at another position on the subject's body as distant as possible from the initial contact point, and rocks the taser forward and backward.

C. Drive-Stun

A function in which the taser is held directly against the subject's body, causing localized pain, but does not override the subject's motor responses.

## II. Policy Statements

A. Chemical Agents

1. Sworn personnel shall carry only those chemical agents that have been authorized by the Chief of Police.

2. Sworn personnel shall not carry chemical spray until training and qualification standards have been satisfied. Sworn personnel shall demonstrate proficiency with chemical spray once each calendar year.

3. Sworn personnel may use chemical spray to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, to prevent escape, or to prevent or stop the commission of a criminal offense.

   a. Sworn personnel should not use chemical spray on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

   b. Supervisors investigating incidents in which chemical spray has been used against a handcuffed person shall comply with the applicable procedures detailed in the Supervisor's Manual and the "Use of Force" directive.

4. The use of a chemical agent deployed by a 37mm or 40mm gas gun *or chemical agent grenade* being thrown or rolled requires the approval of a lieutenant or higher authority.

   a. A SWAT lieutenant may designate a lower-ranking SWAT officer to give such an order.

   b. A sergeant acting as a zone lieutenant *should* not give such approval.

5. *If exigent circumstances exist, such as individuals creating a risk to safety or a hazard, sworn personnel may use their Division-issued chemical spray to disperse a non-violent congregation of individuals who are not complying with lawful commands.* Prior to deployment of the chemical spray, at least *three* notifications should be made to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order.

   a. The notifications should be made in a manner which the participants in the crowd should reasonably be able to hear and understand.

   b. The notifications and subsequent deployment of chemical spray in crowd control situations should be audio/video-recorded when possible.

6. Sworn personnel encountering a group of people, some of whom are engaged in *unlawful* conduct, shall be guided by the "Use of Force" directive when determining whether to use chemical spray. If chemical spray is used, it should be directed at the persons participating in the violent conduct, not at the group in general. The *encounter* should be audio/video-recorded when possible.

7. Sworn personnel deploying a chemical agent shall make a reasonable effort to decontaminate exposed persons once the situation is under control. Decontamination may include exposure to fresh air, flushing the eyes with fresh water, or seeking medical attention.

B. Intermediate Weapons

1. Sworn personnel shall carry only those intermediate weapons authorized by the Chief of Police. The approved intermediate weapons are:

   a. A flashlight not to exceed 15" in length

   b. The issued tactical baton

   c. The approved taser

2. Sworn personnel shall not carry an intermediate weapon until training and qualification standards for that weapon have been satisfied. Sworn personnel shall requalify once each calendar year with each intermediate weapon they are authorized to carry.

3. Sworn personnel may use an intermediate weapon to protect themselves or another person from harm, to effect the arrest of or gain control of a physically aggressive/resistive subject, or to prevent or stop the commission of a criminal offense.

4. Sworn personnel should not use an intermediate weapon on handcuffed subjects unless they pose a danger to themselves, officer(s), or the public.

5. Intermediate weapons are not a substitute for deadly force.

6. It is recommended that sworn personnel have an approved intermediate weapon and a restraint device available when in possession of a firearm while off duty.

7. Sworn personnel shall complete a Use of Force Report, form U-10.128, when an intermediate weapon is used on a subject.

8. Sworn personnel shall complete the Personal Advanced Taser Agreement, form J-10.112, and obtain approval from the Defensive Tactics Unit (DTU) prior to carrying a personally owned taser. Personally owned tasers may be carried while working regular duty, special duty, or off duty as an intermediate weapon. Division-owned tasers that are not personally assigned shall only be used for regular duty.

9. Sworn personnel shall not target the head, face, neck, or groin with the taser in probe mode.

10. Sworn personnel should not intentionally target the chest area above the sternum when deploying the taser in probe mode when possible.

11. Sworn personnel may target the neck or groin with the taser in drive-stun mode.

12. Sworn personnel should consider training and the following when determining whether to use the taser:

  a. Subject's age

  b. Subject's weight

  c. Subject's obvious physical disabilities

  d. Subjects who are in a position where a fall may cause substantial injury or death

  e. Whether the subject is exhibiting signs or symptoms of mental illness

13. Sworn personnel should not use the taser in drive-stun mode for pain compliance if it is likely to be ineffective due to intoxication or signs or symptoms of mental illness.

