IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada,            :
et al.,

                              :

        Plaintiffs,

                              : Case No. 2:20-cv-3431
        vs.                     Judge Marbley
                              : Magistrate Judge Jolson
City of Columbus,
Ohio, et al.,                 :

        Defendants.           :


- - - - -

DEPOSITION OF SMITH WEIR
VIA VIDEOCONFERENCE

- - - - -


Taken at Columbus Division of Police
120 Marconi Boulevard
Columbus, Ohio 43215
February 16, 2021, 10:02 a.m.


- - - - -


Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

```
 1              A P P E A R A N C E S
 2
    ON BEHALF OF PLAINTIFFS:
 3
         The Gittes Law Group
 4       723 Oak Street
         Columbus, OH 43205-1011
 5       By Jeffrey P. Vardaro, Esq.
             Frederick M. Gittes, Esq.
 6           (Via videoconference)
 7       and
 8       Marshall and Forman, LLC
         250 Civic Center Drive, Ste. 480
 9       Columbus, OH 43215
         By John S. Marshall, Esq.
10           Samuel M. Schlein, Esq.
             (Via videoconference)
11
12  ON BEHALF OF DEFENDANTS:
13       Columbus City Attorney's Office
         77 North Front Street, 4th Floor
14       Columbus, OH 43215
         By Alana Valle Tanoury, Esq.
15           Westley M. Phillips, Esq.
             Stephen J. Steinberg, Esq.
16           (Via videoconference)
17
18
19
20
21
22
23
24
```

```
 1                 I N D E X
 2  Examination By                            Page
 3  Mr. Gittes - Cross                          6
 4
    Plaintiffs' Exhibit                       Page
 5
    Exhibit 34 - Division-Wide E-mail           76
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20  (PDF exhibits have been provided to counsel with the
    transcript.  No hard copies were in the possession
21  of the court reporter.)
22
23
24
```

```
 1              Tuesday Morning Session
 2              February 16, 2021, 10:02 a.m.
 3              - - - - -
 4          S T I P U L A T I O N S
 5              - - - - -
 6      It is stipulated by counsel in attendance that
 7  the deposition of Smith Weir, a witness herein,
 8  called by the Plaintiffs for cross-examination,
 9  may be taken at this time by the notary pursuant
10  to notice and subsequent agreement of counsel that
11  said deposition may be reduced to writing in
12  stenotypy by the notary, whose notes may
13  thereafter be transcribed out of the presence of
14  the witness; that proof of the official character
15  and qualification of the notary is waived.  - - -
16  - -
17
18
19
20
21
22
23
24
```

```
 1      THE REPORTER:  Would counsel please
 2  identify themselves for the record, state who they
 3  represent, identify who else is in the room with
 4  them, and express their stipulation that this
 5  deposition may take place with a remote
 6  administration of the oath and remote reporting of
 7  the deposition.
 8      MR. GITTES:  Yes.  My name is Fred
 9  Gittes on behalf of the plaintiffs.  There's no
10  one in the room with me.  Jeff Vardaro, also
11  counsel in the case, is also participating in the
12  deposition as co-counsel.  He -- I will be asking
13  the questions.  And we do agree to the remote
14  swearing in of the witness and the remote taking
15  of this deposition.
16      MS. TANOURY:  Alana Tanoury for the
17  defendants.  I am alone in my office.  Wes
18  Phillips just jumped on as well.  And we agree to
19  the remote taking of the deposition.
20              - - - - -
21          SMITH WEIR
22  being first duly sworn, testifies and says as
23  follows:
24
```

1         CROSS-EXAMINATION

2  BY MR. GITTES:

3  Q.    Okay.  Commander, sorry for the

4  familiarity, but we've been through a lot of

5  depositions in this case, so we kind of --

6  A.    I understand.

7  Q.    -- do a little chitchat on the side.

8       I will be asking you most, maybe all

9  the questions today.  And I need you -- to begin

10  with, would you state your full name for the

11  record?

12  A.    First name is Smith, S-M-I-T-H, last

13  name is Weir, W-E-I-R.

14  Q.    And your current occupation is?

15  A.    I'm a police officer with the City of

16  Columbus.  I've been employed by the City of

17  Columbus Police Department since December of 1999.

18  My current assignment is I'm -- well, my current

19  rank is of commander, and I'm currently assigned

20  as the commander for zone five, patrol operations.

21  Q.    And, Commander, have you been in a

22  deposition before?

23  A.    I have.

24  Q.    And how many times would you say?

1  A.    I believe once.

2  Q.    Oh, okay.  You have testified as an

3  officer and a supervisor, I would assume, many

4  times over the years?

5  A.    Yes, sir.

6  Q.    I think you said you started in '99, so

7  would it be reasonable to think that you've

8  testified in hundreds of cases?

9  A.    Yes, sir.

10  Q.    Okay.  I want to go through a bit of --

11  I should ask:  Do you -- when did you become

12  commander?

13  A.    I was promoted to commander in -- well,

14  the official ceremony was January 24th, I think,

15  of 2020.  I was made acting commander

16  December 31st of 2020, so technically the

17  promotion date is December 31st.

18  Q.    Okay.  We don't -- for purposes of this

19  deposition, which, by the way, I hope to keep

20  short, max two hours, so...

21       Let me go through some, I guess they're

22  my rules for depositions and make sure you're

23  comfortable with them since you've only been in

24  one deposition.  I should interrupt myself and ask

1  you:  How long has it been since you did that

2  deposition?

3  A.    I believe that deposition was either in

4  2011, 2012, somewhere in that time frame.

5  Q.    Okay.  So it's been quite awhile?

6  A.    Yes, sir.

7  Q.    And was that case -- were you a party

8  in the case or just a witness?

9  A.    Just a witness per se.  I wrote a

10  report that was -- I wrote a report that the two

11  parties were talking about, I guess is the best

12  way to put it.

13  Q.    Was it like an accident case or

14  something like that?

15  A.    No.  It was about judicial misconduct.

16  Q.    Oh, okay.  I wish I had more time.  I

17  would love to hear what that was about, but I'll

18  just skip it.

19  A.    Last I heard there was a standing gag

20  order for the Court, so I'm not sure if I can.  I

21  don't know if it's been lifted or not.

22  Q.    Well, that's one way to ruin curiosity.

23  A.    Sorry.

24  Q.    Okay.  So let me go over some of these

1  rules that I would like to see if you can agree

2  to.  I will --

3  A.    I'm sorry to interrupt, I'm getting a

4  lot of glare from my window, can I lower my blinds

5  real quick?

6  Q.    Yeah, sure.  Absolutely.  I have the

7  same problem here, I just did it.

8  A.    Sorry about that.

9  Q.    Now you're less ghostly.

10  A.    Thank you.

11  Q.    I'll be asking you most, probably all

12  the questions today, so do you understand that as

13  we go through, if you don't follow one of my

14  questions for any reason, that you can ask me to

15  explain it to you --

16  A.    Sure.

17  Q.    -- or rephrase it?  Do you understand

18  that?  Is that --

19  A.    I do.

20  Q.    And will you -- will you please tell me

21  if you don't understand something?

22  A.    Yes, sir.

23  Q.    If I ask you a question and you answer

24  it, we're all going to assume you understood the

1 question unless you tell us otherwise, okay?
2 A.    Yes, sir.
3 Q.    All right.  Secondly, I -- we're going
4 to be focusing on mostly the spring of 2020, not
5 all that long after you became a commander.  It's
6 not that long ago, but still it's quite awhile
7 ago.  And I'm sure you've had a lot of things
8 going on in your life since then, so if I ask you
9 a question and you answer it and you realize later
10 that you made a mistake or you forgot something,
11 do you understand you can interrupt me at any
12 point in the deposition, even if I'm in the middle
13 of a question and say, Fred, I just remembered
14 something, I made a mistake or I forgot to point
15 out something, will you do that for us?
16 A.    Yes, sir.
17 Q.    Okay.  Also, this is not going to be a
18 particularly long depo, but if you need a break,
19 please feel free to take it, and I will exercise
20 the same privilege myself if that's okay with
21 everybody.
22       Do you have any questions for me about
23 this deposition?
24 A.    The only question I had was whether if

1 you ask a specific question about a policy, if I'm
2 allowed to say, hey, can I pull that up on my
3 computer and check my notes basically?  Or if you
4 want me to just go off memory at this point?
5 Q.    Well, with respect to policies, I'm
6 fine for you -- with you looking up, as long as
7 you can do it efficiently.  I'm more concerned
8 about time than you looking it up, okay?
9 A.    Gotcha, sir.
10 Q.    Because we promised to get this done in
11 a couple of hours, so...
12       Any other questions?
13 A.    No, sir, that's it.
14 Q.    Let me ask you about your own
15 background.  Have you ever sued anyone yourself
16 before?
17 A.    No.
18 Q.    Have you ever been sued?
19 A.    No.
20 Q.    Okay.  I take it because you're a law
21 enforcement officer, I believe I know the answer
22 to this question, but I always am cautious, have
23 you ever been charged with a crime?
24 A.    As a law enforcement officer?

1 Q.    Yeah.  Well, no, just generally.  But
2 not traffic, by the way, I'm not talking about
3 traffic.
4 A.    I had -- when I was a college student,
5 I had disorderly conduct by intoxication.
6 Q.    Oh, okay.  Nothing else?
7 A.    No.
8 Q.    Okay.  You are going to be testifying
9 today under oath, so let me make sure that there
10 are no obstacles to that.  Are you currently on
11 any medication or taking any kind of drug that
12 would affect your ability to testify accurately
13 and truthfully today?
14 A.    No, sir.
15 Q.    Do you have any kind of health problems
16 that would affect your ability to testify
17 accurately and truthfully?
18 A.    No, sir.
19 Q.    Do you know of any reason you can't
20 testify accurately and truthfully today?
21 A.    None at all.
22 Q.    Okay.  I'm going to mostly focus --
23 well, let me just ask you:  During the -- as you
24 remember, there were demonstrations regarding

1 excessive police force and racism in the spring of
2 2020.  Do you remember that?
3 A.    Yes, sir.
4 Q.    You, at least at some point, played a
5 role in handling those demonstrations?
6 A.    That's correct.
7 Q.    What was your role?
8 A.    So on May 27th, 2020, there was an
9 incident at Livingston/Lockbourne, which is on
10 zone five, it's on the border of 11 and 12
11 precinct.  And we had an officer respond.  There
12 was a person that called in and said there was an
13 individual standing in the middle of Livingston
14 Avenue, he's got a gun on his hip, he's having
15 a -- you know, he's got a sign and he's -- you
16 know, and he's yelling at passing motorists.
17       So our officers showed up, got out of
18 the car, basically said, hey, I don't have a
19 problem with the sign.  The sign by the way said
20 eff the police in so many terms.  It actually
21 spelled it out, though.  And the officer said, I
22 don't have a problem with the sign, but you can't
23 be in the middle of the roadway.
24       At one point, the individual pointed

1  his body, the officer said, don't touch your gun,
2  and it went downhill from there.  It was use of
3  force.  There was assault on a police officer.  I
4  was made aware of the incident shortly thereafter.
5      It turns out that I knew the subject,
6  the citizen who was involved, the arrestee.  I've
7  known him for about 15 years through my time as an
8  officer.  And so we watched the video, we
9  monitored it.  I put out -- you know, we knew that
10  just from the reaction of the community that there
11  was going to be -- you know, this was not going to
12  end, there was going to be an escalation or there
13  was going to be more demonstrations because of the
14  George Floyd death, and then also the incident
15  with Christopher Radden.  So I think then on the
16  28th we got word that there were going to be
17  additional protests, both of which were on zone
18  five and, you know, we went from there.
19  Q.      Okay.  I'm a little confused.  Did you
20  actually go out to the scene when you were called
21  at Lockbourne?
22  A.      No.  By the time I found out about it,
23  the scene had been contained, so to speak.  But
24  like I said, I found out about it that night just

1  in terms of the general incident being informed of
2  it, and then I watched the video first thing on,
3  you know, the next morning when I got to work.
4  Q.      What's the name of the gentleman who
5  was involved?
6  A.      Christopher Radden.
7  Q.      I'm sorry?
8  A.      Christopher Radden.
9  Q.      Okay.  Was -- was he ultimately
10  prosecuted?
11  A.      He was charged.  I don't -- I'm not
12  sure what the outcome of the case was.
13  Q.      Okay.  So you had no direct involvement
14  with him at the scene at all?
15  A.      No.
16  Q.      Okay.  In fact, it sounds like you
17  reviewed the case, but other than that, you didn't
18  have a role in it?
19  A.      No.
20  Q.      Okay.  Was that a demonstration with
21  people -- with people involved other than
22  Mr. Radden?
23  A.      There appeared to be about four or five
24  other people that were standing on the corner of

1  Livingston and Lockbourne.  Christopher was the
2  only person that was out in the street, and --
3  but, yeah, there were about four or five others
4  that were standing on the corner with signs, you
5  know, demonstrating.
6  Q.      Okay.  When is the next time you recall
7  playing a role as a commander related to the
8  spring demonstrations?
9  A.      So the next day, the 28th, we got word,
10  I think that was the Thursday, if I remember
11  correctly.
12  Q.      That's correct.
13  A.      We got word that there were going to be
14  two planned demonstrations.  One was at Livingston
15  and Lockbourne and one was at our internal affairs
16  building at 750 East Long Street.  So during the
17  course of the day, we -- we scrambled and got
18  plans for our bike crews and our community
19  response teams to assist with the -- you know, the
20  two demonstrations.
21      Because of the one at Livingston and
22  Lockbourne, we decided to stage at our
23  communications, our radio room at 1250 Fairwood,
24  so we had the vast majority of our people staged

1  there.  We had some people at our internal affairs
2  building, but not much.  And to be honest, that
3  was -- you know, we didn't have attendance
4  estimates really for either one that were
5  reliable.
6      The second -- the demonstration at our
7  internal affairs was sponsored by a group called
8  Columbus ARA, Anti-Racist Action, which at the
9  time I was not familiar with.  And the other one
10  was -- the one at Livingston and Lockbourne was in
11  support of Mr. Radden, who I was familiar with.
12  So we had most of our resources at the radio room.
13      We tended -- we didn't want to be real
14  visible.  Our Sergeant Fuqua, who's our PIO and
15  also one of our diversity inclusion liaison
16  officers, he knew the organizers for the
17  Livingston and Lockbourne protest, so he was in
18  contact with them.  And I was in contact with him
19  and we were kind of communicating back and forth
20  on that.
21      So at a certain point in the late
22  afternoon, I was at the radio room on Fairwood in
23  the parking lot staged with our squads that we
24  had, the bike squads and the CRT teams.  And

1 basically I -- there at different points, Sergeant
2 Fuqua would call me. We were watching -- we had
3 the community crime camera at Livingston and
4 Miller, so we could turn the camera and kind of
5 keep -- we were about a block away camera-wise and
6 we could kind of keep an eye on the intersection
7 without actually being there, so we were
8 monitoring through the camera.
9 At different points, Sergeant Fuqua
10 called me and kind of gave me updates on what the
11 protestors were trying to do. I remember
12 specifically at one point Sergeant Fuqua called
13 and said that the protestors wanted to take the
14 street. I was -- I tried to discourage that.
15 Obviously it's rush hour traffic. Even in our
16 post-pandemic state where, you know, it's -- rush
17 hour isn't what it used to be, you know, 5:00,
18 6:00 traffic is still heavier than normal.
19 So one of the things I talked to
20 Sergeant Fuqua about, see if -- I go, if they
21 really are that dead set on trying to go into the
22 street, he said they wanted to show their signs to
23 the motorists and get people to honk or have
24 interaction with the passing motorists, my -- my

1 concession on that was I asked that they only come
2 out into the street during red lights.
3 So if the Livingston -- the east/west
4 traffic light was red, if they could go out into
5 the intersection at that point and then come back
6 to the sidewalk when the light turned green. And
7 the organizers for that seemed amenable to that.
8 I felt that that was the best way to minimize the
9 disruption to the uninvolved traffic, which was
10 one of our concerns.
11 So from watching the video, they seemed
12 to stick to that, for the most part. For the
13 first, you know, hour or so it seemed like they
14 would go out when the light was red, they would be
15 in the intersection for about a minute, the light
16 would turn green, and for the most part, the crowd
17 would find its way back to the sidewalk. And we
18 were pretty pleased with that. I mean, I thought
19 that that was a -- you know, an accommodation that
20 we were able to make, a compromise where, you
21 know, we -- we said we kind of minimized that.
22 At a certain point, I think Sergeant
23 Fuqua called me and said they're going to march,
24 and he didn't know where. The concern for us at

1 that point was the Miller-Kelton exit on 70 is
2 pretty close. We are always very concerned about
3 freeway closures with pedestrians and
4 demonstrators. It is very deadly when that
5 happens. There's percentages -- there are studies
6 and percentages that have been shown that, you
7 know, I think it's up to a quarter of the time
8 that, you know, there's a freeway closure that
9 somebody dies. And that's not -- I mean, I think
10 that even counts, you know, more organized
11 closures like construction and stuff like that.
12 So obviously we take it very seriously when, you
13 know, there's the possibility that demonstrators
14 are going to try to take the highway.
15 So because of that, I got a bike squad,
16 and we directed the bike squad to follow them,
17 keep traffic off of them. Not to stop the march,
18 but we wanted to make sure that we had assets in
19 place if they tried to take the freeway, we could
20 stop them. At the same time, we got some cruisers
21 to go up to the actual freeway ramps up at 70 and
22 Kelton and block those off.
23 So they marched, they went east on
24 Livingston and they turned north on Kelton and

1 then -- and then at the same time that this is
2 going on, we start talking to our group at the
3 internal affairs building. And they say -- I
4 guess, just to provide some context, our internal
5 affairs building is at the corner of Hamilton and
6 Long. There is a fairly sizable surface parking
7 lot that's attached to that building. It's not
8 all dedicated to internal affairs or our accident
9 investigation unit, which is also housed there,
10 there are a couple different businesses in that
11 building, coffee shop, I believe, and a couple
12 other things. But the lot is sizable enough that
13 we felt that the protestors would be able to fit
14 on that lot and we wouldn't have to worry about
15 traffic control and all that.
16 The ARA group, obviously it turned out,
17 did not want to stay on the lot. They started
18 marching. So I got a call from our lieutenant and
19 our sergeant that were at the internal affairs
20 building saying, you know, what do we do?
21 That is also -- that is also very close
22 to the entrance of 71 and 670 right there at
23 Spring and Long, and that was our immediate
24 concern was don't let them get on the highway, you

1   know, it's 6:00, or at this point maybe it was a
2   little bit after, you know, but it's a heavy
3   traffic time, we don't want, you know, marchers
4   going on to the freeway, pedestrians going on the
5   freeway, so block off that.
6        Once they blocked off that, they -- he
7   said they kept going westbound on Long, I guess it
8   would be.  We didn't know where they were going
9   and we were guessing headquarters.  I think we
10   called our headquarters operations bureau and
11   said, hey, you know, be mindful there may be a
12   protest coming down to headquarters.  And our
13   direction to the officers that were at internal
14   affairs was follow the group at a distance, keep
15   traffic off of them, but let them march wherever
16   they're going to march and try to be as low
17   profile as you can.  Obviously our thought was
18   because, you know, they're protesting police, we
19   don't want to be right on top of them if we can
20   help it.
21        So then at the same time, our community
22   response team that was at Kelton and Gault and
23   said that things had gone downhill.  Basically the
24   group had stopped and turned around right on top

1   of them.  And a lot of us from the radio room then
2   responded to Kelton and Gault to try to help
3   de-escalate that.  And eventually we were able to
4   de-escalate that one.  There was a lot of
5   shouting, a lot of yelling, but eventually the
6   group turned west on Gault and then made their way
7   eventually back to Livingston and Lockbourne, so
8   they never went to the freeway.
9        Once that happened, at the same time --
10   and I know this is getting confusing, we're
11   bouncing back and forth a lot, but around that
12   same time is about when the ARA group went to
13   Broad and High and that -- the cruiser got
14   surrounded.  And the word was that it was going
15   downhill at Broad and High.
16        So I think at that point, Chief Woods,
17   Deputy Chief Woods, now obviously Interim Chief
18   Woods, and Sergeant Baker, who's his aide, and
19   then they, you know, took some of our resources
20   from the Livingston and Lockbourne area and
21   started going downtown to help that out.  I stayed
22   at Livingston and Lockbourne.
23        And as we went back to the radio room,
24   the group, the protest group went back to

1   Livingston and Lockbourne.  They continued kind of
2   went -- reverted back to their previous, you know,
3   previous, you know, activities where they were --
4   when the light went red, they would go out in the
5   street and they would make their way back.
6        I was on the phone off and on with
7   Sergeant Fuqua.  He ended up being out there at
8   the scene, because, like I said, he knew some of
9   the organizers, so he was trying to help out.  As
10   the situation got worse and worse downtown, I
11   started releasing more people from our area,
12   Livingston and Lockbourne, and sending them
13   downtown.
14        I think by the end, and I want to say
15   it was just getting dark, I was by myself at the
16   radio room and Fuqua was by himself with the --
17   what was left of Livingston and Lockbourne.  And
18   because I wasn't going to leave until he was, you
19   know, away from the scene.
20        So when he said he was leaving, I left
21   the radio room and started driving downtown to
22   meet up and go to headquarters and then make my
23   way to Broad and High.  As I'm driving downtown,
24   Fuqua calls me and he said -- he goes, I just got

1   off the phone with the organizer, he said that the
2   group that's downtown right now is Columbus ARA.
3   And I said, Shawn, that doesn't mean anything to
4   me.  And he goes, they're the group that took over
5   the Stonewall parade a couple years ago.  And then
6   it clicked, because I knew about the incident
7   where the -- I think the four individuals had
8   taken over kind of the Stonewall parade and
9   officers had been asked to come in, and then they
10   arrested them.  And then they kind of like became
11   a thing where I think there was a split in
12   Stonewall and there was kind of a power struggle
13   in Stonewall leadership.  So I had heard about all
14   that.  So once I had the context, I knew kind of
15   what we were dealing with a little bit more.
16        So Sergeant Fuqua, the last thing he
17   said to me was he goes, the organizer for
18   Livingston and Lockbourne said that the ARA is
19   going to do whatever it takes tonight to provoke a
20   police response.  So that was the -- kind of the
21   last thing I heard as I'm pulling up downtown.
22        I parked at headquarters and then I
23   walked to Broad and High and met up with Chief
24   Woods and the other -- you know, the individuals

