IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada,          :
et al.,
                            :

        Plaintiffs,
                            :

        vs.                    Case No. 2:20-cv-3431
                            :  Judge Marbley
City of Columbus,              Magistrate Judge Jolson
Ohio, et al.,               :

        Defendants.         :


- - - - -

30(b)(6) DEPOSITION OF
LIEUTENANT BELA A. BERNHARDT

VIA VIDEOCONFERENCE

- - - - -


Taken at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
January 25, 2021, 1:10 p.m.




- - - - -


Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

    Marshall & Forman, LLC
    250 Civic Center Drive, Ste. 480
    Columbus, OH 43215
    By John S. Marshall, Esq.
       (Via videoconference)
      Helen M. Robinson, Esq.
       (Via videoconference)

    and

    The Gittes Law Group
    723 Oak Street
    Columbus, OH 43205
    By Frederick M. Gittes, Esq.
       (Via videoconference)

ON BEHALF OF DEFENDANTS:
    Columbus City Attorney's Office
    77 North Front Street
    Columbus, OH 43215
    By Janet R. Arbogast, Esq.
       (Via videoconference)
      Stephen J. Steinberg, Esq.
       (Via videoconference)

---

I N D E X

| Examination By | Page |
| --- | --- |
| Mr. Marshall - Cross | 5 |

(No exhibits were marked.)

---

    Monday Afternoon Session
    January 25, 2021, 1:10 p.m.
    - - - - -
S T I P U L A T I O N S
    - - - - -

    It is stipulated by counsel in attendance that the deposition of Lieutenant Bela A. Bernhardt, a witness herein, called by the Plaintiffs for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

    - - - - -

---

1     THE REPORTER:  To start us off, would
2 counsel please introduce themselves for the
3 record, state who they represent, state who is in
4 the room with them, and also state their consent
5 to the remote administration of the oath, please.
6     MR. MARSHALL:  Yeah.  We consent to the
7 remote administration.  This is John Marshall.
8 And Attorney Helen Robinson from my office, she's
9 not in the room, but she's in her own office
10 listening in for Plaintiffs.
11     MS. ARBOGAST:  This is Janet Hill
12 Arbogast, from the Columbus City Attorney's
13 Office, representing the defendants.  Nobody is in
14 my room with me, and I consent to the remote
15 deposition.
16     MR. STEINBERG:  Stephen Steinberg, on
17 behalf of the defendants.  Nobody is in the room
18 with me, and I have no objection....
19     MR. MARSHALL:  I think we got enough
20 that, so...
21     - - - - -
22     LIEUTENANT BELA A. BERNHARDT
23 being first duly sworn, testifies and says as
24 follows:

1            CROSS-EXAMINATION
2   BY MR. MARSHALL:
3   Q.      Would you please give your name.
4   A.      Lieutenant Bela A. Bernhardt.
5   Q.      Lieutenant Bernhardt, my name is John
6   Marshall.  I'm one of the team of lawyers
7   representing the plaintiffs in this case.
8           MR. MARSHALL:  Janet, just to confirm
9   for the record, I'm not going to ask the
10  lieutenant his contact information because I
11  believe the City will -- the City Attorney will
12  agree to accept service of a preliminary
13  injunction hearing or trial hearing subpoena on
14  his behalf, correct?
15          MS. ARBOGAST:  Correct.
16          MR. MARSHALL:  And if, for some reason,
17  he's no longer employed by the City, you'll give
18  us the contact information so we can issue a
19  subpoena if we need to?
20          MS. ARBOGAST:  Yes.
21          MR. MARSHALL:  Okay.
22  Q.      Lieutenant, this deposition's under a
23  special rule called Rule 30(b)(6), so it's the
24  Federal Rules of Civil Procedure.

1           MR. MARSHALL:  And, Janet, can we agree
2   that with respect to topic 9, which I can read
3   into the record in a second, that Lieutenant
4   Bernhardt is here to speak in part on topic 9 and
5   also topic 23, correct?
6   A.      To the best of my knowledge, yes.
7   Q.      Okay.
8           MR. MARSHALL:  Janet, is it the plan
9   that Jenni Edwards is going to speak about most
10  topics with respect to the protests that are the
11  subject of this case only or is Lieutenant
12  Bernhardt speaking on behalf of some of that,
13  those protests?
14          MS. ARBOGAST:  I'm sorry.  Could you
15  repeat that?
16          MR. MARSHALL:  Yeah.  It's not clear to
17  me from the response that we got from Alana that
18  -- whether Lieutenant Bernhardt is here to speak
19  on behalf of the City with respect to the protests
20  or only Jenni Edwards is going to do that.
21          MS. ARBOGAST:  I believe only Jenni
22  Edwards is going to do that.
23          MR. MARSHALL:  Okay.
24  Q.      All right.  The topics that we're here

1   to talk about today, Lieutenant, are charges or
2   complaints, whether internal or external, criminal
3   or administrative, from civilians or law
4   enforcement officers against CDP officers for
5   their conduct, including verbal communications and
6   word usage at demonstrations anytime from the time
7   period May 1, 2015 through the day of the
8   deposition and including investigation of those
9   charges, complaints, and the outcomes of those
10  investigations, et cetera.
11          With respect to anything but the
12  protests that are the subject of this lawsuit,
13  which were the Black Lives Matter that occurred
14  May 28th, 2020 and for a period of time through
15  the summer, are you clear about the matters in
16  which you're designated to testify?
17  A.      I am clear on the -- that I'm here to
18  testify on the general procedures and everything
19  that was concerned with the investigation
20  regarding that, yes.
21  Q.      Sure.  I know that you can't recite for
22  me the outcome of particular investigations unless
23  you just happen to remember them.  I know you
24  can't do all that, but yes.  I intend to ask you

1   mostly about process and procedure, and that's
2   what we'll get into.
3           The other thing you've been identified
4   to testify about is similar, and that is formal or
5   informal charges by demonstrators of retaliatory
6   or excessive use of force against protesters from
7   May 1, 2015, including any complaints filed in any
8   courts and the way those charges were handled and
9   their outcome, including internal investigations.
10          With respect to anything but the Black
11  Lives Matter protests, as I've described them, do
12  you feel that you're able -- or that you're clear
13  about the matters in which you've been designated
14  to testify?
15  A.      Yes.
16  Q.      Did you get notice that these are the
17  areas in which you were going to testify sometime
18  prior to today?
19  A.      Yes.
20  Q.      Did you do anything to prepare for the
21  deposition?
22  A.      Other than speak with counsel so we
23  understood what we were going to be talking about.
24  That was my prep for this, yes.

1  Q.      All right.  Tell me what your current
2  title is.
3  A.      I am currently a lieutenant with the
4  Columbus Division of Police.
5  Q.      Where?  Where within the division are
6  you assigned?
7  A.      I am assigned in the Internal Affairs
8  Bureau.
9  Q.      What is your job in the Internal
10 Affairs Bureau?
11 A.      Ad --
12 Q.      Just give me a general description.
13 A.      Administrative lieutenant.
14 Q.      Does that mean --
15 A.      Over my investigators.  There's also an
16 administrative part, but I am a lieutenant in
17 charge of now 10 investigators, I believe.
18 Q.      All right.  And who do you report to at
19 the present time?
20 A.      I report to Commander Gardner.
21 Q.      He is the commander over Internal
22 Affairs?
23 A.      That is correct.
24 Q.      Does Commander Gardner have

1  responsibility beyond Internal Affairs?
2  A.      No.
3  Q.      Okay.  You have 10 investigators under
4  your command, correct?
5  A.      Correct.
6  Q.      And are they all sergeants?
7  A.      Correct.
8  Q.      How long have you been in your present
9  position?
10 A.      Since July of 2013.
11 Q.      How long all together have you been
12 with the division?
13 A.      Since November of '94.
14 Q.      When were you promoted to lieutenant?
15 A.      I was promoted to lieutenant in May of
16 2011, I believe.
17 Q.      Just walk me through what your
18 assignments were as a lieutenant before Internal
19 Affairs.  So May of 2011, approximately when --
20 A.      I was a patrol relief lieutenant, and
21 then I became a zone lieutenant for one year, and
22 then I became the Internal Affairs lieutenant.
23 Q.      When were you promoted to sergeant?
24 A.      I was promoted to sergeant in July of

1  2007.
2  Q.      Did you work in Internal Affairs as a
3  sergeant?
4  A.      No, I did not.
5  Q.      So your first assignment to Internal
6  Affairs was as the administrative lieutenant?
7  A.      Or as a lieutenant, yeah.  The
8  administrative lieutenant was a different title,
9  but yes, as a lieutenant to Internal Affairs.
10 Q.      So let me just cover some ground rules.
11 Have you been able to hear me pretty clearly so
12 far?
13 A.      Yes.
14 Q.      All right.  Obviously, we're doing this
15 by Zoom, and I certainly can't promise you that
16 all my questions are going to be good ones.
17 Sometimes they're not particularly excellent
18 questions.  So I want you to be sure, throughout
19 the deposition today, if you're not sure you heard
20 the question or you're not sure you understand it,
21 to have me say it again or explain it before you
22 give us an answer.  Will you do that today?
23 A.      Absolutely.
24 Q.      I ask all witnesses whether they've

1  taken any medication or have any health condition
2  that affects their memory.
3  A.      I do not.  I do not have anything that
4  affects it.
5  Q.      All right.  Any health condition or
6  medication that affects your ability to answer
7  questions truthfully?
8  A.      No.
9  Q.      If throughout -- we're not going to be
10 here too long today together, but throughout the
11 time, if you want to add or change something, feel
12 free to do so, all right?
13 A.      Yes, sir.
14 Q.      Give me a little more detailed
15 description of your duties and responsibilities in
16 Internal Affairs.  I know you have command of
17 now 10 sergeant investigators.  What does that
18 involve?
19 A.      That involves managing their caseload.
20 It involves reviewing their cases.  It involves
21 during their case investigation, assisting them in
22 any way that I can.  Sometimes it's just working
23 through with them on investigative plans.  Just
24 day-to-day case work for those 10.

1  Q.    Okay.  As part of that, do you review
2  their work product -- that is, their -- what they
3  create coming out of their investigation?  And I
4  don't mean you look at every piece of paper; I
5  just mean:  Do you look at their reports, their
6  summaries?
7  A.    When they complete a case, the case
8  comes to their lieutenant for review.  So any of
9  my 10 sergeants, their case would go through me.
10  Q.    Okay.  Are there other sergeant -- I'm
11  sorry.  Are there other lieutenants in Internal
12  Affairs that have the same or similar job to you?
13  A.    Yes.
14  Q.    So who else is there now?
15  A.    Right now, there is Lieutenant Bill
16  Laff.
17  Q.    Spell that last name, please.
18  A.    L-a-f-f.
19  Q.    And how long has Lieutenant Laff been
20  in that position?
21  A.    A little over a year, I believe.
22  Q.    Okay.  And before Laff, who was the
23  lieutenant?
24  A.    That would have been Lieutenant Aimee

1  Haley.
2  Q.    How long was she in the job?
3  A.    Two to three years.  I don't have those
4  dates directly in front of me.
5  Q.    All right.  I know you're not here to
6  speak directly about -- that is, to speak on the
7  City's behalf with respect to the Black Lives
8  Matter protests, but I do want to ask some context
9  questions around that.  When I say "Black Lives
10  Matter protests," I'm referring to the protests
11  that occurred mostly in downtown Columbus but in
12  other places that started on May 28th of 2020 and
13  occurred for, you know, quite some time thereafter
14  into the summer.  You know what I'm talking about,
15  generally, right?
16  A.    I'm aware of it, yes, sir.
17  Q.    Okay.  Were you ever out in the field
18  during any of those protests?
19  A.    Yes, I was.
20  Q.    What role did you play in the field?
21  A.    I was a field force commander for two
22  days out in the field.
23  Q.    From when to when?
24  A.    It was in the second week, so I -- it's

1  the -- Friday/Saturday, I was in the mobile field
2  force.
3  Q.    Okay.  When you say "mobile field
4  force," what do you mean?
5  A.    We had cars.
6  Q.    Okay.  As opposed to officers walking
7  on the street, right?
8  A.    Correct.
9  Q.    Let me make sure I get those dates
10  right.  The George Floyd killing occurred on
11  May 25th of 2020.  I think that's not disputed.
12  And I believe the first protest in Columbus was on
13  May 28th, 2020.  You're not talking about that
14  weekend in May; you're talking about that first
15  full weekend in June, right?
16  A.    Correct.  I'm talking about the Friday
17  and Saturday following.
18  Q.    Right.  I see that on the calendar as
19  June 5th and 6th.  Does that sound right?
20  A.    That sounds right.  I'm -- yes.  And
21  I'm pretty sure it was both -- it was a Friday and
22  Saturday.
23  Q.    All right.
24  A.    I don't have the paperwork in front of

1  me.  I thought it was on that weekend.
2  Q.    Who assigned you as field force
3  commander on those days?
4  A.    I don't know who specifically assigned
5  me.  I'm assuming the EOC did.
6  Q.    The EOC is what?
7  A.    The emergency operations center.
8  Q.    Okay.  Who was the commander of the
9  emergency operations center at the time?
10  A.    I don't know who was the commander of
11  that day, and I don't know who was the commander
12  the day before.
13  Q.    Okay.  That day, who were you -- who
14  was your commanding officer?
15  A.    That day, I was under the command of
16  Commander Dennis Jeffrey.  On both days, actually,
17  I was under Commander Dennis Jeffrey.
18  Q.    All right.  And from when to when on
19  those days, the 5th and 6th of January, were you
20  out in the field on the mobile force?
21  A.    Approximately 3 p.m. to -- one night,
22  probably close to midnight.  The other one,
23  probably close to 11 p.m., 10 p.m.  I don't --
24  again, don't have those numbers in front of me.

