IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Tamara K. Alsaada,          :
et al.,

                            :

        Plaintiffs,

                            : Case No. 2:20-cv-3431
        vs.                   Judge Marbley
                            : Magistrate Judge Jolson

City of Columbus,
Ohio, et al.,               :

        Defendants.         :


- - - - -

(b)(6) DEPOSITION OF JENNIFER E. EDWARDS, ESQ.
VIA VIDEOCONFERENCE

- - - - -


Taken at Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
February 9, 2021, 10:2 a.m.


- - - - -


Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

    The Gittes Law Group
    723 Oak Street
    Columbus, OH 43205-1011
    By Frederick M. Gittes, Esq.
      (Via videoconference)

    and

    Marshall and Forman, LLC
    250 Civic Center Drive, Ste. 480
    Columbus, OH 43215
    By John S. Marshall, Esq.
      Edward R. Forman, Esq.
      Madeline J. Rettig, Esq.
      Samuel M. Schlein, Esq.
      (Via videoconference)

ON BEHALF OF DEFENDANTS:

    Columbus City Attorney's Office
    77 North Front Street, 4th Floor
    Columbus, OH 43215
    By Alana Valle Tanoury, Esq.
      Westley M. Phillips, Esq.
      (Via videoconference)

---

    Tuesday Morning Session
    February 9, 2021, 10:2 a.m.
    - - - - -
    S T I P U L A T I O N S
    - - - - -

    It is stipulated by counsel in attendance that the deposition of Jennifer E. Edwards, Esq., a witness herein, called by the Plaintiffs for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

    - - - - -

---

I N D E X

| Examination By | Page |
|---|---|
| Mr. Marshall - Cross | 5 |

| Exhibits | Page |
|---|---|
| Exhibit 42 - Use of Force Report CDP, Incident # 200391487 | 89 |
| Exhibit 54 - Investigation Report for Use of Force Incidents During Protests, 8-28-2020 | 136 |
| Exhibit 55 - Investigation Report for Use of Force Incidents During Protests, 9-1-2020 | 124 |
| Exhibit 57 - Letter to Ginther from Pettus, 6-23-2020 | 52 |
| Exhibit 59 - Evidence Reviewed for Columbus Use of Force Investigations | 131 |

(Exhibits attached electronically. Hard copies were never in Spectrum's possession.)

---

    THE REPORTER:  Before I swear the witness, would counsel please identify themselves for the record, state who they represent, identify who else is in the room with them, and express your stipulation that this deposition may take place with a remote administration of the oath and remote reporting of the deposition.

    MR. MARSHALL:  John Marshall on behalf of the plaintiffs.  No one else is in the room with me.  And also joining from the plaintiffs' team is Fred Gittes, Mattie Rettig and Sam Schlein.  They can tell me if anybody else is sneaking in the room with them, I don't think so.  Ed Forman is also joining us from the plaintiffs' team.  And we -- plaintiffs stipulate to the method of conducting the deposition.

    MS. TANOURY:  Good morning, Alana Tanoury for the defendants.  I am alone in my office.  Wes Philips is separately on Zoom, and we stipulate to the remote taking of the oath.

    - - - - -

    JENNIFER E. EDWARDS, ESQ., being first duly sworn, testifies and says as follows:

1          - - - - -
2          CROSS-EXAMINATION
3    BY MR. MARSHALL:
4    Q.     Good morning.  Will you give us your
5    name for the record.
6    A.     Hi.  My name is Jennifer Elizabeth
7    Edwards.
8    Q.     And, Ms. Edwards, we're not going to
9    ask for any contact information because we have an
10   arrangement with the City that as long as you or
11   your firm are under contract with the City, that
12   if we need to have you attend the preliminary
13   injunction hearing of the trial of this matter
14   that they will accept service by subpoena.  Is
15   that acceptable to you?  And, Alana, is that
16   correct?
17        MS. TANOURY:  Yes.  That's fine.
18   A.     Okay.  That's acceptable to me.
19   Q.     Okay.  May I call you Jenni through the
20   deposition today?
21   A.     That's fine, if I can call you John.
22   Q.     Please.  I know you are familiar with
23   the deposition process.  Just for the record,
24   estimate for me how many depositions you either

1    conducted or defended in the last five years.
2    A.     Last five.  Probably a dozen.
3    Q.     I expect you've also conducted some
4    Civil Rule 30(b) depositions either state or
5    federal court or both?
6    A.     I have.
7    Q.     So you are generally familiar with that
8    process and that rule?
9    A.     I am.
10   Q.     You're here today because you were
11   designated as the City's Civil Rule 30(b) witness
12   on three topics, or at least portions of three
13   topics.  The first one -- so you're aware of that,
14   right?
15   A.     I am.
16   Q.     And let me just mention the topics by
17   number.  They are 9 -- No. 9, No. 21 and No. 23.
18   I'll just briefly without reading --
19   A.     It's an Amber Alert.
20   Q.     Okay.  Is that coming from your
21   computer probably?
22   A.     I don't know.  I don't think so.  But I
23   saw it.
24   Q.     Not mine.

1         I'll briefly describe the topics.
2    First one, No. 9, is charges and/or complaints
3    from civilians or law enforcement officers against
4    CDP officers for their conduct at demonstrations
5    from the time period May 1, 2015 through the date
6    of the deposition.  You were designated on that
7    topic with respect to the protests which are the
8    subject of this case.  You're aware of that,
9    right?
10   A.     I am.
11   Q.     The protests that are subject to this
12   case began on May 28th, 2020 and continued for
13   some weeks thereafter; is that your understanding?
14   A.     It is.
15   Q.     Is there a cutoff date for your firm's
16   contract with the City in terms of when you'd be
17   evaluating or looking at those complaints?
18   A.     There is not an official cutoff date;
19   however, we have not received any new complaints
20   for a matter of months.
21   Q.     Do you happen to know the date or the
22   approximate date of the incident from the most
23   recent complaint that your firm was reviewing?
24   A.     I believe August was the most recent

1    incident that we reviewed.
2    Q.     The other topics were 21, which is just
3    about -- I'll just read the topic, "The
4    BakerHostetler investigation of the protest in
5    late May and early June 2020."
6         And then 23 is similar to 9.  "Formal
7    or informal charges by demonstrators of
8    retaliatory or excessive force against one or more
9    protesters."  And you were designated by the City
10   for the May, June 2020 protests.  So just --
11   A.     Yes.
12   Q.     You're clear that those are the topics
13   on which you were designated to testify by the
14   City, right?
15   A.     I am.
16   Q.     Do you feel comfortable testifying on
17   behalf of the City with regard to those topics?
18   A.     To the extent that BakerHostetler had
19   involvement or a line of sight to those specific
20   topics, yes.
21   Q.     Okay.  When you say line of sight, what
22   do you mean?
23   A.     To the extent -- may be a better way to
24   say it would be to the extent that BakerHostetler

1  -- BakerHostetler's part and involvement in those
2  particular incidents and on those topics, yes, I
3  am comfortable talking about them.
4  Q.      At your firm, what do you call this
5  project?
6  A.      We call it the Columbus use of force
7  investigations.
8  Q.      Okay.  Do you have a shorter name for
9  it?
10  A.      No.  And I should -- let me clarify.  I
11  know that that is what we call it informally.  I
12  believe that the matter is called something
13  different than that.  Investigations into some
14  sort of conduct in 2020, but I don't know the
15  exact matter name.
16  Q.      All right.  So around the firm anyway
17  the informal name is Columbus use of force
18  investigations.  I'm guessing that when you're
19  working on it, you're just talking about the
20  Columbus investigations; is that a --
21  A.      Sure.
22  Q.      All right.
23  A.      That's fair.
24  Q.      So if I use that term "Columbus

1  investigations," we're talking about the project
2  that your firm undertook on behalf of the City to
3  investigate use of force complaints arising out of
4  the subject protests?
5  A.      I would agree.
6  Q.      All right.  How did it get started?
7  What was the first contact you got about it?
8  A.      The first contact I had about it was in
9  probably about mid June.  I understood from Ron
10  Linville that the City had reached out and asked
11  whether we might be willing to undertake these
12  investigations.
13  Q.      Do you know who at the firm received
14  the first contact or made the first contact with
15  the City?
16  A.      Ron Linville.
17  Q.      Do you know who he talked to?
18  A.      George Speaks, who is the deputy
19  director in safety.
20  Q.      Did George reach out to Ron or Ron
21  reach out to George?  How did that get started?
22  A.      My understanding is George reached out
23  to Ron.
24  Q.      How was it that you got involved in the

1  project?
2  A.      Sure.  Ron Linville and I have worked
3  very closely with the City of Columbus for years,
4  including as it relates to the FOP negotiations
5  and contract.  And because of that, Ron informed
6  me that we would be conducting these
7  investigations.
8  Q.      So you and Ron Linville have
9  represented the City for a number of years in
10  various civil matters?
11  A.      In various labor matters, yes.
12  Q.      Okay.  All labor, or has there been
13  some employment -- representing the City in
14  employment matters?
15  A.      We have provided advice on some
16  employment matters over the years, but I don't
17  believe that we have ever represented the City in
18  any sort of litigation that's employment related.
19  Q.      But you have represented them in
20  contract negotiations with some of the city's
21  unions, including the FOP?
22  A.      That's correct.
23  Q.      Are you presently involved in
24  representing the City in the bargaining for the

1  new contract?
2  A.      I am.
3  Q.      Okay.  And Mr. Linville is as well?
4  A.      That's correct.
5  Q.      Who else from your firm is involved in
6  those labor negotiations with the FOP at the
7  present time?
8      MS. TANOURY:  We would just object this
9  is outside the scope.
10      MR. MARSHALL:  Sure.  I understand
11  that's -- what I'm asking is not a 30(b) topic.
12  I'm just trying to get context and understand how
13  this project got going and the background and so
14  on.
15  BY MR. MARSHALL:
16  Q.      Jenni, did you understand my question?
17  A.      I did.
18  Q.      All right.  Who -- yeah.  Sorry.  Go
19  ahead.
20  A.      For BakerHostetler at the time at the
21  table it is only myself and Ron Linville on behalf
22  of the City for the FOP negotiations.  We do rely
23  on others within our department to support those
24  negotiations as necessary.

1  Q.      Who within your department is helping
2  to support those negotiations?
3  A.      Currently?
4          MS. TANOURY:  Objection.  Outside the
5  scope.
6  A.      Thank you.
7  Q.      Okay.
8  A.      Am I to answer?
9          MS. TANOURY:  Yes, you may answer.
10         THE WITNESS:  Okay.  Thank you.
11 A.      Currently Alexa Cellier.
12 Q.      Okay.  Who else is in involved in the
13 Columbus investigations project?
14 A.      Who else was involved?
15 Q.      Yes.  You said you haven't received any
16 complaints for a number of months.  Have you
17 concluded all of the matters that were brought to
18 your attention?
19 A.      We have one matter that remains open.
20 Q.      Are there matters that ended up being
21 incomplete for various reasons, not sufficient
22 information, documentation and so on?  Are there
23 incomplete matters?
24 A.      I don't believe so, no.

1  Q.      All right.  The reason I ask is that we
2  received a spreadsheet that suggested there were a
3  number of matters that were marked incomplete.
4  I'll tell what, we'll look at that in a little
5  bit.
6          But as far as you know, there's only
7  one matter currently under review?
8  A.      That's correct.
9  Q.      So who was involved in the project for
10 your firm?
11 A.      Sure.  Ron Linville, myself, Joe
12 Devine, Mark Hatcher, Jeremiah Wood, Allison
13 Thomas, Teddy Web, Lauren Larrick, Martina
14 Ellerbe, Alexa Cellier and Allison Moss.
15 Q.      Are all of those individuals attorneys?
16 A.      No.
17 Q.      Some of them are paralegal?
18 A.      Allison Moss is a paralegal.
19 Q.      Other than Allison Moss, is everyone
20 else an attorney?
21 A.      Yes.
22 Q.      I know that you and Mr. Linville are
23 partners in the firm.  Who else in that group are
24 partners?

1  A.      Joe Devine and Mark Hatcher.
2  Q.      And the rest are associate counsel to
3  the firm, associates?
4  A.      No.
5  Q.      Are some of them contract counsel?
6  A.      No.
7  Q.      What's the category?
8  A.      Sure.  Lauren Larrick -- Lauren
9  Larrick, I'm sorry, Teddy Web and Allison Thomas
10 and Jeremiah Woods are all staff attorneys, which
11 is a permanent employee of BakerHostetler but not
12 an associate designation.
13 Q.      I see.  So your firm has a designation
14 called staff attorney which means they are a
15 permanent employee attorney but not what you call
16 a traditional associate attorney?
17 A.      Correct.
18 Q.      Meaning they are not on track for
19 potential partnership?  Is that what's meant by
20 that designation?
21 A.      It is.
22 Q.      Kind of can a staff attorney decide
23 that they want to go on a partnership tract?
24 A.      Certainly they can decide whatever they

1  would like.  And then the firm would have a
2  discussion with them about what their future would
3  look like with the firm.
4  Q.      All right.  But as far as you know, all
5  the attorneys that you named and the parallels
6  that you named are still employed by the firm,
7  right?
8  A.      They are, correct.
9  Q.      And as far as you know, they all plan
10 to remain employed by the firm?
11 A.      That's not correct.
12 Q.      Okay.
13 A.      My understanding is Martina Ellerbe has
14 submitted her intent to resign from the firm
15 sometime in the next few weeks for another
16 opportunity.
17 Q.      Okay.
18 A.      As has Teddy Web, although I think her
19 timeline might be a little longer than that.
20 Q.      Thank you.
21         Have you had any trouble hearing my
22 questions so far?
23 A.      I have not.
24 Q.      I didn't think it was necessary to

1 cover the basic ground rules of deposition with
2 you, but I just want to make sure that you hear
3 and understand my questions. I am sure I can
4 count on you to jump in and ask me to say it again
5 or explain the question if we need to do that; is
6 that fair?
7 A. That's fair.
8 Q. And I do want to put on the record my
9 -- my traditional question for all witnesses. Do
10 you take any medication or have any health
11 conditions that affect your memory?
12 A. No.
13 Q. Do you take any medication or have any
14 health conditions that affect your ability to
15 answer questions truthfully?
16 A. No.
17 Q. Thank you.
18 Let's go back to how the project got
19 started. Mr. Speaks reached out to Mr. Linville.
20 You got involved how quickly after that initial
21 contact?
22 A. Pretty quickly after that initial
23 contact. I understood that there were some
24 discussions going on about the contract. But when

1 the work came in, I was involved from the very
2 moment that it came in.
3 Q. Did you participate in any in-person or
4 virtual meetings about the project before the
5 project got started?
6 A. No.
7 Q. Did you participate in drafting or
8 editing the contract between your firm and the
9 City?
10 A. I did not.
11 Q. Have you seen the contract?
12 A. Yes.
13 MR. MARSHALL: Alana, I'll just say it
14 may have been produced, but we spent a few hours
15 looking through -- the -- bear with me here,
16 Jenni.
17 There's an enormous volume of documents
18 and information been produced in this case. We
19 don't have that contract. I don't know that it's
20 really important or critical, but I want to make
21 sure to get it at some point. Do you know, Alana,
22 whether it's been produced?
23 MS. TANOURY: I do not. I would have
24 to check the Steve. But if it's not, we can get

1 it to you.
2 MR. MARSHALL: All right. If you
3 wouldn't mind, please make a note of that. Again,
4 I doubt that I would want to or need to call Jenni
5 back to question her about it.
6 BY MR. MARSHALL:
7 Q. But, Jenni, do you know whether there's
8 one contract or there have been multiple versions
9 thereof?
10 A. What I'm -- I'm aware of one contract.
11 I know that the -- I don't know if there's two
12 separate documents or if the documents that I'm
13 thinking of relate to City Council action.
14 There's one contract that explains the scope and
15 the hourly rate. And the only thing that I am
16 aware of that was changed at some point was the
17 top dollar amount that we would be afforded to
18 work with.
19 Q. Yeah. There were some news stories
20 about that. There was sort of this initial
21 perhaps optimistic view that this was a $50,000
22 contract and then there was a news story that it
23 was going to be more like 550,000, is that -- do
24 you remember those news stories?

1 A. That's correct.
2 Q. Yeah. Is there a cap on the contract
3 at present?
4 A. It remains 550,000.
5 Q. And do you agree that the information
6 I'm asking you about now is public record, that
7 the contract between you and your firm would be a
8 public record? Do you agree with that?
9 A. I wouldn't actually make an assessment
10 on that. I'd defer to the City Attorney's office.
11 Q. Okay. All right. Are you generally
12 familiar with public records law? Have you ever
13 litigated a public records case?
14 A. I have.
15 Q. All right. So you have some
16 familiarity with Ohio's public records law from
17 your law practice, right?
18 A. I do.
19 Q. And how long have you been licensed to
20 practice law in the State of Ohio?
21 A. Since 2005.
22 Q. And are you licensed in any other
23 states?
24 A. I think technically in Indiana.

1  Q.     All right.  And was the Ohio license
2  your first license to practice law?
3  A.     It was.
4  Q.     Has your license -- I should ask, has
5  your license ever been suspended or revoked?
6  A.     Nope.
7  Q.     Do you happen to know how much billing
8  has been done in the work on the contract to date?
9  A.     I know that we have capped out the
10  $550,000.
11  Q.     All right.  So there may be some
12  additional City Council approval necessary to pay
13  whatever the remaining bills are?
14  A.     I'm not sure of what the arrangement
15  would be as to any outstanding bills.
16  Q.     Do you know whether there was a
17  negotiation over the hourly rates that occurred
18  before the contract was entered into or at some
19  point during the contract?
20  A.     My understanding is there were not.
21  Q.     That the firm charged its normal and
22  customary hourly rates?
23  A.     No.
24  Q.     The firm charged a rate special to this

1  contract?
2  A.     The firm charged the rate that has
3  historically been used for work for the city
4  attorney's office.
5  Q.     Those rates would differ by attorney
6  and attorney experience, correct?
7  A.     Correct.  Generally, but not for this
8  particular contract.
9  Q.     Okay.  And when you say historically,
10  so, for example, the rate that you're charging for
11  your work on the Columbus investigations is the
12  same rate that the firm charges for your work for
13  the labor negotiations, have I got that right?
14       MS. TANOURY:  Objection.  I would
15  object to the extent you're potentially getting
16  into attorney/client privileged information.
17       MR. MARSHALL:  I can't imagine, Alana,
18  this is not public record.  This is taxpayer
19  money.  So I mean if you want to instruct her not
20  to answer, that's fine.  And I don't know that
21  this is really important, but I thought we need to
22  know, so.
23       MS. TANOURY:  She can answer.
24       MR. MARSHALL:  Okay.

1       MS. TANOURY:  I think we're also
2  outside the scope.
3       MR. MARSHALL:  Yeah.  I don't disagree
4  that this isn't a 30(b) question.  But just again
5  we're trying -- I'm trying to figure out this
6  whole process.
7  BY MR. MARSHALL:
8  Q.     Jenni, is the rate that the firm is
9  charging for your work in Columbus investigations
10  the same rate as for the labor negotiations?
11  A.     No.
12  Q.     What is the rate that the firm is
13  charging for your work in the Columbus
14  investigations?
15  A.     225 an hour per attorney.
16  Q.     All right.  And is that for all of the
17  lawyers that are working on it?
18  A.     It is.
19  Q.     All right.  So this is a rate that has
20  been as you said historically charged for certain
21  kinds of work with the city attorney?
22  A.     That's correct.
23  Q.     Or with the City of Columbus.
24       What is the rate that the firm charges

1  for your work in the labor negotiations?
2       MS. TANOURY:  Objection.  Outside the
3  scope.  But she can answer.
4  A.     I believe the firm charges my standard
5  billing rate for labor negotiations.  And it just
6  went up January 1st, so I'm not positive of what
7  it is currently.  But prior to January 1st, it was
8  $460 an hour.
9  Q.     Okay.  Thanks.
10  A.     Uh-huh.
11  Q.     Let's go back to the process that got
12  the contract going.  Before the Columbus
13  investigations project at your firm, had you ever
14  done anything like it for the City of Columbus?
15  A.     I had not.
16  Q.     Do you know whether your firm had?
17  A.     No.  No one at the firm had ever done
18  something like this for the City of Columbus
19  because my understanding is no one has ever done
20  anything like this for the City of Columbus
21  before.
22  Q.     I think you're probably right.  But had
23  your firm ever done anything like it for any other
24  municipality, city, town, state government?

1  A.       How are you defining "anything like
2  it"?
3  Q.       Well, how would you describe the
4  project generally?  If you were being interviewed
5  by a journalist and they said, well, explain this
6  project to me, what are you doing?
7  A.       Sure.
8  Q.       Tell me what your answer would be.
9  A.       Sure.  The City of Columbus hired the
10 law firm of BakerHostetler to investigate citizen
11 complaints related to officer conduct and to
12 determine whether officers' use of force was
13 within or outside of CPD policy.
14 Q.       Okay.  Had you or to your knowledge the
15 firm ever done a project like that before?
16 A.       No, we had not.
17 Q.       Okay.  What was the first thing you did
18 on the project?
19 A.       The first thing I did on the project
20 was attend an introductory meeting for both the
21 City teams and the Baker team.
22 Q.       Okay.  I have -- Jenni, you look like
23 you're reading from something.
24 A.       Oh, no, I'm just thinking.

1  Q.       Okay.  All right.
2  A.       Yeah.
3  Q.       You know -- you know what the lawyer is
4  going to ask next, which is give me that document.
5  A.       Yeah.
6  Q.       But you're --
7  A.       Nope.
8  Q.       Who was at this meeting?
9  A.       To the best of my recollection, on the
10 City's side I believe it was George Speaks, Craig
11 Stone, Kathleen Bourke, Greg Bodker, Joe who's
12 last name I don't recall out of the city
13 attorney's office, Jeff Furbee, Kathleen Bourke
14 and potentially Director Pettus.
15 Q.       All right.  Tell me -- I know who some
16 of those people are.
17 A.       Sure.
18 Q.       Tell me what their jobs or titles were
19 for each of those individuals.
20 A.       I was afraid you were going to ask me
21 that.
22          So Director Pettus is the safety
23 director for the City of Columbus.  Craig Stone
24 and George Speaks are both deputy directors within

1  the safety director's office.  Kathleen Bourke is
2  an assistant director within the safety director's
3  office.  There was the attorney I mentioned, Joe.
4  Jeff Furbee is also a city attorney, but I believe
5  is specifically assigned to support CPD.  I think
6  that gets us through everybody.
7  Q.       Bodker is a?
8  A.       Bodker is a deputy chief.
9  Q.       All right.  Was anyone else from your
10 firm present?
11 A.       Yes.
12 Q.       Who else from your firm?
13 A.       On our side we had myself, Ron
14 Linville, Mark Hatcher, Martina Ellerbe -- I will
15 have to go through the whole team.  Mark Hatcher,
16 Martina Ellerbe, Jeremiah Wood, Teddy Web, Allison
17 Thomas, Lauren Larrick, Alexa Cellier.  It was
18 essentially our whole team other than Joe Devine
19 and Allison Moss.
20 Q.       Was the meeting virtual?
21 A.       It was.
22 Q.       How long did it last?
23 A.       Between an hour and two hours would be
24 my best recollection.

1  Q.       What happened at the meeting?
2  A.       The City representatives took turns
3  briefing us on the scope of the investigations and
4  also providing some sense of what they had kind of
5  uncovered to date.
6  Q.       When you say a sense of what they had
7  uncovered, tell me what you remember about that
8  part of the meeting.
9  A.       I recall there being a description of
10 what was happening in the streets during the
11 protests.  That there was -- there was a belief by
12 some that there was kind of some coordinated
13 efforts taking place in the streets, that there
14 was chaos in the streets during different points
15 in time, and that -- that we needed to understand
16 the greater environment of what happened.
17 Q.       Who gave you that information?
18 A.       So I'm questioning whether just --
19 Deputy Chief Bash was there.  So it was either
20 Deputy Chief Bash or Deputy Chief Bodker.
21 Q.       When you say they talked about it being
22 a coordinated effort, did either Bodker or Bash
23 mention they thought there was some national
24 organization to the protests?

1  A.  No.
2  Q.  Did they mention the efforts seemed to
3  be organized -- that there seemed to be some
4  organizing principal to the protest or for many of
5  the protesters?
6  A.  No.
7  Q.  What were they talking about?
8  A.  What I specifically recall is a
9  description of how there were some individuals who
10  were participating in the protests who were
11  driving 4Runners up and down streets and providing
12  supplies to others.  And -- go ahead.
13  Q.  What kind of supplies did they tell you
14  about?
15  A.  They didn't.  They didn't mention
16  specific supplies to the best of my recollection.
17  Q.  Did you learn at that meeting or
18  another meeting with any City officials that they
19  thought that protesters were being supplied with
20  frozen water bottles or rocks to throw at the
21  police?
22  A.  No.
23  Q.  Did you ever hear that from anybody at
24  the City --

1  A.  No.  I don't believe that I ever heard
2  that protesters were being supplied those types of
3  things to throw at the police.
4  Q.  At some point did you hear that they
5  were being supplied with particular items?
6  A.  No.  I don't recall that.
7  Q.  Did you attend any of the protests, go
8  down and --
9  A.  I.
10  Q.  -- watch or --
11  A.  I did not.
12  Q.  Okay.  Did you spend any time looking
13  at news stories about the protests at -- either to
14  prepare for the Columbus investigation project or
15  during the project?
16  A.  Before knowing anything about the
17  project, I did pay attention to the -- the social
18  media and the news because it was such an
19  important civic event in our community and across
20  the nation.  I didn't review anything with an eye
21  towards this project until the videos were
22  supplied from the individual complainants.
23  Q.  All right.  We'll get into the
24  specifics of your work on the project in a little

1  bit.
2  This initial meeting that you're
3  describing with your -- most of your team and
4  several city officials, was that meeting recorded?
5  A.  Not to my knowledge.
6  Q.  Did you take notes during the meeting?
7  A.  I believe that I did.
8  Q.  Do you still have those notes?
9  A.  I'm not sure.
10  Q.  Did you take them in handwriting or on
11  a laptop?  How did you take the notes?
12  A.  I take notes in handwriting.
13  Q.  Did anyone ask you to preserve those
14  notes?
15  A.  Recently, yes.
16  Q.  Okay.  Do you know whether you have
17  them?
18  A.  I don't know if I have them.
19  Q.  Where would they be?  Where would they
20  likely be?
21  A.  They would likely be in my office.
22  Q.  Okay.  Are you at home today or in your
23  office today?
24  A.  I'm at home today.

1  Q.  As the project unfolded, who did you
2  have the most contact with at the City?
3  A.  I would say it was divided between
4  three people.  The most contact would be George
5  Speaks.  And then as the project went on, I had
6  frequent contact with Deputy Chief Bodker and
7  Deputy Chief Bash.
8  Q.  What would be the purpose for
9  contacting each of those individuals?
10  A.  George Speaks from my perspective
11  managed BakerHostetler's participation in the
12  investigations.  And when we had questions would
13  help -- help us figure out either, you know, the
14  direction that the City wanted us to take and/or
15  put us in contact with somebody who could assist
16  with those questions and that's primarily
17  procedural questions.  With Deputy Chief Bodker
18  and Deputy Chief Bash we had a lot of logistics to
19  work out, so primarily we were talking logistical
20  issues over the period of the investigations.
21  Q.  Logistics like accessing or getting
22  video or other -- or documents to do your work?
23  A.  Correct.
24  Q.  Talk to officers or other city

1  witnesses or talk to complainants, those kinds of
2  logistics?
3  A.      That's correct.
4  Q.      Okay.  Did you have e-mail
5  communication with those individuals during the
6  course of the Columbus investigations?
7  A.      Limited, but, yes.
8  Q.      Did you have -- what other methods did
9  you use to communicate with them other than
10  telephone and e-mail?
11  A.      There might have been some text
12  messages with them.
13  Q.      Were those text messages from a
14  personal cell phone?
15  A.      My personal cell phone, yes.
16  Q.      Okay.
17  A.      I'm not sure on their end.
18  Q.      All right.  Did you -- have you
19  retained those text messages?
20  A.      I believe so.
21  Q.      I'm going to just ask on the record
22  that you take steps to retain those.  I don't know
23  that we will need them, but we don't know yet.  So
24  we would ask that that be done.

1          Did you use any other form of
2  communication such as Zoom, Slack, Instant
3  Messaging, any other form of communication with
4  City officials about the Columbus investigations?
5  A.      We had a few additional kind of team
6  meetings with the City of Columbus over Zoom.  But
7  we didn't -- I didn't communicate with any
8  individuals in that way.
9  Q.      The team meetings that you had over
10  Zoom, do you know whether anyone recorded those
11  team meetings?
12  A.      I don't believe so.
13  Q.      Did you take notes at those meetings
14  usually?
15  A.      I would suspect that I did.
16  Q.      All right.  And do you know whether you
17  still have those notes?
18  A.      I don't know.
19  Q.      Before the Columbus investigations
20  project got started, would you say that you were
21  generally familiar with Columbus Division of
22  Police policy with respect to -- I'll just give a
23  couple of examples, crowd control or use of force,
24  were you generally aware of those policies?

1  A.      I was.
2  Q.      How would you describe your depth of
3  knowledge of those kinds of policies prior to this
4  project getting started?
5          Now I'm getting an Amber Alert.  Hold
6  on.  I'm sorry.  Go ahead.
7  A.      The depth of knowledge.  I would say
8  that I had certainly read them and was aware of
9  them from a kind of big picture perspective.
10  Q.      All right.  So you were aware that such
11  policies like the one that described crowd control
12  use of force existed but you didn't know a whole
13  lot about the specific policies; is that fair?
14  A.      I think that's fair.
15  Q.      Did you know that the division
16  maintained an emergency operations manual that had
17  policies regarding use of nonlethal force in crowd
18  control situations, were you aware?
19  A.      I was generally aware.
20  Q.      All right.  When we got started, you
21  told -- you gave me your elevator statement about
22  what this project was about.  And you said it was
23  to do these investigations of complaints about
24  officer conduct during the protests and determine

1  whether they were within -- the conduct of the
2  officers was or was not within division policy.
3  Have I summarized that fairly?
4  A.      I think that's fair.
5  Q.      So before you made any determination,
6  did you yourself make some determinations about
7  whether certain events or certain conduct was
8  within policy?
9  A.      I did.
10  Q.      How many such determinations did you
11  make individually?
12  A.      I don't know.  But my name would be on
13  the investigation reports for those individual
14  incidents.
15  Q.      Okay.  Yeah.  Ultimately, each
16  investigation resulted in something called an
17  Investigation Report For Use of Force Incidence
18  During Protests, correct?
19  A.      Yes.
20  Q.      And they were numbered by the citizen
21  complaint?
22  A.      Is that a question?
23  Q.      Yes, it is.
24  A.      Okay.

