UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TAMARA K. ALSAADA, *et al.*,      )
                                   )
  PLAINTIFFS,                      )      CASE NO. 2:20-CV-3431
                                   )
        vs.                        )
                                   )      VOLUME I OF VII
THE CITY OF COLUMBUS, *et al.*,    )
                                   )
  DEFENDANTS.                      )
_____)


TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VIA GOTOMEETING VIDEOCONFERENCING
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
FEBRUARY 22, 2021; 10:00 A.M.
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFFS:
        Marshall and Forman, LLC
        By:  EDWARD R. FORMAN, ESQ.
             HELEN M. ROBINSON, ESQ.
             JOHN S. MARSHALL, ESQ.
             MADELINE J. RETTIG, ESQ.
             SAMUEL M. SCHLEIN, ESQ.
        240 Civic Center Drive
        Columbus, Ohio  43215

        Walton and Brown, LLP
        By:  CHANDA L. BROWN, ESQ.
             SEAN L. WALTON, JR., ESQ.
        395 East Broad Street
        Columbus, Ohio  43215

        The Gittes Law Group
        By:  FREDERICK M. GITTES, ESQ.
             JEFFREY P. VARDARO, ESQ.
        723 Oak Street
        Columbus, Ohio  43205

APPEARANCES CONTINUED:

FOR THE PLAINTIFFS:
    Marshall and Morrow, LLC
    By:  LOUIS A. JACOBS, ESQ.
    177 19th Street
    Oakland, California  94612


FOR THE DEFENDANTS:
    Columbus City Attorney's Office
    By:  WESTLEY M. PHILLIPS, ESQ.
        ALANA V. TANOURY, ESQ.
        ANDRIA C. NOBLE, ESQ.
        JANET R. HILL ARBOGAST, ESQ.
        MICHAEL R. HALLORAN, ESQ.
        STEPHEN J. STEINBERG, ESQ.
    77 North Front Street
    Columbus, Ohio  43215

- - -

    Proceedings recorded by mechanical stenography, transcript produced by computer.

VOL. I –    3

1    MONDAY MORNING SESSION

2    FEBRUARY 22, 2021

3         – – –

4    THE COURT:  Ms. Clark, would you please call the case.

5    THE DEPUTY CLERK:  20-CV-3431, Tamara Alsaada, et al.

6    versus the City of Columbus, et al.

7    THE COURT:  Would Counsel please identify themselves

8    for the record beginning with Counsel for the plaintiffs.

9    MR. MARSHALL:  Good morning, Your Honor.  John

10    Marshall for the plaintiffs.

11    Do you want me to give the names of the other counsel

12    for the plaintiffs who are present or --

13    THE COURT:  Or they can identify themselves so that

14    Ms. Evans can get accustomed to the various voices.

15    MR. JACOBS:  Judge, Lou Jacobs here for the

16    plaintiffs.

17    THE COURT:  Okay.

18    MS. ROBINSON:  Good morning, Your Honor.  My name is

19    Helen Robinson with Marshall and Forman for the plaintiffs.

20    THE COURT:  What did you say your name was?

21    MS. ROBINSON:  Helen Robinson with Marshall and

22    Forman.

23    MS. BROWN:  Good morning, Your Honor.  This is Chanda

24    Brown for the plaintiffs.

25    MR. GITTES:  Your Honor, I don't know if I was muted

VOL. I –    4

1   or not.  I did actually try to speak.  Fred Gittes for the

2   plaintiffs.

3        MR. VARDARO:  And this is Jeff Vardaro from the Gittes

4   Law Group, plaintiffs.

5        MR. WALTON:  Good morning, Your Honor.  Sean Walton

6   for plaintiffs.

7        MR. RETTIG:  Good morning, Your Honor.  Madeline

8   Rettig for plaintiffs.

9        MR. FORMAN:  Good morning, Your Honor.  Ed Forman on

10  behalf of the plaintiffs.

11       MR. SCHLEIN:  And good morning, Your Honor.  Sam

12  Schlein on behalf of plaintiffs.

13       THE COURT:  Have we now identified all of plaintiffs'

14  counsel, Mr. Marshall?

15       MR. MARSHALL:  Yes, Your Honor.

16       THE COURT:  All right.  Counsel for the defense.

17       MR. PHILLIPS:  Good morning.  Westley Phillips for the

18  defense.

19       MS. TANOURY:  Good morning, Your Honor.  Alana Valle

20  Tanoury for the defense.

21       MR. STEINBERG:  Good morning, Your Honor.  Steve

22  Steinberg for the defense.

23       MR. HALLORAN:  Good morning, Your Honor.  Michael

24  Halloran for the defense.

25       MS. NOBLE:  Good morning, Your Honor.  Andria Noble

VOL. I –    5

1    for the defense.

2            THE COURT:  I believe that is all of defense counsel,

3    if I'm not mistaken.

4            One minor thing that is not so minor depending on your

5    perspective, but there's going to be a small – and I hope to

6    keep it as small as possible – tweaking on the schedule for

7    tomorrow.  And I meant to do this on Friday -- and don't ever

8    let her know that I didn't do this.  But I have to, over the

9    lunch hour tomorrow, take my mother to OSU for her second

10   injection, my 88-year-old mother.

11           So her appointment is at 12:40, but I have -- I've been

12   told if we get there early, they can get her in early.  So I

13   may want to take from 11:45 until 1:00 or 1:15 for lunch

14   tomorrow to take her up there and back.  That's the one thing

15   in which I have kind of no options.  There are some higher

16   powers than Article III, and moms are one of them.  I know that

17   you all know that and it doesn't require any additional

18   explanation.

19           I'm willing to do whatever is necessary to accommodate

20   everyone.  I didn't want to throw off any witness schedules.

21   And so to the extent that we have to work around that, please

22   let me know.  And because I created this, I will be more than

23   happy to be as flexible as possible to make sure that no

24   witnesses are inconvenienced as a result of that alteration of

25   schedule.

VOL. I -    6

1          So, Mr. Marshall, you can let me know at a break today

2     what we'll need to do, if anything, to accommodate that

3     alteration of schedule.

4              MR. MARSHALL:  Thank you.

5              THE COURT:  Okay.

6          We agreed at the final pretrial on Friday that there

7     would not be a -- there will not be opening statements.  The

8     Court has read the briefs.  And unless there are some

9     preliminary matters that we need to take up either from the

10    plaintiffs or from the defense, we can begin with the actual

11    taking of testimony at this time.

12         Mr. Marshall, are there any preliminary matters from the

13    plaintiff?

14             MR. MARSHALL:  No, Your Honor.  We're prepared to call

15    our first witness.

16             THE COURT:  Mr. Phillips, are there any preliminary

17    matters from the defense?

18             MR. PHILLIPS:  Only one, but it's a technical one,

19    Your Honor.  Janet Hill Arbogast from our office is on

20    currently, but apparently no one can see or hear her.  She just

21    let me know she is on.

22             THE COURT:  Okay.  Ms. Arbogast, are you -- you're

23    having trouble getting on by way of video, is that it?

24             MR. PHILLIPS:  That's my understanding, Your Honor.

25             MS. ARBOGAST:  Can you hear me now?

VOL. I –   7

1          THE COURT:  Yes, we can hear you.  But what I'm

2    curious about is are you going to be doing any witnesses,

3    Ms. Arbogast?

4          MS. ARBOGAST:  I may be doing cross on a couple.

5          THE COURT:  It will be difficult for you to be doing

6    cross as a blank screen.  The Court's preference would be to

7    see counsel who are conducting both the direct and the

8    cross-examinations.  Do you know whether the problem with your

9    video is on your end or is it on ours?

10         MS. ARBOGAST:  I'm not sure, Your Honor.  But I think

11   it's on my end, and I'm trying to get in touch with our IT

12   person.

13         THE COURT:  Are you in the office today or are you at

14   home?

15         MS. ARBOGAST:  I'm in the office, Your Honor.

16         THE COURT:  Okay.  Is it possible, then, that -- for

17   purposes of cross, maybe you can switch offices with maybe

18   Mr. Phillips or Mr. Halloran or Ms. Tanoury?

19        There are people who appear to be in the office for the

20   defense.  Am I correct, Mr. Phillips?

21         MR. PHILLIPS:  You're correct, Your Honor.  Our entire

22   team is in the office today.

23         THE COURT:  What I would ask is either you share an

24   office with someone who has video or you swap the office with

25   them while you're doing your cross.

VOL. I -    8

1          MS. ARBOGAST:  Yes.  That's fine, Your Honor.  Thank

2    you.

3          THE COURT:  Mr. Marshall, if you're ready to proceed,

4    please proceed.

5          MR. MARSHALL:  Yes.  Thank you, Your Honor.

6    Plaintiffs call Maeve Walsh.  And Mr. Forman will do the direct

7    examination.

8          THE COURT:  Okay.  Ms. Walsh, would you appear.  There

9    you are.

10         Ms. Clark, would you swear in Ms. Walsh.

11       (Witness sworn.)

12         THE COURT:  Mr. Forman, please proceed.  And I'm going

13   to ask everyone else to mute your phones so that we won't get

14   any feedback.

15         Who is going to do the cross of Ms. Walsh, Mr. Phillips?

16         MR. PHILLIPS:  I believe it's Janet Hill Arbogast.

17         THE COURT:  Okay.

18         MR. PHILLIPS:  We will take care of that problem

19   immediately.

20         THE COURT:  All right.  Mr. Forman, please proceed.

21

22

23

24

25

VOL. I -    9

1                            - - -

2                         MAEVE WALSH

3      Called as a witness on behalf of the Plaintiffs, being first

4    duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. FORMAN:

7      Q.   Good morning.  Could you please state your name?

8      A.   Yes.  Maeve Walsh.

9      Q.   Ms. Walsh, what city do you presently reside in?

10     A.   Columbus, Ohio.

11     Q.   How long have you been here?

12     A.   About four years.

13     Q.   What neighborhood do you live in?

14     A.   University district, near Ohio State's campus.

15     Q.   Are you presently employed?

16     A.   Yes.

17     Q.   Where?

18     A.   I work for an opposition research firm.  I do opposition

19   and defense research for political campaigns.

20     Q.   What does that mean, opposition research?

21     A.   So we have a myriad of clients who will hire us to look

22   into various political issues, or their opponents who they

23   might be running against, and we conduct research into those

24   organizations.

25     Q.   How long have you had that job?

VOL. I -   10

1  A.   About a month.

2  Q.   Are you a member of any political organizations?

3  A.   No, I'm not.

4  Q.   Are you a member of any antipolice groups?

5  A.   No.

6  Q.   Did you attend college?

7  A.   Yes.

8  Q.   Where?

9  A.   I just graduated from Ohio State in December.

10  Q.   What did you major in?

11  A.   Journalism and political science.

12  Q.   As part of your journalism major, did you have any

13  extracurricular activities?

14  A.   Yes.  I was involved -- I was employed by the Ohio State

15  University newspaper *The Lantern*.  I was the special projects

16  editor for *The Lantern*.

17  Q.   What is *The Lantern*?

18  A.   It is Ohio State's independent student newspaper.

19  Q.   When you say special projects manager, what does that

20  mean?

21  A.   Yes.  So I was responsible for pursuing research,

22  research-based stories, enterprise, for news articles over the

23  course of the semester.  Yeah.  And I also -- sorry.  I also

24  would assist with any breaking news that was happening, and I

25  would copy-edit peer's articles.

VOL. I - 11

1    Q.   Ms. Walsh, I'm going to call your attention to the

2    evening of June 1st of 2020.  Do you remember what you were

3    doing that evening?

4    A.   Yes.  I was -- along with two other colleagues from *The*

5    *Lantern*, I was covering protests in the summer that had

6    approached to Ohio State's campus.

7    Q.   Can you tell me about how you went about doing that?

8    A.   Yes.  So I believe it was about 9 p.m., 9:30 p.m., I got

9    a call from my editor, and she requested that I assist in

10   reporting a protest that started downtown near the Statehouse

11   and approached Ohio State's campus.  So I joined my two

12   colleagues, Max Garrison and Sarah Szilagy.  I probably met up

13   with them around Thirteenth Avenue, Fourteenth Avenue and High

14   Street.  And our responsibilities that night were to film and

15   take photos of the protesters who were coming north down High

16   Street onto Ohio State's campus.  And we would then edit those

17   videos, send those photos to our editors, and they would then

18   post those onto Twitter for our readers to see what was going

19   on.

20       And eventually we followed the protesters.  And I want

21   to say there were probably about 200 people at this

22   demonstration that night.  And eventually we followed them

23   until they all congregated in the intersection of High Street

24   and Lane Avenue.  And at that point -- up until this point, we

25   had seen no police presence in the area whatsoever.  And

VOL. I -   12

1   probably after a few minutes of the protesters congregating in

2   the middle of the intersection, at this point, none -- they

3   were stopped and some of them had parked their cars.  And me

4   and my two other colleagues from *The Lantern* were on the

5   sidewalk.  We were kind of behind this brick wall, this barrier

6   between us and the protesters on the street.

7        And within a couple of minutes of the protesters

8   congregating in the intersection, we saw members of the

9   Columbus Police Division approach the intersection.  And it was

10  very instantaneous.  We hadn't seen them following the group at

11  all.  It was within a couple of minutes of them congregating

12  that the police had showed up.

13       And at this point me and my colleagues are standing

14  behind that barrier.  Part of our protocol was to attempt to

15  delineate ourselves as much as possible from the protesters, to

16  make it very clear that we were not part of the protest.  And

17  eventually police started to approach us three on the sidewalk

18  by the intersection.  And I remember one police officer had

19  approached me in riot gear.  And I think there were probably

20  about a dozen to twenty Columbus police there total.

21       And one officer approached me and he told me to leave or

22  I will be arrested.  And at this point there's more police

23  officers coming up to me, Max, and Sarah.  And the whole time

24  we're holding our press passes, which I have here.  This is a

25  visual.  Holding our press passes up to them, telling them

VOL. I - 13

1    we're members of the media, we are exempt from the 10 p.m.

2    curfew as noted in Mayor Ginther's order.

3          And my colleagues were both wearing *Lantern* gear,

4    sweatshirts and hat with *Lantern* logos on them.  Just by our

5    attempts to tell them we were members of the media and we're

6    exempt from the curfew, the police officer told me I don't

7    care, leave or you will be arrested.

8          So eventually at that point, Sarah, Max and I had

9    started retreating.  We were walking backwards east on Lane

10   Avenue kind of away from the police, that they were kind of

11   pushing us east.  And a lot of the congregants had dispersed at

12   this point once the police had shown up because they were

13   deploying pepper spray into the crowd.  So by the time we were

14   retreating, there were probably 20, 30, at max, protesters

15   left, and they had all been kind of running away at this point.

16         And eventually, even though we were backing up from the

17   police, a separate police officer from the one who had

18   approached me and threatened me with arrest deployed pepper

19   spray directly at me and my colleagues.  And at that point we

20   decided that it was no longer safe for us to continue covering

21   those protests.  So we turned our backs to the police officers

22   and retreated down an alley.  And at that point the police had

23   continued to pepper spray us.  My colleague Sarah had burns on

24   the back of her neck.  So, even as we were retreating, they

25   continued to pepper spray us.

VOL. I -   14

1      So, yeah, that's what happened.  Let me know if you have

2  any clarifying questions.

3  Q.   Sure.  Thank you.

4      So, when you were there, did you have the -- I think you

5  said this already.  But, at the time before this happened,

6  about how many protesters were in the street?

7  A.   About two hundred.

8  Q.   And how many police did you observe, approximately?

9  A.   There were about a dozen to 15 or 20 police officers.

10  Q.   Did you have an opportunity to observe the interaction

11  between the police and protesters?

12  A.   Yes, momentarily.

13  Q.   Can you tell me about that?  What did you see?

14  A.   Yeah.  As I said earlier, the police showed up pretty

15  instantaneously; I want to say they were about five minutes.  I

16  was able to observe the interaction between the police and the

17  protesters, and from what me and my colleagues saw, everything

18  was peaceful.  No violence was used by -- no violence was

19  exercised by the protesters.  And it was past the curfew, so

20  eventually I think I remember seeing police deploy pepper spray

21  into the crowd that was congregated at the intersection.  But

22  other than that, there was no violence.

23  Q.   You may have said this already.  But can you tell me

24  approximately what time it was?

25  A.   Yes.  So we were pepper sprayed around 10:25 p.m.  I

VOL. I - 15

1    think it was just after the curfew of 10 p.m.  I believe it was

2    just before 10:30.

3      Q.   And then just to clarify, at the time you were

4    approached by the police officers, about how many protesters

5    remained in the area?

6      A.   When we were approached, there were probably -- probably

7    about a hundred protesters still there.  And once police pepper

8    sprayed us, there were even less, probably about 20.

9      Q.   I am going to attempt -- so forgive me if I mess this

10   up.

11        MR. FORMAN:  Your Honor, I'm going to try to do a

12   share screen here and show a video which has been marked as

13   Plaintiff's Exhibit 140A.  That's 140A.

14        THE COURT:  You may display 140A.

15        MR. FORMAN:  Okay.  Let me see if I can pull this off.

16     I'm so sorry.  This had worked previously.  I'm not

17   presently designated as a presenter.

18        THE COURT:  Okay.

19   BY MR. FORMAN:

20     Q.   Can you see that, Ms. Walsh?

21     A.   Yes, I can.

22      (Video played.)

23   BY MR. FORMAN:

24     Q.   Are we back?

25        THE COURT:  Yes.

VOL. I – 16

1        MR. FORMAN:  Thank you, Your Honor.

2   BY MR. FORMAN:

3   Q.   Ms. Walsh, do you recognize that video?

4   A.   Yes, I do.

5   Q.   Do you know who took it?

6   A.   Yes.  I took that video.

7   Q.   Can you tell me what the video shows?

8   A.   Yes.  So that was the main interaction I had with the

9   police officer who threatened me with arrest if I didn't leave

10  the scene.  And, sorry.  You guys could see my legs for the

11  majority of that.  But that was also when we had started

12  retreating right before the police pepper sprayed us.

13        MR. FORMAN:  If I may just ask a real quick question.

14  Your Honor, did the sound come through for you on the video?

15        THE COURT:  I could hear some sound.  I could not hear

16  clearly any conversation between Ms. Walsh and the police

17  officer.

18        MR. FORMAN:  Okay.

19        THE COURT:  I think there were background sounds.

20        MR. FORMAN:  I guess it was pretty loud under the

21  circumstances.

22        I just want to make sure that we're doing this

23  correctly.

24        THE COURT:  And in the meantime, Ms. Walsh, what

25  intersection was that?

VOL. I -   17

1          THE WITNESS:  Intersection between High Street and

2   Lane Avenue.

3          MR. MARSHALL:  Your Honor, as we work on the

4   technology here, we will get started in just a moment.

5          THE COURT:  All right.

6          MR. FORMAN:  Your Honor, I believe that we're ready.

7   I'm going to play this.  If it doesn't work, Jeff is going to

8   play it.  Let me see if this will work.

9          THE COURT:  Yes.  It's clearly visible.

10          MR. FORMAN:  Okay.  I'm going to play a little bit of

11   it here, Your Honor.

12      (Video played.)

13          MR. FORMAN:  Your Honor, was that better?

14          THE COURT:  Yes.  I could hear the officer say, Leave

15   or you're going to jail.  I heard someone say, We're members of

16   the media.  I heard the officer say, I don't care.

17          MR. FORMAN:  Thank you, Your Honor.

18    BY MR. FORMAN:

19    Q.   Ms. Walsh, from your experience, does this video truly

20   and accurately represent the events that you observed that

21   evening?

22    A.   Yes.

23          MR. FORMAN:  Your Honor, at this time, I would like to

24   move the admission of Plaintiff's Exhibit P140A.

25          THE COURT:  Ms. Arbogast, any objection?

VOL. I -   18

1           MS. ARBOGAST:  No, Your Honor.

2           THE COURT:  All right.  Exhibit 1040A, Mr. Forman,

3    will be received.

4           MR. FORMAN:  Thank you, Your Honor.

5    BY MR. FORMAN:

6    Q.   Ms. Walsh, I am now going to show you what has been

7    marked as Plaintiff's Exhibit 140B, as in boy.  That's 140B.

8    I'm going to attempt to do a screen share here again.  And you

9    just let me know if you're able to see this.

10          Can you see it now?

11   A.   Yes.

12   Q.   I'm going to play this clip.

13      (Video played.)

14          MR. FORMAN:  Thank you.

15   BY MR. FORMAN:

16   Q.   Ms. Walsh, did you have an opportunity to see that

17   video?  Could you hear it?

18   A.   Yes.

19   Q.   Again, I'm going to ask you if you recognize this video?

20   A.   Yes, I do.

21   Q.   Do you know who took it?

22   A.   I believe Max Garrison.

23   Q.   This video, do you recognize what's in it?

24   A.   Yes.  Max was able to capture the moment the police

25   pepper sprayed us very quick on the video.  But this is as we

VOL. I -   19

1   are retreating after the police pepper sprayed us.

2   Q.   Based on your memory, does this video truly and

3   accurately demonstrate the events that happened that night?

4   A.   Yes.

5        MR. FORMAN:  Your Honor, at this time, I would like to

6   move the admission of Plaintiff's Exhibit 140B, as in boy.

7        THE COURT:  Ms. Arbogast, any objection?

8        MS. ARBOGAST:  No objection, Your Honor.

9        THE COURT:  Exhibit P140B is received.

10       Mr. Forman, was the previous exhibit 140A or 1040A?

11       MR. FORMAN:  Your Honor, it should have been 140A.

12       THE COURT:  All right.  Thank you.

13       MR. FORMAN:  May I proceed, Your Honor?

14       THE COURT:  Yes.  140B is going to be received.

15   BY MR. FORMAN:

16   Q.   Ms. Walsh, after the events of this -- that this video

17   portrays, what did you do?

18   A.   After this, we had retreated down an alleyway, and we

19   went to my editor-in-chief's house, Sam Raudins.  And she lives

20   a few blocks away from the intersection we were just at.  So we

21   went there to treat the burns and consult with our advisers

22   about what had happened.

23   Q.   What happened next?

24   A.   So we -- our advisers suggested that we reach out to the

25   Columbus Division of Police.  So my editor-in-chief, Sam

VOL. I -    20

1   Raudins, sent an email to them describing what had happened.

2   And I believe that was how Sergeant Fuqua - he is the public

3   information officer of CPD - was informed of the events.  And

4   he eventually met us at our editor's house to discuss the

5   details of the night and just go over -- go over everything

6   that had happened.  And we showed him the videos and photos

7   that we took.

8             THE COURT:  Ms. Walsh, who was the gentleman from the

9   Columbus Police Department who met with you?

10             THE WITNESS:  Sergeant James Fuqua, F-U-Q-U-A.  I

11   believe his title is public information officer.

12             THE COURT:  And he met with you on that night?

13             THE WITNESS:  He did.  I want to say he came over

14   around midnight.  It was pretty late at that point.

15   BY MR. FORMAN:

16   Q.    Can you tell us about the conversation you had with him?

17   A.    Yes.  So we -- so with Sergeant Fuqua, we basically just

18   kind of talked through what I told you right now, what -- the

19   process of everything that occurred and what the police told

20   us, the pepper spray.  And we showed him those respective

21   videos and photos.  And he -- I don't have -- to be honest, I'm

22   not entirely clear about everything that he told us that night.

23   But I remember -- I remember Sergeant Fuqua had gone into his

24   car that night and -- sorry.  I'm going to back up for a

25   second.

VOL. I – 21

1          Prior to him going to his car to make a quick phone

2     call, I know he –– he was talking about how this probably was

3     just a lack of understanding on the part of the police and just

4     them being ignorant and unaware that media were exempt from the

5     curfew.

6          So, after we talked with him for a little bit, he went

7     outside to his car to make a quick phone call; not entirely

8     sure to who.  I'm guessing someone else from CPD to go over the

9     situation.  I remember we were outside talking to, I believe,

10    10TV and maybe Channel 6 about the incidents.

11         After Sergeant Fuqua came out of his car, I remember him

12    saying, yeah, this is not a good look for us, in terms of the

13    events that happened.

14         THE COURT:  Ms. Walsh, before we go on, while you were

15    telling Sergeant Fuqua about the events, what was his immediate

16    response, as best you can recall?  I missed that.

17         THE WITNESS:  Sorry.  I just want to make sure I get

18    all of this right.

19         Yeah.  So I believe that Sergeant Fuqua's initial

20    response –– he apologized to us personally, you know.  I don't

21    think he apologized on behalf of CPD, but he apologized on his

22    individual behalf that this had happened to us.  He was sorry

23    to hear that this occurred.  I do remember obviously his job is

24    spokesperson.  He did mention that this is definitely going to

25    be something that they have to look into and really figure out

VOL. I -   22

1   what happened and speak with those police officers, you know,

2   to kind of get their side of everything.

3          So does that clear things up, Your Honor?

4          THE COURT:  Yes, if that's what your recollection is.

5   I was just trying to get your recollection of his response.

6          Please proceed, Mr. Forman.

7          MR. FORMAN:  Yes.  Thank you, Your Honor.

8   BY MR. FORMAN:

9   Q.   What did you think of that apology, Ms. Walsh?

10  A.   Yeah.  I was pleased that he apologized from an

11  individual level.  But I think I was -- you know, Sergeant

12  Fuqua and Chief of Police Thomas Quinlan in the press

13  conference maybe a day after or a few days later, they -- you

14  know, we never received an apology on behalf of Columbus police

15  as a whole.

16         And, you know, I think Chief Quinlan, especially, tried

17  to skirt around the issue, in my opinion.  He blamed the

18  situation on, you know, a lack of education of the police

19  officers.  And, you know, I obviously wasn't fully convinced by

20  that argument, especially since the police officer who

21  approached me even after we clearly identified ourselves as

22  members of the media and told him several times that we are

23  exempt from the curfew, he explicitly said, I don't care.  I'm

24  not sure that's so much a lack of education as it is a lack of

25  apathy on their part.  So, yeah.

VOL. I - 23

1  Q.  Ms. Walsh, following these events, did you take any

2  precautions?  Excuse me.  Did you go on reporting on protests?

3  A.  Yes, we did.

4  Q.  In doing so, did you take any precautions that you had

5  not taken previously?

6  A.  Yes.  I remember our adviser Nicole Kraft at *The*

7  *Lantern*, she purchased facemasks that had a plastic film to

8  cover our eyes in the case of any pepper spray or chemical

9  weapons being deployed in the future.

10  Q.  Thank you.

11      And you had mentioned Chief Quinlan's statement.  I just

12  want to ask you this finally.  At the time that you saw the

13  interaction between the protesters and police, did you observe

14  any protesters throwing any bottles?

15  A.  No.

16  Q.  Did you observe the protesters throwing any rocks?

17  A.  No.

18  Q.  Did you observe the protesters engaging in any sort of

19  physical confrontation with the police?

20  A.  No, not that I can recall.

21      MR. FORMAN:  Your Honor, let me check with co-counsel

22  here, but I believe that's all that I have.  Hold on one

23  second.

24      THE COURT:  All right.

25      MR. FORMAN:  Thank you, Your Honor.  We have no

VOL. I -   24

1    further questions at this time.

2         THE COURT:  All right.  Ms. Arbogast, cross?

3         Ms. Arbogast?

4         MS. TANOURY:  Your Honor, I can see her walking down

5    the hallway to go to Steve's computer right now.

6         THE COURT:  All right.

7         Ms. Arbogast, are you ready to proceed with your cross?

8                        - - -

9                   CROSS-EXAMINATION

10   BY MS. ARBOGAST:

11   Q.   Ms. Walsh, I believe you testified on direct that police

12   officers asked you and your colleagues to back up or either be

13   maced, correct?

14   A.   They told us to back up or we were -- to leave or we

15   would go to jail, nothing about backing up or you'll be maced.

16   Q.   Did you back up?

17   A.   Yes.

18   Q.   How far did you back up?

19   A.   Probably a couple feet.  You know, at first when the

20   first officer approached me, we stood our ground trying to

21   explain we were members of the media and explain our press

22   passes.  But when that wasn't enough for them, we started to

23   back up probably a couple feet.  And then -- 10 to 15 feet, I

24   would say.  And then eventually, when we were retreating, even

25   more than that.

VOL. I -   25

1    Q.   And you talked about Sergeant Fuqua and mentioned that

2    he told you he was going to follow up with you, correct?

3    A.   Correct.

4    Q.   And did he do that?

5    A.   No.  I apologize.  I can't recall if Sergeant Fuqua

6    followed up with us.  I believe our advisers at *The Lantern* had

7    continued communication with Columbus police about the

8    incidents.  And then we eventually spoke with -- I believe it

9    was in July or August, we spoke with Richard Wozniak who is the

10   investigator for the prosecutor's office, I believe, and he was

11   investigating this incident specifically.  So we did have -- I

12   guess, to answer your question -- sorry.  We did have follow-up

13   from CPD.

14   Q.   Who were the advisers from *The Lantern* that were having

15   interactions with police after this incident?

16   A.   Spencer Hunt, H-U-N-T.  And he is -- he is the director

17   of media for *The Lantern*.  And our other adviser was Nicole

18   Kraft, K-R-A-F-T.  And Nicole actually came with us, met with

19   us at our editor's apartment the night that Sergeant Fuqua had

20   spoken with us.  She was the former director of media for *The*

21   *Lantern* and a professor in the school of communication, and she

22   served as an adviser to us.

23        MS. ARBOGAST:  I have no further questions.  Thank

24   you.

25        THE COURT:  Thank you, Ms. Arbogast.

VOL. I -   26

1          Mr. Forman, any redirect?

2               MR. FORMAN:  No, Your Honor.  Thank you.

3               THE COURT:  Ms. Walsh, thank you very much, ma'am.

4     You may be excused.

5               THE WITNESS:  Thank you.  Have a good day.

6               THE COURT:  You do likewise.

7          Mr. Marshall, your next witness?

8               MR. MARSHALL:  Your Honor, it will be just about a

9     minute, but our next witness will be Michael Moses Jr.  And Mr.

10    Forman will examine.

11              MR. FORMAN:  It looks like Mr. Moses is present.

12              THE COURT:  Mr. Moses, are you ready to proceed?

13    You're going to need to un-mute yourself.

14              THE WITNESS:  Yes, sir.  Thank you.  Ready to proceed.

15              THE COURT:  Ms. Clark, would you please swear

16    Mr. Moses.

17         (Witness sworn.)

18              THE COURT:  Mr. Forman, please proceed.

19                             - - -

20                          MICHAEL MOSES

21      Called as a witness on behalf of the Plaintiffs, being first

22    duly sworn, testified as follows:

23                       DIRECT EXAMINATION

24      BY MR. FORMAN:

25      Q.   Could you please state your name?

VOL. I -   27

1    A.   My name is Michael Andrew Moses.

2    Q.   Mr. Moses, what city do you live in?

3    A.   I live in Columbus, Ohio.

4    Q.   What neighborhood do you live in?

5    A.   The south part of Clintonville.

6    Q.   How long have you lived there?

7    A.   I've lived in my current house for almost 16 years, and

8    grew up a little north, also in Clintonville.

9    Q.   How old are you?

10   A.   I'm 43 years old.

11   Q.   What is your present occupation?

12   A.   I'm a grants manager in the College of Education and

13   Human Ecology at the Ohio State University.

14   Q.   Can you describe what that means?

15   A.   I help faculty get research grants.  We have -- we're

16   the College of Education, but we have a big biomedical program,

17   too, so we go after a lot of NIH grants, essentially.

18   Q.   Are you married?

19   A.   I am.

20   Q.   Do you have any children?

21   A.   I have two children.

22   Q.   What are their ages?

23   A.   Nine-year-old daughter and a 12-year-old son.

24   Q.   How long have you had your occupation?

25   A.   I've been working at Ohio State for almost 17 years.

VOL. I -   28

1    And I've been in my current position at the College of

2    Education for about five -- over five years.

3       Q.   Are you a member of any political groups?

4       A.   No, sir.

5       Q.   Are you a member of any antipolice groups?

6       A.   No, sir.

7       Q.   Mr. Moses, I'm going to call your attention to the

8    afternoon of May 30th, 2020.  What were you doing on that day?

9       A.   On the afternoon of May 30th, I was just having another

10   day at the house, working on making some food and just spending

11   time with my family.  I did -- I was aware of a protest.  I was

12   unsure if I'd be able to attend it.  And I was aware of a

13   10 p.m. curfew.  So, yeah, I was kind of on the fence as to

14   whether I wanted to go to the protest.  But I was just making

15   food and spending time with my family at the house.

16            THE COURT:  What day of the week was it, Mr. Moses?

17            THE WITNESS:  I'm sorry.  What was that?

18            THE COURT:  Do you remember the day of the week?

19            THE WITNESS:  It was a Saturday.

20            THE COURT:  Please proceed, Mr. Forman.

21   BY MR. FORMAN:

22      Q.   Thank you.  What did you hear about a protest?

23      A.   I guess I was kind of following more from a national

24   point of view.  It just seemed like the preceding couple of

25   days there had been protests.  And I believe I was under the

VOL. I - 29

1   understanding that there would be a presence on campus, a

2   peaceful protest presence on campus, and then maybe obviously

3   at the Statehouse. And then -- that's about all I had in mind

4   in terms of organized protests that I might attend.

5       Q.   Did you make a decision as to whether or not you would

6   attend?

7       A.   I did. Around 7:30, maybe closer to eight o'clock, I

8   saw some folks that I understood to be heading down High

9   Street. I live quite close to High Street. I can see it from

10  my front porch. And I didn't want to be very long or out late,

11  but I made a decision to walk down to campus. And I walked to

12  campus as part of my normal workday. I know how long it takes

13  me. So I walked down to campus at around 8:30 -- between 8

14  and 8:30.

