**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

TAMARA K. ALSAADA, *et al.*       :
                                  :       Civil Action No. 2:20cv3431
                  Plaintiffs,     :
                                  :       CHIEF JUDGE MARBLEY
         v.                       :
                                  :       MAGISTRATE JUDGE JOLSON
THE CITY OF COLUMBUS, *et al.*,   :
                                  :
                  Defendants.     :


**PLAINTIFFS' POST-HEARING ON PRELIMINARY INJUNCTION BRIEF**


**I.      <u>Summary</u>**

     This case arises from unconstitutional use of force by the Columbus Division of Police (CDP) against civil rights demonstrators.  The testimony, videos, photos, and documents establish that Plaintiffs will likely succeed in proving their allegations of unconstitutional force. Defendants have barely tried to rebut Plaintiffs' allegations and instead premise their defense primarily on diverse reform efforts by Mayor Ginther, but he readily acknowledges that change must overcome substantial headwinds and will at best occur at a glacial pace.  (Ginther, Doc. #: 50, PAGEID #: 4937) (hereinafter ##:####).

     The focus of this case is narrower than his multifaceted reform efforts: it is on how and what force CDP will use when controlling crowds protesting police killings of minorities. Recent history, a polarized society, and admissions from a key defense witness leave little doubt that future large protests about police use of deadly force against minorities is a matter of when, not if.  The right of protestors in Columbus to criticize that use of force is irrefutable.

The City's current pause on tear gas, vague discouragement of pepper spray, and possible future changes do not address the heart of this case: indiscriminate pepper-spraying; collective punishment of peaceful protestors for others' isolated, unrelated violent acts; wood projectiles and explosives fired (often by the especially harmful "direct fire" method) at protestors walking to, from, or near areas that may have been declared off-limits; and bicycles used to strike protestors.[1] During the events at issue, CDP policies were followed when supervisors equipped officers with chemicals and other weapons and authorized their use against nonviolent protestors in excessive, unlawful ways. These policies nearly guarantee excessive force whenever dispersal is ordered, even for dubious or inapt reasons, or, in their discretion, officers unjustifiably view protestors as being aggressive.[2] Those policies remain in force, having been changed at most in minor and/or ambiguous ways. And even those minor changes are subject to elimination.

CDP admitted to a virtually complete lack of accountability. Blatantly excessive force has either not been investigated or has been ratified by the lack of any negative consequences. The "Blue Wall of Silence" has been flatly denied, despite a horrendous record of officers and their superiors failing to report even a single incident of excessive force or nearly any race discrimination, and criticism from BakerHostetler ("BH") of suspicious, rampant amnesia among officers as to the identities of officers around them, many of whom failed to display their badge numbers. (Ginther, 46:4014-5); (Quinlan, 48:4477-78) In after-action and use of force reports, CDP has expressly and tacitly approved even vindictive use of force, such as direct-firing wooden projectiles or punishing passive protestors with pepper-spray point blank in their eyes.

---

[1] The City's changed Directive on some use of force to disperse did not even prevent its later use of bicycles and pepper spray to forcibly clear nonviolent protestors from a street on June 21, 2020, and its October 2020 training on crowd control did not meaningfully address changes to preexisting Directives or the disturbing excessive force in late May and June.

[2] (Ohl: 58:12-14; 59:1-7) ("judgment call" by sergeant, asst. team leader, or individual officer on use of MK-9 pepper spray); (Griffith: 35:9-24; 36:1-2) (use of chemical agents subject to officers' and superiors' interpretation of situation); (Lang: 78:6-16) (supervisors use discretion to authorize wood projectiles under totality of circumstances). Supervisors are also authorized to declare an emergency whenever they want. (Griffith: 58:13-24; 59:1-8)

Particularly later at night, objects were thrown, and a handful of police were injured enough to seek medical help.  But the evidence tells a tale of two very different situations: one in daylight and early evening, the other in darkness later at night.[3]  **When excessive, retaliatory force was used against the Plaintiffs, not a single one had engaged in violent or destructive conduct.**  Most were not even committing traffic offenses, instead simply trying to leave or move to a place, such as a sidewalk or blocks away, safe from police use of force or, as with Plaintiff Aleta Mixon, asking for police aid.  Some remained despite dispersal orders and were subjected to force far exceeding what was reasonable to address passive misdemeanors.

From the very beginning, CDP zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism.  Following conversations with  major-city police chiefs, CDP at the highest levels subscribed to the theory that anti-police protests are led by a nationwide conspiracy of outside agitators bent on violence.  This manifested in the training of its officers, both before and since, that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear.  (*Id.* at 48:4455-56; 4469).  That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones.  The message to its officers was clear: there is no such thing as a peaceful protestor.

---

[3] (Kuebler: 160; 161:1-19 ("Q. And your response ... on Twitter was: This is gaslighting. At 11:00 a.m. this morning [May 30, 2020,] and you're quoting Councilman Hardin, although it's not a direct quote . . . 'I saw mostly peaceful protestors, end quote. And you respond, wow, imagine that, at 11:00 a.m. Why aren't you downtown at 11:30 p.m.? I wonder if things are different then. Put on gas mask, join the officers on the line, and then the rest of it is cut off. * * * A. And so his calls for officers handling things differently are based upon things that he's not seeing.").  *Id.* at 162:18-24; 163:1 ("Q.  [I]s it fair to say that during the ... Columbus protests this summer, that most, if not all, of the property damage that occurred in the downtown area occurred late at night and not during the daytime hours or during the early evening hours? A.  That is fair to say, yes.").  *See also* (Knight: 109:19-24; 110:1-10) ("[T]he crowds at night tended to be more violent and also more mobile. * * * The groups at night had a tendency to be more violent, they were very well equipped, they had spotters that we weren't aware of right away that were identifying what resources we had and communicating with them our movements.) *See also Id.* at 112:2-15) ("[It was a general stepdown of violence related to the daylight operational periods from the protesters.").

Actually, these protests were homegrown and overwhelmingly peaceful, not the product of outside anarchists who could be identified, as officers were instructed, by the mere fact that they carried water bottles or wore masks (likely due to the pandemic and the known propensity of officers for indiscriminate use of chemical agents). Police use of force is judged by the circumstances at the time it is used, not those later at night, on prior evenings, or involving separate suspects. The acts of violent suspects do not justify excessive force against, or suppression of expression by, nonviolent protestors. The First and Fourth Amendments lack a blanket exception for large demonstrations.

The injunction sought is consistent with CDP protection of public safety. After trigger-happy pepper-spraying and provocative use of other force had inflicted unjustified injuries, suppressed expression and association, and aroused public outcry, CDP temporarily changed its approach: reducing police presence, avoiding lines of officers facing off against lines of protestors, and demilitarizing interactions with protestors.[4] As Deputy Chief Becker explained at a Roll Call, Ex. P25, arrests, injuries, and property destruction were then largely avoided.[5]

The City argues that the Black Lives Matter demonstrations were extraordinary and that its response to far smaller events since should be the measure of its willingness and capacity to avoid excessive and vindictive force. This is the classic "That's not who we are" defense. But the undeniable pattern in the evidence is that these demonstrations against violence by the police exposed just who they are, unleashed the vindictiveness they felt toward the Black Lives Matter movement, and showed why judicial intervention is essential to changing the CDP culture.

