# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| TAMARA K. ALSAADA, *et al.* | : | |
| | : | Civil Action No. 2:20cv3431 |
| Plaintiffs, | : | |
| | : | CHIEF JUDGE MARBLEY |
| v. | : | |
| | : | MAGISTRATE JUDGE JOLSON |
| THE CITY OF COLUMBUS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' POST-HEARING REPLY BRIEF**

I.  **The City's Overstated Claims of Protestor Violence and Distorted Legal Assertions Are Unpersuasive:  The Uses of Force at Issue Were Excessive Under Any Standard.**

   A.  **The City Cannot Justify the Unrebutted Instances of Excessive Force at Issue Using "Circumstances" Unrelated to those Specific Uses of Force.**

The City's mantra is "the totality of the circumstances," but it expressly refuses to confront the actual circumstances of the uses of force shown at the hearing. Doc #61-1, PAGEID #: 5623-24 ("It is both impossible and unnecessary to get into the specific facts regarding each of the individual Plaintiff's allegations[.]").  Instead, it insists every act of CDP violence against protestors could be justified by any unlawful act by anyone at any time during weeks of protests.

The City has dramatically overstated protestor violence—for instance, from the impeachment of Officer Johnson using video of long periods of peace during a time he claimed officers were under a constant barrage of thrown objects and the cross-examination of reporter Somerville showing CDP used pepper spray much earlier and more often than he recalled.  But far more important is that the "totality" does not mean any circumstance, no matter how distinct in time and place from the actual use of force at issue.  Instead, *Graham v. Connor*, 490 U.S. 386, 396 (1989), explained that reasonableness of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

By failing to rebut the evidence presented (including videos corroborating the individual instances and the pattern of conduct described by Plaintiffs and witnesses), the City concedes there was no *Graham* justification here.  Unrebutted, credible testimony showed widespread use of force causing pain and injury against peaceful protestors suspected at most of traffic violations or similar misdemeanors, and, more commonly, against those like Plaintiffs Mixon, Carlock, Hubby, and

1

Calvey, who were standing on sidewalks or attempting to follow the commands they heard. The City ignores what these individuals were doing before being gassed, sprayed, and struck by projectiles, explosives, bicycles, and fists, and relies exclusively on unrelated circumstances. That expansion of the "totality of circumstances" is unsupported and sacrifices individual rights to protest and bodily integrity to the interest of unlawful collective punishment.

**B.** *Torres v. Madrid* **Does Not Alter the Fourth Amendment Analysis Here.**

The City argues that *Torres v. Madrid*, No. 19-292, 2021 WL 1132514 (U.S. Mar. 25, 2021), makes the Fourth Amendment inapplicable to the claims of some of the Plaintiffs. But it is inconceivable that the Court intended to excise from the Fourth Amendment analysis above, based on *Graham* (which *Torres* did not cite), all excessive force claims where officers seek to control individuals' freedom of movement by dispersing rather than restraining them.

*Torres* involved the situation "when an officer shoots [and hits] someone who temporarily eludes capture after the shooting." 2021 WL 1132514 at *2. It held that "[t]he application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." As "[t]he Fourth Amendment prohibits unreasonable 'seizures' to safeguard '[t]he right of the people to be secure in their persons,'" it applied even to a failed attempt to restrain a suspect, *Torres*, 2021 WL 1132514 at *3. *Torres* approvingly cited the types of seizure recognized in *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968): "physical force"; "show of authority"; or means that "in some way restrain [one's] liberty." *See also United States v. Jacobsen*, 466 U.S. 109, 113 n. 5 (1984) ("interference" with "freedom of movement").

The key distinction in *Torres*, 2021 WL 1132514 at *6 (emphasis in original), was between "use of force *with intent to restrain*" and "[a]ccidental force." The force used here was not accidental; it sought to restrain protestors' freedom of movement. The City argues dispersal fits a

2

different distinction in *Torres*: "Nor will force intentionally applied for some other purpose satisfy this rule." *Id.* Dispersal is a restraint of movement, not "some other purpose."

*Torres* preserves (or, per the dissent, ***expands***) the Fourth Amendment's scope; it does not narrow "seizures" to include only efforts to keep subjects from moving, rather than to force them to move against their will. The majority's reference to "some other purpose" was merely a retort to an issue raised by the dissent: "We do not accept the dissent's invitation to opine on matters not presented here—pepper spray, flash-bang grenades, lasers, and more." *Id.* That portion of the dissent criticized the majority for vagueness, arguing its definition could include uses of weapons apart from restraint for arrest. *Id.* at *21 (Gorsuch, J., dissenting). Nothing in *Torres* supports the City's claim that only restraint to capture a subject is covered.

