IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TAMARA K. ALSAADA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF COLUMBUS, OHIO, et al., <br><br> Defendants. | Case No. 2:20-cv-3431 <br><br> Chief Judge Algenon L. Marbley <br><br> Magistrate Judge Kimberly A. Jolson <br><br> **DEFENDANT'S POST-PRELIMINARY INJUNCTION HEARING REPLY BRIEF** |

Plaintiffs have not carried their burden of proving the circumstances clearly demand a preliminary injunction. Accordingly, their Motion should be denied.

**A. No Actual Case or Controversy**

As a threshold matter, Plaintiffs have not presented evidence of a real and immediate threat of future injury by Defendants. Plaintiffs have made no showing that they are realistically threatened by repetition of their past experiences at the Protests, and have alleged no more than a subjective fear of attending future protests, which is insufficient to confer standing.[1]

Additionally, contrary to Plaintiffs' assertions, their claims for injunctive relief related to CPD's use of tear gas and chemical spray are moot. Plaintiffs deny mootness, pointing to the fact that Amended Directive 2.04 can be changed and that some CPD officers do not agree with the amended policy. Plaintiffs have not shown, however, that Interim Chief Woods or Mayor Ginther—the individuals with the ability to change the policy—have any intention of doing so.

---

[1] *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 105-111, n. 8 (1983); *Daubenmire v. City of Columbus,* No. 2:04-cv-1105, 2008 U.S. Dist. LEXIS 116430, at *23-29 (S.D. Ohio Oct. 24, 2008); *Hange v. City of Mansfield,* 257 F.App'x 887, 891-93 (6th Cir.2007); *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); *See Laird v. Tatum,* 408 U.S. 1, 13-14 (1972); *Parsons v. United States DOJ,* 801 F.3d 701, 710-11 (6th Cir. 2015).

1

(Woods Dep. Tr., at p. 125:14-18, ECF No. 29; Ginther, Tr. Vol. V, p. 1008:15-19, ECF No. 50.) Indeed, Mayor Ginther testified he would relieve a Chief from duty for insubordination if he/she tried to repeal the directive. (Ginther, Tr. Vol. V, at pp. 1022:14-1023:9, ECF No. 50.)

Further, Plaintiffs have not shown that CPD has failed to comply with or to enforce Amended Directive 2.04.[2] On this point, Plaintiffs cite to the June 21, 2020 protest. Commander Weir explained that chemical irritants were used that day in response to aggressive and violent actions of the crowd, which included protestors surrounding an uninvolved vehicle, grabbing an officer's bike, throwing a scooter at officers, slamming wooden shields into officer's bikes, leaning into their shields to prevent the bike squad from advancing, and throwing shields and bottles at officers. (Weir, Tr. Vol. VII, pp. 1516:13-1525:6, ECF No. 52; *see also* June 21, 2020 Video, Ex. D 43.) Moreover, since June of 2020, sizeable protests pertaining to allegations of police brutality have occurred in Columbus with no uses of force at all. This demonstrates that Plaintiffs' claims are moot with respect to CPD's use of chemical irritants, or, at minimum, that Plaintiffs will not suffer irreparable harm in the absence of an injunction.

Additionally, Plaintiffs' request for injunctive relief related to body worn cameras is moot because City Council passed legislation requiring them to be activated.[3] (*See* CCC § 1914.02.)

### B. Plaintiffs are Not Likely to Succeed on their *Monell* Claims

Even if one or more Plaintiffs have a likelihood of success on their underlying civil rights claims,[4] the injunction should be denied because Plaintiffs have not shown a likelihood that the

