## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **TAMARA K. ALSAADA,** *et al.*, | : | |
| | : | **Case No. 2:20-cv-3431** |
| **Plaintiffs,** | : | |
| | : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| **CITY OF COLUMBUS,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

I.   INTRODUCTION.................................................................................................................2
II.  BACKGROUND..................................................................................................................4

   A.   THE HISTORY OF POLICING ............................................................................................4
   B.   THE KILLING OF GEORGE FLOYD ...................................................................................8
   C.   POLICIES AND PROCEDURES OF THE COLUMBUS DIVISION OF THE POLICE ..................9
      1.   Use of Force Policy ..........................................................................................10
      2.   Chemical Irritants ............................................................................................11
      3.   Impact Munitions..............................................................................................13
      4.   Bikes, Horses, and Kettling .............................................................................14
   D.   THE PROTESTS ..............................................................................................................14
      1.   Thursday, May 28, 2020...................................................................................15
      2.   Friday, May 29, 2020 .......................................................................................20
      3.   Saturday, May 30, 2020....................................................................................28
      4.   Sunday, May 31, 2020 ......................................................................................36
      5.   Monday, June 1, 2020.......................................................................................39
      6.   Sunday, June 21, 2020 (Father's Day Demonstration) .....................................41
      7.   CPD's Characterization of the Protests ...........................................................44

III. STANDARD OF REVIEW ...............................................................................................45
IV.  LAW & ANALYSIS...........................................................................................................46

   A.   THE FLOYD CASE LAW .................................................................................................46
   B.   STANDING TO SEEK INJUNCTIVE RELIEF .......................................................................47
   C.   MOOTNESS....................................................................................................................56
      1.   Capable of Repetition Yet Evading Review ......................................................57
      2.   Voluntary Cessation Doctrine ..........................................................................58
   D.   FACTORS FOR PRELIMINARY-INJUNCTIVE RELIEF..........................................................59
      1.   Likelihood of Success on the Merits .................................................................59
      a.   The Fourth Amendment (Excessive Force)........................................................59
      b.   First Amendment (Retaliation) .........................................................................74
      c.   Municipal Liability under *Monell* ...................................................................77
      (1)  Illegal Official Policy or Legislative Enactment ..............................................78
      (3)  Failure to Supervise and Discipline .................................................................79
      (4)  Custom or Tolerance of Acquiescence..............................................................81
      (5)  Finding on *Monell* Factors.............................................................................84
      2.   Irreparable Harm..............................................................................................84
      3.   Balance of the Equities .....................................................................................85

V.   CONCLUSION...................................................................................................................88

## I.  INTRODUCTION

But somewhere I read of the freedom of assembly. Somewhere I read of the freedom of speech. Somewhere I read of the freedom of press. Somewhere I read that the greatness of America is the right to protest for rights.[1]

The document to which Nobel Laureate, Dr. Martin Luther King, Jr., referred is the First Amendment to the United States Constitution. Unfortunately, some of the members of the Columbus Police Department had no regard for the rights secured by this bedrock principle of American democracy. This case is the sad tale of police officers, clothed with the awesome power of the state, run amok.

Because cell phones captured last year's police killing of George Floyd, the world stopped. Last year's protests in the aftermath of Mr. Floyd's death reignited the flashpoint around which this case revolves—the accessibility and protection of constitutional rights. Dr. King's words serve as a reminder that progress is not linear and that history is both a collective diary and a mirror. As this Court will explore in detail below, the march continues.

This matter comes before the Court on Plaintiffs' Motion for a Preliminary Injunction. (ECF No. 6). Defendants oppose. (ECF No. 10). Plaintiffs are twenty-six individuals who joined protests or were proximate to protests during summer 2020.[2] Defendants are the City of Columbus, Deputy Chief of Police Thomas Quinlan, Sergeant David Gitlitz, Officer Shawn Dye, Officer Thomas Hammel, Officer Holly Kanode, Officer Kenneth Kirby, Officer Michael Eschenburg, and John and Jane Does #1-30—i.e., officers whose identities are not yet known.

---

[1] Martin Luther King, Jr., I've Been to the Mountaintop (April 3, 1968), http://kingencyclopedia.stanford.edu/encyclopedia/documentsentry/ive_been_to_the_mountaintop.

[2] Plaintiffs are: (1) Tamara Alsaada; (2) Demetrius Burke; (3) Bernadette Calvey; (4) Stephanie Carlock; (5) Andrew Fahmy; (6) Talon Garth; (7) Randy Kaigler; (8) Rebecca Lamey; (9) Nadia Lynch; (10) Aleta Mixon; (11) Darrell Mullen; (12) Heather Wise; (13) Mahir Ali; (14) S.L.C., a minor; (15) Jennifer Eidemiller; (16) Holly Hahn; (17) Bryan Hazlett; (18) Justin Horne; (19) Kurghan Horn; (20) Terry D. Hubby, Jr.; (21) Elizabeth Koehler; (22) Mia Mogavero; (23) Leeanne Pagliaro; (24) Torrie Ruffin; (25) Amanda Weldon; and (26) Summer Schultz.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs move for a preliminary injunction:

(1) restraining Defendants from using non-lethal force, including tear gas, pepper spray, flash-bang grenades, rubber bullets, wooden pellets, batons, body slams, pushing or pulling, or kettling, on nonviolent protestors to enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, and/or misdemeanors that were not committed with actual or imminently threatened physical harm or property destruction;

(2) requiring Defendants to recognize that, for purposes of the injunction, "nonviolent protestors" includes individuals who are chanting, verbally confronting police, sitting, holding their hands up when approaching police, occupying streets or sidewalks, and/or passively resisting police orders;

(3) requiring Defendants to enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, or misdemeanor enforcement, to the extent practicable, through citations or arrests, based on probable cause that an individual has committed a violation;

(4) prohibiting the Defendants from the infliction of pain to punish or deter "nonviolent protestors" and limiting infliction of pain on any protestor when incidental to a use of force necessary for preventing crimes committed with actual or imminently threatened physical harm or property destruction and/or arresting, based on probable cause, an individual who allegedly committed such an offense;

(5) requiring Defendants to ensure that body and vehicle cameras are in good working order and used during every interaction with "nonviolent protestors" and badge numbers and/or identity cards are prominently displayed in each such interaction, even when riot gear is being worn;

(6) requiring Defendants to recognize that individuals legitimately displaying "press," "media," "reporter," "paramedic," "medic," "legal observer," or similar words and/or symbols are permitted to be present in a position enabling them to record at protests and/or to intervene to assist individuals who appear to have been injured and that all individuals, regardless of their occupation or nonviolent activity, are permitted to record at protests or whenever any police officer interacts with the public; and

(7) requiring the City of Columbus (hereinafter "City") and its Division of Police ("CPD") to request that mutual aid law enforcement personnel cooperating with them adhere to the foregoing restraints or standards on the use of non-lethal force and enforcement, infliction of pain, cameras and identification, and recognition of "nonviolent protestors" and individuals assisting or observing them.

(ECF No. 6 at 1–2).

This Court held a preliminary injunction hearing, which lasted from February 22 to March 2, 2021. Subsequently, the parties submitted their post-hearing briefing and replies. (ECF Nos. 59, 61, 63, 64). Defendants oppose injunctive relief, asserting lack of standing, mootness, and a failure to meet the familiar four preliminary injunction prongs. For the reasons that follow, this Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction. (ECF No. 6).

## II.  BACKGROUND

### A.  The History of Policing

An 1871 *New York Times* article on the history of policing wrote: "The *personnel* of the force is an excellent one, though there are of course some decided exceptions, as in all large bodies of men."[3] The history of policing in the United States presents, as history is wont to do, uncomfortable truths upon which this Court pauses to reflect.

As the nascent colonies matured, a concerted effort to surveil society's goings-on developed. Night watches, constables, and sheriffs were a mix of ad hoc vigilante groups and those with more institutional legitimacy.[4] It was 1631 Boston that created the idea of the so-called Boston Watch (also known as "The Court"; "Town Watch"; and "citizen Watchmen"). These citizen Watchmen were organized as a "military guard" to surveil and punish infractions. Everything from wearing "extravagant boots," to northeastern Indian tribes engaging in sacred cultural traditions, to infamous accusations of witchcraft, became punishable at the hands of the Town Watch.[5] New York followed suit in 1845, establishing a police force of 800 men.[6] The recruits were told that

---

[3] *The New-York Police*, N.Y. TIMES, June 4, 1871, at 8.
[4] Edward H. Savage, *A Chronological History of the Boston Watch and Police (from 1631 to 1865)* 11 (Boston, 1865).
[5] *Id.*
[6] *See* Raymond W. Kelly, Police Dep't City of New York, *The History of the New York City Police Department* 5, https://www.ncjrs.gov/pdffiles1/Digitization/145539NCJRS.pdf. The first reported police shooting took place in 1858 in New York City, when an unarmed Irish immigrant named John Hollis was shot with an officer's personal firearm while attempting to flee.

"the prevention of crime [was] the most important object."[7] And "[b]y the late 1880s, all major U.S. cities had municipal police forces in place."[8]

In the Antebellum South, formal policing took its earliest form in slave patrols. By 1822, the slave patrol system in South Carolina was 100-members strong.[9] During the 1830s, New Orleans adopted a militaristic police force to control slaves.[10] These slave patrols had three primary functions: (1) to chase down, apprehend, and return to their owners, runaway slaves; (2) to provide a form of organized terror to deter slave revolts; and (3) to maintain a form of discipline for slave-workers who were subject to summary justice, outside of the law, if they violated plantation rules.[11]

After the Civil War, chattel slavery ended formally, but the legal and economic subjugation of Black Americans endured, as slave codes gave way to Black Codes.[12] The two codes were so similar it is a wonder that the copy-and-paste functionality was only invented more recently.[13] Confederate defeat also initiated the convict-lease system—which reified the societal synonymization of blackness with criminality.[14] Of course, ratification of the Reconstruction Amendments, i.e., the Thirteenth, Fourteenth, and Fifteenth Amendments, did not create *de jure*

---

[7] *Id.*

[8] Samuel Walker, *Popular Justice, A History of American Criminal Justice* 49–80 (2d ed. 1998). Olivia B. Waxman, *How the U.S. Got Its Police Force*, TIME (May 18, 2017), https://time.com/4779112/police-history-origins.

[9] Walker, *Popular Justice* at 52.

[10] Dennis C. Rousey, *Policing the Southern City: New Orleans 1805−1889* (1996).

[11] Gary Potter, *The History of Policing in the United States, Part 1*, E. Ky. Univ. Police Stud. (June 25, 2013), https://plsonline.eku.edu/insidelook/history-policing-united-states-part-1.

[12] *See* Chelsea Hansen, *Slave Patrols: An Early Form of American Policing*, Nat'l Law Enf't Museum, (July 10, 2019), https://lawenforcementmuseum.org/2019/07/10/slave-patrols-an-early-form-of-american-policing ("After the Civil War, Southern police departments often carried over aspects of the patrols . . . includ[ing] systematic surveillance, the enforcement of curfews, and even notions of who could become a police officer.").

[13] *Id.*

[14] Angela Davis, *Policing the Black Man* 11, 12 (Pantheon Books 1st ed. 2017) ("Convict leasing, the practice of 'selling' the labor of state and local prisoners to private interests for state profit . . . The presumptive identify of black men as 'slaves' evolved into the presumptive identity of 'criminal,' and we have yet to fully recover from this historical frame.").

or *de facto* equity. Rather, Jim Crow laws took the place of the Black Codes—lasting until recently: 1968.[15]

In the American West, law officers such as the Texas Rangers committed violence against indigenous persons, Mexicans, and Mexican-Americans in Texas.[16] In California, so-called "vigilance committees" terrorized Chinese immigrants; some such committees acted with legal authority, arresting, trying, and eventually executing people.[17]

In the North, the development of policing as we know it today was intimately bound up with the policing of "undesirable" immigrant groups and free or freed Blacks in the swelling cities.[18] In cities like Boston, Chicago, and New York, nineteenth-century police participated in strike-breaking and perpetrated election fraud in the service of political machines of the day.[19]

As history books turned from black-and-white to full color, the role of law enforcement in society remained fraught. The organizational structure of police departments grew increasingly dependent on technology such as the two-way radio and surveillance devices. Televisions aired police barring Black students from integrating Little Rock Central High School; they showed that peaceful protests for civil rights were met with police violence and arrests, fire hoses, and dog

---

[15] *See Jim Crow Laws*, History (updated Mar. 26, 2021), https://www.history.com/topics/early-20th-century-us/jim-crow-laws.

[16] Jill Lepore, *The Invention of the Police*, New Yorker (July 13, 2020), https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police (noting that immigration from Ireland and German contributed to the emergence of urban policing in major American cities).

[17] *Id.*

[18] *See* Potter, *The History of Policing* (observing that one of primary focuses of police in the 1830s and 1840s was the surveillance of immigrants); Robinson, *Black Bodies on the Ground* at 555 (opining that "police departments had a function of controlling immigrants with brute force and brutality"); Lawrence M. Friedman, *Crime and Punishment in American History* 66–73 (1993) (recounting the "professionalization" of the system of criminal justice during the nineteenth century).

[19] Potter, *The History of Policing*; *see also* Lepore, *The Invention of the Police*.

attacks.[20] Riots that erupted after instances of police brutality or discrimination occurred with regularity in American cities during the 1960s.[21]

Technology did not just bring the struggle for equity to those seemingly unaffected by injustice. It also thrust officer conduct into scrutiny's spotlight. The 1985 Philadelphia Police Department bombing targeted a rowhome inhabited by a Black separatist group, killing eleven people and destroying sixty-one homes (a formal municipal apology came just in 2020).[22] The brutal police beating of Rodney King in 1991—and the acquittal of police officers on all charges of excessive force—precipitated riots across the United States. The 1993 law-enforcement siege in Waco, Texas, was broadcast live for weeks on end.

That brings us to today. Police occupy an interesting role in our societal consciousness. Children play cops-and-robbers and dream of becoming a police officer when grown. And law enforcement is an ever-present topic in songs,[23] musical theater,[24] television,[25] and movies.[26]

---

[20] *Id.*; *see also* Jeremy Gray, *Bull Connor Used Fire Hoses, Police Dogs on Protestors*, Birmingham News (May 3, 1963), https://www.al.com/birmingham-news-stories/2013/05/bull_connor_used_fire_hoses_po.html.

[21] Potter, *The History of Policing*.

[22] Lindsey Norward, *The Day Philadelphia Bombed Its Own People*, Vox (Aug. 15, 2019), https://www.vox.com/the-highlight/2019/8/8/20747198/philadelphia-bombing-1985-move; *John Ismay, 35 Years After MOVE Bombing that Killed 11, Philadelphia Apologizes*, N.Y. Times (Nov. 13, 2020), https://www.nytimes.com/2020/11/13/us/philadelphia-bombing-apology-move.html.

[23] Hip-hop artist KRS-One's "Sound of da Police" likens modern-day policing to that of an overseer of the antebellum south:

> [] Officer, Officer, Officer! Yeah, officer from overseer. You need a little clarity? Check the similarity! The overseer rode around the plantation. The officer is off patrolling all the nation. The overseer could stop you what you're doing. The officer will pull you over just when he's pursuing. The overseer had the right to get ill. And if you fought back, the overseer had the right to kill. The officer has the right to arrest. And if you fight back they put a hole in your chest! Woop! They both ride horses. After 400 years, I've got no choices!

KRS-ONE, *Sound of Da Police* (Jive Records 1993); *see also* 2Pac, *Trapped* (Interscope Records 1991); Rick James, *Mr. Policeman* (Motown Records 1981); Gil Scott-Heron, *No-Knock* (Ace Records 2014).

[24] Javert, the inspector in Victor Hugo's theatrical version of *Les Misérables*, acted with impudence and displayed a total lack of empathy; for example, without any investigation into the circumstances, he adjudged innocent Fantine guilty without inquiring into the circumstances, stating: "She will answer for her actions when you make a full report. You can rest assured, Monsieur, that she will answer to the court." Les Misérables, *Fantine's Arrest*, *on Les Misérables: The Complete Symphonic Recording* (First Night Records 2004). In the cinematographic adaptation of *West Side Story*, Officer Krupke is a perennial thorn-in-the-side of the protagonists, though is hapless and doles out empty threats. *West Side Story* (Mirisch Pictures 1961).

[25] *The Andy Griffith Show* (CBS); *Brooklyn Nine-Nine* (Fox); *Live PD* (A&E Network).

[26] *The Trial of the Chicago Seven* (Amblin Entertainment 2020); *Turner & Hooch* (Touchstone Pictures 1989); *Die Hard* (Gordon Company 1988).

Despite a shift toward community policing, new dark chapters have been drafted in this institution's history books.[27] And they continue to be drafted.

## B.  The Killing of George Floyd

Against this backdrop, Columbus, Ohio, the United States, and our international neighbors are fighting dual battles: a horrifying and deadly pandemic and grappling with historical vestiges and present displays of racial hatred. Neither has a panacea. Both have wrought and revealed substantial division in our communities. 2020 was a precedent-setting year. Many of us wish we could erase the year from our minds and calendars. But last year remains indelible, particularly as it proved a tragic flashpoint between the COVID-19 pandemic and deep-seated racism. Analogous to how the television brought the Civil Rights Movement into living rooms, cell phones immortalizing the killings of unarmed black citizens bring these intimate final moments to our palms.

On May 25, 2020, George Floyd, a Black American, presented a counterfeit $20 bill at a convenience store. Police arrived. Moments later, Mr. Floyd showed no signs of life. After Officer Derek Chauvin kneeled on Mr. Floyd's neck for approximately nine minutes and 29 seconds, Mr. Floyd died.[28] "I can't breathe"—a cry for help gasped by an incalculable number of Americans dying at the hands of government officials, including Mr. Floyd—became an international rallying cry.[29]

---

[27] Today's stop-and-frisk programs, employed on massive scales throughout American society, may be but a modern-day version of enforcement of the Black Codes. Davis, *Policing the Black Man* at 43. Robinson, *Black Bodies on the Ground*, at 559 (noting that the Black Code allowed the stopping of Black people in public to search for weapons and "[i]f a Black [person] refused to stop on demand and was on horseback, the colonist was authorized to shoot to kill").

[28] Nicholas Bogel-Burroughs, *8 Minutes, 46 Seconds Became a Symbol in George Floyd's Death. The Exact Time Is Less Clear*, N.Y. Times, June 18, 2020 ("The precise length of time that Mr. Floyd was pinned beneath the officer's knee, however, is no longer as exact.").

[29] Al Goodman, David Goodman & Benjamin Mueller, *Beyond the Chokehold: The Path to Eric Garner's Death*, N.Y. Times, June 13, 2015 ("The chokehold. The swarm of officers. The 11 pleas for breath");  Doha Madani, *2 Ex-Deputies Indicted on Manslaughter Charge in Death of Javier Ambler*, NBC News, Mar. 30, 2021 ("Ambler is also

Days after the killing, protests began across the nation, and Columbus, Ohio was no exception. Most of the demonstrations occurred between May 28 and June 21, 2020, with further protests on either end of that period in response to deaths of other Americans at the hands of law enforcement. (ECF No. 1 ¶ 47).

### C. Policies and Procedures of the Columbus Division of the Police

Before this Court today are protestors desiring to engage in their rights guaranteed by the Constitution, without fear of retaliation by police officers' use of tear gas, pepper spray, flash-bang grenades, rubber bullets, wooden pellets, batons, body slams, pushing or pulling, or kettling.

