**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

TAMARA K. ALSAADA; MAHIR ALI; MARY : 
BARCZAK; DEMETRIUS BURKE; :
BERNADETTE CALVEY; STEPHANIE :
CARLOCK; S.L.C., a minor; KEITH DUERK; :     Civil Action No. 2:20cv3431
JENNIFER EIDEMILLER; ANDREW FAHMY; :
TALON GARTH; HOLLY HAHN, BRYAN :
HAZLETT; JUSTIN HORN; KURGHAN HORN; :
TERRY D. HUBBY, Jr.; RANDY KAIGLER; :
ELIZABETH KOEHLER; REBECCA LAMEY; :
RICKY LEE LANE; NADIA LYNCH; MIA :
MOGAVERO; MICHAEL MOSES; ALETA :
MIXON; DARRELL MULLEN; LEEANNE :
PAGLIARO; TORRIE RUFFIN; SUMMER :
SCHULTZ; CLARRESSA THOMPSON; :
AMANDA WELDON; AMANDA WILLIAMS, :
and HEATHER WISE, :
                                   :     CHIEF JUDGE MARBLEY
              Plaintiffs, :
                                     :     MAGISTRATE JUDGE JOLSON
      v. :
                                       :
THE CITY OF COLUMBUS; CHIEF THOMAS :
QUINLAN, in his individual and official capacities; :
COMMANDER DAVID B. GRIFFITH, in his :
Individual and official capacities; LIEUTENANT :
DUANE MABRY, in his individual and official :
capacities; LIEUTENANT LOWELL RECTOR, in :
his individual and official capacities; LIEUTENANT :
LAWRENCE YATES, in his individual and official :
capacities; SERGEANT SCOTT BRAY, in his :
individual and official capacities; SERGEANT :
BRIAN BRUCE, in his individual and official :
capacities; SERGEANT CHRISTOPHER :
CAPRETTA, in his individual and official :
capacities; SERGEANT CAROLINE CASTRO, in :
her individual and official capacities; SERGEANT :
DAVID GITLITZ, in his individual and official :
capacities; SERGEANT BRIAN STEELE, in his :
individual and official capacities; SERGEANT :
PAUL SZABO, in his individual and official :

1

capacities; OFFICER PAUL BADOIS, in his :
individual and official capacities; OFFICER :
MICHAEL DUNLEVY, in his individual and :
official capacities; OFFICER SHAWN DYE, in his :
individual and official capacities; OFFICER :
MICHAEL ESCHENBURG, in his individual and :
official capacities; OFFICER THOMAS HAMMEL,:
in his individual and official capacities; OFFICER :
HOLLY KANODE, in her individual and official :
capacities; OFFICER KENNETH KIRBY, in his :
individual and official capacities; OFFICER :
BENJAMIN MACKLEY, in his individual and :
official capacities; OFFICER BENJAMIN :
MESSERLY, in his individual and official :
capacities; OFFICER GARY PATTERSON, in his :
individual and official capacities; OFFICER :
ROBERT REFFITT, in his individual and official :
capacities; OFFICER AMBER RICH, in her :
individual and official capacities; OFFICER :
SHANNON SCHMID, in his individual and official :
capacities; OFFICER PHILLIP WALLS, in his :
individual and official capacities; and JOHN and :
JANE DOE, Nos. 1-30, in their individual and :
official capacities, :
 :
 :
 : **JURY DEMAND ENDORSED HEREON**
                           Defendants. :

## SECOND AMENDED COMPLAINT

## I.  Preliminary Statement

1.      On May 25, 2020, the killing of George Floyd, who was being arrested for
allegedly passing a counterfeit $20 bill to buy cigarettes, by then Minneapolis Police Department
Officer Derek Chauvin was live-streamed over the Internet for eight minutes and 46 seconds and
later televised around the world.

2.      Starting on May 28, 2020, in Columbus, Ohio, Plaintiffs, along with hundreds of
thousands in cities, states, and countries, took to the streets to demonstrate against excessive use
of force by police, saying the names of Black men and women who had recently been killed by
police or vigilantes; chanting that "Black Lives Matter," "No Justice, No Peace," "I can't

breathe," "Hands up, Don't Shoot," and "Whose Streets? Our Streets"; and expressing their outrage at the militarization of police forces, the disparate impact on minority communities of law enforcement priorities, and a pattern or practice of governments at all levels tolerating systemic racism and failing to adopt effective policies or implement adequate training, supervision, and discipline of law enforcement officers.

3.      Plaintiffs and other demonstrators in Columbus comprised a multi-racial group, informally brought together by Black community leaders and activists primarily through the use of social media and dedicated to nonviolent protest, including civil disobedience of traffic, parade, and mass-gathering regulations, to generate urgent widespread public attention to the historic and continuing police violence directed overwhelmingly at communities and people of color condoned by mostly White police supervisors and administrators.

4.      The goals of Plaintiffs and other demonstrators included engendering serious, effective, and immediate actions to bring a halt to the endemic racism infecting America's law enforcement and justice systems and the general tolerance of excessive force routinely administered by police officers against arrestees, regardless of innocence or guilt, and especially against citizens who question an officer's actions.

5.      On May 28, 2020, Plaintiffs and other demonstrators in Columbus exercised their rights of assembly and expression by gathering downtown.

6.      Defendants Commander, Lieutenants, Sergeants, and Officers were angered by the civil disobedience they observed, the message of the protests, and the criticisms and denunciation they heard.

7.      Defendants Commander, Lieutenants, Sergeants, and Officers had received minimal and ineffective training from Defendants City and Chief and were subject to vague, ineffective, and rarely enforced policies regarding the need to handle protesters without using force or using the least amount of non-lethal force necessary.

8.     Defendants Commander, Lieutenants, Sergeants, and Officers instead responded to the protests with excessive use of force, including kettling, pepper spraying, tear gassing, smoke bombs, and assaulting with physical force, sonic cannon, batons, horses, bicycles, and rubber and wooden bullets, or bean bag rounds and flash-bang grenades against nonviolent protestors who were standing in the streets, from which vehicular traffic had already been blocked and eliminated by police, or on sidewalks, chanting, and holding signs and posing no threat of violence or property destruction, typically without giving audible warnings to their targets, and targeting clearly-identifiable journalists, medical assistants, and legal observers who were there peaceably to assist protestors.

9.     Defendants Commander, Lieutenants, Sergeants, and Officers either criticized, often profanely, the protestors for their chants, signs, and civil disobedience or heard, without commenting, other Officers do so while using excessive force.

10.     Defendants Commander, Lieutenants, Sergeants, and Officers purposely used excessive force to punish one or more Plaintiffs and other demonstrators, to deter them from continuing to protest and others from joining a protest with which they disagreed, and to reclaim the streets.

11.     Defendants Commander, Lieutenants, Sergeants, and Officers maliciously prosecuted one or more Plaintiffs to punish them and deter other demonstrators from continuing to protest and some purposely covered their names and badge numbers with tape to avoid being identified when they used excessive force or retaliated for speech they resented.

12.     Just the month before, Defendants had exercised restraint when demonstrators, some of whom openly carried weapons and engaged in hate speech while violating statewide social-distancing and mask mandates, protested the COVID-19 lockdown at and around the Statehouse.

13.     Despite the excessive use of force earlier on May 28, 2020, the overwhelming majority of the demonstrators remained nonviolent, fled from the toxic chemicals, and left, sought medical assistance, or tried to regroup at a safe distance.

14.     After Defendants needlessly escalated and provoked protestors, there were sporadic incidents of property destruction or harassment of law enforcement officers by throwing objects, but none of these actions caused serious injury to officers, and none of them was committed by or reasonably could have been attributed to the Plaintiffs and other nonviolent demonstrators.

15.     After Defendants had escalated their force against non-violent protestors, triggering property destruction by others, they authorized more police and mutual-aid law enforcement personnel to use greater force against the remaining demonstrators, who were injured even though the overwhelming majority of them were not engaged in any violence toward police or property destruction.

16.     On May 29 and 30, a similar dynamic occurred; a curfew from 10:00 p.m. to 6:00 a.m. was imposed on May 30; and public indignation at the broadcasts on social media and local and national television of the demonstrations and reports and pictures or video sent to reportcpd@columbus.gov ultimately convinced the Columbus Mayor, who had initially falsely described what had been happening and excused the police use of force, to limit the use of tear gas and, on June 1, 2020, denounce excessive force by police officers.

17.     Plaintiffs have suffered injuries to their civil rights and their bodies, and they reasonably expect to exercise, and are unwilling to refrain from exercising, their fundamental rights to assemble, protest, travel, and live freely within and around Columbus in the future.

18.     Plaintiffs seek declaratory and injunctive relief; compensatory damages for injuries; punitive damages from Defendants Chief, Commander, Lieutenants, Sergeants, and Officers; and attorneys' fees and costs for violations of their Fourth and Fourteenth Amendments rights to be free from excessive use of force and malicious prosecution; their First and

Fourteenth Amendments rights to peaceably assemble and exercise freedom of expression; and/or their Ohio common-law right not to be battered or maliciously prosecuted and/or injured by the gross negligence of police officers, and/or their Ohio statutory right to recover damages inflicted by a criminal act caused by the failure of Defendants City of Columbus and Chief to adopt effective policies and adequately train, supervise, and discipline police officers.

## II.    Jurisdiction and Venue

19.    This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

20.    Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202; 42 U.S.C. § 1983; and the common law of the State of Ohio.

21.    Under 42 U.S.C. § 1983 and the statutory and common law of the State of Ohio, compensatory damages may be awarded against all Defendants and punitive damages may be awarded against Defendants Chief, Commander, Lieutenants Sergeants, and Officers.

22.    Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and the common law of the State of Ohio.

23.    Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio where Defendant City of Columbus is located and operates the Division of Police, headed by Defendant Chief, which empowered Defendants Chief, Commander, Lieutenants, Sergeants, and Officers to use force.

## III.    Parties

24.    Plaintiff Tamara K. Alsaada is an African-American female and a citizen of the State of Ohio residing in Franklin County, Ohio; serves in the position of Lead Organizer for the Juvenile Justice Coalition, a non-profit organization committed to improving Ohio's juvenile justices system; was the founder and is the Organizing Director of People's Justice Project, a non-profit organization organizing working people and people of color to lead the fight for safe, healthy, and equitable lives by opposing mass incarceration, and has facilitated Heal Columbus,

a web site focused on restructuring the Division of Police and involving community oversight; has been actively involved in criminal justice reform for more than 15 years; received the 2017 YWCA Women of Achievement award; and has published several books on topics related to her work.

25.    Plaintiff Mahir Ali is a 34-year-old, dark-skinned Somali-American male; a resident of Franklin County, Ohio; works as a truck driver; and occupies a leadership position in the local Somali community.

26.    Plaintiff Mary Barczak is a 35-year-old White female; a resident of Franklin County, Ohio; and works as an artist and photographer.

27.    Plaintiff Demetrius Burke is an African-American male and a citizen of the State of Ohio residing in Franklin County, Ohio.

28.    Plaintiff Bernadette Calvey is a 21-year-old White female, a university student, and a citizen of the State of Ohio residing in Franklin County, Ohio.

29.    Plaintiff Stephanie Carlock is a 21-year-old White female; graduated from The Ohio State University in December 2019; worked for Defendant City as an employee of the Columbus Women's Commission before she was indefinitely laid off due to the COVID-19 pandemic; currently works full-time at a Columbus nonprofit organization; and is a citizen of the State of Ohio residing in Franklin County, Ohio.

30.    Plaintiff S.L.C. is a minor, suing through his legal guardian, Plaintiff Justin Horn; a cousin of Plaintiff Kurghan Horn; and a citizen of the State of Ohio residing in Hamilton County, Ohio.

31.    Plaintiff Keith Duerk is a White male and citizen of the State of Ohio residing in Franklin County, Ohio.

32.    Plaintiff Jennifer Eidemiller is a 25-year-old White female; works as a Resource and Communications Coordinator at a Central Ohio nonprofit organization committed to ending sexual violence; and is a citizen of the State of Ohio residing in Franklin County, Ohio.

33.     Plaintiff Andrew Fahmy is a 24-year-old Middle Eastern male and a citizen of the State of Ohio residing in Franklin County, Ohio.

34.     Plaintiff Talon Garth is an African-American male and a citizen of the State of Ohio residing in Franklin County, Ohio.

35.     Plaintiff Holly Hahn is a White female, age 47, and a citizen of the State of Ohio residing in Franklin County, Ohio.

36.     Plaintiff Bryan Hazlett is a White male, age 40, a citizen of the State of Ohio, and a resident of Franklin County, Ohio.

37.     Plaintiff Justin Horn is a 44-year-old White male, the legal guardian of his nephew, Plaintiff S.L.C., and father of Plaintiff Kurghan Horn; and a citizen of the State of Ohio residing in Hamilton County, Ohio.

38.     Plaintiff Kurghan Horn is a 27-year-old White male, son of Plaintiff Justin Horn and cousin of Plaintiff S.L.C.; and a citizen of the State of Ohio residing in Hamilton County, Ohio.

39.     Plaintiff Terry D. Hubby, Jr., is a 31-year-old African-American male and a citizen of the State of Ohio, residing in Franklin County, Ohio.

40.     Plaintiff Randy Kaigler is an African-American male and a citizen of the State of Ohio residing in Franklin County, Ohio.

41.     Plaintiff Elizabeth Koehler is a 32-year-old White female and citizen of the State of Ohio who resides in Franklin County, Ohio.

42.     Plaintiff Rebecca Lamey is a White and Mexican female and a citizen of the State of Ohio residing in Franklin County, Ohio.

43.     Plaintiff Ricky Lee Lane is a 31-year-old male and a citizen of the State of Ohio residing in Franklin County, Ohio.

44.     Plaintiff Nadia Lynch is a White female and a citizen of the State of Ohio residing in Franklin County, Ohio.

45.     Plaintiff Mia Mogavero is a White female and a citizen of the State of Ohio residing in Franklin County, Ohio.

46.     Plaintiff Michael Moses is a 43-year-old White male, a Senior Grants and Contracts Specialist at The Ohio State University, and a citizen of the State of Ohio residing in Franklin County, Ohio.

47.     Plaintiff Aleta Mixon is a 39-year-old African-American female who is the single mother of four children, employed as a nurse's aide, and a citizen of the State of Ohio residing in Franklin County, Ohio

48.     Plaintiff Darrell Mullen is a White male and a citizen of the State of Ohio residing in Franklin County, Ohio.

49.     Plaintiff Leeanne Pagliaro, who is Plaintiff Summer Schultz's wife, is a 28-year-old White female and a citizen of the State of Ohio residing in Franklin County, Ohio.

50.     Plaintiff Torrie Ruffin is an African-American female and a citizen of the State of Ohio residing Franklin County. Ohio.

51.     Plaintiff Summer Schultz, who is Plaintiff Leeanne Pagliaro's wife, is a 32-year-old White female and a citizen of the State of Ohio residing in Franklin County, Ohio.

52.     Plaintiff Reverend Clarressa Thompson is a 58-year-old African-American female, resident of Columbus Ohio, and a Non-Denominational Ordained Minister since 2002.

53.     Plaintiff Amanda Weldon is a 24-year-old White female; graduated from The Ohio State University in 2018; works in property management; resides in downtown Columbus in Franklin County, Ohio; and is a citizen of the State of Ohio.

54.     Plaintiff Amanda Williams is a 30-year-old White female and citizen of the State of Ohio residing in Franklin County, Ohio.

55.     Plaintiff Heather Wise is a White female and a citizen of the State of Ohio residing in Franklin County, Ohio.

56.     Defendant City of Columbus is a political subdivision of the State of Ohio pursuant to Chapter 2744, Ohio Revised Code; at all times material to this Complaint, the employer of Defendant Chief, Commander, Lieutenants, Sergeants, and Officers; established policies on and trained, supervised, and disciplined, or failed to do so, its Sergeant and Officers in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and entered into agreements with other entities to provide mutual-aid law enforcement personnel under its general direction.

57.     Defendant Thomas Quinlan, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police as its Chief; is being sued in his individual and official capacities; convened Division leadership after the May 25, 2020 killing of George Floyd to prepare for mass protests in Columbus; without imposing any enforceable or meaningful restraints on the use of non-lethal force authorized Defendants Commander, Lieutenants, Sergeants, and Officers to use such force; continuously monitored the mass protests starting on May 28, 2020, in Columbus; knew that Defendants Commander, Lieutenants, Sergeants, and Officers had used excessive force; has not provided effective policies and adequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; was a "person" under 42 U.S.C. §1983 who acted under color of law; and provided general direction to mutual-aid law enforcement personnel from other entities.

58.     Defendant Commander David B. Griffith, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

10

59.     Defendant Lieutenant Duane Mabry, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

60.     Defendant Lieutenant Lowell Rector, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

61.     Defendant Lieutenant Lawrence Yates, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

62.     Defendant Sergeant Scott Bray, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech

they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

63.     Defendant Sergeant Brian Bruce, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

64.     Defendant Sergeant Caroline Castro, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in her individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

65.     Defendant Sergeant Christopher Capretta, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

66.     Defendant Sergeant Caroline Castro, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in her individual and official capacities; used or tolerated the use by other officers of an excessive

amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

67. Defendant Sergeant David Gitlitz, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

68. Defendant Officer Paul Badois, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

69. Defendant Officer Michael Dunlevy, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

70. Defendant Officer Shawn Dye, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

71. Defendant Officer Michael Eschenburg, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

72. Defendant Officer Thomas Hammel, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

73. Defendant Officer Holly Kanode, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in her individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech

they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

74.     Defendant Officer Kenneth Kirby, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

75.     Defendant Officer Benjamin Mackley, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

76.     Defendant Officer Benjamin Messerly, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

77.     Defendant Officer Gary Patterson, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive

amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

78.     Defendant Officer Robert Reffitt, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

79.     Defendant Officer Amber Rich, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in her individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

80.     Defendant Officer Shannon Schmid, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

81.     Defendant Officer Phillip Walls, at all times material to this Complaint, was employed by Defendant City of Columbus in its Division of Police; is being sued in his individual and official capacities; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and was a "person" under 42 U.S.C. §1983 who acted under color of law.

82.     Defendants John or Jane Doe, at all times material to this Complaint, were police officers whose identities are not currently known; they are being sued in both their individual and official capacities; are employees of the Defendant City of Columbus, Ohio; used or tolerated the use by other officers of an excessive amount of force; received inadequate training, supervision, and/or discipline by or on behalf of Defendant City of Columbus in the use of force during demonstrations and retaliating for speech they opposed and/or resented; and each is a "person" under 42 U.S.C. §1983 who acted under color of law.

## IV.     Facts

### A.     Societal Background

83.     For years, African-Americans have been the victims of police and vigilante use of deadly excessive force, and Plaintiffs and the other demonstrators have said the victims' names during their protests.

84.     Those names include Tamir Rice, a 12-year-old African-American killed in 2015 by a Cleveland Police Officer when the child was carrying a pellet gun; Breonna Taylor, an African-American Emergency Medical Technician, shot eight times on March 13, 2020, by officers of the Louisville Metro Police Department who were executing a no-knock warrant at her residence; Michael Brown, an unarmed African-American teenager, fatally shot in 2014 by a Ferguson, Missouri police officer; Eric Garner, an African-American whose cry, "I can't

breathe," was repeated by George Floyd, fatally choked in 2014 by a New York City police officer who was arresting him for selling loose cigarettes; Philando Castile, an African-American elementary school cafeteria worker shot five times during a 2016 traffic stop by a St. Paul, Minnesota police officer; and Trayvon Martin and Ahmaud Arbery, young African-Americans killed by vigilantes, one of whom was a former police officer.