14. Sworn personnel should not use the taser on small children, infirm or elderly individuals, obviously pregnant females, or subjects who are in control of a motor vehicle.

15. Sworn personnel shall not deploy the taser on subjects known to have come in contact with flammables or in environments where flammables are obviously present.

16. Sworn personnel shall not use the taser on a fleeing subject who committed a minor misdemeanor as a primary offense, unless the subject is posing an articulable threat to the officer or to another citizen.

Note: Failure to Comply and/or Obstructing Official Business violations ***arising solely from the act of fleeing from a minor misdemeanor*** are not justification for using the taser.

17. Sworn personnel shall properly store the taser when it is not in use. Once the taser is issued, sworn personnel shall not leave the taser unattended.

18. Sworn personnel shall not change or modify the taser.

19. Sworn personnel shall contact a DTU supervisor for replacement of any taser that is not safe or functioning properly. Only a DTU supervisor shall repair the taser or accessories.

20. Sworn personnel shall not remove the Digital Power Magazine (DPM) from the taser unit. Once the DPM read-out reaches 20% or less, personnel should have the DPM replaced. The DPM shall only be replaced by a DTU supervisor.

21. Taser ***unintentional*** discharges

   a. Sworn personnel shall notify an on-duty supervisor and record the incident on the Taser Log Sheet, form S-70.113.

   (1) If a subject is struck, sworn personnel shall complete a Use of Force Report and follow the applicable procedures outlined in the "Use of Force" directive.

   (2) If no subject is struck, sworn personnel shall ensure that the probes and cartridges are destroyed.

   (3) The supervisor shall conduct an administrative investigation when an incident occurs at a location other than a police facility, or at a police facility when a suspect or arrestee is present.

22. Taser deployment

   a. Sworn personnel choosing to deploy a taser shall confirm that the weapon selected is a taser and not a firearm.

   b. Only cartridges marked "25 FEET" or "XP" shall be used in the taser.

   c. When feasible, sworn personnel should communicate to the subject that the taser is going to be deployed to attempt to gain compliance. This can be communicated to the subject by removing the air cartridge, displaying the laser on the subject, and "sparking" the taser unit.

   Note: When the taser is "sparked" for compliance, sworn personnel shall complete a Use of Force Report.

   d. If possible, personnel should give the loud verbal command, "Taser! Taser! Taser!" prior to firing the taser.

   e. Sworn personnel may use the taser in the drive-stun mode to gain control of suspects displaying active resistance. The drive-stun mode shall not be used with a live air cartridge in place.

    f.  Sworn personnel should attempt to control and handcuff the subject under power during the window of opportunity the taser cycle provides.

    g.  Sworn personnel should consider moving on to another force option if unable to control and handcuff under power.

23. Taser post-use

    a.  Any subject upon whom the taser is used, in either probe or drive-stun mode, shall be examined by EMS personnel and shall remain under observation by sworn personnel until slated or released.

    b.  Sworn personnel shall request an EMS unit to respond to the scene to remove any probes that have penetrated the skin or to care for wounds caused by probes that penetrated but fell out. Sworn personnel shall not remove the probes.

     (1)  If the subject is transported to a medical facility, sworn personnel shall ride in the medic unit and remain with the subject until further medical attention has been offered.

     (2)  Sworn personnel shall call EMS personnel to the scene if any signs or symptoms of medical distress become evident.

    c.  Sworn personnel shall provide the subject with the Taser Aftercare form, S-70.112.

    d.  Sworn personnel shall treat the taser cartridge, wires, and probes as evidence and shall secure and submit them to the Property Control Unit for two years. This does not apply to **unintentional** discharges when no subject is struck **or when used against an animal**. Probes that have penetrated the skin should be treated as a biohazard and proper universal health precautions should be taken when handling and packaging them.

24. Taser dataport

    a.  Only zone lieutenants, a DTU supervisor, and Internal Affairs Bureau supervisors shall access the taser's USB dataport.

    b.  Taser dataport settings shall only be set or adjusted by a DTU supervisor.