1  that were there.  And then by that point, there
2  was already the skirmish line, there was already
3  officers in riot gear and the, you know, things
4  were starting to get heated.
5  Q.     Okay.  That was a lot to take in, but
6  first of all, let me make sure I understand your
7  role.  Were you -- and if my terminology is wrong,
8  please correct me.  Were you the scene commander
9  on the 28th?
10  A.     So Chief Woods was out there, so he --
11  typically a deputy chief is the incident
12  commander.
13  Q.     Incident commander, okay.
14  A.     Yeah.  And the commander -- commander,
15  me, is the operations section chief, or there
16  could be commanders in other -- like a logistics
17  chief or a -- a planning sections chief, I mean,
18  it just depends on what the roles are, it's all
19  through the, you know, the incident command system
20  or ICS.  But I would have been the operations
21  section chief.
22  Q.     Okay.  So -- and so you were there,
23  when did you start your -- your duty on the 28th?
24  A.     Well, I mean, when I got to work was

1  probably 8:00 a.m.
2  Q.     Okay.  And when was it that you
3  actually went off duty?
4  A.     3:00 a.m. the next day.
5  Q.     Okay.
6  A.     3:00 or 4:00.
7  Q.     And so as I understand it, your time
8  was split between Livingston and Lockbourne,
9  downtown, later on at least --
10  A.     Yeah.
11  Q.     -- and the radio room?
12  A.     Yeah.  The radio room was really like I
13  said, just our staging area for the Livingston and
14  Lockbourne --
15  Q.     Right.
16  A.     -- area.
17  Q.     Right.
18  A.     So, yeah, I think in terms of the two
19  theaters, it's Livingston and Lockbourne and
20  downtown.
21  Q.     And correct me if I'm wrong, from your
22  descriptions and, you know, I am trying to be
23  careful with time here, but I think this is going
24  to take a little longer than I thought, you -- you

1  were able to resolve any issues with -- not you
2  personally, but under your supervision -- ARA in
3  terms of -- in terms of internal affairs and the
4  marching, at least up to the time things started
5  happening downtown, you were -- your officers were
6  able to handle it and keep a low profile?
7  A.     Yeah.  My understanding was from
8  talking to them, they were able to follow at a
9  distance.  They never got really close, but they
10  were able -- they were, I don't know whether it
11  was a half a block or a block or whatever, but
12  they were able to stay behind, block traffic from
13  coming up on them and so that there wasn't
14  necessarily, like I said, cars pulling into the
15  middle of the march, which is something we always
16  worry about.  So, yeah, that was my understanding.
17  Q.     Okay.  So that segment, it went okay?
18  I mean, there wasn't violence or threats or there
19  was no need to use non-lethal weapons to
20  accomplish the goal that you -- your -- I don't
21  want to call them troops, but your officers
22  accomplished, especially that section?
23  A.     Right.  As far as I know, sir, there
24  were no contact at that point.  Our big concern,

1  like I said, was a freeway entrance.
2  Q.     Right.
3  A.     And then the only -- you know, the
4  biggest problem we had internally was lack of
5  intelligence at that point.  We had no idea where
6  they were going, what their intent was, so it --
7  Q.     Peaceful -- I'm sorry, I don't mean to
8  interrupt.
9        But so you handled it on the fly
10  without having a clear idea where things were
11  going to end up, but you did keep them off the
12  freeway and without having to use force?
13  A.     Yes, sir.
14  Q.     And that was generally true of the
15  situation out at Lockbourne, you came up with a
16  solution so that they could demonstrate sometimes
17  in the street, other times off the street, they
18  marched, you took the necessary steps, maintaining
19  a low profile to make sure there was no risks to
20  anybody at the freeway entrance?
21  A.     Yes, sir.
22  Q.     Okay.  That -- then at some point, and
23  I'm still a lit unclear of it, you end up
24  downtown?

1  A.    Yes.
2  Q.    Broad and High, right?
3  A.    Yes.
4  Q.    And that was a much more complicated
5  situation, I take it?
6  A.    Yes.
7  Q.    And about what time did you physically
8  get there?
9  A.    I want to say it was 8:00, 9:00, you
10  know, I can't be exact.  It was dark and late May,
11  so probably was closer to 9:00.
12  Q.    Okay.  And up to that time, your focus
13  wasn't really on the downtown scene?
14  A.    No.
15  Q.    Okay.  And were you out in the Broad --
16  Broad/High area the rest of the night physically?
17  A.    Yes.
18  Q.    Okay.
19  A.    I mean, I was in the downtown area,
20  obviously towards the, you know, after things all
21  broke loose, I mean, we were all over the southern
22  part of downtown.  I don't think, for the most
23  part, I was north of Broad Street much.  It was
24  pretty much Broad and High to the south.

1  Q.    Broad and High to the south?  All
2  right.
3      Did you have your body cam on?
4  A.    I did.
5  Q.    Do you know whether --
6  A.    I don't know whether -- I don't know at
7  what point it died.  I know at some point it died.
8  I had it on at Livingston -- Livingston and
9  Lockbourne when we showed up at the scene there at
10  Gault for -- Kelton and Gault for a little bit.
11  And then I had it on, I know at -- initially at
12  Broad and High, and at some point during the night
13  it died.
14  Q.    You know, this reminds me of something
15  I didn't ask you that I should have.  Have you
16  reviewed any information, whether it's a copy of
17  the lawsuit or reports or video before coming to
18  the deposition today at any time?
19  A.    No.  I mean, I have watched some of my
20  -- previously I've watched some of my video from
21  Father's Day.
22  Q.    Okay.
23  A.    But no in terms of the rest of it.  I
24  know when the lawsuit was initially filed, I think

1  there's a zone five officer that was named on it,
2  so I think I forwarded -- I got a copy of that and
3  then forwarded it up as part of our policy, and in
4  terms of recommending whether, you know, the city
5  represents the officer or not.
6  Q.    Okay.  And I assume you recommended
7  that the city provide a defense?
8  A.    Yes, sir.
9  Q.    And is that routine?
10  A.    Yes.  Any time there's a civil lawsuit
11  against an officer, it's in our directives, we --
12  the officer writes a letter up saying, I've been
13  named in a lawsuit, this is what it pertains to,
14  they provide a copy of any documentation and they
15  forward it up through their chain of command.  And
16  in their letter, they would request city
17  representation, you know, if it was part of their
18  official duties, so that is -- that is fairly
19  routine.
20  Q.    And who is the officer that was named,
21  if you remember?
22  A.    I do not remember.
23  Q.    Okay.  Did you re-read those documents
24  for this depo, his letter?

1  A.    I didn't.
2  Q.    Okay.  Have -- did you review your own
3  body cam footage before -- other -- you know, not
4  back then, I'm talking about more recently?
5  A.    No.  Unfortunately, sir, I -- it's been
6  very busy here, I would say the past couple weeks,
7  but really it's been the past eight months, and I
8  haven't had as much time to prep for stuff --
9  Q.    Yeah.
10  A.    -- as I would like.
11  Q.    It's not a criticism.  I just wanted to
12  know.
13      So do you know or do you have any idea
14  of when your body cam on the 28th stopped
15  recording?
16  A.    I do not.
17  Q.    Okay.  What was your -- I mean, what
18  was your job -- I guess, Deputy Chief Woods was
19  the incident commander.  Did you have a specific
20  assignment on the 28th that he gave you?
21  A.    You know, I would be the operations
22  section chief, it's my zone, we're having a
23  civil -- you know, civil disturbance or a protest
24  on my zone, so that is -- that would be the role

1  that I would play.
2  Q.     So you were basically the second in
3  command, and for practical purposes, directing the
4  officers --
5  A.     Yes, sir.
6  Q.     -- as things developed?  Okay.
7      Did you at that -- did you see any use
8  of chemical weapons during your time that evening
9  downtown?
10  A.     Yes.
11  Q.     Okay.  Did you see any officers
12  spraying individuals, let's talk about I think
13  they're called K-9s, is that the right terminology
14  for the larger mace dispensers?
15  A.     No.  It would be Mark 9s.
16  Q.     Mark 9s.  Thank you.  I have a habit of
17  getting that wrong.
18  A.     That's okay.
19  Q.     I guess I like dogs and I always think
20  of K-9, but --
21  A.     Right.
22  Q.     -- they don't spray any -- well, I
23  guess they do spray things.  Anyway...
24      Can you -- did you see Mark 9s being

1  used to spray people who were standing on
2  sidewalks?
3  A.     Standing on sidewalks?
4  Q.     Yeah.  Not in the street, on sidewalks?
5  A.     I can't say specifically that except
6  for at one point there was a group -- so Broad and
7  High, we had our line of officers kind of on the
8  north part of that intersection across High
9  Street.  That Tim Hortons is on the northeast
10  corner of Broad and High, and it's kind of
11  elevated -- there's kind of an elevated walkway or
12  elevated sidewalk there.
13  Q.     Yes.
14  A.     And officers kind of were up right
15  against that.  There was a group -- there was a
16  large crowd of people that were kind of standing
17  over that elevated thing.  At one point, I saw an
18  officer spray that, somebody -- it was at that --
19  on that elevated crosswalk.  And my impression
20  was, and from what I was told, was somebody up
21  there had thrown or hit or done something to the
22  officer and they sprayed as a reaction to that.
23      And I know that at one point then they
24  pulled an arrest, somebody that was under arrest

1  back and took them to the prisoner transport
2  vehicle, which I think we had right around High
3  and Gay.  And that was the first, I think, use of
4  mace that day was right there.
5      As for other uses of mace that were --
6  that were not on the street, I know that the
7  individuals that broke into the Statehouse when
8  our officers were going into the Statehouse and
9  grabbing them, and I know that there was some uses
10  of mace there on the Statehouse steps.
11  Q.     We don't really -- I know that, and we
12  don't need to spend time on it, because there's no
13  issue about that, at least for purposes of today.
14  A.     Yeah.  So in terms of like spraying
15  people on the sidewalk or spraying people that
16  weren't in the street, that's the first two things
17  that come to mind.  I can't think of any other
18  uses of mace that were on the sidewalk.  But,
19  again, there were thousands of people out there
20  and, you know, I didn't see everything.
21  Q.     So -- and that -- I was going to ask
22  you that.  When you arrived, I think you said it
23  was 8:00ish, is that roughly when you showed up?
24  A.     I know it was dark.

1  Q.     Oh, it was already dark?
2  A.     Yes.  It was --
3  Q.     Okay.  This is -- I'm sorry.  I don't
4  mean to interrupt you.  Please go ahead.
5  A.     No.
6  Q.     So I know this is summertime, right?
7  A.     Yes.
8  Q.     So it's --
9  A.     So I remember it being dusk when I left
10  Livingston and Lockbourne.  And as I was walking
11  up to Broad and High, it was completely dark.
12  Q.     Okay.  Just based on your own personal
13  experience, wouldn't that mean it was probably
14  closer to 8:45, 9:00 more like when -- after
15  sunset in the summertime?
16  A.     Yes, sir.
17  Q.     Springtime?
18  A.     Yes, sir.
19  Q.     Okay.  And you were -- and you're
20  saying when you arrived, there were what you
21  described as thousands of people?
22  A.     Well, it looked like hundreds when I
23  first got there.
24  Q.     Okay.

1  A.    The height of it around 11:00, 12:00, I
2  would say there was probably -- it was high
3  hundreds, you know?
4  Q.    Okay.
5  A.    You know, but, I mean, it was -- it
6  was -- there was a lot of people.
7  Q.    Okay. Jeff, my colleague, just checked
8  on sunset that day on the Internet and it was
9  8:52.
10  A.    Very good.
11  Q.    Given that, would you agree with me
12  that in terms of it being dark, it would have been
13  close to have to have been 9:00 or after?
14  A.    Yes, sir.
15  Q.    Okay. Also that -- when you say the --
16  someone threw something at that officer who
17  sprayed that you were aware of or saw, he
18  didn't -- was he able, amid this crowd, to just
19  spray that person or was he doing a spray of
20  people in that area?
21  A.    I don't know, sir.
22     MS. TANOURY: Objection.
23  A.    I didn't catch the whole thing. It was
24  one of those, I was 50 feet behind the line and I

1  was talking to, you know, I -- whether it was one
2  of the lieutenants or Deputy Chief Woods or
3  whatever, but I wasn't looking directly at that
4  area. Once I heard the disturbance, obviously my
5  attention went to that direction.
6  Q.    Who was the officer that did that
7  spray?
8  A.    Sir, I don't know.
9  Q.    Okay. And did -- would you have
10  reviewed a use of force report for that incident?
11  A.    I don't know. I reviewed -- I had a
12  large stack of use of force reports after that
13  initial time period. I was, you know, in the
14  process -- by the time I got them from the
15  lieutenants, it was probably mid June and --
16  Q.    Oh.
17  A.    -- the direction I received that we all
18  received was stop everything you're doing and
19  forward everything to Baker Hostetler. So I
20  packed everything up and I forwarded it to IA who
21  forwarded everybody's after actions and uses of
22  force reports to Baker Hostetler.
23  Q.    So you actually did not have the
24  opportunity to systematically review use of

1  report -- use of force reports related to these
2  spring demos?
3  A.    I went through some. I went through --
4  I know that, you know, that I know the general
5  areas where, like I said, zone five officers
6  forwarded their -- you know, their reports. But
7  that first night, there was no -- you know,
8  systematic I know that zone five officers are here
9  and zone four officers are here and zone --
10  because it was one of those, everything happened
11  at once and we were, you know, every -- you know,
12  we basically had no -- no plan for how that
13  escalated.
14     So it was -- you know, our plan had
15  been -- for Livingston and Lockbourne, our plan
16  had been for internal affairs. We didn't have a
17  plan if they marched Broad and High and all of a
18  sudden the crowd, you know, quadruples in size, so
19  we had officers assigned in different locations at
20  that point.
21  Q.    Okay. But the bottom line is you
22  really never had the opportunity to do a
23  systematic review of use of force reports during
24  this period?

1  A.    No. We -- everything got forwarded to
2  Baker Hostetler and we were told to stop all
3  reviews.
4  Q.    That reminds me of something else. In
5  a situation like this when you're dealing with
6  crowd control and there's a lot of different
7  interactions at different times, is each officer
8  expected to write a separate use of force report
9  for each time they use a chemical weapon or is it
10  more after -- after the event or after duty, but
11  write up the ones that come to mind? What really
12  happens?
13  A.    It depends on I guess how it happens.
14  So if I'm the lieutenant or I'm the sergeant and,
15  you know, we're dealing with a group of protestors
16  in front of us and we see activity or we've been
17  giving warnings and we have an enforcement action
18  we're taking, and I, as the supervisor, order that
19  use of force, that should probably be written --
20  that's going to be written up by the lieutenant or
21  by the sergeant who's giving the order. And it's
22  going to say, I directed my squad consisting of,
23  you know, these officers, and I directed them to
24  use a chemical irritant on this crowd because of

1  this behavior and for the -- you know, for these
2  lawful purposes or whatever.
3      If -- as an officer standing on the
4  line, if the guy -- you know, a protestor comes up
5  and pushes me or punches me and I use a chemical
6  irritant on my own because I'm in a use of force
7  situation, that officer then would be responsible
8  for writing that up.  So it depends on the
9  circumstances.
10 Q.      What I'm really asking is as a
11 practical matter, you know, as I understand it,
12 officers were doing shifts like 12 hours long and
13 they could have multiple interactions with people
14 which could involve spraying or some kind of
15 pushing or, you know, interactions that were
16 physical, but not -- you know, not striking them
17 with a baton or anything.
18 A.      Right.
19 Q.      Do they have to report -- are they
20 expected to report each of those incidents --
21 A.      Yes.
22 Q.      -- separately?
23 A.      It depends on -- I would say, again,
24 depends on the circumstances.  If it's all part of

1  the same -- if I'm standing at the same
2  intersection dealing with the same person and I
3  have, over the course of a half an hour, two or
4  three different, you know, uses of spray, I think
5  that you could do that as one event.
6      You would say, I -- you know, over the
7  course of 15 minutes, I sprayed -- you know, I
8  deployed three, you know, two-second bursts of
9  chemical mace, you know, to do the -- you know,
10 for this end.
11     But if it's at different intersections
12 with different people under different
13 circumstances, then my direction would be that,
14 yes, they have to fill -- you know, they have to
15 report those separately.
16 Q.      And when do they do it?
17 A.      Well, sir, that was -- you know,
18 obviously, you know, it should be, you know, by
19 the end of the shift.  Obviously those first
20 couple days were very chaotic --
21 Q.      We -- you're on mute now for some
22 reason.  Okay.
23 A.      My fault.  Anyway, it said I was muted
24 for a second.

1  Q.      Sorry, end of the shift they do it?
2  A.      Yes.  They're supposed to report it by
3  the end of the shift.
4  Q.      Okay.  And as I'm understanding it,
5  there's -- there's two general situations when
6  officers may use non-lethal weapons.  One is when
7  a lieutenant or supervisor directs their officers
8  to use the weapons because of a situation that the
9  supervisor feels requires it.
10     And then secondly, officers have
11 discretion to use those weapons, I mean, according
12 to the policies and guidelines when their judgment
13 is that they're necessary given their individual
14 situation?
15 A.      Yes.
16 Q.      Okay.  Did -- did you see any firing
17 of -- of the -- what are they called, multi baton
18 weapons?  What do you refer to those -- they look
19 like rifles that shoot the wooden ammunition?
20 A.      Knee knockers.
21 Q.      Knee knockers?  Okay.
22     Actually, you're saying that brings up
23 a question I have.  Did you take training as a
24 grenadier yourself?

1  A.      I did not.
2  Q.      Okay.  Have -- did you -- have you ever
3  had training using that weapon, what you call knee
4  knockers?
5  A.      Yes, I have.  Before we called them
6  grenadiers and had separate training for officers
7  to actually be trained grenadiers, the -- I think
8  right around 2015 we had a civil disorder
9  training, and I was a newly-promoted lieutenant,
10 and I was trained in how to use those.
11 Q.      Okay.  And when you were training, did
12 you actually -- you practiced firing?
13 A.      Yes, sir.
14 Q.      And were you instructed or was it your
15 understanding that the weapons could or could not
16 be fired directly at people?
17 A.      So my understanding and my direction
18 that you fire several feet in front of the target
19 so that it -- basically you're skipping and the --
20 skipping the rounds towards them.
21 Q.      Okay.  And based on your own practice,
22 when you do that, is it -- aren't there times when
23 the bounce goes above knees and above legs?
24 A.      So during my practice, no, because I

1 never fired at individuals. I -- I fired in a
2 static environment in a parking lot in a training
3 environment, so I didn't have -- I didn't have all
4 the variables there.
5 Q. Okay. Based on just your experiences
6 as a, you know, law enforcement officer and being
7 at crowd scenes, isn't it the case that if you --
8 if you're trying to skip or bounce a double baton
9 shot, a lot of factors influence where they go?
10 It can be whether the level of the ground, the
11 nature of the surface, whether you accidentally
12 hit a curb or object that's in the street, all
13 those variables affect both the direction and the
14 height, don't they?
15 A. Yes, sir. There can be multiple
16 variables that could change that, yes.
17 Q. Okay. Under any circumstances, based
18 on what you know, have officers been trained they
19 may, in some circumstances, aim directly at the
20 main torso or head of a suspect or person that
21 needs to be shot at? I don't know how else to put
22 it.
23 A. Not if it's being used as less than
24 lethal. I mean, if you're going to aim at the

1 head, then it would be a deadly force situation --
2 Q. And is that --
3 A. -- so...
4 Q. -- is that the department's policy, as
5 you understand it, that shooting -- officers, if
6 they shoot at a suspect at their head, that is
7 considered a deadly force use, not just a skip
8 bounce?
9 A. Yeah. My understanding would be if
10 they're aiming the knee -- if they're aiming that
11 at somebody's head, then that would be what we
12 would consider a level eight.
13 Q. And what is it if they're aiming at
14 their body, not trying to skip it, not their head,
15 but at their chest, stomach, arm, you know,
16 shoulders, upper part of their torso?
17 A. I -- I don't know if that would be a --
18 I mean, that would be a level eight necessarily,
19 but I don't know if that would necessarily also be
20 in policy.
21 Q. Okay. Is the policy that -- is the
22 policy that specific about those questions as
23 opposed to training?
24 MS. TANOURY: Objection.

1 Q. And, Commander, I want to make this
2 clear to you, if you don't know something, it's
3 fine with me just to tell me that. I understand
4 it. I don't know that I want you to look up the
5 wording at the moment, and I certainly don't want
6 you to search for training videos, just --
7 A. Yeah, I know that I was trained that
8 we're not aiming at the head; that we're trying to
9 skip it in. I don't remember how specific the
10 policy gets.
11 Q. Okay. Fair enough.
12 So let's go back to the 28th. And I'm
13 going to have to try to speed up, and
14 unfortunately that means I'm going to try to ask
15 more yes and no questions.
16 So did you see the use of the knee
17 knockers during the 28th after -- after dark when
18 you came downtown, I mean, personally? I'm asking
19 you if somebody reported it?
20 A. I believe I did.
21 Q. Okay. Did you see any occasions when
22 they -- they were being shot at people who were
23 leaving the area?
24 A. No.

1 Q. Okay. Would that be appropriate or
2 within policy if someone was moving away, walking,
3 like if they left the intersection of Broad and
4 High and were heading north away from the area,
5 would it have been appropriate to fire at them?
6 A. I don't know, per se. I know that as
7 we were giving warnings, we were directing people
8 that the safe avenue of egress was east. But
9 without knowing the circumstances, I can't say
10 whether there would be a reason why somebody who
11 would be going north would get knee knockers fired
12 at them.
13 Q. Well, let me put it to you this way:
14 Absent some conduct, you know, that constituted a
15 threat or indicated that they were not leaving, if
16 someone was walking away after a dispersal order
17 back to the officers, their back is turned to the
18 officers, they're walking away up north on High
19 Street, would that be a violation of policy to
20 shoot at them with the knee knockers?
21 A. I would not direct an officer to fire a
22 knee knocker at an individual walking away, absent
23 some other kind of threat that that person
24 constituted.