1  Q.      All right.  And were you required to be
2  out in the field until things were sufficiently
3  calm for you to leave or was that just the regular
4  time for you to end your shift?
5  A.      There was no really end of a shift.  It
6  was pretty much driven by what was going on in the
7  streets at that time.
8  Q.      All right.  So about 11 p.m. on one
9  night and midnight on the other?
10 A.      Correct.
11 Q.      Whatever was going on in the streets
12 was sufficiently under control that they didn't
13 need you out in the field anymore, right?
14         (Mr. Gittes joined the
15 videoconference.)
16 A.      Correct.
17 Q.      All right.  Other than June 5th
18 and 6th, did you spend any other time in the field
19 during the Black Lives Matter protests?
20 A.      No.  I was not out in any of the areas
21 where protests were ongoing.
22 Q.      Arising out of your brief time in the
23 field those two days, did you make any complaints
24 or bring any charges against any law enforcement

1  personnel based on your observations?
2  A.      No, I did not.
3  Q.      Are you aware of anyone in your mobile
4  field force that you had responsibility for in
5  those two days that brought such a complaint or
6  charge?
7  A.      I am not.
8  Q.      Let's go back.  We were starting to
9  talk about your duties and responsibilities in
10 Internal Affairs, which you've had, I think, since
11 2013, correct?
12 A.      Correct.
13 Q.      Does the -- Lieutenant Laff have a
14 similar number of investigators under his command?
15 A.      He has nine, and he also has
16 responsibility for the duty desk.
17 Q.      What is the duty desk responsibility?
18 A.      They are the intake who receive
19 complaints.
20 Q.      Have you had that responsibility over
21 time?
22 A.      No.
23 Q.      Have you ever had that responsibility
24 on a relief basis?

1  A.      When the lieutenant isn't there, I
2  would step in if they needed time off or something
3  or had to make a decision for them, but,
4  generally, I am not involved with them.
5  Q.      Is the duty desk responsibility
6  actually taking calls from the public or others --
7  A.      Yes.
8  Q.      -- or is that assigned to a lower-level
9  person?
10 A.      That is exactly was it is.  It's taking
11 calls from the public.
12 Q.      Okay.  Are those calls tracked in some
13 way and documented?
14 A.      Yes.
15 Q.      Describe the way in which they are
16 documented and tracked.
17 A.      They are put into an intake log.
18 Q.      Is that intake log handwritten or is it
19 on a computer screen?
20 A.      Computer.
21 Q.      During the seven years you've been a
22 lieutenant in Internal Affairs, has it always been
23 on a computer screen?
24 A.      Yes.

1  Q.      Is that data saved, retained?
2  A.      Yes.
3  Q.      For how long a period of time?
4  A.      It's still there.  I don't -- I can't
5  tell you.  In front of me -- I'm not in charge of
6  that database, but I know there's historical data
7  there.
8  Q.      Do you know how to access that
9  historical data?
10 A.      I can or another sergeant can.  It
11 would take us a minute, but yes.
12 Q.      I'm not going to ask you to do it.  I
13 just wonder -- describe for me what's involved in
14 accessing that database at the intake at the duty
15 desk.
16 A.      I can't describe to you.  I know that
17 if I talked to one of the duty desk sergeants and
18 tell them I need something, they'll find it.
19 Q.      Okay.
20         MR. MARSHALL:  And, Janet, separating
21 out that it is Jenni Edwards whose been designated
22 by the City to speak about the subject protests,
23 we'll call them -- that is the Black Lives Matter
24 protests as we've described and identified them, I

1 do want to ask the lieutenant about his knowledge
2 of that, so -- and I understand that Jenni Edwards
3 is the person who's been designated, and we'll
4 certainly ask her these questions.
5 Q.    But, Lieutenant Bernhardt, are you
6 aware of any complaint or charge of excessive
7 force made by any member of law enforcement --
8 that's broader than just the Columbus Division --
9 any member of law enforcement against any sworn
10 personnel of the Columbus Division arising out of
11 their conduct at the Black Lives Matter protests?
12 A.    I am not aware.
13 Q.    Have you heard from any source that
14 there was such a complaint or charge made by a law
15 enforcement person against another law enforcement
16 person?
17 A.    I am not aware.
18 Q.    To your knowledge, is Internal Affairs
19 investigating -- at the present time investigating
20 any charge or complaint of excessive force arising
21 out of the Black Lives Matter protests?
22 A.    No.  Because that responsibility was
23 taken away from us.
24 Q.    And given to...

1 A.    BakerHostetler.
2 Q.    Okay.  Do you know why that
3 responsibility was taken away from Internal
4 Affairs?
5 A.    I know that an order was placed out in
6 June that an independent group would be
7 investigating complaints, and I know a reports CD
8 was created.  I know that, initially, that was to
9 go through Assistant Director Kathleen Bourke.
10 Q.    All right.  Were there any complaints
11 or charges pending in IAB at the time the decision
12 was made to hand the investigation to
13 BakerHostetler?
14 A.    Yes, there was.
15 Q.    Do you know approximately how many?
16 A.    There were at least, to my
17 understanding, around 300 calls that had come in.
18 Q.    From civilians, all of them?
19 A.    Yes.
20 Q.    Were there any calls that had come in
21 from any member of law enforcement, to your
22 knowledge?
23 A.    Not that I'm aware of.
24 Q.    Would the tracking system that we were

1 referring to, the duty desk tracking system --
2 would that reflect whether any of those 300 calls
3 came in from members of law enforcement?
4 A.    Possibly.
5 Q.    Doesn't the system record from whom the
6 contact came?
7 A.    It does, but if it's from Columbus
8 police law enforcement against Columbus police law
9 enforcement, that doesn't go to that desk.
10 Q.    That's just what I was going to ask
11 you.  What's the manner in which complaints are
12 lodged by Columbus Police against Columbus Police?
13 A.    That would be a formal letter written
14 up the chain of command.
15 Q.    That would make --
16 A.    That's one of the division directives.
17 Q.    That would make its way to Internal
18 Affairs at some point if it was determined
19 Internal Affairs should investigate, right?
20 A.    That is correct.
21 Q.    How is it -- how is it determined
22 whether Internal Affairs should investigate a
23 complaint made by sworn personnel versus another
24 sworn personnel within the Columbus Division?

1 A.    Through the chain of command.
2 Q.    You mean someone in the chain of
3 command makes that judgment call?
4 A.    Yes.  Again, I'm not part of that
5 process on that side.  I receive the letter that's
6 making the investigation.  I don't know who talks
7 with whom and how that process is completely done,
8 but that's done outside of our office.
9 Q.    Do you know at what level the chain of
10 command can require or order Internal Affairs to
11 do an investigation?
12 A.    It's usually a commander or higher.
13 Q.    Do you know whether lieutenants have
14 that authority?
15 A.    I don't believe so.  I believe we have
16 to send it through a commander.
17 Q.    Have you gotten complaints from lower
18 levels that you have then sent it back to say,
19 hey, we need commander authorization?  Has that
20 happened?
21 A.    We don't get it until it's authorized.
22 The letter doesn't come to us.  It goes through
23 their chain of command.
24 Q.    Okay.  So until it gets to that level,

1  you don't see it, right?
2  A.      Correct.
3  Q.      Okay.  Is there any other method other
4  than the formal letter through the chain of
5  command in which a Columbus sworn personnel can
6  complain about another member of the sworn
7  personnel?
8  A.      That is the method outlined in the
9  directives by which to file such a complaint.
10  Q.      Other than the intake desk where you
11  take phone calls, is there any other method that
12  civilians can complain about?
13  A.      The civilians had multiple methods and
14  means.  They have electronic forms that they can
15  fill out, but, eventually, all that gets routed to
16  the duty desk, and the duty desk would give them a
17  call to follow up on their complaint.
18  Q.      So the tracking system is going to
19  record the contact about all complaints, whether
20  they -- whatever method they come in to IAB from,
21  right?
22  A.      For citizen complaints, yes.
23  Q.      All right.  Now, how about other law
24  enforcement agencies?  Let's just give examples.

1  The Columbus -- the Franklin County Sheriff's
2  Office or the Ohio State Highway Patrol, let's
3  take those two.  Is there another method or route
4  for them to make complaints, if they have them?
5  A.      They are considered civilians in our
6  book.
7  Q.      Meaning they would -- whatever method
8  of complaint they used, they would eventually get
9  a call from the duty desk to follow up?
10  A.      They could, unless there was something
11  directly sent to a -- there's other means.
12  There's not -- this isn't all-encompassing.
13  Generally, yes.  There are cases where it could go
14  straight to -- a deputy chief might say, follow up
15  with these people, and then the duty desk will
16  call out to them.
17  Q.      Okay.  And track that call in their
18  system?
19  A.      Correct.
20  Q.      Are you aware of any other law
21  enforcement person, whether it be county, another
22  city or municipality, state, federal, making a
23  complaint or raising a complaint or charge of
24  excessive force against a Columbus Division

1  personnel doing the Black Lives Matter protests?
2  A.      I am not aware.
3  Q.      Okay.  Were there any such
4  investigations ongoing at the time BakerHostetler
5  was assigned to do all that work?
6  A.      What type are you talking about?
7  Q.      Were there any complaints from other
8  law enforcement agencies or personnel about the
9  conduct of Columbus police officers?
10  A.      I am not aware, because if we didn't
11  have anyone that I'm aware of making the
12  complaint, we wouldn't have an investigation.
13  Q.      I want to ask you about the process of
14  the investigations themselves.  Before I do that,
15  let me make sure I've covered -- I used the
16  example of excessive force in the Black Lives
17  Matter protests.  I'm going to cover all
18  complaints of any kind of misconduct.  It could be
19  verbal misconduct, excessive force, inappropriate
20  use of chemical agents or munitions.  Just
21  anything that might be misconduct.  Are you with
22  me?
23  A.      I'm with you.
24  Q.      All right.  Was all of that -- with

1  respect to what occurred during the Black Lives
2  Matter protest, was that all given to
3  BakerHostetler to investigate?
4  A.      At some point, it was, yes.
5  Q.      All right.  Were there any ongoing
6  investigations of misconduct more broadly defined
7  that were going on at least for a period of time
8  within Internal Affairs before BakerHostetler took
9  over the whole investigation?
10  A.      There were investigations that were
11  made by civilians regarding the events of that
12  week that were already in the process of being
13  looked at.  A lot of them, we were told put on
14  hold due to the mayor's announcement.  There were
15  investigations that were actively being
16  investigated with Internal Affairs' involvement
17  that were later told to be handed over to
18  BakerHostetler.
19  Q.      Okay.  And you said complaints about
20  civilians.  You meant complaints by civilians,
21  right?
22  A.      Yes.
23  Q.      Okay.
24  A.      Complaints by civilians.

1  Q.      And so there were both processes in
2  place from those complaints that were put on hold
3  and ongoing investigations that were actually, you
4  know, in the -- somewhere in the investigation
5  that were handed off to BakerHostetler at the time
6  that everything was ordered to go to
7  BakerHostetler.  Do I have that right?
8  A.      At some point in time, yes.
9  Q.      Okay.  The documentation surrounding
10  those, even if the investigation was only in its
11  infancy, the documentation surrounding those, does
12  that still exist in the Internal Affairs Bureau?
13  A.      Yes.  It exists, and it was also handed
14  over to BakerHostetler.
15  Q.      But you kept copies, whether electronic
16  or paper, right?
17  A.      There are copies, yes.
18  Q.      Yeah.  Is it paper or is it electronic
19  or both?
20  A.      Again, I would -- I'm sure there are
21  some things that are just paper.  There are some
22  things that are duplicated electronically, so I
23  could not tell you off the top of my head.
24  Q.      Yeah.  I don't know that you're ever

1  going to be asked to do this, Lieutenant, but if
2  you were tasked with -- give me all the paper and
3  all the electronic records of those, you know,
4  early investigations or those on-hold
5  investigations or those complaints, whatever --
6  you know, whatever it is, where would you go to
7  gather all that or how would you gather it?
8  A.      It would be in Internal Affairs, and I
9  would go through whatever records we have.
10  Q.      I'm just asking what your process would
11  be.  Just for example, you were asked to -- you
12  said that Internal Affairs got some 300 calls
13  arising out of the protests.  That seems like a
14  lot.  I don't know.  You've been doing this for
15  seven years.  Is that -- was that a large number
16  relative to other events and incidents?
17  A.      Depending on the events.  Those
18  multiple days were extraordinary.
19  Q.      Okay.
20  A.      And there were an extraordinary amount
21  of people that were in contact with the division,
22  so -- but there have been other events that have
23  generated hundreds of calls also along the way.
24  Q.      Give me another example that has

1  generated hundreds of calls along the way.
2  A.      I can't give you off my head, but I
3  know there's been other events that we've had
4  hundreds of phone calls come in.  This was
5  extraordinary.  It was greater than any other, but
6  there had been other events.
7  Q.      Okay.  All right.  That was my
8  question, then.  In comparing events, have you --
9  since you've been in Internal Affairs, have you
10  had any events in the city where they generated as
11  many calls and complaints as the Black Lives
12  Matter protests?
13  A.      Not in totality, no.
14  Q.      Okay.  So to get to my question, if
15  someone tasked you with gathering all that
16  documentation, whether it's electronically stored
17  or paper, what would you actually do to do that?
18  What would you have to do?
19  A.      Are you asking me to detail -- like, I
20  would open up a file, take it out --
21  Q.      Well, yeah.
22  A.      -- scan it, or are you just saying --
23  Q.      No.  No.
24  A.      -- do we have that --