1  Q.    I'm looking at one now.  It says
2  subject complaint number BH201.  Was that an
3  internal number, a BakerHostetler number?
4  A.    It was.
5  Q.    Okay.  Do you know how many total
6  complaints were investigated?
7  A.    I believe we have submitted 49 reports.
8  Q.    Okay.  The reason I ask is that we've
9  got a number BakerHostetler 201, I see
10  BakerHostetler 19 on another document.  You
11  submitted a total of 40 investigation reports.
12  But how many complaints or charges to use the
13  language of the 30(b) topic, how many complaints
14  or charges of officer conduct or misconduct were
15  submitted to BakerHostetler for initial review?
16  A.    Again, I think it was 49 reports.  And
17  we submitted something in writing for every
18  complaint that was sent our direction.  You'll
19  notice that on some of the investigative reports
20  there's more than one number listed.
21  Q.    Yeah.
22  A.    So that might be where we combined
23  several initial complaints, understanding that
24  they were related.  There's -- I believe, though,

1  that we submitted a report for every complaint
2  sent our way.
3  Q.    All right.  Did you make any
4  determination that the matter sent to your
5  attention was not worthy of an investigation and
6  issuance of a report?
7  A.    We in conjunction with George Speaks
8  decided that we would submit something in writing
9  even for the types of cases that might normally
10  not justify an investigation.
11  Q.    Was the thing that you submitted in
12  writing always titled Investigation Report For Use
13  of Force Incidence During Protests?  Did they all
14  say that?
15  A.    Yes, I believe they all said that
16  title.  If there's a variation, it's not because
17  of any sort of intentional distinction between
18  them.
19  Q.    You've described your -- that you were
20  generally aware of, for example, the division's
21  emergency operations manual and policies regarding
22  use of force.  You knew they existed, you maybe
23  knew a little bit about them before this project.
24  Was there anyone in your firm that was very

1  familiar with the division policies regarding use
2  of force, for example, or similar policies before
3  this project began?
4  A.    To the extent that they had arisen in
5  prior arbitrations, then yes.  On a broad scale,
6  no.  So, for example, Joe Devine handled --
7  represented the City in its effort to uphold the
8  termination of Officer Rosen and the use of force
9  policy was certainly front and center in that
10  arbitration.
11  Q.    Okay.  Other than that, there wasn't
12  anybody at the firm that was -- had deep knowledge
13  of the policies generally, fair?
14  A.    Correct.
15  Q.    All right.  Did you think a -- at least
16  a working knowledge of the use of force and
17  similar policies and the emergency operations
18  manual policies that applied to protest activity,
19  do you think a good working knowledge of those
20  policies was necessary in order for attorneys at
21  the firm to complete their work?
22  A.    I don't believe it was necessary to
23  have that in advance of this project.
24  Q.    Ah.  I -- that wasn't my question.

1  Sorry.  Bad question.
2      Was it necessary to have that knowledge
3  before issuing an investigation report on a
4  particular complaint?
5  A.    It was necessary to understand the use
6  of force policy and the chemical agents policy in
7  order to be able to determine whether someone was
8  within or outside of that policy.
9  Q.    So how did the attorneys at the firm
10  who were working on and issuing these reports
11  gaining that knowledge?
12  A.    We had several trainings with Jeff
13  Furbee, the city attorney's office attorney who is
14  directly -- who directly supports CPD.  We were
15  provided training materials to read to -- that are
16  the types of training materials that are generally
17  provided to officers.  And we had meetings to --
18  again with the City to discuss questions that we
19  had early on in the investigations.
20  Q.    Okay.  Who did you meet with at the --
21  are these the team meetings you're talking
22  about --
23  A.    Correct.
24  Q.    -- when you would have meetings to

1 discuss questions that you had?
2 A.    That's correct.
3 Q.    And who from the City would answer your
4 questions or answer members of your firms
5 questions about application or interpretation of
6 certain policies?
7 A.    Primarily Jeff Furbee provided the kind
8 of greatest guidance to us on the intent and
9 application of the policies.
10 Q.    Were there times that Mr. Furbee was
11 asked to interpret what a particular policy meant?
12 A.    I mean, to the extent that we sought
13 clarification, again kind of early on to make sure
14 we understood the general bounds of the policy,
15 yes.
16 Q.    The trainings that occurred, did they
17 -- did all of the trainings occur before the first
18 investigation report was issued?
19 A.    Yes.
20 Q.    How many trainings occurred?
21 A.    Three or four.
22 Q.    Were they virtual?
23 A.    Yes.
24 Q.    Were they over Zoom?

1 A.    I believe so.
2 Q.    Do you know if they were recorded?
3 A.    I don't believe so.
4 Q.    Did you make notes of -- make some
5 notes during those trainings?
6 A.    I would suspect I did, yes.
7 Q.    Do you know if you still have those
8 notes?
9 A.    I don't know.
10 Q.    You don't know, okay.
11       Were you given training materials?  For
12 example, were you given copies of all what the
13 City believed to be the relevant policies?
14 A.    Yes.
15 Q.    Were those given to you electronically?
16 A.    Yes.
17 Q.    Do you maintain a folder on your
18 computer or does the firm have folders in which
19 you have all of the policies that were provided to
20 you by the City for the purpose of the Columbus
21 investigations?
22 A.    The firm has folders for that, yes.
23 Q.    Okay.  So if you are asked to produce
24 all of the policies that were provided by the City

1 as part of the Columbus investigations project,
2 that would be available on the firm's folders --
3 firm's computer system somewhere, right?
4 A.    That's correct.
5 Q.    Were you provided other training
6 materials other than, for example, emergency
7 operations manual policies or other -- or
8 directives, other than directives and emergency
9 operations, were you provided other written
10 materials from the City?
11 A.    Yes.
12 Q.    Give me your memory of what other
13 materials you were provided.
14 A.    Yeah.  And you're -- to be clear,
15 you're thinking specifically at the training
16 stage, not as we received documents for the
17 investigation; is that right?
18 Q.    Yeah.  Thank you.  Thanks for that.
19 Yes.  At the training stage.
20 A.    Okay.  At the training stage, we
21 received some additional -- there were some
22 PowerPoints and supplemental materials that my
23 understanding was Jeff Furbee had provided to
24 trainings for officers in the past, it was office

1 -- within CPD.  I don't know if it was officers or
2 higher ranks, and so we were provided with those.
3 Q.    Do you remember getting any video
4 training materials?  You said PowerPoints.  Did
5 you get any videos that had been used at the
6 division to train officers?
7 A.    No.  The only video -- I received a
8 link at one point because it was believed we would
9 need LEADS certification.  And so there was a
10 video related to LEADS training, but that's the
11 only video that was provided as it relates to
12 training.
13 Q.    By LEADS, you mean L-E-A-D-S, the law
14 enforcement database, right?
15 A.    That's correct.
16 Q.    And did you end up needing
17 certification to access LEADS?
18 A.    Turned out, no.
19 Q.    What was the initial thought about that
20 that?  And why wasn't it necessary?
21 A.    There was a concern on behalf of the
22 Division that the materials that were turned over
23 to us as a part of the investigation may contain
24 LEADS information, and therefore they believed

1  that we should be -- if we were certified, it
2  would kind of hasten the process of them, like,
3  giving us -- turning over videos and other
4  information. We went through the LEADS training,
5  we went down and were fingerprinted, and then we
6  were told that the City had decided actually we
7  couldn't be LEADS certified because we didn't meet
8  the requirements, which I believe was we had to be
9  -- we needed the -- we could only use the LEADS
10  certification if we were engaging in law
11  enforcement activities, which we were not.
12  Q.    Okay. The three to four trainings, the
13  virtual trainings all occurred before any
14  particular investigation report was issued,
15  correct? Can -- is that right?
16  A.    Yes.
17  Q.    All right. Sorry.
18       Do you recall the date or approximate
19  date the first investigation report was generated
20  out of this project?
21  A.    The last few days of August.
22  Q.    When was the most recent one submitted?
23  A.    Late December.
24  Q.    Let's go back to training materials.

1  Fair to say that Mr. Furbee who was the principal
2  trainer for the group that were going to do the
3  Columbus investigations?
4  A.    As it relates to use of force policies,
5  yes.
6  Q.    How about other kinds of policies, were
7  there other trainers, other information you got?
8  A.    Sure. We also spent time with Deputy
9  Director of HR Brooke Carnevale and Pam Gordon who
10  was another Columbus city attorney office's
11  attorney, specific to labor relations to review
12  the FOP labor contract with the team.
13  Q.    Okay. What was the purpose of
14  understanding the FOP contract?
15  A.    The City had an interest in our
16  completing the investigations as closely within
17  the confines of the FOP contract as possible.
18  Q.    So, for example, they needed to be
19  completed within the normal 90-day time frame?
20  A.    Correct.
21  Q.    Absent special circumstances, right?
22  A.    That was our direction, yes.
23  Q.    Were you able to do that for the most
24  part?

1  A.    For the majority, yes. But not for
2  all.
3  Q.    Any other direction that came out of
4  the collective bargaining agreement?
5  A.    Certainly -- so Article 8 is the
6  article that deals with investigations into
7  officers. So we talked through the restrictions
8  in Article 8 and the kind of process in Article 8.
9  And I don't think -- it would only have been
10  Article 8 that governed how we conducted the
11  investigations.
12  Q.    Okay. How were you trained in what the
13  potential findings were and the definitions of
14  those designations? Does that question make
15  sense?
16  A.    Yeah. It does.
17  Q.    All right. Tell me how you learned
18  about that.
19  A.    The initial training was a part of that
20  first meeting. And we were provided with a memo
21  dated June 26th from Director Pettus I believe to
22  the Mayor's Office that laid out the potential
23  outcomes for the investigations.
24  Q.    Was this a memo developed specifically

1  for the Columbus investigations project?
2  A.    I believe so. Yes.
3  Q.    That memo laid out the potential
4  findings that might come out of any particular
5  investigation, right?
6  A.    Yes.
7  Q.    And it defined what those terms meant?
8  A.    Yes.
9  Q.    Can you from memory tell me what the --
10  what those potential findings are?
11  A.    I mean, I'd prefer to look at it. But
12  to the best of my recollection, they were
13  sustained, not sustained, exonerated, unfounded or
14  withdrawn.
15  Q.    Okay. That sounds right, at least from
16  my knowledge of how IAB works. Were you told that
17  these were the same possible findings that would
18  come out of a normal internal affairs
19  investigation if the division were doing it?
20  A.    Yes.
21  Q.    That memo that you're referring to, is
22  that something that you would have available to
23  you now where you are sitting?
24  A.    No.

1  Q.     How could you access it for us?
2  A.     I mean, I could -- I could find it on
3  my computer.
4  Q.     Yeah.  I think it may help speed things
5  along quite a bit if we could access that.  That's
6  not something that I had -- again, Alana or Wes,
7  I'm not suggesting it wasn't produced.  That's not
8  something that we found.  It might be very
9  helpful, if it's all right with you, we can take a
10  break, and if Jenni could find it and maybe e-mail
11  it to you and you can send it to us or e-mail it
12  to everyone, however you want to do it.  That I
13  think would be helpful and make this pretty
14  efficient.  So if it's all right with you, why
15  don't we take a 15 minute break and do that?
16  A.     Okay.
17        MR. MARSHALL:  Alana, is that all
18  right?
19        MS. TANOURY:  Yep.  That's fine.
20  BY MR. MARSHALL:
21  Q.     Jenni, if you can find it, that would
22  be great.  And you can send it around to -- send
23  it around to either or us or just for propriety
24  sake, you can send it to Alana and then she can

1  send it to me.  And --
2  A.     I'll go ahead and send it to Alana.
3        (A short recess is taken.)
4  BY MR. MARSHALL:
5  Q.     All right.  Jenni, thanks for sending
6  us this memo.  Do you have it in front of you or
7  do you want us to share screen?
8  A.     I'd prefer we'd share screen if that's
9  okay.
10  Q.     Yeah.  No problem.
11        MR. MARSHALL:  Mattie, can you share
12  screen?
13        MS. RETTIG:  Yes.  Just give me a quick
14  minute here.
15        MR. MARSHALL:  I'm wondering if Stacy
16  needs to give you permission to share screen.
17        MS. RETTIG:  It's actually my -- I have
18  to set it on my computer to allow it.  And it's
19  saying that I will have to quit the Zoom app to do
20  so.
21        MR. MARSHALL:  That may be because you
22  -- Stacy, have you allowed share screen?
23        THE REPORTER:  Yes.
24        MR. SCHLEIN:  I can do it.

1        (A short recess is taken.)
2  BY MR. MARSHALL:
3  Q.     Jenni, are we looking at the June 23rd,
4  2020 memo from Safety Director Pettus to Mayor
5  Ginther outlining the systematic review process
6  that you were talking about earlier?
7  A.     We are.
8  Q.     And at the end of this memo on the last
9  -- and we have marked this for the record as
10  Exhibit 57.  On the last two pages --
11        MR. MARSHALL:  Sam, scroll down to
12  almost the last -- the second-to-last page.  All
13  right.  We're looking at -- stop there.  Thanks.
14        - - - - -
15        Thereupon, Exhibit 57 is marked for
16  purposes of identification.
17        - - - - -
18  BY MR. MARSHALL:
19  Q.     Under Roman numeral III here we have
20  disposition, and it has the five potential
21  dispositions of these investigation reports,
22  right?
23  A.     Correct.
24  Q.     I didn't hear if you gave an answer.

1  Sorry.
2  A.     Oh.  I said correct.  Can you hear me?
3  Q.     Now I can hear you fine.  Thanks.
4  A.     Okay.
5  Q.     Were there any other dispositions that
6  your firm used other than these five?
7  A.     No.
8  Q.     Based upon this memo and the trainings
9  that you received, the three to four virtual
10  trainings as well as the training materials, did
11  the firm analyze the excessive force complaints
12  based upon the policies, the directives in the
13  operations manual, the trainings and this memo,
14  did it use all of that information and materials
15  in determining what the disposition should be?
16  A.     As it relates to individual
17  investigations and following those extra steps,
18  yes.
19  Q.     Did the firm -- did BakerHostetler or
20  any member of the firm do any legal analysis of
21  the legal question of whether a particular event
22  constituted excessive force under the law?
23  A.     No.
24  Q.     Did the BakerHostetler firm or any

1  member of the firm do any analysis of whether any
2  of the division policies, directives, operations
3  manual, whether any of those materials were or
4  were not constitutional under the law?
5  A.      No, we did not.
6  Q.      Did anyone at the firm -- did you or
7  anyone at the firm consider whether the policies
8  that you were being asked to apply were
9  constitutional policies?
10  A.      We were not asked to engage in a
11  consideration of that, so, no.
12  Q.      And were you asked, was the firm asked
13  to give any legal analysis of any of the policies
14  or training materials that you were provided?
15  A.      We were not.
16  Q.      Fair to say then that you and the other
17  members of the firm took the information you got
18  from the City, the trainings, the operations
19  manual, the directives, the policies, the
20  PowerPoints, this memo, and took them at face
21  value in applying them to each complaint or
22  charges of excessive force?
23  A.      I'm not -- I'm not clear what you mean
24  by "face value." But we did our best to apply

1  those things as they were provided to us.
2  Q.      Yeah.  Did you question whether those
3  -- any of those trainings or policies or materials
4  were appropriate under the law?
5  A.      We did not.
6  Q.      Did you learn that during the course of
7  your training that one of the division's policies
8  and one of the things it trains its officers to do
9  is to use appropriate means, including nonlethal
10  force to keep a group of protesters separate from
11  police, to keep a separation?
12  A.      I don't recall that specifically.
13  Q.      Were you trained or did you learn that
14  it's part of the policies that if a group of
15  protesters is ordered to disperse, then it is
16  appropriate to use nonlethal force to get them to
17  disperse?
18  A.      I learned that if dispersal orders were
19  given, then it would be potentially appropriate to
20  use nonlethal force.  But it would depend on those
21  facts and circumstances what level of nonlethal
22  force.  Assuming the dispersal order was lawful I
23  should say.
24  Q.      Well, if the dispersal order is lawful

1  and the protesters are not complying with the
2  dispersal order, what level of nonlethal force is
3  not appropriate?
4  A.      What level of nonlethal force is not
5  appropriate?  I think it's going to depend on each
6  particular circumstance.
7  Q.      Well, how so?  If nonlethal force is
8  permitted to disperse protesters who are not
9  complying with the dispersal order, why does it
10  matter what the level of nonlethal force is?
11  A.      Because it has to be reasonable under
12  the circumstances.
13  Q.      How did you and the members of the firm
14  in making your analysis determine whether a
15  particular level of force was reasonable or not
16  under those particular circumstances?
17  A.      Sure.  By virtue of interviewing the
18  complainants, interviewing the officers, reviewing
19  objective evidence, including video evidence and
20  other circumstances that were occurring around a
21  particular incident at the time, we would take all
22  of that into consideration to determine whether it
23  was reasonable under the circumstances.
24  Q.      Were there times that you weren't sure

1  -- I guess I should have asked you, do you have
2  any law enforcement experience personally?
3  A.      I do not.
4  Q.      Do you know whether any of the members
5  of the firm who engaged in this analysis or worked
6  on the Columbus investigations project had any law
7  enforcement experience?
8  A.      Yes.  Teddy Web was a military police
9  officer.
10  Q.      Okay.
11  A.      And also I think served as a -- like an
12  auxiliary officer for a department in her home
13  state.
14        And Mark Hatcher served as a
15  probationary officer prior to his legal career.
16  Q.      Other than those two, did anyone else
17  have any law enforcement experience?
18  A.      Not to my knowledge.
19  Q.      So if you had a question about whether
20  a certain level of force was reasonable, how did
21  you figure that out?
22  A.      We used the training and our judgment
23  based on the facts that we had gathered to
24  determine whether it was reasonable, sufficient to

1  be within or outside of policy.
2  Q.     Now, can you think of a situation in
3  which nonlethal force would be considered
4  excessive when it's being used to disperse
5  protesters who had been given multiple dispersal
6  orders but are not in compliance? And with my
7  example, that's assuming there's nothing else
8  going on other than they are protesting.
9  A.     So you're asking me to answer the
10  hypothetical?
11  Q.     Yes.
12        MS. TANOURY: I would object as this is
13  outside the scope. But she can answer.
14  A.     So the question was whether I could --
15  whether I could think of a circumstance in which
16  it would be excessive? I believe that there would
17  be times that, for example, a level 7 use of
18  force, so what I would refer to as knee knockers,
19  might be excessive if there was nothing going on
20  other than a group of individuals standing
21  somewhere. I think that's your hypothetical.
22  Q.     In order -- level 7 is what in your
23  parlance? What does that mean?
24  A.     I would want to see it. But I would --

1  what comes to mind as level 7 is the use of knee
2  knockers or multiple baton rounds.
3  Q.     Are knee knockers and multiple baton
4  rounds the same thing? These are --
5  A.     Yes.
6  Q.     Sorry.
7  A.     It's my understanding, yes. I'm sorry.
8  Q.     All right. These are the baton rounds
9  that are fired, supposed to be skip-fired at
10  protesters, right?
11  A.     That's my understanding, yes.
12  Q.     Did you ever see any video or anybody
13  in the firm see any video that showed direct fire
14  at protesters of wooden baton rounds?
15  A.     We didn't see any video that -- where
16  we could conclusively determine that there was
17  direct fire.
18  Q.     Did you have individuals who complained
19  that there was direct fire?
20  A.     I believe so.
21  Q.     But all of those were determined to be
22  either not sustained or unfounded?
23  A.     I believe that that is true. But I
24  would want to see the individual reports to --

1  because I believe that was for different reasons
2  in the different investigations.
3  Q.     The level 7 use of force is what you're
4  referring to as knee knockers or wooden baton
5  rounds. Is that the only thing that level 7 meant
6  or is there other levels of force that are within
7  level 7?
8  A.     There are other types of force that are
9  within level 7, I just don't have them memorized.
10  Q.     Would one of them be something called a
11  sponge round that's fired at the legs or torso?
12  A.     I've not heard of a sponge round
13  personally. Again, if it's listed in the policy,
14  then certainly it would fall under level 7. But
15  without the policy in front of me, I don't recall
16  the entire definition.
17  Q.     Let's go back to my question, which was
18  about determination of whether the use of wooden
19  baton rounds was appropriate. Were you aware that
20  there are two types of wooden baton rounds,
21  there's a 37 millimeter and 40 millimeter? Did
22  that come to your attention during this process?
23  A.     That did not come to my attention in
24  the cases that I investigated. No.

1  Q.     All right. Do you know that they have
2  different numbers of wooden spools or blocks that
3  get fired, there are two different types, did you
4  know that?
5  A.     I was aware that there were two -- that
6  different types shot at different number of
7  rounds, yes.
8  Q.     In the course of your investigations,
9  the ones you did and based upon the training you
10  received from the City, is it always the case that
11  absent the need for deadly force that wooden baton
12  round should never be direct fired? Is that your
13  understanding?
14  A.     Yes. That is my understanding.
15  Q.     So if you'd seen evidence that allowed
16  you or required you to conclude that wooden baton
17  rounds had been fired in a nondeadly force
18  situation, that would have resulted in a finding
19  of excessive force?
20  A.     If it had been done by CPD officers,
21  yes.
22  Q.     Did you see video that suggested there
23  was direct fire from other agencies, other law
24  enforcement agencies?

1  A.      We didn't see video that allowed us to
2  conclude that another agency direct fired.
3  Q.      So going back to my question about
4  determination of reasonableness of the use of
5  force when it comes wooden baton rounds, can you
6  think -- under what circumstances would wooden
7  baton rounds be appropriately used, assuming they
8  were skip-fired at protesters who were simply not
9  dispersing?
10         MS. TANOURY: Objection. Outside the
11 scope. But she can answer.
12 A.      Again, if we're assuming that there is
13 nothing else occurring around that situation that
14 increases the level of danger to those protesters
15 or to the officers, I would say that that would
16 not -- there would not be appropriate
17 circumstances to use that in a nondeadly
18 situation. I think that was the question.
19 Q.      So did you learn in your training that
20 if protesters were aggressive in addition to
21 failing to comply with the dispersal order, that
22 if they were aggressive, then wooden baton round
23 could be appropriately used?
24 A.      I don't recall.

1  Q.      Do you remember this word "aggressive"
2  being part of the policy with respect to use of
3  those rounds?
4  A.      You know, I don't. I don't
5  specifically remember that off the top of my head.
6  Again, if we could put the policy in front of me
7  to help me refresh my recollection of what the
8  policy says, I would be happy to do that. But I
9  don't remember.
10         MR. MARSHALL: Okay. Sam, let's take
11 down this memo --
12 BY MR. MARSHALL:
13 Q.      Actually, before we take down the memo,
14 sorry, Jenni, did this memo get distributed to all
15 members of the firm who were engaged in the
16 Columbus investigations?
17 A.      All of the attorneys, yes.
18 Q.      And I notice that on the second page,
19 first paragraph. Right there. This says -- this
20 is a paragraph about intake duties. It says with
21 respect to the systematic tracking of complaints,
22 an Excel spreadsheet shall be created which tracks
23 the approximate 815 e-mails received as of June
24 18, 2020. Were those e-mails all e-mails that had

1  some kind of complaint or concern that had been
2  made to the City involving the protests?
3  A.      I'm not certain. We never received all
4  815 e-mails. That wasn't what was sent to us.
5  Q.      How did it get winnowed down to I think
6  you said 49 investigations by your firm?
7  A.      Sure. So we investigated what was sent
8  to us by the City. My understanding is the
9  director's office went through a process in
10 conjunction with the city attorney's office to
11 winnow those down to determine what would be sent
12 in to us, but that wasn't a process we were a part
13 of. What we received were two -- initially, we
14 received three types of complaints or the files
15 for three types of complaints. Those that had
16 already been determined by the city attorney's
17 office to be criminal, those that the director's
18 office had decided should be fully investigated,
19 and a group that we called triage cases that were
20 cases where we were asked to make initial contact
21 with the complainant to determine whether that was
22 something that we should fully investigate.
23 Q.      Out of the triage group, did some of
24 them end up being fully investigated?

1  A.      Yes.
2  Q.      What criteria did the firm use to
3  determine if a triage complaint should be fully
4  investigated?
5  A.      Sure. It was a list of criteria. One
6  would be depending on what -- we contacted every
7  complainant and we made an effort to contact every
8  complainant at least three times. If that
9  complainant reached back out to us and was able to
10 provide context for the complaint, if we were able
11 to determine that it was in fact a complaint
12 related to these protests, if they were able to
13 give us a date and time that helped us determine
14 it was related to the protests, to the extent that
15 the conduct they were describing was in fact a use
16 of force. Some people who, you know, had other
17 types of complaints we -- these were the things we
18 took into consideration. We also considered any
19 sort of evidence they were able to submit. So
20 even someone who had not -- who didn't reach back
21 out to us, if they had provided really clear video
22 of a use of force, we would have done what we
23 could with that. So we took all of those into
24 consideration to determine whether it was

1  something that we should fully investigate.
2  Q.      Can you give me a sense of how many of
3  those triage complaints ended up being fully
4  investigated?
5  A.      I closed all of them out with a written
6  document.  But from the level of investigation
7  that we were able to complete from there, you'll
8  notice in the reports that we put together there
9  are some where there's very little that we were
10  able to do with what was sent to us, and so we
11  would close that out, you noted earlier with the
12  same kind of form as those where we had
13  information that we were able to dive into more
14  fully.
15  Q.      All right.  I was just trying to get a
16  sense of the volume of the triage group.  Were
17  there 100 of them and you ended up investigating
18  three, or were there 23 and you ended up
19  investigating seven?  Do you have any sense of
20  that?
21  A.      I don't.  But I -- to help you with the
22  numbering system that we devised, anything that
23  started with a 200 was something that was
24  originally assigned to us as a triage case.

1  Anything that didn't start with a 200 was
2  something that the director's office specifically
3  assigned us to investigate.
4  Q.      Thank you.
5         The ones that the director assigned to
6  be fully investigated all were, I take it?
7  A.      Correct.
8  Q.      How about the ones that were designated
9  as criminal, what happened with those?
10  A.      Those were assigned to a former FBI
11  agent by the name of Wozniak.  I think you've
12  probably read about that in the paper.
13  Q.      Yes.  So what communication did you or
14  your firm have with Agent Wozniak?
15  A.      Very little.
16  Q.      Did you transmit information that you
17  might have had about particular matters to his
18  attention?
19  A.      We did not.
20  Q.      Did Agent Wozniak contact you during
21  the course of the Columbus investigations to ask
22  questions about events or situations that he
23  thought you knew about?
24  A.      He e-mailed once or twice related to

1  logistics.  So, for example, where interviews
2  could be conducted, we had a hard time finding --
3  all of us had a hard time finding appropriately
4  large space given the COVID restrictions.  So I
5  know he contacted me once about that.  I believe
6  he asked me one substantive question, but I
7  referred him back to Deputy Director Speaks.
8  Q.      What was the substantive question?
9  A.      I don't recall because I didn't -- I
10  just referred it to Deputy Director Speaks and
11  didn't -- didn't respond individually.
12  Q.      Did he conduct any of his work or
13  interviews at BakerHostetler's offices?
14  A.      He did not.
15  Q.      Do you know where he did his work?
16  A.      I don't.
17  Q.      Do you know who else was working with
18  him in the criminal investigations?
19  A.      I don't.
20  Q.      Do you know who's handling any
21  prosecutorial decisions about those criminal
22  investigations?
23  A.      The only thing I know is that we -- if
24  we had any communication related to criminal, we

1  sent it back to Assistant Director Bourke.  And
2  then she worked with the city attorney's office to
3  make determinations.  And I don't know how or
4  whom.
5  Q.      Are you aware of any officers being
6  charged criminally arising out of the protests?
7  A.      I'm not aware.
8  Q.      Did BakerHostetler keep track of the --
9  in some kind of summary or report of its overall
10  -- either its overall findings or its overall
11  approach or the specific findings of each
12  incident?
13  A.      Did we keep track.  We maintained a
14  spreadsheet of all of the investigations and we
15  maintained a column that said what the final
16  finding was.
17  Q.      All right.  We do have those
18  spreadsheets.  And I think we're going to figure
19  out how to share screen them with you in a minute.
20         Let's do this.  I know we just took a
21  break a little while ago, but let me go to the
22  breakout room with my team, and I want to figure
23  out the most efficient way to do this.
24  A.      Okay.