15      Q.   Can you tell me about that? Tell me about the walk.

16  What did you see?

17      A.   I saw just normal -- walking south along High Street

18  from Clintonville, you know, a normal day. It was warm. And

19  there was a handful of people who I sensed were going to the

20  protest or very clearly had signs. And the closer we got to

21  campus, more of those folks, more signs, and then chanting.

22  And then campus, there didn't seem to be a big organized

23  necessarily, protest on campus, but it seemed to be moving

24  south.

25          So I kept walking south with -- the closer we got to the

VOL. I - 30

1    Short North, people started to get in the streets, safely

2    walking in the streets.  Much of High Street at that point was

3    very war-zone looking regardless of a protest.  It was all just

4    lots of construction on the street, and so it didn't feel

5    unsafe to be walking in the street because there was very

6    little vehicle traffic and more and more protesters peacefully

7    protesting and chanting names and things.

8        Q.    Why did you make the decision to attend the protest?

9        A.    It just seemed -- going to protests very intermittently

10   in my life, maybe a half dozen.  Usually it's just there.  It's

11   close to me.  It's where my -- you know, it's where my heart

12   lies, I guess.  That's why I would attempt to go to any

13   protest.

14       Q.    Did you go with anyone else?

15       A.    I did not.

16       Q.    Did you bring anything with you?

17       A.    Did I bring anything?

18       Q.    Yes.

19       A.    Yeah, just a sign.

20       Q.    So I think you had mentioned that you were walking south

21   on High Street.  How far south did you walk?

22       A.    I walked -- we got to campus, and then we proceeded to

23   walk south.  It was just a mass of protesters walking south

24   carrying signs and chanting.

25            And we got to about Fifth and High and that's -- I guess

VOL. I - 31

1  maybe Fourth and High is clearly where there was a large gap

2  between a group of protesters and a line of riot police, and

3  maybe about a hundred to two hundred feet between -- of a gap

4  between the groups.  So it was very clear there was a point not

5  to go any further south.  And within minutes it was clear we

6  were being asked to move north, although that was not a -- that

7  was not a super clear command that people, you know, responded

8  to immediately.  There was a lot of confusion.

9              THE COURT:  Just a second, Mr. Forman.

10         Ms. Evans, could you read back that question and answer,

11  please.

12     (Thereupon, the last question was read by the court

13  reporter.)

14   BY MR. FORMAN:

15   Q.   When you arrived at this location, what did you do?

16   A.   I just stood with a group of protesters chanting names,

17  holding signs, and that's about it.  I wasn't there for very

18  long before there was a confrontation.  So I wasn't at that

19  spot for more than 15 minutes probably before things got, you

20  know, less peaceful.

21   Q.   And just to clarify, how many protesters were on the

22  scene, approximately?

23   A.   Easily a hundred.  It was late at night.  It was hard to

24  tell, you know, who was out for what reason.  But there were a

25  lot of signs and a lot of chanting, and I would say easily a

VOL. I - 32

1   hundred peaceful protesters.

2   Q.   Approximately what time of day was it when you arrived?

3   A.   It must have been nine o'clock, right around nine

4   o'clock.

5   Q.   Again, I think you stated this earlier, but the -- about

6   how much distance was there between the protesters and the

7   police?

8   A.   There seemed to be about half of a football field, a

9   good buffer.

10   Q.   After you had been standing -- excuse me.  Did you have

11   an opportunity to observe the interaction between the

12   protesters and the police?

13   A.   Yeah.  Like I said, I wasn't there -- I wasn't in that

14   area for more than 10 or 15 minutes.  And, yeah, any

15   interaction I observed was emotion on the part of protesters,

16   vocal, and signs.  The protesters were I think confused because

17   there was -- we were well before curfew which we understood to

18   be 10 p.m.  And there was -- it was -- sonically, it was an

19   overwhelming environment, the noise, all kinds of protest

20   noise, street noise, and then something like bullhorn commands

21   from the police that were not very clear.  So protesters were

22   looking to each other to figure out who maybe amongst us knew

23   what we were being asked to do, where we were being asked to

24   go.

25   Q.   The police, as you observed, what did they look like?

VOL. I - 33

1    A.    I saw a mix of white shirts, like beat police maybe, a

2  lot of riot police.  I want to say a couple dozen, possibly

3  more, very geared up.  I think there were shields and things.

4  There was definitely a lot of armor on the individual police

5  officers.

6    Q.    Did you observe the protesters throw any bottles at

7  police?

8    A.    I did not.

9    Q.    Did you observe the protesters throwing any rocks at the

10  police?

11    A.    Not where I was, not -- no.

12    Q.    Did you observe any protesters being physically

13  confrontational with the police?

14    A.    No.  Once the riot police and some of the protesters got

15  tangled up, I did not see great resistance to arrests.  But it

16  was -- it was kind of a chaotic scene.  Like I said, I didn't

17  end up being in that area for very long.

18    Q.    So, after the 10- to 15-minute period that you were

19  talking about, what happened?

20    A.    So I, hearing commands, a bullhorn, some kind of loud

21  speaker command from the authorities, I didn't understand what

22  they were -- what they were communicating.  So I looked to

23  other protesters who were strangers to me but we are in a group

24  together.  And I see a couple people turn toward me and

25  indicate that they want us to start moving north.  And within

VOL. I - 34

1  minutes after that, we started doing that.  And I was surprised

2  to almost immediately feel a munition of some kind hit my body.

3          THE COURT:  Where did you feel the projectile,

4  Mr. Moses?

5          THE WITNESS:  I felt two very rapidly.  One hit me on

6  my left ribs almost directly six to eight inches under my

7  armpit, and then also on the mid to slightly left side of my

8  back also on the ribs, but on the back.

9          MR. FORMAN:  At the time you were -- Your Honor, is

10  that -- we good?

11          THE COURT:  Yes.

12  BY MR. FORMAN:

13  Q.   At the time you were hit, what were you doing?

14  A.   I was turning around to head north with a bunch of other

15  people.  At the time I was hit with projectile munitions, I was

16  turning around with the other protesters to disperse the area.

17  BY MR. FORMAN:

18  Q.   Mr. Moses, how tall are you?

19  A.   Six one.  Almost six one.

20  Q.   At the time you were hit, were you standing upright?

21  A.   Yes.

22  Q.   You indicated that a projectile hit you in the back.

23  How far up your back was it?

24  A.   Not far from my left shoulder blade, maybe diagonally

25  about eight or ten inches.  I don't know.  It's hard to

VOL. I -   35

1   describe.  The middle left side of my back about halfway down.

2      Q.   What did it feel like when you were hit?

3      A.   It felt like a really -- I mean, I've done paintball

4   before, hit with a baseball before.  It felt a little worse

5   than that.  It hurt.

6      Q.   Do you know what it was that hit you?  What the

7   projectile was?

8      A.   At the time I was not certain.  I had a hunch it was

9   plastic or cork or some kind of munition like that.

10     Q.   You said at the time.  Have you learned anything else

11  about that subsequently?

12     A.   Yeah.  I've learned that -- well, I was hit hard enough

13  and kind of in enough pain that almost immediately I went to

14  verify that it wasn't anything worse than a pellet munition of

15  some kind.

16     Q.   At the time you were hit, did you hear anything?

17     A.   No.  I mean, aside from the -- just the general

18  commotion of the protest.  The last thing I remember hearing

19  and acting on was move north, disperse the area.

20     Q.   After you were hit, did you hear anything?

21     A.   Yeah.  It just seemed -- things seemed to get louder.

22  Like before I was hit, I didn't see any other firing of

23  munitions.  I didn't see objects being thrown and anything like

24  that.  So it seemed like this was just the start of the

25  escalation, I guess.

VOL. I - 36

1      So immediately after feeling the munitions hit me, like

2   I said, I went to go -- I wanted to move away from that whole

3   scene, but I felt I had to go see if I was okay.  So I went

4   toward I think a coffee shop doorway entrance to just check

5   myself out.  I bent down to check myself out.  Then I heard a

6   whole lot of boots marching directly my way.  And so at that

7   point, anything I was hearing was from the people that were

8   handling and processing me.

9   Q.    What happened next?

10  A.    So I look at myself quickly.  I jog -- I got hit.  I jog

11  away north probably just half a block or a block, check myself

12  out under the cover of the coffee shop entrance, stoop, and I

13  see I'm generally okay.  I'm not bleeding profusely or

14  anything.  I hurt but -- and then I hear a bunch of boots

15  jogging my way, and things just really seemed to escalate.  And

16  I gather I'm about to be grabbed; so I just remember thinking

17  don't present any resistance.  And I made a point to just let

18  my body be, you know, calm and -- but so I was immediately

19  grabbed.

20      I was grabbed by my right wrist and arm and forced down

21  to the ground really hard, hitting my face and right shoulder.

22  And then I was put into plastic cuffs very quickly and asked

23  for my name and things like that.

24      THE COURT:  Mr. Moses, at the time that you were

25  placed under arrest, were you still in the doorway of the

VOL. I - 37

1   coffee shop or had you moved from it?

2          THE WITNESS:  No.  I was grabbed while I was still in

3   that doorway.

4          THE COURT:  At the time you were grabbed, what were

5   you doing?

6          THE WITNESS:  I had just examined myself quickly.  And

7   I was really just thinking, okay, I need to keep proceeding and

8   get the heck out of there.  And quickly I learned that was --

9   you know, it all happened very fast.  But I'm in this doorway,

10  confirming to myself that I'm not going to bleed terribly, and

11  then making the decision to proceed north.  But before I could

12  take any steps north, I was grabbed by the authorities.

13         THE COURT:  Within five minutes of the time you were

14  grabbed by the authorities, had you been given any commands by

15  policing authorities?

16         THE WITNESS:  Within five minutes, it's hard to say.

17  No, I would say I did not.  I would say just prior to that,

18  there was a command that the crowd seemed to have trouble

19  hearing and acting on.

20         THE COURT:  Do you recall what that command was?

21         THE WITNESS:  Not verbatim whatsoever.  It was very

22  muffled.

23         THE COURT:  Is it in response to that command that you

24  began to walk north and enter the coffee shop?

25         THE WITNESS:  It was in response to communicating with

VOL. I -   38

1  other protesters who seemed to agree that we wanted -- that as

2  a group we should be heading north.  And then I was -- I was

3  hit first before going into the cover by the coffee shop.

4           THE COURT:  I see.

5         Please proceed, Mr. Forman.

6           MR. FORMAN:  Thank you, Your Honor.

7  BY MR. FORMAN:

8  Q.   Mr. Moses, at the time you were hit, to your

9  observation, how far away were the police from the protesters?

10  A.   Still a good hundred, 150 feet.

11  Q.   After you were -- I guess handcuffed, I guess, is a

12  better way of saying it.  After that, after you were

13  handcuffed, what happened next?

14  A.   I believe a white-shirted police officer pulled me up

15  and asked for my name.  Then there was just some waiting

16  around.  I explained -- almost immediately after being pulled

17  up from the ground, I explained it's not curfew, I was holding

18  a sign, I'm not violent, what's happening?

19         And after saying that a couple of times, I -- my goal

20  was to cooperate.  And there were five or six other individuals

21  who were being handcuffed and processed.  And I want to say

22  within five or ten minutes we were put into a wagon to go

23  downtown.

24  Q.   What happened next?

25  A.   I was in a wagon with about five other folks, and we

VOL. I - 39

1  seemed to be certain to be going to a facility to be processed.

2  And one of the -- we took a turn that was a little, you know,

3  herky-jerky.  And one of the other people in the back of the

4  van, you know, said, get ready for more of that or something.

5  And so people braced their legs a little bit.  And driving was

6  rough.  At one point we kind of -- all of us kind of flew

7  across the back of the wagon.  And then we get to the facility

8  not long after that, and just initial processing before I come

9  to learn that we're going to be going to Jackson Pike.

10  Q.  What happened at that point?

11  A.  At Jackson Pike?

12      It was fairly uneventful.  There were a lot of people.

13  I was initially put into a holding room that was quite big but

14  only had about ten people.  And over the course of the night,

15  another 10 or 15 came into that room.  I was just wanting to

16  call my wife, and I was not able to do that until like five in

17  the morning.

18      I was very briefly checked out, screened for COVID,

19  talked to a nurse.  And, yeah, just fairly uneventful, just a

20  long night and next day.

21  Q.  Were you charged with a criminal offense?

22  A.  I was charged with failure to disperse.

23  Q.  What happened --

24      MR. FORMAN:  I'm sorry, Your Honor.

25      THE COURT:  One other question.  Before you were -- as

VOL. I -    40

1   you were being handcuffed or immediately before that,

2   Mr. Moses, were you told why you were being placed under arrest

3   at the scene?

4           THE WITNESS:  They did say that we were ordered to

5   leave and we didn't.

6           THE COURT:  Okay.  Please continue, Mr. Forman.

7           MR. FORMAN:  Thank you, Your Honor.

8     BY MR. FORMAN:

9     Q.   Do you know what happened with those criminal charges?

10    A.   They were dismissed, I want to say, within a week.  I

11  was assessed an 80-dollar fine, charged with failure to

12  disperse.  And charges were dismissed I want to say within --

13  maybe it was more like three weeks or so.

14    Q.   Mr. Moses, I'm going to attempt to share screen here.

15  Hopefully I can do this effectively.  Hold on one second.

16          MR. FORMAN:  Your Honor, I would like to show -- I did

17  this in reverse order and I apologize.  I would like to show

18  Plaintiff's Exhibit No. 65.

19          THE COURT:  You may.

20          MR. FORMAN:  Thank you, Your Honor.

21    BY MR. FORMAN:

22    Q.   Mr. Moses, I'm showing you an exhibit.  It has multiple

23  pages, but look at the first page which is presently displayed

24  on the screen.  What do you see here?

25    A.   I see my body and my elbows, my left elbow with a --

VOL. I -   41

1  swollen and with a scab forming.

2  Q.   Do you have any idea when this photograph was taken?

3  A.   This photograph was likely taken with a week following.

4  I took pictures on two or more occasions, and the scabbing on

5  this one makes it look like this was a few days later.

6  Q.   Can you tell us what happened to your elbow as seen in

7  this picture?

8  A.   Yes.  This was a result of being forced down on the

9  ground very hard – sorry – while my right shoulder and right

10  elbow –– I'm sorry, right shoulder, right side of my check and

11  much of my right side was forced to the body –– or was forced

12  to the ground.  My other elbow hit too.

13  Q.   Thank you.  I'm going to bring up a –– scroll to a

14  second picture.  Can you see that?

15  A.   Yes.

16  Q.   Again, I'm going to ask you what this –– if you

17  recognize this picture.

18  A.   Yeah, I recognize this picture.  I took this the day

19  after.  And that is the bruise and scrape on the right side of

20  my cheek, cheekbone, from the impact of being slammed to the

21  ground.

22  Q.   And you said the day after.  What are you referring to?

23  Which day?

24  A.   May 31st, which would be the day after Saturday,

25  May 30th.

VOL. I -   42

1    Q.   Go forward one additional picture here.  Could you take

2    a look at that?  Can you tell me what this shows?

3    A.   That's the projectile that hit me in my back.  I do

4    think -- this picture was taken on May 31st.  And that is what

5    I believe to be one of two pellet munitions that hit me and

6    causing me to, you know, check myself out under the coffee shop

7    stoop.

8    Q.   I'm going to go forward one more page.  Can you see the

9    picture?

10   A.   Yes.

11   Q.   Can you tell me what -- do you recognize this picture?

12   A.   Yeah.  The same photo session.  This is my left ribs

13   under my left armpit.  And this is where the other of the two

14   munitions made contact with my body.

15   Q.   Thank you.  Moving forward, do you recognize what this

16   picture is?

17   A.   Yes.  That's my left elbow.  I took that picture.

18   Again, I'm sorry, just because I took multiple stages of

19   pictures, but I believe this would also be from May 31st.

20   Q.   Can you tell me what this shows, this picture shows?

21   A.   That's my right shoulder, and also showing my right

22   cheekbone -- sustained from being forced to the ground on

23   May 30th.

24   Q.   Do you know what time this photo was taken?

25   A.   Approximately early afternoon of May 31st.

VOL. I – 43

1    Q.   I'm going to ask you the same thing about this picture.

2    Do you recognize what this picture shows?

3    A.   Yeah.  That's my face, my right cheek bruised and a

4    scrape.  This one is later in the week; so maybe four days

5    after May 30th.

6    Q.   Again, if you can take a look at this picture, what does

7    this show?

8    A.   That's the same spot under my armpit that you saw in the

9    previous picture, one of the previous pictures.  I do think

10   this was also more like four days after the -- May 30th.

11   Q.   Two more.  Again, describe what you see in this picture.

12   A.   Yeah.  This is my scrape that you saw in the previous

13   picture on the right shoulder.  This would be, again, about

14   approximately four days after May 30th; so just the progression

15   of that scrape.

16   Q.   And then, finally, do you recognize what is in this

17   picture?

18   A.   That's my left elbow with the scrape and the swelling

19   having gone down, taken approximately four or five days after

20   May 30th.

21   Q.   All the pictures I've just shown you, the injuries

22   contained therein, were these caused in your interaction with

23   police on Saturday, May 30th?

24   A.   Yes.

25   Q.   These pictures, as you see them, are they true and

VOL. I - 44

1  accurate representations of what your body looked like at the

2  time they were taken?

3  A.   Yes.

4       MR. FORMAN:  Your Honor, at this time, I would like to

5  move for the admission of Plaintiff's Exhibit 65.

6       MR. STEINBERG:  Your Honor, I have no objection.

7       THE COURT:  Was that Mr. --

8       MR. STEINBERG:  Steinberg.

9       THE COURT:  Mr. Steinberg.  Plaintiff Exhibit 65 will

10  be received into evidence.

11  BY MR. FORMAN:

12  Q.   Mr. Moses, with regard to your criminal charges, did you

13  plead guilty to any offense?

14  A.   No.

15  Q.   Mr. Moses, the events that happened to you on May 30th,

16  would these have any affect on whether or not you would attend

17  a protest again?

18  A.   In general, no.

19  Q.   If you were to attend a protest again, based on these

20  events, would you have done anything differently?  Would you do

21  anything differently?

22       MR. FORMAN:  I'm sorry, Your Honor.  Let me rephrase

23  that.

24  BY MR. FORMAN:

25  Q.   Mr. Moses, based on the events of May 30th, if you were

VOL. I -   45

1   to attend a protest again, would you do anything differently?

2     A.    I would only plan my attendance to be less spur of the

3   moment perhaps.  And this is from being a family man and

4   someone that's not interested in violent confrontations of any

5   kind.  So, yeah, I might consider protests more -- I would

6   not -- I wouldn't change whether I would join a protest or not

7   in the future.

8           MR. FORMAN:  Thank you.  I want to confer with

9   co-counsel.  I may be done, Your Honor.  Hold on one second.

10          THE COURT:  All right.

11          MR. FORMAN:  Your Honor, we have no further questions

12  at this time.  Thank you.

13          THE COURT:  All right.

14          MR. FORMAN:  I need to take off shared screen.

15          THE COURT:  Mr. Steinberg, are you ready to proceed

16  with your cross?

17          MR. STEINBERG:  May I have 30 seconds?

18          THE COURT:  Yes, you may.

19          MR. STEINBERG:  Your Honor, may I proceed?

20          THE COURT:  Yes, you may.

21          MR. STEINBERG:  Thank you.

22                         - - -

23                    CROSS-EXAMINATION

24    BY MR. STEINBERG:

25    Q.    Mr. Moses, good morning.

VOL. I -   46

1     A.   Good morning.

2     Q.   Are you able to hear me okay?

3     A.   I can, yes.

4     Q.   Okay.  My name is Steve Steinberg.  I represent the City

5  of Columbus in this.  Have you lived your whole life in

6  Columbus?

7     A.   Yes, with the exception of college which was not far.

8  And I lived in Massachusetts in the Cambridge area for about

9  three years, 2001 to 2004.  Other than that, Columbus, Ohio.

10    Q.   But you grew up in Columbus?

11    A.   Correct.

12    Q.   And you're actually Michael Moses Jr., correct?

13    A.   No.  I don't identify by that.  There might have been

14  some -- my father is Michael Moses, but I'm not technically a

15  junior or second.

16    Q.   Okay.  And you said you've lived in south Clintonville

17  for 16 years?

18    A.   That's correct.

19    Q.   You told us that you found out about the protests.  You

20  found out how?

21    A.   I found out, you know, on a national scale things were

22  going on in a number of cities.  And then on a more local

23  scale, there were a mix of different media and word of mouth,

24  but mostly Twitter and Instagram and those kind of things.

25  Yeah.

VOL. I -   47

1    Q.    Through social media?

2    A.    Some, yeah.

3    Q.    And some of your friends were telling you about the

4    protests?

5    A.    Not really, not close friends, just kind of -- it was

6    clear to me -- I work on campus.  And so from the student side

7    of things, that's always a place where protests will gather.  I

8    didn't have specific people or groups that I was going to join

9    up with, to protest with.  I was going on my own.

10    Q.    And you made a decision to go in the evening, correct?

11    A.    Correct.

12    Q.    And on your social media accounts and with the people

13    you have contact with on campus, you knew that the protests had

14    started before May 30th, correct?

15    A.    Yeah.  But I wouldn't say that was -- again, I'm not

16    linked in to like professional protesters on social media.

17    This was just reading a number of local and national media and

18    hearing that there are organized protests and deciding to go to

19    the closest one to me.

20    Q.    Okay.  And the closest one to you would have been down

21    High Street at Fourth or Fifth, correct?

22    A.    Yeah.  I thought -- I didn't intend to go to the

23    capitol, but I knew there was a protest presence there.  And

24    then I was thinking there would be one near the Union or the

25    Oval.  But what I saw down here, the Union or Oval was more

VOL. I -   48

1   just people moving south.

2   Q.   And you participate in sports, correct?

3   A.   Not so much lately.

4   Q.   Okay.

5   A.   Did you say sports?

6   Q.   Yes.

7   A.   No, not currently.

8   Q.   You exercise?

9   A.   Yes.

10   Q.   You run?

11   A.   No.

12   Q.   You exercise how?

13   A.   Walk, hike and bike mostly, basketball from time to

14   time.

15   Q.   You made a decision to go down to the protest.  That was

16   a decision of conscience, correct?

17   A.   Yes.

18   Q.   You believed in the cause?

19   A.   Yes.

20   Q.   And you wanted to show support for the cause?

21   A.   Yes.

22   Q.   And you wanted a chance to voice your opinion?

23   A.   As part of a group, yeah.

24   Q.   And you knew that there would be police at the protest,

25   correct?

VOL. I - 49

1    A.    I imagined there would be a police presence potentially,

2    yeah.

3    Q.    Okay.  You said you started moving down High Street from

4    your house.  And that was around 7:30?

5    A.    Perhaps closer to eight.  But, yeah, approximately 7:30,

6    8.

7    Q.    It was still light out?

8    A.    Yes.  It was that time of year, yeah.

9    Q.    And you just went by yourself?

10   A.    Correct.

11   Q.    And you describe High Street as looking like a war zone,

12   correct?

13   A.    Once -- I think much of campus was kind of rough.  But

14   it was a little bit more south campus and King.  South of King

15   there was a whole lot of the street dug up, the street

16   narrowed, and businesses had these makeshift boardwalks so that

17   people catching a bus or whatever could navigate the

18   construction.

19   Q.    This was still north of Fifth Street, correct?

20   A.    Yes.  And then also -- I mean, south of Fifth Street, it

21   seemed to be the same case in terms of the construction and the

22   street work in progress.

23   Q.    You saw businesses boarded up as well?

24   A.    I don't recall that so much, no.

25   Q.    When you got to the scene on May 30th, it was about 8:30

VOL. I -    50

1   when you got to Fifth?

2   A.   I think it was closer to nine.  I would say much closer

3   to nine o'clock.

4   Q.   It was dark?

5   A.   Yeah.  It was darker now, yes.

6   Q.   But you were able to see protesters?

7   A.   Yes.

8   Q.   You were able to see police?

9   A.   At a point.  Once I got to the southernmost point that I

10  was at that night, yes.

11  Q.   And you're familiar with the way police officers dress,

12  correct?

13  A.   Generally, yes.

14  Q.   Can you describe generally how you've seen police

15  officers dress?

16  A.   I mean, depending on who they're with, yeah.  Sometimes

17  white shirts, sometimes brown shirts, sometimes blue.  But,

18  yeah, I'm familiar with how cops dress.

19  Q.   Okay.  And you saw police dressed in that way, as well

20  as police dressed in riot gear, correct?

21  A.   Correct.

22  Q.   And riot gear includes body armor, a helmet, and a mask,

23  correct?

24  A.   Yes.

25  Q.   Okay.  So you saw both sets?

VOL. I - 51

1    A.    By nine o'clock, yeah, yes.

2    Q.    Okay.  And you actually saw a line of police officers

3    about -- you said about half a football field away from the

4    line of protesters.  Is that fair?

5    A.    Yes.

6    Q.    And the protesters were chanting?

7    A.    Yes.

8    Q.    And your statement was, it was clear we were being asked

9    to move north, in response to whatever you were saying; is that

10   correct?

11   A.    Just before I was hit with munitions, it was clear to me

12   from other protesters --

13   Q.    Your testimony was that when you arrived, you said we

14   were asked to move north.  Was that -- were you there for, in

15   fact, a while before you were asked to move north?

16   A.    No.  I got there at that point near Fifth and High

17   shortly around or a little bit after nine.  And ten minutes

18   passed just protesting, and then there was a command that the

19   crowd has trouble hearing.  The crowd looks to each other.  I

20   mean, I looked to other protesters.  And it seems to me that we

21   started shifting north because that's what the muffled command

22   was.  And within almost instantly, I felt a pellet hit me.

23   Q.    So you heard a command to move north?

24   A.    I heard a command.

25   Q.    Okay.  And you started to move north?

VOL. I -   52

1    A.    Yes.

2    Q.    Along with other protesters?

3    A.    Yes.

4    Q.    And that was -- was it your opinion, then, at that point

5    the protest was over?

6    A.    I was well aware of the ten o'clock curfew.  So it -- I

7    mean, the protest was almost over, as I saw it.  And then it

8    seemed like it was going to end early, or we would go someplace

9    else where we were allowed to protest until ten o'clock.

10   Q.    You describe there as being emotion on the part of the

11   protesters.  Do you remember saying that?

12   A.    Yes.

13   Q.    And emotion you mean shouting, correct?

14   A.    Chanting names primarily, yes.

15   Q.    Chanting names primarily.  Chanting anything else other

16   than names?

17   A.    I mean, there was a lot of names and some phrases, but

18   nothing violent, nothing that I would have felt uncomfortable

19   with chanting.

20   Q.    And you chanted?

21   A.    Yeah.

22   Q.    You also saw police with shields, correct?

23   A.    Correct.

24   Q.    And at some point you started to move north and you felt

25   something behind you, correct, in your back?

VOL. I -   53

1   A.    Correct.

2   Q.    And you described it as you felt a munition hit your

3   body.  Do you remember saying that a few minutes ago?

4   A.    Yes.

5   Q.    You weren't aware of what it was when it actually hit

6   you, were you?

7   A.    I was not fully aware of what I was struck with when I

8   was struck.

9   Q.    And the term munition is a term that you learned later,

10  correct?

11  A.    Sorry.  You chopped up a little bit there.

12  Q.    Is it better now?

13  A.    Yeah.

14  Q.    You learned the term munition for what hit you later,

15  correct?

16  A.    I mean, I've always known what a munition is.  But,

17  yeah.  I guess, yeah.  I mean, honestly, I don't to this day

18  know exactly what it was, what it was made of.  I guess I'm

19  referring to munitions and projectiles.

20  Q.    And you then turned to head north and went into the

21  doorway of a coffee shop; is that correct?

22  A.    Correct.

23  Q.    And you weren't having any trouble walking after you

24  felt this in your back, correct?

25  A.    Not walking because the pain was in the upper part of my

VOL. I -   54

1   body at that point.

2      Q.   And your specific words were that you started to jog,

3   correct?

4      A.   Yeah.  Lightly jog away, yes.

5      Q.   And would you describe yourself as fit enough to jog for

6   a mile?

7      A.   Probably.

8      Q.   Okay.

9      A.   Yes.

10      Q.   You play basketball.  You play half or full court?

11      A.   I don't really play, but it's got to be half.

12      Q.   And at some point you said there was an officer who was

13   in that archway with you, correct?

14      A.   Well, there was a group of officers, and I guess one

15   that grabbed me out of the doorway very quickly.

16      Q.   And there weren't other people around you besides the

17   officers at that point, correct?

18      A.   It's hard for me to recall.  Not too far from me other

19   individuals were being apprehended.  But, in my immediate area,

20   yes, it was officers and me.

21      Q.   And you stopped voluntarily?

22      A.   Yes.

23      Q.   Okay.  The officer who handcuffed you, you didn't get

24   that person's name, correct?

25      A.   I did not.

VOL. I -   55

1    Q.    Okay.  And you eventually were charged with a criminal

2    offense?

3    A.    I was charged with failure to disperse.  That is a

4    criminal -- yes.

5    Q.    You went to court, correct?

6    A.    No.

7    Q.    Mr. Moses, you had an attorney that represented your

8    interest in court, correct?

9    A.    Yes.

10   Q.    And that attorney was Dan Sabol, correct?

11   A.    Initially, yes.

12   Q.    And the officer that arrested you and charged you, that

13   officer was dressed how?

14   A.    He looked more like a uniformed, you know, police

15   officer I guess you would say; white shirt, dark pants, older.

16   Q.    At the time you were arrested, you were aware there had

17   been an order for you to move north, right?

18   A.    By that time, yes.  It was clear that the garbled

19   command was to disperse the area.

20   Q.    And you had initially moved north relatively quickly by

21   jogging, correct?

22   A.    I wasn't jogging before I was hit.  We just -- we turned

23   around and it happened really fast.

24   Q.    But then you were moving relatively quickly at some

25   point before you were arrested, correct?

VOL. I -   56

1    A.    Yeah.  From the time I was hit -- I guess the distance

2    from the point I was hit with a projectile to the point I got

3    to the coffee shop stoop, the distance probably -- I don't

4    know, maybe as little as 40 feet, maybe as many as 60.  So it

5    was a short jog to check myself out.

6    Q.    And then at the time you were arrested, you actually

7    weren't moving along?

8    A.    I was picking myself up to continue to disperse the area

9    but wasn't given a chance before I was grabbed.

10   Q.    And you remember your attorney or counsel for the

11   plaintiffs asking if you saw any bottles thrown, correct?

12   A.    I don't recall being asked that question directly.  I

13   remember like in a formal setting, I did -- I have provided a

14   statement that I didn't see bottles and such being thrown by

15   protesters.

16   Q.    You didn't see this where you were on May 30th?

17   A.    Correct.

18   Q.    You cared about the cause, correct?

19   A.    Correct.

20   Q.    And you still care about the cause?

21   A.    Correct.

22        MR. STEINBERG:  Your Honor, may I have a moment,

23   please?

24        THE COURT:  Yes, you may.

25        MR. STEINBERG:  Your Honor, I don't have any other

VOL. I - 57

1    questions.  Thank you.

2          THE COURT:  Thank you, Mr. Steinberg.

3       Mr. Forman, do you have any redirect?

4          MR. FORMAN:  No, Your Honor.

5          THE COURT:  Mr. Moses, before you go, I want to

6    clarify a couple of things.  You said that at the time of the

7    arrest -- I think you told Mr. Steinberg that at the time of

8    your arrest, you knew that you were to move north.  Is that

9    accurate?

10         THE WITNESS:  At the time of my arrest, yes, that's

11   accurate.  I was --

12         THE COURT:  Okay.  And had you been told by the police

13   to move north, or did some of the other protesters indicate to

14   you that you were to move north?

15         THE WITNESS:  The latter.  It was not clear to me

16   until I looked at other protesters who were turning around and

17   communicating that we should all be doing that.

18         THE COURT:  Now, at the place at which you were

19   arrested, was that north of where you had moved from?

20         THE WITNESS:  Yes.

21         THE COURT:  All right.

22      Mr. Steinberg, in light of my questions, do you have

23   anything further?

24         MR. STEINBERG:  If I may, Your Honor, just very

25   briefly?

VOL. I –   58

1              THE COURT:  Yes.

2         BY MR. STEINBERG:

3         Q.   You described hearing a garbled command from Columbus

4    police, correct?

5         A.   Correct.

6         Q.   And that was an announcement –– that was an announcement

7    that made other people in the group of protesters begin to head

8    north, correct?

9         A.   Correct.

10             MR. STEINBERG:  Your Honor, I do not have any other

11   questions.

12             THE COURT:  Mr. Forman, do you have anything in

13   addition?

14             MR. FORMAN:  Nothing further, Your Honor.  Thank you.

15             THE COURT:  Mr. Moses, thank you very much, sir.  You

16   may be excused.

17             THE WITNESS:  Thank you, Your Honor.  Take care,

18   everybody.

19             THE COURT:  Take care.

20         Mr. Marshall, your next witness?

21             MR. MARSHALL:  Yes.  The plaintiffs call Bernadette

22   Calvey.  And Ms. Rettig will examine.

23             MS. CALVEY:  Good morning.  Can you hear me?

24             THE COURT:  Good morning, Ms. Calvey.  How are you?

25             MS. CALVEY:  Good.  How are you?

VOL. I -   59

1          THE COURT:  I'm well.

2       Ms. Clark is going to swear you in.

3     (Witness sworn.)