---

[4] Officers are trained that their conduct might provoke peaceful protestors. (Lang 64:1-8) Ex. P150, the "Leave the Roadway" video, shows Broad and High at night, as an announcement is made to leave the road, and officers walk across the sidewalk and spray onlookers at a restaurant railing, then move forward on the street spraying nonviolent protestors. After this, two scooters were thrown and some bottles came from behind the front line of protestors, while protestors chanted, "Hell, No, We Won't Go," followed by a lengthy period when nothing was thrown.
[5] CDP decided at some point to route traffic around the protestors rather than insist on dispersal. (Woods: 155:9-25)

## II.    Citation to Evidence

The likelihood of irreparable harm in the absence of an injunction is demonstrated through evidence of the CDP culture, the command staff's resistance to change, the ratification of excessive and vindictive force by the absence of reports from other officers and supervisors, and the chill inflicted on Plaintiffs through their experience at the 2020 demonstrations. The equities weigh heavily in Plaintiffs' favor when the excessive and vindictive force they suffered is weighed against the lack of a viable government interest in punishing and deterring peaceful, nonviolent protestors. Traffic control can and has been implemented in mere minutes. The injunction Plaintiffs seek serves the public interest by ensuring the CDP will be able to handle violent actors, while permitting peaceful, nonviolent protestors to voice their concerns.

### A.    Homegrown Organic Protest

CDP approached the protests with the mindset that they were nationally organized, well-coordinated, and led by outside agitators—professional protestors bent on violence and supplying objects to be thrown, barricades to block the police, and medics. (Quinlan, 48:4453-55; 4469)[6] CDP believed, and trained its officers before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. (*Id.* at 48:4455-56; 4469; Mabry, 52:5278-79) CDP operated with the understanding that, unlike other protests, these were focused directly on police misconduct and racism. (*Id.* at 48:4453) After talking with other city police chiefs, CDP implemented the means that would serve standing Directives.[7] (*Id.* at 48:4455; 4468)

---

[6] Before the BH investigation began, a Deputy Chief told it "there was a belief by some that there was kind of some coordinated efforts taking place in the streets, that there was chaos in the streets during different points in time, and that . . . we needed to understand the greater environment of what happened." (Edward: 29:9-20)

[7] Major-city police engaged in a pattern of excessive use of force and reinforced that pattern among their police chiefs.   *See L.A.P.D. Strongly Criticized Over Handling of George Floyd Protests*, https://www.nytimes.com/2021/03/11/us/lapd-george-floyd-protests.html (downloaded Mar. 12, 2021).

Credible testimony before the Court exposes how distorted – and provocative -- the CDP mindset was. Plaintiffs and other protestors who testified reflected a diverse group in age, race, gender, Central Ohio roots, and occupation. They were informed by social media about the demonstrations, influenced by seeing George Floyd's murder and knowing about other instances of racist policing, and truly amateur protestors.[8] The non-party witnesses included a long-time Grants Manager for The Ohio State University, (Moses, 46:3939; 3960); two volunteer legal observers, one a local attorney, the other an Ohio Public Defender investigator, affiliated with the National Lawyers' Guild,[9] not a professional protestors' group (Wenning, 47:4290-91; 4318-19; 4329 Pagels, 49:4613); a Public Information Officer for the Franklin County Prosecutor's Office (Merchant, 49:4759); and a street medic who serves many local demonstrations and works as an Outreach Coordinator for the Mid-Ohio Food Bank. (Bardus, 50:4856-57; 4859-60; 4864)

Plaintiffs were a Nurse Assistant at Westminster Thurber, a residential and assisted living facility, (Calvey, 46:3972); a Special Needs Teacher's Assistant in the Columbus City Schools, (Ruffin, 46:4014); a Director of Concessions for concert venues, (Lamey, 47:4156-57); a Patient Support Assistant at Riverside Hospital, (Mixon, 47:4206-07); a Personal Banker at Fifth Third Bank, (Fahmy, 47:4251); a Billing and Savings Analyst. (Lynch, 48:4541); a warehouse worker (Hubby, 48:4579); a commercial electrician, (Hazlett, 49:4660); an artist, (Schultz, 49:4726); and

---

[8] The demonstrators were a cross-section of the community, and how most were dressed and acted marks them as amateur protestors. Ex. P141, the "Chemicals Gag" video, shows a large crowd of nonviolent protestors coughing, wiping their eyes, and fleeing the deployment of chemical agents. The video was taken from a cellphone shortly after noon on May 30, 2020, on High, south of Broad. Ex. P30 lists the protestors cited for criminal activity by names and address, and nearly all the addresses are from Central Ohio.

[9] "The National Lawyers Guild is the nation's oldest and largest progressive bar association and was the first one in the US to be racially integrated." About | National Lawyers Guild (nlg.org) (downloaded March 15, 2021) The NLG regularly appears as *amici* in federal courts. *See, e.g., Keeley v. Whitaker*, 910 F.3d 878, 884–86 n. 9 (6th Cir. 2018) ("The Court also considered the well-drafted *amici* brief filed jointly by the National Immigrant Justice Center, the Immigrant Defense Project, and the National Immigration Project of the National Lawyers' Guild."); *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 692 n.2 (6th Cir. 2016) ("Brief of *Amici Curiae* includes * * * the Ohio Chapter of the National Lawyers' Guild.").

a life insurance seller at Nationwide, (Carlock, 49:4792) Their testimony leaves no doubt that none is a professional protestor.  They were Americans participating in democracy.

      B.    <u>Excessive and Vindictive Reaction by Police.</u>

      Videos show pepper spray used with such gusto that a vindictive motivation is clear.[10] The protestor known as the "Lady in White," whose only apparent transgression was protesting by sitting in the street, was sprayed and attacked mercilessly.[11]  Protestors who had already been sprayed were trying to walk away and tend to their injuries when they were gratuitously sprayed again.[12]  Spraying in the face at point-blank range was a common tactic. *See, e.g.,* (Carlock, 49:4800)

      Nonviolent protestors were routinely pepper-sprayed.  A protestor using a walker was pepper-sprayed while standing on a sidewalk.[13] Protestors using the sit-in technique from the civil rights movement were sprayed,[14] as were those sitting arm-in-arm and singing the Baptist hymn, *Just As I Am*. (Merchant, 49:4768-71) Even protestors on sidewalks were fair game.[15]

---

[10] Ex. P126, the "In Your Face" video, shows a line of bicycle police riding by a few nonviolent protestors in the street when they stop, walk up to one protestor holding a sign in both hands, and copiously pepper-spray him at point-blank range in the face.  The video was taken from a surveillance camera at the intersection of Broad and Front at approximately 9:30 p.m. on May 29, 2020, at the intersection of Broad and Front.

[11] Ex. P102-A & B, the "Lady in White" videos, show a protestor sitting in the middle of West Broad, between High and Front, on May 31, 2020, at approximately 7:45 p.m.  An Emergency Announcement to leave the area can be heard.  Moments later, officers a few feet away from her aim and discharge their rifles and then approach and pepper-spray her in the face. Protestors help her to the sidewalk, but she is then attacked by an explosive device. An officer then starts shooting at two legal observers on a sidewalk as they were quickly leaving.  Her dazed condition is reflected in Ex. P68.  Testimony narrated the excessive force being used against her.  (Pagels, 49:4619-21)

[12] Ex. P 112 & 137, the "One More for Good Measure" video, shows an officer pepper-spraying two nonviolent protestors who had already been sprayed and were trying to leave the scene while washing out or clearing their eyes. The video was taken by a cellphone in the evening of May 30, 2020, at the intersection of Russell and High.

[13] Ex. P114, the "Crosswalks and Sidewalks" video, shows projectiles being fired at protestors in a crosswalk, followed by pepper-spraying them, and then approaching and pepper-spraying three women, one using a walker, on the sidewalk.  The video is from the body-worn camera of Officer Fletcher Farr at the intersection of Broad and High on May 30, 2020, at approximately 12:25 p.m.