*Graham* itself expressly did not confine "seizures" to arrests: "Today we make explicit what was implicit in *Garner* 's analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395 (emphasis in original). *Torres* did not silently overrule this holding. Nor should officers be afforded more protection when they claim that they used excessive force with the intent to disperse (*i.e.*, to force individuals to move to particular locations or in particular directions) rather than apprehend. Curtailing freedom of movement remains a seizure after *Torres*.

### C.  Even if the Fourteenth Amendment Rather than the Fourth Amendment Applied, the City's Conduct Would "Shock the Conscience."

Even under the City's distortion of *Torres*, *Terry*, and *Graham*, those Plaintiffs who the officers did not seek to apprehend would still be protected by the due process clause and its "shocks

3

the conscience" standard, rather than the Fourth Amendment's "objective reasonableness" standard. The way CDP officers applied the City's Directives here clearly meets that standard.

As the videos and testimony demonstrate, officers and their superiors had extensive time in which to consider whether to use force, and how much, against static demonstrators, and they were deliberately indifferent to the rights of nonviolent protestors. *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 851-52 (1998) (deliberate indifference standard where officers were "afforded a reasonable opportunity to deliberate"). If officers could claim they were responding to a fluid, dangerous predicament, the standard is "malice or sadism." *See Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013) (using deliberate indifference when officers can deliberate, and malice or sadism when fluid and dangerous). But even that standard is so obviously met here that the City may want to rethink whether it prefers a due process clause standard. In Fourth Amendment cases, motive is neither necessary ***nor sufficient*** to establish a violation. *Graham*, 490 U.S. at 397. But in due process cases, malicious or sadistic motive is nearly conclusive proof that the force shocks the conscience.

Plaintiffs' evidence demonstrates that officers wanted to inflict pain, to both banish nonviolent protestors and punish them for protesting. The "Celebration" videotape, Ex. P138, shows an officer who attacked a nonviolent protestor from behind, tearing off the protestor's gas mask, gleefully celebrate what he did. Drowning the Lady in White in pepper spray and attacking her with explosives and tear gas, Ex. P120-A;B; Ex. 68; 74, or spraying Plaintiff Mixon, pushing her down, breaking her knee, and cursing her for coming to the protest; or tackling Plaintiff Lynch and then accusing her of assaulting the officer who abused her, Ex. P148, P148A, P70, also establish malice or sadism, as does the other vindictive conduct Plaintiffs have briefed. The extent of that vindictiveness necessitates issuance of a preliminary injunction.

4

The City's officers were not merely enforcing laws or lawful orders; they were unleashing excessive force against peaceful protestors they chose to treat, without anything like reliable evidence, as enemy combatants working in concert with violent anarchists. Their conduct "was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957). *Accord Range v. Douglas,* 763 F.3d 573, 589-90 (6th Cir. 2014). For a country where the First Amendment right to protest is sacrosanct, that is shocking. *See United States v. Salerno,* 481 U.S. 739, 746 (1987) (due process is implicated where government "interferes with rights 'implicit in the concept of ordered liberty'") (citation omitted).

## II. *Monell* Is Satisfied Here by a Wide Array of Evidence Showing a Policy or Custom.

The City converts *Monell* from a prohibition of vicarious liability into a nearly insurmountable barrier for Plaintiffs to prove municipal liability. The City characterizes one alternative as requiring Plaintiffs to show that all officers always use excessive and/or retaliatory force. That is an extraordinary burden not supported by precedent.

For instance, the policy that violated the Fourth Amendment in *Tennessee v. Garner*, 471 U.S. 1 (1985), stated that, after giving notice of an intent to arrest, "the officer may use all the necessary means to affect the arrest." It did not require ***all*** officers to ***always*** use deadly force. The *Garner* violation mirrors the City's: Tennessee omitted probable cause to believe a fleeing suspect posed a significant threat, while the City's policies omitted reasonable suspicion, let alone probable cause, to believe protestors committed anything but traffic violations or misdemeanors, yet directed officers to inflict pain and injury using any or all their non-lethal weapons.