---

[2] Plaintiffs also assert that the term "aggressive" is vague. However, CPD's rules of engagement provide examples of violent or aggressive conduct. (Ex. D 44, p. 4.) Plaintiffs also point to Officer Johnson's testimony regarding what he considers aggressive, but Officer Johnson has not been back to work since May 30, 2020, so he was unsure of the new policies, (Tr. Vol. VI, at p. 1272:2-16, ECF No. 51), and would not have received the new rules of engagement.
[3] Defendants mistakenly stated Andre's Law was passed February 1, **2020** in their brief (ECF No. 61-1.) It was passed February 1, **2021**. (*See* Columbus City Code § 1914.02.)
[4] Plaintiffs have not shown a likelihood of success on their underlying constitutional claims. The evidence presented by Plaintiffs consists of short video clips that omit context regarding the totality of the circumstances at the time of the alleged constitutional violations. Further, Plaintiffs have not cited case law demonstrating that directly pepper

2

City has an unconstitutional policy or custom that caused their constitutional violations.[5]

Plaintiffs have not shown that either CPD's original Directive 2.04 *or* Amended Directive 2.04, "Chemical Agents and Intermediate Weapons Regulations," is unconstitutional. (*See* Ex. D 4; Ex. D 5.) *See also Abdur-Rahim*, 425 F. Supp. 3d at 956-59; *Abdur-Rahim*, 825 F.App'x at 285-88. Additionally, CPD's policy on multiple baton rounds (wooden projectiles) provides that the rounds are "designed to be skip-fired (ricocheted off a hard surface) toward a targeted subject . . . ***Operational exceptions may be made in a critical situation in which the use of deadly force is justified***." (Ex. D 55*; see also* Riot Control Munition Directive 4.4., Ex. D 1, p. 96.) CPD's Use of Force Policy, Directive 2.01, provides that multiple baton rounds are a level 7 on the use of force continuum. (Ex. D 2.) Furthermore, all uses of force—including in a crowd control situation—must comply with CPD's Use of Force Policy, Directive 2.01. (Ex. D 2; Mabry, Tr. Vol. VI, at pp. 1313:20-1314:3, ECF No. 51.) Directive 2.01(II)(A) states, "Police officers shall not use more force than is reasonable in a particular incident," and provides a list of factors "to be considered when determining the reasonableness of a use of force." *Id*. The Directive essentially repeats the holding of *Graham v. Connor*, 490 U.S. 386 (1989), in which the Supreme Court first

---

spraying individuals that failed to comply with lawful dispersal orders constitutes excessive force. *See Abdur-Rahim v. City of Columbus*, 825 F.App'x 284, 285-88 (6th Cir. 2020). Moreover, use of non-lethal force to disperse a crowd is not a Fourth Amendment "seizure" because, in such circumstances, officers do not objectively manifest an intent to restrain. *See Torres v. Madrid*, _U.S._ (2021), 2021 U.S. LEXIS 1611, *16-17. Thus, for Plaintiffs that were not seized, their burden is even higher. *See Arnold v. Curtis*, 359 F.App'x 43, 48 (10th Cir. 2009) ("when a plaintiff is 'not actually seized by the police,' the plaintiff's § 1983 claim cannot be based on a Fourth Amendment excessive force theory and instead must be governed by Fourteenth Amendment substantive due process standards.") (citations omitted); *see, e.g., Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (explaining a Fourteenth Amendment "shock the conscience" analysis is more burdensome to Plaintiffs than a Fourth Amendment analysis). With respect to their First Amendment claims, Plaintiffs have not shown they were engaged in protected conduct when the alleged retaliation occurred. *See Abdur-Rahim v. City of Columbus*, 425 F. Supp. 3d 935, 953-954 (S.D. Ohio 2019), *aff'd in part, rev'd in part* 825 F.App'x 284 (6th Cir. 2020) (reversed on other grounds). Accordingly, Plaintiffs are not likely to succeed on the merits of their underlying claims.

[5] "In order to establish municipal liability, [plaintiff] must prove both the existence of a municipal policy or custom and a direct causal link between the policy or custom and the alleged constitutional deprivation." *Gale v. O'Donohue*, 751 F. App'x 876, 881 (6th Cir. 2018).

explicitly applied the Fourth Amendment's objective reasonableness test[6] to force used in the law enforcement contexts. *See id.* at 395–96. Thus, the City does not have unconstitutional written policies. Plaintiffs also have not shown a likelihood of success on a failure to train, pattern or practice, or final policymaker theory of municipal liability.