The heart of Plaintiffs' Motion for Preliminary Injunction is that apart from assembling, chanting, or holding signs in the middle of streets or other locations that Columbus police officers wanted them to abandon, Plaintiffs were not violating any laws, threatening violence, destroying any property, or hampering traffic. (ECF No. 6; *see also* ECF No. 1 ¶ 92). Rather than responding appropriately to an isolated incident—such as a protestor throwing a water bottle—Plaintiffs allege that officers engaged in collective punishment by indiscriminately pepper-spraying, tear-gassing, or shooting wooden bullets at a group of obviously different protestors who had not engaged in any such conduct; and, what is more, sometimes failed to give audible warnings or adequate time to disperse before resorting to less-lethal force. (ECF No. 1 ¶ 93).

The term "less-lethal force" is a term of art that refers to munitions, projectiles, and the use of physical force that officers might use to restrain or compel movement (but not intended to cause

---

heard telling the deputies he had congestive heart failure"); Stacia Glenn, *Tacoma's 'Can't Breathe' Case: Manuel Ellis' Family Demands Answers After He Was Killed While Being Restrained by Police*, Seattle Times, June 4, 2020; Meagan Flynn, *Another Black Man Who Died in Custody Told Officer, 'I Can't Breathe.' One Responded, 'I don't Care.'* Wash. Post, June 11, 2020 ("Officers also suggested aloud on multiple occasions that Scott was only pretending to be unconscious, only "acting" like he was"); Anita Hassan, *When Byron Williams Died Saying, 'I Can't Breathe,' Few Protested. Now His Family Is Fighting for Justice*, NBC News, June 18, 2020 (telling officers "I can't breathe" at least 17 days before dying); Lee Sanderlin & Michael Hewlett, *'Help Me,' John Neville Pleaded*, Winston-Salem J., July 9, 2020 ("The officers didn't let him go, one of them telling him at least twice "Come on, buddy, if you can talk, you can breathe," according to three independent sources familiar with the investigation.").

death). Less-lethal force is intended to create temporary and minimal pain in order "to gain compliance, restore order, [or] temporarily incapacitate dangerous persons." (ECF No. 26-2 at 83). Indeed, the Columbus Division of Police ("CPD") has various policies dictating which of these crowd-control tactics officers may use and under what circumstances they may use them.[30] This Court heard from multiple departmental personnel, including from Mayor Andrew Ginther, Defendant Deputy Chief Quinlan, and several officers on the proper use of force and less-lethal weapons.[31]

*1. Use of Force Policy*

CPD policies define "use of force" as: "The exertion of energy or the actions of personnel in the performance of their duties used to *direct or control* another's movements or actions. A use of force may be implemented to control resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property." (Pl.'s Ex. 8 ¶ 1(A) (emphasis added)).[32]

To determine if force is authorized in a crowd-control scenario, a 2017 CPD training manual instructs officers to "identify[] and isolate[e]" unlawful behavior from lawful behavior. (Pl.'s Ex. 12 at 10).[33] CPD officers are trained to be "mentally prepared to use force." (Mabry Dep.

---

[30] CPD's Emergency Operations and the Directives Manuals provide instructions with respect to field force operations, including riot gear, civil disturbance tactics, and operating guidelines for riot-control munitions. (*See generally* Pl.'s Ex. 5).

[31] Witness and Defendant Thomas Quinlan is the Deputy Chief at the Columbus Division, Support Services Division, and has been with the division for thirty-two years. He served previously as Chief of the Columbus Division of Police.

[32] In addition, there are eight levels of force the Division of Police follows. Level 0 is officer presence, verbal, and non-verbal commands, flashbangs, baton rounds, and the use of the Long Range Acoustic Device ("LRAD") warning tone; Level 1 is empty hand control, grounding techniques, and joint manipulations; Level 2 is chemical spray; Level 3 is electronic device, such as a taser; Level 4 is "hard empty hand control," e.g., strike, punch, kick; Level 5 is use of an impact weapon, e.g., baton or flashlight; Level 6 is a police K-9 bite; Level 7 is less-lethal weapons, such as beanbags or multiple baton rounds; and Level 8 is deadly force.

[33] CPD trains lieutenants to use five tactics in crowd-control scenarios: (1) monitor; (2) contain; (3) block; (4) disperse; and (5) arrest. (ECF No. 26-2 at 24). To "monitor" is to "[w]atch the crowd's progress and development . . . [to] gauge their intent." (*Id.* at 25). To "contain" refers to "[p]erimter control," and "[c]onsists of restraining a large number of individuals within the area, containing any further aggressive activity. (*Id.* at 26). To "block" amounts to a "[p]hysical denial of a crowd's advance upon an area or facility," and is deployed via riot formations or barricades. (*Id.* at 27). To "disperse" is to "fragment a crowd," but officers are warned "that this technique may spread lawlessness rather than

at 147). Even seemingly innocent behavior by a demonstrator—e.g., bringing gas masks, oven mitts, backpacks, bandanas, or half masks—might conceal unlawful intent. (Pl.'s Ex. 14; ECF No. 26-3 at 32). Likewise, a 2020 training to new CPD supervisors instructed that not all protestors standing with their hands raised are peaceful. And children, the elderly, and individuals with disabilities might be used to control the protestors' message to maximize shock and awe. (Mabry Dep. at 164). Signs made with heavy sticks or written or verbal statements (e.g., "Fuck the Police, Pigs Must Die") carry the potential for a violent crowd. (ECF No. 26-3 at 32).

Other indicia officers are trained to notice are whether the chants are "calm" and "structured" (demonstrating "good behavior") or "erratic," "excessively loud," or "not organized" (demonstrating "bad behavior"). (*Id.* (instructing that good behavior is where laws are obeyed; bad behavior is where laws are not obeyed)).

### 2. Chemical Irritants

Columbus police officers used dispersal irritants, including pepper spray and CS gas ("tear gas"), with regularity during the 2020 protests. (Pl.'s Ex. 149 (providing instructions on use); Pl.'s Ex. 141 (showing scores of individuals coughing, apparently experiencing the effects of a chemical spray); Pl.'s Ex. 126 (officers on bikes, spraying congregants); Pl's Ex. 110-B (protestors yelling "hands up, don't shoot," followed by officers spraying the crowd); Pl.'s Ex. 117 (officers spraying); Pl.'s Ex. 105 (same)).

CPD policy on the use of these sprays is memorialized in Directive 2.04, "Chemical Intermediate Weapons Regulations," and subsequent implementing amendments. (Pl.'s Ex. 9). The policy requires officers to provide notifications before deploying irritants. Typically, an

---

reduce it[,] so it is important to control the escape routes." Dispersing also includes proclamations, shows of force, use of riot formations, and chemical or specialty munitions that are done upon the order of a ranking person. (*Id.* at 28).

officer should first give three warnings, but, as Deputy Chief Quinlan testified, "[t]hat's not always possible." (ECF No. 48 at 51). Further, "[t]he notifications should be made in a manner which the participants in the crowd should reasonably be able to hear and understand." (Pl.'s Ex. 16 ¶ 5(a)). The use of chemical spray should only "be directed at the persons participating in the violent conduct, not at the group in general." (*Id.* ¶ 6).

These dispersal irritants are sometimes deployed by a hand-thrown canister or by direct spraying. Pepper spray is deployed through spray canisters or Mark-9 propellant systems designed to disperse larger crowds. Tear gas is often deployed through canisters, rolled, thrown, or placed near the crowd to-be-dispersed. "The use of a chemical irritant deployed by a gas gun or a chemical irritant grenade being thrown or rolled requires the approval of a lieutenant or higher authority." (Pl.'s Ex. 16). After deploying a chemical irritant, law enforcement personnel should "make a reasonable effort to decontaminate exposed persons once the situation is under control," such as by flushing the individual's eyes with freshwater or seeking medical attention. (*Id.* ¶ 7).

In the wake of the Columbus protests, Mayor Ginther instructed then-Chief Quinlan[34] to change departmental policy on the use of force, reflected in Amended Directive 2.04. (ECF No. 46 at 184). "The changes include prohibiting the use of tear gas to disperse a crowd and prohibiting the use of chemical spray to disperse a non-aggressive, non-violent crowd."[35] (ECF No. 10; Quinlan Aff. ¶ 14). But the exceptions are significant (and arguably swallow the rule). For instance, a key exception allows officers to use chemical irritants to clear a congregation from a traffic way, i.e., "every street or highway" that congregants "have no legal right of access to or from." (Quinlan

---

[34] In January 2021, Mayor Ginther demoted then-Chief Quinlan, stating that the latter had lost the faith and trust of the community and proved unable to change the culture of the division of the police. (ECF No. 46 at 150).

[35] On November 11, 2020, Columbus City Attorney Zach Klein and Defendant Chief Quinlan announced "a recent policy change issued by the Columbus Division of Police related to the process of arresting and incarcerating individuals who commit nonviolent misdemeanors, such as theft or trespassing." (ECF No. 6 at 18).

Aff. ¶ 14 (citing O.R.C. § 4511.01(CC)).[36] In addition, the trigger for officers' use of force is if the crowd is violent, aggressive, or resistive. But these terms are not crisply defined in CPD's use of force policy or elsewhere. As Deputy Chief Kuebler explained in his deposition:

> Q. Is there something in the division's policies that explains what it means for protestors who are in the street to be aggressive?
>
> A. That remains very unclear to us in the division.

(Kuebler Dep. 148:15-19).

### 3. Impact Munitions

Wooden baton rounds, also known as knee knockers, are less-lethal projectiles loaded in a rotary gun and are designed to avoid a hand-to-hand scenario. (Pl.'s Ex. 122; Pl.'s Ex. 5). These launchers look like a regular assault rifle to the untrained eye, except they fire wooden projectiles in a 4.8-inch casing. (*See* ECF No. 26-2 at 86; Pl.'s Ex. 6). CPD's grenadier[37] trainer John Gagnon is responsible for training the officers on how these munitions are deployed. A 40 mm wood baton rotary gun fires three wooden pellets at once, while the 37 mm gun fires five wooden pellets. (*Id.*). Since the 40 mm fires two fewer knee knockers than its counterpart, when using a 40 mm gun, Officer Gagnon states in a training video: "We just have to fire more of them." (Pl.'s Ex. 149).

Under CPD policy, the knee knockers should be skip-fired on the ground in front of protestors, from a distance of 30–50 feet, rather than direct-fired. (Pl.'s Ex. 149 ("[W]ith the old 37 mm, we direct-fired them often . . . But our policy is that they are not to be direct-fired."); *see also* ECF No. 48 at 21–22 ("[A] weapon that is designed to . . . skip-fire them downrange.")). The

---

[36] An additional change required officers working in civil unrest situations, like protests, to wear traffic vests over their riot gears, and mark helmets and vests with badge numbers. The body-worn cameras must be mounted on the traffic vest. (Quinlan Aff. ¶ 15).

[37] A grenadier is an officer "specifically designated for the throwing of grenades and operating less lethal grenade launchers and sometimes assault operations. Grenadiers may also often lead entry into a crowd" by using "less lethal munitions. (ECF No. 26-2 at 81).

skip-fire policy allows for a more effective crowd-control device; as Officer Gagnon noted, direct-firing targets an individual, but skip-firing could "hit him, and him, and him, and maybe bounce over and deter more people. So, the effective use of this is on the ground, in front of the crowd." (Pl.'s Ex. 149). Next, officers are also trained on *where* a knee knocker round should be aimed on the recipient's body. (Pl.'s Ex. 149 (stating that the spine and kidney areas should not be intentionally targeted; conversely, hard-bony areas like the knees, elbows, and shoulders "could cause an injury . . . so [it's] okay to hit th[ose areas], but we're not targeting them . . . not trying to cause a permanent injury.")).

### 4.  *Bikes, Horses, and Kettling*

Officers also effectuate crowd control dispersals with bikes, horses, or physical shows of force. Notably, CPD bike training instructs officers to use bikes as a barrier between the protestors and police officers, with the bikes turned *sideways*. But evidence from the hearing indicated this rule was often flouted, sometimes apparently with the go-ahead of a higher-up. (*See* Pl.'s Ex. 105 (showing officers riding bikes *forward* into protestors repeating, "Get out of the road"); ECF No. 48 at 64; *see also id.* at 193 ("As multiple protestors began taking over High Street from the east sidewalk, they began to close in on the backside of the bike squad, so the squad had to fall back and reposition and make a bike barricade at the south side of the intersection across High Street.")).

### D.  The Protests

Here, the protests began in earnest on May 28, 2020, and lasted throughout the spring and summer, including June 21 ("The Father's Day Demonstration"). Witnesses who attended the protests characterized the demonstrations as both peaceful and tense. Multiple witnesses testified to their physical and emotional injuries suffered at the hands of CPD officers while exercising their fundamental rights to assemble and protest. (ECF No. 1 ¶ 17). Others—including officers and a

TV reporter witness—testified differently, contending that the use of force matched the threat the demonstrators posed. The submitted evidence both supports and undermines these testimonies.

### 1. Thursday, May 28, 2020

On May 28, 2020, Plaintiffs and other demonstrators in Columbus gathered downtown and throughout the city to generate widespread public attention to past and continuing police violence directed overwhelmingly at communities and individuals of color. (ECF No. 1 ¶ 3).

An incident action plan ("IAP") "specifies the goals for [CPD] . . . and additional direction for the field force units." (Pl.'s Ex. 2 (citing Weekley Aff. ¶ 3)). The Columbus Division of Police did not have an IAP for the first day of protests but made one for the following days. (Pl.'s Ex. 1 (citing Woods Aff. ¶¶ 4–5)). In addition, the Division received reports that there would be two protests the evening of May 28: one at Livingston and Lockbourne and the other downtown. (*Id.* ¶¶ 6–7).

At the preliminary injunction hearing, Plaintiff Terry Dean Hubby, Jr. testified that he and a coworker spontaneously joined the protests on May 28 after getting off of work at a warehouse near Livingston and Lockbourne. (ECF No. 48 at 215). Mr. Hubby made a sign with markers and poster boards that other protestors had brought—his sign read, "American Refugee," a term which connotes a sense of alienation and foreignness some citizens experience while in their own country. (*Id.* at 217). Mr. Hubby testified that no protestors were blocking traffic, though some demonstrated in the street, nor did he observe any conflict between protestors and police. (*See also* Woods Aff. ¶ 7 ("I saw protestors blocking the street. We were able to clear the street with no uses of force and no arrests.")).

Downtown, crowds were larger, and clashes between congregants and police, more frequent. (*Id.* ¶ 9 ("Because of the scope of the unrest, I ordered more officers downtown and had

them put on riot gear.")). Officer Anthony Johnson testified that he was dispatched downtown around 2:00 p.m. (ECF No. 51 at 68 (discussing the atmosphere near Broad and High Street)). He recalled an unruly and disobedient crowd, holding signs that said things like, "Defund the police," or "'F' the police." (ECF No. 51 at 69 (recalling orders to disperse were unheeded or answered with, "fuck you, and fuck the police")). Mr. Johnson recalled that protestors surrounded his and other officers' cruisers. (ECF No. 51 at 75). After telling congregants to leave and stop banging on the cruiser, the officers deployed the Mark 9, or pepper spray. (ECF No. 51 at 76 ("[A] Mark 9 is a big canister of pepper spray meant to disperse large crowds"); Pl.'s Ex. 145).[38]

Officer Johnson joined a police barricade line at the northern part of the Broad and High Street intersection, facing south. It was still daylight. "At this point[,] they got much more violent. They began like throwing objects at us[,] such as rocks, bricks, and water bottles. People were walking up to us with bottles and opening them and throwing, like, unknown liquids on us, yelling in our face." (ECF No. 51 at 79; *see also* Woods Aff. ¶ 13 (stating protestors ignored a dispersal order, though they had a clear exit)). A senior member of the department ordered officers to change into riot gear; the crowd continued to grow; and this standoff continued. (ECF No. 51 at 82; ECF No. 50 at 184 (stating May 28 was the first day that SWAT deployed)).

By 6:00 or 7:00 p.m., "[t]hings were definitely tense," with a heavy police presence, according to witness Kayla Merchant. (ECF No. 49 at 149, 153 ("Mostly it was, you know, just people doing general protesting activities.")). Maxwell Garrison, a student at Ohio State University and assistant campus editor of *The Lantern*, who documented the protest near the corner of Broad and High Street, agreed that much of the evening was nonviolent. (ECF No. 49 at 91–92, 94 (testifying that he arrived around 9:40 or 9:45 p.m. and witnessed three or four water bottles thrown

---

[38] Officer Johnson's body-cam footage, running from about 8:00 p.m.–9:15 p.m. on May 28.

from deep in the crowd towards the police officers); *see also* ECF Nos. 23, 24 (recalling that there were a couple of hundred protestors near Broad and High Street by 9:30 p.m.)).

Bryant Somerville, a Channel 10 WBNS ("10TV") reporter, arrived at Broad and High Street to report on the protests on May 28, 2021.[39] He arrived a little after 8:00 p.m. and left around 12:30 a.m. Friday morning. He described a tense atmosphere with police clad in riot gear and about ten feet in front of them, a line of protestors. He testified: "There w[as] chanting[], there w[as] yelling, there was a lot of yelling. Raised voices. But as far as the term peaceful protesting goes, it was peaceful . . . Everybody has a voice[,] and they were letting it be heard." (ECF No. 51 at 9).

The tension rose as the night drew on. Mr. Somerville said that protestors "rows and rows deep" threw objects at officers, including bottles of water, jugs of water and milk, shoes, and small-grade fireworks, characterizing the throwing as "frequent." (*Id.* at 11). Mr. Somerville continued, recalling that protestors would sometimes get right in the officers' faces. (*See generally* Defs.' Ex. 24 (recording bottles and jugs of water thrown at the police, as well as officers spraying the crowd with irritants)). Officers, Mr. Somerville said, showed restraint. (*Id.* at 12 ("They were very, what I would consider, very calm.")).

Witness Rachel Wenning recalls demonstrators throwing water bottles toward the police at an estimated rate of one per minute. (ECF No. 47 at 147). But most of the water bottles hit the ground, another protestor, or flew over the officers' heads. (*Id.*). Ms. Wenning did not see any water bottle hit an officer without the officer hitting it down first, nor did she observe any visible injuries caused by the water bottles. (*Id.* at 148 (explaining the throwing was *not* "constant")). Ms. Merchant agreed: though she did not see any behavior from the protestors that would have justified the deployment of chemical agents, she did witness a couple of water bottles thrown towards the

---

[39] Mr. Somerville took two videos, one on May 28, 2020 (Defs.' Ex. 24) and another on May 29. (Defs.' Ex. 25).

officers. But, similarly, she did not observe any bottles hit the officers. (*Id.* at 49; *see also* Pl.'s Ex. 122 (showing a water bottle thrown towards the officers, hitting the ground before the police line)).

Throughout the hour and fifteen minutes that Mr. Garrison, the student journalist, was present, he observed that CPD's "pepper[-]spraying became a bit more frequent. On the protest side of it, not much changed." (ECF No. 49 at 96; ECF No. 47 at 150 ("[T]here were people who started to be pepper[-]sprayed by the police.")). To flee the pepper spray, Ms. Wenning ran from Broad and High Street towards the intersection of High Street and State Street, where there were 40 or 50 protestors in the street and on the sidewalk. Around that same time—between 9:00 or 10:00 p.m.—Duck Bardus, a volunteer street medic, set up a medic station to treat those injured by chemical agents.[40] But within twenty minutes, the station itself was sprayed, rendering it useless for treatment purposes.

Closer to 11:00 p.m., there were "hundreds" of people downtown still. (ECF No. 51 at 21). Mr. Somerville repeatedly described what he viewed as a game of cat-and-mouse: "These protestors would go places[,] and police would respond." (*Id.*).