85.     Since the May 28-June 3, 2020 Columbus protests, the list has grown. https://www.cbsnews.com/news/say-their-names-list-people-injured-killed-police-officer-involved-incidents/

86.     While in a handful of cases, discipline had been meted out and prosecutions pursued, most of the police officers were not disciplined, let alone successfully prosecuted; indeed, when George Floyd was killed there had been no police discipline meted out for Breonna Taylor's death.

87.     The widespread dissemination of the May 25, 2020 video of Officer Chauvin killing George Floyd coupled with the killing of Breonna Taylor and the history reflected in those names, caused an eruption of public revulsion about police use of excessive force on African-Americans and other minorities.

88.     Social media facilitated the scheduling of demonstrations.

**B.     Defendants' Preparation for Demonstrations**

89.     Defendants knew by May 26, 2020, that demonstrations would occur in downtown Columbus.

90.     Defendants knew that the group Black Lives Matter would call for such demonstrations.

91.     Defendants knew that Black Lives Matter is an organized movement dedicated to non-violent civil disobedience in protest of incidents of police brutality against African-Americans, which began in 2013 when activists used the hashtag #BlackLivesMatter on social media after the acquittal of George Zimmerman in the shooting death of African-American teen Trayvon Martin in February 2012, and was nationally recognized for street demonstrations following the Brown and Garner deaths.

92.     Defendants City and Chief monitored social media communications to and from Black Lives Matter and were aware, before the evening of May 28, 2020, that Black Lives Matter was encouraging a non-violent protest in Columbus.

93.     Many of the Plaintiffs and other protestors were affiliated with, identified with, and/or inspired by the Black Lives Matter movement, dressing in clothing with the group's name or initials, and using chants, such as "Black Lives Matter"; "I Can't Breathe"; "No Justice, No Peace"; and "Hands up, Don't Shoot," which were associated with the group.

94.     Many Columbus Police Officers and their supervisors, along with some mutual-aid law enforcement personnel, nurse an abiding hatred of the Black Live Matters movement, believing that it hurts the image of police and despising the movement's goals and actions seeking to limit the prerogative of police to use force in any manner and amount they wish.

95.     Many Columbus Police Officers and their supervisors, along with some mutual-aid law enforcement personnel, resent the chant "Black Lives Matter" and prefer "Blue Lives Matter" and/or "All Lives Matter," slogans that dismiss and deny the existence and importance of systemic racism in policing.

96.     Anticipating the Columbus protests, many Columbus police officers and their supervisors, along with some mutual-aid law enforcement personnel, decided to use their

assignments to exact revenge on the Black Lives Matter group and chill the exercise of association and freedom of expression by protestors.

97. One tactic used by Defendants City and Chief was to have Columbus Police Officers declare that a peaceful, nonviolent protest in the streets of Columbus had become an emergency and then order the protestors to disperse, using projectile weapons and caustic chemical agents to enforce that order.

98. Defendants City and Chief had adopted a policy, training Columbus Police Officers on that policy, to use that tactic in response to large protests.

99. Failure to disperse when ordered by a law enforcement officer is, under R.C. 2917.04, a minor misdemeanor, unless the order is given in an emergency, when the crime becomes a fourth-degree misdemeanor.

100. Under R.C. 2917.04(B), "Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose."

101. Defendants City and Chief have not emphasized in that policy or training the alternative to use of non-lethal force of citing and/or arresting protestors who do not disperse.

102. Defendants City and Chief have not emphasized in that policy or training a means for Columbus Police Officers to differentiate peaceable assembly for a lawful purpose from an actual emergency.

103. Defendant City's Division of Police has a history of excessive use of force and other abuses of their authority in response to nonviolent demonstrations and expressive conduct by those with whom police officers and their superiors disagree.

104.    For example, on January 30, 2017, nearly two thousand protestors against the Muslim Ban by President Trump came to the Ohio Statehouse and, after a peaceful rally, began to march south on High Street to the Franklin County Court of Common Pleas.

105.    During the march and upon their arrival, protestors overflowed the sidewalks, and, after more protesting, they used the High Street to march back toward the Statehouse.

106.    Columbus Police Officers then ordered approximately 300 protestors to disperse.

107.    Pepper spray or mace was used to disperse the protestors and gratuitously administered directly in the face and eyes of one or more protestors who were not actively resisting arrest.

108.    On June 17, 2017, when Black Lives Matter became involved with a protest at the Columbus Pride Parade, police officers raced to the scene with pepper-spray canisters already drawn.

109.    Only weeks later, on July 7, 2017, when protestors with disabilities, many of them in wheelchairs, peacefully occupied Senator Rob Portman's Columbus office to urge him to vote against a federal health care bill supported by President Trump (who is supported publicly and privately by many police officers because he opposes any form of accountability for police abuses), Columbus Police Officers arrived at the scene, claiming there was an emergency call for assistance, and forcibly arrested the peaceful protestors using excessive force, including knocking over wheelchairs and carrying some protestors with mobility issues out of the building.

110.    The following year, on July 11, 2018, Stephanie Clifford (also known as Stormy Daniels), the adult film star who was paid hush money by President Trump to conceal an affair, visited a Columbus strip club on a publicity tour embarrassing to the President, and several Columbus Police Officers targeted Daniels for arrest because of her status as an anti-Trump

political symbol and arrested other women working at the club because of their association with Daniels and to cover up their retaliatory motive.

111. Social media message board posts among Columbus Police Officers celebrated the arrests as a blow against President Trump's critics.

112. In contrast, Columbus Police Officers have peacefully monitored protests and other expressive events in downtown Columbus with whose messages they are neutral or sympathetic, including the recent protests by an overwhelmingly White group at the Ohio Statehouse against COVID-19-related closures, where many protestors were armed with rifles and carried ammunition, and the intense mass protests and public rallies in 2011 by public employee unions (including their own) against the effort to restrict collective bargaining rights.

113. Despite knowing about this history of Defendant City's Division of Police and the negative feelings towards Black Lives Matter of its officers and their superiors, Defendants City and Chief took no specific precautions against excessive use of force in handling the protests.

114. Defendants City and Chief ensured that Columbus Police Officers were armed with batons, pepper spray, tear gas canisters, sonic cannons, smoke bombs or grenades, flash-bang grenades, and/or weapons that could shoot rubber and wooden bullets or bean bag rounds.

115. Defendants City and Chief characterized such weapons as "non-lethal" and encouraged their use as an alternative to Tasers and guns and/or rifles that used regular bullets, despite knowing that these "non-lethal" weapons, while less lethal than officers' service weapons, still have the potential to cause death or serious injury, especially (though not exclusively) when used without appropriate precautions

116.    The way Columbus Police Officers, Deputies, and mutual-aid law enforcement personnel used such weapons posed a significant risk of serious and harmful bodily injury to nonviolent protestors.

117.    Batons are hard, ergonomic sticks designed to inflict pain and, when applied with the usual force, will break bones and cause concussions and internal bleeding.

118.    Pepper spray is a chemical compound that irritates the target's eyes, causing a burning sensation, pain, and temporary blindness; inflicts shortness of breath by burning the target's lungs; and interferes with breathing by irritating the respiratory system, which, during the protests, was already a concern because of the COVID-19 pandemic.

119.    Tear gas canisters contain a chemical weapon, colloquially known as mace, which causes severe eye and respiratory pain, skin irritation, bleeding, and blindness.

120.    The use of tear gas in warfare is prohibited by international treaties.

121.    Long-lasting effects of tear gas can include development of respiratory illnesses, and the canisters can be delivered with such force that they cause severe bruising, loss of eyesight, and/or skull or bone fractures.

122.    Tear gas has also been linked with painful disruptions to the menstrual cycle of female protestors, including a heavier flow at abnormal intervals with more intense cramping, and unexpected spotting by those with IUDs (intrauterine device).

123.    Flash-bang grenades, which are also known as stun grenades, are explosive devices that emit both an extremely loud bang, usually with higher decibels than a jet engine at full throttle, and ultra-bright light to disorient their targets.

124.    Flash-bang grenades cause temporary blindness and pain to the retina, impaired hearing, and/or disruption of the inner-ear fluid and consequent loss of balance.

125.    Rubber bullets, technically kinetic impact projectiles, are hard rubber or rubber-coated projectiles that can be fired at the same velocity as bullets from standard weapons or riot guns.

126.    Rubber bullets are intended to cause pain without serious injury, but they typically cause not only contusions, abrasions, and hematomas, but also bone fractures.

127.    Rubber bullets are not designed to be safely shot point-blank or at a target's head, but it is well known that law enforcement officers often disregard this instruction.

128.    Wooden bullets are dowel-shaped rods sliced into projectiles the size of pill bottles to be fired at the same velocity as bullets.

129.    Like rubber bullets, wooden bullets are intended to cause pain without serious injury, but they typically cause bone fractures as well as contusions, abrasions, and hematomas.

130.    Wooden bullets can also splinter and infect areas where their targets are hit.

131.    While wooden bullets are not designed to be safely shot point-blank or at a target's head, officers frequently do so anyway.

132.    Bean bag rounds consist of nylon or other fabric sacks filled with lead shot and fired at high speed from 12-gauge shotguns.

133.    Officers are trained to aim for "green" (thigh or leg) or "yellow" (stomach) zones of the body, while avoiding the "red" (face or groin) zone, though they frequently target the head.

134.    A bean bag round spreads to hit a one square inch area of the target where it is intended to cause a muscle spasm; however, the bean bag round often causes a fracture or concussion.

135.     Smoke bombs, grenades, or canisters consist of a device loaded with white phosphorus and an internal bursting mechanism.

136.     Smoke bombs, grenades, or canisters are typically thrown indiscriminately into or near a group.

137.     Upon detonation, a brilliant yellow flame is emitted and produces a large amount of white smoke or phosphorus pentoxide.

138.     A chemical irritant can be added to smoke bombs, grenades, or canisters, though the ones used by Defendants appear to have produced pure smoke.

139.     The smoke obscures the vision of individuals by creating a fog, irritates eyes, and affects the breathing of individuals nearby the deployed smoke bombs, grenades, or canisters.

140.     Sonic cannons, known by the acronym LRAD for "Long Range Acoustic Device," emit focused soundwaves over a long distance, inflict pain, and can cause permanent or long-term damage to an individual's hearing.

141.     A normal conversation level is 60 dB (decibels), a lawn mower averages 90 dB, the pain threshold for the average person is 103 dB, and an LRAD's maximum continuous volume is 162 dB.

142.     Columbus Police Officers were provided protective ear plugs when sonic cannons were used on protestors.

### C.     Days and Nights of Police and Deputy Rage

143.     Over the course of the demonstrations on May 28, 29, and 30 and June 1, 2, and 3, Columbus Police Officers beat peaceful protestors and bystanders; pepper-sprayed without provocation and at point blank range protestors and observers, including United States Congresswoman Joyce Beatty, City Council President Shannon Hardin, and County

Commissioner Kevin Boyce; lobbed and/or shot tear gas canisters without provocation; fired rubber or wooden bullets and flash-bang grenades directly at vulnerable body areas of protestors, as truly and accurately reflected in a video posted at https://www.youtube.com/watch?time_continue=5&v=vZaoz9ZRVOc&feature=emb_title and shown below; and targeted identified journalists and individuals providing medical assistance. A true and accurate copy of that video is provided below (double click to play or click the link).



144.    The targeting of identified journalists was done to eliminate eye-witness reports and photographs or videos of police engaging in use of excessive force and retaliating against protestors for the content and urgency of their expression.

145.    A tactic used by Defendants is "kettling," where groups of nonviolent protestors are boxed in, typically by using commands, bicycles, horses, and/or lines of police, and moved from one place to another, even though the protestors were unwilling or, due to other protestors or physical barriers, unable to move, and then arresting them for resisting, obstructing, and/or failing to disperse.

146. Apart from assembling and chanting or holding signs in the middle of streets or other locations Defendants wanted them to abandon, these groups of protestors were not violating, as reflected in the true and accurate pictures below, any laws, threatening violence, destroying any property, or hampering traffic.









147.    Another tactic used by Defendants was collective punishment: responding to any action by an isolated individual who threw a water bottle, harassed or taunted an officer, or engaged in property destruction by indiscriminately pepper-spraying or tear-gassing a group of obviously different protestors who had not engaged in any such conduct.

148.    The "kettling" and collective punishment created a chaotic situation among the protestors which Defendants then used as an excuse for additional force including using force against protestors who moved to assist others who had been subjected to excessive force.

149. Defendant Chief knew that such tactics were being used to provoke demonstrators and justify arrests, but he did not intervene to limit their use.

150. To the contrary, Defendant Chief excused the targeting of identifiable journalists by falsely claiming that they had been difficult to identify and force was used in a fast-moving situation where officers were being assaulted, "pelted with bottles and rocks."

151. The false claims of Defendant Chief to excuse misconduct were intended to be taken by Columbus Police Officers, and were in fact taken, as a form of approval and condonation of their tactics and an invitation to continue and escalate them.

152. Photographs and videos taken at the scene demonstrate that journalists, who were wearing hats and hoodies bearing the name of their newspaper, were targeted even though nothing was being thrown at the police, the protestors were not out of control, and the situation was not fast-moving.

153. The way Defendants Commander, Lieutenants, Sergeants, and Officers routinely pepper-sprayed demonstrators who were not engaging in violent behavior is accurately illustrated by the picture below; a true and accurate depiction of Defendants' aggressive conduct appears in the video posted at https://www.youtube.com/watch?v=npXL2-NT1Zs, where pepper spray was used on small sections of the protestors and one protestor was punched by Defendant Lucci. A true and accurate copy of that video is provided below (double click to play or click the link):



© Getty



154. Social media contained first-hand accounts of excessive use of force; for example,

https://www.facebook.com/permalink.php?story_fbid=1686026474878930&id=1000041478178

93 accurately reported about tear gas on May 30, 2020: "I experienced a traumatic event today. I was participating in a BLM protest with hundreds of other people today in downtown Columbus. We were yelling chants & marching around the statehouse on the sidewalks but nothing more as we were told this would be a peaceful demonstration.  Then bike cops show up. All of them had gas masks on. People started getting uneasy.  A SWAT truck drives by, yelling people to stay off the road. But other than people crossing on the crosswalk, no one was on the streets nor blocking the traffic.  More cops on horseback show up.  People starts murmuring.  More police cars show up & park in the middle of a busy street. Police officers start unloading and gearing up.  People were yelling 'what are you doing? We're not doing anything wrong!'  First rounds of tear gas goes off in the crosswalk area. People start screaming and yelling others to run. People were coughing and crying from the effects of the gas (there were children & seniors in the group). People were handing out water to those who needed to rinse their face.  Another round of gas goes off. This time, ON THE SIDEWALK. Not on the roads, but directly on the sidewalk. People were running, jumping over the fence, falling on the ground & running for their lives. This is when my friend and I were impacted and we had to rinse our faces off with water for several minutes. We decided that it was getting too dangerous and left shortly afterwards.  We weren't attacking the police. We weren't vandalizing/looting any properties. No protester had weapons on them.  So tell me, why did we get maced?"

155.    Corroborating    that    report    is    a    video    housed    at https://www.youtube.com/watch?time_continue=30&v=AswhNfIjqG4&feature=emb_title, accurately showing the tear-gassing of a group of protestors and police on horseback moving the protestors. A true and accurate copy of the video is provided below (double click to play or click the link).

31



156.    Reflecting the animus toward medical helpers are two accurate videotapes of Columbus Police Officers on May 30, 2020, chasing a clearly-marked medic down an alley where she had gone to help a protestor; the first posted on Twitter, (1) https://twitter.com/OncoKaty/status/1266816739444166656?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1266873339542470656&ref_url=https%3A%2F%2Fwww.columbusnavigator.com%2Fcolumbus-police-protests%2F by Katy@OncoKaty asks, "Tell me, @ColumbusPolice what part of this is protect or serve? We were treating people in an alley and you gleefully chased us and sprayed another medic from a distance of inches and LAUGHED about it. #columbusprotest #ColumbusOhio," with the second posted on Twitter, (2) https://twitter.com/SAColumbus/status/1266867613872857094, with the message: "Yet another disgusting example of what Ginther shamefully called 'exceptional restraint' - a Columbus PD officer point-blank spraying a street medic who is trying to help another protester screaming in pain (out of frame). #BlackLivesMatter #columbusprotest #georgefloyd. True and accurate copies of both videos are reflected below (double click to play or follow the links).



(1)



(2)

157. One May 30, 2020 video, posted at https://twitter.com/lalaitskelcey2/status/1266821476122058752 by @lalaitskelcey2, accurately "shows Columbus police macing a woman as she walks away from them. Absolutely disgusting." A true and accurate copy of that video is reflected below; this woman was later identified as Plaintiff Aleta Mixon (double click to play or follow the link).



158. The true and accurate copy of the picture below, which was posted by KRobPhoto, gives a sense of how Columbus Police Officers used pepper spray to punish, here on May 30, 2020, walking up to a protester and spraying her in the face for being on South High Street while Congresswoman Beatty was nearby:



159.    Columbus Police Officers pushing and pepper spraying protestors on the other side    of    a    barrier    on    May    28,    2020,    is    accurately    depicted    at https://www.youtube.com/watch?time_continue=26&v=npXL2-NT1Zs&feature=emb_title.    A true and accurate copy of that video is provided below (double click to play or click the link).



160.    The earlier portion of the nonviolent protests on May 28, 2020, is accurately depicted in the video at https://youtu.be/AB6LmkmLnUI which shows peaceful protestors sitting in the middle of a street when a phalanx of Columbus Police Officers on bicycles suddenly and without warning pepper spray them. A true and accurate copy of that video is provided below (double click to play or click the link).



161.    On May 29, 2020, Columbus Police Officers walked their bicycles, used them to block off a group of protestors, and then pepper-sprayed protestors, as accurately depicted on the

video at https://www.youtube.com/watch?v=thjbZhftL_A. A true and accurate copy of that video is provided below (double click to play or click the link).



162.    In addition to the injuries described below that each Plaintiff suffered from being mistreated by Columbus Police Officers, all plaintiffs suffered fear, frustration, anger, emotional distress, and/or humiliation, as a proximate cause of being mistreated.

**D.    Defendants City and Chief Knew of the Need for Effective Training, Supervision, and Discipline to Curb Police Use of Excessive Force and Retaliation for Associations or Expression Officers Hated.**

163.    According to the police tracking website https://mappingpoliceviolence.org, during the years 2013 through 2019, Columbus Police Officers killed at a rate of 7.3 per 100,000 residents, which was the highest rate of any department in the State of Ohio and more than double the rate in Cleveland, Ohio.

164.    During that period, Columbus Police Officers killed 27 African-Americans, including in 2016 Henry Green, age 23, who was killed by plainclothes officer in the predominantly Black neighborhood of South Linden, and three months later, 13-year-old Tyre King.

165. African-Americans make up 28% of the population of the City of Columbus, but during that period constituted half (varying between 49% and 53% since 2013) of the use-of-force incidents.

166. Defendants City and Chief were aware of these statistics and, while claiming to believe that most of the individual uses of force were justified, still knew Columbus Police Officers were engaging in a troubling pattern of mistreating African-Americans.

167. Despite this knowledge, Defendants City and Chief did not take specific steps to address what appeared to be mistreatment of African-Americans.

168. In order to become a Columbus Police Officer, applicants need only have a high school diploma or GED, be 20 years of age or older, have a valid driver's license, and be a U.S. citizen.

169. Upon hire, Columbus Police Officers receive an initial salary of $58,947.20 per year, which steadily increases over their first four years of service, with officers who have worked for the Division for more than 48 months receiving an annual salary of $90,230.40.