25. Each unit assigned a taser shall maintain a Taser Log Sheet that shall include:

    a.  Tasers assigned to the unit;

    b.  Taser cartridge serial numbers assigned to the unit; and

    c.  Spent taser cartridge serial numbers with the date fired, the officer's name and badge number, and the taser serial number from which it was fired.

26. When the Taser Log Sheet indicates four cartridges remain assigned to a unit, the first shift supervisor shall obtain replacements through DTU.

27. Completed Taser Log Sheets shall be forwarded to DTU for retention.

| Columbus Police Division Directive | EFFECTIVE Jul. 30, 2000 | NUMBER 2.05 |
|---|---|---|
| | REVISED Jul. 30, 2019 | TOTAL PAGES 3 |



### Gas Guns and Grenades

## I. Introduction

A. Gas guns and grenades are used to deploy projectiles, distraction devices, and chemical agents that are not designed to be lethal, but have the potential to cause injury or death.

B. Chemical agents in the form of aerosol canisters that are thrown and spray devices worn on the gun belt that are not deployed by the ignition of a primer are excluded from the provisions of this directive.

## II. Definitions

A. Bean bag round

Also referred to as a flexible baton round, a bean bag round contains a cloth bag filled with silica sand and is fired from a gas gun. It is designed for direct impact on a targeted subject.

B. Flashbang

A non-bursting detonation device that emits light and sound when deployed.

C. Gas gun

A 37mm or 40mm single-barrel or rotary-style firearm used to deploy projectiles, distraction devices, and chemical agents.

D. Gas round

Any of a variety of rounds fired from a gas gun that release chemical agents or projectiles containing chemical agents.

E. Less-lethal weapons and ordnance

This includes gas guns, grenades, bean bag rounds, and multiple baton rounds, which have the potential to cause death, though they are not designed to be lethal.

F. Multiple baton round

A high velocity round containing **wood** projectiles fired from a gas gun. It is designed to be skip-fired (ricocheted off a hard surface) toward a targeted subject or to be used as a distraction device (deployed through and breaking a window). ***Operational exceptions may be made in a critical situation in which the use of deadly force is justified.***

G. Rubber Ball Blast Grenade

A combination irritant and diversion device that delivers three stimuli for psychological and physiological effect: light, sound, and chemical agent.

H. Sponge Round

A plastic body with a foam nose which is spin-stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.

I. Warning/Signaling Munitions

A plastic body which produces 170 decibels of sound, emits 5 million candelas of light, and *deflagrates* at a distance of 100 meters with a CS irritant payload.

## III. Policy Statements

A. ***Authorized sworn personnel shall only carry and use those gas guns and grenades that have been approved by the Chief of Police.***

**B.** The Division's use of force policy shall *guide* the *use of* gas guns and grenades; therefore, any discharge of a gas gun or detonation of a grenade (excluding flashbangs *and multiple baton rounds used as a diversion*) shall be a Level 7 use of force.

**C.** Only *sworn personnel* who have satisfactorily completed annual specialty impact and gas munitions training are permitted to possess**,** deploy**,** *or order the deployment of* these munitions in the field.

**D.** Supervisors shall issue the order to use a gas gun or grenade only when reasonable based upon the totality of the circumstances, which should include an evaluation of the need to use the device(s) weighed against the danger they pose to the suspect or others.

**E.** Division personnel shall give a verbal warning that the use of a less-lethal weapon and/or projectile is imminent when practical.

## IV. Procedures

A. Use of Gas Guns and Grenades

  1. Zone Lieutenant

    a. Ensure that the zone has at least one gas gun available for use at all times.

    b. Determine whether to use a gas gun or grenade immediately or call for SWAT.

    c. Issue the order to use the gas gun or grenade. Such an order may be given via electronic or radio communications.

  2. SWAT or *Drug Interdiction* Section Lieutenant

    a. Determine when a gas gun or grenade is to be used.

    b. Issue the order to deploy the weapon.

      (1) The order may be given via electronic or radio communications.

      (2) Designate a lower-ranking SWAT or *Drug House Interdiction* officer to give the order when necessary.