1  Q.    Okay.  Also, in your training and under
2  the policy, the goal, at least, and what people
3  are trained to do, is to bounce the -- the ammo to
4  keep the strike below the waist.  Isn't that what
5  it's all about?
6  A.    That was what I was trained on, yes,
7  sir.
8  Q.    I'm not -- I'm -- if I'm understanding
9  your answers, you saw some occasions where the --
10  the knee knocker -- knee knockers were being used,
11  but you -- you can't tell me about any specific
12  incident, the exact circumstances, you just
13  observed that there were occasions where they were
14  being used?
15  A.    Well, I don't remember saying that I
16  don't remember specifics.  I think when we got
17  to -- we had -- at a certain point advanced to the
18  southern part -- the south intersections, so we
19  had a skirmish line on the southern part of High
20  Street and Broad, and then on the eastern part of
21  High Street and Broad.  There were still
22  individuals in the street blocking our -- blocking
23  our movement.
24        We had obviously been giving verbal

1  warnings, audible warnings for hours.  We had had,
2  you know, lots of projectiles thrown at us, rocks,
3  scooters, water bottles.  The mob was starting to
4  destroy the bus shelter at the -- in front of like
5  kind of by the McKinley statue on High Street.
6  And I think at that point, we used knee knockers
7  to try to get people out of the street so that we
8  could get to the mob that was destroying the bus
9  shelter.
10        And at that point then, that's when
11  there was the mass storming of the Cap -- you
12  know, the Statehouse.  And that was kind of when
13  we broke the skirmish line up and just went to try
14  to protect the Statehouse, because I think there
15  were only a handful of troopers on duty and they
16  couldn't -- they couldn't prevent it.
17  Q.    Commander, let me -- let me ask you
18  some questions about your use of the word "mob."
19  Is it your testimony that if we look at body cam
20  footage of the individuals who were trying to tear
21  down or damage the bus stop near the corner of
22  Broad and High, that there were hundreds of people
23  involved in that?
24  A.    No, I wouldn't say hundreds.

1  Q.    What -- isn't it more accurate to say
2  that may be somewhere between 20 or maybe a few
3  more people were engaged in trying to damage that
4  bus stop?
5  A.    That would probably be a fair
6  description.
7  Q.    Okay.  Also isn't it the case that on
8  the 28th, as the hours got later and later, much,
9  if not most -- putting aside the Statehouse, I
10  mean, I -- do you have an actual count now in
11  hindsight available to you that you've seen of
12  actually how many people really got into the
13  Statehouse or even tried?
14  A.    There were very few.  There was a
15  large -- there was a large number that basically
16  ran at the Statehouse and got up on the steps.
17  There was a very small number that actually got
18  in.  You know, as we were running up to try to
19  stop it, a lot of people fled, you know, north,
20  south, they ran.  But there was a very large --
21  much larger than the contingent that just was
22  damaging the bus stop.
23  Q.    Right.
24  A.    There was a large number of people that

1  ran at the Statehouse that, like I said, but I
2  think there was only several that actually gained
3  entrance.  There was -- there was more than
4  several, but not the entire group obviously that
5  damaged Statehouse property, whether throwing
6  bricks through the windows or whatnot.  But like I
7  said, there was only several that got in.
8  Q.    And in terms of the Statehouse area,
9  the grounds, isn't it also true that the crowd
10  that -- first of all, throughout the
11  demonstrations, I don't know how many days you
12  were there, I'm going to be asking you that
13  shortly, that was kind of like a gathering area
14  throughout the demonstrations, people would gather
15  around the Rhodes -- is it Rhodes, isn't there a
16  statue there, McKinley -- McKinley, right?
17  A.    Yes, sir.
18  Q.    And there was even a combination of
19  protestors and just street people who would camp
20  out there, I mean, that was almost continuous
21  throughout the demonstrations, wasn't it?
22  A.    It became so.  It hadn't been up until
23  that point.  Although during the -- you know, the
24  spring demonstrations with Ohioans, but there

1 would always be some, you know, people, you know,
2 when there were demonstrations at the McKinley
3 statue. But it became a permanent kind of fixture
4 after that first weekend.
5 Q.      Okay. And on the 28th as events
6 unfolded again, getting into the much later hours
7 of the night, most of the violence was focused on
8 is it -- I think it's State Street? Isn't that
9 just to the south of the capitol building where
10 the -- where the Ohio Theater is and then around
11 that area and across the street from Riffe, isn't
12 that where some of the worst physical damage was
13 done to property and -- and your officers were
14 pelted with various kinds of thrown material?
15 A.      Yes. The majority of the thrown
16 material at officers happened at Broad and High,
17 and part of that is just because the length of
18 time we were there. And because the first however
19 many hours we basically were telling our officers
20 not to react. You know, like I said, we -- we had
21 that information that they were trying to provoke
22 a response, so we were trying not to give them
23 that response.
24      And I think that's why -- one reason

1 why you saw the escalation of weapons. So it
2 started with water bottles, and when that didn't
3 get the response they wanted, then it went to
4 rocks. And when that didn't get the response they
5 wanted, it then went to scooters. And, you know,
6 once you're having scooters thrown at officers'
7 heads, it's a little bit hard, you know, that
8 could do some serious damage, so of course rocks
9 could, too.
10      But as we progressed from the
11 Statehouse down to State Street, there was some
12 incidents of weapons being thrown at officers, but
13 that's really when the transition happened to the
14 looting and the damage --
15 Q.      Right.
16 A.      -- to property. And it was more us at
17 that point chasing the crowds and trying to stop
18 property destruction for businesses, and that's
19 kind of where the transition happened was right
20 around State and High.
21 Q.      Yeah. And that -- that transition
22 happened, I'm just asking you after the -- those
23 individuals attempted to break into the
24 Statehouse?

1 A.      Yes.
2 Q.      Okay. And at that time in the evening,
3 the number of people in the downtown area had
4 declined quite a bit, had it not?
5 A.      So, yes, I mean, it reached its height
6 in terms of people, I think around 11:00. And
7 then as the night went on, I think those that
8 stayed were people that were looking for -- you
9 know, looking for trouble, so to speak.
10      You know, the first -- obviously the
11 first incident where I physically knew of the
12 property destruction was the bus stop in front of
13 -- the COTA stop in front of the Statehouse, and
14 that's because I was -- I was right there, I was
15 watching it. And then obviously the Statehouse.
16      After that, I walked to State Street,
17 and we had an officer, one of our black officers,
18 and he was getting just all kinds of things
19 screamed at him by people calling him names,
20 calling him the traitor. And so I went up and I
21 stood next to him and just let him know that I was
22 with him and everything.
23      And as I'm standing there, that's when
24 I heard the glass break and I turned and we saw

1 the Ohio Theater, the ticket booth of the Ohio
2 Theater catching on fire and we saw people running
3 away. So we all kind of ran that way. I think I
4 got on the air and asked for somebody with a fire
5 extinguisher and to call CFD. Our officers were
6 able to get that out.
7      And then from there, it just seemed
8 like one after another kind of the gates had
9 opened, so to speak. And I remember then KC
10 Sports was the next one we heard about, and the
11 CVS, and there was a bank and/or another office
12 building. I mean, basically it was just one
13 business to the next. And that was kind of the
14 transition time.
15 Q.      Yep, and I appreciate that. And I
16 appreciate your descriptions.
17      You mentioned seeing -- did you -- let
18 me ask you now because it has -- it's going to
19 affect how long this depo is, how many nights or
20 days and nights were you physically at the
21 demonstrations? I understand you were there the
22 28th. When's the next time you went?
23 A.      Zone five is my zone, I was there every
24 day that I was not physically ordered to not be

1 there. So I was there the 29th, I was there the
2 30th, the Sunday I was told to stay home because I
3 had been working 18 hours, 19 hours a day. And
4 then I -- you know, I think the next week we kind
5 of started a rotation. But, I mean, I was -- I
6 was there a ton of time.
7 Q. Okay.
8 A. Like I said, zone five is my
9 responsibility.
10 Q. And zone five is -- what does it cover?
11 A. Downtown, the Short North and the near
12 east side.
13 MR. GITTES: Okay. You know, I'm going
14 to request a break here. We have breakout rooms,
15 so Jeff and I will disappear for a few minutes.
16 Because in light of that, which I did not know you
17 were there every day, I want to kind of try to
18 feel my way.
19 Alana, this clearly is not going to be
20 over at noon. So I -- and I did not anticipate
21 that and I know John didn't. So I want to think
22 about ways I can try to get as much done as I can
23 today and allowing a little bit of overrun and see
24 if I can finish it somehow. That's why I want to

1 take a break.
2 MS. TANOURY: Okay. And you know,
3 Officer Johnson isn't scheduled until 12:30.
4 MR. GITTES: Oh, I didn't know that. I
5 thought he was at 12:00. That helps.
6 MS. TANOURY: He's at 12:30, and we'll
7 be, you know, flexible within reason --
8 MR. GITTES: Okay.
9 MS. TANOURY: -- if we have to try and
10 ask if he can shift a little bit.
11 MR. GITTES: Yeah, and you all have
12 a -- I think you have a conference call with the
13 Court.
14 MS. TANOURY: At 2:00.
15 MR. GITTES: Yeah, so that's going to
16 interrupt if it runs over, that's why I'm trying
17 to figure out -- well, let me not waste more time.
18 Let me talk to Jeff real quick and I'll see if I
19 can figure out a way to keep this shorter despite
20 what I'm learning.
21 MS. TANOURY: Okay.
22 MR. GITTES: Okay.
23 (A recess is taken.)
24 Q. All right. Commander, I'm going to do

1 my best to narrow this down just so we can have a
2 chance of making our goal.
3 So what I'm going to do is instead of
4 going through each and every day and the kind of
5 detail we were just doing, I'm going to ask you
6 some more broader questions that hopefully you can
7 answer, you know, briefly.
8 Just going back to the 28th, have
9 you -- the command structure for that day and
10 subsequent days was essentially that your role as
11 the operations commander was to make decisions
12 about where units or where groups of your officers
13 should be located and the general parameters of
14 what their assignment was with respect to whatever
15 that location was; is that accurate?
16 A. Yes and no. In regards to the 28th,
17 the way it worked out was I was more on the street
18 level with the lieutenants and the sergeants
19 working more directly with them. Typically, and I
20 think what you'll find and probably what you've
21 already heard, is after that first weekend, we got
22 back to our more traditional ICS system where the
23 operations section chief, the commander is in the
24 emergency operations center kind of with the

1 30,000 foot view with the incident commander.
2 That first weekend, that first day, the
3 28th, the commanders were out on the street with
4 lieutenants and sergeants and everything like
5 that, so -- and that was out of necessity.
6 Obviously we've already talked about some of the
7 factors that played into that.
8 But, yes, I mean, typically that would
9 be -- you know, as the operations section chief, I
10 am using the intent of the incident commander and
11 I'm saying, this is our goal, use our policies and
12 tactics to make it happen. This is what -- you
13 know, this is our objective, this is what we want
14 and that's what the lieutenants then would carry
15 out. I obviously, because I was out on the street
16 on the 28th, I was a little bit more hands on in
17 terms of tactics, you know, as far as that went.
18 Q. So let's -- let's take what was
19 happening on the 28th first. So were you actually
20 making individual decisions about whether
21 non-lethal force would be used each time, or was
22 that generally going to be a decision made by a
23 lieutenant or sergeant when it -- when they saw a
24 need for active use -- let's put aside individual

1  officer decisions.  I mean, that's -- as I
2  understand it, that always comes up and officers
3  have authority to use non-deadly force depending
4  on individual circumstances.  But in terms of
5  making -- notifying officers that non-lethal force
6  should be used, was that mostly a decision a
7  lieutenant or a supervisor would make for a group
8  of officers?
9  A.      Yeah.  Typically that is a lieutenant
10  decision.  There were some times on the Thursday
11  night on the 28th, I think specifically one time
12  when we were at the -- we had moved to the
13  southern part -- the southern part of the
14  intersection of, you know, Broad and High where I
15  did direct less than lethal knee knockers going at
16  individuals that were in the street that were
17  refusing to move that were -- you know, that fit
18  our policy.
19       So the -- overall, though, for the most
20  part during that first couple hours, my role was
21  more talking about tactics in terms of not use of
22  force, but, you know, what are we going to do
23  with, you know, the crowd and to handle the
24  situation we're doing.

1       So -- and when I first showed up
2  around -- after 9:00ish on Thursday, the first
3  thing I noticed was it was a really strong wind,
4  and it was coming straight south to north, so it
5  was coming into our face, and as bottles were
6  being thrown at us.
7       And at that time, Deputy Chief Woods
8  was still out on the street.  One of the
9  conversations we had was -- one of the
10  conversations I had was, why did we pick the north
11  side of the intersection, you know, against the
12  wind to be standing?  And that's when I think some
13  of the sergeants and lieutenants informed me about
14  what happened earlier where the uninvolved
15  cruiser, you know, was -- happened to be going
16  through the intersection, didn't know about the
17  protest and the -- you know, basically got
18  surrounded.
19       And then the officers that had been
20  tailing, you know, the march, had to go up and try
21  to get the protestors off the cruiser and get the
22  cruiser out of there.  And so they said it was by
23  default that we just ended up kind of on the north
24  side into the wind.  And at that point, you know,

1  we talked, well, there's nothing we can do about
2  it now, we have to, you know, adapt and find a
3  better way to handle this.
4       So those were the kind of conversations
5  that was happening, you know, in terms of, you
6  know, what are our objectives and, you know, how
7  can we make that happen --
8  Q.      Okay.
9  A.      -- so -- go ahead.
10  Q.      So -- and let's -- so going forward,
11  like that's the 28th.  So the 29th, 30th, 31st,
12  are we still -- there's -- there's a -- there's an
13  incident chief, right?  I mean, what's the title
14  of the deputy chief who's in charge?
15  A.      That would be incident commander.
16  Q.      So --
17  A.      Moving forward to the 29th, yeah, there
18  was incident commander and then there were several
19  commanders that were charged -- in charge of
20  different stuff.  I think initially on the 29th,
21  we had had, in addition to any activities and
22  protests downtown, there was also I believe one
23  that was scheduled for Broad and Nelson.  And I
24  think we were -- there was another one maybe near

1  Livingston and Lockbourne.
2       So I remember I had, I think Livingston
3  and Lockbourne and Broad and Nelson.  Those are
4  both on zone five as well, and another commander,
5  and I forget who, I think was in charge of the
6  downtown stuff.  So initially on the 29th, I was I
7  think out east monitoring the Broad and Nelson and
8  the Livingston and Lockbourne.
9  Q.      So just to make it clear, you've got a
10  lot of the decisions about non-lethal weapons and
11  when to use them are made by lieutenants and
12  sergeants within the scope of the overall
13  tactics --
14  A.      Yes.
15  Q.      -- that the operations commander and
16  the incident commander develop?
17  A.      That's correct.
18  Q.      All right.  Now, were you the
19  operations commander also on the 29th, the 30th,
20  31st, through that weekend?
21  A.      So I did not work the 31st, I believe
22  that was Sunday or -- yeah, I believe that was
23  Sunday.  I worked Thursday, Friday, Saturday, I
24  was off Sunday.  I believe I was listed as -- I

1  know by Friday and Saturday there was more than
2  just -- I was not the only commander at that point
3  working.  You know, they had delineated the tasks
4  and were bringing other commanders in to help out.
5       So like I said, I remember on Friday I
6  was -- my, you know, initial assignment was, you
7  know, the two zone five protests that were outside
8  of downtown and then, you know, it kind of evolved
9  because of circumstances later in the evening.
10 Q.   Okay.  So -- but I'm trying to be real
11 -- understand the nomenclature, not just what you
12 were doing.  Is there always one operations
13 commander in addition to an incident commander?
14 A.   That is correct, there should be.
15 Q.   Okay.  And other -- I mean, I gather
16 from what you've told me, the 28th you were the
17 operations manager -- commander, I mean?
18 A.   Yes.  I think obviously as the night
19 went on, a couple other commanders got called in.
20 Q.   No, I understand, but I'm just talking
21 about the title you carried, that you were the
22 number two guy?
23 A.   Yes, sir.
24 Q.   Okay.  Was that also true on the 29th?

1  A.   I'm not positive how it got worked out
2  in terms of that, but yes.
3  Q.   Okay.  When's the next time after that?
4  And I mean, I think Sunday you weren't -- you were
5  off duty.  What's the next time you remember being
6  designated the operations commander?
7  A.   I think there was a -- there was a time
8  on a weeknight the next week where I worked late
9  and I was the operations section chief.  I don't
10 remember the specific day.
11 Q.   Okay.
12 A.   But that was -- I think as we moved
13 into the 1st, we started getting Deputy Chief
14 Woods, Chief Quinlan basically put out a schedule
15 saying, you know, the -- this commander has this
16 12-hour shift, this commander has this 12-hour
17 shift, and rotating it from there.
18 Q.   And then what about -- so Friday you
19 ended up being the operations commander again.
20 What about operations chief, whatever the proper
21 title is, I'm sorry, what about Saturday, the
22 30th?
23 A.   Saturday I don't remember -- I know
24 that Saturday I came in about mid afternoon, I

1  think 3:00 or 4:00, because, again, I had been
2  there Friday until about 3:00 or 4:00 in the
3  morning.
4       So I came in Saturday mid afternoon,
5  obviously I was, you know, briefed up on the
6  activities of Saturday morning and early afternoon
7  in terms of the downtown protests.  And as I got
8  in -- walked into the EOC on Saturday afternoon,
9  before I had even gotten an assignment or
10 whatever, there was traffic officers screaming
11 that there was a large group that was trying to
12 take 670 over by -- in the Short North by Goodale
13 and North Fourth, that area behind the convention
14 center.  So I forget -- I think it was Chief Woods
15 I was talking to.  But he looked at me and said
16 go.  We had a bunch --
17 Q.   I apologize for interrupting, I don't
18 need the background.
19 A.   Okay.
20 Q.   I'm trying to find out if you were the
21 designated operations chief on that Saturday?
22 A.   I'm not sure, sir.
23 Q.   Okay.
24 A.   I was not -- obviously like I said, I

1  came in at 3:00 or 4:00 in the afternoon, so I
2  would not have been on first shift.  Second shift
3  because of the circumstances that, you know, I
4  don't know how that got articulated in the -- in
5  the IAP just because, like I said, I made it two
6  steps into the EOC and I was told to run out to
7  the street.
8  Q.   Gotcha.
9       And I gather on the occasions going
10 forward after the -- that weekend, that -- well,
11 I'm asking this:  Did the operations commander
12 spend significant amounts of time at the
13 emergency -- what do you -- the EOC, the emergency
14 operations center?
15 A.   Yes, sir.
16 Q.   Okay.  So, I mean, I'm not saying you
17 would never go out, but you would be there with
18 the incident commander viewing and watching as --
19 you used a nice term for it, from a higher view?
20 A.   30,000 foot view.  Yes, typically
21 that's what the role is of the commander.  And as
22 the protests scaled down a little bit and as we
23 kind of got our sea legs under us in terms of our
24 emergency operations, we kind of resorted back to

1  that.
2  Q.    Okay.  So -- and then that -- given
3  that structure, the lieutenants and the sergeants
4  were doing a lot of the on-the-ground direction of
5  their officers as to implementing the tactics that
6  you and the incident commander were coming up
7  with?
8  A.    Yes, sir.
9  Q.    And that would include how to apply and
10  use and when to use less than lethal force?
11  A.    That's correct.
12  Q.    Now, as part of your job, I'll start
13  with you and what I mean by you as a commander and
14  as an operation commander on those occasions when
15  you filled that function, if you saw a use of
16  non-lethal force outside of policy, did -- were
17  you expected to report it?
18  A.    Absolutely.
19  Q.    Okay.  Is that also true of the
20  lieutenants and the sergeants?
21  A.    That is correct.  That's true of
22  everybody on the division of police.  If you see
23  somebody, I mean, out of policy, use of force,
24  then that's -- that's something that needs to be

1  addressed immediately.
2  Q.    Do you recall yourself at any time
3  during any of the protests that spring when you
4  were on duty functioning either as a commander of
5  your -- of the -- your patrol unit or functioning
6  as the operations commander or just a commander of
7  a -- at a particular location, did you ever report
8  any non-lethal use of force that you felt was
9  outside of policy or improper?
10  A.    No.
11  Q.    Okay.  To your knowledge, during any of
12  the days you were involved with supervision of any
13  personnel, policing or doing police work at the
14  demonstrations, do you remember any lieutenant or
15  sergeant -- I actually should say, do you know of
16  any lieutenant or sergeant who reported improper
17  or out of policy use of non-lethal force?
18  A.    No.
19  Q.    Just so I know for sure, if one of your
20  lieutenants observed improper, out of policy use
21  of force, would they report to you or are they
22  permitted to just report it to IAB or somebody
23  else?  What are they supposed to do?
24  A.    They could do either.  They should

1  report it to me and then I would ask them to write
2  a letter up, and then we would ship it over to
3  internal affairs to investigate.
4  Q.    If any -- to your knowledge, did any
5  patrol officer -- is that the right designation
6  for your -- the men and women who work under you?
7  A.    Yes, sir.
8  Q.    In your chain of command I mean?
9  A.    Yes.
10  Q.    Did any patrol officers report
11  observing an improper or out of policy use of
12  non-lethal force at any time during the
13  demonstrations?
14  A.    No, not that I -- not to my knowledge.
15  Q.    Okay.  Are you aware of any officer who
16  has been disciplined related to any alleged
17  inappropriate, out of policy conduct during the
18  demonstrations, as you sit here today?
19  A.    I think there was an officer, not my
20  chain of command, but there was an officer -- out
21  of one of the Baker Hostetler ones that they
22  reviewed that got out of policy.  I don't know
23  what the discipline was or where that is, if it's
24  been -- if it's been, you know, quote/unquote,

1  adjudicated yet or not, but, yeah, I do believe
2  there was one.
3  Q.    And actually that's what I was going to
4  question whether or not that -- you understood the
5  Baker & Hostetler findings were recommendations,
6  they weren't -- they didn't have the power to
7  administer discipline, right?
8  A.    That is correct, yes.
9  Q.    Okay.  And if you remember, is the one
10  you heard about a recommendation of some kind of
11  discipline or out of -- a finding of out of policy
12  conduct related to not doing a use of force
13  report?
14  A.    I believe so.
15  Q.    Okay.  But other than that, you're not
16  aware of anything that was either through Baker &
17  Hostetler or any other means resulting in an
18  actual discipline?
19  A.    Not to my recollection, no.
20  Q.    Okay.  Did -- do you -- were you the
21  operations manager on June 21st?
22  A.    I was.
23  Q.    Were you -- during that day, were you
24  primarily located in the EOC, the emergency

1 operations center, or were you spending most of
2 your time out in the streets?
3 A.     I was out on the street on June 21st.
4 Q.     Okay.  And -- and on that -- on that
5 occasion, what was your role?
6 A.     So my role officially was the
7 operations section chief.
8 Q.     Okay.
9 A.     The reason that I had gone out on the
10 street myself as opposed to staying in the
11 emergency operations center was because of all the
12 series of events that had happened that had
13 transpired between June 1st and June 21st, and the
14 changes that had been made to policies and
15 procedures.  And -- and just the tone of
16 everything that had happened, I felt that it was
17 important for me specifically personally to be out
18 on the street directing the events and our
19 response basically, because our officers had had
20 so much change and this back and forth and there
21 was a lot of policy changes, so to speak, or there
22 had been lots of talk publicly about policy
23 changes that I wanted them to have the confidence
24 that -- that their commander was out on the street

1 with them, and that any decisions that were being
2 made were being made by my authority and that --
3 and that I was, you know -- I wanted them to have
4 confidence that what I was telling them to do
5 was -- was what I wanted them to do and was within
6 policy, the new policy as it were.  So that's why
7 I was out on the street on that specific day.
8 Q.     And as I understand it, and I would
9 like you to tell me whether you -- I'm correct,
10 there was a policy change, both in written form
11 and in terms of understanding, as -- of, I mean,
12 understanding that the mayor and others had asked
13 for a policy change as of June 17th of 2020; is
14 that your recollection?
15 A.     That is correct.  I think it got
16 signed -- it got approved on June 17th, and I
17 think we disseminated it on the 18th.  So, yes, it
18 was a brand new what we called a rules of
19 engagement in terms of our -- I'm sorry, was that
20 me or --
21     (Mr. Marshall entered the deposition.)
22 Q.     No, that's another one of our counsel,
23 John Marshall has joined.
24 A.     So, yes, that was a new change.  I

1 think it got signed off on the 17th and enacted or
2 disseminated on the 18th.
3 Q.     Okay.  I would like you to take a look
4 at Exhibit 34, and Jeff's going to share that just
5 so you can eyeball it.  And do you know -- are you
6 sure about the date of its dissemination?  Because
7 I -- first of all, do you recognize -- can you see
8 this on the screen, Exhibit 34?
9 A.     Well, I -- roughly.  I'm working off my
10 phone, because we don't have cameras on our
11 desktops, so it's -- I can see it, but it's small.
12 But I'm not -- is that --
13 Q.     Is that better now?
14 A.     Yes, sir.  That is a division-wide
15 e-mail that went out the 16th.
16 Q.     Okay.
17 A.     So, yeah, it's -- obviously I could
18 have the dates mixed up between the 16th and the
19 18th.
20 Q.     Okay.  Why don't you just take one
21 minute and you tell Jeff when you need him to move
22 any part of it so you can read it.  And I just
23 want you to confirm for us that this document
24 reflects the policy changes that you have

1 testified to over the last few minutes.
2 A.     Jeff, could you scroll down, please?
3 Thank you.
4     Can you scroll down a little bit more,
5 please?
6     Can you scroll down again, please?
7 Q.     If it saves time, the second part of
8 this is not of concern to us.
9 A.     This is similar to, but it's not the
10 same e-mail I'm referring to.  The e-mail I
11 believe is on the 18th.  I believe it was sent out
12 by Deputy Chief Bash.  And it actually goes
13 specifics into the rules of engagement.  And that
14 where it talks about specific actions that
15 basically if they -- you know, if A happens, then
16 we can do B.
17     And it talks about the specific actions
18 of aggressive or non -- aggressive or violent or
19 turbulent protest groups or crowds.  So this is
20 like the general -- this is what we're doing to
21 the 2.04 policy.  And then on Friday, I think or
22 Thursday or whatever the 18th is, I think that's
23 when the more specific rules of engagement came
24 out.