1  Q.      That --
2  A.      -- and would we be able to produce
3  them?
4  Q.      That's a good -- that's a good
5  clarification.  You know, when I asked that
6  question, I'm wondering:  Are they all kept in one
7  place?  Are they kept by date?  Are they kept by
8  -- how are they kept?
9  A.      Again, I don't have -- I can tell you
10  the files are maintained, and if you ask for it,
11  we would be able to produce it.  I'm not, right
12  now, able to tell you what exactly organization
13  they're in.
14  Q.      All right.  Other people -- I realize
15  you have a lot of responsibility.  Other people
16  have those organizational responsibilities?
17  A.      It's -- again, I can produce them.
18  They're in files.  I know where they're located.
19  I don't have any idea of how I organized them, the
20  fact of -- is it by date, by that?  I know what
21  was sent to Baker.  You asked me what was sent to
22  Baker.  I can produce that for you.
23  Q.      I see.  So all the stuff that was sent
24  to Baker was then segregated into a different file

1 or different electronic folders; is that correct?
2 A.    That's correct.
3 Q.    All right. So everything that IAB sent
4 to Baker is essentially one place, whether
5 that's a box or a file cabinet or an electronic
6 folder or both, right?
7 A.    Correct.
8 Q.    Got it. Thank you. Can you give me a
9 sense of the volume of that, at least the paper
10 part of that?
11 A.    A lot.
12 Q.    Is it 1,000 pages or 10,000 pages
13 with --
14 A.    It's probably greater than 1,000 pages.
15 Q.    Is it less than 5,000 pages?
16 A.    Yeah. I'd said between 1 and 5 would
17 be a fair estimate.
18 Q.    All right. That's the paper part. How
19 about the electronic part? Give me a sense of
20 that volume. Do you have any idea?
21 A.    A gig -- I mean close to 100-plus
22 gigabytes, if not more. Maybe 150. Maybe more
23 than that, even.
24 Q.    All right. Thank you. That's helpful.

1 Lieutenant, I'm going to walk you through the
2 process of a civilian complaint of excessive force
3 that would -- and I suspect they all follow the
4 same process wherever the source is, but let's
5 just use the example of a civilian complaint of
6 excessive force in which the civilian claims that
7 the excessive force occurred during the protest on
8 the streets in Columbus by a Columbus police
9 officer. Are you with me?
10 A.    I'm with you.
11 Q.    All right. And let's assume that they
12 call the duty desk with that complaint. Give me a
13 rundown of what happens from there.
14 A.    As with any complaint, the call comes
15 in. Most likely, a voicemail will be left, unless
16 the phone is able to be answered at that time,
17 because the duty desk personnel are on the phone a
18 lot. They would then talk to that individual, get
19 basic data from them. You get a synopsis of what
20 the event was. They're describing what they
21 believe the misconduct was.
22        They would then be given a case number.
23 The duty desk personnel would then finish typing
24 up that case. They would look for any calls or

1 video or anything that's associated with that
2 complaint. They would ask, of course, that the
3 complainant, if they had any video, to please
4 provide it; if they were claiming any injury, to
5 please provide any pictures of said injuries; if
6 they were complaining they went to a hospital, to
7 please get a release and provide that information
8 or we can have them sign a release to get that
9 information.
10        But that would be all the parts that
11 were put together to make up an initial complaint
12 packet. That packet would then be sent upstairs
13 where the lieutenants would look at it, whether --
14 what time of day this was, and -- because there's
15 a split as to how we investigate by time of day.
16 And then it would get assigned to an investigator.
17        (Mr. Gittes left the videoconference.)
18 Q.    Okay. And what would the investigator
19 do from there, generally?
20 A.    Investigate.
21 Q.    Right. Does that mean talk to -- you
22 know, get all available documentation, talk to all
23 pertinent witnesses?
24 A.    Exactly.

1 Q.    Right. And those could include
2 witnesses that are neutral, those that are the
3 supportive of the allegation, those that are not
4 supportive of the allegation? They're supposed to
5 talk to everybody who may have pertinent
6 information, right?
7 A.    That they are able to locate, yes. So,
8 of course, that's one of the questions always
9 asked of someone who files a complaint. Do you
10 have any other people you would like us to
11 interview? Could you provide their information to
12 us? The investigator calls that person again and
13 re-interviews them again to determine everything
14 that they have in their complaint. Very rarely
15 does anyone provide video or photos up front, so
16 there is a need to sit there and call back to get
17 that information.
18 Q.    The investigator does whatever they
19 need to do, and when they finish, what do they
20 create out of that investigation?
21 A.    Well, they also do interviews,
22 obviously, of the officers, because when an
23 allegation is placed against an officer, the
24 officer is also interviewed.

1 Q. Sure. And any officers who may have
2 been there --
3 A. Right.
4 Q. -- or observed or had any --
5 A. Yes. And there's also --
6 Q. I get that.
7 A. -- you know, body-worn camera, cruiser
8 video, if we're able to get camera stuff from the
9 city or from a business that might be near that
10 location, those are also avenues that we look at.
11 And then they create a report where they give the
12 investigation and they come up with initial
13 findings.
14 Q. Okay. The initial findings are done in
15 writing?
16 A. That is correct.
17 Q. And to whom do they submit the initial
18 findings?
19 A. The initial findings, once their report
20 is complete and signed with the initial findings,
21 that gets routed to their lieutenant. And for a
22 point of clarification -- I don't think we ever
23 got to this point. I'm actually in charge of
24 second shift sergeants. Laff is in charge of

1 first shift sergeants.
2 Q. Okay. And what happens from there?
3 A. From there, I would -- I send it back
4 with any questions, corrections, because I'm going
5 to ensure that if they are having an allegation
6 and they have their findings that they come up
7 with, that they're supported. And if I believe
8 there needs to be more done, questions answered,
9 people re-interviewed, so on and so forth, I ask
10 that. If it's -- their investigation is complete,
11 then I forward it to the commander. The commander
12 then reviews it. If he has any other questions
13 that he might have or if he finds the
14 investigation is sufficient, he signs it, then he
15 sends it out to the focus officer's chain of
16 command.
17 Q. What database exists, if any, within
18 Internal Affairs that would tell us the results of
19 various investigations? What is there?
20 A. It's PremierOne.
21 Q. PremierOne, I talked to Lieutenant Lipp
22 about earlier today. He gave me a description of
23 that database. Is it the same database we're
24 talking about? In other words, he's in the

1 discipline grievance liaison office. You know who
2 I'm talking about, right?
3 A. Yes.
4 Q. If he was accessing PremierOne, is he
5 looking at the same thing you would be if you were
6 accessing PremierOne?
7 A. No.
8 Q. All right. So what are you looking at?
9 A. PremierOne is divided into silos, and,
10 primarily, Lieutenant Lipp, along with 95 percent
11 of the division, works out of the Columbus PD
12 silo. Internal Affairs has its own silo.
13 Q. All right. So is the Internal Affairs
14 silo the PremierOne database -- is it broken down
15 by what division directive was allegedly violated?
16 A. No.
17 Q. If you were tasked -- well, over the
18 seven years you've been in Internal Affairs, have
19 there been officers -- when I say "officers,"
20 let's agree that what I'm referring to is any
21 number of the sworn personnel, all right?
22 A. Agreed.
23 Q. Could be sergeant, lieutenant, on up,
24 but -- you know, or patrol officer, whatever. Are

1 you with me?
2 A. I'm with you.
3 Q. All right. During the seven years
4 you've been in Internal Affairs, have there been
5 officers who were found to have violated policies
6 regarding the use of mace or pepper spray?
7 A. I can't recall a specific right now,
8 but there's a possibility that one did occur or
9 more did occur.
10 Q. Yeah. No. I'm not looking for names
11 or specifics; I'm just trying to test your
12 knowledge of what's out there.
13 Have there been officers who have been
14 found to have violated the policy regarding use of
15 munitions, like the wooden baton or the sponge
16 baton or the beanbag? Have there been findings
17 like that?
18 A. I'm not aware of that, but --
19 Q. Who --
20 A. -- again, I don't have the database in
21 front of me. You have to understand, in general,
22 300 complaints come in a year from citizens, so
23 you're talking now 2,100 possible cases. Plus,
24 you're talking, you know, other investigations

1 that aren't civilian-led. So it's -- I don't have
2 knowledge of everything that's come through --
3 Q.    Got it.
4 A.    -- and what all's been sustained or not
5 sustained.
6 Q.    You've actually touched upon a subject
7 I want to ask you about, which was -- you just
8 said, on average, about 300 complaints come in a
9 year from civilians, right?
10 A.    That is correct.
11 Q.    And I assume a much smaller number from
12 other sources, like law -- other law enforcement
13 personnel or internally, right?  But some?
14 A.    Some internal.  Again, other law
15 enforcement personnel would fall into the civilian
16 complaint side.
17 Q.    You're right.  You said that.  I'm
18 sorry.  But, internally, about how many complaints
19 to you -- get to Internal Affairs that are
20 internal, generally, within the division?
21 A.    Twenty to forty.  Again, I don't have
22 those numbers in front of me, but significantly
23 lower.
24 Q.    All right.  So maybe 20 to 40 or so?

1 I'm not going to hold you to --
2 A.    Yeah.  I can't off the top of my head
3 tell you exactly.
4 Q.    All right.  Which makes the 300 calls
5 you got from -- arising out of the Black Lives
6 Matter protests -- that sort of doubled your
7 intake for the year, didn't it?
8 A.    No.
9 Q.    I thought you said you got 300 a year.
10 A.    We investigated 300 a year.
11 Q.    I see.
12 A.    Our intake generally gets about 2,500
13 calls per year.
14 Q.    I see.  That's very helpful, because
15 you wouldn't necessarily investigate every call
16 because some of them are just -- well, like the
17 calls I get here at the office, right?
18 A.    Correct.  So even those 300 calls that
19 you're talking about, that could have just been
20 five complaints.
21 Q.    Okay.  Or it could have been more.  It
22 just depends, right?
23 A.    It does, but it's -- again, it's one of
24 those deals where -- 300 calls doesn't mean that

1 every person had a legitimate complaint, either.
2 It just means there were 300 calls.
3 Q.    Got it.  All right.  So 2,500 calls,
4 but you're investigate -- actually looking into
5 300 or approximately --
6 A.    Approximately.  I'm just using a very
7 round figure.  I don't have the data in front of
8 me.  I'm just giving you --
9 Q.    Okay.
10 A.    -- a 10,000...
11 Q.    No.  But that's helpful.  That's part
12 -- that's really a lot of what I wanted to do
13 today, was get that view so we understand what's
14 there and how it works and how the process works.
15       If you were -- if you were asked by,
16 you know, the chief or somebody in command to pull
17 out for the chief, for the years 2015 through
18 2019, all of the complaints of inappropriate use
19 of chemical agents that were investigated by
20 Internal Affairs, how would you go about doing
21 that?
22 A.    Again, within our database we would be
23 looking for, we don't break it down by that.  The
24 other part to this is uses of force -- you're only

1 talking citizen complaints for us.  So if no one
2 has complained about a use of force involving
3 mace, we are not investigating it.
4 Q.    Got it.
5 A.    If there's no -- so if in that year
6 there were no uses of CS gas, there would be no
7 complaints of CS.  There would be -- if there were
8 no overarching protests such that were on those
9 dates, you, again, would not have any of those
10 investigations.
11 Q.    Understood.  There have been, over the
12 years you've been there, some investigations of
13 excessive use of force?  I'll use that term
14 broadly.  And that could be just hand-to-hand.  It
15 could be use of a baton.  It could be use of a
16 flashlight.  It could be use of chemical agents or
17 munitions.  Any of that.  Are you with me?
18 A.    Yes.
19 Q.    Okay.  Are you able, within your
20 PremierOne system, your side, to extract, if you
21 were asked to do so, all of the excessive force
22 complaints that IAB investigated for any
23 particular period of time, as long as it's still
24 in the database?

1  A.       As long as it's still in the database,
2  yes.  We can -- we just use it as force.  Force
3  used, because anytime someone complains about
4  force, their perception is that it's excessive.
5  Very rarely are people saying, the officer did --
6  we want to complain about a good use of force.  So
7  everything to us has that moniker to it, so,
8  force, we can look at what cases had a force
9  allegation.
10  Q.       Sure.  They're not calling you to
11  complain if they think the force was appropriate;
12  they're calling because they thought it was
13  excessive, correct?
14  A.       Correct.
15  Q.       And you're investigating whether or not
16  the force used was in compliance with division
17  policy, correct?
18  A.       Correct.
19  Q.       And so at least initially, the
20  investigator's making a finding one way or the
21  other about that, and then it goes on up, as
22  you've described it, to various levels for a final
23  determination, right?
24  A.       That is correct.  But in most cases,

1  there's already a preliminary use of force that
2  has already been done by the chain of command.  So
3  that is also documentation that would be received
4  by us in the course of our investigation, and in
5  some cases, their investigation might already be
6  complete before we actually receive the complaint.
7  Q.       Yeah.  Meaning any use of force that
8  rises to a certain level, right -- and we're not
9  talking about --
10  A.       That means any use of force in the
11  division results in an investigation.  The
12  consideration of how large of an investigation is
13  determined on the level of force, but a -- laying
14  on of hands to someone, which is a level I, that
15  automatically generates a form that is reviewed by
16  a sergeant.  If the sergeant doesn't believe that
17  the circumstances are correct, they could go
18  beyond.  If they see there, they agree with,
19  they can say whether that's within policy.  But
20  every use of force is signed off by a division
21  supervisor.
22  Q.       Right.  And depending on the level of
23  that force, there's a different level of
24  investigation, right?