1  Q.      It's 11:29.  Let's do 10 minutes and
2  then we'll figure this out.
3  A.      Okay.
4         (A short recess is taken.)
5  BY MR. MARSHALL:
6  Q.      All right.  Why don't you share screen
7  the memo, Director Pettus's memo to the Mayor that
8  we were just looking at.
9         All right.  So go to the top of page 3
10  -- I'm sorry.  Go back to the top of page 2.
11        All right.  Jenni, as I understand it,
12  there was a winnowing out process that resulted in
13  your firm getting a certain number of things to
14  investigate, right?
15  A.      Yes.
16  Q.      Did you or any members of your firm
17  play any role in that winnowing out process?
18  A.      No.
19  Q.      Do you know what criteria -- hold on
20  one second.
21        Do you know what criteria the division
22  applied in determining whether a matter should be
23  investigated as an excessive force allegation?
24  A.      I don't know if it was the division or

1  the department.  But also, no, I don't know what
2  criteria they used.
3  Q.      All right.  It could have been the
4  division or the Department of Public Safety or
5  both, right?
6  A.      Yeah, I don't know who it was.
7  Q.      But what you do know is that only X
8  number of matters came to your firm's attention to
9  be determined?
10  A.      That's correct.
11  Q.      And I think you said you issued 49
12  total reports?
13  A.      Correct.
14  Q.      Some of those reports involved multiple
15  individuals complaints or multiple situations,
16  right?
17  A.      Correct.
18  Q.      But altogether it was a total of 49,
19  and I think they're titled investigation reports
20  for use of force incidents during protests, right?
21  A.      I believe that that's the title for all
22  of them, yes.
23  Q.      Some of them were real short reports
24  because there just wasn't enough information

1  available to conclude anything; is that fair?
2  A.      Correct.  Even to conclude kind of next
3  steps that would be useful.
4  Q.      But the majority of them there was some
5  conclusion whether it was sustained, not
6  sustained, unfounded or exonerated, right?
7  A.      I issued a conclusion in each,
8  regardless of the number of steps we reached prior
9  to reaching that conclusion.
10  Q.      If you couldn't -- if you didn't have
11  enough information to determine what happened,
12  what would be the finding?
13  A.      Generally, ideally it would be not
14  sustained.  I do believe there were a few places
15  where people may have reached unfounded also
16  because of a lack of information.
17        MR. MARSHALL:  Sam, scroll down to the
18  bottom to those definitions again.
19  BY MR. MARSHALL:
20  Q.      I'm just going to read these into the
21  record as we move along here.  Sustained means the
22  allegation of excessive force is supported by a
23  preponderance of the evidence.  Not sustained
24  means the allegation of excessive force is not

1  supported or refuted by a preponderance of the
2  evidence.  Unfounded means the allegation of
3  excessive force is refuted by a preponderance of
4  the evidence.  And exonerated means the evidence
5  indicates the force occurred but the actions were
6  lawful and no misconduct was substantiated.  And
7  then there's withdrawn where the complainant
8  retracted their allegations.  Did I read those
9  right?
10  A.      You did.
11  Q.      And how would you determine -- it looks
12  to me like there's an overlap between not
13  sustained and unfounded, and that is a situation
14  where the allegation is not support -- is refuted
15  I should say by a preponderance of the evidence.
16  Do you see that overlap?
17  A.      I do.
18  Q.      How did you decide what finding to make
19  if you had a situation where the allegation is
20  refuted by a preponderance of the evidence?
21  A.      Typically there would be a
22  conversation.  So I had a teammate, personally
23  Lauren Larrick, and we would have a conversation
24  about that conclusion and where we landed on it.

1    And I'm hesitating because I reviewed a report
2    last night where I think upon further reflection
3    we may have -- we maybe should have done something
4    differently, reached a not sustained rather than
5    unfounded.  At the time, however, when we would
6    review these, we would look and say do we have
7    enough and then decide whether -- whether we had
8    enough information, and if so what that
9    information demonstrated and then decide together
10   on a conclusion.
11   Q.        Based on your training from the City,
12   what difference does it make if you find not
13   sustained versus unfounded?
14   A.        What difference does it make as far as
15   results in the officer -- for the officer, none.
16   Q.        Why would you be worried about -- you
17   said you reviewed a report where you thought,
18   well, this one maybe should have been not
19   sustained rather than unfounded.  Why does it make
20   a difference?
21   A.        To be more precise.
22   Q.        But I --
23   A.        Because of my own dedication to being
24   accurate.

1    Q.        Yes, I understand that.  But I'm
2    confused.
3    A.        Sure.
4    Q.        Maybe it's just me.  But not sustained
5    can be found if the allegation is refuted by a
6    preponderance of the evidence and unfounded can be
7    found if the allegation is refuted by a
8    preponderance of the evidence.  It's the same
9    standard, right?
10   A.        The allegation -- no.  I would not read
11   them as the same standard.  I would say not
12   sustained is the allegation of excessive force is
13   not supported by a preponderance of the evidence
14   or is -- and/or, right, is not refuted by a
15   preponderance of the evidence.  So you can't reach
16   a conclusion is -- is where my -- the way I would
17   interpret not sustained.
18   Q.        All right.  So not sustained is I don't
19   know if it's refuted by a preponderance of the
20   evidence; is that what you're saying?
21   A.        Yes.
22   Q.        Meaning I can't tell one way or the
23   other?
24   A.        Correct.

1    Q.        Yeah, that brings me to these
2    questions.  So if you've got a -- let's just take
3    a complaint about pepper spray.  Your firm handled
4    several of those I take it?
5    A.        That's correct.
6    Q.        All right.  So the question is whether
7    the use of pepper spray, mace or what they call
8    pepper spray was -- the use of it was excessive
9    force or not.  That's the question.  Are you with
10   me?
11   A.        I am.
12   Q.        In a situation where you just can't
13   determine whether or not the use of it was
14   excessive, what's the finding?
15   A.        If I can't determine whether the use of
16   it was success -- was excessive, pardon me, I
17   would ideally conclude that it was not sustained.
18   Q.        So this report you read last night you
19   thought you might want to -- it may be have been
20   better designated as not sustained, even though
21   the result for the officer is no different, right?
22   A.        Correct.
23   Q.        Okay.  Are you going to submit a
24   correction to that report?

1    A.        I didn't ever give that consideration.
2    So I don't know.
3    Q.        All right.  What do you do if you have
4    a balance of the evidence?  That is, from the best
5    investigation you can do, the evidence on either
6    side is equally balanced, what's the finding
7    there?
8    A.        It would be not sustained.
9    Q.        What if you cannot identify the officer
10   that did the act on the video or did the act
11   alleged?  Whether or not there was a video.
12   A.        Well, depending on what it showed --
13   because again remember that the use of pepper
14   spray also considers facts and circumstances
15   around it, including de-escalation efforts,
16   including there was a subjective element of
17   whether the officer feared for his or her own
18   safety or the safety of others.  So the lack of --
19   or the inability to identify an officer makes it
20   more likely that you're going to reach a
21   conclusion of not sustained.
22   Q.        What if it's clear that the officer --
23   and let's take the example where you've got a
24   complaint that someone was pepper sprayed and they

1  think it was excessive force, the civilian who got
2  pepper sprayed thinks it's excessive force. And
3  there's video evidence available that makes you
4  conclude that this might be excessive force or the
5  preponderance is the use of pepper spray was not
6  appropriate under those circumstances so it was
7  excessive. But you can't -- the first question is
8  you can't identify the officer as a Columbus
9  division officer. You don't know -- it's a law
10  enforcement officer of some kind, you don't know
11  where they're from and you can't tell if they're
12  Columbus or not. What do you do in that
13  situation?
14  A.    Again, that's a pretty limited number
15  of facts and doesn't take into consideration the
16  entirety of the policy. But the individual team
17  would have to look at that and determine they were
18  going to land on not sustained or unfounded.
19  Q.    It would either be not sustained or
20  unfounded if you can't identify whether or not the
21  officer is even a Columbus division officer,
22  correct?
23  A.    Yes. Because we can't sustain an
24  allegation against a division officer if we don't

1  know for a fact that it is in fact a division
2  officer.
3  Q.    All right. So then my next question is
4  it's clear from the video evidence that it's a
5  division officer, but despite your best efforts
6  you can't identify who. Do you follow my example?
7  A.    I do.
8        And so it would most likely result in a
9  not sustained or an unfounded conclusion.
10  Q.    Well, how could it result in sustained
11  if you can't identify who the officer is?
12  A.    Correct. I said a not sustained or an
13  unfounded.
14  Q.    Right. You said most likely a not
15  sustained or unfounded. So, sorry, I'm parsing
16  your words.
17  A.    Yeah. I --
18  Q.    In the situation where you know it's a
19  division officer based upon the evidence, but you
20  -- and despite your best efforts you can't
21  identify who it is, that's either not sustained or
22  unfounded, right?
23  A.    Yes.
24  Q.    Now, what about a -- these days we'll

1  call it a she-said-she-said situation, right?
2  You've got a civilian who says excessive force.
3  You've got an officer who says, no, I did it and
4  it was appropriate for these reasons. And that's
5  all you've got. You don't have any video. You
6  don't have any other witnesses. And you don't
7  have any other information about the particular
8  circumstances of that individual situation. It's
9  straight up she-said-she-said. Are you with me?
10  A.    I'm following you.
11  Q.    All right. What do you do in that
12  situation?
13  A.    I think it's going to be in part a
14  credibility determination, the credibility of the
15  officer.
16  Q.    Okay.
17  A.    And whether you believe him or her to
18  be telling the truth and what they're pointing to
19  as their reasons for doing it. It's not simply
20  that they provide reasons, but it's that they are
21  -- their reasons you believe are credible based on
22  their perception that there's a fear of harm to
23  themselves or others or that they were preventing
24  the commission of a crime or any of the other

1  number of circumstances listed within the policy.
2  That's going -- that's going to lead you to your
3  conclusion.
4  Q.    Did you have any situations like that,
5  where you had to make a determination about either
6  the credibility of the officer or of the
7  complainant?
8  A.    I don't recall specifically. I'd have
9  to look at the individual reports.
10  Q.    Do you know whether anyone else at the
11  firm did, that they conferred with you about,
12  where they were saying I can't figure this one
13  out, I've got to decide who's telling the truth?
14  A.    I don't recall that conversation with
15  anyone, no.
16  Q.    Did you have video evidence available
17  for a majority of the 49 events that you
18  investigated?
19  A.    Yes. I think that's correct.
20        MR. MARSHALL: Let's go to the
21  spreadsheets. And, Sam, if you could share the
22  one you got by e-mail. I think we'll be able to
23  see all the tabs.
24        Before we -- we're going to look at

1    this here in a second.
2        And does that give us a view of all the
3    tabs, Sam, or does it need to be spread out?
4        MR. SCHLEIN: Yeah, I think you can see
5    them kind of where my curser is here on the
6    bottom.
7        MR. MARSHALL: Ah, all right.
8    BY MR. MARSHALL:
9    Q.    So now we're on the tab called
10   Incomplete.
11   A.    Oh, this. Okay.
12   Q.    All right. We'll look at this in a
13   second, Jenni. Before we get there, I was asking
14   you about videos. Was it your direction from the
15   City that if in review of a video you saw what you
16   thought might be excessive use of force by a law
17   enforcement officer that you were supposed to
18   further investigate that event?
19   A.    Yes. Are you asking about if we
20   identified something other than what we believed
21   the original complaint to be?
22   Q.    Well, if you were looking at a video
23   that were giving you information about the
24   original complaint, you were simply looking at it

1    to evaluate that original complaint, right?
2    A.    We were. But there were some instances
3    where we also identified something else that
4    looked like a potential use of force incident, and
5    we would send that back through Assistant Director
6    Bourke and ask for her direction about whether we
7    should investigate that incident further as well.
8    Q.    Okay. And that could include
9    additional force involving the same cast of
10   characters or could it also include use of force
11   separate and apart from the complainant and the
12   officers you were looking at?
13   A.    The second. It could also contain
14   something separate and apart from the officers we
15   were originally directed to investigate or the
16   original incident.
17   Q.    So it could be both, right?
18   A.    Correct.
19   Q.    And then you'd send that back to
20   Director Bourke and the safety director's office
21   about whether it should come back to you for
22   further investigation, right?
23   A.    Correct.
24   Q.    How many such either videos or other

1    information did you send back to Director Bourke?
2    A.    There were only a few that we sent back
3    to Director Bourke.
4    Q.    Did any of them come back for further
5    investigation?
6    A.    Yes.
7    Q.    Do you know what percentage or how
8    many?
9    A.    I don't.
10   Q.    Was it all of them or only some of
11   them?
12   A.    I don't know, John.
13   Q.    Okay. We are looking at the first tab
14   of the spreadsheet that was provided to us. Is
15   this -- do you recognize this first of all, Jenni,
16   as a spreadsheet that you created, or was this
17   created by someone else?
18   A.    We did not create this spreadsheet.
19   Q.    Have you seen it before?
20   A.    Maybe.
21   Q.    Okay.
22   A.    I don't recall specifically seeing this
23   spreadsheet. But that doesn't mean that I didn't
24   see it at some point.

1    Q.    All right. You may have seen a
2    spreadsheet similar to this that sort of listed
3    the various items that BakerHostetler might have
4    been investigating; is that fair?
5    A.    That's fair.
6    Q.    Do you know who created these
7    spreadsheets?
8    A.    Would you mind looking at the other
9    tabs for me? Let me take --
10       MR. MARSHALL: Sam, do under review.
11   A.    Okay. And then the last one, completed
12   use of force.
13       Okay. So I believe that this
14   spreadsheet was created by IAB, and it relates
15   specifically to the use of force forms that were
16   created by officers related to the protests.
17   Q.    Okay. When you say this spreadsheet,
18   do you mean the completed or all three of these?
19   A.    All three of those tabs. So the
20   entirety of the workbook I believe was created by
21   IA, and I believe that that is what they used to
22   document the use of force reports or forms that
23   they were forwarding to us.
24   Q.    Okay. So they were simply documenting

1  what they were sending on to BakerHostetler at the
2  point in time in which they were required to
3  deliver all of that to you for your investigation?
4  A.      Yes.  I think that's right.
5  Q.      Yeah.  I took the deposition of
6  Lieutenant Bela Bernhardt.  Have you met
7  Lieutenant Bernhardt, talked to him?
8  A.      I've never met him.  I may have talked
9  to him once.  I do recall seeing his name in my
10 inbox however.
11 Q.      You know he's one of the two lieutenant
12 commanders of internal affairs, right?
13 A.      Correct.
14 Q.      All right.  He testified that there
15 came a point in time, he couldn't give me an exact
16 date, but I think it was in June sometime that he
17 was told to stop working on any protest
18 complaints, any complaints arising out of the
19 protests and package it all up basically and get
20 it to BakerHostetler.  Does that sound like what
21 happened?
22 A.      No.
23 Q.      Tell me what happened from your
24 perspective.

1  A.      Oh, okay.  So we received complaints, citizen
2  start for you.  So we received complaints, citizen
3  complaints that came through two sources.  The
4  first source, and I believe the original memo that
5  Director Pettus prepared, was focusing on the
6  reportCPD e-mail address.
7  Q.      Okay.
8  A.      So complaints, citizen complaints that
9  came through that e-mail address went through the
10 process we've already discussed, and those were
11 forwarded to us by Assistant Director Bourke.  At
12 the same time that that e-mail address was set up
13 and was receiving complaints from citizens, there
14 were some citizens who were also lodging
15 complaints with IAB through the normal citizen
16 complaint process.  So that e-mail was well
17 outside kind of the normal practice, that
18 reportCPD e-mail.  Some citizens directly
19 contacted IAB.
20         During the course of our investigation,
21 and as we were kind of wrapping our arms around
22 what all data was available to us and should be
23 reviewed, we came to understand that there were
24 also these IAB investigations, and we started to

1  understand that they were overlapping, that there
2  were some individuals who may have called IAB with
3  a complaint who also sent an e-mail, or two people
4  reported the same incident to the two individual
5  places.  IAB was directed -- once we kind of came
6  to that realization, IAB was directed to stop
7  their investigations and to forward what they had
8  to us so that we could try to put the puzzle
9  pieces together.  But this isn't related
10 necessarily to when they sent the investigations
11 to us.  This chart is related to when they
12 collected the use of force reports, cataloged them
13 and forwarded them to us.
14         MR. MARSHALL:  Okay.  Let's take a
15 sample use of force report and, Sam, you can bring
16 up 42 is a good example.
17 BY MR. MARSHALL:
18 Q.      All right.  Do you see the document
19 that has the Exhibit 42 in the upper right-hand
20 corner?
21 A.      I do.
22 Q.      All right.  And do you recognize this
23 as an example of a use of force report from the
24 Columbus Division of Police?  And this particular

1  one involves an officer named Mark George.
2  A.      I do.
3  Q.      Was this one that you looked into by
4  any chance?
5                    - - - - -
6         Thereupon, Exhibit 42 is marked for
7  purposes of identification.
8                    - - - - -
9  A.      I can't tell from here.  What's the
10 date of --
11 Q.      May 31st?
12 A.      -- incident?  I need to see the whole
13 thing.
14 Q.      Okay.
15 A.      And we could --
16 Q.      Well, let me start with this question
17 though.
18 A.      Yeah.
19 Q.      You recognize the form as a division
20 use of force report, right?
21 A.      Correct.
22 Q.      Did BakerHostetler receive one of these
23 reports or perhaps multiple reports for each of
24 the incidents that it investigated?

1 A.    No. BakerHostetler requested use of
2 force reports related to each incident that we
3 investigated, but we didn't always receive one.
4 Q.    Do you know why you didn't get one for
5 some of the incidents?
6 A.    It could be any number of things. One
7 could -- one number -- I'm sorry. One reason
8 might be that an officer didn't complete a use of
9 force report related to that incident. Another
10 reason might be that we weren't able to match up
11 the date and time of the allegations against a use
12 of force report that was provided to us, we didn't
13 find one that matched. Another would be there
14 were some inaccuracies in the use of force
15 reports. So we might not have found -- found ones
16 that relate, you know, we did our best to identify
17 those. And then there could be any number of
18 other reasons, but those are the big ones that
19 come to mind.
20 Q.    Did BakerHostetler track in any kind of
21 summary or chart format the numbers of -- out of
22 the 49 reports, how many were sustained, not
23 sustained, unfounded, exonerated or withdrawn?
24 Did it track those numbers?

1 A.    We have our own spreadsheet that
2 indicates the findings in those, yes.
3 Q.    Is that a spreadsheet you have
4 available to you today from where you sit?
5 A.    No.
6 Q.    Any chance you can retrieve it for us
7 today?
8 A.    I wouldn't know how to send it to you
9 in all honesty. Like, I don't know how to
10 retrieve it and send it. I'm sure that I could do
11 that for you at some point.
12 Q.    Is it an Excel spreadsheet or --
13 A.    It's -- I don't -- I'm not the -- I'm a
14 user of the spreadsheet, not the owner. I think
15 it's Excel. I think it's housed on Teams. But I
16 know that we've tried to kind of encapsulate that
17 and share it with people and it doesn't work very
18 well because it's very large.
19 Q.    All right. Is there any way you can
20 look at it to answer a question like -- I'll give
21 you an example -- how many of the 49 were
22 sustained, how many were not sustained, how many
23 were unfounded? Is that something you could do
24 for us by just looking at it?

1 A.    Maybe. I'd need to look at it and see,
2 John.
3 Q.    Okay. Well, let's take a break and do
4 that. I don't think I have more than about an
5 hour or so to go.
6 A.    Okay.
7 Q.    And it is now 12:07. What's your
8 preference? Do you want to take a break until
9 12:30 and get a bite and do that and then finish
10 up, we'll finish up around 1:30ish?
11 A.    Okay.
12 Q.    Up to you all, is that -- does that
13 make sense? Or do you want to take a shorter
14 break? I don't -- doesn't matter to me.
15     MS. TANOURY: I'm fine with whatever
16 Jenni is most comfortable with. If you want to
17 take a short lunch, we can do that, Jenni.
18 Q.    We're going to need 10 minutes anyway
19 for you to see if you can figure out what's on the
20 spreadsheet.
21 A.    Yeah. Let's come back together at
22 12:30. To the extent -- and I know we've talked
23 about this previously. If we're able to be done
24 by 3:00, I'm good with whatever we do before that.

1 Q.    Yeah. No. We'll be done by 3:00.
2 A.    Okay. Excellent.
3     MR. MARSHALL: Yeah. Okay. Yeah.
4 Probably well before. Okay. Let's break until
5 12:30.
6     THE WITNESS: Okay. Thank you.
7     MR. MARSHALL: Thanks.
8     (A short recess is taken.)
9 BY MR. MARSHALL:
10 Q.    All right. Thanks for pulling up the
11 spreadsheet. And Sam is going to share here in a
12 minute. I don't know if you've done the math that
13 I asked you to do. But let me just start with
14 that. Were you able to determine from -- well,
15 first of all, maybe we should just identify the
16 spreadsheet. So, Sam, go ahead.
17     All right. Jenni are we looking at the
18 investigations tab or at least a portion of it for
19 the BakerHostetler master log regarding use of
20 force investigation spreadsheet that you mentioned
21 before the break?
22 A.    You are. We are.
23 Q.    All right. And you've given us by
24 e-mail or the city attorney has given us by e-mail

1  the complete spreadsheet, right?
2  A.      Correct.
3  Q.      I see it as having two tabs, one
4  investigations, which reflects -- does that
5  reflect an entry for all of the investigations you
6  did, all 49?
7  A.      It reflects all of the full
8  investigations that we did, yes.
9  Q.      Are there some that were not full
10 investigations?
11 A.      Correct.  If you look at the triage
12 tab, you'll see like at the very -- the last
13 column.
14 Q.      Yeah.
15 A.      Yep.  He's on it.
16         And you'll see that some were closed.
17 It will say, for example, 202 is what we're
18 looking at now, closed and submitted on 9-4.  Of
19 the 49 documents that we submitted to the City,
20 one of those relates to 202.  It's just going to
21 be a significantly smaller report from us than
22 those related -- that are on the investigations
23 tab.
24         MR. MARSHALL:  All right.  Sam, scroll

1  down.  Tell me how many BakerHostetler numbers are
2  on the triage sheet here.  I see eight on the
3  screen in front of me.  Scroll all the way down to
4  where it stops.
5  BY MR. MARSHALL:
6  Q.      It looks like there are 20, 30 maybe.
7  A.      Yeah.  I think 30.
8  Q.      Now, does that mean there are only 19
9  on the other sheet?
10 A.      No.  Because if you look at -- so let
11 me start with this was a working document that is
12 not perfect.  But we were trying to capture to the
13 best of our ability what came into us and how we
14 moved it through our process.  So if you look at
15 the very last one, so it's on line 31, but it says
16 2-29, moved to investigations.  And you can also
17 see on line 29, 2-27, moved to investigations tab.
18 Q.      Yes.  I see that, yep.
19 A.      So those were cases that were sent to
20 us as triage, we determined that we should -- we
21 had enough to do a further investigation so we
22 moved them to the investigations tab for further
23 completion.
24         In addition, you would also see --

1  well, we would have -- if you could scroll up for
2  me, Sam, on triage.  Keep on going.  It will be
3  easier to talk specifics.  Okay.  So pause.  If
4  you scroll down a little bit or even where we are,
5  let's just sit tight.  You'll see on line 20 or
6  line 21, 2-19, do not use, CBH 19.  That's because
7  we determined that 2-19 and 19 were the same
8  incident.
9  Q.      Okay.
10 A.      So we were sent one as triage and one
11 as a complaint.  And then conducting the
12 investigation, we realized those were actually
13 related, so we moved that over as part of the 19
14 investigation.
15 Q.      So if you look through both tabs here
16 and figure out what got moved together or
17 something else happened to it, you'd come up with
18 a total of 49 investigation reports, is that what
19 you're saying?
20 A.      Correct.  49 submissions to the City.
21 Q.      Okay.
22 A.      With the investigation reports.
23 Q.      All right.  So let me understand each
24 of the columns here.  Some of them are obvious.

1  There's a BakerHostetler number that you use, and
2  I think you said if it -- if it starts with a 2 in
3  this column, it was -- it's started as a triage,
4  right?
5  A.      That's correct.
6  Q.      All right.  And document type was the
7  complaint document or the initial information you
8  got?
9  A.      It was, yeah, where the -- how the
10 complaint came into the City.
11 Q.      Okay.  And then document link is a link
12 to the BakerHostetler database that contains
13 documents related to that complaint?
14 A.      Correct.
15 Q.      Date received, is that date received by
16 the City or by the law firm?
17 A.      By the City.
18 Q.      70-day draft to Jeremiah.  What is that
19 column for?
20 A.      Well, it ended up irrelevant, John.
21 Q.      Okay.
22 A.      As I recall, this was aspirational.  So
23 originally we anticipated trying to have the
24 investigations completed and a draft completed by

1 70 days from the date the complaint was submitted
2 to the City. I don't think we met any of those
3 because it took so long for us to receive the
4 data.
5 Q.     Okay.
6 A.     The plan was also that Jeremiah Wood
7 would be the person to review all of the reports.
8 As time went on, we decided that I would be the
9 one to do that instead.
10 Q.     So did you end up reviewing all of the
11 reports before they were submitted?
12 A.     I did.
13 Q.     Did you change any of the findings upon
14 review?
15 A.     If I -- I don't recall. If I did, it
16 was more a matter of ensuring the wording was
17 correct, not changing the conclusion. So, for
18 example, if we worded the allegation against the
19 officer as -- make sure I get this right -- as an
20 excessive use of force, it would be inappropriate
21 to conclude that the officer was exonerated
22 because you could never have an exoneration of an
23 excessive use of force, because by definition an
24 excessive force would be outside of policy. But

1 if we worded it so that it said excessive use of
2 force and we concluded that the officer was within
3 policy, we would conclude that that was unfounded
4 or potentially not -- well, not sustained would be
5 another option. So it was things like that.
6 Ensuring that we were using the right words but
7 not changing the conclusions that the team
8 reached.
9 Q.     Okay. Who wrote the summary of
10 complaint column in this spreadsheet?
11 A.     Who wrote a summary of complaint. Got
12 it. We had different people throughout the course
13 of time who would fill in this summary of
14 complaint. I think initially for the first batch
15 of cases we received because the cases came in
16 over time, for the first batch I believe that
17 Allison Thomas just gave us a general summary.
18 And then as time went on, there were others who
19 put that in, including sometimes the actual team
20 that did the investigation.
21 Q.     Okay. Obviously, going back on the
22 columns, we've got a column for 90 day final DL.
23 Did that end up being not -- you couldn't follow
24 that precisely because some of them took more than

1 90 days?
2 A.     Yes. There were a few where we sought
3 extensions beyond the 90 days. But our
4 overarching goal was to meet the 90-day deadline.
5 Q.     The assigned investigators would be
6 from your firm?
7 A.     Correct.
8 Q.     I think the rest of these are
9 self-explanatory. Other than evidence provided by
10 complainant, was that column if there was specific
11 photographic or video evidence to put that in
12 there?
13 A.     That was its intent, yes. I would not
14 say that that was done consistently.
15 Q.     Okay. I think the rest of these
16 columns are understandable. Let's go to the end.
17       MR. MARSHALL: Keep scrolling further
18 along there, Sam. Stop for a second.
19 BY MR. MARSHALL:
20 Q.     Conflict check for subject officer. Do
21 you see that column?
22 A.     I do.
23 Q.     What does that mean?
24 A.     We ran a conflict check for individual

1 officers to ensure we didn't have a conflict with
2 that officer. We didn't identify any throughout
3 the time.
4 Q.     Okay. Meaning your firm had
5 represented the officer or her or his family or
6 something, that's what you mean by that?
7 A.     Correct.
8 Q.     Okay. Focus officer, witness officer,
9 I see a lot of not applicable. Tell me what those
10 columns mean and --
11 A.     Well, I think the not applicable is
12 just because of what -- where we're looking on the
13 spreadsheet right now.
14 Q.     Okay.
15 A.     Because we had two in lines 21 and 23,
16 I think both got transferred, so they didn't
17 finish --
18 Q.     Ah.
19 A.     -- inputting this data here.
20 Q.     I see. All right.
21       So you would know if there -- the focus
22 officer should always be filled out if this was
23 not transferred or something else happened, right?
24 A.     If it was identified at the very

1 beginning. Some of the complaints it took us a
2 while to determine who the focus officer was. And
3 I am not certain that the teams would go back and
4 fill that in if they were partway through the
5 investigation.
6 Q. There were times that you could not
7 identify the officer, though, right?
8 A. That's also true, yes.
9 Q. Okay. I'm going to guess you looked at
10 quite a bit of video during the course of these
11 investigations?
12 A. I did.
13 Q. Give me a rough estimate of how many
14 hours you think you looked at.
15 A. Oh. Hundreds. I -- initially when we
16 got the first batch, I watched every complainant
17 video that was submitted to us.
18 Q. Okay.
19 A. And then for my individual
20 investigations, I watched videos after my teammate
21 Lauren determined that they, you know, applied
22 because we made pretty big requests for videos. I
23 watched those if --
24 Q. Did you ever see videos from the

1 cameras that are mounted on the Riffe Center which
2 is located at the northwest corner of State and
3 High Streets? Do you know what I'm talking about?
4 A. I do know what you're talking about.
5 And I do not -- I do not believe that I viewed
6 video of that intersection.
7 Q. Yeah. Or do you know if you viewed
8 video taken from cameras mounted on that building
9 that may have been pointed up the street or across
10 the street or down the street or whatever?
11 A. I don't recall being provided videos
12 for that intersection. Like for that -- like on
13 that building.
14 Q. And do you know if the firm was
15 provided videos from cameras mounted on that
16 building?
17 A. I don't believe so.
18 Q. Let's finish up on this triage sheet.
19 MR. MARSHALL: Sam, why don't you
20 scroll down a little on the sheet so that we can
21 see something that's a little more filled in. All
22 right. That's good. Thanks. And then scroll
23 over. We'll figure this out.
24 A. Now Sam is experiencing the pain I was

1 experiencing during the break.
2 Q. He's already got COVID, you know, so it
3 doesn't matter.
4 All right. So at the end of the
5 triage, you're going to determine if it was either
6 closed and submitted with some kind of report or
7 put back into the main investigations column -- or
8 bucket, right?
9 A. Generally, yes.
10 Q. Okay. It looks like this number,
11 BakerHostetler No. 228 was not sustained closed
12 and submitted right out of the triage, in other
13 words it went -- it -- you were able to make a
14 determination of not sustained based on what you
15 had without doing any further investigation,
16 right?
17 A. I mean, based on what we see on this
18 spreadsheet, I would say yes. But the
19 investigative report would provide further
20 details.
21 Q. Do you know anything about this
22 particular one?
23 A. Can you -- I'm sorry. Can we scroll
24 over so I can even see something about it?