4          THE COURT:  Ms. Rettig, please proceed.

5                     – – –

6                 BERNADETTE CALVEY

7   Called as a witness on behalf of the Plaintiffs, being first

8   duly sworn, testified as follows:

9                 DIRECT EXAMINATION

10   BY MS. RETTIG:

11   Q.   Good morning.  Can you hear me?

12   A.   Yes.

13   Q.   Can you please state your name for the record?

14   A.   Bernadette Calvey.

15   Q.   Thank you, Ms. Calvey.  Where do you presently reside?

16   A.   Columbus, Ohio.

17   Q.   What neighborhood do you live in?

18   A.   Campus area.

19   Q.   How long have you lived there?

20   A.   Since the fall of 2017 since I started school at Ohio

21   State.

22   Q.   And you're from Ohio?

23   A.   Yes.

24   Q.   How old are you, Ms. Calvey?

25   A.   I'm 21.

VOL. I - 60

1    Q.    What's your present occupation?

2    A.    Nurse assistant.

3    Q.    How long have you worked there?

4    A.    For a little over two years.

5         THE COURT:  Where do you work, Ms. Calvey?

6         THE WITNESS:  Ohio Living Westminster-Thurber.

7    BY MR. RETTIG:

8    Q.    Are you a member of any political organizations?

9    A.    No.

10   Q.    Are you a member of any antipolice groups?

11   A.    No.

12   Q.    Ms. Calvey, I'm going to call your attention to the

13   evening of May 30th, 2020.  Do you recall where you were at

14   that time?

15   A.    Yes.  I was in the Short North area -- well, I was

16   originally at my friend's house who lived roughly like Fourth

17   Street.  And we heard about the protests that were going on so

18   I wanted to go check it out.  So me and my roommate walked from

19   our friend's house on Fourth Street down to High, close to like

20   First or Second Street, that area.  And there were a line of

21   police officers in the street.  And there were some protesters

22   there also in the street, not a lot though, probably like under

23   50 people.

24        I -- do I keep just telling the story?  Yeah.

25   Q.    Bernadette, I'll interrupt real quick.  Sorry.  What

VOL. I -   61

1   time did you arrive in that area?

2     A.   Around nine o'clock.

3     Q.   Okay.  And how long did you remain in the area?

4     A.   I was there for less than five minutes.

5     Q.   Were you with anyone else?

6     A.   I was just with my roommate at the time.

7     Q.   Did anyone tell you to go to the Short North area?

8     A.   No.  We were -- no.  She had -- previously she had

9   attended the protests during the day.  I was not.  I had worked

10  the previous night before; so I slept during the day.  I work

11  nights.  And then so she knew where the protests were.  I

12  didn't even know where the protests were.  But so no one told

13  us where to go.  She kind of knew where some people were

14  gathering or protesting.

15    Q.   Did you bring anything with you?

16    A.   Just my phone.

17    Q.   Where were you standing when you first arrived?

18    A.   I was on the corner of the sidewalk, the corner of High

19  Street and the intersecting one.  I don't know the exact

20  street, but I was on the sidewalk.

21    Q.   Okay.  What was happening when you arrived?

22    A.   Protesters were yelling or chanting Black Lives Matter

23  or specific names, just -- and that was basically it.  The

24  protesters were chanting in the streets when I arrived.

25    Q.   And you testified that you observed uniformed police

VOL. I –   62

1   officers; is that correct?

2   A.   Yes.  They were in riot gear lined up across the street.

3   Q.   Did you observe any police vehicles?

4   A.   Yes.  There was a white van.

5   Q.   How were the protesters acting with regard to the

6   police?

7   A.   They were just honestly standing there and, yes, they

8   were like yelling stuff at the police, chanting Black Lives

9   Matter and that stuff.  But that was the only interaction from

10  the protesters towards the police, was just standing there and

11  yelling.

12  Q.   How loud was the chanting?

13  A.   It was pretty loud.  At least I could hear what they

14  were saying clearly.

15  Q.   Did you observe protesters throwing anything at the

16  police at that time?

17  A.   No.

18  Q.   Any physical confrontations with the police?

19  A.   No.

20  Q.   Did you hear any announcements to leave the area?

21  A.   No, not before they opened fired on us and I was struck

22  in the face.

23  Q.   Ms. Calvey, what were you doing at this time before you

24  were struck in the face?

25  A.   I was just standing on the sidewalk.  I had never been

VOL. I -    63

1  to a protest before at all.  So I was just taking it all in.  I

2  had never seen police in riot gear before.  It was all just

3  very new.  So I was just observing.

4    Q.    Did you join the protesters at all?

5    A.    No.  I was, again, there for a very short period of

6  time.  So I -- while I support the movement, I hadn't really

7  joined in on the movement yet.  I hadn't joined the protesters.

8  I hadn't been chanting.  I didn't step into the street where

9  the other protesters were.  I was just observing from the

10  sidewalk.

11         THE COURT:  Again, Ms. Calvey, would you tell me where

12  you were, what intersection or -- be as precise with respect to

13  your location as possible.

14         THE WITNESS:  Yeah.  So I was on the west side of High

15  Street at the corner of what I think is the corner of High

16  Street and I thought it was Second Street.  But I'm not a

17  hundred percent sure if it's Second or Third Street.  It was

18  one of those I was at the corner, but I'm not a hundred percent

19  sure what side street it was that was intersecting High Street

20  that I was at.

21         THE COURT:  All right.  Thank you.

22         MS. RETTIG:  Thank you, Your Honor.

23  BY MR. RETTIG:

24    Q.    So how far away from the officers were you?

25    A.    Probably like 20 to 30 yards, I would say.

VOL. I - 64

1    Q.   And how far away from the protesters?

2    A.   The protesters were closer than I was, but there was

3    still a good distance between them.  I would say maybe like ten

4    yards.

5    Q.   Do you mean ten yards from the officers or ten yards

6    from you?

7    A.   Ten yards from the officers, ten-yard gap between the

8    protesters and the officers, yes.

9    Q.   How far away from the protesters were you?

10   A.   Probably another like 10 yards to make me 20 yards away,

11   to 30, something like that roughly.

12   Q.   Thank you.  What happened next, Bernadette?

13   A.   So, yeah.  I had walked up and was just observing

14   protesters just yelling and chanting.  And then the police just

15   sort of opened fired on us, and I was struck in the face with

16   what I believed to be a wooden bullet.  It hit me directly like

17   dead center on my chin.  And a white powder exploded from what

18   I was hit.  So I couldn't see anything else.  I was blinded

19   from that.

20       I grabbed my roommate's hand because I couldn't see, and

21   she -- she led me down the side street of the corner I was

22   standing at, then down the first alley on our right to go back

23   up north, back to our friend's house.  But on the way we --

24   like we hid in that alley behind a car.  So other protesters

25   that were near were giving me like water on a rag to clear my

VOL. I -   65

1    eyes and clean up my chin a little bit because it was bleeding.

2        And then, when we were in the alley and I was like

3    getting aid from the other protesters is when we heard the

4    police on a bullhorn yell that if we do not disperse from the

5    area now, we will be arrested.  So then we quickly got up and

6    continued to go back to my friend's house.

7    Q.   What did you hear after being shot?

8    A.   I just heard a bunch of -- I heard other gunshots.  So

9    it wasn't like just one fired.  There were multiple.  And then

10   after, it was just like panic and chaos from the protesters

11   running away.  They were scared.

12   Q.   Immediately after being shot, did you hear any

13   announcements to leave?

14   A.   Immediately after?  No, not until we got into the alley

15   did I first hear that we would be arrested if we didn't

16   disperse.

17   Q.   Okay.  Ms. Calvey, I want to show you what's been marked

18   as Plaintiff's Exhibit P132.

19        MS. RETTIG:  I have Jeff Vardaro helping me screen

20   share.  So if he could pull that up.

21        MR. VARDARO:  Can you see it?

22        MS. RETTIG:  Yes.

23        THE WITNESS:  Yes.

24        MS. RETTIG:  Your Honor, may I show the witness this

25   video?

VOL. I -    66

1              THE COURT:  Yes, you may.

2              MS. RETTIG:  All right.  Jeff, would you please start

3   it.

4        (Video played.)

5              MR. RETTIG:  It didn't really work on my end.  Did it

6   work for other people?

7              THE WITNESS:  It was very skipping.

8              MR. RETTIG:  Yes.

9              THE COURT:  I only saw a snippet of it.

10             MR. VARDARO:  Let me give it another try.

11             THE COURT:  Okay.  Try again.

12        (Video played.)

13             MS. RETTIG:  It's freezing.

14             MR. VARDARO:  I think I see the problem and I think I

15   can probably fix it.

16             THE COURT:  All right.  Go ahead.

17             MS. RETTIG:  Thank you.

18             MR. VARDARO:  Did that work?

19             MS. RETTIG:  Yes, I believe it worked.

20      BY MR. RETTIG:

21      Q.   Bernadette, did it work for you?

22      A.   Yes.

23      Q.   Ms. Calvey, do you recognize this video?

24      A.   Yes.

25      Q.   What is it?

VOL. I -   67

1    A.    My roommate actually took that video, but I was standing

2    directly next to her.  And that was a video from that night.

3    Q.    Have you had an opportunity to review the video?

4    A.    Yes.

5    Q.    What's happening in the video?

6    A.    So it was right before I actually was shot.  It

7    literally is right before.  But you can kind of see how I was

8    on the sidewalk.  At the beginning it shows we were on the

9    sidewalk - she raised it up - and see the distance that we were

10   from the police.

11        And, yeah, that's just the incident that you can -- you

12   can hear me say, oh, my God.  That was my voice.  And I'm

13   pretty sure -- I don't know what my thought was for that, but,

14   oh, my God, and that's when I got hit.  And that's why it cut

15   off.  We were just running down whatever side street we were

16   connected with on High.

17         MS. RETTIG:  Jeff, can you move the video back to the

18   three-second mark, please?

19        (Video played.)

20    BY MR. RETTIG:

21    Q.    Okay.  Ms. Calvey, can you see in the video any uniform

22   police officers?

23    A.    Yeah.  They're lined up across.  It's kind of hard in

24   the video to see, but they're -- yeah.  Yes.  And you can see

25   the protesters in the street.

VOL. I - 68

1  Q.   Is this video a true and accurate representation of what

2  you observed on May 30th, 2020?

3  A.   Yes.

4       MS. RETTIG:  Your Honor, I move to admit Plaintiff's

5  Exhibit P132 into evidence.

6       THE COURT:  Who is doing cross-examination?

7       MS. RETTIG:  I'm sorry.  I missed that.

8       THE COURT:  I was asking Mr. Phillips who is going to

9  do the cross-examination of Ms. Calvey.

10       MR. PHILLIPS:  I am, Your Honor.  Wes Phillips.

11       THE COURT:  Okay.  Mr. Phillips, is there any

12  objection to Exhibit 132?

13       MR. PHILLIPS:  No, Your Honor.

14       THE COURT:  Exhibit 132 will be received.

15       MS. RETTIG:  Okay.  I no longer need the screen share.

16  So could you please exit?

17  BY MS. RETTIG:

18  Q.   Ms. Calvey, how tall are you?

19  A.   I'm five five.

20  Q.   When you were hit by the projectile, how were you

21  standing?

22  A.   I was standing straight up with my chin looking forward.

23  Q.   Were you able to see who shot the projectile?

24  A.   No.

25  Q.   Do you have any reason to doubt that it was a police

VOL. I -   69

1  officer?

2   A.   No.

3   Q.   Were you able to see the direction from which it came?

4   A.   It came from the line -- the direction I was facing,

5  just from how it hit me.  Definitely came from the direction I

6  was facing, which was towards the line of police officers.

7   Q.   Were you able to see whether the projectile bounced off

8  the ground before hitting you?

9   A.   I don't believe it bounced off the ground before hitting

10  me.

11   Q.   Why not?

12       MR. PHILLIPS:  Objection.

13       MS. RETTIG:  I think we missed something from

14  Mr. Phillips.

15       MR. PHILLIPS:  I objected to the answer.

16       THE COURT:  What's the basis of your objection,

17  Mr. Phillips?

18       MR. PHILLIPS:  She was asked a different question, and

19  then she speculated as to what occurred as opposed to answering

20  the question.

21       THE COURT:  Speculation was your objection?  Your

22  objection is speculation?

23       MR. PHILLIPS:  Yes, Honor.

24       THE COURT:  Ms. Evans, would you read back the

25  question and answer, please.

VOL. I -   70

1      (Thereupon, the last question and answer was read by the

2    court reporter.)

3            THE COURT:  Ms. Calvey, is your answer no?

4            THE WITNESS:  Yes, my answer is no.

5            THE COURT:  I will sustain your objection,

6    Mr. Phillips.  And then that question clarified it for the

7    Court.

8            Please proceed, Ms. Rettig.

9     BY MS. RETTIG:

10     Q.   Okay.  Were you able to identify what the projectile

11    was?

12     A.   I was not.  I'm not a hundred percent certain on this, I

13    will be honest.  But I believe that it was a wooden bullet from

14    the police because of -- there was a mark left on my chin

15    obviously after getting hit that was a like perfect circle.

16    And other protesters from that night had picked up wooden

17    bullets off the ground from that night, same location, and it

18    was the exact size measurement that fit my chin.  So I had

19    concluded that it was a wooden bullet that hit me.

20            MR. PHILLIPS:  Objection.

21            THE COURT:  Basis?

22            MR. PHILLIPS:  Speculation, trying to offer an expert

23    opinion.

24            THE COURT:  I'm going to allow the answer to stand.

25    And it will go, Mr. Phillips, to weight more than to

VOL. I -    71

1    admissibility.  That's just the basis of her testimony.

2         Please continue, Ms. Rettig.

3         MS. RETTIG:  Thank you, Your Honor.

4    BY MS. RETTIG:

5    Q.   Ms. Calvey, based on what you saw, where you were

6    standing, and what you experienced, do you have any doubt that

7    the officer shot directly at you?

8         MR. PHILLIPS:  Objection.

9         THE COURT:  Same basis, Mr. Phillips?

10        MR. PHILLIPS:  Same basis from the earlier

11   questioning.  She had already testified that she didn't see it.

12        THE COURT:  Would you read that question back,

13   Ms. Evans.

14     (Thereupon, the last question was read by the court

15   reporter.)

16        THE COURT:  Overruled.  You may answer.

17        THE WITNESS:  No, I do not.

18   BY MS. RETTIG:

19   Q.   How did you feel after the projectile hit you?

20   A.   Immediately -- well, it was painful.  But I was more --

21   immediately I was just scared.  I had my adrenaline rushing.  I

22   couldn't see.  Immediately my eyes burned.  That was my main

23   concern.  I couldn't see.

24        After I was able to wash out my eyes and stuff, my chin,

25   it was like -- it was like a scraped knee kind of.  So it

VOL. I –   72

1   wasn't like gushing blood.  That scabbed over pretty quickly.

2   But what really hurt was my jaw.  I think I absorbed most of

3   the impact from it.  I couldn't open my mouth super wide, and I

4   couldn't eat hard foods for a solid week after.  I had to eat

5   applesauce and smoothies and stuff.

6       Q.  Ms. Calvey, I'm going to show you what has been marked

7   as Plaintiff's Exhibit P62.

8           MS. RETTIG:  Jeff, would you please screen share.

9       BY MS. RETTIG:

10      Q.  Ms. Calvey, do you recognize this picture?

11      A.  Yes.

12      Q.  What is it?

13      A.  That's me.  That's me the morning after actually.  So

14  the next day, May 31st.

15      Q.  What is the mark on your face?

16      A.  That's what happened at the protests.  That's what I'm

17  talking about with how I got hit in the face.  Yes.

18      Q.  Is this a true and accurate picture of what your face

19  looked like on May 31st, 2020?

20      A.  Yes.

21          MS. RETTIG:  Your Honor, I move to admit Plaintiff's

22  Exhibit P62 into evidence.

23          THE COURT:  Mr. Phillips, any objection?

24          MR. PHILLIPS:  No objection, Your Honor.

25          THE COURT:  Exhibit P62 will be received.

VOL. I -   73

1          MS. RETTIG:  Thank you, Your Honor.

2     BY MS. RETTIG:

3     Q.   Ms. Calvey, do you have a scar from the injury?

4     A.   Yes, I have a little scar right there.  It's kind of

5     hard to see through a computer screen.  But, yes, I do.

6     Q.   Do you believe the scar will be permanent?

7     A.   Yes.

8          MR. PHILLIPS:  Objection.

9          THE COURT:  Well, without -- sustained.  Sustained.

10         MS. RETTIG:  Thank you, Your Honor.

11    BY MS. RETTIG:

12    Q.   How long did it take to heal where the projectile hit

13    you?

14    A.   So I had the scab.  The scab fell off probably within

15    like two weeks.  But then it was like super red and gross.  It

16    went all the way and left only a scar probably like three weeks

17    to a month after.

18    Q.   Ms. Calvey, you still have that scar?

19    A.   Yes.

20    Q.   Ms. Calvey, would you have any concerns about going to

21    another protest about police use of force in the future?

22    A.   I would definitely be hesitant.  This was my first

23    protest, and I was there for less than five minutes and ended

24    up getting shot in the face.  So I was -- definitely be

25    hesitant, but I don't want to say I would never attend one

VOL. I -   74

1   again because I don't want to be scared off.  But I would

2   definitely be hesitant, yes, and use way more precaution, stay

3   in the back, be on high alert at all times.

4           MS. RETTIG:  Thank you, Ms. Calvey.

5       Your Honor, may I have a minute to consult with

6   co-counsel?

7           THE COURT:  I just have one question.  I'm sure that

8   you answered this question, Ms. Calvey, but approximately what

9   time was it when you were shot in the face?

10          THE WITNESS:  Nine p.m.

11          THE COURT:  Did you say 9 p.m.?

12          THE WITNESS:  Yes.

13          MS. RETTIG:  Thank you, Your Honor.  May I have a

14  minute to consult with co-counsel before ending my direct?

15          THE COURT:  Yes, you may.

16          MS. RETTIG:  Thank you.

17      Thank you, Your Honor.  I have no further questions.

18  Thank you.

19          THE COURT:  Mr. Phillips, are you ready to proceed

20  with your cross?

21          MR. PHILLIPS:  I am, Your Honor.

22          THE COURT:  All right.  Please proceed.

23

24

25

VOL. I - 75

1                              - - -

2                        CROSS-EXAMINATION

3      BY MR. PHILLIPS:

4      Q.    Ms. Calvey, this morning you reviewed a number of

5      exhibits to get ready for your testimony today, correct?

6      A.    Correct.

7      Q.    Specifically, you reviewed what was marked as Defense

8      Exhibits 48, 49, 50, 51, and -- sorry, and 47, correct?

9      A.    I don't know what those are, but I would say yes.

10     Q.    You reviewed your Baker & Hostetler interview, correct?

11     A.    What?

12     Q.    Did you look at your Baker & Hostetler interview, what

13     has been marked as Defense Exhibit 47?

14     A.    I did not look over an interview.

15     Q.    Did you look at maps, a set of Google maps, of the area

16     of the Short North?

17     A.    Yes, I looked at the Google map images, yes.

18     Q.    That's why today you testified that now you think you

19     were at the area of High and First, correct?

20     A.    I believe I said I was unclear.

21     Q.    Now, when you talked to Baker and -- do you remember

22     talking to Baker & Hostetler, the law firm that is performing

23     an independent evaluation of incidents out of the protests back

24     in May and June?  Do you remember you interviewing with them?

25     A.    I think what you're referring to is -- because I go to

VOL. I - 76

1  Ohio State.  Ohio State students were allowed to reach out to

2  an email address if they were wrongfully -- if like excessive

3  force was used against them at the protests.  So I had emailed

4  them, but then I never talked to them again after.

5     Q.   Okay.  Well, on August 18th, 2020, you were interviewed

6  by the law firm Baker & Hostetler about your allegations,

7  correct?

8     A.   Yes.

9     Q.   And your attorney Jeff Vardaro was with you during that

10  interview, correct?

11     A.   Yes.  Yes.  I'm sorry, yes.

12     Q.   And I know today you've clarified the issue, but at

13  least on August 18th, 2020, you told Baker & Hostetler you were

14  in the area of High Street and Second Avenue, correct?

15     A.   Yes.

16     Q.   Now, you're familiar with the Short North, correct?

17     A.   Yes.

18     Q.   Second Avenue is quite a bit further away from Hubbard

19  Avenue than First Avenue is.  Would you agree?

20     A.   Yes.

21     Q.   So, if you were on First Avenue and High Street, you

22  were quite a bit closer to the intersection of High and Hubbard

23  than if you were at Second and High, correct?

24     A.   Yes.

25     Q.   You never made it down to High and Hubbard, correct?

VOL. I -    77

1    A.    Okay.  I said I was familiar with the Short North.  Yes,

2    I am familiar with the Short North but not really street names.

3    I'm going to be honest.  I'd have to pull up the map if you're

4    going to ask me about the location.  Am I allowed to do that?

5    Q.    Absolutely, ma'am.  Let's make it easier.

6         Ms. Tanoury is the person who knows how to do the

7    exhibits.  I do not.

8         MR. PHILLIPS:  Your Honor, may I have Ms. Tanoury show

9    the witness Plaintiff's Exhibit -- or Defense Exhibit 49,

10   please?

11        THE COURT:  Yes, you may.

12        MR. PHILLIPS:  Is there a way to make it like full

13   screen where we can see it?

14   BY MR. PHILLIPS:

15   Q.    Do you see that, Ms. Calvey?

16   A.    Yes.

17   Q.    If you look at the very top left of the screen almost

18   center, do you see where it says West Second Avenue?

19   A.    Yes.

20   Q.    And you recognize High Street on this map, correct?

21   A.    Yes.

22   Q.    So you see the intersection of Second Avenue and High

23   Street, correct?

24   A.    Uh-huh.

25   Q.    Yes?

VOL. I - 78

1    A.   Yes.

2    Q.   If you look all the way down to the bottom of Exhibit

3    49, do you see the intersection of North High Street and East

4    Hubbard Avenue?

5    A.   Yes.

6    Q.   You were on the west side of High Street in the area of

7    First Avenue, correct?

8    A.   Yes.

9    Q.   So, if you go about one third up on the map, do you see

10   on the left side of High Street where it says West First Avenue

11   where you can see the intersection of High Street and West

12   First Avenue?

13   A.   Yes.

14   Q.   And you would agree that the intersection of High Street

15   and West First Avenue is closer to the intersection of High

16   Street and East Hubbard Avenue than it is --

17   A.   Yes.

18   Q.   -- than the intersection of West Second Avenue and High

19   Street, correct?

20   A.   Yes.

21   Q.   And you never made it all the way down to High Street

22   and Hubbard Avenue.  Is that accurate?

23   A.   Again, I don't know street names.  I never made it past

24   the point on the video.  If that would be First Avenue and High

25   Street, then, yes, I never made it past that point.

VOL. I -   79

1    Q.   So let's do it this way.  You were walking southbound on

2  High Street from the area of Fourth Avenue which is north of

3  this map, correct?

4    A.   Yes.

5    Q.   And you were walking south; so you walked past Second

6  Avenue, correct?

7    A.   Yes.

8    Q.   And then you walked to the area of High Street and East

9  First Avenue, correct?

10   A.   Yes.

11   Q.   But did you continue going down the area of High Street

12  and East Hubbard Avenue?

13   A.   Again, I was unclear of the location.  All I saw was a

14  line of police across the street.  So I stopped before I got

15  too close.

16   Q.   And now that you see this map, if the furthest south you

17  got that night was High Street and East First Avenue, would you

18  agree that you did not go further south to High Street and East

19  Hubbard Avenue?

20   A.   Yes.

21   Q.   So you don't know what was happening at the intersection

22  of High Street and East Hubbard Avenue, do you?

23   A.   No.

24   Q.   You don't know if protesters were breaking windows in

25  that location, do you?

VOL. I -   80

1    A.    No, I wasn't there.

2    Q.    And you don't know if protesters were throwing water

3    bottles in that location, correct?

4    A.    No.

5    Q.    And you don't know if protesters were throwing chunks of

6    concrete in that location, correct?

7    A.    No.

8    Q.    And you don't know if protesters were setting fires in

9    that location, correct?

10   A.    No.

11   Q.    Because you didn't go that far south, correct?

12   A.    Correct.

13   Q.    But, once again, if that was occurring at High Street

14   and East Hubbard Avenue, you were closer when you were at High

15   Street and First Avenue then you would have been if you were at

16   High Street and Second Avenue, correct?

17   A.    Yes.

18   Q.    So let's go back to your video and --

19      (Background noise.)

20         THE COURT:  Is that a video playing in the background,

21   or is that -- I see at the bottom of my screen there are about

22   six phones or something that are open.

23      (Background noise.)

24         THE COURT:  Where is this coming from?

25         THE DEPUTY CLERK:  That's whoever just logged on.

VOL. I – 81

1      THE COURT:  These folks who have called in, do you

2    have any control?  Can we --

3      THE LAW CLERK:  Yes, Judge.  I just muted that caller,

4    and I'll continue to do that if necessary.

5      THE COURT:  Thank you, Ms. Harris.

6      Mr. Phillips, please proceed.  Start from -- she

7    finished that line of questioning where she indicated that

8    since she was not at High and Hubbard, she did not know what

9    happened at High and Hubbard.

10      So please proceed with your next line of inquiry.

11      MR. PHILLIPS:  Thank you, Your Honor.

12    BY MR. PHILLIPS:

13    Q.   Let's go back to the video that was played in your

14    direct examination.  I believe that is Plaintiff's Exhibit 132.

15      (Video played.)

16    BY MR. PHILLIPS:

17    Q.   Ms. Calvey, do you see we are looking at a screen shot

18    of Exhibit 132?  Can you see that?

19    A.   Yes.

20    Q.   And you said this is the angle that you were looking

21    when you were hit by a projectile, correct?

22    A.   Yes.

23    Q.   So you were looking south on High Street, correct?

24    A.   Yes.

25    Q.   So based on the map that you just saw, you were looking

VOL. I -   82

1   towards the direction of High and Hubbard, correct?

2   A.   Correct.

3   Q.   And this video is only a few seconds long.  Do you know

4   if there is a longer version of that video that is somewhere in

5   existence?

6   A.   I'm not aware of a longer version, no.

7   Q.   And you said your roommate took this video?

8   A.   Yes.

9   Q.   And that's Ellie Hienze (phonetic)?

10   A.   Henze, yes.

11   Q.   So it's E-L-L-I-E, H-E-N-Z-E?

12   A.   Yes.

13   Q.   And do you know if Ms. Henze was taking other video that

14   night as well?

15   A.   I'm not aware.  No, I don't know.

16   Q.   How did this video come to your attention?

17   A.   What?

18   Q.   How did you learn about the existence of this short

19   video?

20   A.   She sent it to me.

21   Q.   Did you ask her if she had a longer version of this

22   video?

23   A.   No, I don't think I asked her that because I did -- no,

24   I didn't ask her that.

25   Q.   And I'm not going to ask for it on the record, but do

VOL. I - 83

1   you have her contact information if we ask for it later in this

2   case?

3    A.   Yes.

4    Q.   So let's play this video.  I want you to really focus on

5   the first two seconds of the audio portion of this video, okay.

6   We might play it two times.  I want you to really focus on the

7   first few seconds of the audio.  Let's start.

8       (Video played.)

9          THE WITNESS:  I don't hear any audio.

10         MR. PHILLIPS:  Neither did I.

11         MS. TANOURY:  I'm sorry.  Maybe I need to un-mute

12  myself.  Maybe this is better.

13      (Video played.)

14         MR. PHILLIPS:  Let's try it again.  Not quite.

15      (Video played.)

16         MS. TANOURY:  I'm hearing audio on my end.  So let me

17  just make sure that it's not -- my computer was muted or

18  something.  My computer audio is working; so I can play it

19  again and see if it comes through.

20         MR. PHILLIPS:  Let's try.

21      (Video played.)

22   BY MR. PHILLIPS:

23    Q.   The audio is not coming through.  Let me start by asking

24  you these questions and we'll see if we can get the audio to

25  work.  Okay.

VOL. I -   84

1          MR. VARDARO:  This is Jeff Vardaro for plaintiffs.  If

2     you want, I can get the audio working.  I just didn't want to

3     disrupt everything to do that.  There is a setting to turn on

4     the audio.

5          THE COURT:  All right.  Go ahead, then, Mr. Vardaro.

6          MR. VARDARO:  Alana, if you go to the top of your

7     screen, there should be controls for the video.  There should

8     be a thing that says options.  One of them is share media sound

9     or something along those lines.

10         MS. TANOURY:  Okay.  Thank you, Jeff.

11         MR. PHILLIPS:  Let's try it again, see if it works.

12       (Video played.)

13     BY MR. PHILLIPS:

14     Q.   Okay.  So let's play it one more time.  I really want

15     you to focus on the first couple seconds of this video, this

16     seven-second video, okay?

17       (Video played.)

18     BY MR. PHILLIPS:

19     Q.   Ma'am, did you hear at the very beginning of that

20     seven-second video that you could hear a police loud speaker

21     saying leave immediately?

22     A.   No.

23     Q.   Let's listen to it again and really focus on the first

24     second.

25       (Video played.)

VOL. I -   85

1   BY MR. PHILLIPS:

2   Q.   Did you hear at the beginning of the video --

3   A.   I heard it that time.

4   Q.   Did you hear it that time?

5   A.   Yes.

6   Q.   And did you hear immediately after an officer announced

7   leave immediately, it sounds like -- tell me if I'm wrong, it

8   sounds like either you or Ellie Henze, the person with the

9   camera, says fuck you?

10   A.   Yeah.  That was Ellie.  That was not me, to clarify.

11   Q.   Okay.

12   A.   You can hear me.  I say, oh, my God, and then it kind of

13   cuts off, but to distinguish the voices.

14   Q.   There are a lot of people.  If you look at the screen

15   shot of that video, there are a lot of people standing in the

16   street.  And that would be the portion of High Street located

17   between First and Hubbard, correct?

18   A.   Yes.

19   Q.   And at one point in the seven-second video, you can hear

20   something being fired, correct?

21   A.   Yes.

22   Q.   So let's watch the people in the street when you hear

23   the thing being fired.

24        MR. PHILLIPS:  All right.  Let's play the video again.

25   (Video played.)

VOL. I -   86

1    BY MR. PHILLIPS:

2    Q.    Did you see the people in the street leaving the street

3    when whatever was being fired was being fired?

4    A.    Yes.

5    Q.    And, once again, you didn't see who fired the shot that

6    hit you, correct?

7    A.    No.

8    Q.    And you don't know exactly where it came from, correct?

9    A.    It came from that general direction, south.

10   Q.    So you said this was the first protest you had ever been

11   to, correct?

12   A.    Correct.

13   Q.    Are you part of any social activism groups?

14   A.    No.

15   Q.    Are you aware that there have been other protests in

16   Columbus regarding police issues since May and June of 2020?

17   A.    You mean other protests regarding police?  Yes.

18   Q.    Are you aware there was a protest regarding the Breonna

19   Taylor incident in Louisville?

20   A.    Yes.

21   Q.    Did you attend that protest?

22   A.    No.  This was the only one I've been to.

23   Q.    Okay.  And you're aware there was a protest regarding

24   the Casey Goodson incident in Franklin County, correct?

25   A.    Yes.

VOL. I -   87

1    Q.    And you're aware there was a protest regarding the Andre

2    Hill incident in Columbus, correct?

3    A.    Yes.

4    Q.    And do you know anybody who had been to those protests?

5    A.    Yes.

6    Q.    Who?

7    A.    People I go to school with.  You need names?

8    Q.    It's your understanding that nothing happened during

9    those protests regarding police force, correct?

10          MS. RETTIG:  Objection.  She wasn't there.

11   Speculation.

12          THE COURT:  I'm going to sustain the objection.  If

13   you want to establish a foundation for that, you may.  But if

14   you're going to take the time to establish a foundation for it,

15   Mr. Phillips, I want to know where this is going.  I'm not

16   certain I understand your relevance on whether she knows anyone

17   else who protested in protests that are not the subject of this

18   litigation.

19   BY MR. PHILLIPS:

20   Q.    You were asked earlier about did what happened in June

21   cause you to be hesitant to going to other protests, correct?

22   A.    It was May, just to clarify.  But --

23          THE COURT:  Whether what happened at this --

24          MR. PHILLIPS:  Correct.

25

VOL. I -  88

1    BY MR. PHILLIPS:

2    Q.   What happened during this event made you hesitant to go

3    to other protests, correct?

4    A.   Yes.

5    Q.   If you had learned that there had been subsequent

6    protests where things worked fine and people exercised their

7    First Amendment rights, would that make you more likely to go

8    to a protest to exercise your First Amendment right as well?

9    A.   I think that if -- I think I would have just assumed

10   previous to going to this protest that protests are peaceful,

11   and that I would just assume that there would be no violence

12   against protesters.  So that wouldn't even really be -- I

13   wasn't scared to go.  I had the idea that, you know, police are

14   there at protests to protect you, not hurt you.

15   Q.   And you don't know what happened during this day, what

16   was happening in downtown Columbus, correct?

17   A.   No, I was not there.

18        MR. PHILLIPS:  I have no further questions, Your

19   Honor.

20        THE COURT:  Just for purposes of clarity,

21   Mr. Phillips, do you want to put that question in temporal

22   context?  What time?

23        I'm going to have to make factual determinations too.

24   So it would help the Court if you would let me know what time

25   you're talking about.

VOL. I -   89

1          MR. PHILLIPS:  Thank you, Your Honor.

2       BY MR. PHILLIPS:

3       Q.    So at the time that the incident occurred that we are

4    looking at in -- that is Exhibit P132, okay -- are you there?

5    You with me?

6       A.    Yes.

7       Q.    Since -- you were not downtown right before this

8    occurred, correct?

9       A.    Correct.

10      Q.    So you don't personally know what was occurring downtown

11   before this incident occurred.  Is that accurate?