[14] Ex. P119, the "Wherever and Whatever" video, shows officers initially chemically spraying protestors sitting in the crosswalk and then moving forward to spray others on the sidewalk.  The video is from the body camera of Officer Jonathon Goodrich on the night of May 28, 2020, at Broad and High.  *See also* (Ruffin, 46:4023-24)

[15] Ex. P129, the "Clear the Sidewalks" video, shows officers walk from the street, apparently in response to something being thrown, onto the sidewalk, tell nonviolent protestors to clear the sidewalks, and immediately start

The ire of CDP officers was especially aroused by protestors with protective gear. One officer grabbed from behind a nonviolent protestor walking away from being pepper-sprayed, tore off his gas mask, and pepper-sprayed him in the face.[16] When the protestor fought back, he was tackled and arrested, and the officer is shown celebrating with others.[17] Another officer left the line, ran after a different protestor with a tear-gas mask, tore it off, and pepper-sprayed him.[18]

Officers reacted to criticism about their use of force by using more force. Profane criticism triggered the officers.[19] An officer dangerously pepper-sprayed a car driving by honking in support of protestors,[20] while another sprayed a yelling sidewalk protestor.[21] Officers pepper-sprayed identified journalists and forced them to leave the area where they were covering the officers' conduct.[22] Chanting "Black Lives Matter" also provoked excessive force.[23] Even

---

pepper-spraying the protestors while tear gas is deployed down the block. The video was taken by a cellphone shortly after noon on May 30, 2020, at the intersection of Broad and High.

[16] Ex. P128, the "Rip Off" video, shows several officers pepper-spraying nonviolent protestors on the sidewalk and, when a protestor wearing a tear-gas mask walks away, an officer rips the mask off from behind and pepper-sprays him directly in the face. The video was taken by a phone around 12:10 p.m. on May 30, 2020, near Broad and High.

[17] Ex. P 138, the "Celebration" video, shows the officer who had ripped off the tear gas gleefully fist-bumping another officer, saying "he didn't like it when I took his mask off" and mentioning "fun," after the arrest when the protestor fought back. The video was taken from the body-worn camera of Officer West shortly after noon on May 30, 2020, on High near Broad. Notably, the celebrant is to be on a special crowd control unit. (Mabry, 52:5355).

[18] Ex. P127, the "Spray You Too" video, shows nonviolent protestors on the sidewalk and officers on foot and holding bicycles lining the street and horse-mounted officers in the street. After tear gas is deployed, sidewalk protestors walk up to officers holding bicycles to condemn the gas and each one is nonchalantly pepper-sprayed. When a protestor wearing a tear-gas mask walks on the street, an officer leaves the line, runs after him, removes his mask, pepper-sprays him, and walks back to the line. The video was taken by a cellphone at shortly after noon on May 20, 2020, at Broad and High. *See also* (Ruffin, 46:4028-29; 4031; 4034-36)

[19] Ex. P143, the "Two Step" video, shows a woman, who had been yelling, holding a sign, and standing in a crosswalk, shoved by an officer with his bicycle and then pepper-sprayed by the officer. The video is taken from the body-worn camera of Office Hickey shortly before noon on May 30, 2020, on High, south of Broad.

[20] Ex. P125, the "If It Moves" video, shows honking cars, some carrying protestors, when an explosive device is deployed and another officer, from a distance of ten feet or so, pepper-sprays a car. The video was taken from the body-worn camera of Officer Cuong Cao at approximately 11:00 p.m. on May 29, 2020, at Broad and High.

[21] Ex. P144, the "Coming Your Way" video, shows an officer pepper-spraying a sidewalk protestor. The video was taken from the body-worn camera of Officer Donnelly shortly after noon on May 20, 2020, at Broad and High.

[22] Ex. P140-A & 140-B, the "I don't care" videos, show officers pepper-spraying LANTERN journalists who clearly identified themselves as press. The videos were taken by a phone on the evening of June 1, 2020, at the intersection of Lane and High, and testimony corroborated them. (Walsh, 46:3924-25; 3928-31) Acting Cmdr. Mabry admitted that force should not be used to disperse journalists who have not engaged in criminal activity. (Mabry, 51:5246)

[23] Ex. P121, the "Spraying Chanters" video, shows officers pepper-spraying protestors whose only conduct was standing several feet in front of a line of foot and bicycle officers chanting "Black Lives Matter." The officers then

medics riled the police: for instance, Medic Bardus, following protestors who had dispersed, saw a Black man injured by several wooden projectile strikes; the man was shielding Bardus from projectiles fired at him as he knelt to treat another protester who had been struck and hurt. (Bardus, 50:4890-91).

Collective punishment was the norm. An overwhelming percentage of the protestors were nonviolent (Ginther, 46:4075; Quinlan, 48:4456-58), with 99% estimated by Deputy Chief Becker. Ex. P25. But protestors in the front rows facing officers were pepper-sprayed when protestors behind them threw objects, even though officers knew the sprayed protestors had not thrown the objects and were telling others not to do so. (Ginther, 46:4095-97; 4103) As the mayor admitted, this practice thus suppressed the speech of nonviolent protestors to punish other protestors (Ginther, 46:4096-97). This naturally creates a chilling atmosphere in which no one, no matter how peaceful their intent, can count on attending a large demonstration in safety, as they could be subjected to force for other protestors' (or counter-protestors') unrelated conduct.

The officers presumed the worst about anyone who came near them. Plaintiff Mixon was seeking help from police in finding her daughter, and she was pepper-sprayed initially for asking for help, started to leave, and was then sprayed from behind, shoved to the ground, and had an officer step on her kneecap.[24] An officer called her "bitch" or "black protesting bitch" and told her being injured was "what the fuck you get for being down here." (Mixon, 47:4223; 4246)

Combinations of force were commonly used. Nonviolent protestors were repeatedly pushed and sprayed.[25] Officers deployed their bicycles as weapons and then pepper-sprayed the

---

moved the line to the space vacated by the protestors. The video was taken from the body-worn camera of Officer Cassie Rosser on May 28, 2020, at the intersection of Broad and High.

[24] Ex. P101 & P147, the "Distressed Mother" videos, show the mistreatment of Plaintiff Mixon. The videos are from May 29, 2020, around 10:00 p.m., between High and Third, and corroborated by testimony. (Mixon, 47:4219-23)

[25] Ex. P120, the "Get Back" video, shows officers yelling "Move Back" and "Get Back" and repeatedly pushing forward and pepper-spraying nonviolent protestors. The video was taken from the body-worn camera of Officer Bryan Brumfield on the evening of May 28, 2020, at Broad and High.

line of protestors being pushed. [26] The "Crosswalks and Sidewalks" video, Ex. P114, shows use of projectiles followed by pepper-spraying. The "War Games" videos illustrates how officers deemed nonviolent protestors enemies in combat.[27] The gross disparity between the protestors' conduct and the officers' use of force is exemplified by a veritable firing squad directed at peaceful protestors.[28] The "Kneeling Protestors" video exemplifies how that disparity translated into gratuitous use of force. (Quinlan, 48:4446-48; Ex. P108[29]) The "Tackling Drill" videos depict brutal tackling of stationary and fleeing protestors and bystanders.[30]

The officers also manufactured charges to justify excessive use of force. The "Takedown" videos show an assault on Plaintiff Lynch by Officer Shawn Dye, yet Officer Dye and others claimed Lynch had grabbed him and thrown him to the ground, leading to criminal charges that were later dismissed.[31] (Lynch, 48:4546-47; 4549-55)

---

[26] Ex. P118, the "New Line" video, shows officers bringing their bicycles directly in front of protestors in the crosswalk at Broad and High during daylight hours on May 30, 2020, and immediately pepper-spraying them.