Plaintiffs proved the existence of that policy and the City's approval of its unconstitutional application in myriad ways. Perhaps the most compelling proof was the City's Directives and instructions for its officers to collectively punish nonviolent demonstrators even though using the

5

force they had been trained to use was palpably excessive. Though the Matrix Report warned the City of a discrepancy between training and practice, the City's training was *very* effective in other, directly harmful ways. Plaintiffs' rights were violated by officers who clearly internalized their grenadier training to use dangerous projectiles and explosives against static protestors to maintain distance, prevent direct yelling, and reduce stress, Ex. P149, and by officers who used crowd control and bike training based on the City's instructions that not all protestors standing with their hands raised were peaceful, that children and the elderly were pawns and shields, that volunteers distributing water on a hot day were fomenting violence, and that protestors wearing protective gear for fear of CDP force were "not actually nonviolent," so officers needed to be "mentally prepared to use force" against them. (Mabry, 52:5278-81, 5287-88).

The fact that then-Chief Quinlan, along with other key CDP leaders, directed officers to view nonviolent protestors as conspiring with violent rioters, and the officers accordingly used excessive force as collective punishment because of the Chief's directions, is sufficient on its own. As *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), held, "Where action is directed by those who establish government policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." Ratification by Quinlan and his command staff also suffices, without regard to how widespread similar violations had been, to trigger municipal liability. In *Pembaur*, 475 U.S. at 484-85, deputies were ordered to enter a medical clinic in violation of the Fourth Amendment, while a decisionmaker directed the destruction of material evidence in *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n.20 (6th Cir. 2009). Officers anticipated ratification, followed orders based on that anticipation, and ratification occurred.

The same was true here. Officers knew from the CDP's history of tolerating and excusing excessive force and racial bias that they would not be held accountable, and its written policies

6

and verbal orders emphasize officers' discretion, while supervisors disclaim the ability to second-guess discretion upon review, with or without video.  Thus, even though the Mayor and then-Chief admitted officers' video-recorded conduct was improper, there have been zero reports by officers of excessive force by others during the protests, zero disciplinary actions or criminal charges for excessive force, and zero efforts to relieve violent officers from duty or remove them from special response teams. Plaintiffs' Post-Hearing Brief, Doc. #59, PAGEID #: 5529-33.

Links between the City's policies and officers' unconstitutional actions also included the use of live video streams at the Emergency Operations Center, through which top command staff watched in real time without intervening as officers on the ground used excessive force; *id.*; PAGEID#: 5534-35; after-action and use-of-force reports showing command officers distributing weapons, authorizing their use, and giving blanket approvals of that use after the fact; *id.*, PAGEID#: 5529-30; direct reports to city officials by Commander Weir and then-Chief Quinlan justifying officers' violence toward peaceful protestors because of law-breaking from the weeks prior to those uses of force; (Weir, Tr. 52:5483-84); and the City's failure to adjust its chemical agent policy in response to warnings from the Matrix report of its unusually low threshold for using such force; *id.*, PAGEID # 5530-31.

### III. The City's Standing and Mootness Arguments Fail Both Factually and Legally.

The City makes a series of interrelated assertions that Plaintiffs lack standing for injunctive relief, that their equitable claims are moot, and/or that their evidence of "chill"—that they and others are being deterred from exercising their First Amendment rights due to the CDP's pattern of excessive force—is ineffective or insufficient.  These assertions are incorrect.

First, no change in City policy has rendered Plaintiffs' claims moot.  Virtually none of the policies discussed above have been altered: the CDP has made no relevant change to its training;

7

no change to its projectiles policy; no real change to the use of force policy; and no effective change to its disciplinary practices. It has made a cosmetic change to its chemical weapons standard that can be reversed at any time, is unclear even to top commanders, still allows officers to justify force against nonviolent demonstrators using others' unrelated violent acts, and was violated with impunity by officers within days of its enactment—with the approval of Commander Weir and then-Chief Quinlan. And while the City claims more recent, uneventful protests prove it has changed its approach, testimony confirmed that any new approach was due to transient "rules of engagement" that change day by day, rather than actual policy shifts, and that these more recent events were smaller, less confrontational, and occurred in inclement weather—while Commander Mabry, who studies protest trends for the CDP, confirms they cannot be compared to the spring 2020 demonstrations and predicts a resurgence in larger events with warmer weather and any new incidents of high-profile police violence (or perhaps developments in ongoing police prosecutions). (Mabry, Tr 52:5315-16).

Second, the facts and law support an injunction despite the City's assertion, based on *Los Angeles v. Lyons*, 461 U.S. 95 (1983), that Plaintiffs have not shown a likelihood of future harm. This is not *Lyons*, where a future risk did not arise from one isolated incident of abuse. Rather, CDP officers used excessive force on May 28, 2020, *e.g.*, Ex. 122 ("War Games"). Then more officers used outrageous force on May 29 against Plaintiffs Hubby and Mixon, and on May 30 against others like Ruffin, Schultz, Lynch, and Calvey, and on May 31 against Lamey and others, and on June 1 against Fahmy and student reporters, and repeatedly on June 21, after a supposed policy shift. And Plaintiff Carlock, who was sprayed and gassed in two distinct incidents on May 30 and shot at on May 31, as well as witnesses Bardus and Wenning, have already shown the real danger of returning to protest after a first incident of police violence.