### 1. No Policy of Failure to Train

Plaintiffs have not identified any inadequacies in CPD's training. Even if they had, their claims would still fail because they have not shown that CPD's training resulted in a history of prior unconstitutional actions against nonviolent protestors, or that the City was on notice that the training was deficient and likely to cause such injuries and maintained the training nonetheless. Plaintiffs therefore cannot show that any purported deficiencies in CPD's training were the result of the City's "deliberate indifference" to the rights of others.[7]

Plaintiffs also are not likely to succeed on a single violation theory, which requires "'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Harvey v. Campbell Cty*, 453 Fed. App'x 557, 567 (6th Cir. 2011) (citations omitted). First, CPD officers are not trained to use wooden baton rounds on protestors merely to keep them at a distance, as Plaintiffs seem to suggest. Although multiple baton rounds are used to stop aggression from a distance and to prevent one-on-one confrontation between officers and "rioters" or "disorderly people" (Ex. P 111, at 1:35-2:30), officers are trained to consider the totality of the

---

[6] The Fourteenth Amendment's "shock the conscience" standard is more burdensome to Plaintiffs than the Fourth Amendment's "objective reasonableness" standard. Thus, at least in this context, the self-imposed requirements of Directive 2.01(II)(A) are more restrictive than the Constitutional requirements.

[7] Inadequate training or supervision amounts to an unconstitutional municipal policy only when the purported failures to train or supervise amount to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac Cty.,* 606 F.3d 240, 255 (6th Cir. 2010) (citations omitted).

4

circumstances when determining whether to use them, and that the Division's Use of Force Policy, Directive 2.01, applies. (Mabry, Tr. Vol. VI, at pp. 1307:11-1308:8; 1313:20-1315:6, ECF No. 51.) Officers are taught this in Crowd Management and Control training, and they also receive annual use of force training. (*Id.*; Quinlan, Tr. Vol. III, at p. 603:13-605:10, ECF No. 48; Ohl, Tr. Vol. V, at p. 1102:4-10, ECF No. 50.) As Chief Quinlan explained, even in a riot, you cannot use a wooden baton round by default. (Quinlan, Tr. Vol. III, at p. 493:2-25, ECF No. 48.) It "still has to be warranted and you still have to give your dispersal orders and you still have to have justification to use that munition over a chemical irritant or officer presence or tactics maneuvering clearing out through bikes." (*Id.*)

Furthermore, CPD's training specifically provides that wooden baton rounds are to be skip-fired. (Ex. P 111, at 7:20-7:30; Ohl, Tr. Vol. V, at pp. 1096:17-1097:7, ECF No. 50; Mabry, Tr. Vol. VI, at p.1338:1-15, ECF No. 51; Quinlan, Tr. Vol. III, at pp. 474:3-9, 476:4-478:6, ECF No. 48.) And, as Plaintiffs point out, CPD trains officers regarding the potential risk of aiming sponge rounds at the center mass in stressful situations. (Ex. D 21, p. 39.) Thus, CPD affirmatively trains to avoid such use, which shows an absence of deliberate indifference. Furthermore, if a CPD officer direct-fired a wooden baton round at the Protests (in a non-deadly force situation), such actions would violate CPD's policy and training. (Ohl, Tr. Vol. V, at 1097:8-12, ECF No. 50.) Notably, Jennifer Edwards of BakerHostetler testified that in the course of their investigations, BakerHostetler "didn't see any video that – where we could conclusively determine that there was direct fire" of wooden baton rounds at protestors. (Edwards Dep. Tr., at p. 59:8-17, ECF No. 39.) CPD also does not have a trained tactic of pushing bikes forward into protestors. (Mabry, Tr. Vol. VII, at pp. 1428:14-1430:6, ECF No. 52.)