A troubling video shows an electric scooter hurled from deep in the crowd of congregants towards the line of officers around 10:00 p.m. A few police officers blunted the scooter's impact mid-air. (*Id.* at 95; *see also* Defs.' Ex. 26 (showing scooter hurled towards officers at 1:17:10 into

---

[40] Duck Bardus is a volunteer street medic—a term used to refer to people who have completed a 20-hour training that covers first aid, CPR, and some other tailored training around typical injuries seen in protest environments. (ECF No. 50 (explaining he typically goes to protests to look for ailments like dehydration, hypothermia, or asthma attacks)). Since his certification in 2016, Mr. Bardus has provided first-aid for a range of protestors, including those with whom he disagreed politically. (ECF No. 50 at 31 (recalling providing aid at a conservative rally to an individual who was face down on the Statehouse lawn)). Mr. Bardus attended multiple days of protest to serve as a street medic; he was not there to protest. (ECF No. 50 at 33 ("My red pack is red and says first aid on it. I try to be as loud and obnoxious about that as I can [to distinguish himself]")). Typically, the medics operate in a buddy system, where one is treating injured folks, and the other is standing sentinel to assess any incoming dangers.

18

video, followed by officers spraying the crowd with irritants); Defs.' Ex. 29 (showing officers' protest-related injuries, including a May 28 injury from a scooter thrown by a protestor)).[41]

Around that same time at Broad and High Street, a surveillance camera video shows a line of officers (some with bikes, some mounted on horses, nearly all in riot gear) facing protestors who are sitting in the street. (Pl.'s Ex. 113; *see generally* Pl.'s Ex. 144). An officer, presumably with some sort of authority, waves her hand, prompting the others to move the police line forwards, now more than a foot away from the sitting protestors. Officers spray the demonstrators' faces with a chemical irritant, causing one individual to crawl away in pain. (Pl.'s Ex. 113; *see* Pl.'s Exs. 119, 120, 121 (same)).

By midnight, a body-worn camera video shows a handful of protestors in the street or on the sidewalk at the intersection of West State and High Street. (Pl.'s Exs. 122, 122-A). CPD officers stand facing the demonstrators. (*Id.*). Some protestors shout various invectives at the officers; others throw water bottles towards the officers in riot gear, with the visible ones landing before the line of officers. Six or seven protestors kneel or stand in the street with their hands in the air—in the familiar, "hands up, don't shoot" position. Four minutes later, an officer throws, apparently unprompted, a flashbang device. (Pl.'s Ex. 122). Two men remain in the street after the explosion, and officers throw another device. Fifty seconds later, officers say, "knockers, knockers, knockers," and an officer fires wooden projectiles at the individuals remaining in the street. Additional riot gear is handed out to officers, and an emergency announcement to leave the area sounds.

---

[41] Officer Johnson himself was hit with an electronic scooter. (ECF No. 51 at 82 ("The weight and the force of the scooter kind of wrenched my arm back resulting in me tearing my rotator cuff and suffering a back sprain and a neck sprain"); *see also id.* at 84 ("[A] majority of the individuals there were *not* peaceful, meaning they weren't listening to our commands, they were screaming at us, throwing stuff at us and throwing stuff on us.") (emphasis added); Pl.'s Ex. 75 (injury report)).

Also, around midnight, Ms. Wenning and other protestors saw the officers line up side-by-side with shields, from which she deduced, "they were probably going to come down the street and force everyone out of the street." (ECF No. 47 at 156). Indeed, an officer's body camera footage captured a dispersal order, roughly transcribed as follows: "This is an emergency. The area must be cleared. If you remain in the area, you will be subject to arrest, and chemical agents may be used against you. You must leave the area now." (Pl.'s Ex. 122). Mr. Somerville of 10TV said that there were multiple announcements over the loudspeakers telling protestors to leave the area. (ECF No. 51 at 13).

After hearing the dispersal order, Ms. Wenning and others walked westward, into an alley "to get away." (ECF No. 47 at 157 ("I was walking away, so I felt I was leaving the area.")). Once she and others got into the alley, she "heard a clink and . . . another like really loud explosion from another flashbang that had been thrown into the alley. And that one had tear gas in it because I inhaled some of it." (*Id.* at 156 (stating that the tear gas was "very thick," making it difficult to "breathe in or out"); *see also* Pl.'s Exs. 122, 122A (taken at the intersection of State and High Street, appearing to show direct-fired projectiles); Pl.'s Ex 122 (showing an officer throwing a device into an alleyway near State Street and Front Street)).[42]

### 2. Friday, May 29, 2020

On May 29, the Division of Police changed its staffing levels to a phase-two mobilization, with all sworn personnel working 12-hour shifts. (Woods Aff. ¶¶ 21, 26, 30). That day, Deputy Chief Quinlan also met telephonically with major city chiefs around the country, including the Minneapolis police chief. (ECF No. 48 at 122). Mr. Quinlan stated: "[W]e had information from the FBI that people were being paid to create chaos or damage or vandalism or looting . . . . [W]e

---

[42] The video also shows a flash-bang device deployed at 4:07 and again at 4:25 against protestors standing in the street.

had a meeting with major city chiefs [about] what was occurring all across the country and started to get an indication that we needed to be on high alert." (ECF No. 48 at 122, 127). Officer Ohl, a member of the Columbus Division of Police in the SWAT section, recalled that his team was dispatched to the protests on May 29 "[t]o support field-force operations." (ECF No. 50 at 189).

The evening proved to be a terrible one, with Plaintiff Mixon's and Plaintiff Hubby's experiences serving as microcosms. Neither Ms. Mixon nor Mr. Hubby was there to create chaos, damage, vandalism, or to loot. Yet, both suffered lasting physical and emotional harm. In summary, Plaintiff Hubby had his kneecap shattered by a CPD-deployed projectile at State and High Street about an hour and a half before Plaintiff Mixon was repeatedly pepper-sprayed and had her knee broken by a separate group of Columbus police officers.

*a. Plaintiff Terry Dean Hubby, Jr.*

After spontaneously attending the previous day's protest, Plaintiff Hubby returned to the protest—this time, downtown—on May 29 around 8:45 or 9:00 p.m. (ECF No. 48 at 219–20). There was not much traffic, and "about a hundred" protestors were "just chanting and holding signs." (*Id.* at 221–22). Mr. Hubby did not see any destruction of property, violence, or vandalism. A video he recorded shows what happened subsequently. Plaintiff Hubby is walking along the sidewalk of State Street and High Street. (Pl.'s Ex. 133). All the sounds characteristic of a modern-day protest are present: honking, screaming, yelling, and sirens. Plaintiff Hubby approaches the corner and stands on the sidewalk. Shortly after reaching the corner, he is struck and injured by a projectile. (*Id.*).

The timing is critical.

The video reveals that the police begin to shoot less-lethal projectiles *while* the CPD loud system sounds a dispersal order. In other words, there was no time for protestors to react. (ECF

No. 48 at 226–27 (stating that only Plaintiff Hubby heard a dispersal announcement *after* he was hit)). The projectile rendered Plaintiff Hubby unable to stand. (*Id.* at 225–26 ("It kind of felt like a hammer or like a steel bat or something was hitting it . . . [My knee] was broken into many little pieces . . . It kind of looked like a puzzle.")). A group of twelve Good Samaritans, strangers to Plaintiff Hubby, dragged him around the corner, out of the way of the raining munitions. (*Id.* at 233 ("Q. How could you tell they were still shooting? A. Because you could hear the shots.")). The protestors-turned-medics fashioned a splint for Mr. Hubby's knee before obtaining a rental bicycle and transforming it into a gurney so that he could be transported without over-exerting his knee. (*Id.* at 234 ("As they were running, a helicopter was following us.")).

Eventually, Mr. Hubby was transported to the hospital and had surgery, resulting in twenty pins and a plate in his knee. Plaintiff Hubby, a 31-year-old man, no longer can walk more than a half-mile without significant pain—an improvement from his condition for the first four to five months post-shooting, when he was unable to walk at all. His knee swells regularly. His balance suffers. (Pl.'s Ex. 77 (containing photographs from February 2021 of injury)). As to whether Plaintiff Hubby would attend a future protest, he answered: "No sir . . . I just don't think it's a good idea now." (ECF No. 48 at 38).

### b. *Plaintiff Aleta Mixon*

Plaintiff Mixon, a patient support assistant, traveled to the vicinity of the Statehouse in the evening, around 9:00 p.m. (ECF No. 47 at 58). She was not there to protest. Instead, she was attempting to locate her daughter, a 21-year-old who joined the demonstrations. Plaintiff Mixon approached a female officer in riot gear, asking if the officer would assist her in locating her daughter. Plaintiff Mixon recounted the following:

Q.     Okay. You mention you saw a female officer. Did you approach her?

A.      Yes, sir, I did . . . I noticed that there was a female officer that was in riot gear. She had one of the helmets on[,] but her face shield was raised up. And her fade was blond[,] kind of like mine. So[,] I approached her[,] and I asked her if she could assist me with helping me find my daughter. The female asked me did I know where she was located, and I told her the last location of me speaking with her was on Broad and High, on the corner of Broad and High Street.

Q.      So[,] what happened after . . . .

A.      Before the conversation could continue, I noticed that someone was coming up from my left side . . . I noticed that it was a male officer that sprayed me with mace as I slightly turned my face. And I began to ask why did he do that. I could hear the female officer say . . . why the fuck did you do that? She was just asking for help. She was asking me to help her find her baby. She just wanted help finding her daughter.

Q.      Okay. [T]ell us what happened next.

A.      Then the officers started to -- the female officer eventually left with her colleagues. I didn't see her or hear her anymore. And the male officers then began to ask me to leave. And I just was very concerned with finding my daughter. So, as authorities, I thought they would assist me in helping me find my daughter. So[,] I just was very concerned and asking the male officers if they could help me find my daughter, that I repetitively said that I just wanted to find my baby. And I was not there, for the record, to protest at all. I just wanted to find my daughter.

(*Id.* at 67–68).

This treatment worsened. She kept seeking help, but the officers "seemed to not care . . . They told me to leave. They just kept telling me to leave. Eventually I was beginning to . . . leave as one of the male officers pushed me." (*Id.* at 70). She continued to try to depart the area, an effort which officers continued to thwart. Near West Broad Street and High Street, Plaintiff Mixon recalled:

[O]fficers were – they were following me and just telling me to leave as I was already walking and leaving. So[,] I turned around just to tell them like I was just wanting help in finding my daughter, I just wanted to find my baby, that's it; I wasn't here to protest. And as I was walking, *one of the officers sprayed me from behind again* [hitting the right side of her face]. I proceeded to run into now the street on West Broad Street[,] where there w[ere] several officers. And I began to run to them screaming for help. And as I was running screaming for help, I kind of like ran through because I saw -- I ran through the crowd of officers screaming for help. As I was screaming for help, I began to scream[,] I'm leaving. So[,] I was telling the officers I was leaving.

23

> [After being sprayed a second time,] I noticed that the officers w[ere] chasing me . . . So[,] I let them know I was obeying their commands. So[,] I ran back to the sidewalk.

(*Id.* at 71–72 (emphasis added)). The second spraying was painful. Her eyes burned, and her vision blurred. She was unable to continue her search for her daughter. She sat down on the sidewalk, between High Street and Third Street, screaming for help. She discerned two officers were walking towards her in riot gear; she hoped help was on the way at last. Instead, CPD officers sprayed her again—now, for the third time. (*Id.* at 73).

Immobilized on the street curb, she tried to stand up. But this awful tale was still far from over:

> And one of the officers pushed me down so hard off the curb. And once again, pardon my language, Your Honor, and members of the court, he stomped on my kneecap, my left kneecap, and stated to me, That's what you get for being down here, you black, protesting bitch.[43] That's what the fuck you get for being down here, you black protesting bitch . . . .
>
> I began to scream, You broke my leg – that he broke my leg, basically, because I felt a snap and intense pain. It happened so quickly that the next thing you know, I was getting snatched back up onto the sidewalk[,] where people began to try to help me walk and get away.

(ECF No. 47 at 74–75).

A 22-second video introduced at the hearing shows a portion of these events. (Pl.'s Ex. 101). In it, Plaintiff Mixon is shown near two or three officers. She walks away. The individual recording provides narration of increased urgency: "This lady has done nothing. This lady has done nothing. They have done nothing wrong." (*Id.*). At this point, Plaintiff Mixon is pepper-sprayed while walking *away* from the officers, stumbles into the street while an officer continues in pursuit. The narrated video continues: "They have done nothing wrong. They did nothing wrong. Are you kidding me?" (Pl.'s Ex. 101).

---

[43] There was some ambiguity as to whether the officer said, "you black bitch" or if he omitted the word "black." (*Compare* ECF No. 47 at 74, *with id.* at 99). Either way, that statement is atrocious.

A body camera video shows the same events, timestamped at 10:08 p.m. (Pl.'s Ex. 147). Plaintiff Mixon approaches the officers, yelling repeatedly and unmistakably that she is trying to find her daughter—imploring that they help. An officer shakes a can of chemical spray as Plaintiff Mixon draws near. A separate officer pushes her away. While Plaintiff Mixon tells the body-camera-wearing officer, "I just want to find my daughter. I don't think all officers are bad," a separate officer comes and pushes her away again. (*Id.*).

Approximately one minute into the body camera video, Plaintiff Mixon is heard screaming after being sprayed from behind. The officers continue east on Broad Street, spraying individuals who are standing still or walking away from them. Approximately 2 minutes and 5 seconds into the video, Plaintiff Mixon can be seen and heard falling from the sidewalk into the street. An officer to her left then sprays her with chemical spray while she is on the ground and pushes her from behind as she attempts to stand. The officer whose body-worn camera is recording walks past Ms. Mixon as she states that her leg is broken and asks for help. He returns at approximately 3 minutes, 20 seconds into the video as Plaintiff Mixon is speaking to another officer, Officer Frank Leeman, who is assisting her with her injuries.

Plaintiff Mixon is heard, pleading, while surrounded by officers:

> I don't want to die. I don't want to die. I don't want to die. I just came to find my daughter . . . I don't want to die. I don't want to die. I don't want to die. Please, Frank, don't let me die. Please, Frank. Please, Frank, Please. Please, Frank. I can't see. Please help me . . . Frank, Frank, I can't see, Frank. I don't think all officers are bad . . . Please. Please . . . I just came to find my daughter.

(Pl.'s Ex. 147). Plaintiff Mixon never located her daughter. But, she recalls: "[S]omehow she ended up finding me." (ECF No. 47 at 81). Ms. Mixon was then taken to the hospital, where she had emergency surgery on her knee and was hospitalized for five days. (Pl.'s Ex. 73 (showing her scar)). Whether she would attend, or perhaps, more accurately, be in the vicinity of a protest again,

Ms. Mixon testified that she would not: "If I wasn't afraid of police officers before, I'm nervous about them now." (ECF No. 47 at 89).

### c.  Other Events on May 29

Elsewhere on May 29, there was, indeed, the sort of chaos and vandalism that then-Chief Quinlan feared. Testimony from CPD officers evinced their difficulty in controlling a growing protest. Officer Johnson arrived during daylight on May 29 to a "much more organized" crowd "with like fatigue-style clothing, tactical-style clothing on, backpacks full of, like, items with frozen water bottles now, meaning they went downtown with frozen water bottles, chunks of rocks in their backpacks, gas masks." (ECF No. 51 at 90). SWAT-team member Officer Ohl recalled arriving downtown around 9:00 or 9:30 p.m., where individuals were graffitiing the Ohio Supreme Court building. (ECF No. 50 at 188 (testifying those individuals ran away when the officers turned their lights and sirens on)). Commander Smith Weir testified to the looting from that evening. (ECF No. 52 at 129).

Mr. Somerville of 10TV arrived downtown around 5:30 p.m. and departed at 8:00 p.m. He recalled seeing protestors throwing objects at the police and officers pepper-spraying the crowd near Broad and High Street. (ECF No. 51 at 29). Mr. Somerville testified at the hearing: "[A]nytime I saw pepper spray used, it was as a measure to control the crowd[,] and it was not unwarranted." (*Id.* at 30). Yet, in his video from the day prior, he is recorded saying: "Oh, wow, we've just been pepper[-]sprayed for no reason." (Defs.' Ex. 24 (at 46:29)).

In terms of which came first—protestors throwing items towards police or police spraying protestors with irritants and munitions—the record is mixed.

Commander Weir testified that the use of crowd-control devices *followed* protestor-involved violence: "[N]othing would happen when they weren't throwing things and objects,

whatever. But obviously[,] at different times[,] there would be objects thrown at our officers, and that's when we would authorize the use of mace to move the crowd or try to disperse the crowd . . . [I]f the crowd is being peaceful, we're not using mace." (ECF No. 52 at 131–32). Mr. Somerville's recordings also show numerous standoffs between police and protestors, each with a familiar pattern of congregants throwing objects (water bottles or milk jugs, and rarely, fireworks) and the police engaging in direct and indiscriminate firing of munitions and chemical irritants. (Defs.' Exs. 24, 25). Other times, the timing was reversed: "Every time [the officers] spray, more and more bottles come their way." (Defs.' Ex. 24).

Other evidence points towards the department's reflexive reliance on pepper spray. A body-worn camera video that evening shows a CPD supervisor stating to the officers that "the group at Broad and High is going to move. They're not going to stay there . . . Tell them to move . . . We are going to move them by any means necessary—reasonably necessary. Everybody got that? Get your mace ready." (Pl.'s Ex. 123-A).

There were multiple other instances of the use of less-lethal tactics without apparent provocation. One video shows a SWAT officer deploying chemical spray against two people standing on the sidewalk, who appear to be recording the officers on their phones. (Pl.'s Ex. 107). A body-worn camera at the corner of Broad and Front Street shows a supervisor directing officers that they will use a Mark-9 chemical spray against the protestors nearby "on the bang," i.e., once an officer activated a noise signal. (Pl.'s Exs. 110-A, 110-B, 123-C). A video at the intersection of Broad and High Street shows an officer throwing a dispersal device into protestors standing in the street; much of the crowd flees, and two additional munitions follow. (Pl.'s Ex. 115; *see also* Pl.'s Ex. 116 (throwing an explosive device towards protestors holding signs)).

The same group of officers who were told to "get [their] mace ready" at roll call are now mounted on bikes, riding *into* individuals standing on the sidewalk *while* screaming at them to "move." (Pl.'s Ex. 123-B). The body-camera-wearing officer sprays chemical irritants at random, hitting individuals standing peacefully on the sidewalk—and *then* yells, "clear the area!" (*Id.*). Some sprayed individuals have their hands up and are asking why they are being sprayed. *All* of these individuals were standing on the sidewalk. (Pl.'s Ex. 123-B; *see also* Pl.'s Ex. 123-C (explosive devices and large amounts of chemical spray); Pl.'s Ex. 110-B (same event); Pl.'s Ex. 125 (throwing a grenade across Broad Street toward the sidewalk, while another officer deploys chemical spray at a car); Pl.'s Ex. 126 (spraying protestors directly in the face with chemical irritants)).

Plaintiff Torrie Ruffin, a special education teacher's assistant, summarized the night of May 29 well: "[T]here was peaceful protesting going on, there was some police aggression and some police push towards the protestors. And the situation turned, I guess, chaotic or dangerous." (ECF No. 46 at 125 (summarizing her friends' recounting)).