170. In addition to their salary, Columbus Police Officers receive a generous benefits package which includes paid training, college tuition reimbursement, life insurance, individual and family health insurance, vision and dental plans, and a significant pension package through the Ohio Police and Fire Pension Fund.

171. In addition to pay and benefits, Columbus Police Officers have the option to provide security and traffic control services, usually referred to as "special duty pay," at the rate of $54.00 per hour, which services are a condition for a parade permit and outdoor events and are typically provided by Columbus Police Officers.

172.    The training received by Columbus Police Officers is based on the notion that being a police officer is an extremely dangerous profession, and stresses their security and safety above all else, especially their ability to use force whenever they feel threatened or perceive a threat to another.

173.    Although being an actual patrol officer is a relatively dangerous profession, with average deaths of 13.7 per 100,000 employees, according to the Bureau of Labor Statistics, it is nowhere nearly as dangerous as common occupations such as roofers (51.5), farmers (24.7). truck drivers (26.0), and groundskeepers (18.6); indeed, with fatal injuries in the amount of 44.3 per 100,000, trash and recycling collectors' jobs are more than three times as dangerous as a patrol officer's job.

174.    A reliable 2020 study demonstrates that only 4% of a police officer's time is generally spent on handling violent crime.  https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html

175.    Defendant City has resisted appointing a civilian review board for police officer activities; instead, all citizen complaints against officers are handled by the Columbus Police Division's Internal Affairs Bureau.

176.    The Internal Affairs Bureau routinely dismisses citizen complaints against its officers as unfounded, almost always believing the statements of officers over that of citizens.

177.    The Internal Affairs Bureau is motivated to dismiss citizen complaints as unfounded because finding against the Officer or Officers might subject the City to civil liability.

178.    Even when citizen complaints of violence are sustained, over the years the Columbus Police Division has meted out disproportionately minor discipline for violent acts, such as written reprimand and short suspensions.

179.    In turn, this custom of failing to discipline establishes standards which the union for Columbus Police Officers invoke to persuade arbitrators to reverse serious discipline as inconstant with past disciplinary standards.

180.    Defendants City and Chief know that it is nearly impossible to fire a Columbus Police Officer for use of excessive force.

181.    Per their union contract with Defendant City, Columbus Police Officers are indemnified for any damages (except punitive damages) awarded due to a claim of excessive force, and Defendant City provides free legal representation to officers accused of excessive force.

182.    Defendants City and Chief knew before the demonstrations which started on May 28, 2020, that Columbus Police Officers faced little or no disincentive from engaging in excessive use of force and regularly failed to comply with the letter or spirit of training and policies on use of force, handling demonstrations, and retaliating for speech they hated.

183.    Within the Columbus Division of Police, it is an unspoken rule that, regardless of whatever violent acts a police officer may witness another officer doing, criminal charges will not be brought against that officer.

184.    In the City of Columbus, misdemeanor offenses are prosecuted by the Columbus City Attorney, and felony offenses are prosecuted by the Franklin County Prosecutor's Office.

185.    Both the Columbus City Attorney's Office and the Franklin County Prosecutor's Office have an unwritten rule or custom that no criminal charges are to be brought against police officers for acts of violence committed against citizens while in uniform.

186.    This unwritten rule or custom applies regardless of the egregiousness of the offense or the strength of the evidence of the officer committing the offenses and reflects, among

other pressures, a conflict of interest that prosecutors have with relying on police witnesses to prosecute other crimes and not wanting to antagonize them by prosecuting their crimes; the perceived political power of police unions and elected status of the City Attorney and Franklin County Prosecutor; and the barriers victims of acts of violence by police officers confront in reaching grand jurors and, if they have any criminal record or suspicious conduct, persuading trial jurors.

187.     Incidents of violence which would cause a regular citizen to be charged with assault, battery, or other crimes of violence are not charged against police officers for the sole reason that they are police officers.

188.     It is common knowledge among Columbus Police Officers that, with the possible exception of deadly violence videotaped by citizens, they are immune from any prosecution for acts of violence committed within the City of Columbus.

189.     The combination of a toothless disciplinary policy, indemnification from civil liability, and practical immunity from criminal prosecution, creates a perfect storm in which Columbus Police Officers know that there will nearly always be no repercussions to them for violent acts.

190.     With regard to all but one recent police killing (a shooting of a White woman by an African-American officer), the Columbus Division of Police did not issue significant discipline for any of the officers involved, and no criminal charges were filed against the officers.

191.     For example, in April of 2017, one of the officers who shot Henry Green, Officer Zachary Rosen, was caught on videotape stomping on the head of a handcuffed and helpless African-American suspect who was lying on the sidewalk.

192.    Despite the fact that Officer Rosen had plainly committed an act of felonious assault that could have killed or grievously injured the suspect, the Columbus City Attorney's Office and Franklin County Prosecutor's office declined to bring criminal charges against Officer Rosen solely because of the fact he was a police officer.

193.    On June 14, 2017, then-Columbus Police Chief Kim Jacobs determined that an appropriate punishment for Officer Rosen stomping on the head of a helpless individual was a 24-hour suspension and recommended this punishment to Columbus Public Safety Director Ned Pettus.

194.    In July of 2017, Public Safety Director Pettus rejected the recommendation of Chief Jacobs and terminated Officer Rosen's employment.

195.    Infuriated that one of their members had been terminated for kicking a helpless African-American suspect in the head, the Columbus Fraternal Order of Police ("FOP") Lodge No. 9 unanimously approved a no-confidence vote in Columbus Mayor Andrew Ginther, Public Safety Director Pettus, and then-City Council President Zach Klein.

196.    In announcing the no-confidence vote, FOP President Jason Pappas stated: "We want to send the message that we've lost faith. It demonstrates to those individuals that we no longer have confidence in their ability to lead. Unless they make significant changes by funding us and staffing us and supporting our officers who are out there day in and day out, that we will not have confidence in their ability to lead us or this city."

197.    In March 2018, an arbitrator rescinded Safety Director Pettus's termination and reinstated Officer Rosen to his patrol officer position with full back pay.

198.    In May 2018, Defendant City paid a $30,000.00 settlement to the individual whose head Officer Rosen had stomped on.

199. This settlement came from public tax dollars, not from Officer Rosen, and Defendant City provided free legal representation to Officer Rosen throughout the process.

200. To eliminate the pattern or practice of excessive use of force and retaliating for speech they hated by Defendant City Police Officers, structural reform, modified policies, and civilian monitoring should, in addition to other policies and practices that may be deemed necessary after further discovery of the facts, include:

a. Creation of a civilian review board empowered, funded, and staffed to receive complaints from individuals who believe they have been the victims of excessive use of force and/or retaliation for their speech; to investigate those complaints; and to recommend discipline which the Director of the Department of Public Safety must mete out absent clear and convincing evidence that the Board based the recommendation on inaccurate facts.

b. Prohibition of the use by Defendant City Division of Police and/or mutual aid law enforcement personnel cooperating with the Division of tear gas, rubber or wooden bullets, sonic cannons, bean bag rounds, smoke bombs, grenades, or cannisters, pepper spray, flashbang grenades, kettling, chokeholds, strangleholds, no-knock warrants, and pressure or weight on the neck, back, or hip of a prone suspect.

c. Maintenance of body and vehicle cameras in good working order and use of those cameras during any interaction with a civilian.

d. Prominent display of badge numbers and/or identity cards whenever a police officer interacts with the public.

e.      Recognition that individuals legitimating displaying "press," "media," "reporter," "paramedic," "medic," "legal observer," or similar words and/or symbols are permitted to be present in a position enabling them to observe and record at protests and/or to intervene to assist individuals who appear to have been injured and that all individuals, regardless of their occupation or non-violent activity, are permitted to record at protests or whenever an police officer interacts with the public.

f.      Commitment to affirmative action in recruitment, selection, retention, and promotion to ensure that, at all ranks, minority officers have more than a token presence.

g.      Training and adoption of policies on the use of batons, Tasers, firearms, and physical force that emphasize use of the least force necessary and then only after de-escalation and disengagement have been attempted, a clearly understood oral warning given, and a purpose other than punishing the target exists, with deadly force as the very last resort after other efforts to prevent serious bodily injury or death have been exhausted, and, unless imminent serious bodily injury or death is reasonably perceived, never to prevent flight or property damage, and expose how stereotyping, implicit bias, and racism affect an officer's perception of an individual and the level of threat that individual poses.

h.      Contracting with and/or employing unarmed intervention specialists required to be used in responding to calls involving intoxication, drug use or abuse, mental health crises, teenagers or children, vandalism, and/or the homeless.

i.     Mandating that (i) any officer who witnesses what he or she believes in good faith to be an excessive use of force or retaliation must stop or attempt to stop another officer from that use of force or retaliation and report in detail within 24 hours that conduct to both the Division Chief and the Internal Affairs Bureau, and explain what steps the officer took to intervene in use of force or retaliation; and that (ii) any officer who uses force must prepare and file with superiors an incident report within eight hours detailing the amount of force used, his or her perception of the justification for that force to be used, the known or suspected injury to the suspect, the witnesses to that use of force, and any recordings from body and vehicle cameras, cell telephones, and/or other surveillance cameras.

j.     Inventory of Division equipment, assessing which equipment is more appropriate for use by the military during war than by police officers, and discarding such equipment.

k.     Screening applicants to determine whether they have been suspected of using excessive force in employment, military, and/or social settings and either affirmatively ensure that the suspicion was unfounded or reject the applicant, and re-screen officers every three years for psychological fitness.

l.     Documenting each suspected use of excessive force by an officer; placing a copy of the suspicion, investigation, and resolution in the officer's file and preserving for ten years in a separate file the original or an electronic counterpart along with exhibits, drawings, recordings, and other evidence; making the entire file available to the Civilian Review Board and any prospective employer; and

considering the entire file in making retention, assignment, and/or promotion decisions.

m.      Engaging in focused deterrence of serious crime by analyzing the specific blocks in neighborhoods and known individuals who have engaged in criminal activity and can reasonably be anticipated to do so again and allocating enforcement priority and referrals for social services accordingly.

n.      Scheduling meetings in predominantly minority neighborhoods to listen to civilian concerns; to acknowledge that past law enforcement practices, starting with the roots of modern policing in Southern States as slave patrols and later the enforcement of Jim Crow segregation, proceeding through acquiescence in lynching, racist mobs, and/or Ku Klux Klan activities, and culminating in the disproportionate focus on minorities in the war on drug use and abuse and related traffic stops, have created a rift which must be healed; and to discuss steps which might contribute to that healing.

o.      Payment for individual officers to have professional liability insurance but then requiring an officer to pay any premium increase attributed to that officer's improper use of force and/or retaliation and conditioning continued employment on being insured.

p.      Appoint and pay for the employment of an independent monitor to oversee and ensure the successful implementation of the above steps.

**E.      Mistreatment of Plaintiff Tamara K. Alsaada**

201.    On May 30, 2020, Ms. Alsaada, in her position as Organizing Director for the People's Justice Project, showed up to a Black Lives Matter rally organized in front of the Ohio Statehouse with the goal of helping to lead the rally and to advocate for police reform.

202.    Ms. Alsaada did not plan the event; however, given her role in the community she was looked at to help provide a voice for the event.

203.    While Ms. Alsaada and other members of the People's Justice Project were speaking on the microphone, protestors at the rally came to Ms. Alsaada and informed her that protestors were being arrested by Columbus Police Officers without justification.

204.    Again, due to her role as a respected community organizer, even serving on Mayor Ginther's Community Safety Advisory Commission, Ms. Alsaada and others walked over to the intersection of Broad and High to help resolve any pending conflicts.

205.    Ms. Alsaada saw Deputy Chief Michael Woods standing near the intersection, who she knew from her time on the Mayor's Community Safety Advisory Commission.

206.    Ms. Alsaada noticed there were lines of police officers at the intersection on bicycles, on horseback, and in riot gear.

207.    Ms. Alsaada asked Deputy Chief Woods who was being arrested, and he informed her that no one was being arrested.

208.    Ms. Alsaada asked Deputy Chief Woods to have the officers clear a path so that she could walk through and continue to address the topic of arrestees, and he subsequently had the officers allow her through.

209.    As Ms. Alsaada and others walked through the line of officers in order to continue peacefully discussing any arrestees, Columbus Police Officers without notice, without any

warning, and without any provocation, began to assault Ms. Alsaada and others with an onslaught of pepper spray.

210.    Ms. Alsaada fell to the ground due to the assault and was unable to breathe or see.

211.    Ms. Alsaada was carried to the corner of Broad and High where she was administered medical attention by volunteer medics.

212.    Ms. Alsaada and numerous others suffered injuries and trauma due to the unprovoked assault by Columbus Police Officers.

**F.    Mistreatment of Plaintiff Mahir Ali**

213.    On May 30, 2020, Mr. Ali was peacefully protesting police brutality and racial injustice in Downtown Columbus, near the intersection of Cleveland Avenue and Broad Street.

214.    As Mr. Ali was involved in the peaceful protest, Columbus Police Officers formed a line and began moving towards Mr. Ali and other protestors.

215.    A Columbus Police Officer singled out and targeted Mr. Ali by approaching him and attempting to pepper spray him.

216.    Mr. Ali was able to evade most of the pepper spray and, as he did, he yelled out, "Hands up! Don't shoot!", repeatedly in an attempt to avoid becoming the victim of any police brutality.

217.    Mr. Ali then noticed one Columbus Police Officer, who appeared to be a supervisor or commanding officer, later identified as Defendant Lieutenant Lowell Rector ("Defendant Lt. Rector"), instruct another officer to shoot Mr. Ali.

218.    That officer then aimed at Mr. Ali and shot him in the left leg with a rubber bullet.

219.    After getting shot, Mr. Ali was able to gather himself and found a parked car that he then used to shield and protect him from the Columbus Police Officers who had targeted him.

220.    While hiding behind this parked car, Mr. Ali witnessed Columbus Police Officers shoot two other peaceful protestors, a male and a female, who happened to be riding bikes.

221.    Mr. Ali continued to hide and protect himself while he witnessed Columbus Police Officers attack other protestors, as the uses of force, chemical agents, and less lethal munitions had been authorized and directed by Defendant Lt. Rector.

222.    Mr. Ali was able to call his wife and, after approximately 15 minutes, Mr. Ali's wife was able to locate and rescue him.

223.    Mr. Ali then went home and attempted to treat his bruises and muscle aches.

**G.    Mistreatment of Plaintiff Mary Barczak**

224.    On May 30, 2020, Ms. Barczak went downtown to photograph the protests.

225.    Between 6:30 and 7:00pm, Ms. Barczak was walking with a group of protestors near the intersection of East Broad and 5th Streets.

226.    The streets were not closed to vehicular traffic, and protestors were in the street along with Columbus Police Officers.

227.    Vehicles were becoming trapped by the crowd and officers in the street, and Ms. Barczak noticed that Columbus Police Officers nearby were not doing anything to direct traffic.

228.    Ms. Barczak and another protestor alerted the crowd of protestors to the vehicles trying to get through and were successful in getting the protestors to move to the side in two groups to allow the vehicles to pass.

229.    During this time, Ms. Barczak approached a group of Columbus Police Officers on bikes and asked them to direct traffic.

230.    Ms. Barczak's request was ignored by the officers, and she ended up being shoved by the bike officers up onto the sidewalk.

231.     While on the sidewalk, Ms. Barczak noticed a vehicle was again trapped in a crowd and had turned towards the officers; she attempted to tell the driver to "get out of here" as he was apparently confused and was turning directly behind the line of Columbus Police Officers.

232.     Ms. Barczak witnessed Columbus Police Officers pull the driver out of the car to arrest him.

233.     Ms. Barczak went over to the Columbus Police Officers to tell them that they needed to direct traffic and that the individual in the car was an innocent bystander who was merely confused because of the lack of traffic regulation, but when she approached them, Defendant Lieutenant Duane Mabry ("Defendant Lt. Mabry") ordered Ms. Barczak to "get out of here."

234.     At this time, the officers already had the driver of the car in handcuffs and appeared to be finished arresting him as Ms. Barczak approached.

235.     Ms. Barczak immediately turned the opposite direction of Defendant Lt. Mabry and the arrested individual to leave the area so as to comply with this order.

236.     However, when Ms. Barczak turned and began walking to leave the area, her path was blocked by the officers' bikes, as Defendant Lt. Mabry ordered she be arrested.

237.     A bike officer used his bike to strike Ms. Barczak as she was attempting to leave the area.

238.     She was then shoved by an officer at hip-level with his bike.

239.     Yet another officer grabbed Ms. Barczak's left arm from behind and used his leg to attempt to trip her and knock her to the ground.

240.     At the same time, another officer ran up behind Ms. Barczak and grabbed her by her shoulders.

241.     After being shoved, grabbed, and tripped, Ms. Barczak started falling to the ground and put her arm out in an automatic effort to brace herself.

242.      All three officers then forcefully pushed her down on the pavement, one keeping his palm on her face while he shoved her downwards.

243.     Ms. Barczak landed back-first and hit the street pavement with such force that her head bounced off of the ground and her glasses were broken during the takedown.

244.     While on the ground lying on her stomach, one of the bike officers began punching her in the face with a closed fist strike.

245.     Another bike officer joined in punching Ms. Barczak in the face with a closed fist strike.

246.     The two officers who punched Ms. Barczak in the face were later identified as Defendant Officers Shawn Dye and Gary Patterson, and the third arresting officer was identified as Defendant Sergeant Paul Szabo.

247.     Ms. Barczak remained on the ground as it became evident that she was tangled up in her camera bag and photo strap, preventing her from being able to freely give her arms to the officers for cuffing purposes.

248.     As such, Defendant Sergeant Szabo forcefully pulled back both of her thumbs to put zip ties on her wrists, dislocating her thumb in the process.

249.     Defendant Officer Dye then grabbed Ms. Barczak by her hair, yanked her head back, and maced her point blank in the face with a Mark-9 chemical spray canister; at this point, Ms. Barczak was in zip tie cuffs on the ground.

250. Ms. Barczak was then taken to a prisoner transport van while she repeatedly asked officers for her inhaler, as she has a serious lung condition that requires use of an inhaler; she also requested hospital transport.

251. Ms. Barczak was told by one of the officers, "if you get into the van and tell us your name, then we will give it to you."

252. Eventually, after approximately fifteen to twenty minutes had elapsed since her repeated requests, she was provided with her inhaler, examined by EMTs at a secondary staging location, and transported to the Franklin County Jail, despite Ms. Barczak's requests to be taken to the hospital.

253. Within thirty minutes of her arrest, Defendant Sergeant Caroline Castro ("Defendant Sgt. Castro") conducted an ad hoc administrative investigation on the scene by interviewing Ms. Barczak and Defendant Officers Dye and Patterson; Defendant Sgt. Szabo; and including Defendant Sgt. Castro's own witness statement where she noted that she interviewed Ms. Barczak immediately following her arrest.

254. During this investigation, Defendant Officers Dye, Patterson, and Defendant Sgt. Szabo knowingly made false statements about Ms. Barczak's conduct leading up to and during her arrest.

255. Specifically, Defendant Sgt. Szabo falsely reported that Ms. Barczak "refused to comply with Lt. Mabry's lawful order" when, in reality, Ms. Barczak immediately attempted to comply when her path was blocked by the bike officers.

256. Defendant Officers Dye and Patterson admitted to each striking Ms. Barczak in the head with a closed fist.

257. Defendant Officer Dye further admitted to using his Mark-9 canister "near" Ms. Barczak's face.

258. Based on the false statements given during the administrative investigation, Defendant Sgt. Castro found the Defendant Officers' and Sergeant's use of force against Ms. Barczak to be within Division policy on July 2, 2020.