  3. Personnel assigned to possess or use a gas gun or grenade

    a. Maintain the gas gun or grenade in good working order.

**b. Contact the Ordnance Unit for any needed maintenance or repair.**

**c.** Use a gas gun or grenade only on the order of a lieutenant, higher-ranking personnel, **or** the SWAT or **Drug Interdiction** Section Lieutenant's designee.

Note: Sergeants deploying beanbag rounds are not required to obtain prior approval.

**d.** Do not fire a gas gun or detonate a grenade without the assistance of a cover officer with a firearm.

4. Ordnance Unit Personnel

Resupply personnel with gas guns, grenades, and less-lethal ordnance at the direction of a lieutenant or higher-ranking supervisor.

B. Reporting and Investigation of Deployment

1. Investigating personnel

a. Comply with the "Discharged Firearms" directive and forward a copy of the administrative investigation to the Legal Advisor when:

(1) A human subject is struck and serious physical harm as defined in the Ohio Revised Code results.

(2) A human subject is struck and death results.

b. Comply with the "Use of Force" directive and forward a copy of the administrative investigation to the Legal Advisor when:

(1) No human subject is struck.

(2) A human subject is struck and not injured.

(3) A human subject is struck, and the resulting injury does not amount to serious physical harm as defined in the Ohio Revised Code.

(4) A human subject is struck and flees the scene in an unknown condition.

2. Internal Affairs Bureau

a. Maintain required records of uses of force.

b. When the involved personnel are ordered by a supervisor to fire a gas gun or detonate a grenade, categorize the incident as an ordered use of force for purposes of the Employee Action Review System.

3. Personnel detonating explosive devices that must be logged as required by the Bureau of Alcohol, Tobacco, and Firearms (ATF)

a. Be aware of the reporting requirement for devices such as the Defense Technology Corporation of America Distraction Device.

b. Report the use of force as required by the "Use of Force" directive.

c. Complete a Distraction Device Deployment report, form U-11.102, and forward it directly to the 1st Shift Ordnance Unit.

4. 1st Shift Ordnance Unit

Maintain a log of all explosive devices as required by ATF.

| Columbus Police Division Directive | EFFECTIVE Mar. 12, 2002 | NUMBER 11.02 |
|---|---|---|
| | REVISED Jun. 30, 2018 | TOTAL PAGES 5 |
| **Cruiser Video System (CVS)** | | |



## I. Introduction

The principal purpose of a *CVS* is to collect evidence *that* may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. The Division's use of a recording system provides documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to prove that Division personnel will be held accountable for their actions and provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

*A* recording which may be used *as evidence to document an incident* as it pertains to an enforcement action/*adversarial* encounter.

Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

*A* recording, whether accidental or intentional, which has no evidentiary or administrative value.

Examples of non-evidence: accidental/incidental recording, equipment checks, training, and CVS recordings triggered by the speed of the cruiser. This is not an all-inclusive list.

3. Permanent

*A* recording to be kept indefinitely.

Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel operating a CVS-equipped unit shall record all investigatory stops, traffic and pedestrian stops, suspected OVI stops, and when engaged in emergency vehicle operations from the beginning of the action.

   1. Recording of an event shall not be stopped until the enforcement action or incident has ended or as directed by a sworn Division supervisor.

B. When the CVS unit is used while effecting an arrest, personnel shall check the CVS box on the Arrest Information, form U-10.100, and shall indicate the unit (50, R50, etc.) and officer(s) who recorded the incident in the narrative section.

C. The driver, or probationary officer in an FTO unit, shall wear the body microphone in the CVS microphone pouch and shall turn on the body microphone when exiting the marked unit anytime the CVS is recording.

Note: When wearing a body-worn camera, the body microphone is not required to be worn.

D. Sworn personnel shall add the letter "V" after the clearance code of a run if a CVS is used.

E. Upon inquiry, sworn personnel shall inform citizens *that* the CVS is recording. Personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

F. Sworn personnel shall complete the required training prior to operating the CVS.

G. Sworn personnel may use the CVS to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken, such as the signing of a Consent to Search, form I-26.102, or Constitutional Rights, form I-20.109. Personnel may use the CVS to supplement, but not replace the use of, any required forms.