1  Q.      Do you still have that e-mail of the
2  18th?
3  A.      I can check.
4  Q.      I'm sorry?
5  A.      Yeah, I can check.  And also the rules
6  of engagement starting, I think on that day got
7  added to the IAP, the daily IAP that emergency
8  management put out.
9  Q.      Can I ask you to provide Alana the
10  e-mail that you just talked about from the 18th as
11  soon as possible after this deposition ends?
12  A.      Sure.
13        MR. GITTES:  Alana, I would request
14  that you send it to us, okay?
15        MS. TANOURY:  Yep, that's fine.
16        MR. GITTES:  Okay.
17  Q.      All right.  So on the 21st, you --
18  going back to where we were before you looked at
19  the exhibit.  You were the operations commander,
20  but you also wanted to be out in the street in
21  light of the new policy and instructions to just
22  help your patrol officers and to be there to
23  assure them and help them?
24  A.      That's correct.

1  Q.      Okay.  Now, during the 21st, do you
2  recall yourself seeing any use of chemical weapons
3  that violated the new guidelines and instructions?
4  A.      No.
5  Q.      If you had, you would have reported it?
6  A.      Absolutely.
7  Q.      Same question regarding the use of
8  other non-lethal weapons such as the knee
9  knockers?
10  A.      I don't remember knee knockers being
11  used on the 21st.
12  Q.      Okay.  Fair enough.
13        By the way, I forgot to ask you before,
14  if you saw an officer using or shooting a knee
15  knocker where it was directed not toward the
16  ground, but to the body of the person, their torso
17  or head, is that something you would report?
18  A.      Absolutely.
19  Q.      Do you recall during the course of the
20  day on the 21st that there were many peaceful
21  protestors that you interacted with personally?
22  A.      I did, yes.
23  Q.      And as I understand it, you walked
24  around and talked to many protestors?

1  A.      That is correct.
2  Q.      You didn't just sit in a car, you
3  actually tried to make yourself available not only
4  to officers, but to protestors?
5  A.      It was important for me that I get the
6  right message with the right tone out.  I knew
7  that the decisions I was making would be viewed
8  upon and I probably would be sitting in a virtual
9  room like I am now talking about it, because of
10  all the -- the political dialogue that had gone
11  back and forth since -- you know, from June 1st
12  till then, the different back and forth with the
13  way the policy modifications were handled.
14        It's just -- it was a very tense
15  environment.  There was a lot going on nationally,
16  not just here, but everything was connected and
17  everything -- like I said, it was very important
18  for me to control the message and I wanted to
19  control the tone.  I wanted to make sure that I
20  was explaining every action we took to the
21  protestors, so I tried to talk to as many as
22  possible.
23        And so, yeah, I was out there --
24  initially I was out there maybe with one other

1  sergeant and it was the two of us talking to
2  everybody.  And then obviously as the crowd grew,
3  you know, there were more protestors and more
4  officers, so, you know, I couldn't be the only
5  officer that was talking, but, you know, I tried
6  to control the message as much as I could.
7  Q.      So, Commander, do you recall a number
8  of individuals who -- some of whom identified
9  themselves to you during your interactions as
10  protestors or leaders of the effort and others who
11  just talked to you about being concerned about the
12  increasing police presence during the time you
13  were out there?
14  A.      Yes.
15  Q.      Okay.  And do you recall them saying to
16  you that they were very concerned, because they
17  thought the increasing police presence would cause
18  problems?
19  A.      I do recall that, yes.
20  Q.      Okay.  And didn't they also talk to you
21  about -- wasn't -- wasn't that the 21st, the day
22  of the gay pride parade?
23  A.      It wasn't titled that, because
24  technically the -- the parade had been canceled,

1  but there was a protest scheduled for the 19th.
2  And our information was that that was going to be
3  the de facto parade.
4          So basically the protest happened at
5  the Statehouse, and there was a planned march
6  north on High Street to the Stonewall building in
7  the Short North, and then there was going to be a
8  little bit of a block party around the Stonewall
9  building in the Short North.
10         The plan for us was we would handle
11 the protests like we would anything else, you
12 know, peaceful protests, everybody's allowed --
13 they were on the Statehouse lawn. We had a very
14 low footprint because of that. Our bike crews
15 helped block traffic east and west on High Street
16 as the march proceeded north into the Short North.
17 Again, they tried to keep a very low profile.
18         After the march got to Stonewall and
19 the block party started, at that point, that's
20 when we moved over to the Statehouse so that we
21 didn't interfere with any of the protest
22 activities.
23 Q.     Okay. But you recall people asking
24 questions about the difference?

1  A.     Difference in terms of what?
2  Q.     In terms of the attention paid to one
3  versus the other?
4  A.     I don't -- I don't follow.
5  Q.     Okay. That's all right. Let me -- let
6  me keep pushing on here.
7          During your interactions that day, I
8  mean, you were walking around, right? You weren't
9  stationary?
10 A.     That's correct.
11 Q.     Okay. Didn't some individuals who were
12 demonstrators come up to you and report what they
13 said was violations that -- in at least one case
14 they personally had been sprayed with mace, in
15 another case reporting that officers had sprayed
16 groups of people. Do you recall them telling you
17 that?
18 A.     There were a couple instances where
19 people reported that.
20 Q.     And do you recall telling them that you
21 would get it -- you would investigate it and you
22 asked for their names?
23 A.     I do recall -- I do recall one incident
24 where I asked for a name.

1  Q.     Did you -- and do you recall saying you
2  would follow up with them?
3  A.     I don't.
4  Q.     Okay. Did you investigate it? Did you
5  do anything about it?
6  A.     Well, again, that was all part of the
7  stuff we shipped off to Baker Hostetler, so I
8  think, you know, it got -- the use of force
9  reports got forwarded to them from that incident.
10 Q.     Okay.
11 A.     There were a couple different things
12 that have come back my way that, you know, stemmed
13 from June 21st.
14 Q.     Well, I mean, did you write up your own
15 report and submit the name of the person who
16 complained?
17 A.     I did not.
18 Q.     Okay. Did you -- did you -- I may have
19 already asked, but -- and if I did, I apologize --
20 but did you observe -- after those individuals
21 spoke to you, did you observe any incidents of
22 misuse of a chemical weapons?
23 A.     I did not.
24 Q.     Do you recall telling one of the

1  individuals who spoke to you that -- that there
2  was a ban on tear gas, but mace was still allowed
3  to be used by officers?
4  A.     I don't recall that specific
5  conversation.
6  Q.     Is that something you were telling
7  officers or individuals that day?
8  A.     Yes. I mean, there is -- I mean, that
9  is correct. There was, quote/unquote, a ban on us
10 using CS. We are still allowed to carry mace and
11 use mace if appropriate and use within the policy
12 that was set forth on, you know, the -- that week
13 or, you know, before, whether it was the 16th or
14 the 18th or whatnot.
15 Q.     Weren't the individual -- the
16 individuals complaining to you about, among other
17 things, mace being used to force people to get off
18 the street?
19 A.     I don't recall the specific nature of
20 what they were saying, no.
21 Q.     Okay. But you were -- you were
22 alerting people that -- and I'm talking about
23 members of the public that mace was still
24 something that could be used?

1 A.        Mace is still something we can use.
2 Q.        Okay.  Now, you mentioned earlier that
3 you made reference to the fact that this was part
4 of -- these protests were part of a national
5 effort.  Do you recall that?  Did I understand you
6 correctly?
7 A.        Well, I didn't -- I did say this was
8 going on nationally, and that is correct.  There
9 were obviously multiple cities throughout the
10 nation that were all seeing very similar, similar
11 things.  And not just the message, but also the
12 tactics being used by different protestors.  And,
13 you know, to the point where we knew that the
14 protestors were trying to turn Broad and High or
15 High Street into a -- their own chop zone in
16 between State and Broad.
17        And I think you'll see that, you know,
18 if you watch -- I remember having numerous
19 conversations with people on the 21st where they
20 were saying, this is our street, you know, you
21 guys can't come here.  You know, we've been --
22 we've controlled this street for, you know, the
23 past month or the past week, you know, I don't
24 recall the exact time frame, but there was

1 numerous people that mentioned that.
2        So there was a concerted effort to turn
3 that into its own autonomous area, so to speak.
4 So, yeah, I mean, I think there were -- there were
5 things that we saw happening in different cities
6 that were also happening here.  And, you know, to
7 a lesser extent we're still seeing that.  I mean,
8 I think that, you know, what we see -- it's a
9 smaller world today than it was years ago.  You
10 know, we see similar messaging and similar tactics
11 from all kinds of protest groups, not just whether
12 they're left or right idealogically.  I think, you
13 know, there's -- you know, the Internet's made the
14 world small.  You know, what happens in Seattle or
15 D.C. happens in Columbus as well.
16 Q.        Okay.  Well, let's -- I would like to
17 focus your attention on some aspects of some of
18 the things we've heard in this case.  You -- you
19 knew a lot -- well, I don't want to say, "a lot,"
20 you knew individuals who were spokespeople or
21 active in Columbus -- local Columbus groups who
22 helped publicize the demonstrations and encouraged
23 people to come down and express their views to
24 protest, right?

1 A.        I knew -- I know more today than I knew
2 back on June 21st, but, yeah, I mean, I was
3 starting to become more familiar with -- with who
4 was more involved in a leadership role.  I think
5 June 21st it would be a little bit early for me to
6 say that I was -- I had kind of a grasp of the
7 who's who.  I think that I'm in a much better
8 place now in terms of having the context and the
9 resources to know all that.  But I was starting to
10 recognize faces and names back then, but it was
11 still very early.
12 Q.        But even by the 21st, you knew at least
13 some individuals who were involved in encouraging
14 people to protest, right?
15 A.        I had met some, yes.
16 Q.        Did you have any reason to believe they
17 were -- their goal was to cause violence, loot, or
18 do anything other than express their views that --
19 about racism, their belief in racism in the police
20 department and excessive force against people of
21 color?
22 A.        There are some people that were --
23 would be part of that crowd that, yes.  I did know
24 of information related to violence, the majority

1 of them that is not -- the majority of them would
2 be peaceful protestors who believed in the cause
3 and wanted to peacefully protest and speak up for
4 their rights.  But there was some individuals that
5 I did know that, you know, had more criminal
6 intentions.
7 Q.        Okay.  So -- so the department had
8 information about specific individuals, at least
9 some -- sounds like you're telling me sometime
10 very early in these demonstrations?
11 A.        Yes.  I don't know whether that was --
12 you know, what time -- the time frame was on when
13 we got certain information.  I think that we knew
14 very early on by that first weekend or the end of
15 the first weekend there were people that
16 were -- that had more criminal intentions than
17 just -- you know, that weren't members of BLM, but
18 that were looking to take advantage of the
19 situation to cause chaos.
20 Q.        What effort did the department take to
21 try to isolate those individuals or -- or if there
22 was evidence of some kind of a conspiracy to
23 protect the peaceful protestors from them?
24 A.        Well, I think that -- twofold.  One, we

1 formed a quasi task force of some detectives to
2 investigate, you know, one, the looting, but, two,
3 the -- you know, more of the criminal actions and
4 nature through our, you know, criminal
5 intelligence unit. So we formed that to kind of
6 look into all -- to try to isolate the criminals
7 and focus on their criminal behaviors as opposed
8 to, you know -- you know, their ancillary role
9 with the, you know, the protestors.
10       And then, two, once the daily protests
11 finally, you know, kind of stopped and we had a
12 chance to, you know, collect ourselves, that's
13 when we formed the police emergency response team
14 and we went through the training and we kind of
15 devised new tactics on how to -- to handle the
16 protests in a way that we could isolate and target
17 criminal violators without interfering with the
18 actual protestors.
19       So it was really a seed change in terms
20 of the old way of lining up on a skirmish line in
21 the street and, you know, clearing the street, so
22 to speak. We really had to kind of change -- do a
23 180 in terms of how we prepared and worked with --
24 and approached the protests. But that -- like I

1 said, we didn't get a chance to do that until I
2 think we started brainstorming for it in August
3 and September and started training in October.
4 Q.      Had there been previously such a plan?
5 I think it was called something like ACT, the
6 arrest something team?
7 A.      So in the early 2000s, ACT was a part
8 of our, I guess it would be a civil disorder
9 response. It was more geared towards campus,
10 because that's historically where we've had the
11 majority of our civil disorder. And they did, you
12 know, respond to campus situations or planned
13 block parties where it often turns, you know,
14 chaotic. And they had --
15 Q.      Commander, I'm going to apologize for
16 interrupting again, but because of the time
17 concerns, you don't have to go through all the
18 details. I just wanted to confirm that
19 there was a crowd control unit at one time?
20 A.      Right.
21 Q.      And, you know, obviously it sounds like
22 it's being -- it was discussed sometime later in
23 2020 again. I just want to -- but that old unit
24 was -- it was designed to do what you sort of

1 described a minute ago, right? To isolate
2 dangerous individuals so that peaceful protestors
3 aren't subjected to dispersal weapons?
4 A.      Right. There are definitely elements
5 of ACT that we incorporated into the PERT.
6 Q.      Okay. Hang on one second.
7       So going back to the 21st, did you --
8 did you observe or interact with some of the
9 street medics that were at the events? It doesn't
10 have to be the 21st. You were aware that there
11 were individuals who were street medics who had
12 training, some of whom were nurses, but others who
13 were not, had basic CPR and other kinds of
14 training to help people who might be affected or
15 injured in a protest?
16 A.      I am not aware of any training that any
17 of the street medics got, because they never would
18 identify themselves or talk to us about that.
19 There were numerous interactions I had with people
20 that claimed to be street medics during that
21 initial weekend and during the subsequent weeks.
22 I know that I did talk to a couple of the medics,
23 the street medics on the 21st when I first got
24 to -- like in front of the McKinley statue,

1 because they had bottles of water they were
2 passing out and things like that.
3       But no, no street medic ever told me
4 about any training that they ever had. And to the
5 contrary, there were several times during the
6 first weekend specifically where street medics
7 interfered with a lot of, you know, one us getting
8 real medics to the scene, caring for somebody that
9 had a rock thrown through their car window and was
10 bleeding. And the street medics basically said,
11 we'll pay you. They hushed them up and jumped in
12 the car with them and then they left leaving our
13 CFD medic right there waiting to care for the
14 person.
15       So, yeah, we actually had talked to the
16 city, the mayor's office about the problem with
17 the street medics and why, you know, we were so
18 upset with them in terms of, you know, we -- if
19 they would have given some kind of I.D. or said,
20 you know, hey, I'm a nurse at, you know, Grant and
21 I do this on my own time because I believe in the
22 cause, I think our response would have been much
23 different. But that's not the case, that was not
24 how any of them presented themselves to us.

1  Q.      Well, the specific incident you just
2  referenced where someone you referred to as a
3  street medic got in a car and drove away and
4  interfered with a paramedic taking care of
5  someone, when was that?
6  A.      Friday night the 29th of May, around
7  Russell and High.
8  Q.      And do you remember the time?
9  A.      Late night.  We -- yeah, it was --
10  Q.      During the wee hours of the morning or
11  more like 11:00 to 12:00?
12  A.      I -- I'm not sure, sir.
13  Q.      Okay.  Were you ever --
14  A.      I just --
15  Q.      I'm sorry.
16  A.      If we have the radio traffic, I aired
17  for a medic to -- because a protestor had thrown a
18  rock through a car window and it had hit and cut
19  the driver up.  And we were about a block -- we
20  were about a block away when it happened.  And
21  then as we came up on it, the street medics were
22  there.
23  Q.      Okay.  Did you see street medics
24  tending to people at any time during the

1  demonstrations, washing their faces, taking care
2  of cuts or other minor injuries?
3  A.      I saw people passing out waters.  A lot
4  of times they had an arm band on or a color of the
5  day, which, you know, we kind of -- again, we
6  didn't know that initially.  But after we had been
7  doing this for a couple of weeks, we realized that
8  there was, you know, a color of the day for the
9  protestors depending on their role, you know --
10  you know, within the organization or -- I use the
11  word, you know, organization loosely, but I think
12  you understand what I mean.
13  Q.      Yep.  What about legal observers, did
14  you talk to or interact with any legal observers?
15  A.      There were times where I saw them, I
16  don't know -- I can't remember if I specifically
17  talked to one that identified themselves as a
18  legal observer or not.  It's possible, but like
19  you said earlier, I talked to a lot of people, you
20  know, on that day specifically, so I'm not
21  positive if any of them identified themselves as
22  such.
23  Q.      And as I recall, you also, for a period
24  of time, kind of negotiated a deal with protestors

1  about getting out of the street?  I'm talking
2  about downtown on the 21st.
3  A.      Yeah.
4  Q.      Am I correct?
5  A.      Yeah.  We tried that a couple times,
6  you know, especially when people were talking
7  about, you know, I don't like seeing this many
8  officers here.  And I would say, if you get on the
9  sidewalk, you know, our officers will go back to
10  the car.  Or we'll pull out of this intersection,
11  if everybody stays on the sidewalk.  We had that
12  message as early as the 28th.
13      You know, we had a -- one of the
14  protest organizers, we invited him behind the
15  lines, got on the PA and told the crowd, everybody
16  can stay as long as they want as long as they stay
17  on the sidewalk and stop throwing things at -- you
18  know, rocks and stuff at the officers.
19      We -- you know, that's been something
20  that all of us have been trained on is to try to
21  find a common ground with, you know, protest
22  organizers from the get-go and, you know, try to,
23  you know, with -- do some kind of a combination
24  on, you know, a win/win kind of deal.  So that's

1  something we've always, you know, tried -- you
2  know, strived for.  And, you know, like I said, we
3  did it on the 28th, we did it on the 29th, and we
4  -- you know, I did it on the 21st.
5  Q.      Okay.  And you were able to get
6  their -- you know, not -- not for the whole time,
7  but you were able to get significant blocks of
8  time when they cooperated with you?
9  A.      Yes, sir.
10  Q.      Isn't it also true that you personally
11  observed many peaceful protestors yelling at other
12  people who would throw things and asking them to
13  stop?
14  A.      Absolutely.
15  Q.      Don't do that?
16  A.      Yeah.
17  Q.      Didn't you also see that in many
18  instances, the people who were throwing things did
19  it from the back of a crowd of other protestors
20  and like a bottle of water would land in front of
21  the protestors, you know, peaceful protestors in
22  front and -- and sometimes even hit the
23  protestors?
24  A.      Yeah, we saw that.  We saw smoke bombs.