1  A.       Correct.
2  Q.       All right.  Any use of deadly force
3  comes under even its own special program, right?
4  A.       Correct.
5  Q.       Okay.  I was asking a question about
6  the documentation available in PremierOne.  Let's
7  go back to that.
8  A.       Yes, sir.
9  Q.       Again, if you were tasked by your --
10  you know, your commanding officers to extract from
11  the database a summary of all of the sustained
12  findings of use of excessive force or use of force
13  in violation of policy, would that be available in
14  the database?
15  A.       Yes, that would be.
16  Q.       All right.  What is that?  Is there a
17  -- is there a report that the database can
18  generate in that regard?
19  A.       I'm not aware of that.
20  Q.       But you could go into the database and
21  find out, right?
22  A.       That is correct.
23  Q.       Let's find out -- let's understand the
24  different types of findings that Internal Affairs

1  makes coming out of its investigations.  I've
2  certainly seen some of that documentation.  I've
3  seen unfounded, I've seen, you know, "sustained"
4  and "not sustained."  Tell me what the different
5  designations are and what they mean.
6  A.       So we'll start with "sustained."
7  "Sustained" is that the actions did occur, but
8  they were outside of policy.  "Exonerated" is the
9  actions occurred, but they were within policy.
10  "Not sustained" is that there was not enough
11  evidence on either side to determine whether that
12  occurred, the event occurred, and as it pertains
13  to policy.  Then you have "unfounded," which means
14  the allegation did not occur.  There is also "not
15  investigated, 8.12," which is a contractual --
16  that there's documentation on the amount of
17  lookback that can be done for an allegation to be
18  investigated.
19  Q.       Okay.  Have we covered all the
20  different categories?
21  A.       We used to have -- and you would see a
22  "disproven."  That is no longer there.  There is a
23  "cancellation," which is canceled info only.  That
24  is that, on its face, the allegation that's being

1 made did not have -- they did not state something
2 that would be misconduct.
3 Q.        Okay.  Is there still "cancellation"?
4 A.        There's still a "cancellation," yes.
5 Q.        And that's just whatever the person's
6 allegation is couldn't possibly be a violation of
7 policy, right?
8 A.        Yes.  It's something that they
9 perceived we should have done or they perceive is
10 something that is something that could be done.
11 An example that was done in the past is, you know,
12 a person gets a ticket on their way to the
13 airport.  They want us to call the -- halt the
14 airplane.  When we don't do that, that's not part
15 of our job, but they believe we should have done
16 so.
17 Q.        That sounds like a real example.
18 A.        It is, actually.
19 Q.        I'm going to have to do that next time
20 I'm late.  So that's "cancellation," because --
21 A.        And so on its face, you can see that
22 that's --
23 Q.        Yeah.
24 A.        -- not our job.

1 Q.        Of course.  "Disproven," when did you
2 stop using that designation?
3 A.        "Disproven" was only in use for about,
4 I think, a year, and there were issues, I believe
5 that it had never been bargained with the union.
6 So, therefore, they asked that be removed.  There
7 used to also be an "unable to resolve" that was
8 removed at that time, removed from our list.
9 Q.        And has it been three or four years at
10 least since you've used "disproven" or "unable to
11 resolve"?
12 A.        No.  It's been within the last two
13 years.
14 Q.        Last two years?
15 A.        I would say.
16 Q.        And then --
17 A.        And then the final one is "withdrawn,"
18 and that, again, is -- some people sit there and
19 make a complaint, and, you know, two weeks later,
20 they get a phone call by the investigator to set
21 up the meeting -- and I'm using two weeks just as
22 a general -- not that that's set in stone in any
23 way.  And the guy goes, you know what?  That
24 night, I was a little bit hotheaded, and I -- the

1 officers didn't do anything wrong, and so we'd
2 like to withdraw the complaint.
3 Q.        Okay.  All right.  Has it been at least
4 a year and a half since disproven and unable to
5 resolve have been used?
6 A.        I can't tell you exactly, but it would
7 be right around, I'd say, in that time frame.
8 Q.        All right.  And then you mentioned not
9 investigated -- did you say A12?
10 A.        8.12.
11 Q.        8.12?
12 A.        Article 8.12.  Not investigated,
13 Article 8.12.
14 Q.        And that's because the collective
15 bargaining agreement prohibits it from being
16 investigated, right?
17 A.        Well, it -- yes.  There is conditions
18 that have to be met for it not to be investigated.
19 The main criteria is it happened greater than 90
20 days.  And then within that, there are criteria
21 that have to be met.
22 Q.        Right.
23 A.        Also, anonymous -- we take anonymous
24 complaints.  8.12 talks about -- anonymous

1 complaints have to be corroborated in order to
2 proceed.
3 Q.        Okay.  Meaning if a person calls and
4 says, you know, I saw this officer act -- you
5 know, here's their cruiser number, do this
6 terrible thing, you have to get initially some
7 corroboration that there was some event in order
8 to investigate, right?
9 A.        Correct.
10 Q.        Okay.  And that's by virtue of a
11 bargained-for provision in the collective
12 bargaining agreement, right?
13 A.        That is correct.
14 Q.        Now, when you say "90 days," I'm
15 familiar with there being a general 90-day limit
16 with several exceptions with respect to Equal
17 Employment Opportunity complaints.  Is there a
18 general 90-day limit with exceptions for any other
19 kind of complaint?
20 A.        I'm sorry.  I don't quite get where
21 you're coming from.
22 Q.        Yeah.  Let me ask you this:  I'm asking
23 about the "8.12, not investigated" designation.
24 Does that 90-day limit have exceptions?

1   A.      Yes.  So as I said, that 8.12 is in
2   regards to civilian complaint or citizen
3   complaints -- and I sometimes use "citizen" and
4   "civilian" interchangeably, but it's regarding a
5   citizen complaint.  The 90 days is from the date
6   of event, and then there are other things that are
7   -- obviously, if it's criminal on its face, if
8   there have been -- someone who has been terminated
9   in the past for the same type of allegation and
10  other criteria, then we would investigate, but
11  that was brought -- what was brought forward.
12  Q.      Are those exceptions written in the
13  collective bargaining agreement or are they --
14  A.      Yes.
15  Q.      Okay.  And just so I understand, a
16  finding of "unfounded" is that the alleged
17  incident didn't occur, right?
18  A.      No.  The alleged misconduct didn't
19  occur.
20  Q.      Yes.
21  A.      The incident could very well have
22  occurred.
23  Q.      Oh, sure.  I understand.  I mean --
24  A.      But the misconduct --

1   Q.      Yes.  Whatever it was that was alleged
2   misconduct didn't happen?
3   A.      Correct.
4   Q.      "Not sustained" is not enough evidence,
5   so explain to me how IAB makes that determination.
6   A.      For example, a rudeness complaint,
7   especially before we had BWC.  You and I are
8   speaking.  Afterwards, you go and you make a phone
9   call and say, Lieutenant Bernhardt used profanity
10  against me or was very rude and did all these
11  things.  When Internal Affairs goes to look at
12  that, there's no audio from you.  There's no audio
13  from us.  There are no witnesses.  I categorically
14  deny that I did it.
15  Q.      Okay.  So you've got a complainant
16  saying this happened and the officer's saying it
17  didn't happen, and no evidence one way or the
18  other.  In other words, the evidence is just the
19  two of them?
20  A.      Correct.
21  Q.      Classic "he said/she said" situation,
22  right?
23  A.      Yes.
24  Q.      That then ends up with a finding of not

1   enough evidence, because you don't have anything
2   to tip the scales either way, right?
3   A.      Yeah.  That comes up with a finding of
4   "not sustained."
5   Q.      Okay.  What if you have two civilian
6   witnesses saying misconduct happened and two
7   officers saying misconduct didn't happen, same
8   finding?
9   A.      Depending on what it -- the situation
10  is, it could be, yes.
11  Q.      All right.  Of course, your
12  investigators are looking for evidence in
13  addition, right, whether it be medical records or
14  camera, you know, videos or whatever, right?
15  A.      Absolutely.
16  Q.      Right.  But if the evidence is just
17  sort of balanced equally, that has to result in a
18  finding of "not sustained," because there's not
19  enough evidence to tip the scales.  Is that how
20  you approach it?
21  A.      That is how we approach it.
22  Q.      Okay.
23          MR. MARSHALL:  We've been going about
24  an hour, a little over an hour.  Let's take a

1   about a nine-minute break to 2:15.  Is that all
2   right?  I want to run to the restroom, and other
3   people may want to.  And I don't think I'm going
4   to be terribly long from here on out.  Maybe an
5   hour at most.
6           MS. ARBOGAST:  Okay.
7           (A short recess is taken.)
8   Q.      Lieutenant, are you -- do you recall --
9   there were -- within the last couple of years,
10  there have been protests at the statehouse.  And
11  in particular, there was one in this past year, in
12  2020, that were by a group of people who were
13  opposed to the governor's health mandates.  They
14  were opposed to the wearing of masks.  Some of
15  them had claims that, you know -- that the COVID
16  crisis was either exaggerated or fabricated.  Do
17  you remember that protest?
18  A.      I remember reading in the news that
19  those type of protests occurred, yes.
20  Q.      Yeah.  Do you remember seeing
21  photographs of armed protesters at the statehouse
22  openly carrying handguns?
23  A.      Again, I can't -- I'm sure they were in
24  the news articles that I was reading.

1  Q.     Do you recall any complaints or charges
2  of excessive use of force against Columbus
3  officers coming out of those protests?
4  A.     I'm not aware of any cases that came
5  from those protests.
6  Q.     As far as you know, there were no
7  investigations of alleged use of -- excessive use
8  of force arising out of those protests?
9  A.     I'm not aware of any such, no.
10  Q.     Were there any arrests made of those --
11  any of those protesters?
12  A.     I would have no idea.
13  Q.     Do you have any recollection of -- and,
14  again, I'm not looking to get into the details of
15  them; just general recollections -- over the past
16  few years of investigations done by the
17  investigators under your command of charges or
18  complaints made against officers relating to their
19  conduct at crowd control at demonstrations?
20  A.     I know that there was one that I
21  believe was done by my investigator following the
22  election of President Trump, soon around his
23  inauguration, if I remember correctly.
24  Q.     There was --

1  A.     If I remember correctly, the -- there
2  was a lawsuit involved with that that said that
3  the City had used level II use of force properly.
4  Q.     Level II is what?
5  A.     Mace.
6  Q.     Okay.  So there was a lawsuit around
7  that.  Do you remember the name of that lawsuit?
8  A.     Not off the top of my head, but do I
9  remember it being referenced that there had been a
10  lawsuit regarding the protest response back
11  in '17.
12  Q.     Okay.  And that lawsuit was found in
13  the City's favor?
14  A.     Yes, I believe so.
15  Q.     Did you testify in that case?
16  A.     No.
17  Q.     Did your investigator testify?
18  A.     I have no idea.
19  Q.     Did you play any role in assembling
20  documents for production in the discovery in this
21  case?  Were you asked to -- or tasked with
22  gathering documents?
23  A.     You're talking the one that I'm
24  currently being deposed for as a 30(b)?

1  Q.     Yes, sir.
2  A.     Yes, I was.
3  Q.     What did you do generally to gather
4  documents?
5  A.     Went into PremierOne, pulled the
6  documents out of it, put it on to some sort of
7  electronic device, whether it be e-mail, USB,
8  whatever, to provide to the City Attorney's Office
9  upon their request.
10  Q.     And generally speaking, what did you
11  gather?
12  A.     Documents regarding uses of force,
13  documents regarding Internal Affairs
14  investigations.
15  Q.     So everything that Internal Affairs
16  either got or did up until the time that -- at
17  least up until the time that BakerHostetler took
18  over that complete investigation; is that right?
19  A.     That's correct.  Plus, events past
20  that, plus all the information regarding uses of
21  force provided to BakerHostetler.
22  Q.     Okay.  And when you say "events past
23  that," you mean incidents or events that were
24  complained about after you sent the stuff to

1  BakerHostetler?
2  A.     I'm talking about incidents that
3  occurred -- where uses of force occurred after
4  that.
5  Q.     Okay.  Because there were some protests
6  after that is what you're saying?
7  A.     Yes.  There's been protests up until
8  about a week and a half ago.
9  Q.     Right.  To your knowledge, has the
10  division done any study of the charges or
11  complaints that were made to Internal Affairs?
12  A.     I don't know what you're talking about.
13  Q.     Has anyone done any summary of the
14  complaints or review of them?  I know
15  BakerHostetler was doing its own -- you know,
16  we'll find out from them what they did, but has
17  Internal Affairs been asked to do any study or
18  summary of these various kinds of complaints
19  coming out of the protests?
20  A.     Well, seeing as Internal Affairs did no
21  -- was not tasked with investigating that, that
22  was tasked to BakerHostetler for the vast
23  majority, if anything, related to protests uses of
24  force.