1 Q. Yeah. Focus officer Clint Eckenrode.
2 A. Can we move so I can see the
3 complainant? That's the easiest.
4 Q. Ah, let's see. Complainant Ms. Pabst.
5 A. Yeah.
6 Q. It's got Andy Choi who is the news
7 reporter posted three videos, events that occurred
8 at Russell and High?
9 A. I do recall seeing some of the videos
10 for this one, yes.
11 Q. Okay. Do you remember seeing a video
12 -- well, ultimately, can you figure out from this
13 column --
14 MR. MARSHALL: And, Sam, you can slowly
15 scroll over.
16 Q. Can you figure out from this particular
17 entry what happened?
18 MR. MARSHALL: And, Sam, why don't you
19 scroll to the end first on 2-28. Go all the way
20 to the -- all the way to the right. The -- yeah,
21 all the way to the right, the other way.
22 BY MR. MARSHALL:
23 Q. All right. So it looks like the
24 recommendation was not sustained. Can you tell

1  why from looking at this?
2  A.  Can I tell why?  No, I could only guess
3  because based on what I see.
4  Q.  What's your estimate?  I'm not going to
5  hold you to it.  But what do you think happened?
6  A.  Well, if you -- and I am sorry, Sam, I
7  wish I could drive myself to help us.  But if you
8  would scroll to the left a little further.  So if
9  we pause here, we're looking at kind of under the
10  BH investigation header.  Complainant contacted
11  date mode and we made three contacts.  The
12  complainant was not interviewed, if you see
13  persons to interview.  My surmise based on this
14  alone is that perhaps the complainant chose not to
15  participate.  Commander Eckenrode is a pretty
16  senior -- that's a senior rank.  So I would look
17  at this and say that I believe they looked at an
18  after action report or something that was more
19  from a big picture standpoint to try to see if
20  they could narrow down anybody who might have been
21  involved in what they saw on the video.
22  Q.  Okay.  And because they couldn't get a
23  response from the complainant or get any further
24  information other than the videos themselves, that

1  resulted in a finding of not sustained?
2  A.  Again, looking at this row, that's what
3  -- that's what I would surmise.  But they wrote --
4  you know, they wrote a summary that explains what
5  they concluded and why.
6  MS. TANOURY:  And I want to object to
7  the extent that we don't have the summaries in
8  front -- and the reports in front of her.
9  MR. MARSHALL:  Oh, yeah, sure.  I
10  understand.
11  BY MR. MARSHALL:
12  Q.  There would have been a summary -- an
13  investigation report summarized on this which
14  would have summarized their reasons, right?
15  A.  Correct.  And the steps that they took
16  to try to dive into it and find out what was
17  there.
18  Q.  Okay.  Let's go to the investigations
19  tab.  This looks like it has pretty much the same
20  columns as the triage tab, right?
21  A.  Correct.  That was intentional.
22  Q.  Okay.  But all of these are filled out
23  to one extent or another.  If you scroll all the
24  way to the bottom, keep going.  Stop.  I think --

1  it looks like there's 47.  Is that because what
2  we're looking at -- is that because there are some
3  that are just in the triage that resulted in a
4  report?  I'm just trying to figure out the 49
5  number.  I don't doubt it.  I just --
6  A.  I know.  It's not the easiest math.
7  So, one, I would know that the first two rows
8  don't count, so that would really put us --
9  actually, the first three rows.  So on this
10  investigation tab, it would show us 44 rows.
11  There are some that if you were to scroll up, you
12  would identify were -- ended up referred for
13  criminal.  So we kept a line for that and then
14  made a note that it had been referred for criminal
15  based on the City's direction.  There was one or
16  two that were referred back as outside the scope
17  of our investigation, so once we interviewed the
18  complainant or looked at the evidence and
19  conferred with the City, it was determined that
20  that was not really a use of force related to the
21  protests.  There -- and so those were referred
22  back.  There's some that are combined, so I'm
23  trying to remember the numbers.  But, like, one of
24  the reports has three complaint numbers --

1  Q.  Yeah.  I saw that.
2  A.  -- combined together.
3  Q.  All right.
4  A.  And several of them have two.  So -- we
5  ended up having to do a little bit of checking off
6  to get to the 49.
7  Q.  All right.  So if you subtract those
8  things that you're talking about now from this tab
9  and then add those things in the triage tab that
10  were completed, you come up with 49.  That's what
11  you're saying?
12  A.  That -- I hope that's what you come up
13  with, yes.
14  Q.  I don't think it really matters.  But
15  you mentioned that if you weren't going to hit the
16  90-day deadline, you would request an extension.
17  How did you go about doing that?
18  A.  Well, what we did is as we got close to
19  the 90-day deadline, we would -- I would talk to
20  George Speaks about cases where we felt like there
21  was a possibility for us to actually complete a
22  thorough investigation.  So, for example, we have
23  a lot of officers who were out on leave.  So if
24  we'd identified a focus officer who was on leave,

1  we didn't want to close that investigation unless
2  or until we had an opportunity to speak with that
3  officer. So we put together a list and shared
4  that with Deputy Director Speaks, then Director
5  Pettus sent a letter to the FOP seeking time
6  beyond the 90 days, and then the FOP would respond
7  and we would be informed. However, in the
8  meantime, we would continue the investigation.
9  Q.    Okay. Based upon your review of this
10  spreadsheet that we've been looking at here, can
11  you tell me how many of the 49 were unfounded, how
12  many were not sustained and how many were
13  sustained?
14  A.    I could, yes.
15  Q.    What would you do to do that? We can
16  do it on our own of course now that we have the
17  spreadsheet.
18  A.    Okay.
19  Q.    But I want to make sure we follow the
20  same process you would have used. Is it simply
21  looking in the last column?
22      MR. MARSHALL: Sam, why don't you
23  scroll all the way to the right.
24  A.    So here's what I would share. I would

1  do a quality check myself. I would look at that
2  last column both as to the investigations and the
3  triage tab, but then I would also look at the
4  individual reports because this -- I would rely on
5  what the reports say over the spreadsheet.
6  Q.    All right. Do you know, have you seen
7  any inconsistencies between the spreadsheet -- we
8  understand that, you know, spreadsheets require
9  human input and sometimes mistakes can be made.
10  A.    Yeah.
11  Q.    But have you spotted in your reviews
12  any inconsistencies between the spreadsheet and
13  the reports themselves?
14  A.    I have not identified any. I've also
15  not made any specific efforts to ensure that they
16  are aligned with one another.
17  Q.    Do you know how many excessive use of
18  force complaints that your firm's investigations
19  sustained?
20  A.    I don't.
21  Q.    Were there any?
22  A.    Yes.
23  Q.    Do you have a rough number? Is it one,
24  two, five?

1  A.    My kind of guesstimate sitting here
2  would be four or five.
3  Q.    Are you aware of any of the complaints
4  that came to your firm's attention that were --
5  was a complaint by a member of the division, a
6  sworn personnel of the division making a complaint
7  on another member?
8  A.    Let me clarify my prior response. I
9  don't know that we have four or five excessive use
10  of force conclusions. I do know that we have four
11  or five sustained violations -- not -- not four or
12  five -- I'm guessing on the number. But they
13  would be sustained violations of the use of force
14  policy.
15  Q.    I see. So there's a difference between
16  something that might be a violation of the use of
17  force policy and a sustained complaint of
18  excessive force?
19  A.    Correct.
20  Q.    Give me an example of the violation of
21  the use of force policy that's not use of
22  excessive force.
23  A.    Failure to submit a use of force report
24  following the use of force.

1  Q.    All right. So it's a violation of the
2  use of force policy to fail to submit the use of
3  force report, correct?
4  A.    Right.
5  Q.    And so if it's -- you're estimating
6  that it's four or five sustained findings in the
7  49. I understand it might be six, it might be
8  three. You know, it's certainly not 12 or 15, is
9  it?
10  A.    That's correct.
11  Q.    All right. So let's say it's certainly
12  under 10, is that a fair statement?
13  A.    Yes.
14  Q.    All right. So of the however many
15  under 10 were sustained, do you know how many were
16  sustained because the officers failed to submit
17  the use of force report?
18  A.    I'm only aware of one, but there might
19  be others. I mean, I'm aware of one on the top of
20  my head, but there might be others.
21  Q.    Okay. Were there any sustained where
22  the finding was -- well, sorry.
23      Are there any other ways in which an
24  officer violates the use of force policy but it's

1  not an excessive use of force?
2  A.    I don't -- I don't think so.
3  Q.    Were the others, if there are them,
4  have been a finding of sustained that there was
5  excessive force used?
6  A.    I do believe there are some of that
7  number that were related to excessive force.
8  Q.    All right. Now --
9  A.    I think -- but I -- let me clarify one
10  thing if I could. Excessive force isn't
11  necessarily the standard in the policy. The
12  policy sets out exactly what needs to be done and
13  then the officer either violated the policy or
14  followed the policy. I think excessive force has
15  another meaning under the law. But our goal was
16  was the policy followed or -- our directive was to
17  determine whether the policy was followed or
18  violated.
19  Q.    I understand your answer.
20  A.    Okay.
21  Q.    Are you aware of any -- well, the
22  process after you made your submissions of your
23  reports were you sent it back to the division to
24  make decisions about what to do about those

1  findings, right?
2  A.    Yes. We submitted the reports to the
3  chain of command and also sent a copy to the
4  safety director's office.
5  Q.    Are you aware of any officers being
6  disciplined for their use of force? I don't mean
7  failing to submit a report. I mean, for use of
8  force arising out of your 49 reports?
9        MS. TANOURY: Objection. Outside the
10  scope. But she can answer.
11  A.    I don't know at all what happened after
12  we submitted and what sorts of decisions were made
13  related to discipline.
14  Q.    After you submitted, did the City come
15  back to you and ask you questions about any of
16  those reports?
17  A.    On a few of them, yes.
18  Q.    Did they talk to you or others or both?
19  A.    Both.
20  Q.    Okay. What communication did you get
21  about that?
22  A.    I got one, a request from then Deputy
23  Chief Woods to list -- we had one allegation, and
24  it wasn't my report, but Baker had an allegation

1  that was related to two officers and numbered it
2  allegation one, and he asked that we break that
3  into two separate allegations, one for each
4  officer.
5  Q.    Okay. But other than that, you don't
6  know what happened with that report, right?
7  A.    Correct.
8  Q.    Have you been interviewed or asked for
9  your opinion about whether officers should be
10  disciplined?
11  A.    No.
12  Q.    And is it your understanding that that
13  is not your or your law firm's role?
14  A.    That's correct. That's my
15  understanding.
16  Q.    Going back to the training videos that
17  I asked you about earlier. I think you told me
18  that in the three or four training sessions you
19  don't recall watching any training videos that
20  were videos that were used to train the officers
21  who were policing these protests, you don't
22  remember seeing those, right?
23  A.    That's correct.
24  Q.    All right. Do you know what the

1  category called grenadiers is within the division?
2  Do you know what I'm talking about? Well,
3  without --
4  A.    I did -- I mean, I heard that term in
5  the context of the investigations. I don't
6  sitting here today recall what the definition is.
7  Q.    All right. That's fine. It's not a
8  memory test. It's --
9  A.    Okay.
10  Q.    -- an officer in the normal force, not
11  a SWAT officer for example, not a detective, not
12  with some other special group that is trained in
13  the use of among other things use of nonlethal
14  force such as wooden batons for crowd control,
15  protest situations, all right?
16  A.    Yes.
17  Q.    Does that sound consistent with what
18  you heard?
19  A.    Yes.
20  Q.    And did you see or to your knowledge
21  did anyone in your firm see the grenadier video
22  training that the division uses to train its
23  grenadiers?
24  A.    We did not.

1  Q.      Did you know that in that training that
2  grenadiers are trained to use Mark 9 canisters of
3  pepper spray to keep -- simply to keep separation
4  between the officers or group of officers and a
5  group of protesters? Did you know --
6          MS. TANOURY: Objection.
7  Q.      -- they were trained to do that?
8          MS. TANOURY: Objection. You can
9  answer.
10         THE WITNESS: Okay.
11 A.      You started with in the video did I
12 know that, and the answer is no because we didn't
13 see the video.
14 Q.      Right. Now I understand you didn't see
15 the video, so I'm asking you more general
16 questions.
17         Do you know that grenadiers are trained
18 to use -- do you remember what a Mark 9 canister
19 is?
20 A.      I do.
21 Q.      It is a larger canister of pepper spray
22 or mace -- you can use those terms I think
23 interchangeably -- that's used to fog an area with
24 the pepper spray or mace. Is that your

1  understanding?
2  A.      It is.
3  Q.      You could also direct it at a person,
4  but it's generally used to fog a larger area; is
5  that correct?
6  A.      I would agree.
7  Q.      All right. Did you know that
8  grenadiers are trained to use Mark 9 canisters
9  simply to keep separation between police officers
10 and groups of protesters?
11 A.      I did not.
12         MS. TANOURY: Objection. Objection.
13 You can answer.
14 A.      Thank you. I did not know that they
15 were trained specifically to do that for that
16 reason.
17 Q.      Did you know that grenadiers were
18 trained to use the Mark 9 canisters to keep the
19 separation from groups of protesters so that they
20 would not be directly subjected to name-calling of
21 the officers?
22         MS. TANOURY: Objection. You can
23 answer.
24 A.      I did not know that that -- I don't

1  know if that occurs in the training.
2  Q.      Did you know that grenadiers were
3  trained that they could use skip-fired wooden
4  batons simply to keep separation from officers and
5  groups of protesters?
6          MS. TANOURY: Objection. You can
7  answer.
8  A.      I did not know that they were
9  specifically trained that they could use them in
10 that way.
11 Q.      Was it your understanding that they
12 could not? That is, that grenadiers were not
13 permitted to use wooden batons simply to keep
14 separation between themselves or other officers
15 and groups of protesters?
16         MS. TANOURY: Objection. You can
17 answer.
18 A.      It was my understanding that there
19 would be an individual determination made about
20 whether and in what circumstances it would be
21 appropriate to use those.
22 Q.      Is that the officers would have to make
23 a determination about something more than just
24 keeping separation between themselves and groups

1  of protesters?
2          MS. TANOURY: Objection. But you can
3  answer.
4  A.      It would be a determination as to the
5  facts and circumstances surrounding that.
6  Q.      Well, my question is different. Was it
7  your understanding as you were doing these
8  investigations that officers were not permitted to
9  use their wooden batons, skip-fired wooden batons
10 simply to keep separation between themselves and
11 groups of protesters?
12         MS. TANOURY: Objection. She can
13 answer.
14 A.      So it -- John, here's where I'm
15 struggling. "Simply," none of this is simple.
16 And so if it is trying to keep distance between
17 themselves and protesters and nothing else is
18 happening related to any of the individuals behind
19 the officers, beside the officers, in front of the
20 officers, nearby the officers, there's so much
21 that goes into one of those circumstances that I
22 don't think it's appropriate to say they can or
23 can't simply to keep the people apart.
24 Q.      Okay. Yeah. I wasn't asking for --

1  because this wasn't what you did as a lawyer or as
2  a law firm.  I wasn't asking for your opinion
3  about the -- either the propriety or the
4  constitutionality of such a policy.  I guess I was
5  asking just to be clear, were you aware that
6  grenadiers are trained that they can skip-fire
7  wooden batons simply to keep separation between
8  officers and groups of protesters for no -- if
9  there's no other reason?
10         MS. TANOURY:  Objection.  Asked and
11  answered.  And objection to the characterization
12  of the training.
13  A.      I am not aware of the training that
14  they received in that regard.
15  Q.      I apologize.  I forgot a question about
16  the extension on the 90 days.  When you got an
17  extension, was the Fraternal Order of Police
18  required to agree to the extension, and how did
19  you get that agreement?
20  A.      We didn't receive agreement on any of
21  the extensions.
22  Q.      Does that mean that the officer, if any
23  of the officers might have been subjected to
24  discipline, they had a grievable -- they could

1  grieve that the report wasn't done within 90 days.
2  Is that your understanding?
3  A.      It would be one element of their
4  grievance under the contract.  The FOP cannot
5  unreasonably withhold its agreement to extend the
6  90 days.  So that would be something that was --
7  would be a part I presume of any future
8  arbitration.  But it wouldn't preclude the future
9  discipline is my understanding.
10  Q.      Let me ask Sam to bring up Exhibit 57
11  again because I had another question about that.
12         Now, 57 is the Safety Director Pettus's
13  letter to the Mayor.  Scroll up to the top of page
14  2, please.  There.  That's good.
15         I'm just looking at this one paragraph,
16  Jenni, that says, "With respect to the systematic
17  tracking of complaints, an Excel spreadsheet shall
18  be created which tracks the approximate 815
19  e-mails received as of June 18th, 2020."  Is that
20  something the City did?
21  A.      That's my understanding.  It's not
22  something that BakerHostetler did.
23  Q.      Did you ever see this -- if it was
24  created, did you ever see a spreadsheet that was

1  tracking those 800-and-something e-mails?
2  A.      I was sent a spreadsheet early on from
3  the public safety department, and I don't recall
4  how in detail it was or if it had all 815.
5  Q.      Was that spreadsheet used at all in
6  BakerHostetler's work?
7  A.      No.  We chose to create one that worked
8  for us, which is what I previously shared.
9         MR. MARSHALL:  All right.  Sam, would
10  you bring up Exhibit 55.
11  BY MR. MARSHALL:
12  Q.      All right.  Can you see Exhibit 55
13  there?
14         - - - - -
15         Thereupon, Exhibit 55 is marked for
16  purposes of identification.
17         - - - - -
18  A.      I can.
19  Q.      All right.  This is an investigation
20  report done by BakerHostetler, correct, involving
21  a complainant named Bernadette Calvey?
22  A.      Correct.
23  Q.      And did you review at the end of the --
24  well, before it was submitted to the City, did you

1  review this one?
2  A.      I did review the written report.
3  Q.      All right.  And did you agree with or
4  change the findings?
5  A.      Would you please show me the findings?
6  Q.      Yeah.
7         MR. MARSHALL:  Scroll all the way down,
8  Sam, to the findings.  All right.  Go back up a
9  little bit.  Well, I'm sorry.  Go back down,
10  sorry, Sam.
11  BY MR. MARSHALL:
12  Q.      The finding is recommended disposition
13  unfounded.  Do you see that?
14  A.      I do see that.
15  Q.      And if you scroll back up just a tick
16  or two, Sam, you'll see -- stop.
17         It says, "Although Calvey likely was
18  struck in the chin by a Level 7 wooden baton,
19  BakerHostetler" -- and then scroll back down,
20  BakerHostetler "is not able to identify the
21  involved officer(s).  Under these circumstances,
22  BakerHostetler concludes the allegation of
23  excessive force is refuted by a preponderance of
24  the evidence."

1  A.      I do see that.
2  Q.      Can you explain what that means?
3  A.      Yes.
4  Q.      If you -- you can look at --
5  A.      I'm sorry.
6  Q.      Go ahead.  I'm sorry.
7  A.      No.  Explain what it means?  It means
8  that this -- that there was a determination made
9  that you could -- that they reached the conclusion
10  that this was not excessive force, as defined
11  under the use of force policy.
12  Q.      Okay.  And whatever their reasons were
13  would be summarized by everything that's in this
14  report, right?
15  A.      That's correct.
16  Q.      All right.  We can read through the
17  report.  But the only thing that I see that
18  relates to what was happening in the area where
19  Calvey was, which was on High Street and Second
20  Avenue, not -- that's in the Short North, right?
21  High Street and Second Avenue?
22  A.      Yeah.  I think so.
23  Q.      Yeah.  There used to be a bakery right
24  there called Laughlin's.  There's a White Castle

1  catty-corner across the street.
2  A.      Yes.  White Castle is a good indicator.
3  Q.      Yes.
4          The action reports relate to Broad and
5  High and High Street and Nationwide Boulevard.
6          MR. MARSHALL:  If you scroll up, Sam,
7  to the part that says summary of after action
8  reports.  All right.  Stop there.
9  BY MR. MARSHALL:
10  Q.      Summary of after action reports, do you
11  see that section?
12  A.      I do.
13  Q.      All right.  And this talks about
14  Russell Street, you know, how far north of Russell
15  Street is Second Avenue?
16  A.      Well, it -- this report says it's
17  approximately .3 to .7 miles south of Second
18  Avenue.
19  Q.      Right.  And if you look at the next
20  report, it says -- this is a report about
21  something that happened at a different time at
22  High Street and Nationwide Boulevard, right?
23  A.      Correct.
24          MR. MARSHALL:  Okay.  Scroll down a

1  little bit, Sam.
2  BY MR. MARSHALL:
3  Q.      All right.  And then it talks about
4  these other uses and report on the area and then
5  Broad and High Street, which is more than a mile
6  south, right?
7  A.      I believe so.
8  Q.      All right.  Yeah.  And then you have
9  this event chronology which says, "Going north,
10  Russell high, County would be spraying and knocking
11  from west and to making arrests."  Is knocking use
12  of the knee knockers, is that what that refers to?
13  A.      I believe so.
14  Q.      All right.  Keep going down.
15          Then it talks about how Calvey didn't
16  respond, which she is part of the lawsuit, right?
17  She's a plaintiff in this case?
18  A.      Uh-huh.  That's correct.
19  Q.      Right.  And then it talks about
20  Allegation I, officers use excessive force.
21          MR. MARSHALL:  Go ahead and scroll
22  down, Sam.  I'm sorry.  Go back up.  Stop.  Go
23  back down a tick or two.  That's good.  Thank you.
24  BY MR. MARSHALL:

1  Q.      It says, "Because Calvey was only in
2  the area for a few minutes, it's difficult to know
3  what took place before Calvey was injured.
4  Officer identification is also difficult because
5  Calvey could not see who used force and none of
6  the after action use of force reports completed
7  that evening report a Level 2 or Level 7 use of
8  force around 9:00 p.m. in the area of High Street
9  and Second Avenue."  Right?
10  A.      Correct.
11  Q.      Okay.  So the finding about what
12  happened to her, the unfounded finding is driven
13  by what?  As I read this, it's driven by the fact
14  that you just couldn't determine who used the
15  wooden baton, right?
16  A.      Yes.  You couldn't determine who used
17  it in that location at that time, that's correct.
18  Q.      Okay.  All we know is that she was out
19  there and she was struck by a wooden baton in the
20  chin, right?
21  A.      Yes.
22  Q.      Was that the -- you know, what's
23  reflected here part of the general approach?  That
24  is, if you just don't have enough information to

1 figure out who did whatever alleged to have
2 happened, even if it seems like -- sorry. Even if
3 it seems like maybe it shouldn't have happened,
4 you can't make a finding of sustained because you
5 don't know who did it; is that what we see here?
6 A.      Well, it's not only that we don't know
7 who did it. But we don't know what was happening
8 in that area, we don't have any additional
9 information about what occurred, you know, before
10 Ms. Calvey was there, while she was there. We
11 don't know for sure that CPD actually used the
12 wooden baton round that hit her. We don't have
13 enough information to determine --
14 Q.      Well --
15 A.      -- anything --
16 Q.      Is there --
17 A.      -- to sustain it.
18 Q.      -- some kind of assumption given that
19 there was, you know, riotous behavior going on
20 three-tenths of a mile to a mile south, that there
21 was the same riotous behavior going on at Second
22 Avenue?
23 A.      No, there was no assumption like that.
24 Q.      Let's take a break. I don't -- I know

1 I said 1:30. We're going to go a few more
2 minutes.
3 A.      That's okay.
4 Q.      But I do want to -- let's take a five
5 minute break and come back.
6 A.      Okay.
7         (A short recess is taken.)
8 BY MR. MARSHALL:
9 Q.      All right. I'm going to ask you about
10 this document in this -- that we found.
11 A.      Okay.
12 Q.      And I would have sent it earlier, but
13 you're welcome to take as much time as you want.
14 It's just two sheets of paper.
15         MR. MARSHALL: Go ahead and scroll
16 down, Sam. We marked it as Exhibit 59.
17         - - - - -
18         Thereupon, Exhibit 59 is marked for
19 purposes of identification.
20         - - - - -
21 BY MR. MARSHALL:
22 Q.      It's two sheets of paper that we found
23 in the materials that your firm produced through
24 the city attorney's office I believe. I don't

1 know where it comes from or how it was created,
2 but maybe you can tell us. So first of all, do
3 you have the two-page document on your screen
4 that's marked Exhibit 59?
5 A.      I do.
6 Q.      What is it?
7 A.      This was an effort to map out what
8 types of evidence we received from the City. So
9 we started our investigation with a large
10 information request that -- before we knew
11 anything about the individual complaints. And
12 these were the documents that were provided to us.
13 What this doesn't do is, for example, lay out
14 dates and all of that. It was really kind of a
15 map of these are the types of things we were
16 provided that we dug into to try to piece together
17 what happened.
18 Q.      All right. This is a descriptive list
19 of the materials and information that you received
20 from the City for the Columbus investigations?
21 A.      In response to the initial request,
22 yes. But then we -- as we dug into the individual
23 cases, we made innumerable specific requests to
24 each case to try to find things that related to

1 that particular incident.
2 Q.      Okay. Do you know who wrote up this
3 list?
4 A.      Alexa Cellier.
5 Q.      Is she an attorney?
6 A.      She is. She's an associate.
7 Q.      Thanks. Sam, you can stop. Will you
8 make sure to e-mail this document to Alana and
9 Wes, please. I'm going to get finished here in a
10 second.
11         I have a question about after action
12 reports. I notice a number of the investigation
13 reports from your firm refer to after action
14 reports. What was your understanding of what
15 those are generally?
16 A.      Generally, that's when a higher ranking
17 officer would prepare a general summary of the
18 evenings events.
19 Q.      Did you get after action reports on the
20 majority of the investigations you were doing?
21 A.      I don't know if we did on a majority.
22 If we individually knew who was -- if we knew what
23 officers were alleged to have engaged in that
24 incident, we wouldn't necessarily need after

1  action reports as much. The goal of our
2  requesting, obtaining after action reports was to
3  help us kind of narrow down on potential incidents
4  and times and officers when we had a difficult
5  time finding them.
6  Q.      To figure out -- after action reports
7  would help you figure out what was going on in the
8  vicinity or at the time in that area?
9  A.      Correct. That was our hope.
10  Q.      All right. And did you trust the
11  narratives in those after action reports? Did you
12  believe they were accurate?
13  A.      I wouldn't say that we believe them to
14  be solely accurate or entirely accurate. And in
15  fact, in some investigations we interviewed those
16  to prepare them to try to find out more
17  information or to determine whether there were
18  inaccuracies.
19  Q.      Did you find any of the after action
20  reports that you looked at more carefully to be
21  inaccurate?
22  A.      I believe some of them were incomplete.
23  I don't recall that we identified any that were
24  inaccurate.

1  Q.      Did you rely upon their descriptions of
2  events unless you found them to be inaccurate?
3  A.      Yes.
4  Q.      Do you think they were more credible
5  versions of events because they were completed by
6  higher ranking officers?
7  A.      No.
8  Q.      Do you have a -- we can -- and we're
9  not luckily going to go through it. But do you
10  have a rough sense of how many of these use of
11  force complaints were found to be either not
12  sustained or unfounded because you were unable to
13  identify the specific officer?
14  A.      I don't have a rough estimate of that.
15      MR. MARSHALL: And, Sam, would you --
16  let me check one thing here. This comes out of a
17  specific report, but I don't know if we need to
18  look at it. It's a general question. There was a
19  report that determined that there were SWAT
20  officer involved but CPD determined the officer --
21  subject officer was not CPD SWAT. Maybe we should
22  look at it.
23      Sam, would you bring up 54, please.
24  BY MR. MARSHALL:

1  Q.      All right. Are we looking at
2  Exhibit 54 together here?
3      - - - - -
4      Thereupon, Exhibit 54 is marked for
5  purposes of identification.
6      - - - - -
7  A.      We are.
8  Q.      This is an investigation report
9  involving complaint number -- you know, it's
10  BakerHostetler No. 19, which came out of the
11  triage list, formerly as No. 219, right?
12  A.      Correct.
13  Q.      And it involves a citizen complaint by
14  a Mr. Crandall. And then it says against nonCPD
15  officers. Do you see that?
16  A.      I do see that.
17      MR. MARSHALL: All right. Now, Sam,
18  scroll all the way down.
19  BY MR. MARSHALL:
20  Q.      And it says here in the findings,
21  reading the second sentence there, "The officers
22  shown in the video have been identified as nonCPD
23  SWAT officers; therefore, they are not employed by
24  or required to follow CPD's policies or

1  directives." Did I read that right?
2  A.      I see that. You did read it well.
3  Q.      So was it your understanding as you and
4  the members of your firm did this work that any
5  other law enforcement entity on the ground
6  policing these protests was not required to follow
7  CPD's policies or directives?
8  A.      We didn't have any understanding about
9  that either way.
10  Q.      Well, your people -- it wasn't you that
11  wrote this report, but you reviewed it. They
12  wrote here, therefore, they are not employed by or
13  required to follow CPD's policies or directives.
14  So where did you get that information?
15  A.      Well, "not employed by" would be based
16  upon the interviews, I -- I don't -- you know,
17  whatever it is that they did in this
18  investigation. I can't see the prior pages so I
19  don't know if they had the opportunity to do
20  interviews or what they were relying on. But we
21  would be relying on -- they relied on the
22  information that they were given as to this
23  individual and being required to follow CPD's
24  policies or directives, so we didn't have a

1  general understanding about that.  But what I
2  would -- again not having read this report just
3  now, what I would surmise from this is they
4  understood based on their investigation into this
5  case that if they -- if officers were not employed
6  by CPD, they were not required to follow CPD's
7  policies or directives.
8          MR. MARSHALL:  All right.  Sam, scroll
9  up.  Stop.
10  BY MR. MARSHALL:
11  Q.      All right.  Under the investigator's
12  comments, I'll just read the part I'm going to ask
13  you about.
14  A.      Yeah.
15  Q.      It's the last sentence on this section.
16  "On July 31, Deputy Chief Bash confirmed that CPD
17  SWAT officers sometimes wear fatigues; however,
18  CPD determined that the subject officer was not
19  CPD SWAT."  So what looks like happened there was
20  there was either a photograph or a video and you
21  couldn't -- and you didn't know or your
22  investigators didn't know who it was and you asked
23  CPD to tell you whether or not they were CPD; is
24  that what happened?