12      A.    That's accurate, yes.

13      Q.    All right.

14          MR. PHILLIPS:  Your Honor, may I have a moment?

15          THE COURT:  Yes, you may, Mr. Phillips.

16          MR. PHILLIPS:  Your Honor, I have no further

17   questions.  May I move my exhibit into evidence?  It's Defense

18   Exhibit 49.

19          THE COURT:  Am I correct that 49 and 162 are the same

20   exhibit, or is there a difference between the two of them?

21          MR. PHILLIPS:  I do not know.

22          THE COURT:  I'm sorry.  Exhibit 49 and Plaintiff's

23   Exhibit 132, are they the same exhibit?

24          MR. PHILLIPS:  No, Your Honor.  Exhibit 49 is the map

25   of this area.

VOL. I - 90

1          THE COURT:  Any objection to the map coming in,

2    Ms. Rettig?

3          MS. RETTIG:  No, Your Honor.

4          THE COURT:  Mr. Phillips, Exhibit 49, I believe the

5    map, will be received.

6          MR. PHILLIPS:  Thank you, Your Honor.

7          THE COURT:  Ms. Rettig, do you have any redirect?

8          MS. RETTIG:  Yes, Your Honor.  I would like to pull up

9    Plaintiff's Exhibit P132 again.

10          THE COURT:  Yes, you may.

11          MR. VARDARO:  It's me, Jeff Vardaro, who needs to show

12    the exhibit.  Got it.

13          THE COURT:  Go ahead.

14                          - - -

15                    REDIRECT EXAMINATION

16    BY MS. RETTIG:

17    Q.   Ms. Calvey, did you share the same video with

18    BakerHostetler?

19    A.   Yes, I believe.  Yeah.

20    Q.   And we're looking at Plaintiff's Exhibit P132 at the

21    four-second mark.  Can you see the police lined up on the

22    street?

23    A.   Yes.

24    Q.   And in this video are the police facing you?

25    A.   Yes.

VOL. I - 91

1    Q.   So based on the map that we just reviewed, the police

2    would have been between you and Hubbard?

3    A.   Yes.

4    Q.   So, if the police were shooting at Hubbard, they would

5    have been away from you?

6         MR. PHILLIPS:  Objection.

7         THE COURT:  Basis, Mr. Phillips?

8         MR. PHILLIPS:  Leading.

9         THE COURT:  I'm going to sustain.

10        Rephrase your question, Ms. Rettig.  You may inquire in

11   that area, just rephrase it.

12   BY MS. RETTIG:

13   Q.   Ms. Calvey, if the police were shooting at Hubbard, they

14   would have been shooting in another direction?

15        MR. PHILLIPS:  Objection.

16        THE COURT:  It's still leading, Ms. Rettig.

17   BY MS. RETTIG:

18   Q.   Which direction were the police shooting from?

19   A.   The police were shooting towards me.  They were facing

20   north on High Street, not south towards Hubbard.

21   Q.   Thank you, Ms. Calvey.  And on the video that we

22   listened to, did you hear any breaking glass?

23   A.   No.  No.

24        MS. RETTIG:  Jeff, can we play the video one more time

25   all the way through?

VOL. I -   92

1      (Video played.)

2            THE WITNESS:  No breaking glass.  I didn't hear any.

3      BY MS. RETTIG:

4      Q.    Thank you, Ms. Calvey.  And during the video, did you

5      see any fires?

6      A.    No.

7      Q.    Did you see any smoke that would indicate a fire was

8      nearby?

9      A.    No.

10           MS. RETTIG:  Jeff, would you please go back to that

11     four-second mark.

12        (Video played.)

13     BY MS. RETTIG:

14     Q.    Ms. Calvey --

15           MS. RETTIG:  Jeff, I'm going to ask you to put the

16     cursor near the police line.

17     BY MS. RETTIG:

18     Q.    Do you see any smoke coming from that area?

19     A.    No.

20           MS. RETTIG:  Jeff, can you play it forward just a

21     little bit more?

22        (Video played.)

23           THE WITNESS:  Yes.  Did you see it?  I saw it, a

24     little puff of smoke.  Yes, I did see that.

25           MS. RETTIG:  Can we go back to that and freeze it on

VOL. I - 93

1    that frame?

2         MR. PHILLIPS:  Objection, Your Honor.  This is beyond

3    the scope of cross.

4         THE COURT:  Mr. Phillips, I believe that you asked

5    multiple questions about this particular exhibit and what was

6    heard on the particular exhibit.  So I believe this is within

7    the scope.  Your objection is overruled.

8         You may continue, Ms. Rettig.

9         MS. RETTIG:  Thank you, Your Honor.

10        MR. VARDARO:  In response to your question, I'm not

11   sure I can freeze it on a particular frame.  But I can play

12   that section of the clip one more time and see if I can catch

13   it.

14        MS. RETTIG:  All right.  Thank you.

15        MR. PHILLIPS:  Your Honor, may I elaborate on my

16   objection?

17        THE COURT:  It won't be necessary.  I've ruled.  And

18   this is not a jury matter.  You will have time, however, if

19   there is anything additional that you need to inquire about,

20   you may.

21        MR. PHILLIPS:  Thank you.

22        THE COURT:  Please continue, Ms. Rettig.

23        MS. RETTIG:  Thank you.  Jeff, would you please just

24   play the video.

25        (Video played.)

VOL. I - 94

1    BY MS. RETTIG:

2    Q.   Ms. Calvey, during that second, were you able to see

3    anything coming from the police line?

4    A.   Yeah.  There was like a little puff of smoke.

5         MS. RETTIG:  Okay.  I think that's all that I have.  I

6    think that's it.

7         THE COURT:  You might want to leave that up,

8    Mr. Vardaro, in the event that Mr. Phillips has any additional

9    questions.

10        Do you have any questions about this segment,

11   Mr. Phillips?

12        MR. PHILLIPS:  No, Your Honor.

13        THE COURT:  Do you have any additional questions?

14        MR. PHILLIPS:  No, Your Honor.

15        THE COURT:  All right.  I want to clarify one thing,

16   Ms. Calvey.  I think that you -- let me see.  You may have

17   answered it.

18        You say, Ms. Calvey, that you arrived at the scene at

19   approximately nine o'clock and you were shot within five

20   minutes of your arrival.  Was that your testimony?

21        THE WITNESS:  Yeah, roughly, yes.

22        THE COURT:  During that five-minute period that you

23   were there before being shot, did you see any protesters

24   confronting the police presence?

25        THE WITNESS:  No, I did not.

VOL. I -   95

1          THE COURT:  Did you see any protesters throwing any

2     rocks?

3          THE WITNESS:  No.  No, I did not.

4          THE COURT:  Did you see any protesters throwing any

5     bottles or any other materials?

6          THE WITNESS:  No.

7          THE COURT:  For the five minutes that you were there,

8     then, what did you observe the protesters doing?

9          THE WITNESS:  Pretty much what you can see in the

10    beginning of the video.  I know it's very short, but just

11    standing there, yelling stuff.  Like my roommate, other people

12    were yelling stuff like fuck you and that kind of thing.  But

13    they were just standing there yelling.  That's all I saw

14    happen.

15         THE COURT:  All right.  Thank you very much,

16    Ms. Calvey.  We have no additional questions for you.  You may

17    be excused.

18         MR. PHILLIPS:  Your Honor, may I follow up on the

19    topic?

20         THE COURT:  As long as it's not repetitive of anything

21    you've already asked because you already established that her

22    roommate dropped the F bomb.  But if there's anything that you

23    have not explored, you may.

24

25

VOL. I —   96

1                              - - -

2                     RECROSS-EXAMINATION

3     BY MR. PHILLIPS:

4     Q.   Ms. Calvey, you did see at the area of First and High,

5     when you were looking south towards the area of High and

6     Hubbard, you did see a line of people standing in the street

7     facing off with the police, correct?

8     A.   I wouldn't really call them a line.  There were a couple

9     individuals, but definitely not a line.

10    Q.   If you look at Exhibit 132, it's more people in the

11    street than a couple, correct?

12    A.   Yeah, but they're staggered.  The police are shoulder to

13    shoulder line across the street.  The protesters were not like

14    that; so I wouldn't call it a line.

15    Q.   But you didn't know who these people were because you

16    had only been there for five minutes, correct?

17    A.   Correct.

18    Q.   Once again, if there were people throwing things at the

19    area of High and Hubbard that happened immediately before the

20    five minutes you got there, you wouldn't know if that happened

21    or not, correct?

22    A.   Correct.

23         MR. PHILLIPS:  I have no further questions.

24         THE COURT:  Ms. Rettig, do you have anything further?

25         MS. RETTIG:  No, Your Honor.  Thank you.

VOL. I - 97

1          THE COURT:  Ms. Calvey, thank you very much, ma'am.

2     You may be excused.  Mr. Marshall, when is your next witness

3     scheduled for?  It's 12:46.  But I didn't know when your next

4     witness was scheduled for.

5          MR. MARSHALL:  We can bring a witness right now, Your

6     Honor.  We can take a break.  Whatever the Court's preference.

7          THE COURT:  Let's take a break, have lunch and resume

8     at 1:30.  Will that give everyone enough time, yet not throw

9     your witness schedule off?  We can break until 1:15 as far as

10    I'm concerned, but I was just going to break until 1:30.

11         MR. MARSHALL:  My preference would be 1:15, Your

12    Honor, so we can get --

13         THE COURT:  That's fine with me.  Mr. Phillips,

14    does 1:15 work for you?

15         MR. PHILLIPS:  It does, Your Honor.

16         THE COURT:  We'll stand in recess until 1:15.

17       (Lunch recess taken from 12:46 p.m. to 1:15 p.m.)

18                              - - -

19                         MONDAY AFTERNOON SESSION

20                         FEBRUARY 22, 2021

21                              - - -

22         THE COURT:  Mr. Marshall, your next witness.

23         MR. MARSHALL:  Thank you, Your Honor.  The plaintiffs

24    will call Torrie Ruffin.  And Mr. Forman will examine.

25         MR. FORMAN:  Your Honor, give me just one second.  Is

VOL. I – 98

1  Ms. Ruffin on right now?  I'm going to put this on mute.  Sorry

2  about all of this.

3        THE COURT:  Okay.

4        MR. FORMAN:  Torrie, if you can hear me, go ahead and

5  flick on your sound and everything.

6        My apologies.  I was just on the phone with her.  She

7  said she was on.  I just don't see her yet.

8        MR. MARSHALL:  We'll try this for another minute, Your

9  Honor, and then we'll move on to the next witness.

10        THE COURT:  All right.

11        MR. MARSHALL:  Mr. Forman, why don't you mute and

12  we'll call Ms. Ruffin again.  And if not, we'll call the next

13  witness.

14        THE COURT:  All right.  If it takes a couple of

15  minutes to get Ms. Ruffin on, we can certainly wait.

16        MR. FORMAN:  She is here.  She's just having trouble

17  turning her camera on.  Hopefully that will be resolved in just

18  one second.

19        It's not letting her share her camera.  I think she's

20  hitting screen share.  I'm so sorry.  I thought we had this

21  worked out.  I'm going to go back on mute.

22        MR. VARDARO:  I would recommend having her log off and

23  log back on.  There is a special icon showing on the screen.

24  She's not muted or anything.  She just doesn't have audio or

25  video access.  Oftentimes if you log off and log back on, it

VOL. I -   99

1    might fix something like that.

2            MR. FORMAN:  Okay.  I just told her to do that.

3            MR. PHILLIPS:  Your Honor, as we're waiting, there are

4    some people who are now currently -- they have boxes on the

5    screen who at least at one point were disclosed as witnesses,

6    and we don't know if they are still -- our understanding is

7    they're not going to testify.  Atticus Garden is one of them.

8            THE COURT:  Obviously, I'm not in a position to answer

9    that.  We have Ms. Ruffin on now.  Is it something,

10   Mr. Phillips, that we need to address in advance of

11   Ms. Ruffin's testimony?

12           MR. PHILLIPS:  If they were going to be witnesses, we

13   obviously would move to separate.

14           MR. MARSHALL:  Mr. Phillips, you're referring to

15   Mr. Garden, Atticus Garden?

16           MR. PHILLIPS:  Correct.  And I think Trent Calloway on

17   as well.

18           MR. MARSHALL:  Lots of people here, so I don't see

19   that.

20           THE COURT:  I see Trent Calloway at the bottom of my

21   screen, and I see Mr. Atticus Garden in the row above

22   Mr. Calloway.  Is either of them going to testify?

23           MR. MARSHALL:  I don't believe so, but give me one

24   moment to check, Your Honor.

25           THE COURT:  All right.

VOL. I - 100

1    MR. MARSHALL:  Your Honor, we see boxes for Atticus

2  Garden and Trent Calloway.  We do not intend to call either as

3  witnesses.

4    THE COURT:  All right.

5    Is there anything further, Mr. Phillips?

6    MR. PHILLIPS:  No, Your Honor.

7    THE COURT:  All right.

8    MR. MARSHALL:  I apologize, Your Honor.  Let me ask

9  Mr. -- let me just say, generally, if there's anyone who is

10  listening in who is going to be called by us as a witness -- I

11  don't see anyone else, but if there is anyone else, you should

12  not be listening in unless you are media.  Obviously the public

13  can listen in by phone, Your Honor.  So I just want to make

14  that announcement.

15    MR. VARDARO:  And the plaintiffs, John, right?

16    MR. MARSHALL:  Of course.  Our plaintiffs, those

17  individuals we represent can certainly watch and listen in, as

18  long as they keep their cameras shut off and on mute.

19    THE COURT:  Is there anything further?  I will note

20  for the record that what Mr. Marshall just advised his

21  witnesses and clients is consistent with the Court's ruling on

22  Friday as to participation by the public.  The press and the --

23  I'm sorry, the plaintiffs and the press may participate by

24  video, but neither the plaintiff nor the press can record this.

25  The rest of the public may participate by audio, but they, too,

VOL. I - 101

1  cannot record this.

2       With that being said, Mr. Forman, would you call your

3  next witness.

4       MR. FORMAN:  Thank you, Your Honor.  The plaintiffs

5  call Torrie Ruffin.

6       THE COURT:  Ms. Ruffin, Ms. Clark, my courtroom

7  deputy, is going to swear you in at this time.

8     (Witness sworn.)

9                            - - -

10                     TORRIE RUFFIN

11   Called as a witness on behalf of the Plaintiffs, being first

12  duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. FORMAN:

15   Q.   Good afternoon, Ms. Ruffin.  Could you state your name?

16   A.   Torrie Ruffin.

17       THE COURT:  Ms. Ruffin, if you can turn your volume up

18  and get a little closer to the mic, that would help.  I

19  appreciate it.  Thank you very much.

20       Please continue, Mr. Forman.

21   BY MR. FORMAN:

22   Q.   Ms. Ruffin, just to clarify, could you state your name

23  one more time, just to make sure the record is clear?

24   A.   Torrie Ruffin.

25   Q.   Ms. Ruffin, where do you reside?

VOL. I - 102

1    A.    Columbus, Ohio.

2    Q.    Any particular neighborhood?

3    A.    McNaughten Woods.  It's near Reynoldsburg, Ohio.

4    Q.    How long have you lived there?

5    A.    I've lived in Reynoldsburg for about 11 years, and in

6 this general area for about five.  But I've been in Columbus

7 just about my entire life.

8    Q.    Are you presently employed?

9    A.    Yes.

10    Q.    Where do you work?

11    A.    Columbus City Schools.

12    Q.    What do you do there?

13    A.    I'm a special needs teacher's assistant.

14    Q.    As part of that job, what do you do?

15    A.    I give instruction and teach and work directly with

16 middle school special needs students, and I also take any

17 directives from the main teacher and assist her in any way that

18 it's needed.

19    Q.    How long have you had that position?

20    A.    Four years.

21    Q.    How old are you?

22    A.    Twenty-six.

23    Q.    Ms. Ruffin, are you a member of any political

24 associations?

25    A.    No.

VOL. I -  103

1    Q.   Are you a member of any antipolice groups?

2    A.   No.

3    Q.   Ms. Ruffin, I'm going to draw your attention to the

4    morning of Saturday, May 30th of 2020.  What were you doing on

5    that morning?

6    A.   I attended a protest downtown in light of the George

7    Floyd protests that were going on.

8    Q.   Had you ever attended a protest before?

9    A.   No.

10   Q.   How did you learn about the protest?

11   A.   I had a few friends that attended the night before on

12   the 29th, and we were discussing what was going on and that

13   there was something also going on the morning of the 30th.

14   Q.   Why did you decide to attend the protest?

15   A.   I thought it was for a good cause.  And after hearing

16   about what was going on on the 29th, I felt inclined to be a

17   part of something that may cause change.

18   Q.   How did you travel to the protest?

19   A.   I went to a friend -- I drove to a friend of mine's

20   house who lives on Fourth Street near campus.  And then we

21   drove together to I believe Third Street and then walked up

22   High to the Statehouse.  I'm sorry.  Broad Street.  I always

23   mix that up.

24   Q.   Who did you go with?

25   A.   I went with two friends named Trey Schober, and Jonathan

VOL. I - 104

1    Eckenrhode.  And then we met three friends of mine that were --

2    the names were Nick Bex, Austin -- I'm sorry.  I don't know

3    Austin's and V's last name.  But a male named Austin, and a

4    male named V, Vipaul.

5    Q.   Where did you park?

6    A.   Down Third Street.  I don't remember which intersection

7    it was.

8    Q.   What did you do after you parked?

9    A.   We went over to the corner of -- I believe it was State

10   and Broad and we waited for the rest of our group.  And then we

11   walked up Broad Street towards the Statehouse.

12   Q.   Tell me what happened on that walk.

13   A.   We noticed that there were some groups that were

14   circling the Statehouse.  They were just chanting and walking.

15   There was about two or three separate groups that were walking

16   through.  So we went and joined.

17   Q.   After you joined, what did you do?

18   A.   We circled I believe twice around the Statehouse, and

19   then we came up to -- on High Street.  In the middle there were

20   some statues that are towards the sidewalk from the Statehouse,

21   and there were some speakers gathering and getting prepared.

22   So we stopped and listened to them for a while.

23   Q.   Approximately what time of day was this?

24   A.   This is about 10 o'clock a.m., maybe 10:15.

25   Q.   What were the -- can you tell me about what happened

VOL. I - 105

1   when you were watching the speakers?

2       A.   There was a mother that spoke and then a few other

3   activists that spoke during it.  It was a very peaceful,

4   powerful moment.  The speeches probably went on for about 15 or

5   so minutes, and there were people gathering around as time went

6   on and just listening, recording, things like that.

7       Q.   What happened next?

8       A.   We turned our attention to High Street, and then stood

9   on the sidewalk, on the curb.  There were some bicycle officers

10  that periodically went through and were standing and just

11  making sure that we stayed on the sidewalk, which we did.

12  There wasn't too much going on.  We were probably there for

13  another 10 or so minutes.

14      Q.   What happened --

15      A.   And then after a while there were some more people

16  gathering on the corner of Broad and High.  So my friends and I

17  decided to walk down there and see if there was anything

18  different going on down in that area.  So that's where we

19  headed.  And it was just about the same thing going on in that

20  area.  People were walking.  There were some chanting.  There

21  was some groups that were just standing and holding signs.  And

22  then after -- it was probably another ten minutes there.  After

23  that, there was a man that went out onto the road.  There were

24  police cars that were parked on the road near the -- I believe

25  it was the bus lane.  And so there was a man and a few other

VOL. I - 106

1  people that ran out and sat in front of those cars, in front of

2  the police cars.  And they started saying this was a peaceful

3  protest, this was a peaceful protest.

4      So my friends and I and maybe -- it was quite a few

5  people, maybe 50 people ran over, sat down in the road.  We

6  linked arms and were sitting and chanting this is a peaceful

7  protest.  Then two or three officers came by with mace and came

8  through and pepper sprayed the faces of protesters that were

9  sitting on the ground.

10     So we got up and -- I'm sorry.  Am I -- can you guys

11  hear me?

12     THE COURT:  Yes.  Ms. Ruffin, this is Judge Marbley.

13  Your picture has frozen, but we can hear you.

14     THE WITNESS:  Everything went out on my computer.  I

15  wanted to make sure.

16     THE COURT:  You're off the screen but we can still

17  hear you.

18     THE WITNESS:  Would you like me to continue for now?

19     THE COURT:  Is there a way that we can get back your

20  visual?

21     THE WITNESS:  I'm going to try and see if it will turn

22  it back on.  I don't know exactly what happened.

23     MR. FORMAN:  This is Ed.  You may see -- next to the

24  mic button, you may see a camera button.  It's probably turned

25  off.

VOL. I - 107

1      THE WITNESS:  I clicked on it, and it's like loading

2  or something.  Can you still hear me now?

3      THE COURT:  Yes.

4      THE WITNESS:  Okay.  It said stop sharing your camera,

5  and it said, we apologize but we're experiencing difficulties

6  with the video conference and are no longer able to share your

7  camera.

8      THE COURT:  Continue with your testimony.

9  BY MR. FORMAN:

10  Q.   I believe when we last were talking, you had mentioned

11  that you had gone into the street.

12      Before you go into the street, did you see any police in

13  the area?

14  A.   Yes.  There were just some bicycle police officers that

15  were just riding down High Street.  I think they were circling

16  the block.  So every few minutes or so they would come by and

17  circle around.

18      THE COURT:  Ms. Ruffin, when you went into the street,

19  where were you located, near or at which intersection?

20      THE WITNESS:  I was right by the intersection of Broad

21  Street and High Street.  And I was still on High Street.

22      THE COURT:  I see.  All right.  Please continue,

23  Mr. Forman.

24  BY MR. FORMAN:

25  Q.   Thank you.

VOL. I –  108

1      So at the time you went into the street, was there any

2  traffic on High Street?

3  A.   No.

4  Q.   Do you know why?

5  A.   I'm not sure.  When we were standing on Broad, there was

6  a pretty normal flow of traffic going through the entire time.

7  I don't -- I saw that there were some police cars that were

8  starting to park in like the middle turn section, and there

9  were some in the bus section.  So I think maybe the roads were

10  getting blocked off to accommodate the protesters that were

11  there.

12  Q.   Why did you make a decision to go into the street?

13  A.   I saw other people going in there.  It didn't seem to be

14  problematic so I thought it was a good idea at the time.

15  Q.   About how long were you in the street before the pepper

16  spray you described occurred?

17  A.   I'd say we were sitting, at max, five minutes.

18  Q.   So were you hit with pepper spray as part of that

19  incident?

20  A.   Yes.

21  Q.   At that point what did you do?

22  A.   I got up because my eyes were burning and I was coughing

23  a bit.  And so I stood up and I went backwards towards the

24  sidewalk that's nearer to the Statehouse.  So I went over

25  there, and I got some water out of a water bottle and flushed

VOL. I - 109

1    out my eyes.  I drank some of it to flush out my throat.  At

2    that time people were starting to gather in the intersection of

3    Broad and High Street just into the crosswalk, and they were

4    linking arms.  So I went over and joined to link arms over

5    there.

6        Q.   When you say in the intersection, will you give us some

7    more information as to where you were in the intersection?

8        A.   Broad and High Street.  So it was Broad and High Street.

9    It's like -- I think it's coming in delayed.

10       Q.   Go ahead.  I'm sorry.

11       A.   Okay.  So it was still the intersection of Broad and

12   High Street, and it was the actual crosswalks.  All four

13   crosswalks had people in them.  I specifically was on the side

14   of High Street that was still by the Statehouse.  So I was in

15   the crosswalk that was Broad and High closest to the

16   Statehouse.

17       Q.   So I'm actually going to walk back in time here for a

18   second.  So prior to the incident when you walked into the

19   street the first time, did you see anything being thrown by

20   protesters?

21       A.   No.

22       Q.   During the time you were seated in the street, did you

23   see anything being thrown by protesters or police?

24       A.   No.

25       Q.   Now that we're back in the street for a second time,

VOL. I - 110

1    when you came back out and you were in that crosswalk, did you

2    observe any police officers?

3      A.   I'm sorry.  Could you repeat that one more time for me?

4      Q.   Sure.  When you were in the crosswalk, as you described

5    it, did you have occasion to view any police officers?

6      A.   Yes.  They -- there were bicycle officers in the

7    intersection.  So, as we were in the crosswalk, they were

8    technically in the middle of the protesters, and they were just

9    lined up at the edge of the crosswalk kind of just keeping us

10   from actually being in the middle of the intersection.

11     Q.   Did you observe any traffic at this time?

12     A.   No.

13     Q.   So what happened next?

14     A.   So we were standing there.  That was probably an

15   extended amount of time, maybe 10 to 20 minutes.  And for the

16   most part, it was just some chanting.  There were just

17   protesters all linked arms in all of the crosswalks.  And at

18   one point some more officers showed up.  And to move us out of

19   the way, the bicycle officers used their bicycles to actually

20   push and physically move us to the side to allow more officers

21   to come in.  And these officers came in with riot gear.

22          And so they were -- I want to say there was maybe ten or

23   so of those officers that came into the middle and were walking

24   around for a period of time.  And then, as we were standing

25   there, we noticed that officers were putting masks on their

VOL. I - 111

1 face.  So we knew that they were preparing to do something.

2 And then there was another mass spraying of pepper spray into

3 the protesters' faces.  So there was chaos again for that.

4          THE COURT:  I'm going to go back for a moment,

5 Ms. Ruffin.  You said first you were near the intersection of

6 Broad and High.  And you and some others who were with you went

7 into the street.  Is that right?

8          THE WITNESS:  Yes.  Yes.

9          THE COURT:  Was that before you then went into the

10 crosswalk?  Or when you went into the street, did you go into

11 the crosswalk?

12          THE WITNESS:  So that was before.  So we went into the

13 street and sat down.  There was a pepper spraying then.

14          THE COURT:  Okay.

15          THE WITNESS:  And then people went into the crosswalk,

16 and that was like another calm period of time, and then there

17 was a second pepper spraying.

18          THE COURT:  Okay.  Before you were pepper sprayed the

19 first time, did the police tell you to leave the street?

20          THE WITNESS:  No.

21          THE COURT:  Did the police --

22          THE WITNESS:  So when we were standing on the side --

23 when we were just on the curb of Broad and the bicycle officers

24 were going by, they would say stay out of the street.  We

25 stayed out of the street because there were still cars going by

VOL. I -  112

1  at that time.  But, when we sat in the street, there was no

2  directive to get up and leave.

3         THE COURT:  Okay.  So you went and sat in the street.

4  As you were seated in the street, you were pepper sprayed.  Is

5  that your testimony?

6         THE WITNESS:  Yes.

7         THE COURT:  Were you pepper sprayed by the officers

8  who were on bicycles?

9         THE WITNESS:  I believe so, but I don't have an

10  accurate memory of who exactly it was who came by with the

11  pepper spray.

12         THE COURT:  Please continue, Mr. Forman.

13         MR. FORMAN:  Thank you.

14  BY MR. FORMAN:

15  Q.   During the second pepper spraying incident, were you

16  hit?

17  A.   Yes.

18  Q.   Can you tell me what that was like?

19  A.   It burned a lot in my eyes.  The second time that I was

20  hit with it, it was a lot more aggressive in my eyes and in my

21  throat.  I wasn't able to see.  I do know that I was able to

22  cross the street, but I was crying a lot.  So I was able to

23  cross the street and sit on the sidewalk.  I was right on the

24  curb.  I asked -- I had lost my friends at that time.  So I

25  asked a woman that was standing near me if she had any water

VOL. I - 113

1    and if I could flush my eyes out.  So she did.  So I was

2    sitting there, and I flushed my eyes out for a period of time

3    before it kind of calmed down.

4    Q.    Now, again, at this time, the second incident was when

5    you were standing linked arms in the crosswalk.  Is that --

6    A.    Yes.

7    Q.    Right before that incident, right before you were pepper

8    sprayed, did you see protesters throwing anything at police?

9    A.    No.

10   Q.    Did you see protesters being physically aggressive with

11   police?

12   A.    No.

13   Q.    What were the protesters doing?

14   A.    For the most part, they were quiet.  There were some

15   that were -- like the ones that were in the front row, there

16   were a couple of females that were maybe yelling at the officer

17   that was standing in front of them.  But, for the most part, it

18   was -- it was just some yelling, some talking, not a ton going

19   on.

20   Q.    You had stated that after you were pepper sprayed the

21   second time, you left the street and went to the sidewalk.  Can

22   you describe where that was?

23   A.    So that sidewalk was still on High Street, and it was

24   across the street from the Statehouse.  So it was right in the

25   general area of where Huntington Bank was.  And there was a

VOL. I –  114

1   pizza place right next to Huntington.  So I was right in that

2   vicinity.

3           MR. FORMAN:  Your Honor, I would like to show the

4   witness what has been marked as Plaintiff's Exhibit P104.

5           THE COURT:  You may.

6           MR. FORMAN:  Thank you.

7       I hope I don't screw this up.

8    BY MR. FORMAN:

9    Q.   Ms. Ruffin, can you see this?

10   A.   Yes.

11   Q.   I'm going to play this now.

12     (Video played.)

13           MR. FORMAN:  Actually, before I do this, please note

14   there is no sound in this video.  So I'm going to start that

15   over.

16           THE COURT:  All right.

17     (Video played.)

18   BY MR. FORMAN:

19   Q.   Ms. Ruffin, I'm going to stop this video at the

20   40-second mark.  If you could look at the picture which is in

21   front of you, do you recognize what this is?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's an overhead camera showing the protests on

25   May 30th.  This was after the second pepper spraying and

VOL. I - 115

1  everyone had cleared back out of the streets.

2  Q.   Would you have been present in this video somewhere?

3  I'm not actually asking you to find yourself, but just

4  generally.

5  A.   Yes.

6  Q.   Where would you have been?

7  A.   If you see the bicycle officers towards the back of the

8  screen, that back middle, I am somewhere near like the third

9  bicycle officer.  I would have been sitting on the curb and

10  standing up at some point during this.

11  Q.   Am I getting the cursor in the right area here?  Can you

12  see that?

13  A.   Again, that's the right general area.

14  Q.   Okay.  So, when last we talked, you were sitting on the

15  sidewalk.  So what happened after that?

16  A.   So I had started recording because I noticed that there

17  were some officers on horses that were now riding onto the

18  sidewalk.  And they were coming from somewhere on the actual

19  intersection of Broad and High.  They went onto that sidewalk

20  that's across from this camera, and they started walking

21  through the crowd with the horses.  And then, as they came

22  through, they ended up coming onto the street after walking by

23  that yellow awning.  They came onto the street.  And then I had

24  stood up and just was recording the area.

25       I noticed that there were some officers that were in

VOL. I - 116

1   riot gear that started placing things on the street right in

2   the middle.  And after a couple of seconds of them placing

3   things on there, they started to run away.  And then there

4   were -- there was smoke bombs that ended up going off, and the

5   crowd kind of turned into chaos and were running and trying to

6   get away from all of the smoke bombs that were going on.

7        And then I noticed that there were some being -- still

8   smoke bombs being thrown from the street onto the sidewalk.

9   And so -- and then they were hitting the sidewalk and going

10  off.  So it was making people disperse more.

11       And then I actually -- I was still recording at the

12  time.  So I walked back towards the curb, and there was a girl

13  who had her phone out and she was recording and saying

14  something in the face of a bicycle officer.  And he pulled his

15  pepper spray out, sprayed her in the face directly point-blank

16  in the eyes.  She turned for a second.  She came back up and

17  said something to him and he sprayed her point-blank in the

18  eyes again.  There was a group of people that were right there

19  and witnessed it too, and they started to get upset about it.

20       And then there were -- there were some more smoke bombs

21  that were thrown onto the sidewalk.  And there was one that

22  landed directly near me or directly next to me.  So I stood

23  back and started to walk towards the Huntington awning.  As I

24  was standing there, there were more people dispersing.  And

25  then there was a man with -- he had like a gas mask on and he

VOL. I - 117

1   was walking away from the crowd, seemingly getting away from

2   the situation.  He was calmly walking.  And there's an officer

3   that ran from behind him, ran up to him, seemingly hit him on

4   the head, pulled his mask off and then took pepper spray and

5   was spraying into his mask, into the guy's face.  And then the

6   guy was able to get away from the officer and he ran off.

7           And then the spraying and everything kind of calmed down

8   after that.  And then there was a -- I believe it's called a

9   meerkat.  It was one of those big officer vans came through

10  with a speaker, and that's when an officer was on the speaker

11  and said this is a state of an emergency, you need to leave

12  this area immediately or you are subject to arrest or worse.

13  And they said that three times.  They prompted that three

14  times, and no one really left.  And then after that third time,

15  a friend of mine was able to get ahold of me over the phone.

16  They called me to see where I was.  And we decided that it was

17  no longer safe to stay so we decided to leave the protest.  And

18  we left after that.

19  Q.   Okay.  Ms. Ruffin, I'm going to play you the rest of

20  this video now starting at 40 seconds.

21  A.   Okay.

22     (Video played.)

23  BY MR. FORMAN:

24  Q.   Ms. Ruffin, have you had an opportunity to view the

25  video now in its entirety?

VOL. I - 118

1    Ms. Ruffin, are you there?

2    Ms. Ruffin, are you still present?

3    MR. VARDARO:  Her thing is showing the different icon

4  where it's not connected anymore.

5    MR. FORMAN:  Geez.

6    MR. MARSHALL:  Your Honor, I'm going to suggest that

7  we take a two-minute break and try to get Ms. Ruffin

8  reconnected.

9    THE COURT:  It's 1:57.  We'll reconvene at two

10  o'clock.

11    MR. MARSHALL:  Thank you.

12    (Recess taken from 1:55 p.m. to 2:00 p.m.)

13    THE COURT:  All right.  Ms. Ruffin, we can both see

14  and hear you now.