[27] Ex. P122 & 122-A, the "War Games" videos, show officers in the center of an intersection watching a small group of protestors walking away until a few protestors kneeled on the street and yelled at them. Explosive devices were deployed, and then wooden projectiles were direct fired at the few protestors who remained. More projectiles are later fired at protestors standing in the street and on the sidewalk, and a line of officers then marched until they reached an alley where protestors were standing and deployed another explosive device. The videos were taken from the body-worn camera of Officer John Hawkins on May 28, 2020, shortly before midnight, at the intersection of W. State and High. Notably, in training, pictures of Kent State National Guard before four protestors were killed had been used to illustrate a field force and as the first slide after the title. Ex. P15.

[28] Ex. P103, the "Firing Squad" video, shows a line of officers at East Broad and Grant, on the evening of May 30, 2020, and more than 15 feet away, three protestors holding signs, yelling, and/or walking with their hands up. The officers then shoot them with sponge-topped bullets, and protestors run out to help one who was injured.

[29] Ex. P108, the "Kneeling Protestors" video, shows two protestors kneeling in a crosswalk in downtown Columbus during daylight early in the evening of either May 30 or May 31, 2020, approximately ten feet away from a line of officers. An officer runs in from the side and chemically sprays both protestors.

[30] Ex. P135, 136 & 139, the "Tackle Drill" videos, show officers chasing protestors, tackling and slamming Plaintiffs Horn and Hazlett and others who appear to be simply attempting to leave, including Hazlett, who had been pepper-sprayed and hit with wooden projectiles and was trying to find his way to the sidewalk. The videos were taken by a cellphone in the late afternoon of May 30, 2020, at the intersection of Russell and High. Ex. P142, the "Their Streets" video, shows protestors in the street and on sidewalks 50 or more yards away from a line of police when the officers fire projectiles and advance. The videos were taken by a cellphone in the late afternoon of May 30, 2020, on High near Russell and confirmed by testimony that included projectiles being fired over the heads of protestors. (Hazlett, 49:4664-45; 4667; 4670-71)

[31] Ex. P148 & 148-A, the "Takedown" videos, show an officer forcefully taking Plaintiff Lynch down to the ground from behind as she was holding a sign in both hands and walking toward a crowd of protestors. They then show her being arrested. The videos were taken by a cellphone around noon on May 30, 2020, near Broad and High.

The excessive and often direct firing of wooden projectiles is another reflection of vindictiveness. This Court has previously faulted the CDP for firing projectiles directly at protestors instead of "skip-firing" them. Yet CDP officers continue to be trained to use projectiles, not only in response to violent or destructive acts, or even the commission of nonviolent misdemeanors, but to keep distance between protestors "directly yelling at an officer" to reduce stress for officers and avoid them being provoked.[32]

When wood projectiles are skip-fired the way they are supposed to be, their velocity is largely spent on hitting the ground and the ricochet typically does not reach above the knee, hence the nickname "knee knockers." (Quinlan, 48:4386; 4474-75) But the CDP trained officers that they could direct fire with unmitigated velocity in emergencies (Ex. P149), and it was well aware that officers will tend to aim higher and shoot directly—particularly in stressful situations, like these protests—due to their much more intensive training with direct-fire weapons. (Mabry, 52:5299-5300).

The location on protestors' bodies where wooden or other projectiles hit them and the force with which they struck refute that they were skip-fired. (Mabry, 52:5297-5303) (describing sound, context, and effect of direct and skip-fired projectiles); (Moses, 46:3946; 3952-56 & Ex. P65) (6'1", standing upright, upper-body injuries); (Calvey, 46:3976-77; 3980 & Ex. P62) (5'5", standing straight up, hit in face so hard she was unable to eat solid foods for days);[33] (Lamey, 47:4166, 4170, 4171; Ex. P130, 130-A, 131) (standing and recording on phone when shot five times injuring hand, inner thighs, left hip, and butt); (P134, 134-A & 134-B; Ex. P76, Fahmy's ankle broken by cannister); (Hubby, 48:4599-60 & Ex. P133, P77) (shattered knee); (Schultz,

---

[32] Ex. P149 compiles excerpts from an August 2018 CDP MALT Grenadier Civil Disorder Training program. The full program is Ex. P111. Firing by the Grenadiers of projectiles is done to avoid nearby protestors provoking officers with insults and profanity. *See also* (Quinlan, 48:4396); Ex. P. 69.

[33] Ex. P132, the "Hurts" video, shows Plaintiff Calvey struck in the face by a wood projectile. The video was taken by a cellphone on the evening of May 30, 2020, in the Short North. (Calvey, 46:3979-80; 3984 & Ex. P62)

49:4736-37 & Ex. 67) (knocked down, leg immobilized, slow-healing bruise). DISPATCH photographer Cairns saw an officer raise a gun and aim at him as he was turning to leave, hitting him in the cheek or safety glasses. (Cairns, 46:4144-695; Ex. P63)

The distance traveled by projectiles or cannisters adds to the likelihood that direct firing occurred. *See, e.g.*, (Lamey leaving after a dispersal border);[34] (Pagels, 49:4623-24; 4626; 4630; 4634) (more than a block away); (Fahmy more than 20 feet away);[35] (Wenning saw targeting of protestors who were stationary, leaving, or after they fled into an alley for shelter);[36] (Hubby on a street corner sidewalk while walking towards demonstration).[37] Wooden projectiles had been fired at protestors even when no thrown objects were observed. (Cairns, 46:4143-44).

Injuries from pepper spray, tear gas, and explosives were also grossly disproportionate to protestors' nonviolent conduct. The dispersal orders and explosions combined with the disorientation, stampedes, and pain caused by chemical weapons terrorized protestors. Pepper spray was the main weapon. (Ruffin, 46:4020-21; 4024-25; 46:4032; 4036 & Ex. P104) (eyes burning, could not see, throat hurt, trouble breathing, especially after smoke bomb, had to sit down on a curb and ask for water to flush out the spray); (Garrison, 49:4714) (saw a reporter's skin become irritated with visible burns and LANTERN team had throat pain); (Walsh, 46:3925) (different reporter suffered "burns on the back of her neck"); (Schultz, 49:4733-34) (hard to

---

[34] Ex. P130, 130-A & 131, the "Direct Fire" videos, show an officer direct-firing a wooden projectile at Plaintiff Lamey and the injuries she suffered. The cellphone videos are from May 31, 2020, on High, north of Broad.

[35] Ex. P134, 134-A, & 134-B, the "Fractured Leg" videos, show Plaintiff Fahmy being struck by a cannister. The videos were taken by a cellphone on the evening of June 1, 2020, at the intersection of Lane and High and corroborated by testimony. (Fahmy, 47:4262-67; 4275; Ex. P76)

[36] Ex. P122 & 122-A, the "War Games" videos, show a scattered, small group of protestors walking away from the area and others, half a block away from officers, kneeling and yelling when two explosive devices are thrown and wood projectiles are direct-fired, the rifle aiming straight ahead, not down at the ground, at the protestors remaining in the street or on the sidewalk. Officers then follow protestors to an alley and throwing another explosive device into the alley. The videos were taken from the body-warn camera of Office John Hawkins at the intersection of West State and High, on May 28, 2020, shortly before midnight and were corroborated by testimony. (Wenning, 47:4303-07)

[37] Ex. P133, the "Shattered Knee" video, shows Plaintiff Hubby on a sidewalk when an announcement is made that force is about to be used and, simultaneously, he is shot by a wood projectile. The phone video is from the evening of May 29, 2020, at State and High, and was confirmed by testimony. (Hubby, 48:4587; 4590-91; 4599); Ex. P77.