8

Such a pattern (and policy, and custom) of unconstitutional acts against a particular group of individuals—demonstrators against police racism and violence—satisfies *Lyons*. *See Ramirez v. Webb*, 787 F.2d 592, 1986 U.S. App. LEXIS 19634 *2-3 (6th Cir.) (odds of Hispanic drivers being stopped based on pattern of racial profiling by INS satisfied *Lyons* standard). *Accord Budget Charters, Inc. v. Pitts*, 2018 U.S. Dist. LEXIS 61562, *18-19 (M.D.Tenn.) ("The rule announced in *Lyons* is not a formalistic bar on a plaintiff's seeking injunctive relief in a case arising originally out of a past constitutional violation . . . the potential for a future injury to the plaintiffs arises out of their allegation of an ongoing pattern of abuse directed at a particular, limited class of targets of which they are members."). This is particularly true where plaintiffs have no ability to control their risk of future harm by following the law. *See Phillips v. Cincinnati*, 479 F.Supp. 3d 611, 651 (S.D. Ohio 2020) (plaintiff's inability to avoid prosecution by following challenged policy makes recurrence more likely). Short of refraining from protesting, the experiences of those like Calvey and Hubby, seriously injured while merely approaching the scene of protests, and Carlock and Mixon, attacked after moving in the direction officers told them, shows a pattern under which no one can be confident of demonstrating safely.

This highlights Plaintiffs' showing of a "chill" on future protesting. The City asserts a cruel Catch-22: examples like Carlock, who has kept protesting despite her fear, allegedly show there is no real chill, while Fahmy, Mixon, and Hubby, who have avoided further protests for fear of additional harm, are merely showing irrelevant "subjective" chill. As noted previously, the City is using inapposite cases where anticipated harm is ***all*** that is at issue (because actual harm has not yet occurred). Doc.# 17; PAGEID#: 1071-72. The pertinent case law confirms that those harmed as part of a series of unconstitutional acts, and who then refrain from protected conduct based on a reasonable fear of future violations, are eligible for injunctive relief because, "[u]nlike Lyons,

9

Plaintiffs have alleged an injury in fact that is real and immediate, not hypothetical." *Cherri v. Mueller*, 951 F.Supp. 2d 918, 929-31 (E.D.Mich. 2013) (finding standing for plaintiffs who refrained from crossing border due to pattern of religious questioning of Muslims in past).

## IV. The Court Has Broad Discretion to Craft a Truly Protective Injunction.

Finally, the City argues that the protection of reporters, legal observers, and medics is outside the scope of available relief because the Plaintiffs are not in those categories. This misstates the Court's authority. "'Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *Atricure, Inc. v. Meng,* 2021 U.S. App. LEXIS 1611, *17 (6th Cir.) (quoting *Trump v. Int'l Refugee Assistance Proj.*, 137 S. Ct. 2080, 2087 (2017)). While the scope of relief is not unlimited, a court may enjoin not just "the conduct which has been found to have been pursued," but also actions "related to the proven unlawful conduct." *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quotation omitted).

The hearing showed the importance of media to communicate why protestors were exercising First Amendment rights and how police were suppressing that exercise; of legal observers to monitor police activity; and of medics to provide aid when force results in injuries and to corroborate based on what they saw. Their participation is especially crucial when officers will not use even mandatory camera equipment, report other officers' misconduct, or aid the injured. Conversely, when police target these individuals, they send a brutal message to demonstrators: if a clearly identified reporter, legal observer, or medic cannot participate safely, ***no one can***. Just as the Court may appoint a monitor to enforce compliance with its orders, it is well within its equity powers to protect those, like media, legal observers, and medics, whose presence protects and reassures the Plaintiffs and encourages officers' compliance with the law.

10

Respectfully submitted,

By: /s/ *John S. Marshall*
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Edward R. Forman (0076651)
(eforman@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

James D. McNamara (0002461)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

i

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was filed with the Court on this 5th day of March, 2021, using the CM/ECF system, which will send notification of such filing to all counsel of record. Parties may access this filing through the court's filing system.

By: /s/ *John S. Marshall*
John S. Marshall (00015160)