Plaintiffs also assert that CPD's training promotes paranoia toward "supposedly paid, professional outside agitators." (ECF No. 59, p. 22.) However, as Commander Mabry explained, the training discusses tactics that CPD has seen used by protestors and provides examples of situations officers should be cognizant of. (Mabry, Tr. Vol. VI-VII, at pp. 1310-1311, 1363-1373, ECF No. 51-52.) Moreover, the evidence at the hearing revealed that such tactics were *actually used* at the subject Protests. (*See id.*, at 1363-1373, 1415:12-1416:15; Quinlan, Tr. Vol. III, at pp. 557:8-25; 542:12-25; 571:19-573:1, ECF No. 48.) Further, CPD had information from the FBI that people were "being paid to create chaos or damage or vandalism or looting." (Quinlan, at pp. 573:19-574:15, ECF No. 48.) Thus, it was reasonable for Chief Quinlan or other leaders to share and/or train on this information for officers' awareness and safety.[8] (*Id.*, at 557:6-18, 571:19-572:9.) Finally, contrary to Plaintiffs' assertions, CPD is not trained to use collective punishment against protestors. (*See* Mabry, Tr. Vol. VI-VII, at pp.1328:1-11, 1326:1-22, 1362:17-1363:1, ECF No. 51-52.) In short, the record does not show "'a complete failure to train" or "training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Harvey*, 453 Fed. App'x at 567. Therefore, Plaintiffs are not likely to succeed on a failure to train theory of municipal liability.

2. **No Custom of Tolerance or Acquiescence**

Plaintiffs assert that CPD's "culture ensures the survival of harmful and unconstitutional policies." (ECF No. 59, p. 19.) Plaintiffs, however, have not shown an unconstitutional written policy or a past pattern or practice of using excessive or retaliatory force against nonviolent

---

[8] Plaintiffs also have not shown a likelihood that a policymaker caused their injuries because there is no evidence that Chief Quinlin ordered or directed officers to take any specific actions against protestors. *See Stillwagon v. Delaware*, Case No.2:14-cv-80, 2016 U.S. Dist. LEXIS 44223, *61-62 (S.D. Ohio March 31, 2016).

6

protestors.[9] To be sure, Plaintiffs have not pointed to even one *prior* use of excessive force on nonviolent protestors. They therefore cannot show a pattern or practice of excessive or retaliatory force on nonviolent protestors that amounts to a custom or policy.

Plaintiffs also do not have a likelihood of success on their failure to discipline theory.[10] Plaintiffs have not identified even one prior instance where CPD failed to investigate, discipline, or hold officers accountable for using excessive force against a protestor or for retaliating against a protestor. Thus, they have not shown a history of widespread unconstitutional uses of force and/or retaliation that has been ignored by the City, and are not likely to succeed on their *Monell* claims on this basis.[11] To the extent Plaintiffs point to a failure to discipline *subsequent* to the Protests, their contention falls short.[12] Failure to discipline after the alleged violation cannot be the *moving force* behind the constitutional violation. Moreover, the City is currently investigating conduct related to the Protests. (Quinlan, Tr. Vol. III, at pp. 606:17-607:4, ECF No. 48.)

### C. Plaintiffs are not Entitled to the Relief they are Seeking

Plaintiffs ask for seven[13] different types of injunctive relief. (Motion, p. 1, ECF No. 6.) The relief Plaintiffs seek goes beyond asking this Court to enjoin alleged unconstitutional policies;

---

[9] A plaintiff "cannot establish a custom solely by pointing to the facts of his own case." *Payne v. Sevier Cty*, 681 F. App'x 443, 446 (6th Cir. 2017). Instead, he or she must "show 'several separate instances' of similar misconduct." *Id.* (citations omitted). Further, "'[c]ontemporaneous or subsequent violations do not provide a municipality with notice and an opportunity to conform to constitutional dictates, which if not performed, constitute deliberate indifference.'" *Abdur-Rahim*, 425 F. Supp. 3d at 958 (citing *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011)).