### 3.  Saturday, May 30, 2020

On May 30, Governor Mike DeWine called in the National Guard; Mayor Ginther declared a State of Emergency and instituted a 10:00 p.m. curfew. (Quinlan Aff. ¶ 7). The tension of the last two days continued. (Pl.'s Ex. 103 (officers firing projectiles, striking individuals); Pl.'s Ex. 104 (bowling tear gas canister into crowd); Pl.'s Ex. 108 (spraying kneeling individuals on May 30 or 31); Pl.'s Ex. 112 (spraying irritants directly at individuals who are fleeing a prior deployment of spray); Pl.'s Ex.117 (similar); Pl.'s Ex.118 (similar); Pl.'s Ex. 114 (similar, including against a woman using a mobility device); Pl.'s Exs. 136, 137 (similar, including spraying those fleeing or turning to flee); Pl.'s Ex. 127 (officers on horses deploying tear gas, with

others spraying individuals on sidewalks); Pl.'s Ex. 141 (recording High and Broad Street in the afternoon, showing scores of individuals coughing, evidently fleeing the deployment of a chemical irritant); Pl.'s Ex. 142 (firing projectiles at crowd on street and sidewalk, with a videographer tackled by an officer); Pl.'s Ex. 42 (using bicycle to shove woman who has been yelling, and then using chemical spray against her)).

In one of the more shocking series of events, an officer grabs a man's gas mask off of his head from behind, while, notably, the man was walking away. The man reacts and fights back; other officers tackle him to the ground. (Pl.'s Exs. 127, 128, 138).

At 12:10 p.m., a body-worn camera shows the officer who grabbed the gas mask off of the individual's head celebrating; he fist-bumps another officer and giggles gleefully: "I took his mask off . . . He didn't like it." (Pl.'s Ex. 138).

This Court heard similar stories from other witnesses and Plaintiffs present on May 30, reviewed below.

### a.   Plaintiff Summer Schultz

Plaintiff Summer Schultz, a master-maker artist, attended the protests on High Street, around 10:30 a.m., with her wife, Leanne, and friend, Tori. (ECF No. 49 at 118). The atmosphere was "beautifully painful," with an overwhelming sense of community. (*Id.* at 119). Law enforcement presence was large and included rooftop sharpshooters, bicycle officers, and "[a]rmy Reserve or military people." (*Id.* at 120).

The trio listened to speeches on the lawn at the Statehouse before hearing "people screaming." (*Id.* at 121–22). Ms. Schultz, who has sensitive lungs, started coughing and deduced that officers began spraying some sort of chemical irritant. She does not recall any comprehensible order to disperse, but only a "muffled" speaker atop a "Hummer-looking police vehicle." (*Id.*). In

memorable language, Plaintiff Schultz describe the speaker as sounding "a lot like how Charlie Brown's phone conversations sound. We couldn't make it out." (*Id.* at 141; *see also id.* at 123 ("[A]ll the protestors were looking at each other like[,] what did they say, did you hear that . . . And nobody could make it out")).

Though Plaintiff Schultz noted no hostile protesting, she was hit by the first of what would be three sprayings of a chemical irritant. (ECF No. 49). Soon thereafter, Plaintiff Schultz was standing in Broad Street, and officers deployed another two rounds of spray, at least one of which hit her in the face. (*Id.* at 127 ("Like split second, as soon as you open your eyes, it burns.")). It was then that Plaintiff Schultz was struck with some projectile—which turned out to be a knee knocker—bringing her to the ground. (Pl.'s Ex. 67 (showing injury)).

Plaintiff Schultz did not attend any more protests afterward. She "was very scared to go back." (ECF No. 49 at 133). Instead, she offered her support to the protests in other ways, such as having conversations with people or dropping off water to demonstrators. (*Id.*). When advising her friends on whether to attend protests, she "urged them against it." (*Id.*).

### b. *Plaintiff Torrie Ruffin*

Plaintiff Torrie Ruffin and a few friends attended the protest downtown just after 10:00 a.m. (ECF No. 46 at 105 ("It was a very peaceful, powerful moment.")). Later, she and her friends joined a sit-in protest in the street, by the intersection of Broad and High Street, chanting, "this is a peaceful protest." (*Id.*). Two or three officers came by with mace and sprayed the faces of the sitting protestors, hitting Ms. Ruffin. She received no order to leave the street. (*Id.* at 111). Plaintiff Ruffin fled to cleanse her eyes, face, and throat from the spray.

Later that day, Ms. Ruffin and other demonstrators stood in a crosswalk chanting, linked arm-in-arm. (*Id.* at 110). Bicycle officers arrived "to actually push and physically move us to the

side to allow more officers to come in . . . And then there was another mass spraying of pepper spray into the protestors' faces." (ECF No. 46 at 110–11).

She did not observe any physically aggressive behavior from the protestors preceding either spraying.

At some point that day, Plaintiff Ruffin recalled sitting on a curb when horse-mounted officers started walking through the crowd; officers in riot gear placed things in the middle of the street before running away. "And then there were . . . smoke bombs that ended up going off." (ECF No. 46 at 116 (explaining that officers also threw smoke bombs onto the sidewalk)).

Plaintiff Ruffin testified that she observed a young woman who was recording while talking to a bicycle officer; the officer sprayed the woman with pepper spray "directly point-blank in the eyes. She turned for a second. She came back up and said something to him[,] and he sprayed her point-blank in the eyes again." (*Id.* at 116). A similar event occurred moments later. She saw a man with a gas mask "calmly walking" away. (*Id.* at 117). "And there's an officer that ran from behind him, ran up to him, seemingly hit him on the head, pulled his mask off and then took pepper spray and was spraying into his mask, into the guy's face." (*Id.* at 117). A police truck then drives by, ordering the congregants to leave the area.

### c. *Plaintiff Bryan Hazlett*

Plaintiff Bryan Hazlett attended the protest to accompany a friend around 7:30 p.m. Upon arrival along High Street, he noted a "quite peaceful" crowd; "just a bunch of people standing around, hands up, don't shoot chants, stuff like that." (ECF No. 49 at 51; *id.* at 53 ("When we first got down there, there was really nothing much going on, just a wall of police.")). As the hour drew on, officers "started firing wooden bullets," prompting protestors to get "plywood to protect themselves from said wood bullets and tear gas canisters." (*Id.* at 53; Defs.' Ex. 52 (same); ECF

No. 49 at 61 (stating the knee knockers were "everywhere" on the ground)). Some protestors threw water bottles at officers, but Mr. Hazlett did not observe any other objects thrown. In addition, a "piercing siren," ordering protestors to disperse, was sounding. (ECF No. 49 at 60). Mr. Hazlett said he was unsure *why* there was a dispersal order, as the protest was primarily peaceful and there was no effective curfew. Nevertheless, he entered the street to reunite with his friend (she had gone into the street to protest earlier); he intended to depart afterward.

But, as Plaintiff Hazlett enters the intersection of Russell Street and High Street, a video shows CPD officers chasing several individuals and body slamming them to the ground, including Mr. Hazlett; an officer also sprays him with a chemical irritant. (Pl.'s Exs. 135, 139). Mr. Hazlett provides a summary of what transpired:

> I was tear[-]gassed. That was painful. And then I got hit by the police officer, dropped to the ground. That was extremely painful . . . I curled up in the fetal position to protect my face and then to which the officer said[,] give me your arm[,] and then another officer circled back around, tear[-]gassed me again, and at that point[,] I had given up my arm[,] and then they basically were just kneeing me and elbowing me and shoving my head into the ground and then they zip[-]tied my hands behind my back. My leg was bleeding. My face was burning. That was about it.

(ECF No. 49 at 68). Mr. Hazlett was then arrested. (*Id.*).

Whether Mr. Hazlett would attend another protest: "I don't think I would . . . It was a horrible experience." (*Id.* at 72).

### d. Witness Michael Andrew Moses

Witness Michael Andrew Moses attended the protests on May 30 around 9:00 p.m. "[S]onically," he recalled, "it was an overwhelming environment." (ECF No. 46 at 32). There was about a half-football-field buffer between the officers, clad in armor and holding shields, and the protestors. (*Id.* at 32). While the scene was largely peaceful—and he did not observe protestors throwing any bottles, rocks, or other items—the atmosphere was "chaotic." (*Id.* at 33). Mr. Moses

heard a "garbled" and "muffled" bullhorn command. (*Id.* at 32, 37, 58). Other protestors gestured to the confused congregants that the police wanted them to start moving north. Minutes after moving north, Mr. Moses was surprised to almost immediately feel two projectiles of some kind hit him in quick succession: one on his left ribs and the other on his back. He ran away from the scene to a coffeeshop doorway. He "heard a whole lot of boots marching directly their way," and Mr. Moses was grabbed by his right wrist and arm, forced down to the ground, hitting his face and right shoulder. (*Id.* at 36). He was cuffed, put into a vehicle with a handful of other seized individuals, and went through processing at Jackson Pike Corrections Center. (Pl.'s Ex. 65 (showing his injuries)).

As to whether he would attend a protest again: "In general, no." (ECF No. 46 at 44).

### e. Plaintiff Bernadette Calvey

Plaintiff Bernadette Calvey, a nurse's assistant, attended the protest in the Short North area with her friend, arriving around 9:00 p.m. at the intersection of High Street and Second or Third Street. (ECF No. 46 at 61–62 ("Protestors were yelling or chanting Black Lives Matter or specific names . . . [officers] were in riot gear lined up across the street.")). At this point, Plaintiff Calvey was standing on the sidewalk and had not yet even joined in the actual protest. (*Id.* at 63 ("I was . . . there for a very short period of time . . . I hadn't joined the protestors . . . I didn't step into the street where the other protestors were. I was just observing from the sidewalk.")).

Though Plaintiff Calvey did not observe any protestor-police confrontations, she noticed police officers shouting; CPD personnel then fired projectiles at demonstrators at close range. (*Id.* at 62). Ms. Calvey, still on the sidewalk, was struck in the face by a projectile, a wooden pellet, which split open her chin. (*Id.* at 64 ("It hit me directly like dead center on my chin.")). A white powder also exploded, which temporarily blinded her. She and others fled into an alley, at which

point she heard a police bullhorn order the protestors' dispersal. (*Id.* at 237). She did not hear any announcement to leave before she was struck in the face. (Pl.'s Ex. 132 (video); Pl.'s Ex. 62 (picture of chin injury); Pl.'s Ex. 55 (police report)).

Whether Ms. Calvey would attend a protest again: "I would definitely be hesitant. This was my first protest, and I was there for less than five minutes and ended up getting shot in the face . . . but I don't want to say I would never attend one again because I don't want to be scared off." (ECF No. 46 at 73).

### f.  Plaintiff Nadia Lynch

Plaintiff Nadia Lynch, a billing and savings analyst, joined the protests near the Statehouse in the morning, around 10:45 or 11:00 a.m., with her sister. She testified to the protestors' "unity" and "lifted spirits." (ECF No. 48 at 181). Closer to noon, Plaintiff Lynch was walking toward the sidewalk at High and Broad Street when an officer pulls her by her backpack, tackles her to the ground, and arrests her. (Pl.'s Ex. 148; ECF No. 48 at 182 ("I couldn't tell you the reason I was arrested. And as soon as I went down, I didn't know what crime I had committed"); Pl.'s Ex. 71 (arrest sheet)). And she testified that she did not hear any instruction to disperse from the traffic way prior to being arrested. (ECF No. 48 at 189–90). Plaintiff Lynch was then placed in what she described as "a paddy wagon," was taken to a police substation where she and others were zip-tied, sat outside in the sun for five to six hours, and then transported on a sheriff's bus to Jackson Pike Corrections Center for slating, sitting in a holding cell for about half an hour or so. (*Id.* at 187). She did not attend any more protests after her arrest. (*Id.* at 199).

### g.  Plaintiff Stephanie Carlock

Plaintiff Stephanie Carlock traveled to the protests downtown around 4:00 p.m. (ECF No. 49 at 185). By 5:15 p.m., she and others were standing arm-in-arm in the High Street crosswalk,

facing south; the police were standing in front of that group, with just a three-foot separation between the groups. The officers "in sync all reached for their pepper spray" and sprayed the protestors "point-blank in the face," causing "[a] really intense burning pain." (*Id.* at 191). She retreated to the sidewalk, pouring milk into her eyes to ease the pain. A dispersal announcement sounded, "[b]ut then a moment later[,] [officers in riot gear] started throwing tear gas canisters," causing Plaintiff Carlock and others to retreat further south towards the Statehouse. (*Id.* at 193). She observed some protestors throwing water bottles towards police officers, prompting other protestors to urge them to stop.

Later, she and other demonstrators sat in the road as a form of protest at the intersection of Fifth and Broad Street. (*Id.* at 197). An officer told them to get out of the street and onto the sidewalk, so some of the group, Plaintiff Carlock included, stood up and dispersed to the sidewalk. But some of the horse-mounted officers "started pushing into the crowd . . . physically [running] into some of us." (*Id.*). The demonstrators' questions of what to do—now that they had complied with the order to disperse from the street—went unanswered. Instead, the officers "herded" the group south, where they met another line of officers blocking the street, thus trapping the protestors. (*Id.*). Officers then threw a tear gas canister at the group on the sidewalk, and "it was almost impossible to get out of that spot we were in." (*Id.* at 199). The protestors fled toward the only point of egress: an alleyway in which a delivery truck was parked, thus allowing for a bottleneck of one person at a time to squeeze through. (ECF No. 49 at 201 ("They hadn't communicated anything after they said to get up on the sidewalk despite us asking what they wanted us to do. They didn't provide any further instruction.")).

Ms. Carlock attended additional protests in late summer and early fall, including a "gathering of remembrance" for Breonna Taylor, a 27-year-old Black medical worker who was shot and killed in her own apartment by Louisville, Kentucky police.[44] (*Id.* at 213).

### 4. Sunday, May 31, 2020

Lea Pagels, an investigator and litigation specialist at the Ohio Public Defenders, attended most days of last year's protests, including May 31, as a legal observer for the National Lawyers Guild. (ECF No. 49 at 4). She testified to seeing police use force against protestors "[u]nder a wide range of circumstances. I saw them use chemical weapons, bicycles, fists, flashbangs on people on sidewalks, on streets, in groups, alone." (*Id.* at 5). The most common less-lethal dispersal technique she observed was pepper spray, followed by knee-knockers. "And then more increasingly throughout the summer[,] I saw [officers'] bicycles being used as weapons." (*Id.*). Although she testified to mostly peaceful crowds, she recalled bottles of water thrown. (*Id.* at 22; Defs.' Ex. 41 (showing protestors throwing bottles, and officers shooting projectiles indiscriminately at 57:27)).

Ms. Pagels arrived downtown, near the intersection of Broad and High Street, early evening on Sunday, with her fellow legal observer, Chris Noble. (ECF No. 49 at 7). Much of her testimony was devoted to discussing a woman to whom she referred as "the woman in white." (*Id.*). A video Ms. Pagels recorded shows the woman in white sitting in the middle of West Broad Street. (Pl.'s Ex. 102-A; ECF No. 49 at 9). The witness recounted:

> I observed the woman in white . . . sitting there peacefully . . . I observed the camouflaged officers point a gun at her. At the time[,] I didn't know what was in the gun . . . I saw an officer spray her in the face with pepper spray at what I would consider point-blank range . . . her body is quite limp.

(ECF No. 49 at 9–10).

---

[44] Richard A. Oppel, Jr., Derrick Bryson Taylor, and Nicholas Bogel-Burroughs, *What to Know About Breonna Taylor's Death*, N.Y. Times, Apr. 26, 2021, https://www.nytimes.com/article/breonna-taylor-police.html.

Stills taken from a video show officers spraying the woman in white at point-blank range. (Pl.'s Ex. 68). Another video Ms. Pagels took shows an officer standing in a bus shelter, apparently shooting an unknown projectile towards the woman in white. (Pl.'s Ex. 102-B (narrating "Oh, my God, they're going to shoot her again . . . She's injured.")). In both videos, a police recording ordering congregants' dispersal is heard plainly. (Pl.'s Exs. 102-A, 102-B).

An officer dressed in military combat gear pivots his attention toward Ms. Pagels and Mr. Noble. He begins shooting projectiles at the pair of fleeing legal observers. (Pl.'s Ex. 102-B (narrating, "I'm getting shot at right now")). The noise from the rotary gun echoes; Ms. Pagels yells to Mr. Noble, "Stay with me, Chris. Stay with me." (*Id.*). Ms. Pagels likened what she experienced to a video game, recalling "ducking," "dodging," "avoiding officers . . . spring[ing] out from alleys with their guns," and "zigzagging our way as best as we could to safety." (ECF No. 49 at 28; *see also id.* at 48 ("Most terrifying experience . . . I definitely suffered from PTSD.")).

When asked if she would encourage or discourage others from attending a protest, Ms. Pagels stated that she would advise nobody with underlying health conditions to attend, given the use of chemical agents. (*Id.* at 31 (recalling that those with respiratory conditions suffered especially)). She also would encourage prospective protestors to understand "the violence that they might endure" from law enforcement. (*Id.* at 31).

Around 5:00 p.m., Plaintiff Rebecca Lamey traveled with a friend to the area near the Statehouse, around Broad and High Street. (ECF No. 47 at 13). There was a bit of "idle time," interspersed with demonstrators shouting, chanting, and kneeling. (*Id.*; *see also id.* at 9 ("Some people were obviously maybe a little bit louder than others. But it was, overall, I would say pleasant.")). The atmosphere began to change when the demonstrations divided into two. (*Id.* at 12 ("A lot of [the officers] were already wearing their riot gear, but a lot of them were starting to

put their gas masks on. It started to become more apparent that violence was the language they were wanting to speak that day.")).

At 7:50 p.m., the now-familiar automated dispersal order sounded. (Pl.'s Ex. 130 ("This is an emergency situation . . . Please leave the area."); *see* ECF No. 47 at 14 (emphasizing there was not any *direct* order to depart)).

At 7:52 p.m., a defense exhibit video shows this same intersection—Broad and High Street—with several demonstrators standing atop a truck, brandishing guns. (Defs.' Ex. 41 (at 52:32)). Ms. Lamey did not recall seeing the truck or these individuals atop it. The video also shows a different young man throwing something like a water bottle towards the officers, who were wearing riot gear. (*Id.*).

A video recorded by a surveillance camera, stationed at the corner of Broad Street and High Street, shows SWAT officers firing projectiles and tear gas into a crowd that soon after disperses. (Pl.'s Ex. 109; *see also* ECF No. 47 at 15). Ms. Lamey, fearful of being trampled, stepped to the side to avoid the dispersing crowd.

At 7:54 p.m.—four minutes after Plaintiff Lamey first recalls hearing the dispersal announcement—she was struck by one of these munitions while walking on the sidewalk. (*Id.* at 15). Specifically, a SWAT officer turned the corner and fired his rotary gun; one knee knocker struck Plaintiff Lamey on the hand; she was struck four more times on her inner thighs, left hip, and buttock. (Pl.'s Exs. 146, 130, 130-A; Defs.' Ex. 36 (showing a screenshot of Pl.'s Ex. 140)). It is unclear whether the projectile was direct- or skip-fired. (Pl.'s Ex. 130 (video of incident); Pl.'s Ex. 131 (similar); Defs.' Ex. 46)).

Later, the above-mentioned surveillance camera video also shows a tactical van driving south on High Street, firing projectiles at protestors on either side, while SWAT officers continue to fire projectiles north at individuals on High Street.

Photojournalist for *The Columbus Dispatch*, Adam Cairns, arrived at the intersection of Broad and High Street in his professional capacity around 9:15 p.m., bearing his press badge. (ECF No. 46 at 230). A photo Mr. Cairns took, timestamped at 9:44 p.m., shows an officer who appears full faced to his camera. Mr. Cairns testified that the officer yelled in Mr. Cairns' direction to leave, and as Mr. Cairns turned to leave, he was struck in the cheek with a wooden projectile.

### 5.  *Monday, June 1, 2020*

Plaintiff Andrew Fahmy, a personal banker, joined the protests downtown, near Broad and High Street, the evening of June 1 at 5:00 p.m. (*See generally* ECF No. 47; *id.* at 105 ("People were not really organized . . . .")). Later, the protestors marched north on High Street; Mr. Fahmy, and his friend who accompanied him, followed. (*Id.* at 109).