259. While at the Jail, Ms. Barczak was examined by a nurse who opined that her thumb was likely broken and recommended Ms. Barczak be transported to the hospital.

260. Rather than transport Ms. Barczak to the hospital, she was taken to a holding cell and eventually released, where she had to walk to the hospital, as her cell phone was not among her returned items.

261. On the probable cause affidavit for her arrest, Defendant Officer Dye falsely reported that Ms. Barczak engaged in "disorderly conduct," damaged personal and public property, blocked public streets, and assaulted him "by punching him in the left ear."

262. Upon release from the Jail, Ms. Barczak received a summons charging her with "aggravated riot," a felony of the fifth degree.

263. A true and accurate depiction of Ms. Barczak's arrest on May 30, 2020 is reflected on the linked video (click this link to play).

264. Ms. Barczak thereafter took herself to the emergency room, was diagnosed with a thumb sprain, head injury, and post-concussion syndrome, and later learned that the tendons in her thumb were torn.

265. In addition to her dislocated thumb and its torn tendons, Ms. Barczak suffered from bruising, bleeding, scrapes and cuts to her face, arms, and legs as a proximate result of her

arrest and excessive force used on her by Defendant Officers Dye and Patterson and Defendant Sgt. Szabo.

266.    Ms. Barczak's charges were dismissed on June 3, 2020.

267.    Ms. Barczak continues to suffer from the injury to her right thumb, which is her dominant hand, is currently receiving physical therapy and treatment for her diagnosis of Post-Traumatic Stress Disorder as a result of this incident.

### H.    Mistreatment of Plaintiff Demetrius Burke

268.    On Wednesday, June 3, 2020, late at night, Mr. Burke was inside his apartment near the intersection of East Starr Avenue and North 9th Street when he heard sirens and a commotion outside.

269.    Mr. Burke's motorcycle was then parked in his apartment complex's parking lot.

270.    Because he was concerned that whatever was going on outside would cause damage to his motorcycle, Mr. Burke went outside to get his motorcycle and move it to a garage provided by his apartment complex.

271.    When he reached his motorcycle, Mr. Burke observed police officers walking north on North 9th Street and decided to ask the officers what was going on.

272.    Because he is an African-American male, Mr. Burke was concerned that the police would act violently towards him and so he turned on his cellphone camera and filmed as he approached the officers.

273.    Mr. Burke was aware that the City of Columbus had imposed a 10:00 p.m. curfew on all residents in public areas and so he was careful to remain on his own property and not step into the street while approaching the Columbus Police Officers.

274.    Mr. Burke's cellphone video clearly shows that he remained on the grass at all times and did not enter the street.

275.    Below is a true and accurate copy of that video (double click to play or click 20200603_003718.mp4).



276.    When he was within speaking distance of the Columbus Police Officers, Mr. Burke asked, "What's happening"?

277.    An unknown male Columbus Police Officer approached Mr. Burke and answered, "I'm sure you know you're out after curfew, right?"

278. Mr. Burke responded, "I live right here, I'm on my property."

279. The unknown officer then said, "You're standing on the street, come here."

280. Mr. Burke protested that he was "right here, I'm on the grass."

281. The unknown male officer then stated that "it doesn't matter, you're under arrest" and falsely told another officer, later identified as Defendant Officer Amber Rich, that Mr. Burke was standing in the street.

282. Defendant Officer Rich then used a zip tie to restrain Mr. Burke's hands behind his back.

283. Defendant Officer Rich then swore to and signed a probable cause affidavit for Mr. Burke's arrest, knowing its contents were false and that his arrest lacked probable cause.

284. Defendant Officer Kenneth Kirby then signed and notarized the probable cause affidavit to cause criminal charges to be filed against Mr. Burke, knowing its contents were false and that his arrest lacked probable cause.

285. Mr. Burke was then transported to a nearby fire station being used to process individuals who had been arrested during the George Floyd protests.

286. From the fire station, Mr. Burke was taken to the Jackson Pike Correctional Center, where he was placed in a cell with other arrested individuals.

287. In the cell where Mr. Burke was detained, there were many individuals who had been arrested for issues not related to the protest, including felonies and violent crimes.

288. During his time in the cell, Mr. Burke witnessed an intensely violent fight, which was terrifying and put him at risk of physical harm.

289. Mr. Burke remained in the cell until early afternoon when his friend posted bail for him.

290. On Tuesday, June 9, 2020, Mr. Burke's curfew violation charges were dismissed as part of the blanket dismissal of curfew violations.

**I.** **Mistreatment of Plaintiff Bernadette Calvey**

291. On May 30, 2020, Ms. Calvey was in the Short North area, accompanied by a roommate.

292. Although Ms. Calvey had not intended to participate in a protest, she and her roommate were walking in the vicinity of First or Second Avenue and High Street when they heard protestors nearby.

293. They walked in the direction of the protests to see what was going on and potentially join the protest since they agreed with the message against police brutality and racism.

294. Ms. Calvey was aware that there had been a curfew imposed that evening, but it was approximately 9:00 p.m., she was not far from her residence, and the curfew would not start for another hour.

295. As Ms. Calvey approached the protest, it appeared peaceful, though Columbus Police Officers were massed in the street approximately 50 feet away from where she was standing.

296. The Columbus Police Officers were shouting at the protestors and began firing projectiles at them at close range.

297. Within moments of approaching the protest, Ms. Calvey was struck in the face by a projectile that, upon information and belief, was a wooden bullet.

298. The wooden bullet split open her chin and caused excruciating pain.

299.    The round that hit Ms. Calvey in the face had been directly fired at her with the intention of hitting her and had not been "skip-fired" as a "knee-knocker" off the ground.

300.    A true and accurate picture of her injury the morning after is below:



301.    Ms. Calvey and her roommate fled down a side alley, where she received water and bandages from a group of protestors.

302.     Ms. Calvey was forced to miss two days of work due to her facial injury and remained unable to chew solid food for approximately a week due to the pain in her jaw.

303.     The projectile wound has created a prominent scar on Ms. Calvey's chin, which appears to be permanent.

**J.     Mistreatment of Plaintiff Stephanie Carlock**

304.     In the late afternoon of Saturday, May 30, 2020, near the Statehouse, around Broad and High Streets, Ms. Carlock joined friends who were protesting against police brutality and racism.

305.     When Ms. Carlock arrived at the protest, non-emergency traffic had been rerouted, and she and others were standing stationary in the crosswalk across High Street.

306.     Many Columbus Police Officers were there dressed in riot gear, but no announcements were made and no orders were given.

307.     While Ms. Carlock was standing stationary in the crosswalk, a Columbus Police Officer in riot gear sprayed her in the face with pepper spray at close range with no provocation, causing Ms. Carlock intense pain and affecting her vision.

308.     Columbus Police Officers began pushing the crowd of people in which Ms. Carlock was standing with their riot shields and telling them to leave.

309.     A van rolled up and many Columbus Police Officers or Franklin County Sheriff's Office Deputies left the van and began firing projectiles at the crowd.

310.     Ms. Carlock and her companions then moved to the Statehouse lawn, but mounted Columbus Police Officers approached and used their horses to push the crowd out of the Statehouse area.

311.  Ms. Carlock moved onto Broad Street and began walking east, with mounted Columbus Police Officers following the crowd and using their horses to push it further down Broad Street.

312.  Ms. Carlock and her companions reached the intersection of Broad Street and Fifth Street and were standing on the sidewalk, next to the plaque recognizing the site of the first Wendy's restaurant.

313.  Columbus Police Officers were still pushing the crowd, and Ms. Carlock and others were asking them where they wanted the protestors to go.

314.  Instead of answering and directing the crowd, the mounted Columbus Police Officers rode their horses onto the sidewalk and began pushing their horses into the crowd.

315.  Ms. Carlock was struck by the legs of horses purposely being ridden into her and other protestors.

316.  Ms. Carlock and others in the crowd continued to walk to the next corner, at which point they were confronted by Columbus Police Officers on bicycles.

317.  These officers cornered the crowd against a building, on the sidewalk, and deployed tear gas, causing Ms. Carlock to choke and cough and have difficulty breathing.

318.  Ms. Carlock and others asked the officers why they were tear-gassing a peaceful crowd on a sidewalk, and, instead of answering, the officers laughed while the protestors choked on the gas.

319.  Ms. Carlock fled and rejoined protestors in another area.

320.  The following evening, Sunday, May 31, at around 8 p.m., Ms. Carlock and a friend went to the Short North area of Columbus, walking down High Street toward downtown, on the sidewalk, seeking to join another protest against police brutality and racism.

321.     Ms. Carlock was aware there was a curfew of 10:00 p.m. that evening, but it was still 40 minutes before curfew (approximately 9:20 p.m.), when the group she was in approached the intersection of High Street and Spring Street.

322.     Ms. Carlock and the protestors she had joined were peaceful, walking on the public sidewalk, and not disobeying any orders from law enforcement.

323.     As Ms. Carlock neared Spring Street, a black van pulled up and Columbus Police Officers in riot gear jumped out.

324.     Without warning, the officers began shooting projectiles and tear gas at the crowd.

325.     Ms. Carlock was once again exposed to tear gas, affecting her breathing and causing her to choke and cough.

**K.     Mistreatment of Plaintiff S.L.C.**

326.     On May 30, 2020, S.L.C. traveled from Hamilton County, with his uncle, Plaintiff J. Horn, to downtown Columbus, Ohio, where they met his cousin, Plaintiff K. Horn, and his cousin's girlfriend.

327.     Prior to traveling to Columbus, Mr. C. had created hand-drawn signs with "Black Lives Matter" and the names of some of the victims of police brutality.

328.     Mr. C. was intending to protest peacefully by holding his hand-drawn signs.

329.     Mr. C. and his family joined a group of peaceful protestors.

330.     After being there less than 15 minutes, Mr. C. witnessed Columbus Police Officers throw tear gas canisters at another group of peaceful protestors, and he and Plaintiff K. Horn went over to help the protestors who had been tear-gassed.

331.    They moved the injured protestors to a different location because Columbus Police Officers were throwing tear-gas canisters all around the area.

332.    In the commotion of helping the other injured protestors, Mr. C. got disconnected from his family and then joined another group of protestors who were walking and carrying signs peacefully.

333.    While in the middle of this group of protestors, Columbus Police Officers threw four canisters of tear gas into Mr. C.'s group.

334.    The tear gas reached Mr. C.'s eyes, causing a severe burning sensation.

335.    There was no one there to offer medical assistance, so Mr. C. ran from the area where he was struck with tear gas, sat down on a sidewalk, and applied water to his eyes until the pain subsided slightly.

336.    Mr. C. was able to reconnect with his family and decided to continue his peaceful protest with his cousin.

337.    Mr. C. witnessed Plaintiff K. Horn get struck in the leg with a wooden bullet while trying to run from tear gas in the area.

338.    Mr. C. observed Plaintiff K. Horn during this entire period, and Plaintiff K. Horn did not act violently or aggressively in any way before being struck.

339.    Mr. C. and his uncle, Plaintiff J. Horn, returned home to Hamilton County the evening of May 30, 2020, and did not return again for any protests.

**L.    Mistreatment of Plaintiff Keith Duerk**

340.    On May 30, 2020, Mr. Duerk decided to go downtown to join protestors at the intersection of Broad and High Streets.

341. Mr. Duerk brought his thirty-pound d'jembe drum with him to play music in support of the protests.

342. He arrived at the intersection of Broad and High around 4:30 p.m. and sat with his drum on a bench on the east side of Broad Street directly outside of the Statehouse and began playing.

343. Many protestors were in the street, facing Division Officers, lined along the intersection.

344. Mr. Duerk was approximately fifty yards from the crowd of protestors and officers in the street; he was close to the Statehouse grounds, remaining on the bench.

345. During this time, Mr. Duerk witnessed Division Officers use crowd control devices to disperse the crowd, including pepper spray, tear gas canisters, and gas grenades.

346. Each time the police used a particular crowd control device, it made a loud booming sound.

347. Mr. Duerk responded to the booming sounds of the crowd control devices by increasing the volume by which he played his drum, remaining seated on the bench away from the crowd.

348. There were a few protestors near Mr. Duerk on the sidewalk, but the majority of protestors were in the street.

349. After approximately twenty minutes of playing his drum, around 5:00 p.m., Mr. Duerk was struck in the face with a wooden bullet while playing loudly in response to police crowd control devices.

350. The wooden bullet came from in front of him, towards his left side, and struck him on his left cheek, immediately under his eye.

351.     When Mr. Duerk was hit with the wooden bullet, he was struck at such a velocity that his entire head rocked back and he experienced a ringing sensation throughout his head.

352.     Upon being struck, Mr. Duerk ran away from the area to put his drum away in his car because he no longer felt safe having it out and believed the police targeted him for making too much noise.

353.     Mr. Duerk then returned to protest but remained at a far distance from the crowd and any officers.

354.     The wooden bullet, shot by an unknown Division Officer, caused Mr. Duerk's face to swell and left a bruise immediately under his left eye and cheek area.

**M.     Mistreatment of Jennifer Eidemiller**

355.     On May 30, 2020, in the early evening, Ms. Eidemiller, who resides near where protests were taking place in downtown Columbus, decided to join the peaceful protests against police brutality.

356.     Ms. Eidemiller had been protesting with others for around ten minutes when she found herself on Third Street.

357.     Ms. Eidemiller began to cross the street legally by remaining in the crosswalk.

358.     When Ms. Eidemiller reached the sidewalk, though, she and a group of other peaceful protestors were pepper-sprayed at point-blank range.

359.     Ms. Eidemiller's vision was temporarily impaired, and the pain in her eyes was terrible.

360.     The Columbus Police Officer who sprayed Ms. Eidemiller sprayed everyone in the area collectively and indiscriminately.

361.     Ms. Eidemiller also witnessed officers on horseback attacking peaceful protestors.

362.    Ms. Eidemiller was taken by medics who immediately provided care for her at the scene.

363.    After being treated by the medics and given instructions on how to self-treat her injuries, Ms. Eidemiller went home and followed those instructions in order to cope with the effects of the chemical spray on her body.

364.    The next morning, May 31, 2020, Ms. Eidemiller returned to downtown Columbus, along with two friends, in order to continue to peacefully protest police brutality.

365.    As they approached the scene of protests already taking place, they noticed a group of protestors and organizers in the intersection of Broad and High Streets, near the east side of the intersection.

366.    Ms. Eidemiller proceeded to lock arms with them and chant out calls for justice.

367.    Protestors stood there peacefully for approximately 30 minutes.

368.    Columbus Police Officers then announced that they would begin using chemical weapons if protestors did not leave the area.

369.    As the protestors were attempting to disperse, Columbus Police Officers used various chemical weapons.

370.    Ms. Eidemiller was pepper-sprayed three or four times at close range by a Columbus Police Officer.

371.    Medics again treated Ms. Eidemiller at the scene and instructed her on how she could deal with the pain, impaired vision, and headache from the chemical spray once she got home.

N.    **Mistreatment of Plaintiff Andrew Fahmy**

372.    On June 1, 2020, Mr. Fahmy and a friend went to downtown Columbus to participate in the protests.

373.    They arrived at the Statehouse at 7:00 p.m. and then participated in a march north on High Street along with several thousand other protestors.

374.    Eventually, at approximately 10:20 p.m., the march reached the intersection of Lane Avenue and High Street just north of The Ohio State University.

375.    By the time the march had reached Lane Avenue, the number of marchers had dwindled considerably and the march seemed to be coming to an end.

376.    As the marchers approached Lane Avenue on High Street, Columbus Police Officers wearing riot gear approached the marchers from the south.

378.    When the Columbus Police Officers were within approximately 15 feet of the remaining marchers, they began spraying pepper spray.

379.    The use of pepper spray, chemical agents, and less-lethal munitions against nonviolent protestors at Lane and High was authorized and directed by Defendant Lieutenant Lawrence Yates.

380.    The pepper spraying caused the remaining marchers to run in all directions.

381.    Mr. Fahmy retreated east on Lane Avenue along with many other marchers.

382.    The Columbus Police Officers then formed a line across Lane Avenue approximately 200 feet east of High Street facing east.

383.    Mr. Fahmy and other protestors got out their phones and began filming the Columbus Police Officers, who were approximately 20 feet away.

384.    None of the protestors were behaving violently or throwing anything at the Columbus Police Officers.

385.    Mr. Fahmy then observed the Columbus Police Officers preparing to fire tear gas canisters.

386.    Before Mr. Fahmy could move out of the way, the Columbus Police Officers shot tear gas canisters directly into the crowd.

387.    Mr. Fahmy was hit in the leg with a canister, which fractured his fibula, causing severe pain, and requiring treatment.

388.    True and accurate pictures of his injuries, including an x-ray of the fracture, are shown below.





### O.    Mistreatment of Plaintiff Talon Garth

389.    On May 31, 2020, Mr. Garth attended a downtown protest of police abuse.

390.    In the early evening, along with hundreds of other protestors, Mr. Garth was standing in the street at the intersection of Broad and High Streets.

391.    That intersection and several blocks had long been closed that evening to vehicular traffic.

392.    While Mr. Garth was standing at the intersection, a Columbus Division of Police Armored Vehicle with the word acronym SWAT painted on the side pulled into the intersection and stopped.

393.    After the armored SWAT vehicle stopped, a team of officers disembarked from it.

394.    The SWAT officers began to tell the crowd standing at Broad and High Street to move.

395.    Prior to the arrival of the SWAT officers, the protest at Broad and High had been peaceful, with no violence or attacks on property.

396.    Prior to the arrival of the SWAT officers, protestors at Broad and High had maintained a good relationship with Ohio Highway Patrol Officers stationed at the Statehouse.

397.    Because there was no vehicular traffic on Broad or High Streets, there was no reason for the protestors to be removed from the streets.

398.    After being told to move, Mr. Garth and more than 100 other protestors close to the SWAT officers sat down on the street in an act of passive resistance.

399.    Mr. Garth was then approximately ten feet away from the SWAT Officers.

400.    At this point, a few individuals in the back of the huge crowd, who were not among those sitting close to the SWAT officers, threw several water bottles at them.

401.    It was obvious that the bottles had not been thrown by Mr. Garth or any of the protestors sitting in front of the SWAT officers.

402.    Nevertheless, the SWAT Officers immediately took deliberate aim and began firing wooden bullets directly into the peaceful seated protestors who were sitting directly in front of them.

403.    The use of wooden bullets against non-violent protestors was authorized and directed by Defendants Sergeant Scott Bray and Sergeant Brian Bruce.

404.    The wooden bullets were around the size of pill bottles.

405.    Mr. Garth was struck by a total of ten wooden bullets, one on each knee, four on his right leg, one on his right thigh, one in the arm, and one in the back of his head.

406.    A wooden bullet also struck Mr. Garth in the foot, fracturing his fourth metatarsal bone.

407.    True and accurate pictures of his leg and foot injuries are below.





408.    Mr. Garth had to seek medical attention for his fractured foot and has been required to wear a walking boot while it heals.

409.    In addition to breaking his foot, the wooden bullet caused severe lacerations to his shins and other parts of his body, many of which are likely to cause permanent scarring.

410.    As a proximate result of his injuries, Mr. Garth has been unable to work since the incident and has suffered significant lost income.

### P.    Mistreatment of Plaintiff Holly Hahn

411.    At approximately 7:30 p.m. on May 30, 2020, Ms. Hahn traveled west from Italian Village towards the protest that was taking place at the intersection of High Street and the I-670 cap.