H. Sworn personnel should not use the CVS to record routine patrol duties unless there is a reasonable belief the recording could benefit the Division.

I. Sworn personnel are not required to use the CVS to record while working traffic control.

J. Sworn personnel shall ensure the CVS backseat camera is activated anytime a person is placed in the rear of their marked unit.

K. All recorded images and audio recordings made on the CVS are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

L. Personnel shall not tamper with, erase, delete, alter, or destroy any original recorded section of video or audio.

M. Division personnel shall classify all CVS recordings consistent with Division training **and policy**. Personnel shall not intentionally classify a video inappropriately or knowingly take actions to prevent a recording from being viewed or downloaded.

N. CVS audio/video recordings shall be maintained by PoliceNET and the Department of Technology **(DOT)** pursuant to the City of Columbus approved Records Retention Schedule.

O. Division personnel needing to hold a CVS recording longer than the required Records Retention Schedule shall reclassify the recording as permanent within the CVS.

  1. When the recording no longer needs to be maintained, reclassify it appropriately.

P. Supervisory and investigative review of CVS recordings

  1. Supervisors wishing to request a copy of a CVS recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

  2. All CVS recordings are subject to review by a police supervisor or investigator at any time while the recording is in the CVS in the marked unit.

  3. Supervisors and the involved chain of command wishing to review a CVS recording shall conduct the review on a Division computer.

   a. Supervisors shall login to the secured CVS server with their Division-issued password.

   b. After being uploaded to the secured server, Division supervisors will have access to all cruiser videos unless access has been archived due to an investigative purpose.

  4. Supervisors shall document the review of CVS recordings related to incidents under investigation **on the Incident Video Review, form U-10.197. Supervisors** shall **address** the relevant portion**(s)** of the recording **within the administrative investigation** to be reviewed by the chain of command **as necessary**.

Q. Supervisors using CVS recordings for an investigative purpose shall review or reclassify the recordings**,** as appropriate, **and** in accordance with established law, Division policy, and applicable **CBA**.

**R.** Public Records Unit personnel shall process all CVS requests for police personnel, court personnel, subpoenas, discovery, or preservation of evidence and all requests made pursuant to the Ohio Public Records Act.

Note: In the event a CVS recording cannot be located, Public Records Unit personnel **shall** contact PoliceNET for further investigation.

**S.** Sworn personnel may be ordered by a sworn Division supervisor or Critical Incident Response Team personnel to return to headquarters to immediately download video/evidence.

***T.*** Sworn personnel shall report malfunctioning CVS equipment as soon as practical, but prior to the end of the shift, to their immediate on-duty supervisor.

***U.*** Sworn supervisors who are informed or otherwise become aware of malfunctioning CVS equipment shall ensure the equipment is taken for authorized repair as soon as practical and as follows:

1. Communications Shop for repairs to the camera, docking station, Digital Video Recorder, microphone, or connections.
2. PoliceNET Unit/DOT for memory card or video/network problems with the CVS.

## IV. Procedures

A. CVS

1. Prior to marking in-service, sworn personnel using a CVS:
   a. Login with the username, area/zone, shift, and unit number using the provided drop-down menu.
   b. Ensure the body microphone is synchronized.
2. Keep the CVS powered-up during the tour.
3. Upon completion of a CVS recording, stop the recording, classify it appropriately, and place only the incident number in the "Case File Number" field.
4. Logoff at the end of the tour and return the body microphone to the appropriate charging cradle.
5. Upload video as often as practical.
6. In exigent circumstances, supervisors shall contact PoliceNET personnel to remove the memory card from a CVS if the video cannot be uploaded by the normal uploading process.

Note: In certain circumstances, DOT may add additional memory cards until a time when the video can be uploaded.

B. Supervisors Conducting Random Reviews

1. *R*eview randomly selected CVS recordings on a regular basis. The incidents should be no more than 30 days old.
2. Forward completed Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review*,* form ***U-10.193,*** to the bureau commander when there are areas of concern, for example, ***user*** error***(s)*** or observations of misconduct, etc.