1  We saw I think -- I want to say the first time I
2  saw it was the 30th where I saw a protestor behind
3  the lines throw a smoke bomb into the crowd, and
4  -- because they wanted the perception that it was
5  us throwing tear gas.  Yeah, so, I mean, I --
6  there were all kinds of different, you know,
7  tactics being used by people that were trying to
8  cause chaos.
9  Q.      And wouldn't you agree with me that --
10 well, I mean, I've heard it described by the mayor
11 and other police officials that clearly 90 plus
12 percent of the crowds for most of the days of
13 those demonstrations and during most of the hours
14 of those demonstrations were peaceful people?
15 A.      I would say that's fair.  I mean, I
16 think at different times it was higher than that,
17 and I think it was -- at different times it was a
18 little bit lower than that.
19        You know, I think that there was a high
20 percentage of people that legitimately wanted to
21 protest, you know -- you know, for their cause.
22 And I think that there were a couple times where
23 crowd contagion kind of played a role and maybe
24 decreased the amount, maybe got some people that,

1  you know, that normally wouldn't have thrown
2  something to throw something.
3        But for the most part, you're correct.
4  You know, the majority of the crowd was peaceful
5  and -- but there was a very highly motivated
6  percentage of the crowd that was not.
7  Q.      Do you -- did you have anything to
8  do -- I'm sorry.  Do you -- do you have
9  information or did you get information about
10 whether or not the vehicles that were coming in
11 for the demonstrations and were -- and being
12 parked by demonstrators were like overwhelmingly
13 all local licensed vehicles?
14 A.      For the most part, yes.  There were
15 times where we got information about people coming
16 into town, but for the most part, they were local.
17 There were people from other cities in Ohio, I
18 think.  You know, we definitely had a percentage
19 of people from Cleveland and Dayton and Cinci that
20 were, you know, in other parts that were coming in
21 for the protests.  And I think part of that is,
22 you know, we're the state capitol and it just kind
23 of was the hub, a little bit of that.
24 Q.      Did the department publish any kind of

1  a listing or a report about where -- you know,
2  about this -- about frankly how relatively few
3  cars or other types of vehicles were found to have
4  come from anywhere outside of Ohio and for the
5  most part outside of central Ohio?
6  A.      I don't know if -- I think after that
7  first weekend when we had I think the majority of
8  arrests happened Saturday, Sunday, but I think
9  there was a time period at which point the media
10 did a public records request about exactly what
11 you're talking about.  And I think the list of
12 names and ages and cities listed the -- not -- we
13 didn't give out street address, but I think cities
14 of residents were provided to the media, and I
15 think that got put out there.  I forget which
16 media outlet, but that seems familiar.
17 Q.      Do you know what it would -- what that
18 information would be called?  Was it like a
19 specific report?
20 A.      I do not.
21 Q.      Okay.
22 A.      My assumption is -- is just that it was
23 something that was compiled due to the public
24 records request.  We don't normally put together a

1  list of like that of, you know, everybody arrested
2  for certain charges on a certain day and their
3  hometown.
4  Q.      What -- what would you -- do you recall
5  being involved with a stop and arrest of a -- it
6  was actually a bus that was called Buttercup, do
7  you know what I'm talking about?  And became a
8  national item?
9  A.      Yeah, I don't think I was at work when
10 that happened.  I heard about it obviously.
11 Everybody heard about it.
12 Q.      Okay.  And that was described publicly
13 as, you know, outside agitators or had serious
14 weapons and it turned out that they were jugglers
15 and clown people, and it was actually a bus they
16 lived in and the hatchet was there because they
17 had a wood stove they used to heat it, you know
18 these details.  Did you learn these details?
19 A.      I -- sir, I -- however you want to
20 represent it is fine.
21 Q.      No, I'm just asking if you heard that.
22 Did you learn that from your officers?
23 A.      Well, the -- there's a stark difference
24 in how the officers are describing what was found

1  on that bus and how certain other people are
2  describing it. I've heard the -- this is
3  traveling musicians way of framing the story. I
4  guess I'll leave it at that.
5  Q.    Was it your patrol officers who stopped
6  the bus?
7  A.    I have no -- I have no idea.
8  Q.    Okay. So I -- so, you know, whenever
9  it happened, you don't recall you being informed
10  of it and you haven't seen the actual footage of
11  the stop and where it was and why it happened?
12  A.    No, sir.
13  Q.    Okay. Fair enough.
14      Do you -- are you aware of any police
15  officer of any rank, other than Lieutenant
16  McFadden, during your years -- do you know who
17  Lieutenant McFadden is?
18  A.    Yes.
19  Q.    Okay. Other than Lieutenant McFadden,
20  are you aware of any black officer that has ever
21  been discharged -- I'm sorry, charged,
22  departmentally charged for discriminating against
23  black officers? I'm sorry, yeah, discriminating
24  against any officer because of race? I said that

1  wrong. So let me say it again to make it clear.
2      Do you know of any other officer who
3  was departmentally charged for discrimination,
4  other than Lieutenant McFadden?
5  A.    I thought Eric Moore was, but I --
6  Q.    And I can represent to you, because
7  we're -- we were involved with the case, he was
8  not departmentally charged for that.
9  A.    Okay. Then no.
10  Q.    Do you know of any officer who has
11  reported discrimination of another officer since
12  you've been working at the Columbus Police
13  Department?
14  A.    Yeah, I think we've had EEO complaints
15  before of -- that have been investigated through
16  internal affairs.
17  Q.    Oh, you have? Do you remember any
18  specific officer who reported discrimination?
19  A.    I mean, I think that would be something
20  that would be more appropriate through the EEO
21  office. I don't know if that's something that I
22  disclose. Yeah, I mean, that's something --
23  Q.    That's okay. I'm just asking you if
24  you remembered. I asked you earlier if you knew

1  of any officer who had been departmentally
2  charged. I'm just trying to find out if you
3  actually know of a specific officer who's ever
4  reported that they -- that another officer, not
5  them, not the person making the report,
6  discriminated against another officer?
7  A.    Oh, like a third party?
8  Q.    Yes. Right.
9  A.    Okay. I'm sorry. Offhand, no, I
10  don't.
11  Q.    Okay. I'm sorry if I didn't make that
12  clear.
13      Do you believe that racism exists
14  within the police department?
15  A.    Sure. Racism exists within the United
16  States of America, within the world, and it's
17  certainly going to -- you represent it in every
18  organization or agency or whatever.
19  Q.    Did you read the Matrix report?
20  A.    I did.
21  Q.    Okay. What was your reaction to the
22  percentage -- you know, that part of the report
23  was a survey of -- a confidential survey of
24  officers and staff, and according to the report,

1  almost one out of four officers indicated they had
2  observed -- they had observed discrimination, but
3  didn't report it?
4  A.    Yeah, I read the report. And I found
5  the survey findings as sad and obviously as a call
6  to action that we have work to do.
7      MR. GITTES: Give me a pause here. I
8  think I can -- I'm trying to find -- to wind this
9  up. Actually, can we take another short break? I
10  think I might be able to be finished within a
11  couple questions.
12      MS. TANOURY: Yep, that will be fine.
13  I'm guessing I should probably let Officer Johnson
14  know he's going to be briefly delayed.
15      MR. GITTES: Yeah, it should be
16  briefly, though, and John's on the line so he can
17  jump right into that.
18      MR. GITTES: Thanks, Commander, I'll be
19  right back.
20      (A recess is taken.)
21  Q.    Okay. I just really have very few
22  questions.
23      After the 21st, were you contacted by
24  anybody in the division or the mayor's office,

1 city council about complaints they had gotten
2 about the use of non-lethal devices, of weapons,
3 on the 21st or --
4 A.    So, yes, sir.  So Monday morning, the
5 20th or the 22nd, sorry, I was summoned to city
6 hall.  And so I went over with Deputy Chief Woods,
7 and I was in a meeting with Mayor Ginther and
8 Council President Hardin and then a couple members
9 of Mayor Ginther's staff.
10 Q.    And what happened?
11 A.    So they -- they asked about what
12 happened, basically long story short, and I
13 explained all my reasons.  Same reasoning I
14 provided to every person I talked to out on the
15 street, you know, for, you know, why we did what
16 we did.  I talked to them about the lead-up in
17 terms of the escalation of basically disturbances
18 and what became violent behavior that was
19 happening on High Street between Broad and State
20 on a nightly basis, including shots fired,
21 bonfires in the middle of the street, cars being
22 surrounded, COTA buses being forced to turn
23 around.  So I went into all that.
24         And then I talked about the rules of

1 engagement that had been approved and signed, and
2 that included the trapping of unocc -- or
3 occupied -- uninvolved motor vehicles.  And then I
4 talked about specifically with Council President
5 Hardin, because I knew obviously, you know, that
6 he had had a -- you know, he had been exposed to
7 mace on the 30th, you know, at the protests
8 downtown.
9         I talked about, you know, our -- what
10 our reasonable response would be.  And so we
11 talked about, you know, the use of a chemical
12 irritant as opposed to going hands on or using a
13 baton or using other methods of force and how we
14 felt that the chemical irritant was the most
15 reasonable and did less harm.  And so we discussed
16 that and -- and that was about it.
17 Q.    That brought to mind one other question
18 I had.  Do you recall that on the 21st, may have
19 happened other times, but I'm just asking about
20 the 21st, people were asking you -- when I say,
21 "people," protestors who you talked to were asking
22 you about why -- why the spraying was happening
23 and why there was an emphasis of getting people
24 off the street?  You know, you were -- you

1 discussed making a deal about if they stay off,
2 you could reduce the officers.  And you told them
3 that one of the main reasons that weeded people
4 off the streets was because of traffic.  Do you
5 recall that?
6         (Mr. Steinberg and Mr. Schlein joined
7 the deposition.)
8 A.    I don't recall specifically saying just
9 traffic.  I think I tried to stay on message
10 throughout the day that -- I mean, that obviously
11 is a consideration, right?  I mean --
12 Q.    Yeah, I just want to ask about that
13 aspect.  I'm not saying it's the only thing you
14 said.
15 A.    Yeah.  I -- I can imagine that that
16 would be one of a handful of reasons that I
17 would -- I would talk about, yes.
18 Q.    Is there some reason that you didn't
19 request that traffic be diverted on that Sunday?
20 A.    So as a general rule, you know, we have
21 a decision to make every time that we're dealing
22 with these protests.  The decision is, do we
23 divert traffic right away and block off the street
24 on the chance that they do take the street, or do

1 we try to keep traffic flowing?  And the -- the
2 general rule -- you know, the general train of
3 thought is is that traffic flow helps because it
4 tends to keep people on the sidewalk or on that
5 private property, you know, for instance, in this
6 case on the Statehouse lawn.
7         And so we try to keep traffic flowing
8 as long as possible.  So that is the reason why
9 initially I didn't block off traffic right away.
10 Obviously once the street became closed, once
11 Broad and High got taken and, you know, I got
12 surrounded and some of my other officers did, too,
13 at that point, the cat's out of the bag, traffic's
14 not flowing anyway.  So at that point we call, you
15 know, hey, have cruisers divert traffic here, tell
16 COTA that High Street is not passable right now.
17 But as a general rule, it's better to have traffic
18 flow than not.
19 Q.    How long does it -- once you make the
20 decision that, hey, look what's -- what has
21 happened here has made, you know -- I mean,
22 sometimes fixing the problem with people in the
23 street effectively means you have police
24 interfering with traffic because you have a lot of

1 your officers in the street. So how long does it
2 take you once you do decide that, hey, we need to
3 divert traffic? How long does it take you to do
4 it? I'm talking about the downtown, I'm not
5 talking about anything else.
6 A.        Minutes. You know, I think now it's
7 gotten a lot quicker, because we've -- in addition
8 to setting up PERT, we've also devised basically a
9 traffic control for marches and downtown. We have
10 that -- a traffic plan downtown now where we could
11 have units that are basically staged at their
12 intersections.
13        And as soon as we say, all right, let's
14 implement the traffic plan, we're -- we're
15 blocking off the street within seconds. But at
16 that time, we still hadn't really fully developed
17 that. It probably took minutes.
18 Q.        Okay. Let me quickly do the last
19 couple of questions. You mentioned that there was
20 a -- I don't remember if you said when, but there
21 was an occasion when somebody, a protestor who
22 clearly wasn't there just to protest, threw a
23 smoke bomb or was it a tear gas grenade into a
24 crowd of protestors?

1 A.        I don't think it was tear gas. I think
2 it was a smoke bomb. Because we subsequently have
3 arrested people that had smoke bombs in their
4 backpacks. And it tends to -- you know, the
5 anarchists, you know, kind of I think looking for
6 chaos. I don't think that they were members of
7 BLM or, you know, any of the related protest
8 organizations. I think it was people that were
9 there to cause chaos.
10        But so, yeah, we have subsequently
11 found smoke bombs on individuals before, but, yes,
12 there was one incident where I thought I saw a
13 person throw -- and it went off like a smoke bomb,
14 and it obviously was not tear gas, so it caused
15 people to run. And I did see that on the 30th.
16 Q.        What day was it, the 30th? Did you
17 just say the 30th?
18 A.        Yes.
19 Q.        Okay. That -- I just kind of wanted to
20 ask you what day it was where -- were any of your
21 officers able to catch that person?
22 A.        No.
23 Q.        Okay. You wouldn't happen to know
24 whether it's -- where it happened?

1 A.        I think it was when we were on Broad.
2 If I remember correctly, we were on Broad east of
3 High Street, and it was further towards Third
4 Street, so we were a good distance away from where
5 it looked like it happened. But that's the
6 general area where I -- you know, I'm pretty
7 sure -- that's what I saw.
8 Q.        Okay.
9 A.        And, well, I know I saw somebody throw
10 something and smoke go off and, you know, it
11 wasn't -- you know, when we got up there, there
12 was no tear gas that had been deployed right there
13 at that time.
14 Q.        And what time -- what time was it,
15 morning, afternoon?
16 A.        Late afternoon. I think if I remember
17 right, I came in mid to late afternoon on
18 Saturday, and by the time I got my initial -- I
19 initially went up to 670 and Goodale, and by the
20 time I got back to Broad and High, late afternoon,
21 early evening, it was still light out.
22 Q.        Does the CPD use or have smoke
23 grenades?
24 A.        We do.

1 Q.        Okay. Were any of those being used
2 during the protests?
3 A.        I did not authorize the use of any
4 smoke grenades. And I don't know of any that had
5 been used. It's -- the thing about the smoke
6 grenades, it's -- it's like calling -- it's like
7 bluffing somebody, so you really can only use them
8 once kind of thing. There are times where it's
9 been trained I think with -- you know, with the
10 use of, you know, especially when you have the
11 horses in play, too, but we did not have the
12 horses in play on that day, and -- at least where
13 I was at. So, no, I did not use or authorize the
14 use of any smoke grenades at that time.
15 Q.        Do you -- do personnel have them -- did
16 they have them during the demonstrations, even if
17 it was a specialty unit, you know, like horses,
18 bicycle officers, SWAT?
19 A.        SWAT probably would have, our
20 grenadiers probably would have and -- but the
21 grenadiers would have only, you know, used them
22 upon direction by a lieutenant or a commander.
23 Q.        Okay. Although like with all -- I
24 should -- I'm asking, like with all non-lethal

1  crowd control weapons or devices, do the officers
2  have some individual discretion if they feel they
3  need to use it and don't want to necessarily use
4  tear gas?
5  A.        Typically that is not treated the same
6  as somebody pulling out their belt mace or Mark 9.
7  If they're shooting a grenade from a canister,
8  that's supposed to be at the direction of a
9  lieutenant or higher.  I suppose that there are
10  scenarios where we would hypothesize and say if
11  this happened, would it be okay if an officer did
12  this?  We probably could come up with some
13  scenarios, you know, where it would be.  But as a
14  general rule for policy, that stuff is directed by
15  a lieutenant or higher.
16  Q.        With one other question, and I think
17  this will be the last one I have.  When did you
18  first become aware that the -- the mayor and city
19  council were not -- they wanted changes in the
20  crowd control tactics?
21  A.        I think we started hearing that, you
22  know, shortly after the morning of the 30th when,
23  you know, there was the incident downtown with
24  Representative Beatty and City Council President

1  Hardin and Commissioner Boyce.  I think that, you
2  know, that was the first time specifically where
3  we started hearing rumors that there was going to
4  be, you know -- you know, some back and forth on
5  that or some new direction.
6  Q.        Do you professionally and personally
7  agree with the instructions that came from the
8  administration?
9  A.        I would say professionally I think it's
10  a tool that works in very limited circumstances.
11  I'm not a fan personally of using it, but I've
12  seen through my experience that there are
13  circumstances where there is a need to clear a
14  large amount of people in a small amount of time,
15  and it is an effective tool, so...
16  Q.        So you -- I'm sorry.  Don't mean to cut
17  you off.
18  A.        But, you know, like I said, so -- but
19  the direction from city hall and from the chief is
20  that we won't use it, so we're not using it.
21  Q.        And that was what you instructed your
22  officers, and you were there personally to try to
23  make sure that new policy was followed?
24  A.        Yes.  In terms of going back to the

1  21st?
2  Q.        Yeah, the 21st, you know, the days
3  after the policy change occurred.
4  A.        Yes.  Like I said, I felt that with
5  everything that had transpired in those -- like I
6  said, those first three weeks of June and the back
7  and forth and the uncertainty, that on the 21st
8  specifically it was very important that I be out
9  for both the public and for my officers to control
10  the message to ensure that the right tone was
11  being taken, yes, so that's correct.
12       MR. GITTES:  Unless you have anything
13  you feel you want to correct or add, those are all
14  the questions I have.
15       THE WITNESS:  Okay.  Thank you, sir.
16       MR. GITTES:  Hang on, I'm getting
17  buzzed, maybe they're -- okay.  Never mind.
18       I would request that -- we're going to
19  order this and I would request, Commander, that
20  you read it and sign.
21       THE WITNESS:  Yes, sir.
22       MR. GITTES:  All righty.  Thanks for
23  your patience.
24       MS. TANOURY:  We'll have a copy.

1       (Signature not waived.)
2       - - - - -
3       Thereupon, the foregoing proceedings
4  concluded at 12:44 p.m.
5       - - - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1  State of Ohio      :        C E R T I F I C A T E
   County of Franklin: SS

2

3      I, Mary Bradley, RPR, CRR, a Notary Public in
   and for the State of Ohio, certify that Smith Weir
   was by me duly sworn to testify to the whole truth

4  in the cause aforesaid; testimony then given was
   reduced to stenotype in the presence of said

5  witness, afterwards transcribed by me; the
   foregoing is a true record of the testimony so

6  given; and this deposition was taken at the time
   and place specified on the title page.

7

       Pursuant to Rule 30(e) of the Federal Rules of

8  Civil Procedure, the witness and/or the parties
   have not waived review of the deposition

9  transcript.

10     I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,

11 and further I am not a relative or employee of any
   attorney or counsel employed by the parties hereto,

12 or financially interested in the action.

13     IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Columbus, Ohio, on

14 February 23, 2021.

15

16

17

18

19

20 _____
   Mary Bradley, Notary Public - State of Ohio

21 My commission expires September 19, 2024.

22

23

24

       Witness Errata and Signature Sheet
         Correction or Change Reason Code
    1-Misspelling  2-Word Omitted  3-Wrong Word
      4-Clarification  5-Other (Please explain)

Page/Line      Correction or Change      Reason Code
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____

I, Smith Weir, have read the entire transcript of
my deposition taken in this matter, or the same
has been read to me.  I request that the changes
noted on my errata sheet(s) be entered into the
record for the reasons indicated.

Date_____Signature_____
The witness has failed to sign the deposition
within the time allowed.
Date_____Signature_____

Ref: Mb301487sw  S-mb P-bw

**Exhibits**

**301487 Exhibit 03**
**4** 4:5 76:4,8

---

**1**

**11** 13:10
**11:00** 38:1 56:6 94:11
**12** 13:10 42:12
**12-hour** 67:16
**1250** 16:23
**12:00** 38:1 59:5 94:11
**12:30** 59:3,6
**12:44** 117:4
**15** 14:7 43:7
**16th** 76:15,18 85:13
**17th** 75:13,16 76:1
**18** 58:3
**180** 90:23
**18th** 75:17 76:2, 19 77:11,22 78:2, 10 85:14
**19** 58:3
**1999** 6:17
**19th** 82:1
**1st** 67:13 74:13 80:11

---

**2**

**2.04** 77:21
**20** 52:2
**2000s** 91:7
**2011** 8:4
**2012** 8:4
**2015** 45:8
**2020** 7:15,16 10:4 13:2,8 75:13 91:23
**20th** 106:5
**21st** 73:21 74:3, 13 78:17 79:1,11, 20 81:21 84:13 86:19 88:2,5,12 92:7,10,23 96:2 97:4 105:23 106:3 107:18,20 116:1,2,7
**22nd** 106:5
**24th** 7:14
**27th** 13:8
**28th** 14:16 16:9 26:9,23 33:14,20 48:12,17 52:8 54:5 57:22 60:8, 16 61:3,16,19 62:11 64:11

66:16 96:12 97:3
**29th** 58:1 64:11, 17,20 65:6,19 66:24 94:6 97:3
**2:00** 59:14

---

**3**

**30,000** 61:1 69:20
**30th** 58:2 64:11 65:19 67:22 98:2 107:7 111:15,16, 17 114:22
**31st** 7:16,17 64:11 65:20,21
**34** 76:4,8
**3:00** 27:4,6 68:1,2 69:1

---

**4**

**4:00** 27:6 68:1,2 69:1

---

**5**

**50** 38:24
**5:00** 18:17

---

**6**

**670** 21:22 68:12 112:19
**6:00** 18:18 22:1

---

**7**

**70** 20:1,21
**71** 21:22
**750** 16:16

---

**8**

**8:00** 27:1 30:9
**8:00ish** 36:23
**8:45** 37:14
**8:52** 38:9

---

**9**

**9** 114:6
**90** 98:11
**99** 7:6
**9:00** 30:9,11 37:14 38:13
**9:00ish** 63:2
**9s** 34:15,16,24

---

**A**

**a.m.** 27:1,4
**ability** 12:12,16

**absent** 49:14,22
**Absolutely** 9:6 70:18 79:6,18 97:14
**accident** 8:13 21:8
**accidentally** 46:11
**accommodation** 19:19
**accomplish** 28:20
**accomplished** 28:22
**accurate** 52:1 60:15
**accurately** 12:12, 17,20
**ACT** 91:5,7 92:5
**acting** 7:15
**action** 17:8 41:17 80:20 105:6
**actions** 39:21 77:14,17 90:3
**active** 61:24 87:21
**activities** 24:3 64:21 68:6 82:22
**activity** 41:16
**actual** 20:21 52:10 73:18 90:18 102:10
**adapt** 64:2
**add** 116:13
**added** 78:7
**addition** 64:21 66:13 110:7
**additional** 14:17
**address** 100:13
**addressed** 71:1
**adjudicated** 73:1
**administer** 73:7
**administration** 5:6 115:8
**advanced** 50:17
**advantage** 89:18
**affairs** 16:15 17:1, 7 21:3,5,8,19 22:14 28:3 40:16 72:3 103:16
**affect** 12:12,16 46:13 57:19
**affected** 92:14
**afternoon** 17:22 67:24 68:4,6,8 69:1 112:15,16, 17,20
**agency** 104:18
**ages** 100:12
**aggressive** 77:18
**agitators** 101:13
**agree** 5:13,18 9:1 38:11 98:9 115:7