1    Q.    Understood.  Up until --
2    A.    That would not be us to do a study on,
3    because we provided all the documents to them.
4    Q.    Got it.  Great.  And as I'm
5    understanding you, these investigations were taken
6    out of Internal Affairs' hands fairly early on.
7    Is that a fair description?
8    A.    Not early, but yes.  They were
9    eventually taken out of our hands, yes.
10   Q.    Were they taken out of your hands
11   before any findings were made on anything?
12   A.    Yes.
13   Q.    So there have been no findings --
14   whether the findings were going to be "unfounded,"
15   "sustained," "not sustained," there have been no
16   findings on any of the complaints arising out of
17   the Black Lives Matter protests at the time things
18   were handed off to BakerHostetler, correct?
19   A.    That is correct.  Investigations were
20   either ongoing or were told to remain on hold
21   until it was determined who would do the
22   investigation.
23   Q.    Which of your sergeants were doing the
24   ongoing investigations at the time things were

1    turned over to BakerHostetler?
2    A.    There were two sergeants who were
3    assigned to assist the city -- or the safety
4    director's office with -- actually, I take that
5    back.  Also, Lieutenant Laff was assigned.  So two
6    sergeants and Lieutenant Laff were assigned to
7    assist the safety director's office with certain
8    investigations that were being handled by them at
9    the time.
10   Q.    Okay.  Who were the two sergeants?
11   A.    One was Sergeant Larry Ferguson.  The
12   other one was Sergeant Tyrone Hollis.
13   Q.    And then they ceased their work on this
14   subject we're talking about once things were
15   headed off to BakerHostetler, right?
16   A.    Once everything was turned over to
17   BakerHostetler, yes.
18   Q.    To your knowledge, have there been any
19   criminal charges levied against any member of the
20   CDP sworn personnel arising out of the Black Lives
21   Matter protests?
22         (Mr. Gittes joined the
23   videoconference.)
24   A.    I'm aware of none.

1    Q.    Are you aware of any ongoing criminal
2    investigations?
3    A.    I am aware that the City Attorney
4    Office -- or not the City Attorney's Office.  I'm
5    sorry.  No.  Actually, the safety director's
6    office has a Director Wozniak who was tasked with
7    looking into whether there was criminality in any
8    of the events of those months.
9    Q.    Do you know the status of that
10   investigation?
11   A.    No, I do not.
12   Q.    Have you been interviewed as part of
13   that investigation?
14   A.    No, I have not.
15   Q.    Were you interviewed by anyone at
16   BakerHostetler?
17   A.    No, I have not.
18   Q.    Other than providing BakerHostetler --
19   or assisting in providing BakerHostetler with all
20   the materials that Internal Affairs had, have you
21   had any communication with BakerHostetler?
22   A.    No.
23   Q.    Do you know who Jenni Edwards is?
24   A.    Yes.

1    Q.    She is one of the attorneys at
2    BakerHostetler?
3    A.    That is correct.
4    Q.    Have you exchanged e-mails with her
5    regarding your investigation?
6    A.    I'm sure she was part of e-mails, as I
7    had sent some stuff to -- I believe her name was
8    Allison Moss, who is their paralegal, who received
9    information on USB sticks that was being provided
10   to them.  And with the BakerHostetler
11   investigations, they did assign Internal Affairs
12   sergeants to act as liaisons within, but they did
13   not do any of the investigations.
14   Q.    Yes, you've explained that.  Who were
15   the sergeants assigned as liaisons with
16   BakerHostetler?
17   A.    The ones that I recall were Tim
18   Grimm -- Sergeant Tim Grimm, Sergeant Chris
19   Graham, Sergeant Joshua Van Dop, Sergeant Scott
20   Gaton.  I believe Sergeant Brian Rose assisted.
21   There might have been another sergeant.  And their
22   primary assist with BakerHostetler was setting up
23   interviews and being there to assist guarantee
24   rights.

1  Q.      Did any of the people who worked on
2  your command or any of the sergeants in Internal
3  Affairs do any reviewing of any of the video
4  evidence of the protests for BakerHostetler?
5  A.      Not that I'm aware of, no.  They were
6  purely to help schedule the interviews that were
7  going to occur.
8  Q.      Okay.  I'm just about finished,
9  Lieutenant, though I do want to take another brief
10 break to check my notes.
11        MR. MARSHALL:  So, let's do this.
12 It's 12:29.  Let's take a 10-minute break to --
13 let's go to -- let's go to 2:40, and then we'll
14 get back on and finish this up, all right?
15        MS. ARBOGAST:  Okay.
16        MR. MARSHALL:  Thank you.
17        (A short recess is taken.)
18 Q.      Lieutenant, I asked you if you were
19 aware of any formal letters or chain of command
20 investigations arising out of the Black Lives
21 Matter protests in which someone internally raised
22 a question about the conduct of someone else or it
23 was just a use of force.  Was all of that internal
24 stuff handed off to BakerHostetler as well?

1  A.      Yes.  We were given an order on
2  July 21st to collect everything in whatever form
3  of completion it was.  It was all to come to
4  Internal Affairs, and then we were to forward it
5  on to BakerHostetler, which we did.
6  Q.      All right.  And so all of the materials
7  that we -- I was asking you about earlier, the
8  more than 1,000/less than 5,000 pages of paper,
9  plus the 150, potentially, gigabytes of data, all
10 of that included these internal -- that included
11 these internal chain of command investigations,
12 use of force investigations, right?
13 A.      That is correct.
14 Q.      And you gathered all that up and sent
15 it to BakerHostetler, right?
16 A.      That is correct.
17 Q.      When I say "you," did you personally do
18 all that gathering or you had people do it with
19 you or --
20 A.      Myself and Lieutenant Laff took on the
21 -- to limit how many people were doing it, made
22 sure to scan and then forward all that.
23 Q.      All right.  Now, was all of that same
24 material that you sent to BakerHostetler also

1  provided to the City Attorney's Office?
2  A.      Yes, as to the use of force.  I don't
3  know what BakerHostetler has provided regarding
4  the cases.  We have had returned cases, but they
5  have the materials.  I don't know if they had more
6  or less.  I don't know what they gathered.
7  Q.      All right.  I have just a few questions
8  regarding what happens once, at least at the
9  Internal Affairs level, there's a finding of
10 either "unfounded," "not founded," or "sustained,"
11 all right?  Are you with me?
12 A.      I'm with you.
13 Q.      All right.  Let's take "unfounded" and
14 "not sustained."  What happens with those findings
15 once Internal Affairs is done?
16 A.      They get sent out to the chain of
17 command.  The chain of command reviews the
18 investigation and then determines if they agree or
19 not.
20 Q.      If they disagree with the finding of
21 "unfounded" or "not sustained," what happens?
22 A.      They change it.
23 Q.      Can they send it back for further
24 investigation?

1  A.      If they so desire, yes.
2  Q.      Does that happen on occasion?
3  A.      Very rarely.
4  Q.      But it has happened in the seven years
5  you've been there?
6  A.      Yes.
7  Q.      Maybe a handful of times, perhaps?
8  A.      Yeah.  And I'm not talking use of force
9  investigations; I'm just talking any
10 investigation.
11 Q.      Sure.
12 A.      But, yes.  It has happened, but it's
13 very rare.
14 Q.      Right.  Could be for any type of
15 investigation, right?
16 A.      Correct.
17 Q.      All right.  And then on up the chain of
18 command.  If there's a finding of "sustained,"
19 that goes up the chain of command as well, right?
20 A.      All findings go -- so any Internal
21 Affairs investigation gets signed off by the
22 commander or the acting commander, if the
23 commander's not available, and gets sent out to
24 either that officer's commander or that officer's

1  deputy chief, depending on the level of an
2  investigation.
3         That deputy chief or commander then
4  sends that investigation down the chain to the
5  next-highest supervisor of the focus.  So if the
6  focus is a sergeant, it gets sent to the
7  lieutenant for review.  If it's an officer, it
8  gets to the sergeant for review.  And then each
9  member of the chain of command weighs in on what
10 -- whether they agree with the Internal Affairs
11 investigation or not.
12 Q.      Right.  And I've seen some of these
13 routing sheets.  Sometimes all of this stuff
14 appears on one or two pieces of paper where it's
15 been routed down and then up the chain of command,
16 right?
17 A.      Correct.  And sometimes, if everyone's
18 in agreement, it's a nice one or two sheets of
19 paper.  If there's disagreement, there could be
20 two or three letters attached to it that, you
21 know, give the basis for why they believe the
22 finding should be changed or supporting whatever
23 they are saying.
24 Q.      Right.  Does all of that come back to

1  Internal Affairs eventually for your file?  In
2  other words, once it's complete, once it's been
3  routed through the entire chain of command and
4  final decisions are made, does it come back to you
5  for your files?
6  A.      Yes.  An Internal Affairs investigation
7  is not complete until it has been ruled on by the
8  chain of command.
9  Q.      Okay.  From there, if there's
10 discipline -- who decides discipline if there's a
11 sustained finding from there?
12 A.      Chain of command.
13 Q.      And from there, that goes to it's own
14 process, whatever it is, right?
15 A.      Depending on the level of discipline,
16 yes.  It could either be taken care of -- so that
17 case could go from us over to the commander, let's
18 say, down, back up to the deputy chief.  Deputy
19 chief or commander agrees, sends it back down for
20 discipline, then comes back.  The discipline is
21 put into a separate location for filing, and then
22 the case gets sent back to us.
23 Q.      Okay.  For what purpose is it sent back
24 to you, just so your file's complete?

1  A.      Just so our file -- well, the finding
2  that we have placed isn't final until the chain of
3  command makes its ruling.
4  Q.      Right.  Or makes a change to it, right?
5  A.      Well, whatever their ruling is.  It can
6  be agreement, disagreement.  Until they rule on
7  it --
8  Q.      Right.
9  A.      -- our finding is conditional.  Their
10 finding is permanent.
11 Q.      Do you track the extent to which your
12 findings -- that is, Internal Affairs' findings --
13 are changed?
14 A.      At one time, we did have a report like
15 that.  I don't know if that report is up to date
16 at this time, but we did at one time, yes.
17 Q.      What's that report called?
18 A.      I think it's just called findings.
19 Internal stuff that we would just use for, like,
20 an annual report.  It's not a published report.
21 Q.      When is the last time that report was
22 generated?
23 A.      I don't believe that report was used
24 for the last annual report, so it might have been

1  a year, year and a half, two years ago.
2  Q.      Is it a report that can be generated
3  through electronic means, meaning something you
4  can just get in the database and do?
5  A.      Yes.  But that assumes that all the
6  data points have been entered in correctly, and
7  that would have to be first reviewed to make sure
8  that that data was entered.
9  Q.      Have you received back the
10 BakerHostetler report?
11 A.      We've received many cases, yes.
12 Q.      You're receiving cases as they are
13 finished up, right?
14 A.      Correct.
15 Q.      All right.  Have you seen any of the
16 summary reports that they've created?
17 A.      I've seen that they've had a summary
18 report, yes.  I haven't read any of them.
19 Q.      All right.  But what's happening is
20 that you're just taking back the reports into your
21 case files.  What happens to those findings of the
22 BakerHostetler cases?
23 A.      Whatever the chain of command
24 determined it to be will be enter into PremierOne.

1 We're probably a little bit behind on that, but
2 we're working on making sure all of those get
3 entered in.
4 Q.       All right.  So BakerHostetler findings,
5 whether it's "unfounded," "sustained," "not
6 sustained," those findings go through the same
7 chain of command process as if it was coming out
8 of Internal Affairs?
9 A.       That is correct.  The final finding
10 comes from the chain of command, not from the
11 investigatory group.
12 Q.       Have any of the findings been changed
13 that you've seen?
14 A.       I've seen a couple that have been along
15 the way, yes.
16 Q.       Approximately how many cases have come
17 back?  Give me a rough number.
18 A.       Thirty-five to forty, maybe.
19 Thirty-five, probably.  Forty.  I'm not sure.
20 It's in that range.
21 Q.       Do you know how many are on stand by?
22 A.       I have no idea, because I've never been
23 provided a list of how many investigations
24 BakerHostetler has.

1 Q.       Okay.  But you're continuing to receive
2 findings back?
3 A.       Yes.
4 Q.       Do they come to you and then you send
5 them up to the chain of command?  Is that the
6 process?
7 A.       That goes back to the sergeants who are
8 liaisons.  They receive the case.  They bring it
9 in and then have it sent out to the chain of
10 command.  And then when the chain of command is
11 finished, it comes back to us for filing.
12 Q.       Got it.  All right.  Let me just look
13 at one more note here, but I think I'm finished.
14 A.       And if I could, I might have misspoke
15 on Wozniak.  I believe I referred to him as
16 assistant director.  He's a deputy director.
17 Q.       In the safety director's office?
18 A.       Yes.  Regarding the criminal
19 investigations, that would be Deputy Director
20 Wozniak, not assistant director.  I think I
21 misspoke.
22 Q.       Do you know who -- he may be
23 responsible for it, but do you know who's actually
24 doing the criminal investigations?