1  A.      Yes, that is what happened.
2  Q.      And you would rely upon the finding or
3  the determination of CPD as to whether or not the
4  individual in the video or photograph was a member
5  of the division, right?
6  A.      To the extent that we could not
7  identify from the information that had been
8  provided to us whether an officer was a member of
9  the division or not, the next kind of safety net
10  that we employed was taking screen grabs of
11  officers, including in these particular SWAT
12  situations, and sending them to CPD.  Those were
13  reviewed by deputy chiefs and the chiefs and
14  sometimes also the public records department,
15  always the public records department, and then we
16  would seek their confirmation about whether they
17  were able to identify them, and then we did in
18  fact rely on that.
19  Q.      Okay.  So once they gave it -- the
20  information back to you, you rely upon that
21  information, right?
22  A.      We did.
23  Q.      Let me ask you, did you review -- did
24  you do any of the investigations that involved

1  SWAT or appeared to be SWAT officers?
2  A.      Yes.
3  Q.      And did you know that CPD SWAT would
4  wear fatigues, at least sometimes?  By fatigues we
5  mean camouflage.
6  A.      Camouflage.  Right.
7  Q.      Yeah.  Yeah.
8  A.      I -- I don't remember.  I'd have to
9  look at the one that we talked about to see
10  whether that was at issue or not.  But I would --
11  I would -- if Deputy Chief Bash -- and Deputy
12  Chief Bash confirmed that to me, so I would
13  believe him that sometimes CPD SWAT officers wear
14  fatigues.
15  Q.      Okay.  Well, in fact, I think during
16  the first four or five days of the protest, CPD
17  SWAT that were deployed were always in their camo.
18  Did you know that?
19  A.      I don't -- I don't recall knowing that.
20  Q.      Did you know whether or not the camo
21  fatigues worn by CPD SWAT had camo fabric on the
22  helmets?
23  A.      There was a distinction about the
24  helmets, but I -- between what CPD officers wore

1  and what other officers wore from other agencies.
2  But I don't recall which ones the CPD SWAT
3  officers wore.
4  Q.      All right.  If I tell you Lieutenant
5  Paul Ohl -- you know who that is, O-H-L?
6  A.      I do.
7  Q.      He's the SWAT lieutenant commander,
8  right?  He's the lieutenant over SWAT?
9  A.      I think that's correct.
10  Q.      And if he testified that CPD SWAT
11  helmets are the camo fabric over top of the
12  helmets, do you have any reason to disagree with
13  that?
14  A.      I would want -- candidly, I would want
15  to confirm that that was also what was shared with
16  us if we asked the question of him.
17  Q.      Yeah.  I -- all right.  I understand
18  your point.
19          Do you know if you look at the video
20  involved in this particular incident whether or
21  not the SWAT officers involved have camo fabric on
22  their helmets?  Do you remember one way or the
23  other?
24  A.      I do not recall.

1 Q. And you relied upon what Deputy Chief
2 Bash told you, right?
3 A. We did. Because we were unable to
4 identify them in any other way either.
5 MR. MARSHALL: Let me check my notes.
6 I think I might be done. I know we were shooting
7 for 1:30. But let me go to the breakout room for
8 one minute and then come back.
9 THE WITNESS: All right. No worries.
10 Thank you.
11 (A short recess is taken.)
12 BY MR. MARSHALL:
13 Q. I do not have -- do you have anything
14 that's coming come to mind that you want to change
15 or add to? I just thought I would give you that
16 chance.
17 A. I appreciate that. The only thing that
18 -- and it's going way back. But that has been in
19 the back of my mind is just identifying that
20 protests use of force spreadsheet that -- that I
21 indicated came to us from IAB. We did not start
22 receiving that spreadsheet until the first week of
23 August, and we received it initially incomplete
24 and received frequent updates thereafter. I just

1 wanted to clarify that piece.
2 Q. All right. Thank you for that. We had
3 referred earlier to the spreadsheet and Safety
4 Director Pettus's letter with the 800-something
5 e-mails tracking them. You said you'd received a
6 version of that at some point. Do you still have
7 that?
8 A. I believe that I would have saved
9 whatever we originally received from the City,
10 yes.
11 MR. MARSHALL: All right. All right.
12 Thank you for your time today. I appreciate it.
13 THE WITNESS: Thank you.
14 MR. MARSHALL: Stacy, we'll order.
15 MR. GITTES: You're muted, Stacy.
16 THE REPORTER: Alana, do you want to
17 advise her regarding signature?
18 MS. TANOURY: Yeah. We'll take a copy
19 if they're ordering also. Jenni, you'll have the
20 opportunity if you'd like to review and sign the
21 transcript or you can waive that. It's up to you.
22 THE WITNESS: I would like to review.
23 MR. MARSHALL: I'm sure. I knew you
24 would jump at the chance to read the fascinating

1 transcript here.
2 (Signature not waived.)
3 - - - - -
4 Thereupon, the foregoing proceedings
5 concluded at 1:57 p.m.
6 - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1 State of Ohio  :  C E R T I F I C A T E
  County of Franklin: SS
2
  I, Stacy M. Upp, a Notary Public in and for the
3 State of Ohio, certify that Jennifer E. Edwards,
  Esq. was by me duly sworn to testify to the whole
4 truth in the cause aforesaid; testimony then given
  was reduced to stenotype in the presence of said
5 witness, afterwards transcribed by me; the
  foregoing is a true record of the testimony so
6 given; and this deposition was taken at the time
  and place specified on the title page.
7
  Pursuant to Rule 30(e) of the Federal Rules of
8 Civil Procedure, the witness and/or the parties
  have not waived review of the deposition
9 transcript.
10 I certify I am not a relative, employee,
  attorney or counsel of any of the parties hereto,
11 and further I am not a relative or employee of any
  attorney or counsel employed by the parties hereto,
12 or financially interested in the action.
13 IN WITNESS WHEREOF, I have hereunto set my hand
  and affixed my seal of office at Columbus, Ohio, on
14 February 23, 2021.
15
16
17
18
19 _____
20 Stacy M. Upp, Notary Public - State of Ohio
  My commission expires August 6, 2021.
21
22
23
24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line      Correction or Change      Reason Code

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____

I, Jennifer E. Edwards, Esq., have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.
Date_____Signature_____
The witness has failed to sign the deposition
within the time allowed.
Date_____Signature_____

Ref: SU301373JE  S-SU P-BW

## Exhibits

**301373 Exhibit 04 2** 4:5 88:19 89:6
**301373 Exhibit 04 3**
**301373 Exhibit 04 4**
**301373 Exhibit 04 5**
**301373 Exhibit 04 6**
**301373 Exhibit 04 7**
**301373 Exhibit 04 8**
**301373 Exhibit 04 9**
**301373 Exhibit 05 0**
**301373 Exhibit 05 1**
**301373 Exhibit 05 2**
**301373 Exhibit 05 3**
**301373 Exhibit 05 4** 4:7 136:2,4
**301373 Exhibit 05 5** 4:9 124:10,12,15
**301373 Exhibit 05 6**
**301373 Exhibit 05 7** 4:11 52:10,15 123:10
**301373 Exhibit 05 8**
**301373 Exhibit 05 9** 4:12 131:16,18 132:4

### $

**$460** 25:8
**$50,000** 20:21
**$550,000** 22:10

### 1

**1** 8:5
**10** 70:1 92:18 113:12,15
**100** 66:17
**11:29** 70:1
**12** 113:8
**12:07** 92:7
**12:30** 92:9,22 93:5
**15** 50:15 113:8
**18** 63:24
**18th** 123:19
**19** 38:10 95:8

96:6,7,13 136:10
**1:30** 131:1 142:7
**1:30ish** 92:10
**1:57** 144:5
**1st** 25:6,7

### 2

**2** 70:10 97:2 123:14 129:7
**2-19** 96:6,7
**2-27** 95:17
**2-28** 105:19
**2-29** 95:16
**20** 95:6 96:5
**200** 66:23 67:1
**2005** 21:21
**201** 38:9
**2015** 8:5
**202** 94:17,20
**2020** 8:12 9:5,10 10:14 52:4 63:24 123:19
**21** 7:17 9:2 96:6 101:15
**219** 136:11
**225** 24:15
**228** 104:11
**23** 7:17 9:6 66:18 101:15
**23rd** 52:3
**26th** 48:21
**28th** 8:12
**29** 95:17

### 3

**3** 70:9 127:17
**30** 95:6,7
**30(b)** 7:4,11 13:11 24:4 38:13
**31** 95:15 138:16
**31st** 89:11
**37** 60:21
**3:00** 92:24 93:1

### 4

**40** 38:11 60:21
**42** 88:16,19 89:6
**44** 108:10
**47** 108:1
**49** 38:7,16 64:6 71:11,18 81:17 90:22 91:21 94:6, 19 96:18,20 108:4 109:6,10 110:11 113:7 115:8
**4runners** 30:11

### 5

**54** 135:23 136:2,4
**55** 124:10,12,15
**550,000** 20:23 21:4
**57** 52:10,15 123:10,12
**59** 131:16,18 132:4

### 7

**7** 58:17,22 59:1 60:3,5,7,9,14 125:18 127:17 129:7
**70** 98:1
**70-day** 97:18

### 8

**8** 48:5,8,10
**800-and-something** 124:1
**800-something** 143:4
**815** 63:23 64:4 123:18 124:4

### 9

**9** 7:17 8:2 9:6 118:2,18 119:8, 18
**9-4** 94:18
**90** 99:22 100:1,3 110:6 122:16 123:1,6
**90-day** 47:19 100:4 109:16,19
**9:00** 129:8

### A

**ability** 18:14 95:13
**absent** 47:21 61:11
**accept** 6:14
**acceptable** 6:15, 18
**access** 45:17 50:1,5
**accessing** 33:21
**accurate** 74:24 134:12,14
**act** 77:10
**action** 20:13 106:18 127:4,7, 10 129:6 133:11, 13,19 134:1,2,6, 11,19

**actions** 73:5
**activities** 46:11
**activity** 40:18
**actual** 99:19
**add** 109:9 142:15
**addition** 62:20 95:24
**additional** 22:12 35:5 44:21 83:9 130:8
**address** 87:6,9,12
**administration** 5:6
**advance** 40:23
**advice** 12:15
**advise** 143:17
**affairs** 49:18 86:12
**affect** 18:11,14
**afforded** 20:17
**afraid** 27:20
**agencies** 61:23, 24 141:1
**agency** 62:2
**agent** 67:11,14,20
**agents** 41:6
**aggressive** 62:20, 22 63:1
**agree** 11:5 21:5,8 119:6 122:18 125:3
**agreement** 48:4 122:19,20 123:5
**ahead** 13:19 30:12 36:6 51:2 93:16 126:6 128:21 131:15
**Alana** 5:17 6:15 19:13,21 23:17 50:6,17,24 51:2 133:8 143:16
**Alert** 7:19 36:5
**Alexa** 14:11 15:14 28:17 133:4
**aligned** 111:16
**allegation** 70:23 72:22,24 73:2,14, 19 75:5,7,10,12 78:24 98:18 115:23,24 116:2 125:22 128:20
**allegations** 73:8 90:11 116:3
**alleged** 77:11 130:1 133:23
**Allison** 15:12,14, 18,19 16:9 28:16, 19 99:17
**allowed** 51:22 61:15 62:1
**altogether** 71:18
**Amber** 7:19 36:5

**amount** 20:17
**analysis** 53:20 54:1,13 56:14 57:5
**analyze** 53:11
**and/or** 8:2 33:14 75:14
**Andy** 105:6
**anticipated** 97:23
**apologize** 122:15
**app** 51:19
**appeared** 140:1
**applicable** 101:9, 11
**application** 42:5,9
**applied** 40:18 70:22 102:21
**apply** 54:8,24
**applying** 54:21
**approach** 69:11 129:23
**appropriately** 62:7,23 68:3
**approval** 22:12
**approximate** 8:22 46:18 63:23 123:18
**approximately** 127:17
**arbitration** 40:10 123:8
**arbitrations** 40:5
**area** 118:23 119:4 126:18 128:4 129:2,8 130:8 134:8
**arisen** 40:4
**arising** 11:3 69:6 86:18 115:8
**arms** 87:21
**arrangement** 6:10 22:14
**arrests** 128:11
**article** 48:5,6,8,10
**aspirational** 97:22
**assessment** 21:9
**assigned** 28:5 66:24 67:3,5,10 100:5
**assist** 33:15
**assistant** 28:2 69:1 83:5 87:11
**associate** 16:2, 12,16 133:6
**associates** 16:3
**assuming** 55:22 58:7 62:7,12
**assumption** 130:18,23
**attend** 6:12 26:20 31:7

**attention** 14:18
31:17 39:5 60:22,
23 67:18 71:8
112:4

**attorney** 15:20
16:14,15,16,22
23:5,6 24:15,21
28:3,4 41:13
47:10,11 93:24
133:5

**attorney's** 21:10
23:4 27:13 41:13
64:10,16 69:2
131:24

**attorney/client**
23:16

**attorneys** 15:15
16:10 17:5 40:20
41:9 63:17

**August** 8:24
46:21 142:23

**auxiliary** 57:12

**Avenue** 126:20,21
127:15,18 129:9
130:22

**aware** 7:13 8:8
20:10,16 35:24
36:8,10,18,19
39:20 60:19 61:5
69:5,7 112:3
113:18,19 114:21
115:5 122:5,13

---

**B**

**back** 18:18 20:5
25:11 46:24
60:17 62:3 65:9,
20 68:7 69:1
70:10 83:5,19,21
84:1,2,4 92:21
99:21 102:3
104:7 108:16,22
114:23 115:15
116:16 125:8,9,
15,19 128:22,23
131:5 139:20
142:8,18,19

**background**
13:13

**Bad** 41:1

**Baker** 26:21
115:24

**Bakerhostetler**
9:4,18,24 13:20
16:11 26:10 38:3,
9,10,15 53:19,24
69:8 85:3 86:1,20
89:22 90:1,20
93:19 95:1 97:1,
12 104:11 123:22
124:20 125:19,
20,22 136:10

**Bakerhostetler's**
10:1 33:11 68:13
124:6

**bakery** 126:23

**balance** 77:4

**balanced** 77:6

**bargaining** 12:24
48:4

**based** 53:8,12
57:23 61:9 74:11
79:19 80:21
104:14,17 106:3,
13 108:15 110:9
137:15 138:4

**Bash** 29:19,20,22
33:7,18 138:16
140:11,12 142:2

**basic** 18:1

**basically** 86:19

**batch** 99:14,16
102:16

**baton** 59:2,3,8,14
60:4,19,20 61:11,
16 62:5,7,22
125:18 129:15,19
130:12

**batons** 117:14
120:4,13 121:9
122:7

**bear** 19:15

**began** 8:12 40:3

**beginning** 102:1

**behalf** 5:8 9:17
11:2 13:21 45:21

**behavior** 130:19,
21

**Bela** 86:6

**belief** 29:11

**believed** 43:13
45:8,24 82:20

**Bernadette**
124:21

**Bernhardt** 86:6,7

**BH** 106:10

**BH201** 38:2

**big** 36:9 90:18
102:22 106:19

**billing** 2:7 25:5

**bills** 22:13,15

**bit** 15:5 32:1
39:23 50:5 96:4
102:10 109:5
125:9 128:1

**bite** 92:9

**blocks** 61:2

**Bodker** 27:11
28:7,8 29:20,22
33:6,17

**bottles** 30:20

**bottom** 72:18
82:6 107:24

**Boulevard** 127:5,
22

**bounds** 42:14

**Bourke** 27:11,13
28:1 69:1 83:6,20
84:1,3 87:11

**break** 50:10,15
69:21 92:3,8,14
93:4,21 104:1

116:2 130:24
131:5

**breakout** 69:22
142:7

**briefing** 29:3

**briefly** 7:18 8:1

**bring** 88:15
123:10 124:10
135:23

**brings** 76:1

**broad** 40:5 127:4
128:5

**Brooke** 47:9

**brought** 14:17

**bucket** 104:8

**building** 103:8,13,
16

---

**C**

**call** 6:19,21 10:4,
6,11 16:15 20:4
76:7 80:1

**called** 10:12
16:14 37:16
60:10 64:19 82:9
88:2 117:1
126:24

**Calvey** 124:21
125:17 126:19
128:15 129:1,3,5
130:10

**cameras** 103:1,8,
15

**camo** 140:17,20,
21 141:11,21

**camouflage**
140:5,6

**candidly** 141:14

**canister** 118:18,
21

**canisters** 118:2
119:8,18

**cap** 21:2

**capped** 22:9

**capture** 95:12

**career** 57:15

**carefully** 134:20

**Carnevale** 47:9

**case** 8:8,12 19:18
21:13 61:10
66:24 128:17
132:24 138:5

**cases** 39:9 60:24
64:19,20 95:19
99:15 109:20
132:23

**cast** 83:9

**Castle** 126:24
127:2

**cataloged** 88:12

**category** 16:7
117:1

**catty-corner**
127:1

**CBH** 96:6

**CDP** 8:4

**cell** 34:14,15

**Cellier** 14:11
15:14 28:17
133:4

**center** 40:9 103:1

**certification** 45:9,
17 46:10

**certified** 46:1,7

**chain** 115:3

**chance** 89:4 91:6
142:16 143:24

**change** 98:13
125:4 142:14

**changed** 20:16

**changing** 98:17
99:7

**chaos** 29:14

**characterization**
122:11

**characters** 83:10

**charged** 22:21,24
23:2 24:20 69:6

**charges** 8:2 9:7
23:12 24:24 25:4
38:12,14 54:22

**charging** 23:10
24:9,13

**chart** 88:11 90:21

**check** 19:24
100:20,24 111:1
135:16 142:5

**checking** 109:5

**chemical** 41:6

**chief** 28:8 29:19,
20 33:6,7,17,18
115:23 138:16
140:11,12 142:1

**chiefs** 139:13

**chin** 125:18
129:20

**Choi** 105:6

**chose** 106:14
124:7

**chronology** 128:9

**circumstance**
56:6 58:15

**circumstances**
47:21 55:21
56:12,16,20,23
62:6,17 77:14
78:6 80:8 81:1
120:20 121:5,21
125:21

**citizen** 26:10
37:20 87:2,8,15
136:13

**citizens** 87:13,14,
18

**city** 6:10,11 8:16

9:9,14,17 11:2,
10,15 12:3,9,13,
17,24 13:22 19:9
20:13 21:10
22:12 23:3 24:21,
23 25:14,18,20,
24 26:9,21 27:12,
23 28:4 29:2
30:18,24 32:4
33:2,14,24 35:4,6
40:7 41:13,18
42:3 43:13,20,24
44:10 46:6 47:10,
15 54:18 61:10
64:2,8,10,16 69:2
74:11 82:15
93:24 94:19
96:20 97:10,16,
17 98:2 108:19
115:14 123:20
124:24 131:24
132:8,20 143:9

**city's** 7:11 12:20
27:10 108:15

**civic** 31:19

**civil** 7:4,11 12:10

**civilian** 78:1 80:2

**civilians** 8:3

**clarification**
42:13

**clarify** 10:10
112:8 114:9

**clear** 9:12 44:14
54:23 65:21
77:22 79:4 122:5

**Clint** 105:1

**close** 66:11
109:18 110:1

**closed** 66:5
94:16,18 104:6,
11

**closely** 12:3
47:16

**collected** 88:12

**collective** 48:4

**Columbus** 10:6,
17,20,24 12:3
14:13 23:11 24:9,
13,23 25:12,14,
18,20 26:9 27:23
31:14 34:6 35:4,
6,19,21 43:20
44:1 47:3,10 49:1
57:6 63:16 67:21
78:8,12,21 88:24
132:20

**column** 69:15
94:13 97:3,19
99:10,22 100:10,
21 104:7 105:13
110:21 111:2

**columns** 96:24
99:22 100:16
101:10 107:20

**combined** 38:22
108:22 109:2

**comfortable** 9:16
10:3 92:16

command 115:3

commander
106:15 141:7

commanders
86:12

comments 138:12

commission
80:24

communicate
34:9 35:7

communication
34:5 35:2,3 67:13
68:24 115:20

community 31:19

complainant
64:21 65:7,8,9
73:7 81:7 83:11
100:10 102:16
105:3,4 106:10,
12,14,23 108:18
124:21

complainants
31:22 34:1 56:18

complained 59:18

complaint 8:23
37:21 38:2,18
39:1 41:4 54:21
64:1 65:3,10,11
76:3 77:24 82:21,
24 83:1 87:16
88:3 96:11 97:7,
10,13 98:1 99:10,
11,14 108:24
112:5,6,17 136:9,
13

complaints 8:2,
17,19 11:3 14:16
26:11 36:23 38:6,
12,13,23 53:11
63:21 64:14,15
65:17 66:3 71:15
86:18 87:2,3,8,
13,15 102:1
111:18 112:3
123:17 132:11
135:11

complete 40:21
66:7 90:8 94:1
109:21

completed 47:19
85:11,18 97:24
109:10 129:6
135:5

completing 47:16

completion 95:23

compliance 58:6

comply 62:21

complying 56:1,9

computer 7:21
43:18 44:3 50:3
51:18

concern 45:21
64:1

conclude 61:16
62:2 72:1,2 76:17
78:4 98:21 99:3

concluded 14:17
99:2 107:5 144:5

concludes 125:22

conclusion 72:5,
7,9 73:24 74:10
75:16 77:21 79:9
81:3 98:17 126:9

conclusions 99:7
112:10

conclusively
59:16

conditions 18:11,
14

conduct 8:4 10:14
26:11 36:24 37:1,
7 38:14 65:15
68:12

conducted 7:1,3
48:10 68:2

conducting 5:16
12:6 96:11

conferred 81:11
108:19

confines 47:17

confirm 141:15

confirmation
139:16

confirmed 138:16
140:12

conflict 100:20,24
101:1

confused 75:2

conjunction 39:7
64:10

consideration
54:11 56:22
65:18,24 77:1
78:15

considered 58:3
65:18

considers 77:14

consistent 117:17

consistently
100:14

constituted 53:22

constitutional
54:4,9

constitutionality
122:4

contact 6:9 11:7,
8,14 18:21,23
33:2,4,6,15 64:20
65:7 67:20

contacted 65:6
68:5 87:19
106:10

contacting 33:9

contacts 106:11

context 13:12
65:10 117:5

continue 110:8

continued 8:12

contract 6:11
8:16 12:5,20 13:1
16:5 18:24 19:8,
11,19 20:8,10,14,

22 21:2,7 22:8,
18,19 23:1,8
25:12 47:12,14,
17 123:4

control 35:23
36:11,18 117:14

conversation
73:22,23 81:14

coordinated
29:12,22

copies 43:12

copy 115:3
143:18

corner 88:20
103:2

correct 6:16
12:22 13:4 15:8
16:17 17:8,11
21:1 23:6,7 24:22
33:23 34:3 37:18
40:14 41:23 42:2
44:4 45:15 46:15
47:20 52:23 53:2
67:7 71:10,13,17
72:2 75:24 76:5,
22 78:22 79:12
81:19 83:18,23
86:13 89:21 94:2,
11 96:20 97:5,14
98:17 100:7
101:7 107:15,21
112:19 113:3,10
116:7,14,23
119:5 124:20,22
126:15 127:23
128:18 129:10,17
134:9 136:12
141:9

correction 76:24

Council 20:13
22:12

counsel 5:2 16:2,
5

count 18:4 108:8

County 128:10

couple 35:23

court 7:5

cover 18:1

COVID 68:4 104:2

CPD 26:13 28:5
41:14 45:1 61:20
130:11 135:20,21
138:6,16,18,19,
23 139:3,12
140:3,13,16,21,
24 141:2,10

CPD's 136:24
137:7,13,23
138:6

Craig 27:10,23

Crandall 136:14

create 84:18
124:7

created 63:22
84:16,17 85:6,14,
16,20 123:18,24
132:1

credibility 80:14
81:6

credible 80:21
135:4

crime 80:24

criminal 64:17
67:9 68:18,21,24
108:13,14

criminally 69:6

criteria 65:2,5
70:19,21 71:2

critical 19:20

CROSS-
EXAMINATION
6:2

crowd 35:23
36:11,17 117:14

curser 82:5

customary 22:22

cutoff 8:15,18

_____

D

danger 62:14

data 87:22 98:4
101:19

database 45:14
97:12

date 8:5,15,18,21,
22 22:8 29:5
46:18,19 65:13
86:16 89:10
90:11 97:15 98:1
106:11

dated 48:21

dates 132:14

day 99:22

days 46:21 79:24
98:1 100:1,3
110:6 122:16
123:1,6 140:16

de-escalation
77:15

deadline 100:4
109:16,19

deadly 61:11

deals 48:6

December 46:23

decide 16:22,24
73:18 74:7,9
81:13

decided 39:8 46:6
64:18 98:8

decisions 68:21
114:24 115:12

dedication 74:23

deep 40:12

defendants 5:18

defended 7:1

defer 21:10

defined 49:7
126:10

credibility 80:14
81:6

defining 26:1

definition 60:16
98:23 117:6

definitions 48:13
72:18

deliver 86:3

demonstrated
74:9

demonstrations
8:4

demonstrators
9:7

department 13:23
14:1 57:12 71:1,4
124:3 139:14,15

depend 55:20
56:5

depending 65:6
77:12

deployed 140:17

deposition 5:5,7,
16 6:20,23 8:6
18:1 86:5

depositions 6:24
7:4

depth 36:2,7

deputy 11:18
27:24 28:8 29:19,
20 33:6,7,17,18
47:8 68:7,10
110:4 115:22
138:16 139:13
140:11 142:1

describe 8:1 26:3
36:2

describing 32:3
65:15

description 29:9
30:9

descriptions
135:1

descriptive
132:18

designated 7:11
8:6 9:9,13 67:8
76:20

designation
16:12,13,20

designations
48:14

detail 124:4

details 104:20

detective 117:11

determination
37:5 39:4 60:18
62:4 80:14 81:5
104:14 120:19,23
121:4 126:8
139:3

determinations
37:6,10 69:3

determine 26:12
36:24 41:7 56:14,
22 57:24 59:16
64:11,21 65:3,11,

13,24 72:11
73:11 76:13,15
78:17 93:14
102:2 104:5
114:17 129:14,16
130:13 134:17
**determined** 59:21
64:16 71:9 95:20
96:7 102:21
108:19 135:19,20
138:18
**determining**
53:15 70:22
**developed** 48:24
**Devine** 15:12 16:1
28:18 40:6
**devised** 66:22
**differ** 23:5
**difference** 74:12,
14,20 112:15
**differently** 74:4
**difficult** 129:2,4
134:4
**direct** 59:13,17,19
61:12,23 62:2
119:3
**directed** 83:15
88:5,6
**direction** 33:14
38:18 47:22 48:3
82:14 83:6
108:15
**directive** 114:16
**directives** 44:8
53:12 54:2,19
137:1,7,13,24
138:7
**directly** 41:14
87:18 119:20
**director** 11:19
27:14,22,23 28:2
47:9 48:21 52:4
67:5 68:7,10 69:1
70:7 83:5,20
84:1,3 87:5,11
110:4 125:12
143:4
**director's** 28:1,2
64:9,17 67:2
83:20 115:4
**directors** 27:24
**disagree** 24:3
141:12
**discipline** 115:13
122:24 123:9
**disciplined** 115:6
116:10
**discuss** 41:18
42:1
**discussed** 87:10
**discussion** 17:2
**discussions**
18:24
**dispersal** 55:18,
22,24 56:2,9 58:5
62:21

**disperse** 55:15,17
56:8 58:4
**dispersing** 62:9
**disposition** 52:20
53:15 125:12
**dispositions**
52:21 53:5
**distance** 121:16
**distinction** 39:17
140:23
**distributed** 63:14
**dive** 66:13 107:16
**divided** 33:3
**division** 35:21
36:15 37:2 40:1
45:6,22 49:19
54:2 70:21,24
71:4 78:9,21,24
79:1,5,19 88:24
89:19 112:5,6
114:23 117:1,22
139:5,9
**division's** 39:20
55:7
**DL** 99:22
**document** 27:4
38:10 66:6 85:22
88:18 95:11 97:6,
7,11 131:10
132:3 133:8
**documentation**
14:22
**documenting**
85:24
**documents** 19:17
20:12 33:22
44:16 94:19
97:13 132:12
**dollar** 20:17
**doubt** 20:4 108:5
**dozen** 7:2
**draft** 97:18,24
**drafting** 19:7
**drive** 106:7
**driven** 129:12,13
**driving** 30:11
**dug** 132:16,22
**duly** 5:23
**duties** 63:20

**E**

**e-mail** 34:4,10
50:10,11 81:22
87:6,9,12,16,18
88:3 93:24 133:8
**e-mailed** 67:24
**e-mails** 63:23,24
64:4 123:19
124:1 143:5
**earlier** 52:6 66:11
116:17 131:12
143:3

**early** 9:5 41:19
42:13 124:2
**easier** 96:3
**easiest** 105:3
108:6
**Eckenrode** 105:1
106:15
**Ed** 5:14
**editing** 19:8
**Edwards** 5:22 6:7,
8
**efficient** 50:14
69:23
**effort** 29:22 40:7
65:7 132:7
**efforts** 29:13 30:2
77:15 79:5,20
111:15
**electronically**
43:15
**element** 77:16
123:3
**elevator** 36:11
**Elizabeth** 6:6
**Ellerbe** 15:14
17:13 28:14,16
**emergency** 36:16
39:21 40:17 44:6,
8
**employed** 17:6,10
136:23 137:12,15
138:5 139:10
**employee** 16:11,
15
**employment**
12:13,14,16,18
**encapsulate**
91:16
**end** 34:17 45:16
52:8 64:24 98:10
99:23 100:16
104:4 105:19
124:23
**ended** 14:20 66:3,
17,18 97:20
108:12 109:5
**enforcement** 8:3
45:14 46:11 57:2,
7,17 61:24 78:10
82:17 137:5
**engage** 54:10
**engaged** 57:5
63:15 133:23
**engaging** 46:10
**enormous** 19:17
**ensure** 101:1
111:15
**ensuring** 98:16
99:6
**entered** 22:18
**entire** 60:16
**entirety** 78:16
85:20

**entity** 137:5
**entry** 94:5 105:17
**environment**
29:16
**equally** 77:6
**ESQ** 5:22
**essentially** 28:18
**estimate** 6:24
102:13 106:4
135:14
**estimating** 113:5
**evaluate** 83:1
**evaluating** 8:17
**evening** 129:7
**evenings** 133:18
**event** 31:19 53:21
82:18 128:9
**events** 37:7 67:22
81:17 105:7
133:18 135:2,5
**evidence** 56:19
61:15 65:19
72:23 73:2,4,15,
20 75:6,8,13,15,
20 77:4,5 78:3
79:4,19 81:16
100:9,11 108:18
125:24 132:8
**exact** 10:15 86:15
**examples** 35:23
**Excel** 63:22
91:12,15 123:17
**Excellent** 93:2
**excessive** 9:8
53:11,22 54:22
58:4,16,19 61:19
70:23 72:22,24
73:3 75:12 76:8,
14,16 78:1,2,4,7
80:2 82:16 98:20,
23,24 99:1
111:17 112:9,18,
22 114:1,5,7,10,
14 125:23 126:10
128:20
**Exhibit** 52:10,15
88:19 89:6
123:10 124:10,
12,15 131:16,18
132:4 136:2,4
**existed** 36:12
39:22
**exonerated** 49:13
72:6 73:4 90:23
98:21
**exoneration**
98:22
**expect** 7:3
**experience** 23:6
57:2,7,17
**experiencing**
103:24 104:1
**explain** 18:5 26:5
126:2,7
**explains** 20:14