15    THE WITNESS:  Okay.  Sorry about that.

16    THE COURT:  Not a problem.

17    Go ahead, Mr. Forman.  Please continue with your

18  examination.

19    MR. FORMAN:  Thank you, Your Honor.

20    BY MR. FORMAN:

21    Q.  Ms. Ruffin, I'm once again going to share the video.

22  I'm sorry.  I don't know when it konked out on you so I'm just

23  going to play it from 39 seconds again.  Can you see it?

24    A.  Yes.

25    (Video played.)

VOL. I -  119

1    BY MR. FORMAN:

2    Q.   Thank you.  Ms. Ruffin, have you had a chance to watch

3    the whole video?

4    A.   Yes.

5    Q.   Ms. Ruffin, based on what you saw that day, does this

6    video appear to be a true and accurate view of what occurred

7    that you were discussing?

8    A.   Yes.

9         MR. FORMAN:  Your Honor, at this time, we would move

10   to admit Plaintiff's Exhibit P104.

11        THE COURT:  Who is going to conduct -- Ms. Arbogast,

12   are you conducting this cross?

13        MS. NOBLE:  No, Your Honor.  It will be myself, Andria

14   Noble.

15        THE COURT:  Ms. Noble, is there any objection to the

16   admission of Exhibit P104?

17        MR. FORMAN:  No, Your Honor.

18        THE COURT:  All right.  Mr. Forman, Exhibit P104 will

19   be received.

20        MR. FORMAN:  Thank you, Your Honor.

21   BY MR. FORMAN:

22   Q.   Ms. Ruffin, I'm just going to kind of go back here and

23   sort of grab something.  Do you see -- I'm going to share my

24   screen again.

25        Can you see that?

VOL. I -  120

1    A.   Yes.

2    Q.   Can you see where the cursor is over here where it

3    appears to be some white smoke?  Do you see that?

4    A.   Yes.

5    Q.   Is that what you were referring to as a smoke bomb?

6    A.   Yes.

7    Q.   When you say smoke bomb, can you tell us -- I'm sorry,

8    go ahead.

9    A.   I was just going to say, I may be calling it the wrong

10   thing.  But that's what I saw it as.

11   Q.   Did you experience any of the smoke that was coming away

12   from it, from one of these?

13   A.   Yes.

14   Q.   And can you tell me about that smoke?

15   A.   For the most part, it kind of made my lungs -- it kind

16   of closed up my lungs a little bit.  I had a little trouble

17   breathing from it and a lot coughing.  But when it started --

18   when the smoke started to kind of disperse out of it, I tried

19   to move away from it as quickly as possible.  So I don't know

20   if it would have affected more if I had stayed next to it.

21   Q.   Thank you.

22        Around this time, right before these smoke bombs went

23   off, had you observed any protesters throwing rocks at police?

24   A.   No.

25   Q.   Had you observed any protesters throwing bottles at

VOL. I - 121

1  police?

2  A.   No.

3  Q.   Did you see any protesters becoming physically violent

4  with police officers?

5  A.   No.

6       MR. FORMAN:  Your Honor, at this time, I would like to

7  put us back on share screen and show Ms. Ruffin a different

8  video that's been marked Plaintiff's Exhibit P127.

9       THE COURT:  All right.  You may.

10  BY MR. FORMAN:

11  Q.   Before I do that, Ms. Ruffin, did you see protesters

12  throw any other items at police?

13  A.   No.

14  Q.   Ms. Ruffin --

15       MR. FORMAN:  Your Honor, did you give me permission to

16  play that for the witness?

17       THE COURT:  Yes, I did.

18       MR. FORMAN:  Thank you, Your Honor.  I'm going to play

19  it now.  I'm going to play it for four seconds to make sure the

20  sound comes through.

21    (Video played.)

22       MR. FORMAN:  Could everyone hear that?

23       THE COURT:  Yes.

24  BY MR. FORMAN:

25  Q.   Torrie, could you hear that?

VOL. I - 122

1      A.    Yes.

2      Q.    I'm going to play the video.  Thank you.

3        (Video played.)

4           MR. FORMAN:  Your Honor, I was just notified the

5    witness -- her sound has gone off again.  I'm going to ask her

6    to join the meeting with her phone.  I'm so sorry.  I don't

7    know what's going on.

8           THE COURT:  All right.

9           THE WITNESS:  I'm so sorry.  Can you hear me now?

10          THE COURT:  Yes.  And we can see you, Ms. Ruffin.

11          THE WITNESS:  I'm so sorry.  I don't know why I'm

12   struggling with my technology.

13          THE COURT:  Please proceed.

14   BY MR. FORMAN:

15     Q.    Torrie, you saw me begin the video, right?

16     A.    Yes.  I got about halfway through the video.

17     Q.    I'm going to play it again so we don't miss anything.

18          Can you see it now?

19     A.    Yes.

20        (Video played.)

21   BY MR. FORMAN:

22     Q.    Ms. Ruffin, have you had an opportunity to view the

23   entire video?

24     A.    Yes.

25     Q.    And do you recognize it?

VOL. I - 123

1    A.    Yes.

2    Q.    Do you know who took it?

3    A.    Yes.  It was me.

4    Q.    Can you tell us what it describes -- excuse me, what it

5    shows?

6    A.    It shows what happened.  Basically, that was on that

7    street camera as well.  But it is what happened after I crossed

8    the street from being pepper sprayed in the crosswalk.

9    Q.    Okay.  I am going to take this to one minute and 48

10   seconds, at least I'm going to try to here.

11         I'm going to take this to one minute and 40 seconds.

12   I'm going to play you a short snippet of this video.

13      (Video played.)

14   BY MR. FORMAN:

15   Q.    Ms. Ruffin, what does that video show?

16   A.    That's the man that was walking seemingly away from the

17   situation that was going on, and an officer coming up behind

18   him and attempting to spray pepper spray directly into his face

19   inside of his mask.

20   Q.    Ms. Ruffin, is this video a true and accurate rendition

21   of the events that you observed on that day?

22   A.    Yes.

23   Q.    I'm not sure that you said the date.  What was the date

24   of this video again?

25   A.    May 30th, 2020.

VOL. I - 124

1        MR. FORMAN:  Your Honor, at this time we would like to

2    move the admission of Plaintiff's Exhibit P127.

3        THE COURT:  Ms. Noble, any objection?

4        MS. NOBLE:  No objection, Your Honor.

5        THE COURT:  P127 will be received.

6        MR. FORMAN:  Your Honor, I'd like to confer with

7    co-counsel.  I think that's all the questions I have.

8        THE COURT:  You may.

9        MR. FORMAN:  Thank you, Ms. Ruffin.  Those are all the

10    questions I have.

11        THE COURT:  Thank you, Mr. Forman.

12       Ms. Noble, cross-examination?

13        MS. NOBLE:  Thank you very much, Your Honor.

14                        - - -

15                   CROSS-EXAMINATION

16     BY MS. NOBLE:

17     Q.   Good afternoon, Ms. Ruffin.  You indicated that your

18    friends went to the protest on May 29th; is that correct?

19     A.   I had -- yes, I had two friends that went on May 29th.

20     Q.   And were they the same friends that you met up with or

21    went with?

22     A.   Yes.  We met with -- we met up with them and walked up

23    to the protest on the 30th.

24     Q.   And what did they tell you about what happened the day

25    or evening prior?

VOL. I -  125

1    A.    They said that it was kind of the same situation where

2    there was peaceful protesting going on, there was some police

3    aggression and some police push towards the protesters.  And

4    the situation turned, I guess, chaotic or dangerous, however

5    you want to phrase the situation.

6         They spoke about how protesters were being sprayed,

7    maced in the face, pepper sprayed in the face.  There were

8    first aid volunteers that were there.  They helped flush out

9    their eyes and helped get protesters back to a point where they

10   can -- to stand up and see and be able to go back to what they

11   were doing, standing on the -- I can't say exactly where they

12   were at, but, you know, standing, having their signs up, back

13   to chanting, protesting, that kind of thing.

14   Q.    And they told you this before you went on May 30th?

15   A.    Yes.

16   Q.    And you opted to go?

17   A.    Yes.

18   Q.    And you indicated when you got there on May 30th that

19   there was chanting.  Can you tell me what the chants were?

20   A.    Black Lives Matter.  There were some chants of whose

21   streets, our streets.  There were people calling out names of

22   victims of police brutality that have been popular names

23   throughout the few couple -- I'm sorry; I'm stuttering -- the

24   couple years that have had some bigger voices and some bigger

25   situations in the media that were going on.  So they were

VOL. I - 126

1  calling out their names and giving recognition to those that

2  have some passed due to brutality.

3     Q.   Do you recall any chants of either ACAB or anything else

4  regarding violence against the police?

5     A.   No.

6     Q.   You indicated that you were initially on the sidewalk

7  but then you moved to the street to sit in front of police

8  cruisers; is that correct?

9     A.   Yes.

10    Q.   When you were -- you were like in front of the police

11 car, on the side of it?  Do you recall?

12    A.   We -- so we were I guess more towards the side.  It

13 would be like the side, slash, front of the cruisers.  But we

14 stayed in the bus lane.  So we didn't go out further than where

15 the bus lane was at.

16    Q.   And that was going to be my next question.  It was not

17 on the first lane of travel but in that bus lane, not anywhere

18 else?

19    A.   Correct.

20    Q.   And at that time was there any vehicle traffic?

21    A.   No.

22    Q.   And do you know if any permits were requesting closure

23 of the streets by anyone involved in arranging the protests?

24    A.   I do not.

25    Q.   Prior to -- while you were sitting in front of the

VOL. I -  127

1   police cruiser, were there any orders made for you to move?

2   A.   Not that I know of.

3   Q.   Was there still a lot of chanting at that time?

4   A.   Yes.

5   Q.   Were you chanting?

6   A.   Yes.

7   Q.   And it would be hard to hear someone else telling you an

8   order if you were also screaming.  Is that also correct?

9   A.   Yes, it's possible.

10   Q.   You indicated you were pepper sprayed at that time.  Do

11   you recall how far away the officer was to you?

12   A.   So I was sitting in about the second row of people that

13   were sitting and linking arms.  So as an officer went by --

14   Q.   I'm sorry.  While you were sitting in front of the

15   police cruiser, not the second incident.  I'm sorry.

16   A.   Yeah, we were linking arms sitting as well.

17   Q.   Okay.  Sorry.

18   A.   So, when we were doing that, an officer went by.  I

19   would say he was probably -- when he came by and sprayed, he

20   was probably about five feet away, maybe a little bit further

21   back.

22   Q.   And you indicated there were multiple rows.  How many

23   rows of people were sitting in front of the police cruiser?

24   A.   From what I could see, I know there was at least five.

25   But I don't know how further back it went.

VOL. I - 128

1    Q.   And when you say you were in the second row from the --

2    were you the second row from the police cruiser or the second

3    row from the outside?

4    A.   The second row from the outside.  So we were sitting at

5    an angle.  So it started kind of from the police cruiser and

6    then kind of angled towards the sidewalk right at the

7    intersection.  So I'm trying to give a good description that

8    you could kind of see what I'm saying.  But it would kind of be

9    angled this way, and I was in the second row.  So that first

10   row was out facing the road still, and I was that row right

11   behind them.

12   Q.   Is it your testimony that nobody in this group of people

13   was outside of the bus lane?

14   A.   That I saw, no.

15   Q.   You were -- we're going to move on to when you were

16   linking arms in the crosswalk.  Which crosswalk were you in?

17   Were you on High Street or on Broad Street?

18   A.   I was on High Street.

19   Q.   Correct me if I'm wrong.  I think your prior testimony

20   indicated you were on the side -- you were near the side closer

21   to the Statehouse; is that correct?

22   A.   Correct, yes.

23   Q.   And there were multiple rows of people there as well; is

24   that correct?

25   A.   Yes.

VOL. I -  129

1    Q.    Do you recall how many people -- or how many rows, not

2    how many people?

3    A.    In that row, I know there was at least three.  I don't

4    know if there's any more than that.

5    Q.    And you indicated previously that you were in the second

6    row; is that correct?

7    A.    Yes.

8    Q.    And so your view is blocked?

9    A.    Not really.  I had people shorter than me in front of

10   me.  So I was able to see the officer that was -- the bicycle

11   officer that was directly in front of them pretty well.

12   Q.    Could you see the entire intersection?

13   A.    Yes.

14   Q.    How long were you standing prior to your -- the pepper

15   spraying?

16   A.    The second one or --

17   Q.    Yes.  I'm sorry.  Yes.

18   A.    So we were probably in the crosswalk I would say

19   somewhere between 10 to 20 minutes.  But I don't have an exact

20   gauge of that time.

21   Q.    And how long after the first pepper spraying incident

22   were you standing in the intersection linking arms with people?

23   A.    I'm sorry.  I think I mixed up your question.

24         Okay.  Let me -- so between the first pepper spraying

25   and the second pepper spraying, that was probably a 10- to

VOL. I - 130

1   20-minute span.  And I probably was in the actual crosswalk for

2   10 to 15 minutes of that time.

3        Does that answer your question?  Or did I wrongly answer

4   one of them?

5   Q.   I believe you cleared yourself up.  So that sounds like

6   it wasn't long after the first pepper spraying incident before

7   you were linking arms with people again; is that correct?

8   A.   Correct.  Yes.

9   Q.   Okay.  And Plaintiff's Exhibit 104, the video that you

10  watched that you did not take, do you recall that video?

11  A.   Yes.

12  Q.   And do you know when this was?  Was it before or after

13  your -- the first spraying or the second spraying?  Do you know

14  when roughly in time that was?

15  A.   That was after the second spraying.  So that was

16  probably only a few -- it probably was about five or so minutes

17  after the second spraying that that video begins.

18  Q.   Okay.  And after you were sprayed the second time, you

19  went from -- you said you were closer to the Statehouse but you

20  went to the other side of the street; is that correct?

21  A.   Yes.

22  Q.   Is there a reason why you went to the other side of the

23  street?

24  A.   I couldn't see, and I got a little nervous with people

25  getting -- running in different directions.  And so the safest

VOL. I – 131

1    spot that I found was an open area on the curb.  So that's

2    where I went.

3    Q.   You indicated you lost your other friends.  Do you

4    recall at what point in that morning that you lose your other

5    friends?

6    A.   So after the first pepper spraying, I lost all but one

7    of my friends.  And then after the second pepper spraying, I

8    was completely by myself.

9    Q.   Okay.  Now, I am going to see if I can share screen.

10        It is not allowing me to share my screen.

11        MS. HARRIS:  Ms. Noble, it has you as a presenter.

12   Let me see if I can disable that and re-enable it.

13        MS. TANOURY:  Ms. Noble, would you like me to share my

14   screen with you?  This is Ms. Tanoury.

15        MS. NOBLE:  Yes, I believe it's going to ask me to

16   restart and leave the meeting.

17        Ms. Tanoury, will you please pull up Exhibit 104.  Will

18   you please start playing around 1:58.

19      (Video played.)

20   BY MS. NOBLE:

21   Q.   Ms. Ruffin, I'm going to ask that she start it back over

22   again.  But I want you to take a close look at the top left

23   corner.  And probably go a little bit before 1:58.  It looked

24   like it was right before there.  I want you to take a close

25   look at where one of those canisters was and just take a close

VOL. I -  132

1    look at that area.  I'll ask a question.

2      A.    Sorry.  Is it possible to make that full scene so I can

3    see it a little better?

4          Thank you.

5        (Video played.)

6      BY MS. NOBLE:

7      Q.    Ms. Ruffin, did you see an individual come from off

8    screen to kick that canister towards the officers and then run

9    back off screen?

10     A.    Yes.

11     Q.    I know that that wasn't necessarily your view where you

12   were, but we did ask previously about anything getting thrown

13   towards police.  So I wanted to see if you had seen anything

14   similar to that while you were on the other side.  Did you see

15   anything similar to that on the other side?

16     A.    I saw that there was something that came towards the --

17   like the curb and someone may have picked it up.  But other

18   than that, I did not see it be thrown or anything like that.

19   So I did not see anything like that on the other side.

20     Q.    And right here right where it's paused at 2:03, there is

21   a gentleman that is wearing a gas mask on the sidewalk.  Do you

22   see him?

23     A.    Let me look a little closer.

24         MS. NOBLE:  Ms. Tanoury, if you go up a little bit.

25

VOL. I - 133

1    BY MS. NOBLE:

2    Q.   Do you see that person?

3    A.   Yes.

4    Q.   Do you see that he's wearing a gas mask?

5    A.   Yes.

6    Q.   Do you see that he's carrying something?

7    A.   Yes.

8    Q.   We're going to -- I'm going to ask Ms. Tanoury to start

9    playing again.  I want you to keep a close eye on that

10   gentleman with the gas mask.

11   A.   Okay.

12      (Video played.)

13   BY MS. NOBLE:

14   Q.   Did you observe that gentleman go and cover up one of

15   the canisters?

16   A.   I saw someone cover it up.  He went off camera and I

17   kind of lost him.  But I did see somebody go over and cover up

18   the canister.

19   Q.   And then he proceeded to take that canister.  He took

20   the bucket and walked off camera?

21   A.   Yes.

22   Q.   Holding the canister inside?

23   A.   I saw him with the bucket go off camera.

24   Q.   Okay.  And the canister was no longer on the sidewalk,

25   correct?

VOL. I -  134

1    A.    Correct.

2    Q.    I'm going to ask Ms. Tanoury if we could just play that

3    again and watch it all the way through and see if you can

4    identify whether or not it is the same person or you think it

5    might be somebody different.

6          MS. TANOURY:  Ms. Noble, what part would you like me

7    to start at?

8          MS. NOBLE:  Start at around two minutes.  I think that

9    should be good.

10     (Video played.)

11   BY MS. NOBLE:

12   Q.    Ms. Ruffin, after watching that, were you able to

13   identify whether or not it seemed to be the same person?

14   A.    I do not think that was the same person.  I believe the

15   person in my video that I saw had a white shirt on, not the

16   black.

17   Q.    I'm sorry.  Not the same person as in your video.  I

18   know he went off camera, but I was trying to see if you believe

19   it was the same person.

20   A.    Yeah.  It seemed to maybe be the same person, yes.

21   Q.    Thank you very much.

22         Now I'm going to ask that Ms. Tanoury pull up

23   Plaintiff's Exhibit 127.  And that's the video that you took.

24   A.    Okay.

25   Q.    Do you recall if you heard them -- the police order

VOL. I - 135

1    people to be dispersed at any time during this video?

2    A.   No.

3         MS. TANOURY:  Would you like me to play the video,

4    Ms. Noble?

5         MS. NOBLE:  Yes.  Actually, can you put it at

6    about 1:10?  And I want Ms. Ruffin to listen very closely to

7    see if she heard any orders to disperse.

8       (Video played.)

9    BY MS. NOBLE:

10   Q.   Did you hear any orders?

11   A.   I did not.  I'm sorry.

12   Q.   It's okay.  There was a lot of noise happening on the

13   video because a lot of people were there; is that correct?

14   A.   Yes.

15   Q.   So, when I'm hearing it, I hear a lot of people talking.

16   But then it sounds like there's a lower -- like a lower sound

17   range that is making -- it sounds like it is saying an order to

18   disperse.

19        So I want you to try to pay attention to see if you can

20   hear that.  It is a lower decibel range.  It is difficult to

21   hear over the people closer to you.

22   A.   Okay.

23        MS. NOBLE:  If you could please play it again,

24   Ms. Tanoury.

25      (Video played.)

VOL. I - 136

1    BY MS. NOBLE:

2    Q.    Did you hear that?

3    A.    I did hear a lower tone sound.  But I also had a

4    walkie-talkie app that was on my phone that was from the

5    administrators who created this event.  They had a

6    walkie-talkie app that was talking on it.  To me it sounds like

7    that app.  And earlier in the video you can hear a couple times

8    when someone was like talking over it, and it's captured in the

9    videos.  So, to me, that's what I'm hearing.

10   Q.    Okay.  So this walkie-talkie app, did you use it

11   frequently while you were out there?

12   A.    Yes.  I left it on the entire time.

13   Q.    And what types of things were on this walkie-talkie app?

14   A.    It was just information on movements of parts of the

15   protest, if they were moving to other parts of the city, or

16   there was information on if there were first aid stations or

17   any type of resource stations where you could get like water or

18   some fruit or something throughout the day.

19   Q.    Was there also discussion about the movement of police?

20   A.    I know that there was discussion on if there was any

21   type of violence going on or if there were like smoke bombs or

22   things like that.  I know earlier in the video they do say

23   there was police preparing with riot gear.  So I do know that

24   there was a warning of officers possibly getting ready to

25   prepare to do something.  But that's all I know of.

VOL. I -  137

1    Q.   And do you still have this app on your phone?

2    A.   I do not.

3    Q.   Do you know who created the app?

4    A.   I don't know.  But the name of the app is Zello.  It's

5    just a random walkie-talkie app that I believe they stumbled

6    upon and decided to use.

7    Q.   I'm unfamiliar with this app so I might ask a lot of

8    questions.

9    A.   Okay.

10   Q.   In this app, is it something where like the organizers,

11   whomever -- do you know who the organizer of this event was?

12   A.   I do, but I don't know their specific names.  It was

13   like a Facebook group.  And it was just -- it was one of those

14   things where you can put like interested or not.  And then they

15   were -- that's where they were communicating where resources

16   would be and things like that.  And then, for some reason,

17   Facebook actually removed the group.  And so they were using

18   the walkie-talkie -- they found the walkie-talkie app to be

19   able to communicate since they no longer have the Facebook

20   group.

21   Q.   Do you recall what the Facebook group name was?

22   A.   It was just -- it was something protest, like George

23   Floyd Protest, and it had the date for May 30th.  But that's

24   all I really knew about the name of it previously.

25   Q.   And do you know the people -- any of the people that

VOL. I -  138

1   were on –– that had indicated interest or helped organize this

2   protest?

3    A.    I don't know the people that helped organize.  But my

4   friends that came with me had showed interest in the group as

5   well.

6    Q.    And were any of your friends the ones that organized it?

7    A.    No.

8    Q.    Can you please state the names of your friends again?

9    A.    Jonathan Eckenrhode.  That's E–C–K–E–N–R–H–O–D–E.

10       And Trey Schober.  So that's Trey, T–R–E–Y, and then

11   Schober, S–C–H–O–B–E–R.

12       And I know that those two had put that they were

13   interested in the group.  But, other than that, I'm not sure if

14   the rest of my group of friends did.

15    Q.    This walkie-talkie app Zello, is this something like

16   where a channel was created for the protests?

17    A.    Yes.

18       MR. FORMAN:  Your Honor, I'm going to object.  I think

19   we're really getting outside the scope of this hearing.  I

20   don't know what the relevance of any of this is.  We're asking

21   the witness how she knows it was created.  I don't think she

22   knows anything about any of this stuff.

23       THE COURT:  Mr. Forman, I understand that your

24   objection is relevance.

25       Ms. Noble, why is Ms. Ruffin's friends relevant?

VOL. I - 139

1    MS. NOBLE:  I just wanted to ensure we knew everybody

2  that was involved.

3    THE COURT:  Ms. Noble, that's a discovery matter.

4  This is not discovery.  This is the preliminary injunction

5  hearing.  I'm going to sustain Mr. Forman's objection.  Please

6  continue.

7    MS. NOBLE:  Thank you, Your Honor.

8   BY MS. NOBLE:

9   Q.   Okay.  Ms. Ruffin, back to the video.

10    I'm going to ask Ms. Tanoury to play Plaintiff's Exhibit

11  127 again.  And we can start off kind of where we left off

12  which was around like -- we can start off right there.

13    MS. NOBLE:  Thank you, Ms. Tanoury.

14    (Video played.)

15   BY MS. NOBLE:

16   Q.   Ms. Ruffin, you indicated that there was a person with a

17  gas mask that an officer struck; is that correct?

18   A.   Yes.

19   Q.   And we just observed that part.  He was wearing a gas

20  mask and carrying around a bucket as well; is that correct?

21   A.   Yes.

22   Q.   And that's similar to the gentleman in the other video

23  who was wearing a gas mask and carrying a bucket and took away

24  a canister; is that correct?

25   A.   Yes.

VOL. I -  140

1      MR. VARDARO:  Now, Ms. Tanoury, I -- we don't need the

2  video anymore so you can take it off.  Thank you for assisting

3  me.

4  BY MS. NOBLE:

5  Q.   Ms. Ruffin, did you join any more days of the protest

6  after May 30th?

7  A.   Yes.

8  Q.   How many days after -- how many more events did you

9  attend?

10  A.   I believe it was maybe seven more spread out over time

11  over the next couple weeks.

12  Q.   After your video ends there, you indicated earlier that

13  you left; is that correct?

14  A.   Yes.

15  Q.   Did you go back out after that day, or did you go back

16  out that day?

17  A.   No.

18  Q.   And after -- the following weeks, there's been

19  additional protests since the summer protests; is that correct?

20  A.   Yes.

21  Q.   And have you attended any of those protests?

22  A.   Not since the summer.

23  Q.   And the ones that you did attend in the summer, aside

24  from the incident on May 30th, did the police use any force

25  against you at those protests?

VOL. I - 141

1    A.    Not while I was there.  So not to my knowledge.

2    Q.    I'm sorry.  My question was if they used any force

3    against you?

4    A.    No, not against me.  No.

5         MS. NOBLE:  If you could give me one moment, Your

6    Honor, please.

7         THE COURT:  Yes, you may.

8         MS. NOBLE:  No further questions at this time, Your

9    Honor.  Thank you very much.

10        THE COURT:  Thank you.

11        Mr. Forman, any redirect?

12        MR. FORMAN:  Just one question.

13                        - - -

14                  REDIRECT EXAMINATION

15   BY MR. FORMAN:

16   Q.    Ms. Ruffin, did you observe any of the protesters you

17   were with bringing any canisters that blew up smoke and caused

18   irritation to people's lungs?

19   A.    No.

20   Q.    What you saw, those originated with the police?

21   A.    Yes.

22        MR. FORMAN:  That's all I have.  Thank you.

23        THE COURT:  Thank you.  Anything further, Ms. Noble,

24   from you?

25        MS. NOBLE:  No.  Thank you very much, Your Honor.

VOL. I -  142

1      THE COURT:  Ms. Ruffin, thank you very much, ma'am.

2   You may be excused.

3      THE WITNESS:  Thank you.

4      MR. GITTES:  John --

5      MR. MARSHALL:  Wait for Judge Marbley, please.

6      THE COURT:  Mr. Marshall, your next witness, please.

7      MR. MARSHALL:  Thank you.  Mr. Gittes will examine

8   witness Adams Cairns.

9      THE COURT:  Okay.

10      MR. GITTES:  Your Honor, Mr. Cairns is signing in

11   right now.

12      MR. PHILLIPS:  Your Honor, I do have one question.  It

13   was my understanding that the plaintiffs were going to call the

14   mayor at three o'clock, and it's 2:50.

15      MR. GITTES:  I don't know that we can -- I'm sorry.

16   Your Honor, may I address that?

17      THE COURT:  Yes.

18      MR. GITTES:  It is still our intention to call the

19   mayor.  This is an extremely short witness, at least -- of

20   course, I know I cannot be scientifically accurate about time,

21   but I would fully expect this to be done within 10 minutes,

22   maybe 15.  So we would like to do the mayor right after this

23   witness.

24      THE COURT:  That's fine.  Do you know Mr. Cairns'

25   flexibility?  Because while your examination, let's say, may

VOL. I - 143

1    take only about five minutes -- Mr. Phillips, are you going to

2    cross-examine Mr. Cairns?

3         MR. PHILLIPS:  I am not.  Someone on our team is.

4         THE COURT:  Do you know who?

5         MS. ARBOGAST:  Your Honor, this is Janet Hill

6    Arbogast.  It will be me.

7         THE COURT:  I don't want to assign any particular

8    significance to the various witnesses but, as a practical

9    matter, the mayor runs this city.  I would hate to keep him

10   waiting if Mr. Cairns has any flexibility in his schedule.  And

11   I have yet to see a witness probably in 24 years who was both

12   put on on direct and cross and done in ten minutes.

13        MR. GITTES:  Your Honor, I understand.  Can we --

14   Mr. Abrams is representing Mr. Cairns.

15        THE COURT:  I know that Mr. Abrams has time to wait.

16   I'm not going to inquire of him because I know that.

17        MR. ABRAMS:  Thank you, Your Honor.

18        THE COURT:  You're welcome, Mr. Abrams.  I know you

19   appreciate the fact that I know your schedule.

20        You see, Mr. Gittes, Mr. Abrams was also one of my

21   students.  So I know that he has time.

22        MR. GITTES:  Okay.  I leave it to your direction

23   whether we want to ask --

24        THE COURT:  We now have six minutes to examine

25   Mr. Cairns.  But the mayor is supposed to be on at three.  Is

VOL. I - 144

1    there any information that he's not going to be available at

2    three?

3        MR. PHILLIPS:  My understanding is he is going to be

4    available at three.

5        THE COURT:  Then, as a professional courtesy, we're

6    going to take the mayor at three.

7        Mr. Cairns, do you have the flexibility to wait until

8    we're done with the examination of Mayor Ginther?

9        MR. CAIRNS:  Yes, I do.

10        THE COURT:  We appreciate your consideration.  Thank

11   you very much.  And thank you, Mr. Abrams.  You know that was

12   in jest.  I was going to inquire about your availability as

13   well.

14        MR. ABRAMS:  Thank you, Your Honor.  We're happy to

15   accommodate the Court whenever we can.  We will then log off

16   and re-log on after you're finished with the mayor.  How is

17   that?

18        THE COURT:  That's fine.  And Mr. Marshall or one of

19   his assistants or associates can let you know when we're

20   concluding with the mayor.

21        Thank you, Mr. Cairns.  Thank you, Mr. Abrams.

22        MR. PHILLIPS:  Your Honor, do you want me to get the

23   mayor on?

24        THE COURT:  Yes.  Give me one minute.

25        Mr. Phillips, whenever you are ready to begin getting

VOL. I -  145

1    Mayor Ginther on.

2            MR. PHILLIPS:  Thank you, Your Honor.  My

3    understanding is they are trying to log in right now.  I sent

4    them the GoToMeeting link.

5            THE COURT:  All right.  Thank you.

6         Good afternoon, Mayor Ginther.

7            MR. GINTHER:  Good afternoon, Judge.  How are you?

8            THE COURT:  I'm well.  How are you?

9            MR. GINTHER:  I'm doing well.

10           THE COURT:  Ms. Clark, would you please swear in the

11   mayor.

12      (Witness sworn.)

13           THE COURT:  Mr. Marshall, who is going to

14   cross-examine the mayor?

15           MR. MARSHALL:  Thank you, Your Honor.  Mr. Gittes will

16   examine.

17           THE COURT:  Mr. Gittes, are you ready to proceed?

18   Once you un-mute yourself, Mr. Gittes, I think that you will be

19   fully ready to proceed.

20           MR. GITTES:  I am now fully ready to proceed.

21           THE COURT:  Please proceed.

22

23

24

25

VOL. I - 146

1                        - - -

2                   ANDREW GINTHER

3    Called as a witness on behalf of the Plaintiffs, as upon

4    cross-examination, being first duly sworn, testified as

5    follows:

6                   CROSS-EXAMINATION

7    BY MR. GITTES:

8    Q.   Good afternoon, Mr. Mayor.  Just again to remind you, my

9    name is Fred Gittes, and I believe we met for the first time at

10   your deposition.

11   A.   Yes.  Good to see you again.

12   Q.   Thank you.

13        Would you state your full name for the record, please?

14   A.   Sure.  Andrew James Ginther.

15   Q.   And Mr. Mayor, how long have you been the mayor?

16   A.   I was elected in November of '15.  So I am now in my

17   fifth year, started my sixth year as mayor.

18   Q.   Mr. Mayor, I'd like to discuss your job duties as they

19   relate to this case briefly.

20        You are the chief executive officer of the City of

21   Columbus; is that right?

22   A.   That is correct.

23   Q.   As the chief executive of the city, you supervise the

24   safety director and the chief of police?

25   A.   That is correct.

VOL. I - 147

1  Q.  They both ultimately report to you?

2  A.  That is correct.

3  Q.  Isn't it also the case that as the chief executive, you

4  have the authority to direct the safety director and the chief

5  to change policies in the police department, training

6  practices, and other aspects of police organization?

7  A.  That is correct.

8  Q.  Your successors will have the same authority, correct?

9  A.  Yes.

10  Q.  During the years you've been mayor -- let me just ask it

11  that way first.  Isn't it also the case that the chief of the

12  division of police has the authority to adopt, modify, rescind

13  division directives?

14  A.  Yes.

15  Q.  And over the years, chiefs have done that, correct?

16  A.  Mostly at the direction of the mayor and the safety

17  director, but, yes.

18  Q.  As we talked about when we were together last, the

19  division does frequently -- in fact, they have a whole system

20  to develop new policies which the chief is authorized to

21  implement unless you intervene or direct otherwise?

22  A.  Yes.

23  Q.  The chief's involvement in policy and practice and

24  training is used often with respect to tactics, equipment,

25  weapons that his officers -- or I should say his or her

VOL. I -  148

1    officers will use in all kinds of situations, correct?

2    A.    Correct.

3    Q.    And you are aware of examples where the chief, under

4    you, has adopted changes with respect to those topics over the

5    last couple of years?

6    A.    I'm sorry.  Repeat the question, Mr. Gittes.

7    Q.    Sure.  You're aware of times that chiefs under your --

8    since you've been the chief executive officer, have modified or

9    made changes regarding tactics, training, equipment, those

10   kinds of things?

11   A.    Yes.

12   Q.    Of course --

13   A.    They get engagement and direction from me and the safety

14   director, but, yes.

15   Q.    Is it your testimony today that the chief on his or her

16   own does not have the authority to adopt policies or modify

17   them?