breathe and skin was hot; wife dry heaving and blinded); (Carlock, 49:4800-01) (intense burning pain, could not open eyes, and disoriented); (Mixon, 47:4221) (sprayed repeatedly: "It began to just burn profusely, like my eyes just started burning and watering really bad. My face started burning. At this point it got way worse so I couldn't see to keep going."); (Hazlett, 49:4672: "blind burning sensation" from chemical weapon; "disoriented and blinded").  "CS" (tear gas), caused pain, panic, and feeling suffocated; as Carlock testified, "you don't know when you're going to be able to get a full breath again." (Carlock, 49:4809-10; Wenning, 47:4307)

Medics observed and treated the pain. (Merchant, 49:4763; 4765-66; 4769); (Bardus, 50:4864; 4878-80) The "Lady in White" was covered in chemical spray and groaned in pain.  *Id.* at 4886-89; Ex. P74. The medic later saw her taken away by ambulance.  *Id.* at 50:4888. The City's witness, reporter Somerville, who confirmed in his testimony having once been pepper-sprayed for no reason, is on a live feed the night of May 29, 2020, coughing, saying, "Oh my God," and describing the effects of being pepper-sprayed indirectly while observing that a protestor was sprayed for no reason. Ex. D24.[38]  CDP's trainer knew about these effects.[39]

Physical force went too far as well.  *See, e.g.,* (Mixon, 47:4223 & Ex. 73) (officer stepped on kneecap after pushing her down); (Hazlett, 49:4672-74; 4682 & Ex. P135; 139 & 142) (ferocious body slam while fleeing, already disoriented from chemical weapons and a strike from wooden projectile, with back so badly bruised that he missed work for more than a week).

C.     A Blatant Lack of Accountability Allows Harm to Recur in the Absence of a Preliminary Injunction.

CDP did not simply ratify excessive force through the lack of reporting and discipline.  It approved the force during the demonstrations because its policies authorized these excessive

---

[38] Somerville admitted seeing pepper spray deployed against nonviolent protestors. (51:5114-16; 5128-29)

[39]  (Lang: 122:11-13) ("I mean, your eyes water, you feel a burning sensation on your skin, your nose, you know, mucus membranes start draining.").

levels of force.  CDP's training on grenadier, bicycle, and crowd control tactics, as well as its after-action reports, Ex. P6, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to CDP policies on use for force.[40] There appears to have been no consideration given to whether such force would be excessive to secure compliance with traffic laws or enforce misdemeanors against nonviolent protestors.

Eight months after the late May and June protests, former Chief Quinlan was unaware of a single report by officers or supervisors about excessive force or against another officer.[41]  The Blue Wall of Silence has its exceptions, though, and Quinlan and Mayor Ginther were aware that a Black Lieutenant had been reported for racial discrimination by officers, investigated, and recommended for discharge (a recommendation so ridiculous the City later discarded it). In dramatic contrast, when a White Sergeant made violent threats and slurs against Black officers and even admitted texting a retaliatory threat against a Black officer who reported his racism, no departmental charges were filed. (Ginther: 46:4078-83; Quinlan, 48:4521-24)[42]

Mayor Ginther admitted that, unless supervisors and officers report other officers for excessive use of force or racial discrimination, accountability will be thwarted, which impacts the ability to change the racist culture that he confirmed existed in the CPD. (Ginther, 46:4070; 4084) The 2019 Matrix Report, which the City commissioned, included surveys that had high rates of officer participation and found frequent discriminatory actions by police and a failure to

---

[40] Ex. P6 (Ohl at 833-34: "SWAT had effective use of riot CS and tri-chamber grenades. SWAT also had effective use of 37 mm high velocity multiple baton rounds"; Schrader at 834-35: "We deployed multiple ordinance."; Griffith at 835-39: "I issued orders to utilize MK-9 Aerosol canisters[.] I also ordered OC grenades to be used as well as deployment of 40 mm wood baton rounds[.] I am not aware of how many times any munitions were utilized; however all were used with my approval or order[.]"; Lokai at 840: "Sergeant Weaver deployed his Mark 9 mace on 3 separate instances (approx. 4:45 - 5:30 p.) to prevent advancement from the aggressive crowd."; Mabry at 856: "The crowd was non-compliant and needed dispersed.  FF, Bikes, and IN/TAC moved the group with the coordinated use of flanking, pushing from the rear, and less lethal.").

[41] (Quinlan, 48:4424-26) The Internal Affairs Lieutenant was "not aware" of any officer reporting improper force. (Bernhardt: 22:5-23) Mayor Ginther knew of no officers reporting such force or violations.  (Ginther, 46:4077).

[42] Racial profiling of citizens has also been identified but downplayed. (Knight: 122:19-24; 123:12-24; 124:1-5)

report them, recognizing that fear of retaliation discourages reporting (Ginther, 46:4067-69); Ex. P7.  Presciently, the Matrix Report both warned CPD that its policies regarding use of chemical weapons were out of step with other departments and recommended changes.  The evidence shows those recommendations had not been acted upon before the protests nine months later.

Attempting to bypass both public skepticism about CDP's disciplinary investigations and poor disciplinary record, Mayor Ginther invited the public to report their complaints about police misconduct, including excessive use of force, and decided to have an outside entity, BH—a firm involved for years in the City's police union contract negotiations—conduct investigations.[43] BH's investigation was subject to problematic limitations, many of which have applied to CDP's own investigations for many years and contribute to the historical lack of accountability.

Over 800 complaints were submitted, but only 49 were sent to BH. (Ginther, 46:4085-86) Even as to the 49 referred cases, BH could only recommend "findings" (not discipline).  BH knew its time limits were not realistic in light of the massive amount of video and other evidence to be reviewed along with the difficulty in identifying the officers who used force.[44]  The latter problem reflected the fact that many officers, contrary to policy, did not use body cameras during the protests; failed to comply with requirements to display their badge numbers; and/or suffered the amnesia BH criticized. Adding to the dearth of BH findings of excessive force or policy violations was the firm's decision to treat every complaint, even if confirmed by injured citizens like the Plaintiffs and/or in some cases with video or photos, as unfounded or not sustained unless it could identify the specific officer involved. (Quinlan, 48:4477)

The Mayor did not instruct BH to treat excessive force complaints as criminal, and the police union denied a request, generated from a BH report that it needed more time, for extension

---

[43] Former Chief Quinlan characterized BH as "the outside independent investigators" and the mandate that "we're directed not to investigate." (Quinlan, 48:4435)
[44] (Edwards 26:9-13, 53:19-24, 54:1-15, 114:10-18: "Excessive force isn't necessarily the standard in the policy.").

of the CBA's 90-day period for non-criminal complaints being investigated. (Ginther, 46:4112-13) The City simply decided not to pursue the contractual exception allowing that limit to be set aside for any incident that could be the basis of a criminal charge (an exception that would have covered virtually every incident at issue). (Ginther, 46:4113-15).  BH made often futile requests for additional information.  *Id.* at 46:4110-11.

In evaluating those incidents where officers could be identified, BH was restricted to evaluating only whether CDP policies were violated, not whether uses of force within those policies were appropriate or even legal.[45]  And in the tiny proportion of cases where BH both identified an officer and found excessive force, no discipline has been meted out, nine-plus months after the protests and six-plus months after BH's findings. (Ginther, 46:4115-17) This was true even for the many officers whose body cameras were not recording or who did not display badge numbers as required.  Although defense witnesses suggested that the body camera problem was unintentional and related to the riot gear worn by officers, none of them provided any explanation for how numerous officers with the same riot gear *did* have operating cameras, resulting in much of the video footage admitted into evidence.