[10] A failure to discipline or investigate can demonstrate a municipal policy or custom "if the plaintiff can show that the municipality historically failed to investigate or discipline similar conduct such that the municipality's inaction represents an unofficial custom of tolerance." *Bear v. Delaware County*, Case No. 2:14-cv00043, 2016 U.S. Dist. LEXIS 6537, *38 (S.D. Ohio Jan. 20, 2016); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994).

[11] Plaintiffs also have not shown a likelihood of success on a failure to supervise claim because they have not shown the City was on notice that officers had previously committed or were likely to commit constitutional violations against nonviolent protestors or that the City was deliberately indifferent. *See, e.g., Bickerstaff v. Cuy. Cty.*, No. 1:18-CV-01142, 2019 U.S. Dist. LEXIS 181647, at *55 (N.D. Ohio Aug. 12, 2019).

[12] "[A]n *after-the-fact approval* of an officer's conduct cannot logically be the *moving force* behind the constitutional violation." *Sherrod v. Williams*, No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915, *70 – 71 (S.D. Ohio Jan. 15, 2019) (emphasis in original); *see Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 fn. 5 (6th Cir. 2006) ("We have not found any legal support for the proposition that, in the absence of deliberate indifference before a constitutional violation, a municipality may be liable for simply failing to investigate or punish a wrongdoer *after* the violation.").

[13] The seventh category is a request that CPD require mutual aid entities to comply with the injunction.

instead, they ask the Court to impose upon the City what they believe to be best practices. In their Brief (ECF No. 59), Plaintiffs fail to show that they are entitled to any of the requested relief.[14]

Plaintiffs first ask the Court to enjoin Defendants from using non-lethal force on nonviolent protestors to enforce dispersal orders, traffic laws, and misdemeanors that were not committed with actual or imminently threatened physical harm. (Motion, p. 1, item (1), ECF No. 6.) Plaintiffs next ask that Defendants be required to recognize that "'nonviolent protestors' includes individuals who are chanting, verbally confronting police, sitting, holding their hands up when approaching police, occupying streets or sidewalks, and/or passively resisting police orders." (*Id.* item (2).)

As explained above, the City has no policy that violates the constitutional rights of nonviolent protestors. Furthermore, contrary to Plaintiffs' assertion, the requested relief does not leave CPD "ample discretion" to serve its interests (ECF No. 59, p. 25). On paper, what Plaintiffs are asking for seems simple. But when applied, it is much more complex. For example, on May 28, 2020, many people at the Protests threw various objects at police and/or destructed property. (*See e.g.,* Ex. D 24; Ex. D 26.) Other protestors were peaceful. (*Id.*) The purpose of providing dispersal warnings is to provide protestors an opportunity to leave the area before using force to disperse the crowd. (*See* Mabry, Tr. Vol. VI, at pp. 1326:1-22, 1328:1-11, ECF No. 51.) On that night, many nonviolent protestors chose to stay, even after receiving lawful orders from the police to disperse. In those types of situations, it can be difficult and dangerous for police to go into a crowd to make arrests. It is also difficult to differentiate peaceful protestors from violent ones. That is why the police provide warnings and dispersal orders; so peaceful protestors might avoid the effects of the crowd control measures. Amended Directive 2.04 sufficiently addresses this issue

---

[14] "An injunction serves as a judicial declaration that a specific policy or proposed plan of action may be violative of the constitutional rights of others." *Coleman v. Dept. of Rehab. & Corr.*, 46 F.App'x 765, 772 (6th Cir.2002). Without a deliberate policy, no injunctive relief is available. *Id.*

8

by prohibiting officers from using chemical spray unless the crowd is engaged in aggressive or violent actions and providing that **"at least three notifications should be made *when possible* to the participants in the crowd advising them that they are committing a violation of law and are to disperse, and that chemical spray will be used if they fail to comply with the order."** (Ex. D 5.) The City's policies are not unconstitutional, and Plaintiffs' request should be denied.