By 9:45 p.m., Plaintiff Fahmy ended up near High and Lane, close to Ohio State's campus.

At 10:20 p.m., five to ten police cruisers, mostly SUVs, drove northbound on High Street. (*Id.* at 113). The officers were wearing riot gear, corralling the crowd from the south. Within a few minutes, Mr. Fahmy "saw like a yellow mist and streams of pepper spray, and I saw people kind of -- a couple of people like hit the ground and were screaming, and a couple of people were trying to pour water in their eyes." (*Id.* at 114). Mr. Fahmy did not hear any orders to disperse, nor any orders relating to curfew. (*Id.* at 115 ("No, not at all"); *id.* at 135–36 ("I would have heard it over the chants.")).

Within a few minutes, tensions continued to rise, and protestors continued to protest. (ECF No. 47 at 118 ("[A] lot of the protestors were yelling . . . .")). Officers in riot gear were positioned on one side of the street, and the protestors, roughly 20 or 30 feet away, opposite the police.

Shortly after 10:27 p.m., Plaintiff Fahmy was struck by a canister of tear gas a few inches above his left ankle, which "felt like . . . a big . . . 20-pound dumbbell." (*Id.* at 119; Pl.'s Ex. 134-B (video taken by witness); Pl.'s Ex. 134-A (same incident from a different angle)). Mr. Fahmy sought medical attention a few days after, and the injury proved to be a severe break. (*Compare* ECF No. 47 at 126 (stating he was in a boot for two-and-a-half-months), *and* Pl.'s Ex. 76 (x-ray of fracture), *with* ECF No. 48 at 28 (Deputy Chief Quinlan testifying that he would be surprised if being hit by a tear gas canister could fracture a bone)).

Mr. Fahmy has been invited to subsequent protests, and he has responded with: "a hard no . . . my personal experience was very negative." (ECF No. 47 at 128).

Witness Maeve Walsh, a student journalist for the Ohio State student newspaper, *The Lantern*, covered the protests on location that evening, June 1. (ECF No. 46 at 11). Just as Mr. Fahmy testified, the protest began downtown, near the Statehouse, and terminated closer to the Ohio State's campus. (*Id.*). She was joined by her two colleagues, Max Garrison and Sarah Szilagy. (*Id.* at 11–12 (estimating 200 protestors and 20 officers)). The trio arrived around 9:00 or 9:30 p.m. (*Id.* at 11). Part of the newspaper protocol is for the student-journalists to identify themselves as much as possible. Thus, Ms. Walsh and her colleagues donned their press badges, a *Lantern* sweatshirt, and a *Lantern* hat. (*Id.* at 13). She did not observe any acts of violence by the protestors.

The curfew came at 10:00 p.m. Around 10:25 p.m., officers approached the student journalists in riot gear, ordering them to depart. Ms. Walsh tells the officers that she and her

colleagues were members of the media and thus exempt from the 10:00 p.m. curfew. A video taken by Ms. Walsh near High Street and Lane Avenue shows how this interaction unfolded.

An officer approaches the students and says, "Leave, or you're going to jail. Leave, or you're going to jail." (Pl.'s Ex. 140-A). Ms. Walsh replies, "We're members of the press," and thus exempt from curfew, to which the officer replies, "I don't care." (*Id.*). At this point, the crowd of protestors had diminished significantly, and a dozen or so officers now outnumber the three students. The students begin to retreat while reminding the officers of their press pass. Seconds later, an officer fires pepper spray at the students. The students run into an alley. The officers continue to pepper spray the journalists' necks and backs. (Pl.'s Ex. 140-B). The next day, at the June 2 CPD roll call, the incident commander alluded to the prior day's events: "Reporters are not subject to a curfew. And that should have been clear from the start." (Pl.'s Ex. 25).

Ms. Walsh continued to cover the protests as a journalist. But she took precautions, including donning a facemask with a plastic film to protect her eyes against pepper spray.

### 6. *Sunday, June 21, 2020 (Father's Day Demonstration)*

Protests continued in Columbus throughout early June. Renewed protests began mid-June, particularly after Rayshard Brooks, a 27-year-old Black man—was shot and killed by Atlanta Police Department officers on June 12, 2020. In addition, Mayor Ginther and then-Chief Quinlan announced a change in CPD policy, limiting the use of chemical sprays for crowd-control scenarios. (Quinlan Aff. ¶¶ 12–13 ("CPD policies now prohibit officers from using chemical spray on a violent, non-aggressive crowd, *even if they fail to leave the street*.") (emphasis added); ECF No. 48 at 14 ("I understood that they would only use pepper spray against people who were being violent."); *id.* at 66 (same); *id.* at 71 (speculating officers did not "get the memo")).

41

Mr. Bardus, the street medic who rendered aid to the injured throughout the spring and summer, returned to the protests to do the same on June 21, around 11:00 a.m., near High Street, south of Broad Street. (ECF No. 50 at 63 (observing about 50 protestors, mostly on the sidewalk)). Ms. Wenning also returned to the demonstrations on June 21 around 3:30 p.m. as a legal observer for the National Lawyers Guild. (ECF No. 47 at 170, 175).

At Broad and High Street, she saw a dozen officers standing in the intersection, facing the protestors, who were standing all along the southern edge of the intersection. (*Id.* at 170). Some protestors at the front were holding reflective material in an apparent artistic protest to symbolize police violence-reflecting police violence. (ECF No. 50 at 68).

Commander Weir spoke into his radio and instructed officers to "clear High Street." (ECF No. 47 at 171; ECF No. 50 at 66). In attempts to do so, bicycle-mounted officers strike the protestors and push them back. Mr. Bardus put it more directly:

> So[,] they showed up on their bikes[,] and they shoved folks out of the street toward the sidewalk. They turned their bikes sideways and basically pushed people. I remember one protestor, a woman, fell in the street, and the officer continued to push her with his bike while she was on the ground.

(ECF No. 50 at 66).

Some officers implemented Commander Weir's order to clear High Street, but with the bicycles facing forwards, *not sideways*. A video shows an officer repeating, in an aggressively monotone voice: "Get out of the road," while riding *forward into* the crowd of stationary protestors, who pled with him to stop and were crying out in pain. He and other officers engaged in some hand-to-hand combat with the protestors. (Pl.'s Ex. 105 (with one officer remarking, apparently, "bitch" after pushing a protestor backward, into the ground)). The use of bicycles in this manner is a tactic that Mayor Ginther testified was not compliant with the old *or* new policies. Deputy Chief Quinlan agreed impliedly but would not go so far as to say that the technique shown

in the above-mentioned video was inconsistent with training. (ECF No. 48 at 64). Mr. Quinlan testified: "[O]ur bike training is designed to use a barrier between the protestors and police officers. Typically[,] the way I see it done is the bikes are turned sideways. [In the video played at the hearing, the bicycle,] looks like it's more forward[-]facing. The other bikes appear to be sideways. That's more the technique." (*Id.*).

Most importantly, despite CPD's newly implemented prohibition on the use of chemical irritants on non-aggressive individuals, such sprayings continued. (Pl.'s Exs. 105, 106).

Ms. Wenning recalled from June 21: "I remember seeing this protestor get pepper[-] sprayed in the face[,] and then they turned around[,] and there was a medic right there [who] flushed their eyes . . . and then the protestor turned back around and immediately got sprayed again directly in the face." (ECF No. 47 at 174).

Mr. Bardus remembered similarly: "Basically, the group that got sprayed was farther south, closer to State [S]treet and High, and there was another group sprayed closer to High and Broad." (ECF No. 55 at 66; *id.* at 68 ("I'm sort of ping-ponging between folks who need to have their eyes flushed."); *id.* at 68–69 (describing "big arc[h]ing sprays of mace")).

Before both of these crowd-control devices were deployed—the use of bikes and the spray—Mr. Bardus did not hear any order given to the protestors standing on the sidewalk. He also did not witness the protestors do anything violent against the officers. (ECF No. 50 at 67).

Ms. Wenning's outlook on attending protests changed after attending last year's demonstrations. (ECF No. 47 at 176). She testified:

> [T]here are definitely times now where I will know that a protest is happening, and I feel like I should not go or I decide not to go because I don't want to risk getting sprayed or getting tear gassed . . . [A]fter I was tear gassed on the 28th – and then also we didn't talk about this date, but two days afterward, I think on the 30th, I was also exposed to some tear gas on that day -- I had like spotting in between periods which I have heard my friends report as well. And that really frightened me. That made me think there was damage done

43

to my body from tear gas. So[,] there are times that I have not gone to events, protests, because I thought something like that could happen.

(*Id.* at 177—76).

### 7. *CPD's Characterization of the Protests*

Much of the testimony and evidence presented in the briefing and at the hearing demonstrated that CPD approached last year's protests differently than if the protests had not been about police brutality. This is evident in then-Chief Quinlan's June 2, 2020 roll call speech to officers: "And with the situation when *we're the focus of the protest*, we can't afford to be the ones that create that provocation. We just can't . . . *It's a lot easier when they're protesting something else.*" (Pl.'s Ex. 25 (emphasis added); *see also* Pl.'s Ex. 4 (citing Thomas Quinlan Aff. ¶ 6)).

He echoed this position at the hearing: "They were against the police . . . I just know officers were concerned for their safety[,] and they were against the police." (ECF No. 48 at 89; *but see* ECF No. 46 at 10, 28, 60, 103 (stating these witnesses are not members of any antipolice groups); ECF No. 47 at 58, 142, 103 (same); ECF No. 49 at 4, 51, 117, 184 (same)).

This Court engaged in the following colloquy with Mr. Quinlan:

THE COURT:        Chief, you indicated that you advised our officers who were going to be the police presence at the protest that there was a national movement that was an antipolice movement. Did I characterize that correctly? And if not, tell me how you characterized it.

THE WITNESS:        Yes, Your Honor. When I talked to officers, I said that these are – these times are different than protests we typically deal with. We typically deal with protestors on two sides[,] and we're in the middle trying to keep the two opposing sides separate to keep [the] peace. In this case, there [are] no two sides. It was protestors facing police to have their voices heard about systemic racism in this country and in Columbus and that they were speaking out about that and that we were the focus of the protest activity. So[,] that changed the dynamics.

(ECF No. 48 at 103–04).

Commander Weir agreed, testifying that on May 28, the first substantive day of the protests: "[B]ecause the protests were anticipated to be antipolice protests, we didn't necessarily want to be very visible." (ECF No. 52 at 104).

CPD's conduct revealed that officers conflated the *spark* of the protests (i.e., Mr. Floyd's murder) with the *effects* of the protest (i.e., chants that criticized police and police brutality). It is understandable why an officer might take personally profane and provocative chants. (ECF No. 47 at 95 ("[O]ther people were yelling stuff like fuck you."); ECF No. 51 at 71 ("They were saying fuck you[,] and fuck the police."); ECF No. 52 at 127 ("[T]here was a bunch of [All Cops Are Bastards ("ACAB")] graffiti all around there.")). But what is not comprehensible is why she would then let that dictate her treatment of individuals exercising their First Amendment right, no matter how unkind their chants and signs might be. (ECF No. 47 at 74–75 ("That's what you get for being down here you black protesting bitch.")).

What separates our nation from some others is the ability to criticize our leaders and those bearing the imprimatur of state authority without fear of retribution. Typically, police are the ones who protect and ensure that this cherished right remains unencumbered. That is not what occurred last summer.

### III.  STANDARD OF REVIEW

Four factors control the Court's discretion to grant a preliminary injunction: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). While a strong likelihood of success is the crucial factor, all four must be balanced

rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). Irreparable harm is nearly as crucial as the success factor: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22–24 (2008). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## IV.   LAW & ANALYSIS

This Court begins its legal analysis with a reminder from the Ninth Circuit:

> Demonstrations can be expected when the government acts in highly controversial ways[] or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure.

*Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996) (citation omitted).

### A.   The Floyd Case Law

Since the last year's protests in the wake of George Floyd's killing, there have been no fewer than seventy-three cases exploring how these protests shine a light on existing First Amendment or Fourth Amendment principles. ("Floyd Caselaw").[45]

---

[45] *See, e.g.*, *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) (granting the temporary restraining order and noting: "Officers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators."); *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2020 WL 3056705, at *1 (D. Minn. June 9, 2020) (dismissing the case absent allegation of immediacy of harm); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1157 (D. Or. 2020) (granting a temporary restraining order, finding that while there was destruction, *these* plaintiffs only engaged in peaceful and non-destructive protest and that officers might have been substantially motivated by an intent to interfere with plaintiffs' constitutionally protected expression); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1210 (W.D. Wash. 2020) (finding a "clear showing" of a likelihood of success on the merits of the First Amendment claim because Plaintiffs demonstrated that the officers' actions—in the use of less-lethal crowd-control tactics, such as tear gas and pepper spray—were substantially motivated by Plaintiffs' conduct and also had a chilling effect on the First Amendment activity); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1069 (N.D. Cal. 2020).

Each case in the Floyd Caselaw presents a similar tale: protestors gather near buildings of community significance, such as state capitol buildings, courthouses, and police stations, to express their horror and outrage at the killings of Black Americans at the hands of police officers; violence occurs at the hands of demonstrators and officers alike; most demonstrators chant, sing, and exercise a number of nonviolent and constitutionally protected activities; other demonstrators serve as an accelerant, engage in violence, and ignore police commands; at various points, officers protecting municipal, federal, and private properties are subject to threats, projectiles, and sometimes violence; dispersal orders or instructions for how to comply with police orders are either unheard, unprovided, or unheeded; police deploy less-lethal munitions, resulting in injuries to violent, nonviolent, and compliant protestors as well as passersby.

As our sister courts have noted, there are several prevailing legal principles from the Floyd Caselaw. First, all individuals have a First Amendment right to protest the actions of government officials, including police officers, without fear for their safety. Second, police officers, almost by definition, operate in an intense and volatile workplace context. Third, the Floyd Caselaw arises in unprecedented times that have upended life; the pandemic has also reminded us of the structural, unequal access to healthcare, particularly for Black, brown, indigenous, and rural communities, those with pre-existing illnesses or stigmatized health profiles, and those with mobility limitations. Finally, the Floyd Caselaw courts have recognized an inherent difficulty in drawing an enforceable line that is sensitive to officers' ability to quell violence and prevent the destruction of property without crossing the line into chilling free speech and abusing those who wish to exercise it.

### B.  Standing to Seek Injunctive Relief

Defendants challenge the existence of standing to seek injunctive relief, arguing that Plaintiffs have not shown a real and immediate threat of future harm. (ECF No. 61-1 at 7). The

doctrine of standing arises from Article III of the Constitution, which gives federal courts jurisdiction over cases and controversies. U.S. CONST. art. III § 2; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). The basic elements of standing are: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61. To win declaratory or injunctive relief, a plaintiff "must show actual present harm or a significant possibility of future harm." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001).

### 1. Injury in Fact

An injury in fact must be concrete, particularized, actual, and imminent. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Put another way, the "threatened injury must be '*certainly impending*' to constitute injury in fact, and '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting another source); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").

Defendants rely on *City of Los Angles v. Lyons*, where the plaintiff sought an injunction against the City of Los Angeles to ban the use of chokeholds in certain circumstances. 461 U.S. 95, 97–98 (1983). In *Lyons*, LAPD officers placed Mr. Lyons in a chokehold during a routine traffic stop, which rendered Mr. Lyons unconscious and caused damage to his larynx. *Id.* at 97. On the initial remand, the district court found that officers stopped Mr. Lyons for a traffic infringement without provocation or legal justification, the officers applied a

department-authorized chokehold. *Id.* at 99 (summarizing the district court's finding that the use of chokeholds in this manner "is unconscionable in a civilized society").

Mr. Lyons sought injunctive relief. The Supreme Court found that Mr. Lyons failed to demonstrate a case or controversy to justify his requested relief. That is, he was unable to establish standing, absent proof of some real and immediate, rather than conjectural or hypothetical, injury or threatened injury. *Id.* at 101. "Nothing" in the police's policy "suggest[ed] that the chokeholds . . . [were] authorized absent some resistance or other provocation," the Court explained. *Id.* at 106. Mr. Lyons could not show that another encounter with the police was likely, nor could he demonstrate: (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter; or (2) that the City ordered or authorized police officers to act in such manner. *Id.* at 106, 110. Accordingly, the *Lyons* court reasoned that because no city policy authorized officers to use illegal chokeholds, "it is surely no more than speculation . . . that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold." *See id.* at 108.[46]

---

[46] While *Lyons* became a seminal case on the mootness doctrine, courts often rely upon it to assess standing. Indeed, the Sixth Circuit has recently applied *Lyons* in election-law cases. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020), *cert. denied*, ⸺ U.S. ⸺, (2020); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 387 (6th Cir. 2020). In *Shelby Advocates*, an organizational plaintiff and four individual plaintiffs alleged "a variety of election administration problems," including that "election workers [were] poorly trained, sometimes distributing the wrong ballots . . . , sometimes recording the wrong address when registering a voter, and once distributing a poll book without redacting voters' personal information." *Shelby Advocates for Valid Elections*, 947 F.3d at 980. Echoing *Lyons*, the court found that the plaintiffs failed to allege imminent harm because there was no evidence that "Shelby County election officials *always* make these mistakes" or that "the government entities *ordered* the election workers to make any such mistakes." *Id.* at 981 (emphasis added).

In *Memphis A. Philip Randolph Institute*, plaintiffs challenged Tennessee's statutory scheme governing absentee voting, particularly the signature verification procedures. *Memphis A. Philip Randolph Inst.*, 978 F.3d at 378. Affirming the district court's order denying the plaintiffs' motion for a preliminary injunction, the Sixth Circuit found that the plaintiffs had not clearly demonstrated that they face an actual, concrete, particularized, and imminent threat of harm. Unlike in *Lyons*, where the plaintiff had a concrete past injury resulting from government conduct, in *Memphis A. Philip Randolph Institute*, the plaintiffs could not cite with certainty or specificity any past erroneous rejection of absentee ballots. The *Memphis A. Philip Randolph Institute* plaintiffs also failed to overcome declarations from state election officials detailing the procedures implemented to protect against human errors in the signature verification process. For example, a mandatory training video instructed election officials to accept all but the most

Even when there is a concrete past harm such as in *Lyons*, the Sixth Circuit heeds the Supreme Court's directive that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Grendell*, 252 F.3d at 832 (quoting *Lyons*, 461 U.S. at 102, 103). In *Grendell*, for example, the Sixth Circuit reviewed a case against the Ohio Supreme Court. Plaintiffs sought injunctive relief, contending that the Ohio Supreme Court Practice Rule XIV § 5 was unconstitutional on its face. Absent evidence of a real and immediate threat of repeated injury, Mr. Grendell's prior injury (i.e., being previously sanctioned by the Ohio Supreme Court) did not establish an adequate injury in fact to confer standing,.

As is relevant to this case, this Court draws the following principles from the Sixth Circuit's interpretation of *Lyons*. First, an absence of a concrete past injury proves fatal to proving standing. Second, the alleged unlawful conduct must be pursuant to some policy, practice, or functional equivalent, and Plaintiffs' past injuries must have stemmed from these policies or procedures. Third, there must be a non-speculative threat of repetition.

Here, Defendants do not contest the existence of a past injury, so this Court's standing determination will focus on the second and third questions.