412.    Ms. Hahn's intention that day was to videotape the interactions of protestors with the police.

413.    Around 8:00 p.m., Ms. Hahn arrived at the intersection of High and Russell Streets just as protestors there were being pushed north by Franklin County Sheriff's Deputies in SWAT uniforms.

414.    Ms. Hahn stood on the sidewalk at the southeast side of the intersection and began filming the protestors who were backing up High Street.

415.    Shortly after Ms. Hahn began filming, SWAT Officers executed their surrounding maneuver on Russell Street.

416.    Ms. Hahn did not hear any order to leave the area.

417.    In reviewing the videotape recording she made, Ms. Hahn heard that order; however, the noise and chaos where she was standing rendered it inaudible to her at the time.

418.    Ms. Hahn was tackled to the ground, maced directly in the face at close range, and handcuffed.

419.    While Ms. Hahn was handcuffed and blinded on the street, a Columbus Police Officer approached her, told her to look at him, and then stated, "You should be ashamed of yourself.  You shouldn't be here, you should be at home making cookies."

420.    Ms. Hahn was placed in a police wagon for several hours, where her hands were handcuffed behind her back, she was not given water, mace remained on her face, and Columbus Police Officers then transported her to an emergency room where she was examined for a concussion, treated for chemical burns, had her face cleansed and took a shower, and given a CT scan.

421.    Ms. Hahn was given a citation for a minor misdemeanor count of failing to disperse by Officer Michael Laird, stating that on the 30th day of May, Ms. Hahn knowingly failed to comply with the order of a law enforcement officer or public official to disperse from the scene of a riot and defining riot as five or more persons participating in a course of disorderly conduct, specifically throwing rocks and bricks at police officers and interfering with another's arrest.

422.    On June 23, 2020, the charge against Ms. Hahn was dismissed.

423.    Previously, on May 28, 2020, Ms. Hahn had gone to the protest taking place near the intersection of Broad and High Streets, arriving around 8:30 p.m.

424.    Ms. Hahn's intent in attending the protest was to video the interactions of the protestors and the police, and she paid special attention to individuals who seemed to be in agitated conversations with police officers.

425.    Ms. Hahn found herself towards the front of the protest near a police line and filming an African-American female who was being vocally aggressive to a police officer.

76

426.    While Ms. Hahn was filming, something happened to her right that caught her attention, and she saw a group of Columbus Police Officers quickly move towards the protestors.

427.    One Columbus Police Officer knocked her cellphone out of Ms. Hahn's hand.

428.    Nearly simultaneously, another Columbus Police Officer then pepper-sprayed Ms. Hahn in the left side of her face, blinding her in one eye.

429.    Columbus Police Officers then grabbed Ms. Hahn by her ponytail and wrist and began to take her to the ground.

430.    As Ms. Hahn was going down, out of her right eye she observed a Columbus Police Officer stomping on her phone.

431.    While Ms. Hahn was being taken down, the Columbus Police Officer who had her wrist began screaming at her to "turn it."

432.    Because of a prior medical issue, Ms. Hahn's wrist bones are fused, and she is unable to turn the wrist; however, she was able to partially use the wrist to break her fall.

433.    When Ms. Hahn landed on the ground, her fused wrist was partially under her body and a Columbus Police Officer was trying to pull it from under her and yelling at her to turn it.

434.    Ms. Hahn attempted to tell the Columbus Police Officer that she could not turn the wrist because it was fused.

435.    The Columbus Police Officer then grabbed Ms. Hahn by the ponytail, used it as a handle to slam her face on the ground, and then handcuffed her.

436.    After being handcuffed, Ms. Hahn was placed in the back of a police car for three hours.

437. Ms. Hahn was then released and told that she would be receiving an "indictment" in the mail.

438. Ms. Hahn was never charged with any crime as a result of the events of the evening of May 28, 2020.

439. The pepper spray continued to irritate her eye and the she suffered pain, bruises, and headaches from the physical force used by Columbus Police Officers.

**Q.** **Mistreatment of Plaintiff Bryan Hazlett**

440. On May 30, 2020, Mr. Hazlett and a friend decided to attend a downtown protest that was occurring near the I-670 Cap over High Street by the intersection of Goodale and High Streets.

441. At approximately 6:30 p.m., Mr. Hazlett and his friend arrived in the Short North and parked near the intersection of High Street and First Avenue.

442. Before heading south to join the protest, Mr. Hazlett and his friend spent time locating another friend who was meeting up with them.

443. After locating the other friend, Mr. Hazlett and his group began walking towards the protest on High Street, which was taking place near the intersection of West Poplar Avenue and High Street, arriving around 8:00 p.m.

444. Upon Mr. Hazlett's arrival, he observed approximately 20 Franklin County Sheriff's Deputies forming a line across High Street, took a picture of the line of officers, and a true and accurate copy of that picture is below.



445.    After arriving at the protest, Mr. Hazlett held a sign and participated in chants.

446.    Shortly after his arrival, Franklin County Sheriff's Deputies played a recording telling protestors to leave.

447.    Mr. Hazlett took the recording to mean that protestors should get off the street and onto the sidewalk, and he retreated to the sidewalk on the south side of the street.  .

448.    Unbeknownst to Mr. Hazlett, the Franklin County Sheriff's Deputies forming the line were SWAT officers assisted by Columbus Police Officers.

449.    The SWAT officers were on the scene as part of planned maneuver to surround, attack, and arrest the protestors on High Street.

450.    As part of the SWAT team's plan, coordinated in advance with Columbus Police Division SWAT and officers, the SWAT officers stationed at the I-670 Cap were to advance

north on High Street, driving the protestors north by showering them with glass from broken windows, directly shooting them with wooden bullets, and spraying them with tear gas and pepper spray.

451.    While the SWAT officers were driving the protestors north on High Street, a large number of other SWAT officers were to take up positions east and west of High Street on Russell Street, and, when the protestors on High Street were driven close to Russell Street, the SWAT officers were to come running out on High Street and take the protestors from the rear.

452.    As part of the plan, it was decided in advance that all of the individuals trapped in the street were to be targeted by wooden bullets, violently tackled to the ground, and pepper-sprayed directly in the face, regardless of whether they resisted arrest or posed any danger to the SWAT officers.

453.    This plan was not made in the heat of the battle or a split-second decision but was calmly created ahead of time.

454.    The Deputies and Officers concocted a pretext for this plan, telling the media that an officer-in-distress call came from protestors allegedly throwing water bottles and rocks at them.

455.    The officer-in-distress call had actually been made around 6:30 p.m., two hours prior to the actions of the SWAT team.

456.    Defendants determined in advance that they would make no distinction between individuals throwing objects at Columbus Police Officers or mutual-aid law enforcement personnel and those engaged in peaceful protesting, videotaping the events, serving as medics or reporters, and/or residing in the neighborhood.

457. Franklin County Sheriff's Office Sergeant Ray DeBolt, whose officers were also involved in the surrounding operation, admitted that he had no idea whether the people surrounded on the street were protestors or rioters: "I can't tell who's a protester and who's a rioter at that point."

458. Instead of making an effort to determine which individuals had actually engaged in violence towards the police, Defendants decided in advance to inflict group punishment, with all individuals present on the street being shot with wooden bullets, violently tackled, and pepper-sprayed at close range.

459. By May 30, 2020, Defendants had seen videos of Columbus Police Officers engaging in unnecessary violence against protestors, including the assault of a United States Congresswoman; were aware that the Officers were undertrained and incapable of engaging in constitutional crowd control; and took no remedial steps, including reconsidering the weaponry used by the Columbus Police Officers and mutual aid law enforcement personnel cooperating with them.

460. Further, Defendants knew by then that some of Columbus Police Officers and mutual aid law enforcement personnel cooperating with them were incapable of keeping their cool during demonstrations and were prone to violence.

461. Nevertheless, such officers were placed in a position where they would be directly interacting with protestors.

462. Defendants also then knew that Columbus Police Officers were routinely disregarding the requirement that wooden bullets be skip-fired and instead were directly firing them at protestors.

463. Despite that knowledge, Defendants continued to equip Columbus Police Officers with wooden bullet launchers knowing they would be misused.

464. After Mr. Hazlett had retreated, he observed that SWAT Officers opened fire with wooden bullets at the second-floor windows of buildings along High Street, shattering the windows and causing glass to rain down on Mr. Hazlett and other protestors standing on the sidewalk.

465. The SWAT Officers intended to not only inflict pain on the protestors but also to cause property damage which could be blamed on the protestors and then justify additional use of violence.

466. In order to avoid the falling glass, Mr. Hazlett walked to the curb of the sidewalk.

467. Columbus Police Officers or mutual-aid law enforcement personnel were then marching up the street direct-firing wooden bullets at any protestors they saw, and protestors in the street were being pushed towards Russell Street.

468. Approximately ten of the protestors had been in the middle of the street with sheets of plywood in front of them to block flying wooden bullets.

469. As Columbus Police Officers or mutual-aid law enforcement personnel marched toward them, the protestors picked up their sheets of plywood and began walking backwards north on High Street while using the plywood to block flying wooden bullets.

470. Mr. Hazlett realized as the protestors were being herded towards Russell Street that serious danger lurked, and he began to look around for his friend, a younger female, to tell her that they needed to get out of there right away.

471. When Mr. Hazlett located his friend, she was one of the protestors walking backwards with the sheets of plywood.

472.     Mr. Hazlett then stepped off the sidewalk into the street to get his friend and drag her out of the situation.

473.     As soon as Mr. Hazlett left the sidewalk, he was hit in the shin by a wooden bullet.

474.     Mr. Hazlett continued into the street, ran up to his friend, and yelled, "We need to get the fuck out of here."

475.     Just as Mr. Hazlett was entering the street, cruisers driven by Columbus Police Officers or mutual-aid law enforcement personnel increased their rate of speed and drove directly toward the group of protestors walking backward, only veering off to the side at the last second.

476.     Thinking that they were about to be hit by the cars, the protestors immediately dropped the sheets of plywood and ran north.

477.     At just this moment, SWAT Officers hiding on both sides of Russell Street ran onto High Street and attacked both the protestors running from the street and individuals who were on the sidewalk or trying to cross High Street at the crosswalk.

478.     Implementing their prearranged plan for group punishment, Columbus Police Officers and/or mutual-aid law enforcement personnel methodically pepper-sprayed fleeing protestors in the face at close range and, while the protestors could not see, other Officers violently tackled the protestors to the ground.

479.     To inflict pain and teach the protestors a lesson, SWAT Officers even pepper-sprayed protestors while they were helplessly restrained on the ground.

480.     One particularly excited SWAT Officer launched himself like a bowling ball into a group of individuals crossing High Street, knocking at least three of them to the ground.

481. Along with the rest of the protestors in the middle of the street, Mr. Hazlett ran from the onrushing police cars.

482. As can be seen in the below videos (double click to play or click the links), which truly and accurately reflect the events, before he had taken more than a couple of steps Mr. Hazlett was pepper-sprayed in the face at point-blank range by an officer as Mr. Hazlett raised his hand in the air. https://www.dropbox.com/s/nr6t9y2ph8yydv7/IMG_0113.mov?dl=0 and https://www.dropbox.com/s/u954qu086ecsn9m/06-05-2020%20officers%20tackling%20protesters%20in%20the%20Short%20North.mp4?dl=0.





483.    After he was hit by the pepper spray, Mr. Hazlett was completely blinded, staggered forward several steps, and then began to pull up.

484.    As the officers from Russell Street ran out to arrest protestors, one officer, later identified as Defendant Columbus Police Officer Michael Eschenburg, Badge Number 2734, hung back awaiting the opportunity to violently attack a protestor.

485.    Defendant Eschenburg harbored animosity and anger towards what the protestors stood for and wanted to impress other Columbus Police Officers with his body-slamming a protestor.

486.    As is reflected on the video, Defendant Eschenburg waited to target a protestor who had been sprayed in the face with pepper spray and blinded.

487.    As Mr. Hazlett stumbled after being pepper sprayed, Defendant Eschenburg observed that Mr. Hazlett had been sprayed in the face with pepper spray and was now a helpless target, and he then lined up Mr. Hazlett for a body slam.

488.    As can be seen in the video, Defendant Eschenburg never attempted a tackle or an arm-bar takedown; instead, he kept himself aligned with Mr. Hazlett's front.

489.    Defendant Eshenburg is a large, muscular man who was fully dressed in protective tactical gear and equipped with both lethal and less-than-lethal weaponry.

490.    Defendant Eschenburg had been trained in numerous forms of physical combat.

491.    Defendant Eschenburg was among 50 or more SWAT Officers, all as fully dressed, armed, and trained as he was.

492.    Mr. Hazlett is considerably smaller than Defendant Eschenburg; was wearing a t-shirt, shorts, and tennis shoes; had no combat training; and was completely blinded by pepper spray.

493.    As can be seen in the video, after Defendant Eschenburg had lined Mr. Hazlett up, he charged towards him, making no effort to tackle Mr. Hazlett or take him to the ground, and, instead, bent down to hit Mr. Hazlett in his midsection.

494.    After hitting Mr. Hazlett in the midsection, Defendant Eschenburg physically picked Mr. Hazlett up in the air and then jumped forward, throwing Mr. Hazlett on his back with Defendant Eschenburg's full weight on him.

495.    As Defendant Eschenburg had planned, Mr. Hazlett's primary point of contact with the pavement was his back and neck area, and that maneuver easily could have caused a broken neck and permanent paralysis.

496.    After being pepper-sprayed and slammed to the ground, Mr. Hazlett was completely disoriented, and he curled up in the fetal position on the pavement.

497.    Several Columbus Police Officers then converged on Mr. Hazlett as he was lying in the street.

87

498.    In response to Columbus Police Officers yelling at Mr. Hazlett to give them his arm, he told them that his arm was injured and that he was blinded.

499.    One Columbus Police Officer then kicked or kneed him in the back, and another sprayed him in the face with pepper spray at point blank range.

500.    Mr. Hazlett's hands were then placed in handcuffs and taken to the curb.

501.    Columbus Police Officers took Mr. Hazlett to a makeshift police station where he remained for six hours and was then transported to the Franklin County Jail at Jackson Pike.

502.    Mr. Hazlett was bleeding, injured, and still covered with pepper spray, and the jail staff at Jackson Pike refused to admit him.

503.    After the jail refused to accept Mr. Hazlett, he was taken back to downtown Columbus where he was given a citation for a fourth-degree misdemeanor count of failing to disperse and dropped off on the street.

504.    In a great deal of pain from his leg injury, Mr. Hazlett limped through downtown up to the Short North to get his car.

505.    On June 16, 2020, the criminal charge against Mr. Hazlett was dismissed.

**R.    Mistreatment of Plaintiff Justin Horn**

506.    On May 30, 2020, around 5:30 p.m., Mr. J. Horn arrived in downtown Columbus with the intent to peacefully protest police brutality and racial injustice.

507.    Mr. J. Horn was accompanied by his son, Kurghan Horn; his nephew, a 16-year-old minor, Plaintiff S.L.C.; and his son's significant other.

508.    After they parked, they walked toward the protest.

509.   After being at the protest for about five minutes, which up until Columbus Police Officers' order to disperse had been peaceful, Mr. J. Horn's son was tear-gassed and shot with a wooden bullet, and Plaintiff S.L.C. was tear-gassed.

510.   Mr. J. Horn walked to where Columbus Police Officers were standing in front of the protestors, and he began videotaping their bombarding protestors.

511.   Mr. J. Horn videotaped for approximately an hour.

512.   As he started to walk away, Mr. J. Horn was tackled by Defendant Sergeant Brian Steele ("Defendant Sgt. Steele"), and his shoulder was dislocated.

513.   Another Columbus Police Officer, Joshua Cramer, assisted Defendant Sgt. Steele in arresting Mr. J. Horn.

514.   Mr. J. Horn screamed in pain and anger at the Columbus Police Officers, and one officer popped his shoulder back into the socket.

515.   Officer Cramer then pulled Mr. J. Horn's arm behind his back and handcuffed him.

516.   Mr. J. Horn remained in pain and asked for medical care.

517.   Columbus Police Officers told Mr. J. Horn that it always hurts when a shoulder is dislocated.

518.   For four hours Mr. J. Horn remained handcuffed and in pain.

519.   Columbus Police Officers told Mr. J. Horn that he would be released on his own recognizance if he signed away the right to any medical care.

520.   Columbus Police Officers transported Mr. J. Horn to a holding facility, speeding up and then quickly braking so that his body bounced around, and he cried out in pain.

521.    Ultimately, Mr. J. Horn sought medical care and was diagnosed with a closed displaced fracture of the proximal end of his left humerus.

522.    Mr. J. Horn was prescribed a lengthy rehabilitation period which he has started.

523.    The fracture continues to cause Mr. J. Horn pain; a true and accurate representation of Mr. J. Horn's back injury sustained from being tackled by the officers is shown below.



### S.     Mistreatment of Plaintiff Kurghan Horn

524.    On May 30, 2020, Mr. K. Horn was watching a live-feed on social media and saw Columbus Police Officers indiscriminately throwing tear gas at peaceful protestors.

525.    Mr. K. Horn had prior limited first-aid training and felt the need to go to the protests and provide whatever assistance he could.

526.    Mr. K. Horn headed to downtown Columbus with his friends and family members, including Plaintiffs J. Horn and S.L.C..

527.    They parked near The Garden, a Short North store, on High Street.

528.    They began helping individuals who had been tear-gassed and were hurt.

529.    They then approached near the front of the protest and witnessed Columbus Police Officers laughing at the protestors.

530.    Columbus Police Officers in a vehicle then ordered everyone to disperse and suddenly began throwing tear gas canisters.

531.    One of the canisters of tear gas was thrown towards Mr. K. Horn.

532.    As Mr. K. Horn picked up the canister to move it away from him, a Columbus Police Officer shot him with an object in the back of his left thigh.

533.    Mr. K. Horn started to retreat, and Columbus Police Officers continued to throw tear gas canisters.

534.    Mr. K. Horn lost contact with his family and friends in the chaos that ensued.

535.    Mr. K. Horn witnessed a Columbus Police Officer grasp a protestor, take her mask off, and then pepper-spray her in the face.

536.    Ultimately, Mr. K. Horn was hit by wooden and/or rubber bullets over a dozen times.

537.    Mr. Horn sustained painful injuries to his left thigh from one or more rubber bullets.

538.    The picture below truly and accurately reflects the bruise on his thigh caused by one or more rubber bullets.



**T.    Mistreatment of Plaintiff Terry D. Hubby, Jr.**

539.    On the evening of May 29, 2020, Mr. Hubby joined the ongoing protests in downtown Columbus.

540.    When Mr. Hubby arrived at the protest, the air was already filled with chemical agents, causing a burning sensation in his eyes and on his skin.

541.    At approximately 9:00 p.m., Mr. Hubby and his companions arrived at the intersection of State Street and High Street where they stood on the sidewalk at the corner.

542.    None of the people with or near Mr. Hubby was doing anything except peacefully protesting, chanting slogans, and observing a large crowd of Columbus Police Officers massed in the street.

543.    Mr. Hubby had his mobile phone in his hand and was filming the scene at the intersection.

544.    Without prior warning, Columbus Police Officers opened fire on the crowd Mr. Hubby was in with projectile weapons, including rubber and wooden bullets.

546.    A loud announcement was made by the Columbus Police Officers as they opened fire, stating that crowd control devices were about to be deployed.

547.    There was no time between when the announcement and when the projectiles began to hit the crowd in which anyone could safely disperse or avoid the projectiles.

548.    A true and accurate reflection and audio of what occurred was captured on the video below (double click to play or click the link): https://www.dropbox.com/s/rlzcry9zbhshkcx/IMG_0119%20%281%29.mov?dl=0.