C. Bureau Commander

1. Forward ***the*** Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review form with ***user*** error***(s)*** through the chain of command to the immediate supervisor of the officer(s) who made the recording.
2. If potential misconduct is discovered within the recording, determine the appropriate course of action.

D. Immediate Supervisor

   1. Ensure sworn personnel who created the CVS recording correct the error.

   2. If directed by the chain of command, complete an administrative investigation and send a copy ***of the Cruiser Video System (CVS)/ Body-Worn Camera (BWC) Supervisory Review form*** to the Patrol Administration Section.

E. Patrol Administration Section

   1. File completed Cruiser Video System (CVS)/***Body-Worn Camera (BWC)*** Supervisory Review forms.

   2. Track results annually to determine compliance/training needs.

| Columbus Police Division Directive | EFFECTIVE Dec. 30, 2016 | NUMBER 11.07 |
|---|---|---|
| | REVISED Jun. 30, 2018 | TOTAL PAGES 7 |
| **Body-Worn Camera (BWC)** | | |



## I. Introduction

The principal purpose of a BWC system is to collect evidence *that* may be used to prosecute traffic and criminal offenses, assist with investigations, or help evaluate and train personnel. It can also provide documentation of whether the situation was handled lawfully and professionally. Police interactions with individuals during enforcement activity may rapidly evolve, and recording these interactions is an excellent way to provide transparency to the community.

## II. Definitions

A. Classification

The category assigned to each video recording, chosen from the following three selections, after the camera has been deactivated.

Note: If personnel are unsure of which classification to choose, the video should be classified as evidence.

1. Evidence

   *A* recording which may be used *as evidence to document an incident* as it pertains to an enforcement action/*adversarial* encounter.

   Examples of evidence: misdemeanor and felony investigations, arrests, use of force incidents, forced entries, and traffic and pedestrian stops. This is not an all-inclusive list.

2. Non-evidence

   *A* recording, whether accidental or intentional, which has no evidentiary or administrative value.

   Examples of non-evidence: accidental/incidental recording, equipment checks, and training. This is not an all-inclusive list.

3. Permanent

   *A* recording to be kept indefinitely.

   Examples of permanent: Any incident that select Division personnel (for example, a supervisor, a detective, CIRT, etc.) believe should be classified in a category that does not expire.

## III. Policy Statements

A. Sworn personnel who are assigned an individual BWC shall, at the beginning of their shift, ensure the BWC is fully charged, operable, and all previous video recordings have been uploaded.

B. Sworn personnel shall use only Division-issued BWCs.

C. All recorded images and audio recordings made on the BWC are the property of the Division of Police. Division personnel shall not disseminate or duplicate these recordings outside of the Division unless approved by the Chief of Police, pursuant to the Ohio Public Records Act, or in accordance with a legally binding subpoena.

D. BWCs shall be worn in the location and manner required by the assignment.

E. BWCs are not required for special duty work, and the City will not compensate personnel for travel time or uploading/charging the BWC.

   1. BWCs may be used for City overtime if personnel have a charged BWC and its use on City overtime does not interfere with the BWC being uploaded or charged for their regularly assigned tour of duty or as ordered by a supervisor.

F. BWC use shall be documented on all appropriate paperwork and in the electronic reporting system.

   1. Sworn personnel shall add the letter "V" after the clearance code of a run when a BWC is used.

G. Activation

   1. Sworn personnel shall activate the BWC at the start of an enforcement action or at the first reasonable opportunity to do so. Enforcement actions shall be recorded unless otherwise prohibited. Enforcement actions shall consist of:

      a. Calls for service and self-initiated activity

      b. All investigatory stops

      c. Traffic and pedestrian stops

      ***Note: Activate the BWC at the start of a pursuit.***

      d. Suspected OVI stops

      e. Uses of force

      f. Arrests

      g. Forced entries

   2. Sworn personnel shall activate the BWC when an encounter becomes adversarial, or its use would be appropriate and/or valuable to document an incident unless otherwise prohibited.

   ***3. Patrol Administration Section and Special Weapons and Tactics personnel shall comply with their respective Standard Operating Procedures.***

H. Sworn personnel wearing a BWC should announce when they are recording as close to the start of the encounter as possible unless it is unsafe, impractical, or unnecessary.