**ahead** 37:4 64:9
**aide** 23:18
**aim** 46:19,24
**aiming** 47:10,13 48:8
**air** 57:4
**aired** 94:16
**Alana** 5:16 58:19 78:9,13
**alerting** 85:22
**alleged** 72:16
**allowed** 11:2 82:12 85:2,10
**allowing** 58:23
**amenable** 19:7
**America** 104:16
**amid** 38:18
**ammo** 50:3
**ammunition** 44:19
**amount** 98:24 115:14
**amounts** 69:12
**anarchists** 111:5
**ancillary** 90:8
**and/or** 57:11
**answers** 50:9
**Anti-racist** 17:8
**anticipate** 58:20
**apologize** 68:17 84:19 91:15
**appeared** 15:23
**apply** 70:9
**approached** 90:24
**approved** 75:16 107:1
**ARA** 17:8 21:16 23:12 25:2,18 28:2
**area** 23:20 24:11 27:13,16 30:16, 19 38:20 39:4 48:23 49:4 53:8, 13 54:11 56:3 68:13 87:3 112:6
**areas** 40:5
**arm** 47:15 95:4
**arrest** 35:24 91:6 101:5
**arrested** 25:10 101:1 111:3
**arrestee** 14:6
**arrests** 100:8
**arrived** 36:22 37:20
**articulated** 69:4
**aspect** 108:13
**aspects** 87:17

**assault** 14:3
**assets** 20:18
**assigned** 6:17 40:19
**assignment** 6:18 33:20 60:14 66:6 68:9
**assist** 16:19
**assume** 7:3 9:24 32:6
**assumption** 100:22
**assure** 78:23
**attached** 21:7
**attempted** 55:23
**attendance** 17:3
**attention** 39:5 83:2 87:17
**audible** 51:1
**August** 91:2
**authority** 62:3 75:2
**authorize** 113:3, 13
**autonomous** 87:3
**avenue** 13:14 49:8
**aware** 14:4 38:17 72:15 73:16 92:10,16 102:14, 20 114:18
**awhile** 8:5 10:6

---

**B**

**back** 17:19 19:5, 17 23:7,11,23,24 24:2,5 33:4 36:1 48:12 49:17 60:8, 22 69:24 74:20 78:18 80:11,12 84:12 88:2,10 92:7 96:9 97:19 105:19 112:20 115:4,24 116:6
**background** 11:15 68:18
**backpacks** 111:4
**bag** 109:13
**Baker** 23:18 39:19,22 41:2 72:21 73:5,16 84:7
**ban** 85:2,9
**band** 95:4
**bank** 57:11
**based** 37:12 45:21 46:5,17
**Bash** 77:12
**basic** 92:13
**basically** 11:3 13:18 18:1 22:23 34:2 40:12 45:19 52:15 54:19

57:12 63:17
67:14 74:19
77:15 82:4 93:10
106:12,17 110:8,
11

**basis** 106:20
**baton** 42:17 44:17
46:8 107:13
**Beatty** 114:24
**begin** 6:9
**behalf** 5:9
**behavior** 42:1
106:18
**behaviors** 90:7
**belief** 88:19
**believed** 89:2
**belt** 114:6
**bicycle** 113:18
**big** 28:24
**biggest** 29:4
**bike** 16:18 17:24
20:15,16 82:14
**bit** 7:10 22:2
25:15 31:10 55:7
56:4 58:23 59:10
61:16 69:22 77:4
82:8 88:5 98:18
99:23
**black** 56:17
102:20,23
**bleeding** 93:10
**blinds** 9:4
**BLM** 89:17 111:7
**block** 18:5 20:22
22:5 28:11,12
82:8,15,19 91:13
94:19,20 108:23
109:9
**blocked** 22:6
**blocking** 50:22
110:15
**blocks** 97:7
**bluffing** 113:7
**body** 14:1 31:3
33:3,14 47:14
51:19 79:16
**bomb** 98:3 110:23
111:2,13
**bombs** 97:24
111:3,11
**bonfires** 106:21
**booth** 57:1
**border** 13:10
**bottle** 97:20
**bottles** 51:3 55:2
63:5 93:1
**bottom** 40:21
**bounce** 45:23
46:8 47:8 50:3
**bouncing** 23:11
**Boyce** 115:1

**brainstorming**
91:2
**brand** 75:18
**break** 10:18 55:23
56:24 58:14 59:1
105:9
**breakout** 58:14
**bricks** 53:6
**briefed** 68:5
**briefly** 60:7
105:14,16
**bringing** 66:4
**brings** 44:22
**Broad** 23:13,15
24:23 25:23 30:2,
15,23,24 31:1,12
35:6,10 37:11
40:17 49:5 50:20,
21 51:22 54:16
62:14 64:23 65:3,
7 86:14,16
106:19 109:11
112:1,2,20
**Broad/high** 30:16
**broader** 60:6
**broke** 30:21 36:7
51:13
**brought** 107:17
**building** 16:16
17:2 21:3,5,7,11,
20 54:9 57:12
82:6,9
**bunch** 68:16
**bureau** 22:10
**bursts** 43:8
**bus** 51:4,8,21
52:4,22 56:12
101:6,15 102:1,6
**buses** 106:22
**business** 57:13
**businesses** 21:10
55:18
**busy** 33:6
**Buttercup** 101:6
**buzzed** 116:17

---

**C**

**call** 18:2 21:18
28:21 45:3 57:5
59:12 105:5
109:14
**called** 13:12
14:20 17:7 18:10,
12 19:23 22:10
34:13 44:17 45:5
66:19 75:18 91:5
100:18 101:6
**calling** 56:19,20
113:6
**calls** 24:24
**cam** 31:3 33:3,14
51:19
**camera** 18:3,4,8

**camera-wise** 18:5
**cameras** 76:10
**camp** 53:19
**campus** 91:9,12
**canceled** 81:24
**canister** 114:7
**Cap** 51:11
**capitol** 54:9 99:22
**car** 13:18 80:2
93:9,12 94:3,18
96:10
**care** 93:13 94:4
95:1
**careful** 27:23
**caring** 93:8
**carried** 66:21
**carry** 61:14 85:10
**cars** 28:14 100:3
106:21
**case** 5:11 6:5 8:7,
8,13 15:12,17
46:7 52:7 83:13,
15 87:18 93:23
103:7 109:6
**cases** 7:8
**cat's** 109:13
**catch** 38:23
111:21
**catching** 57:2
**caused** 111:14
**cautious** 11:22
**center** 60:24
68:14 69:14 74:1,
11
**central** 100:5
**ceremony** 7:14
**CFD** 57:5 93:13
**chain** 32:15 72:8,
20
**chance** 60:2
90:12 91:1
108:24
**change** 46:16
74:20 75:10,13,
24 90:19,22
116:3
**chaos** 89:19 98:8
111:6,9
**chaotic** 43:20
91:14
**charge** 64:14,19
65:5
**charged** 11:23
15:11 64:19
102:21,22 103:3,
8 104:2
**charges** 101:2
**chasing** 55:17
**check** 11:3 78:3,5
**checked** 38:7
**chemical** 34:8
41:9,24 42:5 43:9

79:2 84:22
107:11,14

**chest** 47:15
**chief** 23:16,17
25:23 26:10,11,
15,17,21 33:18,
22 39:2 60:23
61:9 63:7 64:13,
14 67:9,13,14,20
68:14,21 74:7
77:12 106:6
115:19
**chitchat** 6:7
**chop** 86:15
**Christopher**
14:15 15:6,8 16:1
**Cinci** 99:19
**circumstances**
42:9,24 43:13
46:17,19 49:9
50:12 62:4 66:9
69:3 115:10,13
**cities** 86:9 87:5
99:17 100:12,13
**citizen** 14:6
**city** 6:15,16 32:4,
7,16 93:16 106:1,
5 114:18,24
115:19
**civil** 32:10 33:23
45:8 91:8,11
**claimed** 92:20
**clear** 29:10 48:2
65:9 103:1
104:12 115:13
**clearing** 90:21
**Cleveland** 99:19
**clicked** 25:6
**close** 20:2 21:21
28:9 38:13
**closed** 109:10
**closer** 30:11
37:14
**closure** 20:8
**closures** 20:3,11
**clown** 101:15
**co-counsel** 5:12
**coffee** 21:11
**colleague** 38:7
**collect** 90:12
**college** 12:4
**color** 88:21 95:4,8
**Columbus** 6:16,
17 17:8 25:2
87:15,21 103:12
**combination**
53:18 96:23
**comfortable** 7:23
**command** 26:19
32:15 34:3 60:9
72:8,20
**commander** 6:3,
19,20,21 7:12,13,

15 10:5 16:7
26:8,12,13,14
33:19 48:1 51:17
59:24 60:11,23
61:1,10 64:15,18
65:4,15,16,19
66:2,13,17 67:6,
15,16,19 69:11,
18,21 70:6,13,14
71:4,6 74:24
78:19 81:7 91:15
105:18 113:22
116:19
**commanders**
26:16 61:3 64:19
66:4,19
**Commissioner**
115:1
**common** 96:21
**communicating**
17:19
**communications**
16:23
**community** 14:10
16:18 18:3 22:21
**compiled** 100:23
**complained** 84:16
**complaining**
85:16
**complaints**
103:14 106:1
**completely** 37:11
**complicated** 30:4
**compromise**
19:20
**computer** 11:3
**concern** 19:24
21:24 28:24 77:8
**concerned** 11:7
20:2 81:11,16
**concerns** 19:10
91:17
**concerted** 87:2
**concession** 19:1
**concluded** 117:4
**conduct** 12:5
49:14 72:17
73:12
**conference** 59:12
**confidence** 74:23
75:4
**confidential**
104:23
**confirm** 76:23
91:18
**confused** 14:19
**confusing** 23:10
**connected** 80:16
**consideration**
108:11
**considered** 47:7
**consisting** 41:22
**conspiracy** 89:22

constituted 49:14,24

construction 20:11

contact 17:18 28:24

contacted 105:23

contagion 98:23

contained 14:23

context 21:4 25:14 88:8

contingent 52:21

continued 24:1

continuous 53:20

contrary 93:5

control 21:15 41:6 80:18,19 81:6 91:19 110:9 114:1,20 116:9

controlled 86:22

convention 68:13

conversation 85:5

conversations 63:9,10 64:4 86:19

cooperated 97:8

copy 31:16 32:2, 14 116:24

corner 15:24 16:4 21:5 35:10 51:21

correct 13:6 16:12 26:8 27:21 65:17 66:14 70:11,21 73:8 75:9,15 78:24 80:1 83:10 85:9 86:8 96:4 99:3 116:11,13

correctly 16:11 86:6 112:2

COTA 56:13 106:22 109:16

council 106:1,8 107:4 114:19,24

counsel 5:1,11 75:22

count 52:10

counts 20:10

couple 11:11 21:10,11 25:5 33:6 43:20 62:20 66:19 83:18 84:11 92:22 95:7 96:5 98:22 105:11 106:8 110:19

Court 8:20 59:13

cover 58:10

CPD 112:22

CPR 92:13

crews 16:18 82:14

crime 11:23 18:3

criminal 89:5,16 90:3,4,7,17

criminals 90:6

criticism 33:11

CROSS-EXAMINATION 6:1

crosswalk 35:19

crowd 19:16 35:16 38:18 40:18 41:6,24 46:7 53:9 62:23 81:2 88:23 91:19 96:15 97:19 98:3, 23 99:4,6 110:24 114:1,20

crowds 55:17 77:19 98:12

CRT 17:24

cruiser 23:13 63:15,21,22

cruisers 20:20 109:15

CS 85:10

curb 46:12

curiosity 8:22

current 6:14,18

cut 94:18 115:16

cuts 95:2

CVS 57:11

**D**

D.C. 87:15

daily 78:7 90:10

damage 51:21 52:3 54:12 55:8, 14

damaged 53:5

damaging 52:22

dangerous 92:2

dark 24:15 30:10 36:24 37:1,11 38:12 48:17

date 7:17 76:6

dates 76:18

day 16:9,17 27:4 31:21 36:4 38:8 57:24 58:3,17 60:4,9 61:2 67:10 73:23 75:7 78:6 79:20 81:21 83:7 85:7 95:5,8,20 101:2 108:10 111:16,20 113:12

days 43:20 53:11 57:20 60:10 71:12 98:12 116:2

Dayton 99:19

de 82:3

de-escalate 23:3, 4

dead 18:21

deadly 20:4 47:1, 7

deal 95:24 96:24 108:1

dealing 25:15 41:5,15 43:2 108:21

death 14:14

December 6:17 7:16,17

decide 110:2

decided 16:22

decision 61:22 62:6,10 108:21, 22 109:20

decisions 60:11 61:20 62:1 65:10 75:1 80:7

declined 56:4

decreased 98:24

dedicated 21:8

default 63:23

defendants 5:17

defense 32:7

delayed 105:14

delineated 66:3

demonstrate 29:16

demonstrating 16:5

demonstration 15:20 17:6

demonstrations 12:24 13:5 14:13 16:8,14,20 53:11, 14,21,24 54:2 57:21 71:14 72:13,18 87:22 89:10 95:1 98:13, 14 99:11 113:16

demonstrators 20:4,13 83:12 99:12

demos 40:2

department 6:17 88:20 89:7,20 99:24 103:13 104:14

department's 47:4

departmentally 102:22 103:3,8 104:1

depending 62:3 95:9

depends 26:18 41:13 42:8,23,24

deployed 43:8 112:12

depo 10:18 32:24 57:19

deposition 5:5,7, 12,15,19 6:22

7:19,24 8:2,3 10:12,23 31:18 75:21 78:11 108:7

depositions 6:5 7:22

deputy 23:17 26:11 33:18 39:2 63:7 64:14 67:13 77:12 106:6

describing 101:24 102:2

description 52:6

descriptions 27:22 57:16

designated 67:6 68:21

designation 72:5

designed 91:24

desktops 17:4

destroy 51:4

destroying 51:8

destruction 55:18 56:12

detail 60:5

details 91:18 101:18

detectives 90:1

develop 65:16

developed 34:6 110:16

devices 106:2 114:1

devised 90:15 110:8

dialogue 80:10

died 31:7,13

dies 20:9

difference 82:24 83:1 101:23

direct 15:13 49:21 62:15

directed 20:16 41:22,23 79:15 114:14

directing 34:3 49:7 74:18

direction 22:13 39:5,17 43:13 45:17 46:13 70:4 113:22 114:8 115:5,19

directives 32:11

directly 39:3 45:16 46:19 60:19

directs 44:7

disappear 58:15

discharged 102:21

discipline 72:23 73:7,11,18

disciplined 72:16

disclose 103:22

discourage 18:14

discretion 44:11 114:2

discriminated 104:6

discriminating 102:22,23

discrimination 103:3,11,18 105:2

discussed 91:22 107:15 108:1

disorder 45:8 91:8,11

disorderly 12:5

dispensers 34:14

dispersal 49:16 92:3

disruption 19:9

disseminated 75:17 76:2

dissemination 76:6

distance 22:14 28:9 112:4

disturbance 33:23 39:4

disturbances 106:17

diversity 17:15

divert 108:23 109:15 110:3

diverted 108:19

division 70:22 105:24

division-wide 76:14

document 76:23

documentation 32:14

documents 32:23

dogs 34:19

double 46:8

downhill 14:2 22:23 23:15

downtown 23:21 24:10,13,21,23 25:2,21 27:9,20 28:5 29:24 30:13, 19,22 34:9 48:18 56:3 58:11 64:22 65:6 66:8 68:7 96:2 107:8 110:4, 9,10 114:23

driver 94:19

driving 24:21,23

drove 94:3

drug 12:11

due 100:23

duly 5:22

dusk 37:9

duties 32:18

duty 26:23 27:3
41:10 51:15 67:5
71:4

---

**E**

e-mail 76:15
77:10 78:1,10

earlier 63:14 86:2
95:19 103:24

early 68:6 88:5,11
89:10,14 91:7
96:12 112:21

east 16:16 20:23
49:8 58:12 65:7
82:15 112:2

east/west 19:3

eastern 50:20

EEO 103:14,20

eff 13:20

effective 115:15

effectively 109:23

efficiently 11:7

effort 81:10 86:5
87:2 89:20

egress 49:8

elements 92:4

elevated 35:11,
12,17,19

emergency 60:24
69:13,24 73:24
74:11 78:7 90:13

emphasis 107:23

employed 6:16

enacted 76:1

encouraged
87:22

encouraging
88:13

end 14:12 24:14
29:11,23 43:10,
19 44:1,3 89:14

ended 24:7 63:23
67:19

ends 78:11

enforcement
11:21,24 41:17
46:6

engaged 52:3

engagement
75:19 77:13,23
78:6 107:1

ensure 116:10

entered 75:21

entire 53:4

entrance 21:22
29:1,20 53:3

environment
46:2,3 80:15

EOC 68:8 69:6,13

---

73:24

Eric 103:5

escalated 40:13

escalation 14:12
55:1 106:17

essentially 60:10

estimates 17:4

evening 34:8 56:2
66:9 112:21

event 41:10 43:5

events 54:5
74:12,18 92:9

eventually 23:3,5,
7

everybody's
39:21 82:12

evidence 89:22

evolved 66:8

exact 30:10 50:12
86:24

excessive 13:1
88:20

exercise 10:19

exhibit 76:4,8
78:19

exists 104:13,15

exit 20:1

expected 41:8
42:20 70:17

experience 37:13
115:12

experiences 46:5

explain 9:15

explained 106:13

explaining 80:20

exposed 107:6

express 5:4 87:23
88:18

extent 87:7

extinguisher 57:5

eye 18:6

eyeball 76:5

---

**F**

face 63:5

faces 88:10 95:1

fact 15:16 86:3

facto 82:3

factors 46:9 61:7

fair 48:11 52:5
79:12 98:15
102:13

fairly 21:6 32:18

Fairwood 16:23
17:22

familiar 17:9,11
88:3 100:16

familiarity 6:4

---

fan 115:11

Father's 31:21

fault 43:23

feel 10:19 58:18
114:2 116:13

feels 44:9

feet 38:24 45:18

felt 19:8 21:13
71:8 74:16
107:14 116:4

figure 59:17,19

filed 31:24

fill 43:14

filled 70:15

finally 90:11

find 19:17 60:20
64:2 68:20 96:21
104:2 105:8

finding 73:11

findings 73:5
105:5

fine 11:6 48:3
78:15 101:20
105:12

finish 58:24

finished 105:10

fire 45:18 49:5,21
57:2,4

fired 45:16 46:1
49:11 106:20

firing 44:16 45:12

fit 21:13 62:17

fixing 109:22

fixture 54:3

fled 52:19

flexible 59:7

flow 109:3,18

flowing 109:1,7,
14

Floyd 14:14

fly 29:9

focus 12:22 30:12
87:17 90:7

focused 54:7

focusing 10:4

follow 9:13 20:16
22:14 28:8 83:4
84:2

foot 61:1 69:20

footage 33:3
51:20 102:10

footprint 82:14

force 13:1 14:3
29:12 39:10,12,
22 40:1,23 41:8,
19 42:6 47:1,7
61:21 62:3,5,22
70:10,16,23 71:8,
17,21 72:12
73:12 84:8 85:17
88:20 90:1
107:13

---

forced 106:22

foregoing 117:3

forget 65:5 68:14
100:15

forgot 10:10,14
79:13

form 75:10

formed 90:1,5,13

forward 32:15
39:19 64:10,17
69:10

forwarded 32:2,3
39:20,21 40:6
41:1 84:9

found 14:22,24
100:3 101:24
105:4 111:11

Fourth 68:13

frame 8:4 86:24
89:12

framing 102:3

frankly 100:2

Fred 5:8 10:13

free 10:19

freeway 20:3,8,
19,21 22:4,5 23:8
29:1,12,20

Friday 65:23 66:1,
5 67:18 68:2
77:21 94:6

front 41:16 45:18
51:4 56:12,13
92:24 97:20,22

full 6:10

fully 110:16

function 70:15

functioning 71:4,
5

Fuqua 17:14 18:2,
9,12,20 19:23
24:7,16,24 25:16

---

**G**

gag 8:19

gained 53:2

gas 85:2 98:5
110:23 111:1,14
112:12 114:4

gates 57:8

gather 53:14
66:15 69:9

gathering 53:13

Gault 22:22 23:2,
6 31:10

gave 18:10 33:20

gay 36:3 81:22

gear 26:3

geared 91:9

general 15:1 40:4
44:5 60:13 77:20
108:20 109:2,17
112:6 114:14

---

generally 12:1
29:14 61:22

gentleman 15:4

George 14:14

get-go 96:22

ghostly 9:9

Ginther 106:7

Ginther's 106:9

Gittes 5:8,9 6:2
58:13 59:4,8,11,
15,22 78:13,16
105:7,15,18
116:12,16,22

give 54:22 100:13
105:7

giving 41:17,21
49:7 50:24

glare 9:4

glass 56:24

goal 28:20 50:2
60:2 61:11 88:17

good 38:10 112:4

Goodale 68:12
112:19

Gotcha 11:9 69:8

grabbing 36:9

Grant 93:20

grasp 88:6

green 19:6,16

grenade 110:23
114:7

grenades 112:23
113:4,6,14

grenadier 44:24

grenadiers 45:6,7
113:20,21

grew 81:2

ground 46:10
79:16 96:21

grounds 53:9

group 17:7 21:2,
16 22:14,24 23:6,
12,24 25:2,4
35:6,15 41:15
53:4 62:7 68:11

groups 60:12
77:19 83:16
87:11,21

guess 7:21 8:11
21:4 22:7 33:18
34:19,23 41:13
91:8 102:4

guessing 22:9
105:13

guidelines 44:12
79:3

gun 13:14 14:1

guy 42:4 66:22

guys 86:21

---

## H

**habit** 34:16

**half** 28:11 43:3

**hall** 106:6 115:19

**Hamilton** 21:5

**handful** 51:15 108:16

**handle** 28:6 62:23 64:3 82:10 90:15

**handled** 29:9 80:13

**handling** 13:5

**hands** 61:16 107:12

**Hang** 92:6 116:16

**happen** 61:12 64:7 111:23

**happened** 23:9 40:10 54:16 55:13,19,22 63:14,15 74:12, 16 82:4 94:20 100:8 101:10 102:9,11 106:10, 12 107:19 109:21 111:24 112:5