1 A.       I have no idea.
2 Q.       Okay.
3 A.       I have no idea how their investigatory
4 process is being progressed.
5 Q.       Okay.  Lieutenant, I appreciate your
6 time today.  Thank you very much.
7 A.       You're very welcome, sir.
8          (Signature not waived.)
9               - - - - -
10          Thereupon, the foregoing proceedings
11 concluded at 2:51 p.m.
12               - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

1 State of Ohio        :        C E R T I F I C A T E
  County of Franklin: SS
2
3      I, Craig Ross, RPR, CRR, a Notary Public in and
  for the State of Ohio, certify that Lieutenant Bela
4 A. Bernhardt was by me duly sworn to testify to the
  whole truth in the cause aforesaid; testimony then
5 given was reduced to stenotype in the presence of
  said witness, afterwards transcribed by me; the
6 foregoing is a true record of the testimony so
  given; and this deposition was taken at the time
7 and place specified on the title page.
8      Pursuant to Rule 30(e) of the Federal Rules of
  Civil Procedure, the witness and/or the parties
9 have not waived review of the deposition
  transcript.
10     I certify I am not a relative, employee,
  attorney or counsel of any of the parties hereto,
11 and further I am not a relative or employee of any
  attorney or counsel employed by the parties hereto,
12 or financially interested in the action.
13     IN WITNESS WHEREOF, I have hereunto set my hand
  and affixed my seal of office at Columbus, Ohio, on
14 February 23, 2021.
15
16
17
18
19
20 _____
  Craig Ross, Notary Public - State of Ohio
21 My commission expires July 7, 2021.
22
23
24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line      Correction or Change      Reason Code
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____

I, Lieutenant Bela A. Bernhardt, have read the
entire transcript of my deposition taken in this
matter, or the same has been read to me.  I
request that the changes noted on my errata
sheet(s) be entered into the record for the
reasons indicated.
Date_____Signature_____
The witness has failed to sign the deposition
within the time allowed.
Date_____Signature_____

Ref: CR301267BB  S-CR P-SC

**1**

**1** 8:7 9:7 34:16
**1,000** 34:12,14
**1,000/less** 67:8
**10** 10:17 11:3 13:17,24 14:9 17:23
**10,000** 34:12 44:10
**10-minute** 66:12
**100-plus** 34:21
**11** 17:23 18:8
**12:29** 66:12
**150** 34:22 67:9
**17** 59:11

**2**

**2,100** 41:23
**2,500** 43:12 44:3
**20** 42:24
**2007** 12:1
**2011** 11:16,19
**2013** 11:10 19:11
**2015** 8:7 9:7 44:17
**2019** 44:18
**2020** 8:14 15:12 16:11,13 57:12
**21st** 67:2
**23** 7:5
**25th** 16:11
**28th** 8:14 15:12 16:13
**2:15** 57:1
**2:40** 66:13
**2:51** 76:11

**3**

**3** 17:21
**30(b)** 59:24
**30(b)(6)** 6:23
**300** 23:17 24:2 31:12 41:22 42:8 43:4,9,10,18,24 44:2,5

**4**

**40** 42:24

**5**

**5** 34:16
**5,000** 34:15 67:8
**5th** 16:19 17:19 18:17

**6**

**6th** 16:19 17:19 18:18

**8**

**8.12** 49:15 52:10, 11,12,13,24 53:23 54:1

**9**

**9** 7:2,4
**90** 52:19 53:14 54:5
**90-day** 53:15,18, 24
**94** 11:13
**95** 40:10

**A**

**A12** 52:9
**ability** 13:6
**Absolutely** 12:23 56:15
**accept** 6:12
**access** 21:8
**accessing** 21:14 40:4,6
**act** 53:4 65:12
**acting** 69:22
**actions** 49:7,9
**actively** 29:15
**Ad** 10:11
**add** 13:11
**addition** 56:13
**administration** 5:5,7
**administrative** 8:3 10:13,16 12:6,8
**Affairs** 10:7,10,22 11:1,19,22 12:2, 6,9 13:16 14:12 19:10 20:22 22:18 23:4 24:18, 19,22 25:10 29:8 30:12 31:8,12 32:9 39:18 40:12, 13,18 41:4 42:19 44:20 48:24 55:11 60:13,15 61:11,17,20 64:20 65:11 66:3 67:4 68:9,15 69:21 70:10 71:1, 6 74:8
**Affairs'** 29:16 62:6 72:12
**affects** 13:2,4,6
**agencies** 26:24 28:8

**agents** 28:20 44:19 45:16
**agree** 6:12 7:1 40:20 47:18 68:18 70:10
**Agreed** 40:22
**agreement** 52:15 53:12 54:13 70:18 72:6
**agrees** 71:19
**Aimee** 14:24
**airplane** 50:14
**airport** 50:13
**Alana** 7:17
**all's** 42:4
**all-encompassing** 27:12
**allegation** 37:3,4, 23 39:5 46:9 49:14,17,24 50:6 54:9
**alleged** 54:16,18 55:1 58:7
**allegedly** 40:15
**Allison** 65:8
**amount** 31:20 49:16
**announcement** 29:14
**annual** 72:20,24
**anonymous** 52:23,24
**anymore** 18:13
**anytime** 8:6 46:3
**appears** 70:14
**approach** 56:20, 21
**approximately** 11:19 17:21 23:15 44:5,6 74:16
**Arbogast** 5:11,12 6:15,20 7:14,21 57:6 66:15
**areas** 9:17 18:20
**arising** 18:22 22:10,20 31:13 43:5 58:8 62:16 63:20 66:20
**armed** 57:21
**arrests** 58:10
**Article** 52:12,13
**articles** 57:24
**assembling** 59:19
**assign** 65:11
**assigned** 10:6,7 17:2,4 20:8 28:5 36:16 63:3,5,6 65:15
**assignment** 12:5
**assignments** 11:18

**assist** 63:3,7 65:22,23
**assistant** 23:9 75:16,20
**assisted** 65:20
**assisting** 13:21 64:19
**assume** 35:11 42:11
**assumes** 73:5
**assuming** 17:5
**attached** 70:20
**Attorney** 5:8 6:11 64:3
**Attorney's** 5:12 60:8 64:4 68:1
**attorneys** 65:1
**audio** 55:12
**authority** 25:14
**authorization** 25:19
**authorized** 25:21
**automatically** 47:15
**avenues** 38:10
**average** 42:8
**aware** 15:16 19:3 22:6,12,17 23:23 27:20 28:2,10,11 41:18 48:19 58:4, 9 63:24 64:1,3 66:5,19

**B**

**back** 19:8 25:18 37:16 39:3 48:7 59:10 63:5 66:14 68:23 70:24 71:4, 18,19,20,22,23 73:9,20 74:17 75:2,7,11
**Baker** 33:21,22,24 34:4
**Bakerhostetler** 23:1,13 28:4 29:3,8,18 30:5,7, 14 60:17,21 61:1, 15,22 62:18 63:1, 15,17 64:16,18, 19,21 65:2,10,16, 22 66:4,24 67:5, 15,24 68:3 73:10, 22 74:4,24
**balanced** 56:17
**bargained** 51:5
**bargained-for** 53:11
**bargaining** 52:15 53:12 54:13
**based** 19:1
**basic** 35:19
**basis** 19:24 70:21
**baton** 41:15,16 45:15

**beanbag** 41:16
**behalf** 5:17 6:14 7:12,19 15:7
**Bela** 5:22 6:4
**Bernhardt** 5:22 6:4,5 7:4,12,18 22:5 55:9
**Bill** 14:15
**bit** 51:24 74:1
**Black** 8:13 9:10 15:7,9 18:19 21:23 22:11,21 28:1,16 29:1 32:11 43:5 62:17 63:20 66:20
**body-worn** 38:7
**book** 27:6
**Bourke** 23:9
**box** 34:5
**break** 44:23 57:1 66:10,12
**Brian** 65:20
**bring** 18:24 75:8
**broader** 22:8
**broadly** 29:6 45:14
**broken** 40:14
**brought** 19:5 54:11
**Bureau** 10:8,10 30:12
**business** 38:9
**BWC** 55:7

**C**

**cabinet** 34:5
**calendar** 16:18
**call** 21:23 25:3 26:17 27:9,16,17 35:12,14 37:16 43:15 50:13 51:20 55:9
**called** 6:23 72:17, 18
**calling** 46:10,12
**calls** 20:6,11,12 23:17,20 24:2 26:11 31:12,23 32:1,4,11 35:24 37:12 43:4,13,17, 18,24 44:2,3 53:3
**calm** 18:3
**camera** 38:7,8 56:14
**canceled** 49:23
**cancellation** 49:23 50:3,4,20
**care** 71:16
**carrying** 57:22
**cars** 16:5
**case** 6:7 7:11 13:21,24 14:7,9

35:22,24 59:15,
21 71:17,22
73:21 75:8

caseload 13:19

cases 13:20 27:13
41:23 46:8,24
47:5 58:4 68:4
73:11,12,22
74:16

categorically
55:13

categories 49:20

CD 23:7

CDP 8:4 63:20

ceased 63:13

center 17:7,9

cetera 8:10

chain 24:14 25:1,
2,9,23 26:4 39:15
47:2 66:19 67:11
68:16,17 69:17,
19 70:4,9,15
71:3,8,12 72:2
73:23 74:7,10
75:5,9,10

change 13:11
68:22 72:4

changed 70:22
72:13 74:12

charge 10:17 19:6
21:5 22:6,14,20
27:23 38:23,24

charges 8:1,9 9:5,
8 18:24 23:11
58:1,17 61:10
63:19

check 66:10

chemical 28:20
44:19 45:16

chief 27:14 44:16,
17 70:1,3 71:18,
19

Chris 65:18

circumstances
47:17

citizen 26:22 45:1
54:2,3,5

citizens 41:22

city 5:12 6:11,17
7:19 21:22 27:22
32:10 38:9 59:3
60:8 63:3 64:3,4
68:1

City's 15:7 59:13

Civil 6:24

civilian 35:2,5,6
42:15 54:2,4 56:5

civilian-led 42:1

civilians 8:3
23:18 26:12,13
27:5 29:11,20,24
42:9

claiming 36:4

claims 35:6 57:15

clarification 33:5
38:22

Classic 55:21

clear 7:16 8:15,17
9:12

close 17:22,23
34:21

collect 67:2

collective 52:14
53:11 54:13

Columbus 5:12
10:4 15:11 16:12
22:8,10 24:7,8,
12,24 26:5 27:1,
24 28:9 35:8
40:11 58:2

command 11:4
13:16 17:15
19:14 24:14 25:1,
3,10,23 26:5
39:16 44:16 47:2
58:17 66:2,19
67:11 68:17
69:18,19 70:9,15
71:3,8,12 72:3
73:23 74:7,10
75:5,10

commander
10:20,21,24
15:21 17:3,8,10,
11,16,17 25:12,
16,19 39:11
69:22,24 70:3
71:17,19

commander's
69:23

commanding
17:14 48:10

communication
64:21

communications
8:5

comparing 32:8

complain 26:6,12
46:6,11

complainant 36:3
55:15

complained 45:2
60:24

complaining 36:6

complains 46:3

complaint 19:5
22:6,14,20 24:23
26:9,17 27:8,23
28:12 35:2,5,12,
14 36:2,11 37:9,
14 42:16 44:1
47:6 51:19 52:2
53:19 54:2,5 55:6

complaints 8:2,9
9:7 18:23 19:19
23:7,10 24:11
25:17 26:19,22
27:4 28:7,18
29:19,20,24 30:2
31:5 32:11 41:22
42:8,18 43:20
44:18 45:1,7,22
52:24 53:1,17

complete 14:7
38:20 39:10 47:6
60:18 71:2,7,24

completely 25:7

completion 67:3

compliance 46:16

computer 20:19,
20,23

concerned 8:19

concluded 76:11

condition 13:1,5

conditional 72:9

conditions 52:17

conduct 8:5 22:11
28:9 58:19 66:22

confirm 6:8

consent 5:4,6,14

consideration
47:12

considered 27:5

contact 6:10,18
24:6 26:19 31:21

context 15:8

continuing 75:1

contractual 49:15

control 18:12
58:19

copies 30:15,17

correct 6:14,15
7:5 10:23 11:4,5,
7 16:8,16 18:10,
16 19:11,12
24:20 26:2 27:19
34:1,2,7 38:16
42:10 43:18
46:13,14,17,18,
24 47:17 48:1,4,
22 53:9,13 55:3,
20 60:19 62:18,
19 65:3 67:13,16
69:16 70:17
73:14 74:9

corrections 39:4

correctly 58:23
59:1 73:6

corroborated
53:1

corroboration
53:7

counsel 5:2 9:22

county 27:1,21

couple 57:9 74:14

courts 9:8

cover 12:10 28:17

covered 28:15
49:19

COVID 57:15

create 14:3 37:20
38:11

created 23:8
73:16

criminal 8:2 54:7
63:19 64:1 75:18,
24

criminality 64:7

crisis 57:16

criteria 52:19,20
54:10

CROSS-
EXAMINATION
6:1

crowd 58:19

cruiser 38:7 53:5

CS 45:6,7

current 10:1

_____

D

data 21:1,6,9
35:19 44:7 67:9
73:6,8

database 21:6,14
39:17,23 40:14
41:20 44:22
45:24 46:1 48:11,
14,17,20 73:4

date 33:7,20 54:5
72:15

dates 15:4 16:9
45:9

day 8:7 17:11,12,
13,15 36:14,15

day-to-day 13:24

days 15:22 17:3,
16,19 18:23 19:5
31:18 52:20
53:14 54:5

deadly 48:2

deals 43:24

decides 71:10

decision 20:3
23:11

decisions 71:4

defendants 5:13,
17

defined 29:6

demonstrations
8:6 58:19

demonstrators
9:5

Dennis 17:16,17

deny 55:14

depending 31:17
47:22 56:9 70:1
71:15

depends 43:22

deposed 59:24

deposition 5:15
8:8 9:21 12:19

deposition's 6:22

deputy 27:14
70:1,3 71:18

created 23:8
73:16

75:16,19

describe 20:15
21:13,16

describing 35:20

description 10:12
13:15 39:22 62:7

designated 8:16
9:13 21:21 22:3

designation 51:2
53:23

designations
49:5

desire 69:1

desk 19:16,17
20:5 21:15,17
24:1,9 26:10,16
27:9,15 35:12,17,
23

detail 32:19

detailed 13:14

details 58:14

determination
46:23 55:5

determine 37:13
49:11

determined
24:18,21 47:13
62:21 73:24

determines 68:18

device 60:7

directive 40:15

directives 24:16
26:9

directly 15:4,6
27:11

director 23:9 64:6
75:16,19,20

director's 63:4,7
64:5 75:17

disagree 68:20

disagreement
70:19 72:6

discipline 40:1
71:10,15,20

discovery 49:22
51:1,3,10 52:4

disputed 16:11

disproven 49:22
51:1,3,10 52:4

divided 40:9

division 10:4,5
11:12 22:8,10
24:16,24 27:24
31:21 40:11,15
42:20 46:16
47:11,20 61:10

documentation
30:9,11 32:16
36:22 47:3 48:6
49:2,16

documented
20:13,16

documents
59:20,22 60:4,6,
12,13 62:3

Dop 65:19
doubled 43:6
downtown 15:11
driven 18:6
due 29:14
duly 5:23
duplicated 30:22
duties 13:15 19:9
duty 19:16,17
20:5 21:14,17
24:1 26:16 27:9,
15 35:12,17,23