107:4
**express** 5:4
**extend** 123:5
**extension** 109:16
122:16,17,18
**extensions** 100:3
122:21
**extent** 9:18,23,24
23:15 40:4 42:12
65:14 92:22
107:7,23 139:6
**extra** 53:17
**eye** 31:20

**F**

**fabric** 140:21
141:11,21
**face** 54:20,24
**fact** 65:11,15 79:1
129:13 134:15
139:18 140:15
**facts** 55:21 57:23
77:14 78:15
121:5
**fail** 113:2
**failed** 113:16
**failing** 62:21
115:7
**Failure** 112:23
**fair** 10:23 18:6,7
36:13,14 37:4
40:13 47:1 54:16
72:1 85:4,5
113:12
**fairly** 37:3
**fall** 60:14
**familiar** 6:22 7:7
21:12 35:21 40:1
**familiarity** 21:16
**family** 101:5
**fascinating**
143:24
**fatigues** 138:17
140:4,14,21
**FBI** 67:10
**fear** 80:22
**feared** 77:17
**federal** 7:5
**feel** 9:16
**felt** 109:20
**figure** 24:5 33:13
57:21 69:18,22
70:2 81:12 87:1
92:19 96:16
103:23 105:12,16
108:4 130:1
134:6,7
**files** 64:14
**fill** 99:13 102:4
**filled** 101:22
103:21 107:22

**final** 69:15 99:22

**find** 50:2,10,21
74:12 90:13
107:16 132:24
134:16,19

**finding** 61:18
68:2,3 69:16
72:12 73:18
76:14 77:6 107:1
113:22 114:4
125:12 129:11,12
130:4 134:5
139:2

**findings** 48:13
49:4,10,17 69:10,
11 91:2 98:13
113:6 115:1
125:4,5,8 136:20

**fine** 6:17,21 23:20
50:19 53:3 92:15
117:7

**fingerprinted**
46:5

**finish** 92:9,10
101:17 103:18

**finished** 133:9

**fire** 59:13,17,19
61:23

**fired** 59:9 60:11
61:3,12,17 62:2

**firm** 6:11 8:23
10:4,16 11:2,13
13:5 15:10,23
16:3,13 17:1,3,6,
10,14 19:8 21:7
22:21,24 23:2,12
24:8,12,24 25:4,
13,16,17,23
26:10,15 28:10,
12 39:24 40:12,
21 41:9 43:18,22
53:6,11,19,20,24
54:1,6,7,12,17
56:13 57:5 59:13
63:15 64:6 65:2
67:14 70:13,16
76:3 81:11 97:16
100:6 101:4
103:14 117:21
122:2 131:23
133:13 137:4

**firm's** 8:15 44:2,3
71:8 111:18
112:4 116:13

**firms** 42:4

**focus** 101:8,21
102:2 105:1
109:24

**focusing** 87:5

**fog** 118:23 119:4

**folder** 43:17

**folders** 43:18,22
44:2

**follow** 79:6 99:23
110:19 136:24
137:6,13,23
138:6

**FOP** 12:4,21 13:6,
22 47:12,14,17

**G**

**gaining** 41:11

**gathered** 57:23

**gave** 29:17 36:21
52:24 99:17
139:19

**general** 42:14
99:17 118:15
129:23 133:17
135:18 138:1

**generally** 7:7
21:11 23:7 26:4
35:21,24 36:19
39:20 40:13
41:16 72:13
104:9 119:4
133:15,16

**generated** 46:19

**George** 11:18,20,
21,22 27:10,24
33:4,10 39:7 89:1
109:20

**Ginther** 52:5

**Gittes** 5:11
143:15

**give** 6:4 27:4
35:22 44:12
51:13,16 54:13
65:13 66:2 77:1
82:2 86:15 91:20
102:13 112:20
142:15

**giving** 46:3 82:23

**goal** 100:4 114:15
134:1

**good** 5:17 6:4
40:19 88:16
92:24 103:22
123:14 127:2
128:23

**Gordon** 47:9

**governed** 48:10

**government**
25:24

**grabs** 139:10

**great** 50:22

**greater** 29:16

**greatest** 42:8

**Greg** 27:11

**grenadier** 117:21

**grenadiers** 117:1,
23 118:2,17
119:8,17 120:2,
12 122:6

**grievable** 122:24

**grievance** 123:4

**grieve** 123:1

**ground** 18:1
137:5

**group** 15:23 47:2
55:10,14 58:20
64:19,23 66:16
117:12 118:4,5

**110**:5,6 123:4

**force** 9:8 10:6,17
11:3 26:12 35:23
36:12,17 37:17
39:13,22 40:2,8,
16 41:6 47:4
53:11,22 54:22
55:10,16,20,22
56:2,4,7,10,15
57:20 58:3,18
60:3,6,8 61:11,
17,19 62:5 65:16,
22 70:23 71:20
72:22,24 73:3,5
75:12 76:9 78:1,
2,4 80:2 82:16
83:4,9,10 85:12,
15,22 88:12,15,
23 89:20 90:2,9,
12,14 93:20
98:20,23,24 99:2
108:20 111:18
112:10,13,17,18,
21,22,23,24
113:2,3,17,24
114:1,5,7,10,14
115:6,8 117:10,
14 125:23
126:10,11 128:20
129:5,6,8 135:11
142:20

**foregoing** 144:4

**forgot** 122:16

**form** 35:1,3 66:12
89:19

**Formal** 9:6

**Forman** 5:14

**format** 90:21

**forms** 85:15,22

**forward** 88:7

**forwarded** 87:11
88:13

**forwarding** 85:23

**found** 50:8 75:5,7
90:15 131:10,22
135:2,11

**frame** 47:19

**Fraternal** 122:17

**Fred** 5:11

**frequent** 33:6
142:24

**front** 40:9 51:6
60:15 63:6 95:3
107:8 121:19

**frozen** 30:20

**full** 94:7,9

**fully** 64:18,22,24
65:3 66:1,3,14
67:6

**Furbee** 27:13 28:4
41:13 42:7,10
44:23 47:1

**future** 17:2 123:7,
8

**groups** 119:10,19
120:5,15,20
121:11 122:8

**guess** 57:1 102:9
106:2 122:4

**guessing** 10:18
112:12

**guesstimate**
112:1

**guidance** 42:8

**H**

**handled** 40:6 76:3

**handling** 68:20

**handwriting**
32:10,12

**happen** 8:21 22:7

**happened** 29:1,16
67:9 72:11 86:21,
23 96:17 101:23
105:17 106:5
115:11 116:6
127:21 129:12
130:2,3 132:17
138:19,24 139:1

**happening** 29:10
121:18 126:18
126:22

**happy** 63:8

**hard** 68:2,3

**harm** 80:22

**hasten** 46:2

**Hatcher** 15:12
16:1 28:14,15
57:14

**head** 63:5 113:20

**header** 106:10

**health** 18:10,14

**hear** 18:2 30:23
31:4 52:24 53:2,3

**heard** 31:1 60:12
117:4,18

**hearing** 6:13
17:21

**helmets** 140:22,
24 141:11,12,22

**helped** 65:13

**helpful** 50:9,13

**helping** 14:1

**hesitating** 74:1

**high** 103:3 105:8
126:19,21 127:5,
22 128:5,10
129:8

**higher** 45:2
133:16 135:6

**hired** 26:9

**historically** 23:3,9
24:20

**hit** 109:15 130:12

**hold** 36:5 70:19
106:5

**home** 32:22,24
57:12

**honesty** 91:9

**hope** 109:12
134:9

**hour** 24:15 25:8
28:23 92:5

**hourly** 20:15
22:17,22

**hours** 19:14 28:23
102:14

**housed** 91:15

**HR** 47:9

**human** 11:9

**Hundreds** 102:15

**hypothetical**
58:10,21

**I**

**IA** 85:21

**IAB** 49:16 85:14
87:15,19,24 88:2,
5,6 142:21

**ideally** 72:13
76:17

**identification**
52:16 89:7
124:16 129:4
131:19 136:5

**identified** 82:20
83:3 101:24
109:24 111:14
134:23 136:22

**identify** 5:2,3
77:9,19 78:8,20
79:6,11,21 90:16
93:15 101:2
102:7 108:12
125:20 135:13
139:7,17 142:4

**identifying**
142:19

**Ill** 52:19

**imagine** 23:17

**important** 19:20
23:21 31:19

**in-person** 19:3

**inability** 77:19

**inaccuracies**
90:14 134:18

**inaccurate**
134:21,24 135:2

**inappropriate**
98:20

**inbox** 86:10

**Incidence** 37:17
39:13

**incident** 8:22 9:1
56:21 69:12 83:4,
7,16 88:4 89:12
90:2,9 96:8
133:1,24 141:20

**incidents** 10:2
37:14 71:20

89:24 90:5 134:3

**include** 83:8,10

**including** 12:4,21
55:9 56:19 77:15,
16 99:19 139:11

**incomplete** 14:21,
23 15:3 82:10
134:22 142:23

**inconsistencies**
111:7,12

**increases** 62:14

**Indiana** 21:24

**indicator** 127:2

**individual** 31:22
37:13 53:16
59:24 78:16 80:8
81:9 88:4 100:24
102:19 111:4
120:19 132:11,22
137:23 139:4

**individually** 37:11
68:11 133:22

**individuals** 15:15
27:19 30:9 33:9
34:5 35:8 58:20
59:18 71:15 88:2
121:18

**informal** 9:7
10:17

**informally** 10:11

**information** 6:9
14:22 19:18 21:5
23:16 29:17
45:24 46:4 47:7
53:14 54:17
66:13 67:16
71:24 72:11,16
74:8,9 80:7 82:23
84:1 97:7 106:24
129:24 130:9,13
132:10,19 134:17
137:14,22 139:7,
20,21

**informed** 12:5
110:7

**initial** 18:20,22
20:20 32:2 38:15,
23 45:19 48:19
64:20 97:7
132:21

**initially** 64:13
99:14 102:15
142:23

**injunction** 6:13

**injured** 129:3

**innumerable**
132:23

**input** 111:9

**inputting** 101:19

**instances** 83:2

**Instant** 35:2

**instruct** 23:19

**intake** 63:20

**intent** 17:14 42:8
100:13

**intentional** 39:17
107:21

**interchangeably**
118:23

**interest** 47:15

**internal** 38:3
49:18 86:12

**interpret** 42:11
75:17

**interpretation**
42:5

**intersection**
103:6,12

**interview** 106:13

**interviewed** 26:4
106:12 108:17
116:8 134:15

**interviewing**
56:17,18

**interviews** 68:1,
13 137:16,20

**introductory**
26:20

**investigate** 11:3
26:10 64:22 66:1
67:3 70:14 82:18
83:7,15

**investigated** 38:6
60:24 64:7,18,24
65:4 66:4 67:6
70:23 81:18
89:24 90:3

**investigating**
66:17,19 85:4

**investigation** 9:4
31:14 37:13,16,
17 38:11 39:5,10,
12 41:3 42:18
44:17 45:23
46:14,19 49:5,19
52:21 66:6 71:19
77:5 83:22 84:5
86:3 87:20 93:20
95:21 96:12,14,
18,22 99:20
102:5 104:15
106:10 107:13
108:10,17 109:22
110:1,8 124:19
132:9 133:12
136:8 137:18
138:4

**investigations**
10:7,13,18,20
11:1,12 12:7
14:13 23:11 24:9,
14 25:13 29:3
33:12,20 34:6
35:4,19 36:23
41:19 43:21 44:1
47:3,16 48:6,11,
23 49:1 53:17
57:6 60:2 61:8
63:16 64:6 67:21
68:18,22 69:14
87:24 88:7,10
93:18 94:4,5,8,
10,22 95:16,17,
22 97:24 102:11,
20 104:7 107:18
111:2,18 117:5

**intentional**

**121:8** 132:20
133:20 134:15
139:24

**investigative**
38:19 104:19

**investigator's**
138:11

**investigators**
100:5 138:22

**involved** 11:24
12:23 13:5 14:12,
14 15:9 18:20
19:1 71:14
106:21 125:21
135:20 139:24
141:20,21

**involvement** 9:19
10:1

**involves** 89:1
136:13

**involving** 64:2
83:9 124:20
136:9

**irrelevant** 97:20

**issuance** 39:6

**issue** 140:10

**issued** 42:18
46:14 71:11 72:7

**issues** 33:20

**issuing** 41:3,10

**items** 31:5 85:3

**J**

**January** 25:6,7

**Jeff** 27:13 28:4
41:12 42:7 44:23

**Jenni** 6:19 13:16
19:16 20:4,7 24:8
26:22 50:10,21
51:5 52:3 63:14
70:11 82:13
84:15 92:16,17
93:17 123:16
143:19

**Jennifer** 5:22 6:6

**Jeremiah** 15:12
16:10 28:16
97:18 98:6

**jobs** 27:18

**Joe** 15:11 16:1
27:11 28:3,18
40:6

**John** 5:8 6:21
84:12 92:2 97:20
121:14

**joining** 5:10,14

**journalist** 26:5

**judgment** 57:22

**July** 138:16

**jump** 18:4 143:24

**June** 9:5,10 11:9
48:21 52:3 63:23
86:16 123:19

**justify** 39:10

**K**

**Kathleen** 27:11,
13 28:1

**keeping** 120:24

**kind** 16:22 29:4,
12 30:13 35:5
36:9 42:7,13 46:2
48:8 64:1 66:12
69:9 72:2 78:10
82:5 87:17,21
88:5 90:20 91:16
104:6 106:9
112:1 130:18
132:14 134:3
139:9

**kinds** 24:21 34:1
36:3 47:6

**knee** 58:18 59:1,3
60:4 128:12

**knew** 39:22,23
67:23 132:10
133:22 143:23

**knockers** 58:18
59:2,3 60:4
128:12

**knocking** 128:10,
11

**knowing** 31:16
140:19

**knowledge** 26:14
32:5 36:3,7
40:12,16,19 41:2,
11 49:16 57:18
117:20

**L**

**L-E-A-D-S** 45:13

**labor** 12:11,12
13:6 23:13 24:10
25:1,5 47:11,12

**lack** 72:16 77:18

**laid** 48:22 49:3

**land** 78:18

**landed** 73:24

**language** 38:13

**laptop** 32:11

**large** 68:4 91:18
132:9

**larger** 118:21
119:4

**Larrick** 15:13
16:8,9 28:17
73:23

**late** 9:5 46:23

**Laughlin's** 126:24

**Lauren** 15:13 16:8
28:17 73:23
102:21

**law** 8:3 21:12,16,
17,20 22:2 26:10
45:13 46:10
53:22 54:4 55:4

57:2,6,17 61:23
78:9 82:16 97:16
114:15 116:13
122:2 137:5

**lawful** 55:22,24
73:6

**lawsuit** 128:16

**lawyer** 27:3 122:1

**lawyers** 24:17

**lay** 132:13

**lead** 81:2

**LEADS** 45:9,10,
13,17,24 46:4,7,9

**learn** 30:17 55:6,
13 62:19

**learned** 48:17
55:18

**leave** 109:23,24

**left** 106:8

**legal** 53:20,21
54:13 57:15

**legs** 60:11

**letter** 110:5
123:13 143:4

**level** 55:21 56:2,4,
10,15 57:20
58:17,22 59:1
60:3,5,7,9,14
62:14 66:6
125:18 129:7

**levels** 60:6

**license** 22:1,2,4,5

**licensed** 21:19,22

**lieutenant** 86:6,7,
11 141:4,7,8

**limited** 34:7 78:14

**lines** 101:15

**link** 45:8 97:11

**Linville** 11:10,16
12:2,8 13:3,21
15:11,22 18:19
28:14

**list** 65:5 110:3
115:23 132:18
133:3 136:11

**listed** 38:20 60:13
81:1 85:2

**litigated** 21:13

**litigation** 12:18

**located** 103:2

**location** 129:17

**lodging** 87:14

**log** 93:19

**logistical** 33:19

**logistics** 33:18,21
34:2 68:1

**long** 6:10 21:19
28:22 98:3

**longer** 17:19

**looked** 83:4 89:3
102:9,14 106:17
108:18 134:20

**lot** 33:18 36:13 101:9 109:23

**luckily** 135:9

**lunch** 92:17

_____

**M**

**mace** 76:7 118:22,24

**made** 11:14 37:5 64:2 65:7 102:22 106:11 108:14 111:9,15 114:22 115:12 120:19 126:8 132:23

**main** 104:7

**maintain** 43:17

**maintained** 36:16 69:13,15

**majority** 48:1 72:4 81:17 133:20,21

**make** 18:2 19:20 20:3 21:9 37:6,11 39:3 42:13 43:4 48:14 50:13 64:20 69:3 73:18 74:12,14,19 81:5 92:13 98:19 104:13 110:19 114:24 120:22 130:4 133:8

**makes** 77:19 78:3

**making** 56:14 112:6 128:11

**managed** 33:11

**manual** 36:16 39:21 40:18 44:7 53:13 54:3,19

**map** 132:7,15

**Mark** 15:12 16:1 28:14,15 57:14 89:1 118:2,18 119:8,18

**marked** 15:3 52:9, 15 89:6 124:15 131:16,18 132:4 136:4

**Marshall** 5:8 6:3 13:10,15 19:13 20:2,6 23:17,24 24:3,7 50:17,20 51:4,11,15,21 52:2,11,18 63:10, 12 70:5 72:17,19 81:20 82:7,8 85:10 88:14,17 93:3,7,9 94:24 95:5 100:17,19 103:19 105:14, 18,22 107:9,11 110:22 124:9,11 125:7,11 127:6,9, 24 128:2,21,24 131:8,15,21 135:15,24 136:17,19 138:8, 10 142:5,12 143:11,14,23

**Martina** 15:13

**master** 93:19

**match** 90:10

**matched** 90:13

**materials** 41:15, 16 43:11 44:6,10, 13,22 45:4,22 46:24 53:10,14 54:3,14 55:3 131:23 132:19

**math** 93:12 108:6

**matter** 6:13 8:20 10:12,15 14:19 15:7 39:4 56:10 70:22 92:14 98:16 104:3

**matters** 12:10,11, 14,16 14:17,20, 23 15:3 67:17 71:8 109:14

**Mattie** 5:11 51:11

**Mayor** 52:4 70:7 123:13

**Mayor's** 48:22

**meaning** 16:18 75:22 101:4 114:15

**means** 16:14 55:9 72:21,24 73:2,4 126:2,7

**meant** 16:19 42:11 49:7 60:5

**meantime** 110:8

**media** 31:18

**medication** 18:10, 13

**meet** 41:20 46:7 100:4

**meeting** 26:20 27:8 28:20 29:1,8 30:17,18 32:2,4,6 48:20

**meetings** 19:4 35:6,9,11,13 41:17,21,24

**member** 53:20 54:1 112:5,7 139:4,8

**members** 42:4 54:17 56:13 57:4 63:15 70:16 137:4

**memo** 48:20,24 49:3,21 51:6 52:4,8 53:8,13 54:20 63:11,13, 14 70:7 87:4

**memorized** 60:9

**memory** 18:11 44:12 49:9 117:8

**mention** 7:16 29:23 30:2,15

**mentioned** 28:3 93:20 109:15

**messages** 34:12, 13,19

**Messaging** 35:3

**met** 86:6,8 98:2

**method** 5:16

**methods** 34:8

**mid** 11:9

**mile** 128:5 130:20

**miles** 127:17

**military** 57:8

**millimeter** 60:21

**mind** 20:3 59:1 85:8 90:19 142:14,19

**mine** 7:24

**minute** 50:15 51:14 69:19 93:12 131:5 142:8

**minutes** 70:1 92:18 129:2 131:2

**misconduct** 38:14 73:6

**mistakes** 111:9

**mode** 106:11

**moment** 19:2

**money** 23:19

**months** 8:20 14:16

**morning** 5:17 6:4

**Moss** 15:14,18,19 28:19

**mounted** 103:1,8, 15

**move** 72:21 105:2

**moved** 95:14,16, 17,22 96:13,16

**multiple** 20:8 58:5 59:2,3 71:14,15 89:23

**municipality** 25:24

**muted** 143:15

_____

**N**

**name-calling** 119:20

**named** 17:5,6 89:1 124:21

**narratives** 134:11

**narrow** 106:20 134:3

**nation** 31:20

**national** 29:23

**Nationwide** 127:5,22

**nearby** 121:20

**necessarily** 88:10 114:11 133:24

**needed** 29:15 46:9 47:18

**needing** 45:16

**negotiation** 22:17

**negotiations** 12:4,20 13:6,22, 24 14:2 23:13 24:10 25:1,5

**net** 139:9

**news** 20:19,22,24 31:13,18 105:6

**night** 74:2 76:18

**noncpd** 136:14,22

**nondeadly** 61:17 62:17

**nonlethal** 36:17 55:9,16,20,21 56:2,4,7,10 58:3 117:13

**normal** 22:21 47:19 49:18 87:15,17 117:10

**north** 126:20 127:14 128:9

**northwest** 103:2

**note** 20:3 108:14

**noted** 66:11

**notes** 32:6,8,11, 12,14 35:13,17 43:4,5,8 142:5

**notice** 38:19 63:18 66:8 133:12

**number** 7:17 12:9 14:16 15:3 38:2, 3,9,20 61:6 70:13 71:8 72:8 78:14 81:1 90:6,7,17 97:1 104:10 108:5 111:23 112:12 114:7 133:12 136:9

**numbered** 37:20 116:1

**numbering** 66:22

**numbers** 61:2 90:21,24 95:1 108:23,24

**numeral** 52:19

_____

**O**

**O-H-L** 141:5

**oath** 5:6,20

**object** 13:8 23:15 58:12 107:6

**objection** 14:4 23:14 25:2 62:10 115:9 118:6,8 119:12,22 120:6, 16 121:2,12 122:10,11

**objective** 56:19

**obtaining** 134:2

**obvious** 96:24

**occur** 42:17

**occurred** 22:17 42:16,20 46:13 73:5 105:7 130:9

**occurring** 56:20 62:13

**occurs** 120:1

**office** 5:19 21:10 23:4 27:13 28:1,3 32:21,23 41:13 44:24 48:22 64:9, 10,17,18 67:2 69:2 83:20 115:4 131:24

**office's** 47:10

**officer** 26:11 36:24 38:14 40:8 57:9,12,15 74:15 76:21 77:9,17,19, 22 78:8,9,10,21, 24 79:2,5,11,19 80:3,15 81:6 82:17 89:1 90:8 98:19,21 99:2 100:20 101:2,5,8, 22 102:2,7 105:1 109:24 110:3 113:24 114:13 116:4 117:10,11 122:22 129:4 133:17 135:13, 20,21 138:18 139:8

**officer(s)** 125:21

**officers** 8:3,4 33:24 37:2 41:17 44:24 45:1,6 48:7 55:8 56:18 61:20 62:15 69:5 83:12, 14 85:16 101:1 109:23 113:16 115:5 116:1,9,20 118:4 119:9,21 120:4,14,22 121:8,19,20 122:8,23 128:20 133:23 134:4 135:6 136:15,21, 23 138:5,17 139:11 140:1,13, 24 141:1,3,21

**officers'** 26:12

**offices** 68:13

**official** 8:18

**officials** 30:18 32:4 35:4

**Ohio** 21:20 22:1

**Ohio's** 21:16

**Ohl** 141:5

**open** 14:19

**operations** 36:16 39:21 40:17 44:7, 9 53:13 54:2,18

**opinion** 116:9 122:2

**opportunity** 17:16 110:2 137:19 143:20

**optimistic** 20:21

**option** 99:5

**order** 40:20 41:7
55:22,24 56:2,9
58:22 62:21
122:17 143:14

**ordered** 55:15

**ordering** 143:19

**orders** 55:18 58:6

**organization**
29:24

**organized** 30:3

**organizing** 30:4

**original** 82:21,24
83:1,16 87:4

**originally** 66:24
83:15 97:23
143:9

**outcomes** 48:23

**outlining** 52:5

**outstanding**
22:15

**overarching**
100:4

**overlap** 73:12,16

**overlapping** 88:1

**owner** 91:14

_____
**P**

**p.m.** 129:8 144:5

**Pabst** 105:4

**package** 86:19

**pages** 52:10
137:18

**pain** 103:24

**Pam** 47:9

**paper** 67:12
131:14,22

**paragraph** 63:19,
20 123:15

**paralegal** 15:17,
18

**parallels** 17:5

**pardon** 76:16

**parlance** 58:23

**parsing** 79:15

**part** 10:1 29:8
44:1 45:23 47:24
48:19 55:14 63:2
64:12 80:13
96:13 123:7
127:7 128:16
129:23 138:12

**participate** 19:3,7
106:15

**participating**
30:10

**participation**
33:11

**partners** 15:23,24

**partnership**
16:19,23

**partway** 102:4

**past** 44:24

**Paul** 141:5

**pause** 96:3 106:9

**pay** 22:12 31:17

**people** 27:16 33:4
65:16 72:15 88:3
91:17 99:12
121:23 137:10

**pepper** 76:3,7,8
77:13,24 78:2,5
118:3,21,24

**percentage** 84:7

**perception** 80:22

**perfect** 95:12

**period** 8:5 33:20

**permanent** 16:11,
15

**permission** 51:16

**permitted** 56:8
120:13 121:8

**person** 98:7 119:3

**personal** 34:14,15

**personally** 57:2
60:13 73:22

**personnel** 112:6

**persons** 106:13

**perspective** 33:10
36:9 86:24

**Pettus** 27:14,22
48:21 52:4 87:5
110:5

**Pettus's** 70:7
123:12 143:4

**Philips** 5:19

**phone** 34:14,15

**photograph**
138:20 139:4

**photographic**
100:11

**picture** 36:9
106:19

**piece** 132:16
143:1

**pieces** 88:9

**place** 5:6 29:13
129:3

**places** 72:14 88:5

**plaintiff** 128:17

**plaintiffs** 5:9,15

**plaintiffs'** 5:10,14

**plan** 17:9 98:6

**play** 70:17

**point** 19:21 20:16
22:19 31:4 45:8
84:24 86:2,15
91:11 141:18
143:6

**pointed** 103:9

**pointing** 80:18

**points** 29:14

**police** 30:21 31:3
35:22 55:11 57:8
88:24 119:9
122:17

**policies** 35:24
36:3,11,13,17
39:21 40:1,2,13,
17,18,20 42:6,9
43:13,19,24 44:7
47:4,6 53:12
54:2,7,9,13,19
55:3,7,14 136:24
137:7,13,24
138:7

**policing** 116:21
137:6

**policy** 26:13
35:22 37:2,8 40:9
41:6,8 42:11,14
58:1 60:13,15
63:2,6,8 78:16
81:1 98:24 99:3
112:14,17,21
113:2,24 114:11,
12,13,14,16,17
122:4 126:11

**portion** 93:18

**portions** 7:12

**positive** 25:6

**possibility** 109:21

**posted** 105:7

**potential** 16:19
48:13,22 49:3,10
52:20 83:4 134:3

**potentially** 23:15
27:14 55:19 99:4

**Powerpoints**
44:22 45:4 54:20

**practice** 21:17,20
22:2 87:17

**precise** 74:21

**precisely** 99:24

**preclude** 123:8

**prefer** 49:11 51:8

**preference** 92:8

**preliminary** 6:12

**prepare** 31:14
133:17 134:16

**prepared** 87:5

**preponderance**
72:23 73:1,3,15,
20 75:6,8,13,15,
19 78:5 125:23

**present** 13:7 21:3
28:10

**presently** 12:23

**preserve** 32:13

**presume** 123:7

**pretty** 18:22 50:13
78:14 102:22
106:15 107:19

**preventing** 80:23

**previously** 92:23
124:8

**primarily** 33:16,
19 42:7

**principal** 30:4
47:1

**prior** 25:7 36:3
40:5 57:15 72:8
112:8 137:18

**privileged** 23:16

**probationary**
57:15

**problem** 51:10

**procedural** 33:17

**proceedings**
144:4

**process** 6:23 7:8
24:6 25:11 46:2
48:8 52:5 60:22
64:9,12 70:12,17
87:10,16 95:14
110:20 114:22

**produce** 43:23

**produced** 19:14,
18,22 50:7
131:23

**project** 10:5 11:1
12:1 13:13 14:13
15:9 18:18 19:4,5
25:13 26:4,6,15,
18,19 31:14,15,
17,21,24 33:1,5
35:20 36:4,22
39:23 40:3,23
44:1 46:20 49:1
57:6

**propriety** 50:23
122:3

**prosecutorial**
68:21

**protest** 9:4 30:4
40:18 86:17
117:15 140:16

**protesters** 9:9
30:5,19 31:2
55:10,15 56:1,8
58:5 59:10,14
62:8,14,20 118:5
119:10,19 120:5,
15 121:1,11,17
122:8

**protesting** 58:8

**protests** 8:7,11
9:10 11:4 29:11,
24 30:10 31:7,13
36:24 37:18
39:13 64:2 65:12,
14 69:6 71:20
85:16 86:19
108:21 116:21
137:6 142:20

**provide** 65:10
80:20 104:19

**provided** 12:15
41:15,17 42:7
43:19,24 44:5,9,
13,23 45:2,11
48:20 54:14 55:1
65:21 84:14
90:12 100:9
103:11,15

**providing** 29:4
30:11

**public** 21:6,8,12,
13,16 23:18 71:4
124:3 139:14,15

**pulling** 93:10

**purpose** 33:8
43:20 47:13

**purposes** 52:16
89:7 124:16
131:19 136:5

**put** 18:8 33:15
63:6 66:8 88:8
99:19 100:11
104:7 108:8
110:3

**puzzle** 88:8

_____
**Q**

**quality** 111:1

**question** 13:16
18:5,9 20:5 24:4
37:22 40:24 41:1
48:14 53:21 55:2
57:19 58:14
60:17 62:3,18
68:6,8 76:6,9
78:7 79:3 89:16
91:20 121:6
122:15 123:11
133:11 135:18
141:16