18   A.    I'm not sure I understand the question.

19   Q.    I'm trying to confirm that the chief, without going to

20   you or getting your permission, does have the authority to

21   change department policies?

22   A.    That is correct.

23   Q.    I also want to make sure it's clear to the Court that at

24   least since you've been mayor, the FOP has not been involved

25   either by a grievance or by consultation, in decisions that you

VOL. I - 149

1   and the chief have made regarding changes in equipment,

2   tactics, policies applicable to the work of officers in

3   enforcing the law?

4   A.   The answer to your question, has the FOP found

5   grievance?

6   Q.   Maybe I'm not being precise enough.  And I apologize for

7   that.

8        You don't normally -- in fact, you have not consulted

9   the FOP regarding equipment changes, policy directives

10  regarding tactics, policies regarding training related to the

11  policies and tactics?

12  A.   That is correct.

13  Q.   And during at least while you've been mayor, there's

14  never been a grievance filed by the union claiming that they

15  have any authority under the contract to participate in and

16  have any influence on those decisions that you and the chief

17  make about tactics, equipment, and weapons?

18  A.   I'm not aware of any.

19  Q.   You recently demoted former Chief Quinlan, correct?

20  A.   I did.

21  Q.   And, as I understand the mechanism by which that

22  happened, you directed Safety Director Pettus to demote him

23  back to a deputy chief position; is that correct?

24  A.   Yes, sir, that is correct.

25  Q.   And as I understand it, your -- that was your decision?

VOL. I - 150

1   That was your decision to tell the safety director to do that?

2   A.   That's correct.

3   Q.   And I believe you made various public statements about

4   the reasons for doing that which involved that you felt he had

5   failed to make the necessary changes and reforms recommended by

6   outside consultants, independent task force and other groups.

7   Is that a good overall description?

8   A.   I think what I've said publicly is that he had lost

9   faith and trust of the community, and that he was unable to

10  change the culture of the division of police.  And that's what

11  we needed at this time.

12  Q.   Okay.  Well, I think we're close to saying the same

13  thing.  But to make sure we are, can I read you a quote from a

14  press release that you issued and see if you recall this?

15  A.   Sure.

16  Q.   And it became clear to me -- and you are the "me" --

17  that Chief Quinlan could not successfully implement the reform

18  and change I expect and that the community demands.

19       Would that be an accurate statement that you have made

20  and was part of a press release?

21  A.   Yes.

22  Q.   Going on:  Columbus residents have lost faith in him and

23  in the division's ability to change on its own.

24       Do you recall that statement?

25  A.   I do.

VOL. I - 151

1   Q.   Chief Quinlan understood.  He agreed to step back so the
2   City can move forward.
3        Do you recall that statement?
4   A.   Yes, sir.
5   Q.   The new person who is interim chief since you took that
6   step is a very, very experienced deputy chief, now Chief Woods,
7   right?
8   A.   Is that a question or --
9   Q.   Yeah, that's a question.  I'm sorry.  I'm making
10  statements to you, and then I'm asking you if I'm making the
11  statement correctly.
12  A.   Yes.
13  Q.   As I understand it - and please tell us if I'm correct -
14  Chief Woods is scheduled to retire in April?
15  A.   That is correct.
16  Q.   So barring a search that results in a new probationary
17  appointment of a new chief, you will have to appoint another
18  interim chief from within.  Is that fair?
19  A.   Let me understand your question.  Are you saying that --
20  Q.   Once again, I asked a bad question.  Let me see if I can
21  get a little bit more precise.  I guess I stayed up too late
22  last night.
23       Number one, Chief Woods is going to retire in April; is
24  that correct?
25  A.   That is correct.

VOL. I - 152

1  Q.  If you are -- you're involved in a search for a new

2  non-interim chief, correct?

3  A.  That is correct.

4  Q.  If you are unable to find someone that is satisfactory

5  to you for an initial new appointment, would you be going to

6  another deputy chief within to function as an interim in the

7  meantime?

8  A.  Potentially.  I think the other option that we have that

9  Interim Chief Woods has at least acknowledged some level of

10  willingness to entertain is a shorter term service contract.  I

11  think because of the retirement system he's part of, there is a

12  date certain he must retire, but that he could stay on in a

13  shorter-term capacity as interim under something other than

14  full-time employee of the division of police.

15  Q.  All right.  So that if you can't through a search find a

16  new chief, we're going to have Chief Woods remain on the job?

17  A.  Potentially.

18  Q.  That's a potential.  The other potential would be that

19  you would have to look within for another deputy chief or other

20  officer to step into the position on a temporary basis?

21  A.  That would be unlikely, but it is a potential.

22  Q.  Under the charter in Ohio -- in Columbus, I'm sorry --

23  when you do pick -- let's say you find another new chief.  They

24  are probationary for the first year under the charter; is that

25  accurate?

VOL. I - 153

1    A.    That is correct.

2    Q.    I'm going to totally switch gears on you.  Actually, I

3    should finish up.  Can you tell us where you are in terms of

4    the search for a new charter-appointed chief?

5    A.    Very early on in the process.  But I am reaching out to

6    mayors and police -- law enforcement leaders that I know from

7    across the country to see who are some outstanding candidates

8    who have been part of change in reform, particularly

9    transformational change, within divisions of police.  Whether

10   they be chiefs or assistant chiefs or deputy chiefs, but folks

11   that have some experience with transformational change in

12   leadership; and reaching out to some of those folks, finalizing

13   our process with the search firm that we used before which will

14   be a very expedited process.  And our hope is to have a new

15   chief identified this spring.

16   Q.    Okay.  What I take from that answer – and I appreciate

17   it – is that you would describe this as early in the process

18   and you hope to have someone new in the spring.  But you would

19   agree with me there's no guarantee of that?

20   A.    There is no guarantee.  But there's not a higher

21   priority for me and the City than this right now.

22   Q.    But, of course, your highest priority is to get the

23   right person for the job, right?

24   A.    Absolutely.

25   Q.    And whether that takes more time or not, that's the

VOL. I -   154

1   priority?

2      A.   That is correct.

3      Q.   Now, I'm going to switch gears here.  I want to talk

4   about culture.  You've mentioned culture, and I appreciate

5   that.  And I believe we talked about it briefly together in --

6   last month.

7          First of all, you acknowledge that there is racism in

8   the Columbus Police Department.  Is that something that's true

9   about your own awareness?

10     A.   It's based on facts, and it's based on the stories and

11  reports and information shared by both officers and from the

12  public from their interaction with officers.  So that is not my

13  feeling or belief.  It is a fact.

14     Q.   And as I -- in some of the statements you have made

15  publicly, you have -- in fact, let me ask you.  Wasn't one of

16  the issues between you and Chief Quinlan is his disagreement or

17  reluctance about some of the recommendations that came out of

18  the Matrix report, the task force, and there's other groups

19  that have made recommendations?  Didn't he have reservations

20  about them?

21     A.   Nothing significant that I recall.  There may have been

22  difference of opinion on priorities or sequencing.  But I

23  believe nearly 60 or 70 percent of the recommendations from the

24  Matrix report and the safety advisory commission

25  recommendations had been implemented or were in the process of

VOL. I –  155

1   being implemented.  But you may know of one or two instances

2   where there was a difference of opinion but, all in all, I

3   think very much aligned there.

4     Q.   Okay.  So your feeling that he -- your loss of faith in

5   him had nothing to do with that, with any disagreements with

6   those reports and proposals?

7     A.   I don't know if I'd say that.  I think, ultimately, the

8   decision to have him not serve or appointed to a permanent

9   five-year term was based primarily on the loss of confidence in

10  the community and my coming to believe and understand that we

11  needed somebody from outside the division to come in to deal

12  with the culture.

13    Q.   All right.  Well, putting aside the status of now Deputy

14  Chief Quinlan, let's talk about some of the facts that you've

15  alluded to and, in particular, that were part of the Matrix

16  report.

17        The City engaged a firm to do an analysis related to the

18  police department.  Is that accurate?

19    A.   Yes.  That was one of our major priorities in my first

20  term.

21    Q.   As I understand it, the Matrix report was issued in

22  August of 2019.

23    A.   That sounds correct.

24    Q.   Among other things that the report concluded is that

25  within the Columbus Police Department, 29 percent of employees,

VOL. I  -   156

1  based on surveys of officers and staff, reported observing

2  discriminatory acts within the department without reporting

3  them to anyone.  Is that a piece of information that you

4  obtained from the Matrix report?

5     A.   Yes.

6          MR. PHILLIPS:  Objection, Your Honor.

7          THE COURT:  Basis?

8          MR. PHILLIPS:  Relevance.

9          THE COURT:  Overruled.

10    BY MR. GITTES:

11    Q.   And so --

12         THE COURT:  Mr. Gittes, we can no longer hear you.

13       Mr. Gittes, we cannot hear you.

14       Mr. Marshall --

15         MR. MARSHALL:  Your Honor, it appears Mr. Gittes is

16  off line.

17         THE COURT:  Well, he's still on --

18         MR. MARSHALL:  I wasn't able to hear your question.

19         MR. GITTES:  Can anybody hear me now?

20         THE COURT:  We can hear you now.  Would you go back to

21  your previous question and reask it.

22         MR. GITTES:  I'm sorry.  I know we've had some

23  problems.  If it's all right with the Court, I'll ask one of my

24  colleagues just in a muted status just to appear so they can

25  give me a signal or something if I -- it will save time.  I

VOL. I - 157

1    apologize, Mr. Mayor.

2       BY MR. GITTES:

3       Q.   I think the question I had asked was that based on the

4    Matrix report, you learned in August of 2019 that -- not quite,

5    but almost one out of three officers and staff members reported

6    to the Matrix folks that they observed what they felt was

7    discrimination and they didn't make a peep to anybody about it?

8       A.   That is correct.

9       Q.   Also the report indicated that just looking at the

10   responses of white officers and staff, 25 percent of them said

11   they had observed discrimination; and of the black officers and

12   staff, 70 percent indicated they had observed discrimination.

13   You also learned that in August of 2019?

14      A.   That is correct.

15      Q.   One other point that's very related to the protests in

16   this case is that in that survey, the Matrix folks also

17   discovered -- I shouldn't say discovered.  They learned that

18   almost, not quite, 10 percent -- I think the actual number was

19   8 percent of all the officers indicated that they had witnessed

20   another officer demonstrating bias against a person of color in

21   the public in connection with their work.  But, again, it

22   wasn't reported.  Do you remember that conclusion in the

23   report?

24      A.   Yes.

25           THE COURT:  Ms. Evans, would you read back that

VOL. I -  158

1   question, please.

2        (Thereupon, the last question was read by the court

3   reporter.)

4            THE COURT:  Please continue, Mr. Gittes.

5            MR. GITTES:  Thank you, Your Honor.

6     BY MR. GITTES:

7     Q.   In that same report, that number, in terms of the

8   percentage who observed discriminatory or biased conduct of

9   another officer against a person of color in the public, were

10  black officers, and the number was nearly 30 percent.  Do you

11  recall that conclusion?

12    A.   I do.

13    Q.   You used the word culture before.  But you have -- as a

14  mayor and a person who, as you've stated here already to the

15  Court, is concerned about problems in the Columbus Police

16  Department, you have recognized that without accountability --

17  in other words, if officers are fearful of reporting misconduct

18  of their colleagues, if they are not going to report

19  discrimination or misconduct related to even themselves or

20  members of the public, that makes it difficult to change the

21  culture.  Isn't that something you believe?

22    A.   I think that's true.  That would also speak to so many

23  of the changes and reforms we've made since I've been mayor,

24  most pointedly hiring an assistant director for EEO that can

25  receive complaints around discrimination and harassment outside

VOL. I - 159

1    the chain of command for the first time in the city's history,

2    as well as seeking approval from the voters, which they did so

3    overwhelmingly, for a civilian review board and the role of the

4    inspector general that's now a part of the city's charter.  I

5    would agree with you, and that's why we've been working so hard

6    for those other reforms.

7    Q.   I commend you for those steps.  Let's put them in

8    perspective as we go forward for a little bit with my questions

9    here.

10        First of all, the new -- I mean, officers and staff

11   members have always had an independent place to go because

12   there's the Ohio Civil Rights Commission.  It's not only

13   outside the City -- I mean, outside the department, it's

14   outside the City.  Yet you learned from the Matrix folks that

15   it wasn't happening.  People weren't reporting it.

16        Didn't -- I mean, I'm sorry.  I should make it -- I'm

17   not doing a good job of framing it as a question.

18        You knew about the Ohio Civil Rights Commission,

19   correct?

20   A.   Yes, I know about the Ohio Civil Rights Commission.

21   Q.   Been there for decades?

22   A.   Yes, sir.

23   Q.   Nevertheless, you were informed by Matrix in August of

24   2019 that this problem is persisting.  Isn't that one of the

25   conclusions?

VOL. I -  160

1   A.   Yeah.  I don't recall the word persistent, but I think

2   all the other stats and specifics we've talked about here

3   today -- if it's persistent, consistent, then I would -- I

4   don't recall that word in particular.  But if you say it's

5   there, then I acknowledge it's there.

6   Q.   Mr. Mayor, I'm not trying to play verbal or word

7   gymnastics here.  I'm just saying based on those numbers that

8   were in the report, regardless of what word you would use, it

9   would indicate that going outside the department isn't the

10   simple solution to the fact that you have officers who are --

11   you pick your word, hesitant, afraid, I think I've heard you

12   use the word fearful of retaliation in explaining why you

13   developed an EEO office.  Pick your word, but this report was a

14   message to you, was it not, and the City, that we have a

15   problem?

16          MR. PHILLIPS:  Your Honor, I object to the form of

17   that question.  It's compound and argumentative.

18          THE COURT:  Ms. Evans, read the question back, please.

19          MR. GITTES:  Your Honor, I'm happy to rephrase it.

20          THE COURT:  It's withdrawn, Mr. Phillips.

21       Please continue, Mr. Gittes.

22   BY MR. GITTES:

23   Q.   Based on those numbers that I went over that were in the

24   report, you would agree with me that we still have a problem in

25   terms of accountability and officers' willingness to report

VOL. I - 161

1    other officers' misconduct or discrimination?

2    A.    Yes.

3    Q.    And I understand that is one of the reasons you decided

4    to work on creating a separate EEO office.  That was one of the

5    motivations for you to do that?

6    A.    That is correct.

7    Q.    But that office is still part of the safety department,

8    right?

9    A.    That is correct.  But it's outside the chain of command,

10   which has not been an option or an alternative throughout the

11   history of the city.

12   Q.    Just as the Ohio Civil Rights Commission is outside the

13   chain of command and has been there during all the time that

14   the Matrix people were looking at this?

15   A.    That is correct.

16   Q.    I also want to talk to you a little bit about -- in

17   fact, I think -- and tell me if you don't remember because I

18   can pull out your deposition.  I think you used the word that

19   firefighters and officers have been reluctant to report racism

20   and discrimination for fear of retribution.  Do you remember

21   using that word in your deposition?

22   A.    Yes.

23   Q.    And also one of the messages from the Matrix report to

24   the City and to you and the council -- in fact, I should ask

25   that.  Wasn't the Matrix report a joint idea of you and the

VOL. I - 162

1    city council?

2          I don't know.  I'm just asking.  I really don't know.

3     A.   I would have to think back.  I don't believe it was

4    joint.  It might have been announced together.  But this is

5    something that we've been working on for some time.  If you

6    think it was joint, then it was joint.

7     Q.   I don't.  I just don't know.

8          So you did share the report publicly and with council

9    members, did you not?

10    A.   Yeah, with the public at large.

11    Q.   And one of the messages of the Matrix report is that

12   there was a disconnect between -- I'm quoting, between policy

13   and implementation.  Do you recall that?

14    A.   I do.

15    Q.   And I believe you have acknowledged that you are

16   troubled by the fact that law enforcement officers themselves

17   experiencing discrimination troubles you that their sisters and

18   brothers were not reporting it to anybody even when they

19   observed it?

20    A.   That is correct.

21    Q.   Now, let's kind of -- I'm going to kind of jump forward

22   here a little bit to the spring demonstrations.

23          I know you were out with demonstrators multiple times

24   during the demonstrations.  I don't know whether you know how

25   many times, but can you give us some idea?

VOL. I - 163

1    A.   Yes.  Several times.  I think the first time I protested

2    was with leaders from the faith community that Sunday

3    afternoon.  But I would say in that first couple of weeks,

4    four, five, six times.

5    Q.   During the times when you were out, you were actually --

6    spoke with individuals who were protesting.  You engaged in

7    conversations with them.  You engaged with the police.  You

8    engaged with faith leaders.  And you never had a problem

9    interacting with the protesters?

10   A.   A problem meaning what?

11   Q.   No one threatened you, attacked you, refused to talk to

12   you.  You described it as -- I believe you thought you had good

13   conversations with people?

14   A.   That's correct.

15   Q.   Your experience, your personal experience, was that both

16   protesters and the police, when you were out and about, behaved

17   in a way that you thought was appropriate and you didn't see

18   misconduct?

19   A.   That is correct.

20   Q.   And as I understand it, you found that the protesters

21   were, to use your word, overwhelmingly peaceful?

22   A.   That is correct.

23   Q.   Now, obviously at some point you became aware of conduct

24   that you thought was -- that you found inappropriate, not

25   personally but through watching videos, news reports, maybe

VOL. I - 164

1    social media, I'm not sure.  Let me back up.  Were you

2    following social media during the demonstrations?

3    A.    To some extent or, you know, staff would share with me

4    what they were seeing or hearing.

5    Q.    Would it be fair to say that at some point before Sunday

6    the 30th, that first weekend, you became aware of conduct that

7    you found was not acceptable and you felt was unprofessional on

8    the part of police officers?

9    A.    Of just police officers?  Yes.

10    Q.    And that led you to make -- to have a conversation with

11    Chief Quinlan at that time and others about changing the policy

12    regarding use of chemical weapons?

13    A.    That's correct.  That conversation with the chief took

14    place Sunday morning after what I saw, heard, and was shared

15    with me what happened Saturday.

16    Q.    But also --

17           THE COURT:  For the record, Mr. Gittes, would you

18    clarify what date that was?

19    BY MR. GITTES:

20    Q.    When you talk about what happened Saturday, you're

21    talking about the 30th of May 2020.  Is that right, Mayor?

22    A.    Yes.

23    Q.    And your meeting with the chief was that Sunday, is that

24    correct, the next day?

25    A.    Yes.  Just a phone call.  Yes.

VOL. I - 165

1    Q.   A phone call.  I'm sorry.

2         Now, as we go -- as I get into more details about the

3    policy change and crowd control issues that you've had to

4    confront in light of the spring demonstrations, I would like to

5    have something made clear.  As of today, is it still the case

6    that you're not aware of any officer or supervisor who reported

7    any kind of misconduct, excessive force, or policy violation by

8    another officer during the protest?

9    A.   I'm not aware of any.

10   Q.   Have you read the depositions that have been taken in

11   this case of a number of deputy chiefs, lieutenants, and

12   commanders?

13   A.   I have not.

14   Q.   I do not want to know anything about any conversations

15   you've had with your counsel or the city's counsel.  I do want

16   to ask this, though, because other people may have shared

17   information with you in a non-privileged context.

18        Is it a surprise to you if I told you that none of the

19   officers, experienced, high-ranking officers deposed in this

20   case, could recall any instance in which another Columbus

21   police officer reported another officer for using excessive

22   force against a person of color?

23        MR. PHILLIPS:  Objection.

24        MR. GITTES:  Would that surprise you?

25        THE COURT:  Basis, Mr. Phillips?

VOL. I - 166

1        MR. PHILLIPS:  Form of the question.  He's asking him

2   will it surprise him based upon what other witnesses have said.

3        MR. GITTES:  I think you're entirely correct,

4   Mr. Phillips.  I will withdraw the question.

5        Your Honor, let me -- if I may, Your Honor.

6        THE COURT:  Yes, you may.

7   BY MR. GITTES:

8   Q.   I'm asking you if you learned from a non-privileged

9   source, someone who has talked to officers or other people,

10  that in depositions, ranking officers in the department could

11  not recall any instance in which a Columbus officer, including

12  supervisors, reported another officer for using excessive force

13  against a person of color?

14  A.   So is your question did I know that or had I heard that?

15  Q.   Yeah.  Did you learn that from any non-privileged source

16  that there was testimony like that?

17  A.   No.

18       MR. PHILLIPS:  Objection.

19       THE COURT:  The objection is overruled.  The witness's

20  answer will stand.  He said no.

21  BY MR. GITTES:

22  Q.   In addition, you know a black officer, black female

23  officer named Lieutenant McFadden, right?

24  A.   Yes, sir, I do.

25  Q.   You know at one time she was charged with engaging in

VOL. I -  167

1    discriminatory conduct against officers and she was formally

2    charged and recommended for termination or suspension --

3    actually all three -- termination and suspension -- by Chief

4    Jacobs?

5              MR. PHILLIPS:  Objection, Your Honor.  Relevance to

6    this case.  That's the subject of a separate federal lawsuit

7    right now.

8              THE COURT:  How is this relevant?

9              MR. GITTES:  It goes to the issue of accountability

10   and a double standard, which is directly involved in the

11   problem of repetition of the issues and reoccurrences absent

12   accountability.

13             THE COURT:  You mean a *Lyons* issue?  Is this a *Lyons*

14   issue?

15             MR. GITTES:  Yes, Lyons versus the City.

16             THE COURT:  I'm going to allow it to -- I'm going to

17   allow the question to stand.  But Mr. Phillips, if he doesn't

18   tie this up, then you may renew your objection and the

19   witness's answer can be stricken.

20            Mr. Mayor, you may answer.  I can have the question read

21   back if, you wish.

22             THE WITNESS:  Please, Judge.

23             THE COURT:  Ms. Evans, would you read the question

24   back, please.

25           (Thereupon, the last question was read by the court

VOL. I - 168

1    reporter.)

2         THE WITNESS:  That is correct.

3      BY MR. GITTES:

4      Q.   And you know that she is the only officer, to your

5    knowledge, that has ever been formally charged with

6    discrimination in the Columbus Police Department against other

7    officers?

8      A.   That is my understanding.

9      Q.   Now, Deputy Chief Pettus denied the recommendation,

10   right?

11     A.   Safety Director Pettus?

12     Q.   I'm sorry.  Safety Director Pettus, yes.

13     A.   That is correct.

14     Q.   At the same time -- and I want to go over this with you

15   because I know we've discussed this and it has to do with

16   accountability and enforcing policies.  You followed the Shaw

17   case.  Do you remember what I'm talking about, the Shaw case?

18     A.   Yes, sir.

19     Q.   As you will recall, that involved a white sergeant who

20   was determined by the Internal Affairs Bureau to have made

21   racist comments and used racial epithets toward black officers

22   and to have threatened a black officer through a text,

23   threatening him if he took a job in that sergeant's narcotics

24   unit?

25         MR. PHILLIPS:  Your Honor, I renew my objection.  I

VOL. I - 169

1  don't think it's relevant to this case.  That was the subject

2  of a different federal lawsuit that has been resolved.

3      THE COURT:  Mr. Gittes -- first of all, Mr. Phillips,

4  I would have understood you if you would have said objection,

5  relevance.

6      MR. PHILLIPS:  I apologize.

7      THE COURT:  My directive to all counsel that narrative

8  objections are verboten.  Now, having said that, what is the

9  relevance of this line of inquiry, Mr. Gittes?

10     MR. GITTES:  It relates directly to why -- one of the

11 reasons we believe there's repetition -- the *Lyons* problem,

12 because it has to do -- I don't want to say anymore.

13     THE COURT:  I'm going to allow it to stand with the

14 same admonitions, Mr. Phillips.  If not tied together, you may

15 renew your objection.

16     Mr. Mayor, you may answer.

17 BY MR. GITTES:

18 Q.   I'll do it again real quick, Mr. Mayor.

19     You became aware, in connection with that case, that the

20 white sergeant had engaged in racial epithets, had by text

21 threatened a black officer against taking a job under him in a

22 narcotics unit, and the sergeant confirmed the reason he did it

23 is because that black officer, when called in later during an

24 investigation, that he thought the sergeant was racist.  And

25 that information went up the chain of command.  You learned all

VOL. I - 170

1   of that?

2    A.   That is correct.

3    Q.   In that case, no discipline was issued to that sergeant

4   for violating both department policy and issues about

5   retaliation for someone reporting discrimination.  No

6   discipline --

7           MR. PHILLIPS:  Objection.

8           THE COURT:  Overruled.  Go ahead.

9           THE WITNESS:  So the question was whether or not the

10  officer was charged with racism and discrimination or charged

11  with something else?

12   BY MR. GITTES:

13   Q.   Charged with anything related to race, to

14  discrimination?

15   A.   Yeah, I don't think any race and discrimination charges

16  were included with the other charges against that officer.

17          MR. GITTES:  Your Honor, just so you will be clear,

18  this officer was separately investigated for some theft issues

19  totally unrelated to this.  So I just don't want this to be

20  confused.  I'm not asking about that.

21          MR. PHILLIPS:  Objection.

22          THE COURT:  Overruled, Mr. Phillips.

23       You may answer, Mayor Ginther.

24          MR. GITTES:  I apologize.  I believe he did answer,

25  and I was just clarifying his reference.

VOL. I -  171

1    BY MR. GITTES:

2    Q.   By the way, the way it worked in the department is that

3    the internal affairs report about that white sergeant's conduct

4    went up the entire change of command.  I'm sorry, not the

5    entire -- the chain of command for that sergeant which included

6    former Chief Quinlan at the time, right?

7    A.   That is correct.

8    Q.   So, in addition to the Matrix report which raised

9    concerns about whether there was accountability in reporting

10   among the officers in our police department, you learned of a

11   situation where the leadership of the department would not

12   charge a white officer who effectively admitted he retaliated

13   against a black officer, right?

14   A.   Repeat that question, Mr. Gittes.

15   Q.   In addition to the information from the Matrix report

16   about the problem of accountability, an officer reporting other

17   officers' misconduct, you also became aware through this case

18   that the chain of command in the police department itself would

19   not hold one of their supervisors accountable for open

20   retaliatory and discriminatory conduct?

21   A.   Yes, I think in this case that's correct.

22   Q.   As I mention -- as I asked you before, you're not aware

23   of any white officer who has ever been disciplined for

24   discriminatory conduct, racial epithets towards other officers,

25   that kind of thing?

VOL. I - 172

1    A.   I think I said I am not aware of any.

2    Q.   And just so we're clear for the Court, if officers get

3    new policies, you implement a new policy or the chief

4    implements a new policy, and there's no accountability for

5    ignoring the policy or violating it when it comes to use of

6    force related to race or protests, wouldn't you agree that

7    means the policy is ineffective?

8    A.   I'm not sure if the policy --

9    Q.   Let me try to ask it a simpler way.  And I'm glad you're

10   telling me when you don't understand something because I'm the

11   first to admit I'm a lawyer and sometimes I garble questions.

12        So isn't the heart of changing things through changes

13   and policy is enforcing the policies so there's accountability?

14   A.   I agree with that.

15   Q.   Also with respect to the earlier discussion of culture,

16   I believe -- I think -- I want to read a statement that you

17   made, and I want to make sure you remember it and I want to

18   make sure you still agree with your statement.  I'm going to

19   read it to you:  I have been very clear that we have to change

20   the culture within the division of police.  And that's based on

21   history, fact, the Matrix report, the Safety Advisory

22   Commission recommendations, feedback, history of these cases,

23   and lack of complaints and oversight and action.

24        You recall that?

25   A.   I do.  I still believe that.

VOL. I - 173

1    Q.   We are in the process of attempting to change that

2    culture, but we are clearly are not there yet.

3         Do you recall that statement?

4    A.   Yes.  And I still feel that way.

5    Q.   And you have been working on it at least -- I'm sure in

6    your life you worked on it before, but, as the mayor, you were

7    confronted with this perhaps more strikingly in August of 2019

8    when you got the Matrix report?

9    A.   That is correct.

10   Q.   Would you agree?

11        I mean, that's why you got the report, to see where

12   things were, right?

13   A.   That is correct.

14   Q.   So I now want to -- with that kind of overall look at

15   the history of reporting misconduct and disciplining officers

16   related to misuse of force, I want to talk about the protests a

17   little more.

18        Now, you -- I want to ask you some things about whether

19   you observed them during the course of the protests.  And first

20   of all, you did -- I think we've already made clear that you

21   observed press reports and other videos about police conduct --

22   I'm sorry, excuse me, at the demonstrations, right?

23   A.   That is correct.

24   Q.   And at a later point -- I'm not suggesting it was early

25   in the protests.  At a certain point, you actually ordered that

VOL. I -  174

1   a website be created so that citizens could submit videos,

2   comments, and other material about instances of what they

3   thought were excessive force or mistreatment during the

4   protest, right?

5   A.   That is correct, yes.

6   Q.   It also turned out, did it not, that there were over 800

7   complaints to internal affairs about purported misconduct by

8   police officers during the demonstrations?  Isn't that right?

9   A.   That sounds accurate, yes.

10  Q.   And didn't your division officials indicate to you that

11  it was the highest number of complaints about officer conduct

12  they had ever received?

13  A.   I don't remember anybody telling me that or reporting

14  that to me, but that sounds accurate.

15  Q.   When you -- in reaction particularly to events on

16  May 30th -- Saturday, May 30th, you decided that policy had to

17  be changed in the department, and you spoke to the chief?

18  A.   That's correct.  I spoke to him Sunday.  What I observed

19  on Saturday was unacceptable to me and the community, and I

20  shared that with the chief on Sunday morning.

21  Q.   You weren't there yourself, but you viewed it and you

22  got reports from a number of sources, including the division,

23  correct?

24  A.   That is correct.

25  Q.   And what you particularly saw that you concluded was

VOL. I -  175

1  unacceptable was the use of a variety of chemical weapons to

2  disperse crowds in the streets, to disperse crowds that weren't

3  in the streets, on sidewalks, and in some instances doing it by

4  canisters and tear gas, what are known as -- I'm losing the

5  term for it, but it's kind of an explosive grenade that makes a

6  lot of noise but doesn't actually have gas in it, use of I

7  think they're called the Mark 9s, the large tear gas, pepper

8  spray.  You're familiar with those?

9        MR. PHILLIPS:  Objection to the question, Your Honor.

10       THE COURT:  Read the question back, Ms. Evans.  I

11  don't think the question is legally inappropriate.  I do think,

12  however, it's confusing.

13       MR. GITTES:  I'll withdraw it.

14       THE COURT:  Mr. Gittes, before you withdraw your

15  question, you need to hear your question, and that way you can

16  fashion probably a less verbose question.

17       Go ahead, Ms. Evans.

18    (Thereupon, the last question was read by the court

19  reporter.)

20       THE COURT:  Okay.  I'm going to sustain the objection.

21  It was compound because if the witness said yes, we wouldn't

22  know what part he was saying yes to.

23       So rephrase your question, Mr. Gittes.

24       MR. GITTES:  Yes, Your Honor.  Thank you for pointing

25  this out to me.

VOL. I -  176

1    BY MR. GITTES:

2    Q.   First of all, the kinds of things you saw -- let's break

3    it down as the Court suggests.

4         You learned of or observed through media that

5    individuals on sidewalks who were not engaging in violence or

6    misconduct were being sprayed by officers.

7         I don't see -- there you are.

8         That was one of the factors that affected your decision

9    to talk to the chief?

10   A.   That is correct.

11   Q.   You also saw similarly that Mark 9s were -- which are

12   the large spray weapons, were being used for protesters who

13   were in the streets chanting; they were not engaging in any

14   kind of violent conduct, merely protesting.  That also

15   influenced your decision?

16   A.   Yes.  The use of chemical agents or tear gas or any of

17   those types of things on peaceful protesters, all of those

18   things.

19   Q.   Now, there were also on a number of days -- and I'm not

20   going to try to take us through each day.  But do you recall

21   seeing instances when a -- I'll call it a knee knocker rifle.

22   I've heard it referred to that way.  Are you familiar with a

23   weapon that is considered a nonlethal crowd control weapon that

24   the division uses which fires wooden projectiles and is used in

25   crowd control situations?  Are you familiar with that?

VOL. I -  177

1    A.    Yes.

2    Q.    As of that Saturday, at least, were -- had you seen that

3    those projectiles, in the first few days of the demonstrations,

4    had been used against any peaceful protesters?

5    A.    Yes.

6    Q.    Did you see some videos during that early period, before

7    you talked to the chief, of protesters who were leaving

8    downtown or another location and actually were walking away

9    from the officers and the officers fired those projectiles at

10   them?

11            MR. PHILLIPS:  Objection.

12            THE COURT:  Basis?

13            MR. PHILLIPS:  Assumes facts not in evidence.

14            THE COURT:  Overruled.  You may answer.

15            THE WITNESS:  If I remember, correctly, Mr. Gittes, I

16   think you showed me a video of this during the deposition, if I

17   remember correctly.

18   BY MR. GITTES:

19   Q.    Yes.  I'm trying to get you back in time a little bit.

20   Let's break it down.  You have, since the demonstrations, and

21   more recently seen videos, of officers firing at individuals

22   with the knee knocker rifles as they were actually walking away

23   from them.  And you saw that at your deposition?

24            MR. PHILLIPS:  Objection.

25            MR. GITTES:  And you recall that --

VOL. I - 178

1      THE COURT:  Just a second, Mr. Gittes.  Mr. Phillips

2   had an objection.

3      What's the basis of your objection, Mr. Phillips?

4      MR. PHILLIPS:  It assumes facts not in evidence.

5      THE COURT:  That's also overruled.  It happened almost

6   simultaneously.  I don't recall whether Mayor Ginther had

7   answered that question.

8      Ms. Evans, could you read back the last answer and

9   question, please?