The Mayor testified that a few cases were sent to Mr. Wozniak, a former FBI agent conducting criminal investigations for possible prosecution under the Safety Director's supervision, and he confirmed that no criminal charges have yet been advanced for prosecution. (Ginther, 46:4113-15)[46]  A lawsuit against Wozniak's effort to use investigative subpoenas was

---

[45] BH looked only at "whether officers' use of force was within or outside of CPD policy," and did not analyze whether excessive force in violation of the Fourth Amendment had been used or CDP policies were constitutional. (Edwards: (26:9-13; 53:19-24; 54:1-15); 114:10-18 ("Excessive force isn't necessarily the standard in the policy."). It was not hired to form or express an opinion on discipline.  (Edwards: 116:8-15) *See also* (Ginther, 46:4117-18)
[46] *Accord* (Bernhardt: 63:18-24); (Edwards: 69:5-7).

recently filed, claiming the City Charter gives the CDP the exclusive power to investigate its officers' excessive use of non-deadly force; the City withdrew the subpoenas without a hearing.[47]

Ratification can be avoided in ways other than discipline. The Chief is empowered to suspend an officer pending investigation or transfer an officer to a desk job. (Quinlan, 48:4442-43; 4451) Despite documented misconduct, that power had not been exercised in a single case. (Quinlan, 48:4440-42) Even though many officers failed to have operating body-worn cameras or visible badge numbers, none has been disciplined. (Ginther, 46:4106; 4110; 4116)

The way CDP tolerated misconduct relating to body cameras and the absence of name tags and badge numbers is telling. A consciousness of guilt may be inferred from sabotaging efforts to record and hold accountable excessive, vindictive use of force. As recounted by Deputy Chief Becker at his Roll Call, Ex. P25, names were permitted to be removed, notwithstanding the general duty to wear badges, (Ginther, 46:4115-16), because CDP speculated protestors would locate home addresses, (Mabry, 52:5275; 5278), and CDP knew officers had taped over cameras, submerged them under riot gear, or did not replace dead batteries. These demonstrations became an exception to the policies on paper about names, badge numbers, and cameras in operating order.[48]

Illustrating the difference between policies on paper and in practice, Commander Weir, who supervised the CDP response on June 21, 2020, ordered force to be used to clear the streets (rather than simply rerouting traffic, which he could have done in "minutes") because of looting, fires, other conduct, and traffic issues that occurred ***days or weeks earlier, not on the day (much less at the time) he ordered force used***. (Weir, 52:5461-73; Weir Dep. 105-6, 109-10)  Weir

---

[47] *Rector, et al. v. The City of Columbus, et al.,* 21 CV 001711 (Franklin Cty. C.P., filed Mar. 19, 2021, dismissed Mar. 22, 2021) (citing Ohio Constitution and City Ordinance Title 19, Chapter 1903.01(A)). The lead plaintiff opposing the subpoenas was Lowell Rector, the leader of the PERT team discussed below. (Mabry, 52:5339).
[48] Only well into the protests did Chief Quinlan order front- and back-taped badge numbers, after which the City Council belatedly enacted an ordinance on visible identification. (Quinlan, 48:4470-71)

admitted that Officer Daniel Snyder was under his supervision that day and that he had reviewed BH findings and video showing Snyder committed multiple policy violations, including violating the new chemical spray policy and an excessive fist strike. (Weir, 52:5477) Yet Snyder remains on active duty (with no effort to relieve him), and the CDP has thus far not disciplined him, nine months later.  Weir conceded he was also in the area of other officers' uses of force, but denies seeing them until viewing body camera videos during the BH review. (Weir, 52:5467-76)

The date June 21, 2020 matters because the new Directive had been distributed and formally issued by then. (Quinlan, 48:4409-10; Woods: 107:22-24, 108:1-21; 119:17-22) The "Get Out of the Road" and "Spray Away" videos demonstrate how little was changed by the Directive: despite nothing being thrown at them before this excessive use of chemical agents, officers continued to use pepper spray indiscriminately,[49] including toward protestors standing on the sidewalk.[50]  (Wenning, 47:4321-23) The mayor said these videos showed clear violations of the Directive, (Ginther, 46:4132-33; 4135), but no officers have been relieved of duty, much less disciplined.

Most striking, Weir admitted that even prior to reviewing body cameras, top CDP command could see officers handle the protests *in real time* from the Emergency Operations Center ("EOC") using "crime cam" videos.  Some of these were used at the hearing, such as Ex. D41, which shows Columbus SWAT officers firing projectiles at protesters long after they had dispersed and a CDP van driving down High Street shooting indiscriminately at fleeing civilians on the sidewalk. (Pagels, 49:4635-36; Ohl, 50:5050-51). Weir claimed he saw no excessive force

---

[49] Ex. P105, the "Get Out of the Road" video, shows protestors near the middle of the Broad and High on the afternoon of June 21, 2020, holding pliable signs with mylar on one side, when bicycle police used their bicycles to shove the protestors, then seized and ripped their signs, and cleared the street, while officers pepper-sprayed the protestors.  The video was taken from the body-worn camera of Officer Bryan Maselli, who can be heard calling a protestor "Bitch."

[50] Ex. P106, the "Spray Away" video, shows some of the same officers in Ex. P105, as well as an officer behind and off the side, who pepper-spray protestors merely standing in a crosswalk.  The video was taken from the body-worn camera of Officer Christopher Spohn on the afternoon of June 21, 2020, at the intersection of Broad and High.

from the EOC, but it would hardly have mattered.  If he had seen such conduct in real time, he said he would not have intervened, but would only have asked a field supervisor to explain, even as more civilians were being injured. (Weir, 52:5454-55, 5458-60, 5482)

The City's witnesses testified that CDP is all about accountability.  But the utter lack of accountability exposes those words, which are repeated in training and on paper, as perverse. Officers almost wink while the body-cameras are rolling and orders are given.  The "Any Means Necessary" video depicts a supervisor modifying his orders by then inserting "reasonable" before "means" in a hard-to-hear afterthought.[51]  Officers caution one another if cameras are "afoot."[52]

D.    CDP's Culture Ensures the Survival of Harmful and Unconstitutional Policies and Resistance to and Undermining of Any Policy Changes Sought by Politicians.

Mayor Ginther admitted that racism is so entrenched at the CDP that, to achieve transformational change, he has insisted on hiring a new Chief from the outside. (Ginther, 46:4062; 4065; 4067; 4084-85) The Blue Wall of Silence and vindictive use of force are equally entrenched, and a rear guard consists of several Deputy Chiefs and other CDP leaders.  They view the mayor's decision to change the Directive in response to public outcry (Ginther, 46:4076) as the product of politicians catering to minority voters, and they intend to battle the changes in the Directive.[53] Multiple Deputy Chiefs and commanders are on record supporting

---

[51] Ex. P123-A-C, the "Any Means Necessary" videos, show officers mounting their bicycles, instructed by a supervisor that they were going to move protestors by "any means necessary," which he then amends, as an afterthought, to "any reasonable means," and proceeding to pepper-spray nonviolent protestors standing or walking on sidewalks and pushing them with a bicycle, while an explosive device was deployed and other officers pepper-sprayed.  The videos were taken from the body-worn camera of Officer Phillip Walls on the evening of May 29, 2020, at and near Broad and High and Broad and Front.  *See also* Ex. P110-A; B.

[52] Ex. P124, the "Camera Warning" video, shows officers asking whether there was a camera on and then reminding themselves to "be professional" while one remarks, "There is a camera afoot."  The video was taken from the body-worn camera of Officer Nicholas Sands on the evening of May 29, 2020, on West Broad.