Furthermore, Plaintiffs' definition of "nonviolent protestors" is too broad. In the Fourth Amendment context, the relevant question in assessing the reasonableness of a use of force "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. A substantially higher hurdle must be surpassed to show excessive force under the Fourteenth Amendment. Plaintiffs' definition of "nonviolent" protestor does not permit officers to consider the totality of the circumstances. For example, someone could be "occupying a sidewalk or street," or "holding their hands up when approaching a police," while engaging in aggressive or violent conduct. They could be throwing water bottles at police while occupying a sidewalk or street, trapping uninvolved vehicles while occupying a street, etc. Further, at times, it is inappropriate to approach a police officer, even with hands up, including when officers are effecting an arrest. Officers must be permitted to consider the totality of circumstances when determining whether to take enforcement action, and Plaintiffs' request for injunctive relief related to the definition of "nonviolent protestor" should be denied.

For their third request, Plaintiffs ask the Court to require the City to "enforce dispersal orders, traffic laws . . . or misdemeanor enforcement, to the extent practicable, through citations or arrests . . ." (Motion, p. 1, item (3), ECF No. 6.) Plaintiffs have not pointed to an unconstitutional policy of the City on this issue, nor have they shown that this request is constitutionally required.[15]

---

[15] Nonetheless, under Amended Directive 2.04, officers cannot use chemical spray on a non-aggressive, non-violent crowd for failure to leave a street or to move, by itself. (Ex. D 5; Ex. D 44, p. 4.)

9

In item (4) Plaintiffs request that the Court prohibit Defendants from inflicting "pain to punish or deter 'nonviolent protestors' and limiting infliction of pain on any protestor . . ." (Motion, p. 1, item (4) ECF No. 6.) This request is vague, and Plaintiffs have not shown any evidence of a policy of inflicting pain to punish or deter "nonviolent protestors." These requests should be denied. Plaintiffs' fifth request (*id.*, item (5)), regarding body cameras and identification, is moot. Plaintiffs also have not shown that a lack of body worn cameras or identification caused their alleged constitutional violation or that they are constitutionally entitled to the requested relief. Finally, with respect to Plaintiffs' sixth request (*id.*, at item (6)), Plaintiffs lack standing.[16]

### D. Plaintiffs Have Not Demonstrated Irreparable Harm

Plaintiffs have not shown a likelihood that a City policy caused their alleged injuries or that they will again be subject to the alleged unconstitutional conduct before a decision on the merits. Their delay in seeking the injunction further undercuts their argument that they will suffer irreparable harm without it. *See, e.g., Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F.App'x 398, 405 (6th Cir.2013). Plaintiffs waited six months to file their Motion, and more than nine months have now passed since the Protests. In the interim, several other protests pertaining to allegations of police brutality have occurred in Columbus without any uses of force. The City has also changed several policies, including prohibiting use of tear gas to disperse a crowd and limiting the use of chemical spray. Plaintiffs fail to demonstrate that their constitutional rights are currently being threatened or impaired, or that they will otherwise suffer irreparable harm in the absence of an injunction. For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

---

[16] They also have not shown that the City has a policy of prohibiting protestors from recording interactions with police.

Respectfully submitted,

/s/ *Alana V. Tanoury*
Alana V. Tanoury (0092265)
Westley M. Phillips (0077728) – Lead
Janet R. Hill Arbogast (0061955)
Stephen J. Steinberg (0067506)
Andria C. Noble (0086365)
Michael R. Halloran (0086368)
CITY OF COLUMBUS, DEPARTMENT OF LAW
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
avtanoury@columbus.gov
wmphillips@columbus.gov
jrhillarbogast@columbus.gov
sjsteinberg@columbus.gov
acnoble@columbus.gov
mrhalloran@columbus.gov

Attorneys for Defendants

11

### CERTIFICATE OF SERVICE

I hereby certify that, on **April 5, 2021**, I electronically filed the foregoing with the Clerk of this Court by using the Court's CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court's CM/ECF System:

/s/ *Alana V. Tanoury*
Alana V. Tanoury (0092265)