### a. Policy, Practice, or Functional Equivalent

Recall that the Supreme Court found in *Lyons* that because nothing in the policy of the Los Angeles police suggested that chokeholds were authorized absent some resistance or other provocation by the arrestee or other suspect, Mr. Lyons had not established a "real and immediate threat" that he would be stopped and choked again. *Lyons*, 461 U.S. at 105, 110. Evidence of

---

obviously inconsistent signatures. Before any ballot was rejected, three trained election officials, including an administrator, must agree that the signature on the absentee ballot does not match the signature in the voter registration records. Given the training and protections practiced by state officials, the Sixth Circuit found it far from inevitable that an absentee ballot will be incorrectly rejected due to an inconsistent signature.

relatively few instances of violations by individual police officers, "without any showing of a deliberate policy on behalf of the named defendants," does not provide a basis to seek equitable relief. *Id.* at 104.

Therefore, in this case, Plaintiffs must show more than a few instances of alleged excessive force or retaliatory treatment. Instead, Plaintiffs must put forth specific facts establishing a deliberate policy of the City authorizing such misconduct. *Daubenmire v. City of Columbus*, No. 2:04-CV-01105, 2008 WL 4758677, at *10 (S.D. Ohio Oct. 24, 2008). Short of an official written policy authorizing the contested conduct, the question is whether anyone with policymaking authority authorizes its officers to act in such a manner. *Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir. 1984).

Here, Plaintiffs identify two written policies or practices and multiple instances of encouragement or authorization from senior departmental personnel sanctioning the contested conduct. *Cf. Lyons*, 461 U.S. at 106 (stating that Mr. Lyons did not have standing in part because he failed to show that the City ordered or authorized the LAPD to place him in a chokehold).

### (i) Written Policies or Practices

First, CPD's use of force directive allows for an exertion of energy to direct or control "resistive or aggressive behavior toward the involved personnel, other personnel, third parties, or property." (Pl.'s Ex. 8). Use of chemical spray is a Level 2 use of force, and striking, punching, or kicking is a Level 4. (*Id.*).

Second, and relatedly, CPD's Amended Directive 2.04 ("Amended Directive") revised departmental policies on the use of chemical irritants on non-aggressive protestors. (Defs.' Ex. 44 at 4). Chemical spray may be used to gain control of "a physically aggressive/resistive subject, to prevent escape, or to prevent or stop the commission of a criminal offense." (Pl.'s Ex. 9 at 1). But

"it should be directed at the persons participating in the violent or aggressive conduct, not at the group in general." (*Id.*). Importantly, the Amended Directive states: "Failure to leave a street or move, by itself, shall not justify the use of chemical spray against a non-aggressive[,] non-violent crowd." (*Id.* at 5). Indicia of violence or aggression include: (1) stopping or impeding the movement of individuals not engaged in the protest; (2) trapping an occupied vehicle; or (3) impeding emergency personnel.

The Amended Directive contains a large carveout: "Sworn personnel may use chemical irritants to clear a congregation of people from a controlled-access highway or to prevent a congregation of people from entering a controlled-access highway," which, as statutorily defined, refers to "every street or highway."[47] (*Id.*).

### (ii)    Encouragement or Authorization

In addition to these written policies, Plaintiffs also point to a host of orders given from CPD senior personnel during last year's protests as evidence of a policy, practice, or functional equivalent. The hearing revealed verbal orders by CPD higher-ups which point to a pattern of police behavior applying excessive force to protestors and congregants who not physically resisting, destroying property, or threatening to do so. This Court reviews two such examples.

On May 29, 2020, a body-worn camera video from that evening shows a CPD supervisor instructing bicycle officers that "the group at Broad and High is going to move. They're not going to stay there . . . We are going to move them by any means necessary—reasonably necessary. Everybody got that? Get your mace ready." (Pl.'s Ex. 123-A). These officers ride their bicycles into congregants standing on the sidewalk and spray chemical irritants at random.

---

[47] "Controlled-access highway," statutorily defined, means "every street or highway in respect to which owners or occupants of abutting lands and other persons have no legal right of access to or from the same except at some points only and in such manner as may be determined by the public authority having jurisdiction over such street or highway." O.R.C. § 4511.01(CC).

Similarly, recall that the Father's Day Demonstration on June 21, 2020, occurred after the Amended Directive 2.04 in the use of chemical irritants became operative. Commander Weir instructed officers to "clear High Street" of protestors. One video shows officers push, shove, and spray protestors standing in the street. A separate video shows an officer indiscriminately spraying congregants, including some standing on fleeing toward the sidewalk. (Pl.'s Ex. 106).

Unlike in the Sixth Circuit's review of the voting-law cases where it found the training of election staff to be adequate, here, there are questions of the adequacy of CPD training on the definition of when a crowd or individuals are "violent," "aggressive," and "resistive."

Deputy Chief Kuebler admitted the vagueness:

Q. Is there something in the division's policies that explains what it means for protestors who are in the street to be aggressive?

A. That remains very unclear to us in the division.

(Kuebler 148:15—19). This definitional gap is important since an officer is permitted only to use chemical spray, for example, against a violent, aggressive, or resistive individual.

In addition, neither the Directives nor the training relating to the use of wood projectiles and the use of bicycles to shove protestors has been amended at all. Under existing guidelines, CPD can order demonstrators to "clear the area," and officers can treat that order as encompassing sidewalks as well as streets and use their discretion as to whether protestors are leaving fast enough.

Plaintiffs have plausibly alleged that the officers' use of force on protestors and passersby at last year's protest was conducted pursuant to a formal policy or its functional equivalent, regular and routine practice, and even encouragement. *Cf. Lyons*, 461 U.S. at 110 n.9 ("The dissent does not . . . point to any written or oral pronouncement by the LAPD or any evidence showing a pattern

53

of police behavior that would indicate that the official policy would permit the application of [chokeholds on suspects who refrained from engaging in unlawful conduct].").

Based on the written policies and the verbal commands, this Court finds that Plaintiffs' allegations of unlawful police conduct are premised upon unlawful policies and practices, since the use of force policy and Amended Directive 2.04 still allow for the repeated and indiscriminate use of chemical spray, wooden projectiles, and physical force on large swaths of people—not just on those involved in violence or aggression.

### b. Future Harm

"Despite being harmed in the past, the [plaintiffs] must still show that the threat of injury in the future is 'certainly impending' or that it presents a 'substantial risk' of recurrence for the court to hear their claim for prospective relief." *Clapper*, 568 U.S. at 414 n.5.

Plaintiffs have alleged that the unreasonable deployment of less-lethal force is likely to be re-deployed in the future. Conversely, Defendants, relying on *Lyons*, argue that Plaintiffs cannot establish standing by presenting evidence that CPD used the alleged policies against them in the past. Several Plaintiffs and witnesses declared their intention to attend future demonstrators relating to police reform and the treatment of police brutality. Their fear that they will be subjected to an allegedly illegal action is more than subjective.

This is not *Lyons*, where a future risk was found to arise from an isolated incident of abuse. Rather, Plaintiffs introduced evidence of the Defendants' ongoing, sustained pattern of conduct that resulted in numerous injuries to protestors and congregants. "[T]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) (internal quotation marks omitted).

Ms. Pagels, a witness who attended most days of the protest, observed repeated instances of excessive force: "Under a wide range of circumstances[,] I saw them use chemical weapons, bicycles, fists, flashbangs on people on sidewalks, on streets, in groups, alone." (ECF No. 49 at 5). The most common less-lethal dispersal technique she observed was pepper spray, followed by knee-knockers. And then more increasingly, "throughout the summer[,] I saw [officers'] bicycles being used as weapons." (ECF No. 49 at 5).

In other words, CPD's use of less-lethal force on non-aggressive individuals is not, to borrow the Sixth Circuit's terminology, "vanishingly rare." *Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015) (reviewing *Lyons*). And as the Supreme Court said in *Lyons*: "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8. An encounter with CPD at a demonstration, and thus with CPD policies, is likely to occur much more frequently than the speculation Mr. Lyons bore. Thus, Plaintiffs have standing to seek injunctive relief. Thus, Plaintiffs have satisfied the injury-in-fact requirement. *See Samaha v. City of Minneapolis*, No. 20-cv-01715, 2021 WL 931243, at *8 (D. Minn. Mar. 11, 2021) ("Plaintiffs are not required to divine the date when the next controversy will spark widespread outrage in this community. The Court finds that Plaintiffs have standing.").

### 2. *Causation and Redressability*

In addition to the injury-in-fact requirement, a plaintiff must also satisfy the causation and redressability requirements of standing. Plaintiffs have established causation because the alleged excessive force and retaliation is fairly traceable to the City's actions. Under the redressability requirement, a plaintiff must show a likelihood that the requested relief will redress the alleged injury. Plaintiffs seek an injunction restraining CPD's use of less-lethal force on nonviolent

protesters to enforce dispersal orders. This requested relief is directly tied to the injuries Plaintiffs—all nonviolent protestors, observers, and passersby sustained last summer.

Thus, this Court finds that Plaintiffs have demonstrated a concrete past injury of being subjected to less-lethal force, pursuant to CPD's policies and procedures and that the specter of repetition is concrete and non-speculative. A favorable decision would redress these concerns.

## C.        Mootness

Defendants further assert that Plaintiffs' Motion for Preliminary Injunction is moot because they did not seek injunctive relief back in May or June of 2020 when the alleged unconstitutional conduct occurred. (ECF No. 61-1 at 10). In the months that have followed the protests, Defendants contend that much of Plaintiffs' claim for injunctive relief has become moot due to changes the City has made to CPD Directives and the City Code. (*Id.*).

"In addition to requiring that a party have standing, the Constitution's case or controversy requirement mandates that a claim must not become moot prior to the court's decision on the merits." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). A case becomes moot when either the "issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (internal citations omitted). To determine mootness, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244—45 (9th Cir. 1988). If a course of action is mostly completed, but modifications can be made that could alleviate the harm suffered by the plaintiff's injury, the issue is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation marks omitted). The party alleging

mootness bears a "heavy burden" to establish that a court can provide no effective relief. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quoting *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)).

Below, this Court reviews two mootness doctrines: (1) the capable of repetition yet evading review doctrine; and (2) the voluntary cessation doctrine. Both are often referred to as "exceptions" to the mootness doctrine. *See Boston Teachers Union, Local 66, AFT, AFL-CIO v. Edgar,* 787 F.2d 12, 16 (6th Cir.1986) (referring to the voluntary cessation doctrine as an exception to the mootness doctrine); *see also Gottfried v. Medical Planning Servs., Inc.,* 280 F.3d 684, 693 (6th Cir. 2002)) (referring to the capable of repetition yet evading review doctrine as an exception to the mootness doctrine).

### 1. *Capable of Repetition Yet Evading Review*

The capable of repetition, yet evading review exception to the mootness doctrine applies where: "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 470, 473 (6th Cir. 2004) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).The Supreme Court has further stated that it has been "unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Honig v. Doe*, 484 U.S. 305, 320, (1988) (citing *Lyons*, 461 U.S. at 105–06).

This Court finds that there is a reasonable expectation that the same complaining parties, Plaintiffs, would be subject to the same action again. Ms. Pagels, a witness who attended most days of the protest, observed repeated instances of less-lethal force deployed on non-violent congregants: "Under a wide range of circumstances[,] I saw them use chemical weapons, bicycles,

fists, flashbangs on people on sidewalks, on streets, in groups, alone." (ECF No. 49 at 5). As long as police killings are met with public outrage and protest—and as long as CPD relies upon less-lethal force to disperse non-violent congregants—there remains a reasonable likelihood that Plaintiffs will face the same challenged conduct again.[48]

### 2. Voluntary Cessation Doctrine

Further, voluntary cessation of conduct moots a claim only in limited and narrow circumstances. As explained by the Supreme Court:

> The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways. A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. Of course[,] it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This is a matter for the trial judge. But this case is not technically moot, an appeal has been properly taken, and we have no choice but to decide it.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (simplified).[49]

Defendants contend that because Plaintiffs did not seek injunctive relief back in June when the alleged unconstitutional conduct occurred, much of their claim for injunctive relief has become moot. (ECF No. 10 at 12). Further, in the six months that followed the protests, CPD amended its directives with respect to the use of chemical irritants to (according to Mayor Ginther) facilitate better trust and relations with the community. Consequently, Defendants argue that this voluntary change in enforcement tactics moot Plaintiffs' claims as well.

---

[48] Eric Lagatta, *Protests Continue Sunday in Downtown Columbus for Ma'Khia Bryant, Others Killed by Police*, Columbus Dispatch (Apr. 25, 2021), https://www.dispatch.com/story/news/2021/04/25/protests-continue-sunday-columbus-makhia-bryant/7377610002.
[49] *See Brownback v. King* 141 S. Ct. 740, 748 (2021) (using a "cleaned up" parenthetical).

This mootness argument fails. Even acknowledging that the department amended its directives, much of Plaintiffs' Complaint centers on not just the department's written policies but also how those policies are implemented in practice.

Thus, there is a live issue of whether Defendants have a policy, practice, or custom of using excessive force and retaliatory infliction of pain on peaceful protestors.

### D.      Factors for Preliminary-Injunctive Relief

#### 1.   Likelihood of Success on the Merits

Plaintiffs argue that Defendants use of non-lethal, or less-lethal, crowd-control tactics violate their Fourth Amendment right to be free from excessive force and their First Amendment right to protest without retaliation. Plaintiffs also allege that the Defendants are liable for violations of Plaintiffs' constitutional rights under a theory of municipal liability, under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978).

#### a.   The Fourth Amendment (Excessive Force)

Plaintiffs contend that they have a strong likelihood of success on their claim that CPD's use of excessive force was violative of the Fourth Amendment. (ECF No. 6 at 23). Defendants retort CPD's use of force did not constitute a seizure because the protestors were free to leave— in fact, they were ordered to do so, thereby demonstrating that Plaintiffs cannot succeed on their Fourth Amendment claims and must rely instead upon the substantive Due Process Clause of the Fourteenth Amendment. This Court reviews these arguments below. First, it considers whether a seizure has occurred under the Fourth Amendment. After determining that it has, this Court analyzes the reasonableness of force applied.

*(1) Seizure*

Violation of the Fourth Amendment requires an intentional acquisition of physical control. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989). Thus, the threshold question this Court must resolve is: Has there been a seizure? The arrest of a suspect indisputably constitutes a seizure. Circumstances falling short of an arrest also might constitute a seizure, where an "officer, by means of physical force or show of authority, terminates or restrains [someone's] freedom by movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254—55 (2007) (internal citations omitted). Such a seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 597 (emphasis omitted).

At the outset, this Court notes that Defendants' reliance on *Torres v. Madrid*, 141 S. Ct. 989, 991 (2021), is misplaced. In that case, the issue was whether the application of physical force is a seizure if the force hits the targeted individual but fails to stop the person. *Id.* at 995. The Supreme Court said yes: "The application of physical force to the body of a person with the intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Id.* at 993. Defendants attempt to draw from this case a different principle—namely, that no seizure ever occurs *unless* an officer manifests an intent to restrain the subject. (ECF No. 61-1 at 14; ECF No. 64 at 2 n.2). But this is not what the Supreme Court held. Chief Justice Roberts even said as much:

> This approach improperly erases the distinction between seizures by *control* and seizures by *force*. In all fairness, we too have not always been attentive to this distinction when a case did not implicate the issue . . . But each type of seizure enjoys a separate common law pedigree that gives rise to a separate rule . . . Unlike a seizure by force, a seizure by acquisition of control involves either a voluntary submission to a show of authority or the termination of movement.

*Id.* at 1001. Accordingly, the Court held in *Torres* that a woman was seized when officers shot her, despite her failure to yield to that force, as it amounted to a seizure by force given the officers'

intent to restrain. Defendants ignore this distinction and instead argue that any circumstance lacking an intent to restrain falls outside the ambit of the Fourth Amendment entirely.[50] That misreads *Torres* and aggressively narrows Fourth Amendment jurisprudence.

This case deals with both seizures by force and seizures by control. Defendants do not deny that Plaintiff Hazlett and Plaintiff Lynch were seized (by force) when they were arrested. An arrest, of course, is the quintessential seizure.

The rub here is whether other circumstances (falling short of an arrest) amounted to a seizure by the acquisition of control.

A constitutionally cognizable seizure can occur in crowd-control scenarios. *Nelson v. City of Davis* is instructive. 685 F.3d 867, 872 (9th Cir. 2012). There, a partygoing college student was shot in the eye by a pepper ball projectile fired from the weapon of a university officer attempting to clear an apartment complex of 1,000 partygoers. Such a large gathering created crowd-control difficulties and gridlock. *Id.* (recalling a partygoer described the event as "the biggest party in history"). The *Nelson* defendants issued a verbal order to disperse but lacked any means of amplifying their voices to a meaningful level. As their crowd-dispersal strategies proved unsuccessful, the officers found themselves overwhelmed by the crowd, including some individuals who threw bottles at a police vehicle. Some partygoers were attempting to leave the party, but police blocked their means of egress and did not provide any additional instructions on how to leave; the partygoers also raised their hands to show their willingness to comply. There was no audible warning or notice prior to shooting projectiles towards the partyers.

---

[50] Because of the facts presented here, this Court hesitates to ignore the *Torres* Court's language: "We do not accept the dissent's invitation to opine on matters not presented here—pepper spray, flash-bang grenades, lasers, and more." *Id.* at 998.

Whether a constitutionally cognizable seizure by control can occur in protest scenarios is a murkier landscape. The question before this Court is: Was there a seizure by control when the police used less-lethal force, including pepper spray, tear gas, and physical force, to disperse—rather than detain—activists, protestors, and congregants? Some courts answer this question in the affirmative[51] and others in the negative.[52] Others do not answer it at all and instead assume the Fourth Amendment applies.[53] But there is a body of authority suggesting that the use of a chemical agent or other less-lethal crowd control tactics over a demonstrating crowd constitutes a seizure within the meaning of the Fourth Amendment. This Court finds three cases persuasive.

Predating the Floyd Caselaw are two instructive cases: *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003), and *Jennings v. City of Miami*, No. 07-23008-CIV, 2009 WL 413110, at *8 (S.D. Fla. Jan. 27, 2009). Within the Floyd Caselaw, *Downes-Covington v. Las Vegas Metropolitan Police Department*, No. 220CV01790, 2020 WL 7408725, at *10 (D. Nev., Dec. 17, 2020) is useful. As analyzed below, in the cases, the courts considered similar facts and reasoned that officers' use of chemical irritants and physical force could amount to a constitutionally redressable seizure.

First, the District Court of Oregon in *Marbet* reviewed officers' use of force on demonstrators protesting the policies of President George W. Bush while the president spoke at a

---

[51] *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1267 (C.D. Ill. 1996) (concluding that the officers' use of pepper spray on protestors could support a finding of excessive force that constitutes a seizure); *Marbet v. City of Portland*, No. CV 02–1448–HA, 2003 WL 23540258, at *10 ("By physically moving certain plaintiffs and circumscribing the area of movement of other plaintiffs, defendants seized plaintiffs within the meaning of the Fourth Amendment."); *Jennings v. City of Miami*, No. 07-23008-CIV, 2009 WL 413110, at *8 (S.D. Fla. Jan. 27, 2009); *Coles v. City of Oakland*, No. C03-2961 TEH, 2005 WL 8177790, at *2 (N.D. Cal. Apr. 27, 2005).
[52] *Dundon v. Kirchmeier*, No. 1:16-cv-406, 2017 WL 5894552, at *20 (D.N.D. Feb. 7, 2017), *aff'd mem.* 701 F. App'x 538 (8th Cir.) (per curiam) (speculating no seizure occurred because the protestors were never arrested or affirmatively detained by the police).
[53] *Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 840 (8th Cir. 2021) ("This court did not consider whether the use of chemical agents alone is a seizure."); *Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571 (W.D. Mich. 1998), *aff'd*, 205 F.3d 1340 (2000); *Edrei v. City of New York*, 254 F. Supp. 3d 565, 574 (S.D.N.Y. 2017), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018).

hotel in downtown Portland. *Marbet*, 2003 WL 23540258, at *10. The Portland Police Bureau used a loudspeaker to order protestors to move back 120 feet; plaintiffs and protestors allegedly ignored several orders to move, prompting officers to deploy pepper spray and move the crowd with force. Officers later fired rubber bullets at the demonstrators. In denying the motion to dismiss, the court reasoned that officers' show of physical force and use of pepper spray each amounted to a seizure:

> Defendants used pepper spray and physical force to achieve [the dispersal order]. Clearly[,] the effect of defendants' actions was to control plaintiffs' movement. Additionally, certain plaintiffs assert that they were physically prevented from leaving an area cordoned off by the police. By physically moving certain plaintiffs and circumscribing the area of movement of other plaintiffs, defendants seized plaintiffs within the meaning of the Fourth Amendment.