549. Mr. Hubby was immediately struck by a wooden bullet which broke his kneecap, causing him excruciating pain.

550. Mr. Hubby fell to the ground as additional projectiles continued striking protestors and the area around them on the sidewalk.

551. Mr. Hubby was assisted by other protestors, including one who fashioned a splint, and they carried him away from the area where he had been shot.

552. The other protestors did all of this while attempting to protect Mr. Hubby and themselves from further injury as Columbus Police Officers continued to fire on them.

553. Unable to walk or safely seek medical attention, Mr. Hubby waited for nearly an hour until a friend was able to transport him to Grant Hospital.

554. X-rays administered at the hospital revealed that Mr. Hubby's kneecap had been shattered and he needed surgery.

555. The next day, May 30, Mr. Hubby underwent knee surgery, and a number of screws and a metal plate were placed in and around his knee.

556. Mr. Hubby was hospitalized for an additional two days.

557. Mr. Hubby is recovering from his severe knee injury and will need long-term rehabilitation to restore his mobility.

558. Mr. Hubby has Type 1 Diabetes, which makes any restriction of blood flow to his extremities dangerous, and he has been informed that his injury and the need to insert the screws and plate in his knee has greatly increased the likelihood that his leg will require amputation in the future.

U.     **Mistreatment of Plaintiff Randy Kaigler**

559.     On Thursday, May 28, 2020, at approximately 7:30 p.m., Plaintiff Kaigler was driving through downtown Columbus when he observed a peaceful protest in process near the intersection of Broad and High Streets.

560.     Because he believed in the message of the protest, Mr. Kaigler decided to join it, parking his car and proceeding on foot towards the intersection of Broad and High Streets.

561.     While walking to the protest, Mr. Kaigler observed a group of Columbus Police Officers standing on Broad Street across the street from the Ohio Statehouse.

562.     The Columbus Police Officers observed by Mr. Kaigler did not appear to be engaged in crowd-control activities or carrying crowd-control paraphernalia but rather were milling around a cruiser with ample room in the street to move.

563.     When Mr. Kaigler observed the Columbus Police Officers, Broad Street was closed to vehicular traffic and officers and protestors were in the street.

564.     The protest was loud but peaceful.

565.     Upon seeing the Columbus Police Officers, Mr. Kaigler decided to make a political statement: he walked within approximately five feet of them, stopped and raised his arms in a "hands up, don't shoot" position and stated to the officers "I can't breathe."

566.     The "hands up, don't shoot" gesture originated at protests after the August 9, 2014, shooting of Michael Brown in Ferguson, Missouri, and displayed a common sign of submission which communicated that a suspect was not presenting a threat and, like Brown's alleged conduct, should not be shot.

567.     The statement "I can't breathe" is a reference to the 2014 killing of Eric Garner and 2020 killing of George Floyd.

568.     The Columbus Police Officers who observed and heard Mr. Kaigler knew the origin and meaning of those phrases.

569.     The sun was out, and the area around Mr. Kaigler was well lit.

570.     Mr. Kaigler did not have any sort of weapon, and his empty hands were clearly visible to the officers.

571.     Mr. Kaigler's political statement did not cause any alarm or concern about their safety for the group of Columbus Police Officers; indeed, when Mr. Kaigler was pepper-sprayed, the other Columbus Police Officers appeared nonchalant.

572.     After Mr. Kaigler made his statement, one of the officers, later identified as Defendant Gitlitz, casually drew a canister of mace or pepper spray and, without audible warning, sprayed Mr. Kaigler directly in the face at point blank range.

573.     This true and accurate copy of a photograph posted by @Cheesemaman at https://twitter.com/Cheesemaman/status/1266788762295717888, accurately depicts Defendant Gitlitz pepper-spraying Mr. Kaigler:



574.    After he was sprayed, Mr. Kaigler was blinded, could not breathe, and was in intense pain.

575.    Other protestors around Mr. Kaigler assisted him to a first-aid station, where his eyes were rinsed.

**V.      Mistreatment of Plaintiff Elizabeth Koehler**

576.    During late May and early June of 2020, Ms. Koehler attended numerous protests in the downtown area of Columbus.

577.    Ms. Koehler was often pepper-sprayed as part of a group after Columbus Police Officers demanded that protestors leave the street.

578.    On at least six occasions, Ms. Koehler was pepper-sprayed when she was standing on the sidewalk after the streets had been cleared.

579.    On May 30, 2020, Ms. Koehler was attending a protest near the intersection of Broad and High Streets.

580.    Columbus Police Officers had then established a barricade across Broad Street near Third Avenue, and Broad and High Streets were completely blocked to vehicular traffic around their intersection.

581.    Columbus Police Officers wished to use violence against the protestors because they harbored animosity towards the political message of the protestors.

582.    To manufacture an opportunity for that violence, throughout the day Columbus Police Officers would periodically move west down Broad Street from their barricade and clear the street of protestors by pepper-spraying them, driving them back to the sidewalks on both sides of the street.

583.    Because Broad Street was blocked off, there was no danger and no reason for Broad Street to be cleared of protestors.

584.    In herding the protestors, Columbus Police Officers intended to provoke them into fighting back, which the Officers would then use to justify increased violence.

585.    At approximately 5:00 p.m., Ms. Koehler was driven to the sidewalk by Columbus Police Officers using pepper spray as part of their periodic street clearing.

586.    Ms. Koehler was then positioned on the sidewalk on the south side of Broad Street in front of the Ohio Statehouse.

587.    Broad Street was then completely clear, and Columbus Police Officers had returned to behind their barricade.

588.    Ms. Koehler observed a Black female enter the street from the opposite (north) side of Broad.

589.    It is part of the ethos of many protestors that White protestors are supposed to place themselves between Columbus Police Officers and Black protestors in the expectation that that Columbus Police Officers are far less likely to use force on White individuals; consequently, Ms. Koehler entered the street intending to place herself between the police and the Black woman.

590.    After Ms. Koehler had taken five or six steps into the street, a Columbus Police Officer fired a tear gas canister directly at her, hitting her in the leg.

591.    When the tear gas canister was shot at Ms. Koehler, there were no other individuals in her vicinity that could possibly have been a target and an ample clear area in the street for Columbus Police Officers to fire a canister without hitting a person.

592.    The tear gas canister hit her with such force that it inflicted significant pain.

**W.**     <u>**Mistreatment of Plaintiff Rebecca Lamey**</u>

593.    On May 31, 2020, Ms. Lamey, along with two friends, participated in a peaceful protest for hours.

594.    At 7:54 p.m., Columbus Police Officers abruptly decided to stop the protest.

595.    At that point, Ms. Lamey and other protestors were on their knees, with their hands up, on the sidewalk.

596.    Columbus Police Officers ordered the protestors to leave and appeared to be ready to use force against them.

597.    Protestors started running in fear of the force, with some getting knocked down and trampled.

598.    Ms. Lamey and her two friends hung back to avoid getting separated or knocked down.

599.    Ms. Lamey was filming on her cellphone, which she was holding well above her waist, and walking backwards while keeping an eye on her friends.

600.    A Columbus Police Officer turned the corner and, without warning, shot a wooden bullet at Ms. Lamey, hitting her hand, knocking the cellphone to the ground.

601.    The use of wooden bullets against non-violent protestors was authorized and directed by Defendants Sergeant Scott Bray and Sergeant Brian Bruce.

602.    When Ms. Lamey bent over to pick up her cellphone, she was shot four more times; around the same time, her friend was hit by wooden bullet in the back of the head, neck, and upper arm.

603.    Based on the location where the wooden bullet hit Ms. Lamey, it must have been directly fired at her, rather than "skip-fired" off the ground.

604.    Ms. Lamey and a friend ran to a building half a block away, and he left the stairs there to get some ice for her injury.

605.    Moments after the friend returned with the ice and applied it to Ms. Lamey's hand, he screamed, "Get behind the pillar!," as several unmarked vans approached.

606.    The van doors opened and two Columbus Police Officers opened fire with wooden bullets on Ms. Lamey, her friend, and two others, striking them.

607.    A true and accurate video of the moment Ms. Lamey was hit by the wooden bullets (double click to play or click the link https://www.dropbox.com/s/dmu6uucrkhxmkim/Video.MOV?dl=0) and true and accurate pictures of the swelling on Ms. Lamey's hand and wrist and a wooden bullet which had been fired by Columbus Police Officers are below.







608. The swelling took so long to go down and the pain remained so bad that Ms. Lamey went to an Emergency Room a few days later, had X-rays, and learned that no bones were broken.

609. Ms. Lamey has not yet recovered the full use of her hand.

**X.    Mistreatment of Plaintiff Ricky Lee Lane**

610. On the evening of May 29, 2020, Mr. Lane joined the ongoing protests in downtown Columbus.

611. Mr. Lane works full time as a security operations center operator. He is also a freelance photographer.

612. Mr. Lane attended the protests to observe what was happening, take photographs, and participate in peaceful protests of police racism and violence, locally and nationwide.

613. Shortly after 8:40 p.m., a group of Columbus Police Officer assigned to the bicycle team, including Defendant Officer Phillip Walls, gathered on North Ludlow Street, adjacent to the Columbus Police headquarters building.

614. At that time, Defendant Sergeant Christopher Capretta ("Defendant Sgt. Capretta") told the officers, including Defendant Officer Walls, to don gas masks.

615. Defendant Sgt. Capretta shouted instructions to the officers that "the group at Broad and High is gonna move. They are not gonna stay there. . . . When we get up there we are gonna move them by any means necessary."

616. He then added, less forcefully, "reasonably necessary," and told the officers, "Get your mace ready."

617. After giving these orders, Defendants Sgt. Capretta, Officer Walls, and the other bicycle team officers rode their bicycles onto Broad Street, approaching the southwest corner of Broad Street and High Street from the west.

618. As the bicycle unit approached High Street, whatever "group" Defendant Sgt. Capretta had referred to in his orders had largely or entirely left the area.

619. What Defendant Sgt. Capretta, Defendant Officer Walls, and the other bicycle team officers encountered instead was a handful of individuals on the south sidewalk of Broad Street.

620. A few of the individuals were holding signs; others were clearly suffering from the effects of chemical agents that had already been deployed.

621. None of these individuals were blocking traffic in the street or on the sidewalk.

622. Despite the lack of any apparent threat or illegal activity among the individuals on the sidewalk, Defendant Officer Walls and the other bicycle team officers dismounted from their

bicycles, brought them onto the sidewalk, and began attacking with their bicycles and chemical spray any individuals they encountered.

623.    At the time Defendant Officer Walls reached the sidewalk, Mr. Lane was assisting an older Black woman who had apparently already been pepper-sprayed.

624.    Defendant Officer Walls approached Mr. Lane and the woman.

625.    Defendant Officer Walls was easily able to see and hear what Mr. Lane was doing, including telling the woman to "keep blinking."

626.    Defendant Officer Walls nevertheless sprayed pepper spray in the faces of both Mr. Lane and the woman he was assisting, resulting in immediate pain and burning in Mr. Lane's eyes.

627.    A true and accurate representation of Mr. Lane being sprayed is reflected on this video (click the link to play):

https://www.dropbox.com/s/bx35jx2hnxxzncg/Ex.%20P123B.mp4?dl=0.

628.    Mr. Lane left the protest shortly after being pepper-sprayed as a result of the Defendants' actions.

629.    On the following evening, May 30, 2020, Mr. Lane decided to return to the downtown area in another attempt to document the protests with his camera.

630.    When Mr. Lane reached the Short North area, at approximately 7:30 p.m., a group of Columbus Police Officers was marching north on High Street, accompanied by some Franklin County Sheriff's Office deputies, and had reached the area between East Lincoln Street and Buttles Avenue.

631.    At the time Mr. Lane reached the area, a crowd of protesters was facing the officers who were marching north.

632.    Mr. Lane gradually made his way toward the front of the crowd so he could take photographs.

633.    Due to his experience the previous night, he was wearing goggles to protect from chemical agents and a protective vest he sometimes uses when taking photographs in potentially dangerous areas.

634.    The vest was prominently marked with the word "PRESS."

635.    When Mr. Lane reached the front of the crowd, he could see that both Columbus Police officers and Franklin County sheriff's deputies were subjecting the peaceful crowd to thrown canisters of tear gas and flash-bang grenades and firing wooden and rubber projectiles into the crowd.

636.    Mr. Lane did not observe any violent or threatening conduct from the crowd provoking a response of this kind.

637.    The officers holding the projectile launchers appeared to be Columbus Police officers, as they were wearing protective gear marked "police" and were primarily dressed in white Columbus Police uniform shirts under black protective gear.

638.    A true and accurate representation of the group of Columbus Police Officers and Franklin County Sheriff's Office deputies in the Short North area is reflected in the photograph below, taken by Mr. Lane.



639. Mr. Lane began photographing the line of officers as they continued to push the crowd north using chemical agents, grenades, and projectiles.

640. As he took a photograph, he was struck in the chest with a direct-fired wooden projectile.

641. He picked up the projectile and turned to run from the officers' attack.

642. After turning to run, Mr. Lane was struck by additional wooden projectiles in his upper right thigh and buttock area, causing him intense pain and forcing him to limp instead of running.

643. Shortly after being struck from behind, Mr. Lane left the area of the protests because he no longer felt safe, even in his protective gear, and because he could no longer walk correctly due to the continued pain and limited motion in his right leg.

**Y.** **Mistreatment of Plaintiff Nadia Lynch**

644. On Saturday, May 30, 2020, at approximately 11:30 a.m., Ms. Lynch was attending the protest at the intersection of Broad and High Streets in downtown Columbus.

645. The intersection had been taken over by Columbus Police Officers, who had formed a box at the intersection with lines of officers facing protestors.

646. The intersection had long been closed to vehicular traffic that afternoon, and many Columbus Police Officers were milling around in the middle of the street.

647. The Columbus Police Officers facing the protestors were wearing black helmets, black gas masks, and black military style tactical clothing.

648. Ms. Lynch stepped up to greet other protestors on the other side of the police line, taking a photo of other protestors and displaying the sign she had brought to the event.

649. Columbus Police Officers then began forming a line with their bicycles right next to Ms. Lynch, and she realized she was in a bad position.

650. Ms. Lynch then decided to go around and started walking back to her group of friends on the curb.

651. On her way back to the curb, Ms. Lynch was grabbed by Defendant Officer Shawn Dye and thrown down, causing her head to hit the ground.

652. Following the lead of Officer Dye, Defendant Officers Holly Kanode and Shannon Schmid began to attack Ms. Lynch while she was lying on the ground.

653. While on top of Ms. Lynch, Officer Dye used his closed fist to strike Ms. Lynch while she was lying compliantly on the ground and not resisting arrest.

654. The officers pulled Ms. Lynch's hands behind her back and zip-tied them.

655. Before using force on her, no officer ever said anything to Ms. Lynch or yelled any commands.

109

656. All of these events took place in an open, well lit, and relatively calm area.

657. Following Ms. Lynch's arrest, Defendant Officer Schmid was aware that Ms. Lynch had not committed a crime and that he, Officer Kanode, and Officer Dye had no grounds to attack and arrest her.

658. Officer Schmid was also aware that Officer Dye had used excessive force against Ms. Lynch when he threw Ms. Lynch to the ground, causing her to hit her head, and when he delivered a closed fist strike to Ms. Lynch.

659. In order to cover for himself and the other three Officers, in particular Officer Dye, Officer Schmid knowingly and intentionally fabricated a version of events that would justify the false arrest of Ms. Lynch and the excessive force.

660. Officer Schmid subsequently intentionally and knowingly falsified a U-10-100 form, an official government document, by making the following false statements in the form:

a. That Ms. Lynch had "grabbed an unknown Officer by his riot gear and threw him to the ground."

b. That as "the arrest team was attempting to take Ms. Lynch into custody, she pulled away from Officers were trying to arrest her."

661. Video footage of the assault on Ms. Lynch conclusively shows that neither of the above allegations were true.

662. At the time Officer Schmid falsified the U-10-100 form, he was aware that this form would make it more likely that Ms. Lynch would be prosecuted for crimes she had not committed.

663. He was further aware that such a criminal prosecution could cause Ms. Lynch to be jailed and face other criminal penalties, that she would need to hire an attorney and post bail,

and that criminal convictions could have a long-term effect on Ms. Lynch's educational, personal, and professional opportunities.

664. Following the incident, Defendant Officer Dye filled out a Columbus Division of Police Use of Force Report, an official government document.

665. In order to cover up his actions, in that report he falsely stated that he had placed his hands on Ms. Lynch's back and attempted to guide her to a different side of the barricade.

666. He then stated that "Ms. Lynch then became irate, yelling and cursing at Officer Dye. Ms. Lynch then pulled away from Officer Dye, spun around to face him, attempted to remove Officer Dye's gas mask from his face." He then stated that after he had taken Ms. Lynch to the ground "she continued attempting to remove his gas mask."

667. Video footage of the assault on Ms. Lynch conclusively shows that Officer Dye's claims in his Use of Force Report were untrue.

668. Ms. Lynch, who is 5 feet 3 inches tall, did not at any time throw an officer to the ground by his riot gear, attack Defendant Officer Dye, attempt to remove Officer Dye's gas mask, pose a threat to a police officer, or resist arrest.

669. Ms. Lynch was then taken to Jackson Pike where she was slated and spent two hours in jail before she bonded out.

670. Ms. Lynch suffered physical injuries due to the assault and damage to her physical property.

671. In order to effectuate Ms. Lynch's arrest and take her to jail, that same day, Defendant Officer Robert Reffitt filed two sworn criminal complaints against Ms. Lynch.

672. In the first criminal complaint, Defendant Officer Reffitt swore that Ms. Lynch had committed the second-degree misdemeanor crime of resisting arrest when she "grabbed an

officer and took him to the ground when she refused to disperse from Broad and High Street during a protest that became unlawful."

673. In the second criminal complaint, Officer Reffitt swore that Ms. Lynch had committed the fourth-degree misdemeanor crime of disorderly conduct when she threw "water filled bottles at police during a protest that became unlawful."

674. Video evidence conclusively and accurately shows that both charges filed by Officer Reffitt were complete fabrications and utterly without probable cause; a true and accurate copy of the video is shown below (double click to play or click the link https://www.dropbox.com/s/nr6t9y2ph8yydv7/IMG_0113.mov?dl=0).



675.     At the time Officer Reffitt falsified the sworn criminal complaints, he was aware that this criminal prosecution could cause Ms. Lynch to be jailed and face other criminal penalties, that she would need to hire an attorney and post bail, and that criminal convictions could have a long-term effect on Ms. Lynch's educational, personal, and professional opportunities.

676.     Defendant Officer Reffitt falsified these criminal charges in order to cover up Officer Dye's violent attack on Ms. Lynch and her false arrest.

677.     The fabricated criminal charges against Ms. Lynch were dismissed on June 15, 2020, with bond and fees refunded.

**Z.     Mistreatment of Mia Mogavero**

678.     On the morning of May 30, 2020, Ms. Mogavero and several friends arrived at the protest against police brutality and racial injustice taking place outside the Ohio Statehouse.

679.     Ms. Mogavero and her friends started marching peacefully around Broad and High Streets.

680.     Columbus Police Officers started shoving anyone who was close to the intersection.

681.     Columbus Police Officers who were on horseback began riding their horses onto the sidewalk, pushing protestors back, and injuring some.

682.     Ms. Mogavero observed all of this occurring and witnessed her friend, Ellen "Hana" Abdur-Rahim, get pepper-sprayed at close range.

683.     Ms. Mogavero and her friends ran for cover and turned down Pearl Alley, where they noticed medics who were there to assist protestors.