   1. Sworn personnel are not required to cease recording at the request of any person unless ordered by a sworn Division supervisor.

I. Sworn personnel shall continue recording until the enforcement activity or encounter has ended, or they are ordered/permitted to stop recording by a sworn supervisor.

Note: When reviewing BWC footage from an incident, sworn personnel must stop recording to view and/or upload the video.

J. BWC recordings may be used to provide evidence, record an incident to document the actions and statements of suspects during interviews or while being placed into custody, or as a means to verify an action taken.

K. The BWC shall not be used to record non-work-related personal activities where personnel have a reasonable expectation of privacy, such as inside locker rooms, dressing rooms, or restrooms, unless a criminal offense has occurred.

L. The BWC shall not be intentionally activated to record privileged communication or conversations of fellow Division personnel during routine, non-enforcement-related activities with or without their knowledge.

M. The BWC shall not be used:

1. To gather intelligence information solely based on First Amendment protected speech, associations, or religion;
2. During a strip search or body cavity search; or
3. During a Lethality Assessment Screen.

Note: If the BWC was previously activated during an incident, sworn personnel do not need a supervisor's approval to deactivate the BWC for any of the above-listed reasons.

N. The BWC shall not be used if ordered by a sworn supervisor.

1. To preserve privacy and dignity, a sworn supervisor may grant approval to not record or *to* deactivate the BWC for certain people or places.
2. Explicit approval shall be given verbally over the radio or in an operations plan.

O. Sworn personnel may deactivate the BWC*:*

1. *W*hen gathering information from a confidential informant or source.
2. *W*ithout explicit supervisor approval when *not in the presence of suspects or citizens and* speaking with the Division's legal advisor, covert/investigative personnel, a supervisor, or other sworn personnel.
3. *While engaged in guard duty inside a hospital; however, if an encounter becomes adversarial and/or enforcement action becomes necessary, the BWC shall be activated as soon as practical.*
4. *Sworn personnel shall deactivate the BWC after securing weapons and entering the door into the prisoner processing area of the Franklin County Sheriff's Office Corrections Centers.*

**a. The preferred course of action is to allow sheriff's office personnel to handle any problem associated with a prisoner. If Division personnel are forced to take enforcement action, they shall activate the BWC as soon as practical.**

**P.** If sworn personnel do not activate the BWC, the battery is exhausted/ depleted, or the recorder malfunctions, they shall document the reason(s) on the appropriate paperwork, in the CAD, and/or in the electronic reporting system.

**Q.** If sworn personnel do not record the entire contact, justification shall be expressed verbally on the BWC before turning it off when it is safe and practical to do so.

**R.** Sworn personnel should re-activate the BWC if they re-engage suspects/ citizens.

**S.** Sworn personnel may be ordered by a sworn supervisor to relinquish their BWC.

**T.** All digital data shall be uploaded as directed and shall be classified and stored in a secure database that allows limited access. Sworn personnel shall upload video footage prior to going on leave, except when permission is granted by the chain of command designating an alternate time for uploading. If sworn personnel become incapable of uploading the video, the chain of command will make arrangements for uploading all video footage.

**U.** Personnel shall not tamper with, erase, alter, or destroy any original recorded section of video or audio.

   1. The appropriate authority designated by the Chief of Police will determine proper action for recordings captured by inadvertent BWC activation when it is otherwise prohibited.

**V.** Personnel shall classify all recordings consistent with Division training **and policy**. Personnel shall not knowingly classify a video inappropriately or take other inappropriate actions to prevent a recording from being viewed or uploaded or to alter retention periods.

**W.** BWC recordings shall be securely stored and maintained pursuant to the City of Columbus Division of Police Records Retention Schedule. All stored recordings are subject to release in accordance with Ohio's public records laws.

   1. Supervisors investigating/managing an incident or sworn personnel wanting to view video in the mobile environment should follow the procedures outlined on the Division's intranet.

**X.** Sworn personnel may review video footage of an incident in which they were involved prior to completing a report or making a statement to help ensure accuracy. Sworn personnel should not use the fact that a recording was made as a reason to give a less detailed description of **an** incident.