**happening** 28:5 61:19 64:5 87:5,6 106:19 107:22

**hard** 55:7

**Hardin** 106:8 107:5 115:1

**harm** 107:15

**hatchet** 101:16

**head** 46:20 47:1, 6,11,14 48:8 79:17

**heading** 49:4

**headquarters** 22:9,10,12 24:22 25:22

**heads** 55:7

**health** 12:15

**hear** 8:17

**heard** 8:19 25:13, 21 39:4 56:24 57:10 60:21 73:10 87:18 98:10 101:10,11, 21 102:2

**hearing** 114:21 115:3

**heat** 101:17

**heated** 26:4

**heavier** 18:18

**heavy** 22:2

**height** 38:1 46:14 56:5

**helped** 82:15 87:22

**helps** 59:5 109:3

**hey** 11:2 13:18 22:11 93:20 109:15,20 110:2

**high** 23:13,15 24:23 25:23 30:2, 24 31:1,12 35:7, 8,10 36:2 37:11 38:2 40:17 49:4, 18 50:19,21 51:5, 22 54:16 55:20 62:14 82:6,15 86:14,15 94:7 98:19 106:19 109:11,16 112:3, 20

**higher** 69:19 98:16 114:9,15

**highly** 99:5

**highway** 20:14 21:24

**hindsight** 52:11

**hip** 13:14

**historically** 91:10

**hit** 35:21 46:12 94:18 97:22

**home** 58:2

**hometown** 101:3

**honest** 17:2

**honk** 18:23

**hope** 7:19

**horses** 113:11,12, 17

**Hortons** 35:9

**Hostetler** 39:19, 22 41:2 72:21 73:5,17 84:7

**hour** 18:15,17 19:13 43:3

**hours** 7:20 11:11 42:12 51:1 52:8 54:6,19 58:3 62:20 94:10 98:13

**housed** 21:9

**hub** 99:23

**hundreds** 7:8 37:22 38:3 51:22, 24

**hushed** 93:11

**hypothesize** 114:10

## I

**I.D.** 93:19

**IA** 39:20

**IAB** 71:22

**IAP** 69:5 78:7

**ICS** 26:20 60:22

**idea** 29:5,10 33:13 102:7

**ideologically** 87:12

**identified** 81:8 95:17,21

**identify** 5:2,3 92:18

**imagine** 108:15

**immediately** 71:1

**implement** 110:14

**implementing** 70:5

**important** 74:17 80:5,17 116:8

**impression** 35:19

**improper** 71:9,16, 20 72:11

**inappropriate** 72:17

**incident** 13:9 14:4,14 15:1 25:6 26:11,13,19 33:19 39:10 50:12 56:11 61:1, 10 64:13,15,18 65:16 66:13 69:18 70:6 83:23 84:9 94:1 111:12 114:23

**incidents** 42:20 55:12 84:21

**include** 70:9

**included** 107:2

**including** 106:20

**inclusion** 17:15

**incorporated** 92:5

**increasing** 81:12, 17

**individual** 13:13, 24 44:13 49:22 61:20,24 62:4 85:15 114:2

**individuals** 25:7, 24 34:12 36:7 46:1 50:22 51:20 55:23 62:16 81:8 83:11 84:20 85:1, 7,16 87:20 88:13 89:4,8,21 92:2,11 111:11

**influence** 46:9

**information** 31:16 54:21 82:2 88:24 89:8,13 99:9,15 100:18

**informed** 15:1 63:13 102:9

**initial** 39:13 66:6 92:21 112:18

**initially** 31:11,24 64:20 65:6 80:24 95:6 109:9 112:19

**injured** 92:15

**injuries** 95:2

**instance** 109:5

**instances** 83:18 97:18

**instructed** 45:14 115:21

**instructions** 78:21 79:3 115:7

**intelligence** 29:5 90:5

**intent** 29:6 61:10

**intentions** 89:6, 16

**interact** 92:8 95:14

**interacted** 79:21

**interaction** 18:24

**interactions** 41:7 42:13,15 81:9 83:7 92:19

**interfere** 82:21

**interfered** 93:7 94:4

**interfering** 90:17 109:24

**Interim** 23:17

**internal** 16:15 17:1,7 21:3,4,8, 19 22:13 28:3 40:16 72:3 103:16

**internally** 29:4

**Internet** 38:8

**Internet's** 87:13

**interrupt** 7:24 9:3 10:11 29:8 37:4 59:16

**interrupting** 68:17 91:16

**intersection** 18:6 19:5,15 35:8 43:2 49:3 62:14 63:11, 16 96:10

**intersections** 43:11 50:18 110:12

**intoxication** 12:5

**investigate** 72:3 83:21 84:4 90:2

**investigated** 103:15

**investigation** 21:9

**invited** 96:14

**involve** 42:14

**involved** 14:6 15:5,21 51:23 71:12 88:4,13 101:5 103:7

**involvement** 15:13

**irritant** 41:24 42:6 107:12,14

**isolate** 89:21 90:6,16 92:1

**issue** 36:13

**issues** 28:1

**item** 101:8

## J

**January** 7:14

**Jeff** 5:10 38:7 58:15 59:18 76:21 77:2

**Jeff's** 76:4

**job** 33:18 70:12

**John** 58:21 75:23

**John's** 105:16

**Johnson** 59:3 105:13

**joined** 75:23 108:6

**judgment** 44:12

**judicial** 8:15

**jugglers** 101:14

**jump** 105:17

**jumped** 5:18 93:11

**June** 39:15 73:21 74:3,13 75:13,16 80:11 84:13 88:2, 5 116:6

## K

**K-9** 34:20

**K-9S** 34:13

**KC** 57:9

**Kelton** 20:22,24 22:22 23:2 31:10

**kind** 6:5 12:11,15 17:19 18:4,6,10 19:21 24:1 25:8, 10,12,14,20 35:7, 10,11,14,16 42:14 49:23 51:5, 12 53:13 54:3 55:19 57:3,8,13 58:4,17 60:4,24 63:23 64:4 66:8 69:23,24 73:10 88:6 89:22 90:5, 11,14,22 93:19 95:5,24 96:23,24 98:23 99:22,24 111:5,19 113:8

**kinds** 54:14 56:18 87:11 92:13 98:6

**knee** 44:20,21 45:3 47:10 48:16 49:11,20,22 50:10 51:6 62:15 79:8,10,14

**knees** 45:23

**knew** 14:5,9 17:16 24:8 25:6,14 56:11 80:6 86:13 87:19,20 88:1,12 89:13 103:24 107:5

**knocker** 49:22 50:10 79:15

**knockers** 44:20, 21 45:4 48:17 49:11,20 50:10 51:6 62:15 79:9, 10

**knowing** 49:9

**knowledge** 71:11 72:4,14

---

**L**

**lack** 29:4

**land** 97:20

**large** 35:16 39:12 52:15,20,24 68:11 115:14

**larger** 34:14 52:21

**late** 17:21 30:10 67:8 94:9 112:16, 17,20

**law** 11:20,24 46:6

**lawful** 42:2

**lawn** 82:13 109:6

**lawsuit** 31:17,24 32:10,13

**lead-up** 106:16

**leaders** 81:10

**leadership** 25:13 88:4

**learn** 101:18,22

**learning** 59:20

**leave** 24:18 102:4

**leaving** 24:20 48:23 49:15 93:12

**left** 24:17,20 37:9 49:3 87:12 93:12

**legal** 95:13,14,18

**legitimately** 98:20

**legs** 45:23 69:23

**length** 54:17

**lesser** 87:7

**lethal** 46:24 62:15 70:10

**letter** 32:12,16,24 72:2

**level** 46:10 47:12, 18 60:18

**liaison** 17:15

**licensed** 99:13

**lieutenant** 21:18 41:14,20 44:7 45:9 61:23 62:7,9 71:14,16 102:15, 17,19 103:4 113:22 114:9,15

**lieutenants** 39:2, 15 60:18 61:4,14 63:13 65:11 70:3, 20 71:20

**life** 10:8

**lifted** 8:21

**light** 19:4,6,14,15 24:4 58:16 78:21 112:21

**lights** 19:2

**limited** 115:10

**lines** 96:15 98:3

**lining** 90:20

**list** 100:11 101:1

**listed** 65:24 100:12

**listing** 100:1

**lit** 29:23

**lived** 101:16

**Livingston** 13:13 16:1,14,21 17:10, 17 18:3 19:3 20:24 23:7,20,22 24:1,12,17 25:18 27:8,13,19 31:8 37:10 40:15 65:1, 2,8

**Livingston/ lockbourne** 13:9

**local** 87:21 99:13, 16

**located** 60:13 73:24

**location** 60:15 71:7

**locations** 40:19

**Lockbourne** 14:21 16:1,15,22 17:10,17 23:7,20, 22 24:1,12,17 25:18 27:8,14,19 29:15 31:9 37:10 40:15 65:1,3,8

**logistics** 26:16

**long** 8:1 10:5,6,18 11:6 16:16 21:6, 23 22:7 42:12 57:19 96:16 106:12 109:8,19 110:1,3

**longer** 27:24

**looked** 37:22 68:15 78:18 112:5

**loose** 30:21

**loosely** 95:11

**loot** 88:17

**looting** 55:14 90:2

**lot** 6:4 9:4 10:7 17:23 21:7,12,14, 17 23:1,4,5,11 26:5 38:6 41:6 46:2,9 52:19 65:10 70:4 74:21 80:15 87:19 93:7 95:3,19 109:24 110:7

**lots** 51:2 74:22

**love** 8:17

**low** 22:16 28:6 29:19 82:14,17

**lower** 9:4 98:18

---

**M**

**mace** 34:14 36:4, 5,10,18 43:9 83:14 85:2,10,11, 17,23 86:1 107:7 114:6

**made** 7:15 10:10, 14 14:4 23:6 61:22 65:11 69:5 74:14 75:2 86:3 87:13 109:21

**main** 46:20 108:3

**maintaining** 29:18

**majority** 16:24 54:15 88:24 89:1 91:11 99:4 100:7

**make** 7:22 12:9 19:20 20:18 24:5, 22 26:6 29:19 48:1 60:11 61:12 62:7 64:7 65:9 80:3,19 103:1 104:11 108:21 109:19 115:23

**making** 60:2 61:20 62:5 80:7 104:5 108:1

**management** 78:8

**manager** 66:17 73:21

**march** 19:23 20:17 22:15,16 28:15 63:20 82:5, 16,18

**marched** 20:23 29:18 40:17

**marchers** 22:3

**marches** 110:9

**marching** 21:18 28:4

**Mark** 34:15,16,24 114:6

**Marshall** 75:21,23

**mass** 51:11

**material** 54:14,16

**Matrix** 104:19

**matter** 42:11

**max** 7:20

**mayor** 75:12 98:10 106:7,9 114:18

**mayor's** 93:16 105:24

**Mcfadden** 102:16, 17,19 103:4

**Mckinley** 51:5 53:16 54:2 92:24

**means** 48:14 73:17 109:23

**media** 100:9,14, 16

**medic** 93:3,13 94:3,17

**medication** 12:11

**medics** 92:9,11, 17,20,22,23 93:6, 8,10,17 94:21,23

**meet** 24:22

**meeting** 106:7

**members** 85:23 89:17 106:8 111:6

**memory** 11:4

**men** 72:6

**mentioned** 57:17 86:2 87:1 110:19

**message** 80:6,18 81:6 86:11 96:12 108:9 116:10

**messaging** 87:10

**met** 25:23 88:15

**methods** 107:13

**mid** 39:15 67:24 68:4 112:17

**middle** 10:12 13:13,23 28:15 106:21

**Miller** 18:4

**Miller-kelton** 20:1

**mind** 36:17 41:11 107:17 116:17

**mindful** 22:11

**minimize** 19:8

**minimized** 19:21

**minor** 95:2

**minute** 19:15 76:21 92:1

**minutes** 43:7 58:15 77:1 110:6, 17

**misconduct** 8:15

**mistake** 10:10,14

**misuse** 84:22

**mixed** 76:18

**mob** 51:3,8,18

**modifications** 80:13

**moment** 48:5

**Monday** 106:4

**monitored** 14:9

**monitoring** 18:8 65:7

**month** 86:23

**months** 33:7

**Moore** 103:5

**morning** 15:3 68:3,6 94:10 106:4 112:15 114:22

**motivated** 99:5

**motor** 107:3

**motorists** 13:16 18:23,24

**move** 62:17 76:21

**moved** 62:12 67:12 82:20

**movement** 50:23

**moving** 49:2 64:17

**multi** 44:17

**multiple** 42:13 46:15 86:9

**musicians** 102:3

**mute** 43:21

**muted** 43:23

---

**N**

**named** 32:1,13,20

**names** 56:19 83:22 88:10 100:12

**narrow** 60:1

**nation** 86:10

**national** 86:4 101:8

**nationally** 80:15 86:8

**nature** 46:11 85:19 90:4

**necessarily** 28:14 47:18,19 114:3

**necessity** 61:5

**negotiated** 95:24

**Nelson** 64:23 65:3,7

**newly-promoted** 45:9

**nice** 69:19

**night** 14:24 30:16 31:12 40:7 54:7 56:7 62:11 66:18 94:6,9

**nightly** 106:20

**nights** 57:19,20

**nomenclature** 66:11

**non-deadly** 62:3

**non-lethal** 28:19 44:6 61:21 62:5 65:10 70:16 71:8, 17 72:12 79:8 106:2 113:24

**noon** 58:20

**normal** 18:18

**north** 20:24 30:23 35:8 49:4,11,18 52:19 58:11 63:4, 10,23 68:12,13 82:6,7,9,16

**northeast** 35:9

**notes** 11:3

**noticed** 63:3

notifying 62:5
number 52:15,17, 24 56:3 66:22 81:7
numerous 86:18 87:1 92:19
nurse 93:20
nurses 92:12

___

**O**

oath 5:6 12:9
object 46:12
Objection 38:22 47:24
objective 61:13
objectives 64:6
observe 84:20,21 92:8
observed 50:13 71:20 97:11 105:2
observer 95:18
observers 95:13, 14
observing 72:11
obstacles 12:10
occasion 74:5 110:21
occasions 48:21 50:9,13 69:9 70:14
occupation 6:14
occupied 107:3
occurred 116:3
October 91:3
Offhand 104:9
office 5:17 57:11 93:16 103:21 105:24
officer 6:15 7:3 11:21,24 13:11, 21 14:1,3,8 32:1, 5,11,12,20 35:18, 22 38:16 39:6 41:7 42:3,7 46:6 49:21 56:17 59:3 62:1 72:5,15,19, 20 79:14 81:5 102:15,20,24 103:2,10,11,18 104:1,3,4,6 105:13 114:11
officers 13:17 17:16 22:13 25:9 26:3 28:5,21 34:4,11 35:7,14 36:8 40:5,8,9,19 41:23 42:12 44:6, 7,10 45:6 46:18 47:5 49:17,18 54:13,16,19 55:12 56:17 57:5 60:12 62:2,5,8 63:19 68:10 70:5 72:10 74:19

78:22 80:4 81:4 83:15 85:3,7 96:8,9,18 101:22, 24 102:5,23 104:24 105:1 108:2 109:12 110:1 111:21 113:18 114:1 115:22 116:9
officers' 55:6
official 7:14 32:18
officially 74:6
officials 98:11
Ohio 54:10 57:1 99:17 100:4,5
Ohioans 53:24
on-the-ground 70:4
opened 57:9
operation 70:14
operations 6:20 22:10 26:15,20 33:21 60:11,23, 24 61:9 65:15,19 66:12,17 67:6,9, 19,20 68:21 69:11,14,24 71:6 73:21 74:1,7,11 78:19
opportunity 39:24 40:22
opposed 47:23 74:10 90:7 107:12
order 8:20 41:18, 21 49:16 116:19
ordered 57:24
organization 95:10,11 104:18
organizations 111:8
organized 20:10
organizer 25:1,17
organizers 17:16 19:7 24:9 96:14, 22
outcome 15:12
outlet 100:16
overrun 58:23
overwhelmingly 99:12

___

**P**

p.m. 117:4
PA 96:15
packed 39:20
paid 83:2
parade 25:5,8 81:22,24 82:3
paramedic 94:4
parameters 60:13
parked 25:22 99:12

parking 17:23 21:6 46:2
part 19:12,16 30:22,23 32:3,17 35:8 42:24 47:16 50:18,19,20 54:17 62:13,20 70:12 76:22 77:7 84:6 86:3,4 88:23 91:7 99:3,14,16, 21 100:5 104:22
participating 5:11
parties 8:11 91:13
parts 99:20
party 8:7 82:8,19 104:7
passable 109:16
passing 13:16 18:24 93:2 95:3
past 33:6,7 86:23
patience 116:23
patrol 6:20 71:5 72:5,10 78:22 102:5
pause 105:7
pay 93:11
peaceful 29:7 79:20 82:12 89:2, 23 92:2 97:11,21 98:14 99:4
peacefully 89:3
pedestrians 20:3 22:4
pelted 54:14
people 15:21,24 16:24 17:1 18:23 24:11 35:1,16 36:15,19 37:21 38:6,20 42:13 43:12 45:16 48:22 49:7 50:2 51:7,22 52:3,12, 19,24 53:14,19 54:1 56:3,6,8,19 57:2 82:23 83:16, 19 85:17,22 86:19 87:1,23 88:14,20,22 89:15 92:14,19 94:24 95:3,19 96:6 97:12,18 98:7,14,20,24 99:15,17,19 101:15 102:1 107:20,21,23 108:3 109:4,22 111:3,8,15 115:14
percent 98:12
percentage 98:20 99:6,18 104:22
percentages 20:5,6
perception 98:4
period 39:13 40:24 95:23 100:9

permanent 54:3
permitted 71:22
person 13:12 16:2 38:19 43:2 46:20 49:23 79:16 84:15 93:14 104:5 106:14 111:13,21
personal 37:12
personally 28:2 48:18 74:17 79:21 83:14 97:10 115:6,11, 22
personnel 71:13 113:15
PERT 92:5 110:8
pertains 32:13
Phillips 5:18
phone 24:6 25:1 76:10
physical 42:16 54:12
physically 30:7, 16 56:11 57:20, 24
pick 63:10
PIO 17:14
place 5:5 20:19 88:8
plaintiffs 5:9
plan 40:12,14,15, 17 82:10 91:4 110:10,14
planned 16:14 82:5 91:12
planning 26:17
plans 16:18
play 34:1 113:11, 12
played 13:4 61:7 98:23
playing 16:7
pleased 19:18
point 10:12,14 11:4 13:4,24 17:21 18:12 19:5, 22 20:1 22:1 23:16 26:1 28:24 29:5,22 31:7,12 35:6,17,23 40:20 50:17 51:6,10 53:23 55:17 63:24 66:2 82:19 86:13 100:9 109:13,14
pointed 13:24
points 18:1,9
police 6:15,17 13:1,20 14:3 22:18 25:20 70:22 71:13 81:12,17 88:19 90:13 98:11 102:14 103:12 104:14 109:23

policies 11:5 44:12 61:11 74:14
policing 71:13
policy 11:1 32:3 47:4,20,21,22 48:10 49:2,19 50:2 62:18 70:16, 23 71:9,17,20 72:11,17,22 73:11 74:21,22 75:6,10,13 76:24 77:21 78:21 80:13 85:11 114:14 115:23 116:3
political 80:10
positive 67:1 95:21
possibility 20:13
post-pandemic 18:16
power 25:12 73:6
practical 34:3 42:11
practice 45:21,24
practiced 45:12
precinct 13:11
prep 33:8
prepared 90:23
presence 81:12, 17
presented 93:24
President 106:8 107:4 114:24
pretty 19:18 20:2 30:24 112:6
prevent 51:16
previous 24:2,3
previously 31:20 91:4
pride 81:22
primarily 73:24
prisoner 36:1
private 109:5
privilege 10:20
problem 9:7 13:19,22 29:4 93:16 109:22
problems 12:15 81:18
procedures 74:15
proceeded 82:16
proceedings 117:3
process 39:14
professionally 115:6,9
profile 22:17 28:6 29:19 82:17
progressed 55:10
projectiles 51:2

promised 11:10
promoted 7:13
promotion 7:17
proper 67:20
property 53:5
54:13 55:16,18
56:12 109:5
prosecuted 15:10
protect 51:14
89:23
protest 17:17
22:12 23:24
33:23 63:17
77:19 82:1,4,21
87:11,24 88:14
89:3 92:15 96:14,
21 98:21 110:22
111:7
protesting 22:18
protestor 42:4
94:17 98:2
110:21
protestors 18:11,
13 21:13 41:15
53:19 63:21
79:21,24 80:4,21
81:3,10 86:12,14
89:2,23 90:9,18
92:2 95:9,24
97:11,19,21,23
107:21 110:24
protests 14:17
64:22 66:7 68:7
69:22 71:3 82:11,
12 86:4 90:10,16,
24 99:21 107:7
108:22 113:2
provide 21:4 32:7,
14 78:9
provided 100:14
106:14
provoke 25:19
54:21
public 85:23
100:10,23 116:9
publicize 87:22
publicly 74:22
101:12
publish 99:24
pull 11:2 96:10
pulled 35:24
pulling 25:21
28:14 114:6
punches 42:5
purposes 7:18
34:3 36:13 42:2
pushes 42:5
pushing 42:15
83:6
put 8:12 14:9
46:21 49:13
61:24 67:14 78:8
100:15,24
putting 52:9

### Q

quadruples 40:18
quarter 20:7
quasi 90:1
question 9:23
10:1,9,13,24
11:1,22 44:23
73:4 79:7 107:17
114:16
questions 5:13
6:9 9:12,14 10:22
11:12 47:22
48:15 51:18 60:6
82:24 105:11,22
110:19 116:14
quick 9:5 59:18
quicker 110:7
quickly 110:18
Quinlan 67:14
quote/unquote
72:24 85:9

### R

race 102:24
racism 13:1 88:19
104:13,15
Radden 14:15
15:6,8,22 17:11
radio 16:23 17:12,
22 23:1,23 24:16,
21 27:11,12
94:16
ramps 20:21
ran 52:16,20 53:1
57:3
rank 6:19 102:15
re-read 32:23
reached 56:5
react 54:20
reaction 14:10
35:22 104:21
read 76:22 104:19
105:4 116:20
real 9:5 17:13
59:18 66:10 93:8
realize 10:9
realized 95:7
reason 9:14 12:19
43:22 49:10
54:24 59:7 74:9
88:16 108:18
109:8
reasonable 7:7
107:10,15
reasoning 106:13
reasons 106:13
108:3,16
recall 16:6 71:2
79:2,19 81:7,15,
19 82:23 83:16,
20,23 84:1,24