**E**

e-mail 60:7
e-mails 65:4,6
earlier 39:22 67:7
early 31:4 62:6,8
Edwards 7:9,20,
22 21:21 22:2
64:23
election 58:22
electronic 26:14
30:15,18 31:3
34:1,5,19 60:7
73:3
electronically
30:22 32:16
emergency 17:7,9
employed 6:17
Employment
53:17
end 18:4,5
ends 55:24
enforcement 8:4
18:24 22:7,9,15
23:21 24:3,8,9
26:24 27:21 28:8
42:12,15
ensure 39:5
enter 73:24
entered 73:6,8
74:3
entire 71:3
EOC 17:5,6
Equal 53:16
equally 56:17
essentially 34:4
estimate 34:17
event 35:20 49:12
53:7 54:6
events 29:11
31:16,17,22 32:3,
6,8,10 60:19,22,
23 64:8
eventually 26:15
27:8 62:9 71:1
everyone's 70:17
evidence 49:11
55:4,17,18 56:1,
12,16,19 66:4

exaggerated
57:16
examples 26:24
excellent 12:17
exceptions 53:16,
18,24 54:12
excessive 9:6
22:6,20 27:24
28:16,19 35:2,6,7
45:13,21 46:4,13
48:12 58:2,7
exchanged 65:4
exist 30:12
exists 30:13
39:17
Exonerated 49:8
explain 12:21
55:5
explained 65:14
extent 72:11
external 8:2
extract 45:20
48:10
extraordinary
31:18,20 32:5

**F**

fabricated 57:16
face 49:24 50:21
54:7
fact 33:20
fair 34:17 62:7
fairly 62:6
fall 42:15
familiar 53:15
favor 59:13
federal 6:24 27:22
feel 9:12 13:11
Ferguson 63:11
field 15:17,20,21,
22 16:1,3 17:2,20
18:2,13,18,23
19:4
figure 44:7
file 26:9 32:20
33:24 34:5 71:1
72:1
file's 71:24
filed 9:7
files 33:10,18
37:9 71:5 73:21
filing 71:21 75:11
fill 26:15
final 46:22 51:17
71:4 72:2 74:9
find 21:18 48:21,
23 61:16
finding 46:20
54:16 55:24 56:3,
8,18 68:9,20
69:18 70:22

71:11 72:1,9,10
74:9
findings 38:13,14,
18,19,20 39:6
41:16 48:12,24
62:11,13,14,16
68:14 69:20
72:12,18 73:21
74:4,6,12 75:2
finds 39:13
finish 35:23 37:19
66:14
finished 66:8
73:13 75:11,13
flashlight 45:16
Floyd 16:10
focus 39:15 70:5,
6
folder 34:6
folders 34:1
follow 26:17 27:9,
14 35:3
force 9:6 15:21
16:2,4 17:2,20
19:4 22:7,20
27:24 28:16,19
35:2,6,7 44:24
45:2,13,21 46:2,
4,6,8,11,16 47:1,
7,10,13,20,23
48:2,12 58:2,8
59:3 60:12,21
61:3,24 66:23
67:12 68:2 69:8
foregoing 76:10
form 47:15 67:2
formal 9:4 24:13
26:4 66:19
forms 26:14
forty 42:21 74:18,
19
forward 39:11
54:11 67:4,22
found 41:5,14
59:12
founded 68:10
frame 52:7
Franklin 27:1
free 13:12
Friday 16:16,21
Friday/saturday
16:1
front 15:4 16:24
17:24 21:5 37:15
41:21 42:22 44:7
full 16:15

**G**

Gardner 10:20,24
gas 45:6
gather 31:7 60:3,
11
gathered 67:14

68:6
gathering 32:15
59:22 67:18
Gaton 65:20
gave 39:22
general 8:18
10:12 41:21
51:22 53:15,18
58:15
generally 15:15
20:4 27:13 36:19
42:20 43:12 60:3,
10
generate 48:18
generated 31:23
32:1,10 72:22
73:2
generates 47:15
George 16:10
get all 36:22
gig 34:21
gigabytes 34:22
67:9
Gittes 18:14
36:17 63:22
give 6:3,17 10:12
12:22 13:14
26:16,24 31:2,24
32:2 34:8,19
35:12 38:11
70:21 74:17
giving 44:8
good 12:16 33:4
46:6
governor's 57:13
Graham 65:19
Great 62:4
greater 32:5
34:14 52:19
grievance 40:1
Grimm 65:18
ground 12:10
group 23:6 57:12
74:11
guarantee 65:23
guy 51:23

**H**

Haley 15:1
half 52:4 61:8
73:1
halt 50:13
hand 23:12
hand-to-hand
45:14
handed 29:17
30:5,13 62:18
66:24
handful 69:7
handguns 57:22
handled 9:8 63:8

hands 47:14 62:6,
9,10
handwritten
20:18
happen 8:23 55:2,
17 56:7 69:2
happened 25:20
52:19 55:16 56:6
69:4,12
happening 73:19
head 30:23 32:2
43:2 59:8
headed 63:15
health 13:1,5
57:13
hear 12:11
heard 12:19 22:13
hearing 6:13
Helen 5:8
helpful 34:24
43:14 44:11
hey 25:19
higher 25:12
Highway 27:2
Hill 5:11
historical 21:6,9
hold 29:14 30:2
43:1 62:20
Hollis 63:12
hospital 36:1
hotheaded 51:24
hour 56:24 57:5
hundreds 31:23
32:1,4

**I**

IAB 23:11 26:20
34:3 45:22 55:5
idea 33:19 34:20
58:12 59:18
74:22 76:1,3
identified 9:3
21:24
II 59:3,4
inappropriate
28:19 44:18
inauguration
58:23
incident 54:17,21
incidents 31:16
60:23 61:2
include 37:1
included 67:10
including 8:5,8
9:7,9
independent 23:6
individual 35:18
infancy 30:11
info 49:23

informal 9:5
information 6:10,
18 36:7,9 37:6,
11,17 60:20 65:9
initial 36:11
38:12,14,17,19,
20
initially 23:8
46:19 53:6
injunction 6:13
injuries 36:5
injury 36:4
intake 19:18
20:17,18 21:14
26:10 43:7,12
intend 8:24
interchangeably
54:4
internal 8:2 9:9
10:7,9,21 11:1,
18,22 12:2,5,9
13:16 14:11
19:10 20:22
22:18 23:3 24:17,
19,22 25:10 29:8,
16 30:12 31:8,12
32:9 39:18 40:12,
13,18 41:4 42:14,
19,20 44:20
48:24 55:11
60:13,15 61:11,
17,20 62:6 64:20
65:11 66:2,23
67:4,10,11 68:9,
15 69:20 70:10
71:1,6 72:12,19
74:8
internally 42:13,
18 66:21
interview 37:11
interviewed 37:24
64:12,15
interviews 37:21
65:23 66:6
introduce 5:2
investigate 24:19,
22 29:3 36:15,20
43:15 44:4 53:8
54:10
investigated
29:16 43:10
44:19 45:22
49:15,18 52:9,12,
16,18 53:23
investigating
22:19 23:7 45:3
46:15 61:21
investigation 8:8,
19 13:21 14:3
23:12 25:6,11
28:12 29:9 30:4,
10 37:20 38:12
39:10,14 47:4,5,
11,12,24 60:18
62:22 64:10,13
65:5 68:18,24
69:10,15,21 70:2,
4,11 71:6

investigations
8:10,22 9:9 28:4,
14 29:6,10,15
30:3 31:4,5 39:19
41:24 45:10,12
49:1 58:7,16
60:14 62:5,19,24
63:8 64:2 65:11,
13 66:20 67:11,
12 69:9 74:23
75:19,24
investigative
13:23
investigator
36:16,18 37:12,
18 51:20 58:21
59:17
investigator's
46:20
investigators
10:15,17 11:3
13:17 19:14
56:12 58:17
investigatory
74:11 76:3
involve 13:18
involved 20:4
21:13 59:2
involvement
29:16
involves 13:19,20
involving 45:2
issue 6:18
issues 51:4

_____

J

Janet 5:11 6:8
7:1,8 21:20
January 17:19
Jeffrey 17:16,17
Jenni 7:9,20,21
21:21 22:2 64:23
job 10:9 14:12
15:2 50:15,24
John 5:7 6:5
joined 18:14
63:22
Joshua 65:19
judgment 25:3
July 11:10,24
67:2
June 16:15,19
18:17 23:6

_____

K

Kathleen 23:9
killing 16:10
kind 28:18 53:19
kinds 61:18
knowledge 7:6
22:1,18 23:22
41:12 42:2 61:9
63:18

_____

L

L-A-F-F 14:18
Laff 14:16,19,22
19:13 38:24 63:5,
6 67:20
large 31:15 47:12
Larry 63:11
late 50:20
law 8:3 18:24
22:7,9,14,15
23:21 24:3,8
26:23 27:20 28:8
42:12,14
lawsuit 8:12 59:2,
6,7,10,12
lawyers 6:6
laying 47:13
leave 18:3
left 35:15 36:17
legitimate 44:1
letter 24:13 25:5,
22 26:4
letters 66:19
70:20
level 25:9,24 47:8,
13,14,22,23 59:3,
4 68:9 70:1 71:15
levels 25:18 46:22
levied 63:19
liaison 40:1
liaisons 65:12,15
75:8
lieutenant 5:22
6:4,5,10,22 7:3,
11,18 8:1 10:3,
13,16 11:14,15,
18,20,21,22 12:6,
7,8,9 14:8,15,19,
23,24 19:13 20:1,
22 22:1,5 31:1
35:1 38:21 39:21
40:10,23 55:9
57:8 63:5,6 66:9,
18 67:20 70:7
76:5
lieutenants 14:11
25:13 36:13
limit 53:15,18,24
67:21
Lipp 39:21 40:10
list 51:8 74:23
listening 5:10
Lives 8:13 9:11
15:7,9 18:19
21:23 22:11,21
28:1,16 29:1
32:11 43:5 62:17
63:20 66:20
locate 37:7
located 33:18
location 38:10
71:21

lodged 24:12
log 20:17,18
long 11:8,11
13:10 14:19 15:2
21:3 45:23 46:1
57:4
longer 6:17 49:22
lookback 49:17
looked 29:13
lot 29:13 31:14
33:15 34:11
35:18 44:12
lower 25:17 42:23
lower-level 20:8

_____

M

mace 41:6 45:3
59:5
made 22:7,14
23:12 24:23
29:11 50:1 58:10,
18 61:11 62:11
67:21 71:4
main 52:19
maintained 33:10
majority 61:23
make 16:9 18:23
20:3 24:15,17
27:4 28:15 36:11
51:19 55:8 73:7
makes 25:3 43:4
49:1 55:5 72:3,4
making 25:6
27:22 28:11
46:20 74:2
managing 13:19
mandates 57:13
manner 24:11
Marshall 5:6,7,19
6:2,6,8,16,21 7:1,
8,16,23 21:20
56:23 66:11,16
masks 57:14
material 67:24
materials 64:20
67:6 68:5
Matter 8:13 9:11
15:8,10 18:19
21:23 22:11,21
28:1,17 29:2
32:12 43:6 62:17
63:21 66:21
matters 8:15 9:13
mayor's 29:14
meaning 27:7
47:7 53:3 73:3
means 26:14
27:11 44:2 47:10
49:13 73:3
meant 29:20
medical 56:13
medication 13:1,6

meeting 51:21
member 22:7,9
23:21 26:6 63:19
70:9
members 24:3
memory 13:2
mentioned 52:8
met 52:18,21
method 26:3,8,11,
20 27:3,7
methods 26:13
midnight 17:22
18:9
minute 21:11
misconduct
28:18,19,21 29:6
35:21 50:2 54:18,
24 55:2 56:6,7
misspoke 75:14,
21
mobile 16:1,3
17:20 19:3
moniker 46:7
months 64:8
Moss 65:8
multiple 26:13
31:18
municipality
27:22
munitions 28:20
41:15 45:17

_____

N

names 41:10
necessarily 43:15
needed 20:2
neutral 37:2
news 57:18,24
next-highest 70:5
nice 70:18
night 17:21 18:9
51:24
nine-minute 57:1
note 75:13
notes 66:10
notice 9:16
November 11:13
number 19:14
31:15 35:22
40:21 42:11 53:5
74:17
numbers 17:24
42:22