**questioning**
29:18

**questions** 17:22
18:3,15 33:12,16,
17 41:18 42:1,4,5
67:22 76:2
115:15 118:16

**quick** 51:13

**quickly** 18:20,22

**quit** 51:19

_____
**R**

**ran** 100:24

**rank** 106:16

**ranking** 133:16
135:6

**ranks** 45:2

**rate** 20:15 22:24
23:2,10,12 24:8,
10,12,19,24 25:5

**rates** 22:17,22
23:5

**reach** 11:20,21
65:20 75:15
77:20

**reached** 11:10,22
18:19 65:9 72:8,
15 74:4 99:8
126:9

**reaching** 72:9

**read** 9:3 36:8

41:15 67:12
72:20 73:8 75:10
76:18 126:16
129:13 137:1,2
138:2,12 143:24

**reading** 7:18
26:23 136:21

**real** 71:23

**realization** 88:6

**realized** 96:12

**reason** 15:1 38:8
90:7,10 119:16
122:9 141:12

**reasonable** 56:11,
15,23 57:20,24

**reasonableness**
62:4

**reasons** 14:21
60:1 80:4,19,20,
21 90:18 107:14
126:12

**recall** 27:12 29:9
30:8 31:6 46:18
55:12 60:15
62:24 68:9 81:8,
14 84:22 86:9
97:22 98:15
103:11 105:9
116:19 117:6
124:3 134:23
140:19 141:2,24

**receive** 89:22
90:3 98:3 122:20

**received** 8:19
11:13 14:15 15:2
44:16,21 45:7
53:9 61:10 63:23
64:3,13,14 87:2
97:15 99:15
122:14 123:19
132:8,19 142:23,
24 143:5,9

**receiving** 87:13
142:22

**recent** 8:23,24
46:22

**Recently** 32:15

**recess** 51:3 52:1
70:4 93:8 131:7
142:11

**recognize** 84:15
88:22 89:19

**recollection** 27:9
28:24 30:16
49:12 63:7

**recommendation**
105:24

**recommended**
125:12

**record** 5:3 6:5,23
18:8 21:6,8 23:18
34:21 52:9 72:21

**recorded** 32:4
35:10 43:2

**records** 21:12,13,
16 139:14,15

**refer** 58:18 133:13

**referred** 68:7,10
108:12,14,16,21
143:3

**referring** 49:21
60:4

**refers** 128:12

**reflect** 94:5

**reflected** 129:23

**reflection** 74:2

**reflects** 94:4,7

**refresh** 63:7

**refuted** 73:1,3,14,
20 75:5,7,14,19
125:23

**regard** 9:17
122:14

**relate** 20:13 90:16
127:4

**related** 12:18
26:11 38:24
45:10 65:12,14
67:24 68:24
85:16 88:9,11
90:2,9 94:22
96:13 97:13
108:20 114:7
115:13 116:1
121:18 132:24

**relates** 12:4 45:11
47:4 53:16 85:14
94:20 126:18

**relations** 47:11

**relevant** 43:13

**relied** 137:21
142:1

**rely** 13:22 111:4
135:1 139:2,18,
20

**relying** 137:20,21

**remain** 17:10

**remaining** 22:13

**remains** 14:19
21:4

**remember** 20:24
29:7 45:3 63:1,5,
9 77:13 105:11
108:23 116:22
118:18 140:8
141:22

**remote** 5:6,7,20

**report** 37:17 39:1,
6,12 41:3 42:18
46:14,19 69:9
74:1,17 76:18,24
88:15,23 89:20
90:9,12 94:21
104:6,19 106:18
107:13 108:4
112:23 113:3,17
115:7,24 116:6
123:1 124:20
125:2 126:14,17
127:16,20 128:4
129:7 135:17,19
136:8 137:11
138:2

**reportcpd** 87:6,18

**reported** 88:4

**reporter** 5:1 51:23
105:7 143:16

**reporting** 5:7

**reports** 37:13
38:7,11,16,19
41:10 52:21
59:24 66:8 71:12,
14,19,23 81:9
85:22 88:12
89:23 90:2,15,22
96:18,22 98:7,11
107:8 108:24
111:4,5,13
114:23 115:2,8,
16 127:4,8,10
129:6 133:12,13,
14,19 134:1,2,6,
11,20

**represent** 5:3

**representatives**
29:2

**represented** 12:9,
17,19 40:7 101:5

**representing**
12:13,24

**request** 109:16
115:22 132:10,21

**requested** 90:1

**requesting** 134:2

**requests** 102:22
132:23

**require** 111:8

**required** 61:16
86:2 122:18
136:24 137:6,13,
23 138:6

**requirements**
46:8

**resign** 17:14

**respect** 8:7 35:22
63:2,21 123:16

**respond** 68:11
110:6 128:16

**response** 106:23
112:8 132:21

**rest** 16:2 100:8,15

**restrictions** 48:7
68:4

**result** 76:21 79:8,
10

**resulted** 37:16
61:18 70:12
107:1 108:3

**results** 74:15

**retain** 34:22

**retained** 34:19

**retaliatory** 9:8

**retracted** 73:8

**retrieve** 91:6,10

**Rettig** 5:11 51:13,
17

**review** 15:7 31:20
38:15 47:11 52:5
74:6 82:15 85:10

98:7,14 110:9
124:23 125:1,2
139:23 143:20,22

**reviewed** 9:1
74:1,17 87:23
137:11 139:13

**reviewing** 8:23
56:18 98:10

**reviews** 111:11

**revoked** 22:5

**Riffe** 103:1

**right-hand** 88:19

**riotous** 130:19,21

**rocks** 30:20

**role** 70:17 116:13

**Roman** 52:19

**Ron** 11:9,16,20,23
12:2,5,8 13:21
15:11 28:13

**room** 5:4,9,13
69:22 142:7

**Rosen** 40:8

**rough** 102:13
111:23 135:10,14

**round** 60:11,12
61:12 62:22
130:12

**rounds** 59:2,4,8,
14 60:5,19,20
61:7,17 62:5,7
63:3

**row** 107:2

**rows** 108:7,9,10

**rule** 7:4,8,11

**rules** 18:1

**Russell** 105:8
127:14 128:10

———

**S**

**safety** 11:19
27:22 28:1,2 52:4
71:4 77:18 83:20
115:4 123:12
124:3 139:9
143:3

**sake** 50:24

**Sam** 5:11 52:11
63:10 72:17
81:21 82:3 85:10
88:15 93:11,16
94:24 96:2
100:18 103:19,24
105:14,18 106:6
110:22 123:10
124:9 125:8,10,
16 127:6 128:1,
22 131:16 133:7
135:15,23 136:17
138:8

**sample** 88:15

**saved** 143:8

**scale** 40:5

**Schlein** 5:12
51:24 82:4

**scope** 13:9 14:5
20:14 24:2 25:3
29:3 58:13 62:11
108:16 115:10

**screen** 51:7,8,12,
16,22 69:19 70:6
95:3 132:3
139:10

**scroll** 52:11 72:17
94:24 95:3 96:1,4
103:20,22 104:23
105:15,19 106:8
107:23 108:11
110:23 123:13
125:7,15,19
127:6,24 128:21
131:15 136:18
138:8

**scrolling** 100:17

**second-to-last**
52:12

**section** 127:11
138:15

**seek** 139:16

**seeking** 110:5

**self-explanatory**
100:9

**send** 50:11,22,24
51:1,2 83:5,19
84:1 91:8,10

**sending** 51:5 86:1
139:12

**senior** 106:16

**sense** 29:4,6
48:15 66:2,16,19
92:13 135:10

**sentence** 136:21
138:15

**separate** 20:12
55:10 83:11,14
116:3

**separately** 5:19

**separation** 55:11
118:3 119:9,19
120:4,14,24
121:10 122:7

**served** 57:11,14

**service** 6:14

**sessions** 116:18

**set** 51:18 87:12

**sets** 114:12

**share** 51:7,8,11,
16,22 69:19 70:6
81:21 91:17
93:11 110:24

**shared** 110:3
124:8 141:15

**she-said-she-said**
80:1,9

**sheet** 95:2,9
103:18,20

**sheets** 131:14,22

**shooting** 142:6

**short** 51:3 52:1
70:4 71:23 92:17

---

Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC | 614-444-1000

93:8 126:20
131:7 142:11

**shorter** 10:8
92:13

**shot** 61:6

**show** 108:10
125:5

**showed** 59:13
77:12

**shown** 136:22

**side** 27:10 28:13
77:6

**sight** 9:19,21

**sign** 143:20

**signature** 143:17
144:2

**significantly**
94:21

**similar** 9:6 40:2,
17 85:2

**simple** 121:15

**simply** 62:8 80:19
82:24 85:24
110:20 118:3
119:9 120:4,13
121:10,15,23
122:7

**sit** 91:4 96:5

**sitting** 49:23
112:1 117:6

**situation** 58:2
61:18 62:13,18
73:13,19 76:12
78:13 79:18 80:1,
8,12

**situations** 36:18
67:22 71:15 81:4
117:15 139:12

**skip-fire** 122:6

**skip-fired** 59:9
62:8 120:3 121:9

**Slack** 35:2

**slowly** 105:14

**smaller** 94:21

**sneaking** 5:13

**social** 31:17

**solely** 134:14

**sort** 10:14 12:18
20:20 39:17
65:19 85:2

**sorts** 115:12

**sought** 42:12
100:2

**sound** 86:20
117:17

**sounds** 49:15

**source** 87:4

**sources** 87:3

**south** 127:17
128:6 130:20

**space** 68:4

**speak** 110:2

**Speaks** 11:18
18:19 27:10,24
33:5,10 39:7
68:7,10 109:20
110:4

**special** 22:24
47:21 117:12

**specific** 9:19
30:16 36:13
47:11 69:11
100:10 111:15
132:23 135:13,17

**specifically** 28:5
30:8 44:15 48:24
55:12 63:5 67:2
81:8 84:22 85:15
119:15 120:9

**specifics** 31:24
96:3

**speed** 50:4

**spend** 31:12

**spent** 19:14 47:8

**sponge** 60:11,12

**spools** 61:2

**spotted** 111:11

**spray** 76:3,7,8
77:14 78:5 118:3,
21,24

**sprayed** 77:24
78:2

**spraying** 128:10

**spread** 82:3

**spreadsheet** 15:2
63:22 69:14
84:14,16,18,23
85:2,14,17 91:1,
3,12,14 92:20
93:11,16,20 94:1
99:10 101:13
104:18 110:10,17
111:5,7,12
123:17,24 124:2,
5 142:20,22
143:3

**spreadsheets**
69:18 81:21 85:7
111:8

**Stacy** 51:15,22
143:14,15

**staff** 16:10,14,22

**stage** 44:16,19,20

**standard** 25:4
75:9,11 114:11

**standing** 58:20

**standpoint**
106:19

**start** 67:1 87:2
89:16 93:13
95:11 142:21

**started** 11:6,21
18:19 19:5 35:20
36:4,20 66:23
87:24 97:3
118:11 132:9

**starts** 97:2

**state** 5:3 7:4

21:20 25:24
57:13 103:2

**statement** 36:21
113:12

**states** 21:23

**steps** 34:22 53:17
72:3,8 107:15

**Steve** 19:24

**stipulate** 5:15,20

**stipulation** 5:5

**Stone** 27:11,23

**stop** 52:13 86:17
88:6 100:18
107:24 125:16
127:8 128:22
133:7 138:9

**stops** 95:4

**stories** 20:19,24
31:13

**story** 20:22

**straight** 80:9

**street** 103:9,10
126:19,21 127:1,
5,14,15,22 128:5
129:8

**streets** 29:10,13,
14 30:11 103:3

**struck** 125:18
129:19

**struggling** 121:15

**subject** 8:8,11
11:4 38:2 100:20
135:21 138:18

**subjected** 119:20
122:23

**subjective** 77:16

**submissions**
96:20 114:22

**submit** 39:8 65:19
76:23 112:23
113:2,16 115:7

**submitted** 17:14
38:7,11,15,17
39:1,11 46:22
94:18,19 98:1,11
102:17 104:6,12
115:2,12,14
124:24

**subpoena** 6:14

**substantiated**
73:6

**substantive** 68:6,
8

**subtract** 109:7

**success** 76:16

**sufficient** 14:21
57:24

**suggested** 15:2
61:22

**suggesting** 50:7

**summaries** 107:7

**summarized** 37:3
107:13,14 126:13

**summary** 69:9
90:21 99:9,11,13,
17 107:4,12
127:7,10 133:17

**supplemental**
44:22

**supplied** 30:19
31:2,5,22

**supplies** 30:12,
13,16

**support** 13:23
14:2 28:5 73:14

**supported** 72:22
73:1 75:13

**supports** 41:14

**supposed** 59:9
82:17

**surmise** 106:13
107:3 138:3

**surrounding**
121:5

**suspect** 35:15
43:6

**suspended** 22:5

**sustain** 78:23
130:17

**sustained** 49:13
59:22 72:5,6,14,
21,23 73:13 74:4,
13,19 75:4,12,17,
18 76:17,20 77:8,
21 78:18,19 79:9,
10,12,15,21
90:22,23 91:22
99:4 104:11,14
105:24 107:1
110:12,13 111:19
112:11,13,17
113:6,15,16,21
114:4 130:4
135:12

**SWAT** 117:11
135:19,21 136:23
138:17,19 139:11
140:1,3,13,17,21
141:2,7,8,10,21

**swear** 5:1

**sworn** 5:23 112:6

**system** 44:3
66:22

**systematic** 52:5
63:21 123:16

_____

**T**

**tab** 82:9 84:13
93:18 94:12,23
95:17,22 107:19,
20 108:10 109:8,
9 111:3

**table** 13:21

**tabs** 81:23 82:3
85:9,19 94:3
96:15

**taking** 5:20 29:13
139:10

**talk** 33:24 34:1

96:3 109:19
115:18

**talked** 11:17
29:21 48:7 86:7,8
92:22 140:9

**talking** 10:3,19
11:1 30:7 33:19
41:21 52:6 103:3,
4 109:8 117:2

**talks** 127:13
128:3,15,19

**Tanoury** 5:17,18
6:17 13:8 14:4,9
19:23 23:14,23
24:1 25:2 50:19
58:12 62:10
92:15 107:6
115:9 118:6,8
119:12,22 120:6,
16 121:2,12
122:10 143:18

**taxpayer** 23:18

**team** 5:11,15
26:21 28:15,18
32:3 35:5,9,11
41:21 47:12
69:22 78:16 99:7,
19

**teammate** 73:22
102:20

**teams** 26:21
91:15 102:3

**technically** 21:24

**Teddy** 15:13 16:9
17:18 28:16 57:8

**telephone** 34:10

**telling** 80:18
81:13

**term** 10:24 117:4

**termination** 40:8

**terms** 8:16 49:7
118:22

**test** 117:8

**testified** 86:14
141:10

**testifies** 5:23

**testify** 9:13

**testifying** 9:16

**text** 34:11,13,19

**thereof** 20:9

**thing** 20:15 26:17,
19 39:11 59:4
60:5 68:23 89:13
114:10 126:17
135:16 142:17

**things** 31:3 50:4
55:1,8 65:17
70:13 90:6 99:5
109:8,9 117:13
132:15,24

**thinking** 20:13
26:24 44:15

**thinks** 78:2

**Thomas** 15:13
16:9 28:17 99:17

**thought** 23:21 29:23 30:19 45:19 67:23 74:17 76:19 82:16 142:15

**three-tenths** 130:20

**throw** 30:20 31:3

**tick** 125:15 128:23

**tight** 96:5

**time** 8:5 13:7,20 29:15 31:12 47:8, 19 56:21 65:13 68:2,3 74:5 86:2, 15 87:12 90:11 98:8 99:13,16,18 101:3 110:5 127:21 129:17 131:13 134:5,8 143:12

**timeline** 17:19

**times** 42:10 56:24 58:17 65:8 102:6 134:4

**title** 39:16 71:21

**titled** 39:12 71:19

**titles** 27:18

**today** 6:20 7:10 32:22,23,24 91:4, 7 117:6 143:12

**told** 36:21 46:6 49:16 86:17 116:17 142:2

**top** 20:17 63:5 70:9,10 113:19 123:13 141:11

**topic** 8:7 9:3 13:11 38:13

**topics** 7:12,13,16 8:1 9:2,12,17,20 10:2

**torso** 60:11

**total** 38:5,11 71:12,18 96:18

**town** 25:24

**track** 16:18 69:8, 13 90:20,24

**tracking** 63:21 123:17 124:1 143:5

**tracks** 63:22 123:18

**tract** 16:23

**traditional** 16:16 18:9

**train** 45:6 116:20 117:22

**trained** 48:12 55:13 117:12 118:2,7,17 119:8, 15,18 120:3,9 122:6

**trainer** 47:2

**trainers** 47:7

**training** 41:15,16 43:11 44:5,15,19, 20 45:4,10,12 46:4,24 48:19 53:10 54:14 55:7 57:22 61:9 62:19 74:11 116:16,18, 19 117:22 118:1 120:1 122:12,13

**trainings** 41:12 42:16,17,20 43:5 44:24 46:12,13 53:8,10,13 54:18 55:3

**trains** 55:8

**transcript** 143:21 144:1

**transferred** 101:16,23

**transmit** 67:16

**triage** 64:19,23 65:3 66:3,16,24 94:11 95:2,20 96:2,10 97:3 103:18 104:5,12 107:20 108:3 109:9 111:3 136:11

**trial** 6:13

**trouble** 17:21

**true** 59:23 102:8

**trust** 134:10

**truth** 80:18 81:13

**truthfully** 18:15

**turned** 63:18,22

**turning** 46:3

**turns** 29:2

**two-page** 132:3

**type** 97:6

**types** 31:2 39:9 41:16 60:8,20 61:3,6 64:14,15 65:17 132:8,15

**Typically** 73:21

---

**U**

**Uh-huh** 25:10 128:18

**ultimately** 37:15 105:12

**unable** 135:12 142:3

**uncovered** 29:5,7

**understand** 13:10,12,16 18:3 29:15 41:5 70:11 75:1 87:23 88:1 96:23 107:10 111:8 113:7 114:19 118:14 141:17

**understandable** 100:16

**understanding** 8:13 11:22 17:13

**understood** 11:9 18:23 42:14 138:4

**undertake** 11:11

**undertook** 11:2

**unfolded** 33:1

**unfounded** 49:13 59:22 72:6,15 73:2,13 74:5,13, 19 75:6 78:18,20 79:9,13,15,22 90:23 91:23 99:3 110:11 125:13 129:12 135:12

**unions** 12:21

**unreasonably** 123:5

**updates** 142:24

**uphold** 40:7

**upper** 88:19

**user** 91:14

---

**V**

**variation** 39:16

**version** 143:6

**versions** 20:8 135:5

**versus** 74:13

**vicinity** 134:8

**video** 33:22 45:3, 7,10,11 56:19 59:12,13,15 61:22 62:1 65:21 77:10,11 78:3 79:4 80:5 81:16 82:15,22 100:11 102:10,17 103:6, 8 105:11 106:21 117:21 118:11, 13,15 136:22 138:20 139:4 141:19

**videos** 31:21 45:5 46:3 82:14 83:24 102:20,22,24 103:11,15 105:7, 9 106:24 116:16, 19,20

**view** 20:21 82:2

**viewed** 103:5,7

**violated** 114:13, 18

**violates** 113:24

**violation** 112:16, 20 113:1

**violations** 112:11, 13

**22:20 25:19 38:23 44:23 47:14 59:7,11 61:13,14 64:8 116:12,15 119:1 120:11,18 121:7 123:2,9,21 133:14 137:3,8 138:1**

**virtual** 19:4 28:20 42:22 46:13 53:9

**virtue** 56:17

**volume** 19:17 66:16

---

**W**

**waive** 143:21

**waived** 144:2

**wanted** 33:14 143:1

**watch** 31:10

**watched** 102:16, 20,23

**watching** 116:19

**water** 30:20

**ways** 113:23

**wear** 138:17 140:4,13

**Web** 15:13 16:9 17:18 28:16 57:8

**week** 142:22

**weeks** 8:13 17:15

**Wes** 5:19 50:6 133:9

**west** 128:11

**White** 126:24 127:2

**winnow** 64:11

**winnowed** 64:5

**winnowing** 70:12, 17

**withdrawn** 49:14 73:7 90:23

**withhold** 123:5

**witnesses** 18:9 34:1 80:6

**wondering** 51:15

**Wood** 15:12 28:16 98:6

**wooden** 59:14 60:4,18,20 61:2, 11,16 62:5,6,22 117:14 120:3,13 121:9 122:7 125:18 129:15,19 130:12

**Woods** 16:10 115:23

**word** 63:1

**worded** 98:18 99:1

**wording** 98:16

**words** 79:16 99:6 104:13

**wore** 140:24 141:1,3

**work** 19:1 20:18 22:8 23:3,11,12 24:9,13,21 25:1 31:24 33:19,22 40:21 68:12,15

**91:17 124:6 137:4**

**workbook** 85:20

**worked** 12:2 57:5 69:2 124:7

**working** 10:19 24:17 40:16,19 41:10 68:17 86:17 95:11

**works** 49:16

**worn** 140:21

**worried** 74:16

**worries** 142:9

**worthy** 39:5

**Wozniak** 67:11, 14,20

**wrapping** 87:21

**writing** 38:17 39:8,12

**written** 44:9 66:5 125:2

**wrote** 99:9,11 107:3,4 133:2 137:11,12

---

**Y**

**years** 7:1 12:3,9, 16

---

**Z**

**Zoom** 5:19 35:2,6, 10 42:24 51:19

# USE OF FORCE REPORT
## COLUMBUS DIVISION OF POLICE

| Incident # | | I.A.B. # |
|---|---|---|
| 200391487 | | |

| Officer Last | First | Middle | Badge | Assignment | Age | Sex | Ht | Wt |
|---|---|---|---|---|---|---|---|---|
| George | Mark | A. | 105 | In/Tac | 51 | M | 5'9 | 215 |

| Suspect Last | First | Middle | DOB | SSN | Age | Sex | Ht | Wt |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Date | Time | Location | Zone/Pct | |
|---|---|---|---|---|
| 5/31/2020 | 8:10PM | E. State St./ S. High St. | 5/16 | ☐ Dispatched Run ☐ Self-Initiated ☐ Other / ☐ Injury to Suspect ☐ Injury to Officer ■ No Injury Reported |

☐ Occurred after a pursuit or use/attempted use of a stopping tactic.

## AGGRESSIVE/RESISTIVE SUBJECT ACTIONS

☐ Verbal or Physical Danger Cues  ☐ Not Responding to Commands  ☐ Refusing to Move-Dead Weight  ☐ Pulling Away From Officer  ☐ Running From Officer
☐ Pushing Officer  ☐ Wrestling With Officer  ☐ Striking or Kicking Officer  ☐ Assaulting Third Party  ☐ Life Threatening Weaponless Assault
☐ Attempt to Disarm Officer  ■ Weapon Used Against Officer  ☐ Other

## LEVEL OF CONTROL - *CHECK ALL THAT APPLY*

☐ **Level 0:** Officer presence, verbal and non-verbal commands, search and handcuffing.
☐ Handcuffs gapped and double locked    ☐ Complaint of Injury from Handcuffing    ☐ Distraction Device    ☐ Taser sparked for compliance

☐ **Level 1: Empty Hand Control** (pressure point/joint manipulation/pain compliance)
PPCT:                                   E      I                        E      I              E      I
Joint Manipulation:                     ☐ Mandibular Angle              ☐ Jugular Notch       ☐ Hypoglossal
Grounding Technique:                    ☐ Escort Position (Locked Out)  ☐ Transport Wrist Lock ☐ Other _____
☐ Physically Placed on Ground           ☐ Arm Bar Take Down             ☐ Wrist Roll          ☐ Other _____

☐ **Level 2: Use of Chemical Spray**        E    I
                                            ☐    ☐

☐ **Level 3: Use of Electronic Device**     E    I
                                            ☐    ☐

☐ **Level 4: Hard Empty Hand Control** (strike/punch/kick)
Technique Used
        E   I                    E   I                    E   I
        ☐ Common Peroneal        ☐ Femoral                ☐ Tibial
        ☐ Suprascapular          ☐ Radial                 ☐ Median
        ☐ Brachial Plexus Origin ☐ Brachial Plexus Tie-In ☐ Other _____

☐ **Level 5: Use of Impact Weapon** (baton/flashlight)
Technique Used
        E   I                    E   I                    E   I
        ☐ Common Peroneal        ☐ Femoral                ☐ Tibial
        ☐ Radial                 ☐ Median                 ☐ Other_____

☐ **Level 6: Police K-9** (Bite Only)        E   I
                                             ☐   ☐

■ **Level 7: Less Lethal Control**
        E   I              E   I                    E   I
        ☐ Bean Bag         ☐ Multiple Baton Rounds  ■ Other 40mm sponge round _____

☐ **Level 8: Deadly Force**    E   I              E   I
                               ☐ Firearm          ☐ Other _____

## OFFICER-SUBJECT FACTORS/SPECIAL CIRCUMSTANCES

### OFFICER-SUBJECT FACTORS (CHECK ALL THAT APPLY)
☐ Age
☐ Size
☐ Sex
☐ Officer Skill Level
☐ Subject Skill Level
■ Multiple Subjects/Officers
☐ Relative Strength

### SPECIAL CIRCUMSTANCES (CHECK ALL THAT APPLY)
☐ Closeness of a Weapon
☐ Injury or Exhaustion
☐ Being on the Ground
■ Distance From the Subject
☐ Special Knowledge
☐ Availability of Other Options
■ Environmental Awareness
☐ Subject Handcuffed

**All of the Above Must Be Articulated in Narrative**

U-10.128 (12/2017)

E = Effective
I = Ineffective

| Witness Name | Address (and e-mail if available) | Zip | Home Phone | Work Phone |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |

**OFFICER NARRATIVE SUMMARY**          CONTROL LEVEL: 0☐ 1☐ 2☐ 3☐ 4☐ 5☐ 6☐ 7☐ 8☐
☐ U-10.100 Attached

Responded to E. State- S. High St. on a unruly group that had taken over the roadway on S. High St. in front of the State House. Protesters were throwing bottles of water and other projectiles at the bike officers as well as other field force officers were trying to clear the roadway. I deployed one (1) 40mm baton sponge round at a m/b 30's who was throwing bottles of water at police. The round struck him in the right buttocks.