10     (Thereupon, the last question was read by the court

11  reporter.)

12     THE WITNESS:  Yes.

13  BY MR. GITTES:

14  Q.   Now, I'm trying to go back in time.  Do you recall in

15  the first few days -- I guess the first weekend of the

16  demonstrations having been told about or seen that happening?

17  A.   I don't recall that specific instance and approach and

18  tactic being used; many others, but that one doesn't stand out

19  to me as something I recall from that first weekend.

20  Q.   Another I'll call it a tactic.  Do you recall seeing

21  videos or being told about bicycle officers using their

22  bicycles to push or shove protesters, in some cases with enough

23  force to knock them to the ground?

24     MR. PHILLIPS:  Objection.

25     THE COURT:  Overruled.

VOL. I - 179

1    THE WITNESS:  Yes, sir.

2  BY MR. GITTES:

3  Q.   And you were aware of that at some point after the first

4  three or four days of the protests, right?

5  A.   Yes.

6  Q.   That has continued to happen, to your knowledge, even

7  weeks after the initial protests?

8    MR. PHILLIPS:  Objection.

9    THE COURT:  Overruled.

10  BY MR. GITTES:

11  Q.   Do you recall that?

12  A.   When you speak to this, what do you mean?

13  Q.   I'm sorry.  Using bicycles almost like a weapon to push,

14  shove, slam protesters, to move them where they want the person

15  to move and in some cases cause them to fall?

16  A.   My greatest recollection of that is on Father's Day when

17  there was violence and the police were attacked and things were

18  thrown at them, including shields and other things.  My

19  greatest recollection of what you're describing happened when

20  protests turned violent, but there may have been other cases

21  where that happened among peaceful protesters as well.

22  Q.   So you don't recall seeing any videos -- never mind.

23  I'll come back to it.

24    In reaction to what you saw, as I understand it, you

25  asked that the chief adopt a new policy regarding use of

VOL. I - 180

1  chemical weapons?

2  A.   That's correct, and directed him that they should not be

3  used against peaceful protesters.

4  Q.   And that included whether the protesters were in the

5  street or on a sidewalk?

6  A.   I believe so.

7  Q.   I want to come to your comment about issues of

8  protester --

9      MR. GITTES:  I'm sorry, Your Honor.  Give me one

10 second.

11     Your Honor, can I ask for a short break?  I need to

12 consult my co-counsel for a second.

13     THE COURT:  How about we take a 15-minute recess,

14 to 4:22.

15     MR. GITTES:  Thank you, Your Honor.

16   (Recess taken from 4:06 p.m. to 4:21 p.m.)

17     THE COURT:  Mr. Gittes, are you ready to continue?

18     MR. GITTES:  Yes, Your Honor.  And thank you for the

19 break.

20     THE COURT:  Mayor Ginther, are you ready to continue?

21     THE WITNESS:  Yes, Your Honor.

22     THE COURT:  Please proceed, Mr. Gittes.

23   BY MR. GITTES:

24 Q.   Mr. Mayor, let me just come back to the rule changes

25 that you had implemented.  You did implement a change regarding

VOL. I -  181

1   the use of chemical weapons.  I'm not sure if we've described

2   it completely.  But, if I understand it, you banned the use of

3   chemical weapons to disperse peaceful protesters from sidewalks

4   and streets.  Isn't that an accurate summary of at least what

5   your intention was?

6   A.   Yes.

7   Q.   You did not seek any changes regarding how the knee

8   knocker rifles, or I think they're called multi-baton rifles,

9   were used?

10  A.   I believe that's accurate.

11  Q.   And you did not recommend or seek a change in the use of

12  bicycles by bicycle officers?

13  A.   I believe that's accurate.

14  Q.   Also I want to ask you, did you at any time as of today

15  study the training that was actually given to officers

16  regarding all of these crowd control weapons as of today?

17  A.   Have I witnessed the training?

18  Q.   No.  There are exhibits in this case which I don't know

19  whether you've seen them or not that actually are the videos of

20  the training -- PowerPoints about the training.  Have you

21  studied any of those, or reviewed them?

22  A.   I've reviewed them.  I wouldn't say I've studied.  I

23  couldn't memorize them or speak to them.

24  Q.   Would it be fair to say to the judge that you haven't

25  determined whether there's any discrepancy between what the

VOL. I - 182

1    training is versus what the policies are?

2    A.   Yeah, I wouldn't feel qualified to speak to that.

3    Q.   One other point I want to get to because of your

4    comments about objects being thrown and violent protesters.

5    Based on the information you received and the videos you've

6    seen, isn't it true that most of the violence such as looting,

7    throwing of objects, I think in one -- at least one day fires

8    being set, occurred early in the protests, the first couple of

9    days and mostly later at night?

10   A.   I would agree with those statements, generally speaking.

11   Q.   And isn't it the case that you also have learned both

12   from information from the division and your colleagues and

13   watching news coverage that the people who have committed most

14   of that kind of conduct were a much smaller number than the

15   larger crowd of demonstrators during the early hours of the day

16   into the early evening?

17   A.   What was the question, Mr. Gittes?

18   Q.   That the people at night who were doing that are much

19   smaller in number, a significantly smaller number of

20   individuals than the majority, the vast majority -- I'm sorry.

21   I'm just having trouble today.

22        MR. GITTES:  Your Honor, I think I need to take your

23   class.

24   BY MR. GITTES:

25   Q.   The number of protesters who at night were doing,

VOL. I - 183

1    engaging, in violent acts were small compared to the overall

2    number of people demonstrating and protesting during these --

3    A.    Yeah, I think generally that's an accurate statement.

4    Q.    In fact, I understood from your deposition, you

5    didn't -- this small cadre of people who caused trouble, you

6    referred to them as rioters.  You wouldn't even call them

7    protesters?

8    A.    Yes.  I think clearly there is a difference between a

9    peaceful protester and someone who seeks to destroy public or

10   private property or injure law enforcement officers.

11   Q.    You also saw instances, I believe on video at least,

12   where you would have a troublemaker -- I'm going to call them

13   troublemakers.  Just bear with me.  I'm referring to somebody

14   who is throwing something or, you know, trying to cause

15   trouble.

16         You saw instances where individuals like that would be

17   behind protesters who were chanting or holding signs, and they

18   would throw a water bottle or something else toward a police

19   officer from behind the actual protesters, right?

20   A.    I witnessed that, yes.

21   Q.    In some of the video you've seen, it was the protesters

22   up front who got sprayed for what someone behind them did?

23   A.    Is the question -- repeat the question for me.

24   Q.    Sure.  In situations where you had a troublemaker behind

25   the large group of protesters -- whether it's sidewalk or the

VOL. I - 184

1   street, for my purpose doesn't matter.  You got a troublemaker

2   behind them throwing something over the protesters toward the

3   police officers, and the police react by spraying or trying to

4   force a dispersal of the protesters?

5   A.    So I believe this would probably get to the heart of the

6   change of policy direction that I gave to Chief Quinlan that

7   then informed how they interacted with rioters or more violent

8   folks that were there, as opposed to dealing with larger groups

9   indiscriminately.  So both change of use of force involving

10  peaceful protesters, but also directed the chief that we needed

11  to single out and identify folks who were doing things not

12  peaceful, that were violent and destructive, and going after

13  them to hold them accountable, as opposed to using tear gas and

14  pepper spray indiscriminately amongst a large crowd.  I would

15  say that that changed after the direction I gave the chief.

16  Q.    Okay.  And so you would agree with me -- and I suspect

17  one of the reasons you want to change or at least try to change

18  that police response is that if a -- if one or two

19  troublemakers are throwing things and lots of protesters end up

20  getting gassed or sprayed or shot at, that troublemaker has

21  effectively interfered with the free speech rights or the right

22  to protest of a whole lot of people, right?

23  A.    You know, I'm not a lawyer.  I can't speak to, you know,

24  First Amendment rights and those types of things.  But

25  obviously, any time somebody's ability to peacefully protest or

VOL. I -  185

1  hold their government accountable, redress grievances, all

2  those types of things, that's not a good thing.  But I'll leave

3  constitutional law to constitutional lawyers.

4  Q.   I didn't mean to ask you a legal question.  I just meant

5  one of the reasons that you sought to change the police

6  response in those kinds of situations is that the result of

7  trying to do mass spraying because a couple of individuals or

8  three or four from the rear are engaging in throwing, is that

9  you're preventing all the other real protesters from being able

10  to continue their protest safely.  Isn't that part of what you

11  were finding?

12  A.   Correct.

13       MR. GITTES:  At this point, I think I'd like to move

14  to a couple of -- at least one video, Your Honor.

15       THE COURT:  All right.

16       MR. GITTES:  And if I could ask Jeff Vardaro -- and I

17  meant to ask --

18       MR. VARDARO:  I'm enabled, Fred.

19       MR. GITTES:  Okay.  Let's take a look at 141.

20  BY MR. GITTES:

21  Q.   Mr. Mayor, can you see Exhibit 141?

22  A.   Yes, sir, I can.

23  Q.   Okay.  And I will represent to you that this is a video

24  from May 30th which we've talked about a bit and you discussed.

25       MR. GITTES:  You can go ahead, Jeff.

VOL. I -  186

1     (Video played.)

2    BY MR. GITTES:

3    Q.   Mr. Mayor, were you -- could you hear and see -- hear

4    the sounds of that video, as well as see it?

5    A.   Yes, sir.

6    Q.   Do you -- from what you looked at, saw back on May 30th

7    or after, had you seen this video?

8    A.   I don't know if I had seen this video in particular, but

9    I had seen similar videos.

10   Q.   So you saw instances where -- are these the kind of

11   protesters, diversity of people, color, ages, that you

12   considered to be the actual protesters?

13   A.   I'm not sure I --

14   Q.   I mean, this crowd.  Do these people look like the kind

15   of people you talked to and ran into in the various times when

16   you were --

17   A.   Sure, absolutely.

18   Q.   And you became aware that because of the -- could you

19   hear them coughing as they were --

20   A.   I could.

21   Q.   And did you hear various individuals urging people not

22   to run?

23   A.   Yes.

24   Q.   And you're a person who has given speeches to large

25   crowds.  I think it's kind of experience that -- large meetings

VOL. I -  187

1    and political gatherings.  Would you have an estimate of how

2    many people you see rapidly leaving downtown?

3     A.   In this video?

4     Q.   In this video.

5     A.   I'm really bad at estimating those types of things.  It

6    looks like a couple hundred, maybe a couple thousand.

7     Q.   I'm not trying to put you on the spot.  That's okay.

8    That's a lot of people, right?

9     A.   Yes, sir.

10     Q.   And did you understand, from what you learned in other

11    similar videos that you saw, that these people were getting out

12    of Dodge, so to speak, because of all the chemical spray and

13    so-called nonlethal weapons that had been used by the police?

14         MR. PHILLIPS:  Objection.

15         THE COURT:  Basis, Mr. Phillips?

16         MR. PHILLIPS:  It appears he's being asked to analyze

17    a video that he said he doesn't know if he's even seen.  And

18    the question is based on the video.

19         MR. GITTES:  I'll withdraw it, Your Honor.  If I may,

20    I'll --

21         THE COURT:  We have to take a pause here.

22         I just wanted to know the legal basis for the objection.

23    And so I'm going to give you another shot.  And I'm going to

24    disregard, Mr. Phillips, the fact that you have, once again,

25    given me a narrative objection when the question did not call

VOL. I -  188

1    for a narrative objection.

2         Since we're going to be together for a week, I'm going

3    to take this opportunity to tell you about the dog bite case

4    because this is appropriate.  And, Mayor Ginther, excuse me,

5    but this is a procedural issue that we have to deal with.

6         In torts, you will recall, Mr. Phillips, the keeper of a

7    wild animal is not responsible for the first bite, the theory

8    being that the owner did not know of the violent propensities

9    of the dog.  So, if he bit someone, the owner would say I

10   didn't know that was a capability.  But, once he bites someone,

11   then all subsequent bites are bites for which the owner would

12   have responsibility.  You do remember the dog-bite rule from

13   torts.  Am I correct, Mr. Phillips?

14        MR. PHILLIPS:  I am, correct, Your Honor.  And I

15   apologize, Your Honor.

16        THE COURT:  I'm not seeking an apology because, when I

17   explained it to you the first time, it didn't stick.  So, if I

18   explain it to you by something that you had in first-year

19   torts, which I'm sure you loved and mastered, then it might be

20   meaningful to you.  So the point of the story is that none of

21   the other trial lawyers on this case now have any reason to

22   give me a narrative response when I simply asked what the legal

23   basis for your objection is.

24        And, Mayor Ginther, it is not that I get any

25   satisfaction from this pedagogical exchange with the lawyers in

VOL. I -  189

1    the case, but it's that I don't want the lawyers inadvertently

2    to send a signal to the witness as to how that witness should

3    answer the question.  That's why it's important to me, as the

4    gatekeeper here, to make sure that we don't have any of those

5    acts of misfeasance.

6         So I'm going to ask you again, Mr. Phillips, what is the

7    legal basis for your objection?

8         MR. PHILLIPS:  Calls for an opinion.

9         THE COURT:  Okay.  Well, if that's the case, then your

10   objection is overruled because a lay witness can give an

11   opinion as to his or her estimate of the things such as speed,

12   whether someone is intoxicated, and the size of this crowd.

13   But, for the record, I want you to know that I'm not going to

14   hold Mayor Ginther to whether this is two hundred or two

15   thousand.  He says it's a large crowd.  That is a sufficient

16   answer for the Court and I am the fact finder here.

17        So Mr. Gittes, please proceed.

18        MR. GITTES:  Thank you, Your Honor.

19    BY MR. GITTES:

20   Q.   Mr. Mayor, I don't want to ask you that last question

21   about people leaving on the 30th just based on what you saw

22   because you have indicated you've seen other videos like this.

23        So I would just like to know based on all the videos

24   you've seen about the 30th, is it -- was it your impression,

25   your understanding, that these peaceful protesters were

VOL. I - 190

1   leaving -- large numbers -- because of the police response that

2   day?

3      A.   Certainly that is one of the reasons, absolutely.

4      Q.   And it was one of the reasons that you felt something

5   had to be done and you called the chief?

6      A.   Because I believe that using, you know, nonlethal pepper

7   spray and use of force against peaceful protesters did not meet

8   my or community expectations or standards, that is correct.

9      Q.   Thank you.  One last question before we go to the video.

10       Did you observe occasions, either personally or on

11  video, where individuals were, as I described before, behind

12  the mass of what you and I can agree were protesters, and they

13  would throw an object and some -- whether it was a water bottle

14  or whatever it was -- would actually fall amongst the

15  protesters?  It didn't go far enough to actually reach an

16  officer?

17     A.   Is your question is everything that was thrown amongst

18  protesters hit officers?  I'm trying to understand what your

19  question is.  Or that the protesters had bad aim?  Help me

20  understand.

21     Q.   Sure.  I'm asking you if either personally or by

22  watching videos you saw instances - and I'm not asking you

23  numbers - where what I have referred to as a troublemaker

24  throws a bottle of water or some other item over the heads of

25  the protesters in front of him or her and it actually lands on

VOL. I -  191

1    protesters?

2    A.   Yes.

3    Q.   And did you also see occasions when they would throw and

4    it would get past the protesters but never reach an officer?

5    A.   I'm sure that took place, yes.

6    Q.   And did you also observe either in person or on videos

7    protesters yelling at people who were throwing things to stop,

8    don't do that, words like that?

9    A.   Yes.

10        MR. GITTES:  Now, Jeff, can you go -- actually, we

11   just did 141.

12   BY MR. GITTES:

13   Q.   Now I want to talk about the post-investigation because

14   I want to talk a little bit about any accountability that has

15   occurred related to things you saw or other people have

16   reported.

17        I think I've already asked you about there being 800

18   complaints submitted by citizens about police conduct.  You

19   made a decision to go to an outside agency to investigate

20   those, correct?  I don't mean the word agency to be a technical

21   term.  You went to an outside group?

22   A.   Yes, sir.

23   Q.   And that was Baker & Hostetler?

24   A.   Yes, sir.

25   Q.   Do you recall that in Baker & Hostetler's -- well, back

VOL. I -  192

1   up.  Do you recall doing a press conference with one of the

2   attorneys from Baker & Hostetler in September of 2020 to give a

3   report on their investigations?

4   A.   There were two attorneys from Baker & Hostetler, but,

5   yes.

6   Q.   I'm sorry.

7        First of all, Baker & Hostetler actually got 49 cases to

8   investigate out of the 800.  Is that accurate?

9   A.   I believe that is true.  I'm not sure, Mr. Gittes, if

10  there were 800 cases or 800 reports.  So there might be

11  duplicates of incidents, and so I don't know if 800 isolated

12  cases or complaints.

13  Q.   I think that's a fair point.  I mean, out of the 800

14  complaints -- I'm not saying each and every one was a, quote,

15  case.  You're right.  But of the 800 complaints, 49 matters --

16  or actually specific complaints because each was a complaint,

17  right?

18  A.   Yes, that's correct.

19  Q.   And then Baker & Hostetler reported back to you that

20  during the course of their work, they had problems identifying

21  officers involved in the complaints because a number of

22  officers -- and it's not a small number, but a number of

23  officers' body cams were not functioning when they were out

24  doing the work of crowd control or protection.  You knew that?

25  A.   Yes.  And that's why we demanded that badge numbers and

VOL. I -  193

1   new equipment be ordered for body-worn cameras to be on and

2   displayed regardless of the gear officers might be wearing to

3   deal with crowds moving forward.

4     Q.   On that score -- first of all, I just want to make sure

5   you tell the Court.  It wasn't just like a one-day problem.

6   The body cams were off a number of days among a number of

7   officers?

8     A.   That is correct.

9     Q.   And despite Baker & Hostetler's best efforts, they were

10  not able to identify the officers in most cases -- not all

11  cases, but in most cases because there was no body cam footage?

12    A.   I believe that would be an accurate statement and,

13  again, why we made additional changes and reforms to make sure

14  that doesn't happen again.

15    Q.   Well, Mr. Mayor, many of the things I'm talking about I

16  hope you're not taking them as a criticism of me -- I mean, of

17  you.  I'm trying -- body cams are an important issue for you,

18  right?

19    A.   Yes.

20    Q.   In fact, you were the one really among those who pushed,

21  I think right away after you became mayor, to get more body

22  cams?

23    A.   Before I became mayor.

24    Q.   Before that, okay.

25         Would you agree with me that a majority of the officers

VOL. I -  194

1  who did the work during the protest had functioning body cams?

2  A.  Yes.

3  Q.  But there was a significant minority who didn't, right?

4  A.  Significant minority of officers who didn't have

5  body-worn cameras?

6  Q.  Yes.

7  A.  I'd have to go back and look at the numbers.  I think

8  the only folks who weren't issued body-worn cameras might have

9  been squad --

10  Q.  Mr. Mayor, I can tell you, you misunderstood my question

11  or I have misstated my question.

12  A.  Okay.  Try again.

13  Q.  I'm not asking you about issued body cams.  I'm asking

14  you about officers who had body cams but that didn't record

15  during the protests.

16  A.  Because they chose not to, or the gear that they were

17  issued and directed to wear weren't able to have body-worn

18  cameras on top of it.  Yes, that's a correct statement.

19  Q.  That was a significant number of officers?

20  A.  Yeah.  I'd have to look at the numbers, but I think

21  that's a fair statement.

22       THE COURT:  Mayor Ginther, I have a question.  Do we

23  know the number of officers who had body cams but did not turn

24  them on?

25       THE WITNESS:  Your Honor, I do not know the answer to

VOL. I -  195

1  that question.  But I'll be happy to follow up with our folks

2  to see if we can give you an accurate answer.

3        THE COURT:  All right.  I just wanted to distinguish

4  between those in the second category you identified whose suits

5  may not -- or whose armor may not have accommodated the body

6  cam.  I just want to know how many body cams did we have out

7  there -- well, I want to know two things.  One, how many body

8  cams did we have out there of police who were on the scene;

9  and, secondly, of those police officers who had body cams, how

10  many of them had them on.

11        THE WITNESS:  Your Honor, I'll follow up with

12  Mr. Phillips and get you the appropriate information.

13        THE COURT:  I appreciate that.  Thank you.

14  BY MR. GITTES:

15  Q.   Mr. Mayor, I would like to follow up on the judge's

16  questions and go to another one.  Have you gotten -- you

17  understand -- or do you understand that in this case the

18  lawyers have seen officers who were in full body armor gear

19  whose body cams could take photos or video and they did.  Yet,

20  we have been told in depositions that other officers who were

21  wearing the same kind of equipment have blamed the outfit they

22  were in as making it impossible.

23        So how can the officers wearing the same kinds of

24  outfits be one set of them are able to video and the other set

25  not able to video?

VOL. I - 196

1          MR. PHILLIPS:  Objection.

2          THE COURT:  Basis?

3          MR. PHILLIPS:  Foundation.  Facts not in evidence.

4    Relevance.  Unduly prejudicial.

5          THE COURT:  Overruled.  You may answer, Mayor Ginther.

6          THE WITNESS:  Could you repeat your question,

7    Mr. Gittes?

8          THE COURT:  Ms. Evans, would you read back the

9    question.

10       (Thereupon, the last question was read by the court

11   reporter.)

12         THE WITNESS:  Thank you for reading the question.

13         I don't know if I can answer the question.  But I do

14   understand that there are lawyers who have evidence where the

15   same gear was issued to folks wearing body-worn cameras and

16   some that were not.  And one of the remedies to this situation

17   was having the order and directive change about having the

18   body-worn camera on and updating any issues with gear that

19   might have made it more challenging to have it on.

20         So I hope that answers your question, Mr. Gittes.

21     BY MR. GITTES:

22     Q.   Well, I'm not sure it does.  But I'll just ask this

23   question.

24         We are now -- it was in May and June.  So we're now

25   almost nine months since the protest and since the first week

VOL. I - 197

1   of the demonstrations when this problem was occurring.  Have

2   you received an actual report from anybody explaining this?

3   A.   A report on the discrepancies between who was wearing

4   body-worn cameras or who wasn't?

5   Q.   That explains in total the reasons why either officers

6   didn't turn on their body cams or that somehow officers -- some

7   officers were able to make them work with the body armor while

8   other officers didn't.  Have you received a report about this?

9   A.   To answer your question, not as to the "why," but I have

10  gotten an update on the new directives, policies, and gear

11  that's been ordered and outfitted with officers to make sure it

12  doesn't happen again.

13  Q.   Okay.  Did you ever consider that some officers were

14  using their body armor as an excuse or an opportunity not to --

15  to avoid body cam recording what they were doing?

16  A.   I'm not aware of any specific cases or instances.  No

17  officer ever shared that with me.

18  Q.   Okay.  I'm asking you did it ever occur to you.  Whether

19  it occurred to anybody else doesn't matter.  I'm asking you.

20  A.   You're asking whether or not I believe body-worn -- or

21  that gear was used as an excuse not to wear body-worn camera

22  footage?

23  Q.   I'm asking you have you ever even considered it?

24  A.   Sure.  Yes.

25  Q.   And with respect to -- and I know -- I will just tell

VOL. I —  198

1   you I've heard multiple explanations.  It doesn't matter what

2   I've heard.  But given the time that passed and your concern

3   during the first week of the protest that body cams weren't

4   functioning as you wanted and worked to get, did you instruct

5   anybody in the division to do an investigation and report to

6   you?

7       A.   If I remember correctly, I ordered the chief to report

8   back on why and to clarify directives that body-worn cameras

9   should be on; and, if new gear was needed to properly support

10  the body-worn cameras that we purchased, to do that.  That was

11  the extent of my direction and report back from the chief on

12  this.

13      Q.   Let me ask you this.  To your knowledge as of now, has

14  any officer from the spring protest been disciplined related to

15  not having their body cam on?

16      A.   Not that I'm aware of.

17      Q.   Also, with respect to the investigations by B&H, to your

18  knowledge, do you know what the status of the other 800

19  complaints is, the ones that weren't referred to B&H for

20  investigation?

21      A.   I do not.

22      Q.   Also with respect to the BakerHostetler investigation,

23  do you know the status of the -- they reported back to you --

24  and I think it was discussed at the press conference that there

25  was a certain number -- and I won't ask or expect you to

VOL. I - 199

1   remember the number, but there was a number of investigations

2   that were incomplete mostly because of a lack of the ability to

3   identify officers.

4          Do you know what the status of that is?

5   A.   The status of the incomplete --

6   Q.   Yes.

7   A.   -- cases?

8          No, I do not.

9   Q.   And didn't Baker & Hostetler request from the division

10  additional information regarding those incomplete cases?

11  A.   I believe so.

12  Q.   To your knowledge, has the division provided the

13  incomplete information?

14  A.   I believe so.  But I don't know if I can say that

15  exhaustively and completely.

16  Q.   You would not dispute what Ms. Edwards said in her

17  30(b)(6) deposition in this case regarding whether or not

18  they've gotten follow-up from the division?

19  A.   I would not dispute her testimony.

20  Q.   In addition to that, do you know -- I guess we should

21  make sure the Court understands also that Baker & Hostetler was

22  put on a strict time limit, were they not?

23  A.   That is correct.

24  Q.   And it was the 90-day time limit that has applied under

25  the normal CBA procedures for investigating officers?

VOL. I - 200

1    A.    That is correct.

2    Q.    Under that time limit in the contract, there is a

3    provision that says if the conduct being investigated could be

4    the basis of criminal charges or involve criminal issues, that

5    90 days would not apply until such time as a determination or a

6    conclusion as to criminal prosecution, right?

7    A.    Can you repeat the question?  I'm sorry.

8    Q.    Yeah.  I don't know whether you were involved.  Baker &

9    Hostetler, as part of this investigation, all in one period had

10   to investigate -- or largely over the same period investigate

11   these 49 matters that were sent to them, right?

12   A.    Yes.

13   Q.    A 90-day time limit was placed on that collective

14   activity?

15   A.    That is correct.

16   Q.    Would you agree there was not only multiple witnesses in

17   many of these cases, but a whole lot of body cam footage even

18   though not in all of the cases, but in a lot of them there was

19   body cam and there were hours and hours and hours of them,

20   right?

21   A.    That is correct.

22   Q.    And didn't Baker & Hostetler tell you and other city

23   officials they needed more time.  It was going to be very

24   difficult to assess the evidence and even identify some of the

25   officers, many of the officers, without more time?

VOL. I -  201

1    A.    That is correct.

2    Q.    And didn't they ask that the FOP be requested to waive

3    the time limit, which they're allowed to do?

4    A.    That is correct.

5    Q.    But the FOP said no.

6    A.    That is correct.

7    Q.    Did you make a conscious decision or give a direction

8    that Baker & Hostetler or other city representatives should not

9    treat these cases as criminal investigations?

10   A.    No, I never gave that direction.

11   Q.    Did you know that the vast majority of these complaints

12   involved allegations of improper or unlawful -- in fact, both

13   in almost every instance -- use of force?

14        MR. PHILLIPS:  Objection.

15        THE COURT:  Basis?

16        MR. PHILLIPS:  Calls for a legal conclusion.

17        THE COURT:  Overruled.  It's a policy matter.  You may

18   answer, Mayor Ginther.

19        THE WITNESS:  Your Honor, could I have Mr. Gittes

20   repeat the question?

21        THE COURT:  Yes, or I can have Ms. Evans read it back.

22        MR. GITTES:  I'll repeat it.  She works hard enough.

23   I'll try to just do it again.

24    BY MR. GITTES:

25   Q.    Mayor Ginther, I'm asking you, did you understand that

VOL. I -  202

1    the vast majority of these complaints that were sent to

2    BakerHostetler involved claims of excessive force that could be

3    considered criminal assault or other criminal conduct?

4       A.    Yes.  Based on my limited understanding of the law, and

5    particularly criminal law, I would say that would be an

6    accurate statement.

7       Q.    Did you direct Baker & Hostetler, or any other city

8    officials, not to treat them that way so the 90-day time limit

9    would not apply to the investigation?

10      A.    I did not give that direction.

11      Q.    Do you know why no one did it?

12      A.    I do not.

13      Q.    Let's talk about the status of the investigations as far

14   as you know it.  I recall that in your September 2020 press

15   conference you reported that there were a number of egregious

16   cases.  That's a word I will represent to you that you used in

17   the press conference.

18      A.    Yes, sir.

19      Q.    That were referred to Mr. Wozniak, who is a former FBI

20   agent working under Safety Director Pettus's direction, to look

21   into some cases as criminal matters.  Is that -- you did state

22   that?

23      A.    Yes, sir.

24      Q.    We are now -- as I said before, we're six months since

25   your press conference.  How many prosecutions have occurred of

VOL. I - 203

1  any officers?

2  A.  I am not aware of any.  I did receive a general verbal

3  update on the status of the investigations recently.  So but

4  not as of right now, that is correct.

5  Q.  And you do know that during the course of the protests,

6  dozens of protesters were arrested and charged, sometimes the

7  charges were dismissed, sometimes they actually were

8  prosecuted.  You know that?

9  A.  Yes, sir.

10  Q.  With regard to the investigations that were completed

11  with Baker & Hostetler, do you know of any discipline that has

12  been issued to any officer related to any of them?

13  A.  Could you repeat the question?

14  Q.  Sure.  With respect to the investigations that Baker &

15  Hostetler did complete and send back to the City, do you know

16  of any officer who has been disciplined as a result of any of

17  those investigations?

18  A.  Not yet.

19  Q.  Not yet.  Do you -- sorry, just lost my place here.

20       You also became aware, did you not, that officers --

21  some officers did not have their badges visible or their name

22  tags visible during their work during the protest?

23  A.  That is correct.  And in addition to the gear and the

24  directive around the body-worn cameras, I ordered the chief to

25  make sure that officers had their badge numbers and names

VOL. I - 204

1    present after those first couple of weeks.

2       Q.   Okay.  So, to summarize regarding the identification

3    issues, you had a number of officers who had nonfunctioning

4    body cams who have not been disciplined for that fact, correct?

5       A.   That is correct.

6       Q.   And it is a requirement for officers to have their body

7    cams functioning?

8       A.   That is correct.

9       Q.   You have officers who did not have name tags or badges

10   visible, which is a violation of division rules, is it not?

11      A.   That is correct.

12      Q.   None of those officers have been disciplined for that?

13      A.   Not as of yet.

14          THE COURT:  Just a second, Mr. Gittes.

15          Ms. Evans, would you read back that question and answer,

16   please.

17      (Thereupon, the last question and answer was read by the

18   court reporter.)

19          THE COURT:  Mayor, when you say "not as of yet," does

20   that indicate that discipline actions are pending and haven't

21   reached conclusion?

22          THE WITNESS:  I believe that is accurate, Your Honor.

23          THE COURT:  In your view, there are discipline actions

24   pending against several officers but they just haven't reached

25   a conclusion yet?

VOL. I -  205

1          THE WITNESS:  I think -- Your Honor, I think that

2     would be an accurate reflection.

3          THE COURT:  All right.  Please continue, Mr. Gittes.

4          MR. GITTES:  Thank you, Your Honor.

5     BY MR. GITTES:

6     Q.   Mr. Mayor, to be clear, the ultimate decision about

7     discipline will be made with recommendations from chain of

8     command to the safety director?

9     A.   That is correct.

10    Q.   And then the normal grievance process will apply?

11    A.   I believe that is correct.

12    Q.   Assuming there's actually discipline, right?

13    A.   I believe that is correct.

14    Q.   Baker & Hostetler did not have the authority to make an

15    actual decision about discipline?

16    A.   No.  I believe their job was to conduct the

17    investigations and bring back their findings to the chief and

18    the director.

19    Q.   In addition to that, you mentioned earlier the new -- I

20    don't remember the exact title and the charter provision or the

21    legislation, but that civilian review.  That body under the new

22    law does not have authority to actually dispense discipline.

23    They merely -- I don't mean to minimize it, but they make

24    recommendations or findings which go to the division of police?

25    A.   They will make recommendations to the chief of police

VOL. I - 206

1  based on investigations conducted by the inspector general that

2  they rely on.

3    Q.   But they can't actually -- it's up to the chief and the

4  safety director to make any final decision?

5    A.   Who both report to me, correct.

6    Q.   Yes, I understand.  But as of -- I don't know if I

7  discussed it or not.  Your presence as the mayor may continue

8  or may not continue depending on elections?

9    A.   Absolutely.

10    Q.   And the personnel in the police division and the

11  mayors -- never mind, I'll withdraw that, Your Honor.

12    A.   It's important -- you raise an important point here.

13  That's why we believe strongly that a charter amendment in our

14  city's constitution was so important to add the role -- the

15  civilian review board and the inspector general in the city

16  chapter, because regardless of who the mayor is and the council

17  is, this is now part of the city's constitution.  It cannot go

18  away unless there is a vote of the people.

19        So I understand your point and absolutely acknowledge

20  the point you're making.  But the civilian review board and the

21  inspector general will not change or go away unless the people

22  of Columbus say so.

23    Q.   You have not -- I appreciate what you just said, but

24  obviously I'm trying to focus on the institution of the

25  division itself, not outside investigations or recommendations,

VOL. I -  207

1    and the behavior of officers.

2         Have you given any order to the division that they could

3    not, on their own, review what body cam video was taken during

4    the protest to analyze the -- analyze it for training, for

5    policy changes, for misconduct?

6    A.   I'm not sure I understand your question.

7    Q.   I'm asking if you gave any order that the division could

8    not review the body cam footage from the protest for purposes

9    of policy changes, identifying misconduct, change in training?

10   Have you issued such an order?

11   A.   No.

12   Q.   So, if someone in the department were to claim that they

13   had been prohibited from doing anything with the body cam other

14   than to try to identify officers, that wouldn't -- you would

15   not know about any such order?