[53] *See, e.g.* (Kuebler: (21:1-10) ([T]ear gas, which had previously been a level two on the response continuum, which I don't know if you're familiar with, was raised by the community and politicians to be, essentially, a level one million this summer. So I don't know how to phrase it in that particular situation. It was a level two, now society says it was the worst thing we can do. I would assume it's higher than a taser, so that's a little confusing.").  *Accord Id.* at 83:3-24; 84; 85:1-10) ("political interference" in protecting property and streets); *Id.* at 155-56; 157:1-11 (protect livelihood over First Amendment); *Id.* at (172:17-24; 173:1-2) (political expediency)

reversion to the former chemical agent policy at the first opportunity,[54] meaning that even the "banned" weapon of tear gas could easily be redeployed.[55]

This is not a minor concern: unless enacted by ordinance or charter amendment, which they have not been (Mabry, 52:5290-91), the changes are at best temporary and at worst ineffective to change the CDP culture. The Chief has the power to revert or revise. (Woods: 108:22-24; 109; 110:9-10). Though the Safety Director and City Attorney's Office can exercise oversight, "[i]t's ultimately the chief's decision." (*Id.* at 125:14-24; 126: 1-7; 178:19-21)[56]

The new Directive permitted pepper-spraying "aggressive or violent" protestors, leaving to the discretion of officers whether protestors were "aggressive." (Woods: 112:10-24; 113; 114:1-3) Officers are not trained with a definition of "aggressive." (Mabry, 52:5314) The City's featured line officer, Anthony Johnson, explained how broadly he would use his discretion to define "aggressive," including protestors yelling, insulting, and using profanity. (Johnson, 51:5184) Deputy Chief Kuebler admitted the vagueness: "Q. Is there something in the division's policies that explains what it means for protestors who are in the street to be aggressive? A. *That remains very unclear to us in the division*." (Kuebler: 148:15-19) (emphasis noted)[57]

As important, other Directives—some of the very Directives that directly encouraged and caused the unconstitutional conduct at issue—were left unchanged. Changes to the Use of Force

---

[54] (Kuebler: 175:7-10) ("Q. Okay. In your view, it would be a better outcome to go back to the old policy than to stick with the new policy, right? A. Yes."). Cmdr. Griffith also disagreed with the changes: "So taking that tool [tear gas] away from us I believe, yeah, it kind of handcuffed the police." (Griffith: 25:8-17; 26:8-15). Deputy Chief Knight was almost wistful: "We used CS for crowd control for many, many years, very, very effectively." (Knight: 88:6-8) *See also* (Mabry, 52:5290-92: banning tear gas was "an irresponsible policy" and its future is unknown).

[55] (Lang: 70:9-16; 71:2-8) ("Q. It's not like you destroyed or sold the tear gas canisters or anything like that? A. Not yet. And even if we had, we could certainly buy more."). Former Chief Quinlan misremembered that an ordinance banning tear gas had been enacted. (Quinlan, 48:4411) *See* (Mabry, 52:5290)

[56] Even if retained, Ex. P11 clarifies that the change is "only a minor modification from the existing language and applies to crowds." (Woods: 107:22-24; 108:1-2)

[57] The SWAT Commander distinguished "purely . . . peaceful protests" from those subject to dispersal with chemical weapons. (Ohl 144:5-16) ("[P]urely people who are exhibiting peaceful protests -- and all's they're doing is, per se, coming out into a street and occupying a street or an intersection, that there will not be ordinance used to deploy -- to disperse those people purely to remove them from the roadway."). *Accord* (Quinlan, 48:4431) ("Q. Just being illegal in the middle of the street, is that aggressive? A. No. That's why I said that's a different fact.")

directive were not significant, but rather simply reworded versions of requirements that had been in effect for decades. (Mabry, 52:5272; 5293-94).

A "new" Police Emergency Response Team ("PERT") has little potential to produce real change:  it is just a reintroduction of an arrest team that has existed on and off for years and is composed largely of teams already used in the 2020 protests, including members who were among the worst offenders in those protests: the grenadiers, SWAT, and the bike patrol. (Mabry, 52:5336-38).  Acting Commander Mabry confirmed that the bike patrol—which is the model for PERT, and whose members have been neither disciplined nor removed from the team after the protests—included Andrew Hickey (whose body-cam shows him ramming a female protestor with a bicycle and then pepper-spraying her in Ex. P129), Aaron Shotwell (whose body-cam in Ex. 110A and 110B shows a coordinated use of pepper spray against peaceful protestors), Sgt. Chris Capretta (the supervisor instructing officers to use "any means necessary" in Ex. P123A), Phillip Walls (whose body-cam shows him and other bike officers indiscriminately spraying peaceful protestors in Ex. 123B), Daniel Snyder (who was found by BH to have committed excessive force on June 21 but has not been disciplined), Bryan Maselli (whose body-cam shows him striking stationary protestors and shoving one to the ground on June 21 in Ex. P105), Shawn Dye (who tackled Plaintiff Lynch in Ex. P148, as reported in Ex. P70, and who falsely claimed she assaulted him), and Sgt. Michael Ramsey (the supervisor celebrating with other officers after assaulting the man in a gas mask in Exs. P128 and P138). (Mabry, 52:5351-56).

Crucially, neither the Directives nor the applicable training concerning wood projectiles (including firing them to simply "maintain distance" between officers and protestors who are yelling at them) and the use of bicycles to shove protestors have been altered at all. (Ginther,

46:4093)[58]  Protestors can be ordered to "clear the area," and officers may treat that order as encompassing sidewalks as well as streets and use their discretion on whether protestors are leaving fast enough.[59]  Although officers' discretion in this regard is supposed to be guided by their training, the CDP's training uses military-style tactics (including those deployed in the Kent State killings) as a model; openly promotes paranoia toward supposedly paid, professional, outside agitators; and encourages collective punishment of protestors who allegedly pose as peaceful so they and their fellow travelers can harm officers. (Mabry, 52:5275; 5278-81).

Meanwhile, although the City has purchased additional body cameras and enacted policy to mandate their activation, (Quinlan, 48:4505-07), these policies will not produce accountability because the CDP's command staff privileges officers' self-serving firsthand accounts over even the clearest body-cam footage.  CDP Deputy Chiefs and supervisors insist discipline cannot rely on videos from body cameras because they capture only a few moments from a limited viewpoint and never tell the whole story.[60]  They say only an officer and supervisor can provide proof of excessive force by providing the rest of the story.  (Kuebler: 210:24: 211:1-14 ("A.  It's impossible to know based on an image.  * * * There are a thousand things.")  Consequently, the videos one Deputy Chief reviewed, some of which have been submitted in evidence, did not in his opinion depict force "excessive in any way."[61]

---

[58] (Lang: 84:7-24) ("[T]he actual tactic [of using a bicycle to shove protestors] is described in training.").

[59] (Kuebler Dep. 152:6-18) ("And, in fact, [in his 2017 report, Sgt. Zachary Scott] confirms that per policy, if a warning order is given to a crowd to leave, quote/unquote, the area, and it doesn't specify that it's just the street, that it's permissible within policy to mace protestors who are on the sidewalk, right?  A. That's what it says.").  *See also* (Lang: 94:1-7) (unaware of "training that says how to decide whether the person is actually leaving fast enough or not"); (Griffith 58:13-24; 59:1-8 (supervisors can declare an emergency whenever they want to disperse a crowd). Ex. P150, the "Leave the Roadway" video, shows an announcement to leave the roadway followed by officers crossing a sidewalk and pepper-spraying nonviolent observers at a restaurant's railing.  Plaintiff Carlock was "pinned . . . into a small area" with some other protestors as she tried to leave an area.  (Carlock, 49:4807-08)

[60] *See, e.g.,* (Kuebler: 203:9-12) ("A.  There are plenty of things that the officer could have witnessed in that crowd that we can't see on video [of SWAT officers firing] that would make that [use of projectile] justified.").