*Id.* at 10. Thus, it found dispositive that officers acted intentionally to restrain plaintiffs' freedom of movement. The *Marbet* court relied upon *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1265 (C.D. Ill. 1996), which reviewed the City of Decatur's motion for summary judgment in an action arising out of a demonstration, where officers sprayed pepper spray into the crowd of demonstrators. *Lamb*, 947 F. Supp. at 1265 ("This is not a typical excessive force case where the police were struggling with a fleeing felon or a rebellious prisoner. Instead, the police were monitoring a peaceful, lawful[,] and constitutionally protected demonstration."). It denied summary judgment, reasoning that the complaint alleged facts that could support a finding of excessive force that constituted a seizure under the Fourth Amendment.

Second, in *Jennings*, the Southern District of Florida found that plaintiffs sufficiently alleged that a seizure occurred where protestors alleged that they were peacefully observing, filming, or protesting when police opened fire on the demonstrators with tear gas, pepper spray,

shotgun-based projectiles, and other weapons.[54] *Jennings*, 2009 WL 413110, at *7. The police officers began marching shoulder-to-shoulder, continuing to fire projectiles at the peaceful demonstrators and observers. The court found a seizure occurred because officers' tactic as "herding," creating "a large encirclement perimeter," and used riot-clad officers to form "a skirmish line to force the demonstrators in a desired direction" evinced an intentional government termination of protestors' freedom of movement. *Id.*

Third, in accord with *Jennings* is a recent Floyd Caselaw action, *Downes-Covington*, where the District of Nevada reviewed a suit similar to the one presented here: demonstrators sought injunctive relief after being subjected to less-lethal force while protesting in the wake of Mr. Floyd's death. A video documenting the event showed protestors retreating from a tank, which was flanked by two officers. Despite a dispersal order, some demonstrators were blocked: "[T]hey could not go forward over the freeway and could not go backward because police were blocking them." *Downes-Covington*, 2020 WL 7408725, at *9. Protestors, in the video, are seen retreating away from the Interstate-15 on-ramp, mostly walking on the sidewalk, although due to the size of the crowd, some trickle onto the street where other officers are stationed. *Id.* While retreating, officers by the tank are seen firing some chemical irritant. The court found a cognizable seizure because the use of a tank corralling the protestors away from the on-ramp, while two or more officers blocked the street, suggested that protestors were seized. *Id.*

---

[54] The *Jennings* court relied on *Coles. Coles v. City of Oakland*, No. C03-2961 TEH, 2005 WL 8177790, at *2 (N.D. Cal. Apr. 27, 2005). In *Coles*, the plaintiffs were demonstrators, legal observers, videographers, journalists, and dockworkers who were protesting the Iraq war. The *Coles* plaintiffs alleged that police officers fired projectiles into the crowd, charged the plaintiffs with motorcycles, and hit the plaintiffs with clubs. *Id.* They also alleged that the police herded them from the port area to the West Oakland BART station, a distance of more than a mile. *Id.* Defendants filed a motion to dismiss the plaintiffs' Fourth Amendment claims, arguing that plaintiffs had not alleged a seizure. *Id.* at *4. The *Coles* court, relying in part on *Marbet,* found that plaintiffs had in fact been seized and noted that Defendants did more than just order the plaintiffs to disperse but "left Plaintiffs with only one available path by which to leave the scene and applied physical force to ensure that Plaintiffs followed that path." *Id.* at *10.

Thus, a constitutionally redressable seizure can occur where officers use physical force to prevent protestors from coming any closer, such as by herding protestors, forming a skirmish line, or failing to provide a means of egress—where such governmental action is intentional and results in the termination of freedom of movement. *Jennings*, 2009 WL 413110, at *9 (finding a seizure where officers clad in riot gear aligned in a skirmish line to force demonstrators in the desired direction through the use of excessive force); *see also Rauen v. City of Miami*, No. 06-21182-CIV, 2007 WL 686609, at *8 (S.D. Fla. Mar. 2, 2007) ("Plaintiffs' freedom of movement was terminated by the deliberate use of force and skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not have been.").

This Court now asks whether the type of force used—chemical agents, less-lethal projectiles such as wooden knockers, and physical force—militates in favor of finding that a seizure occurred. The dispositive question is one of control: Did the police control Plaintiffs' and protestors' movement through the use of force intentionally applied? *See Florida v. Bostick*, 501 U.S. 429, 435–36 (1991) (determining whether a seizure has occurred implicates the "coercive effect of the encounter" with police). Relevant factors that weigh in favor of a finding of a seizure of a person include the officer's tone of voice, whether the officer displayed a weapon or handcuffs, wore a uniform, touched the individual without permission, or threatened or physically intimidated him. *Id.*

Plaintiffs allege that throughout last summer's protests, they were peacefully observing, providing medical aid, or protesting when Defendants, often clad in riot gear, exercised an indiscriminate use of chemical irritants, physical force, and other weapons. Given that the standard for injunctive relief is a likelihood of success, the Court finds that the evidence and testimony from

last year's protests—explored summarily—suggest that Plaintiffs have met their burden as to the elements of a Fourth Amendment claim.

Here, some protestors were subject to physical force and less-lethal projectiles without a means of escape or egress, as Ms. Carlock's testimony shows. She and other protestors complied with orders to leave the street for the sidewalk. Once they got up on the sidewalk, Ms. Carlock recalled being "herded" by horse-mounted officers who "started pushing into the crowd." (ECF No. 49 at 198). The protestors—again, now on the sidewalk—asked: "[W]hat do you want us to do, what are you doing, where are we allowed to go, like, where should we stand . . . And there was no response that we got from them." (*Id.*). Towards Fifth Street, there were non-mounted police officers blocking the cross street and the mounted officers on the other side. (*Id.* at 198–99). The group of fifteen protestors was "pinned . . . into that small area." (*Id.* at 199). Officers threw a tear gas canister toward the protestors on the sidewalk. (*Id.* at 199 ("And it was almost impossible to get out of that spot we were in.")). The group ran into an alley that had mostly been blocked off by a delivery truck, permitting just one person at a time to squeeze between the alley wall and the truck. Ms. Wenning's testimony is of similar legal import. She recalled walking away in an alley after hearing a dispersal order. (ECF No. 47 at 157 ("I was walking away, so I felt I was leaving the area.")). Yet, a tear gas canister was thrown into the alley into which she dispersed.

These circumstances are on all fours with *Nelson*—where officers deploy force and order dispersal but without a means of egress. Such restraint on movement amounts to a seizure. *Nelson*, 685 F.3d at 882–83 ("Additionally, there is nothing in the record that indicates that the group was told prior to the shooting how they should comply with the dispersal orders (particularly when the officers were blocking their primary means of egress) or that force would be used against them if they did not behave in a particular manner.").

CPD's show of force during the Father's Day Demonstration resulted in a similar termination of freedom. Mr. Bardus testified:

> So[,] they showed up on their bikes[,] and they shoved folks out of the street toward the sidewalk. They turned their bikes sideways and basically pushed people. I remember one protest[o]r, a woman, fell in the street, and the officer continued to push her with his bike while she was on the ground. Several officers continued to hamper their efforts by shoving them with their bikes.

(ECF No. 50 at 66). Ms. Ruffin testified similarly, stating that bicycle officers came to "push and physically move us to the side to allow more officers to come in." (ECF No. 46 at 110–11).

A body-worn camera video shows a CPD supervisor instructing officers that "the group at Broad and High is going to move. They're not going to stay there . . . Tell them to move . . . We are going to move them by any means necessary – reasonably necessary. Everybody got that? Get your mace ready." (Pl.'s Ex. 123-A). Moments later, these same officers, now mounted on bikes, ride into individuals standing on the sidewalk, spraying chemical irritants broadly, without provocation. (Pl.'s Exs. 123-A, 123-B).

Unfortunately, this use of bicycles was not the only way CPD exerted physical force. Recall that Ms. Mixon testified as follows: "And one of the officers pushed me down so hard off the curb . . . he stomped on my kneecap." (ECF No. 47 at 74–75).

It is not fatal to the sufficiency of the Fourth Amendment claim that Plaintiffs were not completely immobilized by CPD's use of force. Rather, what is required is that a person's freedom of movement had been terminated, not that the person's movement itself had been terminated. *Yelverton v. Vargo,* 386 F. Supp. 2d 1224 (M.D. Ala. 2005) ("[Defendant's] pepper[-]spraying of [Plaintiff] constituted a seizure even though it did not stop him."). Even if a "citizen is able to walk or hobble away," a seizure still lies, so long as there was an intentional application of physical force. *Jennings*, 2009 WL 413110, at *7. The impact that chemical irritants and less-lethal

projectiles, such as tear gas, pepper spray, and knee knockers had on the congregants also support Plaintiffs' argument that they were seized. *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (explaining that pepper spray is "'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests").

Accordingly, even absent an arrest, the use of chemical spray and less-lethal projectiles can amount to is a cognizable restraint under the Fourth Amendment where the "clear[]" effect of officers' use of pepper spray "was to control plaintiffs' movement." *Marbet*, 2003 WL 23540258, at *10; *see also Hamilton v. City of Olympia*, 687 F. Supp. 2d 1231, 1241 (W.D. Wash. 2009) ("[H]is freedom of movement was terminated in both instances after he was sprayed with pepper spray."). Here, the impact of the pepper spray often literally rendered the protestor unable to move freely. And the evidence establishes much more than a minimal intrusion on the protestors' bodily integrity; many of the protestors suffered disorientation or were otherwise physically impacted. (ECF No. 47 at 114 (recalling that sprayed protestors hit the ground and were screaming); Pl.'s Ex. 113 (showing a pepper-sprayed individual crawling away)).

Projectiles like knee knockers also denied protestors of their movement. Plaintiff Hubby was standing on the sidewalk when, without audible warning, he was hit with a wooden munition. His knee went numb, and he was unable to stand independently, prompting about a dozen demonstrators to fashion a rental bicycle into a gurney to transport Mr. Hubby. (ECF No. 48 at 234). Plaintiff Schultz was also hit with a knee knocker, which brought her to the ground. (ECF No. 49 at 127). She recalled: "I was struck with something so hard that it brought me to the ground. I went to get back up and I couldn't . . . I went to take a step with my right leg[,] and it just dropped from underneath me. It was kind of like dead-legged . . . Every time I tried to get up, I would fall back down." (*Id.* at 127–28). A friend swung Ms. Schultz's right arm over her shoulder and helped

transport her to an alleyway. (*Id.*; *see also* ECF No. 49 at 28 (recalling "ducking," "dodging" officers shooting projectiles at them while complying with a dispersal order)).

This Court finds that Plaintiffs' allegations are sufficient to set forth a likelihood of success on the merits that the deployment of less-lethal munitions constituted physical force that temporarily restrained the protestors. *See Pluma v. City of New York*, No. 13 CIV. 2017 LAP, 2015 WL 1623828, at *4 (S.D.N.Y. Mar. 31, 2015) (same). The intentionality requirement of the Fourth Amendment seizure analysis is fulfilled since there is no dispute that the protestors were the target of police conduct when the officers held out their hands and sprayed the protestors indiscriminately. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (quoting *Fisher v. City of Memphis*, 234 F.3d 312, 318 (6th Cir. 2000)) ("[W]e emphasized that police officers seize those persons who are the 'deliberate object of their exertion of force.'"). Regardless of officers' motives, their application of force terminated the protestors' freedom of movement and constituted a seizure under the Fourth Amendment.

### (2) Reasonableness of Force

A seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The reasonableness of a particular use of force should be judged from the perspective of a reasonable officer on the scene—not with the benefit of hindsight. *Graham*, 490 U.S. at 396. In addition, the Sixth Circuit has determined that a police officer may be responsible for another officer's use of excessive force if the officer: (1) actively participated in the use of excessive force; (2) supervised the officer who used excessive force; or (3) owed the victim a duty of protection against the use of excessive force. *Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011).

The objective reasonableness of a seizure depends upon a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).[55]

Three factors must be used in determining the degree of force employed: (1) the nature or "severity" of the crime for which the suspect is charged; (2) whether the suspect poses any threat to the officers or others; and (3) whether the suspect has attempted or is likely to attempt to flee officers or to resist arrest. Whether the officer had other means of force available is not relevant to the inquiry. *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005). The question is whether a reasonable officer would have known the actions used were objectively unreasonable, not that there existed a less intrusive means.[56]

The first factor, the severity of the crime at issue, weighs heavily in Plaintiffs' favor and against the use of force employed by the officers. Testimonial, video, and pictorial evidence establish that most congregants were peacefully protesting, observing, reporting, passing by, or providing medical aid when they fell victim to the use of these less-lethal munitions. The protests were mostly peaceful—the incident commander for CPD said as much on June 2, 2020: "99% of these people are peaceful . . . whether they're yelling stuff at you or not, that's still peaceful there if they're not threatening you." (Pl.'s Ex. 25). Even those Plaintiffs that were committing crimes— e.g., failure to disperse—were committing a minor misdemeanor under O.R.C. § 2917(d). While a legally punishable offense, failure to disperse is a minor infraction that justifies raised voices,

---

[55] Prior to *Garner* and *Graham*, most § 1983 excessive-force cases were litigated under the substantive due process "shocks the conscience" theory. Defendants contend that the Fourth Amendment is inapposite here and that Plaintiffs must instead proceed under the Fourteenth Amendment.

[56] While courts, including the Sixth Circuit, offer considerable deference to the apparent need for officers to make split-second judgments concerning the level of force necessary, scholarly commentary has questioned how much deference should be paid, particularly when the totality of the circumstances suggest there was time for thoughtful reflection. *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006).

not raised weapons. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1215 (W.D. Wash. 2020) ("At most, this evidence shows that Plaintiffs, and many protestors alike, were engaging in minor property crime and offered only passive resistance at the time they were attacked."). That CPD felt the need to clear the streets might be legitimate. But in the absence of an actual exigency, these traffic concerns cannot legitimize the application of force when it is not otherwise justified. *Nelson*, 685 F.3d at 880.

Moving to the second *Graham* factor, the threat analysis must be based on objective factors and not merely "a simple statement by an officer that he fears for his safety or the safety of others." *Nelson*, 685 F.3d at 880. In this case, the protests were not overwhelmingly dangerous scenarios for officers clad in riot gear and armed with guns and other munition-deploying devices. And there is no allegation that *these* Plaintiffs engaged in any sort of destructive or harmful behavior aimed at the police. (*Cf.* Defs.' Exs. 30—40, 56 (showing property damage but without any connection to the Plaintiffs or witnesses here)). "These are peaceful demonstrators, journalists, and medics who have been targeted with extreme tactics meant to suppress riots, not to suppress demonstrations." *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020). Under the Plaintiffs' allegations, the security threat posed by the protest was low. On the other hand, recent events in Washington, D.C., and across the nation emphasize the need for robust security, particularly of governmental buildings—which, of course, tend to be the locus of First Amendment activity. But the current record still presents unanswered questions as to whether the level of force applied was reasonable.

Third, the factors that justify the use of force must be weighed against the degree of intrusion posed by the particular type of force to determine if the use in the particular instance was reasonable. The totality of the circumstances suggests objective unreasonableness: the disparity

between the threat posed by the protest and the degree of force is wide, and the Defendants have not pointed to the existence of a specific exigent circumstance justifying the use of non-lethal force.  There is no evidence that the officers reasonably believed that Plaintiffs posed a risk to the officers or any other persons, and the group engaged in passive resistance, at most, by failing to disperse immediately if and when such an order was given.

Many of these instances of force were without provocation or applied at random and indiscriminately. A video from May 30 shows a CPD officer deploying chemical spray against individuals who already appear to be suffering from a prior deployment of chemical spray. It shows officers in riot gear spray one individual in the intersection at point-blank range, and then the same officer pivots and sprays another individual in her face. (Pl.'s Ex. 112; *see also* Pl.'s Ex.117 (horse-mounted officers hurling tear gas canisters into the crowd; bicycle officers spraying chemical irritants at point-blank range); Pl.'s Ex.118 (same, from a different angle)). Another video shows a SWAT officer deploying chemical spray at point-blank range against two people standing on the sidewalk. (Pl.'s Ex. 107).

There is a mountain of evidence that some protestors were confronted with less-lethal munitions while *trying* to follow police orders to leave the demonstrations. (*See, e.g.*, Pl.'s Ex. 137 (walking away while sprayed); Pl.'s Ex. 128 (spraying individuals as they walk away); Pl.'s Ex. 147 (spraying individuals standing still or walking away); Pl.'s Ex. 101 (spraying Plaintiff Mixon while she walks on the sidewalk away from the officers); ECF No. 47 at 157 ("I was walking away, so I felt I was leaving the area," before being subjected to tear gas)). *See also Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155 (D. Or. 2020) (finding a strong likelihood of success on the merits where tear gas was used against protestors trying to follow police orders and leave the demonstrations). Furthermore, the video evidence of police conduct shows that most of

the officers had ample time for reflection, often while the officers are actually talking with the to-be-sprayed individual. (*See* Pl.'s Exs. 140-A, 140-B (ignoring journalists' statements that they were exempt from curfew); ECF No. 46 at 230 (striking a journalist with a wooden munition, though he bore his press badge)).

Also militating strongly against a finding of reasonable force is that CPD routinely failed to give coherent dispersal instructions to protestors. Accordingly, Defendants' reliance on *Dundon v. Kirchmeier*, No. 1:16-CV-406, 2017 WL 5894552, at *18 (D.N.D. Feb. 7, 2017), *aff'd*, 701 F. App'x 538 (8th Cir. 2017) is unpersuasive. There, Plaintiffs *could have* complied with lawful commands to disperse. Dispersal orders were either not provided or unintelligible. Witnesses testified to "muffled," "garbled," and "not very clear" orders preceding the deployment of sprays, munitions, or the exercise of physical force. (ECF No. 46 at 65; ECF No. 47 at 157; ECF No. 46 at 32, 37, 58).

Other times, the dispersal orders were given contemporaneously with the use of less-lethal crowd control devices. For a dispersal order to be meaningful,  officers generally must give time for a dispersal order to be heeded before the use of force. (ECF No. 48 at 219–20 (stating that, at any rate, that he did not hear any message)). Similarly, Ms. Lamey was struck with a knee knocker four minutes after first hearing the dispersal announcement. Four minutes is not enough time for congregants to comply with officers' orders. Officers sometimes rode their horses or bikes into crowds *while* giving a dispersal order—a constitutionally deficient dispersal order given that there was little time to comply. This, too, tracks *Nelson*'s logic. A dispersal order given moments before the exercise of force demonstrates a likelihood of success on whether there was an unreasonable use of force. *Nelson*, 685 F.3d at 881 (noting the object of the police force "certainly could not have been expected to comply with instructions that were never given to him.").