684. As Ms. Mogavero helped Ms. Abdur-Rahim and several other protestors receive medical attention, they noticed approximately ten Columbus Police Officers create a "wall" and begin marching down the alley.

685. Protestors who were being treated and the medics began to leave from the alley.

686. Ms. Mogavero saw a Columbus Police Officer attempt to grab a young Black child who was attempting to move his bicycle which appeared to be stuck.

687. Ms. Mogavero responded by attempting to help him move the bicycle, and the Columbus Police Officer threw her to the ground.

688. Upon hitting the ground, Ms. Mogavero's head bounced off the pavement.

689. Ms. Mogavero was then pepper-sprayed by the Columbus Police Officer while she lay there still on the ground, defenseless, unarmed, and suffering from what was later diagnosed as a concussion.

690. Ms. Mogavero's friend attempted to help her off of the ground, and a Columbus Police Officer pepper-sprayed the friend at close range.

691. As a proximate result of the excessive force, Ms. Mogavero suffered a concussion and chemical burns on her left arm, on the left side of her face, and on her neck.

**AA.** **Mistreatment of Plaintiff Michael Moses**

692. In the early evening of May 30, 2020, Moses decided to attend the protests which were occurring downtown.

693. Somewhere between 8 and 8:30 PM that day, Mr. Moses left his house in Clintonville and travelled on foot south on High Street. He brought a sign with him that expressed his views on police misconduct.

694.    Near the Ohio State University Campus, Mr. Moses joined with other protestors who were heading downtown.  Together they walked south, carrying signs and chanting.

695.    Mr. Moses arrived at the intersection of 5th Avenue and High Street at approximately 9:00 PM.

696.    When he arrived, Mr. Moses observed a protest taking place in the middle of High Street.

697.    Mr. Moses decided to join the protest and participated for approximately 15 minutes.

698.    Although the individuals involved in the protest were loud and vocal, they were peaceful and were not throwing objects.

699.    As he took part in the protest, Mr. Moses observed a line of Columbus Police Officers across High Street near the 4th Avenue intersection.

700.    The Officers were approximately 50 yards from the protestors.

701.    After 15 minutes had passed, Mr. Moses heard a muffled command from what seemed to be a bullhorn.

702.    Because of the noise level in the area, Mr. Moses could not make out what the command was.

703.    Because of this, he looked to other protestors in the area and they indicated to him that he needed to head north.

704.    Shortly thereafter, Mr. Moses started heading north on High Street.

705.    As he began to leave, Mr. Moses was shot in the left side and lower back with wooden bullets.

706. After being shot, Mr. Moses jogged north on High Street for approximately half a block.

707. Because his injuries were painful, after he had jogged for half a block Mr. Moses stopped outside of a coffee shop to examine himself to see how badly he was hurt.

708. While Mr. Moses was examining himself, several officers including Defendant Officer Benjamin Mackley grabbed him by his right wrist and arm and took him forcefully to the ground causing abrasions and bruising to his face and right shoulder.

709. At no time did Mr. Moses offer any resistance or do anything to cause the police to violently take him to the ground in this fashion.

710. Following the takedown, Mr. Moses was placed in a van along with other arrestees and taken to the Jackson Pike Jail facility.

711. Motivated by anger at the political message of Mr. Moses and the other protestors in the van, unknown officers driving the police van gave Mr. Moses and the others what the police refer to as a "rough ride."

712. This consisted of taking a sharp turn with the van causing the prisoners, who were handcuffed and not strapped in, to fly across the back of the wagon.

713. Defendant Officer Mackley then swore out a criminal complaint charging Mr. Moses with a fourth-degree misdemeanor count of failing to disperse.

714. Mr. Moses remained at Jackson Pike until he was bonded out the following day.

715. On June 23, 2020, the charges against Mr. Moses were dismissed.

**BB.** **Mistreatment of Plaintiff Aleta Mixon**

116

716. On the evening of Friday, May 29, 2020, Ms. Mixon was aware that her oldest daughter, who is 20 years old, was attending a protest against police brutality in downtown Columbus.

717. After dropping a younger daughter at a different event, Ms. Mixon learned that the protests her oldest daughter was attending might become dangerous.

718. Ms. Mixon unsuccessfully attempted to contact her daughter by telephone and drove toward downtown Columbus.

719. Ms. Mixon had trouble driving to the vicinity where she believed her daughter was and ultimately, around 9:00 p.m., parked her car on State Street, near the Ohio Statehouse.

720. Ms. Mixon left her vehicle to attempt to find her daughter and saw that Columbus Division of Police officers in riot gear were massing in the street.

721. Ms. Mixon approached a White female officer who was not in riot gear and was standing separate from the officers who were massing and began to ask the female officer for assistance in locating her daughter.

722. As the female officer was about to reply to her request, Defendant Officer Paul Badois charged toward her and sprayed her in the face with pepper spray.

723. The female officer confronted the male officer and said words to the effect of, "Why the fuck did you do that? She was just asking for help."

724. Ms. Mixon began screaming from the pain of the pepper spray and calling for relief.

725. Two White male officers, including Defendant Officer Badois, then approached and sprayed Ms. Mixon again.

726. Ms. Mixon fell to a seated position on the ground from the effects of the pepper spray, and she was sitting out of the street, on the sidewalk, still calling for help.

727. One of the White male officers continued spraying her, and she attempted to stand.

728. As Ms. Mixon attempted to stand up, the officer shoved her off the sidewalk and over the curb.

729. Ms. Mixon felt intense pain and a snap in her leg.

730. The officer who had shoved Ms. Mixon then stood over her and told her, "That's what you get for your protest, bitch," and he stepped hard on her knee, before walking away.

731. Another White male officer who had not been involved in the use of excessive force arrived and assisted Ms. Mixon, calling an ambulance and giving her advice for dealing with the effects of the spray.

732. Ms. Mixon was transported to Grant Hospital, where she was given X-rays and told she needed emergency surgery due to critical tears in a major tendon in her leg.

733. The X-rays also showed that Ms. Mixon's kneecap had been shattered, with multiple fractures in the bone.

734. Ms. Mixon's surgery was delayed until May 31, 2020, due to the urgent medical needs of others injured in the protests.

735. Ms. Mixon was hospitalized until Tuesday, June 2, 2020, after which she was released, with significant restrictions on her mobility.

736. Ms. Mixon is uncertain whether she will recover full use of her leg, and she expects to be unable to work for a period of several months or longer; a true and accurate picture of her leg post-surgery, including permanent scarring, is shown below.



CC. **Mistreatment of Plaintiff Darrell Mullen**

737. On Tuesday, June 2, 2020, at around 1:30 a.m., Darrell Mullen was walking by himself northbound on the sidewalk on the east side of North High Street.

738. Mr. Mullen was walking home from a friend's house on Oakland Avenue to his residence on Findley Avenue.

739. On May 30, 2020, Columbus Mayor Andrew Ginther had issued an executive order instituting a city-wide curfew which required most residents to remain indoors from 10 p.m. to 6 a.m. and was to remain in effect until he rescinded it.

740. The executive order stated that being outside in violation of the curfew was an unspecified degree misdemeanor.

741. As of the time that Mr. Mullen was walking home, North High Street was deserted.

742. Near the intersection of High Street and Oakland Avenue, Mr. Mullen observed four or five police cars drive past him going northbound on High Street.

743. Upon observing the police cars, Mr. Mullen made no effort to flee and continued walking northbound on High Street.

744. Mr. Mullen then observed at least one of the police cars execute a U-turn and drive towards him.

745. Again, Mr. Mullen made no attempt to flee and watched the police vehicle drive up to him.

746. At this point, several Columbus Police Officers, later identified as Defendant Officers Thomas Hammel and Michael Dunlevy and Defendant Sergeants Brian Steele and Benjamin Messerly, got out of the police cruiser and began running at Mr. Mullen.

747. At no time did any Columbus Police Officer order Mr. Mullen to stop, give Mr. Mullen any verbal commands, or inform Mr. Mullen that he was under arrest.

748. Instead, Defendant Officer Hammel violently tackled Mr. Mullen, taking him face down on the sidewalk, and then applied pressure to the back of his head, grinding his face into the pavement.

749. Shortly after that tackling, three more officers, including Dunlevy, Sgt. Steele, and Sgt. Messerly, got on top of Mr. Mullen and began striking his back and legs with their knees.

750. Mr. Mullen was quickly handcuffed, but officers continued to apply pressure to his back and legs, with Officer Hammel continuing to apply pressure to the back and side of his neck, pushing his face into the ground and preventing him from talking.

751. When he was finally able to talk, Mr. Mullen told the officers that he had just been walking home, and Officer Hammel replied, "I know exactly where you live, is your girlfriend out of jail yet?"

752. As a proximate result of the excessive use of force, Mr. Mullen suffered facial abrasions, bruising, and a significant injury to his leg that left him unable to walk.

753. A true and accurate picture of his facial injuries is below:



754. Mr. Mullen was then charged with violating curfew and taken to jail.

755. Because of his leg injury, when Mr. Mullen arrived at the jail, he was checked out by a nurse, who placed him in a wheelchair and recommended x-rays.

756. When Mr. Mullen was released later that day at approximately 1:00 p.m., he was released on crutches.

757. Mr. Mullen was not charged with resisting arrest.

758. All charges against Mr. Mullen were subsequently dismissed.

759. Mr. Mullen has been unable to use his injured leg and as a result has been unable to work or care for himself.

760. On Friday, June 5, 2020, a lawsuit was filed against Defendant City alleging that the indefinite, city-wide curfew was unconstitutional.

761. Hours after the lawsuit was filed, Mayor Ginther rescinded the curfew.

762. On Tuesday, June 9, Columbus City Attorney Zach Klein dismissed all criminal charges for curfew violations brought under Mayor Ginther's executive order, which included the criminal charge brought against Mr. Mullen.

**DD. Mistreatment of Plaintiff Leeanne Pagliaro**

763. On the morning of Saturday, May 30, 2020, Ms. Pagliaro headed to downtown Columbus from her home in the Olde Town East area of Columbus with her wife, Plaintiff Summer Schultz, and an African-American female friend to participate in peaceful protests against the killing of George Floyd and general police misconduct disproportionately inflicted upon people of color.

764. Ms. Pagliaro, her wife, and her friend intentionally decided to go to the protests in the morning with the hope of avoiding any potential conflicts or problems from the police that they heard happened to peaceful protesters who demonstrated later during the evenings and/or after dark.

765. They arrived downtown at approximately 11:00 a.m., parked on Long Street and headed toward Broad and High Streets.

766. They stopped in the front of the Statehouse on the east side of Broad Street to listen to speakers.

767. There was a crowd of people on the Statehouse lawn listening to speakers on a stage and people casually walking around and assembling in the general area of Broad and High Streets.

768. Ms. Pagliaro remained on the east side of High Street while Plaintiff Schultz and her friend crossed to the west side of High Street to take pictures of the Statehouse and of the crowd listening to speakers on the lawn.

769. Plaintiff Schultz and her friend then returned to join Ms. Pagliaro.

770. While they were initially standing on a sidewalk crowded with protestors, they were forced onto the side when the protestors started marching.

771. Ms. Pagliaro noticed more Columbus Police Officers were arriving, including units that looked like SWAT teams, and the Officers started forming a line across High Street.

772. Ms. Pagliaro heard some type of commotion nearby, some protestors began to scream loudly, and she became separated from her wife and friend.

773. Columbus Police Officers were standing with their bicycles in front of the crowd and close to Ms. Pagliaro, but she purposely did not talk or speak to the police at all.

774. Ms. Pagliaro was kneeling in front of other protesters but was being pushed so she had to stand up to avoid being trampled.

775. She was pushed up to the line of Columbus Police Officers on bicycles, but she did not make physical contact with them or speak to them.

776.     Ms. Pagliaro watched Columbus Police Officers pull, without provocation, a woman over the bikes and then repeatedly punched her head into the ground.

777.     Without any warning, Columbus Police Officers turned and sprayed Ms. Pagliaro directly in the face from less than three feet away with what she believes was pepper spray, and she felt her eyes burn, started coughing, and found it difficult to breathe.

778.     The use of chemical agents and munitions to disperse the crowd had been authorized and directed by Defendants Commander David Griffith and Sergeant Caroline Castro.

779.     She was dragged out of the crowd by strangers who took her to a medical station.

780.     While Ms. Pagliaro was receiving medical attention, she was again, without warning, sprayed directly in the face by a different Columbus Police Officer using a substance that she came to believe was pepper spray.

781.     By then, Ms. Pagliaro's eyes were burning badly and watering, she could not breathe, she continued to cough, and her throat was hurting.

782.     Ms. Pagliaro did not know where her wife and friend were.

783.     Ms. Pagliaro and others moved away from the medic station, her wife called her, and they reunited at the medic station.

784.     When Ms. Pagliaro could finally open her eyes, the group moved away from the medic station to let others be treated and they were sprayed again.

785.     Ms. Pagliaro, Ms. Schultz, and others helped pull protesters out of the crowd who had been sprayed and helped them get to medic stations.

786.     Someone in the group looked to see what time it was and remarked, "Wow, it's not even noon yet," or words to that effect.

787.    Ms. Pagliaro left the downtown area and returned home with the people she arrived with.

788.    Ms. Pagliaro felt the spray in her eyes and throat long after she had left downtown.

789.    The spray remained on her clothes and book bag even after cleaning.

790.    Ms. Pagliaro was shocked, disappointed, and in a state of disbelief because of the mistreatment she had received from Columbus Police Officers when she had purposely not uttered a word to them or done anything to provoke being pepper-sprayed the first time, let alone the second and third times.

**EE.    Mistreatment of Plaintiff Torrie Ruffin**

791.    Ms. Ruffin attended the protests in downtown Columbus near the Statehouse each day from May 30, 2020, until approximately June 5, 2020.

792.    Around 11:00 a.m. on May 30, 2020, at the intersection of Broad and High Streets, Ms. Ruffin had linked arms with other protestors and stood in front of Columbus Police Officers.

793.    Ms. Ruffin observed several Columbus Police Officer snipers standing on top of buildings surrounding the protests.

794.    Ms. Ruffin was in the second row of the linked protestors; in front of her, she observed Columbus Police Officers using their bikes to force protestors to move.

795.    Without prior warning or a dispersal order, Columbus Police Officers began pepper-spraying the group of linked protestors.

796.    The use of chemical agents and munitions to disperse the crowd had been authorized and directed by Defendants Commander David Griffith and Sergeant Caroline Castro.

126

797. A Columbus Police Officer who sprayed Ms. Ruffin was standing a few feet away from her face, and Ms. Ruffin had to remove herself from the group to flush out her eyes while sitting on the sidewalk.

798. Ms. Ruffin then joined a large group of protestors sitting on the curb of the sidewalk next to parked Columbus Police Officer cruisers, where protestors were sitting and chanting, "This is a peaceful protest," in front of the Officers.

799. Columbus Police Officers then approached the group and pepper-sprayed them without prior warning or an order to disperse.

800. Columbus Police Officers pepper-sprayed downwards, towards the faces of the protestors, including Ms. Ruffin.

801. Ms. Ruffin started coughing and crying as the pepper-spray rained down upon her eyes and face.

802. Ms. Ruffin experienced a burning sensation and had to flush her eyes out again.

803. Ms. Ruffin then crossed the street and continued protesting on the sidewalk.

804. Columbus Police Officers then approached her group on the sidewalk with their horses, using the horses to push the protestors who were standing on the sidewalk up against the nearby buildings.

805. At that point, there were virtually no protestors in the streets, and Ms. Ruffin and other protestors were on the sidewalk.

806. Columbus Police Officers began deploying tear-gas and smoke bombs against the protestors.

807. The onslaught of tear-gas and smoke bombs continued for more than five minutes.

808. Columbus Police Officers then drove through the streets and ordered the protestors to disperse, threatening arrest for failure to disperse.

809. Columbus Police Officers continued to use tear-gas and smoke bombs to get protestors to leave the downtown area, and the video below fairly and accurately depicts what Ms. Ruffin observed (double click to play or click the link). https://www.dropbox.com/s/e0arxn2syb3j5cm/IMG_2051%20%281%29.MOV?dl=0.



810. Ms. Ruffin's exposure to the pepper-spray, tear gas, and smoke bombs caused her to choke, cry, cough, and experience breathing issues.

**FF.** **Mistreatment of Plaintiff Summer Schultz**

811. On Saturday, May 30, 2020, at about 11:00 a.m., Ms. Schultz headed toward downtown Columbus from her home in the Olde Town East area of Columbus with her wife, Plaintiff Leeanne Pagliaro, and an African-American female friend to participate in peaceful demonstrations against the killing of George Floyd and police misconduct in general that is disproportionately inflicted upon people of color.

812. They intentionally decided to go to the protests in the morning with the hope of avoiding any potential conflicts or problems from the police that they heard happened to peaceful protesters who demonstrated later during the evenings and/or after dark.

813. They arrived downtown around 11:15 a.m. and parked on East Long Street.

814. They walked to where peaceful demonstrators had gathered, near Broad and High Streets.

815. They walked down the east side of High Street and stopped in front of the Ohio Statehouse.

816. Protestors were gathered on the Statehouse lawn listening to speakers, some sitting and some standing, and all were peaceful.

817. Ms. Schultz and her friend wanted to take pictures of the Statehouse and the protestors, so they decided to cross to the west side of High Street to get a better picture.

818. As they were taking pictures, Ms. Schultz noticed more Columbus Police Officers were arriving.

819. Within about five minutes, the number of Columbus Police Officers had increased considerably, and Ms. Schultz noticed there were police snipers on the scene.

820. Columbus Police Officers with bicycles started to form a line blocking the intersection of High and Broad Streets.

821. Ms. Schultz and her friend returned to the other side of High Street where Plaintiff Pagliaro was located.

822. Ms. Schultz could hear that something was happening near Broad and High Streets.

823. All of a sudden, her throat felt closed up, her eyes started burning, and she realized something was being sprayed at her.

824. The use of chemical agents and munitions to disperse the crowd had been authorized and directed by Defendants Commander David Griffith and Sergeant Caroline Castro.

825. It was difficult to see and to hear, and in the confusion she was separated from Ms. Pagliaro.

826. Columbus Police Officers on bicycles lined up next to the sidewalk where she was standing, and they eventually brought their bikes onto the sidewalk.

827. Columbus Police Officers told protestors to get on the sidewalk, but there was not enough room for everyone to fit.

828. As protestors were trying to get on the sidewalk, something was again sprayed, and Ms. Schultz was sprayed in the face.

829. Ms. Schultz's eyes were burning, and someone rinsed them with saline and a milk of magnesia solution.

830. Protestors tried to get on the sidewalk as instructed by the Columbus Police Officers, but they spilled into the street near the corner of Broad and High Streets.

831. Ms. Schultz saw Columbus Police Officers grab a young African-American male – he appeared to be a boy or a teenager – by his shirt and attempt to pull him over a bike.

832. White protestors attempted to shield the child from the Columbus Police Officers to protect him, because the police were not acting as aggressively toward White people.

833. Ms. Schultz was approximately ten feet from the line of Columbus Police Officers, and it was still difficult to see and breathe.

834. Ms. Schultz and others turned to leave and move away from the street and Columbus Police Officers, and she heard protestors repeating, "Walk, do not run; walk, do not run."

835. Ms. Schultz walked away from Columbus Police Officers with her back turned to them and the street.

836. Ms. Schultz was suddenly hit with something so forceful that it knocked her off her feet to the ground, and, when she tried to get up, she could not.

837. Ms. Schultz tried to stand on her feet again, stumbled, and could not get up; she was disoriented, in pain, and could barely see.