**Y.** A supervisor may view BWC video footage for the purpose of investigations, training, reviews, inquiries, civil claims, or litigation. This may include **random reviews or** recordings brought to the supervisor's attention that may lead to **positive corrective action or** discipline as outlined in the applicable collective bargaining agreement (CBA).

**Z.** Supervisory and investigative review of BWC recordings

1. BWC recordings are subject to review at any time once the recording is uploaded to the server.

2. Supervisors and the involved chain of command wishing to review a BWC recording shall conduct the review on a Division computer.

   a. Supervisors shall log in to the secured server with their Division-issued password.

   b. After being uploaded to the secured server, Division supervisors will have access to BWC recordings unless access has been restricted due to an investigative purpose.

3. Supervisors and investigative personnel wishing to request a copy of a BWC recording shall complete and forward an Internal Video/Audio Request, form S-35.104.

4. Supervisors shall document the review of BWC recordings related to incidents under investigation **on the Incident Video Review, form U-10.197. Supervisors** shall **address** the relevant portion(s) of the recording **within the administrative investigation** to be reviewed by the chain of command **as necessary**.

5. Supervisors should conduct random reviews of BWC recordings to ensure videos are classified appropriately and to use the observations for open discussion and training.

6. Supervisors using BWC recordings for an investigative purpose shall review or reclassify BWC recordings as appropriate and in accordance with established law, Division policy, and the applicable CBA.

**AA.** Sworn personnel who have been issued a BWC and who transfer to an assignment that is not assigned a BWC shall return all issued equipment, including any assignment-specific take home chargers, to PoliceNET personnel.

**BB.** Division personnel who are assigned to use or otherwise be involved with BWC equipment must complete mandatory training. This training includes proper operation and care, policies and procedures, and limitations of BWC footage. Additional training shall be provided periodically to ensure the continued effective use of the system and equipment and to incorporate changes, updates, and other revisions in policies or equipment.

1. **Sworn personnel transferring into a unit where BWCs have been deployed shall contact Advanced Training Unit and PoliceNET personnel for training and issuance of a BWC as soon as practical.**

## IV. Procedures

A. Sworn Personnel

1. Classify the recordings as appropriate.
2. Notify your supervisor of any known malfunctioning or lost/damaged equipment.
3. Mark 10-23T for technology repair.
4. Replace or turn in the BWC for repairs to the PoliceNET Unit as soon as possible.

   a. Obtain a replacement BWC from the PoliceNET Unit. If the PoliceNET Unit is closed, obtain a replacement from the Patrol Administration Sergeant. The replacement BWC becomes the sworn **employee's** Division-issued BWC.

B. Investigating Supervisor

1. Determine if the malfunctioning or lost/damaged equipment was the result of normal wear and tear or negligence, and follow the procedures outlined in the "Lost, Damaged, or Malfunctioning Property" directive.

C. PoliceNET Personnel/Patrol Administration Sergeant

1. Collect malfunctioning or damaged equipment and replace it immediately.

D. Chief of Police

1. Appoint specific Division personnel to meet annually to review policy and collect data concerning BWC usage, including when video footage is used in criminal prosecutions, internal affairs matters, civilian complaints, injuries and assaults on sworn personnel, use of force incidents, and any associated costs.

**E. Supervisors Conducting Random Reviews**

1. **Review randomly selected BWC recordings on a regular basis. The incidents should be no more than 30 days old.**
2. **Forward the completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review, form U-10.193, to the bureau commander when there are areas of concern, for example, user error(s) or observations of misconduct, etc.**

**F. Bureau Commander**

1. **Forward the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form with user error(s) through the chain of command to the immediate supervisor of the officer(s) who made the recording.**
2. **If potential misconduct is discovered within the recording, determine the appropriate course of action.**

G. *Immediate Supervisor*

1. *Ensure sworn personnel who created the BWC recording correct the error.*

2. *If directed by the chain of command, complete an administrative investigation and send a copy of the Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review form to the Patrol Administration Section.*

H. *Patrol Administration Section*

1. *File completed Cruiser Video System (CVS)/Body-Worn Camera (BWC) Supervisory Review forms.*

2. *Track results annually to determine compliance/training needs.*