85:4,19 86:5,24
95:23 101:4
102:9 107:18
108:5,8
received 39:17,18
recently 33:4
recess 59:23
105:20
recognize 76:7
88:10
recollection
73:19 75:14
recommendation
73:10
recommendations
73:5
recommended
32:6
recommending
32:4
record 5:2 6:11
recording 33:15
records 100:10,
24
red 19:2,4,14 24:4
reduce 108:2
refer 44:18
reference 86:3
referenced 94:2
referred 94:2
referring 77:10
reflects 76:24
refusing 62:17
related 16:7 40:1
72:16 73:12
88:24 111:7
releasing 24:11
reliable 17:5
remember 12:24
13:2 16:10 18:11
32:21,22 37:9
48:9 50:15,16
57:9 65:2 66:5
67:5,10,23 71:14
73:9 79:10 86:18
94:8 95:16
103:17 110:20
112:2,16
remembered
10:13 103:24
reminds 31:14
41:4
remote 5:5,6,13,
14,19
rephrase 9:17
report 8:10 39:10
40:1 41:8 42:19,
20 43:15 44:2
70:17 71:7,21,22
72:1,10 73:13
79:17 83:12
84:15 100:1,19
104:5,19,22,24
105:3,4

reported 48:19
71:16 79:5 83:19
103:11,18 104:4
REPORTER 5:1
reporting 5:6
83:15
reports 31:17
39:12,22 40:1,6,
23 84:9
represent 5:3
101:20 103:6
104:17
representation
32:17
Representative
114:24
represents 32:5
request 32:16
58:14 78:13
100:10,24 108:19
116:18,19
requires 44:9
residents 100:14
resolve 28:1
resorted 69:24
resources 17:12
23:19 88:9
respect 11:5
60:14
respond 13:11
91:12
responded 23:2
response 16:19
22:22 25:20
54:22,23 55:3,4
74:19 90:13 91:9
93:22 107:10
responsibility
58:9
responsible 42:7
rest 30:16 31:23
resulting 73:17
reverted 24:2
review 33:2 39:24
40:23
reviewed 15:17
31:16 39:10,11
72:22
reviews 41:3
Rhodes 53:15
Riffe 54:11
rifles 44:19
rights 89:4
righty 116:22
riot 26:3
risks 29:19
roadway 13:23
rock 93:9 94:18
rocks 51:2 55:4,8
96:18
role 13:5,7 15:18
16:7 26:7 33:24

60:10 62:20
69:21 74:5,6 88:4
90:8 95:9 98:23
roles 26:18
room 5:3,10 16:23
17:12,22 23:1,23
24:16,21 27:11,
12 80:9
rooms 58:14
rotating 67:17
rotation 58:5
roughly 36:23
76:9
rounds 45:20
routine 32:9,19
ruin 8:22
rule 108:20 109:2,
17 114:14
rules 7:22 9:1
75:18 77:13,23
78:5 106:24
rumors 115:3
run 69:6 111:15
running 52:18
57:2
runs 59:16
rush 18:15,16
Russell 94:7

### S

S-M-I-T-H 6:12
sad 105:5
safe 49:8
Saturday 65:23
66:1 67:21,23,24
68:4,6,8,21 100:8
112:18
saves 77:7
scaled 69:22
scenarios 114:10,
13
scene 14:20,23
15:14 24:8,19
26:8 30:13 31:9
93:8
scenes 46:7
schedule 67:14
scheduled 59:3
64:23 82:1
Schlein 108:6
scooters 51:3
55:5,6
scope 65:12
scrambled 16:17
screamed 56:19
screaming 68:10
screen 76:8
scroll 77:2,4,6
sea 69:23

search 48:6
Seattle 87:14
seconds 110:15
section 26:15,21
28:22 33:22
60:23 61:9 67:9
74:7
sections 26:17
seed 90:19
segment 28:17
send 78:14
sending 24:12
separate 41:8
45:6
separately 42:22
43:15
September 91:3
sergeant 17:14
18:1,9,12,20
19:22 21:19
23:18 24:7 25:16
41:14,21 61:23
71:15,16 81:1
sergeants 60:18
61:4 63:13 65:12
70:3,20
series 74:12
set 18:21 85:12
setting 110:8
share 76:4
Shawn 25:3
shelter 51:4,9
shift 43:19 44:1,3
59:10 67:16,17
69:2
shifts 42:12
ship 72:2
shipped 84:7
shoot 44:19 47:6
49:20
shooting 47:5
79:14 114:7
shop 21:11
short 7:20 58:11
68:12 82:7,9,16
105:9 106:12
shorter 59:19
shortly 14:4 53:13
114:22
shot 46:9,21
48:22
shots 106:20
shoulders 47:16
shouting 23:5
show 18:22
showed 13:17
31:9 36:23 63:1
shown 20:6
side 6:7 58:12
63:11,24
sidewalk 19:6,17

35:12 36:15,18
96:9,11,17 109:4
sidewalks 35:2,3,
4
sign 13:15,19,22
116:20
signature 117:1
signed 75:16 76:1
107:1
significant 69:12
97:7
signs 16:4 18:22
similar 77:9 86:10
87:10
sir 7:5,9 8:6 9:22
10:2,16 11:9,13
12:14,18 13:3
28:23 29:13,21
32:8 33:5 34:5
37:16,18 38:14,
21 39:8 43:17
45:13 46:15 50:7
53:17 66:23
68:22 69:15 70:8
72:7 76:14 94:12
97:9 101:19
102:12 106:4
116:15,21
sit 72:18 80:2
sitting 80:8
situation 24:10
29:15 30:5 41:5
42:7 44:8,14 47:1
62:24 89:19
situations 44:5
91:12
sizable 21:6,12
size 40:18
skip 8:18 46:8
47:7,14 48:9
skipping 45:19,20
skirmish 26:2
50:19 51:13
90:20
small 52:17 76:11
87:14 115:14
smaller 87:9
Smith 5:21 6:12
smoke 97:24 98:3
110:23 111:2,3,
11,13 112:10,22
113:4,5,14
solution 29:16
somebody's
47:11
sort 91:24
sounds 15:16
89:9 91:21
south 30:24 31:1
50:18 52:20 54:9
63:4
southern 30:21
50:18,19 62:13
speak 14:23 56:9
57:9 74:21 87:3

89:3 90:22
specialty 113:17
specific 11:1
33:19 47:22 48:9
50:11 67:10 75:7
77:14,17,23 85:4,
19 89:8 94:1
100:19 103:18
104:3
specifically 18:12
35:5 62:11 74:17
93:6 95:16,20
107:4 108:8
115:2 116:8
specifics 50:16
77:13
speed 48:13
spelled 13:21
spend 36:12
69:12
spending 74:1
split 25:11 27:8
spoke 84:21 85:1
spokespeople
87:20
sponsored 17:7
Sports 57:10
spray 34:22,23
35:1,18 38:19
39:7 43:4
sprayed 35:22
38:17 43:7 83:14,
15
spraying 34:12
36:14,15 42:14
107:22
spring 10:4 13:1
16:8 21:23 40:2
53:24 71:3
Springtime 37:17
squad 20:15,16
41:22
squads 17:23,24
stack 39:12
staff 104:24 106:9
stage 16:22
staged 16:24
17:23 110:11
staging 27:13
standing 8:19
13:13 15:24 16:4
35:1,3,16 42:3
43:1 56:23 63:12
stark 101:23
start 21:2 26:23
70:12
started 7:6 21:17
23:21 24:11,21
28:4 55:2 58:5
67:13 82:19 91:2,
3 114:21 115:3
starting 26:4 51:3
78:6 88:3,9
state 5:2 6:10

18:16 54:8 55:11,
20 56:16 86:16
99:22 106:19
Statehouse 36:7,
8,10 51:12,14
52:9,13,16 53:1,
5,8 55:11,24
56:13,15 82:5,13,
20 109:6
States 104:16
static 46:2
stationary 83:9
statue 51:5 54:3
92:24
statute 53:16
stay 21:17 28:12
58:2 96:16 108:1,
9
stayed 23:21 56:8
staying 74:10
stays 96:11
Steinberg 108:6
stemmed 84:12
steps 29:18 36:10
52:16 69:6
stick 19:12
stipulation 5:4
stomach 47:15
Stonewall 25:5,8,
12,13 82:6,8,18
stood 56:21
stop 20:17,20
39:18 41:2 51:21
52:4,19,22 55:17
56:12,13 96:17
97:13 101:5
102:11
stopped 22:24
33:14 90:11
102:5
storming 51:11
story 102:3
106:12
stove 101:17
straight 63:4
street 16:2,16
18:14,22 19:2
24:5 29:17 30:23
35:4,9 36:6,16
46:12 49:19
50:20,21,22 51:5,
7 53:19 54:8,11
55:11 56:16
60:17 61:3,15
62:16 63:8 69:7
74:3,10,18,24
75:7 78:20 82:6,
15 85:18 86:15,
20,22 90:21 92:9,
11,17,20,23 93:3,
6,10,17 94:3,21,
23 96:1 100:13
106:15,19,21
107:24 108:23,24
109:10,16,23
110:1,15 112:3,4

streets 74:2 108:4
strike 50:4
striking 42:16
strived 97:2
strong 63:3
structure 60:9
70:3
struggle 25:12
student 12:4
studies 20:5
stuff 20:11 33:8
64:20 65:6 84:7
96:18 114:14
subject 14:5
subjected 92:3
submit 84:15
subsequent
60:10 92:21
subsequently
111:2,10
sudden 40:18
sued 11:15,18
summertime
37:6,15
summoned 106:5
Sunday 58:2
65:22,23,24 67:4
100:8 108:19
sunset 37:15 38:8
supervision 28:2
71:12
supervisor 7:3
41:18 44:7,9 62:7
support 17:11
suppose 114:9
supposed 44:2
71:23 114:8
surface 21:6
46:11
surrounded 23:14
63:18 106:22
109:12
survey 104:23
105:5
suspect 46:20
47:6
SWAT 113:18,19
swearing 5:14
sworn 5:22
system 26:19
60:22
systematic 40:8,
23
systematically
39:24

---

T

---

tactics 61:12,17
62:21 65:13 70:5
86:12 87:10
90:15 98:7

114:20

**tailing** 63:20

**takes** 25:19

**taking** 5:14,19
12:11 41:18 94:4
95:1

**talk** 34:12 59:18
74:22 80:21
81:20 92:18,22
95:14 108:17

**talked** 18:19 61:6
64:1 78:10 79:24
81:11 93:15
95:17,19 106:14,
16,24 107:4,9,11,
21

**talking** 8:11 12:2
21:2 28:8 33:4
39:1 62:21 66:20
68:15 80:9 81:1,5
85:22 96:1,6
100:11 101:7
110:4,5

**talks** 77:14,17

**Tanoury** 5:16
38:22 47:24 59:2,
6,9,14,21 78:15
105:12 116:24

**target** 45:18 90:16

**task** 90:1

**tasks** 66:3

**team** 22:22 90:13
91:6

**teams** 16:19
17:24

**tear** 51:20 85:2
98:5 110:23
111:1,14 112:12
114:4

**technically** 7:16
81:24

**telling** 54:19 75:4
83:16,20 84:24
85:6 89:9

**tended** 17:13

**tending** 94:24

**tense** 80:14

**term** 69:19

**terminology** 26:7
34:13

**terms** 13:20 15:1
27:18 28:3 31:23
32:4 36:14 38:12
53:8 56:6 61:17
62:4,21 64:5 67:2
68:7 69:23 75:11,
19 83:1,2 88:8
90:19,23 93:18
106:17 115:24

**testified** 7:2,8
77:1

**testifies** 5:22

**testify** 12:12,16,
20

**testifying** 12:8

**testimony** 51:19

**Theater** 54:10
57:1,2

**theaters** 27:19

**thing** 15:2 25:11,
16,21 35:17
38:23 63:3
108:13 113:5,8

**things** 10:7 18:19
21:12 22:23 26:3
28:4 29:10 30:20
34:6,23 36:16
46:13 56:18
84:11 85:17
86:11 87:5,18
93:2 96:17 97:12,
18

**thought** 19:18
22:17 27:24 59:5
81:17 103:5
109:3 111:12

**thousands** 36:19
37:21

**threat** 49:15,23

**threats** 28:18

**threw** 38:16
110:22

**throw** 97:12 98:3
99:2 111:13
112:9

**throwing** 53:5
96:17 97:18 98:5

**thrown** 35:21 51:2
54:14,15 55:6,12
63:6 93:9 94:17
99:1

**Thursday** 16:10
62:10 63:2 65:23
77:22

**ticket** 57:1

**till** 80:12

**Tim** 35:9

**time** 8:4,16 11:8
14:7,22 16:6 17:9
20:7,20 21:1
22:3,21 23:9,12
27:7,23 28:4
30:7,12 31:18
32:10 33:8 34:8
36:12 39:13,14
41:9 54:18 56:2
57:14,22 58:6
59:17 61:21
62:11 63:7 67:3,
5,7 69:12 71:2
72:12 74:2 77:7
81:12 86:24
89:12 91:16,19
93:21 94:8,24
95:24 97:6,8 98:1
100:9 108:21
110:16 112:13,
14,18,20 113:14
115:2,14

**times** 6:24 7:4
29:17 41:7 45:22
62:10 93:5 95:4,
15 96:5 98:16,17,
22 99:15 107:19
113:8

**title** 64:13 66:21
67:21

**titled** 81:23

**today** 6:9 9:12
12:9,13,20 31:18
36:13 58:23
72:18 87:9 88:1

**told** 35:20 41:2
58:2 66:16 69:6
93:3 96:15 108:2

**ton** 58:6

**tone** 74:15 80:6,
19 116:10

**tonight** 25:19

**tool** 115:10,15

**top** 22:19,24

**torso** 46:20 47:16
79:16

**touch** 14:1

**town** 99:16

**traditional** 60:22

**traffic** 12:2,3
18:15,18 19:4,9
20:17 21:15 22:3,
15 28:12 68:10
82:15 94:16
108:4,9,19,23
109:1,3,7,9,15,
17,24 110:3,9,10,
14

**traffic's** 109:13

**train** 109:2

**trained** 45:7,10
46:18 48:7 50:3,6
96:20 113:9

**training** 44:23
45:3,6,9,11 46:2
47:23 48:6 50:1
90:14 91:3 92:12,
14,16 93:4

**traitor** 56:20

**transition** 55:13,
19,21 57:14

**transpired** 74:13
116:5

**transport** 36:1

**trapping** 107:2

**traveling** 102:3

**treated** 114:5

**troopers** 51:15

**troops** 28:21

**trouble** 56:9

**true** 29:14 53:9
66:24 70:19,21
97:10

**truthfully** 12:13,
17,20

**turbulent** 77:19

**turn** 18:4 19:16
86:14 87:2
106:22

**turned** 19:6 20:24
21:16 22:24 23:6
49:17 56:24

101:14

**turns** 14:5 91:13

**two-second** 43:8

**twofold** 89:24

**types** 100:3

**typically** 26:11
60:19 61:8 62:9
69:20 114:5

---

**U**

**ultimately** 15:9

**uncertainty** 116:7

**unclear** 29:23

**understand** 6:6
9:12,17,21 10:11
26:6 27:7 42:11
47:5 48:3 57:21
62:2 66:11,20
75:8 79:23 86:5
95:12

**understanding**
28:7,16 44:4
45:15,17 47:9
50:8 75:11,12

**understood** 9:24
73:4

**unfolded** 54:6

**uninvolved** 19:9
63:14 107:3

**unit** 21:9 71:5
90:5 91:19,23
113:17

**United** 104:15

**units** 60:12
110:11

**unocc** 107:2

**updates** 18:10

**upper** 47:16

**upset** 93:18

---

**V**

**Vardaro** 5:10

**variables** 46:4,16

**vast** 16:24

**vehicle** 36:2

**vehicles** 99:10,13
100:3 107:3

**verbal** 50:24

**versus** 83:3

**video** 14:8 15:2
19:11 31:17,20

**videos** 48:6

**view** 61:1 69:19,
20

**viewed** 80:7

**viewing** 69:18

**views** 87:23 88:18

**violated** 79:3

**violation** 49:19

**violations** 83:13

**violators** 90:17

**violence** 28:18
54:7 88:17,24

**violent** 77:18
106:18

**virtual** 80:8

**visible** 17:14

---

**W**

**W-E-I-R** 6:13

**waist** 50:4

**waiting** 93:13

**waived** 117:1

**walked** 25:23
56:16 68:8 79:23

**walking** 37:10
49:2,16,18,22
83:8

**walkway** 35:11

**wanted** 18:13,22
20:18 33:11 55:3,
5 74:23 75:3,5
78:20 80:18,19
89:3 91:18 98:4,
20 111:19 114:19

**warnings** 41:17
49:7 51:1

**washing** 95:1

**waste** 59:17

**watch** 86:18

**watched** 14:8
15:2 31:19,20

**watching** 18:2
19:11 56:15
69:18

**water** 51:3 55:2
93:1 97:20

**waters** 95:3

**ways** 58:22

**weapon** 41:9 45:3

**weapons** 28:19
34:8 44:6,8,11,18
45:15 55:1,12
65:10 79:2,8
84:22 92:3
101:14 106:2
114:1

**wee** 94:10

**weeded** 108:3

**week** 58:4 67:8
85:12 86:23

**weekend** 54:4
60:21 61:2 65:20
69:10 89:14,15
92:21 93:6 100:7

**weeknight** 67:8

**weeks** 33:6 92:21
95:7 116:6

**Weir** 5:21 6:13

**Wes** 5:17

---

**west** 23:6 82:15

**westbound** 22:7

**whatnot** 53:6
85:14

**When's** 57:22
67:3

**win/win** 96:24

**wind** 63:3,12,24
105:8

**window** 9:4 93:9
94:18

**windows** 53:6

**women** 72:6

**wood** 101:17

**wooden** 44:19

**Woods** 23:16,17,
18 25:24 26:10
33:18 39:2 63:7
67:14 68:14
106:6

**word** 14:16 16:9,
13 23:14 51:18
95:11

**wording** 48:5

**work** 15:3 26:24
65:21 71:13 72:6
101:9 105:6

**worked** 60:17
65:23 67:1,8
90:23

**working** 58:3
60:19 66:3 76:9
103:12

**works** 115:10

**world** 87:9,14
104:16

**worry** 21:14 28:16

**worse** 24:10

**worst** 54:12

**write** 41:8,11 72:1
84:14

**writes** 32:12

**writing** 42:8

**written** 41:19,20
75:10

**wrong** 26:7 27:21
34:17 103:1

**wrote** 8:9,10

———————
**Y**
———————

**years** 7:4 14:7
25:5 87:9 102:16

**yelling** 13:16 23:5
97:11

———————
**Z**
———————

**zone** 6:20 13:10
14:17 32:1 33:22,
24 40:5,8,9 57:23
58:8,10 65:4 66:7
86:15

| | |
|---|---|
| **From:** | Quinlan, Thomas <TQuinlan@columbuspolice.org> |
| **Sent:** | Thursday, December 17, 2020 2:42 PM |
| **To:** | Tanoury, Alana V.; Phillips, Westley M. |
| **Subject:** | FW: Chief's Time Sensitive Updates June 16th - Use of Chemical Agents |

**From:** Announcements, Division-Wide
**Sent:** Tuesday, June 16, 2020 9:56 PM
**To:** Columbus Division of Police <ColumbusPolice@columbuspolice.org>
**Subject:** Chief's Time Sensitive Updates June 16th - Use of Chemical Agents

There are two important updates that need communicated without delay.

One is regarding a policy change on the use of chemical agents and the second is on accepting gratuities.

**FIRST ISSUE:**

Until directed otherwise officers will follow the revised policy on use of chemical spray as outlined below which was prepared by the City Attorney's Office. Once the Chief's Advisory Panel begins its work in early July we will make more permanent policy changes, send the policy through the concurrence process, reconcile the Emergency Operations Manual with the policy revision, and allow the Union time to review the policy. This policy is a stop gap measure until a complete policy can be finalized and published in directives and posted to PowerDMS.

***Chemical Spray – 2.04 II. A.: Chemical Agents***
1. Sworn personnel shall carry only those chemical agents that have been authorized by the Chief of Police. Tear gas, formally known as lachrymator, shall not be used.

5. Sworn personnel shall not use their Division-issued chemical spray to disperse a congregation of individuals unless the congregation is engaging in aggressive or violent actions towards officers or others. Prior to deployment of the chemical spray on or against an aggressive or violent crowd, at least three notifications should be made when possible to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order. Failure to leave a street, or to move, by itself, shall not justify the use of chemical spray against a non-aggressive non-violent crowd.

a.    The notifications should be made in a matter which the participants in the crowd should reasonably be able to hear and understand.
b.    The notifications and subsequent deployment of chemical spray in crowd control situations should be audio/video-recorded when possible.

This language authored by the City Attorney's Office is only a minor modification from the existing language and applies to crowds. But in short it means officers may not use chemical sprays on nonviolent non aggressive crowds during protests, period. Belt mace may be used to directly impact an individual you are attempting to arrest in a crowd situation who is more than a passive resister. Without the ability to use chemical sprays to disperse crowds, supervisors will need to take a leadership role in addressing crowd situations and officers will follow the directions of the incident commander at the scene or an event or directing actions over a police radio. Officers may find it necessary to either form an arrest team and safely

Ex. 34

target active core members who are using aggressive actions while co-mingling with peaceful protesters or might need to vacate the area so protesters are not able to assault police officers. I do not expect officers to be assaulted and have no recourse to protect yourself. A supervisor will need to decide whether the reasonable response is to make arrests or to remain at a safe distance to avoid assault. Officers should not allow members of the public to be assaulted. If people are being hurt form a rescue team and protect the public within the limits of this policy, and guided by training, leadership, and direction.

**SECOND ISSUE:**

Jeff Furbee wants all officers reminded of the policy on accepting gratuities and the Ohio Ethics Commission opinions and the City Ethics Office opinions.

The media has been working on a story as a follow up to businesses who are stating they support the police and plan to continue their "police discount" and others who have opted to change their policy. As a reminder, the occasional cup of coffee or discounted meal is not expressly prohibited by Ohio ethics law, but is still frowned upon. However, the "cumulative effect" of frequenting a business because they offer a police discount is expressly prohibited per the Ohio Ethics Law and our policy. The media is working on publishing a story about these discounts and officers who are identified or reported violating the policy are placing themselves in jeopardy. Safest course of action is to respectfully decline discounts and keep receipts for meals.

Due to the time sensitive nature of this email I am preparing this message while out of the office. More information will be shared as the policy and training on the policy are finalized. Until that time all personnel are expected to comply with the policy revisions directed to us from the City Attorney's Office.


THOMAS QUINLAN
Chief of Police



THE CITY OF
**COLUMBUS**
ANDREW J. GINTHER, MAYOR

DIVISION OF POLICE