_____

O

oath 5:5
objection 5:18
observations
19:1

observed 38:4

occasion 69:2

occur 41:8,9 49:7, 14 54:17,19 66:7

occurred 8:13 15:11,13 16:10 29:1 35:7 49:9,12 54:22 57:19 61:3

office 5:8,9,13 25:8 27:2 40:1 43:17 60:8 63:4,7 64:4,6 68:1 75:17

officer 17:14 35:9 37:23,24 40:24 46:5 53:4 70:7

officer's 39:15 55:16 69:24

officers 8:4 16:6 28:9 37:22 38:1 40:19 41:5,13 48:10 52:1 56:7 58:3,18

Ohio 27:2

on-hold 31:4

ongoing 18:21 28:4 29:5 30:3 62:20,24 64:1

open 32:20

openly 57:22

operations 17:7,9

Opportunity 53:17

opposed 16:6 57:13,14

order 23:5 25:10 53:1,7 67:1

ordered 30:6

organization 33:12

organizational 33:16

organized 33:19

outcome 8:22 9:9

outcomes 8:9

outlined 26:8

overarching 45:8

**P**

p.m. 17:21,23 18:8 76:11

packet 36:12

pages 34:12,14, 15 67:8

paper 14:4 30:16, 18,21 31:2 32:17 34:9,18 67:8 70:14,19

paperwork 16:24

paralegal 65:8

part 7:4 10:16 14:1 25:4 34:10, 18,19 44:11,24 50:14 64:12 65:6

parts 36:10

past 50:11 54:9 57:11 58:15 60:19,22

patrol 11:20 27:2 40:24

PD 40:11

pending 23:11

people 27:15 31:21 33:14,15 37:10 39:9 46:5 51:18 57:3,12 66:1 67:18,21

pepper 41:6

perceive 50:9

perceived 50:9

percent 40:10

perception 46:4

period 8:7,14 21:3 29:7 45:23

permanent 72:10

person 20:9 22:3, 15,16 27:21 37:12 44:1 50:12 53:3

person's 50:5

personally 67:17

personnel 19:1 22:10 24:23,24 26:5,7 28:1,8 35:17,23 40:21 42:13,15 63:20

pertains 49:12

pertinent 36:23 37:5

phone 26:11 32:4 35:16,17 51:20 55:8

photographs 57:21

photos 37:15

pictures 36:5

piece 14:4

pieces 70:14

place 30:2 33:7 34:4

places 15:12

plaintiffs 5:10 6:7

plan 7:8

plans 13:23

play 15:20 59:19

point 24:18 29:4 30:8 38:22,23

points 73:6

police 10:4 24:8, 12 28:9 35:8

policies 41:5

policy 41:14 46:17 47:19 48:13 49:8,9,13 50:7

position 11:9 14:20

possibility 41:8

possibly 24:4 50:6

potentially 67:9

preliminary 6:12 47:1

Premierone 39:20,21 40:4,6, 9,14 45:20 48:6 60:5 73:24

prep 9:24

prepare 9:20

present 10:19 11:8 22:19

President 58:22

pretty 12:11 16:21 18:6

primarily 40:10

primary 65:22

prior 9:18

procedure 6:24 9:1

procedures 8:18

proceed 53:2

proceedings 76:10

process 9:1 25:5, 7 28:13 29:12 31:10 35:2,4 44:14 71:14 74:7 75:6 76:4

processes 30:1

produce 33:2,11, 17,22

product 14:2

production 59:20

profanity 55:9

program 48:3

progressed 76:4

prohibits 52:15

promise 12:15

promoted 11:14, 15,23,24

properly 59:3

protest 16:12 29:2 35:7 57:17 59:10

protesters 9:6 57:21 58:11

protests 7:10,13, 19 8:12 9:11 15:8,10,18 18:19, 21 21:22,24 22:11,21 28:1,17 31:13 32:12 43:6 45:8 57:10,19 58:3,5,8 61:5,7, 19,23 62:17 63:21 66:4,21

provide 36:4,5,7 37:11,15 60:8

provided 60:21 62:3 65:9 68:1,3 74:23

providing 64:18, 19

provision 53:11

public 20:6,11

published 72:20

pull 44:16

pulled 60:5

purely 66:6

purpose 71:23

put 20:17 29:13 30:2 36:11 60:6 71:21

**Q**

question 12:20 32:8,14 33:6 48:5 66:22

questions 12:16, 18 13:7 15:9 22:4 37:8 39:4,8,12 68:7

REPORTER 5:1

**R**

raised 66:21

raising 27:23

range 74:20

rare 69:13

rarely 37:14 46:5 69:3

re-interviewed 39:9

re-interviews 37:13

read 7:2 73:18

reading 57:18,24

real 50:17

realize 33:14

reason 6:16

recall 41:7 57:8 58:1 65:17

receive 19:18 25:5 47:6 75:1,8

received 47:3 65:8 73:9,11

receiving 73:12

recess 57:7 66:17

recite 8:21

recollection 58:13

recollections 58:15

record 5:3 6:9 7:3 24:5 26:19

records 31:3,9 56:13

referenced 59:9

referred 75:15

referring 15:10 24:1 40:20

reflect 24:2

regard 48:18

regular 18:3

related 61:23

relating 58:18

relative 31:16

release 36:7,8

relief 11:20 19:24

remain 62:20

remember 8:23 57:17,18,20 58:23 59:1,7,9

remote 5:5,7,14

removed 51:6,8

repeat 7:15

report 10:18,20 38:11,19 48:17 72:14,15,17,20, 21,23,24 73:2,10, 18

REPORTER 5:1

reports 14:5 23:7 73:16,20

represent 5:3

representing 5:13 6:7

request 60:9

require 25:10

required 18:1

resolve 51:7,11 52:5

respect 7:2,10,19 8:11 9:10 15:7 29:1 53:16

response 7:17 59:10

responsibilities 13:15 19:9 33:16

responsibility 11:1 19:4,16,17, 20,23 20:5 22:22 23:3 33:15

responsible 75:23

restroom 57:2

result 56:17

results 39:18 47:11

retained 21:1

retaliatory 9:5

returned 68:4

review 14:1,8 61:14 70:7,8

reviewed 47:15 73:7

reviewing 13:20 66:3

reviews 39:12

68:17
**rights** 65:24
**rises** 47:8
**Robinson** 5:8
**role** 15:20 59:19
**room** 5:4,9,14,17
**Rose** 65:20
**rough** 74:17
**round** 44:7
**route** 27:3
**routed** 26:15
38:21 70:15 71:3
**routing** 70:13
**rude** 55:10
**rudeness** 55:6
**rule** 6:23 72:6
**ruled** 71:7
**rules** 6:24 12:10
**ruling** 72:3,5
**run** 57:2
**rundown** 35:13

_____

**S**

**safety** 63:3,7 64:5
75:17
**said/she** 55:21
**Saturday** 16:17,
22
**saved** 21:1
**scales** 56:2,19
**scan** 32:22 67:22
**schedule** 66:6
**Scott** 65:19
**screen** 20:19,23
**segregated** 33:24
**send** 25:16 39:3
68:23 75:4
**sends** 39:15 70:4
71:19
**sense** 34:9,19
**separate** 71:21
**separating** 21:20
**sergeant** 11:23,24
12:3 13:17 14:10
21:10 40:23
47:16 63:11,12
65:18,19,20,21
70:6,8
**sergeants** 11:6
14:9 21:17 38:24
39:1 62:23 63:2,
6,10 65:12,15
66:2 75:7
**service** 6:12
**set** 51:20,22
**setting** 65:22
**sheets** 70:13,18
**Sheriff's** 27:1

**shift** 18:4,5 38:24
39:1
**short** 57:7 66:17
**side** 25:5 42:16
45:20 49:11
**sign** 36:8
**signature** 76:8
**signed** 38:20
47:20 69:21
**significantly**
42:22
**signs** 39:14
**silo** 40:12,14
**silos** 40:9
**similar** 9:4 14:12
19:14
**sir** 13:13 15:16
48:8 60:1 76:7
**sit** 37:16 51:18
**situation** 55:21
56:9
**smaller** 42:11
**sort** 43:6 56:17
60:6
**sound** 16:19
**sounds** 16:20
50:17
**source** 22:13 35:4
**sources** 42:12
**speak** 7:4,9,18
9:22 15:6 21:22
**speaking** 7:12
55:8 60:10
**special** 6:23 48:3
**specific** 41:7
**specifically** 17:4
**specifics** 41:11
**Spell** 14:17
**spend** 18:18
**split** 36:15
**sponge** 41:15
**spray** 41:6
**stand** 74:21
**start** 5:1 49:6
**started** 15:12
**starting** 19:8
**state** 5:3,4 27:2,
22 50:1
**statehouse** 57:10,
21
**status** 64:9
**Steinberg** 5:16
**step** 20:2
**Stephen** 5:16
**sticks** 65:9
**stone** 51:22
**stop** 51:2
**stored** 32:16

**straight** 27:14
**street** 16:7
**streets** 18:7,11
35:8
**study** 61:10,17
62:2
**stuff** 33:23 38:8
60:24 65:7 66:24
70:13 72:19
**subject** 7:11 8:12
21:22 42:6 63:14
**submit** 38:17
**subpoena** 6:13,19
**sufficient** 39:14
**sufficiently** 18:2,
12
**summaries** 14:6
**summary** 48:11
61:13,18 73:16,
17
**summer** 8:15
15:14
**supervisor** 47:21
70:5
**supported** 39:7
**supporting** 70:22
**supportive** 37:3,4
**supposed** 37:4
**surrounding**
30:9,11
**suspect** 35:3
**sustained** 42:4,5
48:11 49:3,4,6,7,
10 55:4 56:4,18
62:15 68:10,14,
21 69:18 71:11
74:5,6
**sworn** 5:23 22:9
24:23,24 26:5,6
40:21 63:20
**synopsis** 35:19
**system** 23:24
24:1,5 26:18
27:18 45:20

_____

**T**

**taking** 20:6,10
73:20
**talk** 8:1 19:9
35:18 36:21,22
37:5
**talked** 21:17
39:21
**talking** 9:23 15:14
16:13,14,16 28:6
39:24 40:2 41:23,
24 43:19 45:1
47:9 59:23 61:2,
12 63:14 69:8,9
**talks** 25:6 52:24
**tasked** 31:2 32:15
40:17 48:9 59:21
61:21,22 64:6

**team** 6:6
**term** 45:13
**terminated** 54:8
**terrible** 53:6
**terribly** 57:4
**test** 41:11
**testifies** 5:23
**testify** 8:16,18
9:4,14,17 59:15,
17
**thing** 9:3 40:5
53:6
**things** 18:2 30:21,
22 54:6 55:11
62:17,24 63:14
**Thirty-five** 74:18,
19
**thought** 17:1 43:9
46:12
**ticket** 50:12
**Tim** 65:17,18
**time** 8:6,14 10:19
13:11 15:13 17:9
18:4,7,18,22
19:21 20:2 21:3
22:19 23:11 28:4
29:7 30:5,8 35:16
36:14,15 45:23
50:19 51:8 52:7
60:16,17 62:17,
24 63:9 72:14,16,
21 76:6
**times** 69:7
**tip** 56:2,19
**title** 10:2 12:8
**today** 8:1 9:18
12:19,22 13:10
39:22 44:13 76:6
**told** 29:13,17
62:20
**top** 30:23 43:2
59:8
**topic** 7:2,4,5
**topics** 7:10,24
**totality** 32:13
**touched** 42:6
**track** 27:17 72:11
**tracked** 20:12,16
**tracking** 23:24
24:1 26:18
**trial** 6:13
**Trump** 58:22
**truthfully** 13:7
**turned** 63:1,16
**Twenty** 42:21
**type** 28:6 54:9
57:19 69:14
**types** 48:24
**typing** 35:23
**Tyrone** 63:12

_____

**U**

**unable** 51:7,10
52:4
**understand** 12:20
22:2 41:21 44:13
48:23 54:15,23
**understanding**
23:17 62:5
**understood** 9:23
45:11 62:1
**unfounded** 49:3,
13 54:16 62:14
68:10,13,21 74:5
**union** 51:5
**upstairs** 36:12
**usage** 8:6
**USB** 60:7 65:9

_____

**V**

**Van** 65:19
**vast** 61:22
**verbal** 8:5 28:19
**versus** 24:23
**video** 36:1,3
37:15 38:8 66:3
**videoconference**
18:15 36:17
63:23
**videos** 56:14
**view** 44:13
**violated** 40:15
41:5,14
**violation** 48:13
50:6
**virtue** 53:10
**voicemail** 35:15
**volume** 34:9,20

_____

**W**

**waived** 76:8
**walk** 11:17 35:1
**walking** 16:6
**wanted** 44:12
**wearing** 57:14
**week** 15:24 29:12
61:8
**weekend** 16:14,
15 17:1
**weeks** 51:19,21
**weighs** 70:9
**withdraw** 52:2
**withdrawn** 51:17
**witnesses** 12:24
36:23 37:2 55:13
56:6
**wondering** 33:6
**wooden** 41:15

**word** 8:6

**words** 39:24
55:18 71:2

**work** 12:2 13:24
14:2 28:5 63:13

**worked** 66:1

**working** 13:22
74:2

**works** 40:11
44:14

**Wozniak** 64:6
75:15,20

**writing** 38:15

**written** 24:13
54:12

**wrong** 52:1

---
**Y**
---

**year** 11:21 14:21
41:22 42:9 43:7,
9,10,13 45:5 51:4
52:4 57:11 73:1

**years** 15:3 20:21
31:15 40:18 41:3
44:17 45:12 51:9,
13,14 57:9 58:16
69:4 73:1

---
**Z**
---

**zone** 11:21

**Zoom** 12:15