Signature _Mark A. George #105_          Date _5/31/2020_

Officer Injury _____

　　　　Treated By _____

Suspect Injury _____

　　　　Treated By _____

☐ Injury Prior to Police Contact  (☐ Minor  ☐ Serious)          ☐ Minor Injury to Suspect

**SUPERVISOR REVIEW (USE PAGE 5 IF NECESSARY)**

☐ Use of Chemical Spray Justified and Within Policy   ☐ CVS Used   ☐ BWC Used   ☐ Other Video_____   ☐ Investigative Letter

Supervisor Signature _____          Date _____

**REVIEWING SUPERVISOR-FORWARD REPORT AND U-10.100 TO I.A.B.**

# Data Processing Worksheet – Columbus Division of Police
## Side A
**(Complete one worksheet for each employee involved with the incident. This includes sides A and B)**

## Section I - Incident Information:

**Classification of Incident (check all that apply):**
- ☐ Forced Entry (complete subsection A)
- ☐ Use of Force – Level: 0 - 1 with a complaint of an injury caused by such (complete subsection D)
- ☑ Use of Force – Level: 2 - 8 (complete all subsections that apply in section IV)
- ☐ Untrained Response – Personal Emergency (complete all subsections that apply in section IV)
- ☐ Injury to Prisoner / Injury Prior to Police Contact (complete subsection D)
- ☐ Discharge of Firearm – Not a Use of Force (complete subsection E)
- ☐ Strip / Body Cavity Search (complete subsection F)
- ☐ Internal Investigation (complete subsection G)
- ☐ Information Only (complete subsection H)
- ☐ Police Vehicle Accident – No property damage or any visible or claimed personal injury, or the damage to the police vehicle is the result of pushing or towing any disabled vehicle (complete subsection H)
- ☐ Vehicular Pursuit (complete subsection H)
- ☐ Use or Attempted Use of Stopping Tactic (complete subsection H)

**Basic Incident Information:**
Date: 05/31/20

Time: 8:10pm

Incident #: 200391487

**Location of Occurrence (check one):**
- ☑ Precinct # 16
- ☐ Headquarters
- ☐ Radio Room
- ☐ Foreign Jurisdiction
- ☐ Impound Lot
- ☐ Unknown

**Incident Location (check one):**
- ☑ Street / Alley
- ☐ Private Residence / Property
- ☐ Public Building / Property
- ☐ Business Building / Property
- ☐ Bar
- ☐ Police Headquarters
- ☐ Police Substation
- ☐ Police Impound Lot
- ☐ Police Vehicle
- ☐ Jail / Correction Facility
- ☐ Court
- ☐ Police Radio Room
- ☐ Property Room
- ☐ Other
- ☐ Hospital
- ☐ Unknown

**Incident Description (check one):**
- ☐ Traffic Incident
- ☐ Demonstration / Riot
- ☐ Domestic Disturbance
- ☐ Crime Committed
- ☐ Routine Duty / Patrol
- ☐ Disturbance / Fight
- ☐ Call for Service
- ☐ Narcotics Complaint
- ☐ Administrative Issue
- ☐ Vice Complaint
- ☐ Juvenile Complaint
- ☐ Request for Information
- ☐ Radio Transmission
- ☐ Warrant Service / Arrested
- ☐ Investigation
- ☐ Tactical Deployment
- ☐ Mentally Ill Person
- ☐ Chain of Command Review
- ☐ Other
- ☐ EARS Review

## Section II - Complainant/Suspect/Subject Information:

Name: Crowd

Street:

City/State/Zip:

Phone:

Phone:

Sex: _____ Age: _____

**Race/Ethnicity (check one):**
- ☐ Asian
- ☐ Black
- ☐ Hispanic
- ☐ White
- ☐ Other
- ☐ Unknown

**Medical Status (check one):**
- ☐ N/A
- ☐ No Injury
- ► Injury / Claimed Injury
- ☐ No Treatment Required
- ☐ Refused Treatment
- ☐ Treated by Squad / Medic
- ☐ Treated and Released by Hospital
- ☐ Hospitalized
- ☐ Killed
- ☑ Unknown

## Section III - Personnel Information:

**Employee:**
Name: Mark George

Badge: 105

Assignment: In/Tac

**Classification (check one):**
- ☑ Sworn: Rank: Officer
- ☐ Non-Police Personnel
- ☐ Non-Sworn Employee
- ☐ Reserve Officer
- ☐ Unidentified

**Duty Status (check one):**
- ☑ On Duty
- ☐ Off Duty
- ☐ Special Duty
- ☐ Secondary Employment
- ☐ Unknown

**Employee's Action at Time of Incident (check one):**
- ☐ Directing Traffic
- ☐ Issuing Citation
- ☐ Issuing Warning
- ☐ Committing Crime
- ☐ Making Arrest
- ☐ Serving Warrant
- ☐ Transporting
- ☐ Processing / Handling Prisoner
- ☐ Handling Property
- ☐ Patrolling
- ☐ Observing
- ☐ Investigating and/or Questioning
- ☐ Operating Vehicle
- ☐ Receiving Calls for Service
- ☐ Dispatching
- ☐ Conversing / Corresponding
- ☐ Tactical Entry
- ☑ Other
- ☐ Unknown
- ☐ Performing Routine Duties

**Employee's Medical Status (check one):**
- ☑ N/A
- ☑ No Injury
- ► Injury / Claimed Injury
- ☐ No Treatment Required
- ☐ Refused Treatment
- ☐ Treated by Squad / Medic
- ☐ Treated and Released by Hospital
- ☐ Hospitalized
- ☐ Killed
- ☐ Unknown

# Data Processing Worksheet – Columbus Division of Police
## Side B
### (Check all boxes that apply)

**Section IV - Type of Incident(s) to Assign to this Specific Employee:**

**(A) Forced Entry:**
☐ SWAT
☐ INTAC
☐ Patrol

**Action:**
☐ Serving Warrant
☐ Making Arrest
☐ Emergency Situation

**Disposition (check one):**
☐ Within Policy
☐ Outside Policy

**(B) Level 2 - Use of Mace:**
☐ Individual Issued Mace
☐ Tactical Unit Ordnance
☑ Field Force Ordnance

**Injury Severity:**
☐ Exposure to Mace
☐ No Injury / No Exposure
☐ Unknown

**Medical Status:**
☐ No Treatment Required
☐ Refused Treatment
☐ Treated by Medic #: _____
► For known adverse reactions complete Subsection (D)

**Disposition (check one):**
☑ Within Policy
☐ Outside Policy

**(C) Levels 3 and Above:**
☐ Level 3 – Electronic Device (Complete Subsection (D) if a transport was made for barb removal)

*Also complete Subsection (D) for the below Levels if injured or an injury is claimed

► **Level 4**
☐ Pushing / Causing Collision (higher than Level 1)
☐ Strike / Punch / Kick

☐ **Level 5 – Use of Impact Weapon**

► **Level 6 – Canine Bite**

► **Level 7 – Less Lethal Control**
☐ Special Ordnance
Ordered by: _____
☐ Other: _____

► **Level 8 – Deadly Force**
☐ Firearm – Defense of Self
☐ Firearm – Defense of Others
☐ Firearm – Fleeing Felon
☐ Firearm – Warning Shots

☐ Firearm – Other: _____
☐ Other: _____

☐ Untrained Response – Personal Emergency
Technique: _____

**Disposition (check one):**
☐ Within Policy
☐ Outside Policy

**(D) Injury to Prisoner:**

**Type of Injury:**
☐ Injury Prior to Police Contact (note - if only using this category in Subsection D omit employee's name on side A)
☐ Injury During Pursuit, Arrest Made
☐ Injury During Pursuit, No Arrest Made
☐ Injury During Arrest
☐ Injury After Arrest (Transporting / Processing)

**Injury Severity:**
► Minor Injury (Injury that does not require transport to a medical facility)
☐ Claimed Injury (none visible)
☐ Visible Injury
► Serious Injury (Injury that requires transport to a medical facility for treatment)
☐ Claimed Injury (none visible)
☐ Visible Injury
☐ Death in Police Custody

**Medical Status:**
☐ No Treatment Required
☐ Refused Treatment
☐ Treated by Medic # _____
☐ Treated and Released by Hospital
☐ Hospitalized
☐ Killed
☐ Unknown

**Disposition (check one):**
☐ Within Policy
☐ Outside Policy

**(E) Discharge of Firearm:**

**Type of Discharge:**
☐ Intentional
☐ Unintentional
☐ Animal (Defense of Self / Others)
☐ Animal (Humane Destruction)

**Disposition (check one):**
☐ Violation of Policy
☐ Not in Violation of Policy

**(F) Strip / Body Cavity Search**
Authorized by:
Name: _____

Badge: _____

Assignment: _____

**Disposition (check one):**
☐ Within Policy
☐ Outside Policy

**(G) Internal Investigation:**
Date Division Gained Knowledge: _____

**Investigating Supervisor:**
Name: _____ IBM: _____

Assignment: _____

**Investigator / Complainant's Status (check one):**
☐ Immediate Supervisor
☐ Division Employee
☐ Chain of Command
☐ Administrative Personnel
☐ Non-Division Personnel

**Nature of Allegation(s) / Investigation:**
☐ City Work Rule: _____
☐ Rule of Conduct: _____
☐ Division Directive: _____
☐ Bureau SOP

Bureau: _____

SOP: _____

Page: _____

**Disposition (check one):**
☐ Within Policy
☐ Outside Policy

**(H) Information Only:** _____

☐ Police Vehicle Accident    ☐ Vehicular Pursuit    ☐ Use or Attempted Use of Stopping Tactic

**Section V - Comments:**

Completed By: _Sergeant Patrick Shaffer #5161_    Assignment: _IN/TAC_

# Investigation Report
# for Use of Force Incidents During Protests
### August 28, 2020

**To:**      Chief Quinlan

**From:**   Mark Hatcher and Allison Thomas, Baker Hostetler

**Subject:**  Complaint No. BH 19 (fka as BH 219)

**Re:**      Citizen Complaint by Icarus Crandall against Non-CPD Officers

---

| | |
|---|---|
| **Name of Complainant:** | Icarus Crandall |
| **Complainant's Contact Information:** | icarusc310@gmail.com |
| **Any Charges:** | None |
| **Date Email Received:** | June 1, 2020 |
| **Date of Alleged Incident:** | May 31, 2020 |
| **Time of Alleged Incident:** | 7:55 pm |
| **Location of Incident:** | 20 E. Broad Street |
| **Involved Officers:** | Non-CPD SWAT Officers |
| **Other Witnesses:** | Unknown |
| **Weapons Involved:** | Level 2 Chemical Spray |
| **Injuries:** | Unknown |
| **Medical Treatment:** | Unknown |

### Circumstances of Incident

Complainant Icarus Crandall alleges that on May 31, 2020 near 20 E. Broad Street, an unknown officer threw a chemical agent grenade across High Street toward protesters standing on the sidewalk.

<u>Allegation I</u>

<b>Non-CPD SWAT Officer Used Excessive Force against Unknown Protestors<br>by Level 2 Chemical Spray</b>

<u><b>Response to Allegation</b></u>

On June 1, 2020, Complainant Icarus Crandall submitted a report to ReportCPD@columbus.gov stating, "When protestors were retreating from shots from CPD, I was able to capture this video." Crandall submitted a 23-second video showing an officer in green fatigues throwing a chemical agent grenade across the street (and over vehicle traffic) onto the sidewalk.

**Summary of Crandall Interview**

Crandall was interviewed on July 28, 2020 at 8:00 a.m. regarding his allegations. He confirmed the date and location of his allegations as May 31, 2020 at 20 E. Broad Street. He said he was standing with a few friends from college. None of these individuals have photos or videos from the date and time in question.

Crandall and his friends arrived downtown between 6:45 p.m. and 7:00 p.m. When they arrived, Crandall did not see a heavy police presence, other than the troopers standing near the Ohio Statehouse.

Crandall said he lined up near the intersection of Broad and High Streets with other white protestors to form a barrier in front of the crowd. He said he saw a protestor throw a half-empty water bottle at police officers, which caused them to move forward and to fire wooden batons. Crandall said he heard a warning to leave the area after the officers fired wooden batons but not before. Crandall said that after the officers fired the wooden batons, the protestors moved back to the sidewalk and additional officers arrived in an armored truck. At that moment, Crandall took the video he attached to his initial email. After taking the video, he and his friends left the protest. They heard later that the police used a pincher attack. Crandall did not experience or witness this "attack." Crandall states that two other cannisters were thrown thereafter. The officers also fired a second round of wooden batons.

Crandall did not know whether Columbus police officers are the officers in his video. He said all of the officers using force wore the same "camo-gear" as the officers in the video.

**Summary of Crandall's Video**

In Crandall's 23-second video, one officer in green fatigues is seen throwing a chemical agent grenade from behind the armored truck across High Street, over traffic, toward protestors on the sidewalk.

**Summary of Sergeant Bray's After-Action Report**

Sergeant Bray's After Action Report states that, on May 31, 2020, officers were deployed to the "downtown area" with additional SWAT assets in an armored bearcat to support the patrol's field force operations. During their deployment, they encountered riotous crowds and protestors throwing rocks, bricks, bottles, hard objects, and fireworks at the officers. The crowds refused to

disperse following multiple dispersal warnings. During their deployment but at an unknown time, SWAT was called to Broad and High to disperse a large crowd that had taken over the intersection.

## Investigator's Comments

Attached to this investigation:

- A copy of Crandall's email complaint to ReportCPD@columbus.gov and the referenced video.
- Correspondence between BakerHostetler and the Complainant.
- Correspondence between BakerHostetler and the City.
- A copy of the July 28, 2020 Interview with Complainant.
- A copy of the After Action Report completed by Sergeant Scott Bray.

Through processes established for identifying officers, on July 28, 2020, BakerHostetler submitted an image from Crandall's video of the unknown officer to CPD for purposes of identification. On July 31, Deputy Chief Bash confirmed that CPD SWAT officers sometimes wear fatigues. However, CPD determined that the subject officer was "Not CPD SWAT."

## Investigator's Recommendation of Finding

## Allegation I

## Non-CPD SWAT Officer Used Excessive Force against Unknown Protestors by Level 2 Chemical Spray

Crandall stated all the officers he observed using force that day wore the same uniform as depicted in his video. The officers shown in the video have been identified as non-CPD SWAT officers; therefore, they are not employed by or required to follow CPD's policies or directives.

Alleged Level of Control: **Level 2 Chemical Spray.**

Recommended disposition: **Unfounded.**

The evidence indicates that the allegation of excessive force is refuted by a preponderance of the evidence with respect to Allegation I. BakerHostetler recommends that this Complaint be forwarded to the entity responsible for deploying additional SWAT assets as stated in Sergeant Bray's report.

Respectfully submitted,

Mark Hatcher
Allison Thomas
BakerHostetler

# Investigation Report
# for Use of Force Incidents During Protests

September 1, 2020

**To:**  Chief Quinlan

**From:**  Mark Hatcher and Allison Thomas, BakerHostetler

**Subject:**  Complaint No. BH 209

**Re:**  Citizen Complaint against Unknown Officer

---

**Name of Complainant:**  Bernadette Calvey

**Complainant's Contact Information:**  bcalv3@gmail.com / 440-413-5530

Ms. Calvey should be contacted through her attorney Jeff Vardaro at The Gittes Law Group, 723 Oak Street, Columbus, OH 43205 (614) 222-4735, jvardaro@gitteslaw.com

**Any Charges:**  None

**Date Email Received:**  June 3, 2020

**Date of Alleged Incident:**  May 30, 2020

**Time of Alleged Incident:**  9:00 p.m. (approximately)

**Location of Incident:**  Intersection of High Street and 2nd Avenue

**Weapons Involved:**  Level 7 Less Lethal Control & Level 2 Chemical Spray

**Injuries:**  Contusion to chin/jaw

**Medical Treatment:**  None

### Circumstances of Incident

Complainant Bernadette Calvey alleges that, on May 30, 2020 around 9:00 p.m., police used excessive force resulting in her being struck in the face with a suspected wooden baton near the intersection of High Street and 2nd Avenue. Calvey also alleges tear gas deployed from the projectile caused a temporary loss of sight. As a result of her injury, Calvey alleges she was unable to eat solid foods or work for a several days.

### Allegation I

**Unknown Officers Used Excessive Force against Bernadette Calvey by Level 7 Less Lethal Control and Level 2 Chemical Spray.**

### Response to Allegation

#### Summary of Complaint

On June 3, 2020, Complainant Bernadette Calvey submitted a complaint to ReportCPD@columbus.gov. The complaint stated:

> My name is Bernadette Calvey and I am a student at The Ohio State University. On Saturday May 30th, 2020, I was standing on the sidewalk on the corner of high street and a side street in the short north at roughly 9pm when I was shot in the face by the Columbus police department with a wooden bullet that exploded tear gas. Once shots were fired, immediately everyone ran in fear, I ran down an ally and hid while other protestors were attempting to give me aid. During this time the police continued to shout threats to get us to leave, I was bleeding, blinded from the tear gas, and terrified, I quickly made my way over to a friends house with the aid of other protestors.

> It is now June 3rd, 2020 and I was just able to eat solid food today. I had to call off work because of the pain losing 20 hours of work or roughly $300. I have provided pictures below of my injuries and a video documenting the distance away I was standing.

> This was a peaceful protest before curfew, while there I witnessed no destruction of property or injuries caused by the protestors and the Columbus Police Department used excessive force to strip our first amendment. The Columbus Police Department needs to be held accountable for its harmful actions against the people they are suppose to protect.

#### Summary of Interview of Calvey

On August 18, 2020, BakerHostetler interviewed Calvey about her allegations. Calvey's legal counsel, Jeff Vardaro, participated in the interview. Calvey said she and her roommate, Ellie Henze, went to the protest around 9:00 p.m. on May 30, 2020. She stood on the corner of High Street and 2nd Avenue. Police and protestors stood in the street. Calvey said there were not a lot of people in the area and the atmosphere was peaceful. The police were in a line across High Street, facing north, just south of the intersection. The police wore riot gear with helmets and shields. Calvey did not notice whether the officers had bicycles. She was not close enough to see any identifying information. Calvey saw the wagon parked nearby. She heard shouting but did not see anything thrown. Calvey wore a black shirt and jean shorts. Calvey cannot remember what her roommate wore.

A few minutes after she arrived, police deployed wooden batons that hit her chin and exploded on contact. Calvey's eyes burned and she coughed, thus, she believed the projectile contained tear

2

gas. White residue was left on her shirt after impact. At the time, Calvey looked in the direction where the shots came from, but she cannot remember whether she saw what or who shot the projectile.

Calvey and her roommate ran west on 2nd Avenue then turned right up the first alley. Calvey could not see anything due to effects of the gas. Calvey's roommate did not suffer from effects of chemical spray. At that point, Calvey heard an amplified warning to leave the area or face arrest. Calvey and her roommate ran back to their house.

Calvey did not seek medical treatment for her injuries, however, she could not work or eat solid food for about a week due to the impact to her jaw. Calvey did not have ongoing effects to her eyes or respiratory system. She could see and breathe normally within 30 minutes of her injury.

**Summary of Photographs Submitted by Calvey**

On August 18, 2020, Calvey submitted four photographs. The first photograph shows a hand holding a wooden baton. Calvey believes this is representative of what struck her based on the fact that the baton lined up with the marks on her face. A different protestor picked the baton up from the ground on May 30, 2020, but Calvey does not believe this is the actual projectile that struck her. The remaining photographs are of Calvey's injury and show bruising and an abrasion to her chin.

**Summary of Video Submitted by Calvey**

On August 18, 2020, Calvey submitted a seven-second video that Calvey's roommate, Ellie Henze, filmed. The video briefly shows protestors and police in the distance on High Street. Shortly thereafter, popping noises can be heard and the video cuts to the ground. Calvey said the video shows the moment she was struck.

**Summary of After Action Reports**

BakerHostetler reviewed After Action and Use of Force Reports completed for May 30, 2020 around 9:00 p.m. in the Short North area. None indicate uses of force at the location of High Street and 2nd Avenue. A brief summary of potentially relevant reports is below:

Lt. Larry Yates (#5080): Lt. Yates' After Action Report stated that, on May 30, 2020, at 9:00 p.m. in the area of High Street and Poplar Avenue, officers deployed chemical spray and multiple baton rounds for a large group of violent protestors refusing to disperse and leave the area. The report described protestors breaking building windows, throwing water bottles, throwing chunks of concrete, building barricades with construction fences, and setting fires in the middle of North High Street. After dozens of warnings were provided and officers were struck with thrown objects, officers deployed 37 mm batons to disperse the crowd on N. High Street near Russell Street and Hubbard Avenue. This location is approximately 0.3 – 0.7 miles south of 2nd Avenue.

Lt. Charles P. Waldenga (#5056): Lt. Waldenga stated that, on May 30, 2020 at approximately 8:00 p.m., his field force was deployed to N. High Street and Nationwide Blvd. then continued northbound on High Street where they discovered multiple fires, broken windows, looted businesses, vehicle damage, and graffiti. At approximately 11:00 p.m., the field force was in the

area of N. High Street and 5th Avenue when it encountered pedestrians in the roadway who refused to leave until officers used Mark-9 chemical spray.

Other reports reviewed from Lt. Edward P. Hasson (#5084), Lt. Scott Bray (#5237), Lt. Nick Konoves (#5040) and Lt. Lowell Rector (#5090) report Level 2 or Level 7 uses of force on May 30, 2020 around 9:00 p.m. in the downtown area near Broad Street and High Street.

**Summary of Event Chronology for May 30, 2020 (P200388834)**

On May 30, 2020 at 8:55 p.m., the event chronology states, "Going north Russell/High . . . County will be spraying and knocking from West and North and making arrest."

## Investigator's Comments

Attached to this investigation:

- A copy of the email submitted by Calvey to ReportCPD@columbus.gov.
- A copy of correspondence between BakerHostetler and Calvey.
- A copy of correspondence between BakerHostetler and CPD.
- A copy of the recorded interview of Calvey taken August 18, 2020.
- A copy of After Action Reports reviewed.
- A copy of the Event Chronology for May 30, 2020 (P200388834).

BakerHostetler emailed Calvey on July 9, 2020, July 16, 2020, and July 20, 2020 regarding her complaint. Calvey did not respond. Thereafter, BakerHostetler learned that Calvey filed a civil lawsuit captioned *Alsaada, et al. v. City of Columbus, et al.*, S.D. Ohio No. 2:20-cv-3431.

BakerHostetler emailed Calvey's legal counsel on August 6, 2020, August 10, 2020 and August 13, 2020, requesting additional information about Calvey's complaint. On August 13, 2020, Jeff Vardaro, Esq., indicated he would reach out to Calvey to see if she wanted to participate in an interview. Calvey completed an interview on August 18, 2020 with Mr. Vardaro's representation.

## Investigator's Recommendation of Finding

## Allegation I

**Unknown Officers Used Excessive Force against Bernadette Calvey by Level 7 Less Lethal Control and Level 2 Chemical Spray.**

On May 30, 2020 around 9:00 p.m., Calvey alleges unknown officers in riot gear positioned near High Street and 2nd Avenue used Level 7 and/or Level 2 use of force which struck her chin while she stood on the sidewalk. Calvey reported hearing dispersal announcements afterward. Because Calvey was only in the area for a few minutes, it is difficult to know what took place before Calvey was injured. Officer identification is also difficult because Calvey could not see who used force, and none of the After Action or Use of Force Reports completed that evening report a Level 2 or Level 7 use of force around 9:00 p.m. on May 30, 2020 at the area of High Street and 2nd Avenue. Although Calvey likely was struck in the chin by a Level 7 wooden baton, BakerHostetler is not

able to identify involved officer(s). Under these circumstances, BakerHostetler concludes the allegation of excessive force is refuted by a preponderance of the evidence.

Alleged Level of Control: **Level 2 Chemical Spray & Level 7 Less Lethal Control**

Recommended disposition: **Unfounded**

Respectfully submitted,

Mark Hatcher
Allison Thomas
Baker Hostetler

**NED PETTUS, JR., Ph.D.**
Director



THE CITY OF
**COLUMBUS**
ANDREW J. GINTHER, MAYOR

DEPARTMENT OF
PUBLIC SAFETY

June 23, 2020

Ex. P57

To:        Mayor Andrew J. Ginther

From:      Ned Pettus Jr., PhD.    $\mathcal{NP}$
           Public Safety Director

Re:        **Systematic review process to address Use of Force Complaints received via ReportCPD@columbus.gov**

On June 1, 2020, Mayor Ginther created an email account, reportCPD@columbus.gov, for the public to report any complaints about the actions of the Columbus Division of Police in regards to ongoing protests. The purpose of this memorandum is to outline a systematic review process to thoroughly address these voluminous complaints. The investigation portion of this review will not be conducted by the Internal Affairs Bureau (IAB) of the Columbus Division of Police; rather, investigations will be undertaken by the Department of Public Safety pursuant to Article 8 of the Collective Bargaining Agreement (CBA) with the Fraternal Order of Police. Specifically, the Department of Public Safety will contract with a law firm(s) to conduct the investigation.

This memorandum will outline a process to review these complaints from intake, to investigation, and disposition. Lastly, it must be noted that pursuant to Section 8.14 of the CBA that the "investigation of citizen complaints shall be concluded within ninety (90) days after the date the complaint was received by the City." Therefore, time is of the essence given the great volume of complaints received.

I.        INTAKE:

A. Duties:

The function of Intake is to: a) to initiate the systematic tracking of all complaints received b) to review all complaints to determine whether excessive use of force investigation is alleged c) if an excessive use of force is alleged then assign to a law firm(s) who is contracted by and works under the auspice of the Office of the Public Safety Director to conduct the investigation d) if excessive force is not alleged then the complaint will be forwarded to the appropriate resource.



**NED PETTUS, JR., Ph.D.**
Director



THE CITY OF
**COLUMBUS**
ANDREW J. GINTHER, MAYOR

DEPARTMENT OF
PUBLIC SAFETY

With respect to the systematic tracking of complaints, an Excel spreadsheet shall be created which tracks the approximate 815 emails received as of June 18, 2020. This spreadsheet shall depict, at a minimum, the following categories: Complaint Number; Date Email Received; Time Received; Email address; Name of Complainant and Contact Information; Location of Incident; Category of Complaint (drop down box with the following sub-categories: 1. Use of Force Complaint; 2. General Complaint on Use of Force Tactics/Policy; 3. Complaints regarding Mayor Ginther, Other elected officials, or Chief Quinlan); 4.Complaints, Non-Use of Force (e.g. Rudeness, Unprofessionalism) – Refer to DC Bash/IAB; 5. Complaints regarding Social Media Content – Refer to Sgt Fuqua; 6. Complaints regarding Arrests/Requests for Review of Criminal Charges – Refer to City Attorney's Office; 7. Possible Threats to Officers – Refer to Deputy Chief Bodker; 8. Public Records Requests; 9. Spam/Email Account Used to Sign Up for Websites – Refer to Department of Technology; 10. Duplicate Emails; 11. Lewd; 12. Investigator Assigned; 13. Refer for Criminal Investigation (yes or no drop down); 14. Refer for Administrative Investigation (yes or no drop down); and 15. Disposition and Date (narrative on action taken)

B. Composition:

The intake duties shall be performed by Kathleen Bourke, Assistant Director of EEO Compliance, Office of the Director Department of Public Safety. Assistant Director Bourke shall receive assistance from Joe Gibson, Deputy Chief Prosecutor for the City Attorney's Office. Deputy Chief Prosecutor Gibson shall determine if any of the use of force complaints rise to the level wherein they should be referred for criminal investigation by a law enforcement agency.

II.     INVESTIGATION:

A. Criminal:

If Deputy Chief Prosecutor Joe Gibson believes that a use of force on the part of an officer rises to the level wherein the case should be referred for criminal investigation by a law enforcement agency then a referral shall be made to a law enforcement agency other than the Columbus Division of Police. Such a referral shall suspend any further administrative investigation until the conclusion of the criminal inquiry. Thereafter, the case may once again be reviewed administratively.





**NED PETTUS, JR., Ph.D.**
Director

B. Administrative:

If an excessive use of force is alleged then Assistant Director Bourke shall assign the case to outside law firm(s). The law firm(s) will work under the auspice of the Office of the Public Safety Director to conduct the investigation and render a recommended disposition of the assigned complaints.

The recommendation for the retention of law firm(s) is for a variety of reasons. First, we will not be utilizing the Internal Affairs Bureau (IAB) as Lead Investigators so as to ensure greater transparency and public accountability to our residents who are demanding change in the investigation of Use of Force Complaints. IAB would only be utilized at the discretion of the law firm(s) for logistical purposes such as helping to procure and collect audio or visual recordings or any other tasks deemed necessary by the law firm(s). Second, given the tremendous number of complaints the Department of Public Safety simply does not have the internal resources to thoroughly investigate in accordance with the contractual limitations of Section 8.14 of the CBA. This Section mandates that the "investigation of citizen complaints shall be concluded within ninety (90) days after the date the complaint was received by the City."

At the outset of engagement, the Columbus City Attorney's Office review shall review with the law firm(s) the Division of Police policies and directives regarding Use of Force. Likewise, the pertinent provisions of the Collective Bargaining Agreement pertaining to investigations will be reviewed

Lastly, during the course of investigating the assigned complaints the law firms(s) shall also investigate any other acts of excessive force discovered during the course of their investigation of the protests.

III. DISPOSISTION:

The law firm(s) work will ultimately culminate with the preparation of a written report recommending the disposition of the complaints. Specifically, the law firm(s) will recommend that complaints of excessive force are:

    i)     Sustained: The allegation of excessive force is supported by a preponderance of evidence.

    ii)    Not Sustained: The allegation of excessive force is not supported or refuted by a preponderance of evidence.



**NED PETTUS, JR., Ph.D.**
Director

THE CITY OF
**COLUMBUS**
ANDREW J. GINTHER, MAYOR

DEPARTMENT OF
PUBLIC SAFETY



iii)     Unfounded: The allegation of excessive force is refuted by a preponderance of the evidence.

iv)     Exonerated: The evidence indicates that force occurred but the actions were lawful and no misconduct was substantiated.

v)     Withdrawn: The Complainant retracted their allegation(s).

This recommended disposition will then be routed for consideration pursuant to Article 10 and any other pertinent provisions of the CBA.



**<u>Evidence Reviewed for Columbus Use of Force Investigations</u>**

1. Use of Force Reports/U-10-128 from May 28, 2020 to date related to City's response to protests
2. Chain-of-command investigative files
3. List of all sworn officers, badge numbers, rank, job, gender, ethnicity, age, and service years up to 6/10/20
4. Emergency Operations Center Daily Notes from May 31, 2020 to date related to City's response to protests
5. Roll Call Reports and audio files of roll call for June 2, 2020
6. Active Response to Resistance Reports from May 28, 2020 to date relating to City's response to protests
7. Arrest Information/U-10-100 from May 28, 2020 to date relating to City's response to protests
8. Videos collected from private and public entities downtown (Ohio Statehouse, any courts, Ohio Department of Transportation, Ohio State University, Gateway) from May 28, 2020 to date
9. National Incident Management System data from May 28, 2020 to date
10. Taser Aftercare Forms from May 28, 2020 to date related to City's response to protests
11. Injury to Prisoner Forms from May 28, 2020 by CPD personnel assigned to assist with City's response to protests
12. Training materials: 2019 Legal In-Service Training
13. Emergency Operations Manual
14. Division Directives
15. Cruiser camera footage related to response to protests from May 28, 2020 to present
16. Body camera video footage of officers assigned to assist with response to protests from May 28, 2020 to present
17. City camera footage of Broad and High, Broad and Front, LeVeque Tower, Riffe building etc. for May 28, 2020 to present
18. Preliminary Investigation Reports from May 28, 2020 to present related to response to protests
19. Rosters from May 28, 2020 to date related to City's response to protests
20. Arrest files for particular individuals identified by citizen complaints
21. Official ten code sheet
22. CPD radio channel recordings for May 28, 2020 to present related to response to protests; mostly Channels 46, 54, and 73
23. ICS 202 – Incident Objectives
24. ICS 203
25. ICS 204 (Even Position & Call Sign – Rank/Name/Badge No. – Function) – for different operational periods from May 28, 2020 forward related to response to protests
26. ICS 205 – Local Communications Plans
27. ICS 207
28. ICS 208
29. Columbus Area Civil Disturbance Incident Action Plans

30. EOC Command Staff Schedule
31. Computer-Aided Dispatch (CAD) or Radio Run Reports from May 28, 2020 to date relating to City's response to protests
32. List of Commanders in June and July 2020
33. Civilian videos, usually cell phone, from May 28, 2020 to date relating to response to protests
34. Safety Message/sPlans
35. Organization Assignment lists
36. Task Force Operations for Civil Unrest
37. EOC and EMS Task Force Rosters
38. CFD Standard Operating Procedures for Civil Disturbances
39. After Action Reports, emails (DC Woods 214)
40. ICS 214
41. Lieutenants' Schedule
42. Go Pro Videos relating to response to protests
43. Intelligence – Social Media postings relating to demonstrations set to occur May 28, 2020 to date
44. Upcoming Ohio Protests (screenshots, posters, etc.) set to occur May 28, 2020 to date
45. OSP Helicopter Video, mostly from 5/30-6/2/20
46. Intelligence – photos of open carrying, surveillance from atop Leveque and other buildings from May 28, 2020 to date related to response to protests
47. Roll Call Powerpoints from 6/5/20 to 6/7/20
48. All arrests by CPD as of 7/5/20
49. Ordnance Grenadier Contact List 2020
50. Sector Map
51. 911 and non-emergency calls from May 28, 2020 to date related to City's response to protests
52. Employee IAB reports/IAB History
53. CPD Injured Officers Spreadsheet (updated to 6/21/20)
54. Operational Memos from May 28, 2020 to date related to response to protests
55. CPD Officer Photos
56. U-25.110 Field Force Rosters
57. CRT2 Roster
58. Incident Video Review
59. Case Information print-Outs from local courts
60. Incident Report Summaries
61. Event Information/Event Chronology
62. Personnel Database print-outs identifying Deputy Chiefs