16   A.   That is correct.  And this may also be -- you've raised

17   this.  This might be part of former U.S. Attorney Carter

18   Stewart and the John Glenn College of Public Affairs that's

19   going to take a holistic view of how the City handled things.

20   So this may very well be something they would be able to give

21   recommendations specific to the police handling of the

22   protests.

23   Q.   Right now, at least at this moment, there is no system

24   at the police department under which body cam footage from

25   officers in general or in crowd control situations are subject

VOL. I - 208

1   to some kind of systematic review, whether it's by random

2   sampling or by serial officer selection or anything.  There's

3   no automatic regular review of the body cam to see how officers

4   are performing and draw conclusions from it.  Isn't that the

5   fact?

6    A.   That is my understanding.

7         MR. GITTES:  Your Honor, I may have -- I think I have

8   a couple of exhibits to share and then I will be -- I think

9   I'll be about done.

10        THE COURT:  All right.

11        MR. GITTES:  Jeff, I believe -- Your Honor, may I ask

12  Mr. Vardaro quickly --

13        THE COURT:  Sure.

14        MR. GITTES:  Jeff, do we have another video lined up?

15        MR. VARDARO:  I've got 124, if you want that one.

16        MR. GITTES:  Let me just remind myself because I don't

17  know them by the numbers.

18        MR. VARDARO:  I might have a different series.

19        MR. GITTES:  Yes, I remember now.  Okay.

20        What other one do we have?  There was at least two more.

21  I need to find them in my notes.

22        Yes, let's start with 126.

23   BY MR. GITTES:

24   Q.   Mr. Mayor, can you see that video?

25   A.   With a little help from my friends here -- yes.  Now, I

VOL. I - 209

1    can see.

2           MR. GITTES:  Jeff, do you want to show it?

3      (Video played.)

4           MR. VARDARO:  I don't want to be distracting, but just

5    for the record, there's no sound on this video.

6           MR. GITTES:  Thank you, Jeff.

7     BY MR. GITTES:

8     Q.   Do you need to see that again, Mr. Mayor?

9     A.   No, sir.

10    Q.   Having viewed that, can you tell me if that is within

11   the old and/or the new policy regarding the use of chemical

12   weapons?

13          MR. PHILLIPS:  Objection.

14          THE COURT:  Basis?

15          MR. PHILLIPS:  Asks for an opinion, asks for a legal

16   conclusion.

17          THE COURT:  I understand your objection.  It's

18   overruled.  You may answer, Mayor Ginther.

19          THE WITNESS:  What I just witnessed I believe

20   potentially could have been within policy before the policy

21   change, but no longer would be within the policy based on the

22   changes I directed with the chief.

23    BY MR. GITTES:

24    Q.   So you believe it was within policy before but is not

25   now?

VOL. I - 210

1   A.   That is my understanding.

2   Q.   By the way, because it's on a street, as you saw, there

3   was no moving traffic in the vicinity of the individual who was

4   sprayed, right?

5   A.   No.  It looked like just stopped traffic at the end of

6   that interaction.

7   Q.   Can you make out whether those are police vehicles

8   further up on the street that are stationary and remain

9   stationary?

10   A.   I cannot.

11   Q.   Do you see any -- I understand I'm asking you to focus

12   on this video.  Do you see any objects being thrown at any

13   officers?

14   A.   I do not.

15   Q.   Do you see any large number of protesters anywhere?

16   A.   I do not.

17   Q.   With regard to traffic -- since I mentioned it, I did

18   want to get this out of the way.  You understand as the mayor,

19   based on your experience as the mayor, that the division of

20   police can route traffic very quickly.  Isn't that true?

21   A.   Yes.  I think we talked about this in the deposition.

22   We have lots of major events in downtown.  We change traffic

23   patterns all the time, that's correct.

24   Q.   If I told you that one of the scene commanders involved

25   with these protests testified in a deposition that traffic

VOL. I - 211

1 could be rerouted in minutes, especially downtown, would you

2 dispute that?

3 A. I think he would know better than I. But I think that

4 makes sense.

5 Q. Isn't it consistent with your conversations about

6 traffic downtown? Haven't you learned yourself from various

7 experiences that it can be rerouted very quickly?

8 A. I think that's accurate.

9 Q. Let's take a look at --

10 MR. GITTES: Your Honor, I would like permission to

11 show a series -- or at least two videos that are marked as

12 Exhibits 110A and 110B. They're each fairly short.

13 THE COURT: You may.

14 MR. GITTES: I forgot to move -- I'm sorry. Your

15 Honor, I'd like to move Plaintiff's Exhibit 126 into evidence.

16 THE COURT: Mr. Phillips, any objection to 126 being

17 received?

18 MR. PHILLIPS: I do object, Your Honor. But I believe

19 you already ruled on it on Friday.

20 THE COURT: You want to preserve your record. I'm

21 going to receive 126. Mr. Phillips' objection is noted for the

22 record.

23 MR. GITTES: Your Honor, may I ask Jeff to show the

24 others now?

25 THE COURT: Yes, you may.

VOL. I -  212

1          MR. GITTES:  Jeff, would you mind doing 110A.

2      BY MR. GITTES:

3      Q.   Mr. Mayor, as these are being loaded, please pay

4  attention to what is being said, not just what is happening.

5      A.   I understand.

6         (Video played.)

7          MR. VARDARO:  My screen is causing me a little

8  trouble.  I'm assuming there was a disruption there.

9          MR. GITTES:  Your Honor, if we may -- just go back.

10        (Video played.)

11     BY MR. GITTES:

12     Q.   Mr. Mayor, do you need it again, or did you hear the

13  instructions that the officers were being given?

14     A.   No, I didn't hear them.

15     Q.   Okay.  We'll play it again.

16        (Video played.)

17     BY MR. GITTES:

18     Q.   Were you able to hear it that time, Mr. Mayor?

19     A.   I think so.

20     Q.   Can we go to the next video?

21          MR. GITTES:  Your Honor, were you able to hear?

22          THE COURT:  Yes.

23          MR. GITTES:  Jeff, whenever you're ready.

24          MR. VARDARO:  I'm just trying to overcome some

25  difficulty here.

VOL. I -  213

1     (Video played.)

2          MR. VARDARO:  Can you see the video or not?

3          MR. GITTES:  We can see the video, yes.

4          MR. VARDARO:  Is it playing there?

5          MR. GITTES:  It started to but it seems to stop.

6     (Video played.)

7          MR. VARDARO:  I don't know what's causing that.

8          MR. GITTES:  Is Sam available?

9          MR. SCHLEIN:  I was going to suggest that I could try,

10    if you make me the presenter.

11         MR. GITTES:  Is that possible?

12         THE LAW CLERK:  I just sent that.

13         MR. GITTES:  It's 110B.

14         MR. SCHLEIN:  Give me two seconds and I will have it

15    up.  Is this visible for everybody?

16         MR. GITTES:  It is for me.

17       Mr. Mayor, is it visible for you?

18         THE WITNESS:  Yes, sir.

19         MR. GITTES:  Your Honor?

20         THE COURT:  Yes.

21     (Video played.)

22    BY MR. GITTES:

23    Q.   Mr. Mayor, would you like to see that again?

24    A.   Please.

25     (Video played.)

VOL. I -  214

1     BY MR. GITTES:

2     Q.   Were you able to see it well enough that time?

3     A.   Yes, sir.

4     Q.   And then we have one last one in this -- about this

5     event, and it's 123.

6          MR. VARDARO:  That's 123C.

7          MR. GITTES:  Yeah, I'm sorry.

8          MR. SCHLEIN:  Is that up on everybody's --

9          THE COURT:  Yes.

10    BY MR. GITTES:

11    Q.   Mr. Mayor, can you see it?

12    A.   Yes, sir.

13    Q.   Okay.

14      (Video played.)

15    BY MR. GITTES:

16    Q.   Do you need to see that again, Mr. Mayor?

17    A.   I don't think so.

18    Q.   Okay.  And it may be obvious to you.  It's a different

19    angle of the same scene.

20         Having reviewed that, Mr. Mayor -- first of all, have

21    you ever seen it before?

22    A.   Did we look at those in the deposition?

23    Q.   Not that one, no.

24    A.   I don't know.  I don't think I have.

25    Q.   As the mayor, would what you just saw be within either

VOL. I - 215

1  the old policy or the new policy?

2          MR. PHILLIPS:  Objection.

3          THE COURT:  Overruled.

4          THE WITNESS:  Again, I believe it could be permissible

5  or allowable under our previous policy.  But I do not believe,

6  based on the direction I gave and the changes in policy around

7  chemical agents on peaceful protesters, that that would be

8  within policy.

9    Q.  I want to show --

10         MR. GITTES:  Your Honor, I'm almost done.  I just have

11  a couple more videos that I want to ask the mayor to address.

12  The next one would be -- I think it's 117.

13         MR. SCHLEIN:  Is this visible for everybody?

14         THE WITNESS:  Yes.

15         MR. GITTES:  Okay.

16    (Video played.)

17  BY MR. GITTES:

18    Q.  Mr. Mayor, did you see the string of protesters that

19  were lined up on the street in that video?

20    A.  I did.

21    Q.  And was that within the policy either before or now?

22         MR. PHILLIPS:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  I believe that potentially could have

25  been within the old policy, but would be outside the current

VOL. I -  216

1    and revised policy.

2            MR. GITTES:  Your Honor, may I have --

3            THE COURT:  Before you go further, Mr. Gittes, what

4    was the number for that video you just played?

5            MR. GITTES:  I'm sorry.

6            MR. SCHLEIN:  117.

7            MR. GITTES:  117.  And, Your Honor, I omitted -- I

8    would like to --

9            THE COURT:  Wait.  I'm sorry.  Did you say 117?

10           MR. GITTES:  117.

11           THE COURT:  And the one before that, but after 126 was

12   what?

13           MR. SCHLEIN:  123C, Your Honor.

14           THE COURT:  All right.

15           MR. GITTES:  The earlier ones were 110A and 110B.  And

16   I would like to move the admission of -- I'll take one at a

17   time.  110A, I would like to move its admission.

18           THE COURT:  Any objection to 110A, Mr. Phillips?

19           MR. PHILLIPS:  I object, Your Honor, but you decided

20   on it Friday.

21           THE COURT:  All right.  110A will be received.

22         How about 110B, Mr. Phillips?

23           MR. PHILLIPS:  I will object.

24           THE COURT:  Okay.  110B will be received.

25         Any objection to 123C, Mr. Phillips?

VOL. I - 217

```
1            MR. PHILLIPS:  I object.

2            THE COURT:  Is that just Pavlovian, or is there a

3   reason for your objection to 123C?

4            MR. PHILLIPS:  May I explain, Your Honor?

5            THE COURT:  Yes.

6            MR. PHILLIPS:  Only because these are short clips of

7   longer videos.  But my understanding is they were going to be

8   admitted.

9            THE COURT:  Okay.  123C will be admitted.

10         Are you seeking to admit 117, Mr. Gittes?

11           MR. GITTES:  Yes, Your Honor, I am.

12           THE COURT:  Any objection to 117?

13           MR. PHILLIPS:  It's the same objection, Your Honor.

14           THE COURT:  Okay.  117 will be admitted.

15           MR. GITTES:  Your Honor, if I can have a moment.  I

16   may not have anything else.  I just need to talk to my

17   colleagues as to whether that's the case.  May I have five

18   minutes?  Is that okay?

19           THE COURT:  It's 5:40 now.  We'll reconvene at 5:45.

20   Go ahead.  We'll talk about this later because Mr. Phillips

21   still has his examination, and I don't know what Mayor Ginther,

22   the rest of his schedule may be.  So we'll resume at 5:45.

23           MR. GITTES:  Thank you, Your Honor.

24        (Recess taken from 5:39 p.m. to 5:44 p.m.)

25           THE COURT:  All right.  Mr. Gittes.
```

VOL. I -  218

1        MR. MARSHALL:  Your Honor, Mr. Gittes will be here in

2   one moment.

3        THE COURT:  All right.

4      Mr. Gittes, are you ready -- is there anything further?

5        MR. GITTES:  Yes, Your Honor, a little bit.  And I

6   appreciate giving me the break.

7      After talking with co-counsel, I do have a few more

8   questions.  May I proceed?

9        THE COURT:  Yes, please.

10   BY MR. GITTES:

11   Q.   Mr. Mayor, regarding the videos that you -- we just

12   watched --

13        MR. GITTES:  The first thing I should do, I was told I

14   have failed to move into evidence Plaintiff's Exhibit 141.  And

15   that was the video --

16        THE COURT:  I have the notes on it.  Mr. Phillips, any

17   objection to 141?

18        MR. PHILLIPS:  Same objection as the other videos,

19   Your Honor.

20        THE COURT:  All right.  Exhibit 141 will be received.

21   Please continue, Mr. Gittes.

22   BY MR. GITTES:

23   Q.   Mr. Mayor, regarding especially these last few videos

24   you looked at, my understanding of your testimony is that it

25   would be -- it would violate the new policy, but you believe it

VOL. I -  219

1    could have been okay under the prior policy.  Is that an

2    accurate recollection of your testimony?

3        A.   I believe that's an accurate recollection.

4        Q.   Do you recognize or agree that under the revised policy

5    that individual officers have discretion to decide whether the

6    behavior of protesters, whether on the street or on the

7    sidewalk, is aggressive and, as a result, are authorized to use

8    chemical weapons against them regardless of where they are?

9            MR. PHILLIPS:  Objection.

10           THE COURT:  Basis?

11           MR. PHILLIPS:  Assumes facts not in evidence.

12           THE COURT:  Overruled.  You may answer, Mayor Ginther.

13           THE WITNESS:  Mr. Gittes, could you repeat the

14   question?

15           MR. GITTES:  Sure.

16     BY MR. GITTES:

17       Q.   I'm asking you whether you understand, under the new

18   policy, individual officers have discretion to use chemical

19   weapons when, in their judgment, protesters' behavior is

20   aggressive regardless of where the protesters are?

21       A.   I believe that to be true.

22       Q.   I would like you to --

23           MR. GITTES:  I have two remaining videos and then I'm

24   done, Your Honor.  The first one is Plaintiff's Exhibit 105.

25           THE COURT:  All right.

VOL. I - 220

1       MR. SCHLEIN:  Is this visible for everybody?

2   BY MR. GITTES:

3   Q.   Mr. Mayor?

4   A.   Yes.

5       MR. GITTES:  I think we're good, Sam.

6     (Video played.)

7   BY MR. GITTES:

8   Q.   Just as a reminder, I think you may have seen this

9   before.  You're going to see some officers spraying in a moment

10  over the heads of the bicycle officers and further down the

11  line.

12      MR. GITTES:  Go ahead.  I'm sorry, Sam.  Go ahead.

13    (Video played.)

14  BY MR. GITTES:

15  Q.   Mr. Mayor, do you need to see that again?

16  A.   I don't.

17  Q.   My question is whether that -- first of all, you saw --

18  you did not see anything being thrown at those officers, right?

19  A.   I did not.

20  Q.   You saw a Mark 9 being used to spray the individuals

21  standing in the street over the heads of the bicycle officers,

22  right?

23  A.   I did.

24  Q.   Did you see any traffic?

25  A.   No.

VOL. I - 221

1    Q.   And you saw the officers at least pushing at the

2    demonstrators who were holding signs or -- words of some type,

3    and stripping the boards away and shoving them with their

4    bikes?

5    A.   That is correct.

6    Q.   And you saw one of the -- a male who was shoved so hard

7    that he was forced back a number of rapid steps and fell to the

8    ground?

9    A.   That is correct.

10   Q.   Would under -- is it your claim that that -- I mean, not

11   claim.

12        Is that acceptable?  Is that authorized under the

13   policy?

14   A.   Again, I think it would be potentially in compliance

15   with previous policy.  I think it would be out of compliance

16   with the revised policy.

17   Q.   Okay.  Now, I'd like to show you the last video which is

18   106.

19        MR. SCHLEIN:  Let me know if that's visible for

20   everybody.

21        MR. GITTES:  I'm sorry.  I apologize.  I'm

22   interrupting myself because I didn't move that exhibit.

23        Let me make a motion to move the admission of

24   Plaintiff's 105.

25        THE COURT:  Mr. Phillips, any objection to 105?

VOL. I - 222

1    MR. PHILLIPS:  No objection to 105, Your Honor.

2    THE COURT:  105 will be received.

3   BY MR. GITTES:

4   Q.   Can you see that, Mr. Mayor?

5   A.   Yes, sir.

6    MR. GITTES:  Your Honor?

7    THE COURT:  Yes.

8    MR. GITTES:  Go ahead, Sam.

9     (Video played.)

10    MR. GITTES:  Sam, stop it and go back a little bit.

11   BY MR. GITTES:

12   Q.   And Mr. Mayor, I want to direct your attention to --

13   you've already seen the officers with the bikes because this is

14   just a different angle.  But I want you to look down toward the

15   end toward the corner on the sidewalk in the vicinity to the

16   steps down to the Statehouse parking garage.

17    MR. GITTES:  Would you reboot it?

18     (Video played.)

19    MR. GITTES:  Now, play it again so we can focus on

20   that.

21     (Video played.)

22   BY MR. GITTES:

23   Q.   Mr. Mayor, do you need to see that again?

24   A.   No, sir.  I think we viewed this at the deposition.  Is

25   that right?

VOL. I -  223

1   Q.   You may have.  I apologize.  I can't say for sure.

2  Probably.

3   A.   I think we did.

4   Q.   And you recall telling me that might have been okay

5  under the old policy but it would not be under the current

6  policy?

7   A.   That's my understanding and belief.

8       MR. GITTES:  Okay.  Just for the record, Your Honor,

9  and for you, Mr. Mayor -- I'm sorry.

10       Just for the record, that video, 105 and 106, were of

11  the Father's Day demonstration on 6-21 which is after the new

12  policy was in effect.

13   BY MR. GITTES:

14   Q.   And Mr. Mayor, I'd like to ask you with regard to either

15  of those policies, are you aware of any officer or supervisor

16  who was present that day who reported any of the officers in

17  those videos as having violated policy or used improper force?

18   A.   I have not.

19       MR. GITTES:  Your Honor, I believe those are all of my

20  questions.

21       MR. VARDARO:  Fred, please move the exhibits.

22       MR. GITTES:  Thank you.

23       I think I moved 105.  So, Your Honor, I'd like to move

24  Plaintiff's Exhibit 106.

25       THE COURT:  Any objection to 106?

VOL. I - 224

1          MR. PHILLIPS:  No objection, Your Honor.

2          THE COURT:  Okay.  106 will also be received.

3          At this point, Mr. Phillips, based on the Court's

4    earlier ruling, you were to begin your examination of Mayor

5    Ginther.  It is three minutes till six.  It's 5:57.  Out of

6    courtesy and respect for Mayor Ginther and what we all know is

7    a terribly busy schedule, if it's better to continue now,

8    that's fine.  If the mayor wishes to come back another time

9    during this week when we're still in this proceeding, I'm going

10   to defer to him on that because I'm assuming, Mr. Gittes, that

11   you have gotten out the testimony that you need for the

12   plaintiff's case in chief?

13         MR. GITTES:  Yes, Your Honor.

14         THE COURT:  All right.  So Mr. Phillips, do you need

15   to confer with the mayor out of our earshot to determine how he

16   would wish to proceed, or do you wish to answer it right now?

17         MR. PHILLIPS:  I would just -- I'm fine with just

18   asking the mayor right now if tonight works or if he needs to

19   come back on another day.

20         THE COURT:  Mr. Mayor, what is your preference?

21         THE WITNESS:  Your Honor, I have a ten-year-old

22   waiting on me at home, and I'm a half hour late to her.  I

23   report to many people, but she is one of the most important.

24   If you would be so kind and willing to allow me to come back in

25   a time appropriate for you, I'd like to honor that commitment.

VOL. I - 225

1       THE COURT:  Absolutely.

2          Mr. Phillips, we believe that the defense will begin its

3    case in chief -- what do we think?  Thursday?  Or was it

4    Wednesday?

5          MR. PHILLIPS:  I think it depends on how quickly the

6    plaintiffs go.  They know the answer better than I.

7          THE COURT:  Mr. Marshall, when do you think you'll be

8    done?

9          MR. MARSHALL:  Your Honor, we'll be certainly no

10   earlier than close of Wednesday before we get done, and maybe

11   not that.

12         THE COURT:  Okay.  Well, we'll see how we go, Mayor

13   Ginther.  But it looks like you may be called in the defense

14   case in chief on either Thursday or Friday; probably late

15   morning, early afternoon.  Mr. Marshall, would that be fair

16   that we can safely say that the defense case will conclude -- I

17   mean the plaintiff's case will conclude?

18         MR. MARSHALL:  Yes.  It might be late morning, early

19   afternoon Thursday.  But we'll do our best.

20         THE COURT:  All right.  And Mr. Phillips, we will know

21   each day how we're going.  And so we'll make -- we'll maintain

22   flexibility to accommodate the mayor's schedule so that his

23   testimony can be presented in your case in chief.

24         MR. PHILLIPS:  Thank you, Your Honor.

25         THE COURT:  Mayor Ginther, we have no more business

VOL. I - 226

1   with you.  I don't want you to be late getting to your

2   ten-year-old.  So, for our purposes, thank you very much, but

3   you are dismissed.

4          THE WITNESS:  Thank you, Your Honor.

5          MR. GITTES:  Your Honor, may I ask a question of you?

6          THE COURT:  Yes.  We can stay in and figure out

7   additional logistics, but I wanted the mayor to have an

8   opportunity to leave.

9          Go ahead, Mr. Gittes.

10         MR. GITTES:  I just wondered what your -- in terms of

11  Adams Cairns and Mr. Abrams, shall we get them done tonight or

12  shall we just wait?

13         THE COURT:  Well --

14         MR. ABRAMS:  Your Honor, if I may?

15         THE COURT:  Mr. Abrams, is Mr. Cairns available in the

16  morning at, let's say, 8:30?

17         MR. ABRAMS:  Your Honor, he may very well be.  I

18  talked to him a bit ago.  We have been waiting all day.  Our

19  preference is to go tonight, if the Court would indulge that.

20  But if the Court has other ideas, we understand that and

21  we'll --

22         THE COURT:  I will certainly indulge it because it was

23  not -- it was no one's fault.  The mayor's examination took as

24  long as it took.  There were no needless delays.  He was a key

25  witness in this case.

VOL. I -  227

1          You still think, Mr. Gittes, Mr. Cairns will take only

2   about ten minutes?

3          MR. GITTES:  Given your education of me, I think it

4   might be a little longer, but it shouldn't be much longer.  He

5   is a very short witness, identifying a photo and a single short

6   moment.

7          THE COURT:  Is Mr. Cairns now available?

8          MR. ABRAMS:  Yes, Your Honor.  I just have to email

9   him and tell him.

10         THE COURT:  Email and tell him -- I would like to be

11  done, gentlemen, by 6:30.  I have a court meeting that was

12  supposed to have taken place at 5:15.  I moved it back to six,

13  and I'm going to move it to 6:30.  So, on your representation,

14  Mr. Gittes, that Mr. Cairns will be short, we will take him.

15         MR. ABRAMS:  I will -- Your Honor, I'll email him

16  right now.

17         MR. GITTES:  I don't know who is doing him.  Can I

18  talk to you a second, because I think I can facilitate keeping

19  this short if I talk to you briefly?

20         MR. PHILLIPS:  Sure, except I'm not going to be the

21  one who is doing this one but --

22         MR. GITTES:  Okay.  Let's just go.  I have an idea of

23  one way to do it, and it's either acceptable or not.

24         MR. ABRAMS:  I appreciate your patience.

25         THE COURT:  Give me one minute.  I'm concluding my

VOL. I -  228

1    quick business.

2                MR. ABRAMS:  Yes, sir.

3                THE COURT:  Mr. Gittes, the good news is we can go as

4    long as we wish.  I've taken care of all of the business I was

5    to have taken care of at 5:15, then 6:00 and then 6:30.

6                MR. GITTES:  My goal is not to abuse that offer.

7                THE COURT:  Ms. Clark, would you swear in Mr. Cairns.

8          (Witness sworn.)

9                MR. ABRAMS:  Your Honor, do you want me to enter an

10   appearance on behalf of Mr. Cairns, or will the record note --

11               THE COURT:  You may do so.  We will allow your

12   statement to serve as your appearance on behalf of Mr. Cairns.

13               MR. ABRAMS:  Okay.  Thank you, Your Honor.

14               THE COURT:  Thank you.

15          Mr. Gittes, please proceed.

16                              -  -  -

17                         ADAM CAIRNS

18     Called as a witness on behalf of the Plaintiffs, being first

19   duly sworn, testified as follows:

20                       DIRECT EXAMINATION

21     BY MR. GITTES:

22     Q.   Would you state your name for the record, please.

23     A.   Adam Cairns.

24     Q.   And Mr. Cairns, where do you live?

25     A.   In Columbus.

VOL. I –  229

1    Q.   Not an address.  Just Columbus.  Okay.

2         Are you from Columbus?

3    A.   No, not originally, but I've worked for The Dispatch

4    Company for 15 years now.

5    Q.   So you answered my next question which is your

6    occupation.  What do you do for *The Dispatch*?

7    A.   I'm a staff photojournalist.

8    Q.   And I'm going to try to expedite this.  And I thank you

9    for your patience.  We all do.

10        Do you -- would you -- we're going to show you a

11   picture.

12        MR. GITTES:  Sam, could you put Exhibit 63 up?

13   BY MR. GITTES:

14   Q.   Can you see that, Mr. Cairns?

15   A.   Yes, I can.

16        MR. GITTES:  Your Honor, can you see it?

17        THE COURT:  Yes, I can.

18   BY MR. GITTES:

19   Q.   Can you identify that photo?

20   A.   Yes.  That is one I took on May 31st.

21   Q.   And where did you take it?

22   A.   The intersection of Broad and High Street downtown

23   Columbus.

24   Q.   Were you there professionally or personally?

25   A.   Professionally.

VOL. I -  230

1   Q.   As part of your work for *The Dispatch*, do you -- when

2   you go to events that are, let's say, large crowds or

3   demonstrations or protests, do you wear something that

4   identifies you as a journalist or *Dispatch* photographer?

5   A.   Yes.  I have a press badge.  It's a credit card sized

6   badge that says press in red letters that I wear around my neck

7   whenever I'm out.

8   Q.   Anything else -- I know this is in the springtime, but

9   do you wear any particular clothing or band?

10  A.   No, we don't have any staff-branded clothing or anything

11  like that.

12  Q.   Okay.  Why did you take this picture?

13  A.   I was covering the protests downtown.  This particular

14  picture was toward the end of the night after working a long

15  day of covering all of the protests that were happening.

16  Q.   And can you tell us what that officer is holding, the

17  officer who seems to be full-faced to your camera?

18  A.   Yes.  It was a -- I don't know the specific type of

19  weapon, but it was one of the weapons that was firing the

20  nonlethal projectiles, the wooden bullets.

21  Q.   Okay.  Did you take more photos after this?

22  A.   There was one frame that I fired after this, but I was

23  taking this as the officer was yelling in my direction to leave

24  the area.  He raised the weapon.  I took a sequence of frames

25  and then I turned to move.

VOL. I - 231

1    Q.    What happened after you turned to move?

2    A.    The -- I believe it was that officer that fired that

3    weapon.  And as I was turning to move, I was struck in the

4    cheek, I believe.  I was wearing some safety glasses so it may

5    have hit the glasses, or it may have ricocheted and hit the

6    glasses as I was heading back toward our office which was about

7    half a block away.

8    Q.    And can you tell -- do you remember whether this was

9    before the curfew at that time?

10   A.    It was.  It was about 11 or -- the curfew was at ten.

11   So this would have been about 9:45.  I think the time stamp may

12   have been 9:44 on the image.

13              MR. GITTES:  Your Honor, those are all my questions.

14              THE COURT:  I have one question, Mr. Cairns.  Before

15   you took this photo, did you observe any of the protesters

16   hurling any type of objects at the assembled officers?

17              THE WITNESS:  From my vantage point, I was on the

18   northeast intersection of Broad and High.  Most of the

19   protesters were across the street from me on the northwest

20   intersection.

21              THE COURT:  Did you see --

22              THE WITNESS:  And some extended further north on High

23   Street.  So I couldn't see all of where the protesters were,

24   but I didn't see anything hurled at this group in particular.

25              THE COURT:  I was not talking about at the protest

VOL. I - 232

1  generally. I'm talking about in the area you could see. You

2  understand?

3         THE WITNESS: No. In the field of view that you can

4  see in this picture, it's a little narrower than what I can see

5  just with human eyesight. But, in this picture, I couldn't see

6  anything thrown at the officers, no.

7         THE COURT: This officer was not pivoting coming

8  toward you because he had been struck by an object; is that

9  right?

10         THE WITNESS: Not that I saw, no.

11         THE COURT: Did you see anyone physically confronting

12  any of the officers you see in this picture?

13         THE WITNESS: No, I did not.

14         THE COURT: All right.

15       Who is going to conduct the cross-examination?

16       MS. ARBOGAST: Your Honor, this is Janet Hill

17  Arbogast. It would be me.

18         THE COURT: Go ahead.

19                        - - -

20                  CROSS-EXAMINATION

21   BY MS. ARBOGAST:

22   Q.   Mr. Cairns, this is Janet Hill Arbogast, and I represent

23  the City in this case.

24       You said you were struck by the officer in the photo on

25  the cheek or the safety glasses, correct?

VOL. I - 233

1    A.    Correct.

2    Q.    What were you hit with?

3    A.    I believe it was a wooden bullet.  I don't know.  I

4    didn't stop to see what exactly was fired.  So it was just

5    anecdotal evidence that we had reporters in that area that

6    picked up wooden bullets afterwards that saw them on the

7    sidewalk; so I assume that's what it was that hit me.

8              MS. ARBOGAST:  No further questions.

9              THE COURT:  Any redirect, Mr. Gittes?

10             MR. GITTES:  Yes, just one.  Before I forget again,

11    could I move the exhibit be admitted?

12             THE COURT:  Ms. Arbogast, any objection to Exhibit 63?

13             MS. ARBOGAST:  No objection, Your Honor.

14             THE COURT:  Exhibit 63 will be received.

15             MR. GITTES:  Thank you, Your Honor.

16                             - - -

17                    REDIRECT EXAMINATION

18    BY MR. GITTES:

19    Q.    One quick follow-up question.  You were hit on the side

20    of your head.  Is that what you said?

21    A.    Correct.  It was the cheek area.

22    Q.    Do you know one way or the other whether what hit you

23    was fired directly at your head?

24    A.    No, I do not know one way or another.  It happened as I

25    was turning away and I was putting down my cameras all in one

VOL. I -  234

1    motion.  So I didn't see exactly how high he raised the weapon

2    to fire.

3      Q.    So did you actually see him fire?

4      A.    No, I didn't.  I was putting my cameras back down.  I

5    carry two cameras with me.  So I was sitting them back on my

6    side on each shoulder, and I was turning to move out of the

7    area.

8            MR. GITTES:  Okay.  Your Honor, that's all I have.

9            THE COURT:  Mr. Cairns, thank you very much, sir.

10   Thank you for your patience.  We appreciate it.  Thank you,

11   Mr. Abrams.  You may be excused.

12           MR. ABRAMS:  Thank you, Your Honor.

13           THE WITNESS:  Thank you.

14           THE COURT:  Mr. Marshall, that will conclude our

15   session for today.  We are scheduled to begin tomorrow morning

16   at 9 a.m.  And as I indicated, we're going to have a hard stop

17   at around 11:40 so I can exit my house at 11:45.  And we should

18   be able to resume I think it will be more like around 1:30, for

19   your planning purposes.  Again, I apologize for the delay over

20   the lunch, but it's unavoidable.

21        Are there any matters that we need to take up from

22   the -- and I will tell you, Mr. Marshall, I know that this is

23   at the eleventh hour, but I certainly have -- I'm certainly

24   willing to begin tomorrow morning at 8:30 if that will help

25   make up the time that's going to be spent over an extended

VOL. I -  235

1    lunch.  But I realize also that you probably scheduled your

2    witness to begin at nine, and 8:30 may be difficult.

3         But, if 8:30 would be doable, I'm happy to begin a half

4    hour early to make up some time because I'll have a hard stop

5    at the latest tomorrow at 4:45 because I begin my class

6    at 4:55.

7         MR. MARSHALL:  At the risk of incurring the wrath of

8    all of the team, I think we should start at 8:30 so we can get

9    as much testimony as we can.

10        THE COURT:  That's fine.  The only thing I was

11   concerned about was whether you could get the nine o'clock

12   witness here a half hour earlier.  If you tell me that we can

13   start at 8:30, then we will.

14        Anything else from the defense -- I mean, from the

15   plaintiff, Mr. Marshall?

16        MR. MARSHALL:  No, Your Honor.

17        THE COURT:  Mr. Phillips, anything from the defense?

18        MR. PHILLIPS:  No, Your Honor.

19        THE COURT:  Have a good evening, everyone.  Get some

20   rest.  Stay safe and healthy.  See everyone in the morning,

21   8:30.

22     (Proceedings concluded at 6:18 p.m.)

23                                   - - -

24

25

VOL. I - 236

1                           - - -

2                       WITNESS INDEX

3                           - - -

4    WITNESSES            DIRECT   CROSS   REDIRECT   RECROSS

5    PLAINTIFF'S:

6    Maeve Walsh              9      24
     Michael Moses           26      45
7    Bernadette Calvey       59      75        90        96
     Torrie Ruffin          101     124       141
8    Andrew Ginther                 146
     Adam Cairns            228     232       233
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOL. I - 237

1                    C E R T I F I C A T E

2

3          I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
12                              Official Federal Court Reporter

13

14                              March 14, 2021

15

16

17

18

19

20

21

22

23

24

25