[61] (Kuebler: 103:11-15) ("Q.  Okay. Did you -- in reviewing those videos, did you see any uses of force that you felt were outside of policy or excessive in any way? A. I did not.").

Confronted with video evidence that officers exaggerated the violence by protestors, the same chorus is sounded. CDP officer Anthony Johnson claimed a barrage of objects were thrown at him throughout his day/night shift, yet he was thoroughly impeached by a video of a body-worn camera of an officer working the same shift and place.[62] Similarly, the City has emphasized the number of officers who reported injuries, Ex. P38, but its report was impeached on cross-examination demonstrating few injuries required medical attention and several were related to exertion or accidents, not related to objects being thrown or protestors' assault. (Hamon, 50:4982; 4985-90; 4995) Exaggeration is another form of resistance to change.

E.      Irreparable Harm Inflicted by Excessive, Vindictive Force Chills Reasonable
        Individuals, Including Plaintiffs, from Attending Future Protests.

Plaintiffs have a First Amendment right to protest nonviolently. They may even engage in civil disobedience and suffer the consequences to demonstrate their commitment to a cause and trigger public reaction to their protests. Irreparable harm is cognizable regardless of whether Defendants violated the First as well as the Fourth Amendments.

While Plaintiffs claim a Fourth Amendment right against being subjected to excessive force, in the context at bar the excessive force did more than hurt them physically and scar them mentally. Even though they remain committed to the cause of Black Lives Matter, it also chilled them from future exercise of free speech and association. Plaintiff Calvey did not want to be scared off protesting by police excessive use of force, but she is now definitely hesitant about protesting. (Calvey, 46:3985-86) Plaintiff Mixon wants to help the Black Lives Matter

---

[62] Ex. P145, the "Waiting Around" video, shows a lengthy period when no objects are thrown and, as it got darker, a few and then more objects. The video was taken from the body-worn camera of Officer Gitlitz, starting around 8:00 p.m. on May 28, 2020, at the intersection of Broad and High. From approximately 9 to 10:30 p.m. Ex. P146, taken from a surveillance camera at the same location, corroborates the overwhelmingly peaceful nature earlier in the evening of the protests. Officer Johnson somehow lost his own body camera, (Johnson, 51:5169-70), and video also contradicted his testimony about protestors banging on his cruiser. *Id.* at 51:5170-72. His own injury report, Ex. P75 established late at night, rather than earlier, as the time of his injury. Notably, the Mayor admitted that protests later at night had fewer protestors and most violence and property destruction occurred then. (Ginther, 46:4094)

movement, but she would not attend personally due to what happened to her. Indeed, she is now nervous around police. (Mixon, 47:4234-35) Plaintiff Fahmy responded with a "hard no" to invitations from friends to join further protests. (Fahmy, 47:4277-78); while remaining passionate about the issue, Plaintiff Lynch will not attend future protests because she could not be guaranteed that a friend would videotape a false arrest and does not want either herself or her friends to experience what she went through. (Lynch, 48:4563) For Plaintiff Hazlett, the experience was so horrible he doubts he will attend a future protest. (Hazlett, 49:4681). *See* (Hubby, 48:4602) (same) Plaintiff Schultz is very scared to return to demonstrations and would not subject herself to that experience again or see others go through it. (Schultz, 49:4742); Plaintiff Carlock warned friends the protests she attended seemed calm before police began using and then escalating physical force, causing some of her friends to think better of attending. (Carlock, 49:4821)

These reasonable reactions were shared by non-Plaintiffs. Legal Observer Wenning returned to some protests, but then reduced her participation because she decided there was too great a risk of chemical weapons that could be physically harmful to her, and because it was very emotionally draining for her to see others hurt. (Wenning, 47:4325-26) Legal Observer Pagels described her experience at the demonstrations as the most terrifying events of her life, even causing psychological effects, and, though she attended later protests due to her responsibility as a Legal Observer, she also avoided going on some days and advised others not to attend if they had a preexisting health condition. (Pagels, 49:4639-40) Amateur medic Merchant no longer felt personally safe and suffered nightmares due to her experiences. (Merchant, 49:4780-81). And even Mayor Ginther admits this response is reasonable, as delay in implementing changes on use of force puts nonviolent protestors at risk of injury. (Ginther, 50:4943)

    F.    <u>Governmental Interests that Would Be Affected by the Requested Preliminary Injunction Are Readily Served by Means Other than Excessive, Vindictive Force.</u>

The balancing of the equities is straightforward. Concerns about traffic can be resolved quickly and efficiently. Rerouting traffic, which CDP can accomplish in a matter of minutes (Ginther, 46:4122-23),[63] rather than insisting on dispersal reduces property damage. (Woods: 160:1-6: "[T]he reported property damage was significantly less than what it was in the first several days[,]" and would have reduced use of force.)[64]

Focusing on individuals who are preparing to and/or committing violence or destruction of property directly serves governmental interests.[65] CDP representatives acknowledge that they have the means, through undercover officers and arrest teams, to identify, isolate, and deter or arrest such individuals without harming others, and without using the types of force against nonviolent protestors at issue in this case.[66] The requested injunction would leave the City ample discretion to serve it governmental interests in a constitutionally sound manner.

## III.    <u>Conclusion</u>

---

[63] (Weir: 108:18-24; 109; 110:1-6) ("Q. So how long does it take you once you do decide that, hey, we need to divert traffic? * * * I'm talking about the downtown, I'm not talking about anything else. A. Minutes."). The Traffic Operations Section Lieutenant testified that, apart from rush hour, it would be "probably fair" to say that it is no harder to reroute traffic downtown than in any other area of Columbus. (Weiner: 45:13-24; 46:1-3)

[64] (Kuebler: 90:3-24; 91:1-2) ("[I]f the objectives that the division was working under... did not include removing people from places they weren't allowed to be, then there necessarily would have been less force, that's correct. Then we would not have used force to remove people in accordance with that previously long-held objective.").

[65] SWAT Commander Ohl explained that pepper spray should be used *after* a failure to disperse has occurred and if reasonable force is necessary to make an arrest. (Ohl, 50:5057)

[66] (Woods: 55: 11-15; 56-4) ("Q. Would it have been a violation of any policy or procedure you're aware of within the division had you told the supervisors in the field to, if they could safely do so, arrest some of these individuals so we can stop this behavior? * * * A. No.") *See also* (Kuebler: (18:17-24) ("A. [G]enerally we were told that there would be a new arrest and control team set up designed to – you know, as he paraphrased it, to do a better job responding to individual violent protestors in an attempt to disable those protestors – or that's not the right word, take those protestors out of the mix, as opposed to using more wide-scale responses to problems in crowds."); (Ohl: 102; 103: 104:1-10) ([For peaceful protestors occupying the streets, the SWAT Commander] "would arrest -- I would call arrest teams and make arrests. * * * Q. By beginning to make arrests, is part of the purpose of doing that to encourage the rest of the protestors to comply with the dispersal orders? MS. TANOURY:· Objection. Q. Do you understand the question? A. I do. Q. Okay. A. My opinion is yes.").

CDP police have shown they cannot police themselves.  For these and the foregoing reasons, constitutional rights of freedom of speech and association and against excessive use of force will only be vindicated by this Court's issuance of a preliminary injunction.

Respectfully submitted,

By: /s/ *John S. Marshall*
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Edward R. Forman (0076651)
(eforman@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453

swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

James D. McNamara (0002461)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a copy of the foregoing was filed with the Court on this 29th day of

March, 2021, using the CM/ECF system, which will send notification of such filing to all

counsel of record. Parties may access this filing through the court's filing system.

By: <u>/s/ *John S. Marshall*</u>
John S. Marshall (00015160)