While it is undisputed that there were individuals hurling both bottles and provocative expletives at officers, Defendants do not allege that Plaintiffs were among them. Nor do Defendants claim that the individuals causing the problems were so numerous that the two categories of demonstrators were indistinguishable. The application of force to Plaintiffs, therefore, could not have been justified by the government's interest in stopping any disorderly behavior. Nor, even if this Court were to consider all the demonstrators as a single entity, was the desire to clear the area a sufficient justification for employing the force used by the government—the firing of less-lethal force, resulting in this instance in serious and permanent injuries to multiple individuals. This force resulted in substantially more than a minimal intrusion and was not justified by the governmental interest in dispersing a group of peaceful protestors and congregants who could most likely be dispersed by less forceful means.

This Court, therefore, concludes that the force used by the government was unreasonable and resulted in a violation of the Plaintiffs' Fourth Amendment rights. Defendants' conduct—specifically, the reliance on the use of less-lethal force during the protests—is so excessive as to constitute a violation of constitutional rights, thus raising the specter of imposing liability under § 1983. *Nelson*, 685 F.3d at 874. There may later be questions of qualified immunity to grapple with, but Plaintiffs have established a strong likelihood of success that Defendants engaged in excessive force contrary to the Fourth Amendment. *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1292 (D. Colo. 2020) (finding strong a likelihood of excessive force in protestor after Mr. Floyd's killing).

### b. First Amendment (Retaliation)

"[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572

U.S. 185, 203 (2014). "Organized political protest is a form of 'classically political speech.'" *Don't Shoot Portland*, 465 F. Supp. 3d at 1155 (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988)). And this protection includes criticism of public officials even when it is "vehement, caustic, and sometimes unpleasantly sharp." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (internal citations omitted).

To establish a First Amendment retaliation claim, plaintiffs must show that: (1) they were engaged in a constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *Martin v. Brown-Clark*, 76 F. App'x 701, 706 (6th Cir. 2003). At this stage, Plaintiffs have made a clear showing of all three elements.

First, Plaintiffs show that they were engaged in the constitutional right to protest police brutality. They exercised their right in public fora. On *this* record, their protests have been passionate but peaceful, and they must thus be protected even if they stand in opposition to the police. The video and testimonial evidence reveal as much. Both parties agree that some demonstrators were violent, launching objects at the police.  This, no doubt, poses a serious threat to officer life and safety.  But, as to *these* protestors, per *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996): "[T]he proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." 110 F.3d at 1372.

Second, CPD's use of less-lethal crowd-control weapons has surely chilled speech. Exposure to tear gas and pepper spray is extremely painful, as are projectiles lobbed into the crowd,

which resulted in lasting and serious physical injuries. Though "less lethal," these devices have been sufficient to deter some protestors from protesting again. "Ordinary firmness" is an objective standard that will not "allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Third, Plaintiffs have demonstrated a likelihood of success on the merits that the *nature* of the protests was a substantial or motivating factor in CPD's use of less-lethal force on nonviolent protestors. CPD characterized the protests as antipolice, and division personnel echoed that message throughout the duration of the protests. Recall then-Chief Quinlan's June 2, 2020 roll call speech to officers: "And if you go one step too far one way, you end up aggravating or provoking a situation. And with the situation when *we're the focus of the protest*, we can't afford to be the ones that create that provocation. We just can't . . . It's a lot easier when they're protesting something else."  (Pl.'s Ex. 25 (emphasis added); Pl.'s Ex. 4 (citing Quinlan Aff. ¶ 6) ("The police were the focus of the protests.")). This attitude seeped its way into the treatment of individuals in the vicinity of the protest, most notably, Plaintiff Mixon, the non-protestor who traveled downtown to find her 21-year-old daughter. Ms. Mixon testified that a CPD officer pushed her off of the curb, stomped on her left kneecap [breaking it], and stated to her: "That's what you get for being down here, you black, protesting bitch." (ECF No. 47 at 74–75).

The use of force on nonviolent protestors and congregants raises a serious question if officers acted in reaction to the protests' antipolice message and aimed to intimidate protestors to deter such speech. This is especially so because the allegations and evidence submitted appear to show that at least some Plaintiffs—peaceful protestors or passersby—were targeted and *not* inadvertently hit.

This evidence supports a finding that Plaintiffs have made a showing of a likelihood of success of the merits on their First Amendment claim.

### c. *Municipal Liability under* Monell

Local governments may not be sued under 42 U.S.C. § 1983 for an injury inflicted solely by employees or agents under a respondeat superior theory of liability. *See Monell*, 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. A municipality can therefore be held liable when it unconstitutionally "implements or executes a policy statement, ordinance, regulation, or decision officially adopted by that body's officers." *Id.* at 690; *DePiero v. City of Macedonia*, 180 F.3d 770, 786 (6th Cir. 1999).[57]

To demonstrate *Monell* liability, one must: (1) identify the policy or custom; (2) connect the policy to the governmental entity; and (3) show causality—i.e., that an injury of a constitutional magnitude occurred because of that policy or custom's execution. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (internal citations omitted).[58] Of these, courts' analyses hinge on the proof of an illegal policy or custom. There are four ways a plaintiff may prove the existence of a municipality's illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

---

[57] The term "policy" has been defined broadly as a deliberate choice to follow a course of action made from various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Arsan v. Keller*, 784 F. App'x 900, 917 (6th Cir. 2019).

[58] Defendants contend that Plaintiffs have failed to identify a policy or custom that authorizes officers to use excessive force against nonviolent protestors or to retaliate against them based on their assembly and expression. (ECF No. 10 at 23). Defendants further argue that even if Plaintiffs could identify such a policy or custom, their claims against the City would still fail because they cannot establish causation or culpability sufficient for municipal liability.

tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Each of these four sub-prongs is addressed, in turn, below:

### (1) Illegal Official Policy or Legislative Enactment

The easiest (and thus rarest) sort of *Monell* case is one where there is a written unconstitutional policy. Defendants argue that Plaintiffs do not identify any written policy that directs or allows Columbus police officers to use excessive force of any kind or to retaliate against protestors on the basis of their speech and assembly. (ECF No. 10 at 23). Plaintiffs acknowledge that they do not challenge "a single, particular City or CPD policy." (ECF No. 6 at 19). While Plaintiffs do cite numerous policies, which they characterize as problematic or illegal, Plaintiffs focus primarily on the remaining three sub-prongs of municipal liability, and this Court follows suit.

### (2) Actions by Officials with Final Decision-Making Authority & Ratification

The second type of *Monell* liability involves a showing of an illegal policy or custom by demonstrating that an official with final decision-making authority ratified illegal actions. *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020). To establish a § 1983 claim against a municipality based on the ratification theory, a municipal official with the final policymaking authority must approve the subordinate's decision and the basis for it. *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004). The ratification theory of municipal liability does not require proof of a pattern or custom. *Wilson v. Louisville-Jefferson Cnty. Metro Gov't & Brett Hankison*, No. 3:19-CV-00739-CRS, 2020 WL 981717, at *2, 2020 U.S. Dist. LEXIS 34437, at *4–6 (W.D. Ky. Feb. 26, 2020). Instead, ratification of a single violative act is enough for municipal liability to attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). An official acting with the final decision-making authority may ratify the unconstitutional acts of its employees in two ways. The first is through

"affirmative approval of a particular decision made by a subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 650 (6th Cir. 1993). The second is by "failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020); *see also Wilson*, 2020 WL 981717, at *2 ("[T]he Sixth Circuit has held that municipal liability may attach when an official with final decision-making authority and a duty to know and act upon unconstitutional conduct fails to investigate or correct the unconstitutional conduct.").

Here, Plaintiffs assert that then-Chief Quinlan was the final policymaker on police practices and provided the "marching orders" to quell the protests, rather than just to prevent a riot—and that resulted in their constitutional violations. As for proof, Plaintiffs claim that in Columbus, a pattern or practice has long existed of flouting the letter or spirit of CPD policies against excessive use of force, favoring the right to protest, or racially discriminating. What happened to Plaintiffs and other protestors went beyond that pattern or practice because the then-Chief issued the policies the officers were implementing against Plaintiffs and other protestors.

Assuming Plaintiffs' allegations are true—that police were armed with military-grade equipment and had a green light to spray pepper spray, deploy tear gas, and fire wooden pellets to inflict pain as a deterrent—then, the consistency of officers' alleged actions supports the assertion that officers were implementing CPD customs or policies. In other words, this Court finds that Plaintiffs have shown a likelihood of success on the merits of a *Monell* claim, insofar as it is premised upon ratification of illegal actions by officials with final decision-making authority.

### (3) Failure to Supervise and Discipline

Plaintiffs assert that Columbus police officers received minimal and ineffective training from Defendants City and CPD Chief and were subject to vague, ineffective, and rarely enforced

policies regarding the need to handle protestors without using force or using the least amount of non-lethal force necessary. (ECF No. 6 at 4). This is essentially an allegation of omission—that Defendants had a "custom" of failing to supervise and discipline. A custom, for purposes of *Monell* liability, must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691. It must reflect a course of action deliberately chosen from among various alternatives. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985).

This contention, Defendants retort, is also unsupported. True, Defendants admit that inadequate police training and supervision *can* demonstrate an improper policy or custom for purposes of municipal liability—but *only* when the purported failures to train or supervise amount to deliberate indifference to the rights of persons with whom the police come into contact. (ECF No. 10 at 27). Defendants insist that Plaintiffs cannot show that the training or supervision of Columbus police officers was, or is, lacking or inadequate because all officers receive extensive training, which includes instruction on community diversity and the inappropriateness of biased-based profiling. With respect to the use of chemical spray, sworn officers are not permitted to carry chemical spray until training and qualification standards have been satisfied. (ECF No. 10 at 28).

Plaintiffs identify multiple deficiencies and inadequacies in CPD's use-of-force or civil disorder and crowd control training or supervision. For example, the crowd-control training instructed that not all protestors standing with their hands raised were peaceful, that children and the elderly were pawns and shields, that volunteers distributing water on a hot day were fomenting violence, and that protestors wearing protective gear for fear of CPD force were "not actually nonviolent," so officers needed to be "mentally prepared to use force" against them. (Mabry Aff. ¶¶ 5278−81, 5287−88). CPD's directives and instructions for its officers to collectively punish

nonviolent demonstrators, even though using the force they had been trained to use, was palpably excessive.

As to discipline, even though the Mayor and then-Chief admitted officers' video-recorded conduct was improper, there have been zero reports by officers of excessive force by others during the protests, zero disciplinary actions or criminal charges for excessive force, and zero efforts to relieve violent officers from duty or to remove them from special response teams. (ECF No. 63 at 8).

Plaintiffs have also demonstrated a likelihood of success on the merits of *Monell* liability based upon failure to supervise or discipline.

### (4) Custom or Tolerance of Acquiescence

Finally, to proceed on an "inaction theory" of liability—i.e., a custom or tolerance of acquiescence—a plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Stanfield v. Lima*, 727 F. App'x 841, 851 (6th Cir. 2018) (quoting another source).

One instance of potential misconduct is insufficient to show a clear and persistent pattern of constitutional violations. *Stewart v. City of Memphis*, 788 F. App'x 341, 347 (6th Cir. 2019). Such a pattern, however, *is* shown by "enough similar incidents" sufficient to put officials on notice that persons "would be subject to constitutional deprivation" if the problem is not remedied. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989). For instance, in *Lipman v. Budish*, the Sixth Circuit held that allegations of six different instances in which county officials interviewed a potential child abuse victim in the presence of her alleged abusers

were "enough to draw the reasonable inference that this custom [of interviewing potential abuse victims in the presence of their alleged abusers] was widespread throughout [the County Division of Children and Family Services] and known to policymakers within the county." 974 F.3d 726, 748 (6th Cir. 2020). Therefore, the court decided these allegations were sufficient to survive a motion to dismiss. *Id.*

The required showing is that the "evidence must show that the need to act is so obvious" that the "conscious decision not to act" amounts to a "policy of deliberate indifference" toward the Plaintiffs' constitutional rights. *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005). This "requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Id.*

In the present case, Plaintiffs allege that the City has an unwritten policy, practice, or custom of condoning the use of excessive force against some protestors, such as those protesting police violence. They argue specifically that the use of excessive force and the quelling of speech by police during peaceful protests demonstrated Defendants' deliberate indifference in the policies, training, supervision, and discipline needed to prevent officers and mutual-aid law enforcement personnel from violating constitutional rights. This alleged failure to investigate or discipline, or to make any meaningful policy reforms, suggests a conscious choice to allow the pattern of alleged conduct to continue.

Plaintiffs also allege that Defendants' custom of acquiescence was the cause of their injuries. The Sixth Circuit has held that a municipality's failure to act in the face of obvious

constitutional violations is properly treated as the cause of subsequent, similar violations. *Leach*, 891 F.2d at 1248.

Defendants state that Plaintiffs have failed to provide any evidence of a pattern or practice of CPD using excessive force on nonviolent protestors or retaliating against them on the basis of their speech and assembly. As a legal matter, Defendants concede that a failure to discipline or investigate can demonstrate a municipal policy or custom "if the plaintiff can show that the municipality historically failed to investigate or discipline similar conduct such that the municipality's inaction represents an unofficial custom or tolerance." (ECF No. 10 at 25 (citing *Bear v. Del. Cnty.*, Case No. 2:14-cv-00043, 2016 U.S. Dist. LEXIS 6537, at *38 (S.D. Ohio Jan. 20, 2016))). But Defendants assert that Plaintiffs' claim still is insufficient because, per *Sherrod v. Williams*, "an *after-the-fact approval* of an officer's conduct cannot logically be the *moving force* behind the constitutional violation." 2019 U.S. Dist. LEXIS 8915, at *70−71 (S.D. Ohio Jan. 15, 2019) (citing another source).

Accepting Plaintiffs' allegations as true, it is at least plausible that CPD's alleged failure to act on city officials' knowledge of potential constitutional violations over the course of several days of protests was the "moving force" behind subsequent violations of the same type. Therefore, in addition to the "ratification" theory of liability, Plaintiffs have also adequately pled all four elements of the "inaction theory" of municipal liability under *Monell.*

Thus, even though the mayor and then-Chief Quinlan admitted officers' video-recorded conduct was improper, there have been zero reports by officers of excessive force by others during the protests, zero disciplinary actions or criminal charges for excessive force, and zero efforts to relieve violent officers from duty or remove them from special response teams. (ECF No. 59).

### (5)  Finding on Monell Factors

The video and testimonial evidence presented by Plaintiffs suggests that police have used physical violence, tear gas, and pepper spray against peaceful protestors without provocation, and city officials have done nothing or not enough to condemn and correct these actions. This evidence leads to the inference that Plaintiffs have a likelihood of success in establishing that unconstitutional conduct by police was carried out pursuant to an official policy or custom.

## 2.  Irreparable Harm

Irreparable harm is nearly as crucial as the success factor: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22−24. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Here, Defendants argue that: (1) it is likely that Plaintiffs will again be subject to the alleged unconstitutional conduct; (2) their delay in seeking an injunction further undercuts their argument that they will suffer irreparable harm without it; (3) when a defendant voluntarily ceases the alleged offending conduct, a cognizable danger of recurrent violation is not shown; and (4) Plaintiffs have not shown irreparable injury because they do not actually attempt to enjoin *unconstitutional* policies (this basically appears to be an overbreadth argument). (ECF No. 10 at 34).

This Court finds that Plaintiffs have demonstrated irreparable harm. Protests combatting police brutality against Black Americans have proven cumulative. Protests are inherently ongoing, and it is often difficult to tell where one protest ends and the next begins. There is nothing in the record that indicates that upon another protest, Plaintiffs will not experience further constitutional deprivations and physical harm at the hands of the police. Indeed, Plaintiffs and witnesses have

attended multiple protests and were twice subject to problematic police treatment. Because "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).

### 3. Balance of the Equities

When considering the third factor, the balance of equities, a court "must balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotations omitted). Police officers are often faced with dangerous and rapidly evolving situations while trying to enforce the law and maintain the safety of the public. And, societally, we have determined it is important that police officers have non-lethal options to use to protect themselves and the public when necessary. Most protests tend to have an element of violence or destruction—and even when nonviolent, they are, by definition, *disruptive*. The locus of First Amendment activity often is public buildings, the risk of a protest overflowing—intentionally or not—into the citadels of republican democracy is non-trivial.

Recent events—including the January 6 attempted insurrection at Capitol Hill, the breach of Governor Inslee's mansion in Washington on the same day, the December 2020 armed break-in to the Oregon state capitol, armed protestors rallying inside the Michigan Statehouse last May, a recent break-into Bellingham City Hall—reify the extent to which many of us rely on police officers to keep our communities and those who serve the government safe. But the relief that Plaintiffs request leaves open all lawful options for police to use reasonable force when necessary to defend against a threat and to make arrests when supported by probable cause. And any possible benefit police officers could gain from deploying chemical agents, projectiles, or striking weapons

against demonstrators who pose no threat and are not resisting lawful commands is outweighed by the irreparable harm peaceful protestors could face.

### 4.  Public Interest

The final factor, the public interest, also weighs in favor of an injunction. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Because the Plaintiffs have established a likelihood of success on the merits of their constitutional claims, an injunction to prevent further irreparable constitutional harm is in the public interest.

### 5.  Scope of Preliminary Injunction

Having found that a preliminary injunction is warranted, this Court turns to the scope of the injunctive relief. This Court hereby **ORDERS** the following:

(1) Defendants are restrained from using non-lethal force, including tear gas, pepper spray, flash-bang grenades, rubber bullets, wooden pellets, batons, body slams, pushing or pulling, or kettling, on nonviolent protestors to enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, and/or misdemeanors, that were not committed with actual or imminently threatened physical harm or property destruction;

(2) Defendants are required to recognize that, for purposes of the injunction, "nonviolent protestors" includes individuals who are chanting, verbally confronting police, sitting, holding their hands up when approaching police, occupying streets or sidewalks, and/or passively resisting police orders;

(3) Defendants may only enforce dispersal orders, traffic laws, such as clearing the streets or sidewalks, or misdemeanor enforcement, to the extent practicable, through citations or arrests, based on probable cause that an individual has committed a violation;

(4) Defendants are prohibited from using the infliction of pain to punish or deter "nonviolent protestors" and are directed to limit infliction of pain on any protestor when incidental to a use of force necessary for preventing crimes committed with actual or imminently threatened physical harm or property destruction and/or arresting, based on probable cause, an individual who allegedly committed such an offense;

(5) Defendants must ensure that body and vehicle cameras are in good working order and used during every interaction with "nonviolent protestors" and badge numbers and/or identity cards are prominently displayed in each such interaction, even when riot gear is being worn;

(6) Defendants must recognize that individuals legitimately displaying "press," "media," "reporter," "paramedic," "medic," "legal observer," or similar words and/or symbols are permitted to be present in a position enabling them to record at protests and/or to intervene to assist individuals who appear to have been injured and that all individuals, regardless of their occupation or nonviolent activity, are permitted to record at protests or whenever any police officer interacts with the public; and

(7) The City of Columbus and its Division of Police must request that mutual aid law enforcement personnel to cooperate with them adhere to the foregoing restraints or standards on the use of non-lethal force and enforcement, infliction of pain, cameras and identification, and recognition of "nonviolent protestors" and individuals assisting or observing them.

## V.  CONCLUSION

For the reasons set forth above, this Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction because: (1) they have standing to sue and the matter is not moot; (2) they have demonstrated a likelihood of success on their Fourth Amendment excessive-force claim, First-Amendment retaliation claim, and the municipal-liability factors under *Monell*; (3) they have established irreparable injury because protests, especially against police brutality, are inherently ongoing; (4) the balance of the equities tilts in Plaintiffs' favor; and (5) the public interest weighs in favor of an injunction because it seeks to prevent the violation of constitutional rights.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: April 30, 2021**