838. Ms. Shultz felt someone pull her up and help her walk and soon realized that she knew the person.

839. The person helped Ms. Schultz walk down Broad Street past a tall building with scaffolding (the Rhodes Office Tower), toward Third Street, and down an alley.

840. Ms. Schultz used her cell phone to call her wife, Plaintiff Pagliaro, and she answered.

841. Ms. Schultz was reunited with her wife and friend, and they left downtown.

842.    Ms. Schultz believes all of the events from the time they arrived downtown until the time they left took place within about 30 to 45 minutes.

843.    Ms. Schultz later realized that she had been shot in the buttocks with wooden bullets.

844.    Ms. Schultz was in significant pain from being shot.

845.    Ms. Schultz could not sit down comfortably for days, was forced to lie on her side, applied ice to reduce the swelling, used over-the-counter pain medication, and took Epsom salt baths to alleviate the pain and swelling.

846.    The wooden bullets left a large round indentation on her buttocks that turned blue with obvious bruising and swelling, and Plaintiff Pagliaro took pictures on the day of the incident and periodically thereafter; a true and accurate copy of one of those pictures is below.



847. Ms. Schultz was in pain for more than a week, and bruises, which were the size of a disk or hockey puck, were visible for weeks.

848. Ms. Schultz remains disturbed about being shot with wooden bullets while peacefully walking away from the police; suffering the smell of tear gas and inhaling pepper spray while she was peaceably protesting; hearing the sound of protestors screaming; and the unprovoked abuse by Columbus Police Officers that she witnessed against other peaceful protesters on the May 30, 2020.

**GG.** **Mistreatment of Plaintiff Reverend Clarressa Thompson**

849.    Plaintiff Reverend Clarressa Thompson ("Rev. Thompson") preaches as a non-affiliated community-based minister and provides clergy services to various community partners, as well as officiating weddings, funerals, and baptisms in and around Columbus Ohio.

850.    Because of a 2014 work accident, Rev. Thompson is affected by an auto-immune disorder that impacts several of her key body systems.

851.    This auto-immune disorder predisposes Rev. Thompson to suffer significant effects of pepper spray and other crowd control chemical agents.

852.    Prior to May 29, 2020, Rev. Thompson had attended several social justice protests in Ohio and Kentucky regarding LGBTQ+ rights, and police misconduct.

853.    When attending protests, Rev. Thompson does so in her religious regalia including her clerical robe and collar.

854.    On May 29, 2020, Rev. Thompson was watching the 6:00pm local news; the news was covering the protests occurring downtown Columbus.

855.    Rev. Thompson was shocked by the coverage and interactions between the police and protestors.

856.    In watching the coverage, Rev. Thompson was concerned by the lack of spiritual leaders at the protest.

857.    Prior to leaving her home to go to the protest, Rev. Thompson donned her clerical robes and collar, and made a sign on canvas out of materials in her home.

858.    The sign read "No Violence God Lives."

859.    Rev. Thompson then drove downtown and parked her car just west of the intersection at Broad Street and High Street at approximately 6:45 p.m.

860. Rev. Thompson saw the crowd of protestors marching peacefully on Broad Street and joined them.

861. Between 7:45 p.m. and 8:00 p.m. Rev. Thompson witnessed a verbal altercation between a protestor and police officer.

862. Rev. Thompson approached the protestor and pulled them away from the officer, telling the protestor words to the effect of "we need you out here, you don't have to go to jail."

863. The protestor acknowledged Rev. Thompson, calmed down and disengaged with the officer.

864. Rev. Thompson deescalated verbal confrontations between at least one other protestor and officer between 7:45 p.m. and 8:00 p.m.

865. As the protest continued, Rev. Thompson and others marched on the sidewalk east on Broad Street towards the Rhodes Tower office building.

866. Between 8:00 p.m. and 8:15 p.m., Rev. Thompson was marching with other protestors on the sidewalk on the north side of East Broad Street directly in front of the Rhodes Tower located at 30 E. Broad Street.

867. While on the sidewalk, Rev. Thompson saw several horse mounted police officers march by and they were flanked by street level officers.

868. As she was marching holding her sign, Rev. Thompson was pushed down by an unknown Columbus Police Officer and fell to the ground.

869. Rev. Thompson was stunned by being pushed, as she had not been warned to move or that force would be used against her.

870. She was not given any direction from the officers prior to being pushed down.

871. After collecting herself, Rev. Thompson continued to march with the protestors.

872. Roughly 45 minutes later, Rev. Thompson was at the northwest corner of Broad Street and High Street.

873. While marching, a woman parked her car, and got out and was looking for her daughter.

874. Rev. Thompson approached the woman and instructed her to leave the area, as she was concerned that the situation was getting dangerous.

875. After a few moments, the woman agreed to leave the intersection and search for her daughter elsewhere.

876. At that point, Rev. Thompson turned around, and was sprayed in the face with pepper spray by an unknown Columbus Police Officer.

877. When she was sprayed, Rev. Thompson was standing in a small group of protestors who were spaced several feet apart.

878. Rev. Thompson was not warned that she was about to be sprayed, nor did Rev. Thompson hear any orders to leave the area.

879. The spray caused extreme pain for Rev. Thompson, which lasted several minutes.

880. Because of her auto-immune disorder, Rev. Thompson felt residual pain in her face and neck for the next several days.

881. Shortly after collecting herself and regaining her faculties, Rev. Thompson left the protest and returned home.

882. Rev. Thompson was so scared by the actions of the police in pushing her down and pepper spraying her without provocation that she did not return to the protests any of the next days.

883.    Rev. Thompson has not engaged in any protest since May 29, 2020, despite her desire to protest for social justice.

884.    Rev. Thompson fears that if she attends another protest that she will be subject to the same violence from the police as she was subject to on May 29, 2020.

HH.    **Mistreatment of Plaintiff Amanda Weldon**

885.    On the morning of May 30, 2020, Ms. Weldon and her roommate headed downtown for an organized protest against police brutality and racism.

886.    While attending the event and peacefully protesting, Ms. Weldon was asked to stand in the front line of a group of protestors to protect the minorities standing behind her as police armed in riot gear began to line the streets.

887.    Many protestors believed that Columbus Police Officers would be less likely to use excessive force against White protestors than Black protestors and called for White protestors to stand between Columbus Police Officers and Black protestors.

888.    Ms. Weldon neither acted violently nor showed any aggression.

889.    While peacefully protesting in front of other protestors, Ms. Weldon was maced twice and pepper-sprayed once by Columbus Police Officers.

890.    On June 1, 2020, Ms. Weldon was attending a protest near the intersection of North High Street and Lane Avenue. She was approached by a Columbus Police Officer who hopped out his cruiser and pointed, without shooting, what she assumed was a real gun at her.

891.    Ms. Weldon was terrified by that incident.

892.    Ms. Weldon witnessed Columbus Police Officers inflicting pain on peaceful protestors and was horrified by what she saw.

893.     Ms. Weldon also observed a female protestor, who was handcuffed and lying on the ground, be pepper-sprayed by a Columbus Police Officer.

894.     The way in which Ms. Weldon was mistreated and the incidents of excessive use of force she observed generated so much anxiety and fear of being harmed that she became physically ill, including vomiting after the incident on June 1, and discontinued going to protests.

II.     **Mistreatment of Plaintiff Amanda Williams**

895.     Ms. Amanda Williams ("Ms. Williams") attended several Black Lives Matter protests downtown in May and June of 2020.

896.     On May 28, 2020, around 10:30 p,m,, Ms. Williams was protesting at the intersection of Broad and High Streets, where she was in the front of a crowd in the intersection.

897.     Columbus Police Officers began using crowd control devices against Ms. Williams and the crowd, including pepper spray, tear gas, gas and/or flash bang grenades.

898.     Around 2:00 a.m., Ms. Williams was holding a sign against police violence and standing on a half wall on the sidewalk of High Street near the intersection of North High and East Broad Streets with a small group of protestors.

899.     While standing on the half wall, Division Officers approached Ms. Williams and the group of protestors and pepper sprayed them point blank in the face, continuing to spray them as they were running away from the area.

900.     On the same night and the next night, May 29, 2020, Ms. Williams experienced being pepper sprayed and teargassed on multiple occasions while standing in the front of a group of non-violent protestors.

901.     On May 30, 2020, Ms. Williams was again protesting downtown at the intersection of East Broad and North High Streets.

902. She marched with a group of protestors before the group formed a line in the intersection by kneeling and chanting.

903. Around 5:00 p.m., Ms. Williams was in the first line of this group of protestors kneeling and facing police officers and engaging in chants regarding police violence in front of the Statehouse, including "Black lives matter," "go home," and "murderers."

904. Columbus Police Officers formed a line across from the group of protestors where Ms. Williams was kneeling and were gradually pushing back the line of protestors away from the Statehouse using chemical agents, including tear gas and wooden bullets.

905. The use of chemical agents and less lethal munitions against non-violent protestors was authorized and directed by Defendants Commander David Griffith and Sergeant Caroline Castro.

906. During this time, Columbus Police Officers sprayed protestors, including Ms. Williams, indiscriminately with pepper spray.

907. Ms. Williams then attempted to leave the intersection with other protestors and was running across Broad Street and away from High Street to get away from the officers using crowd control devices.

908. While running away, a wooden bullet shot by an unknown Columbus Police Officer struck Ms. Williams on the side of her left knee, leaving a bruise.

909. Columbus Police Officers continued shooting wooden bullets at protestors attempting to leave the intersection.

910. Ms. Williams and a smaller group of protestors regrouped and again knelt in the intersection further east down Broad Street, close to the intersection of East Broad and South Sixth Streets, after they had been split up from the larger crowd by Columbus Police Officers.

911.    Columbus Police Officers again formed a line against the crowd with their bikes where Ms. Williams was kneeling and chanting, "Black lives matter," "go home," and "stop killing."

912.    During this time, Ms. Williams noticed at least two officers pointing at her directly and talking amongst themselves and laughing, as if they were targeting her for arrest.

913.    At approximately 7:00p.m,, Columbus Police Officers began riding their bikes into the crowd and spraying division-issued Mark-9 pepper spray at the crowd indiscriminately, causing the protestors to stand up and run away.

914.    Ms. Williams and other protestors attempted to run in the opposite direction in going east on Broad, away from the bike officers.

915.    In running away from the intersection, Ms. Williams was blocked by a bike officer waiting on the sidewalk, who jumped off his bike directly in front of her.

916.    Ms. Williams attempted to avoid this officer and turned quickly to run in another direction when another bike officer, believed to be Defendant Officer Phillip Walls, ran up behind her and tackled her into the ground off of the sidewalk.

917.    Defendant Officer Walls tackled Ms. Williams with such force that she was lifted off the ground and tossed into a bed of mulch lining the sidewalk, landing on the left side of her face and body.

918.    Upon landing in the mulch, Ms. Williams' glasses came off her face and an unidentified male Columbus Police Officer, the bike officer who was waiting on the sidewalk, immediately ripped off her face mask and backpack, with such force that it ripped the fabric on both items.

919. Ms. Williams attempted to turn her head to use her mouth to grab her glasses, and the unknown officer forcefully twisted her head towards him and struck her with his knee on the right side of her face.

920. The unknown officer kept his knee on her head for an extended period of time while she was in the prone position on the ground, while Defendant Officer Walls sat on both of her legs and zip tied her hands.

921. Ms. Williams yelled loudly and repeatedly that she was not resisting arrest.

922. The Officers responded by laughing and saying, "we know" and that they heard her "loud and clear," but the Officer's knee remained on her head, pinning her to the ground the whole time she was being arrested.

923. Ms. Williams was so scared by the arrest situation that she urinated on herself the moment Defendant Officer Walls tackled her.

924. Ms. Williams is 5 feet 2 inches tall, less than 120 pounds, and posed no threat to the officers nor was she resisting arrest in any way.

925. Ms. Williams was then placed on a prisoner transport bus and taken to a satellite booking location behind COSI.

926. Ms. Williams' face was swelling, her lip was bleeding, and she was in pain from the takedown, knee strike, and being shot by the wooden bullet.

927. Ms. Williams remained on the bus in handcuffs for approximately nine hours while she awaited transport to the Franklin County Jail.

928. While Ms. Williams was having the zip ties removed, an unknown male Columbus Police Officer was holding her right wrist upwards and bending it so that her palm was facing her in a way that caused her pain.

929.     Ms. Williams stated that the officer was hurting her and he said, "it's going to hurt, you should not have gotten yourself arrested."

930.     She tried to readjust her arm to stop the pain and immediately was grabbed on her left arm by another unknown male Columbus Police Officer; both officers then held her arms out straight and yelled at her.

931.     One of the officers yelled, "don't try to assault my partner, do you know what we could do to you?"

932.     Again, Ms. Williams was so scared by this situation that she urinated on herself.

933.     Ms. Williams was booked and charged with "failure to disperse," a level four misdemeanor charge, which was later dismissed.

934.     During her booking, Ms. Williams requested an ice pack for her face where the officer kneed her and the booking officers laughed at her.

935.     Ms. Williams was released from the Jail around 2:00pm on May 31, 2021.

936.     As a proximate result of the excessive force used in being tackled, kneed in the face, and pinned down by Defendant Officer Walls, Ms. Williams suffered from bruising on her face and legs for several weeks and still has a knot on her kneecap from where she was struck with the wooden bullet.

### JJ.     <u>Mistreatment of Plaintiff Heather Wise</u>

937.     On June 21, 2020, Ms. Wise went to downtown Columbus to participate in the protests.

938.     During previous incidents, Ms. Wise had been subjected to violence at the hands of Columbus Police Officers, however on her June 21, 2020 visit downtown she was subjected to especially gratuitous violence.

939.    At the corner of Broad and High, Ms. Wise was standing with a group of protestors who were trying to protect themselves from any potential police violence.

940.    Columbus Police Officers on bicycles approached the protestors and began to use their bodies as well as their bicycles as weapons against the protestors, physically assaulting the peaceful protestors.

941.    Ms. Wise was standing there at the intersection of Broad and High as Columbus Police Officers began pepper spraying the peaceful protestors.

942.    As some people dispersed, Ms. Wise was standing next to a Black woman who was being pepper-sprayed and attempted to shield her.

943.    While attempting to protect her fellow peaceful protestor, Ms. Wise was assaulted by a Columbus Police Officer who used the space in between his thumb and index finger to press his hand into her throat and push her back.

944.    Near the same time, Ms. Wise was being assaulted by a Columbus Police Officer who was pushing his bicycle into her and others.

945.    Ms. Wise and others fell to the ground and Columbus Police Officers continued pepper spraying them as they lay there attempting to cover themselves.

946.    Columbus Police Officers then pulled out a vial of a brown liquid that they began pouring into the eyes and faces of Ms. Wise and others.

947.    Ms. Wise suffered bruising across her arms and legs in addition to injuries suffered from the pepper spray and the unknown substance.

## V.    CLAIMS FOR RELIEF

### A.    First Count: Violation of Fourth and Fourteenth Amendment Rights

948.    Paragraphs 1 through 947 above are realleged and incorporated herein.

949.     By using and/or directing or tolerating the use of excessive force, Defendants Commander, Lieutenants, Sergeants, and Officers violated the privacy and bodily integrity protected by the Fourth and Fourteenth Amendments of one or more Plaintiffs.

950.     By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from using excessive force in circumstances similar to those involving the protests, Defendants City of Columbus and Chief caused the deprivation of civil rights and injuries to one or more Plaintiffs and thereby violated the Fourth and Fourteenth Amendments.

### B.     Second Count: Violation of First and Fourteenth Amendment Rights

951.     Paragraphs 1 through 947 above are realleged and incorporated herein.

952.     By punishing one or more Plaintiffs for assembling and exercising their freedom of expression and attempting to discourage assembly and expression of Plaintiffs and other protestors and/or directing or tolerating that punishment, Defendants Commander, Lieutenants, Sergeants, and Officers violated their rights under the First and Fourteenth Amendments.

953.     By their deliberate indifference to the policies, training, supervision, and discipline needed to prevent police officers and mutual aid law enforcement personnel from retaliating against speakers and speech they hated, Defendants City of Columbus and Chief caused one or more Plaintiffs to be punished for assembling and exercising their freedom of expression and caused the officers' attempt to discourage assembly and expression of one or more Plaintiffs and other protestors, and thereby violated the First and Fourteenth Amendments.

### C.     Third Count: Gross Negligence

954.     Paragraphs 1 through 947 above are realleged and incorporated herein.

955.     By their willful, wanton, and reckless acts or omissions, including but not limited to, using excessive force, punishing protestors for their assembly and speech, seeking to discourage protestors, directing or tolerating such actions, and/or failing to adopt effective policies or adequately train, supervise, and discipline police officers, Defendants Chief,

Commander, Lieutenants, Sergeants, and Officers committed gross negligence in dereliction of their duty to preserve and protect the citizens and residents of the City of Columbus and Franklin County.

**D.    Fourth Count: Battery**

956.    Paragraphs 1 through 709 above are realleged and incorporated herein.

957.    By their willful, wanton, and reckless acts or omissions, including but not limited to, engaging in, authorizing, and ratifying excessive force and unlawful arrest and seizure and/or directing or tolerating such actions, Defendants Chief, Commander, Lieutenants,, Sergeants, and Officers committed battery under the common law of the State of Ohio.

**E.    Fifth Count: Malicious Prosecution**

958.    Paragraphs 1 through 947 above are realleged and incorporated herein.

959.    By initiating criminal prosecutions when there was a lack of probable cause for criminal prosecution, falsely concocting such cause, and depriving Plaintiffs Mary Barczak, Nadia Lynch and Demetrius Burke of liberty before the prosecutions were resolved in their favor, Defendants Dye, Kanode, Kirby, Mabry, Patterson, Reffitt, Rich, Schmid, and Szabo, acting with ill will toward protestors and the protest, violated Ms. Barczak's, Ms. Lynch's and Mr. Burke's rights under the Fourth and Fourteenth Amendments and the common law of the State of Ohio.

**F.    Civil Action for Damages from Criminal Act**

960.    Paragraphs 1 through 947 above are realleged and incorporated herein.

961.    By their willful, wanton, and reckless acts or omissions constituting criminal acts, including the battery prohibited by R.C. 2903.13 and the knowing interference with Plaintiffs' civil rights prohibited by R.C. 2921.45, Defendants Chief, Commander, Lieutenants  Sergeants, and Officers, and, as to Defendants Dye, Kanode, Kirby, Patterson, Reffit, Rich, Schmid, and Szabo, the falsification of official documents and statements made under R.C. 2921.13, are liable under R.C. 2307.60 for injuries by conduct made criminal.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally,

a.       declaring that they have violated their civil rights and/or Defendants Chief, Sergeant, and Officers have been grossly negligent toward them and inflicted injuries by conduct made criminal and/or one or more Defendants Officers maliciously prosecuted and battered them;

b.       ordering such equitable relief as will make them whole for Defendants' unlawful conduct and ensure prospectively that they are protected from future similar conduct; costs; and reasonable attorneys' fees;

c.       awarding compensatory and, against Defendants Chief, Sergeant, and Officers, punitive damages in excess of $25,000; and

d.       granting such other relief as the Court may deem appropriate.

Respectfully submitted,

By: /s/ *Edward R. Forman*
Edward R. Forman (0076651)
(eforman@marshallforman.com)
John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Madeline J. Rettig (0098816)
(mrettig@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

Sean L. Walton (0088401)
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
T: (614) 636-3476
F: (614) 636-3453
swalton@waltonbrownlaw.com
cbrown@waltonbrownlaw.com

James D. McNamara (0002461)
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues and defenses triable to a jury.

By: /s/ *Edward R. Forman*
Edward R. Forman (0076651)